James L. Bromley
Andrew G. Dietderich
Christian P. Jensen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Proposed Counsel to the Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| SVB FINANCIAL GROUP,[1] | Case No. 23-10367 (MG) |
| Debtor. | |

## DECLARATION OF WILLIAM C. KOSTUROS IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

William C. Kosturos, being duly sworn, states the following under penalty of

perjury:

1.    I am the Chief Restructuring Officer of SVB Financial Group ("SVB Financial"

and together with its direct and indirect subsidiaries, the "Company"), a Delaware corporation

(the "Debtor").[2]  I have served as Chief Restructuring Officer ("CRO") of SVB Financial since

March 13, 2023.  I am also a Managing Director at Alvarez & Marsal North America, LLC

("A&M"), a limited liability corporation, which has served as the restructuring advisor to the

---

[1]    The last four digits of SVB Financial Group's tax identification number are 2278.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant
First Day Motion (as defined herein).

Debtor since March 12, 2023.  I have over thirty years of financial restructuring and bankruptcy

experience.[3] I have served as a Managing Director in A&M's Restructuring & Turnaround group

since June 2002 and as the Vice-Chair of the U.S. Restructuring Practice since December 2020.

2.      As part of overseeing the Debtor's preparations for the above-captioned case (the

"Chapter 11 Case"), I was involved in advising on, and assisting with, the Debtor's day-to-day

activities and transactions, including liquidity management and cash flow modeling, coordinating

with counterparties, advising on the financial condition of the Debtor at various points in time,

and managing the related diligence processes.  In my capacity as CRO, I have familiarized

myself with the Debtor's day-to-day functions and financial and business affairs.  Except as

otherwise stated in this First Day Declaration (the "Declaration"), the statements set forth herein

are based on (i) my personal knowledge or my opinion based on my experience, (ii) information

that I have received from the Debtor, my colleagues at A&M working directly with me or under

my supervision, direction, or control, or other advisors of the Debtor, and/or (iii) my review of

relevant documents.  References to the Bankruptcy Code (as hereafter defined), the chapter 11

process, and related legal matters are based on my understanding of such matters in reliance on

the explanation provided by, and the advice of, counsel.  I am over the age of 18 and authorized

to submit this Declaration on behalf of the Debtor.  If called upon to testify, I would testify to the

facts set forth herein.

---

[3]     I have advised companies both in-court and out-of-court with respect to financial restructuring across a wide
range of industries, including retail, consumer brands, financial services, and energy.  I have also led complex
engagements for companies, secured lenders and creditors, serving in both interim management and advisory
roles.  I have advised and/or served as a senior executive for, among others, AIG Financial Products Group,
Ascena Retail Group, Toys "R" Us, Cengage Learning, Inc., Washington Mutual, Inc., Movie Gallery, The
Spiegel Group, and Target Canada.

3.     On March 17, 2023 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  The Debtor continues to operate its business and manage its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.     In order to enable the Debtor to minimize the adverse effects of the commencement of this Chapter 11 Case on its business operations, the Debtor has requested various types of relief in certain "First Day" motions (collectively, the "<u>First Day Motions</u>"). The First Day Motions seek relief aimed at, among other goals, (a)  maintaining service relationships with the Debtor's workforce directly employed by Silicon Valley Bridge Bank, N.A.; (d) continuing the Debtor's cash management systems and other business operations and (e) establishing certain administrative procedures to facilitate a smooth transition into chapter 11. The requested relief is essential to the success of this Chapter 11 Case and the Debtor's reorganization efforts.

5.     I submit this Declaration in support of the First Day Motions.  I am familiar with the contents of each First Day Motion, including the exhibits attached thereto, and believe that the relief sought (a) is necessary to preserve the value and productivity of the Debtor's operations, (b) is integral to the successful reorganization of the Debtor and (c) serves the best interest of the Debtor's estates, its creditors and other parties-in-interest.

## PART I

### I.     Overview of the Debtor's Businesses

6.     The principal business of the Company is financial services, focusing on the innovation economy.  Prior to March 10, 2023, SVB Financial owned and operated Silicon Valley Bank, a state-chartered bank.  On March 10, 2023, the California banking authorities

closed Silicon Valley Bank and appointed the Federal Deposit Insurance Corporation as receiver ("FDIC-R").  The circumstances leading to the receivership are described in more detail below.

7.    SVB Financial's primary business lines include SVB Capital, the venture capital and credit investment arm of the Company, and SVB Securities LLC ("SVB Securities"), an investment bank and wholly-owned subsidiary of SVB Financial.

8.    SVB Financial was incorporated in 1999.  Prior to trading of its stock being halted on March 10, 2023, SVB Financial traded on NASDAQ under the ticker "SIVB." NASDAQ will suspend trading of SVB's common stock on March 28, 2023.  After that date, common stock in SVB Financial will be immediately eligible to be quoted on the OTC Pink Quotation System.

## II.    Corporate Structure and Operations

A.    Silicon Valley Bank

9.    Prior to March 10, 2023, SVB Financial operated Silicon Valley Bank. Silicon Valley Bank was a commercial bank that offered a credit, treasury management, foreign exchange, trade finance, and other services to clients in key innovation markets.  Silicon Valley Bank was SVB Financial's primary operating subsidiary and a core element of SVB Financial's business.  Silicon Valley Bank directly employed almost all personnel, who provided services to SVB Financial and its various businesses via intercompany services arrangements (the "Services Agreement").  Silicon Valley Bank was also custodian of most of the books, records, and other data related to the SVB Financial's business.

10.    On March 10, 2023, the California Department of Financial Protection and Innovation closed Silicon Valley Bank and appointed the FDIC-R as the receiver of Silicon Valley Bank.  The FDIC-R subsequently transferred all deposits and substantially all assets of Silicon Valley Bank to a newly created, FDIC-R-operated bridge bank, Silicon Valley Bridge

-4-

Bank, National Association (the "Bridge Bank"). SVB Financial is not the parent of or otherwise affiliated with Bridge Bank.

      B.     SVB Capital

        11.     SVB Capital is the venture capital and credit investment arm of SVB Financial. SVB Capital focuses primarily on funds management and manages over $9.5 billion of funds on behalf of third party limited partner investors and, on a more limited basis, SVB Financial. The SVB Capital family of funds is comprised of pooled investment vehicles such as direct venture funds that invest in companies and funds of funds that invest in other venture capital funds, as well as debt funds that provide lending and other financing solutions. SVB Capital generates income for SVB Financial primarily through investment returns and management fees. As of the Petition Date, SVB Capital is not a formal legal entity but a collection of personnel and funds.

      C.     SVB Securities LLC

        12.     SVB Securities is an investment bank focused on the innovation market and operates as a wholly-owned subsidiary of SVB Financial. SVB Securities provides investment banking services across the healthcare and technology sectors. SVB Securities also provides equity research coverage of over 360 healthcare and technology companies. SVB Securities focuses on the following product and service offerings: capital raising, M&A advisory, structured finance, equity research and sales and trading.

### III.    Summary of Assets and Liabilities

    A.    <u>Assets</u>

13.    SVB Financial had approximately $19.68 billion in total assets as of December 31, 2022.[4] As of the date of this Declaration, the Debtor holds approximately $2.04 billion in cash in accounts held by Bridge Bank and certain other banks and $92.8 million in marketable securities, including Treasuries.

    B.    <u>Liabilities</u>

14.    The Debtor has approximately $3.37 billion in aggregate funded indebtedness, as further described below.  All of the Debtor funded indebtedness is unsecured.

    a.    *The Senior Notes*

15.    On September 10, 2010, SVB Financial entered into an indenture (the "<u>Base Indenture</u>") with U.S. Bank National Association, as trustee (the "<u>Indenture Trustee</u>"), pursuant to which SVB Financial has from time to time issued various series of unsecured notes (the "<u>Senior Notes</u>").  On April 28, 2022, SVB Financial and the Indenture Trustee entered into a first supplemental indenture, supplementing and amending the Base Indenture (the "<u>First Supplemental Indenture</u>" and, together with the Base Indenture, the "<u>Indenture</u>").  The outstanding Senior Notes include the following:

      i.    On January 29, 2015, SVB Financial issued $350 million in principal amount of 3.50% Senior Notes due in January 2025.

      ii.    On June 5, 2020, SVB Financial issued $500 million of 3.125% Senior Notes due in June 2030.

      iii.    On February 2, 2021, SVB Financial issued $500 million of 1.800% Senior Notes due February 2031.

---

[4]    As of December 31, 2022, approximately $15,456,000 was attributable to SVB Financial's former bank subsidiary, Silicon Valley Bank.

4895-9745-7751 v.2

      iv.   On May 13, 2021, SVB Financial issued $500 million of 2.100% Senior Notes due May 2028.

      v.   On October 28, 2021, SVB Financial issued $650 million of 1.800% Senior Notes due October 2026.

      vi.   On April 29, 2022, SVB Financial issued $350 million of 4.435% Senior Fixed Rate/Floating Rate Notes due April 2028.

      vii.   On April 29, 2022, SVB Financial issued $450 million of 4.570% Senior Fixed Rate/Floating Rate Notes due April 2033.

16.     The Senior Notes remain outstanding as of the Petition Date.

     b.  *Boston Private Trusts*

17.     On July 1, 2021, SVB Financial acquired Boston Private Financial Holdings, Inc. ("Boston Private Holdings"), and assumed certain liabilities related to its assumption of two statutory trusts (the "Trusts") in connection with the transaction.  The Trusts, Boston Private Capital Trust I ("Trust I") and Boston Private Capital Trust II ("Trust II") were formed for the purpose of issuing trust preferred securities and investing the proceeds in junior subordinated debentures issued by Boston Private Holdings.  The Trusts' only assets are the junior subordinated debentures issued to each trust by Boston Private Holdings.  In connection with SVB Financial's acquisition of Boston Private Holdings and the Trusts, SVB Financial also assumed Boston Private Holdings' obligations under certain guarantee agreements, providing that SVB Financial would serve as guarantor with respect to the trust preferred securities issued by the Trusts.

18.     With respect to Trust I, as of December 31 2022, there were $100 million of trust preferred securities outstanding.  With respect to Trust II, as of December 31, 2022, there were less than $1 million of trust preferred securities outstanding.

19.     The trust preferred securities issued by Trust I pay interest quarterly and have a fixed distribution rate of 4.875%.  The quarterly distributions are cumulative.  The

effective interest rate for the junior subordinated debentures was 4.875%.  The junior

subordinated convertible debentures mature on October 1, 2034.

20.     The trust preferred securities issued by Trust II pay interest quarterly

based on a floating three-month rate of LIBOR plus 1.68% which are cumulative.  The effective

interest rate on the junior subordinated debentures was 2.676%.  The junior subordinated

debentures mature on December 30, 2035.

## PART II

### I.     Factors Leading to the Commencement of This Chapter 11 Case

#### A.     Silicon Valley Bank

21.     For many years, Silicon Valley Bank was a premiere bank for the

emerging technologies sector.  The end of 2020 marked a golden period for this sector, with

record rates of investment and private financings, resulting in a flood of deposits into the bank's

coffers.  Silicon Valley Bank invested a large portion of those deposits in U.S. Treasuries and

other long-dated government bonds, making Silicon Valley Bank vulnerable to interest rate risk.

In the several years before 2022, that risk was minimal: the benchmark interest rate was near

zero, and the Federal Reserve Board of Governors ("the Federal Reserve") had not raised it since

2018.

22.     That trend ended in early 2022.  In March 2022, spiraling inflation forced

the Federal Reserve to raise the federal interest rate by 25 basis points.  During the following 12

months from March 2022, the Federal Reserve continued to hike interest rates seven more times.

By March 2023, the benchmark interest rate had nearly broken 5%.  As interest rates rose, bond

prices fell, and the value of Silicon Valley Bank's bond portfolio plummeted.  At the same time,

Silicon Valley Bank experienced accelerating withdrawals as its customers burned through cash

to meet the rising costs of doing business.  To fund those withdrawals, Silicon Valley Bank

turned to its $21 billion bond portfolio.

23.     On March 8, 2023, Silicon Valley Bank announced the sale of

substantially all of its bond portfolio, resulting in a loss of $1.8 billion.  Although Silicon Valley

Bank announced plans to raise capital to plug that hole, the market panicked.  On March 9, the

stock price crashed, and Silicon Valley Bank's customers scrambled to withdraw their money in

a bank run.  The next day, California Department of Financial Protection and Innovation closed

Silicon Valley Bank and appointed the FDIC-R.

B.      Restructuring Discussions and Decision to File for Chapter 11

24.     The Silicon Valley Bank receivership had two important consequences for

SVB Financial.  First, the receivership removed SVB Financial's primary operating subsidiary,

depriving SVB Financial of a key source of liquidity and business infrastructure.  Second, the

receivership triggered default clauses in SVB Financial's debt documents.  These circumstances

led SVB Financial to start immediate contingency planning and evaluation of strategic

alternatives.

25.     On March 13, 2023, the Board of Directors of SVB Financial (the

"Board") announced its appointment of a restructuring committee of five independent directors

("the Restructuring Committee") to explore strategic alternatives for SVB Financial and its

various businesses, assets, and investments.  That same day, I was appointed as Chief

Restructuring Officer by the Restructuring Committee.

26.     Over the course of several days, the Board received and reviewed the

recommendations of management and of its various advisors regarding SVB Financial's

available strategic alternatives, including a bankruptcy proceeding under the provisions of the

Bankruptcy Code.  After review and discussion of the information presented, the Board

-9-

determined that it was in the best interests of SVB Financial, its creditors and other stakeholders to prepare to file for chapter 11 protection.

27.     On the evening of March 16, 2023, the Board voted to commence this Chapter 11 case on an emergency basis.  Early the next morning, SVB Financial filed a voluntary petition for relief under the Bankruptcy Code.

28.     In the days following the receivership and leading up to the chapter 11 filing, Debtor continued to receive limited information on its business operations from personnel at Bridge Bank who provide key services to SVB Financial under the shared services arrangements. That cooperation stopped in the days immediately prior to the filing, and Bridge Bank employees have since not provided any of the Debtor's information to the Debtor's officers or representatives and have cut off access to books and records.  The Bridge Bank and FDIC-R each engaged bankruptcy counsel on the Petition Date, with whom the Debtor has been working to obtain access, but as of the date of this declaration the Debtor has been unable to access a substantial portion of its books, records, files, electronic systems and key employees.

**PART III**

29.     The Debtor has filed a number of First Day Motions, consisting of administrative motions and motions relating to the Debtor's cash management and business operations.  The Debtor believes, and I agree, that approval of each First Day Motion important to stabilize and continue the Debtor's businesses and is necessary to ensure a smooth transition into and out of chapter 11 with minimal disruption to its operations.  I have reviewed each of the First Day Motions or had their contents explained to me, including the exhibits thereto, and believe that the Debtor would suffer immediate and irreparable harm absent the ability to continue its business operations, as requested in the First Day Motions.  Factual information with respect to each First Day Motion is provided below and additional detail is contained in each

-10-

First Day Motion.  Capitalized terms, to the extent not defined herein, have the meanings
provided in the respective First Day Motions.

## I.    Administrative Motions

A.    <u>Motion of Debtor for Entry of an Order (I) Extending Time to File Schedules of
Assets and Liabilities, Schedules of Current Income and Expenses, Schedules of
Executory Contracts and Unexpired Leases and Statements of Financial Affairs
(II) Extending Time to File Rule 2015.3 Financial Reports, (III) Waiving
Requirements to File the List of Equity Holders and Serve Notice of
Commencement on All  Equity Holders and (IV) Granting Related Relief</u>

30.    By the Schedules Extension Motion, the Debtor seeks entry of an order
(a) extending the deadline by which the Debtor must file schedules of assets and liabilities,
schedules of current income and expenses, schedules of executory contracts and unexpired leases
and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>") by 45 days, for
a total of 59 days from the Petition Date, without prejudice to the Debtor's ability to request
additional extensions, (b) extending the deadline by which the Debtor must file the 2015.3
Report to 30 days after the initial date set for the 341 Meeting, without prejudice to the Debtor's
ability to request additional extensions, (c) waiving the requirements to (i) file the list of equity
security holders, as set forth in Bankruptcy Rule 1007(a)(3), and (ii) serve notice of
commencement on all equity security holders, as set forth in Bankruptcy Rule 2002(d)

31.    To prepare the Schedules and Statements, the Debtor, with the assistance
of professional advisors, have been working as expeditiously as possible to compile information
from books, records and other documents pertaining to, among other things, accounts payable
and receivable, real estate and capital leases, employee wages and benefits, intercompany
transactions and vendor and supplier agreements which, in the aggregate, are expected to consist
of thousands of claims, assets and contracts of the Debtor entity.  Collecting the required

information requires a substantial amount of time, energy and resources from the Debtor's

personnel and professional advisors.

32.     Making this process even more challenging, the Debtor is currently unable

to access a substantial portion of its books, records, files, electronic systems and key employees.

Following the appointment of the FDIC-R as receiver of Silicon Valley Bank and the transfer of

all deposits and assets to Bridge Bank, Bridge Bank employees have not provided any of the

Debtor's information to the Debtor's officers or representatives and have cut off access to books

and records.  The Bridge Bank and FDIC-R engaged bankruptcy counsel on Friday, March 17

and the Debtor is working to obtain access.

33.     Due to the competing demands on the Debtor and its advisors to stabilize

business operations leading up to the chapter 11 and the initial postpetition time period, I believe

it is unlikely that the Debtor will be able to complete the Schedules and Statements within the

initial 14-day time period.  Additionally, even if the Debtor is able to regain access to its

accounting system operated by Bridge Bank, it is possible that certain invoices related to

prepetition goods and services have not yet been received and entered into the system, and

therefore it will take some time before the information required to prepare the Schedules and

Statements gets collected and compiled.

34.     I also believe it would create an additional expense without a concomitant

benefit to the Debtor's estates to prepare and file a list of the Debtor's equity security holders

with last known addresses at this time.  Sending notices to all such parties would be expensive

and time consuming.  Moreover, I understand that the Debtor filed with its petition a list of

significant holders of its outstanding common stock, and that the Debtor intends to cause the

notices required under Bankruptcy Rule 2002(d) to be served on registered holders of its

4895-9745-7751 v.2

common stock.  I further understand that the notices will be posted on the case website maintained by the Debtor's proposed claims and noticing agent.

35.     The Debtor holds interests in certain non-Debtor subsidiaries that fall under the requirements of Bankruptcy Rule 2015.3, and thus are required to file 2015.3 Reports.  Cause exists to extend the deadline for filing the 2015.3 Reports as requested herein based on (a) the size, complexity and geographic scope of the Debtor's business, (b) the substantial burdens imposed by complying with Bankruptcy Rule 2015.3 in the early days of this Chapter 11 Case and (c) the current lack of access to the Debtor's books and records, as discussed above.  The Debtor is not in a position to complete its initial 2015.3 Report within the time required under Bankruptcy Rule 2015.3.

36.     Extending the deadline to file its initial 2015.3 Report will also enable the Debtor to work with its advisors and the U.S. Trustee to determine the appropriate nature and scope of the report and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3, obviating the need for subsequent amendments to the 2015.3 Report.

37.     For these reasons, I believe that the entry of an order approving the Schedules Extension Motion is in the best interests of the Debtor's estates, creditors and all other parties-in-interest.

B.      Motion of Debtor for Entry of An Order (I) Authorizing the Debtor to Maintain a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (II) Establishing Procedures for Notifying Parties of Commencement of this Chapter 11 Case (the "Creditor Matrix Motion")

38.     Pursuant to the Creditor Matrix Motion, the Debtor seeks entry of an order (i) authorizing, but not directing, the Debtor to maintain a list of creditors (the "Creditor Matrix") in electronic format only, in lieu of filing a formatted mailing matrix and (ii) establishing procedures for notifying parties of the commencement of this Chapter 11 Case.

-13-

39.     I am advised that debtors are usually required to file a list containing the names and addresses of each creditor and a list containing the name, address and claim of the creditors that hold the 30 largest unsecured claims, excluding insiders.  Here, the Debtor requests that the Court authorize the Debtor to maintain the Creditor Matrix in electronic format only, in lieu of filing a formatted mailing matrix.  Converting the Debtor's computerized information to a format compatible with the matrix requirements would be a burdensome task and would greatly increase the risk of error with respect to information on computer systems maintained by the Debtor or its agents.

40.     The Debtor additionally requests that the Court establish procedures for mailing notices to creditors, including the Notice of Commencement of this Chapter 11 Case.  The Debtor proposes that Kroll undertake all mailings directed by the Court, the U.S. Trustee or as required by the Bankruptcy Code, including the Notice of Commencement, and serve the Notice of Commencement by regular mail to creditors in accordance with Bankruptcy Rule 2002.  The Debtor also proposes to publish the Notice of Commencement on the website maintained by Kroll Restructuring Administration LLC at https://restructuring.ra.kroll.com/SVBFG/ in order to provide sufficient notice to persons who did not otherwise receive notice by mail.  The Debtor believes, and I agree, that the proposed procedures provide adequate notice to the Debtor's creditors.  For these reasons, the relief requested in the Creditor Matrix Motion is appropriate under the circumstances.

C.     Debtor's Motion for Entry of Interim and Final Orders (I) Establishing Notification Procedures and Approving Restrictions on (A) Certain Transfers of Interests in , and Claims Against, the Debtor and (B) Claims of Certain Worthless Equity Deductions and (II) Granting Related Relief (the "NOL Motion")

41.     Pursuant to the NOL Motion, the Debtor seeks entry of orders: (a) establishing procedures related to (i) certain transfers of and declarations of worthlessness for federal, state,

-14-

or non-U.S. tax purposes with respect to the Debtor's existing common or preferred stock or any

Beneficial Ownership thereof (any such record or Beneficial Ownership of existing stock, the

"Stock") (the "Stock Procedures"),  and (ii) certain transfers of claims (each, as defined in

section 101(5) of the Bankruptcy Code, a "Claim" ) against one or more of the Debtor (the

"Claims Procedures" and, together with Stock Procedures, the "Procedures"), in each case, as

detailed in Exhibit 1 to the Interim Order and the Final Order; (b) directing that any purchase,

sale, or other transfer of Stock in violation of the Procedures set forth herein shall be null and

void ab initio; and (c) granting certain related relief.  In addition, the Debtor requests that the

Court schedule a hearing to consider approval of the NOL Motion on a final basis.

    42.  The Debtor believes that, as of December 31, 2022, it had federal NOL

carryovers in the amount of approximately $6.4 billion, state NOL carryovers with a value of

approximately $4.5, foreign NOL carryovers in the amount of approximately $22 million, state

general business credit carryforwards in the amount of approximately $16 million, foreign tax

credits with a value of approximately $43 million and an indeterminate amount of net unrealized

built-in loss (collectively, the "Tax Attributes").  The Debtor has also continued to incur or

accrue relevant federal and state Tax Attributes, including NOLs, since December 31, 2022.  I

am advised that these amounts are subject to change as the Debtor continues to investigate its tax

planning options.

    43.  I understand that the Tax Attributes provide the potential for material

future tax savings or other tax structuring possibilities in this Chapter 11 Case because the

Debtor can generally carry forward its Tax Attributes to offset future taxable income, thereby

reducing its future aggregate tax obligations.  Additionally, such Tax Attributes may generally be

utilized by the Debtor to offset any taxable income generated by transactions consummated

during this Chapter 11 Case. Thus, the value of the Tax Attributes will inure to the benefit of all

the Debtor's stakeholders.

44.     I am advised that the Internal Revenue Code limits the amount of taxable

income that can be offset by the Tax Attributes in taxable years following an "ownership

change." I am also advised that this limitation could severely restrict the use of the Tax

Attributes, causing substantial damage to the Debtor's estates. The Procedures, therefore, are the

mechanism by which the Debtor proposes to monitor and, if necessary, object to, certain

transfers of, and declarations of worthlessness with respect to, Stock and transfers of Claims to

ensure preservation of the Tax Attributes.

45.     I believe that implementation of the Procedures is necessary and

appropriate to enforce the automatic stay and, critically, to preserve the value of the Tax

Attributes for the benefits of the Debtor's estates. The Procedures will assist the Debtor to

preserve its flexibility in operating its businesses during the pendency of the Chapter 11 Case

and to implement a chapter 11 plan that makes full and efficient use of the Tax Attributes and

maximized the value of these estates.

46.     Additionally, I believe that the Stock Procedures do not create additional

restrictions on transfers of, or declarations of worthlessness with respect to, Stock. The Debtor

seeks to establish procedures only to monitor those types of transactions that would pose a

serious risk under the Internal Revenue Code of limiting the Debtor's use of the Tax Attributes,

in order to preserve the Debtor's ability to seek substantive relief if it appears that a proposed

transfer or declaration of worthlessness could jeopardize the Debtor's utilization of the Tax

Attributes. Moreover, the Claims Procedures will become effective only upon entry of the Final

Order. The Claims Procedures permit the full trading of Claims until the Debtor or another

-16-

proponent of a plan of reorganization decides that after further factual development and analysis,

to pursue a plan of reorganization contemplating the potential use of relevant special relief under

the Internal Revenue Code.  For these reasons, it is my view that the NOL Motion should be

approved.

        D.      <u>Debtor's Application for Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent (the "Claims Agent Application")</u>

        47.     I understand that this Court is authorized to utilize agents and facilities

other than the Clerk for the administration of bankruptcy cases.  I believe that if Kroll

Restructuring Administration LLC ("<u>Kroll</u>") is retained as the claims and noticing agent in this

Chapter 11 Case, the distribution of notices and the processing of claims will be expedited and

the Clerk will be relieved of the administrative burden of processing what may be an

overwhelming number of claims.

        48.     I have also reviewed Kroll's Engagement Agreement, which is attached as <u>Exhibit C</u> to the Claims Agent Application, and the description of services that Kroll has agreed to

provide and the compensation and other terms of the engagement as provided in its Engagement

Agreement.  Based on that review, I believe that the Debtor's estates, creditors, parties-in-

interest and the Court will benefit from Kroll's experience and cost-effective methods.  Prior to

retaining Kroll, the Debtor obtained and reviewed engagement proposals from at least two other

court-approved claims and noticing agents.  The Debtor believes, and I agree, that Kroll's rates

are competitive and reasonable given Kroll's quality of services and expertise, and that the

appointment of Kroll as claims and noticing agent is the most effective and efficient manner by

which to provide noticing and claims processing services in the Chapter 11 Case and is necessary

and in the best interests of the Debtor and its estates.

## II.    Motions Relating to Business Operations

A.    <u>Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtor to (A) Continue to Use Its Cash Management System, Including Existing Bank Accounts, (B) Pay or Honor Certain Prepetition Obligations Related Thereto and (C) Maintain Existing Business Forms, (II) Authorizing Investment Activities, (III) Temporarily Waiving the Requirements of Section 345(b) and (IV) Granting Related Relief (the "Cash Management Motion")</u>

1.    In the Cash Management Motion, the Debtor is seeking interim and final orders: (a) authorizing, but not directing, the Debtor, in its sole discretion, to (i) continue to use its existing cash management system (the "<u>Cash Management System</u>") as described therein, including existing bank accounts, (ii) honor certain prepetition obligations related thereto and (iii) continue using existing business letterhead, purchase orders, invoices, envelopes, promotional materials and other business forms and correspondence; (b) authorizing and directing (i) applicable banks and other financial institutions to honor and process related checks and transfers and (ii) the Debtor to continue to perform investment activities with its affiliates and third parties on a postpetition basis in the ordinary course of business and consistent with historical practice; (c) transfer funds currently held at institutions that are not in compliance with section 345(b) of the Bankruptcy Code; (d) temporarily waiving the requirements of section 345(b) of the Bankruptcy Code to the extent such requirements are inconsistent with the Debtor's current practices and (e) granting certain related relief, including scheduling a hearing to consider approval of the Cash Management Motion.

2.    The Cash Management System is operated primarily through seven bank accounts (collectively, the "<u>Bank Accounts</u>") maintained by the Debtor at four banking institutions (collectively, the "<u>Banks</u>").  Historically, the Debtor's only bank accounts were maintained at Silicon Valley Bank and the Bank of New York Mellon.  Following the closure of Silicon Valley Bank by regulators and transfer of deposits to Bridge Bank, the Debtor opened

two additional bank accounts at Citizens Bank, N.A. and Keybank, N.A.  A detailed schedule of
the Bank Accounts, including the last four digits of each account number is listed in the Cash
Management Motion.

3.    In the ordinary course of business, the Banks charge, and the Debtor pays,
honors or allows to be deducted from the appropriate Bank Accounts, certain service charges and
other administrative fees, costs and expenses charged by the Banks (collectively, the "Bank
Fees").

4.    Three of the Bank Accounts (the "Bridge Bank Accounts") are held at the Bridge
Bank and two of the Bank Accounts (the "BNYM Bank Accounts," and collectively with the
Bridge Bank Accounts, the "Non-Compliant Bank Accounts") are held at the Bank of New York
Mellon, which are not on the list of authorized depositories for the Southern District of New
York maintained by the Office of the United States Trustee (the "U.S. Trustee").  Both before
and after the Petition Date, the Debtor has attempted to transfer funds from the Non-Compliant
Bank Accounts to other Bank Accounts, but such transfer requests have not been honored by
Bridge Bank or the Bank of New York Mellon, acting at the direction of the FDIC-R.  The
Debtors requests authorization from the Court to transfer the funds in the Non-Compliant Bank
Accounts to Bank Accounts held at authorized depositories in compliance with section 345(b) of
the Bankruptcy Code.  The Debtor further requests that the Court provide the Debtor with 15
days from the Petition Date, without prejudice to seeking an additional extension, to (a) bring the
Non-Compliant Bank Accounts into compliance with section 345(b) of the Bankruptcy Code,
(b) transfer the funds in the Non-Compliant Bank Accounts to Bank Accounts held with
authorized depositories in compliance with section 345(b) of the Bankruptcy Code or (c) to seek
appropriate relief from the Court.

4895-9745-7751 v.2

5.      In the ordinary course of business, the Debtor engages in routine transactions with certain of its affiliates and third-party businesses (collectively, "Investment Activities").  The Debtor routinely provides equity commitments and cash investments to the SVB Capital business platform, the venture capital and credit investment arm of the Debtor's businesses.

6.      In the ordinary course of business, the Debtor also makes contractual commitments to invest in third-party businesses.  These commitments are customarily made in the innovation economy because early-stage businesses rely on pre-planned investments over a long period of time before they can start generating profits.

7.      In addition to equity commitments, the Debtor also provides loans to certain funds on the SVB Capital platform through a capital call line of credit facility, under which these funds may borrow on a revolving basis in order to support working capital needs.  The total commitments under the Capital Call Facility are $170 million, with $62 million outstanding as of the Petition Date.  The Capital Call Facility, under which loans accrue interest at the prime flat rate, may be repaid and redrawn by the borrower funds in the ordinary course of business.

8.      8.      The Debtor estimates that it has, in the aggregate, approximately $141 million of unfunded equity commitments to the funds on the SVB Capital platform as of the Petition Date.  Taking into account the Debtor's equity commitments to SVB Capital funds and equity commitments to third-party businesses, the Debtor anticipates that it will need to make approximately $50 million in aggregate funding of equity investments on a net investment basis within the next three weeks.

9.      Also in the ordinary course of business, the Debtor uses a variety of preprinted business forms including business letterhead, purchase orders, invoices, envelopes, promotional materials and other business forms (the "Business Forms").

4895-9745-7751 v.2

10.     The Debtor's inability to continue using the Cash Management System,
including existing bank accounts, would severely, and perhaps irreparably, disrupt its operations.
The Debtor's corporate and financial structure make it difficult, if not impossible, and in any
event, unduly burdensome, for the Debtor to establish an entirely new system of accounts and a
new cash management system for the Debtor.  Thus, under the circumstances, it is my belief that
maintenance of the Cash Management System is in the best interests of the Debtor's estates and
creditors.  Furthermore, preserving "business as usual" conditions and avoiding the enormous
difficulties inevitably triggered by any substantial disruption of the Cash Management System
will facilitate the Debtor's stabilization of its postpetition business operations and assist the
Debtor in its reorganization efforts.  I understand the Debtor will continue to maintain accurate
and current records with respect to all transactions so that all transactions can be readily
ascertained, traced and properly recorded.

B.     <u>Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing, But Not
Directing, the Debtor to (A) Pay Prepetition Compensation and Benefits
Obligations and (B) Continue Compensation and Benefits Obligations, (II)
Authorizing, But Not Directing, Applicable Banks and Other Financial
Institutions to Honor and Process Related Checks and Transfers and (III) Granting
Related Relief (the "Wages Motion")</u>

11.     The Wages Motion requests authority to pay certain prepetition amounts
related to the Compensation and Benefits Obligations and to continue to pay Compensation and
Benefits Obligations on a postpetition basis in the ordinary course of business.  The
Compensation and Benefit Obligations, which are described in further detail below and in the
Wages Motion, consist of reimbursement obligations in respect of service providers of Bridge
Bank and non-debtor affiliates, certain compensation and benefits programs sponsored by the
Debtor, third-party service provider obligations and non-employee director compensation
(including any related obligations and administrative expenses).  In addition, the Wages Motion

requests that the Debtor be authorized to transfer or assign the sponsorship of certain benefits

programs (and associated vendor contracts) and take actions necessary to establish, or contract

with third parties or non-debtor affiliates to provide and administer, human resources and payroll

functions and compensation and benefits programs that currently are provided through Bridge

Bank.

12.     As of the Petition Date, based on currently available information, the

Debtor believes it did not directly employ any individual; however, the Debtor lacks access to its

full books and records and information systems.  Services are generally performed for the Debtor

through the Services Agreement by service providers who are employees of Bridge Bank.

Approximately 110 employees of Bridge Bank are key members of SVB Capital, and Bridge

Bank employees also provide legal, governance, accounting, finance, administrative and other

operational functions that are critical to the Debtor's ability to continue its operations.  Without

these services, the Debtor would not be able to fulfill its obligations with respect to the Chapter

11 Case or manage the Debtor's day-to-day business responsibilities.

13.     Pursuant to the Services Agreement, the Debtor pays or reimburses Bridge Bank

for the Services Agreement Obligation.  The estimated monthly cost of the Debtor's

reimbursement obligations in respect of service provider wages and benefits under the Services

Agreement Obligation is approximately $7,800,000 and, as of the Petition Date, the Debtor owed

approximately $11,800,000 in respect of such portion of the Services Agreement Obligation.[10]

The Debtor also seeks authority to reimburse Bridge Bank for the Bridge Bank employees who

---

[10]    The estimated amount owed in respect of reimbursement obligations in respect of service provider wages and
benefits under the Services Agreement Obligation is based on the Debtor's limited access to the Debtor's and
Bridge Bank's books and records and management.  This value assumes that the prepetition amounts
outstanding includes amounts owed for February 2023 and March 2023 (prior to the Petition Date).

perform services for SVB Capital. The Debtor estimates the monthly cost related to such Bridge

Bank employees who perform services for SVB Capital is approximately $1,900,000 and, as of

the Petition Date, the Debtor owed approximately $900,000 in respect of such amounts. The

Debtor requests the authority, but not direction, to pay such prepetition amounts and to continue

to operate under the Services Agreement and reimbursement arrangements in the ordinary course

14.     Certain services may also be provided by service providers of the Debtor's

non-debtor subsidiaries from time to time, including by individuals located outside of the United

States who are employed by the Debtor's foreign subsidiaries. Based on information currently

available, as of the Petition Date, the compensation and benefits paid to any of these individuals

is paid by Bridge Bank subject to reimbursement by the Debtor pursuant to the Services

Agreement for its proportionate share of those costs. In the ordinary course, the Debtor pays or

reimburses the cost of services performed for the Debtor by such employees of the Debtor's

foreign subsidiaries. The Debtor estimates that the monthly cost of wages and benefits payable

for or reimbursable in respect of services performed by such employees of the Debtor's foreign

subsidiaries is approximately $17,900,000 and, as of the Petition Date, the Debtor owed

approximately $8,300,000 in respect of such amounts. The Debtor requests the authority, but not

direction, to pay such prepetition amounts and to continue to operate such reimbursement

arrangements in the ordinary course.

15.     Previously, employees and other service providers of Bridge Bank received

certain compensation and benefits through the Debtor's compensation and benefits programs.

Following the Receivership, those service providers of the Debtor ceased to be eligible to

participate in many of the Debtor's programs (other than through COBRA or similar rights, to

the extent applicable), so those Debtor programs now have few, if any, eligible participants.

-23-

16.     Because the Debtor does not currently directly employ any employees, if the Debtor determines appropriate, the Debtor additionally requests the authority to take any actions necessary to establish, or contract with third parties or non-debtor affiliates to provide and administer, human resources and payroll functions and compensation and benefits programs that currently are provided through Bridge Bank.  On an interim basis, the Debtor will not spend in excess of $400,000 in connection with such efforts.  These funds will be used on an interim basis to enable the prompt transfer of employment of the Bridge Bank employees who perform services for the Debtor, including the SVB Capital employees, and to enable the Debtor to engage the services of individuals to perform tasks essential to the Debtor's operations, including, for example, treasury and accounting functions.  I believe that swiftly transferring Bridge Bank professionals performing services for SVB Capital to the Debtor will reduce the risk that such individuals pursue alternative employment opportunities, which would likely have a detrimental effect on the overall value of the estate.

17.     The Debtor provides comprehensive medical, dental and vision benefits to eligible individuals and their dependents (spouses/domestic partners and dependent children up to age 26), telehealth benefits, basic life and AD&D insurance and short-term and long-term disability benefits, which are all part of the Benefits Programs offered by the Debtor.  Eligible individuals may purchase additional life insurance for themselves, their spouse and/or their children.  Other benefits offered by the Debtor include vacation benefits, healthcare and dependent care flexible spending accounts, childcare assistance, commuter benefits, sick time, business travel accident insurance and referral program incentives.  As of the Petition Date, the estimated approximate accrued amount owed with respect to the foregoing categories of Benefits Programs payable in respect of individuals employed at foreign subsidiaries of the Debtor and

individuals employed by Bridge Bank who perform services for SVB Capital was approximately

$4,500,000. The amounts paid in connection with the foregoing categories of Benefits Programs

in respect of individuals employed by foreign subsidiaries of the Debtor, which total $4,100,000,

are not included in the portion owed by the Debtor in respect of its reimbursement obligations

under the Services Agreement, discussed above. Bridge Bank continues to be responsible for the

substantial majority of the ongoing costs of the Benefits Programs pursuant to the Services

Agreement. By the Wages Motion, the Debtor requests the authority to honor any prepetition

obligations arising from the Benefits Programs, continue the Benefits Programs in the ordinary

course and to transfer, discontinue or terminate any of the Benefits Programs and related

contracts, as may be necessary to further facilitate its separation from Bridge Bank.

18.    In the ordinary course of business, the Debtor sponsors a 401(k) Plan for the

benefit of certain eligible employees located in the United States, and may provide similar

defined contribution benefits to employees outside of the United States. The Vanguard Group

serves as the record-keeper and the trustee of the 401(k) Plan. The 401(k) Plan allows eligible

individuals to set aside money for retirement by making pre-tax contributions to the 401(k) Plan

and/or after-tax contributions to a Roth 401(k) (up to limits set by the Internal Revenue Code).

The Debtor matched (subject to reimbursement through the Services Agreement as applicable)

the 401(k) Plan up to certain limits (the "401(k) Plan Contributions"). In the last 12 months, the

Debtor's monthly payments on account of the 401(k) Plan Contributions averaged approximately

$900,000. As of the Petition Date, there was approximately $450,000 outstanding in respect of

payments on account of the 401(k) Plan.[11] Additionally, the Debtor may hold in trust or on

---

[11]   This estimated outstanding prepetition amount is based on the assumption that the last pay period remains
outstanding.

4895-9745-7751 v.2

behalf of employees certain employee contributions to the 401(k) Plan (or similar defined contribution plan), which assets are not assets of the Debtor and instead are assets of the respective employees.  In the Wages Motion, the Debtor requests authority to honor any prepetition obligations on account of the 401(k) Plan and to properly forward any employee contributions to the applicable plan trust.

19.       The Debtor also engages and compensates certain third parties who make available temporary service providers to perform services that are critical to the Debtor's daily operations, and the estimated monthly cost related to the Third Party Service Provider Obligations is approximately $100,000.  As of the Petition Date, the Debtor estimates that the approximate accrued amount owed with respect to the Third Party Service Provider Obligations was $200,000.  By the Wages Motion, the Debtor requests authority to honor any prepetition accrued but unpaid Third Party Service Provider Obligations and to continue the Third Party Service Provider Obligations in the ordinary course.

20.       Through the Director Compensation Program, the Board pays non-employee directors an annual retainer of $90,000 for service on the Board, an annual retainer ranging from $15,000 to $25,000 for service on committees of the Board and an annual retainer ranging from $15,000 to $100,000 for service as the chair of the Board or of a committee of the Board, and historically granted an equity-based award with a grant date value of $160,000 (or $240,000 for the Board chair).  Given the Debtor's lack of access to books and records, out of an abundance of caution, the Debtor requests the authority, on a final basis only, to pay any outstanding, prepetition amounts payable in the ordinary course in respect of the Director Compensation Program.  The Debtor requests, on a final basis only, the authority, but not the direction, to continue the Director Compensation Program in the ordinary course; provided that the Debtor

-26-

may pay any amount that historically was awarded in the form of an equity-based award in cash. I believe that the continuation of the Director Compensation Program is critical to the Debtor's continued operations for such program will enable the continued operations of the Board.

21.      The Debtor historically sponsored bonus, incentive, equity and deferred compensation programs for the benefit of certain service providers.  The Debtor is not seeking in the Wages Motion the authority to pay any amounts in respect of the Bonuses, but reserves the right to seek such authority in a subsequent motion to the Court.

22.      Payment of the obligations and continuation of the benefits programs described in the Wages Motion is critical to the Debtor's ability to continue to operate its businesses.  Absent the Debtor's ability to compensate service providers and transfer or hire service providers to provide services to the Debtor, the Debtor will be unable to complete daily tasks necessary for its operations.  As a result, the payment of the Compensation and Benefits obligations is necessary for the preservation of the Debtor's estates and the Debtor's ability to reorganize would be severely impaired if they were not honored.  For these reasons, I believe that the relief requested in the Wages Motion is in the best interests of the Debtor's estates, its creditors and all other parties-in-interest.

## PART IV

## I.      Information Required by Local Bankruptcy Rule 1007-2

23.      Local Rule 1007-2 requires certain information related to the Debtor, which I have provided in the exhibits attached hereto as Exhibits A through M.

- Exhibit A attached hereto provides the Debtor's current corporate structure chart.

- Pursuant to Local Rule 1007-2(a)(3), Exhibit B attached hereto provides, to the best of the Debtor's knowledge and belief, the names and addresses of the members of, and attorneys of, any committee organized prior to the Petition Date.

- Pursuant to Local Rule 1007-2(a)(4), <u>Exhibit C</u> attached hereto provides, to the best of the Debtor's knowledge and belief, the following information with respect to each of the holders of the Debtor's 50 largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address) and telephone number (provided that the names, addresses and telephone numbers of current and former employees have been redacted); the name(s) of person(s) familiar with the Debtor's accounts; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed or partially secured.  In each case, the claim amounts listed on Exhibit C are estimated and subject to verification.  In addition, the Debtor reserves its rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

- Pursuant to Local Rule 1007-2(a)(5), <u>Exhibit D</u> attached hereto provides the following information with respect to each of the holders of the five largest secured claims against the Debtor: the creditor's name, address (including the number, street, apartment, or suite number and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and whether the claim or lien is disputed.  In each case, the claim amounts listed on Exhibit D are estimated and subject to verification.  In addition, the Debtor reserves its rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

- Pursuant to Local Rule 1007-2(a)(6), <u>Exhibit E</u> attached hereto provides a summary of the Debtor's assets and liabilities.

- Pursuant to Local Rule 1007-2(a)(7), <u>Exhibit F</u> attached hereto provides information on the Debtor's outstanding publicly held securities, listing separately those held by each of the debtor's officers and directors and the amounts so held.

- Pursuant to Local Rule 1007-2(a)(8), <u>Exhibit G</u> attached hereto provides the following information with respect to any property of the Debtor in possession of or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity:  the name, address, and telephone number of such entity and the court in which any proceeding relating thereto is pending.

- Pursuant to Local Rule 1007-2(a)(9), <u>Exhibit H</u> attached hereto provides a list of the premises owned, leased or held under other arrangement from which the Debtor operates its business as of the Petition Date.

- Pursuant to Local Rule 1007-2(a)(10), <u>Exhibit I</u> attached hereto sets forth the location of the Debtor's substantial assets, the location of its books and

records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

- Pursuant to Local Rule 1007-2(a)(11), <u>Exhibit J</u> attached hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtor or its property where a judgment against the Debtor or a seizure of its property may be imminent.

- Pursuant to Local Rule 1007-2(a)(12), <u>Exhibit K</u> attached hereto sets forth a list of the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

- Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), <u>Exhibit L</u> attached hereto provides the estimated amount of weekly payroll to the Debtor's Employees (not including officers, directors and stockholders) and the estimated amounts to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtor, for the 30-day period following the Petition Date.

- Pursuant to Local Rule 1007-2(b)(3), <u>Exhibit M</u> attached hereto provides a schedule for the 30-day period following the Petition Date, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

4895-9745-7751 v.2

Dated: March 19, 2023                    Respectfully submitted,
New York, NY

                                         */s/ William C. Kosturos*
                                         William C. Kosturos
                                         Chief Restructuring Officer

SIGNATURE PAGE TO FIRST DAY DECLARATION

**Exhibit A**

Corporate Structure Chart as of December 31, 2022[1]

[Attached]

---

[1]  As of March 10, 2023, Silicon Valley Bank and its subsidiaries are no longer subsidiaries of the Debtor.





Legal Entity Chart
Core SVBFG Entities
After the close of business on December 31, 2022

SVB Financial Group
(a Delaware corporation)

Silicon Valley Bank **1**
(a California corporation)

SVB Financial Group UK Limited
(a UK company) **3**

SVB Global Financial, Inc.
(a Delaware corporation)

SVB Business Partners (Beijing) Co., Ltd.
(a Chinese private limited company)

SVB Investments Holdings, Inc.
(a Delaware corporation)

SVB Asset Management
(a California corporation)

SVB Investment Services, Inc.
(a Delaware corporation)

SPD Silicon Valley Bank Co., Ltd.
(a Chinese private limited company)

SVB Israel Advisors Ltd
(an Israeli company)

SVB India Advisors PVT Limited
(an Indian private limited company)

The Silicon Valley Bank Foundation
(a California nonprofit public benefit corporation)

SVB Global Services India LLP
(an Indian limited liability partnership)

Silicon Valley Bank UK Limited
(a UK company) **2**

SVB Private Entities on page 8

Indicates 100% Ownership

Indicates less than 100% Ownership or other control relationship

This chart does not depict: (1) significant investments made by SVB Financial Group; (2) consolidated entities on our financial statements; (3) divisions of SVB Financial Group or office locations; (4) minority investments made by subsidiaries in each other; (5) CRA investments where we own greater than or equal to 25% of the entity; or (6) affiliates of Silicon Valley Bank, as defined by Regulation W of the Federal Reserve Act.

**1** *Branches of Silicon Valley Bank*
- Beverly, Massachusetts
- Beverly Hills, California
- Boston, Massachusetts (3)
- Cambridge, Massachusetts
- Los Angeles, California
- Menlo Park, California
- Palo Alto, California (2)

**1** *Branches of Silicon Valley Bank*
- Pasadena, California
- San Francisco, California
- San Jose, California
- San Mateo, California
- Santa Clara, California
- Santa Monica, California
- St. Helena, California

**1** *Branches of Silicon Valley Bank*
- Wellesley, Massachusetts
- Canada Branch
- Cayman Branch
- Germany Branch
- UK Branch*

*pending confirmation of cancellation by UK regulatory authorities

**1** *Representative Offices of Silicon Valley Bank*
- New York Representative Office
- Israel Representative Office
- Hong Kong Representative Office

**2** *Representative Offices of Silicon Valley Bank UK Limited*
- Denmark Representative Office
- Sweden Representative Office

**3** *Branch of SVB Financial Group UK Limited*
- Ireland Branch

SVB Confidential

Page 1





**Legal Entity Chart**
**SVB Capital / Managed VC Funds**
**After the close of business on December 31, 2022**

¥ Serves as General Partner of the underlying partnership

This chart does not depict: (1) significant investments made by SVB Financial Group; (2) consolidated entities on our financial statements; (3) divisions of SVB Financial Group or office locations; (4) minority investments made by subsidiaries in each other; (5) CRA investments where we own greater than or equal to 25% of the entity; or (6) affiliates of Silicon Valley Bank, as defined by Regulation W of the Federal Reserve Act.

SVB Confidential

Legal Entity Chart
SVB Capital / Managed VC Funds
After the close of business on December 31, 2022

¥ Serves as General Partner of the underlying partnership

This chart does not depict: (1) significant investments made by SVB Financial Group; (2) consolidated entities on our financial statements; (3) divisions of SVB Financial Group or office locations; (4) minority investments made by subsidiaries in each other; (5) CRA investments where we own greater than or equal to 25% of the entity; or (6) affiliates of Silicon Valley Bank, as defined by Regulation W of the Federal Reserve Act.

Indicates investment made by one entity to another that is between 25% and 50% ownership

Indicates feeder entity

Controls or serves as General Partner/Controlling Manager/Stockholder (which may or may not include investment/ownership)

SVB Confidential

Page 3





Legal Entity Chart
SVB Capital / Managed VC Funds
After the close of business on December 31, 2022

¥ Serves as General Partner of the underlying partnership
Indicates feeder entity or subsidiary relationship

This chart does not depict: (1) significant investments made by SVB Financial Group; (2) consolidated entities on our financial statements; (3) divisions of SVB Financial Group or office locations; (4) minority investments made by subsidiaries in each other; (5) CRA investments where we own greater than or equal to 25% of the entity; or (6) affiliates of Silicon Valley Bank, as defined by Regulation W of the Federal Reserve Act.

SVB Confidential

Page 4







**Legal Entity Chart**
**SVB Capital Credit Platform**
**After the close of business on December 31, 2022**

Controls or serves as General Partner/Controlling Manager (which may or may not include investment/ownership)

Serves as Non-Member Manager

Serves as Non-Managing Member

Indicates Feeder Entity

¥ Serves as General Partner of the underlying partnership

This chart does not depict: (1) significant investments made by SVB Financial Group; (2) consolidated entities on our financial statements; (3) divisions of SVB Financial Group or office locations; (4) minority investments made by subsidiaries in each other; (5) CRA investments where we own greater than or equal to 25% of the entity; or (6) affiliates of Silicon Valley Bank, as defined by Regulation W of the Federal Reserve Act.

**Legal Entity Chart**
**SVB Capital Credit Platform**
**After the close of business on December 31, 2022**



SVB Financial Group
(a Delaware corporation)

SVB Innovation Credit Partners SMA I, LLC (a Delaware limited liability company ¥)

SVB Innovation Credit Partners SMA II, LLC
(a Delaware limited liability company¥ )

SVB Arizona Innovation Credit Partners, LLC
(a Delaware limited liability company¥ )

Innovation Credit SMA I L.P.
(a Delaware limited partnership)

Innovation Credit SMA II, L.P.
(a Delaware limited partnership)

Arizona Innovation Credit Fund, L.P.
(a Delaware limited partnership)

Innovation Credit SMA II SPE, LLC
(a Delaware limited liability company)

¥ Serves as General Partner of the underlying partnership

This chart does not depict: (1) significant investments made by SVB Financial Group; (2) consolidated entities on our financial statements; (3) divisions of SVB Financial Group or office locations; (4) minority investments made by subsidiaries in each other; (5) CRA investments where we own greater than or equal to 25% of the entity; or (6) affiliates of Silicon Valley Bank, as defined by Regulation W of the Federal Reserve Act.

SVB Confidential







**Legal Entity Chart**
**SVB Securities / SVB Securities Managed VC Funds**
**After the close of business on December 31, 2022**

Indicates investment made by one entity to another that is between 25% and 50% ownership

Indicates feeder entity

Controls or serves as General Partner/Controlling Manager/Stockholder (which may or may not include investment/ownership)

¥ Serves as General Partner of the underlying partnership

This chart does not depict: (1) significant investments made by SVB Financial Group; (2) consolidated entities on our financial statements; (3) divisions of SVB Financial Group or office locations; (4) minority investments made by subsidiaries in each other; (5) CRA investments where we own greater than or equal to 25% of the entity; or (6) affiliates of Silicon Valley Bank, as defined by Regulation W of the Federal Reserve Act.

SVB Confidential

**Legal Entity Chart**
**SVB Private Entities**
**After the close of business on December 31, 2022**

SVB Financial Group
(a Delaware corporation)

BPFH Holding LLC
(a Delaware limited
liability company)

Boston Private Capital
Trust I
(a Delaware Trust)

Boston Private Capital
Trust II
(a Delaware Trust)

Silicon Valley Bank
(a California Corporation)

BPB Securities Corporation
(a Massachusetts Corporation)

BPB Securities Corporation
II (a Massachusetts
Corporation)

BPB-IMT & Co., LLP
(a Massachusetts Limited Liability
Partnership)

SVB Wealth LLC
(a Massachusetts Limited
Liability Company)

Lerob LLC
(a California limited liability
company)

Ten Winthrop Properties, Inc.
(a Massachusetts Corporation)

Indicates investment made by one entity to another
that is between 25% and 50% ownership

Indicates feeder entity

Controls or serves as General Partner/Controlling
Manager/Stockholder (which may or may not
include investment/ownership)

¥ Serves as General Partner of the underlying partnership

This chart does not depict: (1) significant investments made by SVB Financial Group; (2) consolidated entities on our financial statements; (3) divisions of SVB Financial Group or office locations; (4) minority investments made by subsidiaries in each other; (5) CRA investments where we own greater than or equal to 25% of the entity; or (6) affiliates of Silicon Valley Bank, as defined by Regulation W of the Federal Reserve Act.

SVB Confidential



**SVB Financial Group**
**(a Delaware corporation)**

StartupOS, Inc.
(a Delaware corporation)

**Legal Entity Chart**
**Other SVBFG Controlled Entities**
**After the close of business on December 31, 2022**

———————— Indicates 100% Ownership

— — — — Indicates less than 100% Ownership
or other control relationship

¥ Serves as General Partner of the underlying partnership

This chart does not depict: (1) significant investments made by SVB Financial Group; (2) consolidated entities on our financial statements; (3) divisions of SVB Financial Group or office locations; (4) minority investments made by subsidiaries in each other; (5) CRA investments where we own greater than or equal to 25% of the entity; or (6) affiliates of Silicon Valley Bank, as defined by Regulation W of the Federal Reserve Act.

**<u>Exhibit B</u>**

Committees

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtor's knowledge and belief, the following committees have been formed prior to the Petition Date.

None.

## Exhibit C

List of 16 Largest Unsecured Creditors (Excluding Insiders)

Pursuant to Local Rule 1007-2(a)(4), to the best of the Debtor's knowledge and belief, the following table sets forth the information of each of the holders of the Debtor's 16 largest unsecured claims, excluding claims of insiders.  There may be additional unsecured creditors of the Debtor, but the Debtor is unable to currently access books and records held by Silicon Valley Bridge Bank, N.A. and is unable to identify any additional creditors with specificity as of the date of this filing.

Listed claim values reflect outstanding principal value at December 31, 2022.

| | Name of creditor and complete mailing address | Name, telephone number, and email address of creditor contact | Nature of the claim (e.g., trade debts, bank, loan, professional services) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim |
|---|---|---|---|---|---|
| 1 | U.S. Bank National Association ATTN: Corporate Trust Department (SVB Financial Group) 633 West Fifth Street 24th Floor Los Angeles, CA  90071 USA | Corporate Trust Department (SVB Financial Group) EMAIL - PHONE - 213-615-6300 FAX - | 650,000,000 1.800% Senior Notes due 2026 | | $ 650,000,000 |
| 2 | U.S. Bank National Association ATTN: Corporate Trust Department (SVB Financial Group) 633 West Fifth Street 24th Floor Los Angeles, CA  90071 USA | Corporate Trust Department (SVB Financial Group) EMAIL - PHONE - 213-615-6300 FAX - | 500,000,000 2.100% Senior Notes due 2028 | | $ 500,000,000 |
| 3 | U.S. Bank National Association ATTN: Corporate Trust Department (SVB Financial Group) 633 West Fifth Street 24th Floor Los Angeles, CA  90071 USA | Corporate Trust Department (SVB Financial Group) EMAIL - PHONE - 213-615-6300 FAX - | 500,000,000 3.125% Senior Notes due 2030 | | $ 500,000,000 |

| | Name of creditor and complete mailing address | Name, telephone number, and email address of creditor contact | Nature of the claim (e.g., trade debts, bank, loan, professional services) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim |
|---|---|---|---|---|---|
| 4 | U.S. Bank National Association ATTN: Corporate Trust Department (SVB Financial Group) 633 West Fifth Street 24th Floor Los Angeles, CA  90071 USA | Corporate Trust Department (SVB Financial Group) EMAIL - PHONE - 213-615-6300 FAX - | 500,000,000 1.800% Senior Notes due 2031 | | $ 500,000,000 |
| 5 | U.S. Bank National Association ATTN: Corporate Trust Department (SVB Financial Group) 633 West Fifth Street 24th Floor Los Angeles, CA  90071 USA | Corporate Trust Department (SVB Financial Group) EMAIL - PHONE - 213-615-6300 FAX - | 450,000,000 4.570% Senior Notes due 2033 | | $ 450,000,000 |
| 6 | U.S. Bank National Association ATTN: Corporate Trust Department (SVB Financial Group) 633 West Fifth Street 24th Floor Los Angeles, CA  90071 USA | Corporate Trust Department (SVB Financial Group) EMAIL - PHONE - 213-615-6300 FAX - | 350,000,000 3.50% Senior Notes due 2025 | | $ 350,000,000 |
| 7 | U.S. Bank National Association ATTN: Corporate Trust Department (SVB Financial Group) 633 West Fifth Street 24th Floor Los Angeles, CA  90071 USA | Corporate Trust Department (SVB Financial Group) EMAIL - PHONE - 213-615-6300 FAX - | $350,000,000 4.345% Senior Notes due 2028 | | $ 350,000,000 |
| 8 | alterDomus ATTN: Andrew Cherry Chief Financial Officer 15 Boulevard F. W. Raiffeisen L-2411 Luxembourg Grand Duchy of Luxembourg | Andrew Cherry, Chief Financial OfficerEMAIL - PHONE - +352 48 18 28 1FAX - +352 48 18 63 | Trade Payable | | $ 2,500,000 |

| | Name of creditor and complete mailing address | Name, telephone number, and email address of creditor contact | Nature of the claim (e.g., trade debts, bank, loan, professional services) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim |
|---|---|---|---|---|---|
| 9 | Ernst & Young U.S. LLP<br>ATTN: Michael S. Solender<br>Global Vice Chair and General Counsel<br>1 Manhattan W<br>401 9TH Ave<br>New York, NY  10001<br>USA | Michael S. Solender<br>EMAIL -<br>PHONE -  (212) 773-3000<br>FAX - | Trade Payable | | UNDETERMINED |
| 10 | KPMG LLP<br>ATTN: Paul Knopp<br>U.S. Chair and Chief Executive Officer<br>345 Park Avenue<br>New York, NY  10154<br>USA | Paul Knopp<br>EMAIL - pknopp@kpmg.com<br>PHONE - 212-758-9700<br>FAX - 212-758-9819 | Trade Payable | | UNDETERMINED |
| 11 | U.S. Bank National Association<br>ATTN: George Hogan, Corporate Trust<br>Services Division<br>1 Federal Street<br>10th Floor<br>Boston, MA  02110<br>USA | George Hogan, Corporate Trust<br>Services Division<br>EMAIL -<br>george.hogan@usbank.com<br>PHONE - (404) 898-8832<br>FAX - | $105,000,000 Junior<br>Subordinated Convertible<br>Debentures due 2034 | | UNDETERMINED |
| 12 | Wilmington Trust Company<br>ATTN: Corporate Capital Markets<br>Rodney Square North<br>1100 North Market Street<br>Wilmington, DE  19890<br>USA | Corporate Capital MarketsEMAIL -<br>rritrovato@wilmingtontrust.comPH<br>ONE - 302-636-5137FAX - 302-<br>636-4145 | $103,093,000<br>Fixed/Floating Rade<br>Junior Subordinated Debt<br>Securities due 2035 | | UNDETERMINED |
| 13 | Silicon Valley Bridge Bank, N.A.<br>ATTN: Tim Mayopoulos<br>CEO<br>3003 Tasman Dr.<br>Santa Clara, CA  95054<br>USA | Tim Mayopoulos<br>EMAIL - tmayopoulos@svb.com<br>PHONE - 408-654-7400<br>FAX - | Reimbursement<br>obligations for services<br>under Master<br>Intercompany Services<br>Agreement | Contingent<br>and<br>unliquidated | UNDETERMINED |
| 14 | United Healthcare<br>ATTN: Brian Thompson (Chief Executive<br>Officer), Thad Johnson (Chief Legal Officer) | Brian Thompson (Chief Executive<br>Officer), Thad Johnson (Chief Legal<br>Officer) | Employee Health and<br>Welfare benefits related | | UNDETERMINED |

| | Name of creditor and complete mailing address | Name, telephone number, and email address of creditor contact | Nature of the claim (e.g., trade debts, bank, loan, professional services) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim |
|---|---|---|---|---|---|
| | 9900 Bren Rd.<br>Minnetonka, MN  55343<br>USA | EMAIL -<br>Brian.Thompson@uhc.com;<br>Thad.Johnson@uhc.com<br>PHONE - 952-936-1300<br>FAX - | to comprehensive medical plans. | | |
| 15 | BA2 QUAD LLC, c/o TMG Partners<br>ATTN: Matt Field (President), Scott C. Verges (General Counsel, Executive Vice President)<br>100 Bush Street, Ste 2600<br>San Francisco, CA  94104<br>USA | Matt Field (President), Scott C. Verges (General Counsel, Executive Vice President)<br>EMAIL - mfield@tmgpartners.com; sverges@tmgpartners.com<br>PHONE - 415-772-5900<br>FAX - 415-772-5911 | Real Estate Lease Obligations | | UNDETERMINED |
| 16 | MUFG FUND SERVICES (CAYMAN) LIMITED<br>ATTN: Counsel<br>MUFG House<br>227 Elgin Avenue<br>GEORGE TOWN<br>Grand Cayman,   KY1-1107<br>Cayman Islands | Counsel<br>EMAIL -<br>PHONE - +1 345 914 1000<br><br>FAX - | Contract obligations | | UNDETERMINED |

**Exhibit D**

Holders of the Five Largest Secured Claims Against the Debtor on a Consolidated Basis


Pursuant to Local Rule 1007-2(a)(5), to the best of the Debtor's knowledge and belief, the Debtor is not aware of any secured claims against the Debtor.

**Exhibit E**

Summary of the Debtor's Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), the below is a summary of the Debtor's assets and liabilities.  The amounts reflected below were derived by totaling the indicated amounts reflected in each Debtor's books and records.  The following financial data shall not constitute an admission of liability by the Debtor.  The Debtor reserves all rights to assert that any debt or claim included herein is a disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.  As of December 31, 2022, approximately $15,456,000 of the Debtor's assets was attributable to the Debtor's bank subsidiary, Silicon Valley Bank. On March 10, 2023, Silicon Valley Bank was closed by the California Department of Financial Protection and Innovation.

As of December 31, 2022
$ millions

| | |
|---|---:|
| **ASSETS** | |
| Cash and cash equivalents | 2,258 |
| Investment securities | 491 |
| Loans, amortized cost | 1 |
| Lease right-of-use assets | 102 |
| Other assets | 475 |
| Investment in subsidiaries: | |
| Bank subsidiary | 15,456 |
| Nonbank subsidiaries | 896 |
| **TOTAL ASSETS** | **19,679** |
| | |
| **LIABILITIES AND SVBFG STOCKHOLDERS' EQUITY** | |
| Long-term debt | 3,370 |
| Lease liabilities | 135 |
| Other liabilities | 170 |
| Total liabilities | 3,675 |
| **SVBFG STOCKHOLDERS' EQUITY** | **16,004** |
| **TOTAL LIABILITIES AND SVBFG STOCKHOLDERS' EQUITY** | **19,679** |

## **Exhibit F**

The Debtor's Securities

Pursuant to Local Rule 1007-2(a)(7), to the best of the Debtor's knowledge and belief, the Debtor has the below publicly traded stock, debentures, or securities:

Common shares, $0.001 par value per share, 170,000,000 shares authorized, 59,271,187 shares outstanding, as of February 28, 2023.[2]

Common Shares Held by Officers and Directors[3]:

| Name | Number of Shares |
|------|-----------------:|
| Eric Benhamou | 5,765 |
| Elizabeth Burr | 401 |
| Richard Daniels | 1,010 |
| Alison Davis | 1,407 |
| Joel Friedman | 23,574 |
| Thomas King | 297 |
| Jeffrey Maggioncalda | 4,569 |
| Beverly Kay Matthews | 2,840 |
| Mary Miller | 5,605 |
| Kate Mitchell | 4,558 |
| Garen Staglin | 13,964 |
| Dan Beck | 10,394 |
| Greg Becker | 159,099 |
| Philip Cox | 19,000 |
| Michael Descheneaux | 47,705 |
| Michael Zuckert | 21,277 |
| Laura Izurieta | 6,118 |

Preferred shares, $0.001 par value per share, 20,000,000 shares authorized, 383,500 outstanding, as of December 31, 2022, including: [4]

- 350,000 shares outstanding of 5.250% Fixed-Rate Non-Cumulative Perpetual Series A Preferred Stock
- 7,500 shares outstanding of 4.100% Fixed-Rate Non-Cumulative Perpetual Series B Preferred Stock
- 10,000 shares outstanding of 4.000% Fixed-Rate Non-Cumulative Perpetual Series C Preferred Stock

---

[2]  Per SEC PRE14A filling.

[3]  Per SEC PRE14A filling.

[4]  Per SEC 10-K filling.

- 10,000 shares outstanding of 4.250% Fixed-Rate Non-Cumulative Perpetual Series D Preferred Stock
- 6,000 shares outstanding of 4.700% Fixed-Rate Non-Cumulative Perpetual Series E Preferred Stock

Unsecured Senior Notes, including:

- 3.50% Senior Notes due 2025, with a principal of $350,000,000
- 1.800% Senior Notes due 2026, with a principal of $650,000,000
- 2.100% Senior Notes due 2028, with a principal of $500,000,000
- 4.345% Senior Fixed Rate/Floating Rate Notes due 2028, with a principal of $350,000,000
- 3.125% Senior Notes due 2030, with a principal of $500,000,000
- 1.800% Senior Notes due 2031, with a principal of $500,000,000
- 4.570% Senior Fixed Rate/Floating Rate Notes due 2033, with a principal of $450,000,000

## **Exhibit G**

Debtor's Property Not in the Debtor's Possession

Pursuant to Local Rule 1007-2(a)(8), the following is a list of property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.  The Debtor is working to confirm that no other such party is in possession of any of the Debtor's property and reserve the right to supplement this exhibit if additional property is identified.  The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtor.  The Debtor reserves all rights to challenge the priority, nature, amount or status of any claim or debt.

| Property | Entity Holding Property |
|---|---|
| Significant Books and Records | Held by Silicon Valley Bridge Bank, N.A. pursuant to services provided under Master Intercompany Services Agreement dated as of July 19, 2022 |

4869-5255-9447 v.3

## **Exhibit H**

Debtor's Premises

Pursuant to Local Rule 1007-2(a)(9), the following lists the premises owned, leased, or held under other an arrangement from which the Debtor operates its business as of the Petition Date.  There may be additional properties which the Debtor owns or leases, but the Debtor is unable to currently access books and records held by Silicon Valley Bridge Bank, N.A.

| | Debtor/ Lessee | Address | Type of Interest |
|---|---|---|---|
| 1 | SVB Financial Group | 3003 and 3101 Tasman Drive Santa Clara, CA. 95054. | Lease |
| 2 | SVB Financial Group | 387 Park Avenue South New York, NY. 10016. | Lease |

## **Exhibit I**

Location of the Debtor's Assets, Books and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtor's substantial assets, the location of its books and records, and the nature, location, and value of any assets held by the Debtor outside the territorial limits of the United States.


Location and Nature of Debtor's Substantial Assets:

- Excluding its investment in its former bank subsidiary, the Debtor has assets of more than $ 4,000,000,000, as provided in Exhibit E, with substantial assets including cash, investment securities and interests in non-bank subsidiaries.  In addition, the Debtor owns subsidiaries which operate in India, the U.K., Israel, China and Ireland.

Books and Records:

- The Debtor maintains its books and records on an information technology system.  The system and a majority of physical records are maintained by Silicon Valley Bridge Bank, N.A. in the Debtor's offices in Santa Clara, CA, and New York, NY.

## **Exhibit J**

Litigation

Pursuant to Local Rule 1007-2(a)(11), the following lists the nature and present status of each action or proceeding, pending or threatened, against the Debtor or its property where a judgment against the Debtor or a seizure of its property may be imminent as of the Petition Date.

- To the best of the Debtor's knowledge, belief, and understanding, there are no actions or proceedings pending or threatened against the Debtor or its property, as of the Petition Date, where a judgment against the Debtor or a seizure of its property may be imminent.

## Exhibit K

Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following lists the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

The Debtor has no employees as of the Petition Date.  Its sole paid officer is William Kosturos, Chief Restructuring Officer, who is being paid pursuant to a contractual arrangement between the Debtor and its restructuring advisor Alvarez & Marsal ("A&M"), and not being paid directly by the Debtor.

| Name | Title | Duties | Responsibility and Experience |
|---|---|---|---|
| William Kosturos | Chief Restructuring Officer | Responsible for approving and authorizing all corporate actions related to the restructuring of the Debtor and any other proper and necessary corporate actions. | On March 13, 2023, the restructuring committee of the Debtor's board of directors appointed William Kosturos of A&M as the Debtor's Chief Restructuring Officer.<br><br>Mr. Kosturos is a Managing Director with A&M's North American Commercial Restructuring practice in San Francisco. He is Vice-Chair of the U.S. Restructuring Practice and a member of A&M's Executive Committee for U.S. Restructuring, and has more than 30 years of operational experience as an interim manager and financial adviser to both debtors and creditors in and out of Chapter 11 proceedings. Previously, Mr. Kosturos was the Chief Restructuring Officer for Washington Mutual. Other notable advisory or management roles include Cengage Learning, Inc., Movie Gallery, The Spiegel Group (which owned Eddie Bauer), Pacific Gas & Electric Company, Tri-Valley Growers, Levi Strauss, Webvan Group, Sunshine Biscuits, Clothestime, Hexcel Corp., and Spreckels Industries. |

The following persons continue to be officers, but not employees, of the Debtor.  The Board of Director has not yet determined the roles or functions of these persons during this Chapter 11 Case or whether any will be employed in the future in any capacity.

| Name | Title |
| --- | --- |
| Greg Becker | President and Chief Executive Officer |
| Dan Beck | Chief Financial Officer |
| Philip Cox | Chief Operations Officer |
| Laura Cushing | Chief Human Resources Officer |
| Michael Descheneaux | President, Silicon Valley Bank |
| Michelle Draper | Chief Marketing and Strategy Officer |
| Kim Olson | Chief Risk Officer |

### Exhibit L

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides (i) the estimated amount of weekly payroll to the Debtor's Employees (not including officers, directors and stockholders), (ii) the estimated amount to be paid to officers, stockholders, directors, (iii) the estimated amount to be paid to financial and business consultants retained by the Debtor and (iv) the estimated cost payable to Bridge Bank for the 30-day period following the Petition Date.

| Payee | Payment |
|---|---|
| Employees | $0 |
| Officers, Directors and Stockholders | $0 |
| Financial and Business Consultants | $1,000,000 |
| Bridge Bank | $19,600,000 |
| Bridge Bank Employees Performing Services for SVC Capital | $4,400,000 |
| Non-Debtor Foreign Subsidiary Employees | $2,000,000 |

## Exhibit M

Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remain unpaid, other than professional fees.

|  | Amount (thousands of dollars) |
|---|---|
| Cash receipts | $43,489.72 |
| Cash disbursements | ($133,882.33) |
| Net cash gain / (loss) | ($90,392.60) |
| Unpaid obligations | $20,000.00 |
| Uncollected receivables | $15,000.00 |