James L. Bromley
Andrew G. Dietderich
Christian P. Jensen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Proposed Counsel for the Debtor*
*and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————————— x

In re                                                          :          Chapter 11
                                                               :
                                                               :
SVB FINANCIAL GROUP,[1]                                        :          Case No. 23-10367 (MG)
                                                               :
                                                               :
                    Debtor.                                    :
                                                               :
————————————————————————— x

**OBJECTION OF DEBTOR TO MOTION OF**
**FEDERAL DEPOSIT INSURANCE CORPORATION**
**AS RECEIVER FOR SILICON VALLEY BANK**
**FOR AN ORDER TO ESTABLISH A TAX REFUND ESCROW ACCOUNT**

---

[1]        The last four digits of SVB Financial Group's tax identification number are 2278.

# TABLE OF CONTENTS

**Page**

Preliminary Statement ...................................................................................................1

Background .....................................................................................................................4

Argument .....................................................................................................................10

    I.    The Requested Relief Should Be Denied Because It Conflicts With the Debtor's Rights Pursuant to the Bankruptcy Code. ...........................................10

    II.    FDIC-R Violated the Automatic Stay by Violating the Debtor's Rights Under the Tax Allocation Agreement. ...............................................................12

    III.    The Requested Relief Should Be Denied In Light of FDIC-R's Willful Violation of the Automatic Stay. .......................................................................14

    IV.    The Requested Relief Should Be Denied as Procedurally Improper. ...................17

Conclusion ...................................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AMR Corp.*,
  485 B.R. 279 (Bankr. S.D.N.Y.), *aff'd*, 730 F.3d 88 (2d Cir. 2013) .....................................14

*In re Arcapita Bank B.S.C.(c)*,
  648 B.R. 489 (Bankr. S.D.N.Y. 2023).................................................................................15

*Blava In–Line, Inc.* v. *Midlantic National Bank/North (In re Blava In–Line, Inc.)*,
  133 B.R. 33 (Bankr. S.D.N.Y. 1991) ..................................................................................16

*Brown* v. *Pyatt (In re Pyatt)*,
  486 F.3d 423 (8th Cir. 2007) ...............................................................................................10

*City of Chicago* v. *Fulton*,
  141 S. Ct. 585 (2021) ...........................................................................................................15

*In re Computer Communications, Inc.*,
  824 F.2d 725 (9th Cir. 1987) ...............................................................................................16

*In re Congregation Birchos Yosef*,
  535 B.R. 629 (Bankr. S.D.N.Y. 2015)..................................................................................16

*In re First Cent. Fin. Corp.*,
  269 B.R. 481 (Bankr. E.D.N.Y. 2001), *subsequently aff'd*, 377 F.3d 209 (2d
  Cir. 2004) .............................................................................................................................13

*In re Fugazy Exp., Inc.*,
  982 F.2d 769 (2d Cir. 1992) .................................................................................................16

*Ga. Pac. Corp.* v. *Sigma Serv. Corp.*,
  712 F.2d 962 (5th Cir. 1983) ...............................................................................................12

*In re Intelligent Direct Mktg.*,
  518 B.R. 579 (E.D. Cal. 2014) .............................................................................................11

*Kitchen* v. *Boyd (In re Newpower)*,
  233 F.3d 922 (6th Cir. 2000) ...............................................................................................12

*Liu* v. *Sec. & Exch. Comm'n*,
  140 S. Ct. 1936 (2020) .........................................................................................................17

*In re McCann*,
  537 B.R. 172 (Bankr. S.D.N.Y. 2015)...........................................................................11, 16

*In re Miszko*,
    627 B.R. 809 (Bankr. S.D.N.Y. 2021) ................................................................. 15

*In re Operation Open City, Inc.*,
    148 B.R. 184 (Bankr. S.D.N.Y. 1992), *aff'd*, 170 B.R. 818 (S.D.N.Y. 1994) ................ 12, 16

*Root* v. *Railway Co.*,
    105 U.S. 189 (1882) .............................................................................. 17

*In re Saint Vincent's Cath. Med. Centers of New York*,
    445 B.R. 264 (Bankr. S.D.N.Y. 2011) .............................................................. 17

*Small Bus. Admin.* v. *Rinehart*,
    887 F.2d 165 (8th Cir. 1989) ...................................................................... 15

*In re Velichko*,
    473 B.R. 64 (Bankr. S.D.N.Y. 2012) ................................................................ 11

*Yaquinto* v. *Greer*,
    81 B.R. 870 (N.D. Tex. 1988) ..................................................................... 12

## Statutes

11 U.S.C. § 105(a) .................................................................................. 2

11 U.S.C. § 362(a) ............................................................................... 1, 10

11 U.S.C. § 363(b) .................................................................................. 2

11 U.S.C. § 541(a)(1) ........................................................................... 2, 3, 11

11 U.S.C. § 541(a)(1) ............................................................................... 10

11 U.S.C. § 1107(a) ................................................................................. 4

11 U.S.C. § 1108 ................................................................................... 4

## Other Authorities

Fed. R. Bankr. 7001 ................................................................................ 17

SVB Financial Group, debtor and debtor-in-possession (the "Debtor"), hereby submits this objection (the "Objection") to the Motion of the Federal Deposit Insurance Corporation as receiver for Silicon Valley Bank's ("FDIC-R") for an Order to Establish a Tax Refund Escrow Account (the "Motion"), filed in the above-captioned action, and states as follows:

### Preliminary Statement

1. On March 10, 2023 (the "Closure Date"), Silicon Valley Bank was closed on the order of the California Department of Financial Protection and Innovation ("DFPI") and on the same day DFPI asked FDIC-R to step in to serve as receiver of Silicon Valley Bank. The closure of Silicon Valley Bank, the Debtor's largest asset, constituted, at the time, the second largest bank failure in U.S. history. On March 17, 2023 (the "Petition Date"), the Debtor commenced this Chapter 11 case.

2. Since the Closure Date, FDIC-R has repeatedly and intentionally frustrated the Debtor's efforts to obtain access to its books, records and other material assets that were in the possession of Silicon Valley Bank, then were in the possession of Silicon Valley Bridge Bank, N.A. (a creation of FDIC-R) ("Bridge Bank") and now are either in the possession of FDIC-R or First Citizens Bank & Trust Company ("First Citizens"), which purchased substantially all of the legacy Silicon Valley Bank assets from Bridge Bank. Since the Petition Date, such actions of FDIC-R have constituted repeated violations of the automatic stay pursuant to section 326(a), title 11, United States Code (the "Automatic Stay" and "Bankruptcy Code", respectively). By its Motion, FDIC-R now boldly seeks the establishment of an escrow arrangement relating to tax refund checks, which were intercepted by FDIC-R in violation of the Automatic Stay and potentially applicable criminal law, as well as all future tax refunds to which the Debtor has rights.

3.      The Debtor understands that the U.S. Government and various state and local taxing authorities have issued tax refund checks to, and in the name of, the Debtor. In particular, the Debtor understands that at least five checks have been mailed to the Debtor's former business address and are being wrongfully withheld by or at the direction of FDIC-R. One of those checks is the following:



4.      Despite the fact that this and four other checks were addressed to the Debtor, and sent in a manner that clearly identified these items as communications to (and frankly checks payable to) the Debtor, FDIC-R authorized the envelopes to be opened and illegally took possession of the checks. These actions violated the Automatic Stay and potentially violated applicable criminal law.

5.      With the Motion, FDIC-R submits to and invokes the jurisdiction of this Court seeking to have the five tax refund checks already received, and any additional tax refunds to which the Debtor may be entitled in the future (the "Refunds") placed into an escrow account under this Court's supervision. In the Motion, FDIC-R seeks relief under 11 U.S.C. §§ 105(a),

363(b) and 541(a).  The Refunds already received and that will be received in the future undoubtedly constitute property of the estate.  The Refunds already received must be promptly turned over to the Debtor.  The Refunds—and all mail addressed to the Debtor—received in the future must be delivered immediately and unopened to the Debtor.

6.      FDIC-R—without citing any applicable authority—asks the Court to issue an affirmative injunction placing all Refunds—including those that may be issued in the future—in escrow.  FDIC-R claims an equitable interest in some portion of the Refunds pursuant to the Amended Tax Allocation Agreement, effective as January 1, 2016 between the Debtor and Silicon Valley Bank ("Tax Allocation Agreement" or "Agreement"), a contract that the Debtor has neither yet assumed nor rejected in this proceeding, and in any event would give FDIC-R, at most, rights as a creditor to be assessed and adjudicated by this Court alongside those of other creditors of the Debtor's estate.

7.      This request is the latest in a series of improper steps FDIC-R has taken to wrongfully withhold property of the estate, disrupt the ongoing operations of the Debtor's businesses, and require the Debtor to seek funding at great expense while it withholds the Debtor's assets.  The FDIC-R's ham-fisted authoritarianism should not be allowed to continue.

8.      FDIC-R offers no explanation for why this relief is necessary or justified beyond the suggestion that, in FDIC-R's view, some portion of the Refunds are owed to Silicon Valley Bank.  As explained below, FDIC-R is not entitled to the relief it requests for four independent reasons.

9.      *First*, the Refunds constitute property of the Debtor's estate under section 541(a) of the Bankruptcy Code.  The Refunds must be delivered to the Debtor without any

interference by any third party, including without limitation, FDIC-R. FDIC-R's novel suggestion that the Refunds should instead be placed in escrow lacks any justification.

10.    *Second*, FDIC-R's request is inconsistent with the Tax Allocation Agreement, which establishes procedures for allocating tax refunds and for distributing them. FDIC-R offers no explanation as to why it is not bound by the terms of the Tax Allocation Agreement as receiver of Silicon Valley Bank.

11.    *Third*, FDIC-R willfully violated the Automatic Stay, engaging in impermissible self-help, including by instructing First Citizens to withhold the Refunds. If FDIC-R had not violated the Automatic Stay and First Citizens had simply turned over the Refunds to the Debtor, the Motion would be unnecessary. FDIC-R should not be rewarded for its facially unlawful and inequitable conduct, which is sufficient grounds in itself to deny FDIC-R's Motion.

12.    *Fourth*, the Motion is procedurally defective because the sweeping injunctive relief it seeks—directing the disposition of all future tax refunds—is only available through an adversary proceeding.

## Background

13.    On the Petition Date, the Debtor filed with the United States Bankruptcy Court for the Southern District of New York (the "Court") a voluntary petition for relief under the Bankruptcy Code (the "Chapter 11 Case"). The Debtor continues to operate its businesses and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

14.    Prior to March 10, 2023, the Debtor's primary businesses and operations were comprised of Silicon Valley Bank, a state-chartered bank; SVB Capital, a venture capital and credit investment platform that focuses on funds management; and SVB Securities LLC, an

investment bank. (ECF No. 21, at pp. 3-5 ¶¶ 6-12.) Silicon Valley Bank directly employed all personnel providing services to the Debtor via intercompany services arrangements. Silicon Valley Bank was also the custodian of most of the books, records, and other data related to the Debtor's business. (*Id.* at p. 4 ¶ 9.)

15.    On the Closure Date, DFPI closed Silicon Valley Bank and appointed FDIC-R as receiver. (*Id.* at pp. 4-5 ¶ 10.) FDIC-R later entered into an agreement with First Citizens to purchase substantially all of Silicon Valley Bank's assets. First Citizens now occupies most of the properties leased by the Debtor and has possession of the vast majority of the Debtor's documents and information needed to carry on the Debtor's business operations and satisfy its disclosure obligations in this proceeding.

16.    The Debtor also maintained its main bank accounts at Silicon Valley Bank. Following the Closure Date, FDIC-R transferred substantially all of Silicon Valley Bank's assets to the FDIC-R-operated Bridge Bank on March 12, 2023. (*Id.*)[2] When Bridge Bank opened on March 12, 2023, the Debtor had at least three accounts at Bridge Bank that had previously been maintained at Silicon Valley Bank (the "Bank Accounts"). (ECF No. 21 at pp. 18-19 ¶¶ 2-4.) On March 15 and 16, 2023, the Debtor successfully initiated multiple wire transfers from its' accounts at Bridge Bank to various external recipients. (Declaration of James L. Bromley in Support of Debtor's Objection, dated May 11, 2023 ("Bromley Decl.") ¶¶ 2-3.) However, on the evening of March 16, 2023, certain other wire transfers that were properly initiated did not clear and the Debtor's representatives were informed by Bridge Bank representatives that FDIC-R had taken steps to limit access to the Debtor's accounts at Bridge

---

[2]    *See* Press Release, FDIC, *FDIC Acts to Protect All Depositors of the former Silicon Valley Bank, Santa Clara, California* (Mar. 13, 2023), https://www.fdic.gov/news/press-releases/2023/pr23019.html.

Bank. (*Id.* ¶ 4.) The Debtor was also informed that FDIC-R had directed one or more Bridge Bank employees to contact the recipient banks for certain of the wires that had cleared and falsely inform them that the wires had been initiated in error and should be canceled. (*Id.* ¶ 5.) The balances of the Debtor's bank accounts at Bridge Bank totaled approximately $1.93 billion as of March 16, 2023, when the Debtor lost access to its accounts (the "Bank Account Funds"). (ECF No. 43 ¶ 3 & Ex. A.)

17.    Further, certain amounts from the Debtor's accounts at Bridge Bank have apparently been swept or otherwise moved by or at the direction of FDIC-R, including on or after the Petition Date. For example, on March 16, 2023, $18,969,270.57 was wired from one of the Debtor's Bridge Bank's accounts to an unknown account with a transaction description labeled "Per FDIC Instructions" without authorization from, or notice given to, the Debtor. (ECF No. 43 ¶ 3.) The Debtor also learned that on March 17, 2023, after the Chapter 11 Case was initiated, FDIC-R directed the transfer of $2 million from another of the Debtor's Bridge Bank accounts. (Bromley Decl. Ex. B, at 32:23-33:1; *see* ECF No. 41 ¶ 6 n.3 (Bridge Bank representing that "[a]pproximately $2 million . . . was transferred to FDIC-R on March 17, shortly after the Debtor filed its Chapter 11 petition").) Bridge Bank also represented to the Court that FDIC-R caused Bridge Bank to transfer the Debtor's deposits to FDIC-R, and therefore the Bank Accounts have a zero balance as of March 21, 2023. (ECF No. 41 ¶ 6.) While FDIC-R claims that it "did not 'sweep'" any of the Bank Account Funds (ECF No. 145, at 2), and that those funds "remained at the receivership" as "[g]eneral ledger account entries" (Bromley Decl. Ex. C, at 41:1-17), FDIC-R has failed to provide any actual records to support these assertions or to explain the transfer activity described above.

18.     Although FDIC announced to the world on March 13, 2023, that "[a]ll depositors of [Silicon Valley Bank] will be made whole,"[3] and has acknowledged in this proceeding that it will honor the full amount of the Debtor's deposit claim, FDIC-R has refused to allow the Debtor to access its deposits because FDIC-R may have theoretical setoff rights against the Debtor that justify withholding these funds. (*See* ECF No. 33 ¶¶ 16-17, 33-34.) FDIC-R's Statement as Receiver for Silicon Valley Bank Pursuant to the Court's Direction at the April 26, 2023 Hearing (ECF No. 145), however, makes clear that FDIC-R does not have any actual setoff claims (the "FDIC-R Statement"). Indeed, the FDIC-R Statement does not identify a single claim FDIC-R might have against the Debtor to justify withholding access to the Debtor's deposits. Rather, the FDIC-R Statement simply states that law governing setoff exists.

19.     Even if FDIC-R has some theoretical right of setoff, it cannot justify FDIC-R's seizure of $2 billion in the Debtor's accounts. No right of setoff in unlimited amounts exists under law. Even if specific claims in specific amounts had been identified by FDIC-R, they could, to the extent they justified setoff at all, only justify at most setoff proportionate to the claims. But without identification of the specific claims, the legal and factual basis for those claims, and the amount of those claims, no setoff is permissible.

20.     FDIC's claims to withhold the tax refund checks issued in the name of the Debtor are equally spurious. On April 19, 2023, the Debtor learned that First Citizens received a tax refund check from the United States Treasury (the "UST Refund Check", and together with other checks held by or at the direction of FDIC-R, the "Refund Checks"), made out to the

---

[3]     Press Release, FDIC, *FDIC Acts to Protect All Depositors of the former Silicon Valley Bank, Santa Clara, California* (Mar. 13, 2023), https://www.fdic.gov/news/press-releases/2023/pr23019.html.

Debtor in the Debtor's name and addressed to the Debtor. (Bromley Decl. ¶ 6.) An image of the UST Refund Check appears above at paragraph 3.

21.    While the UST Refund Check was plainly addressed to the Debtor and should have been promptly forwarded to the Debtor—unopened—the Debtor learned that First Citizens instead informed FDIC-R about the contents of the Debtor's mail and the existence of the check, and that FDIC-R instructed First Citizens to withhold this mail (including the UST Refund Check itself) from the Debtor. (*Id.*)

22.    That same day, immediately upon being informed of this, counsel for the Debtor emailed counsel for FDIC-R about this most recent instance of obstructionism, explaining that FDIC-R's instruction to First Citizens constituted a violation of the Automatic Stay and requesting that FDIC-R reverse the instruction immediately. (*Id* ¶ 7.)

23.    Two days later, on April 21, 2023, counsel for FDIC-R responded and refused to comply with the Debtor's demand. (*Id.* ¶ 8.) FDIC-R claimed it is entitled to a portion of the tax refund proceeds pursuant to the Tax Allocation Agreement. (*Id.*) FDIC-R said it would be willing to discuss placing the Refunds in escrow, but refused to turn over the Refund Checks or any portion of the proceeds to the Debtor. (*Id.*) FDIC amplified its violation of the Automatic Stay by not only refusing to turn the Refund Check over but may have committed a crime directing that the Debtor's mail be opened or retained to then take possession of the Refund Checks. *See* 18 U.S.C. § 1708.

24.    The Refund Checks comprise five checks amounting to $10,752,216.15, total, each received by First Citizens or FDIC-R after the Petition Date and on or before April 21, 2023. A detailed schedule of the information FDIC-R has provided regarding the Refund Checks is listed in the table below. (*See* Bromley Decl. ¶ 8.) The Debtor currently anticipates

that it will receive approximately $291 million in additional tax refunds that it is owed. (*Id.* ¶ 11.)

| Taxing Authority | Payee Entity | Amount |
|---|---|---|
| 2021 Illinois | Silicon Valley Bancshares & Subsidiaries[4] | $4,824,228.06 |
| 2021 Rhode Island | SVB Financial Group | $1,350,312.10 |
| 2021 Portland Income Tax | SVB Financial Group & Subsidiaries | $8,000.00 |
| 2021 IRS Form 1042 refund | Silicon Valley Bank | $336.01 |
| 2018 IRS | SVB Financial Group | $4,569,339.98 |

25.    FDIC-R's interception of the Debtor's mail in willful violation of the Automatic Stay is just the latest instance of inappropriate conduct by FDIC-R. In addition to the improper withholding of the Debtor's $2 billion in deposits based upon an unspecified and unidentified right of setoff,[5] FDIC-R has obstructed the Debtor's access to its most basic financial records such that the Debtor has had to request an extension to file required schedules because it has been denied the records to do so. (*See* ECF No. 101 ¶ 8.)[6]

---

[4]    Silicon Valley Bancshares is the name under which the Debtor was originally incorporated. (Bromley Decl. ¶¶ 12-13 & Ex. D.)

[5]    As referenced above, FDIC-R has stated publicly and informed the Court that FDIC will fully honor the Debtor's deposits subject to any valid right of setoff. Although FDIC-R was ordered by the Court to identify the basis for its setoff and refusal to provide the Debtor access to the $2 billion in its accounts, FDIC-R's filing on May 3, 2023 does not identify the factual basis for any claim of setoff much less the amount of any such claim, and therefore does not provide any justification for FDIC-R's continued failure to pay the balance in those accounts to the Debtor. Given current interest rates, interest on the Debtor's deposits alone could largely if not completely fund administration of the Debtor's estate.

[6]    FDIC-R has also repeatedly obstructed the Debtor's ability to comply with its obligations in the Chapter 11 Case. Silicon Valley Bank was the custodian to most of the Debtor's business records, and following the Closure Date the Debtor lost access to these records. (ECF No. 21, at p. 4 ¶ 9.) The Debtor was forced to seek an extension of time to file its Schedule of Financial Affairs as a result of its inability to access required information, which has in large part been caused by FDIC-R's requirement that it approve the release of any information to the Debtor, including information that is unquestionably the Debtor's information and in which neither Silicon Valley Bank nor FDIC-R has any rights. (*See* ECF No.

26.     On May 3, 2023, FDIC-R filed the instant Motion, seeking an order that the Refund Checks be placed in escrow, rather than be turned over to the Debtor, and that they not be removed from escrow except by court order or by consent of FDIC-R and the Debtor. (*See* ECF No. 146-1 ("Proposed Order") ¶¶ 2-5.)  FDIC-R also seeks an order requiring that all future Refunds received by FDIC-R, First Citizens or the Debtor be placed in escrow as well. (*Id.*)

## **Argument**

### I.      **The Requested Relief Should Be Denied Because It Conflicts With the Debtor's Rights Pursuant to the Bankruptcy Code.**

27.     FDIC-R violated the Debtor's statutory rights.  FDIC-R is not entitled to the relief it requests because it conflicts with the normal operation of the Bankruptcy Code and the Debtor's rights thereunder.  When the Debtor filed its Chapter 11 Case, the Automatic Stay took effect, prohibiting anyone from engaging in "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).  Bankruptcy Code section 542(a) imposed an affirmative obligation on anyone "in possession, custody, or control, during the case, of [property of debtor's estate], [to] deliver [it] to the [debtor]."  11 U.S.C. § 542(a); *see Brown* v. *Pyatt (In re Pyatt)*, 486 F.3d 423, 427 (8th Cir. 2007).

28.     The Refund Checks were all made out to the Debtor (or the Debtor's subsidiaries) and addressed to the Debtor.  (Mot. ¶¶ 16, 19.)  Even ignoring the fact that it is unlawful to withhold (much less open) someone else's mail, and that the Debtor had a contractual right to receive the Refund Checks, when First Citizens came into possession of the

_____

101 ¶¶ 6-10.)  As a result, there are requests for even the most basic information that have gone unfulfilled for weeks, or even months.

Refund Checks, to forward them to the Debtor as property of the Debtor's estate. *See In re Intelligent Direct Mktg.*, 518 B.R. 579, 590 (E.D. Cal. 2014) ("Tax refunds arising from pre-petition earnings or losses are generally considered property of the bankruptcy estate . . . ."). FDIC-R's instruction to First Citizens not to deliver the Refund Checks, and its subsequent refusal to release the Refund Checks to the Debtor, violated the Automatic Stay and is void. *Cf. In re McCann*, 537 B.R. 172, 180 (Bankr. S.D.N.Y. 2015) ("By possessing and refusing to return [property of debtor's estate to debtor], [defendant] is clearly exercising control over property of the estate, in violation of [the automatic stay]. Any actions taken in violation of the stay are void and without effect."); *In re Velichko*, 473 B.R. 64, 68 (Bankr. S.D.N.Y. 2012) (concluding party violated automatic stay by placing conditions on turnover of estate property in its possession).

29.    FDIC-R cites no authority for the novel proposition that, instead of turning over property to the Debtor, the Refunds should be placed in escrow and out of the Debtor's reach. The three cases FDIC-R cites all involve situations where both parties agreed that the funds should be placed in escrow. (*See* Mot. ¶ 24.) This Debtor does not consent. While FDIC-R asserts that it has an equitable interest in some portion of the Refunds, that in no way justifies its conduct or the present Motion. FDIC-R's interest, if any, can and will be adjudicated by the Court in due course.

30.    Bankruptcy Code section 541(a) makes clear that the Debtor's estate includes "all legal or equitable interests" in property. 11 U.S.C. § 541(a)(1). FDIC-R concedes that the Debtor has legal title to the physical Refund Checks, and both legal and equitable title to some portion of the Refunds. (Mot. ¶¶ 16, 19.) That is sufficient, at a minimum, to confer a possessory interest in the Refund Checks themselves, particularly given the Debtor's clear contractual rights and authority.

-11-

31.     Consistent with this reasoning, courts have held that the fact a debtor lacks an equitable interest in some portion of property does not undermine the debtor's right to have that property turned over as part of the debtor's estate. *See Ga. Pac. Corp.* v. *Sigma Serv. Corp.*, 712 F.2d 962, 967-68 (5th Cir. 1983) ("Even if all or part of this sum were subject to a 'constructive trust' in favor of [a third-party], [Debtor] had a 'legal' interest in the property so impressed . . . was thus property of the estate, [and is] required to be turned over to it . . . ." (internal citations omitted)); *In re Operation Open City, Inc.*, 148 B.R. 184, 192 (Bankr. S.D.N.Y. 1992), *aff'd*, 170 B.R. 818 (S.D.N.Y. 1994) ("[R]egardless of whether the Debtor is entitled to all legal and equitable rights in the Disputed Funds or merely holds the Funds in trust for the benefit of unpaid subcontractors, the Disputed Funds are property of the Debtor's estate."); *Yaquinto* v. *Greer*, 81 B.R. 870, 874-78 (N.D. Tex. 1988) (finding that check payable to the debtor was included in the bankruptcy estate and resulting funds were subject to turnover even if the identity of the party ultimately entitled to the funds was in dispute); *see also Kitchen* v. *Boyd (In re Newpower)*, 233 F.3d 922, 931 (6th Cir. 2000) ("[W]ith respect to items debtor obtained with the embezzled funds, while debtor did not obtain equitable title to these proceeds, he did obtain legal title; all that is necessary to include those assets in the bankruptcy estate."). The Court should reject the requested relief because it is inconsistent with the Debtor's statutory rights under the Bankruptcy Code.

## II.     FDIC-R Violated the Automatic Stay by Violating the Debtor's Rights Under the Tax Allocation Agreement.

32.     FDIC-R's failure to comply with the framework set forth in the Tax Allocation Agreement is itself a violation of the Automatic Stay. FDIC-R's sole basis for wrongfully obstructing delivery of and seizing the Refund Checks is its belief that, under the terms of the Tax Allocation Agreement, FDIC-R may have an equitable interest to some portion

-12-

of the Refund Checks.  But FDIC-R then wholly ignores the framework in the Tax Allocation

Agreement for the distribution of tax refunds, while offering no reason why the Court should

displace or modify the rights established by the Debtor and the former Silicon Valley Bank under

that Agreement.  Until such time as the Debtor assumes or rejects the Tax Allocation Agreement

under section 365 of the Bankruptcy Code, it "control[s] the members' rights" to any refund, full

stop.  *In re First Cent. Fin. Corp.*, 269 B.R. 481, 490 (Bankr. E.D.N.Y. 2001), *subsequently*

*aff'd*, 377 F.3d 209 (2d Cir. 2004).

33.    The Tax Allocation Agreement, as one might, expect, has a clear

allocation procedure.  The Agreement explains that, "[i]f Bank would be entitled to a refund of

Federal corporate income tax if filed a separate Federal income tax return, Parent shall pay to

Bank that sum which shall result from the calculation required by paragraph II." (ECF No. 167-

1 ("Tax Allocation Agreement") § III.3.)  The Agreement further states that this is the <u>exclusive</u>

means to receive payment for a tax refund, leaving no room for the kind of self-help FDIC-R

undertook here.  (*See id.* § III.4 ("With the exception of payment provided for under

subparagraphs 2 and 3 of this paragraph III, neither Parent or Bank shall pay or credit any

amount to the other hereunder . . . .").)  Thus, while the Agreement contemplates a circumstance

where Bank (and, now, FDIC-R) <u>may</u> have a right to payment of a <u>portion</u> of a tax refund, the

same paragraph confirms that any refund check "shall be held in trust <u>by Parent</u>," and Bank's

portion will be "forwarded" to Bank by "Parent." (*Id.* § I.6 (emphasis added).)  Neither the

former Silicon Valley Bank, nor First Citizens, nor FDIC-R has any right to exercise any control

over this Debtor's property, or to do anything with it other than to hand it over to the Debtor.

34.    By the plain terms of the Agreement, it is the Debtor's right and

responsibility to receive and allocate any tax refund in an appropriate manner.  The Agreement

provides that "Parent shall resolve, in its reasonable discretion, any computational or other issue not specifically addressed." (*Id.* § II.5 (emphasis added).) The Agreement thus affords the Debtor the opportunity to exercise the substantial discretion it is vested with in calculating and apportioning any refund payment.

35.     The requested relief would both violate the Tax Allocation Agreement and grant FDIC-R rights that are inconsistent with the Agreement, in effect by providing FDIC-R with a veto right over the Debtor's Refunds. (*See* Proposed Order ¶¶ 4-5.) Not only does such a veto power—and the requested relief more generally—appear nowhere in the Tax Allocation Agreement, but it also conflicts with the substantial discretion afforded to the Debtor pursuant to the Agreement. (*See* Tax Allocation Agreement § II.5.) Accordingly, FDIC-R's Motion must be denied. *See In re AMR Corp.*, 485 B.R. 279, 294 (Bankr. S.D.N.Y.) ("Courts have consistently held that contract rights are property of the estate, and that therefore those rights are protected by the automatic stay" (quotations omitted)), *aff'd*, 730 F.3d 88 (2d Cir. 2013).

## III.    The Requested Relief Should Be Denied In Light of FDIC-R's Willful Violation of the Automatic Stay.

36.     Even if FDIC-R had a valid basis to request that the funds be placed in escrow, FDIC-R waived any entitlement to such relief through its willful violation of the Automatic Stay. FDIC-R's instruction to First Citizens prohibiting it from forwarding the Debtor the Refund Checks violated the Automatic Stay both by exercising impermissible control over the property of the Debtor's estate, *see Small Bus. Admin.* v. *Rinehart*, 887 F.2d 165, 168 (8th Cir. 1989) ("[A] governmental agency violates the automatic stay when it 'holds' or 'freezes' payments the debtor is otherwise entitled to receive."), and by derogating the Debtor's contractual rights under the Tax Allocation Agreement, *see In re AMR Corp.*, 485 B.R. at 294.

37.     Although the "mere retention of estate property after the filing of a bankruptcy petition does not violate" the Automatic Stay, *City of Chicago* v. *Fulton*, 141 S. Ct. 585, 592 (2021), that is not what FDIC-R has done here. Unlike the City of Chicago's failure in that case to return a previously impounded car, FDIC-R affirmatively intercepted and instructed a third party, First Citizens, to deliver the Refund Checks to FDIC-R and not to deliver them to the Debtor, to whom they were addressed. As a court in this district has observed, *Fulton*'s rule regarding mere possession of property in one's possession prior to the inception of the Automatic Stay is inapplicable where, as here, a party "did more than merely retain funds" by "actively execut[ing] a postpetition setoff." *In re Arcapita Bank B.S.C.(c)*, 648 B.R. 489, 502-03 (Bankr. S.D.N.Y. 2023).

38.     FDIC-R's continued refusal to withdraw its instruction to First Citizens, even after the Debtor requested it do so on multiple occasions, establishes its violation was willful. *See In re Miszko*, 627 B.R. 809, 819 (Bankr. S.D.N.Y. 2021) ("[T]he creditor has a duty to undo actions taken in violation of the automatic stay. Failure to undo a technical violation may elevate the violation to a willful one." (quoting 3 Collier on Bankruptcy ¶ 362.12[2] (16th ed. 2021))).

39.     FDIC-R attempts to justify its refusal to release the Refund Checks on the grounds that it owns a portion of the Refunds. Whatever merit this argument might have (and as explained above, it has none) is undermined by FDIC-R's Automatic Stay violation. The kind of self-help FDIC-R has engaged in—directing a third party to withhold property of the Debtor's estate in violation of the Automatic Stay because FDIC-R claims an equitable interest in the property—is the very kind of conduct the Automatic Stay is designed to prevent. *See In re Congregation Birchos Yosef*, 535 B.R. 629, 635 (Bankr. S.D.N.Y. 2015) ("Congress intended in

-15-

§ 362 to prevent self-help, or shooting first and aiming later"); *In re McCann*, 537 B.R. at 180 ("The automatic stay ensures that the remainder of Congress' statutory scheme can be effectuated by preserving estate assets. . . . The Bankruptcy Code does not permit a party to engage in 'self-help' in derogation of the stay."). Having violated the Automatic Stay, FDIC-R may not now come to the Court in equity and ask for extraordinary relief. *See In re Fugazy Exp., Inc.*, 982 F.2d 769, 776 (2d Cir. 1992) ("Judicial toleration of an alternative procedure of self-help and post hoc justification would defeat the purpose of the automatic stay." (quoting *In re Computer Communications, Inc.*, 824 F.2d 725, 731 (9th Cir. 1987)); *cf. In re Operation Open City, Inc.*, 148 B.R. at 194 ("[I]n the exercise of its discretion a 'bankruptcy court should deny a setoff to those creditors who violate the automatic stay'" (quoting *Blava In–Line, Inc.* v. *Midlantic National Bank/North (In re Blava In–Line, Inc.)*, 133 B.R. 33, 36 (Bankr. S.D.N.Y. 1991)).

40.     The inequity of FDIC-R's conduct is acute. The only reason FDIC-R is filing this Motion is because it has refused to comply with the Automatic Stay. Had it turned over the Refund Checks as it is obligated to do, FDIC-R would be compensated in due course: either by the Debtor pursuant to the Tax Allocation Agreement or, if the Debtor repudiates that agreement, by filing a claim with this Court. Granting FDIC-R the relief it requests would reward FDIC-R's decision to circumvent these procedures, violating the "foundational principle" of equity that "[i]t would be inequitable that [a wrongdoer] should make a profit out of his own wrong." *Liu* v. *Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1943 (2020) (quoting *Root* v. *Railway Co.*, 105 U.S. 189, 207 (1882)).

## IV.    The Requested Relief Should Be Denied as Procedurally Improper.

41.     FDIC-R's motion is also procedurally defective. "A proceeding to obtain an injunction, however, must be brought as an adversary proceeding pursuant to Federal Rule of

Bankruptcy Procedure 7001(7) and a showing of irreparable harm must be made. 'Courts have been near universal in reversing injunctions which have been issued without compliance with Rule 7001.'" *In re Saint Vincent's Cath. Med. Centers of New York*, 445 B.R. 264, 270 (Bankr. S.D.N.Y. 2011) (internal citations omitted) (quoting 2 Collier on Bankruptcy ¶ 105.04 (16th ed.)), *aff'd sub nom.*, 581 F. App'x 41 (2d Cir. 2014).

42.    FDIC-R seeks a sweeping injunction that would prohibit the Debtor from accessing not only the Refund Checks in FDIC-R's or First Citizens' possession, but also the approximately $291 million in future refunds the Debtor expects to receive. (*See* Bromley Decl. ¶ 11.) FDIC-R was required to file an adversary proceeding to seek such an injunction, but has failed to do so. *See* Fed. R. Bankr. 7001(7). FDIC-R also has not even mentioned, let alone attempted to satisfy, the standard to obtain such an injunction, including the requirement that it show it will be irreparably harmed if one is not granted and has a likelihood of success on the merits. Nor is there any reason to believe FDIC-R will be irreparably harmed if the Refund Checks are turned over to the Debtor, as FDIC-R will be fully able to file a claim in this Court to obtain any funds to which it is entitled. This procedural defect is alone sufficient grounds to deny FDIC-R's Motion.

## Conclusion

WHEREFORE, the Debtor respectfully requests that the Court deny the Motion.

Respectfully submitted,

Dated: May 11, 2023                    */s/James L. Bromley*

New York, New York

_____

James L. Bromley
Andrew G. Dietderich
Christian P. Jensen
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: bromleyj@sullcrom.com
       dietdericha@sullcrom.com
       jensenc@sullcrom.com

*Proposed Counsel for the Debtor
and Debtor-in-Possession*