| | |
|---|---|
| WILLIAM K. HARRINGTON<br>UNITED STATES TRUSTEE<br>Department of Justice<br>Office of the U.S. Trustee<br>Alexander Hamilton U.S. Custom House<br>One Bowling Green, Rm. 534<br>New York, NY 10004<br>(212) 510-0500<br>By:    Annie Wells, Esq.<br>         Andrea B. Schwartz, Esq.<br>         Trial Attorneys | <u>Hearing Date and Time:</u><br>August 22, 2023, 11:00 a.m.<br><u>Related to:</u><br>ECF No. 442 |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SVB FINANCIAL GROUP,<br><br>                  Debtor.[1] | Chapter 11<br><br>Case No. 23-10367 (MG) |

**OBJECTION OF THE UNITED STATES TRUSTEE TO DEBTOR'S MOTION FOR ENTRY OF ORDER AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO IMPLEMENT A KEY EMPLOYEE INCENTIVE PLAN**

TO:    THE HONORABLE MARTIN GLENN,
          CHIEF UNITED STATES BANKRUPTCY JUDGE:

William K. Harrington, the United States Trustee for Region 2, hereby submits this objection (the "Objection") to the Debtor's Motion (the "KEIP Motion") for Entry of an Order Authorizing, But Not Directing, the Debtor to Implement a Key Employee Incentive Plan (the "KEIP") [ECF No. 442]. In support thereof, the United States Trustee respectfully states as follows:

---

[1] The last four digits of SVB Financial Group's tax identification number are 2278.

1

**PRELIMINARY STATEMENT**

On March 10th of this year, the California Department of Financial Protection and Innovation ("CDFPI") took possession of Silicon Valley Bank ("SVB Bank") due to inadequate liquidity and insolvency, and appointed the FDIC as its receiver (the "FDIC-R"). Substantially all of SVB Bank's assets, including all of its deposits, were subsequently transferred to a newly created, FDIC-R-operated bridge bank, Silicon Valley Bridge Bank ("Bridge Bank"). On March 17, 2023, following the removal of SVB Bank from the control of its parent, SVB Financial Group ("SVBFG" or the "Debtor"), and thereby removing SVB Financial Group's primary operating subsidiary, SVBFG's board of directors voted to file for bankruptcy protection under chapter 11 of the Bankruptcy Code. At the time of the bankruptcy filing, SVBFG's two remaining primary assets were its securities business, which it has now sold in the chapter 11 case, and its capital business, SVB Capital, for which the Debtor has engaged Centerview Partners as its investment banker to similarly explore, among other things, opportunities to sell this business.

By the KEIP Motion, the Debtor seeks this Court's approval to pay between $6.4 million and $12.5 million in bonuses in the next 45 days to nine senior level executives of SVB Capital. Although the Debtor characterizes these bonuses as part of an incentive program, the true purpose of the plan, as evidenced by the Debtor's retention of Centerview Partners who currently is engaged in and accepting bids to sell the capital business, is to keep these KEIP Participants in place so that the value of the business can be maintained and sold to achieve maximum value to the estate. While maximizing value to the estate is an important goal in bankruptcy restructurings, retaining insiders by paying them large bonuses under the guise of an incentive plan that is primarily retentive is not an allowable way to meet this goal. Section 503(c) of the

2

Bankruptcy Code prohibits bonuses to insiders of the Debtor unless the Debtor can meet certain additional requirements, which it cannot in this case. Moreover, regardless of whether the Debtor is able to sell the capital business, it is plain that the payment of large bonuses to insider management executives, many in excess of $1 million, without a plan that firmly ties these substantial compensation awards to the executives' performance is impermissible under the Bankruptcy Code and should not receive this Court's imprimatur.

As discussed in detail below, the KEIP's retentive nature is bolstered by, among other things, metrics (i) that are not particularly rigorous, (ii) the performance of which bear no relation to the KEIP Participants' job functions as senior management level executives, and (iii) that are, at best, vague as to how they would be achieved. By way of example, one of the tasks to be accomplished under the KEIP's Stand-Up Metric to earn nearly $3 million, is that "SVB Capital personnel's electronic devices have been replaced." Such a task is administrative in nature, and plainly not rigorous.

But even if the proposed KEIP is evaluated under Section 503(c)(3), the Debtor has failed to show that the KEIP is justified by the facts and circumstances of the case. The Debtor maintains that the proposed KEIP was developed using the KEIP Participants' aggregate historical incentive compensation, but failed to provide any information as to what those historical compensation figures are, and the extent of any deviations. The Debtor also asserts that the aggregate payments under the KEIP is consistent with other comparative incentive plans. But again, neither the United States Trustee nor the Court will be able to evaluate the reasonableness of the KEIP metrics because the Debtor has not provided the underlying data for the comparative "Peer Group Plans"—such as the industries in which the peer companies

3

operated, how the data was obtained or sourced, what metrics were utilized by the peer group, and what the aggregate and individual compensation awards were for those comparative plans.

For these reasons, as discussed more fully below, the United States Trustee respectfully objects to the KEIP Motion.

**RELEVANT FACTS**

*A.     General Background*

1. On March 17, 2023 (the "Filing Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code §§ 101 *et seq*. (the "Bankruptcy Code") [ECF No. 1].

2. The Debtor continues to operate its businesses and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. On March 28, 2023, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "UCC") pursuant to section 1102 of the Bankruptcy Code [ECF No. 72].

4. At the time of the bankruptcy filing, the Debtor's two remaining primary assets were its securities business, and its capital business, SVB Capital (the Debtor's venture capital and credit investment arm). Pre-petition, SVB Capital was not a formal legal entity but a collection of personnel and funds. Shortly after the Filing Date, First Citizens Bank & Trust Company ("First Citizens") acquired most of the assets and liabilities of Bridge Bank and the former employees of SVB Bank, including the personnel who were performing services for SVB Capital. The Debtor is currently in the process of extracting the SVB Capital business line from First Citizens into a separate stand-alone entity, SVB Capital Management LLC. Since June,

4

efforts have been underway to establish the necessary infrastructure and technological processes for the transfer of requisite data and the SVB Capital personnel, from First Citizens to the Debtor.

5. On June 2, 2023, this Court approved the retention of Alvarez & Marsal North America LLC ("A&M") and the designation of (i) William C. Kosturos as the Debtor's CRO, *nunc pro tunc* to the Filing Date, and (ii) Nicholas Grossi as the Debtor's interim CFO, *nunc pro tunc* to April 20, 2023 [ECF No. 304].

6. On June 8, 2023, the Debtor filed the *Motion for Entry of an Order Authorizing, but not Directing, the Debtor to Implement a Key Employee Retention Plan* (the "KERP Motion") [ECF No. 321].[2] The proposed KERP sought to pay retention awards of an "Allocated Pool" aggregating approximately $3,000,000 on a quarterly basis through year end 2023 (the "Allocated Pool"), as well as a discretionary or "Unallocated" pool of up to $983,000 to 113 employees, of which 95 were employees of SVB Capital. According to the Debtor, the KERP was "in order to attract and retain individuals to the Debtor's key operational roles and to ensure the continuity of the team at SVB Capital through and following the team's transition back to the Debtor[,]" Grossi Supplement ¶ 6.

B. **The KEIP Motion**

7. On July 25, 2023, the Debtor filed the KEIP Motion, seeking the authority, but not the direction, to implement the proposed KEIP. The Debtor developed the KEIP with the assistance of A&M, and in consultation with the former President of SVB Capital, with the

---

[2] The KERP Motion is also supported by the Supplemental Declaration of Nicholas Grossi (the "Grossi Supplement") [ECF No. 408].

5

purported objective of facilitating a stand-up of SVB Capital as a stand-alone legal entity of the Debtor.  *See* KEIP Motion ¶ 13.

8. There are nine KEIP Participants under the KEIP Plan, comprised of the Chief Financial Officer of SVB Capital, the Head of the Debt Platform, the Chief Credit Officer of SVB Capital, as well as four Managing Partners and two Partners.  Subject to the KEIP Participant's continued employment, each participant will be eligible to earn over $6.4 million to $12.5 million in aggregate KEIP awards for Threshold to Stretch levels of performance based on three metrics: (i) Stand Up, (ii) Capital Call Line, and (iii) Expense Reduction.  *See id.* ¶¶ 14-15.

9. Under the Stand-Up Metric, the KEIP Participants are eligible to be paid $2.9 million in the aggregate if all sixteen (16) tasks listed below are accomplished by September 30, 2023:

(1) The SVB Capital payroll process and services for SVB Capital employees are in place;
(2) All SVB Capital personnel have been issued offer letters;
(3) Accounting methodology, procedures and month-end close have been established for SVB Capital and the Debtor;
(4) A cost-allocation methodology has been established between SVB Capital and the Debtor;
(5) SVB Capital personnel's electronic devices have been replaced;
(6) The KEIP Participants have assisted in certain sublease negotiations with First Citizens;
(7) The KEIP Participants have assisted in certain subtenant transitions from First Citizens;
(8) New commercial service agreements required for SVB Capital have been scoped;
(9) Oversight and compliance tools related to the Registered Investment Advisor ("RIA") process have been procured;
(10) Filing requirements for a new RIA for SVB Capital have been completed;
(11) The KEIP Participants have participated in diligence required for new or existing insurance policies;
(12) SVB Capital has established a record retention policy;
(13) The KEIP Participants have established procurement processes, including expense management and an accounts payable system to remit third-party payments;
(14) SVB Capital is wholly prepared and able to receive the transfer of data from First Citizens to the Debtor;

(15) The setup of back-office information technology, applications and systems (e.g., Sharepoint) has been completed with respect to SVB Capital; and

(16) The KEIP Participants have audited the scope and number of data migration files from First Citizens and have confirmed their completeness.

The amounts earned under the Stand-Up Metric do not vary by level. *See id.* ¶¶ 17-19.

10. Under the Capital Call Line Metric, each KEIP Participant will earn an award at end of the third and fourth quarters of 2023 if the average quarterly balance of the SVB Capital call line is no greater than $80 million, $65 million and $50 million, at the Threshold, Target, and Stretch levels, respectively. In addition, if the capital call line is refinanced at anytime with a third party, the KEIP Participants will be paid their capital call award at the Stretch level. The Capital Call Line is a credit facility that the Debtor acquired from a third-party institution for approximately $63 million on March 14, 2023. It is used by funds in the SVB Capital business to advance portfolio investments until amounts can be repaid with capital calls. *See id.* ¶ 22.

11. Under the third metric—the Expense Reduction Metric—the KEIP Participants are eligible to receive approximately $1.4 million in the aggregate if SVB Capital's controllable expense are decreased by 5% and 7.5% at the Threshold level, measured at the end of Q3 and Q4 of 2023, respectively. Like the Stand Up and Capital Call Line Metrics, the awards are conditioned on the KEIP Participant continued employment through the period in which the award is earned. *See id.* ¶¶ 26-30.

## DISCUSSION

**A.    Applicable Legal Standards.**

Section 503 of the Bankruptcy Code governs the allowance of administrative expenses "for actual, necessary costs and expenses of preserving a debtor's bankruptcy estate." 11 U.S.C. § 503(b)(1)(A). The two general overriding policies of Section 503 of the Bankruptcy Code are:

7

(i) to preserve the value of the estate for the benefit of its creditors and (ii) to prevent the unjust enrichment of the insiders of the estate at the expense of its creditors. *See In re J. Reg. Co.*, 407 B.R. 520, 535 (Bankr. S.D.N.Y. 2009) (citing *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1960)). This section was added in 2005 as part of the BAPCPA amendments to curtail "payments of retention incentives or severance to insiders, as well as bonuses granted to other employees without factual and circumstantial justification." *In re J. Reg.*, 407 B.R. at 535. In doing so, Congress imposed significant limits on the payments of retention and incentive bonuses and severance to insiders and on the payments of retention bonuses granted to non-insiders without factual and circumstantial justification. *See id.* Congress intended section 503(c) is to "limit the scope of 'key employee retention plans' and other programs providing incentives to management of the debtor as a means of inducing management to remain employed by the debtor." 4 *Collier on Bankruptcy* ¶ 503.18 (16th ed. 2022); *see also In re AMR Corp.*, 497 B.R. 690, 696 (Bankr. S.D.N.Y. 2013) (noting that the language of Section 503(c) is prohibitive; if payments to insiders do not comply with the applicable 503(c) provisions, they "shall neither be allowed, nor paid").

By enacting the BAPCPA, Congress put into place "a set of challenging standards" and "high hurdles" for debtors to overcome before retention bonuses could be paid. *In re Mesa Air Grp., Inc.,* Case No. 10-10018 (MG), 2010 WL 3810899, *2 (Bankr. S.D.N.Y. Sept. 24, 2010) (citations omitted). Section 503(c) establishes specific evidentiary standards that must be met before a bankruptcy court may authorize payments to an insider to induce such person to remain with a debtor. *See In re Dana Corp.,* 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006) ("*Dana I*"); 11 U.S.C. § 503(c)(1). In particular, under subsection (c)(1), there shall neither be allowed, nor paid—a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for

8

the purpose of inducing such person to remain with the debtors' business, absent a finding by the court based on evidence in the record that:

    (A)    the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

    (B)    the services provided by the person are essential to the survival of the business; and

    (C)    either –

        (i)    the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

        (ii)    if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

11 U.S.C. § 503(c)(1).

Where section 503(c)(1) applies, the transfer cannot be justified solely on the debtor's business judgment. *See In re Borders Grp., Inc.*, 453 B.R. 459, 470-71 (Bankr. S.D.N.Y. 2011); *Dana I*, 351 B.R. at 100; 11 U.S.C. § 503(c)(1). Merely labeling a bonus plan as incentivizing to avoid the strictures of section 503(c)(1) must be viewed with skepticism. *See In re Velo Holdings Inc.*, 472 B.R. 201, 209-10 (Bankr. S.D.N.Y. 2012) ("Attempts to characterize what are essentially prohibited retention programs as incentive programs in order to bypass the requirements of section 503(c)(1) are looked upon with disfavor, as the courts consider the circumstances under which particular proposals are made, along with the structure of the compensation packages, when determining whether the compensation programs are subject to

9

section 503(c)(1)") (internal quotation marks and citations omitted); *Hawker Beechcraft*, 479 B.R. at 313 ("The concern in the type of motion presented ... is that the debtor has dressed up a KERP to look like a KEIP in the hope that it will pass muster under the less demanding 'facts and circumstances' standard in ... § 503(c)(3)."). The burden is on the proponent of a bonus plan to show that the proposed plan is not a retention plan governed by section 503(c)(1). *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012).

### A.      The KEIP is Primarily Retentive.

The KEIP is a disguised retention plan for the nine KEIP Participants. Retention plans usually are intended "to encourage certain crucial employees to remain with the company through a critical, transitional time period when the exact future of the company is unclear and when those employees would be most likely to search for other employment." *In re Brooklyn Hosp. Ctr.*, 341 B.R. 405, 413 (Bankr. E.D.N.Y. 2006) (quoting *In re Georgetown Steel Co.*, 306 B.R. 549, 556 (Bankr. D. S.C. 2004)). That is exactly what we have here – it appears that the KEIP was designed and intended to encourage the Debtor's higher management employees to remain with SVB Capital through a critical bankruptcy period while it is being transitioned into a stand-alone entity, when the exact future and potential sale of SVB Capital is unclear, and when the Debtor most fears that its employees, including the KEIP Participants, may seek other employment." Indeed, the Debtor notes that the President of SVB Capital, who was originally one of the KEIP Participants, has already resigned in July of 2023. The risk of attrition, particularly at the senior management level, and the need to preserve SVB Capital for a potential

10

sale (which sale has been underway since almost the inception of the bankruptcy case)[3], is the backdrop against which the KEIP was developed.

There are other strong indicators that the KEIP is primarily retentive. First, under each of the KEIP metrics, the KEIP Participant's bonus award is conditioned on such participant's continued employment with SVB Capital. *See, e.g.*, KEIP Motion ¶ 15 ("Under the proposed program, the KEIP Participants will be eligible to earn up to three awards on the terms provided herein, in each case subject to the KEIP Participant's continued employment."). Second, the KEIP is structured such that the relevant period for earning the bonus awards tracks the Debtor's timeline for a potential sale of SVB Capital. Historically, the Debtor's incentive compensation opportunities were earned and granted on an annual or long-term basis. *See* KEIP Motion ¶¶ 5-8. Under this proposed KEIP, the metrics and payouts are earned and paid earlier and more frequently, namely at Q3 and Q4 of 2023, which happens to coincide with the Debtor's stated timeline for a possible sale of SVB Capital and/or the formulation of a chapter 11 plan.

Third, as discussed below, the metrics established by the KEIP to "incentivize" performance do not appear to be challenging or rigorous, certainly at least with respect to the Threshold levels (which, for the Stand-Up Metric, is the only level).

B.     *The KEIP Metrics are Not Difficult to Achieve.*

A plan is primarily incentivizing if it presents "targets that are difficult to achieve, forcing the executives to work hard to achieve their bonuses." *In re Aralez Pharmaceuticals, US Inc.*, Case No. 18-12425, 2018 WL 6060356, at *3 (Bankr. S.D.N.Y. Nov. 19, 2018). Here, the

---

[3] *See, e.g.*, 3/21/23 Hr'g Tr. at 69:23-70:6 [ECF No. 94]; *see also* Order Authorizing the Employment of Centerview Partners LLC as Debtor's Investment Banker (listing among the scope of services a potential sale of SVB Capital).

11

"lay-up" nature of the metrics, particularly at the Threshold levels, supports the conclusion that the KEIP is retentive, rather than incentivizing.

Under the Stand-Up Metric, there is only one Threshold level of performance – to wit, the Stand-Up awards of approximately $3 million will be earned if the sixteen identified tasks are accomplished by September 30, 2023. However, there is nothing in the record to support the Debtor's assertion that this award is "difficult to earn." To the contrary, the Debtor concedes that efforts to extract and stand up the SVB Capital segment has been underway for more than 2 months now, since June of 2023, if not earlier. *See, e.g.*, Grossi Supplement ¶¶ 6-7. The Debtor is conspicuously silent as to how many of the 16 identified tasks may have already been accomplished. The tasks themselves do not appear to be particularly challenging to complete, and in some cases, are administrative in nature—for example, replacement of employees' electronic devices, issuing offer letters to SVB Capital personnel, and establishing a record retention policy. Also, the Debtor does not explain how the performance of these tasks will be measured—for example, how are the KEIP Participants to "assist[] in certain sublease negotiations with First Citizens"? Must all nine KEIP Participants participate in such assistance? What does it mean for SVB Capital to be "wholly prepared and able to receive the transfer of data from First Citizens"? Furthermore, the performance of these tasks appears to bear no relationship to the job functions or roles of the KEIP Participants. For example, what role would the Head of the Debt Platform play in the "setup of back-office information technology, applications and systems"?

Under the Capital Call Line Metric, the KEIP Participants stand to be awarded close to $4 million in the aggregate if the Target performance is achieved—that is, the average quarterly balance of the capital line is no greater than $65 million. Again, there is no evidence that this

12

target is particularly challenging .  The Debtor is notably silent as to what the average quarterly or monthly balance is for the current Q3 period, making it nearly impossible to assess the likelihood of meeting this metric.  The Debtor notes that the Capital Line facility was acquired in March for approximately $63 million, which suggests that the target balance of $65 million is not difficult to achieve at all.  Moreover, if at any time the Capital Call line is refinanced by a third party, the KEIP Participants will receive $5.9 million, as if this metric had been met at the Stretch level.  According to the Debtor, there are already discussions underway with nine banks to date, with one potential party reaching a term sheet stage.  That hardly supports the notion that refinancing the Capital Call Line would be a "Stretch."

Lastly, the Expense Reduction Metric is likewise designed to ensure that the KEIP Participants will be eligible to receive at least minimal level bonuses.  To earn the Threshold level payout of nearly $1.4 million, the SVB Capital need only achieve a 5% decrease in controllable expenses (adjusted for costs not allocable to SVB Capital) for the third quarter of 2023.  The Debtor provides no support as to why or how a mere 5% reduction would be a difficult performance goal for the KEIP Participants to attain.  There is no explanation as to what the controllable expenses are.  There is no information as to SVB Capital's average monthly or quarterly expenses, nor any comparative analysis as to SVB Capital's historical costs and expenses, either as a stand-alone business or relative to SVB Bank and the SVBFG enterprise.

In sum, the Debtor has failed to meet its burden of proof that the proposed KEIP is incentivizing, rather than retentive, because, as discussed above, these metrics are simply not difficult to achieve.

**C.      *The KEIP Motion Does Not Meet Section 503(c)(1) Standards.***

Where the KEIP is primarily retentive, it is governed by section 503(c)(1), not section 503(c)(3). Section 503(c)(1) establishes specific and challenging standards that a debtor must satisfy to justify retention bonuses to insiders. *See Dana I*, 351 B.R. at 100; 11 U.S.C. § 503(c)(1). As noted above, the Debtor carries the burden to prove that the proposed KEIP complies with section 503(c)(1). *See Dana I*, 351 B.R. at 100; *Mesa Air Grp.*, 2010 WL 3810899, at *2.

Here, the Debtor does not satisfy the additional requirements under section 503(c)(1). Section 503(c)(1) requires that each insider recipient of the bonus compensation to have a *bona fide* job offer at the same or greater compensation, the services provided by the insider are essential to the survival of the business, and the proposed retention payments are either less than ten times the mean of similar payments made to non-management employees during the calendar year or less than 25% of the amount of any similar payments made in the prior year. 11 U.S.C. § 503(c)(1)(A)-(C). The Debtor has proffered no evidence as to any *bona fide* job offers that any of the nine KEIP Participants have received, let alone the terms and compensation of such offers. Furthermore, neither the KEIP Motion nor supporting declarations contain any information that would allow a determination that the KEIP Participants would not fail the test limiting insider payouts to ten times the average non-insider bonus payout pursuant to section 503(c)(1)(C)(i).

In short, if the KEIP is evaluated under the requirements of section 503(c)(1), as it should be, the Debtor has failed to carry its burden, and it must be denied. *See, e.g.*, *In re Aralez Pharmaceuticals, US Inc.*, 2018 WL 6060356, at *3 ("The Debtors do not attempt to satisfy the evidentiary requirements of this section. Thus, if section 503(c)(1) applies, the KEIP Motion must be denied.").

14

D.     *The KEIP Also Does Not Satisfy Section 503(c)(3)*

Even if this Court finds that the KEIP is not primarily retentive, the KEIP is still deficient. Section 503(c)(3) requires that any compensation outside the ordinary course of business be justified by the facts and circumstances.[4] 11 U.S.C. § 503(c)(3). In evaluating whether a proposed bonus plan is justified pursuant to Section 503(c)(3), bankruptcy courts have generally utilized the factors set forth in *In re Dana Corp.*, 35 B.R. 567, 576 (Bankr. S.D.N.Y. 2006) ("*Dana II*"):

- Whether there is a reasonable relationship between the plan proposed and the results to be obtained (i.e., whether the key employee will stay for as long as it takes for the debtor to reorganize or market its assets, or whether the plan is calculated to achieve the desired performance);
- Whether the cost of the plan is reasonable within the context of the debtor's assets, liabilities and earning potential;
- Whether the scope of the plan is fair and reasonable or discriminates unfairly;
- Whether the plan is consistent with industry standards;
- Whether the debtor engaged in due diligence related to the need for the plan, the employees that needed to be incentivized, and what types of plans are generally applicable in a particular industry; and
- Whether the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation.

Here, however, many of the factors cannot be meaningfully evaluated or applied to determine the reasonableness of the KEIP—for example: Whether the plan is consistent with industry standards; what types of plans are generally applicable in a particular industry; and whether the cost of the plan is reasonable. These factors cannot be meaningfully evaluated because the Debtor failed to provide any of the underlying analytical data used to formulate the KEIP. The Debtor asserts that in developing the KEIP, A&M reviewed 15 "comparable"

---

[4] Although a number of courts, including this Court, has determined that the standard under Section 503(c)(3) is not different from the business judgment rule under Section 363(b)—*see, e.g.*, *In re Residential Capital, LLC*, 491 B.R. 73, 84 (Bankr. S.D.N.Y. 2013)—these and other courts continue to apply the factors listed by Judge Lifland in Dana II, when determining if the proposed bonus plan and the process for its development meet the standard under Section 503(c)(3).

15

incentive plans. However, A&M did not identify the names of the peer group companies, what industries or businesses the peer companies operated in, nor what the metrics were in these comparative incentive plans. A&M did not provide any details as to the source of the data it collected and considered as part of its Peer Group analysis. A&M has not performed any diligence or analysis on similar KEIPs for companies in the venture capital and investment management industry.

The Debtor also provided no information with respect to the KEIP Participants' historical compensation, which served as the Debtor's basis for sizing the KEIP pool. And although the Debtor maintains that its historical bonus program was no longer incentivizing because the metrics were principally tied to the performance of SVB Bank, such information may nevertheless be useful to compare the costs of past incentive plans relative to the proposed KEIP, both on an aggregate basis and individual participant basis, and to evaluate the propriety of any deviations or unreasonable increases.

Without any of these data points, the reasonableness of the KEIP cannot be fairly determined. The Debtor has not carried its burden of demonstrating that the KEIP is justified.

## CONCLUSION

WHEREFORE, the United States Trustee respectfully requests that the Court deny the KEIP Motion, and grant such other and further relief as is just and proper.

Dated: August 15, 2023
      New York, New York

                                  Respectfully submitted,

                                  WILLIAM K. HARRINGTON
                                  UNITED STATES TRUSTEE, Region 2

                              By:    */s/ Annie Wells*
                                    Annie Wells
                                    Andrea B. Schwartz
                                    Trial Attorneys
                                    U.S. Department of Justice
                                    Office of the United States Trustee
                                    Alexander Hamilton Custom House
                                    One Bowling Green
                                    New York, New York 10004
                                    Telephone: (212) 510–0500