**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

―――――――――――――――――――――――――――― x

In re                                                                    :     Chapter 11
                                                 :

SVB FINANCIAL GROUP,[1]                          :     Case No. 23-10367 (MG)
                                                 :

                   Debtor.                       :

―――――――――――――――――――――――――――― x

## DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF
## <u>REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>

James L. Bromley
Andrew G. Dietderich
Christian P. Jensen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:      (212) 558-4000
Facsimile:      (212) 558-3588
E-mail:         bromleyj@sullcrom.com
                dietdericha@sullcrom.com
                jensenc@sullcrom.com

Dated: February 7, 2024

> THIS IS NOT A SOLICITATION OF VOTES OF ACCEPTANCE OR REJECTION OF
> THE PLAN.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR
> APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.
> ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A
> DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY
> COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT
> TO CHANGE.

**A SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN
SUFFICIENT ACCEPTANCES OF SVB FINANCIAL GROUP'S CHAPTER 11 PLAN.**

---

[1]    The last four digits of SVB Financial Group's tax identification number are 2278.

> **UNLESS EXTENDED BY THE DEBTOR (SUBJECT TO ANY CONSENT RIGHTS OF THE UCC AND THE REQUIRED AD HOC SENIOR NOTEHOLDER PARTIES), THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN TIME, ON APRIL [25], 2024 (THE "VOTING DEADLINE").**
>
> **THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS 4:00 P.M. ON MARCH [15], 2024 (THE "VOTING RECORD DATE").**

> **RECOMMENDATION BY THE DEBTOR**
> **The Restructuring Committee of the Board of Directors of SVB Financial Group has approved the transactions contemplated by the Plan (as defined herein) and believes that confirmation and consummation of the Plan is in the best interests of the Debtor's Estate and Holders of Claims and Interests. Accordingly, the Restructuring Committee of the Board of Directors of SVB Financial Group recommends that all Holders of Claims and Interests whose votes are being solicited submit ballots to accept the Plan.**

**THE RESTRUCTURING COMMITTEE OF THE DEBTOR'S BOARD OF DIRECTORS HAS APPROVED THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN AND THE TRANSACTIONS CONTEMPLATED AND DESCRIBED HEREIN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE CHAPTER 11 PLAN IT DESCRIBES HEREIN. NO PERSON SHOULD USE OR RELY ON THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.**

**THIS DISCLOSURE STATEMENT IS BEING DISTRIBUTED TO PARTIES-IN-INTEREST AS A SETTLEMENT PROPOSAL AND IS THEREFORE SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND OTHER APPLICABLE RULES, AND DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER IN CONNECTION WITH ANY PENDING, THREATENED AND POTENTIAL LITIGATION, ARBITRATIONS OR DISPUTES. THE DEBTOR AND ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS OR INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS OR INTERESTS.**

**IF THE BANKRUPTCY COURT DOES NOT CONFIRM THE CHAPTER 11 PLAN AND/OR THE CHAPTER 11 PLAN DOES NOT BECOME EFFECTIVE, NO PORTION OF THE CHAPTER 11 PLAN, INCLUDING ANY SETTLEMENTS, WILL BECOME EFFECTIVE.**

i

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN AND DOCUMENTS RELATED THERETO, STATUTORY PROVISIONS RELEVANT TO CONFIRMATION OF THE PLAN, EVENTS IN THIS CHAPTER 11 CASE AND FINANCIAL INFORMATION RELATED TO THE DEBTOR, NEWCO AND THE LIQUIDATING TRUST.  ALTHOUGH THE DEBTOR BELIEVES SUCH SUMMARIES ARE FAIR AND ACCURATE, THEY ARE QUALIFIED IN THEIR ENTIRETY BY SUCH DOCUMENTS AND STATUTORY PROVISIONS TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRETY OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.

FACTUAL INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.

THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED MATERIALLY SINCE THIS DISCLOSURE STATEMENT WAS FILED.  SUBJECT TO THE CONSENT RIGHTS SET FORTH IN THE RSA, THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE FINANCIAL PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE DEBTOR'S MANAGEMENT WITH THE ASSISTANCE OF THEIR FINANCIAL AND RESTRUCTURING ADVISORS. THESE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTOR'S CONTROL. THE DEBTOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.  FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED AND/OR MAY

HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

NO PERSON SHOULD RELY ON ANY OTHER INFORMATION THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED BY REFERENCE HEREIN.  THE DEBTOR HAS NOT AUTHORIZED ANYONE TO PROVIDE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.

EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  ANY PERSONS DESIRING ANY SUCH ADVICE OR OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE EXTENT SUCH EXEMPTIONS ARE AVAILABLE.  OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS TO THE EXTENT SUCH EXEMPTIONS ARE AVAILABLE.  IN ACCORDANCE WITH SECTION 1125(e) OF THE BANKRUPTCY CODE, A DEBTOR OR ANY OF ITS AGENTS THAT PARTICIPATES, IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY, OFFERED OR SOLD UNDER THE PLAN, OF THE DEBTOR, OF AN AFFILIATE PARTICIPATING IN A JOINT PLAN WITH THE DEBTOR, OR OF A NEWLY ORGANIZED SUCCESSOR TO THE DEBTOR UNDER THE PLAN, IS NOT LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE OFFER, ISSUANCE, SALE, OR PURCHASE OF SECURITIES.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  ANY REPRESENTATION TO THE

**CONTRARY IS A CRIMINAL OFFENSE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**THE DEBTOR MAKES STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995, AS AMENDED. THE DEBTOR CONSIDERS ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS REPRESENT THE DEBTOR'S ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTOR'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE MATERIALLY DIFFERENT FROM THOSE IT MAY PROJECT, AND THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENT. THE DEBTOR EXPRESSLY CAUTIONS READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF SUCCESS OR THE DEBTOR'S ABILITY TO SATISFY ALL CLAIMS OR INTERESTS TO BE PAID UNDER THE PLAN. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT NEED TO BE CONSIDERED. SEE <u>ARTICLE IX</u> OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM OR INTEREST TO ACCEPT THE PLAN.**

## <u>TABLE OF CONTENTS</u>

Page

**ARTICLE I EXECUTIVE SUMMARY** ....................................................................1
    **A.**    **Purpose of this Disclosure Statement** ..........................................2
    **B.**    **Recovery Analysis and Treatment of Claims and Interests** ...........3
    **C.**    **Voting on the Plan** ....................................................................6
    **D.**    **Confirmation of the Plan** ...........................................................8

**ARTICLE II BACKGROUND** ..........................................................................9
    **A.**    **Overview of the Debtor's Businesses** ...........................................9
    **B.**    **The Debtor's Corporate Structure and Global Operations** ............9
    **C.**    **Summary of the Debtor's Assets and Operations** ........................10
    **D.**    **Liabilities – The Debtor's Prepetition Funded Indebtedness** ........12
    **E.**    **Existing Preferred Stock** .........................................................14
    **F.**    **Existing Common Stock** ..........................................................14
    **G.**    **Factors Leading to the Commencement of This Chapter 11 Case** .....15

**ARTICLE III SIGNIFICANT EVENTS AND INITIATIVES IN THIS CHAPTER
11 CASE** .....................................................................................17
    **A.**    **Commencement of the Chapter 11 Case** ....................................17
    **B.**    **First Day Relief** .....................................................................17
    **C.**    **Appointment of the UCC** ........................................................18
    **D.**    **The Ad Hoc Group of Senior Noteholders** .................................19
    **E.**    **The Ad Hoc Cross-Holder Group** .............................................19
    **F.**    **Retention of Debtor Professionals** ............................................19
    **G.**    **Schedules and Statements and 341 Meeting** ...............................20
    **H.**    **Bar Dates and Claims Process** .................................................20
    **I.**    **Assumption and Assignment of Executory Contracts to FCB and Non-
        debtor Subsidiaries** ...............................................................20
    **J.**    **Investigation of Potential Estate Claims and Causes of Action** ......21
    **K.**    **Claims Against the FDIC** ........................................................22
    **L.**    **SVB Securities Sale** ...............................................................24
    **M.**    **SVB Capital Reorganization and Strategic Alternatives Review** .....25
    **N.**    **The Restructuring Support Agreement** ......................................26

**ARTICLE IV SUMMARY OF THE PLAN** ..........................................................27
    **A.**    **Classification, Treatment and Voting of Claims and Interests** ........28
    **B.**    **The Liquidating Trust** ............................................................30
    **C.**    **Implementation of the Plan** .....................................................40
    **D.**    **Provisions Regarding Governance of NewCo** .............................48
    **E.**    **Executory Contracts and Unexpired Leases** ..............................50
    **F.**    **Provisions Governing Distributions** ..........................................52
    **G.**    **Settlement, Release, Injunction and Related Plan Provisions** ........59
    **H.**    **Conditions Precedent** .............................................................68

v

**ARTICLE V STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE
PLAN**..................................................................................................................**70**
    **A.**    **The Confirmation Hearing**...........................................................**70**
    **B.**    **Confirmation Standards**.............................................................**71**
    **C.**    **Best Interests Test**......................................................................**72**
    **D.**    **Financial Feasibility**.................................................................**75**
    **E.**    **Acceptance by Impaired Classes**...............................................**75**
    **F.**    **Confirmation Without Acceptance by All Impaired Classes**...........**76**
    **G.**    **Valuation**....................................................................................**78**
    **H.**    **Classification**............................................................................**78**

**ARTICLE VI VOTING PROCEDURES** .........................................................**78**
    **A.**    **Parties-in-Interest Entitled to Vote** .........................................**80**
    **B.**    **Classes under the Plan** .............................................................**81**
    **C.**    **Form, Content, and Manner of Notices** .....................................**82**
    **D.**    **Voluntary Releases under the Plan** ...........................................**83**
    **E.**    **Voting Procedures**....................................................................**85**

**ARTICLE VII EFFECT OF CONFIRMATION** ..........................................**88**
    **A.**    **Binding Effect of Confirmation** ...............................................**88**
    **B.**    **Good Faith** ................................................................................**88**

**ARTICLE VIII SECURITIES LAW MATTERS** ........................................**88**
    **A.**    **Bankruptcy Code Exemptions from Registration Requirements** ...**88**
    **B.**    **Private Placement Exemptions** ................................................**91**

**ARTICLE IX CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO
VOTING** ...........................................................................................................**93**
    **A.**    **Certain Bankruptcy Law Considerations**................................**94**
    **B.**    **Risks Related to the Debtor's Ongoing Operations during the Chapter
11 Case** .....................................................................................**99**
    **C.**    **Risk Factors Relating to a NewCo Transaction** ..............................**101**
    **D.**    **Risk Factors Relating to NewCo Common Stock to Be Issued Under
the Plan** ....................................................................................**102**
    **E.**    **Operational Risks for NewCo**..................................................**104**
    **F.**    **Risk Factors Relating to Liquidating Trust Interests to Be Issued
Under the Plan**.........................................................................**106**
    **G.**    **Operational Risks for the Liquidating Trust** ...........................**107**
    **H.**    **Additional Risk Factors**..........................................................**109**

**ARTICLE X CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF
THE PLAN** ...................................................................................................**112**
    **A.**    **Consequences to the Debtor** ....................................................**114**
    **B.**    **Consequences to U.S. Holders of Certain Claims and Interests**.....**121**
    **C.**    **Tax Treatment of the Liquidating Trust and Holders of Liquidating
Trust Interests** ........................................................................**130**
    **D.**    **Withholding on Distributions and Information Reporting**............**134**

**ARTICLE XI RECOMMENDATION** ......................................................................................**135**

23-10367-mg    Doc 845    Filed 02/07/24    Entered 02/07/24 21:49:29    Main Document
Pg 9 of 154

<u>Appendices and Exhibits</u>

| <u>Appendix A</u> | Debtor's Plan of Reorganization under Chapter 11 of the Bankruptcy Code |
| <u>Appendix B</u> | Liquidation Analysis |
| <u>Appendix C</u> | Solicitation Procedures Order |
| <u>Appendix D</u> | Financial Projections |
| <u>Appendix E</u> | Restructuring Support Agreement |
| | |
| <u>Exhibit A</u> | Debtor's Organizational Structure |
| <u>Exhibit B</u> | Illustrative Post-Emergence Organizational Structure |
| <u>[Exhibit C]</u> | [Committee Letter][2] |

---

[2]    [**<u>NTD</u>**:  Letter to be filed with the Court in advance of Disclosure Statement hearing.]

viii

# ARTICLE I

# EXECUTIVE SUMMARY

On March 17, 2023 (the "Petition Date"), SVB Financial Group (the "Debtor") filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") (the "Chapter 11 Case").

On January 26, 2024, the Debtor filed the *Debtor's Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (as may be further amended, supplemented or modified from time to time, including the Plan Supplement and all other exhibits and schedules thereto, in each case, as they may be further amended, modified or supplemented from time to time, the "Plan") [D.I. 826]. The Plan is annexed hereto as Appendix A and is incorporated herein by reference.

The Plan provides for the formation of a liquidating trust (the "Liquidating Trust"), to which the Debtor will contribute certain assets, including but not limited to certain claims, causes of action, investment securities, limited partner interests, and cash, as agreed upon by the Debtor, the UCC and the Required Ad Hoc Senior Noteholder Parties under the terms of the Plan and Restructuring Support Agreement (the "RSA"). Upon the Effective Date, the Liquidating Trust will issue three classes of Liquidating Trust Interests and, subject to certain conditions described in the Plan, Holders of certain Classes of Claims and Interests will receive certain Liquidating Trust Interests in accordance with the priority of their Claims. In addition, the Plan provides that the Debtor may undertake certain restructuring transactions which, if effected, will result in a newly-formed Delaware corporation (or other business form as agreed upon under the terms of the Plan) owning, directly or indirectly, 100% of the equity interests in the Debtor. For purposes of the Plan and this Disclosure Statement, "NewCo" shall refer to, as applicable, (i) the Debtor as reorganized pursuant to and under the Plan and any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date or (ii) a newly-formed Delaware corporation (or other business form as agreed upon under the terms of the Plan) that owns or will own, directly or indirectly, 100% of the equity interests in the Debtor. NewCo will retain assets of the Debtor not otherwise contributed to the Liquidating Trust, including the equity interests in certain non-Debtor subsidiaries. NewCo or one of its wholly owned subsidiaries will issue debt to the Liquidating Trust and NewCo will issue 100% of its new common equity interests to Holders of Allowed General Unsecured Claims, subject to dilution by any NewCo Transaction (as defined below).

The Plan and this Disclosure Statement are the result of extensive good faith and arms-length discussions and negotiations among the Debtor, the UCC and the Ad Hoc Group of Senior Noteholders (all terms as defined below). The Plan is a direct product of the RSA among the Debtor, the UCC and the Ad Hoc Group of Senior Noteholders, which RSA is attached hereto as Appendix E. The Debtor believes that the Plan will provide the highest and best recovery to Holders of Claims and Interests in the most efficient and expeditious manner possible. The Debtor submits that (i) through the Plan, Holders of Allowed Claims and Interests will obtain a recovery from the Debtor's Estate equal to or greater than the recovery that they would receive if the Debtor's assets were liquidated under chapter 7 of the Bankruptcy Code and

(ii) consummation of the Plan will maximize the recovery of the Holders of Allowed Claims and Interests.

Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan; *provided*, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), will have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**A.      Purpose of this Disclosure Statement**

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization. Chapter 11 helps a company maximize recovery to all stakeholders. The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying claims against, and interests in, the debtor. Confirmation of a plan by a bankruptcy court binds the debtor and any creditor or interest holder of the debtor. Subject to certain limited exceptions, the order approving confirmation of a plan enjoins parties from enforcing any debt that arose prior to the date of confirmation of the plan or from bringing any causes of action against the debtor in connection with such debt.

In general, a plan (a) divides claims and interests into separate classes, (b) specifies the property or other distributions that each class is to receive under the plan and (c) contains provisions necessary to implement the plan. Under the Bankruptcy Code, "claims" and "interests," rather than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and interests in more than one class.

The Debtor submits this *Disclosure Statement for Debtor's Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code for the purpose of soliciting votes on the proposed Plan. The purpose of this Disclosure Statement is to provide the Holders of Claims and Interests who are entitled, and will be solicited, to vote on the Plan with information of a kind and in sufficient detail, to make an informed decision on whether to accept or reject the Plan. Pursuant to section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited only after a Bankruptcy Court-approved written disclosure statement has been provided to each creditor or interest holder who is entitled to vote on the plan.

This Disclosure Statement includes, among other things, information pertaining to the Debtor's prepetition business operations and financial history and the events leading up to the Chapter 11 Case. In addition, an overview of the Plan is included, which overview sets forth certain terms and provisions of the Plan, the effects of Confirmation of the Plan, certain risk factors associated with the Plan and the manner in which distributions will be made under the Plan. This Disclosure Statement also discusses the Confirmation process and the procedures for voting, which procedures must be followed by the Holders of Claims and Interests entitled to vote under the Plan for their votes to be counted.

**B.      Recovery Analysis and Treatment of Claims and Interests**

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Section 4 of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  For each Class, the Plan describes (a) the underlying Claim or Interest, (b) the recovery available to the Holders of Claims or Interests in that Class under the Plan, (c) whether the Class is Impaired under the Plan, meaning that each Holder will receive less than full value on account of its Claim or Interest or that the rights of Holders under law will be altered in some way and (d) the form of any consideration (*e.g.*, Cash, Liquidating Trust Interests, NewCo Common Stock or a combination thereof) that Holders will receive on account of their respective Claims or Interests.

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Other Administrative Claims, Ad Hoc Noteholder Group Expenses, Senior Note Trustee Expenses, Subordinated Note Trustee Expenses, Professional Fee Claims and Priority Tax Claims, which will generally be paid in Cash when approved by the Bankruptcy Court or in the ordinary course on or after the Effective Date.

The classification of Claims and Interests pursuant to the Plan is as follows:

| Class | Designation | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Senior Note Claims and Other General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Subordinated Note Claims | Impaired | Entitled to Vote |
| 5 | Preferred Equity Interests | Impaired | Entitled to Vote |
| 6 | Common Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Claims and Intercompany Interests | Impaired or Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

The table below provides a summary of the classification, treatment and estimated recoveries of Claims and Interests under the Plan.  This information is provided in summary form for illustrative purposes only, is subject to material change based on contingencies related to the claims reconciliation process, recoveries obtained by the Liquidating Trust in liquidating the Liquidating Trust Assets and the post-Effective Date financial performance of NewCo, and is qualified in its entirety by reference to the provisions of the Plan.  Amounts assumed for purposes of projected recoveries are estimates only.  Actual recoveries received under the Plan may differ materially from the projected recoveries.  For a more detailed description of the treatment of Claims and Interests under the Plan, *see* Article IV below—*Summary of the Plan*. To the extent any inconsistency exists between the summaries contained in this Disclosure

Statement and the Plan, the terms of the Plan shall govern.  For a complete description of the Debtor's classification and treatment of Claims and Interests, reference should be made to the Plan.

THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.

SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS | ESTIMATED PERCENT RECOVERY RANGE | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| 1 | Each Holder of an Allowed Other Secured Claim will receive, at the Debtor's option (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed):  (a) payment in full in Cash; (b) delivery of the collateral securing its Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | [•] | 100% | [•] |
| 2 | Each Holder of an Allowed Other Priority Claim will receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | [•] | 100% | [•] |
| 3 | Each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of (a) 100% of the NewCo Common Stock subject to dilution by any NewCo Transaction, (b) 100% of the Class A Trust Units and (c) Cash sufficient to satisfy the Senior Note Trustee Expenses, to the extent not otherwise paid by the Debtor; [provided, that in lieu of the foregoing, Holders of Allowed General Unsecured Claims will have the ability to elect to receive Cash in lieu of the | [•] | [•] | [•] |

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS | ESTIMATED PERCENT RECOVERY RANGE | |
|---|---|---|---|---|
| | | | **Plan** | **Liquidation** |
| | foregoing distributions in an amount and on terms to be agreed to by the Debtor, the UCC and the Required Ad Hoc Senior Noteholder Parties (the "GUC Cash-Out").][3] | | | |
| 4 | Each Holder of an Allowed Subordinated Note Claim will receive its Pro Rata share of (a) 100% of the Class B Trust Units in an aggregate amount equal to such Holder's Allowed Subordinated Note Claim and (b) Cash sufficient to satisfy the Subordinated Note Trustee Expenses, to the extent not otherwise paid by the Debtor. | [•] | [•] | [•] |
| 5 | Each Holder of an Allowed Preferred Equity Interest will receive its Pro Rata share of 100% of the Class C Trust Units. | [•] | [•] | [•] |
| 6 | All Common Equity Interests will be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of such Interests will not receive or retain any distribution, property, or other value on account of such Interests. | [•] | [•] | [•] |
| 7 | All Section 510(b) Claims will be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive or retain any distribution, property, or other value on account of such Claims. | [•] | [•] | [•] |
| 8 | Each Intercompany Claim and each Intercompany Interest will be (a) canceled, released, and discharged, (b) Reinstated, (c) converted to equity, or (d) otherwise set off, settled, or | [•] | [•] | [•] |

---

[3]    The Debtor, the UCC and the Required Ad Hoc Senior Noteholder Parties intend for the terms and amount of the GUC Cash-Out to be agreed and disclosed prior to the hearing on approval of the Disclosure Statement.

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS | ESTIMATED PERCENT RECOVERY RANGE | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| | distributed, in each case at the option of the Debtor with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed. | | | |

## C.   Voting on the Plan

### 1.   Parties-in-Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is conclusively presumed to have accepted the plan, and the plan proponent need not solicit such holder's vote.  Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan.  For a detailed description of the treatment of Claims and Interests under the Plan, refer to Article IV below—*Summary of the Plan*.

Classes 1 and 2 are Unimpaired under, and conclusively presumed under section 1126(f) of the Bankruptcy Code to have accepted, the Plan.

Classes 3-5 are Impaired under, and entitled to vote to accept or reject, the Plan.

Classes 6 and 7 are Impaired under, and deemed under section 1126(g) of the Bankruptcy Code to have rejected, the Plan.

Class 8 is Impaired or Unimpaired under, and deemed under section 1126(f) or 1126(g) of the Bankruptcy Code, as applicable, to have accepted or rejected the Plan.

Except as described in Article V below—*Statutory Requirements for Confirmation of the Plan*, the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each Impaired Class accept the Plan.  Section 1126(c) of the Bankruptcy Code defines

acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in such class that have voted to accept or reject the plan. Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds in dollar amount of interests in such class that have voted to accept or reject the plan. Holders of claims or interests who fail to vote are deemed neither to accept nor to reject the Plan. For a more detailed description of the requirements for confirmation of the Plan, refer to <u>Article V</u> below—*Statutory Requirements for Confirmation of the Plan*.

Even if the Plan has not been accepted by all Impaired Classes entitled to vote, section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, provided that the Plan has been accepted by at least one Impaired Class of creditors. Notwithstanding the failure of an Impaired Class to accept the Plan, the Plan can be confirmed by a procedure commonly known as cram-down, provided the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan. For a more detailed description of the requirements for confirmation of a nonconsensual plan, refer to <u>Article V</u> below—*Statutory Requirements for Confirmation of the Plan*.

### 2. Submitting a Ballot

If you are the record Holder of a Claim or Interest in a Class entitled to vote on the Plan, accompanying this Disclosure Statement is a ballot (the "<u>Ballot</u>") for voting to accept or reject the Plan.

Classes 3, 4 and 5 are entitled to, or are being solicited to, vote to accept or reject the Plan. If you are entitled to or are being solicited to vote, you should carefully review this Disclosure Statement, including the attached appendices and the instructions accompanying your Ballot or Ballots. Then, indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot or Ballots and return the Ballot or Ballots to Kroll Restructuring Administration LLC (the "<u>Solicitation Agent</u>" or "<u>Kroll</u>") or by submitting a Ballot or Ballots through the online electronic ballot portal (as described on the Ballot) maintained by Kroll. If you are a Beneficial Holder[4] of Claims or Interests in Classes 3, 4 or 5 and received a Ballot for Beneficial Holders (a "<u>Beneficial Holder Ballot</u>"), you must return the Beneficial Holder Ballot to your broker or other nominee, or the agent of a broker or other nominee (each of the foregoing, a "<u>Nominee</u>"), in accordance with the instructions provided by your Nominee, who will then submit a master ballot on your behalf.

As described herein, the Ballot or Election Form (as defined below), as applicable, contains an election for a Holder who rejects the Plan, a Holder abstaining from voting on the Plan, or a Holder deemed to accept the Plan, to opt out of the third-party releases contained in Section 12.9 of the Plan. If applicable, each Holder of a Claim or Interest that does not timely make the opt-out election on its Ballot or Election Form will be deemed to have

---

[4]    A "<u>Beneficial Holder</u>" means a beneficial owner of publicly traded securities whose Claims or Interests have not been satisfied prior to the Record Date pursuant to Court order or otherwise, as reflected in the records maintained by the Nominees holding through the respective indenture trustee or transfer agent (as applicable).

expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties.

The notices of non-voting status for Holders of Claims or Interests that are deemed to reject the Plan contain an election to opt in to the third-party releases contained in Section 12.9 of the Plan. Holders of Claims or Interests that are deemed to reject the Plan but who affirmatively opt in to the third-party releases provided by the Plan by checking the box on the applicable Election Form indicating that they opt in to grant the third-party releases provided in the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties. For further information, refer to <u>Article VI</u> below—*Voting Procedures*, and the Solicitation Procedures Order attached hereto as <u>Appendix C</u>.

Ballots cast by Holders in Classes entitled to vote must be actually received by the Solicitation Agent by 5:00 p.m. Eastern Time on April [25], 2024. Ballots received after the Voting Deadline will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected.

For further information, refer to <u>Article VI</u> below—*Voting Procedures*.

### 3. Recommendation

**The Debtor believes that confirmation and consummation of the Plan is in the best interests of the Debtor's Estate and Holders of Claims and Interests. Accordingly, the Debtor recommends that Holders of Claims and Interests entitled to vote on the Plan vote to accept it.**

### D. Confirmation of the Plan

#### 1. Plan Objection Deadline

Objections to Confirmation of the Plan must be filed with the Bankruptcy Court and served so as to be actually received on or before 4:00 p.m., Eastern Time on April [30], 2024. Unless objections to the Confirmation are timely served and filed in compliance with the Solicitation Procedures Order, they will not be considered by the Bankruptcy Court.

#### 2. Confirmation Hearing

The Bankruptcy Court has scheduled the hearing to consider confirmation (the "<u>Confirmation</u>") of the Plan (the "<u>Confirmation Hearing</u>") at [10]:00 a.m. on May [7], 2024, Eastern Time. The Confirmation Hearing may be adjourned by the Bankruptcy Court or the Debtor without further notice other than by announcement in open court and/or notice(s) of adjournment filed on the docket with the Bankruptcy Court's permission.

# ARTICLE II

# BACKGROUND

## A.    Overview of the Debtor's Businesses

The principal business of the Debtor is diversified financial services with a focus on the innovation economy.  Through the Debtor's various subsidiaries and divisions, the Debtor has long offered a diverse set of banking and financial products and services to clients across the United States and in key international innovation markets.  Prior to March 10, 2023, the Debtor owned and operated Silicon Valley Bank ("SVB"), a California-chartered bank, through which the Debtor offered commercial and private banking products and services.  On March 10, 2023, the California banking authorities closed SVB and appointed the Federal Deposit Insurance Corporation (the "FDIC") as receiver ("FDIC-R1").  The circumstances leading to the receivership are described in more detail below.

Following the closure of SVB, the Debtor's primary business lines were SVB Capital, the venture capital and credit investment arm of the Debtor, which focuses on funds management on behalf of third-party limited partner investors and the Debtor and SVB Securities LLC ("SVB Securities"), an investment bank.  SVB Securities provided investment banking services and provided equity research coverage, especially with respect to healthcare and technology companies.  On October 2, 2023, the Debtor consummated a sale of SVB Securities to a bidder group led by members of SVB Securities management, the circumstances of which are described in more detail below.

## B.    The Debtor's Corporate Structure and Global Operations

### 1.    Silicon Valley Bank

Prior to March 10, 2023, the Debtor operated SVB.  SVB was a commercial bank that offered credit, treasury management, foreign exchange, trade finance, and other services to clients in key innovation markets.  SVB was the Debtor's primary operating subsidiary and a core element of the Debtor's business.  SVB directly employed all of the Debtor's personnel, who provided services to the Debtor and its various businesses via intercompany services arrangements (the "Services Agreement").  SVB was also custodian of most of the books, records, and other data related to the Debtor's business.

On March 10, 2023, the California Department of Financial Protection and Innovation (the "CA DFPI") closed SVB and appointed the FDIC-R1 as receiver.  The FDIC-R1 subsequently transferred all deposits and substantially all assets of SVB to a newly created, FDIC-operated bridge bank, Silicon Valley Bridge Bank, National Association (the "Bridge Bank").  On March 27, 2023, the Office of the Comptroller of the Currency closed Bridge Bank and appointed the FDIC as receiver for Bridge Bank ("FDIC-R2"), and First Citizens BancShares, Inc. ("FCB Parent") announced that it had entered into an agreement with FDIC-R2 and the FDIC in its corporate capacity ("FDIC-C") to assume all remaining deposit liabilities of Bridge Bank and to purchase approximately $72 billion of assets from Bridge Bank at a discount of $16.5 billion.  As of the time of this Disclosure Statement, the legacy banking business of

SVB is now operated as a division of FCB Parent's subsidiary bank, First-Citizens Bank & Trust Company ("FCB").

## 2.    SVB Capital

SVB Capital is the venture capital and credit investment arm of the Debtor.  SVB Capital focuses primarily on funds management and, as of the Petition Date, managed over $[9.5] billion of funds on behalf of third-party limited partner investors and, on a more limited basis, the Debtor.  The SVB Capital family of funds is comprised of pooled investment vehicles such as direct venture funds that invest in companies and funds of funds that invest in other venture capital funds, as well as debt funds that provide lending and other financing solutions.  SVB Capital generates income for the Debtor primarily through investment returns and management fees.

Historically and as of the Petition Date, SVB Capital operated as a "virtual" subsidiary for the Debtor, without a singular non-debtor subsidiary legal entity.  To continue operating this business in the ordinary course, the Debtor took steps to consolidate the various operations that comprise SVB Capital in new legal entities, as explained in more detail below.

## 3.    SVB Securities LLC

SVB Securities was an investment bank focused on the innovation market and, as of the Petition Date, operated as a wholly owned subsidiary of the Debtor held by the intermediate holding company, SVB Securities Holdings.  SVB Securities provided investment banking services across the healthcare and technology sectors.  SVB Securities also provided equity research coverage of over 360 healthcare and technology companies through another SVB Securities Holdings subsidiary, MoffettNathanson LLC.  SVB Securities focused on product and service offerings in capital raising, M&A advisory, structured finance, equity research, sales and trading.

On June 18, 2023, the Debtor announced that it had entered into an agreement to sell SVB Securities (excluding MoffettNathanson LLC) to its management group.  As explained in more detail below, on July 5, 2023, the Bankruptcy Court approved this sale, and the sale of SVB Securities closed on October 2, 2023.  The Debtor continues to own the equity interests in MoffettNathanson LLC, a non-debtor subsidiary.

## C.    Summary of the Debtor's Assets and Operations

## 1.    Assets

In addition to the businesses described above, the Debtor holds a variety of other assets, including (i) investment securities, warrants and investments in SVB Capital funds (ii) Cash and (iii) certain Retained Causes of Action including Claims and Causes of Action against the FDIC-C and the FDIC-Rs (as defined below) and potential Claims and Causes of Action against the Debtor's Related Parties.

### (a)    Investment Securities

The Debtor holds certain direct equity investments in a variety of public and private companies, with a total book value of approximately $231.7 million and certain limited partner interests across over 130 funds of approximately $124.9 million.

### (b)    Warrants

The Debtor holds certain warrants and other derivative investments in a variety of public and private companies.  The warrant portfolio includes over 4,800 warrant positions representing over 3,100 issuers, with a total book value of approximately $316.6 million.  The Debtor's 50 largest warrant issuers account for approximately $141.8 million of the Debtor's total warrant portfolio.  The derivative investments represent conversion rights with a book value of approximately $12.7 million.

### (c)    Investments in SVB Capital Funds

The Debtor holds capital and carried interest positions in certain Fund of Funds, Credit funds and Direct funds managed by SVB Capital with a total book value of approximately $462.5 million.  The book value of these interests are $377.7 million, $50.7 million and $34.1 million for Fund of Funds, Credit funds and Direct funds, respectively.

### (d)    Other Assets

As of the date of this Disclosure Statement, the Debtor and its non-debtor subsidiaries collectively held approximately $320 million in Cash.

Additionally, as discussed in further detail below, the Debtor has certain Claims and Causes of Action against the FDIC-C and the FDIC-Rs (as defined below), pursuant to which the Debtor may seek to recover the approximately $1.93 billion in funds that were on deposit at SVB at the time that SVB was placed into receivership.  Further, the Debtor and the UCC have been investigating potential Claims and Causes of Action against the Debtor's Related Parties relating to the closure of SVB.

### 2.    The Debtor's Board of Directors

The following table lists the Debtor's directors and their respective positions on the Petition Date.

| Name | Position |
| --- | --- |
| Beverly Kay Matthews | Chair of the Board of Directors and Director |
| Greg Becker[5] | President, Chief Executive Officer and Director |
| Eric A. Benhamou | Director |
| Elizabeth Burr | Director |
| Richard D. Daniels | Director |

---

[5]    On April 19, 2023, Mr. Becker resigned from the Debtor's Board and from his positions as President and Chief Executive Officer.

| Name | Position |
|------|----------|
| Alison Davis | Director |
| Joel P. Friedman | Director |
| Thomas King | Director |
| Jeffrey N. Maggioncalda | Director |
| Mary J. Miller | Director |
| Kate D. Mitchell | Director |
| Garen K. Staglin | Director |

### (a)    Restructuring Committee

On March 13, 2023, the Debtor announced that its board of directors (the "Board") appointed a restructuring committee (the "Restructuring Committee") consisting of five independent directors to explore strategic alternatives for the Debtor and its various businesses, assets and investments. The Restructuring Committee was delegated certain authority with respect to the restructuring of the Debtor, and the Restructuring Committee's initial members were Eric Benhamou, Tom King, Kay Matthews, Mary Miller and Kate Mitchell. Joel Friedman was appointed to the Restructuring Committee after the Petition Date.

### (b)    Director Appointments and the Special Committee

On July 13, 2023, the Board increased the number of directors from 11 to 13 and appointed Steven G. Panagos and C. Allen Parker as directors. The Board determined that Mr. Panagos and Mr. Parker are independent directors as defined by the listing standards of NASDAQ. On July 13, 2023, the Board also formed a special committee (the "Special Committee"), which would be initially comprised of Mr. Panagos and Mr. Parker. The Special Committee was delegated authority to consider all matters brought to the Board for which a majority of the directors are conflicted. In addition, Mr. Panagos and Mr. Parker were contemporaneously appointed to the Restructuring Committee.

### 3.    Debtor Employees

As of the Petition Date, the Debtor did not directly employ any individual. Instead, services were performed for the Debtor by employees and other service providers of the former Bridge Bank in accordance with the Services Agreement. Since the Petition Date, the Debtor has hired a number of employees to provide ordinary course services to the Debtor through its wholly owned direct subsidiary SVBFG Employee Holdco LLC ("EmployeeCo"). As of the date of this Disclosure Statement, EmployeeCo has six (6) employees.

### D.    Liabilities – The Debtor's Prepetition Funded Indebtedness

As of the Petition Date, the Debtor had approximately $3.37 billion in aggregate outstanding funded indebtedness. All of the Debtor funded indebtedness is unsecured.

1.      **The Senior Notes**

On September 10, 2020, the Debtor entered into an indenture (the "Base Indenture") with U.S. Bank National Association, as trustee (the "Senior Notes Trustee"), pursuant to which the Debtor has from time to time issued various series of unsecured notes (the "Senior Notes").  On April 28, 2022, the Debtor and the Senior Notes Trustee entered into a first supplemental indenture, supplementing and amending the Base Indenture (together with the Base Indenture, the "Indenture").  The outstanding Senior Notes include the following:

i.      On January 29, 2015, the Debtor issued $350 million in principal amount of 3.50% Senior Notes due in January 2025.

ii.     On June 5, 2020, the Debtor issued $500 million in principal amount of 3.125% Senior Notes due in June 2030.

iii.    On February 2, 2021, the Debtor issued $500 million in principal amount of 1.800% Senior Notes due February 2031.

iv.     On May 13, 2021, the Debtor issued $500 million in principal amount of 2.100% Senior Notes due May 2028.

v.      On October 28, 2021, the Debtor issued $650 million in principal amount of 1.800% Senior Notes due October 2026.

vi.     On April 29, 2022, the Debtor issued $350 million in principal amount of 4.435% Senior Fixed Rate/Floating Rate Notes due April 2028.

vii.    On April 29, 2022, the Debtor issued $450 million in principal amount of 4.570% Senior Fixed Rate/Floating Rate Notes due April 2033.

The Senior Notes remained outstanding as of the Petition Date.

2.      **Boston Private Trusts**

On July 1, 2021, the Debtor acquired Boston Private Financial Holdings, Inc. ("Boston Private Holdings"), and assumed certain liabilities related to its assumption of two statutory trusts (the "Trusts") in connection with the transaction.  The Trusts, Boston Private Capital Trust I ("Trust I") and Boston Private Capital Trust II ("Trust II") were formed for the purpose of issuing trust preferred securities and investing the proceeds in junior subordinated debentures issued by Boston Private Holdings.  The Trusts' only assets are the junior subordinated debentures issued to each Trust by Boston Private Holdings.

In connection with the Debtor's acquisition of Boston Private Holdings and the Trusts, the Debtor also assumed Boston Private Holdings' obligations under certain guarantee agreements, providing that the Debtor would serve as guarantor with respect to the trust preferred securities issued by the Trusts.  With respect to Trust I, as of the Petition Date, there were less than $1 million of trust preferred securities outstanding.  With respect to Trust II, as of the Petition Date, there were approximately $103 million of trust preferred securities

13

outstanding.  The trust preferred securities issued by Trust I pay interest quarterly and have a fixed distribution rate of 4.875%.  The quarterly distributions are cumulative.  The effective interest rate for the junior subordinated debentures was 4.875%.  The junior subordinated convertible debentures mature on October 1, 2034.  The trust preferred securities issued by Trust II pay interest quarterly based on a floating three-month rate of LIBOR plus 1.68% which are cumulative.  The effective interest rate on the junior subordinated debentures was 2.676%.  The junior subordinated debentures mature on December 30, 2035.

## E.    Existing Preferred Stock

The Debtor is authorized to issue 20 million shares of $0.001 par value preferred stock.  As of the Petition Date, the Debtor had issued approximately 350,000 shares of Series A Preferred Stock,[6] 7,500 shares of Series B Preferred Stock,[7] 10,000 shares of Series C Preferred Stock,[8] 10,000 shares of Series D Preferred Stock[9] and 6,000 shares of Series E Preferred Stock.[10]

On March 10, 2023, NASDAQ halted trading in the Debtor's depositary shares, each representing a 1/40th interest in a share of the Series A Preferred Stock of which approximately 14,000,000 were issued as of the Petition Date, which were traded on NASDAQ under the ticker "SIVBP".

## F.    Existing Common Stock

The Debtor is authorized to issue 150 million shares of $0.001 par value stock common stock ("Existing Common Stock"), of which approximately 59,200,925 shares were issued as of the Petition Date.  Prior to March 10, 2023, the Debtor traded on NASDAQ under the ticker "SIVB".  On March 10, 2023, NASDAQ halted trading in the Debtor's Existing Common Stock.  NASDAQ later removed the Debtor's Existing Common Stock and Series A Preferred Stock from listing, effective as of March 28, 2023.  NASDAQ's determination was based on the following factors:  (1) the events described in Article III—*Significant Events and Initiatives in This Chapter 11 Case*; (2) concerns regarding the residual equity interest of the existing listed securities holders; and (3) concerns about the Debtor's ability to sustain compliance with all requirements for continued listing on NASDAQ.  The Debtor did not appeal NASDAQ's decision.

---

[6]    "Series A Preferred Stock" means the 5.250% fixed-rate series A non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series A Certificate of Designation dated December 9, 2019.

[7]    "Series B Preferred Stock" means the 4.100% Fixed-to-Reset series B non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series B Certificate of Designation dated February 2, 2021.

[8]    "Series C Preferred Stock" means the 4.000% Fixed-to-Reset series C non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series C Certificate of Designation dated May 13, 2021.

[9]    "Series D Preferred Stock" means the 4.250% Fixed-to-Reset series D non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series D Certificate of Designation dated October 28, 2021.

[10]   "Series E Preferred Stock" means the 4.7000% Fixed-to-Reset series D non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series E Certificate of Designation dated October 28, 2021.

Following the removal of the Debtor's Existing Common Stock and Series A Preferred Stock from NASDAQ, equity in the Debtor became eligible to be quoted on the OTC Pink quotation system. To be quoted on this system, a market maker must sponsor the security and comply with SEC Rule 15c2-11 before it can initiate a quote in a specific security. Since March 28, 2023, the Debtor's Existing Common Stock and Series A Preferred Stock have been trading on the OTC Pink Market under the tickers "SIVBQ" and "SIVPQ" respectively.

## G.    Factors Leading to the Commencement of This Chapter 11 Case

### 1.    Silicon Valley Bank

For many years, SVB was a premier bank for the emerging technologies sector. The end of 2020 marked a period of significant cash inflow for this sector, with record rates of venture investment and private financings, high levels of IPO and M&A activity and inflows from the federal "Paycheck Protection Program", all of which contributed to a flood of deposits into SVB. SVB invested a portion of those deposits in U.S. Treasuries and long-dated mortgage-backed securities. In the several years before 2022, interest rates remained low: the benchmark interest rate was near zero, and the Federal Reserve Board of Governors (the "Federal Reserve") had not raised since 2018.

That trend ended in early 2022. In March 2022, rising inflation led to the Federal Reserve's decision to raise the federal interest rate by 25 basis points. In the twelve month period after March 2022, the Federal Reserve hiked interest rates seven more times. By March 2023, the benchmark interest rate had nearly broken 5%. As interest rates rose, the rates of investment activity seen in 2020 slowed, bond prices fell, and the market value of SVB's investment portfolio dropped. At the same time, SVB began to experience a meaningful decrease in deposit levels and a shift in deposit mix as customers burned through cash and sought higher interest products while investment and exit opportunities were very limited, resulting in lower inflows and increased rate of withdrawals.

On March 8, 2023, working with outside advisors, SVB announced the sale of substantially all of its "Available for Sale" securities portfolio, resulting in an after-tax loss of $1.8 billion. Although the sale replaced long dated securities with low interest rates with short term securities with higher interest rates, and SVB announced plans to simultaneously raise capital, the market reacted negatively. After the announcement, on March 9, 2023, the Debtor's stock price dropped significantly and SVB's customers scrambled to withdraw their money, resulting in a bank run where nearly 25% of deposits were withdrawn in a single day. The next day, the CA DFPI closed SVB and appointed the FDIC-R1.

This Disclosure Statement is not intended to contain a complete or definite statement respecting SVB's closure, or to bind any person or party. The cause(s) of SVB's closure and receivership have been and continue to be the subject of government investigations

and reports[11], congressional testimony[12], certain previously filed securities class action complaints[13], and may be the subject of further post-confirmation litigation proceedings.  The Debtor takes no position herein on the foregoing statements and allegations made or to be made.

### 2.    Restructuring Discussions and Decision to File for Chapter 11

The SVB receivership had two important consequences for the Debtor.  First, the receivership removed the Debtor's primary operating subsidiary, depriving the Debtor of a key source of liquidity, business infrastructure and personnel.  Second, the receivership triggered default clauses under certain of the Debtor's debt documents.  These circumstances led the Debtor to start contingency planning and evaluation of strategic alternatives.

On March 13, 2023, the Debtor's Board announced its appointment of the Restructuring Committee.  That same day, the Restructuring Committee appointed as Chief Restructuring Officer William Kosturos, Managing Director and Vice-Chair of the Alvarez & Marsal U.S. Restructuring Practice.  Over the course of several days, the Board received and

---

[11]    *See, e.g.*, Michael S. Barr, Board of Governors of the Federal Reserve System, Review of the Federal Reserve's Supervision and Regulation of Silicon Valley Bank (Apr. 28, 2023), https://www.federalreserve.gov/publications/files/svb-review-20230428.pdf; U.S. Government Accountability Office, GAO-23-106736; Bank Regulation: Preliminary Review of Agency Actions Related to March 2023 Bank Failures (Apr. 28, 2023), https://www.gao.gov/assets/gao-23-106736.pdf; Department of Financial Protection & Innovation, Review of DFPI's Oversight and Regulation of Silicon Valley Bank (May 8, 2023), https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/05/Review-of-DFPIs-Oversight-and-Regulation-of-Silicon-Valley-Bank.pdf; Office of Inspector General, Board of Governors of the Federal Reserve System, 2023-SR-B-013, Material Loss Review of Silicon Valley Bank (Sept. 25, 2023), https://oig.federalreserve.gov/reports/board-material-loss-review-silicon-valley-bank-sep2023.pdf.

[12]    *See, e.g.*, Examining the Failures of Silicon Valley Bank and Signature Bank, Hearing before U.S. Senate Committee on Banking, Housing, and Urban Affairs (2023) (testimony of Gregory W. Becker, former CEO of Silicon Valley Bank; Scott A. Shay, co-founder and former Chairman of Signature Bank; and Eric R. Howell, former President of Signature Bank), https://www.banking.senate.gov/hearings/examining-the-failures-of-silicon-valley-bank-and-signature-bank; Continued Oversight Over Regional Bank Failures, Hearing before U.S. House of Representatives Subcommittees on Financial Services and Monetary Policy and Oversight and Investigations (2023) (testimony of Gregory Becker, former CEO of Silicon Valley Bank; Scott Shay, co-founder and former Chairman of Signature Bank; Michael Roffler, former CEO and President of First Republic Bank; The Honorable Adrienne Harris, Superintendent of New York Department of Financial Services; and The Honorable Clothilde Hewlett, Commissioner of Department of Financial Protection and Innovation), https://democrats-financialservices.house.gov/events/eventsingle.aspx?EventID=410427#Webcast; Bank Regulation: Preliminary Review of Agency Actions Related to March 2023 Bank Failures, Hearing before U.S. House of Representatives Subcommittee on Oversight and Investigations, Committee on Financial Services (2023) (statement of Michael E. Clements, director of Financial Markets and Community Investment, U.S. Government Accountability Office), https://www.c-span.org/video/?528024-1/governmentaccountability-office-official-testifies-bank-failures.

[13]    *See In re SVB Financial Group Securities Litigation*, Case No. 3:23-cv-01097-JD (N.D. Cal. Filed as *Vanipenta* v. *SVB Financial Group* on Mar. 13, 2023); *Snook* v. *SVB Financial Group*, Case No. 3:23-cv-01173-VC (N.D. Cal. Filed Mar. 15, 2023); *Siddiqui* v. *Becker*, Case No. 4:23-cv-01228-HSG (N.D. Cal. Filed Mar. 17, 2023); *City of Hialeah Employees Retirement System* v. *Becker*, Case No. 3:23-cv-01697-JD (N.D. Cal. Filed Apr. 7, 2023); *International Union of Operating Engineers Local 132 Pension Fund* v. *SVB Financial Group*, Case No. 3:23-cv-01962-TLT (N.D. Cal. Filed Apr. 24, 2023); *Stevenson v. Becker*, 4:23-cv-02277-HSG (N.D. Cal. Filed May 10, 2023); *Rossi v. Becker*, Case No. 4:23-cv-02335-HSG (N.D. Cal. Filed May 12, 2023); *TIAA-CREF Inv. Mgmt., LLC v. Becker*, No. 3:24-cv-00478-CRB (N.D. Cal. Filed Jan. 25, 2024).

reviewed the recommendations of management and of its various advisors regarding the Debtor's available strategic alternatives, including a bankruptcy proceeding under the provisions of the Bankruptcy Code.  After review and discussion of the information presented, the Board determined that it was in the best interests of the Debtor, its creditors and other stakeholders to prepare to file for chapter 11 protection.

On the evening of March 16, 2023, the Board voted to commence this Chapter 11 Case on an emergency basis.  Early the next morning, the Debtor filed a voluntary petition for relief under the Bankruptcy Code.

## ARTICLE III

## SIGNIFICANT EVENTS AND INITIATIVES IN THIS CHAPTER 11 CASE

The following is a general summary of significant events since the Petition Date, including a discussion of the Debtor's restructuring and business initiatives.

### A.      Commencement of the Chapter 11 Case

The commencement of a chapter 11 case creates an estate that is composed of all of the legal and equitable interests of the debtor as of that date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."  Following the Petition Date, the Debtor continues to operate its businesses as debtor and debtor-in-possession.

### B.      First Day Relief

On the Petition Date, the Debtor filed a number of "first day" motions and applications designed to ease the Debtor's transition into Chapter 11, maximize the value of the Debtor's assets and minimize the effects of the commencement of the Chapter 11 Case.  On March 22 and 24, 2023, the Bankruptcy Court entered orders granting the first-day motions, allowing the Debtor to continue certain normal business activities not specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval.  In particular, the Bankruptcy Court entered orders:

- on an interim basis, (i) authorizing, but not directing, the Debtor, in its sole discretion, to (a) continue to use its cash management system, including existing bank accounts, (b) pay or honor certain prepetition obligations related thereto and (c) continue to use existing business letterhead, purchase orders, invoices, envelopes, promotional materials and other business forms and correspondence and (ii) authorizing, but not directing, the Debtor to continue to perform investment activities with its affiliates and third parties on a post-petition basis in the ordinary course of business and consistent with historical practice; and (d) extending the time to comply with the requirements of section 345(b) of the Bankruptcy Code [D.I. 70];

- (i) authorizing, but not directing, the Debtor, in its sole discretion, to maintain a list of creditors in lieu of submitting a formatted mailing matrix and (ii) establishing procedures for notifying parties of the commencement of this Chapter 11 Case [D.I. 55];

- (i) extending the time for the Debtor to file its schedules and statements by 20 days, (ii) extending the time for the Debtor to file its 2015.3 report to the date that is two days from the initial date set for the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code and (iii) modifying the requirements to file the list of equity security holders and serve notice of commencement on all equity holders [D.I. 53];

- on an interim basis, authorizing, but not directing, the Debtor, in its sole discretion, to (i) pay the prepetition compensation and benefits obligations and (ii) maintain the employee compensation and benefits and pay related administrative obligations [D.I. 71];

- on an interim basis, (i) establishing notice and objection procedures related to certain transfers of equity securities and declarations of worthlessness for federal or state tax purposes with respect existing common or preferred stock or any beneficial ownership thereof; and (ii) directing that any purchase, sale, or other transfer of common or preferred stock in violation of the procedures set forth will be null and void *ab initio* [D.I. 57]; and

- authorizing the retention and appointment of Kroll as claims and noticing agent and administrative advisor [D.I.s 54, 135].

On April 27, 2023, the Bankruptcy Court also entered final orders with respect to the Debtor's cash management system [D.I. 132] and treatment of the Debtor's net operating losses [D.I. 136]. On June 29, 2023, the Bankruptcy Court also entered a final order with authorizing payment of certain prepetition employee compensation and benefit programs [D.I. 372].

In addition, the commencement of the Debtor's Chapter 11 Case triggered the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions by creditors, the enforcement of all liens against property of the Debtor and the commencement or continuation of prepetition litigation against the Debtor. Subject to limited exceptions, the automatic stay will remain in effect until the Effective Date of the Plan.

## C.    Appointment of the UCC

On March 28, 2023, the Official Committee of Unsecured Creditors (the "UCC") was appointed by William K. Harrington, the United States Trustee for Region 2 (the "U.S. Trustee") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Case [D.I. 72]. The initial members of the UCC were Tata

18

Consultancy Services Limited, U.S. Bank National Association (as Indenture Trustee), Wilmington Trust Company (as Indenture Trustee), Satagopan Rajagopalan and Cousins Fund II Phoenix I, LLC.  On September 19, 2023, the UCC was reconstituted to four members: U.S. Bank National Association (as Indenture Trustee), Wilmington Trust Company (as Indenture Trustee), Satagopan Rajagopalan and Cousins Fund II Phoenix I, LLC.

The UCC selected Akin Gump Strauss Hauer & Feld LLP as its legal counsel, Cole Schotz, P.C. as efficiency and conflicts counsel, Berkeley Research Group, LLC as its financial advisor and Lazard Frères & Co. LLC as its investment banker.  The Bankruptcy Court approved the UCC's retentions of these professional advisors [D.I. 295, 296, 338, 499].

The UCC is a party to the RSA and has agreed to support the Plan.

**D.    The Ad Hoc Group of Senior Noteholders**

On May 3, 2023, a group of certain holders, or investment advisors managing or acting on behalf of holders of certain Senior Notes and Preferred Stock issued by the Debtor (the "Ad Hoc Group of Senior Noteholders") filed a verified statement pursuant to Bankruptcy Rule 2019 [D.I. 149].  On July 21, 2023, the Ad Hoc Group of Senior Noteholders filed a first supplemental verified statement pursuant to Bankruptcy Rule 2019 [D.I. 434].  The Ad Hoc Group of Senior Noteholders retained Davis Polk & Wardwell LLP as counsel.

**E.    The Ad Hoc Cross-Holder Group**

On April 28, 2023, a group of holders, or investment advisors, sub-advisors, or managers of holders, of certain Senior Notes and preferred stock issued by the Debtor (the "Ad Hoc Cross-Holder Group") filed a verified statement pursuant to Bankruptcy Rule 2019 [D.I. 142].  On July 20, 2023, the Ad Hoc Cross-Holder Group filed a first amended verified statement pursuant to Bankruptcy Rule 2019 [D.I. 432].  The Ad Hoc Cross-Holder Group retained White & Case LLP as counsel.

**F.    Retention of Debtor Professionals**

The Debtor retained, and the Bankruptcy Court approved the retentions of, the following advisors in the Chapter 11 Case, among others:  (i) Sullivan & Cromwell LLP, as legal counsel to the Debtor; (ii) Alvarez & Marsal North America, LLC, to provide the Debtor a chief restructuring officer and certain additional personnel; (iii) Centerview Partners LLC, as investment banker; (iv) Jenner & Block LLP as conflicts counsel; (v) Kroll, as claims and noticing agent and administrative advisor; (vi) Huron Consulting Services, LLC as financial advisor; and (vii) Lincoln Partners Advisors LLC, as valuation advisor [D.I. 54, 80, 81, 83, 110, 135, 138, 246, 248, 304, 591, 664, 759, 763].  The Debtor proposed the retention of Ernst & Young LLP as its tax advisor, but as of the date of this Disclosure Statement, this retention has not yet been approved.

On April 5, 2023, the Debtor filed with the Bankruptcy Court the Debtor's Motion for Entry of an Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code, Bankruptcy Rule 2016 and Local Rule 2016-1 Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals [D.I. 85] (the "Interim

19

Compensation Motion"). The Interim Compensation Motion was approved by the Bankruptcy Court on April 27, 2023 [D.I. 134]. In approving the Interim Compensation Motion, the Bankruptcy Court established procedures for the fee application process and payment of professionals retained by the Debtor and any statutory committees appointed in the case.

On April 5, 2023, the Debtor filed with the Bankruptcy Court the Debtor's Motion for Entry of an Order Implementing Certain Procedures to Retain, Compensate and Reimburse Professionals Utilized in the Ordinary Course of Business [D.I. 86] (the "Ordinary Course Professionals Motion"). The Ordinary Course Professionals Motion was approved by the Bankruptcy Court on April 28, 2023 [D.I. 139]. In so doing, the Bankruptcy Court established procedures for the employment and compensation of certain ordinary course professionals used by the Debtor in connection with ongoing business operations.

**G.      Schedules and Statements and 341 Meeting**

Pursuant to section 521 of the Bankruptcy Code, Bankruptcy Rule 1007(c), and orders of the Bankruptcy Court granting extensions of time, on May 22, 2023, the Debtor filed (i) schedules of assets and liabilities, (ii) a schedule of executory contracts and unexpired leases, and (iii) a statement of financial affairs (collectively, the "Schedules") [D.I.s 261, 262].

On May 31, 2023, the U.S. Trustee conducted a meeting of creditors pursuant to section 341 of the Bankruptcy Code (the "341 Meeting").

**H.      Bar Dates and Claims Process**

On June 29, 2023, the Bankruptcy Court entered an order, which, among other things, (i) established August 11, 2023, at 4:00 p.m., Eastern Time, as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code), including claims pursuant to section 503(b)(9) of the Bankruptcy Code (the "General Bar Date"); (ii) established September 14, 2023, at 4:00 p.m., Eastern Time, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim (such date, together with the General Bar Date, the "Bar Dates"); (iii) established the later of (a) the General Bar Date and (b) 4:00 p.m., Eastern Time, on the date that is 30 days from the date that notice of the applicable amendment or supplement to the applicable schedules is served on such entity as the amended bar date and (iv) approved the form and manner of notice of the Bar Dates [D.I. 373].

**I.      Assumption and Assignment of Executory Contracts to FCB and Non-debtor Subsidiaries**

Since the Petition Date, the Debtor and its advisors have engaged in a process to collect, review and analyze the contracts to which the Debtor was a party. The Debtor and its advisors have determined that many of those agreements do not relate to the operations of the Debtor or its non-debtor subsidiaries. Specifically, a significant volume of those contracts concern operations solely relevant to the former SVB, now operated by FCB, as successor in interest to the relevant businesses of SVB. The Debtor has consulted with FCB to determine which contracts are expected to be used in the respective ongoing operations of FCB and the Debtor. During that process, the Debtor has considered, among other things, the ongoing value and projected costs of maintaining such contracts.

Ultimately, the Debtor determined in its business judgment that its continuing operations do not depend on nor derive value from hundreds of contracts that involved products and services entirely related to the operations of the former SVB.  Accordingly, the Debtor has assumed and assigned approximately 550 executory contracts related to the operations of the former SVB to FCB.  Likewise, the Debtor determined in its business judgment that its continuing operations did not depend on nor derive value from the premises of certain leases.  Therefore, the Debtor moved to assume and assign, and the Bankruptcy Court approved the assumption and assignment of, hundreds of executory contracts and over 40 leases to FCB, thereby conserving the Debtor's resources, streamlining its operations and avoiding unnecessary obligations [D.I.s 330, 369, 386, 426, 466, 492, 501, 534, 554, 568, 570, 588, 592, 609, 640, 641, 643, 644, 670, 676, 706, 707, 714, 715, 764, 765, 783, 784, 785, 813, 814, 815].

Where the Debtor has determined that it does not require or derive value from certain contracts, and FCB does not desire for such contracts to be assumed and assigned, the Debtor has moved to reject such contracts in order to avoid incurring unnecessary administrative expenses during the pendency of the Chapter 11 Case.  To date, the Debtor has rejected approximately 320 executory contracts [D.I.s 253, 370, 500, 569, 571, 642, 716, 762, 816].

Finally, the Debtor has also determined that certain of the Debtor's contracts are required for the operations of its non-debtor subsidiaries and affiliates, including SVB Capital.  In such cases, the Debtor has moved to assume and assign such contracts to the applicable non-debtor subsidiaries, including SVBC ManCo, as discussed in further detail below.  To date, the Debtor has assumed and assigned approximately 70 contracts to its non-Debtor subsidiaries, including approximately 25 contracts to SVB Securities before the sale of the SVB Securities business (described in more detail below).  [D.I.s 426, 570, 813].

**J.**      **Investigation of Potential Estate Claims and Causes of Action**

The UCC has coordinated with the Debtor (acting at the direction of the Special Committee) to conduct an investigation into the prepetition conduct and events that led to the Debtor's Chapter 11 Case.  In connection with that investigation, the UCC obtained documents from the Debtor on a consensual basis, and the UCC and Debtor obtained permission from the Bankruptcy Court to seek discovery under Bankruptcy Rule 2004 from forty-one (41) current or former directors, officers and employees of the Debtor, six advisors and other third parties, and First Citizens Bank, which is in possession of the majority of the Debtor's prepetition books and records, among other parties [D.I. 345, 346, 659].  In connection with these requests, the UCC and Debtor also obtained permission to receive confidential supervisory information from the Federal Reserve, the CA DFPI, and the Federal Reserve Bank of San Francisco.  The investigation also included the review and analysis of publicly available information concerning SVB, including reports from the Federal Reserve and the U.S. Government Accountability Office surrounding the closure and receivership of SVB, as well as documents and communications that have been made publicly available in connection with those reports, and public testimony from relevant personnel.  The UCC has also coordinated with the Special Committee to conduct informal interviews of certain relevant individuals.

In connection with their investigation, the UCC and Debtor (acting at the direction of the Special Committee) are analyzing potentially valuable claims and causes of

action that may be brought for the benefit of the Debtor's estate. Potential claims, other than those that are subject to a release as set forth on Exhibit [•] to the Plan, are preserved under the Plan and shall be transferred to the Liquidating Trust, as set forth in <u>Article IV</u>—*Summary of the Plan* below.

**K.       Claims Against the FDIC**

As discussed above, on Friday, March 10, 2023, the CA DFPI ordered that SVB be closed and requested that the FDIC be appointed as receiver of SVB. On that date, the FDIC agreed to act as receiver of SVB. At the opening of business on March 10, 2023, the Debtor had on deposit with SVB approximately $2.1 billion in cash residing in three separate deposit accounts (the "<u>Deposit Accounts</u>"). Those funds constituted the substantial majority of the Debtor's cash. As of March 10, 2023, the deposits at SVB were insured through the FDIC's deposit insurance fund (the "<u>Deposit Insurance Fund</u>") to a maximum of $250,000 (the "<u>FDIC Insurance Cap</u>"). On March 12, 2023, the Secretary of the Treasury, upon the written recommendation of the Board of Governors of the Federal Reserve and the Board of Directors of the FDIC and after consultation with the President of the United States, invoked the systemic risk exception ("<u>SRE</u>") under the Federal Deposit Insurance Act to guarantee payment of all deposits – over and above the FDIC Insurance Cap – in consideration of the systemic risk facing the nation's banking system.

Consistent with the March 12, 2023 invocation of the SRE, from Monday, March 13, 2023 through midday on Thursday, March 16, 2023, the Debtor had access to its accounts and deposits, which had been transferred by the FDIC-R1 to the Bridge Bank. On March 15, 2023 and the morning of March 16, 2023, the Debtor initiated over $150 million in wire transfers from its accounts, which wire transfers were honored by the Bridge Bank. Wire transfers initiated by the Debtor during the afternoon of March 16, 2023 and on March 17, 2023, however, were denied by the Bridge Bank at the instruction of FDIC-R1. No explanation was given to the Debtor for the denial of such wires.

On the morning of Friday, March 17, 2023, the Debtor commenced its chapter 11 proceeding by filing a voluntary petition with the Bankruptcy Court. Shortly after the Petition Date, the FDIC-R1 informed the Debtor that pursuant to 12 U.S.C. § 1822(d), which authorizes the FDIC to withhold a portion of a deposit up to the $250,000 FDIC Insurance Cap as may be required to pay a liability of the depositor, the Deposit Accounts had been put on hold by FDIC-R1. The FDIC-R1 subsequently informed the Debtor that the Debtor would have to file a proof of claim in the receivership proceeding to recover any of the $1.93 billion that was present in the Deposit Accounts at the time the Debtor's access to the accounts was denied—notwithstanding the prior invocation of the SRE.

**1.       The Adversary Proceeding**

On July 9, 2023, the Debtor commenced an adversary proceeding against the FDIC (i) in its capacity as FDIC-C, (ii) in its capacity as FDIC-R1 and (iii) in its capacity as FDIC-R2 (the FDIC-R1 and FDIC-R2 together, the "<u>FDIC-Rs</u>") (the "<u>Adversary Proceeding</u>"). *See SVB Financial Group* v. *Federal Deposit Insurance Corp.*, *et al.*, No. 23-01137 (MG) (Bankr. S.D.N.Y.). As against the FDIC-C, the Debtor asserts a turnover claim pursuant to

section 542 of the Bankruptcy Code and Bankruptcy Rule 7001, seeking to compel the FDIC-C to turn over the approximately $1.93 billion on deposit in the Debtor's accounts at Bridge Bank (the "Account Funds") from the Deposit Insurance Fund, as well as other related relief. The Debtor also asserts claims in the alternative against FDIC-R1 and FDIC-R2 for turnover of the Debtor's Account Funds pursuant to section 542 of the Bankruptcy Code and Bankruptcy Rule 7001. Against all three FDIC entities, the Debtor asserts claims for violation of the automatic stay under section 362(a) of the Bankruptcy Code and for declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.*, requesting a declaration that neither the FDIC-C nor either of the FDIC-Rs has a right of setoff against the amount of the Account Funds, or in the alternative, that any right of setoff is limited to amounts for which there is mutuality of obligation between the Debtor and the FDIC-C, FDIC-R1, or FDIC-R2, respectively.

On August 11, 2023, all three FDIC entities filed motions under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, seeking to dismiss the Adversary Proceeding. On the same day, the FDIC-R1 filed a motion to withdraw the reference from the Bankruptcy Court pursuant to 28 U.S.C. § 157(d). That motion was docketed in the United States District Court for the Southern District of New York and assigned to Judge John P. Cronan on August 15, 2023. *See SVB Fin. Grp.* v. *FDIC*, No. 23-cv-07218 (JPC) (S.D.N.Y.). In light of the motion to withdraw the reference, on September 14, 2023, the Bankruptcy Court adjourned *sine die* a hearing on all pending motions in the Adversary Proceeding. On December 13, 2023, Judge Cronan granted the motion to withdraw the reference. To date, no court has ruled on the FDIC's motions to dismiss. On January 15, 2024, the Debtor submitted a letter—joined by the UCC, the Ad Hoc Group of Senior Noteholders, and the Ad Hoc Cross-Holder Group—requesting that Judge Cronan stay the Adversary Proceeding pending further developments in the Debtor's parallel actions against the FDIC. On January 25, 2024, Judge Cronan adjourned *sine die* the oral argument on the pending motions to dismiss and directed the parties to provide the court with updates on any material developments in the Adversary Proceeding, including, no later than March 10, 2024, an update on any other proceedings by the Debtor against the FDIC-C or either of the FDIC-Rs. As of the date of this Disclosure Statement, the Debtor's request for a stay remains pending.

## 2.    FDIC-C Proceedings

On June 26, 2023, the Debtor sent a letter to the FDIC-C demanding access to, or payment of, its $1.93 billion Account Funds as required by the Treasury Secretary's invocation of the systemic risk exception. On September 19, 2023, the FDIC-C sent the Debtor a letter stating that it intended to treat the Debtor's June 26 letter as a deposit claim under 12 U.S.C. § 1821(f), and on October 20, 2023, the FDIC-C denied the Debtor's claim for its Account Funds. On December 19, 2023, the Debtor commenced an action against the FDIC-C in the United States District Court for the Northern District of California to seek relief from the FDIC-C's withholding of the Account Funds and to protect the Debtor's rights in the event that section 1821(f) is found to apply to the Debtor's claims against the FDIC-C. That action is currently pending before Judge Beth Labson Freeman at *SVB Financial Group* v. *Federal Deposit Insurance Corporation, in Its Corporate Capacity*, No. 23-cv-06543 (BLF) (N.D. Cal.). As of the date of this Disclosure Statement, the FDIC-C has not answered or otherwise responded to the Debtor's complaint in that action.

### 3. Proceedings with the FDIC-Rs

On July 11, 2023, the Debtor filed a protective proof of claim with each of the FDIC-R1 and FDIC-R2 regarding the Account Funds, which the FDIC-Rs each separately disallowed on January 5, 2024. The Notice of Disallowance of Claim received by the Debtor from the FDIC-R1 states that "[t]he deposit claim is denied as not proven to the satisfaction of the receiver due to the receiver's defenses. All other claims are denied as speculative, unsupportable, or otherwise not proven to the satisfaction of the receiver." [D.I. 800]. The Notice of Disallowance of Claim received by the Debtor from the FDIC-R2 states that "[t]he deposit claim is denied as not proven to the satisfaction of the receiver because it is not a liability of the FDIC as receiver for Silicon Valley Bridge Bank. All other claims are denied as speculative, unsupportable, or otherwise not proven to the satisfaction of the receiver." [D.I. 800]. Under 12 U.S.C. § 1821(d)(6)(A), the Debtor may "file suit on [its] claim" within 60 days of "the date of any notice of disallowance" in either the United States District Court for the Northern District of California or the United States District Court for the District of Columbia. That deadline falls on March 5, 2024.

## L.    SVB Securities Sale

### 1.    SVB Securities Bidding Procedures

The Debtor and its advisors developed bidding and auction procedures for the marketing and sale of certain assets in this Chapter 11 Case in an orderly and value maximizing manner (the "Bidding Procedures"). On April 27, 2023, the Debtor filed the *Debtor's Motion for Entry of Orders (I)(A) Approving Bid Procedures and the Form and Manner of Notices for the Sale of SVB Securities and (B) Scheduling Auction(s) and Sale Hearing(s), (II) Approving the Sale(s) Free and Clear of Liens, Claims, Interests and Encumbrances and (III) Granting Related Relief* [D.I. 137] (the "SVB Securities Bidding Procedures Motion"). On May 17, 2023, the Bankruptcy Court entered the *Order (A) Approving Bid Procedures and the Form and Manner of Notices for the Sale of SVB Securities, (B) Scheduling Auction(s) and Sale Hearing(s) and (C) Granting Related Relief* [D.I. 250] (the "Bidding Procedures Order"), approving the SVB Securities Bidding Procedures Motion.

### 2.    Post-Petition Marketing Process for SVB Securities

Following the Petition Date and in accordance with the Bidding Procedures Order, the Debtor and its advisors engaged in discussions with various interested parties regarding a sale of the SVB Securities business. The Debtor and its advisors conducted an extensive marketing process of the SVB Securities business, including, among other things, engaging with twenty-nine (29) interested parties. Seven of these parties executed non-disclosure agreements and were granted access to a virtual data room with an overview of information regarding the SVB Securities business. The Debtor's management gave five management presentations to interested parties and, along with the Debtor's advisors, participated in numerous calls with interested parties to address diligence and related topics.

Two bidders submitted non-binding indications of interest for the SVB Securities business or portions thereof and were provided with access to additional diligence materials

through a virtual data room.  The Debtor's marketing process ultimately yielded one binding bid (the "SVBS Bid") from Saffron Buyer LLC ("SVBS Buyer"), an acquisition vehicle established by certain members of the senior management team of SVB Securities and certain funds managed by The Baupost Group, L.L.C.

**3.      SVBS Bid**

On June 2, 2023, the Debtor adjourned the scheduled auction and sale hearing as permitted under the Bidding Procedures Order [D.I. 307], and during the additional time afforded by such adjournment, the Debtor sought to improve the terms of the SVBS Bid.  The Debtor successfully negotiated for meaningful improvements in the terms of SVBS Buyer's bid, and after thoroughly considering SVBS Buyer's improved bid against alternatives, in consultation with the Debtor's advisors, the Debtor determined that the bid from SVBS Buyer was the highest or otherwise best bid for the SVB Securities business, cancelled the auction and declared SVBS Buyer as the successful bidder [D.I. 335].

As set forth in the purchase agreement for the SVBS Bid, the consideration for the SVB Securities business consisted of (i) a cash purchase price of $55 million, (ii) a payoff of certain subordinated debt held by SVB Securities (in the approximate amount of $26 million), (iii) the assumption of certain transferred liabilities, including significant deferred compensation obligations, (iv) a synthetic equity instrument initially representing a 5% equity interest in the direct parent of SVBS Buyer and (v) certain other payments payable at closing (subject to certain adjustments).  On July 5, 2023, the Bankruptcy Court approved the sale of the SVB Securities business to SVBS Buyer and entered the *Order (I) Authorizing the Debtor to Sell the SVB Securities Business by (A) Causing Non-Debtor Subsidiary to Sell Membership Interests in Certain Non-Debtor Entities that Operate the SVB Securities Business and Certain Related Assets and (B) Selling Certain Related Assets of the Debtor Free and Clear of All Liens, Claims, Interests and Encumbrances and (II) Granting Related Relief* [D.I. 393].  The sale closed on October 2, 2023 [D.I. 583].

MoffettNathanson LLC was not included in the sale, and the Debtor continues to own the equity interests in that entity.  The Plan contemplates that MoffettNathanson LLC will be a direct or indirect subsidiary of NewCo upon the Effective Date.

**M.      SVB Capital Reorganization and Strategic Alternatives Review**

As noted above, SVB Capital historically operated as a "virtual" subsidiary for the Debtor, without a formal non-debtor subsidiary legal entity.  Since the Petition Date, in order to continue operating this business in the ordinary course, the Debtor took several steps to consolidate the various operations that comprise SVB Capital (collectively, the "SVB Capital Reorganization").  The Debtor formed a new direct subsidiary, SVB Capital Holdco, LLC ("SVBC Holdco") to house the various operations of SVB Capital.  The Debtor also formed a wholly owned direct subsidiary of SVBC Holdco, SVB Capital Management, LLC ("SVBC ManCo") to serve as the investment advisor for SVB Capital funds and to directly employ all SVB Capital employees.  On August 29, 2023, the Debtor moved for entry of an order approving the assumption and assignment of investment advisory contracts (the "Advisory Contracts") to SVBC ManCo and to contribute certain non-economic non-member manager interests in SVB

25

Capital's Qualified Investor Funds (the "Manager Interests") [D.I. 534].  The Bankruptcy Court approved this motion on September 20, 2023 [D.I. 570], and on October 1, 2023, the Debtor assigned the Advisory Contracts and Manager Interests to SVBC ManCo.  Upon such assignment, SVBC ManCo became the registered investment adviser for SVB Capital funds.

In parallel with the SVB Capital Reorganization, the Debtor and its advisors considered a range of strategic alternatives with respect to SVB Capital and conducted an extensive marketing process of the SVB Capital business.  On January 9, 2024, the Debtor announced that it had determined, in consultation with its advisors and creditor constituencies, that retaining the SVB Capital business would result in superior value creation opportunities, and created a new operating committee to oversee all aspects of the business.  The SVB Capital business is currently overseen by its operating committee and operates through SVBC ManCo, SVB Capital's registered investment adviser and the Debtor's indirect subsidiary.

The Plan contemplates that SVBC Holdco and SVBC ManCo will be direct or indirect subsidiaries of NewCo upon the Effective Date.

## N.    The Restructuring Support Agreement

Throughout the Chapter 11 Case, the Debtor has worked tirelessly to build consensus among key creditor constituencies on the terms of a plan of reorganization.  Sustained, substantive engagement with the UCC, the Ad Hoc Group of Senior Noteholders and the Ad Hoc Cross-Holder Group has allowed the Debtor to drive significant progress in this case to date.  After months of hard-fought negotiations, the Debtor was able to reach resolution with two of these constituencies: the UCC and the Ad Hoc Group of Senior Noteholders.  On January 9, 2024, the Debtor announced that it had entered into the RSA with the UCC and members of the Ad Hoc Group of Senior Noteholders then holding 48.7% of the aggregate outstanding principal amount of the Senior Notes [D.I. 798] (collectively, the "RSA Parties").  As of the date of this Disclosure Statement, members of the Ad Hoc Group of Senior Noteholders holding in excess of 65.19% of the Senior Notes Claims have executed the RSA. Appended to the RSA was a term sheet for a proposed plan of reorganization ("Plan Term Sheet").

The RSA provides for a fair and confirmable plan that the Debtor believes will lead to a swift and consensual resolution of the Chapter 11 Case and represents the RSA Parties' mutual support and commitment with respect to the Debtor's proposed Plan to facilitate the consensual emergence of the Debtor from chapter 11.  The RSA provides that the Debtor will implement the Restructuring Transactions in accordance with certain milestones by which, absent extension or waiver in writing, and subject to the Bankruptcy Court's availability, (a) the Debtor must file the Plan and Disclosure Statement; (b) holders of more than two-thirds of the aggregate outstanding principal amount of the Senior Notes must become party to the RSA; (c) the Bankruptcy Court shall have entered an order to pay certain professional fees and expenses, subject to the terms of the RSA; (d) the Bankruptcy Court shall have entered the Disclosure Statement Order; (e) the Bankruptcy Court shall have entered the Confirmation Order; and (f) the Effective Date shall have occurred.

Pursuant to the terms of the RSA, the RSA Parties also made various commitments to continue support of the Debtor's emergence from chapter 11.  For instance, the

RSA Parties mutually committed to using commercially reasonable efforts to support the consummation and implementation of the Restructuring Transactions (as defined below), among other affirmative and negative covenants.  Second, the terms of the RSA outline various consent rights to facilitate consensus building among the RSA Parties, such as consent rights related to any change in the Debtor's tax election and related decisions, the Debtor's interactions with the Internal Revenue Service (the "IRS"), and matters regarding the claims and Causes of Action of the Debtor against certain related parties of the Debtor and against the FDIC-R1, FDIC-R2 and FDIC-C.  Finally, the Plan Term Sheet represented consensus on several key terms of the Plan, including, for instance:  the classification and treatment of Claims and Interests, the formation of NewCo and the Liquidating Trust, and the issuance of NewCo Debt.  The foregoing summary of the RSA is qualified in its entirety by reference to the RSA, attached hereto as Appendix E.

## ARTICLE IV

## SUMMARY OF THE PLAN

The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying Claims against, and Interests in, a debtor.  Confirmation of a plan makes the plan binding upon the debtor, any issuer of securities under the plan and any creditor of, or equity Holder in, the debtor, whether or not such creditor or equity Holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the effective date of the plan and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the Holders of Claims or Interests in certain classes are to remain unaltered by the reorganization effectuated by the plan.  Such classes are referred to as "unimpaired" and, because of such favorable treatment, are conclusively presumed to accept the plan.  Accordingly, a debtor need not solicit votes from the Holders of Claims or Interests in such classes.  A chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any Claim against a debtor.  Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan.  Any classes that are receiving a distribution of property under the plan but are impaired will be solicited to vote to accept or reject the plan.

Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.  To satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtor is submitting this Disclosure Statement to Holders of Claims and Interests against the Debtor who are entitled to vote to accept or reject the Plan.

The classification and treatment of Claims and Interests; implementation of the Plan; provisions governing Distributions; effect of Confirmation, including the release, injunction and related provisions; and treatment of Executory Contracts and Unexpired Leases are summarized below.  For all other provisions relating to the Plan, including among other

things, acceptance or rejection of the Plan, conditions precedent to effectiveness of the Plan, modification, revocation or withdrawal of the Plan, and retention of jurisdiction, please refer to the Plan attached hereto as <u>Appendix A</u>.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY AND IS SUBJECT TO THE PLAN AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN. REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR UNDER THE PLAN. UPON THE OCCURRENCE OF THE EFFECTIVE DATE, THE PLAN AND ALL SUCH DOCUMENTS WILL BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR AND ITS ESTATE AND ALL OTHER PARTIES-IN-INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

STATEMENTS AS TO THE RATIONALE UNDERLYING THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ARE NOT INTENDED TO, AND SHALL NOT, WAIVE, COMPROMISE OR LIMIT ANY RIGHTS, CLAIMS OR CAUSES OF ACTION IN THE EVENT THE PLAN IS NOT CONFIRMED.

**A.      Classification, Treatment and Voting of Claims and Interests**

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides claims and interests into Classes and sets forth the treatment for each Class (other than administrative expense claims, which, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be and have not been classified). The Debtor is also required, under section 1122 of the Bankruptcy Code, to classify claims against and interests in the Debtor into Classes that contain claims and interests that are substantially similar to the other claims and interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a

less favorable treatment of its claim or interest.  The Debtor believes that it has complied with such standard.  If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the holders of claims and interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Debtor believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Debtor's classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Debtor intends, in accordance with the terms of the Plan and the RSA, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation.  Any such reclassification could materially adversely affect Holders of Claims and Interests by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan. EXCEPT AS SET FORTH IN THE PLAN AND THE RSA, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM OR INTERESTS AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM OR INTEREST PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM OR INTEREST REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

Any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors.  The projected recoveries are based on information available to the Debtor as of the date hereof and reflect the Debtor's views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below.  The Debtor believes that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests.  The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan.  Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

### 1.    Claims Classification and Voting Status

The classification of Claims and Interests pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Senior Note Claims and Other General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Subordinated Note Claims | Impaired | Entitled to Vote |
| 5 | Preferred Equity Interests | Impaired | Entitled to Vote |
| 6 | Common Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Claims and Intercompany Interests | Impaired or Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

## B.    The Liquidating Trust

### 1.    The Liquidating Trust Agreement

On or before the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement. The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties and authorities do not affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes. Notwithstanding anything in the Liquidating Trust Agreement to the contrary, the Liquidating Trust will be structured and operate in a manner that does not require registration of the Liquidating Trust under the Investment Company Act of 1940 or render it subject to the SEC reporting requirements under Sections 12 or 15 of the Exchange Act.

### 2.    Purpose of the Liquidating Trust

The Liquidating Trust will be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets, in accordance with section 301.7701-4(d) of the U.S. Treasury regulations (the "Treasury Regulations"), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. The Liquidating Trust will be deemed a successor-in-interest of the Debtor to the maximum extent necessary for the Liquidating Trust to execute its purpose, and will not otherwise be deemed a successor-in-interest to the Debtor for any purpose other than as specifically set forth in the Plan or in the Liquidating Trust Agreement.

3.    **Liquidating Trust Assets**

On the Effective Date, the Liquidating Trust Assets will be deemed irrevocably transferred to the Liquidating Trust or entities to be formed by the Liquidating Trust, in each case in accordance with the Restructuring Transactions Memorandum and without any further action of NewCo, the Debtor or its subsidiaries or any of their respective managers, employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives.  The Liquidating Trust Assets will vest in the Liquidating Trust, free and clear of all Liens, Claims, charges, rights, or other encumbrances subject to and in accordance with the Plan and the Liquidating Trust Agreement.  For purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust will not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer.  Such transfer will be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtor and its predecessors, successors and assigns, and each other Entity released pursuant to Section 12.9 of the Plan will be discharged and released from all liability with respect to the delivery of such distributions.  Upon the transfer of the Liquidating Trust Assets and pursuant to the Liquidating Trust Agreement, the Debtor will have no reversionary or further interest in or with respect to the Liquidating Trust Assets.

After the Effective Date, the Liquidating Trust may, in its reasonable discretion, contribute all or a portion of the Liquidating Trust Assets to one or more entities (i) wholly owned by the Liquidating Trust and (ii) treated as corporations for U.S. federal income tax purposes (each such entity, a "Blocker Corporation"); *provided* that, the Liquidating Trust will evaluate any such transfer based on the relative tax costs and other tax consequences to the Liquidating Trust Beneficiaries of contributing such assets as compared to if such assets were not contributed to a Blocker Corporation.

4.    **Administration of the Liquidating Trust**

The business and affairs of the Liquidating Trust will be managed by or under the direction of the Liquidating Trust Board.  On the Effective Date, the Liquidating Trust Board will be appointed by the Required Ad Hoc Senior Noteholder Parties in a manner reasonably acceptable to the UCC.  Following the Effective Date, the appointment and removal of the members of the Liquidating Trust Board will be governed by the Liquidating Trust Agreement.

The Liquidating Trust will have all the rights, powers and duties necessary to carry out its responsibilities under the Plan and the Confirmation Order.  For the avoidance of doubt, these powers will include, to the extent applicable, the power to assert, enforce, release, or waive any privilege or any defense (including as to any privilege that the Debtor held prior to the Effective Date).  The Liquidating Trust will be the exclusive representative of the Debtor's Estate for the purposes of 31 U.S.C. § 3713(b) and section 1123(b)(3)(B) of the Bankruptcy Code and receiver, trustee or assignee of all or substantially all the property or business pursuant to 26 U.S.C. § 6012(b)(3).

In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, and subject to the terms of the Confirmation Order, the Plan and the Liquidating Trust Agreement, the Liquidating Trust will, among other things, have the following rights and powers:  (i) to hold, manage, convert to Cash, and distribute the Liquidating Trust Assets to holders of Liquidating Trust Interests, including prosecuting and resolving the claims and Retained Causes of Action belonging to the Liquidating Trust, *provided*, for the avoidance of doubt, that any investment powers of the Liquidating Trust, other than those reasonably necessary to maintain the value of the assets and to further the liquidating purpose of the trust, must be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills, (ii) to sell, transfer, lease, encumber, or otherwise dispose of the Liquidating Trust Assets, (iii) to investigate, prosecute, settle and/or abandon rights, causes of action, or litigation of the Liquidating Trust, including Avoidance Actions, (iv) to disburse funds in the Professional Fee Reserve and the Liquidating Trust Disputed Claims Reserve in accordance with the Liquidating Trust Agreement, which will be consistent with the Plan, (v) to distribute Liquidating Trust Interest from the Liquidating Trust Disputed Interests Reserve in accordance with the Liquidating Trust Agreement, which will be consistent with the Plan, (vi) to distribute NewCo Common Stock from the NewCo Disputed Claims Reserve in accordance with the Shared Services Agreement and the Liquidating Trust Agreement, as applicable, which will be consistent with the Plan, (vii) to file all Tax Returns and tax and regulatory forms, returns, reports, and other documents required with respect to the Liquidating Trust and any Disputed Claims Reserve, (viii) to object to Claims, and manage, control, prosecute, and/or settle on behalf of the Liquidating Trust, objections to Claims on account of which the Distribution Agent will be responsible (if Allowed) for making distributions under the Plan, (ix) to take all actions necessary and create any document necessary to implement the Plan, (x) to act as a signatory to the Debtor for all purposes, including those associated with the novation of contracts or other obligations arising out of the sales of the Debtor's assets, and (xi) to take all necessary actions and file all appropriate motions to obtain an order closing the Chapter 11 Case.  Under no circumstance may any person on the Liquidating Trust Board serve on the board of directors of any Affiliate of the Liquidating Trust.

5.       **Substitution in Pending Legal Actions**

On the Effective Date, the Liquidating Trust will be deemed to be substituted as the party to any pending litigation of a Retained Cause of Action in which the Debtor is a party and will be authorized, but not required, to file notices or other pleadings in such actions to effectuate its substitution for the Debtor.  Such substitution will not result in holders of Claims, including litigation Claims, against the Debtor receiving greater rights in or against the Liquidating Trust than they are otherwise entitled to under the Plan and Liquidating Trust Agreement on account of such Claims.

6.       **Distribution of Liquidating Trust Assets**

i.       From time to time (but no less frequently than annually), the Liquidating Trust will distribute to the Liquidating Trust Beneficiaries on account of their Liquidating Trust Interests in accordance with Section 5.6 of the Plan all unrestricted Cash on hand; *provided*, that in no event will the

Liquidating Trust be required to distribute amounts reasonably necessary to (A) meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (B) pay reasonable incurred or anticipated expenses (including, but not limited to, any Taxes imposed on or payable by the Liquidating Trust or in respect of the Liquidating Trust Assets), or (C) satisfy other liabilities incurred or anticipated by the Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement.

ii.     The Liquidating Trust will issue class A trust units (the "Class A Trust Units"), class B trust units (the "Class B Trust Units") and class C trust units (the "Class C Trust Units") to Holders of Claims and Interests in accordance with Sections 4.2**Error! Reference source not found.** and 11.8 of the Plan.

iii.    The Class A Trust Units will be issued to Holders of Allowed General Unsecured Claims (other than Holders of Allowed General Unsecured Claims that elect to participate in the GUC Cash-Out) with an initial distribution preference of $[•],[14] which will accrete at an annual rate of 12%.  The Class B Trust Units and the Class C Trust Units will receive no distributions until the distribution preference (including, for the avoidance of doubt, any accretion thereto) of the Class A Trust Units has been satisfied in full.

iv.     The Class B Trust Units will be issued to Holders of Allowed Subordinated Note Claims with an initial distribution preference to be calculated at the face amount of the Allowed Subordinated Note Claims, which Class B Trust Units will accrete at an annual rate of 12%.

v.      The Class C Trust Units will be issued to Holders of Allowed Preferred Equity Interests and will receive no distributions until the distribution preference (including, for the avoidance of doubt, any accretion thereto) of the Class B Trust Units has been satisfied in full.

vi.     After satisfaction of the Class A and Class B Trust Units in full, the Class C Trust Units will be entitled to 100% of Liquidating Trust distributions.

---

[14]   [**NTD**:  To be calculated at the face amount (including accrued and unpaid interest on the Senior Notes as of the Petition Date) of the General Unsecured Claims receiving Class A Trust Units, *minus* the value of NewCo Common Stock distributed to Holders of Allowed General Unsecured Claims; *provided* that the determination of such value will be acceptable to the Debtor, the UCC, and the Required Ad Hoc Senior Noteholder Parties and will take into account any NewCo Transaction(s) to be consummated on or prior to the Effective Date. Calculation of the Class A distribution preference and determination of value of NewCo Common Stock to be included in an updated version of the Disclosure Statement filed with the Court in advance of the Disclosure Statement hearing.]

7.      **Costs and Expenses of the Liquidating Trust**

The individuals serving as or comprising the Liquidating Trust Board will be
entitled to reasonable compensation in an amount consistent with that of similar functionaries in
similar roles and paid out of the Liquidating Trust Assets.  The fees and expenses incurred by the
Liquidating Trust Board on or after the Effective Date and any reasonable compensation and
expense reimbursement claims (including attorney fees and expenses) made by the Liquidating
Trust Board in connection with such Liquidating Trust Board's duties will be paid without any
further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the
Liquidating Trust Assets.  Fees and expenses incurred in connection with the prosecution and
settlement of any Claims will be considered costs and expenses of the Liquidating Trust.

The Debtor, NewCo, the Delaware Trustee and the Liquidating Trust Board, as
applicable, will not be required to give any bond or surety or other security for the performance
of its duties unless otherwise ordered by the Bankruptcy Court.  In the event that the Delaware
Trustee or the Liquidating Trust Board is so ordered after the Effective Date, all costs and
expenses of procuring any such bond or surety will be paid for with Cash from the Liquidating
Trust Assets.

8.      **Retention of Professionals/Employees by the Liquidating Trust Board**

The Liquidating Trust Board may appoint officers or other representative agents
of the Liquidating Trust, including a Liquidating Trust manager and a secretary, to serve as
agents to the Liquidating Trust and carry out the purpose of the Liquidating Trust.  The
Liquidating Trust Board will have the right to hire employees and retain the services of
attorneys, accountants, and other professionals, subject to any limitations imposed by the
Liquidating Trust Board, that are necessary to assist the Liquidating Trust Board in the
performance of their duties without Bankruptcy Court approval.  Without limiting the foregoing,
the Liquidating Trust Board may retain any professional that represented parties in interest in the
Chapter 11 Case.

9.      **Liquidating Trust Disputed Claims Reserve**

On or after the Effective Date, the Liquidating Trust will be authorized, but not
directed, to establish one or more Liquidating Trust Disputed Claims Reserves.  After the
Effective Date, the Liquidating Trust may, in its sole discretion, hold any property to be
distributed pursuant to the Plan, in the same proportions and amounts as provided for in the Plan,
in the Liquidating Trust Disputed Claims Reserve in trust for the benefit of the Holders of
Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Other Priority
Claims and Disputed Other Secured Claims ultimately determined to be Allowed after the
Effective Date; *provided* that the Liquidating Trust will use reasonable effort to allocate
sufficient property for the Liquidating Trust Disputed Claims Reserves.  The Liquidating Trust
will distribute such amounts (net of any expenses, including any taxes relating thereto or
otherwise payable by the Liquidating Trust Disputed Claims Reserve), as provided under the
Plan, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts
will be distributable on account of such Claims as such amounts would have been distributable
had such Claims been Allowed Claims as of the Effective Date.  Amounts remaining in the

34

Liquidating Trust Disputed Claims Reserve, if any, after the resolution of all applicable Disputed Claims and the satisfaction of all applicable Allowed Disputed Claims will promptly be transferred to the Liquidating Trust, without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

> **10.    Liquidating Trust Disputed Interests Reserve**

On or after the Effective Date, the Liquidating Trust will be authorized, but not directed, to establish one or more Liquidating Trust Disputed Interests Reserves.  After the Effective Date, the Liquidating Trust may, in its sole discretion, hold any property to be distributed pursuant to the Plan (other than NewCo Common Stock), in the same proportions and amounts as provided for in the Plan, in the Liquidating Trust Disputed Interests Reserve in trust for the benefit of the Holders of Disputed General Unsecured Claims, Disputed Subordinated Note Claims and Disputed Preferred Equity Interests ultimately determined to be Allowed after the Effective Date; *provided* that the Liquidating Trust will use reasonable effort to allocate sufficient property for the Liquidating Trust Disputed Interests Reserves.  The Liquidating Trust will distribute such amounts (net of any expenses, including any taxes relating thereto or otherwise payable by the Liquidating Trust Disputed Interests Reserve), as provided under the Plan, as such Claims or Interests are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims or Interests as such amounts would have been distributable had such Claims or Interests been Allowed Claims or Interests as of the Effective Date.  Amounts remaining in the Liquidating Trust Disputed Interests Reserve, if any, after the resolution of all applicable Disputed Claims or Interests and the satisfaction of all applicable Allowed Disputed Claims and Interests, if any, will promptly be transferred to the Liquidating Trust, without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

> **11.    NewCo Disputed Claims Reserve**

On or after the Effective Date, the Liquidating Trust will be authorized, but not directed, to establish one or more NewCo Disputed Claims Reserves, and such NewCo Disputed Claims Reserves will be deemed transferred to the Liquidating Trust or entities to be formed by the Liquidating Trust, in each case in accordance with the Restructuring Transactions Memorandum and without any further action of NewCo, the Debtor or its subsidiaries or any of their respective managers, employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives.  After the Effective Date, the Liquidating Trust may, in its sole discretion, hold any NewCo Common Stock to be distributed pursuant to the Plan, in the same proportions and amounts as provided for in the Plan, in the NewCo Disputed Claims Reserve in trust for the benefit of the Holders of Disputed General Unsecured Claims ultimately determined to be Allowed after the Effective Date; *provided* that the Liquidating Trust will use reasonable effort to allocate sufficient property for the NewCo Disputed Claims Reserves.  The Liquidating Trust will distribute such amounts (net of any expenses, including any taxes relating thereto or otherwise payable by the NewCo Disputed Claims Reserve), as provided under the Plan, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims or Interest as of the Effective Date.  Amounts remaining in the NewCo Disputed Claims Reserve, if any, after the resolution of all applicable Disputed

Claims and the satisfaction of all applicable Allowed Disputed Claims, if any, will promptly be transferred to NewCo, without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

### 12.    Federal Income Tax Treatment of the Liquidating Trust

#### (a)    Liquidating Trust Assets Treated as Owned by Creditors

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trust), for all United States federal income tax purposes, all parties (including the Debtor, the Liquidating Trust Board and the Liquidating Trust Beneficiaries) will treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as (i) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to the Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims or Interests, which will be treated as transferred to the applicable Disputed Claims Reserve), followed by (ii) the transfer by such beneficiaries to the Liquidating Trust of the Liquidating Trust Assets (other than to the extent Liquidating Trust Assets are allocable to any Disputed Claims Reserve) in exchange for Liquidating Trust Interests.  Accordingly, the Liquidating Trust Beneficiaries will be treated for United States federal income tax purposes as the grantors and deemed owners of their respective share of the Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to any Disputed Claims Reserve, discussed below).  The foregoing treatment will also apply, to the extent permitted by applicable law, for state and local income tax purposes.

However, there can be no assurance that the IRS or other applicable government entities would not take a contrary position.  If the IRS or other applicable government entities were to challenge successfully the classification of the Liquidating Trust, the U.S. federal (and applicable state and local) income tax consequences to the Liquidating Trust could vary from those discussed herein. *See* Article X below—*Certain U.S. Federal Income Tax Consequences of the Plan*.

#### (b)    Tax Reporting

i.    The Liquidating Trust Board will file Tax Returns for the Liquidating Trust treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) (excluding any Disputed Claims Reserve, which will be reported in accordance with Section 5.12.2.iv of the Plan) and in accordance with Section 5.12 of the Plan.  The Liquidating Trust Board also will annually send to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.  The Liquidating Trust Board will also file (or cause to be filed) any other

statement, return or disclosure relating to the Liquidating Trust or any Disputed Claims Reserve that is required by any Governmental Unit.

ii.    As soon as reasonably practicable after Liquidating Trust Assets are transferred to the Liquidating Trust, the Liquidating Trust Board will make a good faith valuation of Liquidating Trust Assets, and will make all such values available from time to time, to the extent relevant, and such values will be used consistently by all parties to the Liquidating Trust (including the Debtor, the Liquidating Trust Board and Liquidating Trust Beneficiaries) for all United States federal income tax purposes.

iii.    Allocations of Liquidating Trust taxable income among the Liquidating Trust Beneficiaries (other than to the extent such taxable income is allocable to any Disputed Claims Reserve) will be determined by reference to the manner in which an amount of cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, other than assets allocable to any Disputed Claims Reserve) to the holders of the Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust.  Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne in a hypothetical liquidating distribution of the remaining Liquidating Trust Assets (other than the assets allocable to any Disputed Claims Reserve).  The tax book value of the Liquidating Trust Assets for purpose of this paragraph will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

iv.    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trust Board of a private letter ruling if the Liquidating Trust Board so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trust), the Liquidating Trust Board will (A) timely elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Liquidating Trust Board, the Debtor, and the Liquidating Trust Beneficiaries) will report for United States federal, state and local income tax purposes consistently with the foregoing.

v.    The Liquidating Trust Board will be responsible for payment, out of the Liquidating Trust Assets, of any Taxes imposed on the trust or its assets,

including any Disputed Claims Reserve; *provided* that, any Disputed Claims Reserve will bear all Taxes allocable to such Disputed Claims Reserve.  In the event, and to the extent, any Cash retained on account of Disputed Claims or Interests in any Disputed Claims Reserve is insufficient to pay the portion of any such Taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims or Interests (including any income that may arise upon the distribution of the assets of any Disputed Claims Reserve), such Taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of such Disputed Claims or Interests, (ii) paid with the proceeds from a sale of the assets of the applicable Disputed Claims Reserve or (iii) to the extent such Disputed Claims or Interests have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidating Trust Board as a result of the resolution of such Disputed Claims or Interests.

vi.    The Liquidating Trust Board may request an expedited determination of Taxes of the Liquidating Trust, any Disputed Claims Reserve, or the Debtor under section 505(b) of the Bankruptcy Code for all Tax Returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

**(c)    Tax Withholdings by Liquidating Trust Board**

The Liquidating Trust Board may withhold and pay to the appropriate Tax Authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of Liquidating Trust Interests.  All such amounts withheld and paid to the appropriate Tax Authority (or placed in escrow pending resolution of the need to withhold) will be treated as amounts distributed to such holders of Liquidating Trust Interests for all purposes of the Liquidating Trust Agreement; *provided* that any amount placed in escrow pending resolution of the need to withhold that is deemed to exceed the amount required to be withheld will be distributed to the applicable holders of Liquidating Trust Interests as soon as reasonably practicable following the determination of the withholding requirement.  The Liquidating Trust Board will be authorized to collect such tax information from the holders of Liquidating Trust Interests (including social security numbers or other tax identification numbers) as in its sole discretion the Liquidating Trust Board deems necessary to effectuate the Plan, the Confirmation Order, and the Liquidating Trust Agreement.  In order to receive distributions under the Plan, all holders of Liquidating Trust Interests (including holders of Allowed Senior Note Claims, Allowed Other General Unsecured Claims, Allowed Subordinated Note Claims and Allowed Preferred Equity Interests, who, in each case, deliver a release in accordance with the provisions of Section 12.9 of the Plan) will be required to identify themselves to the Liquidating Trust Board and provide tax information and the specifics of their holdings, to the extent the Liquidating Trust Board deems appropriate in the manner and in accordance with the procedures from time to time established by the Liquidating Trust Board for these purposes.  This identification requirement generally applies to all holders, including those who hold their securities in street name.  The Liquidating Trust Board may refuse to make a distribution to any

38

holder of a Liquidating Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered, and may treat such holder's Liquidating Trust Interests as disputed; *provided*, *however*, that, if such information is not furnished to the Liquidating Trust Board within six (6) months of the original request to furnish such information, no further distributions will be made to the holder of such Liquidating Trust Interest; and, *provided*, *further*, that, upon the delivery of such information by a holder of a Liquidating Trust Interest, the Liquidating Trust Board will make such distribution to which the holder of the Liquidating Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; and, *provided*, *further*, that if the Liquidating Trust Board fails to withhold in respect of amounts received or distributable with respect to any such holder and the Liquidating Trust Board is later held liable for the amount of such withholding, such holder will reimburse the Liquidating Trust Board for such liability (to the extent such amounts were actually distributed to such holder).

### (d)    Dissolution

The Liquidating Trust Board and the Liquidating Trust will be discharged or dissolved, as the case may be, upon the earlier to occur of (i) all distributions required to be made by the Liquidating Trust Board under the Plan and the Liquidating Trust Agreement have been made, and (ii) the Liquidating Trust Board determines that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit; *provided*, *however*, in no event will the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth (5th) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trust Board that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.  If at any time the Liquidating Trust Board determines, in reliance upon such professionals as the Liquidating Trust Board may retain, that the expense of administering the Liquidating Trust (and any Disputed Claims Reserve) so as to make a final distribution to its beneficiaries is likely to exceed the value of the assets remaining in the Liquidating Trust, the Liquidating Trust Board may apply to the Bankruptcy Court for authority to (a) reserve any amount necessary to dissolve the Liquidating Trust (and any Disputed Claims Reserve), (b) donate any balance to a charitable organization (A) described in section 501(c)(3) of the Tax Code, (B) exempt from United States federal income tax under section 501(a) of the Tax Code, (C) not a "private foundation", as defined in section 509(a) of the Tax Code, and (D) that is unrelated to the Debtor, NewCo, the Liquidating Trust and any insider of the foregoing and (c) dissolve the Liquidating Trust (and any Disputed Claims Reserve).

### (e)    Indemnification of Liquidating Trust Board

The Liquidating Trust Agreement will provide for the indemnification of the Liquidating Trust Board, the individual(s) comprising the Liquidating Trust Board, the Delaware Trustee and certain other individuals as may be set forth therein.  Any indemnification claim of the Liquidating Trust Board (and the other parties entitled to indemnification under this

subsection) will be satisfied solely from the Liquidating Trust Assets.  The Liquidating Trust may obtain, at the expense of the Liquidating Trust and with funds from the Liquidating Trust Assets, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Liquidating Trust Board or any employees of the Liquidating Trust.

### (f)    Exculpation Relating to the Liquidating Trust

No Holder of a Claim or Interest or any other party in interest will have, or otherwise pursue, any Claim or Cause of Action against the Liquidating Trust Board, the Liquidating Trust, or the consultants or professionals thereof (for each of the foregoing, solely in the performance of their duties) for making payments and distributions in accordance with the Plan and the Liquidating Trust Agreement or for fulfilling any functions incidental to implementing the provisions of the Plan or the Liquidating Trust Agreement, except for any acts or omissions that are the result of fraud, gross negligence or willful misconduct.

### (g)    Abandonment of Liquidating Trust Assets

Subject to the Liquidating Trust Agreement, after the Effective Date, the Liquidating Trust Board may abandon any Liquidating Trust Assets which the Liquidating Trust Board determines in its reasonable discretion to be of *de minimis* value or burdensome to the Liquidating Trust.

## C.    Implementation of the Plan

### 1.    Operations Between the Confirmation Date and Effective Date

During the period from the Confirmation Date through and until the Effective Date the Debtor may continue to operate its businesses as debtor-in-possession in the ordinary course in a manner consistent with past practice in all material respects, and as otherwise necessary to consummate the Plan, subject to the terms and conditions of the RSA and all applicable orders of the Bankruptcy Court and the consent rights set forth in the RSA, the Plan and any other Definitive Documents.

### 2.    Sources of Cash for Plan Distributions

Cash payments or distributions to be made hereunder on the Effective Date will be funded from the existing Cash of the Debtor and the Cash proceeds of a NewCo Transaction, if any.

### 3.    NewCo Transaction

The Debtor, the Required Ad Hoc Senior Noteholder Parties and the UCC will continue to work together in good faith to evaluate opportunities to maximize the value of all or some of the assets or equity of NewCo, including through a rights offering, marketing process, private placement, or otherwise (any such transaction, a "NewCo Transaction").  The terms of any such NewCo Transaction will be acceptable to each of the Debtor, the Required Ad Hoc Senior Noteholder Parties and the UCC.  Following Confirmation, without further order or

approval of the Bankruptcy Court and subject to any applicable consent rights set forth in the RSA, the Debtor may in good faith make modifications to the Plan to maximize the value of all or some of the assets or equity of NewCo in connection with a NewCo Transaction (if any); *provided* that such modifications do not materially and adversely affect the treatment of Holders of Claims or Interests and are otherwise permitted under section 1127(b) of the Bankruptcy Code.

### 4.      Exemption from Registration

The Debtor believes that, subject to certain exceptions described below, various provisions of the Securities Act, the Bankruptcy Code and applicable state securities laws ("Blue Sky Laws") exempt from federal and state securities registration requirements (i) the offering, issuance, exchange, distribution or sale of securities pursuant to the Definitive Documents and (ii) subsequent transfers of such securities.

The Liquidating Trust Interests to be distributed to the Liquidating Trust Beneficiaries pursuant to the Plan will be transferrable as set forth in the Liquidating Trust Agreement.  The Liquidating Trust Interests will not be listed on any national exchange and will have the consent and voting rights provided in the Liquidating Trust Agreement.  The Liquidating Trust and the Liquidating Trust Board will not take any steps to facilitate the development of a trading market in the Liquidating Trust Interests.

### (a)      Section 1145

Except with respect to any Person that is an underwriter as defined in section 1145(b) of the Bankruptcy Code, the issuance of the Liquidating Trust Interests to Liquidating Trust Beneficiaries under the Plan and the issuance of NewCo Common Stock to Holders of Allowed General Unsecured Claims under the Plan shall be exempt from registration under Section 5 of the Securities Act (and any applicable Blue Sky Laws) under section 1145(a)(1) of the Bankruptcy Code.

Section 1145(a)(1) of the Bankruptcy Code exempts the issuance, offer, sale, and distribution of securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if the following three principal requirements are satisfied:  (a) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.

The issuance and distribution of the NewCo Common Stock and the Liquidating Trust Interests satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance and distribution are exempt from registration under the Securities Act and any state or local law requiring registration.  To the extent any "offer or sale" of NewCo Common Stock may be deemed to have occurred, such offer or sale is made under the Plan and in exchange for Claims against the Debtor, or principally in exchange for such Claims and partly

for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code.  The availability of the exemptions under section 1145 of the Bankruptcy Code or any other applicable securities laws will not be a condition to occurrence of the Effective Date of the Plan. To the extent section 1145 of the Bankruptcy Code is applicable, the securities to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) in general are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtor as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act.  In addition, securities governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of the various states; however, the availability of such exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration in any given instance.

Notwithstanding the foregoing, any securities or instruments issued under the Plan in reliance on section 1145(a) of the Bankruptcy Code remain subject to:  (x) compliance with any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments; (y) the restrictions in the applicable NewCo Organizational Documents and the Liquidating Trust Agreement, as applicable, on the transferability of such securities and instruments and (z) any other applicable regulatory approval.  Specifically, in an attempt to minimize the likelihood of an additional ownership change occurring after the Effective Date, the charter of NewCo will contain a restriction limiting the accumulation (and disposition) of shares by persons (and certain groups of persons acting in concert) owning (actually or constructively), or who would own (immediately before or after such acquisition), 4.99 percent of any class of stock of NewCo (with certain adjustments), and requiring approval of NewCo's Board for any such transfers.

#### (b)     Section 4(a)(2)

To the extent securities are issued pursuant to the Plan or the other Definitive Documents in reliance on section 4(a)(2) of the Securities Act ("Section 4(a)(2)"), the offering, issuance, exchange, or distribution of such securities pursuant to the Plan or the other Definitive Documents will be conducted in a manner that is exempt from, among other things, the registration requirements of section 5 of the Securities Act.  Section 4(a)(2) exempts from section 5's registration requirements transactions not involving a public offering, and Regulation D under the Securities Act ("Regulation D") provides a safe harbor under Section 4(a)(2) for transactions that meet certain requirements, including that the investors participating therein qualify as "accredited investors" within the meaning of Rule 501 under Regulation D ("Accredited Investors").  Such offering, issuance, exchange or distribution will be structured to be available only to Holders who certify that they are Accredited Investors and who submit documentation allowing verification of their status as Accredited Investors.  Any such securities will be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and will only be transferable if registered under the Securities Act or if transferred pursuant to an exemption from the registration requirements of the Securities Act and other applicable securities laws.

**(c)    DTC**

Should NewCo and/or the Liquidating Trust elect on or after the Effective Date to reflect any ownership of the NewCo Common Stock or the Liquidating Trust Interests, as applicable, through the facilities of DTC, such Entity need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of transfers, exercise, removal of restrictions, or conversion of NewCo Common Stock or the Liquidating Trust Interests, as applicable, under applicable U.S. federal, state or local securities laws.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the NewCo Common Stock or the Liquidating Trust Interests, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the NewCo Common Stock or the Liquidating Trust Interests, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

**5.    NewCo Debt**

On the Effective Date, unless otherwise agreed by the Required Ad Hoc Senior Noteholder Parties in connection with a NewCo Transaction, NewCo or its direct or indirect subsidiary will issue debt (the "NewCo Debt") to the Liquidating Trust in an aggregate principal amount equal to $[•].[15]  Without limiting the foregoing, the issuer of NewCo Debt will pay, as and when due, all fees, expenses, losses, damages, indemnities and other amounts provided under the NewCo Debt Documents.  The principal terms of the NewCo Debt will be set forth in the Plan Supplement.

Confirmation of the Plan will be deemed (a) approval of the NewCo Debt and all transactions contemplated hereby and thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the issuer of NewCo Debt in connection therewith, including the payment of all fees, expenses, losses, damages, indemnities and other amounts provided for by the NewCo Debt Documents and the granting of liens or provision of guarantees by the issuer of NewCo Debt, its direct or indirect parents or any of its subsidiaries to secure the NewCo Debt and (b) authorization for the issuer of NewCo Debt and the Liquidating Trust to enter into and perform under the NewCo Debt Documents.  The NewCo Debt Documents will constitute legal, valid, binding and authorized obligations of the issuer of NewCo Debt, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the NewCo Debt Documents are being extended, and will be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, will not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any

---

[15]    [**NTD**:  Aggregate principal amount to be agreed by the Debtor, the UCC, and the Required Ad Hoc Senior Noteholder Parties reflecting 70-80% of the total enterprise value of NewCo, or a lesser amount agreed by the Debtor, the UCC, and the Required Ad Hoc Senior Noteholder Parties.]

purposes whatsoever, and will not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.

**6.      NewCo Common Stock**

On the Effective Date, NewCo will issue 100% of the NewCo Common Stock to Holders of Allowed General Unsecured Claims, subject to dilution by any NewCo Transaction.

All of the NewCo Common Stock issued pursuant to the Plan will be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of NewCo Common Stock under the Plan will be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the NewCo Organizational Documents and other instruments evidencing or relating to such distribution or issuance, as applicable, which terms and conditions will bind each Entity receiving such distribution or issuance.  For the avoidance of doubt, the acceptance of NewCo Common Stock by any Holder of any Claim or Interest will be deemed as such Holder's agreement to the NewCo Organizational Documents, as may be amended or modified from time to time following the Effective Date in accordance with their terms.

To the extent practicable, as determined in good faith by the Debtor and the Required Ad Hoc Senior Noteholder Parties, NewCo will: (a) emerge from this Chapter 11 Case as a non-publicly reporting company on the Effective Date and not be subject to SEC reporting requirements under Sections 12 or 15 of the Exchange Act, or otherwise; (b) not be voluntarily subjected to any reporting requirements promulgated by the SEC; except, in each case, as otherwise may be required pursuant to the applicable organizational documents or applicable law; (c) not be required to list the NewCo Common Stock on a U.S. stock exchange; (d) timely file or otherwise provide all required filings and documentation to allow for the termination and/or suspension of registration with respect to SEC reporting requirements under the Exchange Act prior to the Effective Date; and, (e) to the extent requested by the Required Ad Hoc Senior Noteholder Parties, make good faith efforts to ensure DTC eligibility of securities issued by NewCo in connection with the Plan (other than any securities required by the terms of any agreement to be held on the books of an agent and not in DTC).

**7.      Deemed Holders of Subordinated Note Claims**

The BP Trust I Declaration of Trust provides that BP Trust I will automatically terminate upon the bankruptcy of SVBFG, as successor by merger to BPFH.[16]  Upon such termination of BP Trust I, the terms of the BP Trust I Preferred Securities require the administrative trustee of the trust to distribute to holders of the BP Trust I Preferred Securities the BP Trust I Junior Subordinated Debentures having a principal amount equal to the liquidation amount per security plus accumulated and unpaid distributions thereon to the date of payment, after satisfaction of liabilities to creditors of BP Trust I as provided by applicable law.[17]  For purposes of the Plan, holders of the BP Trust I Preferred Securities will be deemed to hold the

---

[16]    *See* Section 8.1(a)(i) of the BP Trust I Declaration of Trust.

[17]    *See* Annex I, Section 3 of the BP Trust I Declaration of Trust.

BP Trust I Junior Subordinated Debentures and thus such holders will be deemed to hold the BP Trust I Claims.

The BP Trust II Declaration of Trust provides that BP Trust II will dissolve upon the bankruptcy of SVBFG, as successor by merger to BPFH.[18]  Upon such dissolution of BP Trust II, the terms of the BP Trust II Capital Securities require the institutional trustee of the trust to distribute to holders of the BP Trust II Capital Securities the BP Trust II Junior Subordinated Debentures on a pro rata basis, after satisfaction of liabilities to creditors of BP Trust II as provided by applicable law.[19]  For purposes of the Plan, holders of the BP Trust II Capital Securities will be deemed to hold the BP Trust II Junior Subordinated Debentures and thus such holders will be deemed to hold the BP Trust II Claims.

**8.    Organizational Existence**

Except as otherwise provided in the Plan and the Restructuring Transactions Memorandum, the Debtor will, or as a subsidiary of NewCo will, continue to exist after the Effective Date as a separate legal Entity, with all the powers of a corporation or other form of organization, as applicable, under the laws of its jurisdiction of organization and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under the law of the applicable state or other jurisdiction.

**9.    Cancellation of Existing Interests, Existing Indebtedness and Related Agreements**

On the Effective Date, except as otherwise specifically provided for in the Plan, all rights of any Holder of Interests in the Debtor, including options or warrants to purchase Interests, or obligating the Debtor to issue, transfer or sell Interests of the Debtor, will be canceled.

Upon the indefeasible payment in full in Cash of all Allowed Other Secured Claims, or promptly thereafter, Holders of such Allowed Claims will deliver to the Debtor or, after the Effective Date, the Liquidating Trust, any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Claim that may reasonably be required in order to terminate any related financing statements, mortgages, mechanic's liens, or *lis pendens*, and take any and all other steps reasonably requested by the Debtor or, after the Effective Date, the Liquidating Trust, that are necessary to cancel and/or extinguish any Liens or security interests securing such Holder's Claim; *provided*, *however*, that the Debtor or the Liquidating Trust, as applicable, will be solely responsible for all costs and expenses associated with any of the foregoing actions or requests.

On the Effective Date, except as otherwise provided in the Plan, the obligations of the Debtor under the respective Indentures, and any certificate, share, bond, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of the Debtor giving rise to any Claim or Interest will be

---

[18]    *See* Section 7.1(a)(ii) of the BP Trust II Declaration of Trust.

[19]    *See* Annex I, Section 3 of the BP Trust II Declaration of Trust.

canceled, without any need for a Holder to take further action with respect thereto, and the Debtor and the Liquidating Trust will not have any continuing obligations thereunder; *provided,* that notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of an Allowed Claim or Interest will continue in effect solely for (i) purposes of enabling such Holder to receive distributions under the Plan on account of such Allowed Claim or Interest as provided in the Plan; and (ii) permit the Indenture Trustees to make or assist in making, as applicable, distributions pursuant to the Plan and deduct therefrom such reasonable compensation, fees and expenses (a) due to the Indenture Trustees, or (b) incurred by the Indenture Trustees in making such distributions.  Except as provided in the Plan, on the Effective Date, the Indenture Trustees and their respective agents, successors and assigns will be automatically and fully discharged of their duties and obligations associated with the respective Indentures.  The commitments and obligations of the Holders of the Senior Note Claims and Subordinated Note Claims to extend any further or future credit or financial accommodations to the Debtor, its subsidiaries or assigns under the Indentures, respectively, will fully terminate and be of no further force or effect on the Effective Date.

10.    **Additional Implementing Transactions**

On or prior to the Effective Date, the Debtor and the Liquidating Trust will, in accordance with the RSA and subject to any applicable consent rights thereunder, enter into any transaction and will take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable, the issuance of all securities, notes, instruments, certificates and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, entity formations, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions, including any restructuring transaction contemplated by the RSA (collectively, the "Restructuring Transactions").  The Confirmation Order will, and will be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

11.    **Section 1146 Exemption from Certain Transfer Taxes and Recording Fees**

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers from the Debtor to NewCo, the Liquidating Trust or to any other Entity, pursuant to, in contemplation of, or in connection with the Plan (including any transfer pursuant to:  (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor, the Liquidating Trust, NewCo or Affiliates of NewCo, including, without limitation, the NewCo Common Stock, NewCo Debt and the Liquidating Trust Interests; (ii) the creation, modification, consolidation, assumption, termination, refinancing and/or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment or recording of any lease or sublease; (iv) the grant of collateral as security for the NewCo Debt; or (v) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way

46

related to the Plan) will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents will, and will be directed to, forgo the collection of any such tax, recordation fee or government assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or government assessment.  The Bankruptcy Court will retain specific jurisdiction with respect to these matters.

### 12.    Effectuating Documents and Further Transactions

The Debtor or, after the Effective Date, the Liquidating Trust and NewCo, as applicable, may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.  The secretary and any assistant secretary of the Debtor, NewCo or the Liquidating Trust will be authorized to certify or attest to any of the foregoing actions.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtor will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable law, and without any requirement of further action by the shareholders, directors, managers or partners of the Debtor, or the need for any approvals, authorizations, actions or consents.

On the Effective Date, the Liquidating Trust Agreement, any other organizational document of the Liquidating Trust and the NewCo Organizational Documents will become effective and deemed binding without further action from any Person or Entity (other than the relevant consents required by under the RSA) and will be binding and enforceable upon each of the parties thereto.

### 13.    Abandonment of SVB Stock

At least one day prior to the Effective Date, the Debtor will abandon all of its equity interests in, including all of the common stock of, Silicon Valley Bank (and all entities and arrangements that are treated as a single entity with successor(s) to Silicon Valley Bank for U.S. federal income tax purposes) and take a corresponding worthless stock deduction for U.S. federal income tax and all applicable state and local tax purposes pursuant to a court order permitting the Debtor to abandon such equity interests that the Debtor will request in advance of the Effective Date.

### 14.    Preservation of Retained Causes of Action

Except as provided in the Plan, the Confirmation Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trust or NewCo, as applicable, will retain and may enforce any Retained Causes of Action that the Estate may hold

against any Entity.  The Liquidating Trust or NewCo, as applicable, may pursue any such Retained Causes of Action in accordance with the Plan and the Liquidating Trust Agreement, as applicable.  The Debtor's inclusion or failure to include or describe with sufficient specificity any Retained Causes of Action in the Plan or in the Plan Supplement will not be deemed an admission, denial or waiver of any Retained Causes of Action that the Debtor or the Estate may hold.  The Debtor intends to preserve all Retained Causes of Action.  No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to the Retained Causes of Action upon or after entry of the Confirmation Order on the Effective Date of the Plan based on the Plan or the Confirmation Order, including any argument of waiver on account of the failure to include or describe with sufficient specificity any Retained Causes of Action in the Plan or in the Plan Supplement.

**D.**     **Provisions Regarding Governance of NewCo**

    **1.**     **Organizational Action**

On and after the Effective Date, the adoption, filing, approval, and ratification, as necessary, of all corporate, or related actions contemplated hereby for NewCo will be deemed authorized and approved in all respects.  Without limiting the foregoing, such actions may include:  (i) the adoption of the NewCo Organizational Documents, (ii) the nomination, election, or appointment, as the case may be, of officers, directors and managers for NewCo, (iii) the issuance of the securities contemplated by the Plan or other Definitive Documents and (iv) the Restructuring Transactions to be effectuated pursuant to the Plan and the RSA.

Upon the occurrence of the Effective Date, all matters provided for in the Plan involving the organizational structure of the Debtor or NewCo, or any corporate action required by the Debtor or NewCo in connection with the Plan, will be deemed to have occurred in accordance with the Restructuring Transactions Memorandum and will be in effect, without any requirement of further action by the security holders or directors of the Debtor or NewCo or by any other stakeholder or any other corporate action.

On and after the Effective Date, the appropriate officers of NewCo and members of the board of directors of NewCo are authorized and directed to issue, execute, deliver, file, and record any and all agreements, documents, securities, deeds, bills of sale, conveyances, releases, and instruments contemplated by the Plan in the name of and on behalf of NewCo and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

    **2.**     **NewCo Organizational Documents**

On the Effective Date, the NewCo Organizational Documents will be adopted automatically by NewCo and its subsidiaries.  On or promptly after the Effective Date, NewCo and its subsidiaries may file their respective NewCo Organizational Documents and other applicable agreements with the applicable Secretaries of State or other applicable authorities in their respective states, provinces, or countries of incorporation or formation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or formation.

After the Effective Date, NewCo and each of its subsidiaries may amend and restate its limited liability company agreement, certificate of incorporation, limited partnership agreement, and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the NewCo Organizational Documents, as applicable.

In addition, from and after the Effective Date, the NewCo Organizational Documents will contain certain transfer restrictions in relation to the transfer of NewCo Common Stock.  Specifically, the NewCo Organizational Documents will provide that, without the approval of the NewCo Board, (i) no Person will be permitted to acquire, whether directly or indirectly, and whether in one transaction or a series of transactions, NewCo Common Stock, to the extent that after giving effect to such purported acquisition the purported acquirer or any other Person by reason of the purported acquirer's acquisition would become a Substantial Holder (as defined below) of any class of stock of NewCo; (ii) no Substantial Holder may acquire, directly or indirectly, any shares of NewCo stock without the consent of a majority of the NewCo Board; and (iii) no Substantial Holder may dispose, directly or indirectly, of any shares of NewCo stock without the consent of a majority of the NewCo Board.  A "Substantial Holder" is a person that owns (as determined for applicable U.S. federal income tax purposes) 4.99 percent of any class of stock of NewCo, including any instrument treated as stock for the applicable U.S. federal income tax purposes.

## 3.     Shared Services Agreement

Upon the Effective Date, NewCo and the Liquidating Trust may enter into a Shared Services Agreement.  The terms of the Shared Services Agreement (if any) will be acceptable to each of the Debtor, the Required Ad Hoc Senior Noteholder Parties and the UCC. Confirmation of the Plan will be deemed (a) approval of the Shared Services Agreement (if any), and (b) authorization for NewCo and the Liquidating Trust to enter into and perform under the Shared Services Agreement (if any).

## 4.     Directors and Officers of NewCo

On the Effective Date, the management, control and operation of NewCo will become the general responsibility of the board of directors of NewCo or such other governing body as provided in the NewCo Organizational Documents.

On the Effective Date, the term of the Current Directors and other governing bodies of the Debtor will be deemed to have resigned, such Current Directors will cease to hold office or have any authority from or after such time, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity, and such Current Directors will be replaced by the NewCo Board (or, if the reorganized Debtor is not governed by a board, will be governed and managed as set forth in its applicable NewCo Organizational Documents).

The classification and composition of the NewCo Board will be consistent with applicable non-bankruptcy law and the terms of the NewCo Organizational Documents.  In the Plan Supplement, to the extent known, the Debtor will disclose, pursuant to section 1129(a)(5) of

the Bankruptcy Code, the identity and affiliations of the Persons proposed to serve on the NewCo Board.  The NewCo Board members will serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of the NewCo Organizational Documents.

Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not discharge, impair or otherwise modify any advancement, indemnity or other obligations arising under the D&O Insurance Policies.  In addition, after the Effective Date, none of the Debtor, the Liquidating Trust or NewCo will terminate or otherwise reduce the coverage under the D&O Insurance Policies with respect to conduct occurring prior to the Effective Date, and all directors and officers of the Debtor who served in such capacity at any time prior to the Effective Date will be entitled from the insurers to the full benefits of any such policy, including any prepaid extended reporting period, regardless of whether such directors and officers remain in such positions after the Effective Date.

As of the Effective Date, NewCo will be authorized to procure and maintain directors' and officers' liability insurance policies for the benefit of its directors, officers, members, trustees and managers in the ordinary course of business.

**E.      Executory Contracts and Unexpired Leases**

**1.      Assumption and Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided herein, all Executory Contracts and Unexpired Leases will be deemed automatically rejected as of the Effective Date in accordance with sections 365 and 1123 of the Bankruptcy Code, other than (a) Executory Contracts or Unexpired Leases that, as of the Effective Date, are the subject of a pending motion to assume, or for which a notice of assumption has been filed pursuant to the assumption and assignment procedures approved by the Bankruptcy Court, (b) any Executory Contract or Unexpired Leases listed in the Schedule of Assumed Executory Contracts and Unexpired Leases, or (c) have been previously assumed, assumed and assigned or rejected by the Debtor.

Entry of the Confirmation Order by the Bankruptcy Court will constitute an order approving the assumptions, assumption and assignment, or rejections, as applicable, of such Executory Contracts and Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.

Executory Contracts and Unexpired Leases assumed pursuant to the Plan or by Bankruptcy Court order will revest in and be fully enforceable by NewCo or the Liquidating Trust in accordance with their terms, except as such terms may have been modified by the Debtor and the applicable counterparty, or by order of the Bankruptcy Court.  To the maximum extent permitted by Law, the transactions contemplated by the Plan will not constitute a "change of control" or "assignment" (or terms with similar effect) under any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan, or any other transaction, event, or matter that would (a) result in a violation, breach or default under such Executory Contract or Unexpired Lease, (b) increase, accelerate or otherwise alter any obligations, rights or liabilities of the Debtor, the Liquidating Trust or NewCo, as applicable,

under such Executory Contract or Unexpired Lease, or (c) result in the creation or imposition of a Lien upon any property or asset of the Debtor, the Liquidating Trust or NewCo, as applicable, pursuant to the applicable Executory Contract or Unexpired Lease. Any consent or advance notice required under such Executory Contract or Unexpired Lease in connection with assumption or assumption and assignment thereof will be deemed satisfied by Confirmation. Any provision of any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan that requires (i) the consent or approval of one or more lessors or other parties, or (ii) the payment of any fees or obligations, in order for the Debtor to pledge, grant, sell, assign, or otherwise transfer any such Executory Contract or Unexpired Lease, or the proceeds thereof, or other collateral related thereto, will be deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provisions of any such Executory Contracts or Unexpired Leases will have no force and effect with respect to the pledge, grant, sale, assignment, or other transfer thereof, or the proceeds thereof, or other collateral related thereto, in accordance with the terms of the Plan.

In connection with the transfer and vesting of any Debtor's investments assets in the Liquidating Trust (or any entity formed by the Liquidating Trust) or NewCo (or its subsidiary), any related investment agreements, including shareholder and lockup agreements, will be deemed assumed and assigned to the applicable transferee and deemed listed as an Executory Contract on the Schedule of Assumed Executory Contracts and Unexpired Leases.

The Debtor or the Liquidating Trust, as applicable, reserves the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases, including to add or remove any Executory Contracts and Unexpired Leases, at any time up to and including forty-five (45) days after the Effective Date upon notice to the affected counterparty.

### 2. Objections to and Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

To the extent a monetary default exists under an Executory Contract or Unexpired Lease proposed to be assumed or assumed and assigned pursuant to the Plan, such monetary default will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the applicable Cure Cost by the Debtor, NewCo or the Liquidating Trust, as applicable, on the Effective Date or promptly thereafter, in the ordinary course of business, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.

Objections to the assumption of any Executory Contract or Unexpired Lease or any applicable Cure Cost will be made in accordance with the Solicitation Procedures Order.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise will result in the full release and satisfaction of any Claims held by the non-Debtor Entity party thereto against, or defaults, including bankruptcy-related defaults, by, the Debtor arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of the assumption; *provided*, *however*, that the counterparty to such Executory Contract or Unexpired Lease may seek additional amount(s) on account of any defaults

occurring between the filing of the notice of assumption and the occurrence of the Effective Date of the Plan.

Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed will be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### 3. Modifications, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed, assumed and assigned, or rejected will include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case will not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims or Interests that may arise in connection therewith.

### 4. Reservation of Rights

Nothing contained in the Plan, nor the Debtor's delivery of a notice of proposed assumption of a contract or lease to the applicable contract and lease counterparties, will constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor, NewCo or the Liquidating Trust would have any liability thereunder.

Notwithstanding any non-bankruptcy law to the contrary, the Debtor, NewCo or the Liquidating Trust expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the Debtor from counterparties to rejected Executory Contracts or Unexpired Leases.

## F. Provisions Governing Distributions

### 1. Distribution Agents

The Debtor, in its reasonable discretion (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed), or, after the Effective Date, the Liquidating Trust (and, with respect to the distribution of NewCo Common Stock, NewCo), in their respective sole discretion, will have the authority, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder. To the extent the Debtor or the Liquidating Trust, as applicable, determines

to utilize a Distribution Agent to facilitate any distributions, such Distribution Agent would first be required to: (i) affirm its obligation to facilitate the prompt distribution of any documents, (ii) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan and (iii) waive any right or ability to set off, deduct from or assert any Lien or other encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent.

Notwithstanding any provision in the Plan to the contrary, distributions to the Holders of Senior Note Claims and Subordinated Note Claims will be made to or at the direction of the respective Indenture Trustees, which will act as Distribution Agent (or direct the Distribution Agent) for distributions to the Holders of Senior Note Claims and Subordinated Note Claims, respectively, in accordance with the Plan and the applicable Indentures.

The Debtor or the Liquidating Trust, as applicable, may pay to the Distribution Agents all of their reasonable and documented fees and expenses without the need for any approvals, authorizations, actions or consents of the Bankruptcy Court or otherwise. At the request of counsel to the Debtor or the Liquidating Trust, as applicable, Distribution Agents will submit detailed invoices to counsel to the Debtor or the Liquidating Trust for all fees and expenses for which the Distribution Agents seek reimbursement, and the Debtor or the Liquidating Trust, as applicable, will pay those amounts that it, in its sole discretion, deems reasonable, and will object in writing to those fees and expenses, if any, that the Debtor or the Liquidating Trust, as applicable, deem to be unreasonable. In the event that the Debtor or the Liquidating Trust, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtor or the Liquidating Trust, as applicable, and such Distribution Agent will endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Debtor or the Liquidating Trust, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party will be authorized to move to have such dispute heard by the Bankruptcy Court.

(a)    **Powers of the Distribution Agent**

The Distribution Agent will be empowered to: (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby, (iii) employ professionals to represent it with respect to its responsibilities and (iv) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.    **Timing and Delivery of Distributions**

(a)    **Timing**

Except as otherwise expressly provided herein, distributions to be made under the Plan will be made on (i) the later of (a) the Effective Date and (b) the date that a Claim or Interest becomes an Allowed Claim or Interest, or (ii) such other date that is determined by the Debtor (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to

53

be unreasonably withheld, conditioned or delayed) or, after the Effective Date, the Liquidating Trust, in accordance with the Plan.  The Liquidating Trust may commence distributions to beneficiaries of the Estate at any time after the Effective Date, subject to the terms of the Plan, the Liquidating Trust Agreement and the Confirmation Order.

**(b)**    *De Minimis* **Distributions**

Notwithstanding any other provision of the Plan, neither the Debtor, the Liquidating Trust nor any Distribution Agent will have any obligation to make any distributions under the Plan with a value of less than $50, unless a written request therefor is received by the Distribution Agent from the relevant recipient within 120 days after the later of (i) the Effective Date and (ii) the date such Claim or Interest becomes an Allowed Claim or Interest.  Such undistributed amounts will revert to the Debtor or the Liquidating Trust, as applicable.  Upon such reversion, the relevant Allowed Claim or Interest of less than $50 (and any Claim or Interest on account of such *de minimis* distributions) will be automatically deemed satisfied, discharged, and forever barred, notwithstanding any federal or state escheat laws to the contrary. For the avoidance of doubt, Section 10.2.2 of the Plan will not apply to Distributions to any Holder of an Allowed General Unsecured Claim who timely exercises its GUC Cash-Out option.

**(c)**    **Record Date and Delivery of Distributions**

Distributions will only be made to the record holders of Allowed Claims and Interests as of the Confirmation Date (the "Distribution Record Date").  On the Confirmation Date, the Claims Register and Stock Register will be closed and the Distribution Agent will be authorized and entitled to recognize only those Holders of Claims and Interests listed on the Claims Register and Stock Register as of the close of business on the Confirmation Date. Notwithstanding the foregoing, if a Claim or Interest is transferred twenty (20) or fewer days before the Confirmation Date, the Distribution Agent, at the direction of the Debtor or, after the Effective Date, the Liquidating Trust, will make distributions to the transferee (rather than the transferor) only to the extent practical, and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.  The Distribution Record Date will not apply to publicly held securities deposited with DTC and, in connection with any Distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtor, NewCo or the Liquidating Trust, as applicable, will be entitled to recognize and deal for all purposes under the Plan with Holders of Claims and Interests in each Class to the extent consistent with the customary practices of DTC used in connection with such distributions.

If any dispute arises as to the identity of a Holder of an Allowed Claim or Interest that is entitled to receive a distribution pursuant to the Plan, the Distribution Agent may, in lieu of making such distribution to such Entity, make the distribution into an escrow account until the disposition thereof is determined by Final Order or by written agreement among the interested parties to such dispute.  Distributions made after the Confirmation Date to Holders of Disputed Claims or Interests that are not Allowed Claims or Interests as of the Confirmation Date, but which later become Allowed Claims or Interests, will be deemed to have been made on the Confirmation Date.

Except as otherwise provided herein, the Distribution Agent, at the direction of the Debtor or the Liquidating Trust, as applicable, will make all Distributions required under the Plan to Holders of Allowed Claims or Interests. Except as otherwise provided herein, and notwithstanding any authority to the contrary, Distributions to Holders of Allowed Claims or Interests will be made to Holders of record as of the Confirmation Date by the Distribution Agent, as appropriate: (i) to the signatory set forth on any Proof of Claim filed by such Holder or other representative identified therein (or at the last known address of such Holder if no Proof of Claim is filed or if the Debtor, the Liquidating Trust or the Distribution Agent have been notified in writing of a change of address) or (ii) at the address set forth in any written notice of change of address delivered to the Notice and Claims Agent. The Distribution Agent and the Notice and Claims Agent will not incur any liability whatsoever on account of the delivery of any Distributions under the Plan.

**3.      Manner of Payment Under the Plan**

**(a)      Cash Payments**

At the Distribution Agent's option, any Cash payment may be made by check, wire transfer or any other customary payment method.

**(b)      Notes Distribution**

As applicable, the Indenture Trustees may transfer or direct the transfer of such Distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with the respective Holders of such Claims to the extent consistent with the customary practices of DTC.

For the avoidance of doubt, DTC will be considered a single Holder with respect to Distributions made on account of the Senior Note Claims and Subordinated Note Claims. The Indenture Trustees will have no duties, responsibilities, or liability relating to any form of Distribution that is not DTC eligible, *provided* that the Indenture Trustees will use commercially reasonable efforts to cooperate with the Debtor, the Liquidating Trust, or NewCo, as applicable, to the extent that a Distribution is not DTC eligible.

Notwithstanding anything to the contrary herein, such Distributions will be subject in all respect to any rights of the Indenture Trustees to assert a charging lien against such Distributions. All Distributions to be made to Holders of Senior Note Claims and Subordinated Note Claims through DTC will be made eligible for Distributions through the facilities of DTC and, for the avoidance of doubt, under no circumstances will the Indenture Trustees be responsible for making or required to make any Distribution under the Plan to Holders of Senior Note Claims and Subordinated Note Claims if such Distribution is not eligible to be distributed through the facilities of DTC.

Upon the final distribution on account of the Senior Note Claims or Subordinated Note Claims, (i) the Senior Notes or Subordinated Notes, as applicable, will thereafter be deemed to be worthless, and (ii) at the request of the respective Indenture Trustee, DTC will take down the relevant position relating to the Senior Notes or Subordinated Notes, as applicable,

without any requirement of indemnification or security on the part of the Debtor, the Liquidating Trust, NewCo, or the Indenture Trustees.

### (c)    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Claim entitled to a distribution under the Plan is based upon any obligation or instrument that is treated for U.S. federal income tax purposes as indebtedness of the Debtor and accrued but unpaid interest thereon, such distribution will be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### (d)    Compliance Matters

In connection with the Plan, to the extent applicable, the Debtor, NewCo, the Liquidating Trust and the Distribution Agent will comply with all Tax withholding and reporting requirements imposed on them by any federal, state, local or foreign Tax law, and all distributions pursuant hereto will be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtor, NewCo, the Liquidating Trust and the Distribution Agent will be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind, liquidating a portion of the distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  For purposes of the Plan, any withheld amount (or property) paid to the applicable Tax Authority will be treated as if paid to the applicable claimant.  The Liquidating Trust reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.  Distributions in full or partial satisfaction of Allowed Claims will be allocated first to trust fund-type taxes, then to other taxes, and then to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that has accrued on such Claims.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a Distribution pursuant to the Plan will have responsibility for any Taxes imposed by any Governmental Unit, including income, withholding, and other Taxes, on account of such Distribution.  Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, not to make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder will reimburse such party.  The Distribution Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply with such a request within one hundred and eighty (180) days after the request is made, the amount of such Distribution will irrevocably revert to the Debtor or the Liquidating Trust and any Claim in respect of such Distribution will be discharged and forever barred from assertion against the Debtor, the Liquidating Trust or its respective property.

**(e)        Foreign Currency Exchange Rate**

Except as otherwise provided herein or in an order of the Bankruptcy Court, or as agreed to by any Holder and either the Debtor (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed) or, after the Effective Date, the Liquidating Trust, any Claim or Interest asserted in a currency other than U.S. dollars will be automatically deemed converted, as of the Effective Date, to the equivalent U.S. dollar value using the exchange rate on the first Business Day prior to the Petition Date, as quoted at 4:00 p.m. (New York time), at the mid-range spot rate of exchange for the applicable foreign currency as published in *The Wall Street Journal*, National Edition, on the first Business Day after the Petition Date; *provided* that instead of such automatic conversion, the Debtor may instead elect, subject to the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties (not to be unreasonably withheld, conditioned or delayed) to make payments on account of any such Claim or Interest pursuant to the Plan in the applicable foreign currency.

**(f)        Fractional Payments and Distributions**

Whenever the Plan would otherwise call for, with respect to a particular Entity, payment of a fraction of a dollar, the actual payment will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash to be distributed under the Plan remain undistributed as a result of the aforementioned rounding, such Cash will be treated as an Unclaimed Distribution.

**(g)        Fractional Shares or Units**

No fractional shares of NewCo Common Stock or fractional units of Liquidating Trust Interest will be distributed under the Plan.  When any distribution pursuant to the Plan on account of an Allowed Claim or Interest would otherwise result in the issuance or delivery of a number of shares of NewCo Common Stock or a number of units of Liquidating Trust Interest that is not a whole number, the actual distribution of shares of NewCo Common Stock or units of Liquidating Trust Interest will be rounded to the next lower whole number with no further payment or other distribution therefor.  The total number of shares of NewCo Common Stock or units of Liquidating Trust Interest to be distributed to holders of Allowed Claims and Interests will be adjusted downward as necessary to account for the rounding provided in Section 10.3.7 of the Plan.

**4.        Undeliverable Distributions**

If any distribution is returned as undeliverable, (i) the Debtor or the Liquidating Trust, as applicable, may, but will not be required to, make reasonable efforts to determine the address for such Holder and (ii) no further distribution to such Holder will be made unless and until the Liquidating Trust or the Distribution Agent is notified in writing of the then-current address of such Holder, at which time such distribution will be made to such Holder not less than 30 days thereafter.  Undeliverable distributions will remain in the possession of the Liquidating Trust or the Distribution Agent until such time as such distribution becomes deliverable or such distribution reverts to the Liquidating Trust, or is canceled pursuant to Section 10.5 of the Plan, and will not be supplemented with any interest, dividends or other accruals of any kind.

5.        **Reversion**

Any distribution under the Plan that is an Unclaimed Distribution for a period of six months thereafter, will be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution will revest in the Liquidating Trust.  Upon such revesting, the Claim or Interest of any Holder or its successors and assigns with respect to such property will be canceled, discharged and forever barred, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.  The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions will apply with equal force to distributions that are issued by the Liquidating Trust, NewCo or the Distribution Agent made pursuant to any indenture or Certificate, notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned or unclaimed property law.

6.        **Claims or Interests Paid by Third Parties**

No distributions under the Plan will be made on account of an Allowed Claim that is payable under one of the Debtor's Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.

Except as otherwise provided in the Plan, payments to Holders of Claims covered by an Insurance Policy and otherwise payable under the Plan will be made from the proceeds of such Insurance Policy in accordance with the provisions of any such applicable Insurance Policy. Nothing contained in the Plan will constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including Insurers, nor will anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by Insurers.

To the extent a Creditor receives a payment on account of a Claim from a party that is not the Debtor, the Liquidating Trust, NewCo or a Distribution Agent on account of such Claim, the Debtor or the Liquidating Trust, as applicable, will be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim by the amount of the third-party payment, and such Claim will be disallowed or deemed satisfied, as applicable, to the extent of such third-party payment without an objection having to be filed, but subject to the filing of a notice with the Bankruptcy Court and service of such notice on any affected Creditor.  Any Creditor that receives full or partial payment on account of such Claim from an Entity that is not the Debtor, the Liquidating Trust, NewCo or a Distribution Agent will provide notice of the date and amount of such payment to the Debtor or, after the Effective Date, the Liquidating Trust and NewCo within five (5) Business Days of receipt of such payment.  Such Creditor will repay and/or return to the Debtor or, after the Effective Date, the Liquidating Trust or NewCo any Distribution received on account of the portion of its Claim that was satisfied by such third-party payment within thirty (30) days.

7.        **Setoffs**

Except as otherwise provided herein, a Final Order of the Bankruptcy Court, or as agreed to by the Holder and the Liquidating Trust or NewCo, each as applicable, pursuant to the

Bankruptcy Code (including section 553 thereof), applicable non-bankruptcy law, or such terms as may be agreed to by the Holder and the Liquidating Trust or NewCo, as applicable, the Liquidating Trust or NewCo, as applicable, may, without any further notice to, or action, order or approval of the Bankruptcy Court, set off against any Allowed Claim or Interest and the distributions to be made on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any claim, right and Cause of Action of any nature that the Liquidating Trust or NewCo, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such claim, right or Cause of Action against such Holder has not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided* that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan will constitute a waiver or release by the Debtor, the Liquidating Trust or NewCo, as applicable, of any such Claims or Interests, rights and Causes of Action that the Debtor or the Liquidating Trust may possess against or in such Holder.  In no event will any Person or Entity be entitled to set off any Claim or Interest against any Claim or Interest, right, or Cause of Action of the Debtor, the Liquidating Trust or NewCo, as applicable, in any judicial or administrative proceeding, unless such Person or Entity has filed a Proof of Claim in this Chapter 11 Case preserving such setoff and a Final Order of the Bankruptcy Court has been entered, authorizing and approving such setoff.

###### 8.   No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, required by applicable law, or agreed to by the Debtor or, after the Effective Date, the Liquidating Trust or NewCo, as applicable, no Holder of a Claim or Interest against the Debtor will be entitled to interest accruing on or after the Petition Date with respect to such Claim or Interest, notwithstanding any dispute or other delay with respect to any distribution.  For the avoidance of doubt, the foregoing does not apply to any interest accretion on the Liquidating Trust Interests provided under the Plan.

###### 9.   No Payment Over the Full Amount; Single Satisfaction

In no event will a Holder of a Claim or Interest receive more than the full payment of such Claim or Interest.  To the extent any Holder has received payment in full with respect to a Claim or Interest, such Claim or Interest will be expunged without an objection to such Claim or Interest having been filed and without any further notice to or action, order or approval of the Bankruptcy Court.

##### G.   Settlement, Release, Injunction and Related Plan Provisions

###### 1.   Vesting of Assets

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan or in the Confirmation Order, upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtor will vest in NewCo or its subsidiaries or the Liquidating Trust (or entities to be formed by the Liquidating Trust), as applicable, in accordance with the Plan and the Restructuring Transactions Memorandum, free and clear of all Claims, Liens, encumbrances, charges and

Interests.  All Liens, Claims, encumbrances, charges and Interests will be deemed fully released and discharged as of the Effective Date, except as otherwise provided in the Plan or the Confirmation Order.  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, each of NewCo and the Liquidating Trust may, as applicable, operate its businesses and may use, acquire, and dispose of property and the Liquidating Trust may settle and compromise Claims and Interests, in each case without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code with respect to the Debtor.

The transfer of information to the Liquidating Trust will not result in the destruction or waiver of any applicable work product, attorney-client, or other applicable privilege (the "Privileges").  Further, with respect to any Privileges:  (i) Privileges are transferred to the Liquidating Trust to the extent necessary to enable the Liquidating Trust Board to perform its duties to administer the Liquidating Trust and for no other reason, (ii) such Privileges will be preserved and not waived (except as the Liquidating Trust Board may affirmatively elect to waive such Privileges), and (iii) no information subject to a Privilege will be publicly disclosed by the Liquidating Trust or communicated to any Person not entitled to receive such information or in a manner that would diminish the protected status of any such information, except following a waiver of such Privilege pursuant to (ii) above or pursuant to the specific terms of the Plan and the Confirmation Order and the Liquidating Trust Agreement.

## 2.    Compromise and Settlement of Claims and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions, releases and other benefits provided pursuant to the Plan, upon the Effective Date, the provisions of the Plan will constitute a good-faith compromise of all Claims, Interests, Causes of Action and controversies relating to the contractual, legal and subordination rights that a Holder of an Allowed Claim or Interest may have against the Debtor, or any distribution to be made on account of such an Allowed Claim or Interest.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtor and its Estate and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice or action, order or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trust may compromise and settle Claims against it and Causes of Action against other entities.

## 3.    Subordinated Claims

The allowance, classification and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account, conform to, and satisfy the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto; *provided*, *however*, that the Debtor and the Liquidating Trust reserve the right to reclassify or modify the treatment of any Allowed Claim or Interest in accordance with any contractual, legal, or equitable

subordination relating thereto, unless otherwise provided in a settlement agreement concerning such Allowed Claim or Interest.  For the avoidance of doubt, the Distributions to the Holders of Subordinated Note Claims under the Plan are in settlement and compromise of any contractual, legal and equitable subordination rights relating to such Subordinated Note Claims, and all claims to turnover, release or payment of such Distributions are expressly waived hereby.

### 4.    Release of Liens

Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement or document created pursuant to the Plan or the Confirmation Order, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, indefeasible payment and satisfaction in full in cash of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate will be fully released, settled, discharged and compromised, and all rights, titles and interests of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate will revert to the Debtor and its successors and assigns, in each case, without any further approval of the Bankruptcy Court and without any action or filing being required to be made by the Debtor.  The Debtor, or after the Effective Date, the Liquidating Trust will be authorized to file any necessary or desirable documents to evidence such release in the name of the party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges or other security interests.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department will constitute good and sufficient evidence of, but will not be required to effect, the termination of such Liens.

### 5.    Discharge

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Restructuring Transactions Memorandum, the Confirmation Order or in any contract, instrument, or other agreement or document created pursuant to the Plan or the Confirmation Order, the distributions, rights, and treatments that are provided in the Plan or the Confirmation Order shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims against, Interests in, and Causes of Action against the Debtor, NewCo and the Liquidating Trust of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against Liabilities of, Liens on, obligations of, rights against, and interests in, the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan and the Confirmation Order on account of such Claims or Interests, including demands, Liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case, whether or not (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtor or Affiliates with respect to

61

any Claim or Interest that existed immediately before or on account of the filing of the chapter 11 cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims against, Causes of Action against, and Interests in the Debtor, NewCo or the Liquidating Trust, subject to the occurrence of the Effective Date.

6.      **Term of Injunction or Stays**

Unless otherwise provided herein, any injunction or stay arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code or otherwise that is in existence on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) will remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay. All injunctions or stays contained in the Plan or the Confirmation Order will remain in full force and effect in accordance with their terms.

7.      **Release by the Debtor**

**For good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate the administration of the Chapter 11 Case and the implementation of the transactions contemplated by the Plan, on and after the Effective Date, each of the Released Parties including the Debtor Released Parties but excluding each other Related Party of the Debtor will be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever, and permanently released and discharged by the Debtor, NewCo, the Liquidating Trust and the Debtor's Estate, including any successor and assign to the Debtor, NewCo, the Liquidating Trust or any Estate representative, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims, in each case asserted or assertable on behalf of the Debtor, NewCo or the Liquidating Trust, and their respective successors, assigns, and representatives, or that any Entity or party claiming under or through the Debtor or its Estate, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including those that any of the Debtor, NewCo, the Liquidating Trust or the Debtor's Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, NewCo, the Liquidating Trust, the Estate, the conduct of the businesses of the Debtor, the Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any security of the Debtor, NewCo or the Liquidating Trust, the release or discharge of any mortgage, lien or security interest, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the administration of Claims and Interests prior to or during the Chapter 11 Case, the negotiation, formulation, preparation, dissemination, implementation, administration,**

confirmation and/or effectuation of the RSA (and each prior version thereof), the Plan, any plan supplement, any disclosure statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to intercompany claims and intercompany settlements, any action or omission as an officer, director, agent, representative, fiduciary, controlling Person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of such Released Party to the extent such act or omission is determined by a final order in a court of competent jurisdiction to have constituted gross negligence, willful misconduct, fraud, or a criminal act. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Releases in Section 12.7 of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan and, further, will constitute the Bankruptcy Court's finding that the Debtor Release in Section 12.7 of the Plan is: (a) given in exchange for good and valuable consideration provided by the applicable Released Parties, including the applicable Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good-faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtor and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a bar to the assertion by the Debtor, NewCo, the Liquidating Trust, or the Debtor's Estate of any claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release; (g) essential to the Confirmation of the Plan; and (h) a prudent exercise of the Debtor's business judgment.

Notwithstanding the foregoing, nothing contained in Section 12.7 of the Plan will be deemed to release any Retained Causes of Action, including any Claims and Causes of Action against any Debtor Related Parties other than those Debtor Related Parties identified on Exhibit [•] to the Plan.

8.    Exculpation

Upon entry of the Confirmation Order, each of the Exculpated Parties will be deemed to have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and in a manner consistent with the Disclosure Statement, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations in connection with all of their respective activities relating to support and consummation of the Plan, including the negotiation, execution, delivery, and performance of the RSA and are entitled to the protections of section 1125(e) of the Bankruptcy Code and all other applicable protections and rights provided in the Plan. Without limiting the generality of

the foregoing, upon entry of the Confirmation Order, the Debtor and its directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring advisors and other professional advisors, representatives and agents will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with the solicitation.

As of the Effective Date, to the fullest extent permissible under any applicable laws and without affecting, expanding or limiting the releases contained in Section 12 of the Plan, and except as otherwise provided herein, the Exculpated Parties will neither have nor incur any liability arising on or after the Petition Date to any Entity for any act or omission in connection with, relating to or arising out of (i) this Chapter 11 Case; (ii) the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation and/or consummation of the RSA (and each prior version thereof), any disclosure statement, the Plan, any plan supplement, and any related contract, instrument, release or other agreement or document created or entered into in connection therewith (including the solicitation of votes for the Plan or other actions taken in furtherance of confirmation or consummation of the Plan, including the issuance of any securities under or in connection with the Plan) or in connection with any other obligations arising under the Plan or the obligations assumed hereunder; or (iii) the settlement of Claims or renegotiation of Executory Contracts or Unexpired Leases, other than liability resulting from any act or omission that is determined by final order in a court of competent jurisdiction to have constituted gross negligence, willful misconduct, fraud or a criminal act. In all respects, such Entities will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; *provided*, *however*, that nothing in the Plan or Confirmation Order will relieve the Exculpated Parties from their obligations under postpetition transactions, agreements or instruments that have not been expressly canceled by the Plan.

Notwithstanding the foregoing, nothing contained in Section 12.8 of the Plan will be deemed to exculpate any party from liability with respect to any Retained Causes of Action or other Claims or Causes of Action related to actions or inactions occurring prior to the Petition Date, including any Claims and Causes of Action against any Debtor Related Parties other than those Debtor Related Parties identified on Exhibit [•] to the Plan.

9.     **Voluntary Release by Holders of Claims and Interests**

For good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate the administration of the Chapter 11 Case, the implementation of the reorganization contemplated by the Plan, the release of mortgages, liens and security interests on property of the Estate, and distributions made pursuant to the Plan, on and after the Effective Date, to the fullest extent permitted by applicable law, the Releasing Parties (regardless of whether a Releasing Party is a Released Party), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for,

or because of the foregoing Entities, will be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtor, NewCo or the Liquidating Trust and any of its or their successors, assigns, and representatives, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtor, NewCo, the Liquidating Trust or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, NewCo, the Liquidating Trust, the Estate, the conduct of the businesses of the Debtor, this Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any security of the Debtor, NewCo or the Liquidating Trust, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the administration of Claims and Interests prior to or during this Chapter 11 Case, the negotiation, formulation, preparation, dissemination, implementation, administration, confirmation and/or effectuation of the RSA (and each prior version thereof), the Plan, any plan supplement, any disclosure statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to intercompany claims or intercompany settlements, any action or omission as an officer, director, agent, representative, fiduciary, controlling Person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a final order in a court of competent jurisdiction to have constituted gross negligence, willful misconduct, fraud, or a criminal act.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not constitute a release by the Debtor of any of its Related Parties other than the Debtor Released Parties nor will they release any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Section 12.9 of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, will constitute the Bankruptcy Court's finding that the releases set forth in Section 12.9 of the Plan is:  (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released pursuant to Section 12.9 of the Plan; (e) in the best interests of the Debtor and its Estate; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing

Parties asserting any Claim or Cause of Action of any kind whatsoever released pursuant to Section 12.9 of the Plan.

      **10.**    **Injunction**

        **Except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons or Entities who have held, hold or may hold (i) Claims or Interests that arose prior to the Effective Date, (ii) Causes of Action that have been released pursuant to Sections 12.7 and 12.9 of the Plan or are subject to exculpation pursuant to Section 12.8 of the Plan (but only to the extent of the exculpation provided in Section 12.8 of the Plan), or (iii) Claims, Interests or Causes of Action that are otherwise discharged, satisfied, stayed, or terminated pursuant to the terms of the Plan and all other parties-in-interest seeking to enforce such Claims, Interests or Causes of Action are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim (including a Section 510(b) Claim) against or such Interest in the Debtor, NewCo or the Liquidating Trust, or property of the Debtor, NewCo or the Liquidating Trust, other than to enforce any right to a distribution pursuant to the Plan, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor, NewCo or the Liquidating Trust or property of the Debtor, NewCo or the Liquidating Trust with respect to any such Claim or Interest, other than to enforce any right to a distribution pursuant to the Plan, (c) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Debtor, NewCo or the Liquidating Trust, or against the property or interests in property of the Debtor, NewCo or the Liquidating Trust with respect to any such Claim or Interest, other than to enforce any right to a distribution pursuant to the Plan, or (d) asserting any right of setoff (except for setoffs validly exercised prepetition) or subrogation of any kind against any obligation due from the Debtor, NewCo or the Liquidating Trust, or against the property or interests in property of the Debtor, NewCo or the Liquidating Trust, with respect to any such Claim or Interest.  Such injunction will extend to any successors or assignees of the Debtor, NewCo or the Liquidating Trust and their respective properties and interests in properties.**

        **With respect to claims or Causes of Action that have not been released, discharged, or are not subject to exculpation, no Person or Entity may commence or pursue a claim or Cause of Action of any kind against the Debtor, NewCo, the Liquidating Trust, any Exculpated Party, or any Released Party that relates to any act or omission occurring from the Petition Date to the Effective Date in connection with, relating to, or arising out of, in whole or in part, the Chapter 11 Case (including the filing and administration thereof), the Debtor, the governance, management, transactions, ownership, or operation of the Debtor, the purchase, sale, exchange, issuance, termination, repayment, extension, amendment, or rescission of any debt instrument or security of the Debtor, NewCo, or the Liquidating Trust, the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party, the restructuring of any Claim or Interest before or during the Chapter 11 Case, any other in- or out-of-court restructuring efforts of the Debtor; any intercompany transactions, any Restructuring Transaction, the RSA, the formulation,**

66

**preparation, dissemination, negotiation, or filing of the RSA and the Definitive Documents, or any other contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, or any of the other Definitive Documents, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), without the Bankruptcy Court (a) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim and (b) specifically authorizing such Person or Entity to bring such Claim or Cause of Action. To the extent the Bankruptcy Court would have jurisdiction over such colorable Claim or Cause of Action, the Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate such underlying Claim or Cause of Action should it permit such Claim or Cause of Action to proceed.**

**11.      Scope of Releases**

**Each Person providing releases under the Plan, including the Debtor, NewCo, the Liquidating Trust, the Debtor's Estate and the Releasing Parties, will be deemed to have granted the releases set forth in the Plan notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of such release.**

**For the avoidance of doubt, nothing herein, including the releases, waivers, and exculpations provided in Sections 12.7–12.9 of the Plan, will constitute a release, waiver, discharge, or limitation of any kind of (i) any Retained Causes of Action, including any Claims or Causes of Action against Debtor Related Parties other than those Debtor Related Parties identified on Exhibit [•] to the Plan or (ii) any rights, liabilities, or obligations arising under the Plan or any other agreement, document or instrument executed in connection with the Plan.**

**12.      Preservation of Causes of Action**

Except as expressly provided in Section 12 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtor, NewCo or the Liquidating Trust may have or that the Debtor, NewCo or the Liquidating Trust, as applicable, may choose to assert on behalf of the Estate under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including (i) any and all Causes of Action or Claims against any Person or Entity, to the extent such Person or Entity asserts a cross-claim, counterclaim and/or claim for setoff that seeks affirmative relief against the Debtor, NewCo or the Liquidating Trust, and in

each case, its officers, directors or representatives or (ii) the turnover of any property of the Estate to the Debtor, NewCo or the Liquidating Trust.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor, NewCo or the Liquidating Trust, as applicable, will not pursue any and all available Causes of Action against them. The Debtor, NewCo or the Liquidating Trust expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.

Except as set forth in Section 12 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtor had immediately prior to the Petition Date or the Effective Date against or regarding any Claim or Interest left Unimpaired by the Plan. The Liquidating Trust will have, retain, reserve, and be entitled to assert all such rights and Causes of Action, including any actions specifically enumerated in the Schedule of Retained Causes of Action, as fully as if the Chapter 11 Case had not been commenced, and all of the Liquidating Trust's legal and equitable rights respecting any Claim or Interest left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.

Except as set forth in Section 12 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order will be deemed to release any post-Effective Date obligations of any party under the Plan, or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, including pursuant to Section 12 of the Plan or a Final Order, the Liquidating Trust expressly reserves all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches will apply to such Causes of Action upon, after, or as a consequence of the Confirmation or occurrence of the Effective Date.

## H.     Conditions Precedent

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied on or prior to the Effective Date or waived in accordance with Section 13.2 of the Plan:

i.    The RSA shall not have been terminated, and shall remain in full force and effect, and no event or occurrence shall have occurred that, with the passage of time or the giving of notice, would give rise to the right of the Required Ad Hoc Senior Noteholder Parties or the UCC to terminate the RSA;

ii.     All Definitive Documents for the Restructuring Transactions contemplated by the RSA to be executed and delivered on or before the Effective Date shall have been executed and delivered and remain in full force and effect;

iii.    The Bankruptcy Court shall have entered the Confirmation Order which shall be a Final Order;

iv.     The Debtor shall have filed the final version of the Plan, including all of the schedules, documents, and exhibits contained therein, and the Plan Supplement in a manner consistent in all material respects with the RSA and the Plan;

v.      The Debtor shall have obtained all applicable authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan (and all applicable waiting periods have expired);

vi.     The Debtor shall have implemented the Restructuring Transactions and all other transactions contemplated in the RSA (subject to, and in accordance with, the consent rights set forth therein) and the Plan to be implemented on or before the Effective Date;

vii.    No governmental entity or federal or state court of competent jurisdiction has enacted, issued, promulgated, enforced or entered any law or order (whether temporary, preliminary or permanent), in any case which is in effect and which prevents or prohibits consummation of the Plan, and no governmental entity has instituted any action or proceeding (which remains pending at what would otherwise be the Effective Date) seeking to enjoin, restrain or otherwise prohibit consummation of the transactions contemplated by the Plan;

viii.   All Ad Hoc Noteholder Group Expenses, Senior Note Trustee Expenses and Subordinated Note Trustee Expenses have been paid in full in Cash as provided in the RSA;

ix.     All professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses in full after the Effective Date shall have been placed in a professional fee escrow account as set forth in, and in accordance with, the Plan; and

x.      All Claims asserted by the IRS or any other Tax Authority shall have been resolved in a manner acceptable to the Required Ad Hoc Senior Noteholder Parties and the UCC or estimated by the Bankruptcy Court for the purpose of Plan distributions at an amount acceptable to the Required Ad Hoc Senior Noteholder Parties and the UCC.

Except as set forth in the Plan and the RSA, the Debtor, with the prior written consent (e-mail being sufficient) of the Required Ad Hoc Senior Noteholder Parties and the UCC, may waive any of the conditions set forth in Section 13.1 of the Plan at any time, without any notice to any other parties-in-interest or the Bankruptcy Court and without any formal action other than proceeding to confirm and/or consummate the Plan. The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## ARTICLE V

## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code include: (i) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that: (i) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (ii) the Debtor has complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (iii) the Plan has been proposed in good faith.

The following is a brief summary of the process of the Confirmation of the Plan. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

A.      **The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing at which the Debtor will seek confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to the Confirmation of the Plan.

**THE CONFIRMATION HEARING IS SCHEDULED TO BE HELD ON MAY [7], 2024 AT [10]:00 A.M. EASTERN TIME, BEFORE THE HONORABLE MARTIN GLENN, CHIEF UNITED STATES BANKRUPTCY JUDGE. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTOR WITHOUT FURTHER NOTICE OTHER THAN BY ANNOUNCEMENT IN OPEN COURT AND/OR NOTICE(S) OF ADJOURNMENT FILED ON THE DOCKET WITH THE BANKRUPTCY COURT'S PERMISSION.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE APPLICABLE PARTIES SO AS TO BE ACTUALLY RECEIVED ON OR BEFORE 4:00 P.M. EASTERN TIME**

70

**ON APRIL [30], 2024 IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER.  UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER, THEY WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**B.     Confirmation Standards**

To confirm the Plan, the Bankruptcy Court must find that the requirements of section 1129 of the Bankruptcy Code have been satisfied.  The Debtor believes that section 1129 has been satisfied because, among other things:

a.     the Plan complies with the applicable provisions of the Bankruptcy Code;

b.     the Debtor, as plan proponent, has complied with the applicable provisions of the Bankruptcy Code;

c.     the Plan has been proposed in good faith and not by any means forbidden by law;

d.     any payment made or promised under the Plan for services or for costs and expenses in or in connection with this Chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

e.     with respect to each Class of Impaired Claims or Interests, each Holder of a Claim or Interest in such Class has either accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code (*see* Article V.C—*Best Interests Test*);

f.     each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such class pursuant to section 1129(b) of the Bankruptcy Code;

g.     except to the extent that the Holder of a certain Claim under section 3.1.1 of the Plan has agreed or will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative Expense Claims will be paid in full in Cash on the Effective Date;

h.     except to the extent that a holder of an Allowed Other Priority Claim has agreed to a different treatment of such Claim, each such Holder will receive Cash in an amount equal to the Allowed amount of such Claim, or treatment in any other manner so that such Claim will otherwise be rendered Unimpaired, (a) on the Effective Date or as soon as reasonably practicable thereafter; (b) if an Other Priority Claim is Allowed after the

Effective Date, on the date such Other Priority Claim is Allowed or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtor or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court;

i.      except to the extent that the applicable Holder of an Allowed Priority Tax Claim has been paid by the Debtor before the Effective Date, or such Holder agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, at the option of the Debtor or, after the Effective Date, the Liquidating Trust (i) payment in full in Cash made (a) on or as soon as reasonably practicable after the Effective Date or (b) on the date such payment is due in the ordinary course of business, (ii) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the Holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim;

j.      at least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class;

k.      Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan (*see* Article V.D—*Financial Feasibility*); and

l.      all fees payable under section 1930 of title 28 of the United States Code will be paid as of the Effective Date of the Plan.

## C.    Best Interests Test

### 1.    Explanation of the Best Interests Test

Pursuant to section 1129(a)(7) of the Bankruptcy Code, Confirmation of the Plan requires that, with respect to each Class of Impaired Claims or Interests, each Holder of a Claim or Interest in such Class either (a) accepts the Plan or (b) receives or retains under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code (this latter clause is known as the "Best Interests Test").

To determine the probable distribution to Holders of Claims and Interests in each Impaired Class if the Debtor was liquidated under chapter 7 of the Bankruptcy Code, the

Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation.

The Debtor's chapter 7 liquidation value would consist primarily of the cash held by the Debtor at the time of the conversion to a chapter 7 liquidation, the proceeds resulting from the sale of the Debtor's remaining assets and properties by a chapter 7 trustee and Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised or settled.  The gross cash proceeds available for distribution would be reduced by the costs and expenses of the chapter 7 liquidation and any additional Administrative Expense Claims that might arise as a result of the chapter 7 cases.  Costs and expenses incurred as a result of the chapter 7 liquidation would include, among other things, the fees payable to a trustee in bankruptcy and the fees payable to attorneys and other professionals engaged by such trustee. Additional Administrative Expense Claims could arise by reason of, among other things, the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtor during the pendency of the Chapter 11 Case.  Such Administrative Expense Claims and any other Administrative Expense Claims that might arise in a liquidation case or result from this Chapter 11 Case, such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Claims.

To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a chapter 7 liquidation of the Debtor's assets and properties, after subtracting the amounts attributable to the costs, expenses and Administrative Expense Claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired Classes under the Plan.  If the hypothetical chapter 7 liquidation distribution to Holders of Claims or Interests in any non-consenting Impaired Class is greater than the distributions to be received by such parties under the Plan, then the Plan is not in the best interests of the Holders of Claims or Interests in such Impaired Class.

## 2.    The Debtor's Liquidation Analysis

Amounts that a Holder of Claims and Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtor prepared by the Debtor's management with the assistance of their restructuring advisors, and attached to this Disclosure Statement as <u>Appendix B</u> (the "<u>Liquidation Analysis</u>"). [20]

As described in the Liquidation Analysis, underlying this analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtor's management, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the Debtor's control.  The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change.  Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis.

---

[20]    [**<u>NTD</u>**: Liquidation analysis to be included in an updated version of the Disclosure Statement filed in advance of the Disclosure Statement hearing.]

The Liquidation Analysis was developed solely for purposes of the formulation and negotiation of the Plan and to enable Holders of Claims or Interests entitled to vote under the Plan to make an informed judgment about the Plan, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtor or any of its affiliates.

Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtor does not intend and does not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events. Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of actual future results.

In deciding whether to vote to accept or reject the Plan, Holders of Claims or Interests must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

3.      **Application of the Best Interests Test to the Liquidation Analysis of the Debtor**

Notwithstanding the difficulties in quantifying with precision the recoveries to Holders of Claims and Interests, the Debtor believes that, based on a comparison between the recoveries under the Plan and the Liquidation Analysis, the Debtor's proposed Plan satisfies the requirements of the Best Interests Test. [As the Plan and the Liquidation Analysis indicate, Confirmation of the Plan will provide each Holder of an Allowed Claim or Interest in an Impaired Class with a recovery that is equal to or greater than the value of distributions to Holders in such Class if the Chapter 11 Case was converted to a case under chapter 7 of the Bankruptcy Code. Under the Plan, Holders of Allowed Administrative Expense Claims, Priority Tax Claims, Other Secured Claims and Other Priority Claims will receive payment in full on their Claims on the Effective Date or as soon thereafter as their Claims are Allowed. Thus, all Holders of such Claims are in the same or better position under the Plan as they would be in a liquidation under chapter 7. Similarly, Holders of Allowed Senior Note Claims and Other General Unsecured Claims (other than such Holders that elect to participate in the GUC Cash-Out) will receive a combination of Liquidating Trust Interests and NewCo Common Stock, with an estimated recovery that exceeds the projected recovery to Holders of such Claims in a chapter 7 liquidation, as set forth in the Liquidation Analysis. Further, Holders of Allowed Subordinated Note Claims and Preferred Equity Interests will also receive Liquidating Trust Interests under the Plan, which will enable them to receive distributions from the Liquidating Trust after the distribution preference (including, for the avoidance of doubt, any accretion thereto) of the Class A Trust Units has been satisfied in full, and in the case of Holders of Allowed Preferred Equity Interests, after the distribution preference (including, for the avoidance of doubt, any accretion thereto) of the Class B Trust Units has also been satisfied in full. As reflected in the Liquidation Analysis, the recovery to the Holders of such Claims and Interests is the same or better than the recovery than it would be in a case under chapter 7. Finally, under either the Plan or in a liquidation under chapter 7, Holders of Common Equity Interests are expected to receive no

74

recovery on account of their Interests, and accordingly, Holders of such Common Equity Interests are in the same position as they would be in a case under chapter 7.

Further, a chapter 7 liquidation would require the Debtor's Estate to incur additional costs and expenses, including fees payable to the chapter 7 trustee and fees that may be payable to attorneys or other professionals retained by the chapter 7 trustee. Such costs and expenses would be paid in full from the proceeds of the liquidation of the Debtor's Estate in chapter 7, if any, before the balance of those proceeds would be made available to Holders of Allowed Claims and Interests.

Finally, liquidating the Debtor's Estate under chapter 7 would not provide a timely distribution to Holders of Allowed Claims and Interests because of the potential added time and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtor's Estate.

Accordingly, the Debtor believes that the Plan will allow the realization of greater value for their respective Impaired Classes than a hypothetical liquidation.

## D.    Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation of the Plan, that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Debtor or the need for further financial reorganization, unless such liquidation or reorganization is contemplated by the Plan.

To determine whether the Plan meets this feasibility requirement, the Debtor, with the assistance of its advisors, has analyzed its ability to meet its obligations under the Plan. As part of this analysis, the Debtor has prepared [projected consolidated balance sheet, income statement, and statement of cash flows for NewCo and the Liquidating Trust] (the "Financial Projections") which, together with the assumptions on which they are based, are set forth in Appendix D of this Disclosure Statement. Creditors and other interested parties should review Article IX—*Certain Risk Factors to be Considered Prior to Voting* for a discussion of certain factors that may affect the future financial performance of NewCo.

Based upon the Financial Projections, the Debtor believes that NewCo will be a viable operation following the Chapter 11 Case, that NewCo will be able to make all payments required under the Plan, and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

## E.    Acceptance by Impaired Classes

Except as described in Article V.F—*Confirmation Without Acceptance by All Impaired Classes*, the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each Impaired Class accept the Plan. A class of claims that is unimpaired under the Plan is conclusively presumed to have accepted the Plan and, therefore, solicitation of acceptances with respect to such class is not required. Under section 1124 of the Bankruptcy Code, a class is impaired under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal

right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met.  Under section 1126(d) of the Bankruptcy Code, a class of interests will have voted to accept the plan only if two-thirds in amount of the interests that actually vote to accept or reject the plan cast their ballots in favor of acceptance.  Holders of claims or interests who fail to vote are deemed neither to accept nor to reject the plan.

In addition to these voting requirements, section 1129 of the Bankruptcy Code requires that a plan be accepted by each Holder of a claim or interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each Holder of a claim or interest in such class.  *See* Article V.C—*Best Interests Test*.  Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code discussed below.  *See* Article V.F—*Confirmation Without Acceptance by All Impaired Classes* below.

## F.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, provided that the Plan has been accepted by at least one Impaired Class of creditors. Notwithstanding the failure of an Impaired Class to accept the Plan, the Plan will be confirmed in a procedure commonly known as cram-down, so long as the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan.  Pursuant to Section 6.5 of the Plan, the Debtor reserves the right to seek confirmation under section 1129(b) of the Bankruptcy Code if necessary.

### 1.    Unfair Discrimination

The Plan does not "discriminate unfairly" for the purposes of section 1129 of the Bankruptcy Code if the Plan gives substantially equivalent treatment to each Class of equal rank; in determining whether a plan discriminates unfairly, courts take into account a number of factors, including the effect of applicable subordination agreements between parties.

### 2.    Fair and Equitable

The "fair and equitable" test applies to Classes of different priority and status and includes the general requirement that no Class of Claims or Interests receive more than 100 percent of the amount of the Allowed Claims or Interests in the Class. As to the dissenting Class, the test sets different standards depending upon the type of Claims or Interests in the Class.

The condition that the Plan be fair and equitable includes the following requirements as applicable:

a.      with respect to a non-accepting Class of Secured Claims, that:  (i) the Holders of such Secured Claims retain the Liens securing such Claims to the extent of the Allowed amount of the Secured Claims, whether the property subject to the liens is retained by the Debtor or transferred to another entity under the Plan, (ii) each Holder of a Secured Claim in the Class receives deferred cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date, at least equivalent to the value of such Secured Claim Holder's interest in the Debtor's property subject to the Liens, or (iii) the property securing the Secured Claim is sold free and clear of Liens with such Liens to attach to the proceeds of the sale, and such Liens on proceeds to receive treatment consistent with clause (i) or (ii) above;

b.      with respect to a non-accepting Class of General Unsecured Claims, that either:  (i) the Plan provide that each Claim Holder in such Class receive or retain, on account of such Claim, property of a value, as of the Effective Date, equal to the Allowed amount of such Claim or (ii) no Holder of any Claim or Interest that is junior to the Claims or Interests of such Class receive or retain any property under the Plan on account of such junior Claim or Interest; and

c.      with respect to a non-accepting Class of Interests, that either:  (i) the Plan provide that each Holder of an Interest in such Class receive or retain under the Plan, on account of such Interest, property of a value, as of the Effective Date, equal to the greater of:  (1) the Allowed amount of any fixed liquidation preference to which such Holder is entitled; (2) any fixed redemption price to which such Holder is entitled or (3) the value of such Interest or (ii) if the Class does not receive property in the amount required under (i), no Class of Interests junior to the non-accepting Class receive a distribution under the Plan.

**3.      Confirmation of the Plan Pursuant to Section 1129(b)**

The Debtor may seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class presumed to reject the Plan, and reserves the right to do so with respect to any other rejecting Class of Claims, and/or modify the Plan subject to the consent rights set forth in the RSA.  Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation of the Plan by the acceptance of the Plan by at least one Class that is Impaired under the Plan.

The Debtor submits that the Plan does not "discriminate unfairly" for the purposes of section 1129(b) of the Bankruptcy Code.  The Debtor believes that, under the Plan, all impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  Accordingly, the

Debtor believes that the Plan does not discriminate unfairly as to any impaired Class of Claims or Interests.

The Debtor submits that the Plan is "fair and equitable" for the purposes of section 1129(b) of the Bankruptcy Code because, as set forth above and in the Plan, the Holders of Claims in Classes 5 (Preferred Equity Interests), 6 (Common Equity Interests), 7 (Section 510(b) Claims) and 8 (Intercompany Claims and Intercompany Interests) may not receive a distribution equal to the Allowed amount of their Claims or Interests, as applicable, but no Holders of Claims or Interests junior to these Classes will receive a distribution under the Plan on account of such junior Claims or Interests.

Therefore, the requirements of section 1129(b) of the Bankruptcy Code would be satisfied in the event that the Debtor is required to cram down.

**G.    Valuation**

[•]²¹

**H.    Classification**

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divides the different claims (excluding administrative claims and certain other categories of claims) against, and equity interests in, a debtor into separate classes based upon their legal nature.  Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtor believes that the Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan.  Accordingly, the classification of Claims and Interests in the Plan complies with section 1122 of the Bankruptcy Code.

## ARTICLE VI

## VOTING PROCEDURES

On [•], the Bankruptcy Court entered an order, among other things, approving this Disclosure Statement, approving procedures for soliciting votes on the Plan, approving the form of the solicitation documents and various other notices, setting the Voting Record Date (as defined below), the Voting Deadline, the Release Election Deadline (as defined below) and the date of the Confirmation Hearing and establishing the relevant objection deadlines and procedures associated with Confirmation of the Plan, including the proposed assumption or

---

²¹    [**NTD**: Valuation description to be included in an updated version of the Disclosure Statement filed with the Court in advance of the Disclosure Statement hearing..]

assumption and assignment of certain of the Debtor's Executory Contracts and Unexpired Leases (the "<u>Solicitation Procedures Order</u>").[22]

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan and make any other elections or representations required pursuant to the Plan.  To ensure your vote is counted, you must complete, date, sign, and promptly mail the Ballot enclosed with the notice to the Solicitation Agent or complete your Ballot using the online portal maintained by the Solicitation Agent, or if you are a Beneficial Holder of Claims or Interests in Classes 3, 4 or 5 who has received a Beneficial Holder Ballot, you must return the Beneficial Holder Ballot to your Nominee, in each case indicating your decision to accept or reject the Plan in the boxes provided.

As described in **<u>Error! Reference source not found.</u>**—***Error! Reference source not found.*** herein and Section 12 of the Plan, Holders of Claims or Interests that vote to accept the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties.

The Ballot and Election Forms contain an election for a Holder who rejects the Plan, a Holder abstaining from voting on the Plan, or a Holder deemed to accept the Plan, to opt out of the third-party releases contained in Section 12.9 of the Plan.  All Holders of Claims or Interests (i) that vote to reject the Plan or (ii) that abstain from voting on the Plan, and do not affirmatively opt out of the third-party releases provided by the Plan by checking the box on the applicable Ballot indicating that they opt not to grant the third-party releases provided in the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties.  Holders of Claims or Interests deemed to accept the Plan and who do not affirmatively opt out of the third-party releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt out of the third-party releases provided in the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties.

The notices of non-voting status for Holders of Claims or Interests that are deemed to reject the Plan contains an election to opt in to the third-party releases contained in Section 12.9 of the Plan.  Holders of Claims or Interests that are deemed to reject the Plan but who affirmatively opt in to the third-party releases provided by the Plan by checking the box on the applicable Election Form indicating that they opt in to grant the third-party releases provided in the Plan.

The Solicitation Procedures Order, a copy of which is attached hereto as <u>Appendix C</u>, should be read in conjunction with this <u>Article VI</u>—*Voting Procedures* of this Disclosure Statement.  For the purposes of <u>Article VI</u>—*Voting Procedures* of this Disclosure Statement, capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Solicitation Procedures Order.

---

[22]    Capitalized terms in this <u>Article VI</u> not otherwise defined in this Disclosure Statement or the Plan will have the meanings ascribed to them in the Solicitation Procedures Order.

If you have any questions about (i) the procedures for voting your Claim or with respect to the packet of materials that you have received or (ii) the amount of your Claim, please contact the Debtor's Solicitation Agent at https://restructuring.ra.kroll.com/svbfg/.  If you wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement or other solicitation documents, you can obtain them from the Debtor's case information website (located at https://restructuring.ra.kroll.com/svbfg/) or by requesting a copy from the Debtor's Solicitation Agent, who can be reached at (833) 570-5297 (Domestic, Toll-Free), +1 (646) 440-4782 (International), or by email at svbinfo@ra.kroll.com.

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code.  In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law and, under Bankruptcy Rule 3020(b)(2), it may make such a determination without receiving evidence if no objection is timely filed.

In particular, and as described in more detail below, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that:  (a) the Plan has been accepted by the requisite votes of all Classes of Impaired Claims unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes; (b) the Plan is "feasible," meaning there is a reasonable probability that the Debtor will be able to perform its obligations under the Plan; and (c) the Plan is in the "best interests" of all Holders of Claims and Interests, meaning that all such Holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

The Bankruptcy Court must find that all conditions mentioned above are met before it can confirm the Plan.  Thus, even if all classes of Impaired Claims accept the Plan by the requisite votes, the Bankruptcy Court must still make an independent finding that the Plan satisfies these requirements of the Bankruptcy Code, that the Plan is feasible, and that the Plan is in the best interests of the Holders of Claims against and Interests in the Debtor.

UNLESS THE BALLOT BEING FURNISHED IS TIMELY RECEIVED BY THE SOLICITATION AGENT ON OR PRIOR TO 5:00 P.M. EASTERN TIME ON APRIL [25], 2024, TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED TO BE SUBMITTED WITH SUCH BALLOT, THE DEBTOR WILL REJECT SUCH BALLOT AS INVALID AND, ACCORDINGLY, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THE DEBTOR RESERVES THE RIGHT, IN ITS SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW ANY SUCH BALLOTS TO BE COUNTED.  IN NO CASE SHOULD A BALLOT OR ANY OF THE CERTIFICATES BE DELIVERED TO THE DEBTOR OR ANY OF ITS ADVISORS.

## A.        Parties-in-Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless:  (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan

cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is conclusively presumed to have accepted the plan, and the plan proponent need not solicit such holder's vote.  Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan.  For a detailed description of the treatment of Claims and Interests under the Plan, refer to Article IV—*Summary of the Plan*.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

**B.    Classes under the Plan**

**1.    Voting Classes**

Classes 3 (Senior Note Claims and Other General Unsecured Claims), 4 (Subordinated Notes Claims), and 5 (Preferred Equity Interests) are Impaired and entitled to receive distributions under the Plan and, thus, are entitled to vote to accept or reject the Plan. Consistent with the procedures described in the Solicitation Procedures Motion and below in Article VID—*Voluntary Releases under the Plan*, each Holder of a Claim or Interest in Classes 3, 4 and 5 that does not vote in favor of the Plan will be given an opportunity to opt out of the voluntary release in Section 12.9 of the Plan.

**2.    Non-Voting Classes**

Claims in Classes 1 and 2, and, to the extent such Claims or Interests are reinstated, Class 8 (such Classes, the "Unimpaired Non-Voting Classes"), are unimpaired and conclusively presumed under section 1126(f) of the Bankruptcy Code to accept the Plan and, accordingly, are not entitled to vote.  Consistent with the procedures described in the Solicitation Procedures Motion and below in Article VID—*Voluntary Releases under the Plan*, Holders of Claims or Interest in Unimpaired Non-Voting Classes will be given an opportunity to opt out of the voluntary, third-party release in Section 12.9 of the Plan or indicate their consent to such release by abstaining from opting out.

Claims and Interests in Classes 6 and 7, and, to the extent such Claims or Interests are not reinstated, Class 8 (the "Impaired Non-Voting Classes," and together with the Unimpaired Non-Voting Classes, the "Non-Voting Classes"), will not receive any distributions under the Plan and are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code and, accordingly, are not entitled to vote.  Consistent with the procedures described in the

Solicitation Procedures Motion and below in Article VID—*Voluntary Releases under the Plan*, Holders of Claims or Interest in Impaired Non-Voting Classes will be given an opportunity to opt in to the voluntary third-party release in Section 12.9 of the Plan.

## C.    Form, Content, and Manner of Notices

### 1.    Solicitation Packages for Voting Classes

As set forth in the Solicitation Procedures Order, the Debtor will distribute, or cause to be distributed, a solicitation package to each Holder of a Claim entitled to vote on the Plan (a "Solicitation Package"). The Solicitation Packages will contain:

  a.  the cover letter to the Solicitation Package, which describes the contents of the Solicitation Package and recommends all Holders of Claims and Interests in the Voting Classes accept the Plan;

  b.  a letter prepared by the UCC recommending that all Holders of General Unsecured Claims and Subordinated Note Claims vote to accept the Plan, which is attached hereto as Exhibit [C] (the "Committee Letter");

  c.  the Confirmation Hearing Notice;

  d.  the Solicitation Procedures Order (without accompanying exhibits), as entered;

  e.  instructions detailing how to access copies of the Disclosure Statement and Plan on the Solicitation Agent's website and how to request hard copies of the Disclosure Statement and Plan;

  f.  the applicable Ballot with detailed voting instructions and a pre-addressed, postage pre-paid return envelope[23]; and

  g.  such other materials as the Bankruptcy Court may direct.

### 2.    Notices for Non-Voting Classes

Under section 1126(f) of the Bankruptcy Code, classes that are not impaired under a plan are deemed to accept the plan. Classes 1 (Secured Claims) and 2 (Other Priority Claims) are Unimpaired under the Plan and deemed under section 1126(f) of the Bankruptcy Code to accept the Plan. Classes 6 (Common Equity Interests) and 7 (Section 510(b) Claims) and 8 (Intercompany Claims / Intercompany Interests) are Impaired under the Plan and deemed to reject the Plan. The votes of these respective Classes to accept or reject the Plan will not be solicited.

---

[23]  Service of the Solicitation Package by electronic mail to Holders for which email addresses are available, as well as to beneficial holders of Class 3 Senior Note Claims, Class 4 Subordinated Note Claims and Class 5 Preferred Equity Interests, will not contain a pre-addressed, postage pre-paid return envelope.

As set forth in the Solicitation Procedures Order, in lieu of a Solicitation Package, such Holders in Unimpaired Classes will only receive, within three business days after the Solicitation Procedures Order has been entered, (a) the Confirmation Hearing Notice (as defined in the Solicitation Procedures Order) and (b) a notice of unimpaired status, in each case by electronic service where possible (the "Notice of Unimpaired Status").  In addition, as set forth in the Solicitation Procedures Order, in lieu of a Solicitation Package, non-voting Holders in Classes 6 and 7 will only receive, on or before the Solicitation Mailing Deadline by electronic mail where possible, (a) the Confirmation Hearing Notice and (b) a notice of impaired non-voting status, in each case by electronic service where possible (together with the Notice of Unimpaired Status, the "Non-Voting Notices").

The Non-Voting Notices will provide the applicable Holders with instructions for viewing or obtaining a copy of the Plan, Disclosure Statement and Order, as required by Bankruptcy Rule 3017(d).  In addition, the Non-Voting Notices will include an election form annexed to such notice (the "Election Form") to permit Holders to opt in to or out of the voluntary, third-party release in Section 12.9 of the Plan, as further described below in Article VID—*Voluntary Releases under the Plan*.  The Election Form contains the full text of the voluntary, third-party release in Section 12.9 of the Plan and provides instructions for opting in to or out of such release.  The deadline for Holders of Claims and Interests to opt in to or out of the voluntary, third-party release contained in Section 12.9 of the Plan is April [25], 2024 at 5:00 p.m. Eastern Time (the "Release Election Deadline").  The Election Form also includes clear instructions regarding how to submit the Election Form and a pre-addressed, postage pre-paid return envelope.

Election Forms received after the Release Election Deadline will not be considered for purposes of determining whether such Holders have elected to opt in to or out of the voluntary, third-party release contained in Section 12.9 of the Plan.

**D.      Voluntary Releases under the Plan**

The voluntary, third-party release and injunction language in Section 12 of the Plan is described above in Article IVG of this Disclosure Statement.

**HOLDERS OF CLAIMS OR INTERESTS WILL RECEIVE EITHER A BALLOT OR ELECTION FORM, IN EACH CASE, TO ALLOW SUCH HOLDER TO OPT OUT OF OR OPT IN TO THE VOLUNTARY, THIRD-PARTY RELEASE CONTAINED IN SECTION 12.9 OF THE PLAN BY CLEARLY MARKING THE "OPT OUT" OR "OPT IN" BOX, AS APPLICABLE, ON THE BALLOT OR ELECTION FORM PROVIDED TO SUCH HOLDER.**

**HOLDERS OF CLAIMS IN CLASSES 1 AND 2 WILL EACH RECEIVE AN ELECTION FORM ALLOWING SUCH HOLDERS TO OPT OUT OF THE VOLUNTARY, THIRD-PARTY RELEASE CONTAINED IN SECTION 12.9 OF THE PLAN BY CLEARLY MARKING THE "OPT OUT" BOX ON THE ELECTION FORM PROVIDED TO SUCH HOLDER.**

**HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 3, 4 OR 5 WILL EACH RECEIVE A BALLOT, WHICH WILL ALLOW HOLDERS WHO (I) VOTE TO REJECT THE PLAN OR (II) ABSTAIN FROM VOTING ON THE PLAN, TO OPT OUT OF THE VOLUNTARY, THIRD-PARTY RELEASE CONTAINED IN SECTION 12.9 OF THE PLAN BY CLEARLY MARKING THE "OPT OUT" BOX ON THE BALLOT PROVIDED TO SUCH HOLDER.**

**HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 6 AND 7 WILL EACH RECEIVE AN ELECTION FORM ALLOWING SUCH HOLDERS TO OPT IN TO THE VOLUNTARY, THIRD-PARTY RELEASE CONTAINED IN SECTION 12.9 OF THE PLAN BY CLEARLY MARKING THE "OPT IN" BOX ON THE ELECTION FORM PROVIDED TO SUCH HOLDER.**

**ALL (I) HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 1 AND 2 WHO DO NOT PROPERLY CHECK THE "OPT-OUT" BOX ON A TIMELY SUBMITTED ELECTION FORM, (II) HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 3, 4 OR 5 WHO (X) VOTE TO REJECT THE PLAN OR (Y) ABSTAIN FROM VOTING ON THE PLAN AND DO NOT PROPERLY CHECK THE "OPT OUT" BOX ON A TIMELY SUBMITTED BALLOT, AND (III) HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 6 AND 7 WHO PROPERLY CHECK THE "OPT-IN" BOX ON THE APPLICABLE AND TIMELY SUBMITTED ELECTION FORM, WILL BE RELEASING PARTIES FOR PURPOSES OF SECTION 12.9 OF THE PLAN.**

The Debtor submits that the releases and accompanying opt-out procedures (as described in this Article VI–*Voting Procedures*) are consistent with practices of courts in this jurisdiction. Courts in this jurisdiction often find that releases pursuant to a settlement are appropriate. *See, e.g.*, *In re Garrett Motion Inc.*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. Apr. 26, 2021), D.I. 1161 (approving releases pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019); *In re Bally Total Fitness Holding Corp.*, 2007 WL 2779438, at *12 (Bankr. S.D.N.Y. Sept. 17, 2007) ("To the extent that a release or other provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); *In re Spiegel, Inc.*, 2005 WL 1278094, at *11 (Bankr. S.D.N.Y. May 25, 2005) (approving releases pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a)). Furthermore, the voluntary, third-party releases and accompanying opt out procedures are consistent with similar elections that have been approved by courts in this district in similar situations. *See, e.g.*, *In re Avianca Holdings S.A.*, 632 B.R. 124, 136 n.11 (Bankr. S.D.N.Y. 2021) (approving opt out procedures with respect to third-party releases) (collecting cases); *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Nov. 9, 2023), D.I. 3972 (approving opt out procedures for certain classes); *In re Endo Int'l plc*, No. 22-22549 (JLG) (Bankr. S.D.N.Y. Jan. 12, 2024), D.I. 3549 (conditionally approving opt out procedures for certain classes).

Likewise, exculpation provisions that extend to non-estate fiduciaries are also regularly approved. *See, e.g.*, *In re Oneida Ltd.*, 351 B.R. 79, 94 n.22 (Bankr. S.D.N.Y. 2006) (considering an exculpation provision covering a number of prepetition actors with respect to certain prepetition actions, as well as postpetition activity); *In re Celsius Network LLC,* No. 22-10964 (MG) (Bankr. S.D.N.Y. Nov. 9, 2023) [D.I. 3972] (confirming plan which exculpated

certain non-estate fiduciaries); *In re All Year Holdings Limited,* No. 21-12051 (MG) (Bankr. S.D.N.Y. Jan. 31, 2023) [D.I. 352] (approving plan exculpation provision providing for exculpation for certain non-estate fiduciaries); *In re Evergreen Garden Mezz LLC*, No. 21-10335 (MG) (Bankr. S.D.N.Y. Nov. 5, 2021) [D.I. 222] (same); *In re Avianca Holdings S.A.,* No. 20-11133 (MG) (Bankr. S.D.N.Y. Nov. 2, 2021) [D.I. 2300] (approving exculpation of both estate fiduciaries and non-estate fiduciaries); *In re Residential Cap. LLC,* Case No. 12-12020 (MG) 2013 WL 12161584, at *13 (Bankr. S.D.N.Y. Dec. 11, 2013) (approving exculpation for parties that were "instrumental to the successful prosecution of the Chapter 11 Cases or their resolution pursuant to the Plan, and/or provided a substantial contribution to the Debtors"); *see also* Tr. of Hr'g at 69, *In re Celsius Network LLC* [D.I. 3999] ("If [non-estate fiduciaries] are facing the threat of lawsuits by other disgruntled creditors who don't agree with what they did, it makes it very hard to achieve a consensual result. For those reasons, I think what historically may have been viewed as exculpation just for estate fiduciaries has extended beyond that to other active participants in the plan process. We may not agree with that, but I mean, that's what I think, where the law has moved").  In approving these provisions, courts consider a number of factors, including whether the beneficiaries of the exculpation have participated in good faith in negotiating in the plan and bringing it to fruition, and whether the provision is integral to the plan.  *In re Bearing Point, Inc.*, 435 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decision makers."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (same), aff'd, *In re DBSD N. Am., Inc.*, No. 09-10156, 2010 WL 1223109 (S.D.N.Y. May 24, 2010), aff'd in part, rev'd in part, 634 F.3d 79 (2d Cir. 2011); *In re Bally Total Fitness Holding Corp.*, 2007 WL 2779438, at *8 (Bankr. S.D.N.Y. Sept. 17, 2007) (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31, 2003) (approving an exculpation provision where it "was an essential element of the [p]lan formulation process and negotiations"); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

## E.    Voting Procedures

### 1.    Ballots

The record date for voting on the Plan is 4:00 p.m. Eastern Time on March [15], 2024 (the "Voting Record Date").  Accordingly, only Holders of Claims or Interests who have timely filed a Proof of Claim as of the Voting Record Date and that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

In voting for or against the Plan, please use (i) only the Ballot sent to you with this Disclosure Statement or (ii) the online electronic ballot portal.  If you are a Holder of a Claim in Class 3, 4, or 5 and did not receive a Ballot, if your Ballot is damaged or lost or if you have any questions concerning voting procedures, please contact the Solicitation Agent at (833) 570-5297 (Domestic, Toll-Free), +1 (646) 440-4782 (International), or by email at svbinfo@ra.kroll.com.

### 2.    Submitting Ballots

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete and submit your Ballot in accordance with the instructions in your Ballot.

To be counted, all Ballots must be properly executed, completed and delivered by: (i) first-class mail (using the reply envelope provided in the Solicitation Package or otherwise), (ii) overnight mail, (iii) hand delivery or (iv) the online electronic ballot portal (as described on the Ballot), in each case so that they are actually received NO LATER THAN 5:00 P.M. EASTERN TIME ON APRIL [25], 2024 by the Solicitation Agent.  If you are submitting a Ballot via first-class mail, it should be sent to:

SVB Financial Group Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11233

If you are submitting a Ballot via hand delivery or overnight mail, it should be sent to:

SVB Financial Group Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11233

If you are submitting a Ballot via the online electronic ballot portal: Visit the Solicitation Agent's website at https://restructuring.ra.kroll.com/svbfg/, click on the ["Submit E-Ballot, Opt Out or Opt In Form"] section of the Debtor's website and follow the instructions to submit your electronic Ballot.

If you are a Beneficial Holder of Claims or Interests in Classes 3, 4 or 5 and received a Beneficial Holder Ballot, you must return the Beneficial Holder Ballot to your Nominee, in accordance with the instructions provided by your Nominee, who will then submit a master ballot on your behalf.  Return the Beneficial Holder Ballot to your Nominee as promptly as possible and in sufficient time to allow such Nominee to process your instructions and return a completed master ballot to the Notice and Claims Agent by the Voting Deadline.

EACH NOMINEE SHOULD ADVISE ITS APPLICABLE HOLDERS TO RETURN THEIR BENEFICIAL HOLDER BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW THE NOMINEE TO PREPARE AND RETURN THE MASTER BALLOT TO THE NOTICE AND CLAIMS AGENT SO THAT IT IS ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT ON OR BEFORE THE VOTING DEADLINE.

The method of delivery of Ballots to be sent to the Solicitation Agent is at the election and risk of each Holder of a Claim or Interest.  Except as otherwise provided in the Plan, such delivery will be deemed made only when Debtor's Solicitation Agent actually receives the original executed Ballot.  In all cases, sufficient time should be allowed to assure timely delivery.

For submissions via first-class mail, overnight courier or hand delivery, original, executed Ballots are required. Ballots will not be accepted by facsimile transmission, electronic mail or other electronic means of transmission (except via the Solicitation Agent's e-ballot platform). Ballots received after the Voting Deadline will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected.

Ballots must be signed, legible, and contain sufficient information to identify the Holder of the Claim.

Ballots must be clearly marked to either accept or reject the Plan (but not both) and may not partially accept or partially reject the Plan.

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or other person acting in a fiduciary or representative capacity, such person must indicate such capacity when signing the Ballot and, if required or requested by the Debtor's Solicitation Agent, the Debtor or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, you must provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to this Ballot.

No Ballot should be sent to the Debtor, or the Debtor's financial or legal advisors, agents or representatives (other than the Solicitation Agent), and if so sent will not be counted. If no Holders of Claims or Interests in a particular Class that is entitled to vote on the Plan vote to accept or reject the Plan, then such Class will be deemed to accept the Plan.

Except as provided in the Solicitation Procedures Order and subject in all respect to the RSA, after the Voting Deadline, no Ballot may be withdrawn or modified without the prior consent of the Debtor. If multiple Ballots are received from the same Holder with respect to the same Claim or Interest prior to the Voting Deadline, the last Ballot timely received will supersede and revoke any earlier received Ballots; provided, however, where ambiguity exists with respect to which Ballot was the latest dated, the Solicitation Agent has the right to determine the appropriate tabulation of such Ballot and to contact the respective Holder to determine such Holder's intent in connection therewith.

Subject to certain restrictions and requirements set forth in section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan and the RSA, the Debtor may alter, amend or modify the Plan, including the Plan Supplement, without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date. After the Confirmation Date and before substantial consummation of the Plan, the Debtor may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, including the Plan Supplement, the Disclosure Statement or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and effects of the Plan.

Except as set forth in the Plan, after the Confirmation Date, but before the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the

Plan, including the Plan Supplement, without further order or approval of the Bankruptcy Court, subject to all applicable consent rights (including those set forth in the RSA); provided, that such adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or Interests and are otherwise permitted under section 1127(b) of the Bankruptcy Code.

Entry of a Confirmation Order shall mean that all modifications and amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code, and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**3.    Voting**

A Holder of a Claim or Interest entitled to vote on the Plan may vote to accept or reject the Plan only if no party-in-interest has objected to such Claim or Interest (or the Claim or Interest has been Allowed subsequent to any objection or estimated for voting purposes).

## ARTICLE VII

## EFFECT OF CONFIRMATION

**A.    Binding Effect of Confirmation**

Unless otherwise expressly provided in the Plan, Confirmation will bind the Debtor and all Holders of Claims and Interests to the provisions of the Plan, whether or not the Claim or Interest of any such Holder is impaired under the Plan and whether or not any such Holder of a Claim or Interest has accepted the Plan and will have the effect of converting all Claims and Interests into rights to receive the treatment specified in Article IV—*Summary of the Plan*.

**B.    Good Faith**

Confirmation of the Plan will constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code and (ii) all solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## ARTICLE VIII

## SECURITIES LAW MATTERS

**A.    Bankruptcy Code Exemptions from Registration Requirements**

**1.    Issuance**

The Plan provides for the issuance of Liquidating Trust Interests and NewCo Common Stock (collectively, the "Securities") without registration under the Securities Act or any similar law in reliance upon section 1145 of the Bankruptcy Code to the extent such exemption is available (any Securities issued pursuant to section 1145, the "1145 Securities").

The Debtor believes that the Securities are "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and applicable state securities laws.  Except with respect to a Person that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code, section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.  The Debtor believes that the issuance and distribution of the 1145 Securities satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

To the extent that Persons who receive any Securities pursuant to the Plan are deemed to be "underwriters," the issuance of Securities to such Persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Section 1145(b)(1) of the Bankruptcy Code defines four types of "underwriters" (except with respect to "ordinary trading transactions" of an entity that is not an "issuer"):

(i) Persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

(ii) Persons who offer to sell securities offered under a plan for the Holders of such securities;

(iii) Persons who offer to buy such securities from the Holders of such securities, if the offer to buy is:

(A) with a view to distributing such securities and

(B) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(iv) a Person who is an "issuer" with respect to the securities as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an "underwriter" under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition

of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means to possess, directly or indirectly, the power to direct or cause to direct management and policies of a Person, whether through owning voting securities, contract, or otherwise.

Whether or not any particular Person would be deemed to be an "underwriter" with respect to the Securities or any other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtor expresses no view as to whether any particular Person receiving any Securities or other securities under the Plan would be an "underwriter" with respect to such Securities or other securities.

Persons who would otherwise be deemed to be "underwriters" may, however, receive securities without registration under the Securities Act or any similar law in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder, to the extent such exemption is then available, as described in "Private Placement Exemption" below.

## 2.    Subsequent Transfers

To the extent section 1145 of the Bankruptcy Code is applicable, 1145 Securities to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) in general are freely tradable and transferable by any initial recipient thereof. 1145 Securities governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of the various states; however, the availability of such exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration in any given instance. Notwithstanding the foregoing, any securities or instruments issued under the Plan in reliance on section 1145(a) of the Bankruptcy Code remain subject to: (x) compliance with any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments; (y) the restrictions in the applicable NewCo Organizational Documents and the Liquidating Trust Agreement, as applicable, on the transferability of such securities and instruments[24] and (z) any other applicable regulatory approval.

---

[24]    As described in Article Article IVC.4(a)—*Implementation of the Plan* and Article Article XA.5(a)(iv)—*Consequences to the Debtor*, in an attempt to minimize the likelihood of an additional ownership change occurring after the Effective Date, the charter of NewCo will contain a restriction limiting the accumulation (and disposition) of shares of persons (and certain groups acting in concert) owning (actually or constructively), or who would own (immediately before or after such acquisition), 4.99 percent of any class of stock of NewCo (with certain adjustments), and requiring approval of NewCo's Board for any such transfers.

### B.    Private Placement Exemptions

#### 1.    Issuance

The Plan provides that, to the extent section 1145 of the Bankruptcy Code is not applicable, certain securities may be issued without registration under the Securities Act or any similar law in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder (the "4(a)(2) Securities").  To the extent such securities are issued pursuant to the Plan or the other Definitive Documents, the offering, issuance, exchange, or distribution of those securities will be conducted in a manner that is exempt from, among other things, the registration requirements of section 5 of the Securities Act.  Section 4(a)(2) exempts from section 5's registration requirements transactions not involving a public offering, and Regulation D provides a safe harbor under Section 4(a)(2) for transactions that meet certain requirements, including that the investors participating therein qualify as Accredited Investors.

Section 4(a)(2) provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act.

The issuance of 4(a)(2) Securities will be subject to the respective Blue Sky Laws of the various states; the availability of any Blue Sky Laws exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration in any given instance.

#### 2.    Subsequent Transfers

Because the 4(a)(2) Securities would not be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, they would be deemed "restricted securities" (within the meaning of Rule 144 under the Securities Act) that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available.

The Debtor does not plan to register the 4(a)(2) Securities.  Thus, persons who receive 4(a)(2) Securities will not be permitted to offer, sell or otherwise transfer their 4(a)(2) Securities except pursuant to an available exemption from registration.

All persons who receive 4(a)(2) Securities will be required to agree that they will not offer, sell or otherwise transfer any 4(a)(2) Securities other than pursuant to an effective registration statement under the Securities Act or an available exemption from registration thereunder.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met.  These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer.  An affiliate is defined as "a person that directly,

or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period whether or not there is current public information regarding the issuer. Adequate current public information is available for a reporting issuer if the issuer has filed all periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934 during the twelve months preceding the sale of the restricted securities. If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available. The Debtor currently expects that NewCo will not be a reporting issuer and will make certain information publicly available to allow resales under Rule 144 by non-affiliates when the six-month holding period expires (approximately six months after the emergence date).

An affiliate may resell restricted securities after the six-month holding period if at the time of the sale certain current public information regarding the issuer is available. As noted above, the Debtor currently expects that this information requirement will be satisfied. The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the greater of 1% of the average weekly reported volume of trading in such restricted securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted securities except in certain situations. Third, if the sale exceeds 5,000 restricted securities or has an aggregate sale price greater than $50,000, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice unless an amended notice is filed.

To the extent 4(a)(2) Securities are issued, the Debtor believes that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least six months after the Effective Date. Accordingly, each holder of 4(a)(2) Securities would be required to hold its 4(a)(2) Securities for at least six months and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, unless such sale is made pursuant to an effective registration statement under the Securities Act.

To the extent 4(a)(2) Securities are issued, such securities will be issued in uncertified form and each book-entry statement evidencing the 4(a)(2) Securities shall bear a restrictive legend. Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Security will be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], AND HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT PURSUANT TO THE EXEMPTION FROM REGISTRATION UNDER THE ACT PROVIDED BY RULE 144 THEREUNDER, WHEN AVAILABLE OR ANOTHER AVAILABLE EXEMPTION FROM REGISTRATION."

[NewCo] will reserve the right to require certification or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. [NewCo] will also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144 or another available exemption from registration.

Resales of 4(a)(2) Securities will be subject to the respective Blue Sky Laws of the various states; the availability of any Blue Sky Laws exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration in any given instance.

Any persons receiving "restricted securities" under the Plan, or any persons who believe they may be, or be deemed by the SEC to be, affiliates of the issuer of any applicable securities under the Plan, should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NEITHER THE DEBTOR NOR NEWCO MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

## ARTICLE IX

## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS OR INTERESTS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE

OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE
DOCUMENTS DELIVERED TOGETHER HEREWITH REFERRED TO OR
INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE
TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE
REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION
WITH THE PLAN AND ITS IMPLEMENTATION.

## A.    Certain Bankruptcy Law Considerations

### 1.    General

While the Debtor believes that the remainder of the Chapter 11 Case will be of
relatively short duration, the Debtor cannot be certain that this will be the case.  Although the
Plan is designed to minimize the length of the Chapter 11 Case it is impossible to predict with
certainty the amount of time that the Debtor may spend in bankruptcy or to assure parties-in-
interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy
proceedings to confirm the Plan could have a material adverse effect on the Debtor's business
and the value of its Estate.  A delay in the bankruptcy proceedings will also involve additional
expense and may divert some of the attention of the Debtor's management away from
maximizing the value of the Estate.

### 2.    Plan Confirmation

The Debtor can make no assurances that it will receive the requisite acceptances
to confirm that Plan or that the conditions to Confirmation will be satisfied or waived.  Further, if
the requisite acceptances are not received, the Debtor may seek to accomplish an alternative
restructuring and obtain acceptances to an alternative plan of reorganization for the Debtor or
otherwise, that may not have the support of the Holders of Claims or Interests and/or may be
required to liquidate these Estates under chapter 7 or 11 of the Bankruptcy Code.  There can be
no assurance that the terms of any such alternative restructuring arrangement or plan would be
similar to or as favorable to the Holders of Claims or Interests as those proposed in the Plan.

A non-accepting Holder of a Claim or Interest might challenge either the
adequacy of this Disclosure Statement or whether the balloting procedures and voting results
satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy
Court determines that this Disclosure Statement, the balloting procedures, and voting results
were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it concludes that
any of the statutory requirements for Confirmation have not been met.  If a chapter 11 plan is not
confirmed by the Bankruptcy Court, it is unclear whether the Debtor will be able to restructure
and what, if anything, Holders of Claims or Interests against the Debtor would ultimately receive
with respect to their Claims or Interests.

The Debtor, subject to the terms and conditions of the Plan and the RSA, reserves
the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Subject
to the terms and conditions of the Plan and the RSA, any such modifications could result in less
favorable treatment of any non-accepting Class, as well as any Class junior to any such non-
accepting Class, than the treatment currently provided in the Plan.  Such less favorable treatment

could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 3.        Objections to Classification of Claims and Interests

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtor.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtor believes that all Claims and Interests have been appropriately classified in the Plan.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtor would, subject to the RSA, seek (i) to modify the Plan to provide for whatever classification might be required for Confirmation and (ii) to use the acceptances received from any Holder of Claims or Interests pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims or Interests, although subject to the notice and hearing requirements of the Bankruptcy Code, could materially adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtor will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

### 4.        Risks Related to Possible Objections to the Plan

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtor believes that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party-in-interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

### 5.        Risk of Non-Approval by the Bankruptcy Court of the Restructuring Transactions

There can be no assurance that the Debtor will be able to obtain approval and complete the proposed Restructuring Transactions, or any other significant reorganization transaction, including as a result of objections from our stakeholders.  Such objections from stakeholders could result from stakeholders' preference for an alternative plan of reorganization.

If the Debtor is unable to complete the proposed Restructuring Transactions in the Chapter 11 Case, it may be necessary to seek additional funding sources, or convert from the chapter 11 reorganization process to a chapter 7 liquidation process.  If the proposed

Restructuring Transactions are completed, it may not generate the anticipated or desired outcomes (including with respect to consideration received).

Even if the Restructuring Transactions are implemented, the Debtor will continue to face a number of risks, including certain risks that are beyond the Debtor's control, such as changes in economic conditions and changes in the Debtor's industry. As a result, there is no guarantee that the Restructuring Transactions will achieve the Debtor's stated goals.

**6.      Risk of Nonoccurrence of the Effective Date**

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As set forth in Section 13 of the Plan, the Effective Date of the Plan is subject to the satisfaction (or waiver) of a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place, and it is unclear what distributions, if any, Holders of Allowed Claims or Interests would receive with respect to their Allowed Claims or Interests.

**7.      Closing of the Restructuring Transactions Is Dependent on a Number of Conditions that May Not Occur**

The closing of the Restructuring Transactions in connection with consummation of the Plan remains contingent on a number of conditions, including regulatory approvals if necessary. There is a risk that the Debtor will be unable to satisfy or waive all conditions to closing the Restructuring Transactions.

**8.      Nonconsensual Confirmation**

In the event that any impaired class of claims or interests does not accept a Chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting class. The Debtor believes that the Plan satisfies these requirements, and the Debtor may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

**9.      Filing of a Competing Plan**

At the outset of a chapter 11 case, the Bankruptcy Code provides a debtor with the exclusive right to file a plan of reorganization and prohibits third parties from proposing a plan. The Debtor has retained the exclusive right to propose the Plan through and including January 26, 2024. The Debtor now has the exclusive right to solicit votes on the Plan through and including March 26, 2024. If the exclusivity period expires, or if the Bankruptcy Court

terminates the Debtor's exclusive right, there may be a material adverse effect on the Debtor's ability to have the Plan confirmed, because third parties may propose competing plans.

### 10. The Debtor May Object to the Amount or Classification of a Claim or Interest

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 11. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims or Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims or Interests to be subordinated to other Allowed Claims or Interests.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims or Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.  The estimated Claims or Interests and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims or Interests may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims or Interests may vary from the estimated Claims or Interests contained in this Disclosure Statement.  Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims or Interests that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims or Interests under the Plan.

### 12. The Debtor May Fail to Satisfy the Solicitation Requirements Requiring a Re-Solicitation

To satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), the Debtor will be delivering the Solicitation Package to all Holders of Claims and Interests as of the Voting Record Date in the Classes entitled to vote.  Accordingly, the Debtor believes that the solicitation is proper under section 1125 of the Bankruptcy Code.  The Debtor cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, the Confirmation of the Plan could be denied.  If the Bankruptcy Court were to conclude that the Debtor did not satisfy the solicitation requirements, then the Debtor may seek to re-solicit votes to accept or reject the Plan or to solicit votes from one or more Classes that were not previously solicited.  The Debtor cannot provide any assurances that such a re-solicitation would be successful.  Re-solicitation could delay or jeopardize confirmation of the Plan.  Non-confirmation of the Plan could result in a protracted Chapter 11 Case.

### 13.     Certain Creditors May Bring Litigation Against the Debtor

Even if the Debtor receives the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.  Further, third parties, including certain of the Debtor's creditors, may bring litigation against the Debtor during the course of this Chapter 11 Case, the outcome of which is uncertain.  Although the Debtor believes the Plan satisfies all of the requirements necessary for Confirmation by the Bankruptcy Court, creditors and other parties-in-interest may bring objections to challenge Confirmation of the Plan.

### 14.     The Total Amount of Allowed General Unsecured Claims May Be Higher Than Anticipated by the Debtor

With respect to Holders of Allowed General Unsecured Claims, the claims filed against the Debtor's Estate may be significantly higher than the Debtor has estimated.  There can be no assurance that the estimated amount of Claims is correct, and the actual Allowed amounts of Claims may differ from estimates.  The estimated amounts are subject to certain risks, uncertainties and assumptions.  Should one or more of these risks or uncertainties materialize or should underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated therein.

### 15.     The Total Amount of Allowed Administrative and Priority Claims May Be Higher or the Amount of Distributable Cash May Be Lower Than Anticipated by the Debtor

The amount of Cash the Debtor ultimately receives on account of the Restructuring Transactions and from other sources prior to and following the Effective Date may be lower than anticipated.  Additionally, Allowed Administrative Expense Claims and Allowed Priority Claims maybe higher than anticipated.  Accordingly, there is a risk that the Debtor will not be able to pay in full in cash all Administrative Expense Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan of reorganization.

### 16.     Third-Party Offers

The Debtor may receive inquiries or offers from third parties related to the disposition of all or a substantial amount of their assets, including SVB Capital, which the Debtor may choose to pursue.

### 17.     Conversion into Chapter 7 Case

If the Bankruptcy Court finds that it would be in the best interest of the Holders of Claims or Interests, the Bankruptcy Court may convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities under the Bankruptcy Code.  The Debtor believes that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided in a chapter 11 plan because of (a) the likelihood that assets would have to be sold in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment

of a chapter 7 trustee and (c) additional expenses and claims, some of which would be entitled to priority.

### 18.    The Results of an Actual Chapter 7 Liquidation May Be Different from the Liquidation Analysis

Underlying the Liquidation Analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtor's management and advisors, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtor.  The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change.  Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis.  Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed or, alternatively, may have been unanticipated.

### 19.    Plan Releases, Injunctions and Exculpation Provisions May Not Be Approved

There can be no assurance that the Plan releases, injunctions and exculpation provisions, as provided in Section 12 of the Plan, will be granted.  Furthermore, the releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties and Exculpated Parties) provided in the Plan are subject to objection by parties in interest.  Failure of the Bankruptcy Court to grant such relief may result in a plan of reorganization that differs from the Plan or the Plan not being confirmed.

### 20.    The Amount and Timing of Available Distributions, if Any, May Vary

While the Debtor has attempted to project what it believes are likely distributions, if any, to be made to parties holding Allowed Claims and Interests, there can be no certainty that the projections will be accurate and that Holders will receive the distributions described in the Plan.  The projections will necessarily be affected by, among other things, recoveries generated in connection with the liquidation of certain of the Debtor's remaining assets (including, without limitation, the recoveries, if any, on the account of the Retained Causes of Action), the outcome of objections to Claims or Interests, resolution of litigation, and the cost and expenses of such actions and generally administering and winding down (as applicable) the Debtor's Estate.  Additionally, the timing of actual distributions to Holders of Allowed Claims or Interests may be affected by many factors that cannot be predicted.  Therefore, the Debtor cannot guarantee the timing of any recovery on account of Allowed Claims or Interests.

### B.    Risks Related to the Debtor's Ongoing Operations during the Chapter 11 Case

### 1.    The Debtor Will Be Subject to Risks and Uncertainties Associated with the Chapter 11 Case

For the duration of the Chapter 11 Case, the Debtor's ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (i) ability to develop, confirm, and consummate the Plan; (ii) ability to obtain Bankruptcy Court approval

with respect to motions filed in the Chapter 11 Case from time to time; (iii) ability to maintain relationships with vendors, service providers, customers, employees, current and prospective investors, and other third parties; (iv) ability to maintain contracts that are critical to the Debtor's operations; (v) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtor; (vi) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtor to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Case to a chapter 7 proceeding; and (vii) the actions and decisions of the Debtor's creditors and other third parties who have interests in the Chapter 11 Case that may be inconsistent with the Debtor's plans.

These risks and uncertainties could affect the Debtor's business and operations in various ways. For example, negative events associated with the Chapter 11 Case could adversely affect the Debtor's relationships with service providers, investors and other third parties, which, in turn, could materially adversely affect the Debtor's operations and financial condition. Also, the Debtor will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtor's ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Case, the Debtor cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Case that may be inconsistent with the Debtor's plans.

## 2.    Operating in Bankruptcy for a Long Period of Time May Harm the Debtor's Business

The Debtor's future results will be dependent upon the successful Confirmation and implementation of the Plan. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtor's business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Case continue, the Debtor's management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. In addition, the longer the proceedings related to the Chapter 11 Case continues, the more likely it is that investors and other third parties will lose confidence in the Debtor's ability to reorganize its businesses successfully and will seek to establish alternative commercial relationships.

## 3.    Undue Delay in Confirmation May Disrupt Operation of the Debtor

Although the Plan is designed to minimize the length of the Chapter 11 Case, it is impossible to predict with certainty the amount of time that the Debtor may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed.

The continuation of the Chapter 11 Case, particularly if the Plan is not confirmed in the time frame currently contemplated, could materially adversely affect operations. If Confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Case could result in, among other things, increased costs for professional fees and other case expenses. In addition, a prolonged Chapter 11 Case would require senior management to spend a

significant amount of time and effort dealing with the Debtor's financial reorganization instead of focusing on the operation of the Debtor's businesses.

The uncertainty surrounding a prolonged Chapter 11 Case could have other adverse effects on the Debtor, including limiting the Debtor's ability to retain key employees; affecting the perception of the Debtor's business by regulators, investors, and lenders; and reducing the Debtor's assets and/or liquidity.

### 4.    The Debtor's Ongoing Liquidity Needs May Impact Recoveries

The Debtor has incurred significant professional fees and other costs in connection with the Chapter 11 Case and expects to continue to incur further professional fees and costs throughout the remainder of this Chapter 11 Case. The Debtor cannot guarantee that cash on hand will be sufficient to continue to fund its operations and allow the Debtor to satisfy obligations related to the Chapter 11 Case until the Debtor is able to emerge from bankruptcy protection. Accordingly, depending on how long the Chapter 11 Case continues, the recoveries that Holders of Claims or Interests are estimated to receive will be impacted by the Debtor's ongoing liquidity requirements. The Debtor faces uncertainty regarding the adequacy of its liquidity and capital resources. The Debtor's liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) its ability to maintain adequate cash on hand; (b) its ability to confirm and consummate the Plan; and (c) the ultimate cost, duration, and outcome of this Chapter 11 Case. The Debtor's ability to maintain adequate liquidity depends, in part, upon general economic, financial, competitive, regulatory and other factors beyond the Debtor's control.

### 5.    Risks Related to Loss of Key Personnel

The Debtor's operations, including the SVB Capital business, are dependent on a relatively small group of key management personnel. The Debtor's Chapter 11 Case has created distractions and uncertainty for key personnel and employees, and the Debtor has suffered significant attrition since the Petition Date. Personnel retention was further complicated by the fact that as of the Petition Date, personnel were almost all employed by the former Silicon Valley Bank. Because competition for experienced personnel can be significant and it is difficult to hire as a debtor in Chapter 11, the Debtor may be unable to find acceptable replacements with comparable skills and experience. The loss of such key personnel could adversely affect the Debtor's ability to lead this Chapter 11 Case to resolution by consummating the Plan. In addition, the loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtor's ability to fulfill responsibilities related to its Chapter 11 Case and emerge successfully therefrom.

## C.    Risk Factors Relating to a NewCo Transaction

### 1.    The Debtor May Effectuate a NewCo Transaction

The Debtor, the Required Ad Hoc Senior Noteholder Parties and the UCC shall continue to work together in good faith to evaluate opportunities to maximize the value of all or some of the assets or equity of NewCo in the NewCo Transaction.

### 2.    The Bankruptcy Court May Not Approve the NewCo Transaction

The Bankruptcy Court may not approve the NewCo Transaction.  Failure to obtain the Bankruptcy Court's approval of the NewCo Transaction could prevent the Debtor from consummating the Plan and the transactions contemplated thereby.

### D.    Risk Factors Relating to NewCo Common Stock to Be Issued Under the Plan

### 1.    Potential Dilution

The ownership percentage represented by the NewCo Common Stock distributed on the Effective Date under the Plan to the Holders General Unsecured Claims will be subject to dilution (i) by any NewCo Transaction (as applicable) and (ii) from any other shares that may be issued post-emergence, including Holders of Claims that are Disputed as of the Effective Date.

In the future, similar to all companies, additional equity financings or other share issuances by NewCo could adversely affect the value of the NewCo Common Stock issuable upon such conversion.  The amount of dilution effected by any of the foregoing could be material.

### 2.    Equity Interests Subordinated to NewCo's Indebtedness

In any subsequent liquidation, dissolution, or winding-up of NewCo, the NewCo Common Stock would rank below all debt claims against NewCo, including, without limitation, the NewCo Debt.  As a result, holders of the NewCo Common Stock would not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution or winding-up of NewCo until after all of NewCo's obligations to its debt holders have been satisfied.

### 3.    Implied Valuation of NewCo Common Stock May Not Represent Trading Value of NewCo Common Stock

Any implied valuation of the NewCo Common Stock stated herein or in the Plan is not intended to represent the trading value of NewCo Common Stock and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things:  (a) prevailing interest rates, (b) conditions in the financial markets, (c) the anticipated value of the initial securities of creditors receiving NewCo Common Stock under the Plan, some of which may prefer to liquidate their investment rather than hold it on a long-term basis, and (d) other factors that generally influence prices of securities.  Factors unrelated to NewCo's actual operating performance and other factors not possible to predict could affect the market price of the NewCo Common Stock.  Accordingly, the implied value of the securities to be issued, stated herein and in the Plan, should not be construed as reflecting values that will be attained for the NewCo Common Stock in the private markets.

### 4.    No Dividends

NewCo may not pay any dividends on the NewCo Common Stock and may instead retain any future cash flows for debt reduction and to support its operations.  As a result,

the success of an investment in the NewCo Common Stock may depend entirely upon any future appreciation in the value of the NewCo Common Stock.  There is no guarantee that the NewCo Common Stock will appreciate in value or even maintain its initial value.

5.    **No Public Market for NewCo Common Stock**

There is no public market for the NewCo Common Stock and there can be no assurance as to the development or liquidity of any market for the NewCo Common Stock.  The Plan does not contemplate that the NewCo Common Stock will be listed upon any national securities exchange or any over-the-counter market after the Effective Date.  If a trading market does not develop, is not maintained, or remains inactive, holders of the NewCo Common Stock may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, NewCo.  In addition, on the Effective Date, it is expected that the NewCo will not be required under U.S. securities laws to file any reports with the SEC or otherwise provide financial or other information to the public which may further impair liquidity and prevent brokers or dealers from publishing quotations and that the ownership and transfer of the NewCo Common Stock will be subject to limitations set out in the charter of NewCo.  This means that a holder of NewCo Common Stock may not be able to sell its NewCo Common Stock to raise money for immediate or future needs.

6.    **Significant Holders of NewCo Common Stock**

Certain Holders of Allowed Claims are expected to acquire a significant ownership interest in the NewCo Common Stock pursuant to the Plan.  If such Holders were to act as a group, such Holders may be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders.  This concentration of ownership could also facilitate or hinder a negotiated change of control of NewCo and, consequently, have an impact upon the value of the NewCo Common Stock.

7.    **The NewCo Organizational Documents May Limit the Rights of Holders of NewCo Common Stock**

The NewCo Organizational Documents may contain certain provisions that limit the rights of holders of the NewCo Common Stock.  In particular, the NewCo Organizational Documents may include provisions relating to (a) the corporate governance of NewCo, the election of the board of directors, and the duties of directors and officers, (b) transfer restrictions with respect to NewCo Common Stock (including tag-along rights and drag-along rights), (c) voting rights of NewCo Common Stock, (d) information rights provided to Holders of NewCo Common Stock, and (e) related rights and obligations.  There is no guarantee that any holder of the NewCo Common Stock will be able to freely transfer its NewCo Common Stock immediately after the Effective Date or will become able to freely transfer such NewCo Common Stock in the future.  Minority holders of NewCo Common Stock may have very limited protections and virtually no ability to influence management of the business of NewCo.

In addition, from and after the Effective Date, the NewCo Organizational Documents will contain certain transfer restrictions in relation to the transfer of NewCo Common Stock.  Specifically, the NewCo Organizational Documents will provide that, without the approval of the NewCo Board, (i) no Person will be permitted to acquire, whether directly or indirectly, and whether in one transaction or a series of transactions, NewCo Common Stock, to the extent that after giving effect to such purported acquisition the purported acquirer or any other Person by reason of the purported acquirer's acquisition would become a Substantial Holder of any class of stock of NewCo; (ii) no Substantial Holder may acquire, directly or indirectly, any shares of NewCo stock without the consent of a majority of the NewCo Board; and (iii) no Substantial Holder may dispose, directly or indirectly, of any shares of NewCo stock without the consent of a majority of the NewCo Board.

### E.    Operational Risks for NewCo

#### 1.    The Debtor's Financial Projections and Other Forward-Looking Statements Are Subject to Inherent Uncertainty Due to the Numerous Assumptions upon Which They Are Based

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended.  Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims or Interests in the various Classes that might be allowed.

The Plan relies upon the Financial Projections that are based on numerous assumptions including, without limitation, the timing, Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of NewCo and the Liquidating Trust, financial industry performance, general business and economic conditions, competition, adequate financing, absence of material claims, the ability to make necessary capital expenditures, use of unrestricted cash, the ability to control future operating expenses, and other matters, many of which will be beyond the control of NewCo and the Liquidating Trust and some or all of which may not materialize.  Particular uncertainties with respect to NewCo's operations and financial results arise from the risks and uncertainties relating to changes in the demand for NewCo's financial services; legislation and regulations relating to the financial markets; operational factors; fluctuations in the amount of cash NewCo will generate from operations, or amounts that the Liquidating Trust will generate through the liquidation of the Liquidating Trust Assets, and numerous other matters of national, regional and global scale, including those of a political, economic, business, competitive or regulatory nature.

The Financial Projections represent management's view based on currently known facts, the successful Confirmation and implementation of the Plan and hypothetical assumptions regarding NewCo's future operations and ability to finance such operations; they do not guarantee NewCo's future financial performance.  Actual financial results will be subject to a number of factors, including general business and economic conditions, and other matters, many

of which will be beyond the control of NewCo and may differ materially from the Financial Projections.  Therefore, the Financial Projections should not be relied upon as an assurance of the actual results that will occur.  Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization implemented will occur or, even if they do occur, that they will have the anticipated effects on NewCo and its business or operations or on the Liquidating Trust.  The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of any plan of reorganization.

Except with respect to the Financial Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement and the Plan do not reflect any events that might occur subsequent to the date hereof.  Such events could have a material impact on the information contained in this Disclosure Statement and the Plan.  Neither the Debtor, NewCo nor the Liquidating Trust intend to update the Financial Projections.  The Financial Projections therefore may not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Financial Projections.

In addition, if the Debtor emerges from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtor's operating plans pursuant to a plan of reorganization.  The Debtor also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtor's balance sheets.  The Debtor's financial results after the application of fresh start accounting also may be different from historical trends.

Finally, this Disclosure Statement was not approved by the Securities and Exchange Commission.

## 2.    Risks Pertaining to Access to Capital Markets

NewCo may require additional capital in the future to finance its growth and development, satisfy regulatory compliance obligations, and meet general working capital needs.  NewCo's capital requirements will depend on many factors, including acceptance of and demand for NewCo's services, the extent to which NewCo invests in new technology and personnel and the status and timing of these developments.  If NewCo's access to capital were to become constrained significantly, or if costs of capital increased significantly, due to lowered credit ratings, prevailing industry conditions, the solvency of customers, a material decline in demand for services, the volatility of the capital markets or other factors, NewCo's financial condition, results of operations and cash flows could be adversely affected.

## 3.    NewCo May Be Adversely Affected by Potential Litigation

In the future, NewCo may become party to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect NewCo's financial results.  In the ordinary

course of business, NewCo may be party to a number of lawsuits, investigations and disputes (some of which involve substantial amounts claimed) arising out of current and historical business, commercial transactions, prior acquisitions and divestitures, employment, employee benefits plans, intellectual property, antitrust, and other matters.  The costs incurred in connection with such lawsuits, investigations and disputes can be substantial and result in the diversion of the NewCo's attention and resources.  It is not possible to predict the potential litigation that NewCo may become party to, nor the final resolution of such litigation.  The impact of any such lawsuits, investigations and disputes on NewCo's business and financial stability, however, could be material.

4.      **Tax Risks**

NewCo's future results of operations could be adversely affected by changes in the effective tax rate as a result of a change in the mix of earnings in countries with differing statutory tax rates, changes in tax laws, regulations and judicial rulings (or changes in the interpretation thereof), changes in generally accepted accounting principles, changes in the valuation of deferred tax assets and liabilities, the results of audits and examinations of previously filed tax returns and continuing assessments of NewCo's tax exposures and various other governmental enforcement initiatives.  NewCo's tax expense includes estimates of tax reserves and reflects other estimates and assumptions, including assessment of NewCo's future earnings which could impact the valuation of the deferred tax assets.  Changes in tax laws or regulations may increase tax uncertainty and may adversely impact NewCo's provision for income taxes.

Furthermore, NewCo's ability to utilize certain tax attributes, including net operating loss carryforwards, is uncertain.  Even if NewCo is able to utilize certain tax attributes, the resulting impact of those tax attributes is uncertain.

For a discussion of certain U.S. federal income tax considerations to NewCo, the Debtor and certain holders of Claims and Interests in connection with the implementation of the Plan, *see* Article X below—*Certain U.S. Federal Income Tax Consequences of the Plan*.

**F.      Risk Factors Relating to Liquidating Trust Interests to Be Issued Under the Plan**

1.      **Risks Associated with Absence of Any Established Trading Market for Liquidating Trust Interests**

With regard to any private sales of the Liquidating Trust Interests after the Effective Date, neither the Liquidating Trust nor the Liquidating Trust Board will take steps designed to facilitate the development of a secondary market in the Liquidating Trust Interests. Neither the Liquidating Trust nor the Liquidating Trust Board intend for an active trading market for the Liquidating Trust Interests to develop.  It may be difficult to sell the Liquidating Trust Interests at an attractive price.  The price at which the Liquidating Trust Interests could be sold may be below the original cost of the holders of the Liquidating Trust Interests, and the holders of the Liquidating Trust Interests may not be able to sell the Liquidating Trust Interests at all. This means that a holder of a Liquidating Trust Interest may not be able to sell its Liquidating Trust Interests to raise money for immediate or future needs.

2.      **Potential Dilution**

The ownership percentage represented by the Liquidating Trust Interests
distributed on the Effective Date under the Plan to the Holders of Allowed General Unsecured
Claims, Allowed Subordinated Note Claims and Preferred Equity Interests will be subject to
dilution from any other units that may be issued post-emergence, if any, including Holders of
Claims or Interests that are Disputed as of the Effective Date.

In the future, unit issuances by the Liquidating Trust could adversely affect the
value of the Liquidating Trust Interests.  The amount of dilution effected by the foregoing could
be material.  Furthermore, the Liquidating Trust could issue additional Liquidating Trust
Interests with a distribution preference over the Liquidating Trust Interests that will be
distributed on the Effective Date under the Plan to the Holders of Allowed General Unsecured
Claims, Allowed Subordinated Note Claims and Preferred Equity Interests.

The Class A Trust Units issued to Holders of Allowed General Unsecured Claims
(other than Holders of Allowed General Unsecured Claims that elect to participate in the GUC
Cash-Out) will receive a distribution preference of $[•], which will accrete at an annual rate of
12%.  Given that the Class B Trust Units and the Class C Trust Units will receive no
distributions until the distribution preference of the Class A Trust Units has been satisfied in full,
including any accretion thereto, delays in distributions from the Liquidating Trust may reduce
distributions to holders of Class B Trust Units and Class C Trust Units.  The Class B Trust Units
issued to Holders of Allowed Subordinated Note Claims will receive a distribution preference to
be calculated at the face amount of the Allowed Subordinated Note Claims, which will accrete at
an annual rate of 12%.  Given that the Class C Trust Units will receive no distributions until the
distribution preferences of the Class A Trust Units and Class B Trust Units have been satisfied in
full, including any accretion thereto, delays in distributions from the Liquidating Trust may
reduce distributions to holders of Class C Trust Units.

3.      **The Liquidating Trust May be Required to Register Under the Investment
Company Act, Which Would Increase Its Regulatory Burden and Negatively
Affect the Value of the Liquidating Trust Interest**

The Liquidating Trust may be required to register as an investment company
under the Investment Company Act.  While the Debtor takes the position that the Liquidating
Trust should not be required to register under the Investment Company Act and that the
Liquidating Trust is not subject to the Investment Company Act, the SEC may disagree and
could require registration of the Liquidating Trust either immediately or at some point in the
future.  As a result, there could be an increased regulatory burden on the Liquidating Trust which
could negatively affect the value of the Liquidating Trust Interests.

G.      **Operational Risks for the Liquidating Trust**

1.      **Risks Associated with Financial Projections**

The Debtor's management, with the assistance of their financial advisors, have
prepared the Financial Projections based on certain assumptions, as set forth in Appendix D

hereto.  The Financial Projections represent the management's view based on currently known facts, the successful Confirmation and implementation of the Plan and hypothetical assumptions regarding the Liquidating Trust.  Actual financial results will be subject to a number of factors, including general business and economic conditions, and other matters, many of which will be beyond the control of the Liquidating Trust Board and may differ materially from the Financial Projections.  The Liquidating Trust may not be able to liquidate the Liquidating Trust Assets in the timeframe or at prices that are consistent with the Financial Projections and as envisioned under the Plan, the Liquidating Trust Agreement and this Disclosure Statement after the Effective Date.

### 2.    The Timing and Outcome of the FDIC Litigation Is Uncertain and Has a Significant Impact on the Liquidating Trust

The Debtor is party to litigation against the FDIC with respect to the FDIC Claims, in which the Debtor seeks the return of approximately $1.93 billion in its deposits held by the former SVB at the time of its receivership.  This litigation is currently taking place in two venues: (i) the United States District Court for the Southern District of New York, with respect to the FDIC-C, FDIC-R1 and FDIC-R2 (the "SDNY Proceeding") and (ii) the United States District Court for the Northern District of California, solely with respect to the FDIC-C (together with the SDNY Proceeding, the "FDIC Proceedings").  The FDIC disputes the Debtor's allegations and is defending itself in the FDIC Proceedings.  Additional proceedings regarding the FDIC Claims in additional venues may be filed before a hearing is held regarding confirmation of the Debtor's Plan.

The outcome of the FDIC Proceedings will have a significant impact on the value of the Liquidating Trust.  A material portion of the ultimate recoveries, if any, to be obtained by the Liquidating Trust on behalf of Holders of Allowed Claims in Classes 3, 4 and 5 are contingent on the resolution of the FDIC Claims.  However, any recovery on account of the FDIC Claims is highly speculative.  The FDIC Proceedings may result in a range of outcomes, including settlements, which could significantly affect the value of the Liquidating Trust.  Additionally, the timing of any resolution of the FDIC Proceedings is impossible to predict, which may also adversely impact the value of the Liquidating Trust.  The FDIC Claims feature complex and novel questions of law and of fact and the FDIC Proceedings (including those proceedings regarding the FDIC Claims that may be filed in the future) are procedurally complicated.  While the Debtor believes in the merits of its lawsuits, these circumstances make it impossible to predict the resolution of the FDIC Proceedings (or similar lawsuits regarding the FDIC Claims) or the timing thereof.

### 3.    The Timing and Outcome of Litigation Relating to the Retained Causes of Action is Uncertain and May have a Significant Impact on the Liquidating Trust

Pursuant to the Plan, certain Retained Causes of Action will be transferred to the Liquidating Trust.  The outcome of any litigation involving the Retained Causes of Action may have a significant impact on the value of the Liquidating Trust.  Additionally, the timing of any resolution of litigation involving the Retained Causes of Action is impossible to predict, which may also have a significant impact on the value of the Liquidating Trust.  The Retained Causes

of Action include Claims and Causes of Action that involve complex factual and legal issues and that may be procedurally complicated.  These circumstances make it impossible to predict the resolution of any litigation involving the Retained Causes of Action or the timing thereof.

### 4.    Liquidating Trust Expenses May Exceed Current Expectations

The ultimate amount of Cash available to distribute to the holders of Liquidating Trust Interests depends, in part, on the manner in which the Liquidating Board operates the Liquidating Trust and the expenses that it incurs in doing so.  Such expenses may include, without limitation, the reasonable and necessary expenses of administering the Liquidating Trust, including the costs to liquidate the Liquidating Trust Assets, investigate and prosecute the FDIC Claims, investigate and prosecute the Retained Causes of Action and make distributions.  If the Liquidating Trust incurs professional or other expenses in excess of current expectations, the amount of distributable assets remaining to provide distributions to the holders of Liquidating Trust Interests will decrease.

### 5.    The Liquidating Trust May Be Adversely Affected by Potential Litigation

In the future, the Liquidating Trust may become party to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Liquidating Trust's financial results.  It is not possible to predict the potential litigation that the Liquidating Trust may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Liquidating Trust's businesses and financial stability, however, could be material.

### 6.    Tax Risks

There are a number of material income tax considerations, risks, and uncertainties associated with the Liquidating Trust.  Holders of Claims or Interests and other interested parties should read carefully the discussion of certain U.S. federal income tax consequences of the Plan set forth in Article X below—*Certain U.S. Federal Income Tax Consequences of the Plan*.

## H.    Additional Risk Factors

### 1.    The Financial Information is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit Was Performed

In preparing this Disclosure Statement, the Debtor relied on financial data derived from its books and records that was available at the time of such preparation.  Although the Debtor has used its reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtor believes that such financial information fairly reflects its financial condition, the Debtor is unable to warrant or represent that the financial information contained in this Disclosure Statement (or in any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

**2.      The Debtor Could Amend, Waive, Modify or Withdraw the Plan**

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtor, subject to the terms of the Plan and the RSA.  Further, the Debtor reserves the right, prior to the Confirmation of the Plan or substantial consummation thereof, subject to the provisions of section 1127 of the Bankruptcy Code and applicable law and the terms of the RSA, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan.  The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.  Holders of Claims and Interests will receive notice of such amendments or waivers as required by applicable law and the Bankruptcy Court.  If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtor seeks (in accordance with the terms of the RSA) to modify the Plan, the previously solicited acceptances will be valid only if (a) all classes of adversely affected creditors and interest holders accept the modification in writing or (b) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

**3.      There is a Risk of Termination of the RSA**

To the extent that events giving rise to termination of the RSA occur, the RSA may terminate prior to the Confirmation or the Effective Date, which could result in the loss of support for the Plan by important creditor constituencies, which could adversely affect the Debtor's ability to confirm and consummate the Plan.  If the Plan is not consummated, there can be no assurance that the Chapter 11 Cases would not be converted to chapter 7 liquidation cases or that any new chapter 11 plan would be as favorable to Holders of Claims or Interests as the current Plan.

**4.      No Representations Outside the Disclosure Statement Are Authorized**

No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Disclosure Statement.  Any representations or inducements made to secure your vote for acceptance or rejection of the Plan that are other than those contained in, or included with, the Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

**5.      Certain Tax Consequences**

For a discussion of certain U.S. federal income tax considerations to NewCo, the Debtor and certain holders of Claims and Interests in connection with the implementation of the Plan, *see* <u>Article X</u> below—*Certain U.S. Federal Income Tax Consequences of the Plan*.

6. **No Legal or Tax Advice Is Provided by the Disclosure Statement**

The contents of the Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest. The Disclosure Statement is not legal advice to you. The Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

7. **No Admission Made**

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or Holders of Claims or Interests.

8. **Failure to Identify Projected Objections**

No reliance should be placed on the fact that a projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtor may seek to investigate, file, and prosecute Claims and may object to Claims and Interests after Confirmation and consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims and Interests.

9. **Information Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors**

Counsel to and other advisors retained by the Debtor have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. Also, as of the Petition Date, much of the information relevant to this Disclosure Statement was not in the Debtor's possession due to the seizure and receivership of the former Silicon Valley Bank, as described above. Counsel to the Debtor and other advisors have retained by the Debtor have engaged in significant efforts to retrieve documents and other material not in the Debtor's possession at the time of the Petition Date, but may not have copies of all books and records. Further, these advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, but they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

10. **Risk of the Inability to Obtain Regulatory Approval**

The closing of the Restructuring Transactions may be subject to regulatory review in the United States. The failure of any governmental or regulatory unit to grant an approval could prevent or limit consummation of the Restructuring Transactions and Confirmation of the Plan.

11.    **Governmental Laws, Regulations and Actions Could Adversely Affect the Debtor**

The Debtor is subject to various federal, state and local laws, orders and regulations.  Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal fines and penalties or the imposition of injunctive relief.

Future compliance with laws and regulations, including environmental, production, transportation, sales, rate and tax rules and regulations, and any changes to such laws or regulations, may reduce the Debtor's profitability and have a material adverse effect on its financial position, liquidity and cash flows.  Such laws and regulations may require more stringent and costly measures.

12.    **The Debtor Has No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

# ARTICLE X

# CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtor, NewCo and certain U.S. Holders (as defined below) of Claims or Interests.  Except as otherwise indicated, this discussion assumes that the Restructuring Transactions are consummated pursuant to the Plan.  The following summary does not address the U.S. federal income tax consequences to Holders who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or who are deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury regulations, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect), so as to result in U.S. federal income tax consequences different from those summarized herein.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  The U.S. federal income tax consequences of the contemplated Plan and the Restructuring Transactions are complex and subject to significant uncertainties.  As discussed further below, the Debtor has requested a private letter ruling from the IRS with respect to certain, but not all, of the U.S. federal income tax consequences relating to the Plan and does not presently intend to seek any additional rulings from the IRS with respect to the remaining tax aspects of the Plan, subject to the discussion below.  There is no assurance that a favorable ruling will be obtained, and the consummation of the Plan is not conditioned upon the issuance of such

a ruling.  Moreover, the private letter ruling will rely on certain facts, assumptions, representations and undertakings from the Debtor, which, if incorrect or inaccurate, may jeopardize the ability to rely on such private letter ruling.  The discussion below is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.  If the IRS successfully challenges any of the tax treatments described below, adverse U.S. federal income tax consequences may result.

This summary does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor, NewCo or to Holders of Claims or Interests in light of their individual circumstances.  This summary does not address non-U.S., state, or local tax consequences of the contemplated Plan and the Restructuring Transactions, nor does it address all of the U.S. federal income tax consequences of the transactions that might be relevant to special classes of taxpayers in light of their particular circumstances (e.g., small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold their Claims or Interest through, S corporations or other pass-through entities for U.S. federal income tax purposes, persons who received their Claims or Interests pursuant to the exercise of an employee stock option or otherwise as compensation, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that elect to use the mark-to-market method of tax accounting for their securities, and persons whose Claims or Interests are part of a straddle, hedging, constructive sale, or conversion transaction).  In addition, this discussion does not address the alternative minimum tax (including the corporate alternative minimum tax), the "Medicare" tax on net investment income, or U.S. federal taxes other than income taxes.  Unless otherwise indicated, this discussion assumes that all Claims and Interests, NewCo Common Stock and NewCo Debt are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their respective forms.  This summary does not discuss differences in tax consequences to Holders of Claims or Interests that otherwise act or receive consideration in a capacity other than any other Holder of a Claim or Interests of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.

As used herein, the term "U.S. Holder" means, with respect to Claims, Interests, NewCo Common Stock or NewCo Debt, a beneficial owner that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of Claims or Interests, the tax treatment of a partner (or other beneficial owner) in such partnership (or such other pass-through entity) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partnership (or other pass-through entity). If you are a partner (or other beneficial owner) in such a partnership (or other pass-through entity) holding any such instruments, you should consult your own tax advisor.

***THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON YOUR INDIVIDUAL CIRCUMSTANCES. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.***

## A.    Consequences to the Debtor

### 1.    Characterization of Certain Restructuring Transactions

For U.S. federal income tax purposes and immediately prior to certain Restructuring Transactions discussed below, the Debtor is the common parent of an affiliated group of corporations which files a consolidated U.S. federal income tax return (the "Tax Group"). The Debtor's Tax Group includes SVB in receivership, even though SVB is under the effective control of the FDIC. Accordingly, the income, profit, gain, loss and deductions of SVB while under FDIC's effective control affect the Debtor's U.S. federal taxable income until such time as SVB is deconsolidated from the Tax Group (as described below).

On or prior to the Effective Date, the Debtor may undertake a series of Restructuring Transactions as a result of which NewCo (an entity treated as a C corporation for U.S. federal income tax purposes) will own 100 percent of the equity interests in the Debtor, the Debtor is converted from a Delaware corporation to a Delaware limited liability company (or other business form as agreed upon under the terms of the Plan) disregarded as separate from its owner for U.S. federal income tax purposes and the equity owners of Debtor immediately prior to such reorganization become equity owners of NewCo immediately thereafter (collectively, the "Debtor F Reorganization"). It has not yet been decided whether the Debtor would undertake the Debtor F Reorganization.

If effected, the Debtor F Reorganization is intended to be treated as a reorganization under section 368(a)(1)(F) of the Tax Code. Section 368(a)(1)(F) of the Tax Code provides that a reorganization includes a mere change in identity, form, or place of

organization of one corporation, however effected.  Furthermore, the Tax Code and Treasury Regulations provide that, in the case of a reorganization qualifying under section 368(a)(1)(F) of the Tax Code, the resulting corporation will generally be treated for purposes of the Tax Code the same as the transferor corporation would have been treated had there been no reorganization. Accordingly, except as otherwise described herein, (a) the Debtor F Reorganization is not expected to give rise to any taxable gain or loss to the Debtor or the shareholders of the Debtor, (b) NewCo will generally succeed to Debtor's income tax attributes (including net operating losses ("NOL") and tax basis and holding period in assets) and (c) the basis and holding period of NewCo stock received by the Debtor's equity owners in the Debtor F Reorganization is expected to be equal to the basis and holding period of the Interests in the Debtor exchanged therefor.  This characterization is subject to some uncertainty and is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different characterization.

The remainder of this discussion assumes that the Debtor F Reorganization is not consummated or (if effected) qualifies under section 368(a)(1)(F) of the Tax Code, and unless specified otherwise, references to the "Debtor" in this Article X shall include a reference to NewCo for U.S. federal income tax purposes.

Whether or not the Debtor effects the Debtor F Reorganization, the Debtor may undertake one or more additional Restructuring Transactions in order to implement the Plan.  For example, in order to ensure that the implementation of the Plan is a fully taxable transaction for U.S. federal income tax purposes to the U.S. Holders of Claims or Interests, the Debtor may undertake certain Restructuring Transactions in order to have each of NewCo Debt and NewCo Common Stock be issued by different affiliates that indirectly wholly own the Debtor.  The details of such Restructuring Transactions, if any, are yet to be determined as of the date of this Disclosure Statement and the U.S. federal income tax consequences of any such Restructuring Transactions are expected to be complex and subject to additional uncertainty.  Such additional Restructuring Transactions may result in adverse consequences to the Debtor if the IRS disagrees with any of the positions taken with respect to such transactions.

**2.      Cancellation of Indebtedness**

In general, absent an exception, a debtor will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration (as determined for U.S. federal income tax purposes) less than the adjusted issue price of such indebtedness.  Under section 108 of the Tax Code, a debtor is not required to include COD Income in gross income if the debtor is under the jurisdiction of a court in a case under the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, in general, the Tax Code provides that the debtor must reduce certain of its tax attributes—including carryforward and current year NOL, capital loss carryforwards, tax credits, and tax basis in assets (but not below the amount of liabilities to which the debtor remains subject)—by the amount of any COD Income incurred but excluded from income under section 108 of the Tax Code.

If advantageous, the borrower can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.  Where the

borrower joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the borrower and other members of the group also be reduced.  Any reduction in tax attributes in respect of COD Income incurred does not occur until the end of the taxable year and after such attributes have been applied.

The ultimate amount of COD Income in connection with the implementation of the chapter 11 plan will depend on, among other things, the issue price of NewCo Debt, the final amount of cash and the fair market value of any other property (including NewCo Common Stock and Liquidating Trust Interests) distributed to Holders of Claims.  Certain of these figures cannot be known with certainty until after the Effective Date.  Accordingly, the amount of COD Income that the Debtor may incur is uncertain, but may be significant.

### 3.       Treatment of the NewCo Debt

The Debtor presently expects and intends that NewCo Debt will be treated as debt of its issuer for U.S. federal income tax purposes.  However, the terms of NewCo Debt have not been finalized, and depending on the final terms, other characterizations of NewCo Debt are possible, which may have an adverse impact on NewCo and the Tax Group.  There can be no assurance that the IRS would agree with the Debtor's intended characterization of NewCo Debt.  The remainder of this disclosure assumes that NewCo Debt is properly characterized as debt of its issuer for U.S. federal income tax purposes, unless otherwise indicated.

### 4.       Transfer of Liquidating Trust Assets to the Liquidating Trust

Pursuant to the Plan, on or before the Effective Date, the Debtor will transfer the Liquidating Trust Assets to the Liquidating Trust, on behalf of the respective Holders of Claims and Interests comprising the Liquidating Trust Beneficiaries.  The transfer of the Liquidating Trust Assets by the Debtor pursuant to the Plan may result in the recognition of gain or income by the Debtor, depending in part on the value of the Liquidating Trust Assets on the Effective Date and the Debtor's tax basis in the Liquidating Trust Assets.  Subject to the impact of any Restructuring Transactions to be determined and subject to the receipt of a favorable ruling discussed below regarding the character of the Stock Loss (defined below), the Debtor anticipates that, any current year tax deductions incurred in the year that includes the Effective Date should be available to offset the Tax Group's taxable income (inclusive of any gain or income recognized upon transfer of assets pursuant to the Plan) incurred during such year, subject to the ownership change rules of the Tax Code, discussed below (or other limitations as provided under the Tax Code).  Due to the lack of guidance with respect to the sale or other taxable disposition of Retained Causes of Action, there can be no assurance that a subsequent resolution of such claims or Causes of Action could not result in additional income to the Debtor, which may or may not be able to be offset by the tax attributes of the Tax Group.

**5.      Potential Limitations on NOL Carryforwards and Other Tax Attributes**

**(a)      Section 382**

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Tax Group's ability to use any remaining tax attributes post-emergence may be subject to certain limitations under sections 382 and 383 of the Tax Code.

Under sections 382 and 383 of the Tax Code, if the Debtor undergoes an "ownership change," the amount of any remaining NOL, section 163(j) carryforwards, tax credit carryforwards, net unrealized built-in losses ("NUBIL"), and possibly certain other attributes of the Debtor allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a NUBIL at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the five-year period beginning on the ownership change date (up to the amount of the original NUBIL) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) NUBIL will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change. It is currently uncertain whether the Tax Group would have a NUBIL immediately prior to the Effective Date.

The rules of section 382 of the Tax Code are complex, but as a general matter, the Debtor anticipates that the issuance of NewCo Common Stock pursuant to the terms of the Plan will result in an ownership change of the Tax Group for these purposes, and that the Tax Group's use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies. In addition, it is possible there could be a subsequent ownership change after the Effective Date, which would further limit Debtor's NOL. Lastly, because a corporation can experience multiple ownership changes, it is possible that certain of the Tax Group's tax attributes (including any built-in loss in the stock of SVB) are subject to one or more additional section 382 limitations that could adversely impact the Tax Group's ability to utilize its tax attributes.

**(i)      General Section 382 Limitation**

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, or 3.81 percent for an ownership change during February 2024). The annual limitation may be increased to the extent that the Tax Group recognizes certain built-in gains in its assets during the five-year period following the ownership change, or is treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65, but only to the extent that the Tax Group had a "net unrecognized built-in gain"

117

overall in its assets at the time of the ownership change.  Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

If the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is generally reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to recognized built-in gains).

Notwithstanding the above and as discussed below, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (ii)    Abandonment of SVB Stock

The Debtor currently expects to take advantage of at least a portion of the tax loss that is anticipated to result from the Debtor abandoning its equity investment in SVB[25] for U.S. federal income tax purposes.  Specifically, the Debtor anticipates that it has a substantial tax basis in its stock investment in SVB. The Debtor anticipates taking such worthless stock deduction at a time when the Debtor believes that such stock investment is worthless.  In addition to the investment in SVB stock being worthless, in order for the Debtor to claim the worthless stock deduction (the "Stock Loss") with respect to all or part of the SVB stock, SVB must also meet certain conditions such as ceasing to be a member of the Tax Group, at which point the Tax Group's consolidated NOL attributable to SVB (as determined under the relevant Treasury Regulations, at the end of the taxable year, after taking into account the Tax Group's income for such year) would no longer be available to the Tax Group. The Stock Loss (subject to the receipt of a favorable ruling discussed below), together with deductions incurred in connection with the implementation of the Plan, is anticipated to result in a substantial NOL for the taxable year in which the Effective Date occurs.  The Debtor has requested a private letter ruling from the IRS that the character of the Stock Loss is ordinary.  There can be no assurance that a favorable ruling will be obtained, and the consummation of the Plan is not conditioned upon the issuance of such a ruling.  Moreover, the private letter ruling will rely on certain facts, assumptions, representations and undertakings from the Debtor, which, if incorrect or inaccurate, may jeopardize the ability to rely on such private letter ruling.  If the character of the Stock Loss is capital rather than ordinary, then such capital loss generally would only offset capital gains.

The Debtor currently anticipates abandoning its equity investment in SVB *prior* to (but in the same taxable year as) the Effective Date.  If the Debtor abandons its equity investment in SVB prior to (but in the same taxable year as) the Effective Date, a substantial NOL may not be subject to the annual limitation resulting from the implementation of the Plan, even if a change in ownership occurs on the Effective Date of

---

[25]    Solely for purposes of the discussion of the U.S. federal income tax consequences herein, references to SVB includes references to certain entities treated as successors to SVB for U.S. federal income tax purposes.

the Plan, because the resulting NOL (determined after taking into account other activities occurring in the taxable year that includes the Effective Date) would be pro-rated between the pre- and post-change portions of the taxable year, such that the post-change portion would not be treated as a Pre-Change Loss described above.

However, based on facts and circumstances not yet known to Debtor as of the date of this Disclosure Statement (including whether the Debtor has a NUBIL as of the Effective Date), the Debtor may, subject to any applicable consent rights set forth in the RSA to amend the Plan, abandon its equity investment in SVB *after* the Effective Date, in which case the NOL from a post-Effective Date abandonment may be treated as a post-change loss. Such determination is subject to significant uncertainties, including with respect to facts relating to the activities of SVB after the commencement of the receivership. Accordingly, even if the Debtor were to abandon its equity investment in SVB after the Effective Date and treat the Stock Loss as a post-change loss, there can be no assurance that the IRS will not assert that such Stock Loss will not be subject to section 382 limitations. Irrespective of whether the abandonment occurs before or after the Effective Date, the availability of the NOL attributable to the Stock Loss described above, would be subject to, among other things, (i) reduction under the tax rules applicable to COD Income, and (ii) any applicable limitations imposed by the ownership change rules of the Tax Code, discussed above, and may be further limited to the extent that the Debtor had undergone an ownership change prior to the Effective Date.

### (iii)    Special Bankruptcy Exception

With respect to the possible ownership change that could occur on the Effective Date, an exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors," together with certain pre-change shareholders, of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "<u>382(l)(5) Exception</u>"). If the requirements of the 382(l)(5) Exception are satisfied, the ownership change resulting from the consummation of the chapter 11 plan would not result in a limitation on the Debtor's Pre-Change Losses, but, instead, NOL carryforwards and 163(j) carryforwards would be reduced by the amount of any interest deductions claimed by the Debtor during the three taxable years preceding the Effective Date, and during the part of the taxable year prior to and including the Effective Date, in respect of all debt converted into stock pursuant to the Plan. If the 382(l)(5) Exception applies and the Debtor undergoes another ownership change within two years after the Effective Date, then the Debtor's Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "<u>382(l)(6) Exception</u>") with respect to the ownership change resulting from the consummation of the chapter 11 plan. Under the 382(l)(6) Exception, the annual limitation on the Debtor's Pre-Change Losses will be calculated by reference to the lesser of (a) the value of the NewCo Common Stock (with certain adjustments) immediately after the ownership change or (b) the value of the NewCo's assets (determined without regard to liabilities) immediately before the

ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation if a subsequent ownership change were to occur after the Effective Date would be determined under the regular rules for ownership changes.

Whether the chapter 11 plan qualifies for the 382(l)(5) Exception is unclear and depends on a number of factors that are not yet known, including the existence of any rights offering or a similar transaction as part of a NewCo Transaction, and may require the receipt of one or more additional rulings from the IRS. Moreover, it is possible that the Restructuring Transactions, when finally determined if implemented as part of the Plan, will not be consistent with the 382(l)(5) Exception. Finally, even if the Debtor does qualify, the Debtor may, if it so desires, elect not to have the exception apply and instead apply the 382(l)(6) Exception.

### (iv)    Risk of Subsequent Ownership Changes

In an attempt to minimize the likelihood of an additional ownership change occurring after the Effective Date, the charter of NewCo will contain a restriction limiting the accumulation (and disposition) of shares by persons (and certain groups of persons acting in concert) owning (actually or constructively), or who would own (immediately before or after such acquisition), 4.99 percent of any class of stock of NewCo (with certain adjustments), and requiring approval of NewCo's Board for any such transfers. Nevertheless, it is possible that NewCo could undergo an additional ownership change, either by events within or outside of the control of the NewCo Board, *e.g.*, indirect changes in the ownership of persons treated as owning 5 percent or more of the stock of NewCo (by value). Also, in the unlikely event that NewCo Debt is recharacterized as equity of NewCo, transfers of such debt might be taken into account for purposes of section 382. In such event, subsequent transfers of NewCo Debt potentially could result in an ownership change of NewCo after the Effective Date. In the event of a subsequent ownership change of NewCo, all or part of the NOL (or other relevant tax attributes) would become subject to an annual limitation or disallowed entirely, depending on, among other things, if the 382(l)(5) Exception applies to the Plan and whether such ownership change occurs within a certain period of time after the Effective Date.

### (b)    Other Provisions

Aside from the objective limitations of section 382 of the Tax Code, the IRS may disallow, pursuant to section 269 of the Tax Code, the subsequent use of a corporation's losses following an acquisition of control of a corporation by one or more persons if the principal purpose of the acquisition is the avoidance or evasion of tax by securing a tax benefit which such person(s) or the corporation would not otherwise enjoy. Accordingly, if the principal purpose of any group of persons (including Holders of Claims or Interests in connection with the Plan) in acquiring control of NewCo is to obtain the use of the

120

NOL, the IRS could disallow the use of the full NOL (*i.e.*, which may include *both* the pre-change portion that would be subject to the annual section 382 limitation and the post-change unlimited portion). Other provisions of the Tax Code may also preclude the use of a corporation's NOL and certain tax attributes in other ways under certain circumstances.

**6.     Other Income and Uncertainty of Debtor's Tax Treatment**

The Debtor may incur other income for U.S. federal income tax purposes in connection with the Plan that, unlike COD Income, generally will not be excluded from the Debtor's U.S. federal taxable income. In addition, the U.S. federal income tax considerations relating to the Plan are complex and subject to uncertainties. No assurance can be given that the IRS will agree with the Debtor's interpretations of the tax rules applicable to, or tax positions taken with respect to, the transactions undertaken to effect the Plan. If the IRS were to successfully challenge any such interpretation or position, the Debtor may recognize additional taxable income for U.S. federal income tax purposes, and the Debtor may not have sufficient deductions, losses or other attributes for U.S. federal income tax purposes to fully offset such income.

In addition, because SVB is under the receivership of FDIC, until the Debtor abandons the stock of SVB, SVB generally will continue to be a member of the Tax Group for U.S. federal income tax purposes, and the actions of SVB while under FDIC's effective control could affect the Debtor's U.S. federal taxable income as well as the positions taken with respect to any transactions implemented in connection with the Plan. No assurance can be given that the FDIC will not take any action with respect to SVB that would adversely affect the tax consequences described in this Disclosure Statement.

**B.     Consequences to U.S. Holders of Certain Claims and Interests**

Pursuant to the Plan, except to the extent that any Holder of an Allowed Claim agrees to less favorable treatment: Holders of Allowed General Unsecured Claims will receive Class A Liquidating Trust Units, NewCo Common Stock and/or cash (subject to certain elections and adjustments), in complete and final satisfaction of their respective Claims; Holders of Allowed Subordinated Note Claims will receive Class B Liquidating Trust Units and cash sufficient to satisfy the Subordinated Note Trustee Expenses (subject to certain elections and adjustments), in complete and final satisfaction of their respective Claims; and Holders of Preferred Equity Interests will receive Class C Liquidating Trust Units, in complete and final satisfaction of their respective Claims.

As discussed below (*see* Article XB.7—*Consequences of Owning and Disposing of NewCo Debt Received Under the Plan*

As discussed further below in Article XC—*Tax Treatment of the Liquidating Trust and Holders of Liquidating Trust Interests*, the Liquidating Trust Beneficiaries are treated as directly owning the Liquidating Trust Assets (except for any assets that are allocable to any Disputed Claims Reserve). Among such Liquidating Trust Assets is NewCo Debt to be issued pursuant to the Plan. The following discussion summarizes certain U.S. federal income tax

considerations to the Liquidating Trust Beneficiaries as a result of being treated as owning such NewCo Debt for U.S. federal income tax purposes.

The discussion of NewCo Debt assumes that NewCo Debt will be treated as debt and will not have terms that will require NewCo Debt to be treated under special rules, such as rules regarding "contingent debt payment instruments" within the meaning of Treasury Regulation section 1.1275-4 ("CPDI").  However, there can be no assurance that the IRS will agree with the Debtor's intended characterization of NewCo Debt, and the rules surrounding debt, such as the CPDI rules, are complex and subject to uncertainties.  Additionally, the terms of NewCo Debt have not been finalized and depending on the final terms, alternative characterizations of NewCo Debt could result in the Holders' of NewCo Debt experiencing tax consequences that are different from, and possibly adverse compared to, those discussed in this summary.  The Liquidating Trust Beneficiaries are urged to consult their tax advisors regarding potential tax consequences of being treated as owning and disposing of NewCo Debt.

       (a)       **Interest on NewCo Debt**

A Holder generally will be required to recognize and include in gross income qualified stated interest on NewCo Debt as ordinary income at the time it is paid or accrued on NewCo Debt in accordance with such holder's method of accounting for U.S. federal income tax purposes.  The term "qualified stated interest" means stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate or, subject to certain conditions, based on one or more interest indices.  It is possible that the final terms of the NewCo Debt may permit, or require, interest to be entirely "paid-in-kind" and therefore not provide for any qualified stated interest.

If the "issue price" (as discussed below) of NewCo Debt is less than the stated redemption price at maturity within the meaning of section 1273 of the Tax Code and the Treasury Regulations thereunder (including any interest that can be "paid-in-kind") and the difference is equal to or more than a *de minimis* amount (as set forth in the Tax Code and the applicable Treasury Regulations), NewCo Debt will be treated as issued with OID, and a U.S. Holder will be required to include the difference in income as ordinary income as it accrues (in accordance with a constant yield method, as set forth in the applicable Treasury Regulations), in advance of the receipt of any cash in respect of the OID, regardless of whether and when the U.S. Holder receives cash payments of interest.  Accordingly, a U.S. Holder could be treated as receiving income in advance of a corresponding receipt of cash.

The determination of the "issue price" of NewCo Debt will depend, in part, on whether NewCo Debt or any Allowed Claims are treated as traded on an "established market" at any time during the 31-day period ending 15 days after the transfer of Liquidating Trust Assets to the Liquidating Trust.  In general, a debt instrument (or the property exchanged therefor) will be treated as traded on an established market if at any time during the aforementioned 31-day period there is (a) a "sales price" for an executed purchase or sale of the debt instrument (or the property exchanged therefor) during the 31-day period appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (b) a "firm" price quote for the debt instrument (or the property exchanged therefor) is available from at least one broker, dealer

or pricing service and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the debt instrument; or (c) an "indicative" price quote for the debt instrument (or the property exchanged therefor) is available from at least one broker, dealer or pricing service for property and the price quote is not a firm quote.  The issue price of a debt instrument that is traded on an established market or that is issued for another debt instrument so traded would be the fair market value of such debt instrument, if such debt instrument is treated as traded on an established market, or such other debt instrument, if the first instrument is not treated as traded on an established market and the other debt instrument is treated as traded on an established market, on the issue date as determined by such trading.  The issue price of a debt instrument that is neither so traded nor issued for another debt instrument so traded would be its stated redemption price at maturity.

If neither NewCo Debt nor the Allowed Claims (with respect to which NewCo Debt is deemed to have been received) are treated as traded on an established market within the meaning of the applicable Treasury Regulations, the "issue price" of NewCo Debt should generally equal the stated redemption price at maturity of such NewCo Debt.  However, if NewCo Debt or any Allowed Claims (with respect to which NewCo Debt is deemed to have been received) are treated as traded on an established market within the meaning of the applicable Treasury Regulations, the issue price of NewCo Debt would be the fair market value, at the time of the exchange, (1) of NewCo Debt if it is treated as publicly traded or (2) of any Allowed Claims (with respect to which NewCo Debt is deemed to have been received) if they are treated as publicly traded and NewCo Debt is not treated as publicly traded.

The rules regarding OID are complex and the rules described above may not apply in all cases.  Holders should consult their own tax advisors regarding the potential application to NewCo Debt of the OID rules and the consequences thereof.

### (b)    Sale, Exchange, Retirement, Redemption, or Other Taxable Disposition of NewCo Debt

Upon the actual or deemed sale, exchange, retirement, redemption or other taxable disposition of NewCo Debt, a U.S. Holder generally will recognize gain or loss equal to the difference between (i) the amount realized on the actual or deemed disposition (other than any amounts attributable to accrued but unpaid stated interest, which will be taxable as ordinary income for U.S. federal income tax purposes to the extent not previously included in income) and (ii) the U.S. Holder's adjusted tax basis in NewCo Debt.

Generally, gain or loss recognized will be capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has been treated as holding such NewCo Debt for longer than one year.  Non-corporate taxpayers generally are subject to a reduced federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations under the Tax Code.  Holders should consult their tax advisors regarding the deductibility of capital losses in their particular circumstances.

Tax Treatment of the Liquidating Trust and Holders of Liquidating Trust Interests), it is intended that the Liquidating Trust qualify as a "grantor trust" for U.S. federal income tax purposes.   Accordingly, it is intended that each Holder of an Allowed Claim,

Subordinated Claim or Interest receiving a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust Assets (consistent with its economic rights in the trust), including NewCo Debt held by the Liquidating Trust.   Pursuant to the Plan, the Liquidating Trust (as provided in the Plan) will in good faith value the assets transferred to the Liquidating Trust, and all parties to the Liquidating Trust (including Holders of Claims and Interests receiving Liquidating Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes.  However, the IRS or another taxing authority may disagree with such valuation and assert a different valuation, which, if sustained, could result in adverse tax consequences to such parties.

The U.S. federal income tax consequences to a Holder of an Allowed Claim or Interest who receives (or is deemed to receive via such Holder's interests in the Liquidating Trust, as discussed further below) NewCo Debt or NewCo Common Stock will differ depending on the ultimate structure adopted to implement the Plan.  If the structure adopted to implement the Plan is intended to result in a taxable transaction to the Holder, then the consequences to such Holder are generally as discussed below in <u>Article XB.1</u>—*Gain or Loss – In General*.  Alternatively, if the structure adopted to implement the Plan results in a "recapitalization" of NewCo for U.S. federal tax purposes, and certain other conditions are met, a Holder's loss, if any, in respect of its Claims or Interests would generally be deferred and a Holder would only be required to recognize taxable gain to the extent of the amount of "boot" received in the recapitalization, as described in more detail below.

Even where a structure is intended to potentially result in a recapitalization transaction to a Holder of an Allowed Claim who receives NewCo Debt or NewCo Common Stock, whether the transaction qualifies as such also depends, in part, on whether such Claim or NewCo Debt constitutes a "security" of NewCo for U.S. federal income tax purposes (as discussed in more detail below).  The term "security" is not defined in the Tax Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions.   The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not.   One of the most significant factors considered in determining whether a particular debt obligation is a "security" is its original term.   In general, debt obligations issued with a weighted average maturity at issuance of five years or less (*e.g.*, trade debt and revolving credit obligations) do not constitute "securities," whereas debt obligations with a weighted average maturity at issuance of ten years or more constitute "securities."   Accordingly, certain Allowed General Unsecured Claims and Subordinated Claims may qualify as "securities" while others may not.  The U.S. federal income tax treatment of NewCo Debt, the terms of which have not yet been finalized as of the date of this Disclosure Statement, is unclear.  Although the debt status of NewCo Debt is uncertain, the Debtor expects that NewCo Debt will be treated as "securities" of its issuer; accordingly, the remainder of this disclosure assumes NewCo Debt are "securities" of its issuer.   If an Allowed Claim constitutes a "security" and the structure adopted to implement the Plan is intended to result in a recapitalization transaction to the Holder of such Claim (to the extent permitted by law), then the consequences to such Holder are generally as discussed below in <u>Article XB.2</u>—*Recapitalization Treatment*.  If an Allowed

Claim does not constitute a "security," then the consequences to the Holder of such Claim are generally as discussed below in <u>Article XB.1</u>—*Gain or Loss – In General.*

***You are urged to consult your own tax advisor regarding the characterization as "securities" for U.S. federal income tax purposes of your Claim and/or NewCo Debt and the consequences of such treatment.***

**1.    Gain or Loss – In General**

If the Debtor (subject to the applicable consent rights set forth in the RSA) structures the Plan to qualify for taxable treatment, or if the Allowed Claim is not a "security," it is generally intended that the exchanging Holder will recognize gain or loss (although any loss with respect to such a Claim or Interest might be deferred until all Disputed Claims or Interests are resolved) in an amount equal to the difference, between (i) the sum of the amount of any cash, the issue price of NewCo Debt, and the fair market value of all other consideration received, including NewCo Common Stock and any undivided interest in the Liquidating Trust (other than any amounts received in respect of any Claim for accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in its Claim or Interest (other than any tax basis attributable to accrued but unpaid interest).    The deduction of capital losses is subject to certain limitations.

In the event of a subsequent disallowance of a Disputed Claim, it is possible that a Holder of a previously Allowed Claim or Interest may be taxed, as such Disputed Claims are resolved, and such Holder effectively becomes entitled to an increased share of the assets held in the Liquidating Trust or an increased number of NewCo Common Stock. The imputed interest provisions of the Tax Code may apply to treat a portion of such increased share or any additional distributions (*e.g.*, the redistribution among Holders of Allowed Claims of undeliverable distributions) as imputed interest.    In addition, it is possible that any loss realized by a Holder in satisfaction of an Allowed Claim or Interest may be deferred until all Disputed Claims in such Holder's class are determined and such Holder's share can no longer increase, and with respect to certain claims, a portion of any gain realized may be deferred under the "installment method" of reporting.  Holders are urged to consult their tax advisors regarding the possibility for deferral, and the ability to elect out of the installment method of reporting any gain realized in respect of their Claims or Interests.

A Holder's aggregate tax basis in any NewCo Debt, NewCo Common Stock and/or undivided interest in the Liquidating Trust Assets received in satisfaction of a Claim will equal the amount taken into account in respect of such notes, stock or undivided interest in determining the Holder's amount realized.   A Holder's holding period in such debt, stock or undivided interest generally will begin the day following the Effective Date.

**2.    Recapitalization Treatment**

Unless the structure adopted to implement the Plan is intended to result in a taxable transaction to the Holders, as described above, the receipt of any NewCo Debt (if NewCo Debt constitutes "securities" of NewCo), NewCo Common Stock and any other instrument that constitutes stock or a "security" of NewCo (such as potentially any

Subscription Rights, discussed further below in 0—*Tax Treatment of the Potential NewCo Transaction*) in partial satisfaction of an Allowed General Unsecured Claim or Allowed Subordinated Note Claim that constitutes a "security" for U.S. federal income tax purposes generally would qualify as a "recapitalization" for U.S. federal income tax purposes.   In such event, each such Holder generally will not recognize any loss upon the exchange of its Claim, but will recognize any gain (computed as discussed in the preceding section) to the extent of any cash and the fair market value of its undivided interest in the Liquidating Trust Assets received (other than to the extent received in respect of a Claim for accrued but unpaid interest, or attributable to the receipt of any instrument that constitutes stock or a "security" of NewCo such as potentially NewCo Debt or Subscription Rights, if any).   The treatment of distributions in respect of a Claim for accrued but unpaid interest is discussed in the next section.

In a recapitalization exchange, a Holder's aggregate tax basis in any NewCo Debt (if NewCo Debt constitutes "securities" of NewCo), NewCo Common Stock and any other instrument that constitutes a "security" of NewCo (such as potentially any Subscription Rights, discussed further below in 0—*Tax Treatment of the Potential NewCo Transaction*) received in respect of an Allowed Claim that constitutes a "security" will equal the Holder's adjusted tax basis in such Claim (including any Claim for accrued but unpaid interest), increased by any gain recognized or interest income received in respect of such Claim, and decreased by the amount of any cash and the fair market value of any share of the Liquidating Trust Assets (other than any instrument that constitutes a "security" of NewCo such as potentially NewCo Debt) received and any deductions claimed in respect of any previously accrued but unpaid interest.  The aggregate tax basis should be allocated among the "securities" of NewCo received in accordance with their relative fair market values as of the Effective Date.

In a recapitalization exchange, a Holder's holding period in any NewCo Debt (if NewCo Debt constitutes "securities" of NewCo), NewCo Common Stock and any other instrument that constitutes a "security" of NewCo (such as potentially any Subscription Rights, discussed further below in 0—*Tax Treatment of the Potential NewCo Transaction*) received will include the Holder's holding period in the Claim exchanged therefor, except to the extent of any Liquidating Trust Assets or NewCo Common Stock received in respect of a Claim for accrued but unpaid interest (which will commence a new holding period).

A Holder's tax basis in its undivided interest in the Liquidating Trust Assets (other than any instrument that constitutes stock or a "security" of NewCo such as potentially NewCo Debt or Subscription Rights, if any) will equal the fair market value of such interest, and the Holder's holding period generally will begin the day following the Effective Date.

### 3.      Consideration Received in Satisfaction of Accrued Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a Holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income).  For purposes of this paragraph and related discussions above, "interest accrued" during a holding period includes original issue discount ("OID") accrued over the

course of such holding period.  Conversely, a Holder may be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.  The Plan provides that consideration received in respect of a Claim is generally allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to any Claim for accrued but unpaid interest.  There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.  Holders are urged to consult their tax advisors regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID, if applicable) and the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for U.S. federal income tax purposes.

### 4.    Character of Gain or Loss

Where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim or Interest constitutes a capital asset in the hands of the Holder, how long the Claim or Interest has been held, whether the Claim or Interest was acquired at a market discount, and whether and to what extent the Holder previously claimed a bad debt deduction.  A Holder that purchased its Claims from a prior Holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code.  A Holder that purchased its Claim from a prior Holder will be considered to have purchased such Claim with "market discount" if the Holder's adjusted tax basis in its Claim is less than the revised issue price of such Claim by at least a *de minimis* amount.  Under these rules, gain recognized on the exchange of Claims (other than in respect of a Claim exchanged for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the Holder, on a constant yield basis) during the Holder's period of ownership, unless the Holder elected to include the market discount in income as it accrued.  If a Holder of Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange in the case of a taxable exchange.

In the case of an exchange of any Claims that qualifies as a recapitalization, any accrued market discount that is not included in income should be applied to any "securities" received in the exchange (such as the New Common Stock, NewCo Debt, if applicable, or Subscription Rights (as defined below), if applicable), such that any gain recognized by a Holder upon a subsequent disposition of such "securities" would be treated as ordinary income to the extent of any accrued market discount not previously included in income. If a Holder of such Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts should be carried over to the "securities" received in the exchange to the extent that any accrued market discount is applied to such "securities" and should become deductible upon a subsequent disposition of such "securities."  To date, specific Treasury Regulations implementing these rules have not been issued.

**5.      Tax Treatment of the Potential NewCo Transaction**

The characterization of a potential NewCo Transaction will depend on the ultimate structure of such NewCo Transaction, which has not yet been determined as of the date of this Disclosure Statement.  Moreover, even upon the determination of the final structure of a particular NewCo Transaction, the tax consequences of such NewCo Transaction may be subject to uncertainty.  For example, if NewCo issues rights to purchase additional NewCo Common Stock in a rights offering (such rights, "Subscription Rights"), the characterization of such Subscription Rights and their subsequent exercise for U.S. federal income tax purposes – as simply the exercise of options to acquire the underlying stock or, alternatively, as an integrated transaction pursuant to which the underlying stock is acquired directly in partial satisfaction of a Holder's Claim or Interests – is uncertain.  If the Subscription Rights are not disregarded in such integrated transaction analysis, then the Holder's tax basis in the Subscription Rights received depends on whether the structure adopted to implement the Plan qualifies as a recapitalization, discussed above.  If the Holder's receipt of the Subscription Rights is pursuant to a recapitalization transaction and is a "security," then the Holder's tax basis in the Subscription Rights is generally determined as described above in Article XB.2—*Recapitalization Treatment*.  If the Holder's receipt of the Subscription Rights is not pursuant to a recapitalization or is pursuant to a recapitalization but is not a "security," then the Holder's tax basis in the Subscription Rights received should be equal to the fair market value of such Subscription Rights when received.  Regardless of the characterization, however, a Holder of Subscription Rights generally would not recognize any gain or loss upon the exercise of such Subscription Rights (beyond the gain or loss recognized in respect of its Claim or Interests, as described above).

A Holder's aggregate tax basis in the additional NewCo Common Stock received upon exercise of a Subscription Right should be equal to the sum of (i) the amount paid for the additional NewCo Common Stock and (ii) the Holder's tax basis, if any, in the Subscription Rights or, alternatively, under an integrated transaction analysis, in any additional NewCo Common Stock that is treated as directly acquired in partial satisfaction of the Holder's Allowed Claim.   A Holder's holding period in the additional NewCo Common Stock received upon exercise of a Subscription Right generally should commence the day following the Effective Date, unless the Subscription Right is disregarded and the Holder is instead treated as receiving for its Allowed Claim a portion of the additional NewCo Common Stock acquired equal in value to the Subscription Rights.   In the latter event, the Holder could have a split holding period (part carry over to the extent of a portion of the additional NewCo Common Stock equal to the value of the Subscription Rights, and part new, to the extent of the remaining value of the NewCo Common Stock otherwise received upon the exercise of the Subscription Rights) if the receipt of the additional stock was part of a "recapitalization" exchange for U.S. federal income tax purposes.   In addition, if either the Subscription Rights or, under an integrated transaction analysis, the additional NewCo Common Stock acquired is treated as received as part of a recapitalization exchange, any gain recognized upon a subsequent disposition of the additional NewCo Common Stock may be treated as ordinary income to the extent of any carryover of accrued market discount not previously included in income (*see* preceding section).

It is uncertain whether a Holder that does not exercise a Subscription Right should be treated as receiving anything of additional value in respect of its Claim or Interests.   If the

128

Holder is treated as having received a Subscription Right of value (despite its subsequent lapse), such that it obtains a tax basis in the right, the Holder generally would recognize a loss to the extent of the Holder's tax basis in the Subscription Right upon the lapse or expiration of such right.  In general, such gain or loss would be a capital gain or loss, long-term or short-term, depending upon whether the requisite holding period was satisfied (taking into account that the receipt of the Subscription Rights in partial satisfaction of a Claim could be part of a recapitalization exchange, even if the right goes unexercised, such that the Holder may carry over the holding period in its Claim).

**6.    Ownership and Disposition of NewCo Common Stock**

**(a)    Distributions on NewCo Common Stock**

Cash distributions with respect to the NewCo Common Stock generally will be treated as taxable dividends to the extent allocable to the Reorganized Debtor's current and/or accumulated earnings and profits as determined under U.S. federal income tax principles ("Earnings and Profits") and will be includible in income by the Holder when received.  To the extent the amount of any distribution exceeds available Earnings and Profits with respect to such distribution, the excess will be applied against and will reduce the Holder's adjusted tax basis (on a dollar-for-dollar basis) in respect of the stock as to which the distribution was made, but not below zero.  Any remaining excess will be treated as gain from the sale or exchange of such stock.

Dividends are generally taxed as ordinary income; however, dividends received by non-corporate Holders may qualify for taxation at lower rates applicable to long-term capital gains, provided certain holding period and other requirements are satisfied.  The length of time that a shareholder has held stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions.  Non-corporate Holders are urged to consult their own tax advisors regarding the applicability of such lower rates under their particular factual situation.  Subject to applicable limitations, a distribution to a corporate shareholder that is treated as a dividend for U.S. federal income tax purposes may qualify for the dividends received deduction.  No assurance can be given that the Debtor will have sufficient Earnings and Profits (as determined for U.S. federal income tax purposes) to cause distributions to be treated as dividends and thus eligible for a dividends received deduction.  The dividends received deduction is only available if certain holding period and taxable income requirements are satisfied.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.  Finally, the tax consequences of the receipt of a dividend by a corporate shareholder may be different if the dividend is treated as an "extraordinary dividend" under applicable rules.

**(b)    Sale, Redemption, or Repurchase of NewCo Common Stock**

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption (other than a redemption treated as a distribution for U.S. federal income tax purposes under section 302(d) of the Tax Code, in which case the

consequences described above under "Distributions on NewCo Common Stock" would generally apply), or other taxable disposition of the NewCo Common Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the NewCo Common Stock for more than one year. Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to limitations.

Notwithstanding the foregoing, any gain recognized by a Holder upon a subsequent taxable disposition of any NewCo Common Stock received in respect of a Claim against the Debtor (or any stock or property received for such stock in a later tax-free exchange) would be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to the Claim or any ordinary loss allowed to the Holder upon satisfaction of the Claim for which NewCo Common Stock was received, less any income (other than interest income) recognized by the Holder upon satisfaction of the Claim, and (ii) with respect to a cash-basis Holder, also any amounts which would have been included in its gross income if the Holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

In addition, as discussed above, in the event of an exchange of Claims that qualifies as a recapitalization for U.S. federal income tax purposes, a portion of any gain recognized upon a subsequent disposition of any NewCo Common Stock received may be treated as ordinary income to the extent of any carryover of accrued market discount not previously included in income.

### 7. Consequences of Owning and Disposing of NewCo Debt Received Under the Plan

As discussed further below in Article XC—*Tax Treatment of the Liquidating Trust and Holders of Liquidating Trust Interests*, the Liquidating Trust Beneficiaries are treated as directly owning the Liquidating Trust Assets (except for any assets that are allocable to any Disputed Claims Reserve). Among such Liquidating Trust Assets is NewCo Debt to be issued pursuant to the Plan. The following discussion summarizes certain U.S. federal income tax considerations to the Liquidating Trust Beneficiaries as a result of being treated as owning such NewCo Debt for U.S. federal income tax purposes.

The discussion of NewCo Debt assumes that NewCo Debt will be treated as debt and will not have terms that will require NewCo Debt to be treated under special rules, such as rules regarding "contingent debt payment instruments" within the meaning of Treasury Regulation section 1.1275-4 ("CPDI"). However, there can be no assurance that the IRS will agree with the Debtor's intended characterization of NewCo Debt, and the rules surrounding debt, such as the CPDI rules, are complex and subject to uncertainties. Additionally, the terms of NewCo Debt have not been finalized and depending on the final terms, alternative characterizations of NewCo Debt could result in the Holders' of NewCo Debt experiencing tax consequences that are different from, and possibly adverse compared to, those discussed in this summary. The Liquidating Trust Beneficiaries are urged to consult their tax advisors regarding potential tax consequences of being treated as owning and disposing of NewCo Debt.

(c)    **Interest on NewCo Debt**

A Holder generally will be required to recognize and include in gross income qualified stated interest on NewCo Debt as ordinary income at the time it is paid or accrued on NewCo Debt in accordance with such Holder's method of accounting for U.S. federal income tax purposes.  The term "qualified stated interest" means stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate or, subject to certain conditions, based on one or more interest indices.  It is possible that the final terms of the NewCo Debt may permit, or require, interest to be entirely "paid-in-kind" and therefore not provide for any qualified stated interest.

If the "issue price" (as discussed below) of NewCo Debt is less than the stated redemption price at maturity within the meaning of section 1273 of the Tax Code and the Treasury Regulations thereunder (including any interest that can be "paid-in-kind") and the difference is equal to or more than a *de minimis* amount (as set forth in the Tax Code and the applicable Treasury Regulations), NewCo Debt will be treated as issued with OID, and a U.S. Holder will be required to include the difference in income as ordinary income as it accrues (in accordance with a constant yield method, as set forth in the applicable Treasury Regulations), in advance of the receipt of any cash in respect of the OID, regardless of whether and when the U.S. Holder receives cash payments of interest.  Accordingly, a U.S. Holder could be treated as receiving income in advance of a corresponding receipt of cash.

The determination of the "issue price" of NewCo Debt will depend, in part, on whether NewCo Debt or any Allowed Claims are treated as traded on an "established market" at any time during the 31-day period ending 15 days after the transfer of Liquidating Trust Assets to the Liquidating Trust.  In general, a debt instrument (or the property exchanged therefor) will be treated as traded on an established market if at any time during the aforementioned 31-day period there is (a) a "sales price" for an executed purchase or sale of the debt instrument (or the property exchanged therefor) during the 31-day period appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (b) a "firm" price quote for the debt instrument (or the property exchanged therefor) is available from at least one broker, dealer or pricing service and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the debt instrument; or (c) an "indicative" price quote for the debt instrument (or the property exchanged therefor) is available from at least one broker, dealer or pricing service for property and the price quote is not a firm quote.  The issue price of a debt instrument that is traded on an established market or that is issued for another debt instrument so traded would be the fair market value of such debt instrument, if such debt instrument is treated as traded on an established market, or such other debt instrument, if the first instrument is not treated as traded on an established market and the other debt instrument is treated as traded on an established market, on the issue date as determined by such trading.  The issue price of a debt instrument that is neither so traded nor issued for another debt instrument so traded would be its stated redemption price at maturity.

If neither NewCo Debt nor the Allowed Claims (with respect to which NewCo Debt is deemed to have been received) are treated as traded on an established market within the meaning of the applicable Treasury Regulations, the "issue price" of NewCo Debt should

131

generally equal the stated redemption price at maturity of such NewCo Debt.  However, if NewCo Debt or any Allowed Claims (with respect to which NewCo Debt is deemed to have been received) are treated as traded on an established market within the meaning of the applicable Treasury Regulations, the issue price of NewCo Debt would be the fair market value, at the time of the exchange, (1) of NewCo Debt if it is treated as publicly traded or (2) of any Allowed Claims (with respect to which NewCo Debt is deemed to have been received) if they are treated as publicly traded and NewCo Debt is not treated as publicly traded.

The rules regarding OID are complex and the rules described above may not apply in all cases.  Holders should consult their own tax advisors regarding the potential application to NewCo Debt of the OID rules and the consequences thereof.

### (d)    Sale, Exchange, Retirement, Redemption, or Other Taxable Disposition of NewCo Debt

Upon the actual or deemed sale, exchange, retirement, redemption or other taxable disposition of NewCo Debt, a U.S. Holder generally will recognize gain or loss equal to the difference between (i) the amount realized on the actual or deemed disposition (other than any amounts attributable to accrued but unpaid stated interest, which will be taxable as ordinary income for U.S. federal income tax purposes to the extent not previously included in income) and (ii) the U.S. Holder's adjusted tax basis in NewCo Debt.

Generally, gain or loss recognized will be capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has been treated as holding such NewCo Debt for longer than one year.  Non-corporate taxpayers generally are subject to a reduced federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations under the Tax Code.  Holders should consult their tax advisors regarding the deductibility of capital losses in their particular circumstances.

## C.    Tax Treatment of the Liquidating Trust and Holders of Liquidating Trust Interests

### 1.    Tax Classification of the Liquidating Trust

As described above, the Liquidating Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (*i.e.*, the Liquidating Trust Beneficiaries are deemed to own the assets of the trust, and all of the trust's income and loss is taxed directly to the Liquidating Trust Beneficiaries).  Pursuant to the Plan, all parties (including, without limitation, the Debtor, the Liquidating Trust Board, the Liquidating Trust and the Liquidating Trust Beneficiaries) will be required to treat, for U.S. federal income tax purposes, the Liquidating Trust as a grantor trust of which the Liquidating Trust Beneficiaries are the owners and grantors.  The following discussion assumes that the Liquidating Trust will be so respected for U.S. federal income tax purposes.  However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes.  Although the Liquidating Trust will be structured with the intention of complying with guidelines established by the IRS in Revenue Procedure 94-45, 1994-2 C.B. 684, for the formation of liquidating trusts, no opinion of counsel has been

requested, and the Liquidating Trust may or may not obtain a ruling from the IRS, concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to successfully challenge the classification of the Liquidating Trust, the U.S. federal income tax consequences to the Liquidating Trust and/or the Holders of Allowed Claims or Interests could vary from those discussed herein (including the potential for imposition of tax on the net income of the Liquidating Trust at the entity level, in addition to taxation at the level of the Liquidating Trust Beneficiaries).

**2.      Tax Treatment of the Disputed Claims Reserve**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trust of a private letter ruling if the Liquidating Trust so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trust), the Liquidating Trust will (A) timely elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (a "DOF"), and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If the Liquidating Trust properly files a tax election to treat a Disputed Claims Reserve as a DOF, then the DOF may be treated as a separate taxable entity for U.S. federal income tax purposes (rather than a pass-through tax entity) and will be treated as the owner of all assets that it holds for U.S. federal income tax purposes. A DOF will generally be taxed for U.S. federal income tax purposes as either (a) a C corporation, unless all the assets transferred to the DOF by or on behalf of any transferors are passive investments assets, or (b) a "qualified settlement fund" within the meaning of section 468B of the Tax Code and the applicable Treasury Regulations thereunder (a "QSF"), if all the assets transferred to the DOF by or on behalf of any transferors are passive investment assets. A DOF that is taxable as a QSF is generally subject to taxation at the maximum rate applicable to estates and trusts under section l(e) of the Tax Code (which is currently 37% for taxable years beginning before January 1, 2026, and 39.6% thereafter) on its "modified gross income." The "modified gross income" is the QSF's gross income under section 61 of the Tax Code as modified by the rules detailed in Treasury Regulation sections 1.468B-2(b) and 1.468B-9. It is anticipated that any NewCo Disputed Claims Reserve will be treated as a DOF that is taxable as a QSF. Any Liquidating Trust Disputed Claims Reserve and any Liquidating Trust Disputed Interests Reserve may also be treated as a DOF taxable as a QSF, depending on facts and circumstances not yet determined as of the date of this Disclosure Statement, including the specific nature of the assets transferred to any such reserve.

The Liquidating Trust will be responsible for payment, out of the Liquidating Trust Assets, of any Taxes imposed on the Liquidating Trust or the Liquidating Trust Assets, including any Disputed Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims in a Disputed Claims Reserve is insufficient to pay the portion of any such Taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, such Disputed Claims (including any income that may arise upon any distribution of the assets of the applicable Disputed Claims Reserve), such Taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, (ii) paid with the proceeds from a sale of the assets of the applicable Disputed Claims Reserve or (iii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise

distributable by the Liquidating Trust as a result of the resolution of such Disputed Claims. Therefore, the tax liability of a Disputed Claims Reserve may reduce the amount of property otherwise distributable upon the resolution of any Disputed Claims.

**3.    General Tax Reporting by the Liquidating Trust and Liquidating Trust Beneficiaries**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trust), for all U.S. federal income tax purposes, all parties (including, without limitation, the Debtor, the Liquidating Trust, the Liquidating Trust Board and the Liquidating Trust Beneficiaries) must treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as (i) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to the Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to any Liquidating Trust Disputed Claims Reserve or Liquidating Trust Disputed Interests Reserve), followed by (ii) the transfer by the Liquidating Trust Beneficiaries to the Liquidating Trust of the Liquidating Trust Assets (other than to the extent Liquidating Trust Assets are allocable to any Liquidating Trust Disputed Claims Reserve or Liquidating Trust Disputed Interests Reserve) in exchange for Liquidating Trust Interests. Accordingly, all parties must treat the Liquidating Trust as a grantor trust of which the Liquidating Trust Beneficiaries are the owners and grantors, and treat the Liquidating Trust Beneficiaries as the direct owners of an undivided interest in the Liquidating Trust Assets (other than the Liquidating Trust Assets allocable to any Liquidating Trust Disputed Claims Reserve or Liquidating Trust Disputed Interests Reserve), consistent with their economic interests therein, for all U.S. federal income tax purposes.  Holders are urged to consult their tax advisor regarding any subsequent year's adjustments for the elimination of obligations to Holders of Disputed Claims and their replacement with a smaller amount of Allowed Claims that are then paid out of the Liquidating Trust Assets.

As soon as reasonably practicable after the Liquidating Trust Assets are transferred to the Liquidating Trust, the Liquidating Trust shall make a good faith valuation of Liquidating Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Liquidating Trust (including, without limitation, the Debtor, the Liquidating Trust, the Liquidating Trust Board and the Liquidating Trust Beneficiaries) for all U.S. federal income tax purposes.

Allocations of Liquidating Trust taxable income among the Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to any Liquidating Trust Claims Reserve or Liquidating Trust Disputed Interest Reserve) shall be determined by reference to the manner in which an amount of cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, other than assets allocable to any Liquidating Trust Disputed Claims Reserve or Liquidating Trust Disputed Interests Reserve) to the Holders of the Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust.  Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately

after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for purposes of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

Taxable income or loss allocated to Liquidating Trust Beneficiaries will generally be treated as income or loss with respect to such Holder's undivided interest in the Liquidating Trust Assets, and *not* as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss will depend on the Liquidating Trust Assets and the particular situation of the Liquidating Trust Beneficiary. Certain U.S. federal income tax considerations for the Liquidating Trust Beneficiaries with respect to NewCo Debt are discussed above in <u>Article XB.7</u>—*Consequences of Owning and Disposing of NewCo Debt Received Under the Plan*. In addition, whether the Liquidating Trust Beneficiaries would be treated as holding any rights regarding FDIC Proceedings (or similar lawsuits regarding the FDIC Claims) as capital assets and the timing and character of any income, gain or loss recognized upon recovery from the FDIC Proceedings (or similar lawsuits regarding the FDIC Claims) is subject to some uncertainty. While not free from doubt, the Debtor expects such income, gain or loss be treated as capital gain or loss to the Liquidating Trust Beneficiaries. However, such position is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different characterization. Depending on the specific nature of the Liquidating Trust Assets and the particular Liquidating Trust Beneficiary's individual circumstances, the character of any income or gain recognized with respect to such Liquidating Trust Beneficiary's undivided interest in the Liquidating Trust Assets may be ordinary or capital, and such Liquidating Trust Beneficiary's ability to use losses (if any) from the implementation of the Plan may be limited (for example, if the Plan gives rise to capital losses to a Holder as discussed above in <u>Article XB.1</u>—*Gain or Loss – In General*, then the ability to use such capital losses to offset ordinary income arising from Liquidating Trust Assets would be limited).

The U.S. federal income tax obligations of a Holder that is subject to U.S. federal income tax with respect to its Liquidating Trust Interest are not dependent on the Liquidating Trust distributing any cash or other proceeds. Thus, such a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the Liquidating Trust's income even if the Liquidating Trust does not make a concurrent distribution to the Holder. In general, other than in respect of cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a Holder's Allowed Claim), a Distribution of cash by the Liquidating Trust will not be separately taxable to a Liquidating Trust Beneficiary since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidating Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash originally retained by the Liquidating Trust on account of Disputed Claims.

The Liquidating Trust will comply with all applicable governmental withholding requirements. Thus, in the case of any Liquidating Trust Beneficiaries that are

not U.S. persons, the Liquidating Trust may be required to withhold up to 30 percent of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).  Significantly, as discussed above, a Liquidating Trust Beneficiary is treated for U.S. federal income tax purposes as holding an undivided interest in the underlying assets of the Liquidating Trust.  Accordingly, any amounts received by the Liquidating Trust, the economic benefit of which inures to a Liquidating Trust Beneficiary on the basis described above with respect to the allocation of income, is treated as received by the beneficiary in respect of the underlying asset, and *not* in respect of its Allowed Claim.  ***As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders; accordingly, such Holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Liquidating Trust.***

### D.    Withholding on Distributions and Information Reporting

Payments of interest or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the Liquidation Trust Assets or NewCo Common Stock may be subject to "backup withholding" if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding.  Backup withholding is not an additional tax.  Any amounts deducted and withheld generally should be allowed as a refund or credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS.  Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner.  Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions.  Information may also be required to be provided to the IRS concerning payments, unless an exemption applies.  Holders of Claims and Interests should consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.  The Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds.  Holders of Claims and Interests should consult their tax advisors regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on their tax returns.

***THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.***

## ARTICLE XI

## RECOMMENDATION

In the opinion of the Debtor, the Plan is preferable to the alternatives described herein.  Therefore, the Debtor recommends that Holders of Claims and Interests entitled to vote on the Plan vote to accept it.

Dated: February 7, 2024

Respectfully submitted,

SVB Financial Group.

By: _____
Name:
Title:

## Appendix A

**Debtor's Plan of Reorganization
under Chapter 11 of the Bankruptcy Code**

## **Appendix B**

**Liquidation Analysis**

[*To come.*]

## **Appendix C**

### Solicitation Procedures Order

[*To come.*]

## **Appendix D**

## **Financial Projections**

[*To come.*]

## **Appendix E**

**Restructuring Support Agreement**

## Exhibit A

**Debtor's Organizational Structure**

[*To come.*]

## **Exhibit B**

### **Illustrative Post-Emergence Organizational Structure**

[*To come.*]