**GOODWIN PROCTER LLP**
Howard S. Steel
Alexander J Nicas
Artem Skorostensky
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 813-8800
Facsimile: (212) 355-3333

*Counsel to Christopher Cooper*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | x | |
| In re | : | Chapter 11 |
| | : | |
| SVB FINANCIAL GROUP,[1] | : | Case No. 23-10367 (MG) |
| | : | |
| Debtor. | : | |
| | : | |
| | x | |

## NOTICE OF MOTION OF CHRISTOPHER COOPER FOR ORDER GRANTING LEAVE TO FILE LATE PROOF OF CLAIM PURSUANT TO BANKRUPTCY RULES 3003(c) AND 9006(b)(1)

**PLEASE TAKE NOTICE** that on the date hereof, Christopher Cooper filed the *Motion of Christopher Cooper for Order Granting  Leave to File Late Proof of Claim Pursuant to Bankruptcy Rules 3003(C) and 9006(B)(1)* (the "Motion").  The undersigned counsel will present the Motion to the Honorable Martin Glenn, United States Bankruptcy Court for the Southern District of New York (the "Court") at a hearing to be held on **April 9, 2024 at 10:00 a.m. (ET)**.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections ("Objections") to the Motion shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for

---

[1]  The last four digits of SVB Financial Group's tax identification number are 2278.

the United States Bankruptcy Court for the Southern District of New York and shall be filed with the Court in accordance with the customary practices of the Court and General Order M-399. Objections must be filed and received no later than **April 2, 2024 at 4:00 p.m. (Eastern Time)** (the "Objection Deadline") and must be served on the following parties: (a) counsel to Christopher Cooper, Goodwin Procter, LLP, The New York Times Building, 620 Eighth Avenue, New York, NY 10011 Attn: Howard S. Steel (hsteel@goodwinlaw.com); Alexander J. Nicas (anicas@goodwinlaw.com) and Artem Skorostensky (askorostensky@goodwinlaw.com); and (b) to the extent not listed herein, those parties requesting notice pursuant to Bankruptcy Rule 2002 and the *Order Establishing Case Management Procedures* [Doc. No. 131] entered on April 27, 2023.

**PLEASE TAKE FURTHER NOTICE** that only those Objections that are timely filed, served and received will be considered at the Hearing. Failure to file a timely Objection may result in the entry of an order granting the relief requested in the Motion without further notice. Failure to attend the Hearing in person or by counsel may result in relief being granted or denied upon default. In the event that no Objection to the Motion is timely filed and served, the relief requested in the Motion may be granted without a hearing before the Court.

**PLEASE TAKE FURTHER NOTICE** that the Hearings will take place in a hybrid fashion both in person and via Zoom for Government. Those wishing to participate in the Hearings in person may appear before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, in Courtroom No. 523, located at One Bowling Green, New York, New York 10004-1408. For those wishing to participate remotely, in accordance with General Order M-543 dated March 20, 2020, the Hearings will be conducted remotely using Zoom for Government. Parties wishing to appear at or listen to

2

the Hearings, whether (a) an attorney or non-attorney, (b) making a "live" or "listen only" appearance before the Court or (c) attending the hearing in person or via Zoom, **all need to register an electronic appearance (an "eCourtAppearance")** through the Court's website at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl. When making an eCourtAppearance, parties must specify whether they are making a "live" or "listen only" appearance. Electronic appearances (eCourtAppearances) need to be made by **4:00 p.m. Prevailing Eastern Time on the business day before the relevant hearing**.

**PLEASE TAKE FURTHER NOTICE** that due to the large number of expected participants in the Hearings and the Court's security requirements for participating in a Zoom for Government audio and video hearing, all persons seeking to attend the Hearings remotely **must connect to the relevant hearing beginning one hour before the applicable hearing time on the relevant hearing date**. When parties sign in to Zoom for Government and add their names, they must type in the first and last name that will be used to identify them at the Hearings. Parties that type in only their first name, a nickname, or initials will not be admitted into the Hearings. When seeking to connect for either audio or video participation in the Hearings via Zoom for Government, you will first enter a "Waiting Room" in the order in which you seek to connect. Court personnel will admit each person to the Hearings from the Waiting Room after confirming the person's name (and telephone number, if a telephone is used to connect) with their eCourtAppearance. Because of the large number of expected participants, you may experience a delay in the Waiting Room before you are admitted to the Hearings. Further instructions on participating in the hearing via Zoom for Government are available on the Court's website at https://www.nysb.uscourts.gov/zoom-video-hearing-guide.

**PLEASE TAKE FURTHER NOTICE** that a copy of the pleadings filed in this chapter 11 case may be obtained free of charge by visiting the website of Kroll Restructuring Administration LLC, at https://restructuring.ra.kroll.com/svbfg/Home-DocketInfo.  You may also obtain copies of the pleadings filed in this chapter 11 case by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: March 15, 2024
      New York, New York

**GOODWIN PROCTER LLP**

*/s/ Alexander J. Nicas*
Howard S. Steel
Alexander J. Nicas
Artem Skorostensky
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 813-8800
Facsimile: (212) 355-3333
Email: hsteel@goodwinlaw.com
      anicas@goodwinlaw.com
      askorostensky@goodwinlaw.com

*Counsel to Christopher Cooper*

4

**Hearing Date:  April 9, 2024 at 10:00 AM (ET)**
**Objection Deadline: April 2, 2024, 2024 at 4:00 PM (ET)**

**GOODWIN PROCTER LLP**
Howard S. Steel
Alexander J Nicas
Artem Skorostensky
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 813-8800
Facsimile: (212) 355-3333

*Counsel to Christopher Cooper*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | x | |
| | : | Chapter 11 |
| In re | : | |
| | : | Case No. 23-10367 (MG) |
| SVB FINANCIAL GROUP,[1] | : | |
| | : | |
| Debtor. | : | |
| | : | |
| | x | |

## MOTION OF CHRISTOPHER COOPER FOR ORDER GRANTING LEAVE TO FILE LATE PROOF OF CLAIM PURSUANT TO BANKRUPTCY RULES 3003(c) AND 9006(b)(1)

Christopher Cooper ("Cooper"), hereby submits this motion (the "Motion") pursuant to Rules 3003(c)(3) and 9006(b)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order authorizing Cooper to file a late proof of claim in the above-captioned chapter 11 case (the "Chapter 11 Case") of SVB Financial Group (the "Debtor" or "SVBFG") despite passage of the bar date in the Chapter 11 Case on August 11, 2023.  In support of the Motion, Cooper respectfully states as follows:

---

[1] The last four digits of SVB Financial Group's tax identification number are 2278.

## PRELIMINARY STATEMENT

1.       On or around July 1, 2021, Boston Private Financial Holdings, Inc. ("Boston Private") merged with and into SVBFG (the "Merger"), with SVBFG as the surviving corporation. Prior to the Merger, Cooper served as the Head of Legal and Corporate Secretary of Boston Private. After the Merger, Cooper did not join SVBFG as an employee.   Much to Cooper's surprise, roughly two weeks ago, Cooper learned that he was named as a defendant in a new securities class action that alleges misrepresentations in SVBFG's disclosures relating to the Merger.  As a result, Cooper now seeks to secure his rights to contribution, indemnity, and advancement of expenses from SVBFG.

2.       Pursuant to the terms of the Merger, each shareholder of Boston Private stock had the right to receive cash and shares of SVBFG common stock.  As part of this stock-for-stock exchange, SVBFG issued (i) an amended registration statement (the "Registration Statement") filed with the U.S. Securities and Exchange Commission ("SEC") on March 16, 2021,[2] which the SEC declared effective on March 17, 2021, and (ii) a prospectus filed on Form 424B3 dated March 17, 2021 and subsequently mailed to Boston Private shareholders on or about March 19, 2021,[3] (collectively, the "Offering Materials").

3.       The Offering Materials contained the following, unequivocal disclaimer: "[SVBFG] has supplied all information contained or incorporated by reference into this proxy statement/prospectus relating to [SVBFG], and Boston Private has supplied all information contained or incorporated by reference into this proxy statement/prospectus relating to Boston Private."   Cooper had no role in preparing information in the Offering Materials and is not

---

[2]   *Available at*: https://www.sec.gov/Archives/edgar/data/719739/000119312521082245/d97737ds4a.htm.

[3]   *Available at*: https://www.sec.gov/Archives/edgar/data/719739/000119312521084502/d97737d424b3.htm.

responsible for any of the statements made therein.  The only attenuated tie between Cooper and

the Offering Materials is that SVBFG included with the Offering Materials that SVBFG filed with

the SEC a letter signed by Cooper as Corporate Secretary on behalf of the Board of Directors of

Boston Private, alerting shareholders of the time, place, and proposals to be decided at a special

meeting of Boston Private shareholders, as well as other information related to the then-proposed

Merger.

4.      In the aftermath of the collapse of Silicon Valley Bank and SVBFG's chapter 11

petition, several securities class action complaints were filed concerning securities offerings by

SVBFG.  *See, e.g., City of Hialeah Employees Retirement System v. Becker*, No. 3:23-cv-01697-

JD (N.D. Cal., filed Apr. 7, 2023); *In re SVB Financial Group Sec. Litig.*, No. 3:23-cv-01097-JD

(N.D. Cal., filed Mar. 13, 2023); *Rossi v. Becker, et al.*, Case No. 3:23-cv-2335 (Cal. Superior Ct.,

filed May 12, 2023).  At a high level, these actions alleged violations of the federal securities laws,

specifically misrepresentations and omissions by SVBFG, its officers, directors, underwriters, and

auditors, arising from various events, statements, and SVBFG filings with the SEC, in the lead up

to SVBFG's bankruptcy.  Neither Cooper, nor Boston Private, nor any other director or officer of

Boston Private was named as a defendant in any of these lawsuits.  Nor were any disclosures by

or concerning Boston Private alleged to be untrue or misleading or otherwise challenged in any of

these lawsuits.

5.      On June 29, 2023, the Court entered an order [D.I. 373 ] (the "Bar Date Order") in

the chapter 11 case establishing August 11, 2023 at 4:00 p.m., Eastern Time (the "General Bar

Date") as the general deadline for each person or entity to file a proof of claim against SVBFG.

Neither the motion to establish the General Bar Date, nor the Bar Date Order was served on

Cooper.[4]

6.      Now, almost one year after SVBFG's collapse and after the General Bar Date,
Cooper was named as a defendant in a new lawsuit that alleges misrepresentations *by SVBGF
about SVBFG in SVBFG's* Offering Materials concerning *SVBFG's* acquisition of Boston Private.
*See Stephen Rossi v. Anthony Dechellis, et al*., Complaint for Violations of the Securities Act of
1933, Super. Court of the State of Cal. Cty. of Santa Clara, February 15, 2024 (the "*Rossi
Complaint*", attached hereto as **Exhibit A**).

7.      If Cooper is found liable for the claims asserted in the *Rossi* Complaint, he will
have contribution claims against SVBFG under the securities laws. *See, e.g.*, 15 U.S.C. § 77k(f)
(statutory contribution for claims under Section 11 of the Securities Act); *Odette v. Shearson,
Hammill & Co.*, 394 F. Supp. 946, 958 (S.D.N.Y. 1975) (recognizing an implied right of
contribution under Section 12 of the Securities Act).

8.      In addition, SVBFG has an obligation to indemnify Cooper and advance his
attorneys' fees and other costs pursuant to Section 6.6 of the Merger Agreement dated January 4,
2021 (the "Merger Agreement"), between SVBFG and Boston Private:

> From and after the Effective Time [of the Merger], [SVBFG] shall
> indemnify and hold harmless, to the fullest extent permitted by
> applicable law, each present and former director, officer or
> employee of Boston Private and its Subsidiaries (in each case, when
> acting in such capacity) (collectively, the "Boston Private
> Indemnified Parties") against any costs or expenses (including
> reasonable attorneys' fees), judgments, fines, losses, damages or
> liabilities incurred in connection with any threatened or actual claim,
> action, suit, proceeding or investigation, whether civil, criminal,
> administrative or investigative, whether arising before or after the
> Effective Time [of the Merger], arising in whole or in part out of, or
> pertaining to, (i) the fact that such person is or was a director, officer,
> or employee of Boston Private or any of its Subsidiaries or (ii)
> matters existing or occurring at or prior to the Effective Time [of the

---

[4] *See Affidavit of Service* [D.I. 421], *Affidavit of Service* [D.I. 457], and *Supplemental Affidavit of Service* [D.I. 429].

Merger], including matters, acts or omissions occurring in connection with the approval of this [Merger] Agreement and the consummation of the transactions contemplated hereby; and [SVBFG] shall also advance expenses as incurred by such Boston Private Indemnified Party to the same extent as such persons are entitled to advancement of expenses as of the date of this Agreement by Boston Private pursuant to the Boston Private Articles of Organization, Boston Private's Bylaws, the governing or organizational documents of any Boston Private Subsidiary and any indemnification agreements in existence as of the date hereof that have been disclosed to [SVBFG]; provided that the Boston Private Indemnified Party to whom expenses are advanced provides an undertaking (in a reasonable and customary form) to repay such advances if it is ultimately determined that such Boston Private Indemnified Party is not entitled to indemnification.[5]

9.       Cooper files this Motion to request leave to file a late proof of claim.  In considering whether "excusable neglect" exists such that Cooper should be permitted to file a proof of claim after the bar date, the Court considers the four factors laid out by the U.S. Supreme Court in *Pioneer Investment Services Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993).

10.      Here, the Movant satisfies all four factors of the *Pioneer* test and should be permitted to file and prosecute his proof of claim notwithstanding the passage of the General Bar Date because, *inter alia*, he had no reason to suspect that he might be named as a defendant in a lawsuit relating to the Debtor.  Accordingly, Cooper respectfully requests a *nunc pro tunc* extension of the period to file a proof of claim for his unliquidated contribution, indemnity, and advancement of expenses claims against the Debtor.

---

[5] Article V of Boston Private's Amended and Restated Bylaws, adopted as of January 18, 2017 ("Boston Private Bylaws"), states that "Directors and officers shall be entitled to indemnification in accordance with the Articles of Organization" and that "[i]f the laws of The Commonwealth of Massachusetts are hereafter amended from time to time, or are succeeded by new provisions of applicable law to increase the scope of permitted indemnification, indemnification required hereunder shall be provided to the fullest extent permitted or required by any such amendment or successor provision and indemnification permitted hereunder shall be permitted to the fullest extent authorized by any such amendment or successor provision."  *See* Bylaws Art. V §§ 1, 3.  Section 6.3 of Boston Private's Articles of Incorporation, as amended as of April 26, 2012 (the "Boston Private Articles of Incorporation"), establishes an obligation on behalf of Boston Private to indemnify Cooper and advance his attorneys' fees and other costs.  *See* Art. of Incorporation § 6.3.  True and correct copies of the Merger Agreement, the Boston Private Bylaws, and the Boston Private Articles of Incorporation are attached hereto as **Exhibits B-D**.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2021 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested herein are Rules 3003(c)(3) and 9006(b)(1) of the Bankruptcy Rules.

## BACKGROUND

12.     On March 17, 2023 (the "Petition Date"), the Debtor commenced the Chapter 11 Case in the U.S. Bankruptcy Court for the Southern District of New York (the "Court") under chapter 11 of the U.S. Code (the "Bankruptcy Code").

13.     The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of title 11 of the Bankruptcy Code.  On March 28, 2023, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") of the Debtor to serve as a fiduciary for all unsecured creditors.

14.     On June 8, 2023, the Debtor filed a motion to establish the General Bar Date [D.I. 320].  On June 29, 2023, the Court entered the Bar Date Order, establishing the General Bar Date.

15.     On January 26, 2024, the Debtor filed the Plan of Reorganization [D.I. 826] (the "Plan") and on February 7, 2024, the Debtor filed the Disclosure Statement [D.I. 845] related to the Plan.  The Court will hold a hearing to consider approval of the Disclosure Statement on April 9, 2024.

16.     Cooper was served with the *Rossi* Complaint, and first became aware of that lawsuit, on February 29, 2024.

## RELIEF REQUESTED

17.　Cooper respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit E** (the "Proposed Order") extending, *nunc pro tunc*, Cooper's time to file a proof of claim in this proceeding despite passage of the General Bar Date.

## BASIS FOR RELIEF

18.　Cooper asks the Court for an extension of time to file a proof of claim for his unliquidated contribution, indemnity, and advancement of expenses claims against the Debtor. Cooper is entitled to such relief primarily because, (i) neither the motion to establish the General Bar Date, nor the Bar Date Order was served on him and (ii) he had no reason to expect, nor could have anticipated, the claims asserted against him in the *Rossi* Complaint.

### A.　The "Excusable Neglect" Standard

19.　Bankruptcy Rule 9006(b)(1) authorizes a bankruptcy court to accept late-filed claims where the failure to act is a result of "excusable neglect," and contemplates that courts are permitted, where appropriate, to accept late filings.　FED. R. BANKR. P. 9006(b)(1).

20.　In determining whether the failure to timely file a proof of claim is the result of "excusable neglect," courts apply a four-part test articulated by the Supreme Court in *Pioneer* "to assist bankruptcy courts in evaluating excusable neglect: (1) the danger of prejudice to the debtor; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith." *In re Residential Capital*, Case No. 12-12020 (MG), 2020 WL 1228646 at *3 (Bankr. S.D.N.Y. March 12, 2020) (citing *Pioneer*, 507 U.S. at 395).　While courts have recognized that the inquiry is an equitable one and that "all relevant circumstances surrounding the party's omission" must be considered, courts in the Second Circuit accord particular weight to the third factor – the reason for the delay. *Midland Cogeneration Venture Ltd.*

*P'ship v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115, 121 (2d Cir. 2005) (citing *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366 (2d Cir. 2003)); *In re Dana Corp.*, 2007 WL 1577763 at *4 (Bankr. S.D.N.Y. May 30, 2007) (quoting *In re Musicland Holding Corp.*, 356 B.R. 603, 607 (Bankr. S.D.N.Y. 2006)).

21.    In addition, courts have routinely "found excusable neglect where the creditor fails to comply with the bar date because, through no fault of its own, it had no notice of that date." *In re William B. Wilson Mfg. Co.*, 59 B.R. 535, 538 (Bankr. W.D. Tex. 1986); *In re Yoder Co.*, 758 F.2d 1114, 1118 (6th Cir. 1985) ("[N]onreceipt of notice would clearly constitute excusable neglect."); *In re Pettibone Corp.*, 162 B.R. 791, 814 (Bankr. N.D. Ill. 1994) (quotations omitted) ("Courts have consistently found the lack of notice to 'known' creditors to constitute the paradigm example of excusable neglect and freely grant motions to file late claims on behalf of known creditors who through no fault of their own, had no notice of the bar date.").

**B**.    **An Extension of Cooper's Deadline to a File Proof of Claim is Warranted**

22.    Each of the four factors set forth by the Supreme Court in *Pioneer* for permitting late-filed claims  is  present  here.  *First*, filing the proof of claim will ***not prejudice*** the Debtor because the Plan has not been confirmed and because the mere prospect of having to pay a legitimate claim does not constitute "prejudice" under *Pioneer*.  *Second*, there was no delay by Cooper in filing a claim and, even if there had been a delay, there will be ***no impact on any judicial proceeding***.  *Third*, there is ***good cause for any delay*** because Cooper only recently learned of the *Rossi* Complaint and could not have anticipated the claims asserted therein prior to the General Bar Date—which do not identify any alleged misconduct by him or Boston Private, but rather seek to hold him liable for SVBFG's alleged misconduct.  Indeed, upon learning of the *Rossi* Complaint, Cooper promptly filed this Motion to request permission to file his proof of claim (attached as

**Exhibit F**).  *Fourth*, there can be no argument that Cooper has done anything other than act in good faith.

       i.     *Prejudice to the Debtors*

23.    *First*, allowing a late-filed claim will not prejudice the Debtor because neither the Plan, nor any plan of reorganization, has been confirmed by the Court.  *See In re Herman's Sporting Goods, Inc.*, 166 B.R. 581, 584 (Bankr. D. N.J. 1994) ("The absence of a confirmed plan of reorganization indicates a lack of prejudice to the debtor."); *Matter of Papp Intern., Inc.*, 189 B.R. 939, 944 (Bankr. D. Neb. 1995) ("Several courts have concluded the lack of a confirmed plan indicates a lack of prejudice to the debtor if a late filed proof of claim is permitted.").  The Debtor and unsecured creditors are in the same position as if Cooper's proof of claim been filed before the General Bar Date—the Debtor will have to object to or provide for the claim in the Plan.

24.    Further, the mere possibility that a debtor would have to pay a legitimate claim, or that paying such claim could leave less money in the estate for other creditors, does not constitute "prejudice" sufficient to justify prohibiting the assertion of a claim after the bar date.  *See R.H. Macy & Co., Inc.*, 166 B.R. 799, 802 (S.D.N.Y. 1994) (stating that "prejudice to the debtor is a more flexible and complex concept than a simple dollar-for-dollar depletion of assets otherwise available for timely filed claims.  Were it otherwise, virtually all late filings would be condemned by this factor[.]"); *In re Dietz*, 136 B.R. 459, 469 (Bankr. E.D. Mich. 1992) (finding that just because "other creditors . . . will receive a smaller distribution than they would receive if [the post-bar date] claim were not allowed does not establish the kind of 'prejudice' which would preclude amendment.").  If the Cooper is not permitted to file a claim, it would result in a windfall to the Debtor's other similarly situated creditors because those creditors will get paid without dilution by Cooper's claim.  And moreover, there is no reason to believe that allowing Cooper to file a proof

9

of claim will result in a mountain of new claims filed against the Debtor's estate—the *Rossi* Complaint involves a limited subset of defendants and the scope of the claims in the *Rossi* Complaint are completely inapposite to mass tort litigation and claims where this argument is frequently made.  *See In re Tronox Inc.*, 626 B.R. 688 (Bankr. S.D.N.Y. 2021).

25.    Relatedly, Cooper has sought coverage for his attorneys' fees and costs in defending the *Rossi* Complaint pursuant to the directors' and officers' liability insurance ("D&O") policies maintained by Boston Private and the Debtor, and such coverage may mitigate any financial impact on the Debtors' estate resulting from the allowance of Cooper's proof of claim. But as of the date of this filing, the D&O insurers have yet to make a determination concerning Cooper's eligibility for coverage.  Consequently, Cooper is currently incurring un-indemnified attorneys' fees and other expenses in connection with the *Rossi* Complaint.  And if the D&O carriers ultimately agree to coverage, such coverage may not cover all of Cooper's liabilities, expenses, attorneys' fees, and other costs arising from the *Rossi* Complaint—all of which he is entitled to be indemnified for by the Debtor.

26.    Here, a scenario in which the Debtor needs to provide for Cooper's claim in its Plan does not amount to prejudice under *Pioneer.*  Allowing Cooper to file a proof of claim will not disrupt the Plan process since no disclosure statement has been approved, neither the Plan nor any plan of reorganization has been confirmed, and none of Debtor's assets have been distributed to pay any similarly situated claims.

ii.    *Length of Delay*

27.    "The Second Circuit has stated, 'neither we nor—as far as our research discloses— any other court has established a bright-line rule governing when the lateness of a claim will be considered "substantial."  The length of delay in time is only given meaning by its effect on the

administration of the case." *In re Lyondell Chem. Co.*, 543 B.R. 400, 411 (Bankr. S.D.N.Y. 2016).

Notably, courts have accepted claims filed more than a year after the bar date where the impact on

the proceedings was minimal. *See e.g., In re Byrne*, 162 B.R. 816 (Bankr. W.D. Wisc. 1993)

(impact on proceedings minimal where proof of claim filed one year and two months late).

28.    Although the General Bar Date has passed, there was no delay by Cooper in

asserting his contribution, indemnity, and advancement of expenses claims after being served with

the *Rossi* Complaint on February 29, 2024.  In only a couple weeks' time, Cooper promptly began

to evaluate the allegations in the *Rossi* Complaint and retained the undersigned counsel to defend

him with respect to the *Rossi* Complaint and prepare this Motion and related proof of claim.    In

any event, no aspect of or the administration of this Chapter 11 Case will be impacted in any way

if Cooper is permitted to file his proof of claim. *See Lyondell*, 543 B.R. at 410 (stating length of

the delay is only given meaning by its effect on the administration of the case); *In re BuildNet,

Inc.*, No. 01-82293, 2003 WL 22078079, at *3 (M.D.N.C. 2003) (allowing late-filed

indemnification claim because, *inter alia*, claim was filed "within one month of the

commencement of the action").

iii.        *Reason for Delay*

29.    Any delay on the part of Cooper in filing his contribution, indemnity, and

advancement of expenses claims against the Debtor is excusable.  When a creditor is unaware of

a bar date due to circumstances beyond the creditor's control, there is no question that the creditor's

"neglect" is excusable. *See*, *e.g.*, *Pioneer*, 507 U.S. at 398-99.  One situation giving rise to

"excusable neglect" is when a creditor does not receive actual notice of the bar date. *See In re

Thomson McKinnon Securities, Inc.*, 159 B.R. 146 (Bankr. S.D.N.Y. 1993).  A second situation is

when the existence of a creditor's claim did not become known until after the bar date has passed.

*See In re New York Trap Rock Corp.*, 153 B.R. 642 (Bankr. S.D.N.Y 1993). "Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." *Pioneer*, 507 U.S. at 388.

30.    Cooper was not served with the motion to establish the General Bar Date, nor the Bar Date Order as evidenced by the affidavits of service filed in the Chapter 11 Case.[6]  But even if Cooper had been served and was on notice of the General Bar Date, Cooper would still have a strong claim for excusable neglect because Cooper was not on notice or aware that any claims would be asserted against him in connection with the Merger between Debtor and Boston Private. Nor did Cooper have any other reason before the General Bar Date to suspect that any claims would be asserted against him that would implicate his rights to contribution, indemnity, and advancement of expenses from the Debtor.  Multiple lawsuits concerning the Debtor's alleged misrepresentations were commenced almost one year ago, but Cooper was not named as a defendant in any of those lawsuits, nor did any of those lawsuits allege any misrepresentations by or concerning Boston Private or any of its officers.  It therefore would have been unreasonable for Cooper to have filed a proof of claim seeking contribution, indemnity, and advancement of expenses against the Debtor prior to the General Bar Date.  This is underscored by the fact that a prior lawsuit regarding the same subject matter was filed by the same plaintiff as the *Rossi* Complaint against different defendants (*see Rossi v. Becker, et al.*, Case No. 3:23-cv-2335 (Cal. Superior Ct. filed May 12, 2023)), and the *Rossi* Complaint itself does not allege that Cooper or Boston Private made any misstatement or omission in connection with the Offering Materials or related to the Merger, or otherwise.

---

[6] *See supra* note 4.

31.     The U.S. Court of Appeals for the Second Circuit has held that a failure to file a

claim—including, in particular, a claim for contribution—prior to the bar date is not fatal where,

as here, the claimant did not know the claim existed until after the bar date lapsed. *See SPV Osus*

*Ltd. v. UBS AG*, 882 F.3d 333, 340-41 (2d Cir. 2018) (citing *In re PT–1 Commc'ns, Inc.*, 292 B.R.

482, 489 (Bankr. E.D.N.Y. 2003)).    In *PT-1*, the court agreed that the claimant should not be

required to file a protective proof of claim where the claimant "had no reason on the basis of the

facts known to it prior to the Bar Date to conclude" that it had a claim to assert against the debtor.

*See PT–1*, 292 B.R. at 489; *see also BuildNet*, 2003 WL 22078079, at *3 (allowing late-filed

indemnification claim because, *inter alia*, "there was no indication that there might be claims . . .

that would trigger their indemnification rights until well after the Bar Date").[7]   The test under

*Pioneer* is, at bottom, an "equitable inquiry" (*Pioneer*, 507 U.S. at 389) and equity supports

permitting Cooper to file a proof of claim for contribution, indemnity, and advancement of

---

[7] Cooper acknowledges that the Second Circuit, in *dicta*, observed that "[e]xcusable neglect does not excuse
the failure to file proof of claim for an indemnification liability by the bar date." *SPV Osus*, 882 F.3d at
341 (citing *Allstate Ins. Co. v. Credit Suisse Securities (USA) LLC*, No. 11 Civ. 2232, 2011 WL 4965150,
at *5 (S.D.N.Y. Oct. 19, 2011), and *Sealink Funding Ltd. v. Bear Stearns & Co. Inc.*, No. 12 Civ. 1397,
2012 WL 4794450, at *3 (Oct. 9, 2012)).   But the two decisions cited by the Second Circuit are readily
distinguishable from this case.   In *Allstate*, the issue was whether a party should be permitted to remove a
case as "related to" various bankruptcies, not whether the party should be permitted to file a late proof of
claim—which was not even an issue before the court.   2011 WL 4965150, at *4.   The *Allstate* court's
analysis focused on whether "related to" jurisdiction was sufficiently established where the removing
defendants had not filed, or even sought to file, any proof of claim in the relevant bankruptcies for the
indemnification claims on which their "related to" arguments were based. *Id*. at *5.   In ruling that this was
"too remote" a basis for "related to" jurisdiction, the *Allstate* court did not rule that the party had failed to
demonstrate "excusable neglect."   To the contrary, it expressly declined "to speculate" on whether a
bankruptcy court would excuse the late filing, and thus implicitly acknowledged that a bankruptcy court
could excuse the late filing. *Id*. at *4-5.   The situation was the same in *Sealink*.   There, the court relied on
*Allstate* in ruling that where potential indemnification claims had not been asserted as proofs of claim by
the applicable bar dates and there was no "evidence of pursuit of such claims," there was too "attenuated
and tangential" an effect on the bankruptcies to establish "related to" jurisdiction.   2012 WL 4794450, at
*3-4.   But, as in *Allstate*, the *Sealink* court acknowledged the possibility that a late-filed indemnity claim
"might be allowed." *Id*. at *3.   For the reasons discussed above, Cooper should be permitted to file a proof
of claim based on his indemnity, advancement, and contribution rights arising under the Merger Agreement,
Boston Private's governing documents, and the securities laws. *See, e.g.*, *BuildNet*, 2003 WL 22078079,
at *3 (applying *Pioneer* factors and allowing late-filed indemnification claim).

expenses because, for the reasons discussed, Cooper was not served with the motion to establish the General Bar Date or the Bar Date Order and could not have been on notice, and had no reason to suspect, that claims against him, such as those alleged in the *Rossi* Complaint, would be asserted.

      iv.    *Good Faith*

32.    Finally, and for the same reasons discussed above as to the other three factors, the fourth *Pioneer* factor weighs in favor of Cooper, as there is no reasonable suggestion that he failed to act in anything other than good faith. Cooper diligently hired counsel and began preparing this Motion and the attached proof of claim immediately upon being made aware of the *Rossi* Complaint. As explained in detail above, Cooper could not have been expected to file a proof of claim in connection with defending against claims alleging misstatements and omissions about **SVBFG** in **SVBFG's** SEC filings related to the Merger, particularly when he did not sign the Registration Statement, was not involved in the preparation of the Offering Materials, and the alleged misstatements identified in the *Rossi* complaint are attributed to SVBFG, not to Cooper or to Boston Private.

33.    Accordingly, by virtue of Cooper's good faith efforts to timely seek this Court's permission to file the late proof of claim, the absence of prejudice to the Debtor's estate and the absence of a negative impact on the efficiency of court administration, Cooper respectively submits that, pursuant to Bankruptcy Rules 3003(c) and 9006(b)(1), the Court should conclude that excusable neglect is present and extend, *nunc pro tunc*, Cooper's time to file a proof of claim to within 14 days of a decision granting such relief.

## **NOTICE**

34.    Notice of this Motion will be provided to: (i) counsel to the Debtor; (ii) counsel for the U.S. Trustee; (iii) counsel to the Committee; and (iii) to the extent not listed herein, those parties requesting notice pursuant to Bankruptcy Rule 2002. Cooper submits that, in light of the

nature of the relief requested, no other or further notice need be provided.

## NO PRIOR REQUEST

35.     No prior request for the relief sought in this Motion has been made to this or any

other court.

## CONCLUSION

**WHEREFORE**, Cooper respectfully requests that the Court (i) enter the Proposed Order

substantially in the form attached hereto as **Exhibit E**, and (ii) grant such other and further relief

as the Court deems just and proper.

Dated: March 15, 2024         **GOODWIN PROCTER LLP**
        New York, New York

        _/s/ Alexander J. Nicas_
        Howard S. Steel
        Alexander J. Nicas
        Artem Skorostensky
        The New York Times Building
        620 Eighth Avenue
        New York, New York 10018
        Telephone: (212) 813-8800
        Facsimile: (212) 355-3333
        Email: hsteel@goodwinlaw.com
               anicas@goodwinlaw.com
               askorostensky@goodwinlaw.com

        _Counsel to Christopher Cooper_

## Exhibit A

### *Rossi* Complaint

ACTIVE/128309192

# SUMMONS
## *(CITACION JUDICIAL)*

**SUM-100**

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

E-FILED
2/15/2024 11:34 AM
Clerk of Court
Superior Court of CA,
County of Santa Clara
24CV431200
Reviewed By: C. Roman
Envelope: 14421483

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
ANTHONY DECHELLIS, CHRISTOPHER COOPER, and MORGAN STANLEY & CO., LLC

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
STEPHEN ROSSI, individually and on behalf of all others similarly situated

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Santa Clara Superior Court<br><br>Downtown Superior Court, 191 North First Street, San Jose, CA 95113 | CASE NUMBER:<br>*(Número del Caso):*  **24CV431200** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Adam E. Polk, Girard Sharp LLP, 601 California Street, Suite 1400, San Francisco, CA 94108 Tel: 415.981.4800

| DATE:<br>*(Fecha)* 2/15/2024 11:34 AM | **Clerk of Court** | Clerk, by<br>*(Secretario)* | C. Roman | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. [XX] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [ ] on behalf of *(specify):*

    under: [ ] CCP 416.10 (corporation)     [ ] CCP 416.60 (minor)
    [ ] CCP 416.20 (defunct corporation)   [ ] CCP 416.70 (conservatee)
    [ ] CCP 416.40 (association or partnership)  [ ] CCP 416.90 (authorized person)
    [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

E-FILED
2/15/2024 11:34 AM
Clerk of Court
Superior Court of CA,
County of Santa Clara
24CV431200
Reviewed By: C. Roman

DAVID W. HALL (SBN 274921)
dhall@hedinhall.com
ARMEN ZOHRABIAN (SBN 230492)
azohrabian@hedinhall.com
**HEDIN HALL LLP**
Four Embarcadero Center, Suite 1400
San Francisco, CA  94104
Telephone: (415) 766-3534
Facsimile: (415) 402-0058

ADAM E. POLK (SBN 273000)
apolk@girardsharp.com
SEAN GREENE (SBN 328718)
sgreene@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

*Attorneys for Plaintiff and the Proposed Class*

[Additional counsel on signature page]

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | |
|---|---|
| STEPHEN ROSSI, individually and on behalf of all others similarly situated, ) | Case No. 24CV431200 |
| Plaintiff, ) | <u>CLASS ACTION</u> |
| vs. ) | COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 |
| ANTHONY DECHELLIS, CHRISTOPHER COOPER, and MORGAN STANLEY & CO., LLC ) | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. ) | |

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1    Plaintiff Stephen Rossi, individually and on behalf of all others similarly situated, alleges the

2    following based upon personal knowledge as to Plaintiff and his own acts, and otherwise based upon

3    the investigation conducted by and through Plaintiff's attorneys, which included, among other

4    things, a review of U.S. Securities and Exchange Commission ("SEC") filings by SVB Financial

5    Group (the "Company" or "SVB") and Boston Private Bank & Trust Company ("Boston Private"),

6    as well as media, testimony, and analyst reports concerning the Company and its public statements.

7    Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth

8    herein.

9    **SUMMARY OF THE ACTION**

10    1.    This is a securities class action on behalf of all persons who acquired SVB common

11    stock pursuant to the S-4 registration statement and 424B3 prospectus (collectively, with materials

12    incorporated by reference therein, the "Offering Materials") issued in connection with the July 2021

13    stock-for-stock exchange through which SVB acquired and merged with Boston Private (the

14    "Merger"). Plaintiff asserts strict liability claims for relief under §§ 11, 12(a)(2), and 15 of the

15    Securities Act of 1933 ("1933 Act" or "Securities Act") against certain Boston Private officers who

16    signed and solicited the Offering Materials and against Morgan Stanley & Co., LLC ("Morgan

17    Stanley"), financial advisor for the Merger.

18    2.    At the time of the Merger, SVB operated as a financial services company, a bank

19    holding company, and a financial holding company, offering banking and financial products and

20    services to domestic and international clients. It offered its banking services through its primary

21    subsidiary, Silicon Valley Bank, which operated as a California state-chartered bank.

22    3.    Pursuant to the Merger, each share of Boston Private stock was converted into the

23    right to receive $2.10 in cash and 0.0228 shares of SVB common stock. Through this cash-and-stock

24    exchange, in connection with the Merger, Defendants solicited and sold to former Boston Private

25    shareholders approximately 1.9 million shares of SVB common stock. All these new shares of SVB

26    common stock were registered, issued, sold, and solicited pursuant to the Offering Materials.

27    4.    The Offering Materials contained false and misleading statements of material fact,

28    and omitted material facts that were both required by governing regulations, and necessary to make

- 1 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

the statements not misleading. Leading up to the Merger, in an environment of historically low interest rates, SVB shifted a substantial portion of its investment portfolio to longer-term, fixed-rate securities. In doing so, because a rise in interest rates reduces the market value of fixed-rate securities, SVB exposed itself to far greater interest rate risk than disclosed in the Offering Materials.

5.      As shown in greater detail below, the Offering Materials were rife with materially false and misleading statements and omissions as to the significant, undisclosed market risks, including severe interest rate risk, uninsured depositor risk and liquidity risk, that SVB faced. Among other matters, the Offering Materials failed to disclose that:

(a)      Higher interest rates were already jeopardizing the bank's future earnings, and worse, instead of mitigating such risks, SVB had exacerbated those risks by, inter alia, overconcentrating its investments in long-term investments to deliver short-term profits;

(b)      As more deposits flowed in, SVB's executives had disregarded internal assessments, including recommendations to purchase shorter-term bonds to hedge its balance sheet, which would have offset the material risk of losses from rising interest rates, and instead continued investing in long-term bonds in order to drive short-term profits;

(c)      SVB had ignored internal risk management alarms, had failed to reasonably address and comply with key risk metrics, and had altered assumptions underlying internal models that showed higher interest rates could devastate SVB's future earnings, using unreasonable and improper tweaks to those models to mask the undisclosed risks and facilitate SVB's profit-driven strategy;

(d)      SVB lacked effective internal controls, had deficient risk management systems, its holding Company had been rated as deficient under the CAMELS (acronym for Capital adequacy, Assets, Management capability, Earnings, Liquidity, Sensitivity) rating system, regulators had warned SVB that its risk management systems were inadequate and below the Federal Reserve's expectations, and SVB was already facing many serious operational and technological problems, impairing the Company's ability to track risks, including interest rate risks, among other matters;

(e)      SVB lacked a diversified customer base, was over-reliant on a small group of large, uninsured depositors tied into the same, insular venture capital networks, and thus an

- 2 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1   overwhelmingly inordinate percentage of SVB deposits across that non-diversified customer base

2   were particularly susceptible to the risk of a run on the bank; and

3         (f)    SVB's liquidity was less than represented by Defendants and, in truth,

4   inadequate in view of its customers' business and their collective deposits.

5       6.    Moreover, with respect to interest rate risk, SVB failed to disclose that a foreseeable

6   rise in interest rates presented a critical threat to its future business. The Offering Materials' risk factor

7   disclosures were materially false and misleading, framing potential interest rate increases as a net

8   *positive* for SVB. According to the Offering Materials, such increases would increase its interest rate

9   spread, allowing SVB to charge more for its loans and buy higher yielding securities at a rate that

10   would outpace the increased interest it would be obligated to pay on its customer deposits. But that

11   same risk factor disclosure omitted that higher rates would reduce the market value of SVB's

12   marketable securities, resulting in material unrealized losses from their declining market value or

13   realized losses if they had to be liquidated.

14       7.    On March 9, 2023, the truth about SVB's vulnerability began to emerge. The

15   Company announced in a mid-quarter update that it had sold "substantially all of our Available for

16   Sale (AFS) securities portfolio" resulting in an estimated realized post-tax loss of $1.8 billion. SVB's

17   stock plummeted more than 60% the next day.

18       8.    Since March 8, 2023, the stock has lost substantially all of its value. SVB terminated

19   its previously announced equity offerings; Silicon Valley Bank was shut down by the California

20   Department of Financial Protection and Innovation; and on March 17, 2023, SVB announced it had

21   filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy

22   Court for the Southern District of New York.

23       9.    The Federal Reserve System has since undertaken a review of the SVB failure.

24   According to prepared testimony by Michael Barr, the Fed's Vice Chair for Supervision, before the

25   Senate Committee on Banking, Housing, and Urban Affairs, "[t]he picture that has emerged thus far

26   shows SVB had inadequate risk management and internal controls . . . ." In fact, as reported in *The*

27   *New York Times*, at around the time of the Merger, the Fed alerted SVB that it "was doing a bad job

28   of ensuring that it would have enough easy-to-tap cash on hand in the event of trouble." And *The*

- 3 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

*Washington Post* reported in April 2023 that an internal model at SVB "showed that higher interest rates could have a devastating impact on the bank's future earnings" but that, "[i]nstead of heeding that warning—and over the concerns of some staffers—SVB executives simply changed the model's assumptions . . . ."

10.     Plaintiff Stephen Rossi owned Boston Private stock before the Merger and acquired SVB stock pursuant to the Offering Materials in the Merger. Plaintiff asserts causes of action under §§ 11, 12, and 15 of the Securities Act against Defendants—the directors and officers who signed the Offering Materials, and KPMG, SVB's independent auditor.

**JURISDICTION AND VENUE**

11.     This Court has original subject matter jurisdiction under the California Constitution, Article VI, Section 10.  Removal is barred by Section 22 of the 1933 Act.

12.     This Court has personal jurisdiction and venue is proper under California Code of Civil Procedure § 410.10. Certain Defendants and their agents reside in California. Further, certain Defendants drafted and signed the Offering Materials, and controlled SVB's operations, within California and this county.KPMG signed the "Consent of Independent Registered Public Accounting Firm" and the "Report of Independent Registered Public Accounting Firm" in California. Certain Defendants and their agents also affirmatively solicited the subject securities and disseminated the false and misleading statements and omissions to investors in California and this county. Individually and collectively, these contacts with California are substantially connected to the claims set forth in this complaint.

13.     This Court is a proper venue under California Code of Civil Procedure § 395.

**PARTIES**

14.     Plaintiff Stephen Rossi is a resident of Castro Valley, California.  Plaintiff acquired SVB common stock directly in the Merger, in exchange for Boston Private shares, pursuant to the Offering Materials and was damaged thereby.

15.     Defendant Anthony DeChellis was, at relevant times, Chief Executive Officer of Boston Private. Defendant DeChellis reviewed, contributed to, and signed the Offering Materials. Defendant DeChellis solicited Plaintiff and other former Boston Private investors to participate in

- 4 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

the merger and purchase the securities issued pursuant thereto, planned and contributed to the Merger and Offering Materials, and attended promotional events to meet with and present favorable information to Boston Private investors.

16.    Defendant Christopher Cooper was, at all relevant times, the Corporate Secretary and Head of Legal for Boston Private. Defendant Cooper reviewed, contributed to, and signed the Offering Materials. On behalf of and at the direction of Boston Private, Defendant Cooper oversaw the company's legal function and department, acted as an advisor to the board of directors on matters of corporate governance, including serving as Corporate Secretary, structured and negotiated business agreements and contracts in connection with the Merger, managed compliance functions in connection with securities regulations, including the preparation and filing of SEC Forms 10-K, 10-Q and 8-K, and earnings releases, maintained the company's insider stock ownership program, supported the company's various business functions, including finance, information technology, investor relations, marketing, business development and corporate real estate, coordinated the company's insurance programs, advised the human resources department regarding equity plans and executive compensation programs, conducted internal employee investigations and provided recommendations for disciplinary actions, up to and including terminations, and directed the work of external law firms on behalf of Boston Private. Defendant Cooper solicited Plaintiff and other former Boston Private investors to participate in the merger and purchase the securities issued pursuant thereto, planned and contributed to the Merger and Offering Materials, and attended promotional events to meet with and present favorable information to Boston Private investors.

17.    The Defendants named in ¶¶ 15-16 are referred to herein as the "Individual Defendants." Each of them signed and was identified in the Offering Materials, solicited the securities issued pursuant thereto, planned and contributed to the Merger and Offering Materials, and attended promotional events to meet with and present favorable information to Boston Private investors.

18.    Defendant Morgan Stanley ("Morgan Stanley") is a New York-based investment bank that signed and was identified in the Offering Materials, solicited Plaintiff and other former Boston Private investors to participate in the Merger and purchase the securities issued in the stock-

- 5 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

for-stock exchange pursuant thereto, contributed to the Merger and Offering Materials, and directly solicited ostensibly favorable information to Boston Private investors, including by providing an expert opinion in the Offering Materials that the Merger consideration was fair to Boston Private shareholders. Morgan Stanley also represented that they had conducted adequate due diligence and had consulted with management on the companies' operations and financial condition. As independent financial professionals assisting Boston Private with the Merger negotiations and with access to SVB's non-public information, Morgan Stanley put their imprimatur on the false and misleading statements contained in the Offering Materials, including but not limited to those regarding the fairness of the Merger consideration and the prospects for SVB.

## FACTUAL BACKGROUND

### Relevant Banking Background

19.     A typical commercial bank accepts deposits that customers can withdraw at will. The bank may pay interest on some or all of those deposits. These deposits are liabilities because they are owed to the bank's customers.

20.     A typical commercial bank also holds some cash to manage day-to-day withdrawals and deposits. The bank seeks to earn interest on the balance of the deposited funds, typically by making loans or investing in assets. The bank makes a profit on the difference between the interest that its assets earn and the interest that it must pay on its liabilities. This difference is called the "interest rate spread."

21.     Low interest rates in the market generally correspond to a low interest rate spread. And because a bank makes its profit off the interest rate spread, low interest rates can result in low profits.

22.     The securities that banks purchase generally fall into two categories: (1) "available-for-sale," or "AFS," and (2) "hold-to-maturity," or "HTM." AFS securities are those that might be sold to raise revenue, so their book value—their value on a balance sheet—is adjusted periodically to reflect changes in their market value, such as due to interest rate fluctuations. HTM securities are intended to be held to maturity, so their book value is kept fixed throughout their life. Selling HTM

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1  securities prior to their date of maturity results in the portfolio being immediately "marked to market"

2  (valued at current market value versus value at maturity), which can create a need to raise capital.

3  **SVB's Origins and Development to 2021**

4  23.    SVB was founded in Santa Clara County in 1983 and has been headquartered in the

5  same county ever since. Until its bankruptcy, SVB (through its primary subsidiary, Silicon Valley

6  Bank) specialized in taking deposits from and lending to startup companies, particularly ones based

7  in the Silicon Valley region of the San Francisco Bay Area.

8  24.    Throughout the 2010s, interest rates were low by historical standards, resulting in

9  lower-than-desired profits at SVB. The concerns about profitability became more acute by the late

10  2010s, as SVB's assets approached $50 billion. The Dodd-Frank Wall Street Reform and Consumer

11  Protection Act of 2010 subjected all bank holding companies with $50 billion or more in assets to

12  enhanced regulations due to their presumed systemic importance.

13  25.    In 2017, there was a change in leadership within SVB's key finance functions, and in

14  2018, the new financial leadership at SVB sought greater returns on the bank's assets. To that end,

15  SVB shifted a large portion of its investment portfolio from short-term bonds to long-term bonds.

16  The latter pay higher interest rates but tie up funds and remain on the books for longer.

17  26.    Between the fourth quarter of 2019 and during 2021, including when the COVID-19

18  pandemic led to an increase in the use of the Internet for most activities and the federal government

19  injected money into the economy to prevent a significant downturn, SVB experienced massive

20  growth in deposits. In 2018, SVB's deposits were just under $50 billion. In 2020, its deposits had

21  grown to $102 billion. By 2021, its deposits were approaching $190 billion.

22  27.    More deposits came in than SVB could lend out. Loans to startups were a relatively

23  small part of SVB's business in the early 2020s, both because of the equity investments funding

24  startups and because the typical startup has not built up a track record of good creditworthiness. SVB

25  made home loans and performed other kinds of business lending, such as vineyard finance, but in

26  accordance with the strategy it had adopted a few years earlier, much of the inflow of deposits to

27  SVB in 2020 and 2021 went to purchasing long-term securities, such as U.S. Treasury bonds.

28

- 7 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

28. SVB concentrated its investments in HTM securities (as opposed to AFS securities) for its expanding securities portfolio. (*See infra* ¶¶ 139-42.)

29. As a consequence of these developments, SVB's balance sheet in 2021 had the following essential characteristics:

- First, SVB's liabilities consisted primarily of recent deposits, often from startups. These deposits brought significant risk. Venture capital firms invest in startups to earn returns, but as interest rates rise, safer alternatives to investing in startups become more viable by paying a higher return. When interest rates rise, therefore, fewer startups receive funding, startups have less cash to deposit in a bank, and some may need to withdraw funds.

- Second, a substantial proportion of SVB's assets were long-term U.S. Treasury bonds and other government-affiliated debt securities.

30. U.S. Treasury bonds are sometimes described as "safe" investments. But, while U.S. Treasury bonds are safe from *credit* risk (*i.e.*, the U.S. Treasury has never failed to repay creditors), all fixed-interest bonds are subject to significant interest rate risk. A U.S. Treasury bond provides payments at a fixed interest rate for a set number of years, but when interest rates rise, a bond at the older, lower rate *loses* value because investors can buy bonds at a new, higher rate.

31. Long-term bonds pose additional risks. By definition, they tie up liquidity for a longer period. Hence, if there is an unexpected need for liquidity, bonds must be sold. If interest rates have risen, bonds must be sold at a loss.

32. In the 2010s, interest rates had been low for years. The Federal Funds Rate, a key benchmark, dropped close to zero during the financial crisis in 2007 and 2008, and had remained close to zero ever since, except for a few small increases between 2017 and 2020, which were quickly reversed.

33. By early 2021, market conditions had changed enough that SVB's exposure to rising interest rates was no longer a potential future risk: It presented a near-term crisis. Typically, the Federal Reserve raises interest rates to fight inflation. Accordingly, by early 2021, with interest rates

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

at near historic lows, interest rates were set to rise with expected inflation.[1] These increases were foreseeable. Before 2022, interest rates were historically low: from the end of 2008 to early 2022, rates were lower than they had ever been in any previous time period of comparable length. Historically, though, the Federal Reserve has lowered **and raised** interest rates to respond to macroeconomic conditions. Near-zero rates could not persist indefinitely.

### DEFENDANTS' FALSE AND MISLEADING OFFERING MATERIALS

34.    On January 4, 2021, SVB announced that it had entered into a definitive merger agreement pursuant to which it would acquire Boston Private Bank & Trust Company. Under the terms of the merger agreement, Boston Private shareholders would receive 0.0228 shares of SVB common stock and $2.10 of cash for each Boston Private share they owned.

**The Offering Materials**

35.    On February 11, 2021, SVB filed with the SEC on Form S-4 a draft registration statement which would register the SVB shares to be issued and exchanged in the Merger.

36.    On March 16, 2021, SVB filed with the SEC a final amendment to the registration statement. The amended registration statement incorporated by reference, among other matters, the following SVB SEC filings, namely:

- Annual Report on Form 10-K for the fiscal year ended December 31, 2020, filed with the SEC on March 1, 2021;

- Definitive Proxy Statement on Schedule 14A for the 2021 annual meeting of stockholders, filed with the SEC on March 4, 2021;

- Current Reports on Form 8-K filed with the SEC on January 4, 2021, January 8, 2021, January 21, 2021 (only with respect to Item 8.01) and February 2, 2021; and

- Description of SVB common stock, par value $0.001 per share, contained in registration statement on Form 8-A filed with the SEC on April 23, 1987, including any amendment or report filed for the purposes of updating such description.

---

[1] The Federal Reserve announced seven rate increases in 2022, beginning in March, amounting to a total of four percentage points. Another rate hike followed in early 2023.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

37.    The SEC declared the amended registration statement effective on March 17, 2021.

38.    On March 18, 2021, SVB filed a prospectus on Form 424B3 for the SVB shares issued and exchanged in the Merger.

39.    On July 1, 2021, the Merger closed. Until then, Boston Private shareholders could sell their shares on the open market if they did not want to receive SVB stock in the Merger. On that date, Boston Private shareholders received 0.0228 shares of SVB common stock and $2.10 of cash for each Boston Private share they owned. The final closing price of Boston Private stock was $14.75.

**The Offering Materials' False and Misleading Statements and Omissions Regarding Interest Rate and Deposit Risk**

40.    The Offering Materials contained untrue statements of material fact and omitted material facts that were both required by governing regulations and necessary to make the statements made not misleading.

41.    The Offering Materials failed to disclose that SVB faced significant interest rate risk, including on both the asset and liability sides of its balance sheet from investing predominantly in long-term, fixed-rate, government-backed debt securities. On the asset side of SVB's balance sheet, higher interest rates risked decreasing the value of SVB's long-term debt securities. On the liability side of SVB's balance sheets, higher interest rates risked less capital allocated to technology companies, thereby decreasing the supply of cheap deposit funding.

42.    The Offering Materials failed to disclose that SVB's deposits and long-term debt security assets were subject to interest rate risk, such that if interest rates substantially rose, SVB could be expected to need liquidity to repay depositors while simultaneously being unable to acquire liquidity except by selling its long-term debt security assets at large losses. As detailed below, *see* ¶¶ 137-52, this relationship between the interest rate risk in SVB's deposits and its assets—which was an existing material risk by early 2021—materialized in March 2023 and precipitated the bank run that caused SVB's collapse.

43.    The Risk Factors section of SVB's 2020 10-K, incorporated by reference into the Offering Materials, failed to disclose the serious interest rate risk that SVB faced.

- 10 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

44.    The Risk Factors section stated the following:

**Our interest rate spread has declined, and may continue to decline in the future. Any material reduction in our interest rate spread could have a material adverse effect on our business, results of operations or financial condition.[2]**

A significant portion of our net income comes from our interest rate spread, which is the difference between the interest rates paid by us on interest-bearing liabilities, such as deposits and internal borrowings, and the interest rates and fees we receive on our interest-earning assets, such as loans extended to our clients, securities held in our investment portfolio and excess cash held to manage short-term liquidity. Our interest rate spread can be affected by the mix of loans, investment securities, deposits and other liabilities on our balance sheet, as well as a variety of external factors beyond our control that affect interest rate levels, such as competition, inflation, recession, global economic disruptions, unemployment and the fiscal and monetary policies of various governmental bodies. For example, changes in key variable market interest rates, such as the Federal Funds, National Prime ("Prime"), LIBOR or Treasury rates, generally impact our interest rate spread. While changes in interest rates do not generally produce equivalent changes in the revenues earned from our interest-earning assets and the expenses associated with our interest-bearing liabilities, increases in market interest rates are nevertheless *likely to cause our interest rate spread to increase. Conversely, if interest rates decline, our interest rate spread will likely decline. In the first quarter of 2020, the Federal Reserve lowered the target Federal Funds rate to between zero and 0.25%, which contributed to the decline of our interest rate spread, and also led to a decrease in the rates and yields on U.S. Treasury securities. If interest rates do not rise, or if the Federal Reserve lowers the target Federal Funds rate to below 0%, these low rates could continue to constrain our interest rate spread and may adversely affect our business forecasts*. On the other hand, increases in interest rates may result in a change in the mix of non-interest and interest-bearing accounts, and the level of off-balance sheet market-based investment preferred by our clients, which may also impact our interest rate spread.

(emphasis added).

45.    This paragraph incorporated into the Offering Materials was materially misleading because, among other matters, it portrays an increase in interest rates as "likely to cause [SVB's] interest rate spread to increase," which would increase the Company's net income from the spread. In other words, SVB could charge more for its loans and buy higher yielding securities. In reality, an increase in interest rates would sharply reduce the value of SVB's long-term debt security assets.

---

[2] Bolding in original.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

46.     SVB's omissions regarding its interest rate risk also rendered the Offering Materials false and misleading. Specifically, the Offering Materials failed to disclose the substantial risk that higher interest rates posed to SVB, including that higher interest rates would lower the market value of SVB's long-term debt securities, resulting in material unrealized losses from their declining market value or realized losses if they had to be liquidated. Instead of informing investors of this risk, the Offering Materials presented future rate increases as something that would benefit SVB.

47.     In late 2020, as deposits increased at SVB, Company executives rejected an internal recommendation to purchase shorter-term bonds to reduce the risk of material losses from interest rate increases. As Bloomberg reported on March 13, 2023:

> In late 2020, the firm's asset-liability committee received an internal recommendation to buy shorter-term bonds as more deposits flowed in, according to documents viewed by Bloomberg. That shift would reduce the risk of sizable losses if interest rates quickly rose. But it would have a cost: an estimated $18 million reduction in earnings, with a $36 million hit going forward from there.

> Executives balked. Instead, the company continued to plow cash into higher-yielding assets. That helped profit jump 52% to a record in 2021 and helped the firm's valuation soar past $40 billion. But as rates soared in 2022, the firm racked up more than $16 billion of unrealized losses on its bond holdings.

> Throughout last year, some employees pleaded to reposition the company's balance sheet into shorter duration bonds. The asks were repeatedly rejected, according to a person familiar with the conversations. The firm did start to put on some hedges and sell assets late last year, but the moves proved too late.[3]

48.     Nor did the Offering Materials disclose that, to inflate short-term profits, the Company ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that (correctly) showed that higher interest rates could devastate SVB's future earnings. As reported by *The Washington Post* in an article titled, "*Silicon Valley Bank's risk model flashed red. So its executives changed it*":

> Flush with cash from a booming tech industry, **Silicon Valley Bank executives embarked on a strategy in 2020 to juice profits that quickly triggered an internal alarm. In buying longer-term investments that paid more interest, SVB had fallen out of compliance with a key risk metric. An internal model showed that higher**

---

[3]     https://www.bloomberg.com/news/articles/2023-03-13/svb-failure-sparks-blame-game-over-trump-era-regulatory-rollback#xj4y7vzkg

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

*interest rates could have a devastating impact on the bank's future earnings, according to two former employees familiar with the modeling who spoke on the condition of anonymity to describe confidential deliberations.*

*Instead of heeding that warning — and over the concerns of some staffers — SVB executives simply changed the model's assumptions, according to the former employees and securities filings.* The tweaks, which have not been previously reported, initially predicted that rising interest rates would have minimal impact.

The new assumptions validated SVB's profit-driven strategy, but they were profoundly misplaced. Over the past year, interest rates have climbed nearly five percentage points, the fastest pace since the 1980s. Meanwhile, the tech industry has entered a post-pandemic swoon, causing SVB's elite clientele to withdraw cash far faster than bank executives had expected.

On March 8, the bank was forced to raise additional cash by selling securities at a $1.8 billion loss. That touched off panic among SVB clients, who staged one of the biggest bank runs in U.S. history. Fanned by social media, depositors tried to withdraw $42 billion in a single day. The next morning, the bank collapsed and federal regulators took control.

*The episode shows that executives knew early on that higher interest rates could jeopardize the bank's future earnings. Instead of shifting course to mitigate that risk, they doubled down on a strategy to deliver near-term profits, displaying an appetite for risk that set the stage for SVB's stunning meltdown.*

\*     \*     \*

"They thought they could never go wrong," said a former bank official who spoke on the condition of anonymity to discuss internal business practices, recalling an internal stress test in late 2018 or 2019 that showed SVB could lose at least a third of its deposits over two years. Executives directed that that model also be reworked. "If they see a model they don't like," the official said, "they scrap it."

Kate Mitchell, a venture capitalist and chair of the SVB board's risk committee, didn't respond to a request for comment.

The behavior of customers depositing money is a key variable that banks use in developing risk models. One metric, closely tracked by banks and their examiners, estimates future cash flows and how sensitive they are to changes in interest rates. It was this metric, called the economic value of equity, that triggered a warning in mid-2020, according to the former employees.[4]

49.     The Offering Documents failed to disclose the risks from SVB's comparatively narrow and impulsive base of clients which rendered SVB's deposit base particularly at risk. As

---

[4] https://www.washingtonpost.com/business/2023/04/02/svb-collapse-risk-model/

- 13 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Bloomberg reported on April 1, 2023: "There's all these venture-capital funded companies that have $5, $10, $20, $25, sometimes hundreds of millions of dollars parked with this little bank," he said. "And you can move money with the click of a mouse now. And then they're all talking to one another. So in retrospect, it's like yeah, should have seen that one coming more easily."[5]

50.    The Offering Materials failed to disclose that the deposit risk the Company faced because it lacked a diversified customer base was amplified by the large percentage of uninsured deposits at SVB.[6]

51.    Because depositors with uninsured deposits are exposed to the danger that they will lose everything if a bank fails, they are much more likely to withdraw their money, triggering a self-fulfilling cycle in which customers withdraw cash, forcing the bank into a fire sale of assets that further drives down their value.  The Offering Materials did not disclose the uninsured depositor risk that SVB faced.

52.    Further, there are several additional false and misleading disclosures in the Offering Materials, as set forth below.

53.    The Risk Factors section of SVB's 2020 10-K stated:

**Liquidity risk could impair our ability to fund operations and jeopardize our financial condition.[7]**

Liquidity is essential to our business, both at the SVB Financial and the Bank level. We require sufficient liquidity to meet our expected financial obligations, as well as unexpected requirements stemming from client activity and market changes, such as the unexpected cash outflows that occurred at the onset of the COVID-19 pandemic when certain clients increased utilization of their credit lines. . . . . *The primary source of liquidity for the Bank is client deposits*. When needed, our liquidity is supplemented by wholesale borrowing capacity in the form of short- and long-term borrowings secured by our portfolio of high-quality investment securities, long-term capital market debt issuances and unsecured overnight funding channels available to us in the Federal Funds market. An inability to maintain or raise funds through these

---

[5]    https://www.bloomberg.com/news/articles/2023-04-01/svb-s-fall-stunned-even-the-one-stock-analyst-who-said-to-sell

[6] While the Federal Deposit Insurance Corporation ("FDIC") insures bank deposits up to $250,000, the great majority of deposits in SVB (by value) were above $250,000.

[7] Bolding in original.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

sources could have a substantial negative effect, individually or collectively, on SVB Financial and the Bank's liquidity. Our access to funding sources in amounts adequate to finance our activities, or on terms attractive to us, could be impaired by factors that affect us specifically or the financial services industry in general. For example, *factors that could detrimentally impact our access to liquidity sources include a decrease in the level of our business activity due to a market downturn or adverse regulatory action against us, a downturn in asset markets such that the collateral we hold cannot be realized or is liquidated at prices not sufficient to recover the full amount of our secured obligations, a reduction in our credit rating, any damage to our reputation or any other decrease in depositor or investor confidence in our creditworthiness and business. Our access to liquidity could also be impaired by factors that are not specific to us, such as laws and regulations that limit the amount of intercompany dividends that bank subsidiaries may pay, severe volatility or disruption of the financial markets or negative views and expectations about prospects for the financial services industry as a whole.* Any such event or failure to manage our liquidity effectively could affect our competitive position, increase our borrowing costs and the interest rates we pay on deposits, limit our access to the capital markets and have a material adverse effect on our financial condition.

(emphasis added).

54.    The MD&A section of SVB's 2020 10-K, incorporated by reference into the Offering Materials, stated:

Net gains on investment securities include gains and losses from our non-marketable and other equity securities, which include public equity securities held as a result of exercised equity warrant assets, as well as gains and losses from sales of our AFS debt securities portfolio, when applicable.

Our non-marketable and other equity securities portfolio primarily represents investments in venture capital and private equity funds, including a joint venture bank in China, debt funds, the newly acquired managed credit platform, private and public portfolio companies and qualified affordable housing projects. We experience variability in the performance of our non-marketable and other equity securities from period to period, which results in net gains or losses on investment securities (both realized and unrealized). This variability is due to a number of factors, including unrealized changes in the values of our investments, changes in the amount of realized gains and losses from distributions, changes in liquidity events and general economic and market conditions. Unrealized gains or losses from non-marketable and other equity securities for any single period are typically driven by valuation changes, and are therefore subject to potential increases or decreases in future periods. Such variability may lead to volatility in the gains or losses from investment securities. As such, our results for a particular period are not necessarily indicative of our expected performance in a future period.

The extent to which any unrealized gains or losses will become realized is subject to a variety of factors, including, among other things, the expiration of certain sales

---

- 15 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

restrictions to which these equity securities may be subject to (e.g. lock-up agreements), changes in prevailing market prices, market conditions, the actual sales or distributions of securities and the timing of such actual sales or distributions, which, to the extent such securities are managed by our managed funds, are subject to our funds' separate discretionary sales/distributions and governance processes.

Our AFS securities portfolio is a fixed income investment portfolio that is managed with the objective of earning an appropriate portfolio yield over the long-term while maintaining sufficient liquidity and credit diversification as well as addressing our asset/liability management objectives. ***Though infrequent, sales of debt securities in our AFS securities portfolio may result in net gains or losses and are conducted pursuant to the guidelines of our investment policy related to the management of our liquidity position and interest rate risk.***

(emphasis added).

55.    With respect to interest rate derivatives and swaps, the MD&A section of SVB's 2020 10-K, incorporated by reference into the Offering Materials, also stated:

*Client Interest Rate Derivatives*

We sell interest rate contracts to clients who wish to mitigate their interest rate exposure. ***We economically reduce the interest rate risk from this business by entering into opposite way contracts with correspondent banks.*** . . .

*Interest Rate Swaps*

***To manage interest rate risk on our variable-interest rate loan portfolio, we enter into interest rate swap contracts to hedge against future changes in interest rates*** by using hedging instruments to lock in future cash inflows that would otherwise be impacted by movements in the market interest rates.

(emphasis added; italics in original).

56.    With respect to interest rate risk management, SVB's 2020 10-K, incorporated by reference into the Offering Materials, stated:

**Interest Rate Risk Management[8]**

Market risk is defined as the risk of adverse fluctuations in the market value of financial instruments due to changes in market interest rates. ***Interest rate risk is our primary market risk and can result from timing and volume differences in the repricing of our rate-sensitive assets and liabilities, widening or tightening of credit spreads, changes in the general level of market interest rates and changes in the***

---

[8] Bolding in original.

- 16 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

*shape and level of the benchmark interest rates. **Additionally, changes in interest rates can influence the rate of principal prepayments on mortgage securities, which affects the rate of amortization of purchase premiums and discounts***. Other market risks include foreign currency exchange risk and equity price risk (including the effect of competition on product pricing). These risks and related impacts are important market considerations but are inherently difficult to assess through simulation results. Consequently, simulations used to analyze the sensitivity of net interest income to changes in interest rates will differ from actual results due to differences in the timing and frequency of rate resets, the magnitude of changes in market rates, the impact of competition, fluctuating business conditions and the impact of strategies taken by management to mitigate these risks.

. . .

***Interest rate risk is managed primarily through strategies involving our fixed income securities portfolio, available funding channels and capital market activities. In addition, our policies permit the use of off-balance sheet derivatives, such as interest rate swaps, to assist with managing interest rate risk***.

(emphasis added).

57.    SVB's 2020 10-K, incorporated by reference into the Offering Materials, also represented that the Company had implemented a risk management system to identify and manage risks including market and liquidity risk and that "if" the risk management framework is not effective, the Company "could" suffer losses:

**An ineffective risk management framework could have a material adverse effect on our strategic planning and our ability to mitigate risks and/or losses and could have adverse regulatory consequences.**

We have implemented a risk management framework to identify and manage our risk exposure. This framework is comprised of various processes, systems and strategies, and is designed to manage the types of risk to which we are subject, including, among others, credit, market, liquidity, operational, capital, compliance, strategic and reputational risks. Our framework also includes financial, analytical, forecasting or other modeling methodologies, which involve management assumptions and judgment. In addition, our Board of Directors, in consultation with management, has adopted a risk appetite statement, which sets forth certain thresholds and limits to govern our overall risk profile. However, there is no assurance that our risk management framework, including the risk metrics under our risk appetite statement, will be effective under all circumstances or that it will adequately identify, manage or mitigate any risk or loss to us. If our risk management framework is not effective, we could suffer unexpected losses and become subject to regulatory consequences, as a result of which our business, financial condition, results of operations or prospects could be materially adversely affected.

(emphasis in original).

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

58.    SVB's 2020 10-K, incorporated by reference into the Offering Materials, also represented that SVB maintained effective controls, and that "if" such controls became ineffective, it "may" harm the Company and "could" adversely effect SVB's business, financial condition or results of operation:

> **If we fail to maintain an effective system of internal control over financial reporting, we may not be able to accurately report our financial results. As a result, current and potential holders of our securities could lose confidence in our financial reporting, which would harm our business and the trading price of our securities.**
>
> Maintaining and adapting our internal controls over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act and related rules and regulations of the SEC, can be costly and require significant management attention. As we continue to grow or acquire additional businesses, our internal controls may become more complex and require additional resources to ensure they remain effective amidst dynamic regulatory and other guidance. Failure to maintain effective controls or implement required new or improved controls or difficulties encountered in the process may harm our operating results or cause us to fail to meet our reporting obligations. If we or our independent registered accounting firm identify material weaknesses in our internal controls over financial reporting or if we are otherwise required to restate our financial statements, we could be required to implement costly and time-consuming remedial measures and could lose investor confidence in the accuracy and completeness of our financial reports. We may also face regulatory enforcement or other actions, including the potential delisting of our common stock from the NASDAQ Stock Market. This could have an adverse effect on our business, financial condition or results of operations, as well as the trading price of our securities, and could potentially subject us to litigation.

(emphasis in original).

59.    SVB's 2020 10-K, incorporated by reference into the Offering Materials, also stated that SVB used quantitative models to manage risk, including estimating the effects of changing interest rates, and that the Company "could" face material adverse effects "if" the assumptions in the model are inappropriate or if the models are deficient:

> **We rely on quantitative models to measure risks and to estimate certain financial values.**
>
> Quantitative models may be used to help manage certain aspects of our business and to assist with certain business decisions, including estimating credit losses, measuring the fair value of financial instruments when reliable market prices are unavailable, estimating the effects of changing interest rates and other market measures on our financial condition and results of operations, and managing risk. However, all models have certain limitations. For example, our measurement methodologies rely on many

- 18 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

assumptions, historical analyses and correlations. These assumptions may not capture or fully incorporate conditions leading to losses, particularly in times of market distress, and the historical correlations on which we rely may no longer be relevant. Additionally, as businesses and markets evolve, our measurements may not accurately reflect the changing environment. Further, even if the underlying assumptions and historical correlations used in our models are adequate, our models may be deficient due to errors in computer code, bad data, misuse of data, or the use of a model for a purpose outside the scope of the model's design. Although we employ strategies to manage and govern the risks associated with our use of models, they may not be effective or fully reliable. As a result, our models may not capture or fully express the risks we face, suggest that we have sufficient capitalization when we do not, lead us to misjudge the business and economic environment in which we operate and ultimately cause planning failures or the reporting of incorrect information to our regulators. Any such occurrence or the perception of such occurrence by our regulators, investors or clients could in turn have a material adverse effect on our business, financial condition, results of operations or reputation.

(emphasis in original).

60.    Each of the statements excerpted in paragraphs 44, 53-59, above, were false and misleading for numerous reasons. The Offering Materials failed to disclose that higher interest rates jeopardized the bank's future earnings but that instead of mitigating such risks, the bank doubled down on a strategy of investing in long-term investments to deliver short-term profits. Moreover, the Offering Materials failed to disclose that despite internal recommendations at the bank to purchase shorter-term bonds as it took in more deposits, to offset the material risk of losses from rising interest rates, SVB's executives focused on short-term profits and disregarded duration risks despite pleas from employees to hedge SVB's balance sheet with shorter duration bonds. Additionally, the Offering Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that showed that higher interest rates could devastate SVB's future earnings, using unreasonable and improper tweaks to the model to validate SVB's profit-driven strategy. The Offering Materials also failed to disclose that SVB lacked effective internal controls, had poor risk management, its holding Company was rated as deficient under the CAMELS rating system, regulators had warned SVB that its risk management systems were inadequate and below the Federal Reserve's expectations, and SVB was riddled with many serious operational and technological problems that impeded Defendants' ability to track risks, including interest rate risks, among other matters. Further still, the Offering Materials failed to

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

disclose that SVB lacked a diversified customer base and that a large percentage of the deposits of that non-diversified customer base were uninsured and therefore much more likely to trigger a run on the bank. Indeed, SVB failed to disclose that its startup clients' deposits—the primary source of the Company's liquidity—were particularly sensitive to interest rates: higher interest rates result in lower overall investment in startups and therefore lower deposits in Silicon Valley Bank. Accordingly, the Offering Materials failed to disclose the extent and severity of the undisclosed material market risks, including the interest rate risk, uninsured depositor risk and liquidity risk that SVB faced.

61.    SVB's 2020 10-K, incorporated by reference into the Offering Materials, also discussed a model for the effect of interest rate changes of 1 and 2 percentage points (100 and 200 basis points). In pertinent part, SVB's 2020 10-K stated:

> **Rapid deposit growth has exceeded the pace of our loan growth**, and as a result, a significant amount of excess deposits not used to fund loan growth have contributed to the growth of our cash and investments balances. Much of the investment portfolio is held in fixed rate MBS and CMOs which generally have a higher market value sensitivity than variable rate loans or cash. Thus, **under an upward rate shock scenario, the market value of investments changes more than the market value of deposits resulting in a negative EVE [economic value of equity, defined as the market value of assets, less the market value of liabilities] sensitivity in those scenarios**.

(emphasis added).

62.    These generalized statements were false and misleading for several reasons. First, SVB's deposit growth had not merely exceeded the pace of its loan growth. The Company's loans, which paid higher interest rates and were more profitable than its long-term debt security assets, were highly dependent on the performance of the technology market in Silicon Valley, which had been performing as well as it ever had in 2020, and hence it was unlikely that SVB would be able to substantially increase its loan portfolio without changing its lending model.

63.    For example, more than half of SVB's loans were capital call loans, which are short-term loans to bridge the time between a call for capital from an investment firm's partners to pay for an investment and the actual receipt of the funds. Demand for capital call loans from SVB depended on the frequency of capital calls among venture capital firms investing in technology companies.

- 20 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

That frequency was very high by historical standards in 2020 and was unlikely to continue at the same level indefinitely, much less increase.

64.    The Offering Materials failed to disclose that SVB could not substantially grow its loan business from its size in 2020.

65.    Second, an upward rate shock would not simply result in a negative economic value of equity, as SVB suggested. It would also decrease liquidity. Hence, just as SVB's assets were decreasing in value, SVB would also need to sell assets to raise cash, resulting in heavy losses.

66.    Third, the effect of an upward rate shock was nonlinear. SVB's simulation—which only tested up to 2 percentage points—showed that an increase of 1 percentage point in interest rates would result in a 5.9% decrease in economic value of equity, and a 2 percentage point increase would result in a 15.4% decrease in economic value of equity. But SVB did not disclose that as interest rates continued to increase (a highly probable outcome), they would exert an exponential effect on SVB's economic value of equity, resulting in total collapse of the Company at around 4-5 percentage points.

**The Offering Materials' False and Misleading Statements and Omissions Regarding Compliance with Generally Accepted Accounting Principles**

67.    Despite the Offering Materials' representations to the contrary, SVB violated Generally Accepted Accounting Principles ("GAAP").

**GAAP Overview**

68.    SEC Regulation S-X, 17 C.F.R. § 210.4 01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

69.    GAAP constitutes those standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB") and the American Institute of Certified Public Accountants ("AICPA"). SEC Regulation S-X, Rule 4-01, 17

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

70.    GAAP consists of a hierarchy of authoritative literature. The highest authority is the Accounting Standards Codification, or ASC, formerly the FASB Statements of Financial Accounting Standards ("FAS"), followed by FASB Interpretations ("FIN"), FASB Staff Positions ("FSP"), Accounting Principles Board Opinions ("APB"), AICPA Accounting Research Bulletins ("ARB"), AICPA Statements of Position ("SOP"), and AICPA Industry Audit and Accounting Guides ("AAG"). GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements ("FASCON").

71.    As set forth in ASC 105-10-05-1, the Financial Accounting Standards Board (FASB) Accounting Standards Codification is the source of authoritative GAAP:

> This Topic establishes the Financial Accounting Standards Board (FASB) Accounting Standards Codification® (Codification) as the source of authoritative generally accepted accounting principles (GAAP) recognized by the FASB to be applied by nongovernmental entities. Rules and interpretive releases of the Securities and Exchange Commission (SEC) under authority of federal securities laws are also sources of authoritative GAAP for SEC registrants. In addition to the SEC's rules and interpretive releases, the SEC staff issues Staff Accounting Bulletins that represent practices followed by the staff in administering SEC disclosure requirements, and it utilizes SEC Staff Announcements and Observer comments made at Emerging Issues Task Force meetings to publicly announce its views on certain accounting issues for SEC registrants.

72.    Additionally, under ASC 105-10-05-3, the following non-authoritative sources of accounting guidance may be relevant depending on circumstances, including the specificity of the guidance, the general recognition of the issuer or author as an authority, and the extent of its use in practice:

> Accounting and financial reporting practices not included in the Codification are nonauthoritative. Sources of nonauthoritative accounting guidance and literature include, for example, the following:
>
> a. Practices that are widely recognized and prevalent either generally or in the industry
> b. FASB Concepts Statements (FASCON)
> c. American Institute of Certified Public Accountants (AICPA) Issues Papers
> d. International Financial Reporting Standards of the International Accounting Standards Board

- 22 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

    e.  Pronouncements of professional associations or regulatory agencies

    f.  Technical Information Service Inquiries and Replies included in AICPA Technical Practice Aids

    g.  Accounting textbooks, handbooks, and articles.

The appropriateness of other sources of accounting guidance depends on its relevance to particular circumstances, the specificity of the guidance, the general recognition of the issuer or author as an authority, and the extent of its use in practice.

73.    SVB was also expected to adhere to fundamental accounting principles that state a Company's financial statements should be presented in a manner which, among other things, should:

(a) Provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. (FASCON 1 ¶ 34);

(b) Provide information about an enterprise's economic resources, obligations, and owners' equity. That information helps investors, creditors, and others identify the enterprise's financial strengths and weaknesses and assess its liquidity and solvency. (FASCON 1 ¶ 40);

(c) Provide information about an enterprise's financial performance during a period. "Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance." (FASCON 1 ¶ 42);

(d) Include explanations and interpretations to help users understand financial information because management knows more about the enterprise and its affairs than investors, creditors, or other "outsiders" and can often increase the usefulness of financial information by identifying certain transactions, other events, and circumstances that affect the enterprise and explaining their financial impact on it. (FASCON 1 ¶ 54);

(e) Be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting. (FASCON 2 ¶¶ 58-59);

(f) Be complete, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. (FASCON 2 ¶ 79);

(g) Be verifiable in that it provides a significant degree of assurance that accounting measures represent what they purport to represent. (FASCON 2 ¶ 81); and

(h) Reflect that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASCON 2 ¶¶ 95, 97).

- 23 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

74.    SVB was subject to risks associated with depository and lending institutions. One such risk factor identified by the AICPA in the applicable AAG was "significant declines in customer demand and increasing business failures in either the industry or overall economy," including "deteriorating economic conditions . . . within industries or geographic regions in which the institution has significant credit concentrations." (Ch. 5, Audit Considerations and Certain Financial Reporting Matters, Ex. 5-1, Fraud Risk Factors).

75.    The AAG identifies another risk factor for lenders as occurring when "[v]acant staff positions remain unfulfilled for extended periods, thereby preventing the proper segregation of duties," and when there exists an "[u]nderstaffed accounting or information technology department, inexperienced or ineffective accounting or information technology personnel, or high turnover."

76.    Among the risk factors the AICPA identifies are "concentration in a particular type of financial instrument" and "a failure by management and those charged with governance to set parameters (for example, trading limits, credit limits, and aggregate market risk limits) and to continuously monitor trading activities against those parameters."

77.    ASC 450 (formerly Statement of Financial Accounting Standards No. 5, Accounting for Contingencies) defines a loss contingency as "an existing condition, situation, or set of circumstances involving uncertainty as to [a] possible . . . loss to an enterprise that will ***ultimately be resolved when one or more future events occur or fail to occur***." Under ASC 450, a charge to income should be taken if "(1) Information (before financial statements are issued) indicates that it is probable that an asset has been impaired or a liability incurred at the date of the financial statement; and (2) Amount of loss is reasonably estimable. Further, ASC 450 requires disclosure in the footnotes to the financial statements for material loss contingencies and/or significant risks and uncertainties. The occurrence, or non-occurrence, of a future event meets the definition of a loss contingency under GAAP. Under ASC 450, disclosing a loss contingency in the notes to the financial statements is ***required*** when there is more than a remote chance that a loss will be incurred (even in the event that a reliable estimate of eventual losses cannot be made at the time). The threshold for disclosure of a loss contingency (as opposed to a higher threshold for the ***accrual*** of a loss contingency) is very low – GAAP requires disclosure if, "***[t]he chance of the future event or events***

- 24 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

*occurring is more than remote but less than likely*." Under ASC 450: "***The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made***." Defendants failed to account or disclose the loss contingencies SVB faced, including from material market risks, including interest rate risk, uninsured depositor risk and liquidity risks.

78.    Contrary to Defendants' representations in the Offering Materials, SVB's incorporated financial statements and other disclosures were not in compliance with GAAP. In numerous respects, SVB had violated GAAP, including the standards detailed above, including by failing to properly account for the following matters. The Offering Materials failed to disclose that higher interest rates jeopardized the bank's future earnings but that instead of mitigating such risks, the bank doubled down on a strategy of investing in long-term investments to deliver short-term profits. Moreover, the Offering Materials failed to disclose that despite internal recommendations at the bank to purchase shorter-term bonds as it took in more deposits, to offset the material risk of losses from rising interest rates, SVB's executives focused on short-term profits and disregarded duration risks despite pleas from employees to hedge SVB's balance sheet with shorter duration bonds. Additionally, the Offering Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that showed that higher interest rates could devastate SVB's future earnings, using unreasonable and improper tweaks to the model to validate SVB's profit-driven strategy. Further, the Offering Materials failed to provide requisite quantitative disclosures to reflect reasonably possible near-term changes to interest rates, thereby misrepresenting and failing to disclose the critical change in the Company's market risk exposure, including interest rate risk, as well as how it would manage such risk. The Offering Materials also failed to disclose that SVB lacked effective internal controls, had poor risk management, its holding Company was rated as deficient under the CAMELS rating system, regulators had warned SVB that its risk management systems were inadequate and below the Federal Reserve's expectations, and SVB was riddled with many serious operational and technological problems that impeded Defendants' ability to track risks, including interest rate risks, among other matters. Further still, the Offering Materials failed to disclose that SVB lacked a

- 25 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

diversified customer base and that a large percentage of the deposits of that non-diversified customer base were uninsured and therefore much more likely to trigger a run on the bank. Indeed, SVB failed to disclose that its startup clients' deposits—the primary source of the Company's liquidity—were particularly sensitive to interest rates: higher interest rates result in lower overall investment in startups and therefore lower deposits in Silicon Valley Bank. Accordingly, the Offering Materials failed to disclose the extent and severity of the undisclosed material market risks, including interest rate risk, uninsured depositor risk and liquidity risks that SVB faced.

**The Offering Materials Falsely Represented that SVB's Internal Controls Over Financial Reporting Were Effective Despite Pervasive Operational and Technological Issues, Including Critical Problems Tracking Interest Rate Risk**

79.    SVB falsely asserted in its Offering Documents that it maintained effective internal controls over financial reporting. In fact, SVB lacked effective internal controls and the absence of such controls facilitated SVB misrepresenting, among other matters, that:

(a)    It was exposed to significantly less risk, including market risk such as interest rate risk, liquidity risk, and uninsured depositor risk, than was inherent in the assets it held;

(b)    Its risk management personnel and procedures were effective and reliable, when they were not;

(c)    It was able to make reasonable estimates of the fair value of its financial instruments; and

(d)    The fair value of the Company's financial instruments and other assets was reasonable.

80.    The Committee of Sponsoring Organizations ("COSO") defines "internal controls" in Chapter 1 of its Framework as follows:

Internal control is a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (i) Effectiveness and efficiency of operations; (ii) Reliability of financial reporting; (iii) Compliance with applicable laws and regulations.

81.    Moreover, COSO emphasizes the importance of a strong control environment, which sets a positive "tone at the top" and then flows down through the Company. The COSO Framework

- 26 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Executive Summary identifies the pervasive influence that the control environment has on the Company, as follows:

> The control environment sets the tone of an organization, influencing the control consciousness of its people. It is the foundation for all other components of internal control, providing discipline and structure. Control environment factors include the integrity, ethical values and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors.

82.    In addition, the COSO Framework, Ch. 2, establishes that management's philosophy and operating style directly affects the manner in which the company is managed, the amount of risk that the company accepts and ultimately the success of the company. Chapter 2 of the COSO Framework states:

> Management's philosophy and operating style affect the way the enterprise is managed, including the kinds of business risks accepted…Other elements of management's philosophy and operating style include attitudes toward financial reporting, conservative or aggressive selection from available alternative accounting principles, conscientiousness and conservatism with which accounting estimates are developed, and attitudes toward data processing and accounting functions and personnel. . . . The impact of an ineffective control environment could be far reaching, possibly resulting in a financial loss, a tarnished public image or a business failure.

83.    Section 404 of the Sarbanes-Oxley Act of 2002 ("the Sarbanes-Oxley Act") requires management to assess the effectiveness of the internal control structure and the financial reporting for procedures. Management is responsible for performing this assessment in the context of a top-down risk assessment, which requires management to base both the scope of its assessment and the evidence gathered on risk. Management's conclusion of its assessment of the effectiveness of the Company's internal control must be included in the Company's annual report. Moreover, it was crucial for SVB to regularly monitor those controls to verify their operating effectiveness.

84.    Further, SEC rules require management to report publicly all material weaknesses in the Company's internal controls.

85.    Defendants Becker and Beck were required under Rule 302 of the Sarbanes-Oxley Act to provide assurances relating to the Company's "internal control over financial reporting." Rule 302 states as follows:

- 27 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

[E]ach annual report . . . [should] contain an internal control report, which shall: (1) state the responsibility of management for establishing and maintaining an adequate internal control structure and procedures for financial reporting; and (2) contain an assessment, as of the end of the most recent fiscal year of the issuer, of the effectiveness of the internal control structure and procedures of the issuer for financial reporting.

86.    In connection with the Offering Materials, Defendants Becker and Beck executed the applicable Rule 302 certification on March 1, 2021.

87.    As explained above and in the Company's regulatory filings, in doing so Defendants Becker and Beck represented to the marketplace that their assessment of internal controls over financial reporting was reliable and based upon the framework established by COSO. Also, Defendants Becker and Beck stated in the Company's Form 10-K filings that "management concluded that the Company's internal control over financial reporting was effective as of" the year ended 2020. These statements were false because: SVB lacked effective internal controls, including over market rate risk, interest rate risk, uninsured deposit liability risk and liquidity risk; engaged in poor risk management; its holding Company was rated as deficient under the CAMELS rating system; federal regulators had warned SVB that its risk management systems were inadequate and below the Federal Reserve's expectations; SVB was riddled with many serious operational and technological problems, impairing Defendants' ability to track risks, including interest rate risks, among other matters; and Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered new assumptions to internal models that showed that higher interest rates could devastate SVB's future earnings, to facilitate SVB's profit-driven strategy. Thus, because SVB's internal controls were ineffective, management's reports on internal control over financial reporting, required by Rule 302 of the Sarbanes-Oxley Act, were materially false and misleading. Defendants Becker's and Beck's statements were false and misleading because SVB's internal controls were significantly deficient and ineffective to prevent or detect errors or misstatements in its operations and financial reporting.

88.    Management's assessment of internal control over financial reporting was a significant matter for investors because it provided assurance that the Company's financial statements were reliable and in compliance with applicable laws. However, SVB did not properly

- 28 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

assess its internal controls over financial reporting; it consequently violated the "Internal Control-Integrated Framework" issued by COSO and various other requirements found in the SEC regulations and Sarbanes-Oxley Act.

89.    The Offering Materials failed to disclose that in January 2019, regulators warned SVB that its risk management systems were inadequate, and also warned SVB in 2020 that its risk management systems were below the Federal Reserve's expectations. As reported by *The Wall Street Journal* on March 19, 2023:

> The Federal Reserve raised concerns about risk management at Silicon Valley Bank starting at least four years before its failure earlier this month, documents show.
>
> In January 2019, the Fed issued a warning to SVB over its risk-management systems, according to a presentation circulated last year to employees of SVB's venture-capital arm, which was viewed by The Wall Street Journal.
>
> The Fed issued what it calls a Matter Requiring Attention, a type of citation that is less severe than an enforcement action. Regulators are supposed to make sure the problem is addressed, but it couldn't be learned if the Fed held SVB to that standard in 2019.
>
> *        *        *
>
> Following the 2019 warning, the Fed informed SVB in 2020 that its system to control risk didn't meet the expectations for a large financial institution, or a bank holding company with more than $100 billion in assets, the presentation to employees at SVB's venture-capital arm said.
>
> Large banks that don't meet the Fed's expectations are supposed to take corrective action to fix the problems or potentially face enforcement actions.
>
> At that time, the bank was growing quickly as deposits poured in during the early months of the pandemic. The average level of interest-earning assets grew 76% in the first quarter of 2021, compared with the same period one year earlier, the presentation said.
>
> The bank's assets rose to $114 billon at the end of 2020, from about $70 billion in 2019, the year the Fed voiced its concerns. They nearly doubled from 2020 to the end of 2021 to about $209 billion, according to Federal Deposit Insurance Corp. data.
>
> The Fed's criticism of SVB's risk-management systems raises the question of "why were they allowed to double their size after that," said Keith Noreika, an executive

- 29 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

vice president at Patomak Global Partners who served as acting Comptroller of the Currency in 2017.[9]

90.    The Offering Materials failed to disclose that SVB lacked effective internal controls to reduce the risk of material losses from quickly rising interest rates:

> In late 2020, the firm's asset-liability committee received an internal recommendation to buy shorter-term bonds as more deposits flowed in, according to documents viewed by Bloomberg. That shift would reduce the risk of sizable losses if interest rates quickly rose. But it would have a cost: an estimated $18 million reduction in earnings, with a $36 million hit going forward from there.

> Executives balked. Instead, the company continued to plow cash into higher-yielding assets. That helped profit jump 52% to a record in 2021 and helped the firm's valuation soar past $40 billion. But as rates soared in 2022, the firm racked up more than $16 billion of unrealized losses on its bond holdings.

> Throughout last year, some employees pleaded to reposition the company's balance sheet into shorter duration bonds. The asks were repeatedly rejected, according to a person familiar with the conversations. The firm did start to put on some hedges and sell assets late last year, but the moves proved too late.[10]

91.    The Offering Materials also failed to disclose that SVB had many serious operational and technological problems and weaknesses which examiners appointed by the Federal Reserve Bank of San Francisco identified, and that triggered formal warnings to SVB's executives. As reported by Bloomberg on March 17, 2023:

> Just over a year before Silicon Valley Bank's collapse threatened a generation of technology startups and their backers, the Federal Reserve Bank of San Francisco appointed a more senior team of examiners to assess the firm. They started calling out problem after problem.

> As the upgraded crew took over, it fired off a series of formal warnings to the bank's leaders, pressing them to fix serious weaknesses in operations and technology, according to people with knowledge of the matter.

---

[9] https://www.wsj.com/articles/fed-raised-concerns-about-svbs-risk-management-in-2019-4a1d802c

[10]    https://www.bloomberg.com/news/articles/2023-03-13/svb-failure-sparks-blame-game-over-trump-era-regulatory-rollback#xj4y7vzkg

- 30 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Then late last year they flagged a critical problem: The bank needed to improve how it tracked interest-rate risks, one of the people said, an issue at the heart of its abrupt downfall this month.[11]

92.     The Offering Materials also failed to disclose that SVB had critical problems in tracking interest rate risk including billions of dollars in unrealized losses. As Bloomberg reported on March 31, 2023, Federal Reserve examiners identified this "critical problem" at SVB in late 2022:

> Late last year, Fed examiners identified a critical problem: the bank needed to improve how it tracked interest-rate risks. The firm had about $15 billion in unrealized losses at year-end on mortgage-backed securities that it loaded up when rates were lower.[12]

93.     By 2021, as well, SVB's liquidity problems were clear to insiders. According to *The New York Times*, in 2021, "[s]upervisors at the Federal Reserve Bank of San Francisco, which oversaw Silicon Valley Bank, issued six citations" designated as "matters requiring attention" (MRAs) or "matters requiring immediate attention" (MRIAs). The warnings "flagged that the firm was doing a bad job of ensuring that it would have enough easy-to-tap cash on hand in the event of trouble." The article stated in part:

> Silicon Valley Bank's risky practices were on the Federal Reserve's radar for more than a year — an awareness that proved insufficient to stop the bank's demise.

> The Fed repeatedly warned the bank that it had problems, according to a person familiar with the matter.

> In 2021, a Fed review of the growing bank found serious weaknesses in how it was handling key risks. Supervisors at the Federal Reserve Bank of San Francisco, which oversaw Silicon Valley Bank, issued six citations. Those warnings, known as "matters requiring attention" and "matters requiring immediate attention," flagged that the firm was doing a bad job of ensuring that it would have enough easy-to-tap cash on hand in the event of trouble.

> But the bank did not fix its vulnerabilities. By July 2022, Silicon Valley Bank was in a full supervisory review — getting a more careful look — and was ultimately rated deficient for governance and controls. It was placed under a set of restrictions that prevented it from growing through acquisitions. Last autumn, staff members from the

---

[11]  https://www.bloomberg.com/news/articles/2023-03-17/fed-alarms-at-svb-began-more-than-year-ago-as-examiners-changed

[12]   https://www.bloomberg.com/news/articles/2023-03-21/svb-s-loans-to-insiders-tripled-to-219-million-before-it-failed?re_source=boa_related

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

San Francisco Fed met with senior leaders at the firm to talk about their ability to gain access to enough cash in a crisis and possible exposure to losses as interest rates rose.

It became clear to the Fed that the firm was using bad models to determine how its business would fare as the central bank raised rates: Its leaders were assuming that higher interest revenue would substantially help their financial situation as rates went up, but that was out of step with reality.

\*        \*        \*

The picture that is emerging is one of a bank whose leaders failed to plan for a realistic future and neglected looming financial and operational problems, even as they were raised by Fed supervisors. For instance, according to a person familiar with the matter, executives at the firm were told of cybersecurity problems both by internal employees and by the Fed — but ignored the concerns.[13]

94.     The Federal Reserve describes MRAs as "a call for action to address weaknesses that could lead to deterioration in a banking organization's soundness. MRAs are confidential and not publicly issued."

95.     The Federal Reserve describes MRIAs as "a call for more immediate action to address acute or protracted weaknesses that could lead to further deterioration in a banking organization's soundness, may result in harm to consumers, or have caused, or could lead to, noncompliance with laws and regulations. MRIAs are confidential and not publicly issued."

96.     Although the MRAs and MRIAs issued by SVB's primary regulator—as well as the risk management failings that led to them—were apparent to SVB, investors remained in the dark.

**The Offering Materials Violated Affirmative Disclosure Obligations Under SEC Regulation S-K**

97.     Regulation S-K, Item 305, sets forth quantitative and qualitative disclosure requirements regarding market risk, including interest rate risk.

98.     As to quantitative disclosures about market risk, Item 305(a) provides registrants three disclosure alternatives: (1) tabular presentation of fair values of the market risk sensitive instruments and contract terms sufficient to determine future cash flows from those instruments, categorized by expected maturity dates; (2) sensitivity analysis disclosures that express the potential

---

[13] https://www.nytimes.com/2023/03/19/business/economy/fed-silicon-valley-bank.html

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

loss in future earnings, fair values, or cash flows of market risk sensitive instruments resulting from one or more selected hypothetical changes in interest rates, foreign currency exchange rates, commodity prices, and other relevant market rates or prices over a selected period of time: or (3) value at risk disclosures that express the potential loss in future earnings, fair values, or cash flows of market risk sensitive instruments over a selected period of time, with a selected likelihood of occurrence, from changes in interest rates, foreign currency exchange rates, commodity prices, and other relevant market rates or prices. 17 C.F.R. § 229.305(a)(1)(i)-(iii).

99. For sensitivity analysis disclosures, Item 305(a)(1)(ii) requires registrants to describe the model, assumptions, and parameters necessary to understand the sensitivity analysis disclosures. The instructions to sensitivity analysis disclosures under paragraph 305(a)(1)(ii) make clear that "Registrants should select *hypothetical changes in market rates or prices that are expected to reflect reasonably possible near-term changes in those rates and prices*. In this regard, absent economic justification for the selection of a different amount, registrants should use changes that are not less than 10 percent of end of period market rates or prices." The same instructions state that "the term reasonably possible has the same meaning as defined by generally accepted accounting principles (*see, e.g.*, FASB ASC Master Glossary). The FASB ASC Master Glossary defines "reasonably possible" as "[t]he chance of the future event or events occurring is more than remote but less than likely." Moreover, the same instructions state: "For purposes of instruction 3.A. of the Instructions to Paragraph 305(a), the term near term means a period of time going forward up to one year from the date of the financial statements (*see* FASB ASC Master Glossary)."

100. The instructions to Item 305(a)(1)(ii) also set forth the following requirements:

Model, assumptions, and parameters that should be described include, but are not limited to, how *loss* is defined by the model (*e.g.*, loss in earnings, fair values, or cash flows), a general description of the modeling technique (*e.g.*, duration modeling, modeling that measures the change in net present values arising from selected hypothetical changes in market rates or prices, and a description as to how optionality is addressed by the model), the types of instruments covered by the model (*e.g.*, derivative financial instruments, other financial instruments, derivative commodity instruments, and whether other instruments are included voluntarily, such as certain commodity instruments and positions, cash flows from anticipated transactions, and certain financial instruments excluded under instruction 3.C.ii. of the General Instructions to Paragraphs 305(a) and 305(b), and other relevant information about the

- 33 -
COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

model's assumptions and parameters, (*e.g.*, the magnitude and timing of selected hypothetical changes in market rates or prices used, the method by which discount rates are determined, and key prepayment or reinvestment assumptions).

101.    Contrary to these requirements, the Offering Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that showed that higher interest rates likely would devastate SVB's future earnings, making unreasonable and improper tweaks to the model to validate and advance SVB's profit-driven strategy.

102.    As to qualitative disclosures about market risk, Item 305(b) requires registrants to describe, to the extent material, market risks including interest rate risk:

(i) The registrant's primary market risk exposures;

(ii) How those exposures are managed. Such descriptions shall include, but not be limited to, a discussion of the objectives, general strategies, and instruments, if any, used to manage those exposures; and

(iii) Changes in either the registrant's primary market risk exposures or how those exposures are managed, when compared to what was in effect during the most recently completed fiscal year and what is known or expected to be in effect in future reporting periods.

103.    The instructions accompanying Item 305(b) make clear that "primary market risk exposure" includes "interest rate risk," stating:

1. For purposes of disclosure under paragraph 305(b), primary market risk exposures means:

A. The following categories of market risk: interest rate risk, foreign currency exchange rate risk, commodity price risk, and other relevant market rate or price risks (e.g., equity price risk); and

B.    Within each of these categories, the particular markets that present the primary risk of loss to the registrant. For example, if a registrant has a material exposure to foreign currency exchange rate risk and, within this category of market risk, is most vulnerable to changes in dollar/yen, dollar/pound, and dollar/peso exchange rates, the registrant should disclose those exposures. Similarly, *if a registrant has a material exposure to interest rate risk and, within this category of market risk, is most vulnerable to changes in short-term U.S. prime interest rates, it should disclose the existence of that exposure.*

- 34 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

2. For purposes of disclosure under paragraph 305(b), registrants should describe primary market risk exposures that exist as of the end of the latest fiscal year, and how those exposures are managed.

104.    As to the materiality assessment required under Item 305, the accompanying instructions make clear that registrants should evaluate:

i. The materiality of the fair values of derivative financial instruments, other financial instruments, and derivative commodity instruments outstanding as of the end of the latest fiscal year; and

ii. The materiality of potential, near-term losses in future earnings, fair values, and/or cash flows from reasonably possible near-term changes in market rates or prices.

iii. If either paragraphs B.i. or B.ii. in this instruction of the General Instructions to Paragraphs 305(a) and 305(b) are material, the registrant should disclose quantitative and qualitative information about market risk, if such market risk for the particular market risk exposure category is material.

105.    In conducting the materiality assessment, moreover, "registrants generally should not net fair values, except to the extent allowed under generally accepted accounting principles," and "registrants should consider, among other things, the magnitude of:

i. Past market movements;

ii. Reasonably possible, near-term market movements; and

iii. Potential losses that may arise from leverage, option, and multiplier features."

106.    The SEC's Office of the Chief Accountant and the Division of Corporation Finance have provided the following guidance on determining whether its market risk exposures are material enough to require the quantitative and qualitative disclosures under Item 305:

To determine if the quantitative and qualitative disclosures must be furnished, a company must perform the following procedure:

Step 1: Categorize its market risk sensitive instruments into two portfolios: instruments entered into for trading purposes, and all other instruments.

Step 2: further categorize instruments within the two portfolios by type of market risk exposure category (interest rate risk, foreign currency exchange rate risk, commodity price risk, etc.).

- 35 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Step 3: the company must assess the materiality of the market risk exposure for each category within each portfolio. *This assessment must evaluate both (1) the materiality of the fair values of market sensitive instruments as of the end of the latest fiscal year, and (2) the materiality of potential, near-term losses in future earnings, fair values and cash flows from reasonably possible near-term changes in market rates or prices. If either is material, then the company should disclose the quantitative and qualitative information for that particular market risk exposure.* For these tests, registrants should not net favorable and unfavorable fair values, except where allowed under generally accepted accounting principles.

For example, assume a company has both a trading and non-trading portfolio. Each portfolio contains instruments that expose the company to changes in interest rates, foreign currency exchange rates, and commodity prices.

The company initially determines whether the fair values of market risk sensitive instruments were material at period end. If they were material, disclosure is material. If the fair values at period end were not material, the company would assess whether the interest rate sensitive instruments in its trading portfolio create a material exposure to changes in interest rates. That assessment should be made based on of [sic] fair values, cash flows, or earnings. If any of those measures is material, the company would provide quantitative information regarding its interest rate sensitive trading portfolio. Similar assessments are necessary for interest rate sensitive instruments in its non-trading portfolio, and all other exposures.

Quantitative disclosures are required only for material exposures. Thus, if the company's only material exposure is to changes in interest rates in its trading portfolio, it must present quantitative information only for that specific exposure. Quantitative disclosures about other, immaterial exposures are elective.[14]

107.    With respect to sensitivity analysis disclosures, the SEC's Office of the Chief Accountant and the Division of Corporation Finance further directed that:

Companies using sensitivity analysis should select hypothetical changes in market rates or prices that are expected to reflect reasonably possible near-term changes in those rates and prices. Companies should use changes not less than 10% of end-of-period market rates or prices unless there is economic justification for a different amount. The rule provides that the magnitude of selected hypothetical changes in rates or prices may differ among and within market risk exposure categories.[15]

\*       \*       \*

Companies must select hypothetical changes in market rates or prices that are expected to reflect reasonably possible near-term changes in those rates and prices. The rules

---

[14] https://www.sec.gov/divisions/corpfin/guidance/derivfaq.htm

[15] https://www.sec.gov/divisions/corpfin/guidance/derivfaq.htm

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

specified the use of a change that is not less than 10%, unless there is justification for using another amount. If a company has sufficient historical data indicating that a reasonably possible near-term change will be an amount less than 10%, it may use that amount. The Company should disclose why it chose a hypothetical change less than 10%.

108.    The SEC's Office of the Chief Accountant and the Division of Corporation Finance also made clear that Item 305 requires the following qualitative disclosures about market risks:

Qualitative disclosure about interest rate risk in a non-trading portfolio would include:

1) the nature of the interest rate exposure,

2) how interest rate risks are managed,

3) changes in interest rate exposures or how the interest rate exposures were managed when compared to the conditions that existed during the most recently completed fiscal year, and

4) known trends in interest rates, or anticipated rates in future reporting periods.

109.    The Offering Materials failed to provide the required disclosures under Item 305. The quantitative disclosures violated Item 305 because they failed to reflect "reasonably possible near term changes." Instead, SVB used only a maximum 200 bps rate increase. It was reasonably possible at the time of the Offering Materials that the Federal Reserve would (as it ultimately did) raise interest rates to a greater degree.

110.    The Offering Materials qualitative disclosures also violated Item 305, as they misrepresented and failed to disclose the critical change in the Company's market risk exposure, including interest rate risk, as well how it would manage such risk. Further, the Offering Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that showed that higher interest rates could devastate SVB's future earnings, making unreasonable and improper tweaks to the model to validate and advance SVB's profit-driven strategy.

111.    SEC Regulation S-K, Item 105, requires disclosure of "material" risk factors. As detailed therein, the "Risk Factor" section of the Offering Materials must "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or

- 37 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

offering speculative or risky." 17 C.F.R. § 229.105.[16] Item 105 requires disclosure of the risks to which reasonable investors would attach importance in making investment or voting decisions. Contrary to Item 105's requirements, the Offering Materials failed to disclose that higher interest rates would jeopardize the bank's future earnings but that, instead of mitigating such risks, the Company had doubled down on a strategy to deliver short-term profits. Further, the Offering Materials failed to disclose that despite internal recommendations to purchase shorter-term bonds as more deposits flowed in, to offset the material risk of losses from rising interest rates, SVB's executives focused on short-term profits, and disregarded duration risks despite strong recommendations from employees to prudently hedge SVB's balance sheet with shorter duration bonds. Further still, the Offering Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that showed that higher interest rates could devastate SVB's future earnings, using unreasonable and improper tweaks to the model to validate SVB's profit-driven strategy. Additionally, the Offering Materials failed to disclose that SVB lacked effective internal controls and was riddled with many serious operational and technological problems, plaguing Defendants' ability to track risks, including interest rate risks. Moreover, the Offering Materials failed to disclose that SVB lacked a diversified customer base and that a large percentage of the deposits of that non-diversified customer base were uninsured and therefore much more likely to trigger a run on the bank. Indeed, SVB failed to disclose that its startup clients' deposits, the primary source of the Company's liquidity, were especially sensitive to interest rates: higher interest rates result in lower overall investment in startups and therefore lower deposits in Silicon Valley Bank. Additionally, SVB never disclosed the relationship between the interest rate risk in the Company's deposits and its long-term debt security assets. Moreover, SVB also failed to disclose that SVB largely did *not* manage its interest rate risk in its fixed-income securities portfolio—in fact, it faced enormous interest rate risk from that portfolio. And it made grossly inadequate use of derivatives or other hedging strategies, such as interest rate swaps, to mitigate interest rate risk. While the Offering Materials' discussion of risk factors listed

---

[16] Before April 2, 2019, current Item 105 was Item 503(c).

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1    market and liquidity risks in vague and generic terms, it did not even mention the actual material

2    risks posed by the foregoing, much less adequately describe those risks as required by Item 105.

3        112.    SEC Regulation S-K, Item 303, requires that management's discussion and analysis

4    (MD&A) "[i]dentify any known trends or any known demands, commitments, events or

5    uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity

6    increasing or decreasing in any material way" and "[d]escribe any known trends or uncertainties that

7    have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales

8    or revenues or income from continuing operations." 17 C.F.R. § 229.303. Contrary to Item 303's

9    requirements, the Offering Materials failed to disclose the material market risks, including the

10   interest rate risk, uninsured depositor risk and liquidity risk that SVB faced, and which resulted in,

11   and were reasonably likely to result in, SVB's liquidity materially decreasing and having a materially

12   unfavorable impact on SVB's revenues and income. As detailed herein, the Offering Materials failed

13   to disclose that higher interest rates jeopardized the bank's future earnings but that, instead of

14   mitigating such risks, the bank had doubled down on a strategy to deliver short-term profits. Further,

15   the Offering Materials failed to disclose that despite internal recommendations to purchase shorter-

16   term bonds as more deposits flowed in to offset the material risk of losses from rising interest rates,

17   SVB's executives focused on short-term profits, disregarding duration risks despite pleas from

18   employees to hedge SVB's balance sheet with shorter duration bonds. Further still, the Offering

19   Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk

20   metrics, and engineered assumptions to internal models that showed that higher interest rates could

21   devastate SVB's future earnings, using unreasonable and improper tweaks to the model to validate

22   SVB's profit-driven strategy. Additionally, the Offering Materials failed to disclose that SVB lacked

23   effective internal controls and was riddled with many serious operational and technological

24   problems, plaguing Defendants' ability to track risks, including interest rate risks.  Moreover, the

25   Offering Materials failed to disclose that SVB lacked a diversified customer base and that a large

26   percentage of the deposits of that non-diversified customer base were uninsured and therefore much

27   more likely to seek to withdraw their money *en masse*. Indeed, SVB failed to disclose that its startup

28   clients' deposits, the primary source of the Company's liquidity, were especially sensitive to interest

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

rates: higher interest rates result in lower overall investment in startups and therefore lower deposits in Silicon Valley Bank. Additionally, SVB never disclosed the relationship between the interest rate risk in the Company's deposits and its long-term debt security assets. SVB also failed to disclose that SVB largely did *not* manage its interest rate risk in its fixed income securities portfolio—in fact, it faced enormous interest rate risk from that portfolio. And it made grossly inadequate use of derivatives or other hedging strategies, such as interest rate swaps, to mitigate interest rate risk. Accordingly, the Offering Materials failed to disclose the extent and severity of the undisclosed material market risks, including interest rate risk, uninsured depositor risk and liquidity risk that SVB faced. These undisclosed trends, events, and their likely consequences, were known at the time and thus Item 303 required disclosure.

## KPMG'S MISCONDUCT

### KPMG Overview

113.    KPMG audited SVB's financial statements and its system of internal controls over financial reporting for the year ended December 31, 2020. KPMG also issued and signed audit opinions in which it certified that KPMG's internal controls were adequate and that the Company's financial statements were free of material misstatements and fairly presented SVB's financial position.

114.    The 2020 10-K includes as Item 8 a "Report of Independent Registered Public Accounting Firm," signed by KPMG. The KPMG Report states in relevant part:

*Opinions on the Consolidated Financial Statements and Internal Control Over Financial Reporting*

We have audited the accompanying consolidated balance sheets of SVB Financial Group and subsidiaries (the Company) as of December 31, 2020 and 2019, the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2020, and the related notes (collectively, the consolidated financial statements). We also have audited the Company's internal control over financial reporting as of December 31, 2020, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of

- 40 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

December 31, 2020 and 2019, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2020, in conformity with U.S. generally accepted accounting principles. **Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2020 based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission**.

(bolding added; italics in original).

115.    KPMG consented to the incorporation by reference of its above-described report concerning the effectiveness of SVB's internal controls into the Offering Materials. Specifically, the Offering Materials included as an exhibit a "Consent of Independent Registered Public Accounting Firm" that provides in relevant part:

We consent to the use of our report dated March 1, 2021, with respect to the consolidated balance sheets of SVB Financial Group as of December 31, 2020 and 2019, the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2020, and the related notes, and the effectiveness of internal control over financial reporting as of December 31, 2020, incorporated herein by reference and to the reference to our firm under the heading "Experts" in this prospectus.

116.    KPMG's unqualified opinions on SVB's financial statements, incorporated by reference into the Offering Materials, were materially false and misleading. Contrary to its representations, KPMG's audits of those financial statements were not conducted in accordance with Generally Accepted Auditing Standards ("GAAS") or Public Company Accounting Oversight Board ("PCAOB") standards, and SVB's financial condition and results of operations were not presented in conformity with GAAP. These representations were materially false and misleading because, as set forth above, SVB's financial statements for FY2020 did not present fairly, in all material respects the Company's results of operations or its financial condition in accordance with GAAP. Further, in certifying SVB's financial statements and internal controls, KPMG specifically represented (based on its GAAS audit) that the Company maintained effective internal controls over financial reporting as of December 31, 2020. In other words, KPMG's certification represented to investors that it purportedly conducted an audit in compliance with GAAS, and that the audit included a factual basis to conclude that SVB had effective internal controls. In truth, however, in violation of GAAS, KPMG

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

disregarded the numerous, significant internal control deficiencies. Contrary to its statements, KPMG's audit did not constitute a reasonable investigation of whether the Company's management's assessment of internal controls was properly and accurately presented. Alternatively, to the extent KPMG's statements that it conducted its audit in accordance with GAAS are deemed statements of opinion or belief, those statements were materially misstated statements of opinion or belief when made, as set forth herein. Further, KPMG omitted to inform investors that its audit did not show a sufficient factual basis to conclude that SVB had effective internal controls.

117.    In issuing unqualified audit opinions and consenting to their incorporation in SVB's SEC filings, KPMG made false and misleading statements in violation of Section 11 of the Securities Act.

**Overview of GAAS**

118.    As SVB's external auditor, KPMG was required to audit the Company's financial statements and the effectiveness of SVB's internal controls over financial reporting in accordance with GAAS.

119.    The PCAOB, established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that are required to be followed by registered public accounting firms. On April 16, 2003, the PCAOB adopted as its interim standards GAAS as described by the AICPA Auditing Standards Board's SAS No. 95, Generally Accepted Auditing Standards, and related interpretations in existence on that date. Accordingly, an auditor's reference to "the standards of the Public Accounting Oversight Board (United States)" includes a reference to GAAS in existence as of April 16, 2003. For simplicity, all references to GAAS hereinafter include the standards of the PCAOB. The standards adopted by PCAOB that also have been approved by the SEC are designated with the prefix "AS." Preexisting interim standards that have been adopted by the PCAOB are designated by the prefix "AU."

120.    GAAS is comprised of ten standards that establish the quality of an auditor's performance and the overall objectives to be achieved in a financial statement audit. Auditors are required to follow those standards in each and every audit they conduct.

- 42 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

121. The GAAS standards fall into three categories: General Standards; Fieldwork Standards; and Reporting Standards. The General Standards require, among other things, that the auditor exercise professional skepticism. The General Standards provide guidance to an auditor on the exercise of due professional care in the performance of the audit. The Field Work Standards require, among other things, that an auditor obtain a sufficient understanding of the entity's business and operating environment to properly plan an audit in accordance with GAAS. Finally, the Reporting Standards require that an auditor express an opinion on the financial statements of a company taken as a whole, or an assertion to the extent that an opinion cannot be expressed.

122. An audit is a risk-based process during which the auditor should exercise due care. An auditor should be always aware of the risk of misstatements due to fraud or error. As those risks increase or materialize, auditors are obligated by GAAS and PCAOB standards to alter their audit procedures accordingly. KPMG failed to recognize glaring risks, and consequently, failed to adjust its audit procedures, leading to an unqualified audit report that was materially false and misleading.

123. KPMG violated GAAS Standard of Reporting No. 1, which requires the audit report to state whether the financial statements are presented in accordance with GAAP. KPMG's audit opinion inaccurately represented that SVB's FY2020 Financial Statements were presented in conformity with GAAP when, as alleged herein, they were not.

124. KPMG failed to exercise sufficient professional care in its audits of SVB's financial statements, and thus violated GAAS General Standard No. 3, which requires due professional care to be exercised in the performance of the audit and the preparation of the report. AU § 150.02. KPMG violated General Standard No. 3 by, among other things, disregarding SVB's internal control deficiencies detailed herein. KPMG also failed to exercise sufficient professional care in its audits of SVB's financial statements, and thus violated AU § 230, Due Professional Care in the Performance of Work, which states that "[d]ue professional care imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of field work and reporting." AU § 230.02. The duty to exercise due care required KPMG to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud. AU § 230.10. KPMG did not obtain such assurances.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

125.    KPMG also failed to exercise sufficient professional skepticism in violation of AU §

316:

> Due professional care requires the auditor to exercise professional skepticism. Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the fraud risks. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity. Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

AU § 316.13 (internal citations omitted).

126.    AU § 316 therefore required KPMG to be continually alert for indications of misstatements of SVB's financial statements, whether due to error or fraud. The PCAOB standards require the auditor to approach the audit "with a mindset that recognizes the possibility that a material misstatement due to fraud could be present." AU § 316.13. As detailed above, due to the presence of multiple red flags, KPMG knew or should have known that there was a strong possibility of material misstatements in connection with SVB's financial statements for the 2020 fiscal year.

127.    KPMG should have been aware that there was a heightened risk associated with the market risks, including the interest rate risk, uninsured depositor risk and liquidity risk, that SVB faced. That heightened risk obligated KPMG to perform more stringent and rigorous audit procedures compared to those it otherwise performed. For example, paragraphs 6 and 9 of AS No. 13, The Auditor's Responses to the Risk of Material Misstatements, state the following:

> The auditor also should determine whether it is necessary to make pervasive changes to the nature, timing, or extent of audit procedures to adequately address the assessed risks of material misstatement. Examples of such pervasive changes include modifying the audit strategy to: (a) increase the substantive testing of the valuation of numerous significant accounts at year end because of significantly deteriorating market conditions, and (b) obtain more persuasive audit evidence from substantive procedures due to the identification of pervasive weaknesses in the company's control environment.
>
> *    *    *
>
> In designing the audit procedures to be performed, the auditor should . . . obtain more persuasive audit evidence the higher the auditor's assessment of risk.

- 44 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

128.    AS No. 13.14 provides specific examples of how KPMG should have modified its audit procedures to address its assessed risks. In that regard, KPMG should have:

(a) Chang[ed] the nature of audit procedures to obtain evidence that is more reliable or to obtain additional corroborative information;
(b) Chang[ed] the timing of audit procedures to be closer to the end of the period or to the points during the period in which fraudulent transactions are more likely to occur; and
(c) Chang[ed] the extent of the procedures applied to obtain more evidence, *e.g.*, by increasing sample sizes or applying computer-assisted audit techniques to all of the items in an account.

129.    In failing to modify its audit procedures, KPMG failed to comply with AS No. 13. Had KPMG appropriately modified its audit procedures to be responsive to the risk of material misstatement of the Company's financial statements and carried out those procedures with the appropriate degree of professional skepticism, it would have discovered that the Company's financial statements failed to account for material market risks, including interest rate risk, uninsured depositor risk and liquidity risk.

130.    KPMG failed to obtain sufficient appropriate evidentiary matter regarding the market risks that SVB faced, including the interest rate risk, uninsured depositor risk and liquidity risk. KPMG also did not comply with PCAOB auditing standards. For example, KPMG violated GAAS Standard of Fieldwork Nos. 2 and 3, which require an independent auditor to obtain, through inspection, observation, inquiries and confirmations, competent, sufficient appropriate evidentiary matter to afford a reasonable basis for: (1) the opinion regarding the financial statements and (2) the opinion regarding internal control over financial reporting. KPMG likewise violated AS No. 15: Audit Evidence, which provides that an auditor has a reasonable basis for issuing an audit opinion when the auditor has planned and performed audit procedures in a manner that enables the auditor to obtain "sufficient appropriate audit evidence." AS No. 5 defines sufficiency as "the measure of the quantity of audit evidence" and appropriateness as "the measure of the quality of audit evidence." AS No. 15 also states that "as the risk increases, the amount of evidence that the auditor should obtain also increases. . . . [O]rdinarily more evidence is needed to respond to significant risks." Despite ample indicators of increased market risks, including interest rate risk, uninsured depositor risk and liquidity risk, KPMG failed to obtain more evidence than it typically would in the absence

- 45 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

of increased risk. In addition, AS No. 14, Evaluating Audit Results, provides that when evaluating whether the financial statements as a whole are free of material misstatement, the auditor should evaluate the qualitative aspects of the company's accounting practices, including potential bias in management's judgments about the amounts and disclosures in the financial statements.

131.    KPMG also violated GAAS Standards of Reporting Nos. 1 and 4[17] by falsely representing that SVB's financial statements were presented in conformity with GAAP when they were not and by improperly providing unqualified opinions on SVB's financial statements for the year ended December 31, 2020, even though its audits were not conducted in accordance with PCAOB auditing standards and the financial statements were not prepared in accordance with GAAP. As a result of KPMG's violations of GAAS set forth above, it also violated Standard of Reporting Nos. 1 and 4 because KPMG had an insufficient basis to express an unqualified opinion on its 2020 audit of SVB.

132.    Had KPMG performed its audit in accordance with the standards of the PCAOB, it would have recognized that SVB's FY2020 financial statements were not presented in conformity with GAAP and could not be relied upon. In other words, KPMG failed to obtain sufficient appropriate audit evidence as required by applicable auditing standards.

133.    Under AS No. 5, KPMG was required to complete a careful examination regarding SVB's effective controls over financial reporting. PCAOB's rulemaking in connection with AS No. 5 makes clear that KPMG could not simply rely on the assessment of internal controls reached and communicated to it by SVB's management or third parties but was instead required to conduct its own independent assessment of internal controls before it could issue a "clean" opinion. According to AS No. 5: "The auditor is required to provide an independent opinion on the effectiveness of the company's internal control over financial reporting. . . . The auditor cannot obtain sufficient evidence to support an opinion on the effectiveness of internal controls based solely on observation of or interaction with the company's controls. Rather, the auditor needs to perform procedures such as

---

[17] Standard of Reporting No. 4 requires an auditor to express an opinion on the financial statements of a company taken as a whole, or to state that an opinion cannot be expressed. AU § 150.02.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

inquiry, observation, and inspection of documents, or walkthroughs, which consist of a combination of these procedures, in order to fully understand and identify the likely sources of potential misstatements[.]" After performing an independent analysis, an independent auditor is not permitted to issue a clean opinion if any "material weaknesses" exist.

134.    KPMG's public statements that its audits were conducted in accordance with GAAS were materially false and misleading. Further, KPMG's certifications and representations were false and misleading. The above-described misrepresentations and omissions, SVB's failure to adequately manage interest rate risk, and its attendant collapse demonstrate significant deficiencies in SVB's internal controls. In his prepared Senate testimony, Michael S. Barr, the Vice Chair for Supervision of the Board of Governors of the Federal Reserve System, attributed SVB's failure to "inadequate risk management and internal controls that struggled to keep pace with the growth of the bank." These risk management and internal control failures prompted six "supervisory findings" in late 2021 which included the MRAs and MRIAs described at paragraphs 93-96, above.

135.    With the foregoing misrepresentations and omissions in the Offering Materials, Defendants were able to complete the Merger. But as the truth of Defendants' misrepresentations and omissions became clear, the price of SVB shares plunged, and the stock ultimately lost all value.

## DEFENDANTS' MISSTATEMENTS AND OMISSIONS WERE MATERIAL

136.    In April 2022, SVB terminated its Chief Risk Officer Laura Izurieta, paying her severance of over $7.1 million. SVB did not fill the position of Chief Risk Officer until Kim Olson "succeeded to the role of Chief Risk Officer on December 27, 2022."

137.    SVB's deficient risk management protocols and internal controls led to its March 2023 failure.

138.    Throughout 2022, and continuing in the first three months of 2023, as interest rates rose, depositors withdrew substantial funds from SVB, exhausting the cash that the Company kept on hand to handle day-to-day deposits and withdrawals. Deposits fell from $198 billion at the end of March 2022 to $173 billion at the end of 2022 and to $165 billion at the end of February 2023.

139.    Much of the rest of the Company's funds were tied up in long-term HTM securities. Many of those investments were purchased when the Company's deposits skyrocketed in 2020 and

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

2021 and thus would not mature—and return the principal invested in them—until several years in the future.

140.    To raise cash, SVB decided to sell its entire portfolio of AFS securities.

141.    According to SVB's 2022 disclosure on Form 10-K, as of December 31, 2022, SVB held roughly $26 billion in AFS securities. By March 8, 2023, the Company had sold substantially all of these securities.

142.    Due to the rise in interest rates, however, SVB sold these securities at a $1.8 billion loss.

143.    According to Axios, early in the week of February 27, 2023, SVB was informed that the credit rating agency Moody's was considering a double downgrade of SVB's debt. SVB asked Moody's to postpone the downgrade, and Moody's agreed.

144.    By the middle of the week, SVB was speaking with Goldman Sachs and private equity firms about raising capital. The next week, in early March, SVB decided to sell $2.25 billion in shares to raise revenue, including $500 million to private equity firm General Atlantic.

145.    On March 8, 2023, Moody's downgraded SVB's debt. On the same day, SVB announced its $1.8 billion loss and its plan to sell $2.25 billion in shares to raise revenue (though the Company had not found investors to purchase all the shares it intended to sell).

146.    SVB stated in a March 8 letter to investors:

> The sale of substantially all of our AFS securities will enable us to increase our asset sensitivity, particularly lock in funding costs, better insulate net interest income (NII) and net interest margin (NIM) from the impact of higher interest rates, and enhance profitability.
> . . .
>
> While *we will realize a one-time, post tax earnings loss of approximately $1.8 billion* in connection with the sale, we expect the reinvestment of the proceeds to be immediately accretive to net interest income (NII) and net interest margin (NIM), resulting in a short payback period of approximately three years.

(emphasis added).

147.    The market immediately reacted, with the price of SVB's shares dropping more than 60% the next day.

- 48 -

148.    On March 9, 2023, Peter Thiel's Founders Fund, which invests in and advises many startups and is closely watched by other market participants, began advising startups to withdraw their money from SVB.

149.    Depositors, including from SVB's startup-heavy depositor base, began to rapidly withdraw their deposits, a sequence of events partially driven by the fact that the bulk of SVB's startup-heavy deposit base was not FDIC insured. By the end of 2022, over 95% of the value of the deposits at SVB was not backed by FDIC insurance.

150.    Because the great majority of deposits at SVB were not FDIC insured, when news of trouble at SVB began to spread, depositors feared that they might lose their deposited funds. These fears sparked a bank run. On March 9, 2023, depositors attempted to withdraw $42 billion from their accounts at Silicon Valley Bank.

151.    On March 10, the California Department of Financial Protection and Innovation took possession of Silicon Valley Bank, ordered that it be liquidated, and named the FDIC as the receiver. On March 13, the FDIC transferred all deposits to a new FDIC-operated bank, Silicon Valley Bridge Bank, N.A.

152.    On March 17, SVB announced it had filed for bankruptcy. Its stock has since lost substantially all of its value.

153.    Thus, while depositors are being made whole, SVB stockholders have been wiped out. They have received nothing, and their shares are now virtually worthless.

## CLASS ACTION ALLEGATIONS

154.    Plaintiff brings this action as a class action on behalf of all persons who acquired SVB common stock int her Merger exchange pursuant to the Offering Materials (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

155.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1   can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of

2   members in the proposed Class. Members of the Class may be identified from records maintained

3   by SVB or its transfer agent and may be notified of the pendency of this action by mail, using the

4   form of notice similar to that customarily used in securities class actions.

5        156.   Plaintiff's claims are typical of the claims of the members of the Class, as all members

6   of the Class are similarly affected by Defendants' wrongful conduct in violation of law that is

7   complained of herein.

8        157.   Plaintiff will fairly and adequately protect the interests of the members of the Class

9   and has retained counsel competent and experienced in class and securities litigation.

10       158.   Common questions of law and fact exist as to all members of the Class and

11   predominate over any questions solely affecting individual members of the Class. Among the

12   questions of law and fact common to the Class are:

13           (a)   whether Defendants violated the Securities Act;

14           (b)   whether the Offering Materials were negligently prepared and contained

15   inaccurate statements of material fact and omitted material information required to be stated therein;

16   and

17           (c)   to what extent the members of the Class have sustained damages and the

18   proper measure of damages.

19        159.   A class action is superior to all other available methods for the fair and efficient

20   adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

21   damages suffered by individual Class members may be relatively small, the expense and burden of

22   individual litigation make it impossible for members of the Class to individually redress the wrongs

23   done to them. There will be no difficulty in the management of this action as a class action.

24                             **FIRST CAUSE OF ACTION**

25                  **For Violation of § 11 of the Securities Act**

                            **Against All Defendants**

26

27        160.   Plaintiff incorporates all the foregoing by reference.

28

- 50 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

161.   This Cause of Action is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

162.   This Count alleges and sounds in strict liability. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or scienter, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.

163.   The Offering Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

164.   Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

165.   The Individual Defendants each signed or were named in the Offering Materials. As such, each is strictly liable for the material misrepresentations in the Offering Materials and the failure of the Offering Materials to be complete and accurate. Defendants DeChellis and Cooper also signed and solicited the Offering Materials within the scope of their employment by or agency on behalf of Boston Private. Each Individual Defendant had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Materials and ensure that the representations in the Offering Materials were true and accurate, that there were no omissions of material facts that would render the Offering Materials misleading, and that the Offering Materials contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misrepresentations and omissions contained in the Offering Materials and should have known of the omissions of material facts necessary to make the statements made therein not misleading or otherwise required to be stated therein. Accordingly, the Individual Defendants are liable to Plaintiff and the Class under Section 11 for the material misrepresentations and omissions in the Offering Materials, and the failure of the Offering Materials to be complete and accurate.

166.   Defendant Morgan Stanley signed and was identified in the Offering Materials, solicited Plaintiff and other former Boston Private investors to participate in the Merger and purchase the securities issued in the stock-for-stock exchange pursuant thereto, contributed to the Merger and

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Offering Materials, and directly solicited ostensibly favorable information to Boston Private investors, including by providing an expert opinion in the Offering Materials that the Merger consideration was fair to Boston Private shareholders. Morgan Stanley also represented that they had conducted adequate due diligence and had consulted with management on the companies' operations and financial condition. As independent financial professionals assisting Boston Private with the Merger negotiations and with access to SVB's non-public information, Morgan Stanley put their imprimatur on the false and misleading statements contained in the Offering Materials, including but not limited to those regarding the fairness of the Merger consideration and the prospects for SVB.

167.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were true and without omissions of any material facts and were not misleading.

168.    By reason of the conduct herein alleged, each Defendant violated, or controlled an employee or other person who violated, § 11 of the Securities Act.

169.    Plaintiff acquired SVB shares pursuant to the Offering Materials.

170.    Plaintiff and the Class have sustained damage. The value of SVB common stock has declined substantially subsequent to and due to defendants' violations.

171.    At the time of their acquisition of SVB shares, Plaintiff and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action. Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

### SECOND CAUSE OF ACTION

**For Violation of § 12(a)(2) of the Securities Act
Against All Defendants**

172.    Plaintiff incorporates all the foregoing by reference.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

173.    This Count is brought pursuant to § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class against the Defendants.

174.    This Count alleges and sounds in strict liability. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or scienter, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.

175.    The prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the Class who purchased SVB shares pursuant to the prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses to ensure that such statements were true and that there was no failure to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the prospectus as set forth above.

176.    Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the prospectus at the time Plaintiff acquired SVB shares.

177.    By reason of the conduct alleged herein, the Defendants violated § 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiff and the other members of the Class, who purchased SVB shares pursuant to the prospectus, sustained substantial damages in connection with their purchases of the stock. Accordingly, Plaintiff and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to Defendants sued herein. Class members who have sold their common stock seek damages to the extent permitted by law.

### THIRD CAUSE OF ACTION

**For Violation of § 15 of the Securities Act
Against the Individual Defendants**

178.    Plaintiff incorporates all the foregoing by reference.

- 53 -

179.    This Cause of Action is brought pursuant to § 15 of the Securities Act against the Individual Defendants.

180.    The Individual Defendants were controlling persons of SVB by virtue of their positions as directors or senior officers of SVB and/or Boston Private. The Individual Defendants each had a series of direct or indirect business or personal relationships with other directors or officers or major shareholders of SVB and Boston Private.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Certifying this class action, appointing Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B.    Awarding damages in favor of Plaintiff and the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission, disgorgement, or such other equitable or injunctive relief as deemed appropriate by the Court.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: February 15, 2024                              Respectfully submitted,

                                                        /s/ David W. Hall
                                                        DAVID W. HALL (SBN 274921)
                                                        dhall@hedinhall.com
                                                        ARMEN ZOHRABIAN (SBN 230492)
                                                        azohrabian@hedinhall.com
                                                        **HEDIN HALL LLP**
                                                        Four Embarcadero Center, Suite 1400
                                                        San Francisco, CA  94104
                                                        Telephone: (415) 766-3534
                                                        Facsimile: (415) 402-0058

                                                        *Attorneys for Plaintiff and the Proposed Class*

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

/s/ Adam E. Polk

ADAM E. POLK (SBN 273000)
apolk@girardsharp.com
SEAN GREENE (SBN 328718)
sgreene@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

*Attorneys for Plaintiff and the Proposed Class*

BRIAN SCHALL (Bar No. 290685)
brian@schallfirm.com
RINA RESTAINO (Bar. No. 285415)
rina@schallfirm.com
**THE SCHALL LAW FIRM**
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile: (310) 388-0192

*Additional Attorneys for Plaintiff*

- 55 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Adam E. Polk (State Bar No. 273000)<br>Girard Sharp LLP, 601 California Street, Suite 1400, San Francisco, CA 94108<br><br>TELEPHONE NO.: 415.981.4800          FAX NO.: 415.981.4846<br>EMAIL ADDRESS: apolk@girardsharp.com<br>ATTORNEY FOR *(Name):* Plaintiff Stephen Rossi | **Electronically Filed**<br>**by Superior Court of CA,**<br>**County of Santa Clara,**<br>**on 2/15/2024 11:34 AM**<br>**Reviewed By: C. Roman**<br>**Case #24CV431200**<br>**Envelope: 14421483** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
STREET ADDRESS: 191 North First Street
MAILING ADDRESS: 191 North First Street
CITY AND ZIP CODE: San Jose, 95113
BRANCH NAME: Downtown Superior Court

CASE NAME:
Rossi v. DeChellis, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: 24CV431200 |
|---|---|---|
| [x] Unlimited (Amount demanded exceeds $35,000)   [ ] Limited (Amount demanded is $35,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[x] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [x] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [x] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [x] Substantial amount of documentary evidence
   d. [x] Large number of witnesses
   e. [x] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action *(specify):* Three
5. This case [x] is [ ] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: February 15, 2024
Adam E. Polk
_____
(TYPE OR PRINT NAME)          ▶          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2024]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) (if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/ Wrongful Death
Product Liability (not asbestos or toxic/environmental) (24)
Medical Malpractice (45)
    Medical Malpractice– Physicians & Surgeons
    Other Professional Health Care Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip and fall)
    Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
    Intentional Infliction of Emotional Distress
    Negligent Infliction of Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) (not civil harassment) (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice (not medical or legal)
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction)
    Contract/Warranty Breach–Seller Plaintiff (not fraud or negligence)
    Negligent Breach of Contract/ Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
Insurance Coverage (not provisionally complex) (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property (not eminent domain, landlord/tenant, or foreclosure)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court Case Matter
    Writ–Other Limited Court Case Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims (arising from provisionally complex case type listed above) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
    Confession of Judgment (non-domestic relations)
    Sister State Judgment
    Administrative Agency Award (not unpaid taxes)
    Petition/Certification of Entry of Judgment on Unpaid Taxes
    Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (not specified above) (42)
    Declaratory Relief Only
    Injunctive Relief Only (non-harassment)
    Mechanics Lien
    Other Commercial Complaint Case (non-tort/non-complex)
    Other Civil Complaint (non-tort/non-complex)

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition (not specified above) (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late Claim
    Other Civil Petition

**ATTACHMENT CV-5012**

# CIVIL LAWSUIT NOTICE

*Superior Court of California, County of Santa Clara*
*191 North First St., San José, CA 95113*

CASE NUMBER: _____24CV431200_____

## PLEASE READ THIS ENTIRE FORM

___PLAINTIFF___ (the person suing):  Within 60 days after filing the lawsuit, you must serve each Defendant with the *Complaint, Summons,* an *Alternative Dispute Resolution (ADR) Information Sheet,* and a copy of this *Civil Lawsuit Notice,* and you must file written proof of such service.

___DEFENDANT___ (The person sued):  **You must do each of the following to protect your rights:**

1. You must file a **written response** to the *Complaint, using the proper legal form or format,* in the Clerk's Office of the Court, within **30 days** of the date you were served with the *Summons* and *Complaint;*
2. You must serve by mail  a copy of your written response on the  Plaintiff's attorney or on the Plaintiff if Plaintiff has no attorney (to "serve by mail" means to have an adult other than yourself mail a copy); and
3. You must attend the first Case Management Conference.

    **Warning:  If you, as the Defendant, do not follow these instructions, you may automatically lose this case.**

___RULES AND FORMS:___   You must follow the California Rules of Court and the Superior Court of California, County of Santa Clara Local Civil Rules and use proper forms.  You can obtain legal information, view the rules and receive forms, free of charge, from the Self-Help Center at 201 North First Street, San José or at https://www.scscourt.org/self_help/civil/civil_help.shtml.

- State Rules and Judicial Council forms:  https://www.courts.ca.gov/formsrules.htm
- Local Rules and Forms:  https://www.scscourt.org/forms_filing.shtml  and https://www.scscourt.org/court_divisions/civil/civil_rules/civil_rules.shtml

___CASE MANAGEMENT CONFERENCE (CMC):___   You must meet with the other parties and discuss the case, in person or by telephone at least 30 calendar days before the CMC.  You must also fill out, file and serve a *Case Management Statement* (Judicial Council form CM-110) at least 15 calendar days before the CMC.

*You or your attorney must appear at the CMC.  You may have the option, or be required, to appear remotely – see Local Civil Rule 8.*

Your Case Management Judge is: _____Rosen, Amber_____   Department: ____16____

The 1st CMC is scheduled for:  (Completed by Clerk of Court)
Date: 07/30/2024    Time: 1:30 PM    in Department: 16

The next CMC is scheduled for:  (Completed by party if the 1st CMC was continued or has passed)
Date: _____    Time: _____    in Department: _____

___ALTERNATIVE DISPUTE RESOLUTION (ADR):___   If all parties have appeared and filed a completed *ADR Stipulation Form* (local form CV-5008) at least 30 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at https://www.scscourt.org/court_divisions/civil/adr/civil_adr.shtml or call the ADR Administrator (408-828-8547) for more information.

___WARNING:___ Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

# SANTA CLARA COUNTY SUPERIOR COURT
## ALTERNATIVE DISPUTE RESOLUTION
## INFORMATION SHEET

Many cases can be resolved to the satisfaction of all parties without the necessity of traditional litigation, which can be expensive, time consuming, and stressful. The Court finds that it is in the best interests of the parties that they participate in alternatives to traditional litigation, including arbitration, mediation, neutral evaluation, special masters and referees, and settlement conferences. Therefore, all matters shall be referred to an appropriate form of Alternative Dispute Resolution (ADR) before they are set for trial, unless there is good cause to dispense with the ADR requirement.

### What is ADR?
ADR is the general term for a wide variety of dispute resolution processes that are alternatives to litigation. Types of ADR processes include mediation, arbitration, neutral evaluation, special masters and referees, and settlement conferences, among others forms.

### What are the advantages of choosing ADR instead of litigation?
ADR can have a number of advantages over litigation:

- **ADR can save time.** A dispute can be resolved in a matter of months, or even weeks, while litigation can take years.

- **ADR can save money.** Attorney's fees, court costs, and expert fees can be reduced or avoided altogether.

- **ADR provides more participation.** Parties have more opportunities with ADR to express their interests and concerns, instead of focusing exclusively on legal rights.

- **ADR provides more control and flexibility.** Parties can choose the ADR process that is most likely to bring a satisfactory resolution to their dispute.

- **ADR can reduce stress.** ADR encourages cooperation and communication, while discouraging the adversarial atmosphere of litigation. Surveys of parties who have participated in an ADR process have found much greater satisfaction than with parties who have gone through litigation.

### What are the main forms of ADR offered by the Court?
**Mediation** is an informal, confidential, flexible and non-binding process in the mediator helps the parties to understand the interests of everyone involved, and their practical and legal choices. The mediator helps the parties to communicate better, explore legal and practical settlement options, and reach an acceptable solution of the problem. The mediator does not decide the solution to the dispute; the parties do.

Mediation may be appropriate when:
- The parties want a non-adversary procedure
- The parties have a continuing business or personal relationship
- Communication problems are interfering with a resolution
- There is an emotional element involved
- The parties are interested in an injunction, consent decree, or other form of equitable relief

**Neutral evaluation**, sometimes called "Early Neutral Evaluation" or "ENE", is an informal process in which the evaluator, an experienced neutral lawyer, hears a compact presentation of both sides of the case, gives a non-binding assessment of the strengths and weaknesses on each side, and predicts the likely outcome. The evaluator can help parties to identify issues, prepare stipulations, and draft discovery plans. The parties may use the neutral's evaluation to discuss settlement.

Neutral evaluation may be appropriate when:
- The parties are far apart in their view of the law or value of the case
- The case involves a technical issue in which the evaluator has expertise
- Case planning assistance would be helpful and would save legal fees and costs
- The parties are interested in an injunction, consent decree, or other form of equitable relief

*-over-*

**Arbitration** is a less formal process than a trial, with no jury. The arbitrator hears the evidence and arguments of the parties and then makes a written decision. The parties can agree to binding or non-binding arbitration. In binding arbitration, the arbitrator's decision is final and completely resolves the case, without the opportunity for appeal. In non-binding arbitration, the arbitrator's decision could resolve the case, without the opportunity for appeal, unless a party timely rejects the arbitrator's decision within 30 days and requests a trial. Private arbitrators are allowed to charge for their time.

Arbitration may be appropriate when:

- The action is for personal injury, property damage, or breach of contract
- Only monetary damages are sought
- Witness testimony, under oath, needs to be evaluated
- An advisory opinion is sought from an experienced litigator (if a non-binding arbitration)

**Civil Judge ADR** allows parties to have a mediation or settlement conference with an experienced judge of the Superior Court. Mediation is an informal, confidential, flexible and non-binding process in which the judge helps the parties to understand the interests of everyone involved, and their practical and legal choices. A settlement conference is an informal process in which the judge meets with the parties or their attorneys, hears the facts of the dispute, helps identify issues to be resolved, and normally suggests a resolution that the parties may accept or use as a basis for further negotiations. The request for mediation or settlement conference may be made promptly by stipulation (agreement) upon the filing of the Civil complaint and the answer. There is no charge for this service.

Civil Judge ADR may be appropriate when:

- The parties have complex facts to review
- The case involves multiple parties and problems
- The courthouse surroundings would he helpful to the settlement process

**Special masters and referees** are neutral parties who may be appointed by the court to obtain information or to make specific fact findings that may lead to a resolution of a dispute.
Special masters and referees can be particularly effective in complex cases with a number of parties, like construction disputes.

**Settlement conferences** are informal processes in which the neutral (a judge or an experienced attorney) meets with the parties or their attorneys, hears the facts of the dispute, helps identify issues to be resolved, and normally suggests a resolution that the parties may accept or use as a basis for further negotiations.
Settlement conferences can be effective when the authority or expertise of the judge or experienced attorney may help the parties reach a resolution.

***What kind of disputes can be resolved by ADR?***
Although some disputes must go to court, almost any dispute can be resolved through ADR. This includes disputes involving business matters; civil rights; collections; corporations; construction; consumer protection; contracts; copyrights; defamation; disabilities; discrimination; employment; environmental problems; fraud; harassment; health care; housing; insurance; intellectual property; labor; landlord/tenant; media; medical malpractice and other professional negligence; neighborhood problems; partnerships; patents; personal injury; probate; product liability; property damage; real estate; securities; sports; trade secret; and wrongful death, among other matters.

***Where can you get assistance with selecting an appropriate form of ADR and a neutral for your case, information about ADR procedures, or answers to other questions about ADR?***

*Contact:*
Santa Clara County Superior Court
ADR Administrator
408-882-2530

## **Exhibit B**

**Merger Agreement**

EX-2.1 2 d103536dex21.htm EX-2.1

**Exhibit 2.1**

EXECUTION VERSION

AGREEMENT AND PLAN OF MERGER

by and between

SVB FINANCIAL GROUP

and

BOSTON PRIVATE FINANCIAL HOLDINGS, INC.

———————————————

Dated as of January 4, 2021

TABLE OF CONTENTS

Page

ARTICLE I

THE MERGER

| | | |
|---|---|---|
| 1.1 | The Merger | 1 |
| 1.2 | Closing | 1 |
| 1.3 | Effective Time | 1 |
| 1.4 | Effects of the Merger | 2 |
| 1.5 | Conversion of Boston Private Common Stock | 2 |
| 1.6 | SVB Financial Common Stock | 3 |
| 1.7 | Treatment of Boston Private Equity Awards | 3 |
| 1.8 | Treatment of Boston Private ESPP | 4 |
| 1.9 | Certificate of Incorporation of Surviving Corporation | 4 |
| 1.10 | Bylaws of Surviving Corporation | 4 |
| 1.11 | Tax Consequences | 4 |
| 1.12 | Bank Merger | 4 |

ARTICLE II

EXCHANGE OF SHARES

| | | |
|---|---|---|
| 2.1 | SVB Financial to Make Shares Available | 5 |
| 2.2 | Exchange of Shares | 5 |

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF BOSTON PRIVATE

| | | |
|---|---|---|
| 3.1 | Corporate Organization | 7 |
| 3.2 | Capitalization | 9 |
| 3.3 | Authority; No Violation | 10 |
| 3.4 | Consents and Approvals | 11 |
| 3.5 | Reports | 11 |
| 3.6 | Financial Statements | 12 |
| 3.7 | Broker's Fees | 14 |
| 3.8 | Absence of Certain Changes or Events | 14 |
| 3.9 | Legal and Regulatory Proceedings | 14 |
| 3.10 | Taxes and Tax Returns | 14 |
| 3.11 | Employees | 15 |
| 3.12 | SEC Reports | 18 |
| 3.13 | Compliance with Applicable Law | 18 |
| 3.14 | Certain Contracts | 20 |
| 3.15 | Agreements with Regulatory Agencies | 21 |
| 3.16 | Environmental Matters | 22 |
| 3.17 | Investment Securities | 22 |
| 3.18 | Real Property | 23 |
| 3.19 | Intellectual Property | 23 |
| 3.20 | Related Party Transactions | 24 |
| 3.21 | State Takeover Laws | 25 |
| 3.22 | Reorganization | 25 |
| 3.23 | Opinion | 25 |

|  |  | Page |
|---|---|---|
| 3.24 | Boston Private Information | 25 |
| 3.25 | Loan Portfolio | 25 |
| 3.26 | Insurance | 26 |
| 3.27 | Investment Adviser Subsidiaries | 27 |
| 3.28 | Volcker Rule | 28 |
| 3.29 | No Other Representations or Warranties | 28 |

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF SVB FINANCIAL

| 4.1 | Corporate Organization | 29 |
|---|---|---|
| 4.2 | Capitalization | 30 |
| 4.3 | Authority; No Violation | 31 |
| 4.4 | Consents and Approvals | 31 |
| 4.5 | Reports | 32 |
| 4.6 | Financial Statements | 32 |
| 4.7 | Broker's Fees | 33 |
| 4.8 | Absence of Certain Changes or Events | 34 |
| 4.9 | Legal and Regulatory Proceedings | 34 |
| 4.10 | SEC Reports | 34 |
| 4.11 | Compliance with Applicable Law | 34 |
| 4.12 | Agreements with Regulatory Agencies | 35 |
| 4.13 | Reorganization | 35 |
| 4.14 | SVB Financial Information | 35 |
| 4.15 | No Other Representations or Warranties | 35 |

ARTICLE V

COVENANTS RELATING TO CONDUCT OF BUSINESS

| 5.1 | Conduct of Business of Boston Private Prior to the Effective Time | 36 |
|---|---|---|
| 5.2 | Boston Private Forbearances | 36 |
| 5.3 | SVB Financial Forbearances | 39 |

ARTICLE VI

ADDITIONAL AGREEMENTS

| 6.1 | Regulatory Matters | 40 |
|---|---|---|
| 6.2 | Access to Information | 41 |
| 6.3 | Boston Private Shareholder Approval | 42 |
| 6.4 | Stock Exchange Listing | 43 |
| 6.5 | Employee Matters | 43 |
| 6.6 | Indemnification; Directors' and Officers' Insurance | 45 |
| 6.7 | Additional Agreements | 46 |
| 6.8 | Advice of Changes | 46 |
| 6.9 | Acquisition Proposals | 46 |
| 6.10 | Public Announcements | 47 |
| 6.11 | Change of Method | 47 |
| 6.12 | Restructuring Efforts | 48 |

-ii-

|  |  | Page |
|---|---|---|
| 6.13 | Takeover Statutes | 48 |
| 6.14 | Exemption from Liability Under Section 16(b) | 48 |
| 6.15 | Litigation and Claims | 48 |
| 6.16 | Trust Preferred Securities | 49 |
| 6.17 | Non-Solicitation Covenants | 49 |
| 6.18 | Advisory Contracts | 49 |

ARTICLE VII

CONDITIONS PRECEDENT

| 7.1 | Conditions to Each Party's Obligation to Effect the Merger | 51 |
| 7.2 | Conditions to Obligations of SVB Financial | 52 |
| 7.3 | Conditions to Obligations of Boston Private | 53 |

ARTICLE VIII

TERMINATION AND AMENDMENT

| 8.1 | Termination | 53 |
| 8.2 | Effect of Termination | 54 |

ARTICLE IX

GENERAL PROVISIONS

| 9.1 | Nonsurvival of Representations, Warranties and Agreements | 55 |
| 9.2 | Amendment | 55 |
| 9.3 | Extension; Waiver | 56 |
| 9.4 | Expenses | 56 |
| 9.5 | Notices | 56 |
| 9.6 | Interpretation | 57 |
| 9.7 | Counterparts | 57 |
| 9.8 | Entire Agreement | 57 |
| 9.9 | Governing Law; Jurisdiction | 57 |
| 9.10 | Waiver of Jury Trial | 58 |
| 9.11 | Assignment; Third Party Beneficiaries | 58 |
| 9.12 | Specific Performance | 58 |
| 9.13 | Severability | 59 |
| 9.14 | Confidential Supervisory Information | 59 |
| 9.15 | Delivery by Electronic Transmission | 59 |

| Exhibit A | Form of Bank Merger Agreement | |

-iii-

INDEX OF DEFINED TERMS

|  | Page |
|---|---|
| Acquisition Proposal | 47 |
| Advisory Agreement | 27 |
| Advisory Entity | 27 |
| affiliate | 57 |
| Agreement | 1 |
| Articles of Merger | 2 |
| Bank Merger | 4 |
| Bank Merger Agreement | 4 |
| Bank Merger Certificates | 4 |
| BHC Act | 7 |
| Boston Private | 1 |
| Boston Private 401(k) Plan | 44 |
| Boston Private Articles of Organization | 8 |
| Boston Private Bank | 4 |
| Boston Private Benefit Plans | 15 |
| Boston Private Bylaws | 8 |
| Boston Private Common Stock | 2 |
| Boston Private Compensation Committee | 3 |
| Boston Private Contract | 21 |
| Boston Private Disclosure Schedule | 7 |
| Boston Private Equity Award Exchange Ratio | 4 |
| Boston Private Equity Awards | 9 |
| Boston Private ERISA Affiliate | 16 |
| Boston Private ESPP | 4 |
| Boston Private Indemnified Parties | 45 |
| Boston Private Insiders | 48 |
| Boston Private Leased Properties | 23 |
| Boston Private Meeting | 42 |
| Boston Private Owned Properties | 23 |
| Boston Private Performance-Based RSU Award | 3 |
| Boston Private Performance-Based Stock Option | 3 |
| Boston Private Qualified Plans | 16 |
| Boston Private Real Property | 23 |
| Boston Private Regulatory Agreement | 21 |
| Boston Private Reports | 18 |
| Boston Private RSU Award | 3 |
| Boston Private Stock Option | 3 |
| Boston Private Subsidiary | 8 |
| business day | 57 |
| CECL | 12 |
| Certificate of Merger | 1 |
| Chosen Courts | 58 |
| Closing | 1 |
| Closing Date | 1 |
| Code | 1 |
| Confidentiality Agreement | 42 |
| Continuation Period | 43 |
| Continuing Employees | 43 |
| Data Protection Requirements | 19 |
| Delaware Secretary | 2 |
| Derivative Transaction | 22 |

| | Page |
|---|---|
| DGCL | 1 |
| Effective Time | 2 |
| Enforceability Exceptions | 10 |
| Environmental Laws | 22 |
| ERISA | 15 |
| Exception Shares | 2 |
| Exchange Act | 13 |
| Exchange Agent | 5 |
| Exchange Fund | 5 |
| Exchange Ratio | 2 |
| FDIC | 8 |
| Federal Reserve Board | 11 |
| Form ADV | 28 |
| GAAP | 8 |
| Governmental Entity | 11 |
| Intellectual Property | 23 |
| Investment Advisers Act | 27 |
| Investment Advisory Services | 27 |
| Investment Company Act | 28 |
| IRS | 16 |
| IT Assets | 24 |
| knowledge | 57 |
| Liens | 10 |
| Loans | 25 |
| made available | 57 |
| Massachusetts Secretary | 2 |
| Material Adverse Effect | 7 |
| Materially Burdensome Regulatory Condition | 41 |
| MBCA | 1 |
| Merger | 1 |
| Merger Consideration | 2 |
| Multiemployer Plan | 16 |
| Multiple Employer Plan | 16 |
| NASDAQ | 6 |
| New Certificates | 2 |
| New Plans | 43 |
| Non-Solicitation Covenant | 49 |
| Non-U.S. Retail Fund | 50 |
| Old Certificate | 2 |
| Pandemic Measures | 8 |
| PBGC | 16 |
| Per Share Cash Consideration | 2 |
| Permitted Encumbrances | 23 |
| person | 57 |
| Personal Data | 19 |
| Premium Cap | 45 |
| Privacy and Security Policies | 18 |
| Private Fund | 51 |
| Processing | 19 |
| Proxy Statement | 11 |
| Public Fund | 49 |

-v-

| | Page |
|---|---|
| Public Fund Board | 49 |
| Registered | 23 |
| Regulatory Agencies | 11 |
| Requisite Boston Private Vote | 10 |
| Requisite Regulatory Approvals | 52 |
| S-4 | 11 |
| Sarbanes-Oxley Act | 13 |
| SEC | 11 |
| Securities Act | 18 |
| Security Breach | 19 |
| Series A Preferred Stock | 30 |
| Software | 24 |
| SRO | 11 |
| Subsidiary | 8 |
| Superior Proposal | 47 |
| Surviving Corporation | 1 |
| SVB Bank | 4 |
| SVB Financial | 1 |
| SVB Financial 401(k) Plan | 44 |
| SVB Financial Bylaws | 4 |
| SVB Financial Certificate | 4 |
| SVB Financial Common Stock | 2 |
| SVB Financial Disclosure Schedule | 29 |
| SVB Financial PSU Award | 30 |
| SVB Financial Regulatory Agreement | 35 |
| SVB Financial Reports | 34 |
| SVB Financial Restricted Stock Award | 30 |
| SVB Financial RSU Award | 3 |
| SVB Financial Share Closing Price | 6 |
| SVB Financial Stock Option | 3 |
| SVB Financial Stock Options | 30 |
| Takeover Statutes | 25 |
| Tax | 15 |
| Tax Return | 15 |
| Taxes | 15 |
| Termination Date | 54 |
| Termination Fee | 55 |
| Transaction Notice | 50 |
| Trust Preferred Securities | 49 |
| Volcker Rule | 28 |

-vi-

## AGREEMENT AND PLAN OF MERGER

AGREEMENT AND PLAN OF MERGER, dated as of January 4, 2021 (this "Agreement"), by and between SVB Financial Group, a Delaware corporation ("SVB Financial"), and Boston Private Financial Holdings, Inc., a Massachusetts corporation ("Boston Private").

### W I T N E S S E T H :

WHEREAS, the Boards of Directors of SVB Financial and Boston Private have approved the entry into this Agreement and determined that it is in the best interests of their respective companies to consummate the strategic business combination transaction provided for herein, pursuant to which Boston Private will, subject to the terms and conditions set forth herein, merge with and into SVB Financial (the "Merger"), so that SVB Financial is the surviving corporation (hereinafter sometimes referred to in such capacity as the "Surviving Corporation") in the Merger;

WHEREAS, for Federal income tax purposes, it is intended that the Merger shall qualify as a "reorganization" within the meaning of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and this Agreement is intended to be and is adopted as a plan of reorganization for purposes of Sections 354 and 361 of the Code; and

WHEREAS, the parties desire to make certain representations, warranties and agreements in connection with the Merger and also to prescribe certain conditions to the Merger.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements contained herein, and intending to be legally bound hereby, the parties agree as follows:

### ARTICLE I

### THE MERGER

1.1  The Merger. Subject to the terms and conditions of this Agreement, in accordance with the Delaware General Corporation Law (the "DGCL") and the Massachusetts Business Corporations Act (the "MBCA"), at the Effective Time, Boston Private shall merge with and into SVB Financial. SVB Financial shall be the Surviving Corporation in the Merger and shall continue its corporate existence under the laws of the State of Delaware. Upon consummation of the Merger, the separate corporate existence of Boston Private shall terminate.

1.2  Closing. Subject to the terms and conditions of this Agreement, the closing of the Merger (the "Closing") will take place (a) by electronic exchange of documents at 10:00 a.m., New York City time, on the first business day of the calendar month following the calendar month in which all of the conditions set forth in Article VII hereof have been satisfied or waived at least three (3) business days before the end of such month (other than those conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver thereof), and if all such conditions are satisfied or waived within the last three (3) business days of a calendar month, then on the first business day of the second succeeding calendar month; or (b) at such other date, time or place as SVB Financial and Boston Private may mutually agree in writing after all of such conditions have been satisfied or waived (other than those conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver thereof). The date on which the Closing occurs is referred to in this Agreement as the "Closing Date."

1.3  Effective Time. On or (if agreed by SVB Financial and Boston Private) prior to the Closing Date, SVB Financial and Boston Private, respectively, shall cause to be filed a certificate of merger (the "Certificate of

Merger") with the Delaware Secretary of State (the "Delaware Secretary") and articles of merger (the "Articles of Merger") with the Secretary of the Commonwealth of Massachusetts (the "Massachusetts Secretary"). The Merger shall become effective at such time as specified in the Certificate of Merger in accordance with the relevant provisions of the DGCL and MBCA, or at such other time as shall be provided by applicable law (such time hereinafter referred to as the "Effective Time").

1.4    Effects of the Merger. At and after the Effective Time, the Merger shall have the effects set forth in the applicable provisions of the DGCL, the MBCA and this Agreement.

1.5    Conversion of Boston Private Common Stock. At the Effective Time, by virtue of the Merger and without any action on the part of SVB Financial, Boston Private or the holder of any of the following securities:

(a)    Subject to Section 2.2(e), each share of the common stock, par value $1.00 per share, of Boston Private issued and outstanding immediately prior to the Effective Time (the "Boston Private Common Stock"), except for shares of Boston Private Common Stock owned by Boston Private as treasury stock or otherwise owned by Boston Private or SVB Financial (in each case other than shares of Boston Private Common Stock (i) held in any Boston Private Benefit Plans or related trust accounts, managed accounts, mutual funds and the like, or otherwise held in a fiduciary or agency capacity, that are beneficially owned by third parties and (ii) shares held, directly or indirectly, in respect of debts previously contracted (collectively, the "Exception Shares")), shall be converted, in accordance with the procedures set forth in this Agreement, into the right to receive, without interest, (i) 0.0228 shares (the "Exchange Ratio") of the common stock, par value $0.001 per share, of SVB Financial (the "SVB Financial Common Stock") and (ii) $2.10 in cash (the "Per Share Cash Consideration") (the consideration described in clauses (i) and (ii), the "Merger Consideration").

(b)    All the shares of Boston Private Common Stock converted into the right to receive the Merger Consideration pursuant to this Article I shall no longer be outstanding and shall automatically be cancelled and shall cease to exist as of the Effective Time, and each certificate (each, an "Old Certificate", it being understood that any reference herein to "Old Certificate" shall be deemed to include reference to book-entry account statements relating to the ownership of shares of Boston Private Common Stock) previously representing any such shares of Boston Private Common Stock shall thereafter represent only the right to receive (i) the Merger Consideration, (ii) cash in lieu of a fractional share which the shares of Boston Private Common Stock represented by such Old Certificate have been converted into the right to receive pursuant to this Section 1.5 and Section 2.2(e), without any interest thereon, and (iii) any dividends or distributions which the holder thereof has the right to receive pursuant to Section 2.2, without any interest thereon. Old Certificates previously representing shares of Boston Private Common Stock shall be exchanged for certificates or, at SVB Financial's option, evidence of shares in book-entry form (collectively referred to herein as "New Certificates"), representing whole shares of SVB Financial Common Stock and cash as set forth in Section 1.5(a) (together with any dividends or distributions with respect thereto and cash in lieu of fractional shares issued in consideration therefor) upon the surrender of such Old Certificates in accordance with Section 2.2, without any interest thereon. If, between the date of this Agreement and the Effective Time, the outstanding shares of Boston Private Common Stock or SVB Financial Common Stock shall have been, in accordance with Section 5.2(b) or Section 5.3(b), respectively, changed into or exchanged for a different number or kind of shares or securities, as a result of a reorganization, recapitalization, reclassification, stock dividend, stock split, reverse stock split, or other similar change in capitalization, or there shall be any extraordinary dividend or distribution, an appropriate and proportionate adjustment shall be made to the Exchange Ratio, and to the Merger Consideration, to give holders of Boston Private Common Stock the same economic effect as contemplated by this Agreement prior to such event.

(c)    Notwithstanding anything in this Agreement to the contrary, at the Effective Time, all shares of Boston Private Common Stock that are owned by Boston Private or SVB Financial (in each case other than the Exception Shares) or by any direct or indirect Boston Private Subsidiary prior to the Effective Time shall be cancelled and shall cease to exist and neither the Merger Consideration nor any other consideration shall be delivered in exchange therefor.

-2-

1.6    <u>SVB Financial Common Stock</u>. At and after the Effective Time, each share of SVB Financial Common Stock issued and outstanding immediately prior to the Effective Time shall remain issued and outstanding and shall not be affected by the Merger.

1.7    <u>Treatment of Boston Private Equity Awards</u>.

(a)    At the Effective Time, each option to purchase shares of Boston Private Common Stock that is not a Boston Private Performance-Based Stock Option (a "<u>Boston Private Stock Option</u>") that is outstanding and unexercised immediately prior to the Effective Time shall, automatically and without any required action on the part of the holder thereof, be converted into an option (a "<u>SVB Financial Stock Option</u>") to purchase that number of whole shares of SVB Financial Common Stock (rounded down to the nearest whole share) equal to the product of (i) the number of shares of Boston Private Common Stock subject to such Boston Private Stock Option multiplied by (ii) the Boston Private Equity Award Exchange Ratio (as defined below in Section 1.7(f)) with an exercise price per share of Boston Private Common Stock (rounded up to the nearest whole cent) equal to the quotient of (x) the exercise price per share of Boston Private Common Stock of such Boston Private Stock Option divided by (y) the Boston Private Equity Award Exchange Ratio; <u>provided</u>, <u>however</u>, that the exercise price and the number of shares of SVB Financial Common Stock purchasable pursuant to the Boston Private Stock Options shall be determined in a manner consistent with the requirements of Section 409A of the Code; <u>provided</u>, <u>further</u>, that in the case of any Boston Private Stock Option to which Section 422 of the Code applies, the exercise price and the number of shares of SVB Financial Common Stock purchasable pursuant to such option shall be determined in accordance with the foregoing, subject to such adjustments as are necessary in order to satisfy the requirements of Section 424(a) of the Code. Except as expressly provided in this Section 1.7(a), each such SVB Financial Stock Option shall be subject to the same terms and conditions (including vesting and exercisability terms) as applied to the corresponding Boston Private Stock Option immediately prior to the Effective Time.

(b)    At the Effective Time, each performance-based stock option award in respect of shares of Boston Private Common Stock (a "<u>Boston Private Performance-Based Stock Option</u>") that is outstanding and unexercised immediately prior to the Effective Time shall, subject to requisite consent by the holder thereof, be cancelled at the Effective Time for no consideration or payment.

(c)    At the Effective Time, each time-based restricted stock unit award in respect of shares of Boston Private Common Stock (a "<u>Boston Private RSU Award</u>") that is outstanding immediately prior to the Effective Time shall, automatically and without any required action on the part of the holder thereof, be converted into a restricted stock unit award (a "<u>SVB Financial RSU Award</u>") in respect of that number of shares of SVB Financial Common Stock (rounded to the nearest whole share) equal to the product of (i) the total number of shares of Boston Private Common Stock subject to the Boston Private RSU Award immediately prior to the Effective Time multiplied by (ii) the Boston Private Equity Award Exchange Ratio. Each such SVB Financial RSU Award shall be settleable in shares of SVB Financial Common Stock. Except as expressly provided in this Section 1.7(c), each such SVB Financial RSU Award shall be subject to the same terms and conditions (including vesting terms) as applied to the corresponding Boston Private RSU Award immediately prior to the Effective Time.

(d)    At the Effective Time, each performance-based restricted stock unit award in respect of shares of Boston Private Common Stock (a "<u>Boston Private Performance-Based RSU Award</u>") that is outstanding immediately prior to the Effective Time shall, automatically and without any required action on the part of the holder thereof, be converted into a SVB Financial RSU Award in respect of that number of shares of SVB Financial Common Stock (rounded to the nearest whole share) equal to the product of (i) the total number of shares of Boston Private Common Stock subject to the Boston Private Performance-Based RSU Award immediately prior to the Effective Time, with the number of shares of Boston Private Common Stock determined based on the greater of target and actual performance for the portion of the performance period through the Effective Time as reasonably determined by the compensation committee of the Boston Private Board of Directors (the "<u>Boston Private Compensation Committee</u>") consistent with past practice multiplied by (ii) the Boston Private Equity Award Exchange Ratio. Each such SVB Financial RSU Award

-3-

shall be settleable in shares of SVB Financial Common Stock. Except as specifically provided in this Section 1.7(d), each such SVB Financial RSU Award shall be subject to the same terms and conditions (including service-based vesting terms) as applied to the corresponding Boston Private Performance-Based RSU Award immediately prior to the Effective Time.

(e)     At or prior to the Effective Time, Boston Private, the Board of Directors of Boston Private or the Boston Private Compensation Committee, as applicable, shall adopt any resolutions and take any actions that are necessary to effectuate the provisions of this Section 1.7. As of the Effective Time, the number and kind of shares available for issuance under each equity incentive plan of Boston Private shall be adjusted to reflect SVB Financial Common Stock in accordance with the provisions of the applicable plan. SVB Financial shall take all corporate actions that are necessary for the assumption of the Boston Private Equity Awards pursuant to Section 1.7(a) through 1.7(d), including the reservation, issuance and listing of SVB Financial Common Stock as necessary to effect the transactions contemplated by this Section 1.7. As soon as practicable following the Effective Time, SVB Financial shall file with the SEC a post-effective amendment to the Form S-4 or a registration statement on Form S-8 (or any successor or other appropriate form) with respect to the shares of SVB Financial Common Stock underlying such Boston Private Equity Awards, and shall use reasonable best efforts to maintain the effectiveness of such registration statement for so long as such assumed Boston Private Equity Awards remain outstanding.

(f)     For purposes of this Agreement, "Boston Private Equity Award Exchange Ratio" means the sum of (A) the Exchange Ratio and (B) the quotient obtained by dividing (I) the Per Share Cash Consideration by (II) the SVB Financial Share Closing Price (as defined below in Section 2.2(e)).

1.8     Treatment of Boston Private ESPP. The right to acquire shares of Boston Private Common Stock under the 2001 Employee Stock Purchase Plan, as amended and restated (the "Boston Private ESPP") is not a Boston Private Stock Option for purposes of this Agreement. No Offering (as defined in the Boston Private ESPP) shall be commenced for a period after December 31, 2020.

1.9     Certificate of Incorporation of Surviving Corporation. At the Effective Time, the Amended and Restated Certificate of Incorporation of SVB Financial (the "SVB Financial Certificate"), as in effect at the Effective Time, shall be the Certificate of Incorporation of the Surviving Corporation until thereafter amended in accordance with its terms and applicable law.

1.10     Bylaws of Surviving Corporation. At the Effective Time, the Amended and Restated Bylaws of SVB Financial (the "SVB Financial Bylaws"), as in effect at the Effective Time, shall be the Bylaws of the Surviving Corporation until thereafter amended in accordance with their terms and applicable law.

1.11     Tax Consequences. It is intended that the Merger shall qualify as a "reorganization" within the meaning of Section 368(a) of the Code, and that this Agreement is intended to be and is adopted as a plan of reorganization for the purposes of Sections 354 and 361 of the Code.

1.12     Bank Merger. Following the Merger, Boston Private Bank & Trust Company ("Boston Private Bank"), a Massachusetts-chartered trust company and a wholly owned Subsidiary of Boston Private, will merge (the "Bank Merger") with and into Silicon Valley Bank ("SVB Bank"), a California-chartered commercial bank and a wholly owned Subsidiary of SVB Financial, pursuant to an agreement in substantially the form attached hereto as Exhibit A (with such reasonable changes as specified by SVB Financial), which agreement shall be entered into by SVB Bank and Boston Private Bank promptly after the date of this Agreement (the "Bank Merger Agreement"). SVB Bank shall be the surviving entity in the Bank Merger and, following the Bank Merger, the separate corporate existence of Boston Private Bank shall cease. Prior to the Effective Time, Boston Private shall cause Boston Private Bank, and SVB Financial shall cause SVB Bank, to execute the Bank Merger Agreement and such certificates or articles of merger and such other documents and certificates as are necessary to make the Bank Merger effective ("Bank Merger Certificates") following the Effective Time.

-4-

ARTICLE II

EXCHANGE OF SHARES

2.1   <u>SVB Financial to Make Shares Available</u>. At or prior to the Effective Time, SVB Financial shall deposit, or shall cause to be deposited, with a bank or trust company designated by SVB Financial and reasonably acceptable to Boston Private (the "<u>Exchange Agent</u>"), for the benefit of the holders of Old Certificates, for exchange in accordance with this Article II, (a) New Certificates to be issued pursuant to Section 1.5 and exchanged pursuant to Section 2.2(a) in exchange for outstanding shares of Boston Private Common Stock, and (b) cash in an amount sufficient to pay (i) the aggregate cash portion of the Merger Consideration and (ii) cash in lieu of any fractional shares (such cash and New Certificates described in the foregoing clauses (a) and (b), together with any dividends or distributions with respect thereto, being hereinafter referred to as the "<u>Exchange Fund</u>"). The Exchange Agent shall invest any cash included in the Exchange Fund as directed by SVB Financial, provided that no such investment or losses thereon shall affect the amount of Merger Consideration payable to the holders of Old Certificates. Any interest and other income resulting from such investments shall be paid to SVB Financial.

2.2   <u>Exchange of Shares</u>.

(a)   As promptly as practicable after the Effective Time, but in no event later than ten (10) days thereafter, SVB Financial shall cause the Exchange Agent to mail to each holder of record of one or more Old Certificates representing shares of Boston Private Common Stock immediately prior to the Effective Time that have been converted at the Effective Time into the right to receive the Merger Consideration pursuant to Article I, a letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to the Old Certificates shall pass, only upon proper delivery of the Old Certificates to the Exchange Agent) and instructions for use in effecting the surrender of the Old Certificates in exchange for certificates representing the number of whole shares of SVB Financial Common Stock, any cash in lieu of fractional shares and the cash portion of the Merger Consideration which the shares of Boston Private Common Stock represented by such Old Certificate or Old Certificates shall have been converted into the right to receive pursuant to this Agreement as well as any dividends or distributions to be paid pursuant to Section 2.2(b). From and after the Effective Time, upon proper surrender of an Old Certificate or Old Certificates for exchange and cancellation to the Exchange Agent, together with such properly completed letter of transmittal, duly executed, the holder of such Old Certificate or Old Certificates shall be entitled to receive in exchange therefor, as applicable, (i) a New Certificate representing that number of whole shares of SVB Financial Common Stock to which such holder of Boston Private Common Stock shall have become entitled pursuant to the provisions of Article I and (ii) a check representing the amount of (A) the cash portion of the Merger Consideration which such holder has the right to receive in respect of the Old Certificate or Old Certificates surrendered pursuant to the provisions of this Article II, (B) any cash in lieu of fractional shares which such holder has the right to receive in respect of the Old Certificate or Old Certificates surrendered pursuant to the provisions of this Article II and (C) any dividends or distributions which the holder thereof has the right to receive pursuant to this Section 2.2, and the Old Certificate or Old Certificates so surrendered shall forthwith be cancelled. No interest will be paid or accrued on the cash portion of the Merger Consideration or any cash in lieu of fractional shares payable to holders of Old Certificates. Until surrendered as contemplated by this Section 2.2, each Old Certificate shall be deemed at any time after the Effective Time to represent only the right to receive, upon surrender, the Merger Consideration and any cash in lieu of fractional shares or in respect of dividends or distributions as contemplated by this Section 2.2.

(b)   No dividends or other distributions declared (if any) with respect to SVB Financial Common Stock shall be paid to the holder of any unsurrendered Old Certificate until the holder thereof shall surrender such Old Certificate in accordance with this Article II. After the surrender of an Old Certificate in accordance with this Article II, the record holder thereof shall be entitled to receive any such dividends or other distributions, without any interest thereon, which theretofore had become payable with respect to the

-5-

whole shares of SVB Financial Common Stock which the shares of Boston Private Common Stock represented by such Old Certificate have been converted into the right to receive.

(c)    If any New Certificate representing shares of SVB Financial Common Stock is to be issued in a name other than that in which the Old Certificate or Old Certificates surrendered in exchange therefor is or are registered, it shall be a condition of the issuance thereof that the Old Certificate or Old Certificates so surrendered shall be properly endorsed (or accompanied by an appropriate instrument of transfer) and otherwise in proper form for transfer, and that the person requesting such exchange shall pay to the Exchange Agent in advance any transfer or other similar Taxes required by reason of the issuance of a New Certificate representing shares of SVB Financial Common Stock in any name other than that of the registered holder of the Old Certificate or Old Certificates surrendered, or required for any other reason, or shall establish to the satisfaction of the Exchange Agent that such Tax has been paid or is not payable.

(d)    After the Effective Time, there shall be no transfers on the stock transfer books of Boston Private of the shares of Boston Private Common Stock that were issued and outstanding immediately prior to the Effective Time. If, after the Effective Time, Old Certificates representing such shares are presented for transfer to the Exchange Agent, they shall be cancelled and exchanged for the Merger Consideration, cash in lieu of fractional shares and dividends or distributions that the holder presenting such Old Certificates is entitled to, as provided in this Article II.

(e)    Notwithstanding anything to the contrary contained herein, no New Certificates or scrip representing fractional shares of SVB Financial Common Stock shall be issued upon the surrender for exchange of Old Certificates, no dividend or distribution with respect to SVB Financial Common Stock shall be payable on or with respect to any fractional share, and such fractional share interests shall not entitle the owner thereof to vote or to any other rights of a shareholder of SVB Financial. In lieu of the issuance of any such fractional share, SVB Financial shall pay to each former shareholder of Boston Private who otherwise would be entitled to receive such fractional share an amount in cash (rounded up to the nearest whole cent) determined by multiplying (i) the average of the closing-sale prices of SVB Financial Common Stock on the NASDAQ Stock Market (the "NASDAQ") as reported by *The Wall Street Journal* for the five (5) full trading days ending on the day preceding the Closing Date (the "SVB Financial Share Closing Price") by (ii) the fraction of a share (rounded to the nearest thousandth when expressed in decimal form) of SVB Financial Common Stock which such holder would otherwise be entitled to receive pursuant to Section 1.5. The parties acknowledge that payment of such cash consideration in lieu of issuing fractional shares is not separately bargained-for consideration, but merely represents a mechanical rounding off for purposes of avoiding the expense and inconvenience that would otherwise be caused by the issuance of fractional shares.

(f)    Any portion of the Exchange Fund that remains unclaimed by the shareholders of Boston Private for one (1) year after the Effective Time shall be paid to the Surviving Corporation. Any former shareholders of Boston Private who have not theretofore exchanged their Old Certificates pursuant to this Article II shall thereafter look only to the Surviving Corporation for payment of the Merger Consideration, cash in lieu of any fractional shares and any unpaid dividends and distributions on the SVB Financial Common Stock deliverable in respect of each former share of Boston Private Common Stock such shareholder holds as determined pursuant to this Agreement, in each case, without any interest thereon. Notwithstanding the foregoing, none of SVB Financial, Boston Private, the Surviving Corporation, the Exchange Agent or any other person shall be liable to any former holder of shares of Boston Private Common Stock for any amount delivered in good faith to a public official pursuant to applicable abandoned property, escheat or similar laws. SVB Financial and the Exchange Agent shall be entitled to rely upon the stock transfer books and records of Boston Private to establish the identity of those entitled to receive shares of SVB Financial Common Stock or any other amounts issuable or payable in accordance with this Agreement, which books and records shall be conclusive with respect thereto.

(g)    SVB Financial shall be entitled to deduct and withhold, or cause the Exchange Agent to deduct and withhold, from the cash portion of the Merger Consideration, any cash in lieu of fractional shares of

-6-

SVB Financial Common Stock, cash dividends or distributions payable pursuant to this Section 2.2 or any other cash amounts otherwise payable pursuant to this Agreement to any holder of Boston Private Common Stock such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code or any provision of state, local or foreign Tax law. To the extent that amounts are so withheld by SVB Financial or the Exchange Agent, as the case may be, and paid over to the appropriate governmental authority, the withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of Boston Private Common Stock in respect of which the deduction and withholding was made by SVB Financial or the Exchange Agent, as the case may be.

(h)    In the event any Old Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming such Old Certificate to be lost, stolen or destroyed and, if required by SVB Financial, the posting by such person of a bond in such amount as SVB Financial may determine is reasonably necessary as indemnity against any claim that may be made against it with respect to such Old Certificate, the Exchange Agent will issue in exchange for such lost, stolen or destroyed Old Certificate the Merger Consideration and any cash in lieu of fractional shares deliverable in respect thereof pursuant to this Agreement.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF BOSTON PRIVATE

Except (i) as disclosed in the disclosure schedule delivered by Boston Private to SVB Financial concurrently herewith (the "Boston Private Disclosure Schedule"), provided, that (a) no such item is required to be set forth as an exception to a representation or warranty if its absence would not result in the related representation or warranty being deemed untrue or incorrect, (b) the mere inclusion of an item in the Boston Private Disclosure Schedule as an exception to a representation or warranty shall not be deemed an admission by Boston Private that such item represents a material exception or fact, event or circumstance or that such item is reasonably expected to have a Material Adverse Effect and (c) any disclosures made with respect to a section of this Article III shall be deemed to qualify (1) any other section of this Article III specifically referenced or cross-referenced and (2) other sections of this Article III to the extent it is reasonably apparent on its face (notwithstanding the absence of a specific reference or cross reference) from a reading of the disclosure that such disclosure applies to such other sections or (ii) as disclosed in any Boston Private Reports filed by Boston Private since December 31, 2018, and prior to the date hereof (but disregarding risk factor disclosures contained under the heading "Risk Factors," or disclosures of risks set forth in any "forward-looking statements" disclaimer or any other statements that are similarly non-specific or cautionary, predictive or forward-looking in nature), Boston Private hereby represents and warrants to SVB Financial as follows:

3.1    Corporate Organization.

(a)    Boston Private is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts and is a bank holding company duly registered under the Bank Holding Company Act of 1956, as amended (the "BHC Act"). Boston Private has the corporate power and authority to own, lease or operate all its properties and assets and to carry on its business as it is now being conducted in all material respects. Boston Private is duly licensed or qualified to do business and in good standing in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such licensing, qualification or standing necessary, except where the failure to be so licensed or qualified or to be in good standing would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Boston Private. As used in this Agreement, the term "Material Adverse Effect" means, with respect to SVB Financial, Boston Private or the Surviving Corporation, as the case may be, any effect, change, event, circumstance, condition, occurrence or development that, either individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on (i) the business, properties, assets,

-7-

liabilities, results of operations or financial condition of such party and its Subsidiaries taken as a whole (provided, however, that, with respect to this clause (i), Material Adverse Effect shall not be deemed to include the impact of (A) changes, after the date hereof, in U.S. generally accepted accounting principles ("GAAP") or applicable regulatory accounting requirements, (B) changes, after the date hereof, in laws, rules or regulations of general applicability to companies in the industries in which such party and its Subsidiaries operate, or interpretations thereof by courts or Governmental Entities, (C) changes, after the date hereof, in global, national or regional political conditions (including the outbreak of war or acts of terrorism) or in economic or market (including equity, credit and debt markets, as well as changes in interest rates) conditions affecting the financial services industry generally and not specifically relating to such party or its Subsidiaries, (D) changes, after the date hereof, resulting from hurricanes, earthquakes, tornados, floods or other natural disasters or from any outbreak of any disease or other public health event (including the COVID-19 pandemic and the implementation of the Pandemic Measures), (E) public disclosure or consummation of the transactions contemplated hereby or actions expressly required by this Agreement or that are taken with the prior written consent of the other party in contemplation of the transactions contemplated hereby (it being understood and agreed that this clause (E) shall not apply with respect to any representation or warranty that is intended to address the consequences of the execution, announcement or performance of this Agreement or consummation of the Merger) or (F) the failure, in and of itself, to meet earnings projections or financial forecasts, but not including the underlying causes thereof; except, with respect to subclause (A), (B), (C) or (D), to the extent that the effects of such change are disproportionately adverse to the business, properties, assets, liabilities, results of operations or financial condition of such party and its Subsidiaries, taken as a whole, as compared to similar companies in the industry in which such party and its Subsidiaries operate); or (ii) the ability of such party to timely consummate the transactions contemplated hereby. As used in this Agreement, the term "Pandemic Measures" means any quarantine, "shelter in place", "stay at home", social distancing, shut down, closure, sequester or other directives, guidelines or recommendations promulgated by any Governmental Entity, including the Centers for Disease Control and Prevention and the World Health Organization, in each case, in connection with or in response to the COVID-19 pandemic; and the term "Subsidiary" when used with respect to any person, means any subsidiary of such person within the meaning ascribed to such term in either Rule 1-02 of Regulation S-X promulgated by the SEC or the BHC Act. True and complete copies of the Restated Articles of Organization of Boston Private, as amended (the "Boston Private Articles of Organization") and the Amended and Restated Bylaws of Boston Private (the "Boston Private Bylaws"), in each case as in effect as of the date of this Agreement, have previously been made available by Boston Private to SVB Financial.

(b)    Each Subsidiary of Boston Private (a "Boston Private Subsidiary") (i) is duly organized and validly existing under the laws of its jurisdiction of organization, (ii) is duly licensed or qualified to do business and, where such concept is recognized under applicable law, in good standing in all jurisdictions (whether federal, state, local or foreign) where its ownership, leasing or operation of property or the conduct of its business requires it to be so licensed or qualified and in which the failure to be so licensed or qualified or in good standing would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect on Boston Private and (iii) has all requisite corporate power and authority to own, lease or operate its properties and assets and to carry on its business as now conducted, except where the failure to have such corporate power or authority would not, individually or in the aggregate, reasonably be expected to be material to Boston Private and its Subsidiaries, taken as a whole. There are no restrictions on the ability of Boston Private or any Boston Private Subsidiary to pay dividends or distributions except, in the case of Boston Private or a Boston Private Subsidiary that is a regulated entity, for restrictions on dividends or distributions generally applicable to all such regulated entities under applicable law. The deposit accounts of Boston Private Bank are insured by the Federal Deposit Insurance Corporation (the "FDIC") through the Deposit Insurance Fund (as defined in Section 3(y) of the Federal Deposit Insurance Act of 1950) to the fullest extent permitted by law, all premiums and assessments required to be paid in connection therewith have been paid when due, and no proceedings for the termination of such insurance are pending or, to Boston Private's knowledge, threatened. There are no Subsidiaries of Boston Private other than Boston Private Bank that have or are required to have deposit insurance. Section 3.1(b) of the Boston Private

-8-

Disclosure Schedule sets forth a true, correct and complete list of all Boston Private Subsidiaries as of the date hereof. True and complete copies of the organizational documents of each Boston Private Subsidiary as in effect as of the date of this Agreement have previously been made available by Boston Private to SVB Financial. There is no person whose results of operations, cash flows, changes in shareholders' equity or financial position are consolidated in the financial statements of Boston Private other than the Boston Private Subsidiaries.

3.2    Capitalization.

(a)    The authorized capital stock of Boston Private consists of 170,000,000 shares of Boston Private Common Stock and 2,000,000 shares of preferred stock, par value $1.00 per share. As of December 27, 2020, there were (i) 82,334,257 shares of Boston Private Common Stock issued and outstanding; (ii) 1,118,703 shares of Boston Private Common Stock reserved for issuance upon the exercise of outstanding Boston Private Stock Options; (iii) 391,850 shares of Boston Private Common Stock reserved for issuance upon the exercise of the Boston Private Performance-Based Stock Options (assuming performance goals are fully satisfied); (iv) 998,613 shares of Boston Private Common Stock reserved for issuance upon the settlement of outstanding Boston Private RSU Awards; (v) 1,525,993 shares of Boston Private Common Stock reserved for issuance upon the settlement of outstanding Boston Private Performance-Based RSU Awards (assuming performance goals are satisfied at the target level) or 2,618,758 shares of Boston Private Common Stock reserved for issuance upon the settlement of outstanding Boston Private Performance-Based RSU Awards (assuming performance goals are satisfied at the maximum level); (vi) 81,929 shares of Boston Private Common Stock reserved for issuance under the Boston Private ESPP; and (vii) no shares of preferred stock outstanding. As of the date of this Agreement, except as set forth in the immediately preceding sentence, for changes since December 27, 2020 resulting from the exercise, vesting or settlement of any Boston Private Stock Options, Boston Private Performance-Based Stock Options, Boston Private RSU Awards, Boston Private Performance-Based RSU Awards and accumulated contributions to purchase shares of Boston Private Common Stock under the Boston Private ESPP (collectively, "Boston Private Equity Awards") described in the immediately preceding sentence, there are no shares of capital stock or other voting securities or equity interests of Boston Private issued, reserved for issuance or outstanding. All the issued and outstanding shares of Boston Private Common Stock have been duly authorized and validly issued and are fully paid, nonassessable and free of preemptive rights, with no personal liability attaching to the ownership thereof. There are no bonds, debentures, notes or other indebtedness that have the right to vote on any matters on which shareholders of Boston Private may vote. Except as set forth in Section 3.2(a) of the Boston Private Disclosure Schedule, as of the date of this Agreement, no trust preferred or subordinated debt securities of Boston Private are issued or outstanding. Other than Boston Private Equity Awards issued prior to the date of this Agreement as described in this Section 3.2(a), as of the date of this Agreement there are no outstanding subscriptions, options, warrants, stock appreciation rights, phantom units, scrip, rights to subscribe to, preemptive rights, anti-dilutive rights, rights of first refusal or similar rights, puts, calls, commitments or agreements of any character relating to, or securities or rights convertible or exchangeable into or exercisable for, shares of capital stock or other voting or equity securities of or ownership interest in Boston Private, or contracts, commitments, understandings or arrangements by which Boston Private may become bound to issue additional shares of its capital stock or other equity or voting securities of or ownership interests in Boston Private, or that otherwise obligate Boston Private to issue, transfer, sell, purchase, redeem or otherwise acquire, any of the foregoing.

(b)    There are no voting trusts, shareholder agreements, proxies or other agreements in effect to which Boston Private or any of its Subsidiaries is a party with respect to the voting or transfer of Boston Private Common Stock, capital stock or other voting or equity securities or ownership interests of Boston Private or granting any shareholder or other person any registration rights. Section 3.2(b) of the Boston Private Disclosure Schedule sets forth a true, correct and complete list of all Boston Private Equity Awards outstanding as of the date hereof specifying, on a holder-by-holder basis, (A) the name of each holder, (B) the number of shares subject to each such Boston Private Equity Award, (C) the grant date of each such

-9-

Boston Private Equity Award, (D) the Boston Private equity incentive plan under which such Boston Private Equity Award was granted, (E) the exercise price for each Boston Private Equity Award that is a Boston Private Stock Option, and (F) the expiration date of each such Boston Private Equity Award that is a Boston Private Stock Option. Other than the Boston Private Equity Awards, no equity-based awards (including any cash awards where the amount of payment is determined in whole or in part based on the price of any capital stock of Boston Private or any of its Subsidiaries) are outstanding.

(c)     Except as set forth on Section 3.2(c) of the Boston Private Disclosure Schedule, Boston Private owns, directly or indirectly, all of the issued and outstanding shares of capital stock or other equity ownership interests of each of the Boston Private Subsidiaries, free and clear of any liens, claims, title defects, mortgages, pledges, charges, encumbrances and security interests whatsoever ("Liens"), and all of such shares or equity ownership interests are duly authorized and validly issued and are fully paid, nonassessable (except, with respect to Boston Private Subsidiaries that are depository institutions, as provided under any provision of applicable state law comparable to 12 U.S.C. § 55) and free of preemptive rights, with no personal liability attaching to the ownership thereof. No Boston Private Subsidiary has or is bound by any outstanding subscriptions, options, warrants, calls, rights, commitments or agreements of any character calling for the purchase or issuance of any shares of capital stock or any other equity security of such Subsidiary or any securities representing the right to purchase or otherwise receive any shares of capital stock or any other equity security of such Subsidiary.

(d)     Other than its ownership interests in the Boston Private Subsidiaries, Boston Private does not directly or indirectly "own" or "control" (such terms as used within the meaning of the BHC Act and its implementing regulations) any equity securities of any other person.

3.3    Authority; No Violation.

(a)     Boston Private has full corporate power and authority to execute and deliver this Agreement and, subject to the shareholder and other actions described below, to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the Merger have been duly and validly approved by the Board of Directors of Boston Private. The Board of Directors of Boston Private has determined that the Merger, on the terms and conditions set forth in this Agreement, is advisable and in the best interests of Boston Private and its shareholders, has adopted this Agreement and the transactions contemplated hereby (including the Merger), and has directed that this Agreement be submitted to Boston Private's shareholders for approval at a meeting of such shareholders and has adopted a resolution to the foregoing effect. Except for the approval of this Agreement by the affirmative vote of sixty-six and two-thirds percent (66 2/3%) of all the shares of Boston Private Common Stock entitled to vote on this Agreement (the "Requisite Boston Private Vote"), and the approval of the Bank Merger Agreement by the board of directors of Boston Private Bank and Boston Private as Boston Private Bank's sole shareholder, no other corporate proceedings on the part of Boston Private are necessary to approve this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Boston Private and (assuming due authorization, execution and delivery by SVB Financial) constitutes a valid and binding obligation of Boston Private, enforceable against Boston Private in accordance with its terms (except in all cases as such enforceability may be limited by bankruptcy, insolvency, fraudulent transfer, moratorium, reorganization or similar laws of general applicability affecting the rights of creditors generally and the availability of equitable remedies (the "Enforceability Exceptions")).

(b)     Neither the execution and delivery of this Agreement by Boston Private nor the consummation by Boston Private of the transactions contemplated hereby (including the Merger and the Bank Merger), nor compliance by Boston Private with any of the terms or provisions hereof, will (i) violate any provision of the Boston Private Articles of Organization or the Boston Private Bylaws or comparable governing documents of any Boston Private Subsidiary, or (ii) assuming that the consents and approvals referred to in Section 3.4 are duly obtained, (x) violate any law, statute, code, ordinance, rule, regulation, judgment, order, writ, decree or injunction applicable to Boston Private or any of its Subsidiaries or any of their respective

-10-

properties or assets, or (y) violate, conflict with, result in a breach of any provision of or the loss of any benefit under, constitute a default (or an event that, with notice or lapse of time, or both, would constitute a default) under, result in the termination of or a right of termination or cancellation under, accelerate the performance required by, or result in the creation of any Lien upon any of the respective properties or assets of Boston Private or any of its Subsidiaries under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which Boston Private or any of its Subsidiaries is a party, or by which they or any of their respective properties or assets may be bound, except (in the case of clauses (x) and (y) above) for such violations, conflicts, breaches, defaults, terminations, cancellations, accelerations or creations that, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect on Boston Private.

3.4    <u>Consents and Approvals</u>. Except for (a) the filing of any required applications, filings and notices, as applicable, with the NASDAQ Stock Market, LLC, (b) the filing of any required applications, filings and notices, as applicable, with the Board of Governors of the Federal Reserve System (the "<u>Federal Reserve Board</u>") under the BHC Act and approval of such applications, filings and notices, (c) the filing of any required applications, filings and notices, as applicable, with the Federal Reserve Board under the Bank Merger Act, and approval of such applications, filings and notices, (d) the filing of any required applications, filings and notices, as applicable, with the California Department of Financial Protection and Innovation and the Massachusetts Commissioner of Banks, and approval of such applications, filings and notices, including the making of any arrangements with the Massachusetts Housing Partnership Fund necessary to obtain approval of the Massachusetts Commissioner of Banks, (e) those additional applications, filings and notices, if any, listed on Section 3.4 of the Boston Private Disclosure Schedule or Section 4.4 of the SVB Financial Disclosure Schedule and approval of such applications, filings and notices, (f) the filing with the Securities and Exchange Commission (the "<u>SEC</u>") of a proxy statement in definitive form relating to the meeting of Boston Private's shareholders to be held in connection with this Agreement and the transactions contemplated hereby (including any amendments or supplements thereto, the "<u>Proxy Statement</u>"), and the registration statement on Form S-4 in which the Proxy Statement will be included as a prospectus, to be filed with the SEC by SVB Financial in connection with the transactions contemplated by this Agreement (the "<u>S-4</u>") and the declaration by the SEC of the effectiveness of the S-4, (g) the filing of the proxy solicitation and other advisory client materials for any Public Funds with the SEC, as contemplated by Section 6.18, (h) the filing of the Certificate of Merger with the Delaware Secretary pursuant to the DGCL, the filing of the Articles of Merger with the Massachusetts Secretary pursuant to the MBCA and the filing of the Bank Merger Certificates with the applicable Governmental Entities as required by applicable law, and (i) such filings and approvals as are required to be made or obtained under the securities or "Blue Sky" laws of various states in connection with the issuance of the shares of SVB Financial Common Stock pursuant to this Agreement and the approval of the listing of such SVB Financial Common Stock on the NASDAQ, no consents or approvals of or filings or registrations with any court, administrative agency or commission or other governmental or regulatory authority or instrumentality or SRO (each a "<u>Governmental Entity</u>") are necessary in connection with (A) the execution and delivery by Boston Private of this Agreement or (B) the consummation by Boston Private of the Merger and the other transactions contemplated hereby (including the Bank Merger). As of the date hereof, Boston Private has no knowledge of any reason why the necessary regulatory approvals and consents will not be received by Boston Private to permit consummation of the Merger and the Bank Merger on a timely basis.

3.5    <u>Reports</u>. Boston Private and each of its Subsidiaries have timely filed (or furnished, as applicable) all reports, forms, correspondence, registrations and statements, together with any amendments required to be made with respect thereto, that they were required to file (or furnish, as applicable) since January 1, 2018 with (i) any state regulatory authority (including any state securities commission or similar authority), (ii) the SEC, (iii) the Federal Reserve Board, (iv) the FDIC, (v) any foreign regulatory authority and (vi) any self-regulatory organization (an "<u>SRO</u>") (clauses (i) – (vi), collectively "<u>Regulatory Agencies</u>"), including any report, form, correspondence, registration or statement required to be filed (or furnished, as applicable) pursuant to the laws, rules or regulations of the United States, any state, any foreign entity, or any Regulatory Agency, and have paid all fees and assessments due and payable in connection therewith, except where the failure to timely file (or

-11-

furnish, as applicable) such report, form, correspondence, registration or statement or to pay such fees and assessments, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect on Boston Private. As of their respective dates, such reports, forms, correspondence, registrations and statements, and other filings, documents, and instruments were complete and accurate and complied with all applicable laws, in each case, except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on Boston Private. Subject to Section 9.14, except for normal examinations conducted by a Regulatory Agency in the ordinary course of business of Boston Private and its Subsidiaries, no Regulatory Agency has pending any proceeding or, to the knowledge of Boston Private, investigation into the business or operations of Boston Private or any of its Subsidiaries, except where such proceedings or investigations would not reasonably be expected to be, either individually or in the aggregate, material to Boston Private and its Subsidiaries (taken as a whole). Subject to Section 9.14, there (i) is no unresolved violation, criticism, or exception by any Regulatory Agency with respect to any report or statement relating to any examinations or inspections of Boston Private or any of its Subsidiaries and (ii) has been no formal or informal inquiries by, or disagreements or disputes with, any Regulatory Agency with respect to the business, operations, policies or procedures of Boston Private or any of its Subsidiaries, in each case, which would reasonably be expected to be, either individually or in the aggregate, material to Boston Private and its Subsidiaries (taken as a whole).

3.6    Financial Statements.

(a)    The financial statements of Boston Private and its Subsidiaries included (or incorporated by reference) in the Boston Private Reports (including the related notes, where applicable) (i) have been prepared from, and are in accordance with, the books and records of Boston Private and its Subsidiaries, (ii) fairly present in all material respects the consolidated results of operations, cash flows, changes in shareholders' equity and consolidated financial position of Boston Private and its Subsidiaries for the respective fiscal periods or as of the respective dates therein set forth (subject in the case of unaudited statements to year-end audit adjustments normal in nature and amount), (iii) complied, as of their respective dates of filing with the SEC, in all material respects with applicable accounting requirements and with the published rules and regulations of the SEC with respect thereto and (iv) have been prepared in accordance with GAAP consistently applied during the periods involved, except, in each case, as indicated in such statements or in the notes thereto. The books and records of Boston Private and its Subsidiaries have since December 31, 2017 been, and are being, maintained in all material respects in accordance with GAAP and any other applicable legal and accounting requirements, except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on Boston Private. Since December 31, 2017, no independent public accounting firm of Boston Private has resigned (or informed Boston Private that it intends to resign) or been dismissed as independent public accountants of Boston Private as a result of or in connection with any disagreements with Boston Private on a matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure. The financial statements of Boston Private Bank included in the consolidated reports of condition and income (call reports) of Boston Private Bank complied, as of their respective dates of filing with the Federal Reserve Board and FDIC, in all material respects with applicable accounting requirements and with the published instructions of the Federal Financial Institutions Examination Council with respect thereto.

(b)    The allowances for loan losses and for credit losses contained in the consolidated balance sheet of Boston Private included in its Quarterly Report on 10-Q for the fiscal quarter ended September 30, 2020 were established in accordance with the practices and experiences of Boston Private and its Subsidiaries, and are adequate under and in accordance with the requirements of GAAP and the applicable Governmental Entities to provide for possible losses on loans (including accrued interest receivable) and credit commitments (including stand-by letters of credit) outstanding as of the date of such balance sheet. Boston Private adopted and fully implemented CECL effective as of January 1, 2020, other than for regulatory capital purposes. As used in this Agreement, "CECL" means Current Expected Credit Losses, a new credit

-12-

loss accounting standard that was issued by the Financial Accounting Standards Boards on June 16, 2016, pursuant to Accounting Standards Update (ASU) No. 2016, Topic 326.

(c)    Except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on Boston Private, neither Boston Private nor any of its Subsidiaries has any liability of any nature whatsoever (whether absolute, accrued, contingent or otherwise and whether due or to become due) required by GAAP to be included on a consolidated balance sheet of Boston Private, except for those liabilities that are reflected or reserved against on the consolidated balance sheet of Boston Private included in its Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2020 (including any notes thereto) and for liabilities incurred in the ordinary course of business consistent with past practice since September 30, 2020, or in connection with this Agreement and the transactions contemplated hereby.

(d)    The records, systems, controls, data and information of Boston Private and its Subsidiaries are recorded, stored, maintained and operated under means (including any electronic, mechanical or photographic process, whether computerized or not) that are under the exclusive ownership and direct control of Boston Private or its Subsidiaries or accountants (including all means of access thereto and therefrom), except for any non-exclusive ownership and non-direct control that would not reasonably be expected to have a Material Adverse Effect on Boston Private. Boston Private (i) has implemented and maintains disclosure controls and procedures and internal controls over financial reporting (as defined in Rule 13a-15(e) and (f), respectively, of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) to ensure that material information relating to Boston Private, including its Subsidiaries, is made known to the chief executive officer and the chief financial officer of Boston Private by others within those entities as appropriate to allow timely decisions regarding required disclosures and to make the certifications required by the Exchange Act and Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), and (ii) has disclosed, based on its most recent evaluation prior to the date hereof, to Boston Private's outside auditors and the audit committee of Boston Private's Board of Directors (x) any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) which are reasonably likely to adversely affect Boston Private's ability to record, process, summarize and report financial information, and (y) any fraud, whether or not material, that involves management or other employees who have a significant role in Boston Private's internal controls over financial reporting. These disclosures were made in writing by management to Boston Private's auditors and audit committee and true, correct and complete copies of such disclosures have been made available by Boston Private to SVB Financial. Neither Boston Private nor its independent audit firm has identified any unremediated material weakness in internal controls over financial reporting or disclosure controls and procedures. There is no reason to believe that Boston Private's outside auditors and its chief executive officer and chief financial officer will not be able to give the certifications and attestations required pursuant to the rules and regulations adopted pursuant to Section 404 of the Sarbanes-Oxley Act, without qualification, when next due.

(e)    Since January 1, 2018, (i) neither Boston Private nor any of its Subsidiaries, nor, to the knowledge of Boston Private, any director, officer, auditor, accountant or representative of Boston Private or any of its Subsidiaries, has received or otherwise had or obtained knowledge of any material complaint, allegation, assertion or claim, whether written or, to the knowledge of Boston Private, oral, regarding the accounting or auditing practices, procedures, methodologies or methods (including with respect to loan loss reserves, write-downs, charge-offs and accruals) of Boston Private or any of its Subsidiaries or their respective internal accounting controls, including any material complaint, allegation, assertion or claim that Boston Private or any of its Subsidiaries has engaged in questionable accounting or auditing practices, and (ii) no employee of or attorney representing Boston Private or any of its Subsidiaries, whether or not employed by Boston Private or any of its Subsidiaries, has reported evidence of a material violation of securities laws or banking laws, breach of fiduciary duty or similar violation by Boston Private or any of its Subsidiaries or any of their respective officers, directors, employees or agents to the Board of Directors of Boston Private or any committee thereof or the Board of Directors or similar governing body of any Boston Private Subsidiary

-13-

or any committee thereof, or to the knowledge of Boston Private, to any director or officer of Boston Private or any Boston Private Subsidiary (including pursuant to any whistleblower or similar process).

(f)    As of the date of this Agreement, no executive officer of Boston Private has failed in any respect to make the certifications required of him or her under Section 302 or 906 of the Sarbanes-Oxley Act.

3.7    Broker's Fees. With the exception of the engagement of Morgan Stanley & Co. LLC, neither Boston Private nor any Boston Private Subsidiary nor any of their respective officers or directors has employed any broker, finder or financial advisor or incurred any liability for any broker's fees, commissions or finder's fees in connection with the Merger or related transactions contemplated by this Agreement. Boston Private has disclosed to SVB Financial as of the date hereof the aggregate fees provided for in connection with the engagement by Boston Private of Morgan Stanley & Co. LLC related to the Merger and the other transactions contemplated hereunder (as well as the structure and timing for payment of such fees).

3.8    Absence of Certain Changes or Events.

(a)    Since December 31, 2019, there has not been any effect, change, event, circumstance, condition, occurrence or development that has had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on Boston Private.

(b)    Since December 31, 2019, Boston Private and its Subsidiaries have carried on their respective businesses in all material respects in the ordinary course of business consistent with past practice, except for the Pandemic Measures or in connection with the transactions contemplated by this Agreement.

3.9    Legal and Regulatory Proceedings.

(a)    Neither Boston Private nor any of its Subsidiaries is a party to any, and there are no outstanding or pending or, to the knowledge of Boston Private, threatened, legal, administrative, arbitral or other proceedings, claims, actions or governmental or regulatory investigations of any nature against Boston Private or any of its Subsidiaries or any of their current or former directors or executive officers (i) that would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on Boston Private, or (ii) of a material nature challenging the validity or propriety of this Agreement or the transactions contemplated hereby.

(b)    There is no material injunction, order, judgment, decree, or regulatory restriction imposed upon Boston Private, any of its Subsidiaries or the assets of Boston Private or any of its Subsidiaries (or that, upon consummation of the transactions contemplated by this Agreement, would apply to the Surviving Corporation or any of its affiliates).

3.10    Taxes and Tax Returns.

(a)    With respect to Boston Private and its Subsidiaries: (i) each of Boston Private and its Subsidiaries has duly and timely filed (including all applicable extensions) all material Tax Returns in all jurisdictions in which Tax Returns are required to be filed by it, and all such Tax Returns are true, correct and complete in all material respects; (ii) neither Boston Private nor any of its Subsidiaries is the beneficiary of any extension of time within which to file any material Tax Return (other than extensions to file Tax Returns obtained in the ordinary course of business consistent with past practice); (iii) all material Taxes of Boston Private and its Subsidiaries (whether or not shown on any Tax Returns) that are due have been fully and timely paid and all Taxes required to have been collected and paid on the sale of products or Taxable services by Boston Private or its Subsidiaries (whether or not denominated as sales or use taxes) have been properly and timely collected and paid, or all sales tax exemption certificates or other proof of the exempt nature of sales of such products or services have been properly collected, retained and submitted, to the extent required; (iv) each of Boston Private and its Subsidiaries has withheld and paid all material Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, creditor, shareholder, independent contractor or other third party; (v) each of Boston Private and its

-14-

Subsidiaries has complied in all material respects with all material information reporting and withholding requirements, in respect of payments made by Boston Private or any of its Subsidiaries, including maintenance of required records with respect thereto; (vi) there are no material Liens on the assets of Boston Private or any of its Subsidiaries relating or attributable to Taxes other than Liens for Taxes not yet due and payable; (vii) neither Boston Private nor any of its Subsidiaries has granted any extension or waiver of the limitation period applicable to any material Tax that remains in effect; (viii) neither Boston Private nor any of its Subsidiaries has received any notice of a material assessment or proposed material assessment in connection with any amount of Taxes, and there are no threatened in writing or pending disputes, claims, audits, examinations or other proceedings regarding any material Tax of Boston Private and its Subsidiaries or the assets of Boston Private and its Subsidiaries; (ix) neither Boston Private nor any of its Subsidiaries is a party to or is bound by any material Tax sharing, allocation or indemnification agreement or arrangement (other than such an agreement or arrangement exclusively between or among Boston Private and its Subsidiaries); (x) neither Boston Private nor any of its Subsidiaries (A) has been a member of an affiliated group filing a consolidated federal income Tax Return for which the statute of limitations is open (other than a group the common parent of which was Boston Private) or (B) has any material liability for the Taxes of any person (other than Boston Private or any of its Subsidiaries) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise; (xi) neither Boston Private nor any of its Subsidiaries has been, within the past two (2) years or otherwise as part of a "plan (or series of related transactions)" within the meaning of Section 355(e) of the Code of which the Merger is also a part, a "distributing corporation" or a "controlled corporation" (within the meaning of Section 355(a)(1)(A) of the Code) in a distribution of stock intending to qualify for tax-free treatment under Section 355 of the Code; (xii) neither Boston Private nor any of its Subsidiaries has participated in a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2); and (xiii) at no time during the past five (5) years has Boston Private been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code.

(b)    As used in this Agreement, the term "Tax" or "Taxes" means, whether disputed or not (i) any and all U.S. federal, state, local, and non-U.S. income, excise, gross receipts, ad valorem, profits, gains, property (real, personal, tangible and intangible), capital, sales, transfer, use, license, payroll, employment, social security (including health, unemployment, disability, workers' compensation and pension insurance), severance, unemployment, withholding, duties, excise, windfall profits, franchise, backup withholding, value added, alternative or add-on minimum, and other taxes, charges, levies or like assessments together with all penalties and additions to tax and interest thereon; (ii) any liability for the payment of any amounts of the type described in (i) above as a result of being a member of an affiliated, consolidated, combined, unitary or similar group (including any arrangement for group or consortium relief or similar arrangement) for any period, and (iii) any liability for the payment of any amounts of the type described in clauses (i) or (ii) above as a result of any express or implied obligation to indemnify any other person or as a result of any obligation under any agreement or arrangement with any other person with respect to such amounts and including any liability for Taxes of a predecessor or transferor, by contract or otherwise by operation of law.

(c)    As used in this Agreement, the term "Tax Return" means any return, declaration, report, claim for refund, information return or any other document or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof, supplied or required to be supplied to a Governmental Entity.

3.11    Employees.

(a)    Section 3.11(a) of the Boston Private Disclosure Schedule sets forth an accurate and complete list of each material Boston Private Benefit Plan. Each Boston Private Benefit Plan (as defined below) has been established, operated and administered in material compliance with its terms and the requirements of all applicable laws, including ERISA and the Code. For purposes of this Agreement, the term "Boston Private Benefit Plans" means all employee benefit plans (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), whether or not subject to ERISA, and all

-15-

compensation plans, including all equity, bonus or incentive, deferred compensation, retiree medical or life insurance, supplemental retirement, severance, termination, change in control, retention, employment, welfare, insurance, medical, fringe or other benefit plans, programs, agreements, contracts, policies, arrangements or remuneration of any kind with respect to which Boston Private or any Subsidiary, is a party or has any current or future obligation or that are maintained, contributed to or sponsored by Boston Private or any of its Subsidiaries for the benefit of any current or former employee, officer, director or independent contractor of Boston Private or any of its Subsidiaries, excluding, in each case, any "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA (a "Multiemployer Plan").

(b)    Boston Private has made available to SVB Financial true, correct and complete copies of each material Boston Private Benefit Plan and the following related documents, to the extent applicable: (i) all summary plan descriptions, amendments, modifications or material supplements, (ii) the most recent annual report (Form 5500) filed with the Internal Revenue Service (the "IRS"), (iii) the most recently received IRS determination letter, and (iv) the most recently prepared actuarial report.

(c)    The IRS has issued a favorable determination letter or opinion with respect to each Boston Private Benefit Plan that is intended to be qualified under Section 401(a) of the Code (the "Boston Private Qualified Plans") and the related trust, which letter or opinion has not been revoked (nor has revocation been threatened), and, to the knowledge of Boston Private, there are no existing circumstances and no events have occurred that would reasonably be expected to adversely affect the qualified status of any Boston Private Qualified Plan or the related trust. With respect to each Boston Private Benefit Plan that is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, neither Boston Private nor any of its Subsidiaries has engaged in a transaction in connection with which Boston Private or any of its Subsidiaries reasonably could be subject to either a civil penalty assessed pursuant to Section 409 or 502(i) or ERISA or a tax imposed pursuant to Section 4975 or 4976 of the Code, except as would not reasonably be expected to be material to Boston Private and its Subsidiaries taken as a whole.

(d)    With respect to each Boston Private Benefit Plan that is subject to Section 302 or Title IV of ERISA or Section 412, 430 or 4971 of the Code: (i) the minimum funding standard under Section 302 of ERISA and Sections 412 and 430 of the Code has been satisfied and no waiver of any minimum funding standard or any extension of any amortization period has been requested or granted, (ii) no such plan is in "at-risk" status for purposes of Section 430 of the Code, (iii) the present value of accrued benefits under such Boston Private Benefit Plan, based upon the actuarial assumptions used for funding purposes in the most recent actuarial report prepared by such Boston Private Benefit Plan's actuary with respect to such Boston Private Benefit Plan, did not, as of its latest valuation date, exceed the then current fair market value of the assets of such Boston Private Benefit Plan allocable to such accrued benefits, (iv) no reportable event within the meaning of Section 4043(c) of ERISA for which the 30-day notice requirement has not been waived has occurred, (v) all premiums to the Pension Benefit Guaranty Corporation (the "PBGC") have been timely paid in full, (vi) no liability (other than for premiums to the PBGC) under Title IV of ERISA has been or is expected to be incurred by Boston Private or any of its Subsidiaries, and (vii) the PBGC has not instituted proceedings to terminate any such Boston Private Benefit Plan.

(e)    None of Boston Private and its Subsidiaries nor any trade or business of Boston Private or any of its Subsidiaries, whether or not incorporated, all of which together with Boston Private would be deemed a "single employer" within the meaning of Section 4001 of ERISA (a "Boston Private ERISA Affiliate") has, at any time during the last six (6) years, contributed (or had any obligation to contribute) to a Multiemployer Plan or a plan that has two (2) or more contributing sponsors at least two (2) of whom are not under common control, within the meaning of Section 4063 of ERISA (a "Multiple Employer Plan"), and none of Boston Private and its Subsidiaries nor any Boston Private ERISA Affiliate has incurred any liability that has not been satisfied to a Multiemployer Plan or Multiple Employer Plan as a result of a complete or partial withdrawal (as those terms are defined in Part I of Subtitle E of Title IV of ERISA) from a Multiemployer Plan or Multiple Employer Plan.

-16-

(f)  Except as required by applicable law, no Boston Private Benefit Plan provides for any material post-employment or post-retirement health or medical or life insurance benefits for retired, former or current employees or beneficiaries or dependents thereof.

(g)  All material contributions required to be made to any Boston Private Benefit Plan by applicable law or by any plan document or other contractual undertaking, and all material premiums due or payable with respect to insurance policies funding any Boston Private Benefit Plan, for any period through the date hereof, have been timely made or paid in full or, to the extent not required to be made or paid on or before the date hereof, have been fully reflected on the books and records of Boston Private.

(h)  There are no pending or threatened claims (other than routine claims for benefits), lawsuits or arbitrations which have been asserted or instituted, and, to the knowledge of Boston Private, no set of circumstances exists which may reasonably give rise to a claim or lawsuit, against the Boston Private Benefit Plans, any fiduciaries thereof with respect to their duties to the Boston Private Benefit Plans or the assets of any of the trusts under any of the Boston Private Benefit Plans, in each case, that would reasonably be expected to result in any material liability of Boston Private or any of its Subsidiaries.

(i)  Neither the execution and delivery of this Agreement, shareholder or other approval of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in conjunction with any other event) result in the acceleration of vesting, exercisability, funding or delivery of, or entitle any employee, officer, director or other service provider of Boston Private or any of its Subsidiaries to severance pay or increase in the amount or value of, any payment, right or other benefit to any employee, officer, director or other service provider of Boston Private or any of its Subsidiaries, directly or indirectly cause Boston Private to transfer or set aside any assets to fund any material benefits under any Boston Private Benefit Plan or result in any limitation on the right of Boston Private or any of its Subsidiaries to amend, merge, terminate or receive a reversion of assets from any Boston Private Benefit Plan or related trust on or after the Effective Time. Without limiting the generality of the foregoing, no amount paid or payable (whether in cash, in property, or in the form of benefits) by Boston Private or any of its Subsidiaries in connection with the transactions contemplated hereby (either solely as a result thereof or as a result of such transactions in conjunction with any other event) will be an "excess parachute payment" within the meaning of Section 280G of the Code.

(j)  No Boston Private Benefit Plan provides for the gross-up or reimbursement of Taxes under Section 409A or 4999 of the Code, or otherwise.

(k)  As of the date hereof, there are no pending or, to Boston Private's knowledge, threatened labor grievances or unfair labor practice claims or charges against Boston Private or any of its Subsidiaries, or any strikes or other labor disputes against Boston Private or any of its Subsidiaries. Neither Boston Private nor any of its Subsidiaries is party to or bound by any collective bargaining or similar agreement with any labor organization, or work rules or practices agreed to with any labor organization or employee association applicable to employees of Boston Private or any of its Subsidiaries and, there are no pending or, to the knowledge of Boston Private, threatened organizing efforts by any union or other group seeking to represent any employees of Boston Private or any of its Subsidiaries. In the last three years, (x) no allegations of sexual harassment or misconduct have been made to Boston Private against any individual in his or her capacity as (i) an officer of Boston Private or any of its Subsidiaries or (ii) a member of the Board of Directors of Boston Private and (y) neither Boston Private nor any of its Subsidiaries has entered into any settlement agreements related to allegations of sexual harassment or misconduct by (i) an officer of Boston Private or any of its Subsidiaries or (ii) a member of the Board of Directors of Boston Private.

(l)  Boston Private is and has been in compliance in all respects with all applicable laws respecting employment and employment practices, terms and conditions of employment, collective bargaining, worker classification, disability, immigration, health and safety, wages, hours and benefits, non-discrimination in employment and workers' compensation, in each case, except as would not reasonably be expected to be material to Boston Private and its Subsidiaries taken as a whole.

-17-

3.12    <u>SEC Reports</u>. Boston Private has previously made available to SVB Financial an accurate and complete copy of each (a) final registration statement, prospectus, report, schedule and definitive proxy statement filed with or furnished to the SEC since December 31, 2017 by Boston Private pursuant to the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), or the Exchange Act (the "<u>Boston Private Reports</u>"), and (b) communication mailed by Boston Private to its shareholders since December 31, 2017 and prior to the date hereof, and no such Boston Private Report or communication, as of the date thereof (and, in the case of registration statements and proxy statements, on the dates of effectiveness and the dates of the relevant meetings, respectively), contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances in which they were made, not misleading, except that information filed or furnished as of a later date (but before the date of this Agreement) shall be deemed to modify information as of an earlier date. Since December 31, 2017, as of their respective dates, all Boston Private Reports filed or furnished under the Securities Act and the Exchange Act complied in all material respects with the published rules and regulations of the SEC with respect thereto. As of the date of this Agreement, there are no outstanding comments from, or unresolved issues raised by, the SEC with respect to any of the Boston Private Reports.

3.13    <u>Compliance with Applicable Law</u>.

(a)    Boston Private and each of its Subsidiaries hold, and have at all times since December 31, 2017, held, all licenses, registrations, franchises, certificates, variances, permits, charters and authorizations necessary for the lawful conduct of their respective businesses and ownership of their respective properties, rights and assets under and pursuant to each (and have paid all fees and assessments due and payable in connection therewith), except where neither the cost of failure to hold nor the cost of obtaining and holding such license, registration, franchise, certificate, variance, permit, charter or authorization (nor the failure to pay any fees or assessments) would, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Boston Private, and to the knowledge of Boston Private, no suspension or cancellation of any such necessary license, registration, franchise, certificate, variance, permit, charter or authorization is threatened.

(b)    Except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Boston Private, Boston Private and each of its Subsidiaries have complied with and are not in default or violation under, and to the knowledge of Boston Private, there are no facts or circumstances that would reasonably be expected to cause Boston Private or any of its Subsidiaries to violate, any applicable law, statute, order, rule, regulation, policy and/or guideline of any Governmental Entity relating to Boston Private or any of its Subsidiaries. Boston Private and its Subsidiaries have established and maintain a system of internal controls designed to ensure compliance in all material respects by Boston Private and its Subsidiaries with applicable recordkeeping and reporting requirements of applicable money laundering prevention laws in jurisdictions where Boston Private and its Subsidiaries conduct business.

(c)    Boston Private Bank is an "insured depository institution" as defined in the Federal Deposit Insurance Act of 1950 and applicable regulations thereunder. Boston Private Bank has a Community Reinvestment Act rating of "satisfactory" or better and does not expect to have a Community Reinvestment Act rating that is not at least "satisfactory". All of the deposits held by Boston Private Bank (including the records and documentation pertaining to such deposits) have been established and are held in compliance with (i) all applicable policies, practices and procedures of Boston Private Bank, and (ii) all applicable laws, including anti-money laundering and anti-terrorism laws and sanctioned persons requirements, in each case, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Boston Private.

(d)    Boston Private maintains a written information privacy and security program and organizational, physical, administrative and technical measures regarding privacy, cyber security and data security (collectively, "<u>Privacy and Security Policies</u>") that are commercially reasonable and that comply in all material respects with (i) all requirements of all applicable laws relating to the receipt, collection,

-18-

compilation, use, storage, processing, sharing, safeguarding, security (both technical and physical), encryption, disposal, destruction, disclosure or transfer (collectively, "Processing") of Personal Data (as defined below), (ii) all of Boston Private's and each of its Subsidiaries' policies and notices regarding Personal Data, and (iii) all of Boston Private's and each of its Subsidiaries' contractual obligations with respect to the Processing of Personal Data (collectively, "Data Protection Requirements"). Boston Private maintains reasonable measures to protect the privacy, confidentiality and security of all information that identifies, could be used to identify or is otherwise associated with an individual person or device or is otherwise covered by any "personal information" or similar definition under applicable law (e.g., "personal data," "personally identifiable information" or "PII") (collectively "Personal Data") against any (i) unauthorized access, loss or misuse of Personal Data, (ii) unauthorized or unlawful operations performed upon Personal Data or (iii) other act or omission that compromises the privacy, security or confidentiality of Personal Data (clauses (i) through (iii), a "Security Breach"). Boston Private has not experienced any Security Breach that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Boston Private or require a report to a Regulatory Agency. Within the three (3) year period prior to the date hereof, Boston Private and each of its Subsidiaries has (i) complied in all material respects with all of their respective Privacy and Security Policies and applicable Data Protection Requirements, and (ii) used commercially reasonable measures consistent with reasonable practices in the industry to ensure the confidentiality, privacy and security of Personal Data. To the knowledge of Boston Private, there are no data security or other technological vulnerabilities with respect to its information technology systems or networks that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect on Boston Private.

(e)    Without limitation, none of Boston Private or any of its Subsidiaries, or to the knowledge of Boston Private, any director, officer, employee, agent or other person acting on behalf of Boston Private or any of its Subsidiaries has, directly or indirectly, (i) used any funds of Boston Private or any of its Subsidiaries for unlawful contributions, unlawful gifts, unlawful entertainment or other expenses relating to political activity, (ii) made any unlawful payment to foreign or domestic governmental officials or employees or to foreign or domestic political parties or campaigns from funds of Boston Private or any of its Subsidiaries, (iii) violated any provision that would result in the violation of the Foreign Corrupt Practices Act of 1977, as amended, or any similar law, (iv) established or maintained any unlawful fund of monies or other assets of Boston Private or any of its Subsidiaries, (v) made any fraudulent entry on the books or records of Boston Private or any of its Subsidiaries, or (vi) made any unlawful bribe, unlawful rebate, unlawful payoff, unlawful influence payment, unlawful kickback or other unlawful payment to any person, private or public, regardless of form, whether in money, property or services, to obtain favorable treatment in securing business, to obtain special concessions for Boston Private or any of its Subsidiaries, to pay for favorable treatment for business secured or to pay for special concessions already obtained for Boston Private or any of its Subsidiaries, or, in the past five (5) years, has been subject to any United States sanctions administered by OFAC, except in each case as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Boston Private.

(f)    As of the date hereof, each of Boston Private and Boston Private Bank is "well-capitalized" (as such term is defined in the relevant regulation of the institution's primary federal regulator).

(g)    Except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Boston Private, (i) Boston Private Bank has complied in all material respects with all requirements of the Coronavirus Aid, Relief, and Economic Security (CARES) Act and the Paycheck Protection Program, including applicable guidance, in connection with its participation in the Paycheck Protection Program; (ii) Boston Private and each of its Subsidiaries have properly administered all accounts for which it acts as a fiduciary, including accounts for which it serves as a trustee, agent, custodian, personal representative, guardian, conservator or investment advisor, in accordance with the terms of the governing documents and applicable state, federal and foreign law; and (iii) none of Boston Private, any of its Subsidiaries, or any of its or its Subsidiaries' directors, officers or employees, has committed any breach of trust or fiduciary duty with respect to any such fiduciary account, and the accountings for each such

-19-

fiduciary account are true, correct and complete and accurately reflect the assets and results of such fiduciary account.

3.14    Certain Contracts.

(a)    Except as set forth in Section 3.14(a) of the Boston Private Disclosure Schedule or as filed with any Boston Private Reports, as of the date hereof, neither Boston Private nor any of its Subsidiaries is a party to or bound by any contract, arrangement, commitment or understanding (whether written or oral), but excluding any Boston Private Benefit Plan:

(i)    which is a "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K of the SEC);

(ii)    which contains a provision that materially restricts the conduct of any line of business by Boston Private or any of its Subsidiaries or upon consummation of the transactions contemplated by this Agreement will materially restrict the ability of SVB Financial or any of its affiliates to engage in any line of business or in any geographic region (including any exclusivity or exclusive dealing provisions with such an effect);

(iii)    which is a collective bargaining agreement or similar agreement with any labor organization;

(iv)    with any record or beneficial owner of five percent (5%) or more of the outstanding shares of Boston Private Common Stock;

(v)    any of the benefits of or obligations under which will arise or be increased or accelerated by the occurrence of the execution and delivery of this Agreement, receipt of the Requisite Boston Private Vote or the announcement or consummation of any of the transactions contemplated by this Agreement, or under which a right of cancellation or termination will arise as a result thereof, or the value of any of the benefits of which will be calculated on the basis of any of the transactions contemplated by this Agreement, where such increase or acceleration of benefits or obligations, right of cancellation or termination, or change in calculation of value of benefits would, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Boston Private;

(vi)    (A) that relates to the incurrence of indebtedness by Boston Private or any of its Subsidiaries, including any sale and leaseback transactions, capitalized leases and other similar financing arrangements (other than deposit liabilities, trade payables, federal funds purchased, advances and loans from the Federal Home Loan Bank and securities sold under agreements to repurchase, in each case, incurred in the ordinary course of business consistent with past practice), or (B) that provides for the guarantee, support, indemnification, assumption or endorsement by Boston Private or any of its Subsidiaries of, or any similar commitment by Boston Private or any of its Subsidiaries with respect to, the obligations, liabilities or indebtedness of any other person, in the case of each of clauses (A) and (B), in the principal amount of $1,000,000 or more;

(vii)    that grants any right of first refusal, right of first offer or similar right with respect to any material assets, rights or properties of Boston Private or its Subsidiaries;

(viii)    which creates future payment obligations in excess of $1,000,000 per annum (other than any such contracts which are terminable by Boston Private or any of its Subsidiaries on sixty (60) days or less notice without any required payment or other conditions, other than the condition of notice), other than with respect to indebtedness disclosed in any Boston Private Report(s) filed since January 1, 2020;

(ix)    that is a settlement, consent or similar agreement and contains any material continuing obligations of Boston Private or any of its Subsidiaries;

(x)    that relates to the acquisition or disposition of any person, business or asset and under which Boston Private or its Subsidiaries have or may have a material obligation or liability; or

-20-

(xi)    pursuant to which (i) any license, covenant not to sue, release, waiver, option or other right is granted under any material Intellectual Property owned by Boston Private or any of its Subsidiaries, (ii) any person has granted any license, covenant not to sue, release, waiver, option or other right under any Intellectual Property to Boston Private or any of its Subsidiaries that is material to their businesses, other than non-exclusive licenses for off-the-shelf Software that have been granted on standardized, generally available terms, (iii) Boston Private or any of its Subsidiaries has assigned or agreed to assign any material Intellectual Property to any person, or (iv) Boston Private or any of its Subsidiaries is subject to any obligation or covenant with respect to the use, licensing, enforcement, prosecution or other exploitation of any material Intellectual Property, including stand-stills, and trademark co-existence or consent contracts.

Each contract, arrangement, commitment or understanding of the type described in this Section 3.14(a), whether or not set forth in the Boston Private Disclosure Schedule, is referred to herein as a "Boston Private Contract," and neither Boston Private nor any of its Subsidiaries knows of, or has received written, or to the knowledge of Boston Private, oral notice of, any violation of any Boston Private Contract by any of the other parties thereto which would reasonably be likely to be, either individually or in the aggregate, material to Boston Private and its Subsidiaries, taken as a whole. Boston Private has made available to SVB Financial true, correct and complete copies of each Boston Private Contract in effect as of the date hereof.

(b)    (i) Each Boston Private Contract is valid and binding on Boston Private or one of its Subsidiaries, as applicable, and in full force and effect, except as, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect on Boston Private, (ii) Boston Private and each of its Subsidiaries have in all material respects complied with and performed all obligations required to be complied with or performed by any of them to date under each Boston Private Contract, except where such noncompliance or nonperformance, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect on Boston Private, (iii) to the knowledge of Boston Private, each third-party counterparty to each Boston Private Contract has in all material respects complied with and performed all obligations required to be complied with and performed by it to date under such Boston Private Contract, except where such noncompliance or nonperformance, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect on Boston Private, (iv) neither Boston Private nor any of its Subsidiaries has knowledge of, or has received notice of, any violation of any Boston Private Contract by any of the other parties thereto which would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on Boston Private, and (v) no event or condition exists which constitutes or, after notice or lapse of time or both, will constitute, a material breach or default on the part of Boston Private or any of its Subsidiaries, or to the knowledge of Boston Private, any other party thereto, of or under any such Boston Private Contract, except where such breach or default, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect on Boston Private.

3.15    Agreements with Regulatory Agencies. Subject to Section 9.14, neither Boston Private nor any of its Subsidiaries is subject to any cease-and-desist or other order or enforcement action issued by, or is a party to any written agreement, consent agreement or memorandum of understanding with, or is a party to any commitment letter or similar undertaking to, or is subject to any order or directive by, or has been ordered to pay any civil money penalty by, or has been since January 1, 2018, a recipient of any supervisory letter from, or since January 1, 2018, has adopted any policies, procedures or board resolutions at the request or suggestion of, any Regulatory Agency or other Governmental Entity that restricts in any material respect or would reasonably be expected to restrict in any material respect the conduct of its business or that in any material manner relates to its capital adequacy, its ability to pay dividends, its credit or risk management policies, its management or its business (each, whether or not set forth in the Boston Private Disclosure Schedule, a "Boston Private Regulatory Agreement"), nor has Boston Private or any of its Subsidiaries been advised since January 1, 2018, by any Regulatory Agency or other Governmental Entity that it is considering issuing, initiating, ordering, or requesting any such Boston Private Regulatory Agreement.

-21-

3.16    <u>Environmental Matters</u>. Except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on Boston Private, Boston Private and its Subsidiaries are in compliance, and have complied, with any federal, state or local law, regulation, order, decree, permit, authorization, common law or agency requirement relating to: (a) the protection or restoration of the environment, health and safety as it relates to hazardous substance exposure or natural resource damages, (b) the handling, use, presence, disposal, release or threatened release of, or exposure to, any hazardous substance, or (c) noise, odor, wetlands, indoor air, pollution, contamination or any injury to persons or property from exposure to any hazardous substance (collectively, "<u>Environmental Laws</u>"). There are no legal, administrative, arbitral or other proceedings, claims or actions, or to the knowledge of Boston Private, any private environmental investigations or remediation activities or governmental investigations of any nature seeking to impose, or that could reasonably be expected to result in the imposition, on Boston Private or any of its Subsidiaries of any liability or obligation arising under any Environmental Law pending or threatened against Boston Private, which liability or obligation would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on Boston Private. To the knowledge of Boston Private, there is no reasonable basis for any such proceeding, claim, action or governmental investigation that would impose any liability or obligation that would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on Boston Private. Boston Private is not subject to any agreement, order, judgment, decree, letter agreement or memorandum of agreement by or with any court, Governmental Entity, Regulatory Agency or other third party imposing any liability or obligation with respect to the foregoing that would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on Boston Private.

3.17    <u>Investment Securities</u>.

(a)    Each of Boston Private and its Subsidiaries has good title to all securities and commodities owned by it (except those sold under repurchase agreements or held in any fiduciary or agency capacity), free and clear of any Lien, except to the extent such securities or commodities are pledged in the ordinary course of business consistent with past practice to secure obligations of Boston Private or its Subsidiaries. Such securities are valued on the books of Boston Private in accordance with GAAP in all material respects.

(b)    Boston Private and its Subsidiaries employ investment, securities, commodities, risk management and other policies, practices and procedures that Boston Private believes are prudent and reasonable in the context of their respective businesses, and Boston Private and its Subsidiaries have, since January 1, 2017, been in compliance with such policies, practices and procedures in all material respects. Prior to the date of this Agreement, Boston Private has made available to SVB Financial the material terms of such policies, practices and procedures.

(c)    Neither Boston Private nor its Subsidiaries owns securities, in each case that are referred to generically as "structured notes," "high risk mortgage derivatives," "capped floating rate notes," or "capped floating rate mortgage derivatives". Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Boston Private, each swap, cap, floor, option agreement, future and forward contract and other similar derivative transactions and risk management arrangements (each a "<u>Derivative Transaction</u>"), which Boston Private or any of its Subsidiaries has entered into for its own account, or which Boston Private or any of its Subsidiaries has agreed to enter into for its own account, was or will be entered into for *bona fide* hedging purposes and not for speculation. Each Derivative Transaction entered into for the account of Boston Private or any of its Subsidiaries, or for the account of any customer thereof, and each such Derivative Transaction which Boston Private or any of its Subsidiaries has agreed to enter into, (i) was or will be entered into in the ordinary course of business, in accordance with applicable rules, regulations and policies of any Governmental Entity of competent jurisdiction, with counterparties believed to be financially responsible at the time, and (ii) is in full force and effect and constitutes a valid and legally binding obligation of Boston Private or such Subsidiary, as the case may be, enforceable against such person in accordance with its terms, in each case except as enforceability may be limited by the Enforceability Exceptions. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Boston Private, Boston Private and its Subsidiaries have duly

-22-

performed their obligations thereunder to the extent that such obligations have accrued, and, to the knowledge of Boston Private, there are no breaches, violations or defaults or allegations or assertions of such by any party thereunder.

3.18  <u>Real Property</u>. Boston Private or a Boston Private Subsidiary (a) has good and marketable title to all real property reflected in the latest audited balance sheet included in the Boston Private Reports as being owned by Boston Private or a Boston Private Subsidiary or acquired after the date thereof (except properties sold or otherwise disposed of since the date thereof in the ordinary course of business) (the "<u>Boston Private Owned Properties</u>"), free and clear of all material Liens, except (i) statutory Liens securing payments not yet due, (ii) Liens for real property Taxes not yet due and payable, (iii) easements, rights of way, and other similar encumbrances that do not materially affect the value or use of the properties or assets subject thereto or affected thereby or otherwise materially impair business operations at such properties and (iv) such imperfections or irregularities of title or Liens as do not materially affect the value or use of the properties or assets subject thereto or affected thereby or otherwise materially impair business operations at such properties or the value or free transferability of such properties (collectively, "<u>Permitted Encumbrances</u>"), and (b) is the lessee of all leasehold estates reflected in the latest audited financial statements included in such Boston Private Reports or acquired after the date thereof (except for leases that have expired by their terms since the date thereof) (the "<u>Boston Private Leased Properties</u>" and, collectively with the Boston Private Owned Properties, the "<u>Boston Private Real Property</u>"), free and clear of all Liens of any nature whatsoever, except for Permitted Encumbrances, and is in possession of the properties purported to be leased thereunder, and each such lease is valid without default thereunder by the lessee or, to the knowledge of Boston Private, the lessor. There are no pending or, to the knowledge of Boston Private, threatened condemnation proceedings against the Boston Private Real Property.

3.19  <u>Intellectual Property</u>.

(a)  Section 3.19(a) of the Boston Private Disclosure Schedule sets forth a true and complete list of all Intellectual Property owned by Boston Private or any of its Subsidiaries that is Registered, indicating, for each item of such Registered Intellectual Property, the registration or application number and the applicable filing jurisdiction. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Boston Private, Boston Private or one of its Subsidiaries is the sole and exclusive owner of the Registered Intellectual Property owned or purported to be owned by Boston Private or any of its Subsidiaries, free and clear of all Liens (other than Permitted Encumbrances), and all rights in such Registered Intellectual Property are subsisting valid and enforceable. To the knowledge of Boston Private, Boston Private and its Subsidiaries own or have a valid right to use all material Intellectual Property used by any of them, all of which rights shall survive the consummation of the transactions contemplated hereby materially unchanged. For purposes of this Agreement, "<u>Intellectual Property</u>" means any of the following, whether or not registered, and all rights therein, arising in the U.S. or any other jurisdiction throughout the world: (i) trademarks, service marks, Internet domain names, logos, brand names, common law trademark rights, trade dress and trade names and other indicia of origin, registrations and applications for registration of the foregoing, and the goodwill associated therewith and symbolized thereby, (ii) rights in all works of inventorship, including all patents and patent applications and all divisions, continuations, continuations-in-part, reissues, reexaminations, and any extensions thereof, (iii) confidential and proprietary information, including trade secrets and know-how and (iv) websites, copyrights (including rights in works of authorship including all computer software (in object code and source code)), registrations and applications for registration of the foregoing, and all renewals, extensions, reversions and restorations thereof, and (v) any other similar intellectual property rights; and the term "<u>Registered</u>" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or internet domain name registrar.

(b)  Except as set forth in Section 3.19(b) of the Boston Private Disclosure Schedule, (i) the operation of the businesses of Boston Private and its Subsidiaries as currently conducted does not infringe, misappropriate or violate the Intellectual Property of any third party, and during the three (3) years preceding the date hereof, the businesses of Boston Private and its Subsidiaries have not infringed,

-23-

misappropriated or violated the Intellectual Property of any third party, in each case, in a manner that has resulted in or is reasonably likely to result in, material liability to Boston Private or any of its Subsidiaries, and (ii) to the knowledge of Boston Private, no third party is infringing, misappropriating or violating any Intellectual Property owned by Boston Private or its Subsidiaries.

(c)    Except as set forth in Section 3.19(c) of the Boston Private Disclosure Schedule, neither Boston Private nor any of its Subsidiaries has received any written claim, notice, invitation to license or similar communication within the three (3) year period prior to the date hereof (i) contesting or challenging the use, validity, enforceability or ownership of any Intellectual Property material to Boston Private's or any of its Subsidiaries' respective businesses that are owned by or purported to be owned by Boston Private or any of its Subsidiaries, or (ii) alleging that Boston Private or any of its Subsidiaries or any of their respective products or services infringes, misappropriates or otherwise violates the Intellectual Property of any person, whether directly or indirectly.

(d)    Boston Private and its Subsidiaries have taken reasonable measures to protect (i) their respective rights in the Intellectual Property owned by Boston Private or its Subsidiaries and (ii) the confidentiality of all trade secrets that are included in the Intellectual Property owned by Boston Private or its Subsidiaries and such trade secrets have not been used or disclosed to any person except pursuant to appropriate nondisclosure agreements which, to the knowledge of Boston Private, have not been breached.

(e)    Each current and former employee or independent contractor of Boston Private and its Subsidiaries who made a contribution to the creation or development of any material Intellectual Property on behalf of Boston Private or any of its Subsidiaries has signed an agreement that assigns to Boston Private or its applicable Subsidiary all of such employee's or independent contractor's rights in such contribution or Boston Private or its applicable Subsidiary otherwise owns all such rights as a matter of law.

(f)    Neither Boston Private nor any Subsidiary has incorporated or linked to any open source or "copyleft" Software in any material proprietary Software of Boston Private or any of its Subsidiaries in a manner that would require any components of such material proprietary Software owned by Boston Private or any of its Subsidiaries to be licensed, disclosed or distributed to any third party under any terms, including making the source code publicly available.

(g)    The IT Assets owned, used or held for use (including through cloud-based or other third party service providers) by Boston Private or any of its Subsidiaries are sufficient for the current and currently anticipated needs of the businesses of Boston Private and its Subsidiaries, and in the three (3) year period prior to the date hereof, there has been no unauthorized access to or unauthorized use of (i) any such IT Assets, (ii) any information stored on or processed by such IT Assets or (iii) any confidential or proprietary information that is in Boston Private's or any of its Subsidiaries' possession or control, in each case, in a manner that, individually or in the aggregate, has resulted in or is reasonably likely to result in material liability to, or material disruption of the business operations of, Boston Private or any of its Subsidiaries. As used in this Agreement, "IT Assets" means technology devices, computers, Software, servers, networks, workstations, routers, hubs, circuits, switches, data communications lines, and all other information technology equipment, and all associated documentation. As used in this Agreement, "Software" means any computer program, application, middleware, firmware, microcode and other software, including operating systems, software implementations of algorithms, models and methodologies, in each case, whether in source code, object code or other form or format, including libraries, subroutines and other components thereof, and all documentation relating thereto.

3.20    Related Party Transactions. As of the date hereof, except as set forth in any Boston Private Reports, there are no transactions or series of related transactions, agreements, arrangements or understandings, nor are there any currently proposed transactions or series of related transactions (including any transactions entered into or to be entered into in connection with the transactions contemplated hereby), between Boston Private or any of its Subsidiaries, on the one hand, and any current or former director or "executive officer" (as defined in Rule 3b-7 under the Exchange Act) of Boston Private or any of its Subsidiaries or any person who beneficially owns

-24-

(as defined in Rules 13d-3 and 13d-5 of the Exchange Act) five percent (5%) or more of the outstanding Boston Private Common Stock (or any of such person's immediate family members or affiliates) (other than Subsidiaries of Boston Private) on the other hand, of the type required to be reported in any Boston Private Report pursuant to Item 404 of Regulation S-K promulgated under the Exchange Act.

3.21    <u>State Takeover Laws</u>. The Board of Directors of Boston Private has taken all action necessary and appropriate to render Chapters 110C, 110D and 110F of the Massachusetts General Laws and any similar "moratorium," "control share," "fair price," "takeover" or "interested shareholder" law (any such laws, "<u>Takeover Statutes</u>") inapplicable to this Agreement and the other transactions contemplated hereby.

3.22    <u>Reorganization</u>. Boston Private has not taken any action and is not aware of any fact or circumstance that could reasonably be expected to prevent the Merger from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code.

3.23    <u>Opinion</u>. Prior to the execution of this Agreement, Boston Private has received an opinion (which, if initially rendered verbally, has been or will be confirmed by a written opinion, dated the same date) from Morgan Stanley & Co. LLC to the effect that, as of the date of such opinion and based on and subject to the various assumptions, procedures, matters, qualifications and limitations on the scope of the review undertaken by Morgan Stanley & Co. LLC as set forth therein, the Merger Consideration to be received by the holders of Boston Private Common Stock (other than Exception Shares) pursuant to this Agreement is fair from a financial point of view to such holders of Boston Private Common Stock. Such opinion has not been amended or rescinded as of the date of this Agreement.

3.24    <u>Boston Private Information</u>. The information relating to Boston Private and its Subsidiaries that is provided in writing by Boston Private or its Subsidiaries or their respective representatives specifically for inclusion in the Proxy Statement and the S-4, or in any other document filed with any other Regulatory Agency or Governmental Entity in connection herewith, will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances in which they are made, not misleading. The portion of the Proxy Statement relating to Boston Private or any of its Subsidiaries will comply in all material respects with the provisions of the Exchange Act and the rules and regulations thereunder. The portion of the S-4 relating to Boston Private or any of its Subsidiaries will comply in all material respects with the provisions of the Securities Act and the rules and regulations thereunder.

3.25    <u>Loan Portfolio</u>.

(a)    As of the date hereof, except as set forth in Section 3.25(a) of the Boston Private Disclosure Schedule, neither Boston Private nor any of its Subsidiaries is a party to any written or oral loan, loan agreement, note or borrowing arrangement (including leases, credit enhancements, commitments, guarantees and interest-bearing assets) (collectively, "<u>Loans</u>") in which Boston Private or any Subsidiary of Boston Private is a creditor that, as of September 30, 2020, had an outstanding balance of $1,000,000 or more and under the terms of which the obligor was, as of September 30, 2020, over ninety (90) days or more delinquent in payment of principal or interest. Set forth in Section 3.25(a) of the Boston Private Disclosure Schedule is a true, correct and complete list of (A) all the Loans of Boston Private and its Subsidiaries that, as of September 30, 2020 (x) had an outstanding balance of $1,000,000 or more and were classified by Boston Private as "Watch List" or words of similar import, (y) had an outstanding balance of $500,000 or more and were classified by Boston Private as "Special Mention," "Other Loans Specially Mentioned," "Criticized" or words of similar import and (z) were classified by Boston Private as "Substandard," "Doubtful," "Loss," "Classified," "Troubled Debt Restructuring" or words of similar import, in each case, together with the principal amount of and accrued and unpaid interest on each such Loan and the identity of the borrower thereunder, together with the aggregate principal amount of and accrued and unpaid interest on such Loans, by category of Loan (<u>e.g.</u>, commercial, consumer, etc.), together with the aggregate principal amount of all such Loans by category (<u>provided</u>, that, in determining the aggregate principal amount of all

-25-

such Loans by category, Loans shall be included without regard to the outstanding balance amounts set forth in clauses (x) and (y) above), (B) all the Loans of Boston Private and its Subsidiaries that, as of September 30, 2020, had an outstanding balance of $1,000,000 or more and for which interest or principal has been deferred since January 1, 2020 and (C) each asset of Boston Private or any of its Subsidiaries that, as of September 30, 2020, is classified as "Other Real Estate Owned" and the book value thereof.

(b)    Except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on Boston Private, each Loan of Boston Private or any of its Subsidiaries (i) is evidenced by notes, agreements or other evidences of indebtedness that are true, genuine and what they purport to be (without any oral amendments or modifications thereto), (ii) to the extent carried on the books and records of Boston Private and its Subsidiaries as secured Loans, has been secured by valid restrictions, claims or Liens, as applicable, which have been perfected, (iii) is the legal, valid and binding obligation of the obligor named therein, enforceable in accordance with its terms, subject to the Enforceability Exceptions and (iv) is not subject to any claim as to the enforcement which been asserted in writing against Boston Private, Boston Private Bank or such Subsidiaries for which there is a reasonable possibility of an adverse determination.

(c)    Except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on Boston Private, each outstanding Loan of Boston Private or any of its Subsidiaries (including Loans held for resale to investors) was solicited and originated, and is and has been administered and, where applicable, serviced, and the relevant Loan files are being maintained, in all material respects in accordance with the relevant notes or other credit or security documents, the written underwriting standards of Boston Private and its Subsidiaries (and, in the case of Loans held for resale to investors, the underwriting standards, if any, of the applicable investors) and with all applicable federal, state and local laws, regulations and rules.

(d)    None of the agreements pursuant to which Boston Private or any of its Subsidiaries has sold Loans or pools of Loans or participations in Loans or pools of Loans contains any obligation to repurchase such Loans or interests therein solely on account of a payment default by the obligor on any such Loan.

(e)    There are no outstanding Loans made by Boston Private or any of its Subsidiaries to any "executive officer" or other "insider" (as each such term is defined in Regulation O promulgated by the Federal Reserve Board) of Boston Private or its Subsidiaries, other than Loans that are subject to and that were made and continue to be in compliance in all material respects with Regulation O promulgated by the Federal Reserve Board or that are exempt therefrom.

(f)    Neither Boston Private, Boston Private Bank nor any of their Subsidiaries is now or has been since January 1, 2018, subject to any suspension, material fine, or settlement or other administrative agreement or sanction by, or any reduction in any loan purchase commitment from, any Governmental Entity relating to the origination, sale, or servicing of mortgage or consumer Loans.

(g)    Boston Private Bank and its Subsidiaries have taken commercially reasonable steps to prepare for the cessation of publication of settings of the London Interbank Offered Rate, taking into account the size of the impacted portfolio and the expected timeframe for the cessation.

3.26    _Insurance_. Except as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect on Boston Private: (a) Boston Private and its Subsidiaries are insured with reputable insurers against such risks and in such amounts as the management of Boston Private reasonably has determined to be prudent and consistent with industry practice, and Boston Private and its Subsidiaries are in compliance in all material respects with their insurance policies and are not in default under any of the terms thereof; (b) each such policy is outstanding and in full force and effect and, except for policies insuring against potential liabilities of officers, directors and employees of Boston Private and its Subsidiaries, Boston Private or the relevant Subsidiary thereof is the sole beneficiary of such policies, and (c) all premiums and other payments due under any such policy have been paid, and all claims thereunder have been filed in due and timely fashion. There is no material claim for coverage by Boston Private or any of its Subsidiaries pending under any insurance

-26-

policy as to which coverage has been denied or disputed by the underwriters of such insurance policy. Neither Boston Private nor any of its Subsidiaries has received notice of any threatened termination of, material premium increase with respect to, or material alteration of coverage under, any insurance policies.

3.27    Investment Adviser Subsidiaries.

(a)    Section 3.27 of the Boston Private Disclosure Schedule lists each Subsidiary of Boston Private that provides investment management, investment advisory or sub-advisory services ("Investment Advisory Services") to any person (including management and advice provided to separate accounts and participation in wrap fee programs), and that is required to register with the SEC as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act") (each, an "Advisory Entity"). Each Advisory Entity is registered as an investment adviser under the Investment Advisers Act and has operated since January 1, 2017 and is currently operating in compliance with all laws applicable to it or its business and has all registrations, permits, licenses, exemptions, orders and approvals required for the operation of its business or ownership of its properties and assets substantially as presently conducted, except, in each case, as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect on Boston Private. There is no action, suit, proceeding or investigation pending or, to Boston Private's knowledge, threatened that would reasonably be expected to lead to the revocation, amendment, failure to renew, limitation, suspension or restriction of any such registrations, permits, licenses, exemptions, orders and approvals in any material respect.

(b)    Each Advisory Entity has been since January 1, 2017 and is in all material respects in compliance with each contract for services provided in its capacity as an Advisory Entity to which it is a party (each such contract, an "Advisory Agreement"). Each Advisory Agreement includes all provisions required by and complies in all respects with the Investment Advisers Act, and no Advisory Entity provides Investment Advisory Services to any person other than advisory clients of the Advisory Entity and such services are in each case provided pursuant to a written Advisory Agreement.

(c)    The accounts of each advisory client of Boston Private or its Subsidiaries, for purposes of the Investment Advisers Act, that are subject to ERISA have been managed by the applicable Advisory Entity in all material respects in compliance with the applicable requirements of ERISA.

(d)    Each Advisory Entity has designated and approved an appropriate chief compliance officer in accordance with Rule 206(4)-7 under the Investment Advisers Act. Each Advisory Entity has established in compliance with requirements of applicable law, and maintained in effect at all times required by applicable law since January 1, 2017, (i) written policies and procedures reasonably designed to prevent violation, by the Advisory Entity and its supervised persons, of the Investment Advisers Act and the rules thereunder (ii) written anti-money laundering policies and procedures that incorporate, among other things, a written customer identification program, (iii) a code of ethics and a written policy regarding insider trading and the protection of material non-public information, (iv) written cyber security and identity theft policies and procedures, (v) written supervisory procedures and a supervisory control system, (vi) written policies and procedures designed to protect non-public personal information about customers, clients and other third parties, (vii) written recordkeeping policies and procedures and (viii) other policies required to be maintained by such Advisory Entity under applicable law, including Rules 204A-1 and 206(4)-7 under the Investment Advisers Act, except, in each case under clauses (i)-(viii), as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Boston Private.

(e)    With respect to each Advisory Entity, except as would not reasonably be expected to be, individually or in the aggregate, material to such Advisory Entity, (i) none of such Advisory Entity, its control persons, its directors, officers or employees (other than employees whose functions are solely clerical or ministerial), nor, to the knowledge of Boston Private, any of such Advisory Entity's other "associated persons" (as defined in the Investment Advisers Act) is (A) subject to ineligibility pursuant to Section 203 of the Investment Advisers Act to serve as a registered investment adviser or as an "associated person" of a registered investment adviser, (B) subject to ineligibility pursuant to Section 9(a) of the

-27-

Investment Company Act of 1940, as amended (the "Investment Company Act") to serve as investment adviser of an investment company registered under the Investment Company Act, (C) subject to disqualification pursuant to Rule 206(4)-3 under the Investment Advisers Act or (D) subject to disqualification under Rule 506(d) of Regulation D under the Securities Act, unless in the case of clause (A), (B), (C) or (D), such Advisory Entity or "associated person" has received effective exemptive relief from the SEC with respect to such ineligibility or disqualification, nor (ii) is there any proceeding pending or, to the knowledge of Boston Private, threatened in writing by any Governmental Entity that would reasonably be expected to result in the ineligibility or disqualification of such Advisory Entity, or any of its "associated persons" to serve in such capacities or that would provide a basis for such ineligibility or disqualification which would reasonably be expected to be, individually or in the aggregate, material to Boston Private.

(f)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Boston Private, there are no unresolved issues with the SEC with respect to any Advisory Entity.

(g)    As of the date hereof, each Advisory Entity is not currently subject to, and has not received written notice of, an examination, inspection, investigation or inquiry by a Governmental Entity.

(h)    No Advisory Entity is prohibited from charging fees to any person pursuant to Rule 206(4)-5 under the Investment Advisers Act or any similar "pay-to-play" rule or requirement, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Boston Private.

(i)    Boston Private has made available to SVB Financial true and complete copies of each Uniform Application for Investment Adviser Registration on Form ADV filed since January 1, 2017 by each Advisory Entity, including any predecessor or constituent entities of an Advisory Entity, that is required to be registered as an investment adviser under the Investment Advisers Act, reflecting all amendments thereto to the date hereof (each a "Form ADV"). The Forms ADV are in compliance in all material respects with the applicable requirements of the Investment Advisers Act. Since January 1, 2017, each Advisory Entity has made available to each advisory client its Form ADV to the extent required by the Investment Advisers Act. Boston Private has made available to SVB Financial true and complete copies of all deficiency letters and inspection reports or similar documents furnished to any Advisory Entity by the SEC since January 1, 2017 and the Advisory Entity's responses thereto, if any.

3.28    Volcker Rule. Boston Private and its Subsidiaries do not engage in "proprietary trading" (as defined in 12 U.S.C. § 1851 and the regulations promulgated by the Federal Reserve Board in connection therewith (the "Volcker Rule")) or hold any ownership interest in or sponsor any "covered fund" (as defined in the Volcker Rule).

3.29    No Other Representations or Warranties.

(a)    Except for the representations and warranties made by Boston Private in this Article III, neither Boston Private nor any other person makes any express or implied representation or warranty with respect to Boston Private, its Subsidiaries, or their respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects, and Boston Private hereby disclaims any such other representations or warranties. In particular, without limiting the foregoing disclaimer, neither Boston Private nor any other person makes or has made any representation or warranty to SVB Financial or any of their respective affiliates or representatives with respect to (i) any financial projection, forecast, estimate, budget or prospective information relating to Boston Private, any of its Subsidiaries or their respective businesses or (ii) except for the representations and warranties made by Boston Private in this Article III, any oral or written information presented to SVB Financial or any of its affiliates or representatives in the course of their due diligence investigation of Boston Private, the negotiation of this Agreement or in the course of the transactions contemplated hereby.

-28-

(b)    Boston Private acknowledges and agrees that neither SVB Financial nor any other person has made or is making any express or implied representation or warranty other than those contained in Article IV.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF SVB FINANCIAL

Except (i) as disclosed in the disclosure schedule delivered by SVB Financial to Boston Private concurrently herewith (the "SVB Financial Disclosure Schedule"), provided, that (a) no such item is required to be set forth as an exception to a representation or warranty if its absence would not result in the related representation or warranty being deemed untrue or incorrect, (b) the mere inclusion of an item in the SVB Financial Disclosure Schedule as an exception to a representation or warranty shall not be deemed an admission by SVB Financial that such item represents a material exception or fact, event or circumstance or that such item is reasonably expected to have a Material Adverse Effect, and (c) any disclosures made with respect to a section of this Article IV shall be deemed to qualify (1) any other section of this Article IV specifically referenced or cross-referenced and (2) other sections of this Article IV to the extent it is reasonably apparent on its face (notwithstanding the absence of a specific reference or cross reference) from a reading of the disclosure that such disclosure applies to such other sections or (ii) as disclosed in any SVB Financial Reports filed by SVB Financial since December 31, 2018, and prior to the date hereof (but disregarding risk factor disclosures contained under the heading "Risk Factors," or disclosures of risks set forth in any "forward-looking statements" disclaimer or any other statements that are similarly non-specific or cautionary, predictive or forward-looking in nature), SVB Financial hereby represents and warrants to Boston Private as follows:

4.1    Corporate Organization.

(a)    SVB Financial is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and is a bank holding company duly registered under the BHC Act that has elected to be treated as financial holding company under the BHC Act. SVB Financial has the corporate power and authority to own, lease or operate all its properties and assets and to carry on its business as it is now being conducted in all material respects. SVB Financial is duly licensed or qualified to do business and in good standing in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such licensing, qualification or standing necessary, except where the failure to be so licensed or qualified or to be in good standing would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on SVB Financial. True and complete copies of the SVB Financial Certificate and SVB Financial Bylaws, as in effect as of the date of this Agreement, have previously been made available by SVB Financial to Boston Private.

(b)    SVB Bank (i) is duly organized and validly existing under the laws of its jurisdiction of organization, (ii) is duly licensed or qualified to do business and, where such concept is recognized under applicable law, in good standing in all jurisdictions (whether federal, state, local or foreign) where its ownership, leasing or operation of property or the conduct of its business requires it to be so licensed or qualified and in which the failure to be so licensed or qualified or in good standing would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect on SVB Financial and (iii) has all requisite corporate power and authority to own, lease or operate its properties and assets and to carry on its business as now conducted, except where the failure to have such corporate power or authority would not, individually or in the aggregate, reasonably be expected to be material to SVB Financial and its Subsidiaries, taken as a whole. There are no restrictions on the ability of SVB Bank to pay dividends or distributions except for restrictions on dividends or distributions generally applicable to all such regulated entities under applicable law. The deposit accounts of SVB Bank are insured by the FDIC through the Deposit Insurance Fund (as defined in Section 3(y) of the Federal Deposit Insurance Act of 1950) to the

-29-

fullest extent permitted by law, all premiums and assessments required to be paid in connection therewith have been paid when due, and no proceedings for the termination of such insurance are pending or, to SVB Financial's knowledge, threatened. There are no Subsidiaries of SVB Financial other than SVB Bank that have or are required to have deposit insurance.

4.2    <u>Capitalization</u>.

(a)    The authorized capital stock of SVB Financial consists of 150,000,000 shares of SVB Financial Common Stock and 20,000,000 shares of preferred stock, par value $0.001 per share. As of November 30, 2020, there were (i) 51,831,667 shares of SVB Financial Common Stock issued and outstanding; (ii) 112,020 shares of SVB Financial Common Stock granted in respect of outstanding awards of restricted SVB Financial Common Stock under a SVB Financial equity incentive plan (a "<u>SVB Financial Restricted Stock Award</u>"); (iii) 564,287 shares of SVB Financial Common Stock reserved for issuance upon the exercise of outstanding stock options to purchase shares of SVB Financial Common Stock ("<u>SVB Financial Stock Options</u>"); (iv) 723,014 shares of SVB Financial Common Stock reserved for issuance upon the settlement of outstanding SVB Financial RSU Awards; (v) 128,522 shares of SVB Financial Common Stock reserved for issuance upon the settlement of outstanding performance-based restricted stock units in respect of shares of SVB Financial Common Stock ("<u>SVB Financial PSU Award</u>") (assuming performance goals are satisfied at the target level) or 192,783 shares of SVB Financial Common Stock reserved for issuance upon the settlement of outstanding SVB Financial PSU Awards (assuming performance goals are satisfied at the maximum level); and (vi) 1,244,434 shares of SVB Financial Common Stock reserved for issuance under the SVB Financial 1999 Employee Stock Purchase Plan, as amended and restated ("<u>SVB Financial ESPP</u>"). As of the date of this Agreement, except as set forth in the immediately preceding sentence, for changes since November 30, 2020 resulting from the exercise, vesting or settlement of any SVB Financial Restricted Stock Award, SVB Financial Stock Option, SVB Financial RSU Award or SVB Financial PSU Award, and accumulated contributions to purchase shares of SVB Financial Common Stock under the SVB Financial ESPP described in the immediately preceding sentence and shares of SVB Financial Common Stock reserved for issuance pursuant to future grants under the SVB Financial equity incentive plans, there are no shares of SVB Financial Common Stock issued, reserved for issuance or outstanding. All the issued and outstanding shares of SVB Financial Common Stock have been duly authorized and validly issued and are fully paid, nonassessable and free of preemptive rights, with no personal liability attaching to the ownership thereof. Other than SVB Financial Restricted Stock Awards, SVB Financial Stock Options, SVB Financial PSU Awards and accumulated contributions to purchase shares of SVB Financial Common Stock under the SVB Financial ESPP as described in this Section 4.2(a) and SVB Financial's 5.250% Fixed-Rate Non-Cumulative Perpetual Preferred Stock, Series A ("<u>Series A Preferred Stock</u>"), and depositary shares, each representing 1/40th interest in a share of Series A Preferred Stock, as of the date of this Agreement there are no outstanding subscriptions, options, warrants, stock appreciation rights, phantom units, scrip, rights to subscribe to, preemptive rights, anti-dilutive rights, rights of first refusal or similar rights, puts, calls, commitments or agreements of any character relating to, or securities or rights convertible or exchangeable into or exercisable for, shares of capital stock or other voting or equity securities of or ownership interests in SVB Financial, or contracts, commitments, understandings or arrangements by which SVB Financial may become bound to issue additional shares of capital stock or other voting or equity securities of or ownership interest in SVB Financial, or that otherwise obligate SVB Financial to issue, transfer, sell, purchase, redeem or otherwise acquire, any of the foregoing.

(b)    SVB Financial owns, directly or indirectly, all of the issued and outstanding shares of capital stock or other equity ownership interests of each Subsidiary of SVB Financial, free and clear of any Liens, and all of such shares or equity ownership interests are duly authorized and validly issued and are fully paid, nonassessable (except, with respect to Subsidiaries of SVB Financial that are depository institutions, as provided under any provision of applicable state law comparable to 12 U.S.C. § 55) and free of preemptive rights, with no personal liability attaching to the ownership thereof. SVB Bank does not have and is not bound by any outstanding subscriptions, options, warrants, calls, rights, commitments or agreements of any character calling for the purchase or issuance of any shares of capital stock or any other equity security of

-30-

SVB Bank or any securities representing the right to purchase or otherwise receive any shares of capital stock or other equity security of SVB Bank.

4.3   Authority; No Violation.

(a)   SVB Financial has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the Merger have been duly and validly approved by the Board of Directors of SVB Financial. Except for the approval of the Bank Merger Agreement by the board of directors of SVB Bank and SVB Financial as SVB Bank's sole shareholder, no other corporate proceedings on the part of SVB Financial are necessary to approve this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by SVB Financial and (assuming due authorization, execution and delivery by Boston Private) constitutes a valid and binding obligation of SVB Financial, enforceable against SVB Financial in accordance with its terms (except in all cases as such enforceability may be limited by the Enforceability Exceptions). The shares of SVB Financial Common Stock to be issued in the Merger have been validly authorized and, when issued, will be validly issued, fully paid and nonassessable, and no current or past shareholder of SVB Financial will have any preemptive right or similar rights in respect thereof.

(b)   Neither the execution and delivery of this Agreement by SVB Financial, nor the consummation by SVB Financial of the transactions contemplated hereby (including the Merger and the Bank Merger), nor compliance by SVB Financial with any of the terms or provisions hereof, will (i) violate any provision of the SVB Financial Certificate or the SVB Financial Bylaws or (ii) assuming that the consents and approvals referred to in Section 4.4 are duly obtained, (x) violate any law, statute, code, ordinance, rule, regulation, judgment, order, writ, decree or injunction applicable to SVB Financial, any of its Subsidiaries or any of their respective properties or assets or (y) violate, conflict with, result in a breach of any provision of or the loss of any benefit under, constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, result in the termination of or a right of termination or cancellation under, accelerate the performance required by, or result in the creation of any Lien upon any of the respective properties or assets of SVB Financial or any of its Subsidiaries under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which SVB Financial or any of its Subsidiaries is a party, or by which they or any of their respective properties or assets may be bound, except (in the case of clauses (x) and (y) above) for such violations, conflicts, breaches, defaults, terminations, cancellations, accelerations or creations that, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect on SVB Financial.

4.4   Consents and Approvals. Except for (a) the filing of any required applications, filings and notices, as applicable, with the NASDAQ Stock Market, LLC, (b) the filing of any required applications, filings and notices, as applicable, with the Federal Reserve Board under the BHC Act and approval of such applications, filings and notices, (c) the filing of any required applications, filings and notices, as applicable, with the Federal Reserve Board under the Bank Merger Act, and approval of such applications, filings and notices, (d) the filing of any required applications, filings and notices, as applicable, with the California Department of Financial Protection and Innovation and the Massachusetts Commissioner of Banks, and approval of such applications, filings and notices, including the making of any arrangements with the Massachusetts Housing Partnership Fund necessary to obtain approval of the Massachusetts Commissioner of Banks, (e) those additional applications, filings and notices, if any, listed on Section 3.4 of the Boston Private Disclosure Schedule or Section 4.4 of the SVB Financial Disclosure Schedule and approval of such applications, filings and notices, (f) the filing with the SEC of the Proxy Statement and the S-4, and the declaration by the SEC of the effectiveness of the S-4, (g) the filing of the proxy solicitation and other advisory client materials for any Public Funds with the SEC, as contemplated by Section 6.18, (h) the filing of the Certificate of Merger with the Delaware Secretary pursuant to the DGCL, the filing of the Articles of Merger with the Massachusetts Secretary pursuant to the MBCA and the filing of the Bank Merger Certificates with the applicable Governmental Entities as required by applicable law, and (i) such

-31-

filings and approvals as are required to be made or obtained under the securities or "Blue Sky" laws of various states in connection with the issuance of the shares of SVB Financial Common Stock pursuant to this Agreement and the approval of the listing of such SVB Financial Common Stock on the NASDAQ, no consents or approvals of or filings or registrations with any Governmental Entity are necessary in connection with (A) the execution and delivery by SVB Financial of this Agreement or (B) the consummation by SVB Financial of the Merger and the other transactions contemplated hereby (including the Bank Merger). As of the date hereof, SVB Financial has no knowledge of any reason why the necessary regulatory approvals and consents will not be received by SVB Financial to permit consummation of the Merger and the Bank Merger on a timely basis.

4.5    Reports. SVB Financial and each of its Subsidiaries have timely filed (or furnished, as applicable) all reports, forms, correspondence, registrations and statements, together with any amendments required to be made with respect thereto, that they were required to file (or furnish, as applicable) since January 1, 2018 with any Regulatory Agencies, including any report, form, correspondence, registration or statement required to be filed (or furnished, as applicable) pursuant to the laws, rules or regulations of the United States, any state, any foreign entity, or any Regulatory Agency, and have paid all fees and assessments due and payable in connection therewith, except where the failure to timely file (or furnish, as applicable) such report, form, correspondence, registration or statement or to pay such fees and assessments, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect on SVB Financial. As of their respective dates, such reports, forms, correspondence, registrations and statements, and other filings, documents, and instruments were complete and accurate and complied with all applicable laws, in each case, except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on SVB Financial. Subject to Section 9.14, except for normal examinations conducted by a Regulatory Agency in the ordinary course of business of SVB Financial and its Subsidiaries, no Regulatory Agency has pending any proceeding or, to the knowledge of SVB Financial, investigation into the business or operations of SVB Financial or any of its Subsidiaries, except where such proceedings or investigations would not reasonably be expected to be, either individually or in the aggregate, material to SVB Financial and its Subsidiaries (taken as a whole). Subject to Section 9.14, there (i) is no unresolved violation, criticism, or exception by any Regulatory Agency with respect to any report or statement relating to any examinations or inspections of SVB Financial or any of its Subsidiaries and (ii) has been no formal or informal inquiries by, or disagreements or disputes with, any Regulatory Agency with respect to the business, operations, policies or procedures of SVB Financial or any of its Subsidiaries, in each case, which would reasonably be expected to be, either individually or in the aggregate, material to SVB Financial and its Subsidiaries (taken as a whole).

4.6    Financial Statements.

(a)    The financial statements of SVB Financial and its Subsidiaries included (or incorporated by reference) in the SVB Financial Reports (including the related notes, where applicable) (i) have been prepared from, and are in accordance with, the books and records of SVB Financial and its Subsidiaries, (ii) fairly present in all material respects the consolidated results of operations, cash flows, changes in stockholders' equity and consolidated financial position of SVB Financial and its Subsidiaries for the respective fiscal periods or as of the respective dates therein set forth (subject in the case of unaudited statements to year-end audit adjustments normal in nature and amount), (iii) complied, as of their respective dates of filing with the SEC, in all material respects with applicable accounting requirements and with the published rules and regulations of the SEC with respect thereto, and (iv) have been prepared in accordance with GAAP consistently applied during the periods involved, except, in each case, as indicated in such statements or in the notes thereto. The books and records of SVB Financial and its Subsidiaries have since December 31, 2017, been, and are being, maintained in all material respects in accordance with GAAP and any other applicable legal and accounting requirements, except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on SVB Financial. Since December 31, 2018, no independent public accounting firm of SVB Financial has resigned (or informed SVB Financial that it intends to resign) or been dismissed as independent public accountants of SVB Financial as a result of or in connection with any disagreements with SVB Financial on a matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure.

-32-

(b)    Except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on SVB Financial, neither SVB Financial nor any of its Subsidiaries has any liability of any nature whatsoever (whether absolute, accrued, contingent or otherwise and whether due or to become due) required by GAAP to be included on a consolidated balance sheet of SVB Financial, except for those liabilities that are reflected or reserved against on the consolidated balance sheet of SVB Financial included in its Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2020 (including any notes thereto) and for liabilities incurred in the ordinary course of business consistent with past practice since September 30, 2020, or in connection with this Agreement and the transactions contemplated hereby.

(c)    The records, systems, controls, data and information of SVB Financial and its Subsidiaries are recorded, stored, maintained and operated under means (including any electronic, mechanical or photographic process, whether computerized or not) that are under the exclusive ownership and direct control of SVB Financial or its Subsidiaries or accountants (including all means of access thereto and therefrom), except for any non-exclusive ownership and non-direct control that would not reasonably be expected to have a Material Adverse Effect on SVB Financial. SVB Financial has implemented and maintains disclosure controls and procedures and internal controls over financial reporting (as defined in Rule 13a-15(e) and (f), respectively, of the Exchange Act) to ensure that material information relating to SVB Financial, including its Subsidiaries, is made known to the chief executive officer and the chief financial officer of SVB Financial by others within those entities as appropriate to allow timely decisions regarding required disclosures and to make the certifications required by the Exchange Act and Sections 302 and 906 of the Sarbanes-Oxley Act. Neither SVB Financial nor its independent audit firm has identified any unremediated material weakness in internal controls over financial reporting or disclosure controls and procedures. There is no reason to believe that SVB Financial's outside auditors and its chief executive officer and chief financial officer will not be able to give the certifications and attestations required pursuant to the rules and regulations adopted pursuant to Section 404 of the Sarbanes-Oxley Act, without qualification, when next due.

(d)    Since January 1, 2019, (i) neither SVB Financial nor any of its Subsidiaries, nor, to the knowledge of SVB Financial, any director, officer, auditor, accountant or representative of SVB Financial or any of its Subsidiaries, has received or otherwise had or obtained knowledge of any material complaint, allegation, assertion or claim, whether written or, to the knowledge of SVB Financial, oral, regarding the accounting or auditing practices, procedures, methodologies or methods (including with respect to loan loss reserves, write-downs, charge-offs and accruals) of SVB Financial or any of its Subsidiaries or their respective internal accounting controls, including any material complaint, allegation, assertion or claim that SVB Financial or any of its Subsidiaries has engaged in questionable accounting or auditing practices, and (ii) no employee of or attorney representing SVB Financial or any of its Subsidiaries, whether or not employed by SVB Financial or any of its Subsidiaries, has reported evidence of a material violation of securities laws or banking laws, breach of fiduciary duty or similar violation by SVB Financial or any of its Subsidiaries or any of their respective officers, directors, employees or agents to the Board of Directors of SVB Financial or any committee thereof or the Board of Directors or similar governing body of any Subsidiary of SVB Financial or any committee thereof, or to the knowledge of SVB Financial, to any director or officer of SVB Financial or any Subsidiary of SVB Financial (including pursuant to any whistleblower or similar process).

(e)    As of the date of this Agreement, no executive officer of SVB Financial has failed in any respect to make the certifications required of him or her under Section 302 or 906 of the Sarbanes-Oxley Act.

4.7    <u>Broker's Fees</u>. With the exception of the engagement of Goldman Sachs & Co. LLC, neither SVB Financial nor any Subsidiary of SVB Financial nor any of their respective officers or directors has employed any broker, finder or financial advisor or incurred any liability for any broker's fees, commissions or finder's fees in connection with the Merger or related transactions contemplated by this Agreement.

-33-

4.8 <u>Absence of Certain Changes or Events</u>. Since December 31, 2019, there has not been any effect, change, event, circumstance, condition, occurrence or development that has had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on SVB Financial.

4.9 <u>Legal and Regulatory Proceedings</u>.

(a) Neither SVB Financial nor any of its Subsidiaries is a party to any, and there are no outstanding or pending or, to the knowledge of SVB Financial, threatened, legal, administrative, arbitral or other proceedings, claims, actions or governmental or regulatory investigations of any nature against SVB Financial or any of its Subsidiaries or any of their current or former directors or executive officers (i) that would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on SVB Financial, or (ii) of a material nature challenging the validity or propriety of this Agreement or the transactions contemplated hereby.

(b) There is no material injunction, order, judgment, decree, or regulatory restriction imposed upon SVB Financial, any of its Subsidiaries or the assets of SVB Financial or any of its Subsidiaries (or that, upon consummation of the transactions contemplated by this Agreement, would apply to the Surviving Corporation or any of its affiliates).

4.10 <u>SEC Reports</u>. SVB Financial has previously made available to Boston Private an accurate and complete copy of each (a) final registration statement, prospectus, report, schedule and definitive proxy statement filed with or furnished to the SEC since December 31, 2017 by SVB Financial pursuant to the Securities Act or the Exchange Act (the "<u>SVB Financial Reports</u>"), and (b) communication mailed by SVB Financial to its shareholders since December 31, 2017 and prior to the date hereof, and no such SVB Financial Report or communication, as of the date thereof (and, in the case of registration statements and proxy statements, on the dates of effectiveness and the dates of the relevant meetings, respectively), contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances in which they were made, not misleading, except that information filed or furnished as of a later date (but before the date of this Agreement) shall be deemed to modify information as of an earlier date. Since December 31, 2017, as of their respective dates, all SVB Financial Reports filed or furnished under the Securities Act and the Exchange Act complied in all material respects with the published rules and regulations of the SEC with respect thereto. As of the date of this Agreement, there are no outstanding comments from, or unresolved issues raised by, the SEC with respect to any of the SVB Financial Reports.

4.11 <u>Compliance with Applicable Law</u>.

(a) SVB Financial and each of its Subsidiaries hold, and have at all times since December 31, 2017, held, all licenses, registrations, franchises, certificates, variances, permits, charters and authorizations necessary for the lawful conduct of their respective businesses and ownership of their respective properties, rights and assets under and pursuant to each (and have paid all fees and assessments due and payable in connection therewith), except where neither the cost of failure to hold nor the cost of obtaining and holding such license, registration, franchise, certificate, variance, permit, charter or authorization (nor the failure to pay any fees or assessments) would, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on SVB Financial, and to the knowledge of SVB Financial, no suspension or cancellation of any such necessary license, registration, franchise, certificate, variance, permit, charter or authorization is threatened.

(b) Except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on SVB Financial, SVB Financial and each of its Subsidiaries have complied with and are not in default or violation under, and to the knowledge of SVB Financial, there are no facts or circumstances that would reasonably be expected to cause SVB Financial or any of its Subsidiaries to violate, any applicable law, statute, order, rule, regulation, policy and/or guideline of any Governmental Entity relating to SVB Financial or any of its Subsidiaries. SVB Financial and its Subsidiaries have

-34-

established and maintain a system of internal controls designed to ensure compliance in all material respects by SVB Financial and its Subsidiaries with applicable financial recordkeeping and reporting requirements of applicable money laundering prevention laws in jurisdictions where SVB Financial and its Subsidiaries conduct business.

(c)    SVB Bank is an "insured depository institution" as defined in the Federal Deposit Insurance Act of 1950 and applicable regulations thereunder. As of the date hereof, each of SVB Financial and SVB Bank is "well-capitalized" (as such term is defined in the relevant regulation of the institution's primary federal regulator). SVB Bank has a Community Reinvestment Act rating of "satisfactory" or better and does not expect to have a Community Reinvestment Act rating that is not at least "satisfactory".

4.12    <u>Agreements with Regulatory Agencies</u>. Subject to Section 9.14, neither SVB Financial nor any of its Subsidiaries is subject to any cease-and-desist or other order or enforcement action issued by, or is a party to any written agreement, consent agreement or memorandum of understanding with, or is a party to any commitment letter or similar undertaking to, or is subject to any order or directive by, or has been ordered to pay any civil money penalty by, or has been since January 1, 2018, a recipient of any supervisory letter from, or since January 1, 2018, has adopted any policies, procedures or board resolutions at the request or suggestion of any Regulatory Agency or other Governmental Entity that restricts in any material respect or would reasonably be expected to restrict in any material respect the conduct of its business or that in any material manner relates to its capital adequacy, its ability to pay dividends, its credit or risk management policies, its management or its business (each, whether or not set forth in the SVB Financial Disclosure Schedule, a "<u>SVB Financial Regulatory Agreement</u>"), nor has SVB Financial or any of its Subsidiaries been advised since January 1, 2018, by any Regulatory Agency or other Governmental Entity that it is considering issuing, initiating, ordering or requesting any such SVB Financial Regulatory Agreement.

4.13    <u>Reorganization</u>. SVB Financial has not taken any action and is not aware of any fact or circumstance that could reasonably be expected to prevent the Merger from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code.

4.14    <u>SVB Financial Information</u>. The information relating to SVB Financial and its Subsidiaries that is provided in writing by SVB Financial or its Subsidiaries or their respective representatives specifically for inclusion in the Proxy Statement and the S-4, or in any other document filed with any other Regulatory Agency or Governmental Entity in connection herewith, will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances in which they are made, not misleading. The portion of the Proxy Statement relating to SVB Financial and its Subsidiaries will comply in all material respects with the provisions of the Exchange Act and the rules and regulations thereunder. The portion of the S-4 relating to SVB Financial or any of its Subsidiaries will comply in all material respects with the provisions of the Securities Act and the rules and regulations thereunder.

4.15    <u>No Other Representations or Warranties</u>.

(a)    Except for the representations and warranties made by SVB Financial in this Article IV, neither SVB Financial nor any other person makes any express or implied representation or warranty with respect to SVB Financial, its Subsidiaries, or their respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects, and SVB Financial hereby disclaims any such other representations or warranties. In particular, without limiting the foregoing disclaimer, neither SVB Financial nor any other person makes or has made any representation or warranty to Boston Private or any of its affiliates or representatives with respect to (i) any financial projection, forecast, estimate, budget or prospective information relating to SVB Financial, any of its Subsidiaries or their respective businesses or (ii) except for the representations and warranties made by SVB Financial in this Article IV, any oral or written information presented to Boston Private or any of its affiliates or representatives in the course of their due diligence investigation of SVB Financial, the negotiation of this Agreement or in the course of the transactions contemplated hereby.

-35-

(b)   SVB Financial acknowledges and agrees that neither Boston Private nor any other person has made or is making any express or implied representation or warranty other than those contained in Article III.

ARTICLE V

COVENANTS RELATING TO CONDUCT OF BUSINESS

5.1   <u>Conduct of Business of Boston Private Prior to the Effective Time</u>. During the period from the date of this Agreement to the Effective Time or earlier termination of this Agreement, except as expressly contemplated or permitted by this Agreement (including as set forth in the Boston Private Disclosure Schedule), required by law (including the Pandemic Measures) or as consented to in writing by SVB Financial (such consent not to be unreasonably withheld, conditioned or delayed), (i) Boston Private shall, and shall cause its Subsidiaries to, (a) conduct its business only in the ordinary course of business consistent with past practice and (b) use reasonable best efforts to maintain and preserve intact its business organization, employees and advantageous business relationships, and (ii) Boston Private shall, and shall cause its Subsidiaries to, take no action that would reasonably be expected to adversely affect or materially delay the ability to obtain any necessary approvals of any Regulatory Agency or other Governmental Entity required for the transactions contemplated hereby or to perform Boston Private's covenants and agreements under this Agreement or to consummate the transactions contemplated hereby on a timely basis. Notwithstanding anything to the contrary set forth in this Section 5.1 or Section 5.2, Boston Private and its Subsidiaries may take any commercially reasonable actions that Boston Private reasonably determines are necessary or prudent to take in response to the COVID-19 pandemic or the Pandemic Measures; <u>provided</u> that Boston Private shall provide prior notice to and consult with SVB Financial in good faith to the extent such actions would otherwise require consent of SVB Financial under this Section 5.1 or Section 5.2 or would have a material impact on Boston Private or any Boston Private Subsidiary.

5.2   <u>Boston Private Forbearances</u>. During the period from the date of this Agreement to the Effective Time or earlier termination of this Agreement, except as set forth in the Boston Private Disclosure Schedule, as expressly contemplated or permitted by this Agreement or as required by law (including the Pandemic Measures), Boston Private shall not, and shall not permit any of its Subsidiaries to, without the prior written consent of SVB Financial (such consent not to be unreasonably withheld, conditioned or delayed):

(a)   other than (i) federal funds borrowings and Federal Home Loan Bank borrowings, in each case, with a maturity not in excess of six months, (ii) deposits, (iii) issuances of letters of credit, (iv) purchases of federal funds, (v) sales of certificates of deposit and (vi) entry into repurchase agreements, in each case, in the ordinary course of business consistent with past practice, incur any indebtedness for borrowed money (other than indebtedness of Boston Private or any of its wholly owned Subsidiaries to Boston Private or any of its Subsidiaries), assume, guarantee, endorse or otherwise as an accommodation become responsible for the obligations of any other person (other than any Subsidiary of Boston Private);

(b)   (i) adjust, split, combine or reclassify any capital stock;

(ii)   make, declare, pay or set a record date for any dividend, or any other distribution on, or directly or indirectly redeem, purchase or otherwise acquire, any shares of its capital stock or other equity or voting securities or any securities or obligations convertible (whether currently convertible or convertible only after the passage of time or the occurrence of certain events) or exchangeable into or exercisable for any shares of its capital stock (except (A) regular quarterly cash dividends by Boston Private at a rate not in excess of $0.06 per share of Boston Private Common Stock declared and paid on a schedule consistent with past practice, and required dividends in respect of its trust preferred securities, (B) dividends paid by any of the Subsidiaries of Boston Private to Boston Private or any of its wholly owned Subsidiaries and (C) the acceptance of shares of Boston Private Common Stock as payment for the exercise price of Boston Private Stock Options or for withholding taxes incurred in

-36-

connection with the exercise of Boston Private Stock Options or the vesting or settlement of Boston Private Equity Awards and dividend equivalents thereon, if any, in each case in accordance with past practice and the terms of the applicable award agreements);

(iii)    grant any stock options, restricted stock, restricted stock units, performance stock units or other equity-based awards or interests, or grant any person any right to acquire any shares of its capital stock; or

(iv)    issue, sell, transfer, encumber or otherwise permit to become outstanding any shares of capital stock or voting securities or equity interests or securities convertible (whether currently convertible or convertible only after the passage of time or the occurrence of certain events) or exchangeable into, or exercisable for, any shares of its capital stock or other equity or voting securities or any options, warrants, or other rights of any kind to acquire any shares of capital stock or other equity or voting securities, except for the issuance of shares upon the exercise of Boston Private Stock Options, the vesting or settlement of Boston Private Equity Awards (and dividend equivalents thereon, if any), or the issuance of shares upon the exercise of purchase rights under the Boston Private ESPP in accordance with their terms;

(c)    sell, transfer, mortgage, encumber or otherwise dispose of any of its material properties or assets or any business to any individual, corporation or other entity other than a wholly owned Subsidiary, or cancel, release or assign any material indebtedness to any such person or any claims held by any such person, in each case, other than in the ordinary course;

(d)    grant, extend, amend, waive or modify any material rights in or to, nor sell, assign, lease, transfer, license, let lapse, abandon, cancel or otherwise dispose of, or extend or exercise any option to sell, assign, lease, transfer, license, or otherwise dispose of, any material Intellectual Property owned by Boston Private or any of its Subsidiaries;

(e)    except for foreclosure or acquisitions of control in a fiduciary or similar capacity or in satisfaction of debts previously contracted in good faith in the ordinary course of business consistent with past practice, make any material investment in or acquisition of (whether by purchase of stock or securities, contributions to capital, property transfers, merger or consolidation, or formation of a joint venture or otherwise) any other person or the property or assets of any other person, in each case, other than in a wholly owned Subsidiary of Boston Private;

(f)    engage in "proprietary trading" (as defined in the Volcker Rule), acquire or hold any ownership interest in or sponsor any "covered fund" (as defined in the Volcker Rule) or enter into any new, or amend any existing, agreement to act as investment adviser, investment sub-adviser, sponsor or manager for any Public Fund, Non-U.S. Retail Fund or Private Fund;

(g)    in each case, except for transactions in the ordinary course of business consistent with past practice, terminate, materially amend, or waive any material provision of, any Boston Private Contract, or make any change in any instrument or agreement governing the terms of any of its securities, other than normal renewals of contracts and leases without material adverse changes of terms with respect to Boston Private or enter into any contract that would constitute a Boston Private Contract if it were in effect on the date of this Agreement;

(h)    except as required under applicable law or the terms of any Boston Private Benefit Plan existing as of the date hereof, as applicable, (i) enter into, establish, adopt, amend (other than administrative amendments that do not materially increase liabilities) or terminate any Boston Private Benefit Plan, or any arrangement that would be a Boston Private Benefit Plan if in effect on the date hereof, (ii) increase the compensation or benefits payable to any current or former employee, officer, director or consultant, (iii) pay or award, or commit to pay or award, any material bonuses or incentive compensation other than in the ordinary course of business consistent with past practice, (iv) grant or accelerate the vesting of any equity-based awards or other compensation, (v) enter into any new, or amend any existing, employment, severance, change in control, retention, collective bargaining agreement or similar agreement or arrangement, (vi) fund

-37-

any rabbi trust or similar arrangement or in any other way secure the payment of compensation or benefits under any Boston Private Benefit Plan, (vii) terminate the employment or services of any officer or any employee whose annual base salary or wage rate is greater than $250,000 or whose total target annual compensation is greater than $500,000, other than for cause, or (viii) hire any officer, employee, independent contractor or consultant (who is a natural person) who has an annual base salary or wage rate greater than $250,000;

(i)    except for debt workouts in the ordinary course of business, settle any claim, suit, action or proceeding, except involving solely monetary remedies in an amount and for consideration not in excess of $500,000 individually or $1,500,000 in the aggregate or that would not impose any material restriction on, or create any adverse precedent that would be material to, the business of it or its Subsidiaries or the Surviving Corporation or to the receipt of regulatory approvals for the transactions contemplated hereby on a timely basis;

(j)    take any action or knowingly fail to take any action where such action or failure to act could reasonably be expected to prevent the Merger from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code;

(k)    amend the Boston Private Articles of Organization, Boston Private Bylaws or comparable governing documents of its Subsidiaries;

(l)    merge or consolidate itself or any of its Subsidiaries with any other person, or restructure, reorganize or completely or partially liquidate or dissolve it or any of its Subsidiaries;

(m)    materially restructure or materially change its investment securities or derivatives portfolio or its interest rate exposure, through purchases, sales or otherwise, or the manner in which the portfolio is classified or reported, except as may be required by GAAP or by applicable laws, regulations, guidelines or policies imposed by any Governmental Entity;

(n)    take any action that is intended or expected to result in any of the conditions of the Merger set forth in Article VII not being satisfied, except, in every case, as may be required by applicable law;

(o)    implement or adopt any change in its accounting principles, practices or methods, other than as may be required by GAAP;

(p)    (i) enter into any new line of business or change in any material respect its lending, investment, hedging, underwriting, risk and asset liability management and other banking and operating, securitization and servicing practices or policies (including any change in the maximum ratio or similar limits as a percentage of its capital exposure applicable with respect to its loan portfolio or any segment thereof), except as required by applicable law, regulation or policies imposed by any Governmental Entity or (ii) make any loans or extensions of credit or renewals thereof, except in the ordinary course of business consistent with past practice, provided (A) any loan or extension of credit or renewal thereof that pursuant to Boston Private's approved loan policies as in effect as of the date hereof (copies of which have been provided to SVB Financial prior to the date hereof) would require prior approval of Boston Private Bank's Risk Management Committee (provided, that, subject to Section 6.2 and Section 9.14, SVB Financial will be provided with copies of all reporting and materials provided to any loan committee of Boston Private Bank, including the Residential Loan Committee, Management Loan Committee, Executive Loan Committee and Risk Management Committee) or (B) any loan or extension of credit or renewal thereof of the type set forth on Section 5.2(p)(ii) of the Boston Private Disclosure Schedule, in each case, shall require the prior written approval of the Chief Credit Officer of SVB Bank or another officer designated by SVB Financial, which approval or rejection shall be given in writing within three (3) business days after the loan package is delivered to such individual and deemed given if no response is received;

(q)    make, or commit to make, any capital expenditures that exceed by more than 5% the amounts disclosed in Boston Private's capital expenditure budget set forth in Section 5.2(q) of the Boston Private Disclosure Schedule;

-38-

(r)    make, change or revoke any material Tax election, change an annual Tax accounting period, adopt or change any material Tax accounting method, file any material amended Tax Return, enter into any material closing agreement with respect to Taxes, or settle any material Tax claim, audit, assessment or dispute or surrender any right to claim a material refund of Taxes, in each case, other than in the ordinary course of business;

(s)    (i) except as set forth in Section 5.2(s)(i) of the Boston Private Disclosure Schedule, make application for the opening, relocation or closing of any, or open, relocate or close any, branch office, loan production office or other significant office or operations facility of it or its Subsidiaries or (ii) other than in consultation with SVB Financial, purchase any new real property (other than other real estate owned (OREO) properties in the ordinary course);

(t)    knowingly take any action that is intended to or would reasonably be expected to adversely affect or materially delay the ability of SVB Financial or Boston Private or their respective Subsidiaries to obtain any necessary approvals of any Governmental Entity required for the transactions contemplated hereby or by the Bank Merger Agreement or to perform its covenants and agreements under this Agreement or the Bank Merger Agreement or to consummate the transactions contemplated hereby or thereby; or

(u)    agree to take, make any commitment to take, or adopt any resolutions of its Board of Directors or similar governing body in support of, any of the actions prohibited by this Section 5.2.

5.3    <u>SVB Financial Forbearances</u>. During the period from the date of this Agreement to the Effective Time or earlier termination of this Agreement, except as set in the SVB Financial Disclosure Schedule, as expressly contemplated or permitted by this Agreement or as required by law (including Pandemic Measures), SVB Financial shall not, and shall not permit any of its Subsidiaries to, without the prior written consent of Boston Private (such consent not to be unreasonably withheld, conditioned or delayed):

(a)    amend the SVB Financial Articles or the SVB Financial Bylaws in a manner that would materially and adversely affect the holders of Boston Private Common Stock, or adversely affect the holders of Boston Private Common Stock relative to other holders of SVB Financial Common Stock;

(b)    adjust, split, combine or reclassify any SVB Financial Common Stock, or make, declare or pay any extraordinary dividend or distribution on any SVB Financial Common Stock;

(c)    take any action or knowingly fail to take any action where such action or failure to act could reasonably be expected to prevent the Merger from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code;

(d)    knowingly take any action that is intended to or would reasonably be expected to adversely affect or materially delay the ability of SVB Financial or Boston Private or their respective Subsidiaries to obtain any necessary approvals of any Governmental Entity required for the transactions contemplated hereby or by the Bank Merger Agreement or to perform its covenants and agreements under this Agreement or the Bank Merger Agreement or to consummate the transactions contemplated hereby or thereby;

(e)    take any action that is intended or expected to result in any of the conditions of the Merger set forth in Article VII not being satisfied, except, in every case, as may be required by applicable law; or

(f)    agree to take, make any commitment to take, or adopt any resolutions of its Board of Directors or similar governing body in support of, any of the actions prohibited by this Section 5.3.

-39-

ARTICLE VI

ADDITIONAL AGREEMENTS

6.1  <u>Regulatory Matters</u>.

(a)  SVB Financial and Boston Private shall promptly prepare and file with the SEC, no later than 45 days after the date of this Agreement, the Proxy Statement and SVB Financial shall promptly prepare and file with the SEC the S-4, in which the Proxy Statement will be included as a prospectus. Each of SVB Financial and Boston Private shall use its reasonable best efforts to have the S-4 declared effective under the Securities Act as promptly as practicable after such filing, and Boston Private shall thereafter mail or deliver the Proxy Statement to its shareholders. In furtherance of the foregoing, each of SVB Financial and Boston Private shall use reasonable best efforts to file all information required by Part III of Form 10-K that is not included in its annual report on Form 10-K for the fiscal year ended December 31, 2020 by no later than March 19, 2021 (by including such information within either a proxy statement or an amendment to such annual report on Form 10-K). SVB Financial shall also use its reasonable best efforts to obtain all necessary state securities law or "Blue Sky" permits and approvals required to carry out the transactions contemplated by this Agreement, and Boston Private shall furnish all information concerning Boston Private and the holders of Boston Private Common Stock as may be reasonably requested in connection with any such action.

(b)  The parties hereto shall cooperate with each other and use their reasonable best efforts to promptly prepare and file all necessary documentation, to effect all applications, notices, petitions and filings, to obtain as promptly as practicable all permits, consents, approvals and authorizations of all third parties and Governmental Entities which are necessary or advisable to consummate the transactions contemplated by this Agreement (including the Merger and the Bank Merger), and to comply with the terms and conditions of all such permits, consents, approvals and authorizations of all such third parties and Governmental Entities. Without limiting the generality of the foregoing, as soon as practicable and in no event later than 45 days after the date of this Agreement, SVB Financial and Boston Private shall, and shall cause their respective Subsidiaries to, each prepare and file any applications, notices and filings required in order to obtain the Requisite Regulatory Approvals. SVB Financial and Boston Private shall each use, and shall each cause their applicable Subsidiaries to use, reasonable best efforts to obtain each such Requisite Regulatory Approval as promptly as reasonably practicable. The parties shall cooperate with each other in connection therewith (including the furnishing of any information and any reasonable undertaking or commitments that may be required to obtain the Requisite Regulatory Approvals). SVB Financial and Boston Private shall have the right to review in advance, and, to the extent practicable, each will consult the other on, in each case subject to applicable laws relating to the exchange of information, all the information relating to Boston Private or SVB Financial, as the case may be, and any of their respective Subsidiaries, which appears in any filing made with, or written materials submitted to, any third party or any Governmental Entity in connection with the transactions contemplated by this Agreement. In exercising the foregoing right, each of the parties hereto shall act reasonably and as promptly as practicable. The parties hereto agree that they will consult with each other with respect to the obtaining of all permits, consents, approvals and authorizations of all parties and Governmental Entities necessary or advisable to consummate the transactions contemplated by this Agreement and each party will keep the other reasonably apprised of the status of matters relating to completion of the transactions contemplated herein. Each party will provide the other with copies of any applications and all correspondence relating thereto prior to filing, other than any portions of material filed in connection therewith that contain (i) competitively sensitive business or other proprietary information filed under a claim of confidentiality or (ii) confidential supervisory information (including confidential supervisory information as defined in 12 C.F.R. § 261.2(c) and as identified in 12 C.F.R. § 309.5(g)(8)) of a Governmental Entity. In furtherance and not in limitation of the foregoing, each party shall use its reasonable best efforts to respond to any request for information and resolve any objection that may be asserted by any Governmental Entity with respect to this Agreement or the transactions contemplated hereby. Notwithstanding the foregoing, nothing contained herein shall be

-40-

deemed to require SVB Financial or Boston Private to take any action, or commit to take any action, or agree to any condition or restriction, in connection with obtaining the foregoing permits, consents, approvals and authorizations of Governmental Entities that would reasonably be expected to have a material adverse effect on SVB Financial and its Subsidiaries, taken as a whole (measured on a scale relative to Boston Private and its Subsidiaries, taken as a whole) (a "Materially Burdensome Regulatory Condition").

(c)    SVB Financial and Boston Private shall, upon request, furnish each other with all information concerning themselves, their Subsidiaries, directors, officers and shareholders and such other matters as may be reasonably necessary or advisable in connection with the Proxy Statement, the S-4 or any other statement, filing, notice or application made by or on behalf of SVB Financial, Boston Private or any of their respective Subsidiaries to any Governmental Entity in connection with the Merger the Bank Merger and the other transactions contemplated by this Agreement. Each of SVB Financial and Boston Private agrees, as to itself and its Subsidiaries, that none of the information supplied or to be supplied by it for inclusion or incorporation by reference in (i) the S-4 will, at the time the S-4 and each amendment or supplement thereto, if any, becomes effective under the Securities Act, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, (ii) the Proxy Statement and any amendment or supplement thereto will, at the date of mailing to shareholders and at the time of Boston Private's meeting of its shareholders to consider and vote upon approval of this Agreement, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which such statement was made, not misleading and (iii) any applications, notices and filings required in order to obtain the Requisite Regulatory Approvals will, at the time each is filed, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading. Each of SVB Financial and Boston Private further agrees that if it becomes aware that any information furnished by it would cause any of the statements in the S-4 or the Proxy Statement to be false or misleading with respect to any material fact, or to omit to state any material fact necessary to make the statements therein not false or misleading, to promptly inform the other party thereof and to take appropriate steps to correct the S-4 or the Proxy Statement.

6.2    Access to Information.

(a)    Upon reasonable notice and subject to applicable laws, each of SVB Financial and Boston Private, for the purposes of verifying the representations and warranties of the other and preparing for the Merger and the other matters contemplated by this Agreement, shall, and shall cause each of their respective Subsidiaries to, afford to the officers, employees, accountants, counsel, advisors and other representatives of the other party, access, during normal business hours during the period prior to the Effective Time, to all its properties, books, contracts, personnel, information technology systems, and records, and each shall cooperate with the other party in preparing to execute after the Effective Time conversion or consolidation of systems and business operations generally (including by entering into customary confidentiality, non-disclosure and similar agreements with such service providers and/or the other party), and, during such period, each of SVB Financial and Boston Private shall, and shall cause its respective Subsidiaries to, make available to the other party such information concerning its business, properties and personnel as such party may reasonably request. Each party shall use commercially reasonable efforts to minimize any interference with the other party's regular business operations during any such access. Neither SVB Financial nor Boston Private nor any of their respective Subsidiaries shall be required to provide access to or to disclose information where such access or disclosure would violate or prejudice the rights of SVB Financial's or Boston Private's, as the case may be, customers, jeopardize the attorney-client privilege of the institution in possession or control of such information (after giving due consideration to the existence of any common interest, joint defense or similar agreement between the parties) or contravene any law, rule, regulation, order, judgment, decree, fiduciary duty or binding agreement entered into prior to the date of this Agreement. The parties hereto will make appropriate substitute disclosure arrangements under circumstances in which the restrictions of the preceding sentence apply.

-41-

(b)    Each of SVB Financial and Boston Private shall hold all information furnished by or on behalf of the other party or any of such party's Subsidiaries or representatives in confidence to the extent required by, and in accordance with, the provisions of the Amended and Restated Mutual Non-Disclosure Agreement, dated as of July 15, 2020, between SVB Financial and Boston Private (the "Confidentiality Agreement").

(c)    No investigation by either of the parties or their respective representatives shall affect or be deemed to modify or waive the representations and warranties of the other set forth herein. Nothing contained in this Agreement shall give either party, directly or indirectly, the right to control or direct the operations of the other party prior to the Effective Time. Prior to the Effective Time, each party shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations.

6.3    Boston Private Shareholder Approval.

(a)    Boston Private shall call a meeting of its shareholders (the "Boston Private Meeting") to be held as soon as reasonably practicable after the S-4 is declared effective for the purpose of obtaining the Requisite Boston Private Vote required in connection with this Agreement and the Merger, and, if so desired and mutually agreed, upon other matters of the type customarily brought before an annual or special meeting of shareholders to approve a merger agreement. Boston Private shall use its reasonable best efforts to cause such meeting to occur as soon as reasonably practicable. Such meeting may be held virtually, subject to applicable law and the organizational documents of Boston Private. The Board of Directors of Boston Private shall use its reasonable best efforts to obtain from the shareholders of Boston Private the Requisite Boston Private Vote, including by communicating to its shareholders its unqualified recommendation (and including such recommendation in the Proxy Statement) that they approve this Agreement and the transactions contemplated hereby and the Boston Private Board of Directors shall not (i) withdraw, modify or qualify such recommendation in a manner adverse to SVB Financial, or resolve to do so, (ii) fail to reaffirm such recommendation within ten (10) business days after SVB Financial requests in writing that such action be taken, (iii) fail to publicly and without qualification (A) recommend against any Acquisition Proposal or (B) reaffirm the board recommendation within ten (10) business days (or such fewer number of days as remains prior to the Boston Private Meeting) after an Acquisition Proposal is made public or any request by SVB Financial to do so, (iv) adopt, approve, recommend or endorse an Acquisition Proposal or publicly announce an intention to adopt, approve, recommend or endorse an Acquisition Proposal, or (v) publicly propose to do any of the foregoing. Boston Private shall engage a proxy solicitor reasonably acceptable to SVB Financial to assist in the solicitation of proxies from shareholders relating to the Requisite Boston Private Vote. However, subject to Section 8.1 and Section 8.2, if the Board of Directors of Boston Private, after receiving the advice of its outside counsel and, with respect to financial matters, its financial advisors, determines in good faith that it would more likely than not result in a violation of its fiduciary duties under applicable law to continue to recommend this Agreement, then in submitting this Agreement to its shareholders, the Board of Directors of Boston Private may submit this Agreement to its shareholders without recommendation (although the resolutions approving this Agreement as of the date hereof may not be rescinded or amended), in which event the Board of Directors of Boston Private may communicate the basis for its lack of a recommendation to its shareholders in the Proxy Statement or an appropriate amendment or supplement thereto to the extent required by law; provided, that the Board of Directors of Boston Private may not take any actions under this sentence unless (i) Boston Private shall have complied in all material respects with Section 6.9; (ii) if such actions are taken in response to an unsolicited *bona fide* Acquisition Proposal, the Boston Private Board of Directors shall have concluded in good faith, after giving effect to all the adjustments which may be offered by SVB Financial pursuant to clause (iv) below, that such Acquisition Proposal constitutes a Superior Proposal; (iii) Boston Private shall notify SVB Financial, at least four (4) business days in advance, of the intention of the Boston Private Board of Directors to change its recommendation (including, in the event such change in recommendation is in response to an Acquisition Proposal, the identity of the party making such Acquisition Proposal and furnish to SVB Financial all the material terms and conditions of such proposal to the extent not previously provided pursuant to Section 6.9, or describe in reasonable detail such other event or

-42-

circumstances if such change in recommendation is not in response to an Acquisition Proposal); and (iv) prior to effecting a change in the recommendation of the Boston Private Board of Directors, Boston Private shall, and shall cause its financial and legal advisors to, during the period following Boston Private's delivery of the notice referred to in clause (iii) above, negotiate with SVB Financial in good faith for a period of up to four (4) business days (to the extent SVB Financial desires to negotiate) to allow SVB Financial to propose such adjustments in the terms and conditions of this Agreement so that an Acquisition Proposal referred to in clause (ii) above ceases to constitute a Superior Proposal or so that it would no longer more likely than not result in a violation of the Boston Private Board of Directors' fiduciary duties under applicable law to continue to recommend this Agreement. Any material amendment to any Acquisition Proposal will be deemed to be a new Acquisition Proposal for purposes of this Section 6.3 and will require a new notice period as referred to in this Section 6.3.

(b)    Boston Private shall adjourn or postpone the Boston Private Meeting, if, as of the time for which such meeting is originally scheduled there are insufficient shares of Boston Private Common Stock represented (either in person or by proxy) to constitute a quorum necessary to conduct the business of such meeting, or if on the date of such meeting Boston Private has not received proxies representing a sufficient number of shares necessary to obtain the Requisite Boston Private Vote; provided, that Boston Private shall only be required to adjourn or postpone the Boston Private Meeting two (2) times pursuant to the first sentence of this Section 6.3(b). Notwithstanding anything to the contrary herein, unless this Agreement has been terminated in accordance with its terms, the Boston Private Meeting shall be convened and this Agreement shall be submitted to the shareholders of Boston Private at the Boston Private Meeting, for the purpose of voting on the approval of this Agreement and the other matters contemplated hereby, and nothing contained herein shall be deemed to relieve Boston Private of such obligation.

6.4    <u>Stock Exchange Listing</u>. SVB Financial shall cause the shares of SVB Financial Common Stock to be issued in the Merger to be approved for listing on the NASDAQ, subject to official notice of issuance, prior to the Effective Time.

6.5    <u>Employee Matters</u>.

(a)    During the period commencing at the Effective Time and ending on the first anniversary thereof (the "<u>Continuation Period</u>"), SVB Financial shall cause the Surviving Corporation to provide continuing employees of Boston Private and its Subsidiaries (the "<u>Continuing Employees</u>") with (i) base salary or base wage rather that is no less favorable than that provided by Boston Private and its Subsidiaries to each Continuing Employee immediately prior to the Effective Time, and (ii) benefits (including pension and welfare benefits) that are substantially comparable in the aggregate to those provided by Boston Private immediately prior to the Effective Time. Additionally, SVB Financial agrees that each Continuing Employee shall, during the Continuation Period, be provided with severance benefits that are no less favorable than the severance benefits provided by Boston Private and its Subsidiaries to such Continuing Employee immediately prior to the Effective Time, as set forth in Section 6.5(a) of the Boston Private Disclosure Schedule.

(b)    With respect to any employee benefit plans of SVB Financial or its Subsidiaries in which any employees of Boston Private or its Subsidiaries become eligible to participate on or after the Effective Time (the "<u>New Plans</u>"), SVB Financial shall or shall cause the Surviving Corporation to: (i) waive all pre-existing conditions or limitations and waiting periods under any group health plans of SVB Financial or its affiliates to be waived with respect to the Continuing Employees and their eligible dependents, (ii) provide each Continuing Employee credit for the plan year in which such Continuing Employee commences participation in such New Plan towards applicable deductibles and annual out-of-pocket limits for medical expenses incurred prior to commencing participation for which payment has been made and (iii) give each Continuing Employee service credit for such Employee's employment with Boston Private and its Subsidiaries (and any predecessor entity) for all purposes under each applicable New Plan, as if such service had been performed with SVB Financial, provided that the foregoing service recognition shall not

-43-

apply (A) to the extent it would result in duplication of benefits for the same period of services, (B) for purposes of any defined benefit pension plan or benefit plan that provides retiree welfare benefits, or (C) to any benefit plan that is a frozen plan or provides grandfathered benefits.

(c)    Prior to the Effective Time, if requested by SVB Financial in writing no later than 14 days prior to the Effective Time, to the extent permitted by applicable law and the terms of the applicable plan or arrangement, Boston Private shall cause Boston Private's tax-qualified defined contribution plan (the "Boston Private 401(k) Plan") to be terminated effective immediately prior to the Effective Time, contingent on the occurrence of the Effective Time. In the event that SVB Financial requests that the Boston Private 401(k) Plan be terminated, Boston Private shall provide SVB Financial with evidence that such Boston Private 401(k) Plan has been terminated (the form and substance of which shall be subject to review and reasonable approval by SVB Financial) not later than the day immediately preceding the Effective Time.

(d)    In the event that SVB Financial requests that the Boston Private 401(k) Plan be terminated, prior to the Effective Time and thereafter (as applicable), (i) Boston Private and SVB Financial shall take any and all actions as may be required, including amendments to the Boston Private 401(k) Plan and/or the tax-qualified defined contribution retirement plan designated by SVB Financial (the "SVB Financial 401(k) Plan") to permit such Continuing Employee to make rollover contributions of "eligible rollover distributions" (within the meaning of Section 401(a)(31) of the Code) in an amount equal to the full account balance distributed to such Continuing Employee (including the in-kind rollover of notes evidencing loans) from the Boston Private 401(k) Plan to the SVB Financial 401(k) Plan and (ii) each Continuing Employee shall become a participant in the SVB Financial 401(k) Plan on the Closing Date (giving effect to the service crediting provisions of Section 6.5(b)); it being agreed that there shall be no gap in participation in a tax-qualified defined contribution plan. Boston Private and SVB Financial shall cooperate to take any and all commercially reasonable actions needed to permit each Continuing Employee with an outstanding loan balance under the Boston Private 401(k) Plan as of the Effective Time to continue to make scheduled loan payments to the Boston Private 401(k) Plan after the Effective Time, pending the distribution and in-kind rollover of the notes evidencing such loans from the Boston Private 401(k) Plan to the SVB Financial 401(k) Plan, as provided in the preceding sentence, so as to prevent, to the extent reasonably possible, a deemed distribution or loan offset with respect to such outstanding loans.

(e)    SVB Financial shall, or shall cause the Surviving Corporation to, assume and honor all Boston Private Benefit Plans in accordance with their terms. SVB Financial hereby acknowledges that a "change in control", "sale event" (or similar phrase) within the meaning of the Boston Private Benefit Plans will occur at the Effective Time.

(f)    Notwithstanding the provisions of Section 6.10, prior to Boston Private making any broad-based written or material oral communications to the managers, officers or employees of Boston Private or any of its Subsidiaries pertaining to the consequences of the transactions contemplated by this Agreement with respect to compensation or benefit matters, Boston Private shall provide SVB Financial with a copy of the intended communication, SVB Financial shall have two business days to review and comment on the communication, and Boston Private shall consider any such comments in good faith; provided, however, that Boston Private shall not be required to provide to SVB Financial a copy of any communication that is materially consistent with a communication previously reviewed by SVB Financial. Nothing in this Agreement shall confer upon any employee, officer, director or consultant of Boston Private or any of its Subsidiaries or affiliates any right to continue in the employ or service of the Surviving Corporation, Boston Private, or any Subsidiary or affiliate thereof, or shall interfere with or restrict in any way the rights of the Surviving Corporation, Boston Private, SVB Financial or any Subsidiary or affiliate thereof to discharge or terminate the services of any employee, officer, director or consultant of Boston Private or any of its Subsidiaries or affiliates at any time for any reason whatsoever, with or without cause. Nothing in this Agreement shall be deemed to (i) establish, amend, or modify any Boston Private Benefit Plan, New Plan or any other benefit or employment plan, program, agreement or arrangement, or (ii) alter or limit the ability of SVB Financial, the Surviving Corporation or any of its Subsidiaries or affiliates to amend, modify or

-44-

terminate any particular Boston Private Benefit Plan, New Plan or any other benefit or employment plan, program, agreement or arrangement after the Effective Time. Without limiting the generality of the final sentence of Section 9.11, nothing in this Agreement, express or implied, is intended to or shall confer upon any person, including any current or former employee, officer, director or consultant of Boston Private or any of its Subsidiaries or affiliates, any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement (except as set forth in Section 6.6).

6.6    Indemnification; Directors' and Officers' Insurance.

(a)    From and after the Effective Time, the Surviving Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law, each present and former director, officer or employee of Boston Private and its Subsidiaries (in each case, when acting in such capacity) (collectively, the "Boston Private Indemnified Parties") against any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, damages or liabilities incurred in connection with any threatened or actual claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, whether arising before or after the Effective Time, arising in whole or in part out of, or pertaining to, (i) the fact that such person is or was a director, officer, or employee of Boston Private or any of its Subsidiaries or (ii) matters existing or occurring at or prior to the Effective Time, including matters, acts or omissions occurring in connection with the approval of this Agreement and the consummation of the transactions contemplated hereby; and SVB Financial and the Surviving Corporation shall also advance expenses as incurred by such Boston Private Indemnified Party to the same extent as such persons are entitled to advancement of expenses as of the date of this Agreement by Boston Private pursuant to the Boston Private Articles of Organization, Boston Private's Bylaws, the governing or organizational documents of any Boston Private Subsidiary and any indemnification agreements in existence as of the date hereof that have been disclosed to SVB Financial; provided that the Boston Private Indemnified Party to whom expenses are advanced provides an undertaking (in a reasonable and customary form) to repay such advances if it is ultimately determined that such Boston Private Indemnified Party is not entitled to indemnification.

(b)    Subject to the following sentence, for a period of six (6) years after the Effective Time, the Surviving Corporation shall cause to be maintained in effect the current policies of directors' and officers' liability insurance maintained by Boston Private (provided, that the Surviving Corporation may substitute therefor policies with a substantially comparable insurer of at least the same coverage and amounts containing terms and conditions which are no less advantageous to the insured) with respect to claims against the present and former officers and directors of Boston Private or any of its Subsidiaries arising from facts or events which occurred at or before the Effective Time (including the transactions contemplated by this Agreement); provided, however, that the Surviving Corporation shall not be obligated to expend, on an annual basis, an amount in excess of 300% of the aggregate annual premium paid as of the date hereof by Boston Private for such insurance (the "Premium Cap"), and if such premiums for such insurance would at any time exceed the Premium Cap, then the Surviving Corporation shall cause to be maintained policies of insurance which, in the Surviving Corporation's good faith determination, provide the maximum coverage available at an annual premium equal to the Premium Cap. In lieu of the foregoing, Boston Private, in consultation with, but only upon the consent of SVB Financial, may (and at the request of SVB Financial, Boston Private shall use its reasonable best efforts to) obtain at or prior to the Effective Time a six-year "tail" policy under Boston Private's existing directors and officers insurance policy providing equivalent coverage to that described in the preceding sentence if and to the extent that the same may be obtained for an amount that, in the aggregate, does not exceed the Premium Cap.

(c)    The provisions of this Section 6.6 shall survive the Effective Time and are intended to be for the benefit of, and shall be enforceable by, each Boston Private Indemnified Party and his or her heirs and representatives. If the Surviving Corporation or any of its successors or assigns, consolidates with or merges into any other entity and is not the continuing or surviving entity of such consolidation or merger, transfers all or substantially all of its assets or deposits to any other entity or engages in any similar transaction, then in each case, the Surviving Corporation will cause proper provision to be made so that the successors and assigns of the Surviving Corporation will expressly assume the obligations set forth in this Section 6.6.

-45-

6.7    <u>Additional Agreements</u>. In case at any time after the Effective Time any further action is necessary or desirable to carry out the purposes of this Agreement or to vest the Surviving Corporation with full title to all properties, assets, rights, approvals, immunities and franchises of any of the parties to the Merger, the proper officers and directors of each party to this Agreement and their respective Subsidiaries shall take, or cause to be taken, all such necessary action as may be reasonably requested by the other party, at the expense of the party who makes any such request.

6.8    <u>Advice of Changes</u>. SVB Financial and Boston Private shall each promptly advise the other party of any effect, change, event, circumstance, condition, occurrence or development (i) that has had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on such first party, or (ii) that such first party believes would or would reasonably be expected to cause or constitute a material breach of any of its representations, warranties, obligations, covenants or agreements contained in this Agreement that reasonably could be expected to give rise, individually or in the aggregate, to the failure of a condition in Article VII; <u>provided</u>, that any failure to give notice in accordance with the foregoing with respect to any breach shall not be deemed to constitute a violation of this Section 6.8 or the failure of any condition set forth in Section 7.2 or 7.3 to be satisfied, or otherwise constitute a breach of this Agreement by the party failing to give such notice, in each case, unless the underlying breach would independently result in a failure of the conditions set forth in Section 7.2 or 7.3 to be satisfied; and <u>provided</u>, <u>further</u>, that the delivery of any notice pursuant to this Section 6.8 shall not cure any breach of, or noncompliance with, any other provision of this Agreement or limit the remedies available to the party receiving such notice.

6.9    <u>Acquisition Proposals</u>.

(a)    Boston Private shall not, shall cause its Subsidiaries and its and their officers and directors not to, and shall use its reasonable best efforts to cause its and their agents, advisors and representatives not to, directly or indirectly, (i) initiate, solicit, knowingly encourage or knowingly facilitate inquiries or proposals with respect to, (ii) engage or participate in any negotiations with any person concerning, (iii) provide any confidential or nonpublic information or data to, or have or participate in any discussions with, any person relating to, any Acquisition Proposal or (iv) publicly propose any of the foregoing or propose any of the foregoing to a third party; <u>provided</u>, that, prior to receipt of the Requisite Boston Private Vote, in the event Boston Private receives an unsolicited *bona fide* written Acquisition Proposal, it may, and may permit its Subsidiaries and its and its Subsidiaries' officers, directors, agents, advisors and representatives to, furnish or cause to be furnished nonpublic information or data and participate in such negotiations or discussions to the extent that its Board of Directors concludes in good faith (after receiving the advice of its outside counsel, and with respect to financial matters, its financial advisors) that failure to take such actions would be more likely than not to result in a violation of its fiduciary duties under applicable law; <u>provided</u>, <u>further</u>, that, prior to or concurrently with providing any nonpublic information permitted to be provided pursuant to the foregoing proviso, Boston Private shall have provided such information to SVB Financial, and shall have entered into a confidentiality agreement with such third party on terms no less favorable to it than the Confidentiality Agreement, which confidentiality agreement shall not provide such person with any exclusive right to negotiate with Boston Private. Boston Private will, will cause its officers and directors to, and will use reasonable best efforts to cause its agents, advisors and representatives to, immediately cease and cause to be terminated any activities, discussions or negotiations conducted before the date of this Agreement with any person other than SVB Financial with respect to any Acquisition Proposal. Boston Private will promptly (and in any event within twenty-four (24) hours and before entering into any discussions or providing any information) advise SVB Financial following receipt of any Acquisition Proposal or any inquiry which could reasonably be expected to lead to an Acquisition Proposal, and the substance thereof (including the material terms and conditions of and the identity of the person making such inquiry or Acquisition Proposal), will provide SVB Financial with an unredacted copy of any such Acquisition Proposal and any draft agreements, proposals or other materials received in connection with any such inquiry or Acquisition Proposal, and will promptly (and in any event within twenty-four (24) hours) advise SVB Financial of any related material developments, discussions and negotiations on a current basis,

-46-

including any amendments to or revisions of the material terms of such inquiry or Acquisition Proposal. Boston Private shall use its reasonable best efforts to enforce any existing confidentiality or standstill agreements to which it or any of its Subsidiaries is a party in accordance with the terms thereof. Boston Private shall not, and shall cause its Subsidiaries and its and their officers, directors, agents, advisors and representatives not to on its behalf, enter into any letter of intent, memorandum of understanding, agreement in principle, acquisition agreement, merger agreement, or other agreement (other than a confidentiality agreement referred to and entered into in accordance with this Section 6.9(a)) relating to any Acquisition Proposal. As used in this Agreement, "Acquisition Proposal" means, other than the transactions contemplated by this Agreement, any offer, proposal or inquiry relating to, or any third party indication of interest in, (i) any acquisition or purchase, direct or indirect, of 25% or more of the consolidated assets of Boston Private and its Subsidiaries or 25% or more of any class of equity or voting securities of Boston Private or its Subsidiaries whose assets, individually or in the aggregate, constitute more than 25% of the consolidated assets of Boston Private, (ii) any tender offer (including a self tender offer) or exchange offer that, if consummated, would result in such third party beneficially owning 25% or more of any class of equity or voting securities of Boston Private or its Subsidiaries whose assets, individually or in the aggregate, constitute more than 25% of the consolidated assets of Boston Private, or (iii) a merger, consolidation, share exchange or other business combination involving Boston Private or its Subsidiaries whose assets, individually or in the aggregate, constitute more than 25% of the consolidated assets of Boston Private. As used in this Agreement, "Superior Proposal" means a *bona fide* written Acquisition Proposal that the Board of Directors of Boston Private concludes in good faith to be more favorable to its shareholders than the Merger and the other transactions contemplated hereby, (i) after receiving the advice of its financial advisors, (ii) after taking into account the likelihood of consummation of such transaction on the terms set forth therein and (iii) after taking into account all legal (with the advice of outside counsel), financial (including the financing terms of any such proposal), regulatory and other aspects of such proposal (including any expense reimbursement provisions and conditions to closing) and any other relevant factors permitted under applicable law; provided, that for purposes of the definition of "Superior Proposal," the reference to "25%" in the definition of Acquisition Proposal shall instead refer to "50%".

(b)    Nothing contained in this Agreement shall prevent Boston Private or its Board of Directors from complying with Rule 14d-9 and Rule 14e-2 under the Exchange Act with respect to an Acquisition Proposal or from making any legally required disclosure to Boston Private's shareholders; provided, that such Rules will in no way eliminate or modify the effect that any action pursuant to such Rules would otherwise have under this Agreement.

6.10    Public Announcements. Boston Private and SVB Financial shall each use their reasonable best efforts to (a) develop a joint communications plan, (b) to ensure that all press releases and other public statements with respect to the transactions contemplated hereby shall be consistent with such joint communications plan, and (c) except in respect of any announcement required by (i) applicable law or regulation, (ii) a request by a Governmental Entity or (iii) an obligation pursuant to any listing agreement with or rules of any securities exchange, or in connection with a change in recommendation by Boston Private in accordance with Section 6.3, Boston Private and SVB Financial agree to consult with each other and to obtain the advance approval of the other party (which approval shall not be unreasonably withheld, conditioned or delayed) before issuing any press release or, to the extent practical, otherwise making any public statement with respect to this Agreement or the transactions contemplated hereby.

6.11    Change of Method. SVB Financial may at any time change the method of effecting the Merger, and Boston Private agrees to enter into such amendments to this Agreement as SVB Financial may reasonably request in order to give effect to such restructuring; provided, however, that no such change or amendment shall (i) alter or change the amount or kind of the Merger Consideration provided for in this Agreement, (ii) adversely affect the Tax treatment of the Merger with respect to Boston Private's shareholders or (iii) be reasonably likely to cause the Closing to be materially delayed or the receipt of the Requisite Regulatory Approvals to be prevented or materially delayed.

-47-

6.12    <u>Restructuring Efforts</u>. If Boston Private shall have failed to obtain the Requisite Boston Private Vote at the duly convened Boston Private Meeting or any adjournment or postponement thereof, each of the parties shall in good faith use its reasonable best efforts to negotiate a restructuring of the transaction provided for herein (<u>provided</u>, <u>however</u>, that no party shall have any obligation to agree to (i) alter or change any material term of this Agreement, including the amount or kind of the Merger Consideration provided for in this Agreement or (ii) adversely affect the Tax treatment of the Merger with respect to Boston Private's shareholders) and/or (in the case of Boston Private) resubmit this Agreement or the transactions contemplated hereby (or as restructured pursuant to this Section 6.12) to its shareholders for approval.

6.13    <u>Takeover Statutes</u>. Neither Boston Private nor its Board of Directors shall take any action that would cause any Takeover Statute to become applicable to this Agreement, the Merger or any of the other transactions contemplated hereby, and Boston Private and its Board of Directors shall take all necessary steps to exempt (or ensure the continued exemption of) the Merger and the other transactions contemplated hereby from any applicable Takeover Statute now or hereafter in effect. If any Takeover Statute may become, or may purport to be, applicable to the transactions contemplated hereby, Boston Private and the members of its Board of Directors will grant such approvals and take such actions as are necessary so that the transactions contemplated by this Agreement may be consummated as promptly as practicable on the terms contemplated hereby and thereby and otherwise act to eliminate or minimize the effects of any Takeover Statute on any of the transactions contemplated by this Agreement, including, if necessary, challenging the validity or applicability of any such Takeover Statute.

6.14    <u>Exemption from Liability Under Section 16(b)</u>. Boston Private and SVB Financial agree that, in order to most effectively compensate and retain those officers and directors of Boston Private subject to the reporting requirements of Section 16(a) of the Exchange Act (the "<u>Boston Private Insiders</u>"), both prior to and after the Effective Time, it is desirable that Boston Private Insiders not be subject to a risk of liability under Section 16(b) of the Exchange Act to the fullest extent permitted by applicable law in connection with the conversion of shares of Boston Private Common Stock and Boston Private Equity Awards in the Merger, and for that compensatory and retentive purpose agree to the provisions of this Section 6.14. The Board of Directors of SVB Financial and of Boston Private, or a committee of non-employee directors thereof (as such term is defined for purposes of Rule 16b-3(d) under the Exchange Act), shall promptly, and in any event prior to the Effective Time, take all such steps as may be necessary or appropriate to cause (i) any dispositions of Boston Private Common Stock or Boston Private Equity Awards and (ii) any acquisitions of SVB Financial Common Stock and/or SVB Financial Stock Options and/or SVB Financial RSU Awards in respect of Boston Private Equity Awards converted at the Effective Time pursuant to Article I, in each case, pursuant to the transactions contemplated by this Agreement and by any Boston Private Insiders who, immediately following the Merger, will be officers or directors of the Surviving Corporation or SVB Financial subject to the reporting requirements of Section 16(a) of the Exchange Act, to be exempt from liability pursuant to Rule 16b-3 under the Exchange Act to the fullest extent permitted by applicable law.

6.15    <u>Litigation and Claims</u>. Each party shall promptly notify the other in writing of any action, arbitration, audit, hearing, investigation, litigation, suit, subpoena or summons issued, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Entity or arbitrator pending or, to the knowledge of such party, threatened against Boston Private, SVB Financial or any of their Subsidiaries that (a) questions or would reasonably be expected to question the validity of this Agreement, the Bank Merger Agreement or the other agreements contemplated hereby or thereby or any actions taken or to be taken by Boston Private, SVB Financial or their Subsidiaries with respect hereto or thereto, or (b) seeks to enjoin or otherwise restrain the transactions contemplated hereby or thereby. Boston Private shall give SVB Financial the opportunity to participate at its own expense in the defense or settlement of any shareholder litigation against Boston Private and/or its directors or affiliates relating to the transactions contemplated by this Agreement, and no such settlement shall be agreed without SVB Financial's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed).

-48-

6.16    Trust Preferred Securities. Upon the Effective Time, SVB Financial or a Subsidiary of SVB Financial shall assume the due and punctual performance and observance of the covenants and conditions to be performed by Boston Private under the (i) Indenture, between Boston Private and SunTrust Bank, as debenture trustee, dated October 12, 2004 and (ii) Indenture, between Boston Private and Wilmington Trust Company, as debenture trustee, dated September 27, 2005 (the "Trust Preferred Securities"), and the due and punctual payments of the principal of and premium, if any, and interest on the Trust Preferred Securities. In connection therewith, Boston Private, SVB Financial or any applicable Subsidiary shall execute and deliver any supplemental indentures, and the parties hereto shall use reasonable best efforts to provide any opinion of counsel to the trustee thereof, required to make such assumptions effective.

6.17    Non-Solicitation Covenants. Boston Private shall use its reasonable best efforts to enforce any existing Non-Solicitation Covenants to which it or any of its Subsidiaries is a party in accordance with the terms thereof. As used in this Agreement, "Non-Solicitation Covenant" means any covenant, obligation or agreement of a third party to not solicit, hire or attempt to solicit or hire any employee of Boston Private or any Boston Private Subsidiary for employment or in any other capacity (including as an independent contractor or consultant) contained in any existing agreement entered into in connection with any investment, strategic transaction, acquisition, disposition or other similar transaction between Boston Private or any Boston Private Subsidiary and such third party.

6.18    Advisory Contracts.

(a)    Public Funds. Subject to the requirements of applicable law and the fiduciary duties of the Boston Private Board of Directors, the board of directors (or persons performing similar functions) of any Boston Private Subsidiary and each Public Fund Board:

(i)    with respect to any pooled investment vehicle (including each portfolio or series thereof, if any) for which Boston Private or any Boston Private Subsidiary acts as investment adviser, investment sub-adviser, sponsor or manager, and which is registered as an investment company under the Investment Company Act (each, a "Public Fund", and the board of directors or trustees (or persons performing similar functions) thereof, each, a "Public Fund Board"), Boston Private shall use its reasonable best efforts, and shall cause each Boston Private Subsidiary to use its reasonable best efforts to: (A) request, as promptly as practicable following the date of this Agreement, such Public Fund Board to approve (and to recommend that the shareholders of such Public Fund approve) a new Advisory Agreement with the applicable Boston Private Subsidiary, to be effective as of the Effective Time, containing terms, taken as a whole, that are substantially similar to the terms of the existing Advisory Agreement between such Public Fund and such Boston Private Subsidiary; (B) request, as promptly as practicable following receipt of the approval and recommendation described in the foregoing clause (A), such Public Fund Board to call a special meeting of the shareholders of such Public Fund to be held as promptly as reasonably practicable for the purpose of voting upon a proposal to approve (in the requisite manner) such new Advisory Agreement; (C) request such Public Fund to prepare and to file (or to cause to be prepared and filed) with the SEC and all other applicable Governmental Entities, as promptly as practicable following receipt of the approval and recommendation described in the foregoing clause (A), all proxy solicitation materials required to be distributed to the shareholders of such Public Fund with respect to the actions recommended for shareholder approval by such Public Fund Board and to mail (or to cause to be mailed) such proxy solicitation materials as promptly as practical after clearance thereof by the SEC (if applicable); and (D) request such Public Fund Board to submit, as promptly as practical following the mailing of the proxy materials to the shareholders of such Public Fund for a vote at a shareholders meeting the proposal described in clause (B) above. In the event that the approval of the shareholders of a Public Fund of the applicable new Advisory Agreement described in the foregoing sentence is not obtained prior to the Closing, Boston Private may request the Public Fund Board of each such Public Fund to approve, in conformity with Rule 15a-4 under the Investment Company Act, an interim Advisory Agreement with the applicable Boston Private Subsidiary, with such agreement to be effective as of the

-49-

Effective Time, containing terms, taken as a whole, that are substantially similar to the terms of the existing Advisory Agreement between such Public Fund and such Boston Private Subsidiary (except for changes thereto to the extent necessary to comply with Rule 15a-4 under the Investment Company Act).

(ii)   SVB Financial and Boston Private agree that a Public Fund shall be deemed to have consented for all purposes under this Agreement to the continued management of such Public Fund by the applicable Boston Private Subsidiary following the Effective Time, if a new Advisory Agreement has been approved by the Public Fund Board and shareholders of such Public Fund in the manner contemplated by clauses (A)-(D) of Section 6.18(a)(i), unless at any time prior to the Closing the respective Public Fund Board notifies the applicable Boston Private Subsidiary, in writing, that such Public Fund has terminated its existing, interim, or new Advisory Agreement prior to or following the Effective Time.

(b)   Non-U.S. Retail Funds. With respect to any pooled investment vehicle (including each portfolio or series thereof, if any) for which Boston Private or any Boston Private Subsidiary acts as investment adviser, investment sub-adviser, sponsor or manager, and which is registered or authorized by a non-U.S. Governmental Entity in the jurisdiction in which it is established (including in the European Union undertakings for collective investment in transferable securities) (each a "Non-U.S. Retail Fund"), as promptly as practicable following the date of this Agreement, to the extent required by applicable law or the terms of the existing Advisory Agreement with such Non-U.S. Retail Fund, Boston Private shall use its reasonable best efforts, and shall cause each of its Subsidiaries to use their reasonable best efforts to (A) provide notice of the transactions contemplated by this Agreement to such Non-U.S. Retail Fund and, where required by applicable law or the applicable Advisory Agreement, to the investors in such Non-U.S. Retail Fund, and (B) obtain any material approval, consent, deemed approval, deemed consent or other similar action, if any, that is required from or by the board of directors or trustees (or persons performing similar functions) of such Non-U.S. Retail Fund, the investors in such Non-U.S. Retail Fund or any regulating or self-regulating authority for such Non-U.S. Retail Fund, so that, after the Closing, the applicable Advisory Entity may continue to provide Investment Advisory Services to such Non-U.S. Retail Fund following the Closing Date.

(c)   Private Funds and Other Non-Fund Clients.

(i)   If consent or other action is required by applicable law or by the Advisory Agreement of any advisory client other than a Public Fund or a Non-U.S. Retail Fund for the Advisory Agreement with such advisory client to continue after the Effective Time, as promptly as reasonably practicable following the date of this Agreement, and in any event no less than 30 days before the anticipated Closing Date, Boston Private shall, and shall cause the applicable Boston Private Subsidiaries to, send a notice (a "Transaction Notice") complying with applicable law and the terms of such advisory client's Advisory Agreement. Each Transaction Notice shall inform the applicable advisory client: (1) of the intention to complete the transactions contemplated by this Agreement, which may result in a deemed assignment of such advisory client's Advisory Agreement; (2) of the applicable Boston Private Subsidiary's intention to continue to provide the Investment Advisory Services pursuant to the existing Advisory Agreement with such advisory client after the Effective Time if such advisory client does not terminate such agreement prior to the Effective Time; and (3) that the consent of such advisory client will be deemed to have been granted if such advisory client continues to accept such advisory services for a period of at least 30 days after the sending of the Transaction Notice without termination.

(ii)   Boston Private agrees that the information that is contained in any Transaction Notice to be furnished to any advisory client other than a Public Fund or a Non-U.S. Retail Fund (and other than information that is or will be provided in writing by or on behalf of SVB Financial or its affiliates specifically for inclusion in such Transaction Notice) to the extent consent or other action is required under applicable law or the applicable Advisory Agreement for the purpose of having the Advisory Agreement continue after the Effective Time will be true, correct and complete in all material respects.

-50-

SVB Financial agrees that the information provided by it or its affiliates (or on their behalves) in writing for inclusion in any Transaction Notice to be furnished to any advisory client other than a Public Fund or a Non-U.S. Retail Fund to the extent consent or other action is required under applicable law or the applicable Advisory Agreement for the purpose of having the Advisory Agreement continue after the Effective Time will be true, correct and complete in all material respects.

(iii)    With respect to any pooled investment vehicle (including each portfolio or series thereof, if any) for which Boston Private or any Boston Private Subsidiary acts as investment adviser, investment sub-adviser, sponsor or manager, which is neither a Public Fund nor a Non-U.S. Retail Fund (each a "Private Fund"), Boston Private shall not, and shall cause its Subsidiaries not to, extend the termination date with respect to such Private Fund without prior written consent of SVB Financial. With respect to each such Private Fund, Boston Private shall, and shall cause the applicable Boston Private Subsidiary to, request from each holder of the ownership interests of such Private Fund written consent to commence the liquidation and dissolution of such Private Fund in accordance with such Private Fund's certificate of partnership and limited partnership agreement (or comparable documents), the applicable Advisory Agreement and applicable law; provided, that any such commencement of liquidation and dissolution shall be effective at or after the Closing and, if requested by Boston Private, be made conditional on the Closing. In addition, Boston Private shall cooperate with SVB Financial to take any other actions with respect to such Private Fund that SVB Financial deems reasonably necessary in connection with the liquidation and dissolution of such Private Fund at or after the Closing, including, if requested by SVB Financial, working with SVB Financial to cause the applicable Boston Private Subsidiary to (A) cease serving as the investment adviser, investment sub-adviser, sponsor or manager to such Private Fund at or after the Closing or (B) require any holder of the ownership interests of such Private Fund to withdraw from such Private Fund at or after the Closing, in each case in accordance with such Private Fund's certificate of partnership and limited partnership agreement (or comparable documents), the applicable Advisory Agreement and applicable law.

(d)    Prospective Clients. In addition to the foregoing, as promptly as practicable following the date of this Agreement, Boston Private shall cause each Boston Private Subsidiary to use its reasonable best efforts (i) to supplement the offering documentation with respect to each Public Fund, each Non-U.S. Retail Fund and each Private Fund to inform prospective investors therein of the transactions contemplated by this Agreement; and (ii) with respect to any new advisory clients following the date of this Agreement, to include a Transaction Notice along with the Advisory Agreement and other materials provided to such new advisory clients.

(e)    For the avoidance of doubt, the receipt of any approval, consent, deemed approval or deemed consent in connection with any of the matters contemplated by this Section 6.18 or otherwise in respect of any Advisory Agreement or similar agreement in connection with Boston Private's or any Boston Private Subsidiary's service as an investment adviser, investment sub-adviser, sponsor, manager or other similar capacity, including any approval of any Public Fund Board or the shareholders of any Public Fund or holders of ownership interests of any Private Fund, shall not be a condition to the obligations of the parties to effect the Merger.

ARTICLE VII

CONDITIONS PRECEDENT

7.1    Conditions to Each Party's Obligation to Effect the Merger. The respective obligations of the parties to effect the Merger shall be subject to the satisfaction at or prior to the Effective Time of the following conditions:

(a)    Shareholder Approval. This Agreement shall have been approved by the shareholders of Boston Private by the Requisite Boston Private Vote.

-51-

(b)    NASDAQ Listing. The shares of SVB Financial Common Stock that shall be issuable pursuant to this Agreement shall have been authorized for listing on the NASDAQ, subject to official notice of issuance.

(c)    S-4. The S-4 shall have become effective under the Securities Act and no stop order suspending the effectiveness of the S-4 shall have been issued and no proceedings for that purpose shall have been initiated or threatened by the SEC and not withdrawn.

(d)    No Injunctions or Restraints; Illegality. No order, injunction or decree issued by any court or agency of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the Merger or the Bank Merger shall be in effect. No statute, rule, regulation, order, injunction or decree shall have been enacted, entered, promulgated or enforced by any Governmental Entity which prohibits or makes illegal consummation of the Merger or the Bank Merger.

(e)    Regulatory Approval. (i) All regulatory authorizations, consents, orders or approvals from the Federal Reserve Board, the California Department of Financial Protection and Innovation and the Massachusetts Commissioner of Banks and any other approvals set forth in Sections 3.4 and 4.4 which are necessary to consummate the transactions contemplated by this Agreement, including the Merger and the Bank Merger, shall have been obtained and shall remain in full force and effect and all statutory waiting periods in respect thereof shall have expired (such approvals and the expiration of such waiting periods being referred to herein as the "Requisite Regulatory Approvals"), and (ii) no such Requisite Regulatory Approval shall have resulted in the imposition of any Materially Burdensome Regulatory Condition.

7.2    Conditions to Obligations of SVB Financial. The obligation of SVB Financial to effect the Merger is also subject to the satisfaction, or waiver by SVB Financial, at or prior to the Effective Time, of the following conditions:

(a)    Representations and Warranties. The representations and warranties of Boston Private set forth in Section 3.2(a) and Section 3.8(a) (in each case after giving effect to the lead in to Article III) shall be true and correct (other than, in the case of Section 3.2(a), such failures to be true and correct as are de minimis) in each case as of the date of this Agreement and (except to the extent such representations and warranties speak as of an earlier date) as of the Closing Date as though made on and as of the Closing Date, and the representations and warranties of Boston Private set forth in Sections 3.1(a), 3.1(b) (with respect to Boston Private Bank only), 3.2(c) (with respect to Boston Private Bank only) and 3.3(a) (in each case, after giving effect to the lead in to Article III) shall be true and correct in all material respects as of the date of this Agreement and (except to the extent such representations and warranties speak as of an earlier date) as of the Closing Date as though made on and as of the Closing Date. All other representations and warranties of Boston Private set forth in this Agreement (read without giving effect to any qualification as to materiality or Material Adverse Effect set forth in such representations or warranties but, in each case, after giving effect to the lead in to Article III) shall be true and correct in all respects as of the date of this Agreement and (except to the extent such representations and warranties speak as of an earlier date) as of the Closing Date as though made on and as of the Closing Date; provided, however, that for purposes of this sentence, such representations and warranties shall be deemed to be true and correct unless the failure or failures of such representations and warranties to be so true and correct, either individually or in the aggregate, and without giving effect to any qualification as to materiality or Material Adverse Effect set forth in such representations or warranties, has had or would reasonably be expected to have a Material Adverse Effect on Boston Private or the Surviving Corporation. SVB Financial shall have received a certificate signed on behalf of Boston Private by the Chief Executive Officer and the Chief Financial Officer of Boston Private to the foregoing effect.

(b)    Performance of Obligations of Boston Private. Boston Private shall have performed in all material respects the obligations, covenants and agreements required to be performed by it under this Agreement at or prior to the Closing Date, and SVB Financial shall have received a certificate signed on behalf of Boston Private by the Chief Executive Officer and the Chief Financial Officer of Boston Private to such effect.

(c)    Federal Tax Opinion. SVB Financial shall have received the opinion of Sullivan & Cromwell LLP, in form and substance reasonably satisfactory to SVB Financial, dated as of the Closing Date, to the

-52-

effect that, on the basis of facts, representations and assumptions set forth or referred to in such opinion, the Merger will qualify as a "reorganization" within the meaning of Section 368(a) of the Code. In rendering such opinion, counsel may require and rely upon representations contained in certificates of officers of SVB Financial and Boston Private, reasonably satisfactory in form and substance to such counsel.

7.3    <u>Conditions to Obligations of Boston Private</u>. The obligation of Boston Private to effect the Merger is also subject to the satisfaction, or waiver by Boston Private, at or prior to the Effective Time, of the following conditions:

(a)    <u>Representations and Warranties.</u> The representations and warranties of SVB Financial set forth in Section 4.2(a) and Section 4.8 (in each case, after giving effect to the lead in to Article IV) shall be true and correct (other than, in the case of Section 4.2(a), such failures to be true and correct as are de minimis) in each case as of the date of this Agreement and (except to the extent such representations and warranties speak as of an earlier date) as of the Closing Date as though made on and as of the Closing Date, and the representations and warranties of SVB Financial set forth in Sections 4.1(a), 4.1(b) (with respect to SVB Bank only), 4.2(b) (with respect to SVB Bank only) and 4.3(a) (in each case, after giving effect to the lead in to Article IV) shall be true and correct in all material respects as of the date of this Agreement and (except to the extent such representations and warranties speak as of an earlier date) as of the Closing Date as though made on and as of the Closing Date. All other representations and warranties of SVB Financial set forth in this Agreement (read without giving effect to any qualification as to materiality or Material Adverse Effect set forth in such representations or warranties but, in each case, after giving effect to the lead in to Article IV) shall be true and correct in all respects as of the date of this Agreement and (except to the extent such representations and warranties speak as of an earlier date) as of the Closing Date as though made on and as of the Closing Date, provided, however, that for purposes of this sentence, such representations and warranties shall be deemed to be true and correct unless the failure or failures of such representations and warranties to be so true and correct, either individually or in the aggregate, and without giving effect to any qualification as to materiality or Material Adverse Effect set forth in such representations or warranties, has had or would reasonably be expected to have a Material Adverse Effect on SVB Financial. Boston Private shall have received a certificate signed on behalf of SVB Financial by the Chief Executive Officer and the Chief Financial Officer of SVB Financial to the foregoing effect.

(b)    <u>Performance of Obligations of SVB Financial.</u> SVB Financial shall have performed in all material respects the obligations, covenants and agreements required to be performed by it under this Agreement at or prior to the Closing Date, and Boston Private shall have received a certificate signed on behalf of SVB Financial by the Chief Executive Officer and the Chief Financial Officer of SVB Financial to such effect.

(c)    <u>Federal Tax Opinion.</u> Boston Private shall have received the opinion of Wachtell, Lipton, Rosen & Katz, in form and substance reasonably satisfactory to Boston Private, dated as of the Closing Date, to the effect that, on the basis of facts, representations and assumptions set forth or referred to in such opinion, the Merger will qualify as a "reorganization" within the meaning of Section 368(a) of the Code. In rendering such opinion, counsel may require and rely upon representations contained in certificates of officers of SVB Financial and Boston Private, reasonably satisfactory in form and substance to such counsel.

ARTICLE VIII

TERMINATION AND AMENDMENT

8.1    <u>Termination</u>. This Agreement may be terminated at any time prior to the Effective Time, whether before or after approval of this Agreement by the shareholders of Boston Private:

(a)    by mutual consent of SVB Financial and Boston Private in a written instrument, if the Board of Directors of each so determines by a vote of a majority of the members of its entire Board;

-53-

(b)    by either SVB Financial or Boston Private if any Governmental Entity that must grant a Requisite Regulatory Approval has denied approval of the Merger or the Bank Merger and such denial has become final and nonappealable or any Governmental Entity of competent jurisdiction shall have issued a final nonappealable order, injunction or decree permanently enjoining or otherwise prohibiting or making illegal the consummation of the Merger or the Bank Merger, unless the failure to obtain a Requisite Regulatory Approval shall be due to the failure of the party seeking to terminate this Agreement to perform or observe the covenants and agreements of such party set forth herein;

(c)    by either SVB Financial or Boston Private if the Merger shall not have been consummated on or before January 3, 2022 (the "Termination Date"), unless the failure of the Closing to occur by such date shall be due to the failure of the party seeking to terminate this Agreement to perform or observe the covenants and agreements of such party set forth herein;

(d)    by either SVB Financial or Boston Private (provided, that the terminating party is not then in material breach of any representation, warranty, obligation, covenant or other agreement contained herein) if there shall have been a breach of any of the obligations, covenants or agreements or any of the representations or warranties (or any such representation or warranty shall cease to be true) set forth in this Agreement on the part of Boston Private, in the case of a termination by SVB Financial, or SVB Financial, in the case of a termination by Boston Private, which breach or failure to be true, either individually or in the aggregate with all other breaches by such party (or failures of such representations or warranties to be true), would constitute, if occurring or continuing on the Closing Date, the failure of a condition set forth in Section 7.2, in the case of a termination by SVB Financial, or Section 7.3, in the case of a termination by Boston Private, as the case may be, and which is not cured within the earlier of the Termination Date and 45 days following written notice to Boston Private, in the case of a termination by SVB Financial, or SVB Financial, in the case of a termination by Boston Private, or by its nature or timing cannot be cured during such period; or

(e)    by SVB Financial, prior to such time as the Requisite Boston Private Vote is obtained, if (A) the Board of Directors of Boston Private shall have (i) failed to recommend in the Proxy Statement that the shareholders of Boston Private approve this Agreement, or withdrew, modified or qualified such recommendation in a manner adverse to SVB Financial, or resolved to do so, (ii) failed to reaffirm such recommendation within ten (10) business days after SVB Financial requests in writing that such action be taken, (iii) failed to publicly and without qualification (A) recommend against any Acquisition Proposal or (B) reaffirm the board recommendation within ten (10) business days (or such fewer number of days as remains prior to the Boston Private Meeting) after an Acquisition Proposal is made public or any request by SVB Financial to do so, (iv) adopted, approved, recommended or endorsed an Acquisition Proposal or publicly announced an intention to adopt, approve, recommend or endorse an Acquisition Proposal or (v) publicly proposed to do any of the foregoing or (B) Boston Private or the Boston Private Board of Directors shall have breached its obligations under Section 6.3 or Section 6.9 in any material respect.

The party desiring to terminate this Agreement pursuant to clause (b), (c), (d) or (e) of this Section 8.1 shall give written notice of such termination to the other party in accordance with Section 9.5, specifying the provision or provisions hereof pursuant to which such termination is effected.

8.2    Effect of Termination.

(a)    In the event of termination of this Agreement by either SVB Financial or Boston Private as provided in Section 8.1, this Agreement shall forthwith become void and have no effect, and none of SVB Financial, Boston Private, any of their respective Subsidiaries or any of the officers or directors of any of them shall have any liability of any nature whatsoever hereunder, or in connection with the transactions contemplated hereby, except that (i) Sections 3.3(a), 3.7, 4.3(a), 4.7, 6.2(b), this Section 8.2 and Article IX shall survive any termination of this Agreement, and (ii) notwithstanding anything to the contrary contained in this Agreement, neither SVB Financial nor Boston Private shall be relieved or released from any liabilities or damages arising out of its fraud or willful and material breach of any provision of this Agreement.

-54-

(b)   (i) In the event that after the date of this Agreement a *bona fide* Acquisition Proposal shall have been made known to the Board of Directors or senior management of Boston Private or shall have been made directly to its shareholders generally or any person shall have publicly announced (and not withdrawn) an Acquisition Proposal with respect to Boston Private and (A) thereafter this Agreement is terminated by either SVB Financial or Boston Private pursuant to Section 8.1(c) and Boston Private shall have failed to obtain the Requisite Boston Private Vote at the duly convened Boston Private Meeting or any adjournment or postponement thereof at which a vote on the approval of this Agreement was taken or (B) thereafter this Agreement is terminated by SVB Financial pursuant to Section 8.1(d), and (C) prior to the date that is twelve (12) months after the date of such termination, Boston Private enters into a definitive agreement or consummates a transaction with respect to an Acquisition Proposal (whether or not the same Acquisition Proposal as that referred to above), then Boston Private shall, on the earlier of the date it enters into such definitive agreement and the date of consummation of such transaction, pay SVB Financial, by wire transfer of same day funds, a fee equal to $36,000,000 (the "Termination Fee"); provided, that for purposes of this Section 8.2(b), all references in the definition of Acquisition Proposal to "25%" shall instead refer to "50%".

(ii)   In the event that this Agreement is terminated by SVB Financial pursuant to Section 8.1(e) (or this Agreement is terminated pursuant to Section 8.1(c) but at the time of such termination SVB Financial could have terminated this Agreement pursuant to Section 8.1(e)), then Boston Private shall pay SVB Financial, by wire transfer of same day funds, the Termination Fee within two business days of the date of termination.

(c)   Notwithstanding anything to the contrary herein, but without limiting the right of any party to recover liabilities or damages arising out of the other party's fraud or willful and material breach of any provision of this Agreement, the maximum aggregate amount of fees payable by Boston Private under this Section 8.2 shall be equal to the Termination Fee. In no event shall Boston Private be required to pay the Termination Fee on more than one occasion.

(d)   Each of SVB Financial and Boston Private acknowledges that the agreements contained in this Section 8.2 are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, the other party would not enter into this Agreement; accordingly, if Boston Private fails promptly to pay the amount due pursuant to this Section 8.2, and, in order to obtain such payment, SVB Financial commences a suit which results in a judgment against Boston Private for the Termination Fee or any portion thereof, Boston Private shall pay the costs and expenses of SVB Financial (including reasonable attorneys' fees and expenses) in connection with such suit. In addition, if Boston Private fails to pay the amounts payable pursuant to this Section 8.2, then Boston Private shall pay interest on such overdue amounts (for the period commencing as of the date that such overdue amount was originally required to be paid and ending on the date that such overdue amount is actually paid in full) at a rate per annum equal to the "prime rate" (as announced by JPMorgan Chase & Co. or any successor thereto) in effect on the date on which such payment was required to be made for the period commencing as of the date that such overdue amount was originally required to be paid.

ARTICLE IX

GENERAL PROVISIONS

9.1   Nonsurvival of Representations, Warranties and Agreements. None of the representations, warranties, covenants and agreements in this Agreement or in any instrument delivered pursuant to this Agreement (other than the Confidentiality Agreement, which shall survive in accordance with its terms) shall survive the Effective Time, except for Section 6.6 and for those other covenants and agreements contained herein and therein which by their terms apply or are to be performed in whole or in part after the Effective Time.

9.2   Amendment. Subject to compliance with applicable law, this Agreement may be amended by the parties hereto, at any time before or after approval of the matters presented in connection with Merger by the

-55-

shareholders of Boston Private; provided, however, that after the approval of this Agreement by the shareholders of Boston Private, there may not be, without further approval of such shareholders, any amendment of this Agreement that requires further approval under applicable law. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each of the parties in interest at the time of the amendment.

9.3    Extension; Waiver. At any time prior to the Effective Time, the parties hereto may, to the extent legally allowed, (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the agreements or satisfaction of any conditions contained herein; provided, however, that after approval of this Agreement by the shareholders of Boston Private, there may not be, without further approval of such shareholders, any extension or waiver of this Agreement or any portion thereof that requires further approval under applicable law. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of such party, but such extension or waiver or failure to insist on strict compliance with an obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

9.4    Expenses. Except (i) with respect to costs and expenses of printing and mailing the Proxy Statement and all filing and other fees paid to the SEC in connection with the Merger, which shall be borne equally by SVB Financial and Boston Private, and (ii) as otherwise provided in Section 8.2, all fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such fees or expenses, whether or not the Merger is consummated.

9.5    Notices. All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by email, upon confirmation of receipt, (b) on the first business day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or (c) on the earlier of confirmed receipt or the fifth business day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

(a)    if to Boston Private, to:

Boston Private Financial Holdings, Inc.
10 Post Office Square
Boston, MA 02109
Attention: Colleen Graham, General Counsel
Email:    cgraham@bostonprivate.com

*With a copy (which shall not constitute notice) to:*

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
Attention: Edward D. Herlihy & Jacob A. Kling
Email:    EDHerlihy@wlrk.com & JAKling@wlrk.com

and

(b)    if to SVB Financial, to:
SVB Financial Group
3005 Tasman Drive
Santa Clara, CA 95054
Attention: Michael Zuckert, General Counsel
Email:    MZuckert@svb.com

-56-

With a copy (which shall not constitute notice) to:
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Attention: H. Rodgin Cohen & Jared M. Fishman
Email:      cohenhr@sullcrom.com & fishmanj@sullcrom.com

9.6    <u>Interpretation</u>. The parties have participated jointly in negotiating and drafting this Agreement. In the event that an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement. When a reference is made in this Agreement to Articles, Sections, Exhibits or Schedules, such reference shall be to an Article or Section of or Exhibit or Schedule to this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." References to "the date hereof" shall mean the date of this Agreement. As used in this Agreement, the "<u>knowledge</u>" of Boston Private means the actual knowledge of any of the officers of Boston Private listed on Section 9.6 of the Boston Private Disclosure Schedule, and the "<u>knowledge</u>" of SVB Financial means the actual knowledge of any of the officers of SVB Financial listed on Section 9.6 of the SVB Financial Disclosure Schedule. As used herein, (i) "<u>business day</u>" means any day other than a Saturday, a Sunday or a day on which banks in New York, New York are authorized by law or executive order to be closed, (ii) the term "<u>person</u>" means any individual, corporation (including not-for-profit), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, Governmental Entity or other entity of any kind or nature, (iii) an "<u>affiliate</u>" of a specified person is any person that directly or indirectly controls, is controlled by, or is under common control with, such specified person and (iv) the term "<u>made available</u>" means any document or other information that was (a) provided by one party or its representatives to the other party and its representatives prior to the date hereof, (b) included in the virtual data room of a party prior to the date hereof or (c) filed by a party with the SEC and publicly available on EDGAR prior to the date hereof. The Boston Private Disclosure Schedule and the SVB Financial Disclosure Schedule, as well as all other schedules and all exhibits hereto, shall be deemed part of this Agreement and included in any reference to this Agreement. All references to "dollars" or "$" in this Agreement are to United States dollars. This Agreement shall not be interpreted or construed to require any person to take any action, or fail to take any action, if to do so would violate any applicable law.

9.7    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts (including by electronic means), all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterpart.

9.8    <u>Entire Agreement</u>. This Agreement (including the documents and the instruments referred to herein) together with the Confidentiality Agreement constitutes the entire agreement among the parties and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

9.9    <u>Governing Law; Jurisdiction</u>.

(a)    This Agreement shall be governed and construed in accordance with the laws of the State of Delaware, without regard to any applicable conflicts of law (except that matters relating to the fiduciary duties of the Board of Directors of Boston Private shall be subject to the laws of the Commonwealth of Massachusetts).

(b)    Each party agrees that it will bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contemplated hereby exclusively in the Delaware Court of

-57-

Chancery and any state appellate court therefrom within the State of Delaware or, if the Delaware Court of Chancery declines to accept jurisdiction over a particular matter, any federal or state court of competent jurisdiction located in the State of Delaware (the "Chosen Courts"), and, solely in connection with claims arising under this Agreement or the transactions that are the subject of this Agreement, (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party and (iv) agrees that service of process upon such party in any such action or proceeding will be effective if notice is given in accordance with Section 9.5.

9.10    Waiver of Jury Trial. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR OTHER PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT: (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY ACTION, SUIT OR PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10.

9.11    Assignment; Third Party Beneficiaries. Neither this Agreement nor any of the rights, interests or obligations shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other party. Any purported assignment in contravention hereof shall be null and void. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns. Except as otherwise specifically provided in Section 6.6, which is intended to benefit each Boston Private Indemnified Party and his or her heirs and representatives, this Agreement (including the documents and instruments referred to herein) is not intended to and does not confer upon any person other than the parties hereto any rights or remedies hereunder, including the right to rely upon the representations and warranties set forth herein. The representations and warranties in this Agreement are the product of negotiations among the parties hereto and are for the sole benefit of the parties. Any inaccuracies in such representations and warranties are subject to waiver by the parties hereto in accordance herewith without notice or liability to any other person. In some instances, the representations and warranties in this Agreement may represent an allocation among the parties hereto of risks associated with particular matters regardless of the knowledge of any of the parties hereto. Consequently, persons other than the parties may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date. Except as provided in Section 6.6, notwithstanding any other provision hereof to the contrary, no consent, approval or agreement of any third party beneficiary will be required to amend, modify to waive any provision of this Agreement.

9.12    Specific Performance. The parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and, accordingly, that the parties shall be entitled to specific performance of the terms hereof, including an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof (including the parties' obligation to consummate the Merger), in addition to any other remedy to which they are entitled at law or in equity. Each of the parties hereby further waives (a) any defense in any action for specific performance that

-58-

a remedy at law would be adequate and (b) any requirement under any law to post security or a bond as a prerequisite to obtaining equitable relief.

9.13    _Severability_. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction such that the invalid, illegal or unenforceable provision or portion thereof shall be interpreted to be only so broad as is enforceable.

9.14    _Confidential Supervisory Information_. Notwithstanding any other provision of this Agreement, no disclosure, representation or warranty shall be made (or other action taken) pursuant to this Agreement that would involve the disclosure of confidential supervisory information (including confidential supervisory information as defined in 12 C.F.R. § 261.2(c) and as identified in 12 C.F.R. § 309.5(g)(8)) of a Governmental Entity by any party to this Agreement to the extent prohibited by applicable law. To the extent legally permissible, appropriate substitute disclosures or actions shall be made or taken under circumstances in which the limitations of the preceding sentence apply.

9.15    _Delivery by Electronic Transmission_. This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments or waivers hereto or thereto, to the extent signed and delivered by e-mail delivery of a ".pdf" format data file, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No party hereto or to any such agreement or instrument shall raise the use of e-mail delivery of a ".pdf" format data file to deliver a signature to this Agreement or any amendment hereto or the fact that any signature or agreement or instrument was transmitted or communicated through e-mail delivery of a ".pdf" format data file as a defense to the formation of a contract and each party hereto forever waives any such defense.

*[Signature Page Follows]*

-59-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

SVB FINANCIAL GROUP

By:  /s/ Greg Becker
      Name: Greg Becker
      Title:  President and Chief Executive Officer

BOSTON PRIVATE FINANCIAL HOLDINGS, INC.

By:  /s/ Anthony DeChellis
      Name: Anthony DeChellis
      Title:  Chief Executive Officer and President

[Signature Page to Agreement and Plan of Merger]

**EXHIBIT A**
**FORM OF BANK MERGER AGREEMENT**

# FORM OF AGREEMENT AND PLAN OF MERGER OF
## SILICON VALLEY BANK AND BOSTON PRIVATE BANK & TRUST COMPANY

This Agreement and Plan of Merger (this "<u>Agreement</u>"), dated as of [●], is made by and between Silicon Valley Bank, a California-chartered commercial bank ("<u>SVB Bank</u>"), and Boston Private Bank & Trust Company, a Massachusetts-chartered trust company ("<u>Boston Private Bank</u>").

### WITNESSETH:

**WHEREAS**, SVB Bank is a California-chartered commercial bank, all the issued and outstanding capital stock of which is owned as of the date hereof directly by SVB Financial Group, a Delaware corporation ("<u>SVB Financial</u>");

**WHEREAS**, Boston Private Bank is a Massachusetts-chartered trust company, all the issued and outstanding capital stock of which is owned as of the date hereof directly by Boston Private Financial Holdings, Inc., a Massachusetts corporation ("<u>Boston Private</u>");

**WHEREAS**, <u>SVB Financial</u> and Boston Private have entered into an Agreement and Plan of Merger, dated as of January 4, 2021 (as amended and/or supplemented from time to time, the "<u>Merger Agreement</u>"), pursuant to which, subject to the terms and conditions thereof, Boston Private will merge with and into <u>SVB Financial</u>, with <u>SVB Financial</u> surviving the Merger as the surviving corporation (the "<u>Merger</u>");

**WHEREAS**, contingent upon the Merger, on the terms and subject to the conditions contained in this Agreement, the parties to this Agreement intend to effect the merger of Boston Private Bank with and into SVB Bank, with SVB Bank surviving the merger (the "<u>Bank Merger</u>"); and

**WHEREAS**, the board of directors of SVB Bank and the board of directors of Boston Private Bank deem the Bank Merger desirable and in the best interests of their respective banks, and have authorized and approved the execution and delivery of this Agreement and the transactions contemplated hereby.

**NOW, THEREFORE**, in consideration of the premises and of the mutual agreements herein contained, the parties hereto do hereby agree as follows:

### ARTICLE I

### CONSTITUENT ENTITIES

Section 1.01    SVB Bank and Boston Private Bank shall be the constituent entities with respect to the Bank Merger.

### ARTICLE II

### BANK MERGER

Section 2.01    <u>The Merger</u>. Subject to the terms and conditions of this Agreement, effective as of the Effective Time (as defined below), Boston Private Bank shall be merged with and into SVB Bank in accordance with Section 4880 et seq. of the California Financial Code ("<u>CFC</u>"), and with the effect provided in Section 4889 of the CFC and Section 1107 of the California General Corporation Law. At the Effective Time (as defined below), the separate existence of Boston Private Bank shall cease, and SVB Bank, as the surviving institution (the "<u>Surviving Bank</u>"), shall continue unaffected and unimpaired by the Bank Merger. All assets of Boston

Private Bank as they exist at the Effective Time of the Bank Merger shall pass to and vest in the Surviving Bank without any conveyance or other transfer. The Surviving Bank shall be responsible for all of the liabilities of every kind and description of each of the merging banks existing as of the Effective Time, including all deposits, accounts, debts, obligations and contracts thereof, matured or unmatured, whether accrued, absolute, contingent or otherwise, and whether or not reflected or reserved against on balance sheets, books of account or records thereof. Immediately following the Effective Time, the Surviving Bank shall continue to operate the main office and each of the branches of Boston Private Bank existing as of the Effective Time as branches of the Surviving Bank at the officially designated address of each such office or branch, as listed in <u>Annex A</u> hereto, and shall continue to operate each of the branches of the Surviving Bank existing at the Effective Time, in each case without limiting the authority under applicable law of the Surviving Bank to close, relocate or otherwise make any change regarding any such branch.

Section 2.02    <u>Closing</u>. The closing of the Bank Merger will take place by electronic exchange of documents following the Merger or at such other time and date as specified by the parties hereto, but in no case prior to the Merger or the date on which all of the conditions precedent to the consummation of the Bank Merger specified in this Agreement shall have been satisfied or duly waived by the party entitled to satisfaction thereof.

Section 2.03    <u>Effective Time</u>. The Bank Merger shall become effective following the effective time of the Merger when all of the conditions precedent to the consummation of the Bank Merger specified in this Agreement shall have been satisfied or duly waived by the party entitled to satisfaction thereof (such date and time being herein referred to as the "<u>Effective Time</u>").

Section 2.04    <u>Articles of Incorporation and Bylaws</u>. The articles of incorporation and bylaws of SVB Bank in effect immediately prior to the Effective Time shall be the articles of incorporation and the bylaws of the Surviving Bank, in each case until amended in accordance with applicable law and the terms thereof.

Section 2.05    <u>Board of Directors and Officers</u>. The directors and officers of SVB Bank, in each case, immediately prior to the Effective Time shall, at and after the Effective Time, be the directors and officers, respectively, of the Surviving Bank, such individuals to serve in such capacity until such time as their successors shall have been duly elected or appointed and qualified or until their earlier death, resignation or removal from office.

Section 2.06    <u>Name and Main Office</u>. The name of the Surviving Bank shall be "Silicon Valley Bank" and the main office of the Surviving Bank shall be at 3003 Tasman Drive, Santa Clara, California 95054.

Section 2.07    <u>Tax Treatment</u>. It is the intention of the parties hereto that the Bank Merger be treated for U.S. federal income tax purposes as a "tax free reorganization" pursuant to Section 368(a) of the Internal Revenue Code of 1986, as amended.

## ARTICLE III

### TREATMENT OF SHARES

Section 3.01    <u>Effect on Boston Private Bank Capital Stock</u>. By virtue of the Bank Merger and without any action on the part of the holder of any capital stock of Boston Private Bank, at the Effective Time, all shares of Boston Private Bank capital stock issued and outstanding shall be automatically cancelled and retired and shall cease to exist, and no cash, new shares of common stock, or other property shall be delivered in exchange therefor.

Section 3.02    <u>Effect on SVB Bank Capital Stock</u>. Each share of SVB Bank capital stock issued and outstanding immediately prior to the Effective Time shall remain issued and outstanding and unaffected by the Bank Merger and shall immediately after the Effective Time constitute all of the issued and outstanding capital stock of the Surviving Bank.

A-2

## ARTICLE IV

### COVENANTS

Section 4.01    During the period from the date of this Agreement and continuing until the Effective Time, subject to the provisions of the Merger Agreement, each of the parties hereto agrees to use all reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement.

## ARTICLE V

### CONDITIONS PRECEDENT

Section 5.01    The Bank Merger and the respective obligations of each party hereto to consummate the Bank Merger are subject to the fulfillment or written waiver of each of the following conditions prior to the Effective Time:

a.    The approval of (i) the Board of Governors of the Federal Reserve System, (ii) the Massachusetts Commissioner of Banks and (iii) the California Department of Financial Protection and Innovation, in each case with respect to the Bank Merger, shall in each case have been obtained and shall be in full force and effect; and all other material approvals and authorizations of, filings and registrations with, and notifications to, all governmental authorities required for the consummation the Bank Merger shall have been obtained or made and shall be in full force and effect, and all statutory waiting periods required by law shall have expired or been terminated.

b.    The parties shall have received any necessary regulatory approval to establish and operate branches at the main office and branches of Boston Private Bank as branches of the Surviving Bank.

c.    This Agreement shall have been adopted by the sole stockholder of each of SVB Bank and Boston Private Bank.

d.    The Merger shall have been consummated in accordance with the terms of the Merger Agreement.

e.    No jurisdiction or governmental authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, judgment, decree, injunction or other order (whether temporary, preliminary or permanent) which is in effect and prohibits or makes illegal consummation of the Bank Merger.

## ARTICLE VI

### FURTHER DOCUMENTS

Section 6.01    If at any time the Surviving Bank shall reasonably require that any further deeds, assignments, conveyances or assurances in law are necessary or desirable to vest, perfect or confirm of record in the Surviving Bank the title to any property or rights of the constituent entities as of the Effective Time, the proper officers and directors of SVB Bank as of the Effective Time and the proper officers and directors of Boston Private Bank, as of the Effective Time, and thereafter the directors and officers of the Surviving Bank acting on behalf of Boston Private Bank, shall execute and deliver any and all proper deeds, assignments, conveyances and assurances in law, and do all things necessary or desirable, to vest, perfect or confirm title to such property or rights in the Surviving Bank and otherwise to carry out the provisions hereof.

A-3

## ARTICLE VII

### TERMINATION AND AMENDMENT

Section 7.01    <u>Termination</u>. This Agreement may be terminated at any time prior to the Effective Time by an instrument in writing executed by each of the parties hereto. This Agreement will terminate automatically upon the termination of the Merger Agreement. In the event of termination of this Agreement as provided in this Section 7.01, this Agreement shall forthwith become void and have no effect.

Section 7.02    <u>Amendment</u>. This Agreement may not be amended, except by an instrument in writing signed on behalf of each of the parties hereto.

## ARTICLE VIII

### GENERAL PROVISIONS

Section 8.01    <u>Representations and Warranties</u>. Each of the parties hereto represents and warrants that this Agreement has been duly authorized, executed and delivered by such party and (assuming due authorization, execution and delivery by the other party) constitutes a valid and binding obligation of such party, enforceable against it in accordance with the terms hereof (except in all cases as such enforceability may be limited by bankruptcy, insolvency, moratorium, reorganization or similar laws of general applicability affecting the rights of creditors generally and the availability of equitable remedies).

Section 8.02    <u>Nonsurvival of Agreements</u>. None of the agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Effective Time.

Section 8.03    <u>Notices</u>. All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given if delivered personally, sent via email (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to Boston Private Bank, to:

> Boston Private Financial Holdings, Inc.
> 10 Post Office Square
> Boston, MA 02109
> Attention:   Colleen Graham, General Counsel
> Email:        cgraham@bostonprivate.com

with a copy (which shall not constitute notice) to:

> Wachtell, Lipton, Rosen & Katz
> 51 West 52nd Street
> New York, NY 10019
> Attention:   Edward D. Herlihy & Jacob A. Kling
> Email:        EDHerlihy@wlrk.com & JAKling@wlrk.com

If to SVB Bank, to:

> SVB Financial Group
> 3005 Tasman Drive
> Santa Clara, CA 95054
> Attention:   Michael Zuckert, General Counsel
> Email:        MZuckert@svb.com

A-4

with a copy (which shall not constitute notice) to:

>Sullivan & Cromwell LLP
>125 Broad Street
>New York, NY 10004
>Attention:   H. Rodgin Cohen & Jared M. Fishman
>Email:       cohenhr@sullcrom.com & fishmanj@sullcrom.com

Section 8.04    <u>Interpretation</u>. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section references are to this Agreement unless otherwise specified. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.05    <u>Counterparts</u>. This Agreement may be executed in two (2) or more counterparts (including by electronic means), all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties and delivered to the other party, it being understood that each party need not sign the same counterpart.

Section 8.06    <u>Entire Agreement</u>. This Agreement (including any exhibits thereto, the documents and the instruments referred to in this Agreement) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, between the parties hereto with respect to the subject matter of this Agreement, other than the Merger Agreement.

Section 8.07    <u>Governing Law</u>. This Agreement shall be governed and construed in accordance with the laws of the State of California applicable to agreements made and to be performed wholly within such state, except to the extent that the federal laws of the United States shall be applicable hereto.

Section 8.08    <u>Assignment</u>. Neither this Agreement nor any of the rights, interests or obligations may be assigned by any of the parties hereto and any attempted assignment in contravention of this Section 8.08 shall be null and void.

A-5

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed in counterparts by their duly authorized officers as of the day and year first above written.

**BOSTON PRIVATE BANK & TRUST COMPANY**

_____

By:
Title:

**SILICON VALLEY BANK**

_____

By:
Title:

**ANNEX A**

**Offices of Boston Private Bank**

[to be inserted]

1

## Exhibit C

**Boston Private Bylaws**

EX-3.2 2 exhibit32amendedandrestate.htm EX 3.2 AMENDED AND RESTATED BYLAWS

**Exhibit 3.2**

## BOSTON PRIVATE FINANCIAL HOLDINGS, INC.

## AMENDED AND RESTATED BYLAWS

### ARTICLE I

### Shareholders

1.  Annual Meeting. The annual meeting of shareholders shall be held at the date, time and place within or without the United States which is fixed by the majority of the Board of Directors, the Chairman of the Board, if one is elected, or the President, which time, date and place may subsequently be changed at any time by vote of the Board of Directors. The purposes for which such annual meeting is to be held, in addition to those prescribed by law, by the Articles of Organization or by these Bylaws, shall be for electing Directors and for such other purposes as shall be specified by the Board of Directors, the Chairman of the Board, if one is elected, or the President and set forth in the notice for the meeting pursuant to Section 4 of this Article I. In the event the time for an annual meeting is not fixed in accordance with these Bylaws to be held within 13 months after the last annual meeting was held, the Board of Directors may designate a special meeting held thereafter as a special meeting in lieu of the annual meeting, and such special meeting shall have, for purposes of these Bylaws or otherwise, all the force and effect of an annual meeting. Any and all references hereafter in these Bylaws to an annual meeting or annual meetings shall be deemed to refer also to any special meeting(s) in lieu thereof.

2.  Special Meetings. Except as provided in this Section 2 of Article I, special meetings of shareholders may be called only by the Board of Directors or the President. Special meetings shall be called by the Secretary or in case of the death, absence, incapacity or refusal of the Secretary, by any other officer, upon written application of one or more shareholders who hold at least (i) 75% in interest of the capital stock entitled to vote at such meeting or (ii) such lesser percentage, if any, (but not less than 40%) as shall be determined to be the maximum percentage which the Corporation is permitted by applicable law to establish for the call of such a meeting. The date, time and place of any special meeting and the record date for determining the shareholders having the right to notice of and to vote at such meeting shall be determined by the Board of Directors. Only business within the purpose or purposes described in the meeting notice may be conducted at a special meeting.

3.  Notice of Shareholder Business and Nominations.

    (a) Annual Meetings of Shareholders.

        (1) Nominations of persons for election to the Board of Directors of the Corporation and the proposal of business to be considered by the shareholders may be made at an annual meeting of shareholders (a) pursuant to the Corporation's notice of

meeting, (b) by or at the direction of the Board of Directors or (c) by any shareholder of the Corporation who was a shareholder of record at the time of giving of notice provided for in this Bylaw, who is entitled to vote at the meeting, who is present at the meeting and who complies with the notice procedures set forth in this Bylaw. In addition to the other requirements set forth in this Bylaw, for any proposal of business to be considered at an annual meeting such proposal must be a proper subject for action by shareholders of the Corporation under Massachusetts law.

(2) For nominations or other business to be properly brought before the annual meeting of shareholders, by a shareholder pursuant to clause (c) of paragraph (a)(1) of this Bylaw, in addition to other applicable requirements, the shareholder must have given timely notice thereof in writing to the Secretary of the Corporation as set forth in this Section 3 of Article I. To be timely, a shareholder's notice under this paragraph (a)(2) shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the close of business on the 90th day nor earlier than the close of business on the 120th day prior to the first anniversary of the preceding year's annual meeting; provided, however, that in the event that the date of the annual meeting is advanced by more than 30 days before or delayed by more than 60 days after such anniversary date, notice by the shareholder to be timely must be so delivered not earlier than the close of business on the 120th day prior to such annual meeting and not later than the close of business on the later of the 90th day prior to such annual meeting or the 10th day following the day on which public announcement of the date of such meeting is first made. Such shareholder's notice under this paragraph (a)(2) shall set forth (x) as to each person whom the shareholder proposes to nominate for election or reelection as a Director, all information relating to such person that is required to be disclosed in solicitations of proxies for election of Directors in an election contest, or is otherwise required, in each case pursuant to Regulation 14A under the Exchange Act (including such person's written consent to being named in the proxy statement as a nominee and to serving as a Director if elected); (y) as to any other business that the shareholder proposes to bring before the meeting, a brief description of the business desired to be brought before the meeting, the reasons for conducting such business at the meeting, any material interest in such business of such shareholder and the beneficial owner, if any, on whose behalf the proposal is made, and the names and addresses of other shareholders known by the shareholder proposing such business to support such proposal, and the class and number of shares of the Corporation's capital stock beneficially owned by such other shareholders; and (z) as to the shareholder giving the notice and the beneficial owner, if any, on whose behalf the nomination or proposal is made (i) the name and address of such shareholder, as they appear on the Corporation's books, and of such beneficial owner, and (ii) the class and number

of shares of the Corporation which are owned beneficially and of record by such shareholder and such beneficial owner. For purposes of this paragraph (a)(2), "public announcement" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press or comparable national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Section 13, 14 or 15(d) of the Exchange Act. Notwithstanding anything in the second sentence of this paragraph (a)(2) to the contrary, in the event that the number of Directors to be elected to the Board of Directors of the Corporation is increased and there is no public announcement naming all of the nominees for Director or specifying the size of the increased Board of Directors made by the Corporation at least 85 days prior to the first anniversary of the preceding year's annual meeting, a shareholder's notice required by this paragraph (a)(2) shall also be considered timely, but only with respect to nominees for any new positions created by such increase, if it shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the close of business on the 10th day following the day on which such public announcement is first made by the Corporation.

(b) <u>General</u>.

(1) Only such persons who are nominated in accordance with the provisions of this Bylaw shall be eligible for election and to serve as Directors and only such business shall be conducted at an annual meeting of shareholders as shall have been brought before the meeting in accordance with the provisions of this Bylaw. The Board of Directors or a designated committee thereof shall have the power to determine whether a nomination or any business proposed to be brought before the meeting was made in accordance with the provisions of this Bylaw. If neither the Board of Directors nor such designated committee makes a determination as to whether any shareholder proposal or nomination was made in accordance with the provisions of this Bylaw, the presiding officer of the annual meeting shall have the power and duty to determine whether the shareholder proposal or nomination was made in accordance with the provisions of this Bylaw. If the Board of Directors or a designated committee thereof or the presiding officer, as applicable, determines that any shareholder proposal or nomination was not made in accordance with the provisions of this Bylaw, such proposal or nomination shall be disregarded and shall not be presented for action at the annual meeting.

(2) Notwithstanding the foregoing provisions of this Bylaw, a shareholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth in this Bylaw. Nothing in this Bylaw shall be deemed to affect any rights of (i) shareholders to request inclusion of proposals in the Corporation's proxy statement pursuant to

Rule 14a-8 under the Exchange Act or (ii) the holders of any series of undesignated preferred stock to elect Directors under specified circumstances.

4.    <u>Notice of Meetings</u>. A written notice of each meeting of shareholders (other than adjournments governed by Section 5 of this Article I) stating the date, time and place and the purpose or purposes of such meeting shall be given by the Secretary or an Assistant Secretary (or other officer designated by the Board of Directors) no fewer than 7 days nor more than 60 days before the meeting to each shareholder entitled to vote thereat and to each shareholder who, by law, under the Articles of Organization or under these Bylaws, is entitled to such notice, by delivering such notice to him or her by mailing it, postage prepaid, and addressed to such shareholder at his or her address as it appears in the Corporation's stock transfer books. Such notice shall be deemed to be delivered when hand delivered to such address or deposited in the mail so addressed, with postage prepaid. Notice may be given to a shareholder by any means permitted under applicable law. Without limiting the generality of the foregoing, notice may be given to a shareholder by electronic transmission in a manner specified by the shareholder, including, without limitation, by facsimile transmission, electronic mail or posting on an electronic network. Notwithstanding the foregoing, in case of any special meeting called upon the written demands of shareholders, such meeting shall be scheduled not less than 60 nor more than 90 days after the date on which the Secretary has received sufficient demands to require that such meeting be called and written notice thereof shall be given in accordance with this Section 4 within 30 days of receipt of such demands.

Notice of an annual or special meeting of shareholders need not be given to a shareholder if a written waiver of notice is signed before or after such meeting by such shareholder or such shareholder's authorized attorney, if communication with such shareholder is unlawful, or if such shareholder attends such meeting unless (i) the shareholder at the beginning of the meeting objects to holding the meeting or transacting business at the meeting or (ii) the shareholder objects to the consideration of a particular matter at the meeting as not within the purpose or purposes described in the meeting notice when the matter is presented. Neither the business to be transacted at, nor the purpose of, any annual meeting or special meeting of shareholders need be specified in any written waiver of notice.

5.    <u>Rescheduling of Meetings; Adjournments</u>. The Board of Directors may postpone and reschedule any previously scheduled annual or special meeting of shareholders, and a record date with respect thereto, regardless of whether any notice or public disclosure with respect to any such meeting or record date has been sent or made pursuant to Section 4 of this Article I hereof or otherwise. In no event shall the public announcement of an adjournment, postponement or rescheduling of any previously scheduled annual meeting of shareholders commence a new time period for the giving of a shareholder's notice under Section 3 of Article I of these Bylaws.

When any meeting is convened, the presiding officer may adjourn the meeting if (a) no quorum is present for the transaction of business, (b) the Board of Directors determines that adjournment is necessary or appropriate to enable the shareholders to consider fully

information which the Board of Directors determines has not been made sufficiently or timely available to shareholders, or (c) the Board of Directors determines in its sole discretion that adjournment is otherwise in the best interests of the Corporation. When any annual meeting or special meeting of shareholders is adjourned to another date, time or place, notice need not be given of the adjourned meeting other than an announcement at the meeting at which the adjournment is taken of the date, time and place to which the meeting is adjourned; provided, however, that if a new record date for the adjourned meeting is fixed, notice of the adjourned meeting shall be given under this Article I to persons who are shareholders as of the new record date.

A meeting may be adjourned from time to time by a majority of the votes properly cast upon the question, whether or not a quorum is present.

6.    <u>Quorum</u>.

(a) Unless otherwise provided by law, or in the Articles of Organization, these Bylaws or a resolution of the Directors requiring satisfaction of a greater quorum requirement for any voting group, a majority of the votes entitled to be cast on the matter by a voting group constitutes a quorum of that voting group for action on that matter. As used in these Bylaws, a "voting group" includes all shares of one or more classes or series that, under the Articles of Organization or the Massachusetts Business Corporation Act, as in effect from time to time (or any successor statute) (the "MBCA"), are entitled to vote and to be counted together collectively on a matter at a meeting of shareholders. Shares owned by the Corporation in a fiduciary capacity shall be deemed outstanding for quorum purposes.

(b) A share once represented for any purpose at the meeting is deemed present for quorum purposes for the remainder of the meeting and for any adjournment of that meeting unless (i) the shareholder attends solely to object to lack of notice, defective notice or the conduct of the meeting on other grounds and does not vote the shares or otherwise consent that they are to be deemed present, or (ii) in the case of adjournment, a new record date is or shall be set for the adjournment meeting.

7.    <u>Voting and Proxies</u>. Unless otherwise provided by law or by the Articles of Organization, each shareholder shall have, with respect to each matter voted upon at a meeting of shareholders, one vote for each share of stock entitled to vote owned by such shareholder of record according to the books of the Corporation. A shareholder may vote his or her shares either in person or may appoint a proxy to vote or otherwise act for him or her by signing an appointment form, either personally or by his or her attorney-in-fact. An appointment of a proxy is effective when received by the Secretary or other officer or agent authorized to tabulate votes. Unless otherwise provided in the appointment form, an appointment is valid for a period of 11 months from the date the shareholder signed the form or, if undated, from the date of its receipt by such officer or agent. Any shareholder's proxy may be transmitted by facsimile or other electronic means in a manner complying with applicable law. Except as otherwise

permitted by law or limited therein, proxies shall entitle the persons authorized thereby to vote at any adjournment of such meeting but shall not be valid after final adjournment of such meeting. A proxy with respect to stock held in the name of two or more persons shall be valid if executed by one of them if the person signing appears to be acting on behalf of all the co-owners unless at or prior to exercise of the proxy, the Corporation receives a specific written notice to the contrary from any one of them. Subject to the provisions of Section 7.24 of the MBCA (or any successor provision thereof) and to any express limitation on the proxy's authority provided in the appointment form, the Corporation is entitled to accept the proxy's vote or other action as that of the shareholder making the appointment. A proxy purporting to be executed by or on behalf of a shareholder shall be deemed valid unless challenged at or prior to its exercise and the burden of proving invalidity shall rest on the challenger.

To the extent permitted by applicable law, shareholders and proxyholders not physically present at a meeting of shareholders may, by means of remote communications: (i) participate in a meeting of shareholders; and (ii) be deemed present in person and vote at a meeting of shareholders.

8.   Action at Meeting.

(a) If a quorum of a voting group exists, favorable action on a matter, other than election of Directors, is taken by a voting group if the votes cast within the group favoring the action exceed the votes cast opposing the action, unless a greater number of affirmative votes is required by the MBCA, the Articles of Organization, these Bylaws or a resolution of the Board of Directors requiring receipt of a greater affirmative vote of the shareholders, including one or more separate voting groups.

(b) Unless otherwise provided in the Articles of Organization or these Bylaws, a nominee for Director shall be elected as a Director only if such nominee receives the affirmative vote of a majority of the votes cast as to such nominee by the shares entitled to vote in the election at a meeting at which a quorum is present. Notwithstanding the foregoing, Directors shall be elected by a plurality of the votes cast by the shares entitled to vote in the election at a meeting at which a quorum is present for which (i) the Secretary of the Corporation receives notice that a shareholder has nominated an individual for election as Director in accordance with these Bylaws, and (ii) such nomination has not been withdrawn by such shareholder on or before the 10th day before the Corporation first mails its notice of meeting for such meeting to the shareholders, such that the number of nominees exceeds the number of Directors to be elected.

(c) No ballot shall be required for any election unless requested by a shareholder present or represented at the meeting and entitled to vote in the election. Absent special circumstances, shares of the Corporation's stock are not entitled to vote if they are owned, directly or indirectly, by the Corporation or by another entity of which the Corporation owns, directly or indirectly, a majority of the voting interests.

Notwithstanding the preceding sentence however, the Corporation may vote any share of stock held by it, directly or indirectly, in a fiduciary capacity.

(d) Any incumbent Director who fails to receive the required vote for reelection shall offer to resign from the Board of Directors. The Board of Directors will consider such Director's offer to resign, taking into consideration any such factors that the Board of Directors deems relevant in deciding whether to accept such Director's resignation. Any Director whose offer to resign is under consideration may not participate in any deliberation or vote of the Board of Directors (or committee thereof) regarding such offer, but may participate in the deliberation or vote of any other business transacted by the Board of Directors (or committee thereof). Within 90 days after the date of certification of the election results, the Board of Directors will determine whether to accept or reject such Director's offer to resign. Notwithstanding the foregoing, in the event that no nominee for Director receives the vote required pursuant to this Section 8, any and all Directors may participate in the Board of Directors' deliberation and vote regarding the Directors' offers to resign.

9.   <u>Action without Meeting</u>. Any action required or permitted to be taken at any annual or special meeting of shareholders (including any actions or powers reserved to the shareholders under these Bylaws) may be taken without a meeting, provided that all shareholders entitled to vote on the matter consent to the action in writing and the written consents describe the action taken, are signed by all such shareholders, bear the date of the signatures of such shareholders, and are delivered to the Corporation for inclusion with the records of the meetings of shareholders within 60 days of the earliest dated consent required to be delivered under this Section. Such consents shall be treated for all purposes as a vote at a meeting.

10.   <u>Form of Shareholder Action</u>.

(a) Any vote, consent, waiver, proxy appointment or other action by a shareholder or by the proxy or other agent of any shareholder shall be considered given in writing, dated and signed, if, in lieu of any other means permitted by law, it consists of an electronic transmission that is permitted under applicable law, including, without limitation, an electronic transmission that sets forth or is delivered with information from which the Corporation can determine (i) that the electronic transmission was transmitted by the shareholder, proxy or agent or by a person authorized to act for the shareholder, proxy or agent and (ii) the date on which such shareholder, proxy, agent or authorized person transmitted the electronic transmission. The date on which the electronic transmission is transmitted shall be considered to be the date on which it was signed. The electronic transmission shall be considered received by the Corporation if it has been sent to any address specified by the Corporation for the purpose or, if no address has been specified, to the principal office of the Corporation, addressed to the Secretary or other officer or agent having custody of the records of proceedings of shareholders, or is otherwise received by the Corporation in a manner permitted by applicable law.

(b) Any copy, facsimile or other reliable reproduction of a vote, consent, waiver, proxy appointment or other action by a shareholder or by the proxy or other agent of any shareholder may be substituted or used in lieu of the original writing for any purpose for which the original writing could be used, but the copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

11.   <u>Shareholders List for Meeting</u>.

(a) After fixing a record date for a meeting of shareholders, the Corporation shall prepare an alphabetical list of the names of all its shareholders who are entitled to notice of the meeting. The list shall be arranged by voting group, and within each voting group by class or series of shares, and shall show the address of and number of shares held by each shareholder, but need not include an electronic mail address or other electronic contact information for any shareholder.

(b) The shareholders list shall be available for inspection by any shareholder, beginning two business days after notice is given of the meeting for which the list was prepared and continuing through the meeting: (1) at the Corporation's principal office or at a place identified in the meeting notice in the city where the meeting will be held; or (2) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting.

(c) The Corporation shall make the shareholders list available at the meeting, and any shareholder or his or her agent or attorney is entitled to inspect the list at any time during the meeting or any adjournment.

12.   <u>Presiding Officer</u>. The Chairman, if one is elected, or, in his or her absence, such other officer as shall be designated by the Board of Directors, shall preside at all annual or special meetings of shareholders and shall have the power, among other things, to adjourn such meetings at any time and from time to time in accordance with the provisions of Section 5 of this Article I. The order of business and all other matters of procedure at any meeting of the shareholders shall be determined by the presiding officer.

13.   <u>Voting Procedures and Inspectors of Elections</u>. In advance of any meeting of shareholders, the Board of Directors may appoint one or more inspectors to act at an annual or special meeting of shareholders and make a written report thereon. Any inspector may, but need not, be an officer, employee or agent of the Corporation. Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability. The inspector(s) shall (i) ascertain the number of shares outstanding and the voting power of each, (ii) determine the shares represented at a meeting and the validity of proxies and ballots, (iii) count all votes and ballots, (iv) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors, and (v) certify their determination of the number of shares represented at the meeting, and their count of all votes

and ballots. The inspector(s) may appoint or retain other persons or entities to assist the inspector(s) in the performance of their duties. The presiding officer may review all determinations made by the inspector(s), and in so doing the presiding officer shall be entitled to exercise his or her sole judgment and discretion and he or she shall not be bound by any determinations made by the inspector(s). All determinations by the inspector(s) and, if applicable, presiding officer, shall be subject to further review by the Board of Directors and any court of competent jurisdiction.

14.    <u>Control Share Acquisition</u>. The provisions of Chapter 110D of the General Laws of The Commonwealth of Massachusetts ("Chapter 110D"), as it may be amended from time to time, shall not apply to "control share acquisitions" of the Corporation within the meaning of Chapter 110D.

ARTICLE II

Directors

1.    <u>Classes of Directors; Term of Office; Qualification</u>. The number of Directors of the Corporation shall be fixed solely and exclusively by resolution duly adopted from time to time by the Board of Directors. The Directors shall hold office in the manner provided in the Articles of Organization. No Director need be a shareholder of the Corporation or a resident of The Commonwealth of Massachusetts.

2.    <u>Powers</u>. The business of the Corporation shall be managed under the direction of the Board of Directors who may exercise (or grant authority to be exercised) all the powers of the Corporation except as otherwise provided by law or by the Articles of Organization. In particular, and without limiting the generality of the foregoing, the Directors may at any time issue all or from time to time any part of the unissued capital stock of the Corporation from time to time authorized under the Articles of Organization and may determine, subject to any requirements of law, the consideration for which stock is to be issued and the manner of allocating such consideration between capital and surplus.

3.    <u>Vacancies</u>. The Board of Directors may act notwithstanding a vacancy or vacancies in its membership. Except as otherwise required by applicable law, any and all vacancies in the Board of Directors, however occurring including, without limitation, by reason of an increase in size of the Board of Directors, or the death, resignation, disqualification or removal of a Director, shall be filled solely and exclusively by the affirmative vote of a majority of the remaining Directors then in office, even though less than a quorum. A vacancy that will occur at a specific later date may be filled before the vacancy occurs but the new Director may not take office until the vacancy occurs. Any Director elected in accordance with this Section 3 of Article II shall hold office for the remainder of the full term of the class of Directors in which the vacancy occurred or the new directorship was created (whether or not such term extends beyond the date or dates of any annual meeting or meetings of shareholders succeeding the date of his election) and until his or her successor is duly elected and qualified.

4.  <u>Resignation</u>. Any Director may resign by delivering his or her written resignation to the Corporation at its principal executive office, to the Board of Directors, or the Chairman of the Board (if any). Such resignation shall be effective upon receipt unless it is specified to be effective at some later time or upon the happening of some other event.

5.  <u>Removal</u>. A Director may be removed only as provided by applicable law or the Articles of Organization.

6.  <u>Meetings</u>. Regular meetings of the Board of Directors may be held without notice at such time, date and place as the Board of Directors may from time to time determine. A regular meeting of the Board of Directors may be held without notice at the same place as the annual meeting of shareholders, or the special meeting held in lieu thereof, following such meeting of shareholders.

Special meetings of the Board of Directors may be called, orally or in writing, by the Board of Directors, by the Chairman of the Board, if one is elected, or by the President designating the time, date and place thereof.

7.  <u>Notice of Meetings</u>. Notice of the time, date and place of all special meetings of the Board of Directors shall be given to each Director by the Secretary or Assistant Secretary, or in case of the death, absence, incapacity or refusal of such persons, by the officer or one of the Directors calling the meeting. Notice shall be given to each Director in person or by telephone, voice mail, telegraph, teletype or other electronic means or by facsimile sent to his business or home address, at least 24 hours in advance of the meeting, or by written notice mailed to his or her business or home address at least 48 hours in advance of the meeting. Written notice, other than notice by electronic, telephone or similar means, is effective upon deposit in the United States mail, postage prepaid, and addressed to the Director's address shown in the Corporation's records. Notice need not be given to any Director who waives notice. A Director may waive any notice before or after the date and time of the meeting. The waiver shall be in writing, signed by the Director entitled to the notice, or in the form of an electronic transmission by the Director to the Corporation, and filed with the minutes or corporate records. A Director's attendance at or participation in a meeting waives any required notice to him or her of the meeting unless the Director at the beginning of the meeting, or promptly upon his or her arrival, objects to holding the meeting or transacting business at the meeting and does not thereafter vote for or assent to action taken at the meeting.

8.  <u>Quorum</u>. At any meeting of the Board of Directors, a majority of the Directors then in office shall constitute a quorum, but a smaller number may constitute a quorum pursuant to Section 8.53 or Section 8.55 of the MBCA in making a determination that indemnification or advancement of expenses is permissible in a specific proceeding. Any number of Directors (whether one or more and whether or not constituting a quorum) constituting a majority of Directors present at any meeting or at any adjourned meeting may make any adjournment thereof, and the meeting may be held as adjourned without further notice.

9.    <u>Action at Meeting</u>. At any meeting of the Board of Directors at which a quorum is present, a majority of the Directors present may take any action on behalf of the Board of Directors, unless a larger number is required by law, by the Articles of Organization or by these Bylaws.

10.    <u>Presence Through Communications Equipment</u>. Unless otherwise provided by law or the Articles of Organization, members of the Board of Directors may participate in a meeting of the Board of Directors by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other at the same time and participation by such means shall constitute presence in person at a meeting. A Director participating in a meeting by this means is considered to be present in person at the meeting.

11.    <u>Action by Consent</u>. Unless the Articles of Organization otherwise provide, any action required or permitted to be taken by the Directors at any meeting of the Board of Directors may be taken without a meeting if the action is taken by the unanimous consent of the members of the Board of Directors. The action must be evidenced by one or more consents describing the action taken, in writing, signed by each Director, or delivered to the Corporation by electronic transmission to the address specified by the Corporation for the purpose or, if no address has been specified, to the principal office of the Corporation, addressed to the Secretary or other officer or agent having custody of the records of proceedings of Directors, and included in the minutes or filed with the corporate records reflecting the action taken. Action taken under this Section is effective when the last Director signs or delivers the consent, unless the consent specifies a different effective date. A consent signed or delivered under this Section has the effect of a meeting vote and may be described as such in any document.

12.    <u>Committees</u>. Unless otherwise provided by the Articles of Organization or these Bylaws, the Board of Directors, by vote of a majority of all the Directors then in office, may create one or more committees, may appoint members of the Board of Directors thereto, and may delegate to such committees some or all of its powers except those which by law, by the Articles of Organization, or by these Bylaws may not be delegated. Except as the Board of Directors may otherwise determine, any such committee may make rules for the conduct of its business, but unless otherwise provided by the Board of Directors or in such rules, its business shall be conducted so far as possible in the same manner as is provided by these Bylaws for the Board of Directors. All members of such committees shall hold such offices at the pleasure of the Board of Directors. The Board of Directors may abolish any such committee at any time. Any committee to which the Board of Directors delegates any of its powers or duties shall keep records of its meetings and shall report its action to the Board of Directors. The Board of Directors shall have power to rescind any action of any committee, but no such rescission shall have retroactive effect.

13.    <u>Compensation</u>. The Board of Directors may fix the compensation of Directors.

## ARTICLE III

### Officers

1.    <u>Enumeration</u>. The officers of the Corporation shall consist of a President, a Treasurer, a Secretary, and such other officers, including a Chairman of the Board or one or more Vice Presidents, Assistant Treasurers or Assistant Secretaries, as the Board of Directors may determine.

2.    <u>Appointment</u>. The Chairman of the Board, President, Treasurer and Secretary shall be appointed annually by the Board of Directors at its first meeting following the annual meeting of shareholders. Other officers may be appointed by the Board of Directors at such meeting or at any other meeting. Any such officer that is appointed by the Board of Directors shall be a "Board appointed officer." A Board appointed officer may appoint one or more officers or assistant officers if authorized by the Board of Directors. Each officer has the authority and shall perform the duties set forth in these Bylaws, the duties prescribed by the Board of Directors or by direction of an officer authorized by the Board of Directors to prescribe the duties of other officers.

3.    <u>Qualification</u>. No officer need be a Director of the Corporation except for the Chairman of the Board, if one is elected. Any two or more offices may be held by any person. The Secretary shall be a resident of Massachusetts unless the Corporation has a resident agent appointed for the purpose of service of process. Any officer may be required by the Board of Directors to give bond for the faithful performance of his or her duties in such amount and with such sureties as the Board of Directors may determine.

4.    <u>Tenure</u>. Except as otherwise provided by law, by the Articles of Organization or by these Bylaws, the President, Treasurer, Secretary, and the Chairman of the Board if one is elected, shall hold office until the first meeting of the Board of Directors following the next annual meeting of shareholders and until their respective successors are appointed and qualified; and all other officers shall hold office until the first meeting of the Board of Directors following the next annual meeting of shareholders and until their successors are appointed and qualified, or for such shorter term as the Board of Directors may fix at the time such officers are appointed.

5.    <u>Resignation</u>. Any officer may resign by delivering his or her written resignation to the Corporation at its principal office, and such resignation shall be effective upon receipt unless it is specified to be effective at some later time. If a resignation is made effective at a later date and the Corporation accepts the future effective date, the Board of Directors may fill the pending vacancy before the effective date if the Board of Directors provides that the successor shall not take office until the effective date. An officer's resignation shall not affect the Corporation's contract rights, if any, with the officer.

*Amended and Restated By-Laws*        12

6.   <u>Removal</u>. The Board of Directors may remove any officer at any time with or without cause.

7.   <u>Vacancies</u>. Any vacancy in any office may be filled for the unexpired portion of the term by the Board of Directors. The Board of Directors shall appoint a successor if the office of President, Treasurer or Secretary becomes vacant and may appoint a successor if any other office becomes vacant.

8.   <u>Chairman of the Board and President</u>. Unless otherwise provided by the Board of Directors, the President shall be the chief executive officer of the Corporation and shall, subject to the direction of the Board of Directors, have general supervision and control of its business. Unless otherwise provided by the Board of Directors, the President shall preside, when present, at all meetings of shareholders and (unless a Chairman of the Board has been appointed and is present) of the Board of Directors. If a Chairman of the Board of Directors is appointed, he or she shall preside at all meetings of the Shareholders and the Board of Directors at which he or she is present.

9.   <u>Treasurer</u>. Except as the Board of Directors shall otherwise determine, the Treasurer shall be the Chief Financial and Accounting Officer of the Corporation and shall be in charge of its funds and valuable papers, books of account and accounting records, and shall have such other duties and powers as may be designated from time to time by the Board of Directors or by any officer authorized by the Board of Directors to prescribe such duties and powers.

10.   <u>Secretary</u>. The Secretary shall have responsibility for preparing minutes of the meetings of shareholders and the Board of Directors, and for authenticating records of the Corporation. In case a Secretary is not appointed or is absent, an Assistant Secretary shall keep a record of the meetings of the shareholders and the Board of Directors and may authenticate records of the Corporation. In the absence of the Secretary from any meeting of shareholders, an Assistant Secretary if one be appointed, otherwise a Temporary Secretary designated by the person presiding at the meeting, shall perform the duties of the Secretary. Unless a transfer agent has been appointed or the Board of Directors otherwise prescribes, the Secretary shall keep or cause to be kept the stock and transfer records of the Corporation, which shall contain the names and record addresses of all shareholders and the amount of stock held by each.

11.   <u>Other Powers and Duties</u>. Subject to law, to the Articles of Organization, and to the other provisions of these Bylaws, each officer of the Corporation shall have in addition to the duties and powers specifically set forth in these Bylaws, such duties and powers as are customarily incident to his office, and such duties and powers as may be designated from time to time by the Board of Directors or by direction of an officer authorized by the Board of Directors to prescribe the duties of such other officer.

12.   <u>Employment Contracts</u>. The Corporation may enter into employment contracts authorized by the Board of Directors extending beyond the terms of office of the Directors. An employment contract shall be valid despite any inconsistent provision of these Bylaws relating

to terms of officers and removal of officers with or without cause but shall not affect the authority of the Board of Directors to remove or fail to reappoint officers. Any such removal or failure to reappoint an officer shall be without prejudice to the officer's contract rights, if any, with the Corporation.

## ARTICLE IV

### Capital Stock

1. <u>Issuance and Consideration</u>. The Board of Directors may issue the number of shares of each class or series of stock authorized by the Articles of Organization. The Board of Directors may authorize shares to be issued for any valid consideration. Before the Corporation issues shares, the Board of Directors shall determine that the consideration received or to be received for shares to be issued is adequate. That determination by the Board of Directors is conclusive insofar as the adequacy of consideration for the issuance of shares relates to whether the shares are validly issued, fully paid, and nonassessable. The Board of Directors shall determine the terms upon which the rights, options, or warrants for the purchase of shares or other securities of the Corporation are issued by the Corporation and the terms, including the consideration, for which the shares or other securities are to be issued.

2. <u>Share Certificates</u>. If shares are represented by certificates, at a minimum each share certificate shall state on its face: (a) the name of the Corporation and that it is organized under the laws of The Commonwealth of Massachusetts; (b) the name of the person to whom issued; and (c) the number and class of shares and the designation of the series, if any, the certificate represents. If different classes of shares or different series within a class are authorized, then the variations in rights, preferences and limitations applicable to each class and series, and the authority of the Board of Directors to determine variations for any future class or series, must be summarized on the front or back of each certificate. Alternatively, each certificate may state conspicuously on its front or back that the Corporation will furnish the shareholder this information on request in writing and without charge. Each share certificate shall be signed, either manually or in facsimile, by the President or a Vice President and by the Treasurer or an Assistant Treasurer, or any two officers designated by the Board of Directors, and shall bear the corporate seal or its facsimile. If the person who signed, either manually or in facsimile, a share certificate no longer holds office when the certificate is issued, the certificate shall be nevertheless valid.

3. <u>Uncertificated Shares</u>. The Board of Directors may authorize the issuance of some or all of the shares of any or all of the Corporation's classes or series without certificates. The authorization shall not affect shares already represented by certificates until they are surrendered to the Corporation. Within a reasonable time after the issue or transfer of shares without certificates, the Corporation shall send the shareholder a written statement of the information required by the MBCA to be on certificates.

*Amended and Restated By-Laws*      14

4.  <u>Record and Beneficial Owners</u>. Except as may be otherwise required by law, by the Articles of Organization or by these Bylaws, the Corporation shall be entitled to treat the record holder of stock as shown in the records of the Corporation (or, if the Board of Directors has established a procedure by which the beneficial owner of shares that are registered in the name of a nominee will be recognized by the Corporation as a shareholder, the beneficial owner of shares to the extent provided in such procedure) as the owner of such stock for all purposes, including the payment of dividends and the right to receive notice and to vote with respect thereto, regardless of any transfer, pledge or other disposition of such stock until the shares have been transferred on the books of the Corporation in accordance with the requirements of these Bylaws.

Each shareholder shall have the duty to notify the corporation of such shareholder's post office address.

5.  <u>Lost or Destroyed Certificates</u>. The Board of Directors of the Corporation may, subject to Massachusetts General Laws, Chapter 106, Section 8-405 (or any successor provision), determine the conditions upon which a new share certificate may be issued in place of any certificate alleged to have been lost, destroyed, or wrongfully taken. The Board of Directors may, in its discretion, require the owner of such share certificate, or his or her legal representative, to give a bond, sufficient in its opinion, with or without surety, to indemnify the Corporation against any loss or claim which may arise by reason of the issue of the new certificate.

6.  <u>Transfers</u>. Subject to any restrictions on transfer, if any, stated or noted on the stock certificates, shares of stock may be transferred on the books of the Corporation by the surrender to the Corporation or its transfer agent of the certificate therefore properly endorsed or accompanied by a written assignment and power of attorney properly executed, with transfer stamps (if necessary) affixed, and with such proof of the authenticity of signature as the Corporation or its transfer agent may reasonably require.

7.  <u>Record Date</u>. The Board of Directors may fix in advance a time, which, in the case of any meeting of shareholders, shall be not more than 70 days before the date of such meeting, as the record date for determining the shareholders having the right to notice of and to vote at such meeting and any adjournment thereof or the right to receive a dividend or distribution, and in such case only shareholders of record on such record date shall have such right, notwithstanding any transfer of stock on the books of the Corporation after the record date. If a record date for a specific action is not fixed by the Board of Directors, and is not supplied by the section of the MBCA dealing with that action, the record date shall be the close of business either on the day before the first notice is sent to shareholders, or, if no notice is sent, on the day before the meeting. If the Board of Directors does not fix the record date for determining shareholders entitled to a distribution, other than one involving a purchase, redemption or other acquisition of the Corporation's shares, the record date shall be the date the Board of Directors authorizes the distribution. A determination of shareholders entitled to notice of or to vote at a meeting of shareholders is effective for any adjournment of the meeting unless the

Board of Directors fixes a new record date, which it shall do if the meeting is adjourned to a date more than 120 days after the date fixed for the original meeting.

## ARTICLE V

### Indemnification

1.  <u>Indemnification; Articles of Organization</u>. Directors and officers shall be entitled to indemnification in accordance with the Articles of Organization.

2.  <u>Insurance</u>. The Corporation may purchase and maintain insurance on behalf of an individual who is a Director or officer of the Corporation, or who, while a Director or officer of the Corporation, serves at the Corporation's request as a director, officer, partner, trustee, employee, or agent of another domestic or foreign corporation, partnership, joint venture, trust, employee benefit plan, or other entity, against liability asserted against or incurred by him or her in that capacity or arising from his or her status as a Director or officer, whether or not the Corporation would have power to indemnify or advance expenses to him or her against the same liability under this Article V or the Articles of Organization.

3.  <u>Application of this Article</u>. If the laws of The Commonwealth of Massachusetts are hereafter amended from time to time, or are succeeded by new provisions of applicable law to increase the scope of permitted indemnification, indemnification required hereunder shall be provided to the fullest extent permitted or required by any such amendment or successor provision and indemnification permitted hereunder shall be permitted to the fullest extent authorized by any such amendment or successor provision.

## ARTICLE VI

### Miscellaneous Provisions

1.  <u>Fiscal Year</u>. Except as otherwise determined by the Board of Directors, the fiscal year of the Corporation shall be the twelve months ending December 31st in each year.

2.  <u>Seal</u>. The Board of Directors shall have power to adopt and alter the seal of the Corporation.

3.  <u>Execution of Instruments</u>. All deeds, leases, transfers, contracts, bonds, notes and other obligations to be entered into by the Corporation in the ordinary course of its business without Director action, may be executed on behalf of the Corporation by the President or the Treasurer except as the Board of Directors may generally or in particular cases otherwise determine.

4.  <u>Voting of Securities</u>. Unless otherwise provided by the Board of Directors, the President or Treasurer may waive notice of and act on behalf of this Corporation, or appoint another person or persons to act as proxy or attorney in fact for this Corporation with or without discretionary power and/or power of substitution, at any meeting of shareholders or

shareholders of any other corporation or organization, any of whose securities are held by this Corporation.

5. <u>Resident Agent</u>. The Board of Directors may appoint a resident agent upon whom legal process may be served in any action or proceeding against the Corporation. Said resident agent shall be either an individual, a corporation organized under the laws of Massachusetts, or a corporation organized under the laws of any other state of the United States, which has qualified to do business in Massachusetts, that has a business address in Massachusetts.

6. <u>Corporate Records</u>. The original, or attested copies, of the Articles of Organization, Bylaws and records of all meetings of the incorporators and shareholders, and the stock and transfer records, which shall contain the names of all shareholders and the record address and the amount of stock held by each, shall be kept in Massachusetts at the principal office of the Corporation, or at an office of its transfer agent, Secretary or resident agent.

7. <u>Articles of Organization</u>. All references in these Bylaws to the Articles of Organization shall be deemed to refer to the Amended and Restated Articles of Organization of the Corporation, as amended and in effect from time to time.

8. <u>Amendment</u>. The power to make, amend or repeal these Bylaws shall be in the shareholders; provided, however, that, in accordance with the Articles of Organization, the Directors may make, amend or repeal these Bylaws (other than this Section 8 of Article VI) in whole or in part, except with respect to any provisions thereof which by law, the Articles of Organization or these Bylaws requires action by the shareholders. Notwithstanding the foregoing, the Board of Directors shall not take any action unless permitted by law. Not later than the time of giving notice of the meeting of shareholders next following the making, amending or repealing by the Directors of any Bylaw, notice thereof stating the substance of such change shall be given to all shareholders entitled to vote on amending the Bylaws. Any amendment or repeal of these Bylaws by the Directors and any Bylaw adopted by the Directors may be amended or repealed by the shareholders.

ADOPTED, as revised, <u>January 18, 2017</u>

*Amended and Restated By-Laws*      17

## <u>Exhibit D</u>

**Boston Private Articles of Incorporation**

ACTIVE/128309192

EX-3.1 2 dex31.htm RESTATED ARTICLES OF ORGANIZATION OF BOSTON PRIVATE FINANCIAL HOLDINGS, INC.

**Exhibit 3.1**

D
PC

# The Commonwealth of Massachusetts

**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

**FORM MUST BE TYPED**　　　**Restated Articles of Organization**　　　**FORM MUST BE TYPED**
**(General Laws Chapter 156D, Section 10.07; 950 CMR 113.35)**

(1)  Exact name of corporation:  Boston Private Financial Holdings, Inc.

(2)  Registered office address:  Ten Post Office Square, Boston, Massachusetts, 02109

　　　　　　　　　　　　　　　　　　*(number, street, city or town, state, zip code)*

(3)  Date adopted:  July 28, 2010

　　　　　　　　　　　　　*(month, day, year)*

(4)  Approved by:

　　*(check appropriate box)*

　　☒　the directors without shareholder approval and shareholder approval was not required;

　　OR

　　☐　the board of directors and the shareholders in the manner required by G.L. Chapter 156D and the corporation's articles of organization.

(5)  The following information is required to be included in the articles of organization pursuant to G.L. Chapter 156D, Section 2.02 except that the supplemental information provided for in Article VIII is not required:*

### ARTICLE I

The exact name of the corporation is:

Boston Private Financial Holdings, Inc.

### ARTICLE II

Unless the articles of organization otherwise provide, all corporations formed pursuant to G.L. Chapter 156D have the purpose of engaging in any lawful business. Please specify if you want a more limited purpose:**

To engage in activities permitted to bank holding companies under the Bank Holding Company Act of 1956 (12 U.S.C. 1841 et. seq.), as amended and in force from time to time, and regulations thereunder, including, but not limited to the ownership of substantially all the shares of stock of Boston Private Bank and Trust Company; and

To engage in any business or other activity which may be lawfully carried on by a corporation organized under the Business Corporation Law of the Commonwealth of Massachusetts, whether or not related to those referred to hereinabove.

---

\*　*Changes to Article VIII must be made by filing a statement of change of supplemental information form.*
\*\*　*Professional corporations governed by G.L. Chapter 156A and must specify the professional activities of the corporation.*

---

P.C.

## ARTICLE III

State the total number of shares and par value, * if any, of each class of stock that the corporation is authorized to issue. All corporations must authorize stock. If only one class or series is authorized, it is not necessary to specify any particular designation.

| WITHOUT PAR VALUE | | WITH PAR VALUE | | |
| TYPE | NUMBER OF SHARES | TYPE | NUMBER OF SHARES | PAR VALUE |
| --- | --- | --- | --- | --- |
| Common | N/A | Common | 170,000,000 | $   1.00 |
| Preferred | N/A | Preferred | 2,000,000* | $   1.00 |

* 401 designated as Series B Non-Cumulative Perpetual Contingent Convertible Preferred Stock. 401 designated as Series B-1 Non-Cumulative Perpetual Convertible Preferred Stock.

## ARTICLE IV

Prior to the issuance of shares of any class or series, the articles of organization must set forth the preferences, limitations and relative rights of that class or series. e articles may also limit the type or specify the minimum amount of consideration for which shares of any class or series may be issued. Please set forth the preferences, limitations and relative rights of each class or series and, if desired, the required type and minimum amount of consideration to be received.

See Attachment A, which is attached hereto and incorporated herein by reference.

## ARTICLE V

The restrictions, if any, imposed by the articles or organization upon the transfer of shares of any class or series of stock are:

See Attachment B, which is attached hereto and incorporated herein by reference.

## ARTICLE VI

Other lawful provisions, and if there are no such provisions, this article may be left blank.

See Attachment C, which is attached hereto and incorporated herein by reference.

*Note: The preceding six (6) articles are considered to be permanent and may be changed only by filing appropriate articles of amendment.*

* *G.L. Chapter 156D eliminates the concept of par value, however a corporation may specify par value in Article III. See G.L. Chapter 156D, Section 6.21, and the comments relative thereto.*

**ATTACHMENT A**

ARTICLE 4: CAPITAL STOCK

A description of the different classes and series of the corporation's capital stock and a statement of the designations and the relative rights, preferences and limitations of the shares of each class and series of capital stock are as follows:

SECTION 4.1 *Common Stock.* Except as provided by law or in this Article 4 (or in any supplementary sections hereto or in any certificate of establishment of any series of preferred stock), the holders of the common stock shall exclusively possess all voting power. Each holder of shares of common stock shall be entitled to one (1) vote on all matters for each share held by such holder. There shall be no cumulative voting rights in the election of directors.

In the event of any liquidation, dissolution or winding up of the corporation, the holders of the common stock, and of any class or series of stock entitled to participate in whole or in part therewith as to the distribution of assets, shall be entitled, after payment or provision for payment of all debts and liabilities of the corporation, to receive the remaining assets of the corporation available for distribution, in cash or in kind, in proportion to their holdings.

SECTION 4.2 *Preferred Stock.* Subject to any limitations prescribed by law or these Articles, the Board of Directors is expressly authorized to provide for the issuance of shares of preferred stock in one or more classes or one or more series of stock within any class, and by filing a certificate pursuant to applicable law of the Commonwealth of Massachusetts, to establish or change from time to time the number of shares to be included in each such class or series, and to fix the designation, voting powers, preferences, qualifications, privileges and rights of the shares of each such class or series and any qualifications, limitations and restrictions thereof. The Board of Directors shall have the right to determine or fix by vote or votes providing for the issuance of the shares thereof one or more of the following with respect to each class or series of such preferred stock:

1. The distinctive class or serial designation and the number of shares constituting such class or series;

2. The dividend rates or the amount of dividends to be paid on the shares of such class or series, whether dividends shall be cumulative and, if so, from which date or dates, the payment date or dates for dividends, and the participating and other rights, if any, with respect to dividends;

3. The voting powers, full or limited, if any, of the shares of such class or series;

4. Whether the shares of such class or series shall be redeemable (at the option of the holder or of the corporation or otherwise) and, if so, the price or prices at which, and the terms and conditions on which, such shares may be redeemed;

5. The amount or amounts payable upon the shares of such class or series and any preferences applicable thereto in the event of voluntary or involuntary liquidation, dissolution or winding up of the corporation;

A-1

6. Whether the shares of such class or series shall be entitled to the benefit of a sinking or retirement fund to be applied to the purchase or redemption of such shares, and if so entitled, the amount of such fund and the manner of its application, including the price or prices at which such shares may be redeemed or purchased through the application of such fund;

7. Whether the shares of such class or series shall be convertible into, or exchangeable for, shares of any other class or classes or of any other series of the same or any other class or classes of stock the corporation or the securities of any other entity or any other assets and, if so convertible or exchangeable, the conversion price or prices, or the rate or rates of exchange, and the adjustments thereof, if any, at which such conversion or exchange may be made, and any other terms and conditions of such conversion or exchange;

8. The price or other consideration for which the shares of such class or series shall be issued;

9. Whether the shares of such class or series which are redeemed or converted shall have the status of authorized but unissued shares of preferred stock and whether such shares may be reissued as shares of the same or any other class or series of stock; and

10. Such other powers, preferences, rights, qualifications, limitations and restrictions thereof as the Board of Directors may deem advisable.

Subject to the authority of the Board of Directors as set forth in Paragraph 9 above, any shares of preferred stock shall, upon reacquisition thereof by the corporation, be restored to the status of authorized but unissued preferred stock under this Section 4.2.

Except as specifically provided in these Articles, no vote of the holders of preferred stock or common stock shall be a prerequisite to the designation or issuance of any shares of preferred stock authorized by and complying with the conditions of these Articles, and subject to the authority of the Board of Directors as set forth above, the right to such vote is expressly waived by all present and future holders of the capital stock of the corporation.

SECTION 4.3 *Series B Preferred Stock and Series B-1 Preferred Stock.*

**A:** 401 shares of the authorized preferred stock of the Company are hereby designated "Series B Non-Cumulative Perpetual Contingent Convertible Preferred Stock". Unless otherwise indicated, references to "Sections" or "Subsections" in this Section 4.3A of this Article 4 refer to sections and subsections of 4.3A of this Article 4.

The preferences, limitations, voting powers and relative rights of the Series B Non-Cumulative Perpetual Contingent Convertible Preferred Stock are as follows:

## DESIGNATION

*Section 1. Designation.* There is hereby created out of the authorized and unissued shares of preferred stock of the Company a series of preferred stock designated as the "Series B Non-Cumulative Perpetual Contingent Convertible Preferred Stock" (the "Series B Preferred Stock"). The number of shares constituting such series shall be 401. The par value of the Series B Preferred Stock shall be $1.00 per share, and the liquidation preference of the Series B Preferred Stock shall be $100,000 per share.

A-2

*Section 2. Ranking.* The Series B Preferred Stock will, with respect to dividend rights and rights on liquidation, winding-up and dissolution, rank (i) on a parity with the Series A Preferred Stock and with each other class or series of preferred stock established after the Effective Date by the Company the terms of which expressly provide that such class or series will rank on a parity with the Series B Preferred Stock as to dividend rights and rights on liquidation, winding-up and dissolution of the Company (collectively referred to as "Parity Securities") and (ii) senior to the common stock, par value $1.00 per share, of the Company (the "Common Stock") and each other class or series of capital stock of the Company outstanding or established after the Effective Date by the Company the terms of which do not expressly provide that it ranks on a parity with or senior to the Series B Preferred Stock as to dividend rights and rights on liquidation, winding-up and dissolution of the Company (collectively referred to as "Junior Securities"). The Company has the right to authorize and/or issue additional shares or classes or series of Junior Securities or Parity Securities without the consent of the Holders.

*Section 3. Definitions.* Unless the context or use indicates another meaning or intent, the following terms shall have the following meanings, whether used in the singular or the plural:

(a) "Affiliate" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with, such other Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") when used with respect to any Person, means the possession, directly or indirectly, of the power to cause the direction of management or policies of such Person, whether through the ownership of voting securities by contract or otherwise.

(b) "Agent Members" has the meaning set forth in Section 18(c).

(c) "Articles of Amendment" means the Articles of Amendment of the Company dated August 8, 2008.

(d) "Articles of Organization" means the Restated Articles of Organization of the Company, as amended.

(e) "As-Converted Dividend" means, with respect to any Section 4(c) Dividend Period, the product of (i) the pro forma per share quarterly Common Stock dividend derived by (A) annualizing the last dividend declared during such Section 4(c) Dividend Period on the Common Stock and (B) dividing such annualized dividend by four and (ii) the number of shares into which a share of Series B Preferred Stock would then be convertible (assuming the Stockholder Approvals have been obtained); *provided, however,* that for any Section 4(c) Dividend Period during which no dividend on the Common Stock has been declared, the As-Converted Dividend shall be deemed to be $0.00.

(f) "BHC Act" has the meaning set forth in Section 8(b).

A-3

(g) "Board of Directors" means the board of directors of the Company or any committee thereof duly authorized to act on behalf of such board of directors.

(h) "Business Day" means any day other than a Saturday, Sunday or any other day on which banks in New York City, New York or Boston, Massachusetts are generally required or authorized by law to be closed.

(i) "CIBC Act" has the meaning set forth in Section 8(b).

(j) "Closing Price" of the Common Stock on any date of determination means the closing sale price or, if no closing sale price is reported, the last reported sale price of the shares of the Common Stock on The NASDAQ Global Select Market on such date. If the Common Stock is not traded on The NASDAQ Global Select Market on any date of determination, the Closing Price of the Common Stock on such date of determination means the closing sale price as reported in the composite transactions for the principal U.S. national or regional securities exchange on which the Common Stock is so listed or quoted, or, if no closing sale price is reported, the last reported sale price on the principal U.S. national or regional securities exchange on which the Common Stock is so listed or quoted, or if the Common Stock is not so listed or quoted on a U.S. national or regional securities exchange, the last quoted bid price for the Common Stock in the over-the-counter market as reported by Pink Sheets LLC or similar organization, or, if that bid price is not available, the market price of the Common Stock on that date as determined by a nationally recognized independent investment banking firm retained by the Company for this purpose.

For purposes of these Articles of Amendment, all references herein to the "Closing Price" and "last reported sale price" of the Common Stock on The NASDAQ Global Select Market shall be such closing sale price and last reported sale price as reflected on the website of The NASDAQ Global Select Market (http://www.nasdaq.com) and as reported by Bloomberg Professional Service; *provided* that in the event that there is a discrepancy between the closing sale price or last reported sale price as reflected on the website of The NASDAQ Global Select Market and as reported by Bloomberg Professional Service, the closing sale price and last reported sale price on the website of The NASDAQ Global Select Market shall govern.

(k) "Common Stock" has the meaning set forth in Section 2.

(l) "Company" means Boston Private Financial Holdings, Inc., a corporation organized and existing under the laws of the Commonwealth of Massachusetts.

(m) "Conversion Agent" means the Transfer Agent acting in its capacity as conversion agent for the Series B Preferred Stock, and its successors and assigns.

(n) "Conversion Date" has the meaning set forth in Section 9(e)(i).

(o) "Conversion Price" means for each share of Series B Preferred Stock, $5.52; *provided* that the foregoing shall be subject to adjustment or limitation as set forth herein.

A-4

(p) "Current Market Price" means, on any date, the average of the daily Closing Price per share of the Common Stock or other securities on each of the five consecutive Trading Days preceding the earlier of the day before the date of the issuance, dividend or distribution in question and the day before the Ex-Date with respect to the issuance or distribution, giving rise to an adjustment to the Conversion Price pursuant to Section 10.

(q) "Depositary" means DTC or its nominee or any successor depositary appointed by the Company.

(r) "DTC" means The Depository Trust Company.

(s) "Effective Date" means the date on which shares of the Series B Preferred Stock are first issued.

(t) "Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

(u) "Exchange Property" has the meaning set forth in Section 11(a).

(v) "Ex-Date" when used with respect to any issuance, dividend or distribution giving rise to an adjustment to the Conversion Price pursuant to Section 10, means the first date on which the Common Stock or other securities trade without the right to receive the issuance, dividend or distribution.

(w) "Global Preferred Stock" has the meaning set forth in Section 18(a).

(x) "Holder" means the Person in whose name the shares of the Series B Preferred Stock are registered, which may be treated by the Company, Transfer Agent and Conversion Agent as the absolute owner of the shares of Series B Preferred Stock for the purpose of making payment and settling the related conversions and for all other purposes.

(y) "Investment Agreement" means the Investment Agreement, dated as of July 22, 2008, as may be amended from time to time, between the Company and Investor.

(z) "Investor" means BP Holdco, L.P.

(aa) "Junior Securities" has the meaning set forth in Section 2.

(bb) "Liquidation Preference" means, as to the Series B Preferred Stock, $100,000 per share (as adjusted for any split, subdivision, combination, consolidation, recapitalization or similar event with respect to the Series B Preferred Stock).

(cc) "Officer" means the Chief Executive Officer, the Chief Operating Officer, any Senior Vice President, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Secretary or any Assistant Secretary of the Company.

A-5

(dd) "Parity Securities" has the meaning set forth in Section 2.

(ee) "Person" means a legal person, including any individual, corporation, estate, partnership, joint venture, association, joint-stock company, limited liability company or trust.

(ff) "Record Date" has the meaning set forth in Section 4(d).

(gg) "Reorganization Event" has the meaning set forth in Section 11(a).

(hh) "Section 4(c) Dividend Payment Date" has the meaning set forth in Section 4(c).

(ii) "Section 4(c) Dividend Period" has the meaning set forth in Section 4(c).

(jj) "Securities" has the meaning set forth in the Investment Agreement.

(kk) "Securities Act" means the Securities Act of 1933, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

(ll) "Series A Preferred Stock" means the shares of the Company's Series A Non-Cumulative Perpetual Convertible Preferred Stock.

(mm) "Series B Preferred Stock" has the meaning set forth in Section 1.

(nn) "Special Dividend" has the meaning set forth in Section 4(c).

(oo) "Special Dividend Rate" means (i) from and after September 30, 2008 to but not including March 31, 2009, 14%, (ii) from and after March 31, 2009 to but not including September 30, 2009, 15.5% and (iii) from and after September 30, 2009, 20%.

(pp) "Stockholder Approvals" means all stockholder approvals necessary to (i) approve the conversion of the Series B Preferred Stock into Common Stock and the issuance of any shares of Common Stock which may be issued pursuant to the terms of these Articles of Amendment for purposes of Rule 4350(i) of the NASDAQ Marketplace Rules and (ii) amend the Articles of Organization to increase the number of shares of Common Stock to at least such number as shall be sufficient to permit the full conversion of the Series B Preferred Stock into Common Stock. For the avoidance of doubt, the Stockholder Approvals shall be deemed to be obtained for the purposes of these Articles of Amendment only if all of the foregoing approvals shall have been obtained.

(qq) "Trading Day" means a day on which the shares of Common Stock:

    (i)    are not suspended from trading on any national or regional securities exchange or association or over-the-counter market at the close of business; and

A-6

(ii)  have traded at least once on the national or regional securities exchange or association or over-the-counter market that is the primary market for the trading of the Common Stock.

(rr) "Transfer Agent" means Computershare acting as transfer agent, registrar and paying agent for the Series B Preferred Stock, and its successors and assigns.

(ss) "Voting Securities" has the meaning set forth in the BHC Act and any rules or regulations promulgated thereunder.

*Section 4.*  Dividends.

(a) From and after the Effective Date, the Holders shall be entitled to receive, when, as and if declared by the Board of Directors, out of funds legally available therefor, non-cumulative cash dividends in the amount determined as set forth in Sections 4(b) and 4(c), and shall be entitled to share in the distributions referred to in Section 4(j).

(b) If the Board of Directors declares and pays a cash dividend in respect of any shares of Common Stock, then the Board of Directors shall declare and pay to the Holders a cash dividend in an amount per share of Series B Preferred Stock equal to the product of (i) the per share dividend declared and paid in respect of each share of Common Stock and (ii) the number of shares of Common Stock into which such share of Series B Preferred Stock is then convertible. Dividends payable pursuant to this Section 4(b) shall be payable on the same date that dividends are payable to holders of shares of Common Stock, and no dividends shall be payable to holders of shares of Common Stock unless the full dividends contemplated by this Section 4(b) are paid at the same time in respect of the Series B Preferred Stock.

(c) In the event that the Stockholder Approvals shall not have been obtained by the Record Date with respect to the Section 4(c) Dividend Period ending on December 30, 2008, commencing on December 31, 2008, in lieu of the dividends provided for in Section 4(b), dividends shall be payable quarterly in arrears on March 31, June 30, September 30 and December 31 of each year (each, a "Section 4(c) Dividend Payment Date") or, if any such day is not a Business Day, the next Business Day. Dividends payable pursuant to this Section 4(c), if, when and as declared by the Board of Directors, will be, for each outstanding share of Series B Preferred Stock, payable at an annual rate on the Liquidation Preference equal to the Special Dividend Rate (such dividend, the "Special Dividend"); *provided* that, in the event that the As-Converted Dividend for any Section 4(c) Dividend Period is greater than the Special Dividend, each outstanding share of Series B Preferred Stock shall be entitled to receive, if, when and as declared by the Board of Directors, the As-Converted Dividend rather than the Special Dividend. Dividends payable pursuant to this Section 4(c) will be computed on the basis of a 360-day year of twelve 30-day months and, for any Section 4(c) Dividend Period greater or less than a full Section 4(c) Dividend Period, will be computed on the basis of the actual number of days elapsed in the period divided by 360. No interest or sum of money in lieu of interest will be paid on any dividend payment on the Series B Preferred Stock paid later than the scheduled Section 4(c) Dividend Payment Date. As used herein, "Section 4(c) Dividend Period" means (i) the period from and including September 30, 2008 to and including December 30, 2008 and (ii) each period thereafter from and including a Section 4(c) Dividend Payment Date and to and including the day immediately preceding the following Section 4(c) Dividend Payment Date.

A-7

(d) Each dividend will be payable to Holders of record as they appear in the records of the Company on the applicable record date (each, a "Record Date"), which (i) with respect to dividends payable pursuant to Section 4(b), shall be the same as the record date for the payment of the corresponding dividend payable in respect of the Common Stock and (ii) with respect to dividends payable pursuant to Section 4(c), shall be on the 15th day of the month in which the relevant Section 4(c) Dividend Payment Date occurs or, if such date is not a Business Day, the next day that is a Business Day.

(e) Dividends on the Series B Preferred Stock are non-cumulative. If the Board of Directors does not declare a dividend on the Series B Preferred Stock for a Section 4(c) Dividend Period prior to the related Section 4(c) Dividend Payment Date, the Holders will have no right to receive any dividend for the Section 4(c) Dividend Period, and the Company will have no obligation to pay a dividend for that Section 4(c) Dividend Period, whether or not dividends are declared and paid for any future Section 4(c) Dividend Period with respect to the Series B Preferred Stock or the Common Stock or any other class or series of the Company's preferred stock.

(f) The Company shall not declare or pay or set apart for payment dividends on any Parity Securities unless the Company has declared and paid, or set apart for payment, dividends on the Series B Preferred Stock for the most recent Section 4(c) Dividend Period ending on or before the dividend payment date of such Parity Securities, ratably with dividends on such Parity Securities, in proportion to the respective amounts of (A) the full amount of dividends payable on the Series B Preferred Stock for such Section 4(c) Dividend Period and (B) the accumulated and unpaid dividends, or the full amount of dividends payable for the most recent dividend period in the case of non-cumulative Parity Securities, on such Parity Securities.

(g) If full quarterly dividends payable pursuant to Section 4(c) on all outstanding shares of the Series B Preferred Stock for any Section 4(c) Dividend Period have not been declared and paid, or declared and funds set aside therefor, the Company shall not declare or pay dividends with respect to, or redeem, purchase or acquire any of, its Junior Securities during the next succeeding Section 4(c) Dividend Period, other than (i) redemptions, purchases or other acquisitions of Junior Securities in connection with any benefit plan or other similar arrangement with or for the benefit of any one or more employees, officers, directors or consultants or in connection with a dividend reinvestment or shareholder stock purchase plan, (ii) any declaration of a dividend in connection with any shareholders' rights plan, or the issuance of rights, stock or other property under any shareholders' rights plan, including with respect to any successor shareholders' rights plan, or the redemption or repurchase of rights pursuant thereto and (iii) conversions into or exchanges for other Junior Securities and cash solely in lieu of fractional shares of the Junior Securities.

(h) Payments of cash for dividends will be delivered to the Holder at their addresses listed in the stock record books maintained by the Transfer Agent or, in the case of Global Preferred Stock, through a book-entry transfer through DTC or any successor Depositary.

A-8

(i) If a Conversion Date on which a Holder elects to convert Series B Preferred Stock is prior to the Record Date for any declared dividend for the Section 4(c) Dividend Period, such Holder will not have the right to receive any declared dividend for that Section 4(c) Dividend Period. If a Conversion Date on which a Holder elects to convert Series B Preferred Stock is after the Record Date for any declared dividend and prior to the Section 4(c) Dividend Payment Date, such Holder shall receive that dividend on the relevant Section 4(c) Dividend Payment Date if such Holder was the Holder of record on the Record Date for that dividend. Notwithstanding the preceding sentence, if the Conversion Date on which a Holder elects to convert its Series B Preferred Stock pursuant to Section 8 is after the Record Date and prior to the Section 4(c) Dividend Payment Date, whether or not such Holder was the Holder of record on the Record Date, the Holder shall pay to the Conversion Agent upon conversion of the shares of Series B Preferred Stock an amount in cash equal to the full dividend actually paid on the Section 4(c) Dividend Payment Date for the then-current Section 4(c) Dividend Period on the shares being converted.

(j) If the Company makes a distribution to all holders of shares of Common Stock consisting of capital stock of any class or series, or similar equity interests of, or relating to, a subsidiary or other business unit, the Holders of Series B Preferred Stock shall be entitled to participate in such distribution. The number of shares of such capital stock or equity interests to which each Holder of Series B Preferred Stock shall be entitled shall be the number to which such Holder would have been entitled had such Holder converted such Holder's shares of Series B Preferred Stock immediately prior to the record date for such distribution.

*Section 5. Liquidation.*

(a) In the event the Company voluntarily or involuntarily liquidates, dissolves or winds up, the Holders at the time shall be entitled to receive liquidating distributions in the amount of the Liquidation Preference per share of Series B Preferred Stock, plus an amount equal to any declared but unpaid dividends thereon to and including the date of such liquidation, out of assets legally available for distribution to the Company's shareholders, before any distribution of assets is made to the holders of the Common Stock or any other Junior Securities. After payment of the full amount of such liquidating distributions, the Holders shall be entitled to participate in all further distributions of the remaining assets of the Company as if each share of Series B Preferred Stock had been converted into Common Stock in accordance with the terms hereof immediately prior to such liquidating distributions.

(b) In the event the assets of the Company available for distribution to shareholders upon any liquidation, dissolution or winding-up of the affairs of the Company, whether voluntary or involuntary, shall be insufficient to pay in full the amounts payable with respect to all outstanding shares of the Series B Preferred Stock and the corresponding amounts payable on any Parity Securities, the Holders and the holders of such Parity Securities shall share ratably in any distribution of assets of the Company in proportion to the full respective liquidating distributions to which they would otherwise be respectively entitled.

(c) The Company's consolidation or merger with or into any other entity, the consolidation or merger of any other entity with or into the Company, or the sale of all or substantially all of the Company's property or business will not constitute its liquidation, dissolution or winding up.

A-9

*Section 6. Maturity.* The Series B Preferred Stock shall be perpetual unless converted in accordance with these Articles of Amendment.

*Section 7. Redemptions.*

(a) The Series B Preferred Stock may not be redeemed by the Company (i) prior to the third anniversary of the Effective Date or (ii) on any date after the Stockholder Approvals shall have been obtained. If the Stockholder Approvals shall not have been obtained by the third anniversary of the Effective Date, then at any time after such date and prior to the receipt of the Stockholder Approvals, the Company, at its option, may redeem, in whole at any time or in part from time to time (provided, that the Company may not exercise its right to redeem the Series B Preferred Stock at any time after it has entered into an agreement to effect a Reorganization Event and prior to the consummation thereof or a termination of such agreement prior to the consummation thereof), the shares of Series B Preferred Stock at the time outstanding, upon notice given as provided in Section 7(c) below, at a redemption price per share equal to the greater of (i) 125% of the Liquidation Preference and (ii) the average of the Closing Prices of the Common Stock for the ten consecutive Trading Days ending on the sixth Trading Day prior to the date of redemption multiplied by the number of shares of Common Stock into which one share of Series B Preferred Stock would be convertible on such date, together (except as otherwise provided herein) with (x) an amount equal to any dividends that have been declared but not paid prior to the redemption date and (y) an amount equal to any dividends referenced in Section 4(b) and Section 4(c) (whether or not scheduled) between the Effective Date and the redemption date that were not declared and paid prior to the redemption date. The redemption price for any shares of Series B Preferred Stock shall be payable in cash on the redemption date to the Holder upon surrender of the certificate(s) evidencing such shares to the Company or its agent. Any declared but unpaid dividends payable on a redemption date that occurs subsequent to a Record Date shall not be paid to the holder entitled to receive the redemption price on the redemption date, but rather shall be paid to the holder of record of the redeemed shares on such Record Date.

(b) The Series B Preferred Stock will not be subject to any mandatory redemption, sinking fund or other similar provisions. Holders will have no right to require redemption of any shares of Series B Preferred Stock.

(c) Notice of every redemption of shares of Series B Preferred Stock shall be given by first class mail, postage prepaid, addressed to the Holders of the shares to be redeemed at their respective last addresses appearing on the books of the Company. Such mailing shall be at least 30 days and not more than 60 days before the date fixed for redemption; *provided, however,* that failure to give such notice by mail, or any defect in such notice or in the mailing thereof, to any Holder of shares of Series B Preferred Stock designated for redemption shall not affect the validity of the proceedings for the redemption of any other shares of Series B Preferred Stock to be so redeemed except as to the Holder to whom the Company has failed to give such notice or except as to the Holder to whom notice was defective. Notwithstanding the foregoing, if the Series B Preferred Stock or any depositary shares representing interests in the Series B

A-10

Preferred Stock are issued in book-entry form through DTC or any other similar facility, notice of redemption may be given to the Holders at such time and in any manner permitted by such facility. Each such notice given to a Holder shall state: (1) the redemption date; (2) the number of shares of Series B Preferred Stock to be redeemed and, if less than all the shares held by such Holder are to be redeemed, the number of such shares to be redeemed from such Holder; (3) the redemption price (or manner of determination of the redemption price); and (4) the place or places where certificates for such shares are to be surrendered for payment of the redemption price.

(d) In case of any redemption of only part of the shares of Series B Preferred Stock at the time outstanding, the shares to be redeemed shall be selected *pro rata.* If fewer than all the shares represented by any certificate are redeemed, a new certificate shall be issued representing the unredeemed shares without charge to the Holder thereof.

(e) If notice of redemption has been duly given as provided in Section 7(c) and if on or before the redemption date specified in the notice all funds necessary for the redemption have been set aside by the Company, separate and apart from its other funds, in trust for the *pro rata* benefit of the Holders of the shares called for redemption, so as to be and continue to be available therefor, then, notwithstanding that any certificate for any share so called for redemption has not been surrendered for cancellation, on and after the redemption date unless the Company defaults in the payment of the redemption price, in which case such rights shall continue until the redemption price is paid, dividends shall cease to accrue on all shares so called for redemption, all shares so called for redemption shall no longer be deemed outstanding and all rights with respect to such shares shall forthwith on such redemption date cease and terminate, except only the right of the Holders thereof to receive the amount payable on such redemption, without interest. Any funds unclaimed at the end of two years from the redemption date shall, to the extent permitted by law, be released to the Company, after which time the Holders of the shares so called for redemption shall look only to the Company for payment of the redemption price of such shares. Shares of outstanding Series B Preferred Stock that are redeemed, purchased or otherwise acquired by the Company, or converted into another series of preferred stock, shall be cancelled and shall revert to authorized but unissued shares of preferred stock undesignated as to series.

*Section 8. Right to Convert.*

(a) At any time on or after the Business Day following the date on which the Stockholder Approvals shall have been obtained, each Holder shall have the right, at such Holder's option (but subject to the conversion procedures of Section 9 and the limitations on ownership set forth in Section 8(b)), to convert all or any portion of such Holder's Series B Preferred Stock at the Conversion Price, with cash being payable in lieu of fractional shares in accordance with Section 13 hereof.

(b) Notwithstanding anything to the contrary contained in these Articles of Amendment, each Holder shall be entitled to convert shares of Series B Preferred Stock pursuant to this Section 8, or receive shares of Common Stock upon any such conversion, to the extent (but only to the extent) that such conversion or receipt would not cause or result in such Holder and its Affiliates, collectively, being deemed to own, control or have the power to vote, for

A-11

purposes of the Bank Holding Company Act of 1956, as amended (the "BHC Act"), or the Change in Bank Control Act of 1978, as amended (the "CIBC Act"), and any rules and regulations promulgated thereunder, 10% or more of any class of Voting Securities of the Company outstanding at such time (excluding for purposes of this calculation any reduction in the percentage of Voting Securities such Holder and its Affiliates so owns, controls or has the power to vote resulting from transfers by Investor and its Affiliates of Securities purchased by Investor pursuant to the Investment Agreement; it being understood, for the avoidance of doubt, that no Security shall be included in any such percentage calculation to the extent that it cannot by its terms be converted into or exercised for Voting Securities by such Holder or its Affiliates at the time of such measurement or transfer).

Section 9. *Conversion Procedures.*

(a) Effective immediately prior to the close of business on any applicable Conversion Date, dividends shall no longer be declared on any such converted shares of Series B Preferred Stock and such shares of Series B Preferred Stock shall cease to be outstanding, in each case, subject to the right of Holders to receive any declared and unpaid dividends on such shares and any other payments to which they are otherwise entitled pursuant to Section 8 or this Section 9, as applicable.

(b) Prior to the close of business on any applicable Conversion Date, shares of Common Stock issuable upon conversion of, or other securities issuable upon conversion of, any shares of Series B Preferred Stock shall not be deemed outstanding for any purpose, and the Holders shall have no rights with respect to the Common Stock or other securities issuable upon conversion (including voting rights, rights to respond to tender offers for the Common Stock or other securities issuable upon conversion and rights to receive any dividends or other distributions on the Common Stock or other securities issuable upon conversion) by virtue of holding shares of Series B Preferred Stock.

(c) Shares of Series B Preferred Stock duly converted in accordance with these Articles of Amendment, or otherwise reacquired by the Company, will resume the status of authorized and unissued preferred stock, undesignated as to series and available for future issuance.

(d) The Person or Persons entitled to receive the Common Stock and/or cash, securities or other property issuable upon conversion of Series B Preferred Stock shall be treated for all purposes as the record holder(s) of such shares of Common Stock and/or securities and the owners of such cash or other property as of the close of business on the applicable Conversion Date. In the event that the Holders shall not by written notice designate the name in which shares of Common Stock and/or cash, securities or other property (including payments of cash in lieu of fractional shares) to be issued or paid upon conversion of shares of Series B Preferred Stock should be registered or paid or the manner in which such shares should be delivered, the Company shall be entitled to register and deliver such shares, and make such payment, in the name of the Holders and in the manner shown on the records of the Company or, in the case of Global Preferred Stock, through book-entry transfer through the Depositary.

A-12

(e) Conversion into shares of Common Stock will occur on any applicable Conversion Date as follows:

(i)    On the date of any conversion at the option of a Holder pursuant to Section 8, if such Holder's interest is in certificated form, such Holder must do each of the following in order to convert:

(A) complete and manually sign the conversion notice provided by the Conversion Agent, or a facsimile of the conversion notice, and deliver this irrevocable notice to the Conversion Agent;

(B) surrender the shares of Series B Preferred Stock to the Conversion Agent;

(C) if required, furnish appropriate endorsements and transfer documents;

(D) if required, pay all transfer or similar taxes; and

(E) if required pursuant to Section 4(i), pay funds equal to any declared and unpaid dividend payable on the next Section 4(c) Dividend Payment Date to which such Holder is entitled

If a Holder's interest is a beneficial interest in Global Preferred Stock, in order to convert, a Holder must comply with paragraphs (C) through (E) listed above and comply with the Depositary's procedures for converting a beneficial interest in a global security.

The date on which a Holder complies with the procedures in this clause (i) is the "Conversion Date".

(ii)    The Conversion Agent shall, on a Holder's behalf, convert the Series B Preferred Stock into shares of Common Stock, in accordance with the terms of the notice delivered by such Holder described in clause (i) above.

*Section 10. Anti-Dilution Adjustments.*

(a) The Conversion Price shall be subject to the following adjustments; *provided, however,* that notwithstanding anything to the contrary contained in these Articles of Amendment, any adjustment to the Conversion Price to be made pursuant to these Articles of Amendment shall be made to the extent (but only to the extent) that such adjustment would not cause or result in any Holder and its Affiliates, collectively, being deemed to own, control or have the power to vote, for purposes of the BHC Act or the CIBC Act and any rules and regulations promulgated thereunder, Voting Securities which (assuming, for this purpose only, full conversion and/or exercise of all such securities) would represent 25% or more of any class of Voting Securities of the Company outstanding at such time (excluding for purposes of this calculation any reduction in the percentage of Voting Securities such Holder and its Affiliates so owns, controls or has the power to vote resulting from transfers by Investor and its Affiliates of

A-13

Securities purchased by Investor pursuant to the Investment Agreement); *provided, further, however,* that any adjustment (or portion thereof) prohibited pursuant to this Section 10(a) shall be postponed and implemented on the first date on which such implementation would not result in the condition described above in this Section 10(a):

(i) <u>Stock Dividends and Distributions</u>. If the Company pays dividends or other distributions on the Common Stock in shares of Common Stock, then the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m., New York City time on the Trading Day immediately prior to the Ex-Date for such dividend or distribution by the following fraction:

$$\frac{OS_0}{OS^1}$$

Where,

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to Ex-Date for such dividend or distribution.

$OS^1$ = the sum of the number of shares of Common Stock outstanding immediately prior to the Ex-Date for such dividend or distribution plus the total number of shares of Common Stock constituting such dividend or distribution.

The adjustment pursuant to this clause (i) shall become effective at 9:00 a.m., New York City time on the Ex-Date for such dividend or distribution. For the purposes of this clause (i), the number of shares of Common Stock at the time outstanding shall not include shares held in treasury by the Company. If any dividend or distribution described in this clause (i) is declared but not so paid or made, the Conversion Price shall be readjusted, effective as of the date the Board of Directors publicly announces its decision not to make such dividend or distribution, to such Conversion Price that would be in effect if such dividend or distribution had not been declared.

(ii) <u>Subdivisions, Splits and Combination of the Common Stock</u>. If the Company subdivides, splits or combines the shares of Common Stock, then the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m., New York City time on the Trading Day immediately prior to the effective date of such share subdivision, split or combination by the following fraction:

$$\frac{OS_0}{OS^1}$$

A-14

Where,

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the effective date of such share subdivision, split or combination.

$OS^1$ = the number of shares of Common Stock outstanding immediately after the opening of business on the effective date of such share subdivision, split or combination.

The adjustment pursuant to this clause (ii) shall become effective at 9:00 a.m., New York City time on the effective date of such subdivision, split or combination. For the purposes of this clause (ii), the number of shares of Common Stock at the time outstanding shall not include shares held in treasury by the Company. If any subdivision, split or combination described in this clause (ii) is announced but the outstanding shares of Common Stock are not subdivided, split or combined, the Conversion Price shall be readjusted, effective as of the date the Board of Directors publicly announces its decision not to subdivide, split or combine the outstanding shares of Common Stock, to such Conversion Price that would be in effect if such subdivision, split or combination had not been announced.

(iii) <u>Issuance of Stock Purchase Rights</u>. If the Company issues to all holders of the shares of Common Stock rights or warrants (other than rights or warrants issued pursuant to a dividend reinvestment plan or share purchase plan or other similar plans) entitling them, for a period of up to 45 days from the date of issuance of such rights or warrants, to subscribe for or purchase the shares of Common Stock at less than the Current Market Price on the date fixed for the determination of stockholders entitled to receive such rights or warrants, then the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m., New York City time on the Trading Day immediately prior to the Ex-Date for such issuance by the following fraction:

$$\frac{OS_0 + Y}{OS_0 + X}$$

Where,

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the Ex-Date for such distribution.

$X$ = the total number of shares of Common Stock issuable pursuant to such rights or warrants.

$Y$ = the number of shares of Common Stock equal to the aggregate price payable to exercise such rights or warrants divided by the Current Market Price.

A-15

Any adjustment pursuant to this clause (iii) shall become effective immediately prior to 9:00 a.m., New York City time, on the Ex-Date for such issuance. For the purposes of this clause (iii), the number of shares of Common Stock at the time outstanding shall not include shares held in treasury by the Company. The Company shall not issue any such rights or warrants in respect of shares of the Common Stock held in treasury by the Company. In the event that such rights or warrants described in this clause (iii) are not so issued, the Conversion Price shall be readjusted, effective as of the date the Board of Directors publicly announces its decision not to issue such rights or warrants, to the Conversion Price that would then be in effect if such issuance had not been declared. To the extent that such rights or warrants are not exercised prior to their expiration or shares of Common Stock are otherwise not delivered pursuant to such rights or warrants upon the exercise of such rights or warrants, the Conversion Price shall be readjusted to such Conversion Price that would then be in effect had the adjustment made upon the issuance of such rights or warrants been made on the basis of the delivery of only the number of shares of Common Stock actually delivered. In determining the aggregate offering price payable for such shares of Common Stock, there shall be taken into account any consideration received for such rights or warrants and the value of such consideration (if other than cash, to be reasonably determined by the Board of Directors).

(iv) <u>Debt or Asset Distributions</u>. If the Company distributes to all holders of shares of Common Stock evidences of indebtedness, shares of capital stock, securities, cash or other assets (excluding any dividend or distribution referred to in clause (i) above, any rights or warrants referred to in clause (iii) above, any dividend or distribution paid exclusively in cash, any consideration payable in connection with a tender or exchange offer made by the Company or any of its subsidiaries, and any dividend of shares of capital stock of any class or series, or similar equity interests, of or relating to a subsidiary or other business unit in the case of certain spinoff transactions as described below), then the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m., New York City time on the Trading Day immediately prior to the Ex-Date for such distribution by the following fraction:

$$\frac{SP_0 - FMV}{SP_0}$$

Where,

$SP_0$ = the Current Market Price per share of Common Stock on such date.

FMV = the fair market value of the portion of the distribution applicable to one share of Common Stock on such date as reasonably determined by the Board of Directors.

A-16

In a "spin-off", where the Company makes a distribution to all holders of shares of Common Stock consisting of capital stock of any class or series, or similar equity interests of, or relating to, a subsidiary or other business unit, the Conversion Price will be adjusted on the 15th Trading Day after the effective date of the distribution by multiplying such Conversion Price in effect immediately prior to such 15th Trading Day by the following fraction:

$$\frac{MP_0}{MP_0 + MP_s}$$

Where,

$MP_0$ = the average of the Closing Prices of the Common Stock over the first 10 Trading Days commencing on and including the fifth Trading Day following the effective date of such distribution.

$MP_s$ = the average of the Closing Prices of the capital stock or equity interests representing the portion of the distribution applicable to one share of Common Stock over the first 10 Trading Days commencing on and including the fifth Trading Day following the effective date of such distribution, or, if not traded on a national or regional securities exchange or over-the-counter market, the fair market value of the capital stock or equity interests representing the portion of the distribution applicable to one share of Common Stock on such date as reasonably determined by the Board of Directors.

Any adjustment pursuant to this clause (iv) shall become effective immediately prior to 9:00 a.m., New York City time, on the Ex-Date for such distribution. In the event that such distribution described in this clause (iv) is not so paid or made, the Conversion Price shall be readjusted, effective as of the date the Board of Directors publicly announces its decision not to pay or make such dividend or distribution, to the Conversion Price that would then be in effect if such dividend or distribution had not been declared.

(v) Cash Distributions. If the Company makes a distribution consisting exclusively of cash to all holders of the Common Stock, excluding (a) any cash dividend on the Common Stock to the extent a corresponding cash dividend is paid on the Series B Preferred Stock pursuant to Section 4(b), (b) any cash that is distributed in a Reorganization Event or as part of a "spin-off" referred to in clause (iv) above, (c) any dividend or distribution in connection with the Company's liquidation, dissolution or winding up, and (d) any consideration payable in connection with a tender or exchange offer made by the Company or any of its subsidiaries, then in each event, the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m.,

A-17

New York City time on the Trading Day immediately prior to the Ex-Date for such distribution by the following fraction:

$$\frac{SP_0 - DIV}{SP_0}$$

Where,

$SP_0$ = the Closing Price per share of Common Stock on the Trading Day immediately preceding the Ex-Date.

DIV = the amount per share of Common Stock of the dividend or distribution.

Any adjustment pursuant to this clause (v) shall become effective immediately prior to the 9:00 a.m., New York City time, on the Ex-Date for such dividend or distribution. In the event that any distribution described in this clause (v) is not so made, the Conversion Price shall be readjusted, effective as of the date the Board of Directors publicly announces its decision not to pay such distribution, to the Conversion Price which would then be in effect if such distribution had not been declared.

(vi) <u>Self Tender Offers and Exchange Offers</u>. If the Company or any of its subsidiaries successfully completes a tender or exchange offer for the Common Stock where the cash and the value of any other consideration included in the payment per share of the Common Stock exceeds the Closing Price per share of the Common Stock on the Trading Day immediately succeeding the expiration of the tender or exchange offer, then the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m., New York City time on the expiration date of the offer by the following fraction:

$$\frac{OS_0 \ x \ SP_0}{AC + (SP_0 \ x \ OS^1)}$$

Where,

$SP_0$ = the Closing Price per share of Common Stock on the Trading Day immediately succeeding the expiration of the tender or exchange offer.

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the expiration of the tender or exchange offer, including any shares validly tendered and not withdrawn.

$OS^1$ = the number of shares of Common Stock outstanding immediately after the expiration of the tender or exchange offer.

A-18

AC = the aggregate cash and fair market value of the other consideration payable in the tender or exchange offer, as reasonably determined by the Board of Directors.

Any adjustment made pursuant to this clause (vi) shall become effective immediately prior to 9:00 a.m., New York City time, on the Trading Day immediately following the expiration of the tender or exchange offer. In the event that the Company or one of its subsidiaries is obligated to purchase shares of Common Stock pursuant to any such tender offer or exchange offer, but the Company or such subsidiary is permanently prevented by applicable law from effecting any such purchases, or all such purchases are rescinded, then the Conversion Price shall be readjusted to be such Conversion Price that would then be in effect if such tender offer or exchange offer had not been made.

(vi) <u>Rights Plans</u>. To the extent that the Company has a rights plan in effect with respect to the Common Stock on any Conversion Date, upon conversion of any shares of the Series B Preferred Stock, the Holders will receive, in addition to the shares of Common Stock, the rights under the rights plan, unless, prior to such Conversion Date, the rights have separated from the shares of Common Stock, in which case the Conversion Price will be adjusted at the time of separation as if the Company had made a distribution to all holders of the Common Stock as described in clause (iv) above, subject to readjustment in the event of the expiration, termination or redemption of such rights.

(b) Subject to the limitations set forth in the provisos to the first paragraph of Section 10(a), the Company may make such decreases in the Conversion Price, in addition to any other decreases required by this Section 10, as the Board of Directors deems advisable to avoid or diminish any income tax to holders of the Common Stock resulting from any dividend or distribution of shares of Common Stock (or issuance of rights or warrants to acquire shares of Common Stock) or from any event treated as such for income tax purposes or for any other reason.

(c)　　(i) All adjustments to the Conversion Price shall be calculated to the nearest 1/10th of a cent. No adjustment in the Conversion Price shall be required if such adjustment would be less than $0.01; *provided* that any adjustments which by reason of this subparagraph are not required to be made shall be carried forward and taken into account in any subsequent adjustment; *provided further* that on any Conversion Date adjustments to the Conversion Price will be made with respect to any such adjustment carried forward and which has not been taken into account before such date.

(ii) No adjustment to the Conversion Price shall be made if the Holders may participate in the transaction that would otherwise give rise to an adjustment, as a result of holding the Series B Preferred Stock

A-19

(including without limitation pursuant to Section 4(b) hereof), without having to convert the Series B Preferred Stock, as if they held the full number of shares of Common Stock into which a share of the Series B Preferred Stock may then be converted.

(d) Whenever the Conversion Price is to be adjusted in accordance with Section 10(a) or Section 10(b), the Company shall: (i) compute the Conversion Price in accordance with Section 10(a) or Section 10(b), taking into account the $0.01 threshold set forth in Section 10(c) hereof; (ii) as soon as practicable following the occurrence of an event that requires an adjustment to the Conversion Price pursuant to Section 10(a) or Section 10(b), taking into account the one percent threshold set forth in Section 10(c) hereof (or if the Company is not aware of such occurrence, as soon as practicable after becoming so aware), provide, or cause to be provided, a written notice to the Holders of the occurrence of such event; and (iii) as soon as practicable following the determination of the revised Conversion Price in accordance with Section 10(a) or Section 10(b) hereof, provide, or cause to be provided, a written notice to the Holders setting forth in reasonable detail the method by which the adjustment to the Conversion Price was determined and setting forth the revised Conversion Price.

*Section 11. Reorganization Events.*

(a) In the event of:

(i) any consolidation, merger or other similar business combination of the Company with or into another Person, in each case pursuant to which the Common Stock will be converted into cash, securities or other property of the Company or another Person;

(ii) any sale, transfer, lease or conveyance to another Person of all or substantially all of the property and assets of the Company, in each case pursuant to which the Common Stock will be converted into cash, securities or other property of the Company or another Person;

(iii) any reclassification of the Common Stock into securities including securities other than the Common Stock; or

(iv) any statutory exchange of the outstanding shares of Common Stock for securities of another Person (other than in connection with a merger or acquisition);

(any such event specified in this Section 11(a), a "Reorganization Event"); each share of Series B Preferred Stock outstanding immediately prior to such Reorganization Event shall, without the consent of the Holders thereof, remain outstanding but shall become convertible, at the option of the Holders, into the kind of securities, cash and other property receivable in such Reorganization Event by a holder (other than the counterparty to the Reorganization Event or an Affiliate of such other party) of the number of shares of Common Stock into which each share of Series B Preferred Stock would then be convertible (assuming the Stockholder Approvals have been obtained) (such securities, cash and other property, the "Exchange Property").

A-20

(b) In the event that holders of the shares of Common Stock have the opportunity to elect the form of consideration to be received in such transaction, the consideration that the Holders are entitled to receive shall be deemed to be the types and amounts of consideration received by the majority of the holders of the shares of Common Stock that affirmatively make an election. The amount of Exchange Property receivable upon conversion of any Series B Preferred Stock in accordance with Section 9 shall be determined based upon the Conversion Price in effect on such Conversion Date.

(c) The above provisions of this Section 11 shall similarly apply to successive Reorganization Events and the provisions of Section 10 shall apply to any shares of capital stock of the Company (or any successor) received by the holders of the Common Stock in any such Reorganization Event.

(d) The Company (or any successor) shall, within 20 days of the occurrence of any Reorganization Event, provide written notice to the Holders of such occurrence of such event and of the kind and amount of the cash, securities or other property that constitutes the Exchange Property. Failure to deliver such notice shall not affect the operation of this Section 11.

*Section 12. Voting Rights.*

(a) The Holders will not have any voting rights, including the right to elect any directors, except (i) voting rights, if any, required by law, and (ii) voting rights, if any, described in this Section 12.

(b) So long as any shares of Series B Preferred Stock are outstanding, the vote or consent of the Holders of at least 66 2/3% of the shares of Series B Preferred Stock at the time outstanding, voting as a single class with all other classes and series of Parity Securities having similar voting rights then outstanding and with each series or class having a number of votes proportionate to the aggregate liquidation preference of the outstanding shares of such class or series, given in person or by proxy, either in writing without a meeting or by vote at any meeting called for the purpose, will be necessary for effecting or validating any of the following actions, whether or not such approval is required by Massachusetts law:

(i) any amendment, alteration or repeal of any provision of the Articles of Organization (including these Articles of Amendment) or the Company's bylaws that would alter or change the voting powers, preferences or special rights of the Series B Preferred Stock so as to affect them adversely;

(ii) any amendment or alteration of the Articles of Organization (including these Articles of Amendment) to authorize or create, or increase the authorized amount of, any shares of, or any securities convertible into shares of, any class or series of the Company's capital stock ranking prior to the Series B Preferred Stock in the payment of dividends or in the distribution of assets on any liquidation, dissolution or winding up of the Company; or

A-21

(iii) the consummation of a binding share exchange or reclassification involving the Series B Preferred Stock or a merger or consolidation of the Company with another entity, except that the Holders will have no right to vote under this provision or under Massachusetts law if in each case (x) the Series B Preferred Stock remains outstanding or, in the case of any such merger or consolidation with respect to which the Company is not the surviving or resulting entity, is converted into or exchanged for preference securities of the surviving or resulting entity or its ultimate parent, that is an entity organized and existing under the laws of the United States of America, any state thereof or the District of Columbia, and (y) such Series B Preferred Stock remaining outstanding or such preference securities, as the case may be, have such rights, preferences, privileges and voting powers, taken as a whole, as are not materially less favorable to the Holders thereof than the rights, preferences, privileges and voting powers of the Series B Preferred Stock, taken as a whole;

*provided, however,* that any increase in the amount of the authorized or issued preferred stock or any securities convertible into preferred stock or the creation and issuance, or an increase in the authorized or issued amount, of other series of preferred stock (including the Series B Preferred Stock), or any securities convertible into preferred stock ranking equally with and/or junior to the Series B Preferred Stock with respect to the payment of dividends (whether such dividends are cumulative or non-cumulative) and/or the distribution of assets upon the Company's liquidation, dissolution or winding up will not, in and of itself, be deemed to adversely affect the voting powers, preferences or special rights of the Series B Preferred stock and, notwithstanding any provision of Massachusetts law, the Holders will have no right to vote solely by reason of such an increase, creation or issuance.

If an amendment, alteration, repeal, share exchange, reclassification, merger or consolidation described above would adversely affect one or more but not all series of preferred stock with like voting rights (including the Series B Preferred Stock for this purpose), then only the series affected and entitled to vote shall vote as a class in lieu of all such series of preferred stock.

(c) Notwithstanding the foregoing, the Holders shall not have any voting rights if, at or prior to the effective time of the act with respect to which such vote would otherwise be required, all outstanding shares of Series B Preferred Stock shall have been converted into shares of Common Stock.

*Section 13. Fractional Shares.*

(a) No fractional shares of Common Stock will be issued as a result of any conversion of shares of Series B Preferred Stock.

(b) In lieu of any fractional share of Common Stock otherwise issuable in respect of any conversion pursuant to Section 8 hereof, the Company shall pay an amount in cash (computed to the nearest cent) equal to the same fraction of the Closing Price of the Common Stock determined as of the second Trading Day immediately preceding the effective date of conversion.

A-22

(c) If more than one share of the Series B Preferred Stock is surrendered for conversion at one time by or for the same Holder, the number of full shares of Common Stock issuable upon conversion thereof shall be computed on the basis of the aggregate number of shares of the Series B Preferred Stock so surrendered.

*Section 14. Reservation of Common Stock.*

(a) Following receipt of the Stockholder Approvals, the Company shall at all times reserve and keep available out of its authorized and unissued Common Stock or shares acquired by the Company, solely for issuance upon the conversion of shares of Series B Preferred Stock as provided in these Articles of Amendment, free from any preemptive or other similar rights, such number of shares of Common Stock as shall from time to time be issuable upon the conversion of all the shares of Series B Preferred Stock then outstanding. For purposes of this Section 14(a), the number of shares of Common Stock that shall be deliverable upon the conversion of all outstanding shares of Series B Preferred Stock shall be computed as if at the time of computation all such outstanding shares were held by a single Holder.

(b) Notwithstanding the foregoing, the Company shall be entitled to deliver upon conversion of shares of Series B Preferred Stock, as herein provided, shares of Common Stock acquired by the Company (in lieu of the issuance of authorized and unissued shares of Common Stock), so long as any such acquired shares are free and clear of all liens, charges, security interests or encumbrances (other than liens, charges, security interests and other encumbrances created by the Holders).

(c) All shares of Common Stock delivered upon conversion of the Series B Preferred Stock shall be duly authorized, validly issued, fully paid and non-assessable, free and clear of all liens, claims, security interests and other encumbrances (other than liens, charges, security interests and other encumbrances created by the Holders).

(d) Prior to the delivery of any securities that the Company shall be obligated to deliver upon conversion of the Series B Preferred Stock, the Company shall use its reasonable best efforts to comply with all federal and state laws and regulations thereunder requiring the registration of such securities with, or any approval of or consent to the delivery thereof by, any governmental authority.

(e) The Company hereby covenants and agrees that, if at any time the Common Stock shall be listed on The NASDAQ Global Select Market or any other national securities exchange or automated quotation system, the Company will, if permitted by the rules of such exchange or automated quotation system, list and keep listed, so long as the Common Stock shall be so listed on such exchange or automated quotation system, all the Common Stock issuable upon conversion of the Series B Preferred Stock; *provided, however,* that if the rules of such exchange or automated quotation system permit the Company to defer the listing of such Common Stock until the first conversion of Series B Preferred Stock into Common Stock in accordance with the provisions hereof, the Company covenants to list such Common Stock issuable upon conversion of the Series B Preferred Stock in accordance with the requirements of such exchange or automated quotation system at such time.

*Section 15. Transfer Agent and Conversion Agent.* The duly appointed Transfer Agent and Conversion Agent for the Series B Preferred Stock shall be Computershare. The Company may, in its sole discretion, remove the Transfer Agent in accordance with the agreement between the Company and the Transfer Agent; *provided* that the Company shall appoint a successor transfer agent who shall accept such appointment prior to the effectiveness of such removal. Upon any such removal or appointment, the Company shall send notice thereof by first-class mail, postage prepaid, to the Holders.

*Section 16. Repurchase of Junior Securities.* For so long as the Stockholder Approvals shall not have been obtained, the Company shall not redeem, purchase or acquire any of its Junior Securities, other than (i) redemptions, purchases or other similar acquisitions of Junior Securities in connection with any benefit plan or other similar arrangement with or for the benefit of any one or more employees, officers, directors of consultants or in connection with a dividend reinvestment or stockholder purchase plan and (ii) conversions into or exchanges for other Junior Securities and cash solely in lieu of fractional shares of the Junior Securities.

*Section 17. Replacement Certificates.*

(a) If physical certificates are issued, the Company shall replace any mutilated certificate at the Holder's expense upon surrender of that certificate to the Transfer Agent. The Company shall replace certificates that become destroyed, stolen or lost at the Holder's expense upon delivery to the Company and the Transfer Agent of satisfactory evidence that the certificate has been destroyed, stolen or lost, together with any indemnity that may be required by the Transfer Agent and the Company.

(b) If physical certificates are issued, the Company shall not be required to issue any certificates representing the Series B Preferred Stock on or after the applicable Conversion Date. In place of the delivery of a replacement certificate following the applicable Conversion Date, the Transfer Agent, upon delivery of the evidence and indemnity described in clause (a) above, shall deliver the shares of Common Stock pursuant to the terms of the Series B Preferred Stock formerly evidenced by the certificate.

*Section 18. Form.*

(a) Series B Preferred Stock may be issued in the form of physical certificates, in book entry form through the direct registration system of the Transfer Agent or, to the extent not inconsistent with the terms of the Investment Agreement, in the form of one or more permanent global shares of Series B Preferred Stock in definitive, fully registered form with a global legend in substantially the form attached hereto as Exhibit A (each, a "Global Preferred Stock"), which is hereby incorporated in and expressly made a part of these Articles of Amendment. The Global Preferred Stock may have notations, legends or endorsements required by law, stock exchange rules, agreements to which the Company is subject, if any, or usage (provided that any such notation, legend or endorsement is in a form acceptable to the Company). The aggregate number of shares represented by each Global Preferred Stock may

A-24

from time to time be increased or decreased by adjustments made on the records of the Transfer Agent and the Depositary or its nominee as hereinafter provided. This Section 18(a) shall apply only to a Global Preferred Stock deposited with or on behalf of the Depositary.

(b) If Global Preferred Stock is to be issued, the Company shall execute and the Transfer Agent shall, in accordance with this Section, countersign and deliver initially one or more certificates evidencing the Global Preferred Stock that (i) shall be registered in the name of Cede & Co. or other nominee of the Depositary and (ii) shall be delivered by the Transfer Agent to the Depositary or pursuant to instructions received from the Depositary or held by the Transfer Agent as custodian for the Depositary pursuant to an agreement between the Depositary and the Transfer Agent.

(c) Members of, or participants in, the Depositary ("Agent Members") shall have no rights under these Articles of Amendment with respect to any Global Preferred Stock held on their behalf by the Depositary or by the Transfer Agent as the custodian of the Depositary or under such Global Preferred Stock, and the Depositary may be treated by the Company, the Transfer Agent and any agent of the Company or the Transfer Agent as the absolute owner of such Global Preferred Stock for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Transfer Agent or any agent of the Company or the Transfer Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices of the Depositary governing the exercise of the rights of a holder of a beneficial interest in any Global Preferred Stock. The Depositary may grant proxies or otherwise authorize any Person to take any action that a Holder is entitled to take pursuant to the Series B Preferred Stock, these Articles of Amendment or the Articles of Organization.

(d) Owners of beneficial interests in Global Preferred Stock shall not be entitled to receive physical delivery of certificated shares of Series B Preferred Stock, unless (x) the Depositary has notified the Company that it is unwilling or unable to continue as Depositary for the Global Preferred Stock and the Company does not appoint a qualified replacement for the Depositary within 90 days, (y) the Depositary ceases to be a "clearing agency" registered under the Exchange Act and the Company does not appoint a qualified replacement for the Depositary within 90 days or (z) the Company decides to discontinue the use of book-entry transfer through the Depositary. In any such case, the Global Preferred Stock shall be exchanged in whole for definitive shares of Series B Preferred Stock in registered form, with the same terms and of an equal aggregate Liquidation Preference. Definitive shares of Series B Preferred Stock shall be registered in the name or names of the Person or Persons specified by the Depositary in a written instrument to the Transfer Agent.

(e)    (i) An Officer shall sign the certificates evidencing the Global Preferred Stock for the Company, in accordance with the Company's bylaws and applicable law, by manual or facsimile signature.

(ii) If an Officer whose signature is on a certificate evidencing Global Preferred Stock no longer holds that office at the time the Transfer Agent countersigned the Global Preferred Stock, the Global Preferred Stock shall be valid nevertheless.

A-25

(iii) A certificate evidencing Global Preferred Stock shall not be valid until an authorized signatory of the Transfer Agent manually countersigns the Global Preferred Stock. Each Global Preferred Stock shall be dated the date of its countersignature.

*Section 19. Miscellaneous.*

(a) All notices referred to herein shall be in writing, and, unless otherwise specified herein, all notices hereunder shall be deemed to have been given upon the earlier of receipt thereof or three Business Days after the mailing thereof if sent by registered or certified mail (unless first-class mail shall be specifically permitted for such notice under the terms of these Articles of Amendment) with postage prepaid, addressed: (i) if to the Company, to its office at Ten Post Office Square, Boston, MA 02109, Attention: Margaret W. Chambers, Esq. or to the Transfer Agent at 250 Royall Street, Canton, MA 02021, Attention: Jeff Seiders, or other agent of the Company designated as permitted by these Articles of Amendment, or (ii) if to any Holder or holder of shares of Common Stock, as the case may be, to such Holder or holder at the address listed in the stock record books of the Company (which may include the records of any transfer agent for the Series B Preferred Stock or the Common Stock, as the case may be), or (iii) to such other address as the Company or any such Holder or holder, as the case may be, shall have designated by notice similarly given.

(b) The Company shall pay any and all stock transfer and documentary stamp taxes that may be payable in respect of any issuance or delivery of shares of Series B Preferred Stock or shares of Common Stock or other securities issued on account of Series B Preferred Stock pursuant hereto or certificates representing such shares or securities. The Company shall not, however, be required to pay any such tax that may be payable in respect of any transfer involved in the issuance or delivery of shares of Series B Preferred Stock or Common Stock or other securities in a name other than that in which the shares of Series B Preferred Stock with respect to which such shares or other securities are issued or delivered were registered, or in respect of any payment to any Person other than a payment to the registered holder thereof, and shall not be required to make any such issuance, delivery or payment unless and until the Person otherwise entitled to such issuance, delivery or payment has paid to the Company the amount of any such tax or has established, to the satisfaction of the Company, that such tax has been paid or is not payable.

(c) No share of Series B Preferred stock shall have any rights of preemption whatsoever pursuant to these Articles of Amendment as to any securities of the Company, or any warrants, rights or options issued or granted with respect thereto, regardless of how such securities, or such warrants, rights or options, may be designated issued or granted.

A-26

EXHIBIT A

## FORM OF SERIES B NON-CUMULATIVE PERPETUAL CONTINGENT CONVERTIBLE PREFERRED STOCK

SEE REVERSE
FOR LEGEND

Number: ____

_____Shares

CUSIP NO.: _____

BOSTON PRIVATE FINANCIAL HOLDINGS, INC.

FACE OF SECURITY

This certifies that Cede & Co. is the owner of _____fully paid and non-assessable shares of the Series B Non-Cumulative Perpetual Contingent Convertible Preferred Stock, par value $1.00 per share and a liquidation preference of $100,000 per share, of Boston Private Financial Holdings, Inc., a corporation organized and existing under the laws of the Commonwealth of Massachusetts (the "**Company**"), transferable on the books of the Company by the holder hereof in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate and the shares represented hereby are issued and shall be held subject to all the provisions of the Restated Articles of Organization of the Company and all amendments thereto and the Bylaws of the Company, as amended (copies of which are on file at the office of the Transfer Agent) to all of which the holder of this Certificate by acceptance hereof assents. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Transfer Agent.

IN WITNESS WHEREOF, the Company has caused this Certificate to be duly executed.

BOSTON PRIVATE FINANCIAL HOLDINGS, INC.

By: _____

Name:

Title:

Dated:

Countersigned and Registered

_____

Transfer Agent and Registrar

By: _____

Authorized Officer

A-27

REVERSE OF SECURITY

BOSTON PRIVATE FINANCIAL HOLDINGS, INC.

The shares of Series B Non-Cumulative Perpetual Contingent Convertible Preferred Stock (the "**Series B Preferred Stock**") have the preferences and privileges, conversion rights, dividend rights, liquidation preferences and such other rights and qualifications, limitations and restrictions as provided in the Articles of Amendment relating to the Series B Preferred Stock (the "**Articles of Amendment**"), in addition to those set forth in the Restated Articles of Organization of the Company (and all amendments thereto) and the Company's Bylaws, as amended, copies of which will be furnished by the Company to any holder without charge upon request to the Transfer Agent named on the face of this Certificate.

Upon written request to the Secretary at Ten Post Office Square, Boston, MA 02109, Attention: Corporate Secretary, the Company will furnish the holder of this Certificate without charge the designations, relative rights, preferences and limitations applicable to each class or series of authorized stock and the variations in rights, preferences and limitations determined for each series, and the authority of the Board of Directors to determine variations for future classes or series.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO THE COMPANY OR THE TRANSFER AGENT NAMED ON THE FACE OF THIS CERTIFICATE, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL IN AS MUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO. HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE ARTICLES OF AMENDMENT. IN CONNECTION WITH ANY TRANSFER, THE HOLDER WILL DELIVER TO THE TRANSFER AGENT NAMED ON THE FACE OF THIS CERTIFICATE SUCH CERTIFICATES AND OTHER INFORMATION AS SUCH TRANSFER AGENT MAY REASONABLY REQUIRE TO CONFIRM THAT THE TRANSFER COMPLIES WITH THE FOREGOING RESTRICTIONS.

A-28

**B:** 401 shares of the authorized preferred stock of the Company are hereby designated "Series B-1 Non-Cumulative Perpetual Convertible Preferred Stock". Unless otherwise indicated, references to "Sections" or "Subsections" in this Section 4.3B of this Article 4 refer to sections and subsections of 4.3B of this Article 4.

The preferences, limitations, voting powers and relative rights of the Series B-1 Non-Cumulative Perpetual Convertible Preferred Stock are as follows:

**DESIGNATION**

*Section 1. Designation.* There is hereby created out of the authorized and unissued shares of preferred stock of the Company a series of preferred stock designated as the "Series B- 1 Non-Cumulative Perpetual Convertible Preferred Stock" (the "**Series B-1 Preferred Stock**"). The number of shares constituting such series shall be 401. The par value of the Series B-1 Preferred Stock shall be $1.00 per share, and the liquidation preference of the Series B-1 Preferred Stock shall be $100,000 per share.

*Section 2. Ranking.* The Series B-1 Preferred Stock will, with respect to dividend rights and rights on liquidation, winding-up and dissolution, rank (i) on a parity with the Series B Preferred Stock and with each other class or series of preferred stock established after the Effective Date by the Company the terms of which expressly provide that such class or series will rank on a parity with the Series B-1 Preferred Stock as to dividend rights and rights on liquidation, winding-up and dissolution of the Company (collectively referred to as "**Parity Securities**") and (ii) senior to the common stock, par value $1.00 per share, of the Company (the "**Common Stock**") and each other class or series of capital stock of the Company outstanding or established after the Effective Date by the Company the terms of which do not expressly provide that it ranks on a parity with or senior to the Series B-1 Preferred Stock as to dividend rights and rights on liquidation, winding-up and dissolution of the Company (collectively referred to as "**Junior Securities**"). The Company has the right to authorize and/or issue additional shares or classes or series of Junior Securities or Parity Securities without the consent of the Holders.

*Section 3. Definitions.* Unless the context or use indicates another meaning or intent, the following terms shall have the following meanings, whether used in the singular or the plural:

(a) "Affiliate" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with, such other Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") when used with respect to any Person, means the possession, directly or indirectly, of the power to cause the direction of management or policies of such Person, whether through the ownership of voting securities by contract or otherwise.

(b) "Articles of Amendment" means the amendment to the Articles of Organization incorporated into the Restated Articles of Organization of the Company dated July [__], 2010.

(c) "Articles of Organization" means the Restated Articles of Organization of the Company, as amended.

A-29

(d) "Board of Directors" means the board of directors of the Company or any committee thereof duly authorized to act on behalf of such board of directors.

(e) "Business Day" means any day other than a Saturday, Sunday or any other day on which banks in New York City, New York or Boston, Massachusetts are generally required or authorized by law to be closed.

(f) "Closing Price" of the Common Stock on any date of determination means the closing sale price or, if no closing sale price is reported, the last reported sale price of the shares of the Common Stock on The NASDAQ Global Select Market on such date. If the Common Stock is not traded on The NASDAQ Global Select Market on any date of determination, the Closing Price of the Common Stock on such date of determination means the closing sale price as reported in the composite transactions for the principal U.S. national or regional securities exchange on which the Common Stock is so listed or quoted, or, if no closing sale price is reported, the last reported sale price on the principal U.S. national or regional securities exchange on which the Common Stock is so listed or quoted, or if the Common Stock is not so listed or quoted on a U.S. national or regional securities exchange, the last quoted bid price for the Common Stock in the over-the-counter market as reported by Pink Sheets LLC or similar organization, or, if that bid price is not available, the market price of the Common Stock on that date as determined by a nationally recognized independent investment banking firm retained by the Company for this purpose.

For purposes of these Articles of Amendment, all references herein to the "Closing Price" and "last reported sale price" of the Common Stock on The NASDAQ Global Select Market shall be such closing sale price and last reported sale price as reflected on the website of The NASDAQ Global Select Market (http://www.nasdaq.com) and as reported by Bloomberg Professional Service; *provided, however,* that in the event that there is a discrepancy between the closing sale price or last reported sale price as reflected on the website of The NASDAQ Global Select Market and as reported by Bloomberg Professional Service, the closing sale price and last reported sale price on the website of The NASDAQ Global Select Market shall govern.

(g) "Common Stock" has the meaning set forth in Section 2.

(h) "Company" has the meaning set forth in the preamble.

(i) "Conversion Agent" means the Transfer Agent acting in its capacity as conversion agent for the Series B-1 Preferred Stock, and its successors and assigns.

(j) "Conversion Date" has the meaning set forth in Section 9(e)(i).

(k) "Conversion Price" means for each share of Series B-1 Preferred Stock, $5.52; *provided, however,* that the foregoing shall be subject to adjustment or limitation as set forth herein.

(l) "Current Market Price" means, on any date, the average of the daily Closing Price per share of the Common Stock or other securities on each of the five consecutive Trading Days preceding the earlier of the day before the date of the issuance, dividend or distribution in question and the day before the Ex-Date with respect to the issuance or distribution, giving rise to an adjustment to the Conversion Price pursuant to Section 10.

A-30

(m) "Depositary" means DTC or its nominee or any successor depositary appointed by the Company.

(n) "DTC" means The Depository Trust Company.

(o) "Effective Date" means the date on which shares of the Series B Preferred Stock were first issued.

(p) "Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

(q) "Exchange Property" has the meaning set forth in Section 11(a).

(r) "Ex-Date" when used with respect to any issuance, dividend or distribution giving rise to an adjustment to the Conversion Price pursuant to Section 10, means the first date on which the Common Stock or other securities trade without the right to receive the issuance, dividend or distribution.

(s) "Holder" means the Person in whose name the shares of the Series B-1 Preferred Stock are registered, which may be treated by the Company, Transfer Agent and Conversion Agent as the absolute owner of the shares of Series B-1 Preferred Stock for the purpose of making payment and settling the related conversions and for all other purposes.

(t) "Junior Securities" has the meaning set forth in Section 2.

(u) "Liquidation Preference" means, as to the Series B-1 Preferred Stock, $100,000 per share (as adjusted for any split, subdivision, combination, consolidation, recapitalization or similar event with respect to the Series B-1 Preferred Stock).

(v) "Officer" means the Chief Executive Officer, the Chief Operating Officer, any Senior Vice President, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Secretary or any Assistant Secretary of the Company.

(w) "Parity Securities" has the meaning set forth in Section 2.

(x) "Person" means a legal person, including any individual, corporation, estate, partnership, joint venture, association, joint-stock company, limited liability company or trust.

(y) "Record Date" has the meaning set forth in Section 4(c).

(z) "Reorganization Event" has the meaning set forth in Section 11(a).

(aa) "Securities Act" means the Securities Act of 1933, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

A-31

(bb) "Series B Preferred Stock" means the shares of the Company's Series B Non-Cumulative Perpetual Contingent Convertible Preferred Stock.

(cc) "Series B-1 Preferred Stock" has the meaning set forth in Section 1.

(dd) "Trading Day" means a day on which the shares of Common Stock:

(i) are not suspended from trading on any national or regional securities exchange or association or over-the-counter market at the close of business; and

(ii) have traded at least once on the national or regional securities exchange or association or over-the-counter market that is the primary market for the trading of the Common Stock.

(ee) "Transfer Agent" means Computershare acting as transfer agent, registrar and paying agent for the Series B-1 Preferred Stock, and its successors and assigns.

*Section 4. Dividends.*

(a) The Holders shall be entitled to receive, when, as and if declared by the Board of Directors, out of funds legally available therefor, non-cumulative cash dividends in the amount determined as set forth in Section 4(b), and shall be entitled to share in the distributions referred to in Section 4(f).

(b) If the Board of Directors declares and pays a cash dividend in respect of any shares of Common Stock, then the Board of Directors shall declare and pay to the Holders a cash dividend in an amount per share of Series B-1 Preferred Stock equal to the product of (i) the per share dividend declared and paid in respect of each share of Common Stock and (ii) the number of shares of Common Stock into which such share of Series B-1 Preferred Stock is then convertible. Dividends payable pursuant to this Section 4(b) shall be payable on the same date that dividends are payable to holders of shares of Common Stock, and no dividends shall be payable to holders of shares of Common Stock unless the full dividends contemplated by this Section 4(b) are paid at the same time in respect of the Series B-1 Preferred Stock.

(c) Each dividend will be payable to Holders of record as they appear in the records of the Company on the applicable record date (each, a "**Record Date**"), which shall be the same as the record date for the payment of the corresponding dividend payable in respect of the Common Stock.

(d) Dividends on the Series B-1 Preferred Stock are non-cumulative.

(e) Payments of cash for dividends will be delivered to the Holder at their addresses listed in the stock record books maintained by the Transfer Agent.

(f) If the Company makes a distribution to all holders of shares of Common Stock consisting of capital stock of any class or series, or similar equity interests of, or relating to, a subsidiary or other business unit, the Holders of Series B-1 Preferred Stock shall be entitled to participate in such distribution. The number of shares of such capital stock or equity interests to

A-32

which each Holder of Series B-1 Preferred Stock shall be entitled shall be the number to which such Holder would have been entitled had such Holder converted such Holder's shares of Series B-1 Preferred Stock immediately prior to the record date for such distribution.

*Section 5. Liquidation.*

(a) In the event the Company voluntarily or involuntarily liquidates, dissolves or winds up, the Holders at the time shall be entitled to receive liquidating distributions in the amount of the Liquidation Preference per share of Series B-1 Preferred Stock, plus an amount equal to any declared but unpaid dividends thereon to and including the date of such liquidation, out of assets legally available for distribution to the Company's shareholders, before any distribution of assets is made to the holders of the Common Stock or any other Junior Securities. After payment of the full amount of such liquidating distributions, the Holders shall be entitled to participate in all further distributions of the remaining assets of the Company as if each share of Series B-1 Preferred Stock had been converted into Common Stock in accordance with the terms hereof immediately prior to such liquidating distributions.

(b) In the event the assets of the Company available for distribution to shareholders upon any liquidation, dissolution or winding-up of the affairs of the Company, whether voluntary or involuntary, shall be insufficient to pay in full the amounts payable with respect to all outstanding shares of the Series B-1 Preferred Stock and the corresponding amounts payable on any Parity Securities, the Holders and the holders of such Parity Securities shall share ratably in any distribution of assets of the Company in proportion to the full respective liquidating distributions to which they would otherwise be respectively entitled.

(c) The Company's consolidation or merger with or into any other entity, the consolidation or merger of any other entity with or into the Company, or the sale of all or substantially all of the Company's property or business will not constitute its liquidation, dissolution or winding up.

*Section 6. Maturity.* The Series B-1 Preferred Stock shall be perpetual unless converted in accordance with these Articles of Amendment.

*Section 7. Redemption.* The Series B-1 Preferred Stock shall not be redeemable either at the Company's option or at the option of the Holders at any time.

*Section 8. Right to Convert.* Each Holder shall have the right at any time, at such Holder's option (but subject to the conversion procedures of Section 9), to convert all or any portion of such Holder's Series B-1 Preferred Stock at the Conversion Price, with cash being payable in lieu of fractional shares in accordance with Section 13 hereof.

*Section 9. Conversion Procedures.*

(a) Effective immediately prior to the close of business on any applicable Conversion Date, dividends shall no longer be declared on any such converted shares of Series B-1 Preferred Stock and such shares of Series B-1 Preferred Stock shall cease to be outstanding, in each case, subject to the right of Holders to receive any declared and unpaid dividends on such shares and any other payments to which they are otherwise entitled pursuant to Section 8 or this Section 9, as applicable.

A-33

(b) Prior to the close of business on any applicable Conversion Date, shares of Common Stock issuable upon conversion of, or other securities issuable upon conversion of, any shares of Series B-1 Preferred Stock shall not be deemed outstanding for any purpose, and the Holders shall have no rights with respect to the Common Stock or other securities issuable upon conversion (including voting rights, rights to respond to tender offers for the Common Stock or other securities issuable upon conversion and rights to receive any dividends or other distributions on the Common Stock or other securities issuable upon conversion) by virtue of holding shares of Series B-1 Preferred Stock.

(c) Shares of Series B-1 Preferred Stock duly converted in accordance with these Articles of Amendment, or otherwise reacquired by the Company, will resume the status of authorized and unissued preferred stock, undesignated as to series and available for future issuance.

(d) The Person or Persons entitled to receive the Common Stock and/or cash, securities or other property issuable upon conversion of Series B-1 Preferred Stock shall be treated for all purposes as the record holder(s) of such shares of Common Stock and/or securities and the owners of such cash or other property as of the close of business on the applicable Conversion Date. In the event that the Holders shall not by written notice designate the name in which shares of Common Stock and/or cash, securities or other property (including payments of cash in lieu of fractional shares) to be issued or paid upon conversion of shares of Series B-1 Preferred Stock should be registered or paid or the manner in which such shares should be delivered, the Company shall be entitled to register and deliver such shares, and make such payment, in the name of the Holders and in the manner shown on the records of the Company.

(e) Conversion into shares of Common Stock will occur on any applicable Conversion Date as follows:

(i) On the date of any conversion at the option of a Holder pursuant to Section 8, if such Holder's interest is in certificated form, such Holder must do each of the following in order to convert:

(A) complete and manually sign the conversion notice provided by the Conversion Agent, or a facsimile of the conversion notice, and deliver this irrevocable notice to the Conversion Agent;

(B) surrender the shares of Series B-1 Preferred Stock to the Conversion Agent;

(C) if required, furnish appropriate endorsements and transfer documents; and

(D) if required, pay all transfer or similar taxes.

A-34

The date on which a Holder complies with the procedures in this clause (i) is the "**Conversion Date**".

(ii) The Conversion Agent shall, on a Holder's behalf, convert the Series B-1 Preferred Stock into shares of Common Stock, in accordance with the terms of the notice delivered by such Holder described in clause (i) above.

*Section 10. Anti-Dilution Adjustments.*

(a) The Conversion Price shall be subject to the following adjustments:

(i) <u>Stock Dividends and Distributions</u>. If the Company pays dividends or other distributions on the Common Stock in shares of Common Stock, then the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m., New York City time on the Trading Day immediately prior to the Ex-Date for such dividend or distribution by the following fraction:

$$\frac{OS_0}{OS^1}$$

Where,

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to Ex-Date for such dividend or distribution.

$OS^1$ = the sum of the number of shares of Common Stock outstanding immediately prior to the Ex-Date for such dividend or distribution plus the total number of shares of Common Stock constituting such dividend or distribution.

The adjustment pursuant to this clause (i) shall become effective at 9:00 a.m., New York City time on the Ex-Date for such dividend or distribution. For the purposes of this clause (i), the number of shares of Common Stock at the time outstanding shall not include shares held in treasury by the Company. If any dividend or distribution described in this clause (i) is declared but not so paid or made, the Conversion Price shall be readjusted, effective as of the date the Board of Directors publicly announces its decision not to make such dividend or distribution, to such Conversion Price that would be in effect if such dividend or distribution had not been declared.

(ii) <u>Subdivisions, Splits and Combination of the Common Stock</u>. If the Company subdivides, splits or combines the shares of Common Stock, then the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m., New York City time on the Trading Day immediately prior to the effective date of such share subdivision, split or combination by the following fraction:

$$\frac{OS_0}{OS^1}$$

Where,

A-35

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the effective date of such share subdivision, split or combination.

$OS^1$ = the number of shares of Common Stock outstanding immediately after the opening of business on the effective date of such share subdivision, split or combination.

The adjustment pursuant to this clause (ii) shall become effective at 9:00 a.m., New York City time on the effective date of such subdivision, split or combination. For the purposes of this clause (ii), the number of shares of Common Stock at the time outstanding shall not include shares held in treasury by the Company. If any subdivision, split or combination described in this clause (ii) is announced but the outstanding shares of Common Stock are not subdivided, split or combined, the Conversion Price shall be readjusted, effective as of the date the Board of Directors publicly announces its decision not to subdivide, split or combine the outstanding shares of Common Stock, to such Conversion Price that would be in effect if such subdivision, split or combination had not been announced.

(iii) <u>Issuance of Stock Purchase Rights</u>. If the Company issues to all holders of the shares of Common Stock rights or warrants (other than rights or warrants issued pursuant to a dividend reinvestment plan or share purchase plan or other similar plans) entitling them, for a period of up to 45 days from the date of issuance of such rights or warrants, to subscribe for or purchase the shares of Common Stock at less than the Current Market Price on the date fixed for the determination of stockholders entitled to receive such rights or warrants, then the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m., New York City time on the Trading Day immediately prior to the Ex-Date for such issuance by the following fraction:

$$\frac{OS_0 + Y}{OS_0 + X}$$

Where,

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the Ex-Date for such distribution.

X = the total number of shares of Common Stock issuable pursuant to such rights or warrants.

Y = the number of shares of Common Stock equal to the aggregate price payable to exercise such rights or warrants divided by the Current Market Price.

Any adjustment pursuant to this clause (iii) shall become effective immediately prior to 9:00 a.m., New York City time, on the Ex-Date for such issuance. For the purposes of this clause (iii), the number of shares of Common Stock at the time outstanding shall not include shares held in treasury by the Company. The Company shall not issue any such rights or warrants in respect of shares of the Common Stock held in treasury by the Company. In the event that such rights or warrants described in this clause (iii) are not so issued, the Conversion Price shall be readjusted, effective as of the date the Board of

A-36

Directors publicly announces its decision not to issue such rights or warrants, to the Conversion Price that would then be in effect if such issuance had not been declared. To the extent that such rights or warrants are not exercised prior to their expiration or shares of Common Stock are otherwise not delivered pursuant to such rights or warrants upon the exercise of such rights or warrants, the Conversion Price shall be readjusted to such Conversion Price that would then be in effect had the adjustment made upon the issuance of such rights or warrants been made on the basis of the delivery of only the number of shares of Common Stock actually delivered. In determining the aggregate offering price payable for such shares of Common Stock, there shall be taken into account any consideration received for such rights or warrants and the value of such consideration (if other than cash, to be reasonably determined by the Board of Directors).

(iv) <u>Debt or Asset Distributions.</u> If the Company distributes to all holders of shares of Common Stock evidences of indebtedness, shares of capital stock, securities, cash or other assets (excluding any dividend or distribution referred to in clause (i) above, any rights or warrants referred to in clause (iii) above, any dividend or distribution paid exclusively in cash, any consideration payable in connection with a tender or exchange offer made by the Company or any of its subsidiaries, and any dividend of shares of capital stock of any class or series, or similar equity interests, of or relating to a subsidiary or other business unit in the case of certain spin-off transactions as described below), then the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m., New York City time on the Trading Day immediately prior to the Ex-Date for such distribution by the following fraction:

$$\frac{SP_0 - FMV}{SP_0}$$

Where,

$SP_0$ = the Current Market Price per share of Common Stock on such date.

FMV = the fair market value of the portion of the distribution applicable to one share of Common Stock on such date as reasonably determined by the Board of Directors.

In a "spin-off", where the Company makes a distribution to all holders of shares of Common Stock consisting of capital stock of any class or series, or similar equity interests, of or relating to, a subsidiary or other business unit, the Conversion Price will be adjusted on the 15th Trading Day after the effective date of the distribution by multiplying such Conversion Price in effect immediately prior to such 15th Trading Day by the following fraction:

$$\frac{MP_0}{MP_0 + MP_s}$$

Where,

$MP_0$ = the average of the Closing Prices of the Common Stock over the first 10 Trading Days commencing on and including the fifth Trading Day following the effective date of such distribution.

A-37

$MP_s$ = the average of the Closing Prices of the capital stock or equity interests representing the portion of the distribution applicable to one share of Common Stock over the first 10 Trading Days commencing on and including the fifth Trading Day following the effective date of such distribution, or, if not traded on a national or regional securities exchange or over-the-counter market, the fair market value of the capital stock or equity interests representing the portion of the distribution applicable to one share of Common Stock on such date as reasonably determined by the Board of Directors.

Any adjustment pursuant to this clause (iv) shall become effective immediately prior to 9:00 a.m., New York City time, on the Ex-Date for such distribution. In the event that such distribution described in this clause (iv) is not so paid or made, the Conversion Price shall be readjusted, effective as of the date the Board of Directors publicly announces its decision not to pay or make such dividend or distribution, to the Conversion Price that would then be in effect if such dividend or distribution had not been declared.

(v) <u>Cash Distributions</u>. If the Company makes a distribution consisting exclusively of cash to all holders of the Common Stock, excluding (a) any cash dividend on the Common Stock to the extent a corresponding cash dividend is paid on the Series B-1 Preferred Stock pursuant to Section 4(b), (b) any cash that is distributed in a Reorganization Event or as part of a "spin-off" referred to in clause (iv) above, (c) any dividend or distribution in connection with the Company's liquidation, dissolution or winding up, and (d) any consideration payable in connection with a tender or exchange offer made by the Company or any of its subsidiaries, then in each event, the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m., New York City time on the Trading Day immediately prior to the Ex-Date for such distribution by the following fraction:

$$\frac{SP_0 - DIV}{SP_0}$$

Where,

$SP_0$ = the Closing Price per share of Common Stock on the Trading Day immediately preceding the Ex-Date.

DIV = the amount per share of Common Stock of the dividend or distribution.

Any adjustment pursuant to this clause (v) shall become effective immediately prior to the 9:00 a.m., New York City time, on the Ex-Date for such dividend or distribution. In the event that any distribution described in this clause (v) is not so made, the Conversion Price shall be readjusted, effective as of the date the Board of Directors publicly announces its decision not to pay such distribution, to the Conversion Price which would then be in effect if such distribution had not been declared.

(vi) <u>Self Tender Offers and Exchange Offers.</u> If the Company or any of its subsidiaries successfully completes a tender or exchange offer for the Common Stock where the cash and the value of any other consideration included in the payment per share of the Common Stock exceeds the Closing Price per share of the Common Stock on

A-38

the Trading Day immediately succeeding the expiration of the tender or exchange offer, then the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m., New York City time on the expiration date of the offer by the following fraction:

$$\frac{OS_0 \text{ x } SP_0}{AC + (SP_0 \text{ x } OS^1)}$$

Where,

$SP_0$ = the Closing Price per share of Common Stock on the Trading Day immediately succeeding the expiration of the tender or exchange offer.

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the expiration of the tender or exchange offer, including any shares validly tendered and not withdrawn.

$OS^1$ = the number of shares of Common Stock outstanding immediately after the expiration of the tender or exchange offer.

$AC$ = the aggregate cash and fair market value of the other consideration payable in the tender or exchange offer, as reasonably determined by the Board of Directors.

Any adjustment made pursuant to this clause (vi) shall become effective immediately prior to 9:00 a.m., New York City time, on the Trading Day immediately following the expiration of the tender or exchange offer. In the event that the Company or one of its subsidiaries is obligated to purchase shares of Common Stock pursuant to any such tender offer or exchange offer, but the Company or such subsidiary is permanently prevented by applicable law from effecting any such purchases, or all such purchases are rescinded, then the Conversion Price shall be readjusted to be such Conversion Price that would then be in effect if such tender offer or exchange offer had not been made.

(vii) <u>Rights Plans.</u> To the extent that the Company has a rights plan in effect with respect to the Common Stock on any Conversion Date, upon conversion of any shares of the Series B-1 Preferred Stock, the Holders will receive, in addition to the shares of Common Stock, the rights under the rights plan, unless, prior to such Conversion Date, the rights have separated from the shares of Common Stock, in which case the Conversion Price will be adjusted at the time of separation as if the Company had made a distribution to all holders of the Common Stock as described in clause (iv) above, subject to readjustment in the event of the expiration, termination or redemption of such rights.

(b) The Company may make such decreases in the Conversion Price, in addition to any other decreases required by this Section 10, if the Board of Directors deems it advisable to avoid or diminish any income tax to holders of the Common Stock resulting from any dividend or distribution of shares of Common Stock (or issuance of rights or warrants to acquire shares of Common Stock) or from any event treated as such for income tax purposes or for any other reason.

A-39

(c) (i) All adjustments to the Conversion Price shall be calculated to the nearest 1/10th of a cent. No adjustment in the Conversion Price shall be required if such adjustment would be less than $0.01; *provided, however,* that any adjustments which by reason of this subparagraph are not required to be made shall be carried forward and taken into account in any subsequent adjustment; *provided, further,* that on any Conversion Date adjustments to the Conversion Price will be made with respect to any such adjustment carried forward and which has not been taken into account before such date.

(ii) No adjustment to the Conversion Price shall be made if the Holders may participate in the transaction that would otherwise give rise to an adjustment, as a result of holding the Series B-1 Preferred Stock (including without limitation pursuant to Section 4(b) hereof), without having to convert the Series B-1 Preferred Stock, as if they held the full number of shares of Common Stock into which a share of the Series B-1 Preferred Stock may then be converted.

(d) Whenever the Conversion Price is to be adjusted in accordance with Section 10(a) or Section 10(b), the Company shall: (i) compute the Conversion Price in accordance with Section 10(a) or Section 10(b), taking into account the $0.01 threshold set forth in Section 10(c) hereof; (ii) as soon as practicable following the occurrence of an event that requires an adjustment to the Conversion Price pursuant to Section 10(a) or Section 10(b), taking into account the one percent threshold set forth in Section 10(c) hereof (or if the Company is not aware of such occurrence, as soon as practicable after becoming so aware), provide, or cause to be provided, a written notice to the Holders of the occurrence of such event; and (iii) as soon as practicable following the determination of the revised Conversion Price in accordance with Section 10(a) or Section 10(b) hereof, provide, or cause to be provided, a written notice to the Holders setting forth in reasonable detail the method by which the adjustment to the Conversion Price was determined and setting forth the revised Conversion Price.

*Section 11. Reorganization Events.*

(a) In the event of:

(i) any consolidation, merger or other similar business combination of the Company with or into another Person, in each case pursuant to which the Common Stock will be converted into cash, securities or other property of the Company or another Person;

(ii) any sale, transfer, lease or conveyance to another Person of all or substantially all of the property and assets of the Company, in each case pursuant to which the Common Stock will be converted into cash, securities or other property of the Company or another Person;

(iii) any reclassification of the Common Stock into securities including securities other than the Common Stock; or

(iv) any statutory exchange of the outstanding shares of Common Stock for securities of another Person (other than in connection with a merger or acquisition);

A-40

(any such event specified in this Section 11(a), a "**Reorganization Event**"); each share of Series B-1 Preferred Stock outstanding immediately prior to such Reorganization Event shall, without the consent of the Holders thereof, remain outstanding but shall become convertible, at the option of the Holders, into the kind of securities, cash and other property receivable in such Reorganization Event by a holder (other than the counterparty to the Reorganization Event or an Affiliate of such other party) of the number of shares of Common Stock into which each share of Series B-1 Preferred Stock would then be convertible (such securities, cash and other property, the "**Exchange Property**").

(b) In the event that holders of the shares of Common Stock have the opportunity to elect the form of consideration to be received in such transaction, the consideration that the Holders are entitled to receive shall be deemed to be the types and amounts of consideration received by the majority of the holders of the shares of Common Stock that affirmatively make an election. The amount of Exchange Property receivable upon conversion of any Series B-1 Preferred Stock in accordance with Section 9 shall be determined based upon the Conversion Price in effect on such Conversion Date.

(c) The above provisions of this Section 11 shall similarly apply to successive Reorganization Events and the provisions of Section 10 shall apply to any shares of capital stock of the Company (or any successor) received by the holders of the Common Stock in any such Reorganization Event.

(d) The Company (or any successor) shall, within 20 days of the occurrence of any Reorganization Event, provide written notice to the Holders of such occurrence of such event and of the kind and amount of the cash, securities or other property that constitutes the Exchange Property. Failure to deliver such notice shall not affect the operation of this Section 11.

*Section 12. Voting Rights.*

(a) The Holders will not have any voting rights, including the right to elect any directors, except (i) voting rights, if any, required by law, and (ii) voting rights, if any, described in this Section 12.

(b) So long as any shares of Series B-1 Preferred Stock are outstanding, the vote or consent of the Holders of at least 66 2/3% of the shares of Series B-1 Preferred Stock at the time outstanding, voting as a single class with all other classes and series of Parity Securities having similar voting rights then outstanding and with each series or class having a number of votes proportionate to the aggregate liquidation preference of the outstanding shares of such class or series, given in person or by proxy, either in writing without a meeting or by vote at any meeting called for the purpose, will be necessary for effecting or validating any of the following actions, whether or not such approval is required by Massachusetts law:

(i) any amendment, alteration or repeal of any provision of the Articles of Organization (including these Articles of Amendment) or the Company's bylaws that would alter or change the voting powers, preferences or special rights of the Series B-1 Preferred Stock so as to affect them adversely;

A-41

(ii) any amendment or alteration of the Articles of Organization (including these Articles of Amendment) to authorize or create, or increase the authorized amount of, any shares of, or any securities convertible into shares of, any class or series of the Company's capital stock ranking prior to the Series B-1 Preferred Stock in the payment of dividends or in the distribution of assets on any liquidation, dissolution or winding up of the Company; or

(iii) the consummation of a binding share exchange or reclassification involving the Series B-1 Preferred Stock or a merger or consolidation of the Company with another entity, except that the Holders will have no right to vote under this provision or under Massachusetts law if in each case (x) the Series B-1 Preferred Stock remains outstanding or, in the case of any such merger or consolidation with respect to which the Company is not the surviving or resulting entity, is converted into or exchanged for preference securities of the surviving or resulting entity or its ultimate parent, that is an entity organized and existing under the laws of the United States of America, any state thereof or the District of Columbia, and (y) such Series B-1 Preferred Stock remaining outstanding or such preference securities, as the case may be, have such rights, preferences, privileges and voting powers, taken as a whole, as are not materially less favorable to the Holders thereof than the rights, preferences, privileges and voting powers of the Series B-1 Preferred Stock, taken as a whole;

*provided, however,* that any increase in the amount of the authorized or issued preferred stock or any securities convertible into preferred stock or the creation and issuance, or an increase in the authorized or issued amount, of other series of preferred stock (including the Series B-1 Preferred Stock), or any securities convertible into preferred stock ranking equally with and/or junior to the Series B-1 Preferred Stock with respect to the payment of dividends (whether such dividends are cumulative or non-cumulative) and/or the distribution of assets upon the Company's liquidation, dissolution or winding up will not, in and of itself, be deemed to adversely affect the voting powers, preferences or special rights of the Series B-1 Preferred stock and, notwithstanding any provision of Massachusetts law, the Holders will have no right to vote solely by reason of such an increase, creation or issuance.

If an amendment, alteration, repeal, share exchange, reclassification, merger or consolidation described above would adversely affect one or more but not all series of preferred stock with like voting rights (including the Series B-1 Preferred Stock for this purpose), then only the series affected and entitled to vote shall vote as a class in lieu of all such series of preferred stock.

(c) Notwithstanding the foregoing, the Holders shall not have any voting rights if, at or prior to the effective time of the act with respect to which such vote would otherwise be required, all outstanding shares of Series B-1 Preferred Stock shall have been converted into shares of Common Stock.

*Section 13. Fractional Shares.*

(a) No fractional shares of Common Stock will be issued as a result of any conversion of shares of Series B-1 Preferred Stock.

A-42

(b) In lieu of any fractional share of Common Stock otherwise issuable in respect of any conversion pursuant to Section 8 hereof, the Company shall pay an amount in cash (computed to the nearest cent) equal to the same fraction of the Closing Price of the Common Stock determined as of the second Trading Day immediately preceding the effective date of conversion.

(c) If more than one share of the Series B-1 Preferred Stock is surrendered for conversion at one time by or for the same Holder, the number of full shares of Common Stock issuable upon conversion thereof shall be computed on the basis of the aggregate number of shares of the Series B-1 Preferred Stock so surrendered.

*Section 14. Reservation of Common Stock.*

(a) The Company shall at all times reserve and keep available out of its authorized and unissued Common Stock or shares acquired by the Company, solely for issuance upon the conversion of shares of Series B-1 Preferred Stock as provided in these Articles of Amendment, free from any preemptive or other similar rights, such number of shares of Common Stock as shall from time to time be issuable upon the conversion of of all the shares of Series B-1 Preferred Stock then outstanding. For purposes of this Section 14(a), the number of shares of Common Stock that shall be deliverable upon the conversion of all outstanding shares of Series B-1 Preferred Stock shall be computed as if at the time of computation all such outstanding shares were held by a single Holder.

(b) Notwithstanding the foregoing, the Company shall be entitled to deliver upon conversion of shares of Series B-1 Preferred Stock, as herein provided, shares of Common Stock acquired by the Company (in lieu of the issuance of authorized and unissued shares of Common Stock), so long as any such acquired shares are free and clear of all liens, charges, security interests or encumbrances (other than liens, charges, security interests and other encumbrances created by the Holders).

(c) All shares of Common Stock delivered upon conversion of the Series B-1 Preferred Stock shall be duly authorized, validly issued, fully paid and non-assessable, free and clear of all liens, claims, security interests and other encumbrances (other than liens, charges, security interests and other encumbrances created by the Holders).

(d) Prior to the delivery of any securities that the Company shall be obligated to deliver upon conversion of the Series B-1 Preferred Stock, the Company shall use its reasonable best efforts to comply with all federal and state laws and regulations thereunder requiring the registration of such securities with, or any approval of or consent to the delivery thereof by, any governmental authority.

(e) The Company hereby covenants and agrees that, if at any time the Common Stock shall be listed on The NASDAQ Global Select Market or any other national securities exchange or automated quotation system, the Company will, if permitted by the rules of such exchange or automated quotation system, list and keep listed, so long as the Common Stock shall be so listed on such exchange or automated quotation system, all the Common Stock issuable upon conversion of the Series B-1 Preferred Stock; *provided, however,* that if the rules of such

A-43

exchange or automated quotation system permit the Company to defer the listing of such Common Stock until the first conversion of Series B-1 Preferred Stock into Common Stock in accordance with the provisions hereof, the Company covenants to list such Common Stock issuable upon conversion of the Series B-1 Preferred Stock in accordance with the requirements of such exchange or automated quotation system at such time.

Section 15. *Transfer Agent and Conversion Agent.* The duly appointed Transfer Agent and Conversion Agent for the Series B-1 Preferred Stock shall be Computershare. The Company may, in its sole discretion, remove the Transfer Agent in accordance with the agreement between the Company and the Transfer Agent; *provided, however,* that the Company shall appoint a successor transfer agent who shall accept such appointment prior to the effectiveness of such removal. Upon any such removal or appointment, the Company shall send notice thereof by first-class mail, postage prepaid, to the Holders.

Section 16. *Replacement Certificates.*

(a) If physical certificates are issued, the Company shall replace any mutilated certificate at the Holder's expense upon surrender of that certificate to the Transfer Agent. The Company shall replace certificates that become destroyed, stolen or lost at the Holder's expense upon delivery to the Company and the Transfer Agent of satisfactory evidence that the certificate has been destroyed, stolen or lost, together with any indemnity that may be required by the Transfer Agent and the Company.

(b) If physical certificates are issued, the Company shall not be required to issue any certificates representing the Series B-1 Preferred Stock on or after the applicable Conversion Date. In place of the delivery of a replacement certificate following the applicable Conversion Date, the Transfer Agent, upon delivery of the evidence and indemnity described in clause (a) above, shall deliver the shares of Common Stock pursuant to the terms of the Series B-1 Preferred Stock formerly evidenced by the certificate.

Section 17. *Miscellaneous.*

(a) All notices referred to herein shall be in writing, and, unless otherwise specified herein, all notices hereunder shall be deemed to have been given upon the earlier of receipt thereof or three Business Days after the mailing thereof if sent by registered or certified mail (unless first-class mail shall be specifically permitted for such notice under the terms of these Articles of Amendment) with postage prepaid, addressed: (i) if to the Company, to its office at Ten Post Office Square, Boston, MA 02109, Attention: Margaret W. Chambers, Esq. or to the Transfer Agent at 250 Royall Street, Canton, MA 02021, Attention: Jeff Seiders, or other agent of the Company designated as permitted by these Articles of Amendment, or (ii) if to any Holder or holder of shares of Common Stock, as the case may be, to such Holder or holder at the address listed in the stock record books of the Company (which may include the records of any transfer agent for the Series B-1 Preferred Stock or the Common Stock, as the case may be), or (iii) to such other address as the Company or any such Holder or holder, as the case may be, shall have designated by notice similarly given.

A-44

(b) The Company shall pay any and all stock transfer and documentary stamp taxes that may be payable in respect of any issuance or delivery of shares of Series B-1 Preferred Stock or shares of Common Stock or other securities issued on account of Series B-1 Preferred Stock pursuant hereto or certificates representing such shares or securities. The Company shall not, however, be required to pay any such tax that may be payable in respect of any transfer involved in the issuance or delivery of shares of Series B-1 Preferred Stock or Common Stock or other securities in a name other than that in which the shares of Series B-1 Preferred Stock with respect to which such shares or other securities are issued or delivered were registered, or in respect of any payment to any Person other than a payment to the registered holder thereof, and shall not be required to make any such issuance, delivery or payment unless and until the Person otherwise entitled to such issuance, delivery or payment has paid to the Company the amount of any such tax or has established, to the satisfaction of the Company, that such tax has been paid or is not payable.

(c) No share of Series B-1 Preferred stock shall have any rights of preemption whatsoever pursuant to these Articles of Amendment as to any securities of the Company, or any warrants, rights or options issued or granted with respect thereto, regardless of how such securities, or such warrants, rights or options, may be designated issued or granted.

A-45

## ATTACHMENT B

**A:** 401 shares of the authorized preferred stock of the Company are hereby designated "Series B Non-Cumulative Perpetual Contingent Convertible Preferred Stock". Unless otherwise indicated, references to "Sections" or "Subsections" in this Section 4.3A of this Article 4 refer to sections and subsections of 4.3A of this Article 4.

The preferences, limitations, voting powers and relative rights of the Series B Non-Cumulative Perpetual Contingent Convertible Preferred Stock are as follows:

## DESIGNATION

*Section 1. Designation.* There is hereby created out of the authorized and unissued shares of preferred stock of the Company a series of preferred stock designated as the "Series B Non-Cumulative Perpetual Contingent Convertible Preferred Stock" (the "Series B Preferred Stock"). The number of shares constituting such series shall be 401. The par value of the Series B Preferred Stock shall be $1.00 per share, and the liquidation preference of the Series B Preferred Stock shall be $100,000 per share.

*Section 2. Ranking.* The Series B Preferred Stock will, with respect to dividend rights and rights on liquidation, winding-up and dissolution, rank (i) on a parity with the Series A Preferred Stock and with each other class or series of preferred stock established after the Effective Date by the Company the terms of which expressly provide that such class or series will rank on a parity with the Series B Preferred Stock as to dividend rights and rights on liquidation, winding-up and dissolution of the Company (collectively referred to as "Parity Securities") and (ii) senior to the common stock, par value $1.00 per share, of the Company (the "Common Stock") and each other class or series of capital stock of the Company outstanding or established after the Effective Date by the Company the terms of which do not expressly provide that it ranks on a parity with or senior to the Series B Preferred Stock as to dividend rights and rights on liquidation, winding-up and dissolution of the Company (collectively referred to as "Junior Securities"). The Company has the right to authorize and/or issue additional shares or classes or series of Junior Securities or Parity Securities without the consent of the Holders.

*Section 3. Definitions.* Unless the context or use indicates another meaning or intent, the following terms shall have the following meanings, whether used in the singular or the plural:

(a) "Affiliate" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with, such other Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") when used with respect to any Person, means the possession, directly or indirectly, of the power to cause the direction of management or policies of such Person, whether through the ownership of voting securities by contract or otherwise.

(b) "Agent Members" has the meaning set forth in Section 18(c).

(c) "Articles of Amendment" means the Articles of Amendment of the Company dated August 8, 2008.

(d) "Articles of Organization" means the Restated Articles of Organization of the Company, as amended.

(e) "As-Converted Dividend" means, with respect to any Section 4(c) Dividend Period, the product of (i) the pro forma per share quarterly Common Stock dividend derived by (A) annualizing the last dividend declared during such Section 4(c) Dividend Period on the Common Stock and (B) dividing such annualized dividend by four and (ii) the number of shares into which a share of Series B Preferred Stock would then be convertible (assuming the Stockholder Approvals have been obtained); *provided, however,* that for any Section 4(c) Dividend Period during which no dividend on the Common Stock has been declared, the As-Converted Dividend shall be deemed to be $0.00.

(f) "BHC Act" has the meaning set forth in Section 8(b).

(g) "Board of Directors" means the board of directors of the Company or any committee thereof duly authorized to act on behalf of such board of directors.

(h) "Business Day" means any day other than a Saturday, Sunday or any other day on which banks in New York City, New York or Boston, Massachusetts are generally required or authorized by law to be closed.

(i) "CIBC Act" has the meaning set forth in Section 8(b).

(j) "Closing Price" of the Common Stock on any date of determination means the closing sale price or, if no closing sale price is reported, the last reported sale price of the shares of the Common Stock on The NASDAQ Global Select Market on such date. If the Common Stock is not traded on The NASDAQ Global Select Market on any date of determination, the Closing Price of the Common Stock on such date of determination means the closing sale price as reported in the composite transactions for the principal U.S. national or regional securities exchange on which the Common Stock is so listed or quoted, or, if no closing sale price is reported, the last reported sale price on the principal U.S. national or regional securities exchange on which the Common Stock is so listed or quoted, or if the Common Stock is not so listed or quoted on a U.S. national or regional securities exchange, the last quoted bid price for the Common Stock in the over-the-counter market as reported by Pink Sheets LLC or similar organization, or, if that bid price is not available, the market price of the Common Stock on that date as determined by a nationally recognized independent investment banking firm retained by the Company for this purpose.

For purposes of these Articles of Amendment, all references herein to the "Closing Price" and "last reported sale price" of the Common Stock on The NASDAQ Global Select Market shall be such closing sale price and last reported sale price as reflected on the website of The NASDAQ Global Select Market (http://www.nasdaq.com) and as reported by Bloomberg Professional Service; *provided* that in the event there is a discrepancy between the closing sale price or last reported sale price as reflected on the website of The NASDAQ Global Select Market and as reported by Bloomberg Professional Service, the closing sale price and last reported sale price on the website of The NASDAQ Global Select Market shall govern.

B-2

(k) "Common Stock" has the meaning set forth in Section 2.

(l) "Company" means Boston Private Financial Holdings, Inc., a corporation organized and existing under the laws of the Commonwealth of Massachusetts.

(m) "Conversion Agent" means the Transfer Agent acting in its capacity as conversion agent for the Series B Preferred Stock, and its successors and assigns.

(n) "Conversion Date" has the meaning set forth in Section 9(e)(i).

(o) "Conversion Price" means for each share of Series B Preferred Stock, $5.52; *provided* that the foregoing shall be subject to adjustment or limitation as set forth herein.

(p) "Current Market Price" means, on any date, the average of the daily Closing Price per share of the Common Stock or other securities on each of the five consecutive Trading Days preceding the earlier of the day before the date of the issuance, dividend or distribution in question and the day before the Ex-Date with respect to the issuance or distribution, giving rise to an adjustment to the Conversion Price pursuant to Section 10.

(q) "Depositary" means DTC or its nominee or any successor depositary appointed by the Company.

(r) "DTC" means The Depository Trust Company.

(s) "Effective Date" means the date on which shares of the Series B Preferred Stock are first issued.

(t) "Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

(u) "Exchange Property" has the meaning set forth in Section 11(a).

(v) "Ex-Date" when used with respect to any issuance, dividend or distribution giving rise to an adjustment to the Conversion Price pursuant to Section 10, means the first date on which the Common Stock or other securities trade without the right to receive the issuance, dividend or distribution.

(w) "Global Preferred Stock" has the meaning set forth in Section 18(a).

(x) "Holder" means the Person in whose name the shares of the Series B Preferred Stock are registered, which may be treated by the Company, Transfer Agent and Conversion Agent as the absolute owner of the shares of Series B Preferred Stock for the purpose of making payment and settling the related conversions and for all other purposes.

B-3

(y) "Investment Agreement" means the Investment Agreement, dated as of July 22, 2008, as may be amended from time to time, between the Company and Investor.

(z) "Investor" means BP Holdco, L.P.

(aa) "Junior Securities" has the meaning set forth in Section 2.

(bb) "Liquidation Preference" means, as to the Series B Preferred Stock, $100,000 per share (as adjusted for any split, subdivision, combination, consolidation, recapitalization or similar event with respect to the Series B Preferred Stock).

(cc) "Officer" means the Chief Executive Officer, the Chief Operating Officer, any Senior Vice President, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Secretary or any Assistant Secretary of the Company.

(dd) "Parity Securities" has the meaning set forth in Section 2.

(ee) "Person" means a legal person, including any individual, corporation, estate, partnership, joint venture, association, joint-stock company, limited liability company or trust.

(ff) "Record Date" has the meaning set forth in Section 4(d).

(gg) "Reorganization Event" has the meaning set forth in Section 11(a).

(hh) "Section 4(c) Dividend Payment Date" has the meaning set forth in Section 4(c).

(ii) "Section 4(c) Dividend Period" has the meaning set forth in Section 4(c).

(jj) "Securities" has the meaning set forth in the Investment Agreement.

(kk) "Securities Act" means the Securities Act of 1933, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

(ll) "Series A Preferred Stock" means the shares of the Company's Series A Non-Cumulative Perpetual Convertible Preferred Stock.

(mm) "Series B Preferred Stock" has the meaning set forth in Section 1.

(nn) "Special Dividend" has the meaning set forth in Section 4(c).

(oo) "Special Dividend Rate" means (i) from and after September 30, 2008 to but not including March 31, 2009, 14%, (ii) from and after March 31, 2009 to but not including September 30, 2009, 15.5% and (iii) from and after September 30, 2009, 20%.

B-4

(pp) "Stockholder Approvals" means all stockholder approvals necessary to (i) approve the conversion of the Series B Preferred Stock into Common Stock and the issuance of any shares of Common Stock which may be issued pursuant to the terms of these Articles of Amendment for purposes of Rule 4350(i) of the NASDAQ Marketplace Rules and (ii) amend the Articles of Organization to increase the number of shares of Common Stock to at least such number as shall be sufficient to permit the full conversion of the Series B Preferred Stock into Common Stock. For the avoidance of doubt, the Stockholder Approvals shall be deemed to be obtained for the purposes of these Articles of Amendment only if all of the foregoing approvals shall have been obtained.

(qq) "Trading Day" means a day on which the shares of Common Stock:

    (i)    are not suspended from trading on any national or regional securities exchange or association or over-the-counter market at the close of business; and

    (ii)    have traded at least once on the national or regional securities exchange or association or over-the-counter market that is the primary market for the trading of the Common Stock.

(rr) "Transfer Agent" means Computershare acting as transfer agent, registrar and paying agent for the Series B Preferred Stock, and its successors and assigns.

(ss) "Voting Securities" has the meaning set forth in the BHC Act and any rules or regulations promulgated thereunder.

*Section 4.* Dividends.

(a) From and after the Effective Date, the Holders shall be entitled to receive, when, as and if declared by the Board of Directors, out of funds legally available therefor, non-cumulative cash dividends in the amount determined as set forth in Sections 4(b) and 4(c), and shall be entitled to share in the distributions referred to in Section 4(j).

(b) If the Board of Directors declares and pays a cash dividend in respect of any shares of Common Stock, then the Board of Directors shall declare and pay to the Holders a cash dividend in an amount per share of Series B Preferred Stock equal to the product of (i) the per share dividend declared and paid in respect of each share of Common Stock and (ii) the number of shares of Common Stock into which such share of Series B Preferred Stock is then convertible. Dividends payable pursuant to this Section 4(b) shall be payable on the same date that dividends are payable to holders of shares of Common Stock, and no dividends shall be payable to holders of shares of Common Stock unless the full dividends contemplated by this Section 4(b) are paid at the same time in respect of the Series B Preferred Stock.

(c) In the event that the Stockholder Approvals shall not have been obtained by the Record Date with respect to the Section 4(c) Dividend Period ending on December 30, 2008, commencing on December 31, 2008, in lieu of the dividends provided for in Section 4(b), dividends shall be payable quarterly in arrears on March 31, June 30, September 30 and December 31 of each year (each, a "Section 4(c) Dividend Payment Date") or, if any such day is

B-5

not a Business Day, the next Business Day. Dividends payable pursuant to this Section 4(c), if, when and as declared by the Board of Directors, will be, for each outstanding share of Series B Preferred Stock, payable at an annual rate on the Liquidation Preference equal to the Special Dividend Rate (such dividend, the "Special Dividend"); *provided* that, in the event that the As-Converted Dividend for any Section 4(c) Dividend Period is greater than the Special Dividend, each outstanding share of Series B Preferred Stock shall be entitled to receive, if, when and as declared by the Board of Directors, the As-Converted Dividend rather than the Special Dividend. Dividends payable pursuant to this Section 4(c) will be computed on the basis of a 360-day year of twelve 30-day months and, for any Section 4(c) Dividend Period greater or less than a full Section 4(c) Dividend Period, will be computed on the basis of the actual number of days elapsed in the period divided by 360. No interest or sum of money in lieu of interest will be paid on any dividend payment on the Series B Preferred Stock paid later than the scheduled Section 4(c) Dividend Payment Date. As used herein, "Section 4(c) Dividend Period" means (i) the period from and including September 30, 2008 to and including December 30, 2008 and (ii) each period thereafter from and including a Section 4(c) Dividend Payment Date and to and including the day immediately preceding the following Section 4(c) Dividend Payment Date.

(d) Each dividend will be payable to Holders of record as they appear in the records of the Company on the applicable record date (each, a "Record Date"), which (i) with respect to dividends payable pursuant to Section 4(b), shall be the same as the record date for the payment of the corresponding dividend payable in respect of the Common Stock and (ii) with respect to dividends payable pursuant to Section 4(c), shall be on the 15th day of the month in which the relevant Section 4(c) Dividend Payment Date occurs or, if such date is not a Business Day, the next day that is a Business Day.

(e) Dividends on the Series B Preferred Stock are non-cumulative. If the Board of Directors does not declare a dividend on the Series B Preferred Stock for a Section 4(c) Dividend Period prior to the related Section 4(c) Dividend Payment Date, the Holders will have no right to receive any dividend for the Section 4(c) Dividend Period, and the Company will have no obligation to pay a dividend for that Section 4(c) Dividend Period, whether or not dividends are declared and paid for any future Section 4(c) Dividend Period with respect to the Series B Preferred Stock or the Common Stock or any other class or series of the Company's preferred stock.

(f) The Company shall not declare or pay or set apart for payment dividends on any Parity Securities unless the Company has declared and paid, or set apart for payment, dividends on the Series B Preferred Stock for the most recent Section 4(c) Dividend Period ending on or before the dividend payment date of such Parity Securities, ratably with dividends on such Parity Securities, in proportion to the respective amounts of (A) the full amount of dividends payable on the Series B Preferred Stock for such Section 4(c) Dividend Period and (B) the accumulated and unpaid dividends, or the full amount of dividends payable for the most recent dividend period in the case of non-cumulative Parity Securities, on such Parity Securities.

(g) If full quarterly dividends payable pursuant to Section 4(c) on all outstanding shares of the Series B Preferred Stock for any Section 4(c) Dividend Period have not been declared and paid, or declared and funds set aside therefor, the Company shall not declare or pay dividends with respect to, or redeem, purchase or acquire any of, its Junior Securities

B-6

during the next succeeding Section 4(c) Dividend Period, other than (i) redemptions, purchases or other acquisitions of Junior Securities in connection with any benefit plan or other similar arrangement with or for the benefit of any one or more employees, officers, directors or consultants or in connection with a dividend reinvestment or shareholder stock purchase plan, (ii) any declaration of a dividend in connection with any shareholders' rights plan, or the issuance of rights, stock or other property under any shareholders' rights plan, including with respect to any successor shareholders' rights plan, or the redemption or repurchase of rights pursuant thereto and (iii) conversions into or exchanges for other Junior Securities and cash solely in lieu of fractional shares of the Junior Securities.

(h) Payments of cash for dividends will be delivered to the Holder at their addresses listed in the stock record books maintained by the Transfer Agent or, in the case of Global Preferred Stock, through a book-entry transfer through DTC or any successor Depositary.

(i) If a Conversion Date on which a Holder elects to convert Series B Preferred Stock is prior to the Record Date for any declared dividend for the Section 4(c) Dividend Period, such Holder will not have the right to receive any declared dividend for that Section 4(c) Dividend Period. If a Conversion Date on which a Holder elects to convert Series B Preferred Stock is after the Record Date for any declared dividend and prior to the Section 4(c) Dividend Payment Date, such Holder shall receive that dividend on the relevant Section 4(c) Dividend Payment Date if such Holder was the Holder of record on the Record Date for that dividend. Notwithstanding the preceding sentence, if the Conversion Date on which a Holder elects to convert its Series B Preferred Stock pursuant to Section 8 is after the Record Date and prior to the Section 4(c) Dividend Payment Date, whether or not such Holder was the Holder of record on the Record Date, the Holder shall pay to the Conversion Agent upon conversion of the shares of Series B Preferred Stock an amount in cash equal to the full dividend actually paid on the Section 4(c) Dividend Payment Date for the then-current Section 4(c) Dividend Period on the shares being converted.

(j) If the Company makes a distribution to all holders of shares of Common Stock consisting of capital stock of any class or series, or similar equity interests of, or relating to, a subsidiary or other business unit, the Holders of Series B Preferred Stock shall be entitled to participate in such distribution. The number of shares of such capital stock or equity interests to which each Holder of Series B Preferred Stock shall be entitled shall be the number to which such Holder would have been entitled had such Holder converted such Holder's shares of Series B Preferred Stock immediately prior to the record date for such distribution.

Section 5. Liquidation.

(a) In the event the Company voluntarily or involuntarily liquidates, dissolves or winds up, the Holders at the time shall be entitled to receive liquidating distributions in the amount of the Liquidation Preference per share of Series B Preferred Stock, plus an amount equal to any declared but unpaid dividends thereon to and including the date of such liquidation, out of assets legally available for distribution to the Company's shareholders, before any distribution of assets is made to the holders of the Common Stock or any other Junior Securities. After payment of the full amount of such liquidating distributions, the Holders shall be entitled to participate in all further distributions of the remaining assets of the Company as if each share of Series B Preferred Stock had been converted into Common Stock in accordance with the terms hereof immediately prior to such liquidating distributions.

B-7

(b) In the event the assets of the Company available for distribution to shareholders upon any liquidation, dissolution or winding-up of the affairs of the Company, whether voluntary or involuntary, shall be insufficient to pay in full the amounts payable with respect to all outstanding shares of the Series B Preferred Stock and the corresponding amounts payable on any Parity Securities, the Holders and the holders of such Parity Securities shall share ratably in any distribution of assets of the Company in proportion to the full respective liquidating distributions to which they would otherwise be respectively entitled.

(c) The Company's consolidation or merger with or into any other entity, the consolidation or merger of any other entity with or into the Company, or the sale of all or substantially all of the Company's property or business will not constitute its liquidation, dissolution or winding up.

*Section 6. Maturity.* The Series B Preferred Stock shall be perpetual unless converted in accordance with these Articles of Amendment.

*Section 7. Redemptions.*

(a) The Series B Preferred Stock may not be redeemed by the Company (i) prior to the third anniversary of the Effective Date or (ii) on any date after the Stockholder Approvals shall have been obtained. If the Stockholder Approvals shall not have been obtained by the third anniversary of the Effective Date, then at any time after such date and prior to the receipt of the Stockholder Approvals, the Company, at its option, may redeem, in whole at any time or in part from time to time (provided, that the Company may not exercise its right to redeem the Series B Preferred Stock at any time after it has entered into an agreement to effect a Reorganization Event and prior to the consummation thereof or a termination of such agreement prior to the consummation thereof), the shares of Series B Preferred Stock at the time outstanding, upon notice given as provided in Section 7(c) below, at a redemption price per share equal to the greater of (i) 125% of the Liquidation Preference and (ii) the average of the Closing Prices of the Common Stock for the ten consecutive Trading Days ending on the sixth Trading Day prior to the date of redemption multiplied by the number of shares of Common Stock into which one share of Series B Preferred Stock would be convertible on such date, together (except as otherwise provided herein) with (x) an amount equal to any dividends that have been declared but not paid prior to the redemption date and (y) an amount equal to any dividends referenced in Section 4(b) and Section 4(c) (whether or not scheduled) between the Effective Date and the redemption date that were not declared and paid prior to the redemption date. The redemption price for any shares of Series B Preferred Stock shall be payable in cash on the redemption date to the Holder upon surrender of the certificate(s) evidencing such shares to the Company or its agent. Any declared but unpaid dividends payable on a redemption date that occurs subsequent to a Record Date shall not be paid to the holder entitled to receive the redemption price on the redemption date, but rather shall be paid to the holder of record of the redeemed shares on such Record Date.

B-8

(b) The Series B Preferred Stock will not be subject to any mandatory redemption, sinking fund or other similar provisions. Holders will have no right to require redemption of any shares of Series B Preferred Stock.

(c) Notice of every redemption of shares of Series B Preferred Stock shall be given by first class mail, postage prepaid, addressed to the Holders of the shares to be redeemed at their respective last addresses appearing on the books of the Company. Such mailing shall be at least 30 days and not more than 60 days before the date fixed for redemption; *provided, however,* that failure to give such notice by mail, or any defect in such notice or in the mailing thereof, to any Holder of shares of Series B Preferred Stock designated for redemption shall not affect the validity of the proceedings for the redemption of any other shares of Series B Preferred Stock to be so redeemed except as to the Holder to whom the Company has failed to give such notice or except as to the Holder to whom notice was defective. Notwithstanding the foregoing, if the Series B Preferred Stock or any depositary shares representing interests in the Series B Preferred Stock are issued in book-entry form through DTC or any other similar facility, notice of redemption may be given to the Holders at such time and in any manner permitted by such facility. Each such notice given to a Holder shall state: (1) the redemption date; (2) the number of shares of Series B Preferred Stock to be redeemed and, if less than all the shares held by such Holder are to be redeemed, the number of such shares to be redeemed from such Holder; (3) the redemption price (or manner of determination of the redemption price); and (4) the place or places where certificates for such shares are to be surrendered for payment of the redemption price.

(d) In case of any redemption of only part of the shares of Series B Preferred Stock at the time outstanding, the shares to be redeemed shall be selected *pro rata.* If fewer than all the shares represented by any certificate are redeemed, a new certificate shall be issued representing the unredeemed shares without charge to the Holder thereof.

(e) If notice of redemption has been duly given as provided in Section 7(c) and if on or before the redemption date specified in the notice all funds necessary for the redemption have been set aside by the Company, separate and apart from its other funds, in trust for the *pro rata* benefit of the Holders of the shares called for redemption, so as to be and continue to be available therefor, then, notwithstanding that any certificate for any share so called for redemption has not been surrendered for cancellation, on and after the redemption date unless the Company defaults in the payment of the redemption price, in which case such rights shall continue until the redemption price is paid, dividends shall cease to accrue on all shares so called for redemption, all shares so called for redemption shall no longer be deemed outstanding and all rights with respect to such shares shall forthwith on such redemption date cease and terminate, except only the right of the Holders thereof to receive the amount payable on such redemption, without interest. Any funds unclaimed at the end of two years from the redemption date shall, to the extent permitted by law, be released to the Company, after which time the Holders of the shares so called for redemption shall look only to the Company for payment of the redemption price of such shares. Shares of outstanding Series B Preferred Stock that are redeemed, purchased or otherwise acquired by the Company, or converted into another series of preferred stock, shall be cancelled and shall revert to authorized but unissued shares of preferred stock undesignated as to series.

B-9

*Section 8. Right to Convert.*

(a) At any time on or after the Business Day following the date on which the Stockholder Approvals shall have been obtained, each Holder shall have the right, at such Holder's option (but subject to the conversion procedures of Section 9 and the limitations on ownership set forth in Section 8(b)), to convert all or any portion of such Holder's Series B Preferred Stock at the Conversion Price, with cash being payable in lieu of fractional shares in accordance with Section 13 hereof.

(b) Notwithstanding anything to the contrary contained in these Articles of Amendment, each Holder shall be entitled to convert shares of Series B Preferred Stock pursuant to this Section 8, or receive shares of Common Stock upon any such conversion, to the extent (but only to the extent) that such conversion or receipt would not cause or result in such Holder and its Affiliates, collectively, being deemed to own, control or have the power to vote, for purposes of the Bank Holding Company Act of 1956, as amended (the "BHC Act"), or the Change in Bank Control Act of 1978, as amended (the "CIBC Act"), and any rules and regulations promulgated thereunder, 10% or more of any class of Voting Securities of the Company outstanding at such time (excluding for purposes of this calculation any reduction in the percentage of Voting Securities such Holder and its Affiliates so owns, controls or has the power to vote resulting from transfers by Investor and its Affiliates of Securities purchased by Investor pursuant to the Investment Agreement; it being understood, for the avoidance of doubt, that no Security shall be included in any such percentage calculation to the extent that it cannot by its terms be converted into or exercised for Voting Securities by such Holder or its Affiliates at the time of such measurement or transfer).

*Section 9. Conversion Procedures.*

(a) Effective immediately prior to the close of business on any applicable Conversion Date, dividends shall no longer be declared on any such converted shares of Series B Preferred Stock and such shares of Series B Preferred Stock shall cease to be outstanding, in each case, subject to the right of Holders to receive any declared and unpaid dividends on such shares and any payments to which they are otherwise entitled pursuant to Section 8 or this Section 9, as applicable.

(b) Prior to the close of business on any applicable Conversion Date, shares of Common Stock issuable upon conversion of, or other securities issuable upon conversion of, any shares of Series B Preferred Stock shall not be deemed outstanding for any purpose, and the Holders shall have no rights with respect to the Common Stock or other securities issuable upon conversion (including voting rights, rights to respond to tender offers for the Common Stock or other securities issuable upon conversion and rights to receive any dividends or other distributions on the Common Stock or other securities issuable upon conversion) by virtue of holding shares of Series B Preferred Stock.

(c) Shares of Series B Preferred Stock duly converted in accordance with these Articles of Amendment, or otherwise reacquired by the Company, will resume the status of authorized and unissued preferred stock, undesignated as to series and available for future issuance.

B-10

(d) The Person or Persons entitled to receive the Common Stock and/or cash, securities or other property issuable upon conversion of Series B Preferred Stock shall be treated for all purposes as the record holder(s) of such shares of Common Stock and/or securities and the owners of such cash or other property as of the close of business on the applicable Conversion Date. In the event that the Holders shall not by written notice designate the name in which shares of Common Stock and/or cash, securities or other property (including payments of cash in lieu of fractional shares) to be issued or paid upon conversion of shares of Series B Preferred Stock should be registered or paid or the manner in which such shares should be delivered, the Company shall be entitled to register and deliver such shares, and make such payment, in the name of the Holders and in the manner shown on the records of the Company or, in the case of Global Preferred Stock, through book-entry transfer through the Depositary.

(e) Conversion into shares of Common Stock will occur on any applicable Conversion Date as follows:

(i)    On the date of any conversion at the option of a Holder pursuant to Section 8, if such Holder's interest is in certificated form, such Holder must do each of the following in order to convert:

(A) complete and manually sign the conversion notice provided by the Conversion Agent, or a facsimile of the conversion notice, and deliver this irrevocable notice to the Conversion Agent;

(B) surrender the shares of Series B Preferred Stock to the Conversion Agent;

(C) if required, furnish appropriate endorsements and transfer documents;

(D) if required, pay all transfer or similar taxes; and

(E) if required pursuant to Section 4(i), pay funds equal to any declared and unpaid dividend payable on the next Section 4(c) Dividend Payment Date to which such Holder is entitled

If a Holder's interest is a beneficial interest in Global Preferred Stock, in order to convert, a Holder must comply with paragraphs (C) through (E) listed above and comply with the Depositary's procedures for converting a beneficial interest in a global security.

The date on which a Holder complies with the procedures in this clause (i) is the "Conversion Date".

(ii)    The Conversion Agent shall, on a Holder's behalf, convert the Series B Preferred Stock into shares of Common Stock, in accordance with the terms of the notice delivered by such Holder described in clause (i) above.

B-11

*Section 10. Anti-Dilution Adjustments.*

(a) The Conversion Price shall be subject to the following adjustments; *provided, however,* that notwithstanding anything to the contrary contained in these Articles of Amendment, any adjustment to the Conversion Price to be made pursuant to these Articles of Amendment shall be made to the extent (but only to the extent) that such adjustment would not cause or result in any Holder and its Affiliates, collectively, being deemed to own, control or have the power to vote, for purposes of the BHC Act or the CIBC Act and any rules and regulations promulgated thereunder, Voting Securities which (assuming, for this purpose only, full conversion and/or exercise of all such securities) would represent 25% or more of any class of Voting Securities of the Company outstanding at such time (excluding for purposes of this calculation any reduction in the percentage of Voting Securities such Holder and its Affiliates so owns, controls or has the power to vote resulting from transfers by Investor and its Affiliates of Securities purchased by Investor pursuant to the Investment Agreement); *provided, further, however,* that any adjustment (or portion thereof) prohibited pursuant to this Section 10(a) shall be postponed and implemented on the first date on which such implementation would not result in the condition described above in this Section 10(a):

(i) <u>Stock Dividends and Distributions</u>. If the Company pays dividends or other distributions on the Common Stock in shares of Common Stock, then the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m., New York City time on the Trading Day immediately prior to the Ex-Date for such dividend or distribution by the following fraction:

$$\frac{OS_0}{OS^1}$$

Where,

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to Ex-Date for such dividend or distribution.

$OS^1$ = the sum of the number of shares of Common Stock outstanding immediately prior to the Ex-Date for such dividend or distribution plus the total number of shares of Common Stock constituting such dividend or distribution.

The adjustment pursuant to this clause (i) shall become effective at 9:00 a.m., New York City time on the Ex-Date for such dividend or distribution. For the purposes of this clause (i), the number of shares of Common Stock at the time outstanding shall not include shares held in treasury by the Company. If any dividend or distribution described in this clause (i) is declared but not so paid or made, the Conversion Price shall be readjusted, effective as of the date the Board of Directors publicly announces its decision not to make such dividend or distribution, to such Conversion Price that would be in effect if such dividend or distribution had not been declared.

B-12

(ii) <u>Subdivisions, Splits and Combination of the Common Stock.</u> If the Company subdivides, splits or combines the shares of Common Stock, then the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m., New York City time on the Trading Day immediately prior to the effective date of such share subdivision, split or combination by the following fraction:

$$\frac{OS_0}{OS^1}$$

Where,

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the effective date of such share subdivision, split or combination.

$OS^1$ = the number of shares of Common Stock outstanding immediately after the opening of business on the effective date of such share subdivision, split or combination.

The adjustment pursuant to this clause (ii) shall become effective at 9:00 a.m., New York City time on the effective date of such subdivision, split or combination. For the purposes of this clause (ii), the number of shares of Common Stock at the time outstanding shall not include shares held in treasury by the Company. If any subdivision, split or combination described in this clause (ii) is announced but the outstanding shares of Common Stock are not subdivided, split or combined, the Conversion Price shall be readjusted, effective as of the date the Board of Directors publicly announces its decision not to subdivide, split or combine the outstanding shares of Common Stock, to such Conversion Price that would be in effect if such subdivision, split or combination had not been announced.

(iii) <u>Issuance of Stock Purchase Rights. If the Company issues to all</u> holders of the shares of Common Stock rights or warrants (other than rights or warrants issued pursuant to a dividend reinvestment plan or share purchase plan or other similar plans) entitling them, for a period of up to 45 days from the date of issuance of such rights or warrants, to subscribe for or purchase the shares of Common Stock at less than the Current Market Price on the date fixed for the determination of stockholders entitled to receive such rights or warrants, then the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m., New York City time on the Trading Day immediately prior to the Ex-Date for such issuance by the following fraction:

$$\frac{OS_0 + Y}{OS_0 + X}$$

B-13

Where,

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the Ex-Date for such distribution.

X = the total number of shares of Common Stock issuable pursuant to such rights or warrants.

Y = the number of shares of Common Stock equal to the aggregate price payable to exercise such rights or warrants divided by the Current Market Price.

Any adjustment pursuant to this clause (iii) shall become effective immediately prior to 9:00 a.m., New York City time, on the Ex-Date for such issuance. For the purposes of this clause (iii), the number of shares of Common Stock at the time outstanding shall not include shares held in treasury by the Company. The Company shall not issue any such rights or warrants in respect of shares of the Common Stock held in treasury by the Company. In the event that such rights or warrants described in this clause (iii) are not so issued, the Conversion Price shall be readjusted, effective as of the date the Board of Directors publicly announces its decision not to issue such rights or warrants, to the Conversion Price that would then be in effect if such issuance had not been declared. To the extent that such rights or warrants are not exercised prior to their expiration or shares of Common Stock are otherwise not delivered pursuant to such rights or warrants upon the exercise of such rights or warrants, the Conversion Price shall be readjusted to such Conversion Price that would then be in effect had the adjustment made upon the issuance of such rights or warrants been made on the basis of the delivery of only the number of shares of Common Stock actually delivered. In determining the aggregate offering price payable for such shares of Common Stock, there shall be taken into account any consideration received for such rights or warrants and the value of such consideration (if other than cash, to be reasonably determined by the Board of Directors).

(iv) <u>Debt or Asset Distributions.</u> If the Company distributes to all holders of shares of Common Stock evidences of indebtedness, shares of capital stock, securities, cash or other assets (excluding any dividend or distribution referred to in clause (i) above, any rights or warrants referred to in clause (iii) above, any dividend or distribution paid exclusively in cash, any consideration payable in connection with a tender or exchange offer made by the Company or any of its subsidiaries, and any dividend of shares of capital stock of any class or series, or similar equity interests, of or relating to a subsidiary or other business unit in the case of certain spinoff transactions as described below), then the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m., New York City time on the Trading Day immediately prior to the Ex-Date for such distribution by the following fraction:

$$\frac{SP_0 - FMV}{SP_0}$$

B-14

Where,

$SP_0$ = the Current Market Price per share of Common Stock on such date.

FMV = the fair market value of the portion of the distribution applicable to one share of Common Stock on such date as reasonably determined by the Board of Directors.

In a "spin-off", where the Company makes a distribution to all holders of shares of Common Stock consisting of capital stock of any class or series, or similar equity interests of, or relating to, a subsidiary or other business unit, the Conversion Price will be adjusted on the 15th Trading Day after the effective date of the distribution by multiplying such Conversion Price in effect immediately prior to such 15th Trading Day by the following fraction:

$$\frac{MP_0}{MP_0 + MP_s}$$

Where,

$MP_0$ = the average of the Closing Prices of the Common Stock over the first 10 Trading Days commencing on and including the fifth Trading Day following the effective date of such distribution.

$MP_s$ = the average of the Closing Prices of the capital stock or equity interests representing the portion of the distribution applicable to one share of Common Stock over the first 10 Trading Days commencing on and including the fifth Trading Day following the effective date of such distribution, or, if not traded on a national or regional securities exchange or over-the-counter market, the fair market value of the capital stock or equity interests representing the portion of the distribution applicable to one share of Common Stock on such date as reasonably determined by the Board of Directors.

Any adjustment pursuant to this clause (iv) shall become effective immediately prior to 9:00 a.m., New York City time, on the Ex-Date for such distribution. In the event that such distribution described in this clause (iv) is not so paid or made, the Conversion Price shall be readjusted, effective as of the date the Board of Directors publicly announces its decision not to pay or make such dividend or distribution, to the Conversion Price that would then be in effect if such dividend or distribution had not been declared.

B-15

(v) <u>Cash Distributions</u>. If the Company makes a distribution consisting exclusively of cash to all holders of the Common Stock, excluding (a) any cash dividend on the Common Stock to the extent a corresponding cash dividend is paid on the Series B Preferred Stock pursuant to Section 4(b), (b) any cash that is distributed in a Reorganization Event or as part of a "spin-off" referred to in clause (iv) above, (c) any dividend or distribution in connection with the Company's liquidation, dissolution or winding up, and (d) any consideration payable in connection with a tender or exchange offer made by the Company or any of its subsidiaries, then in each event, the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m., New York City time on the Trading Day immediately prior to the Ex-Date for such distribution by the following fraction:

$$\frac{SP_0 - DIV}{SP_0}$$

Where,

$SP_0$ = the Closing Price per share of Common Stock on the Trading Day immediately preceding the Ex-Date.

DIV = the amount per share of Common Stock of the dividend or distribution.

Any adjustment pursuant to this clause (v) shall become effective immediately prior to the 9:00 a.m., New York City time, on the Ex-Date for such dividend or distribution. In the event that any distribution described in this clause (v) is not so made, the Conversion Price shall be readjusted, effective as of the date the Board of Directors publicly announces its decision not to pay such distribution, to the Conversion Price which would then be in effect if such distribution had not been declared.

(vi) <u>Self Tender Offers and Exchange Offers.</u> If the Company or any of its subsidiaries successfully completes a tender or exchange offer for the Common Stock where the cash and the value of any other consideration included in the payment per share of the Common Stock exceeds the Closing Price per share of the Common Stock on the Trading Day immediately succeeding the expiration of the tender or exchange offer, then the Conversion Price will be adjusted by multiplying the Conversion Price in effect at 5:00 p.m., New York City time on the expiration date of the offer by the following fraction:

$$\frac{OS_0 \text{ x } SP_0}{AC + (SP_0 \text{ x } OS^1)}$$

B-16

Where,

SP$_0$ = the Closing Price per share of Common Stock on the Trading Day immediately succeeding the expiration of the tender or exchange offer.

OS$_0$ = the number of shares of Common Stock outstanding immediately prior to the expiration of the tender or exchange offer, including any shares validly tendered and not withdrawn.

OS$^1$ = the number of shares of Common Stock outstanding immediately after the expiration of the tender or exchange offer.

AC = the aggregate cash and fair market value of the other consideration payable in the tender or exchange offer, as reasonably determined by the Board of Directors.

Any adjustment made pursuant to this clause (vi) shall become effective immediately prior to 9:00 a.m., New York City time, on the Trading Day immediately following the expiration of the tender or exchange offer. In the event that the Company or one of its subsidiaries is obligated to purchase shares of Common Stock pursuant to any such tender offer or exchange offer, but the Company or such subsidiary is permanently prevented by applicable law from effecting any such purchases, or all such purchases are rescinded, then the Conversion Price shall be readjusted to be such Conversion Price that would then be in effect if such tender offer or exchange offer had not been made.

(vi) <u>Rights Plans.</u> To the extent that the Company has a rights plan in effect with respect to the Common Stock on any Conversion Date, upon conversion of any shares of the Series B Preferred Stock, the Holders will receive, in addition to the shares of Common Stock, the rights under the rights plan, unless, prior to such Conversion Date, the rights have separated from the shares of Common Stock, in which case the Conversion Price will be adjusted at the time of separation as if the Company had made a distribution to all holders of the Common Stock as described in clause (iv) above, subject to readjustment in the event of the expiration, termination or redemption of such rights.

(b) Subject to the limitations set forth in the provisos to the first paragraph of Section 10(a), the Company may make such decreases in the Conversion Price, in addition to any other decreases required by this Section 10, as the Board of Directors deems advisable to avoid or diminish any income tax to holders of the Common Stock resulting from any dividend or distribution of shares of Common Stock (or issuance of rights or warrants to acquire shares of Common Stock) or from any event treated as such for income tax purposes or for any other reason.

(c) (i) All adjustments to the Conversion Price shall be calculated to the nearest 1/10th of a cent. No adjustment in the Conversion Price

B-17

shall be required if such adjustment would be less than $0.01; *provided* that any adjustments which by reason of this subparagraph are not required to be made shall be carried forward and taken into account in any subsequent adjustment; *provided further* that on any Conversion Date adjustments to the Conversion Price will be made with respect to any such adjustment carried forward and which has not been taken into account before such date.

(ii) No adjustment to the Conversion Price shall be made if the Holders may participate in the transaction that would otherwise give rise to an adjustment, as a result of holding the Series B Preferred Stock (including without limitation pursuant to Section 4(b) hereof), without having to convert the Series B Preferred Stock, as if they held the full number of shares of Common Stock into which a share of the Series B Preferred Stock may then be converted.

(d) Whenever the Conversion Price is to be adjusted in accordance with Section 10(a) or Section 10(b), the Company shall: (i) compute the Conversion Price in accordance with Section 10(a) or Section 10(b), taking into account the $0.01 threshold set forth in Section 10(c) hereof; (ii) as soon as practicable following the occurrence of an event that requires an adjustment to the Conversion Price pursuant to Section 10(a) or Section 10(b), taking into account the one percent threshold set forth in Section 10(c) hereof (or if the Company is not aware of such occurrence, as soon as practicable after becoming so aware), provide, or cause to be provided, a written notice to the Holders of the occurrence of such event; and (iii) as soon as practicable following the determination of the revised Conversion Price in accordance with Section 10(a) or Section 10(b) hereof, provide, or cause to be provided, a written notice to the Holders setting forth in reasonable detail the method by which the adjustment to the Conversion Price was determined and setting forth the revised Conversion Price.

*Section 11. Reorganization Events.*

(a) In the event of:

(i) any consolidation, merger or other similar business combination of the Company with or into another Person, in each case pursuant to which the Common Stock will be converted into cash, securities or other property of the Company or another Person;

(ii) any sale, transfer, lease or conveyance to another Person of all or substantially all of the property and assets of the Company, in each case pursuant to which the Common Stock will be converted into cash, securities or other property of the Company or another Person;

(iii) any reclassification of the Common Stock into securities including securities other than the Common Stock; or

B-18

(iv) any statutory exchange of the outstanding shares of Common Stock for securities of another Person (other than in connection with a merger or acquisition);

(any such event specified in this Section 11(a), a "Reorganization Event"); each share of Series B Preferred Stock outstanding immediately prior to such Reorganization Event shall, without the consent of the Holders thereof, remain outstanding but shall become convertible, at the option of the Holders, into the kind of securities, cash and other property receivable in such Reorganization Event by a holder (other than the counterparty to the Reorganization Event or an Affiliate of such other party) of the number of shares of Common Stock into which each share of Series B Preferred Stock would then be convertible (assuming the Stockholder Approvals have been obtained) (such securities, cash and other property, the "Exchange Property").

(b) In the event that holders of the shares of Common Stock have the opportunity to elect the form of consideration to be received in such transaction, the consideration that the Holders are entitled to receive shall be deemed to be the types and amounts of consideration received by the majority of the holders of the shares of Common Stock that affirmatively make an election. The amount of Exchange Property receivable upon conversion of any Series B Preferred Stock in accordance with Section 9 shall be determined based upon the Conversion Price in effect on such Conversion Date.

(c) The above provisions of this Section 11 shall similarly apply to successive Reorganization Events and the provisions of Section 10 shall apply to any shares of capital stock of the Company (or any successor) received by the holders of the Common Stock in any such Reorganization Event.

(d) The Company (or any successor) shall, within 20 days of the occurrence of any Reorganization Event, provide written notice to the Holders of such occurrence of such event and of the kind and amount of the cash, securities or other property that constitutes the Exchange Property. Failure to deliver such notice shall not affect the operation of this Section 11.

*Section 12. Voting Rights.*

(a) The Holders will not have any voting rights, including the right to elect any directors, except (i) voting rights, if any, required by law, and (ii) voting rights, if any, described in this Section 12.

(b) So long as any shares of Series B Preferred Stock are outstanding, the vote or consent of the Holders of at least 66 $2/3$ % of the shares of Series B Preferred Stock at the time outstanding, voting as a single class with all other classes and series of Parity Securities having similar voting rights then outstanding and with each series or class having a number of votes proportionate to the aggregate liquidation preference of the outstanding shares of such class or series, given in person or by proxy, either in writing without a meeting or by vote at any meeting called for the purpose, will be necessary for effecting or validating any of the following actions, whether or not such approval is required by Massachusetts law:

(i) any amendment, alteration or repeal of any provision of the Articles of Organization (including these Articles of Amendment) or the Company's bylaws that would alter or change the voting powers, preferences or special rights of the Series B Preferred Stock so as to affect them adversely;

B-19

(ii) any amendment or alteration of the Articles of Organization (including these Articles of Amendment) to authorize or create, or increase the authorized amount of, any shares of, or any securities convertible into shares of, any class or series of the Company's capital stock ranking prior to the Series B Preferred Stock in the payment of dividends or in the distribution of assets on any liquidation, dissolution or winding up of the Company; or

(iii) the consummation of a binding share exchange or reclassification involving the Series B Preferred Stock or a merger or consolidation of the Company with another entity, except that the Holders will have no right to vote under this provision or under Massachusetts law if in each case (x) the Series B Preferred Stock remains outstanding or, in the case of any such merger or consolidation with respect to which the Company is not the surviving or resulting entity, is converted into or exchanged for preference securities of the surviving or resulting entity or its ultimate parent, that is an entity organized and existing under the laws of the United States of America, any state thereof or the District of Columbia, and (y) such Series B Preferred Stock remaining outstanding or such preference securities, as the case may be, have such rights, preferences, privileges and voting powers, taken as a whole, as are not materially less favorable to the Holders thereof than the rights, preferences, privileges and voting powers of the Series B Preferred Stock, taken as a whole;

*provided, however,* that any increase in the amount of the authorized or issued preferred stock or any securities convertible into preferred stock or the creation and issuance, or an increase in the authorized or issued amount, of other series of preferred stock (including the Series B Preferred Stock), or any securities convertible into preferred stock ranking equally with and/or junior to the Series B Preferred Stock with respect to the payment of dividends (whether such dividends are cumulative or non-cumulative) and/or the distribution of assets upon the Company's liquidation, dissolution or winding up will not, in and of itself, be deemed to adversely affect the voting powers, preferences or special rights of the Series B Preferred stock and, notwithstanding any provision of Massachusetts law, the Holders will have no right to vote solely by reason of such an increase, creation or issuance.

If an amendment, alteration, repeal, share exchange, reclassification, merger or consolidation described above would adversely affect one or more but not all series of preferred stock with like voting rights (including the Series B Preferred Stock for this purpose), then only the series affected and entitled to vote shall vote as a class in lieu of all such series of preferred stock.

B-20

(c) Notwithstanding the foregoing, the Holders shall not have any voting rights if, at or prior to the effective time of the act with respect to which such vote would otherwise be required, all outstanding shares of Series B Preferred Stock shall have been converted into shares of Common Stock.

*Section 13. Fractional Shares.*

(a) No fractional shares of Common Stock will be issued as a result of any conversion of shares of Series B Preferred Stock.

(b) In lieu of any fractional share of Common Stock otherwise issuable in respect of any conversion pursuant to Section 8 hereof, the Company shall pay an amount in cash (computed to the nearest cent) equal to the same fraction of the Closing Price of the Common Stock determined as of the second Trading Day immediately preceding the effective date of conversion.

(c) If more than one share of the Series B Preferred Stock is surrendered for conversion at one time by or for the same Holder, the number of full shares of Common Stock issuable upon conversion thereof shall be computed on the basis of the aggregate number of shares of the Series B Preferred Stock so surrendered.

*Section 14. Reservation of Common Stock.*

(a) Following receipt of the Stockholder Approvals, the Company shall at all times reserve and keep available out of its authorized and unissued Common Stock or shares acquired by the Company, solely for issuance upon the conversion of shares of Series B Preferred Stock as provided in these Articles of Amendment, free from any preemptive or other similar rights, such number of shares of Common Stock as shall from time to time be issuable upon the conversion of all the shares of Series B Preferred Stock then outstanding. For purposes of this Section 14(a), the number of shares of Common Stock that shall be deliverable upon the conversion of all outstanding shares of Series B Preferred Stock shall be computed as if at the time of computation all such outstanding shares were held by a single Holder.

(b) Notwithstanding the foregoing, the Company shall be entitled to deliver upon conversion of shares of Series B Preferred Stock, as herein provided, shares of Common Stock acquired by the Company (in lieu of the issuance of authorized and unissued shares of Common Stock), so long as any such acquired shares are free and clear of all liens, charges, security interests or encumbrances (other than liens, charges, security interests and other encumbrances created by the Holders).

(c) All shares of Common Stock delivered upon conversion of the Series B Preferred Stock shall be duly authorized, validly issued, fully paid and non-assessable, free and clear of all liens, claims, security interests and other encumbrances (other than liens, charges, security interests and other encumbrances created by the Holders).

(d) Prior to the delivery of any securities that the Company shall be obligated to deliver upon conversion of the Series B Preferred Stock, the Company shall use its reasonable best efforts to comply with all federal and state laws and regulations thereunder requiring the registration of such securities with, or any approval of or consent to the delivery thereof by, any governmental authority.

B-21

(e) The Company hereby covenants and agrees that, if at any time the Common Stock shall be listed on The NASDAQ Global Select Market or any other national securities exchange or automated quotation system, the Company will, if permitted by the rules of such exchange or automated quotation system, list and keep listed, so long as the Common Stock shall be so listed on such exchange or automated quotation system, all the Common Stock issuable upon conversion of the Series B Preferred Stock; *provided, however,* that if the rules of such exchange or automated quotation system permit the Company to defer the listing of such Common Stock until the first conversion of Series B Preferred Stock into Common Stock in accordance with the provisions hereof, the Company covenants to list such Common Stock issuable upon conversion of the Series B Preferred Stock in accordance with the requirements of such exchange or automated quotation system at such time.

Section 15. *Transfer Agent and Conversion Agent.* The duly appointed Transfer Agent and Conversion Agent for the Series B Preferred Stock shall be Computershare. The Company may, in its sole discretion, remove the Transfer Agent in accordance with the agreement between the Company and the Transfer Agent; *provided* that the Company shall appoint a successor transfer agent who shall accept such appointment prior to the effectiveness of such removal. Upon any such removal or appointment, the Company shall send notice thereof by first-class mail, postage prepaid, to the Holders.

Section 16. *Repurchase of Junior Securities.* For so long as the Stockholder Approvals shall not have been obtained, the Company shall not redeem, purchase or acquire any of its Junior Securities, other than (i) redemptions, purchases or other similar acquisitions of Junior Securities in connection with any benefit plan or other similar arrangement with or for the benefit of any one or more employees, officers, directors of consultants or in connection with a dividend reinvestment or stockholder purchase plan and (ii) conversions into or exchanges for other Junior Securities and cash solely in lieu of fractional shares of the Junior Securities.

Section 17. *Replacement Certificates.*

(a) If physical certificates are issued, the Company shall replace any mutilated certificate at the Holder's expense upon surrender of that certificate to the Transfer Agent. The Company shall replace certificates that become destroyed, stolen or lost at the Holder's expense upon delivery to the Company and the Transfer Agent of satisfactory evidence that the certificate has been destroyed, stolen or lost, together with any indemnity that may be required by the Transfer Agent and the Company.

(b) If physical certificates are issued, the Company shall not be required to issue any certificates representing the Series B Preferred Stock on or after the applicable Conversion Date. In place of the delivery of a replacement certificate following the applicable Conversion Date, the Transfer Agent, upon delivery of the evidence and indemnity described in clause (a) above, shall deliver the shares of Common Stock pursuant to the terms of the Series B Preferred Stock formerly evidenced by the certificate.

B-22

*Section 18. Form.*

(a) Series B Preferred Stock may be issued in the form of physical certificates, in book entry form through the direct registration system of the Transfer Agent or, to the extent not inconsistent with the terms of the Investment Agreement, in the form of one or more permanent global shares of Series B Preferred Stock in definitive, fully registered form with a global legend in substantially the form attached hereto as Exhibit A (each, a "Global Preferred Stock"), which is hereby incorporated in and expressly made a part of these Articles of Amendment. The Global Preferred Stock may have notations, legends or endorsements required by law, stock exchange rules, agreements to which the Company is subject, if any, or usage (provided that any such notation, legend or endorsement is in a form acceptable to the Company). The aggregate number of shares represented by each Global Preferred Stock may from time to time be increased or decreased by adjustments made on the records of the Transfer Agent and the Depositary or its nominee as hereinafter provided. This Section 18(a) shall apply only to a Global Preferred Stock deposited with or on behalf of the Depositary.

(b) If Global Preferred Stock is to be issued, the Company shall execute and the Transfer Agent shall, in accordance with this Section, countersign and deliver initially one or more certificates evidencing the Global Preferred Stock that (i) shall be registered in the name of Cede & Co. or other nominee of the Depositary and (ii) shall be delivered by the Transfer Agent to the Depositary or pursuant to instructions received from the Depositary or held by the Transfer Agent as custodian for the Depositary pursuant to an agreement between the Depositary and the Transfer Agent.

(c) Members of, or participants in, the Depositary ("Agent Members") shall have no rights under these Articles of Amendment with respect to any Global Preferred Stock held on their behalf by the Depositary or by the Transfer Agent as the custodian of the Depositary or under such Global Preferred Stock, and the Depositary may be treated by the Company, the Transfer Agent and any agent of the Company or the Transfer Agent as the absolute owner of such Global Preferred Stock for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Transfer Agent or any agent of the Company or the Transfer Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices of the Depositary governing the exercise of the rights of a holder of a beneficial interest in any Global Preferred Stock. The Depositary may grant proxies or otherwise authorize any Person to take any action that a Holder is entitled to take pursuant to the Series B Preferred Stock, these Articles of Amendment or the Articles of Organization.

(d) Owners of beneficial interests in Global Preferred Stock shall not be entitled to receive physical delivery of certificated shares of Series B Preferred Stock, unless (x) the Depositary has notified the Company that it is unwilling or unable to continue as Depositary for the Global Preferred Stock and the Company does not appoint a qualified replacement for the Depositary within 90 days, (y) the Depositary ceases to be a "clearing agency" registered under the Exchange Act and the Company does not appoint a qualified replacement for the Depositary within 90 days or (z) the Company decides to discontinue the use of book-entry transfer through the Depositary. In any such case, the Global Preferred Stock shall be exchanged in whole for

B-23

definitive shares of Series B Preferred Stock in registered form, with the same terms and of an equal aggregate Liquidation Preference. Definitive shares of Series B Preferred Stock shall be registered in the name or names of the Person or Persons specified by the Depositary in a written instrument to the Transfer Agent.

(e)    (i) An Officer shall sign the certificates evidencing the Global Preferred Stock for the Company, in accordance with the Company's bylaws and applicable law, by manual or facsimile signature.

(ii) If an Officer whose signature is on a certificate evidencing Global Preferred Stock no longer holds that office at the time the Transfer Agent countersigned the Global Preferred Stock, the Global Preferred Stock shall be valid nevertheless.

(iii) A certificate evidencing Global Preferred Stock shall not be valid until an authorized signatory of the Transfer Agent manually countersigns the Global Preferred Stock. Each Global Preferred Stock shall be dated the date of its countersignature.

*Section 19. Miscellaneous.*

(a) All notices referred to herein shall be in writing, and, unless otherwise specified herein, all notices hereunder shall be deemed to have been given upon the earlier of receipt thereof or three Business Days after the mailing thereof if sent by registered or certified mail (unless first-class mail shall be specifically permitted for such notice under the terms of these Articles of Amendment) with postage prepaid, addressed: (i) if to the Company, to its office at Ten Post Office Square, Boston, MA 02109, Attention: Margaret W. Chambers, Esq. or to the Transfer Agent at 250 Royall Street, Canton, MA 02021, Attention: Jeff Seiders, or other agent of the Company designated as permitted by these Articles of Amendment, or (ii) if to any Holder or holder of shares of Common Stock, as the case may be, to such Holder or holder at the address listed in the stock record books of the Company (which may include the records of any transfer agent for the Series B Preferred Stock or the Common Stock, as the case may be), or (iii) to such other address as the Company or any such Holder or holder, as the case may be, shall have designated by notice similarly given.

(b) The Company shall pay any and all stock transfer and documentary stamp taxes that may be payable in respect of any issuance or delivery of shares of Series B Preferred Stock or shares of Common Stock or other securities issued on account of Series B Preferred Stock pursuant hereto or certificates representing such shares or securities. The Company shall not, however, be required to pay any such tax that may be payable in respect of any transfer involved in the issuance or delivery of shares of Series B Preferred Stock or Common Stock or other securities in a name other than that in which the shares of Series B Preferred Stock with respect to which such shares or other securities are issued or delivered were registered, or in respect of any payment to any Person other than a payment to the registered holder thereof, and shall not be required to make any such issuance, delivery or payment unless and until the Person otherwise entitled to such issuance, delivery or payment has paid to the Company the amount of any such tax or has established, to the satisfaction of the Company, that such tax has been paid or is not payable.

B-24

(c) No share of Series B Preferred stock shall have any rights of preemption whatsoever pursuant to these Articles of Amendment as to any securities of the Company, or any warrants, rights or options issued or granted with respect thereto, regardless of how such securities, or such warrants, rights or options, may be designated issued or granted.

B-25

EXHIBIT A

## FORM OF SERIES B NON-CUMULATIVE PERPETUAL CONTINGENT CONVERTIBLE PREFERRED STOCK

SEE REVERSE
FOR LEGEND

Number: _____

_____Shares

CUSIP NO.: _____

### BOSTON PRIVATE FINANCIAL HOLDINGS, INC.

### FACE OF SECURITY

This certifies that Cede & Co. is the owner of _____ fully paid and non-assessable shares of the Series B Non-Cumulative Perpetual Contingent Convertible Preferred Stock, par value $1.00 per share and a liquidation preference of $100,000 per share, of Boston Private Financial Holdings, Inc., a corporation organized and existing under the laws of the Commonwealth of Massachusetts (the "**Company**"), transferable on the books of the Company by the holder hereof in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate and the shares represented hereby are issued and shall be held subject to all the provisions of the Restated Articles of Organization of the Company and all amendments thereto and the Bylaws of the Company, as amended (copies of which are on file at the office of the Transfer Agent) to all of which the holder of this Certificate by acceptance hereof assents. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Transfer Agent.

IN WITNESS WHEREOF, the Company has caused this Certificate to be duly executed.

BOSTON PRIVATE FINANCIAL HOLDINGS, INC.

By: _____
Name:
Title:

Dated:

Countersigned and Registered

_____
Transfer Agent and Registrar

By: _____
Authorized Officer

B-26

REVERSE OF SECURITY

BOSTON PRIVATE FINANCIAL HOLDINGS, INC.

The shares of Series B Non-Cumulative Perpetual Contingent Convertible Preferred Stock (the **"Series B Preferred Stock"**) have the preferences and privileges, conversion rights, dividend rights, liquidation preferences and such other rights and qualifications, limitations and restrictions as provided in the Articles of Amendment relating to the Series B Preferred Stock (the "**Articles of Amendment**"), in addition to those set forth in the Restated Articles of Organization of the Company (and all amendments thereto) and the Company's Bylaws, as amended, copies of which will be furnished by the Company to any holder without charge upon request to the Transfer Agent named on the face of this Certificate.

Upon written request to the Secretary at Ten Post Office Square, Boston, MA 02109, Attention: Corporate Secretary, the Company will furnish the holder of this Certificate without charge the designations, relative rights, preferences and limitations applicable to each class or series of authorized stock and the variations in rights, preferences and limitations determined for each series, and the authority of the Board of Directors to determine variations for future classes or series.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO THE COMPANY OR THE TRANSFER AGENT NAMED ON THE FACE OF THIS CERTIFICATE, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL IN AS MUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO. HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE ARTICLES OF AMENDMENT. IN CONNECTION WITH ANY TRANSFER, THE HOLDER WILL DELIVER TO THE TRANSFER AGENT NAMED ON THE FACE OF THIS CERTIFICATE SUCH CERTIFICATES AND OTHER INFORMATION AS SUCH TRANSFER AGENT MAY REASONABLY REQUIRE TO CONFIRM THAT THE TRANSFER COMPLIES WITH THE FOREGOING RESTRICTIONS.

B-27

**ATTACHMENT C**

ARTICLE 6: OTHER LAWFUL PROVISIONS

SECTION 6.1 *Directors.*

(i) The Board of Directors shall be and is divided into three classes (Class I, Class II and Class III), as nearly equal in number as possible, with one class to be elected annually.

(ii) The initial directors of the corporation shall hold office as follows: the first class of directors shall hold office initially for a term expiring at the annual meeting of stockholders to be held in 1995, the second class of directors shall hold office initially for a term expiring at the annual meeting of stockholders to be held in 1996, and the third class of directors shall hold office initially for a term expiring at the annual meeting of stockholders to be held in 1997, with the members of each class to hold office until their respective successors are duly elected and qualified. At each annual meeting of stockholders of the corporation, the successors to the class of directors whose term expires at that meeting shall be elected to hold office for a term expiring at the annual meeting of stockholders held in the third year following the year of their election and until their respective successors are elected and qualified.

(iii) Subject to the rights of the holders of any preferred stock then outstanding, a director or the entire Board of Directors may be removed by the affirmative vote of the holders of sixty-six and two-thirds percent (66 $^{2}/_{3}$%) of the shares of common stock then entitled to vote in an election of directors, and then, only for cause. For purposes of this Section 6.1, "cause" shall be defined to mean only the following: (i) conviction of a felony, (ii) declaration of unsound mind by order of court, (iii) gross dereliction of duty, (iv) commission of an act involving moral turpitude, or (v) commission of an action which constitutes intentional misconduct or a knowing violation of law if such action in either event results both in an improper substantial personal benefit and a material injury to the Corporation.

SECTION 6.2 *Transactions With Interested Persons.* No contract or transaction between the corporation and one or more of its directors or officers, or between the corporation and any other corporation, partnership, association, or other organization with which one or more of its directors or officers are directors or officers, or have a financial or other interest, shall be void or voidable solely for this reason, or solely because any such director (as used in this Section 6.2, an "interested director") or officer is present at or participates in the meeting of the Board of Directors or committee thereof which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, nor shall any such director or officer be under any liability to the corporation on account of any such contract or transaction if:

(1) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Directors or the committee, and the Board or committee authorized the contract or transaction by the affirmative vote of a majority of the directors who are not interested directors (as used in this Section 6.2, "disinterested directors"), even though the disinterested directors be less than a quorum; or

C-1

(2) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved by a vote of the stockholders; or

(3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the Board of Directors, a committee thereof, or the stockholders.

Interested or disinterested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or of a committee which authorizes the contract or transaction, and if they are stockholders, their votes may be counted for the purpose of a stockholder vote approving such contract or transaction.

SECTION 6.3 *Indemnification.* The corporation shall, to the extent legally permissible, indemnify any person serving or who has served as a director, officer, employee or agent of the corporation, or at its request as a director, officer, employee or agent of the corporation, or at its request as a director, officer, employee, agent or trustee of any organization in which the corporation directly or indirectly owns shares or of which it is a creditor, or at its request in any capacity with respect to any employee benefit plan, against all liabilities and expenses, including amounts paid in satisfaction or judgments, in compromise or as fines and penalties, and counsel fees, reasonably incurred by him in connection with the defense or disposition of any action, suit or other proceeding, whether civil or criminal, in which he may be involved or with which he may be threatened, while in office or thereafter, by reason of his serving or having served in such capacity, except with respect to any matter as to which he shall have been adjudicated in any proceeding not to have acted in good faith in the reasonable belief that his action was in the best interests of the corporation (or, to the extent that such matter relates to service with respect to any employee benefit plan, in the best interests of the participants or beneficiaries of such employment benefit plan); provided, however, that as to any matter disposed of by a compromise payment by such director, officer, employee, agent or trustee, pursuant to a consent decree or otherwise, no indemnification either for said payment or for any other expenses shall be provided unless such compromise and indemnification therefor shall be approved:

(i) by a majority vote of a quorum consisting of disinterested directors (as hereinafter defined);

(ii) if such a quorum cannot be obtained, then by a majority vote of a committee of the Board of Directors consisting of all the disinterested directors;

(iii) if there are not two or more disinterested directors in office, then by a majority of the directors then in office, provided they have obtained an opinion in writing of special independent legal counsel appointed by a majority of the directors to the effect that, based upon a reasonable investigation of the relevant facts as described in such opinion, such director, officer, employee, agent or trustee appears to have acted in good faith in the reasonable belief that his action was in the best interests of the corporation

C-2

(or, to the extent that such matter relates to service with respect to any employee benefit plan, in the best interests of the participants or beneficiaries of such employee benefit plan);

(iv) by the holders of a majority of the shares of stock entitled to vote for the election of directors, which majority may include interested directors and officers; or

(v) by a court of competent jurisdiction.

The notice of any meeting of the directors or any committee thereof or the stockholders and any waiver of such notice shall specify indemnification as one of the purposes of such meeting.

If authorized in the manner specified above for compromise payments, expenses (including counsel fees) reasonably incurred by any such director, officer, employee, agent or trustee in connection with the defense or disposition of any such action, suit or other proceeding, may be paid from time to time by the corporation in advance of the final disposition thereof upon receipt of (a) an affidavit of such individual of his good faith belief that he has met the standard of conduct necessary for indemnification under this Section 6.3 and (b) an undertaking by such individual to repay the amounts so paid to the corporation if it is ultimately determined that indemnification for such expenses is not authorized by law or under this Section 6.3, which undertaking may be accepted by the corporation without reference to the financial ability of such person to make repayment.

If both the corporation and any director, officer, employee, agent or trustee are parties to an action, suit or proceeding (other than an action or suit by or in the right of the corporation to procure a judgment in its favor), counsel representing the corporation therein may also represent such director, officer, employee, agent or trustee (unless such dual representation would involve such counsel in a conflict of interest in violation of applicable principles of professional ethics), and the corporation shall pay all fees and expenses of such counsel incurred during the period of dual representation other than those, if any, which would not have been incurred if counsel were representing only the corporation; and any allocation made in good faith by such counsel of fees and disbursements payable under this paragraph by the corporation versus fees and disbursements payable by any director, officer, employee, agent or trustee shall be final and binding upon the corporation and such director, officer, employee, agent or trustee.

The right of indemnification hereby provided shall not be exclusive of nor affect any other rights to which any such director, officer, employee, agent or trustee may be entitled. Nothing contained in this Section 6.3 shall affect any rights to indemnification to which corporation personnel other than such directors, officers, employees, agents or trustees may be entitled by contract, by vote to the Board of Directors, or otherwise under law.

The corporation may purchase and maintain insurance on behalf of any person who was or is a director, officer, employee or agent of the corporation, or was or is serving at the request of the corporation as a director, officer, employee, agent or trustee of any subsidiary, or was or is serving at the request of the corporation in any capacity with respect to any employee benefit plan, against any liability asserted against, and incurred by, such person in any capacity, or arising out of such person's status as such, whether or not the corporation would have the power

C-3

to indemnify such person against such liability by law or under the provisions of this Section 6.3. The obligation to indemnify and reimburse set forth in this Section 6.3, if applicable, shall be reduced by the amount of any such insurance proceeds paid to such person, or the representatives or successors of such person.

As used in this Section 6.3, the terms "director," "officer," "employee," "agent" and "trustee" include their respective heirs, executors and administrators, an "interested" director or officer is one against whom in such capacity the proceedings in question or other proceedings on the same or similar grounds are then pending, and a "disinterested" director or officer is any director or officer who is not an interested director.

If any term or provision of this Section 6.3, or the application thereof to any person or circumstances, shall to any extent be held invalid or unenforceable, the remainder of this Section 6.3, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Section 6.3 shall be held valid and be enforced to the fullest extent permitted by law.

SECTION 6.4 *Limitation of Liability.* No director shall be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director notwithstanding any provision of law imposing such liability; provided, however, that this provision shall not eliminate the liability of a director to the extent that such liability is imposed by applicable law, (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts of omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 61 or 62 or any successor or amendatory provisions of the Massachusetts Business Corporation Law or (iv) for any transaction from which the director derived an improper personal benefit.

SECTION 6.5 *Acting As A Partner.* The corporation may be a partner in any business enterprise which it would have power to conduct by itself.

SECTION 6.6 *Stockholders Meetings.* Any action required or permitted to be taken by the stockholders of the corporation must be effected at a duly called annual or special meeting of such stockholders and may not be effected by any consent in writing by such stockholder. Meetings of stockholders may be held at such place in the Commonwealth of Massachusetts or, if permitted by applicable law, elsewhere in the United States as the Board of Directors may determine.

SECTION 6.7 *Call of Special Meetings.* Special meetings of the stockholders shall be called by the President or by the Board of Directors.

SECTION 6.8 *Amendment of By-Laws.* The By-Laws may be amended at any time by a majority of the full Board of Directors subject to repeal or change by vote of the holders of a majority of the shares of capital stock issued and outstanding.

SECTION 6.9 *Amendment of Articles of Organization.* No amendment, addition, alteration, change or repeal of these Articles of Organization shall be made, unless the same is first approved by the affirmative vote of at least a majority of the directors of the corporation

C-4

then in office, and thereafter approved by the stockholders by an affirmative vote of not less than two thirds of the total votes eligible to be cast at a duly constituted meeting, or, in the case of Articles 1 or 3 of the Articles, by an affirmative vote of not less than a majority of the total votes eligible to be cast at a duly constituted meeting. Unless otherwise provided by law, any amendment, addition, alteration, change or repeal so acted upon shall be effective on the date it is filed with the Secretary of State of the Commonwealth of Massachusetts or on such other date as specified in such amendment, addition, alteration, change or repeal and/or as the Secretary of State may specify.

C-5

**ARTICLE VII**

The effective date of organization of the corporation is the date and time the articles were received for filing if the articles are not rejected within the time prescribed by law. If a later effective date is desired, specify such date, which may not be later than the 90th day after the articles are received for filing:

It is hereby certified that these restated articles of organization consolidate all amendments into a single document. If a new amendment authorizes an exchange, or effects a reclassification or cancellation, of issued shares, provisions for implementing that action are set forth in these restated articles unless contained in the text of the amendment.

Specify the number(s) of the article(s) being amended:  Article IV and Article III

Signed by:    /s/ Margaret W. Chambers
_____
*(signature of authorized individual)*

☐    Chairman of the board of directors,

☐    President,

☒    Other officer,

☐    Court-appointed fiduciary,

on this 29th day of July, 2010.

**COMMONWEALTH OF MASSACHUSETTS**

William Francis Galvin
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

**Restated Articles of Organization**
**(General Laws Chapter 156D, Section 10.07; 950 CMR 113.35)**

I hereby certify that upon examination of these restated articles of organization, duly submitted to me, it appears that the provisions of the General Laws relative to the organization of corporations have been complied with, and I hereby approve said articles; and the filing fee in the amount of $400 having been paid, said articles are deemed to have been filed with me this 30th day of July, 2010, at 1:05 a.m./p.m. *time*

Effective date:_____
*(must be within 90 days of date submitted)*

WILLIAM FRANCIS GALVIN
*Secretary of the Commonwealth*

_____
Examiner

_____
Name approval            Filing fee: Minimum filing fee $200, plus $100 per article amended, stock increases $100 per 100,000 shares, plus $100 for each additional 100,000 shares or any fraction thereof.

_____
C

_____
M                        TO BE FILLED IN BY CORPORATION
Contact Information:

Joshua M. Diver, Esq.

53 State Street

Boston, Massachusetts 02109

Telephone:  (617) 570-1079

Email:   jdiver@goodwinprocter.com

Upon filing, a copy of this filing will be available at www.sec.state.ma.us/cor. If the document is rejected, a copy of the rejection sheet and rejected document will be available in the rejected queue.

## Exhibit E

## Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ————————————————————X | : | Chapter 11 |
| In re | : | |
| | : | Case No. 23-10367 (MG) |
| SVB FINANCIAL GROUP,[1] | : | |
| | : | |
| Debtor. | : | |
| | : | |
| ————————————————————X | | |

### ORDER GRANTING LEAVE TO FILE LATE PROOF OF CLAIM PURSUANT TO BANKRUPTCY RULES 3003(c) AND 9006(b)(1)

Upon the motion (the "Motion")[2] of Christopher Cooper ("Cooper"), for entry of an order (this "Order") extending the General Bar Date, and this Court having jurisdiction to consider the Motion pursuant to 28 U.S.C. § § 157 and 1334; and venue of these chapter 11 cases and the Motion in this district being proper pursuant to 28 U.S.C. § § 1408 and 1409; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that proper and adequate notice of the Motion and the relief requested therein has been provided; and any objections (if any) to the Motion having been withdrawn or overruled on the merits; and this Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

---

[1]    The last four digits of SVB Financial Group's tax identification number are 2278.

[2]    Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

2.      The General Bar Date for Cooper to file a proof of claim for his contribution, indemnity, and advancement of expenses claims against Debtor shall be 14 days from the date of this Order.

3.      This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the Motion or the implementation, interpretation or enforcement of this Order.

Dated: _____, 2024
       New York, New York

                                    _____
                                    HONORABLE MARTIN GLENN
                                    UNITED STATES BANKRUPTCY JUDGE

2

## Exhibit F

### Proposed Proof of Claim

ACTIVE/128309192

**United States Bankruptcy Court, Southern District of New York**

| Fill in this information to identify the case (Select only one Debtor per claim form): |
|---|
| **Debtor:** SVB Financial Group |
| **Case Number:** 23-10367 |

Modified Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

| | |
|---|---|
| 1. **Who is the current creditor?** | Christopher Cooper |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor |
| 2. **Has this claim been acquired from someone else?** | ☑ No |
| | ☐ Yes. From whom? |
| 3. **Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** |
| | Alexander Nicas c/o Goodwin Procter LLP |
| | Name |
| | The New York Times Building, 620 8th Ave. |
| | Number        Street |
| | New York            NY            10018 |
| | City              State            ZIP Code |
| | Contact phone  212 813 8800 |
| | Contact email  anicas@goodwinlaw.com |

**Where should payments to the creditor be sent?** (if different)

Christopher Cooper c/o Goodwin Procter LLP
Name
The New York Times Building, 620 8th Ave.
Number        Street
New York            NY            10018
City              State            ZIP Code
Contact phone  212 813 8800
Contact email  anicas@goodwinlaw.com

| | |
|---|---|
| 4. **Does this claim amend one already filed?** | ☑ No |
| | ☐ Yes.  Claim number on court claims registry (if known)_____   Filed on ___ / ___ / _____   MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
| | ☐ Yes. Who made the earlier filing? |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ Unliquidated and partially contingent.

**Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See addendum.

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☐ No

☑ Yes. Identify the property: _____

| | | |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ No<br>☑ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☑ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $ *See addendum.* |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |
| **13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | _____ |

### Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   ___3/15/2024___
                              MM / DD / YYYY

___/s/ Alexander J. Nicas_____
Signature

**Name of the person who is completing and signing this claim:**

| | |
|---|---|
| Name | Alexander J. Nicas |
| | First name                    Middle name                    Last name |
| Title | Partner |
| Company | Goodwin Procter LLP |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | The New York Times Building, 620 8th Ave. |
| | Number          Street |
| | New York                              NY          10018 |
| | City                                        State        ZIP Code |
| Contact phone | 212 813 8800                  Email anicas@goodwinlaw.com |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
In re:                                                      :
                                                            :
SVB Financial Group,                                        :        Case No. 23-10367 (MG)
                                                            :        Chapter 11 Case
                          Debtor.                           :
                                                            :
------------------------------------------------------------x

<u>**ADDENDUM TO PROOF OF CLAIM OF CHRISTOPHER COOPER**</u>

1.      Christopher Cooper ("<u>Claimant</u>") hereby submits this Addendum (the "<u>Addendum</u>") to his proof of claim (the "<u>Proof of Claim</u>") against SVB Financial Group (the "<u>Debtor</u>" or "<u>SVBFG</u>").  This Addendum is attached to and made part of the Proof of Claim.

2.      SVBFG's subsidiary, Silicon Valley Bank (the "<u>Bank</u>") was placed in receivership in March 2023.  On March 17, 2023, SVBFG commenced the above-captioned chapter 11 case in the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>").  Thereafter, a series of legal, regulatory, and related investigations and proceedings have ensued concerning SVBFG and/or the Bank.

3.      This Proof of Claim sets forth an unliquidated claim by Claimant against SVBFG for indemnification and advancement of expenses, as well as contribution, in connection with a lawsuit filed on or about February 15, 2024 in which Claimant was named as a defendant.

**I.      Claimant's Rights to Indemnification and Advancement from SVBFG**

4.      On or around July 1, 2021, Boston Private Financial Holdings, Inc. ("<u>Boston Private</u>") merged with and into SVBFG (the "<u>Merger</u>"), with SVBFG as the surviving corporation.

5.      Prior to the Merger, Claimant served as the Corporate Secretary and Head of Legal of Boston Private.  In that role, Claimant was entitled to indemnification and advancement of expenses from Boston Private pursuant to Boston Private's Bylaws and its Articles of Organization.

6.      Article V of Boston Private's Amended and Restated Bylaws, adopted as of January 18, 2017 ("Boston Private Bylaws"), states that "Directors and officers shall be entitled to indemnification in accordance with the Articles of Organization" and that "[i]f the laws of The Commonwealth of Massachusetts are hereafter amended from time to time, or are succeeded by new provisions of applicable law to increase the scope of permitted indemnification, indemnification required hereunder shall be provided to the fullest extent permitted or required by any such amendment or successor provision and indemnification permitted hereunder shall be permitted to the fullest extent authorized by any such amendment or successor provision."  Bylaws Art. V §§ 1, 3.

7.      Section 6.3 of Boston Private's Articles of Incorporation, as amended as of April 26, 2012 (the "Boston Private Articles of Incorporation"), provides that:

> The corporation shall, to the extent legally permissible, indemnify any person serving or who has served as a director, officer, employee or agent of the corporation, . . . against all liabilities and expenses, including amounts paid in satisfaction or judgments, in compromise or as fines and penalties, and counsel fees, reasonably incurred by him in connection with the defense or disposition of any action, suit or other proceeding, whether civil or criminal, in which he may be involved or with which he may be threatened, while in office or thereafter, by reason of his serving or having served in such capacity, except with respect to any matter as to which he shall have been adjudicated in any proceeding not to have acted in good faith in the reasonable belief that his action was in the best interests of the corporation (or, to the extent that such matter relates to service with respect to any employee benefit plan, in the best interests of the participants or beneficiaries of such employment benefit plan)[.]

[E]xpenses (including counsel fees) reasonably incurred by any such director, officer, employee, agent or trustee in connection with the defense or disposition of any such action, suit or other proceeding, may be paid from time to time by the corporation in advance of the final disposition thereof upon receipt of (a) an affidavit of such individual of his good faith belief that he has met the standard of conduct necessary for indemnification under this Section 6.3 and (b) an undertaking by such individual to repay the amounts so paid to the corporation if it is ultimately determined that indemnification for such expenses is not authorized bylaw or under this Section 6.3, which undertaking may be accepted by the corporation without reference to the financial ability of such person to make repayment.

8.      SVBFG also has an obligation to indemnify Cooper and advance his attorneys' fees and other costs pursuant to Section 6.6 of the Merger Agreement dated January 4, 2021 (the "Merger Agreement"), between SVBFG and Boston Private:

From and after the Effective Time [of the Merger], [SVBFG] shall indemnify and hold harmless, to the fullest extent permitted by applicable law, each present and former director, officer or employee of Boston Private and its Subsidiaries (in each case, when acting in such capacity) (collectively, the "Boston Private Indemnified Parties") against any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, damages or liabilities incurred in connection with any threatened or actual claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, whether arising before or after the Effective Time [of the Merger], arising in whole or in part out of, or pertaining to, (i) the fact that such person is or was a director, officer, or employee of Boston Private or any of its Subsidiaries or (ii) matters existing or occurring at or prior to the Effective Time [of the Merger], including matters, acts or omissions occurring in connection with the approval of this [Merger] Agreement and the consummation of the transactions contemplated hereby; and [SVBFG] shall also advance expenses as incurred by such Boston Private Indemnified Party to the same extent as such persons are entitled to advancement of expenses as of the date of this Agreement by Boston Private pursuant to the Boston Private Articles of Organization, Boston Private's Bylaws, the governing or organizational documents of any Boston Private Subsidiary and any indemnification agreements in existence as of the date hereof that have been disclosed to [SVBFG]; provided that the Boston Private Indemnified Party to whom expenses are advanced provides an undertaking (in a reasonable and customary form) to repay such

advances if it is ultimately determined that such Boston Private Indemnified Party is not entitled to indemnification.[1]

## II.    Claimant Is Named a Defendant in a Lawsuit Predicated Upon a SVBFG SEC Filing

9.    On or about February 15, 2024, a putative class action was commenced in the Superior Court of the State of California, County of Santa Clara, captioned *Stephen Rossi v. Anthony DeChellis, et al.*, Case No. 24CV431200 (Cal. Super. Ct.) (the "*Rossi* Action"). Claimant was named as a defendant in the *Rossi* Action and was served with the summons and complaint on or around February 29, 2024. A copy of the complaint in the *Rossi* Action is attached hereto as **Exhibit D**.

10.    The *Rossi* Action asserts claims under Sections 11, 12, and 15 of the Securities Act of 1933 against Claimant and Anthony DeChellis, Boston Private's former Chief Executive Officer and President, as well as claims under Sections 11 and 12 of the Securities Act against Morgan Stanley & Co. LLC, a financial advisor to Boston Private in connection with the Merger.

11.    The *Rossi* Action concerns the offering materials that SBVFG issued in connection with the Merger. Pursuant to the Merger, each shareholder of Boston Private stock had the right to receive cash and shares of SVBFG common stock. As part of this stock-for-stock exchange, SVBFG issued an amended registration statement filed with the U.S. Securities and Exchange Commission ("SEC") on March 16, 2021, which the SEC declared effective on March 17, 2021, and a prospectus filed on Form 424B3 on March 18, 2021. The gravamen of the claims in the *Rossi* Action is that these filings contained false and misleading statements of material fact,

---

[1] True and correct copies of the Merger Agreement, the Boston Private Bylaws, and the Boston Private Articles of Incorporation are attached hereto as **Exhibits A-C**.

4

and omitted material facts, concerning SVBFG including, among other things, its interest rate-related risk, its customer base, its liquidity, and its internal controls and risk management systems.

12.    The complaint in the *Rossi* Action does not allege any misstatement or omission concerning Boston Private, any misstatement or omission made by or attributed to Claimant, or any misstatement or omission made in a Boston Private SEC filing.  All of the allegations against Claimant in the *Rossi* Action arise from his role as the Corporate Secretary for the Board of Directors and Head of Legal of Boston Private at the time of the Merger and a letter to Boston Private shareholders alerting them of the time, place, and proposals to be decided at a special meeting of Boston Private shareholders, as well as other information related to the then-proposed Merger.

## III.    If Claimant Is Held Liable in the Rossi Action, He Will Have a Contribution Claim Against SVBFG

13.    As noted above, the *Rossi* Action asserts claims under Sections 11 and 12 of the Securities Act against Claimant.  Section 11(f) of the Securities Act (codified at 15 U.S.C. § 77k(f)) provides that "every person who becomes liable to make any payment under this section may recover contribution as in cases of contract from any person who, if sued separately, would have been liable to make the same payment, unless the person who has become liable was, and the other was not, guilty of fraudulent misrepresentation."  *See also Moeller-Bertram v. Gemini Tr. Co., LLC*, No. 23-CV-2027 (LJL), 2023 WL 3451379, at *2 (S.D.N.Y. May 15, 2023) (same).

14.    Here, the complaint in the *Rossi* Action does not name SVBFG as a defendant, even though it was SVBFG's (not Boston Private's) SEC filings that contained the alleged misstatements and omissions about SVBFG, and even though the complaint does not identify any alleged false statements by or attributed to either Claimant or Boston Private. Accordingly, if Claimant is held liable under Section 11 in the *Rossi* Action, he will have a

contribution claim against SVBFG under Section 11(f). The amount of such contingent contribution claim is currently unknowable.

15. Similarly, multiple courts have recognized an implied right of contribution arising under Section 12 of the Securities Act (codified at 15 U.S.C. § 77l). *See In re Nat'l Mortgage Equity Corp. Mortgage Pool Certificates Sec. Litig.*, 682 F. Supp. 1073, 1092 (C.D. Cal. 1987) (Courts have recognized implied rights of contribution under § 12(2)); *Nelson v. Quimby Island Reclamation Dist. Facilities Corp.*, 491 F. Supp. 1364, 1383 (N.D. Cal. 1980) ("[A] party is permitted to receive contribution, even if found to have violated s 10(b), Rule 10b-5, s 17(a), and s 12(2). . . . Accordingly, contribution is permitted under federal law.") (internal citations and quotations omitted); *Odette v. Shearson, Hammill & Co.*, 394 F. Supp. 946, 958 (S.D.N.Y. 1975) ("[Defendant] may seek contribution for liability for negligent misconduct under § 12(2)"). Thus, Claimant will also have a contribution claim against SVBFG if he is held liable under Section 12 in the *Rossi* Action. The amount of this contingent contribution claim is currently unknowable.

\*       \*       \*       \*

16. For the reasons set forth above, SVBFG (1) owes Claimant indemnification and advancement of expenses, in an amount yet to be determined and (2) bears contingent liability to Claimant for contribution, in an amount yet to be determined, if Claimant is held liable under Section 11 or Section 12 of the Securities Act in the *Rossi* Action.

## IV.    Reservation of Rights

17. Claimant expressly reserves all of his rights, claims, causes of action, counterclaims, cross-claims, third-party claims and defenses whatsoever against all persons or entities, whether in this Court or elsewhere, whether currently existing or arising in the future, against which Claimant determines to have claim. Without limiting the foregoing, this pre-petition claim is without prejudice to any right by Claimant to assert that any or all of the sums for which

he seeks recovery hereunder are post-petition administrative expenses of the Debtor's bankruptcy estate entitled to priority under Sections 503(b) and 507(a)(2) of the United States Bankruptcy Code (the "Bankruptcy Code"). Further, while Claimant does not believe any such claims exist, to the extent that the Debtor or its bankruptcy estate may assert any claim against Claimant, Claimant reserves all rights to assert any rights of recoupment and/or offset against his claims for indemnification, advancement, reimbursement and contribution asserted herein (and, that, accordingly, such claims are secured under Section 506(a) of the Bankruptcy Code). In addition, to the extent that any portion of this claim may remain contingent and may be subject to disallowance under Section 502(e) of the Bankruptcy Code, Claimant reserves all rights to seek reconsideration of that portion of the claim under Section 502(j) if and when any contingent portion of the claim becomes fixed.

18.    Claimant reserves the right to amend, modify and/or supplement this proof of claim at any time for whatever reason, including, without limitation, for the purpose of specifying the amount of Claimant's contingent, unmatured, and/or unliquidated claims as they become non-contingent, matured and/or liquidated. Claimant further reserves the right to seek estimation of the claims set forth herein.

19.    By filing this Proof of Claim, Claimant does not intend, nor shall be deemed, to waive any right to: (1) contest jurisdiction of this or any other Court in any case, proceeding matter, or controversy; (2) have an Article III judge adjudicate in the first instance any case, proceeding, matter, or controversy as to which a bankruptcy judge may not enter a final order or judgment consistent with Article III of the United States Constitution; (3) have final orders in any case, proceeding, matter, or controversy as to which a bankruptcy judge may not enter a final order or judgment consistent with Article III of the United States Constitution entered only after

an opportunity to object to proposed findings of fact and conclusions of law and a de novo review by the United States District Court; (4) to have the reference withdrawn by the United States District Court in any case, proceeding, matter or controversy subject to mandatory or discretionary withdrawal; or (5) any other rights, claims, actions, defenses, setoffs, or recoupments to which the Claimant or any other person is or may be entitled under agreements, in law, or in equity, all of which rights, claims, actions, defenses, setoffs, and recoupments are hereby expressly reserved.

20.     Nothing in this proof of claim shall constitute an amendment, waiver or relinquishment of any rights, claims, or defenses that Claimant has in connection with the Debtor's chapter 11 case or under any agreement with the Debtor or any other person.

All notices regarding this Proof of Claim should be sent to:

Howard S. Steel
Alexander J. Nicas
Artem Skorostensky
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, New York 10018
hsteel@goodwinlaw.com
anicas@goodwinlaw.com
askorostensky@goodwinlaw.com

## Exhibit A

**Merger Agreement**

## Exhibit B

## Boston Private Bylaws

ACTIVE/128303973

## **Exhibit C**

**Boston Private Articles of Incorporation**

## **Exhibit D**

**_Rossi_ Complaint**