**Hearing Date:  May 16, 2024 at 2:00 p.m. ET**
**Objection Deadline:  May 10, 2024 at 4:00 p.m. ET**

James L. Bromley
Andrew G. Dietderich
Christian P. Jensen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel to the Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ——————————————— x | | |
| In re | : | Chapter 11 |
| | : | |
| SVB FINANCIAL GROUP,[1] | : | Case No. 23-10367 (MG) |
| | : | |
| Debtor. | : | |
| ——————————————— x | | |

### NOTICE OF DEBTOR'S MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING BUYER PROTECTIONS, (B) SCHEDULING A SALE HEARING, (C) APPROVING FORM AND MANNER OF NOTICES FOR SALE OF THE SVB CAPITAL BUSINESS, (D) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (E) GRANTING RELATED RELIEF, AND (II)(A) APPROVING THE SVB CAPITAL PURCHASE AGREEMENT, (B) APPROVING THE SALE OF THE SVB CAPITAL BUSINESS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (C) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND (D) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that on the date hereof, SVB Financial Group, as

debtor and debtor-in-possession (the "Debtor"), filed the *Debtor's Motion for Entry of Orders*

*(I)(A) Approving Buyer Protections, (B) Scheduling a Sale Hearing, (C) Approving Form and*

---

[1]        The last four digits of SVB Financial Group's tax identification number are 2278.

*Manner of Notices for Sale of the SVB Capital Business, (D) Approving Assumption and Assignment Procedures, and (E) Granting Related Relief, and (II)(A) Approving the SVB Capital Purchase Agreement, (B) Approving the Sale of the SVB Capital Business Free and Clear of Liens, Claims, Interests and Encumbrances, (C) Authorizing Assumption and Assignment of Executory Contracts and (D) Granting Related Relief* (the "Motion")[2].

**PLEASE TAKE FURTHER NOTICE** that the Debtor has requested to present the Motion to the Honorable Martin Glenn, United States Bankruptcy Court for the Southern District of New York (the "Court"), and seek approval of relief set forth in the Buyer Protections Order attached to the Motion, at a hearing to be held on **May 16, 2024 at 2:00 p.m. (Eastern Time)** (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that any responses or objections (the "Objections") to the relief requested in the Motion with respect to the Buyer Protections Order shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York and shall be filed with the Court in accordance with the customary practices of the Court and General Order M-399.  The Debtor has requested that the Court establish a deadline such that objections must be filed and received no later than **May 10, 2024 at 4:00 p.m. (Eastern Time)** (the "Objection Deadline") and must be served on the following parties: (a) counsel to the Debtor, Sullivan & Cromwell LLP, 125 Broad Street, New York, NY 10004, Attn: Christian P. Jensen (jensenc@sullcrom.com); (b) counsel to the Official Committee of Unsecured Creditors, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Ira S.

---

[2]    Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

Dizengoff (idizengoff@akingump.com) and Brad M. Kahn (bkahn@akingump.com) and 2001 K Street NW, Washington, DC 20006, Attn: James R. Savin (jsavin@akingump.com); (c) counsel to William K. Harrington, the United States Trustee for Region 2, U.S. Department of Justice, Office of the U.S. Trustee, Alexander Hamilton U.S. Custom House, One Bowling Green, Room 534, New York, New York 10004, Attn: Andrea B. Schwartz, Esq. (andrea.b.schwartz@usdoj.gov) and Annie Wells, Esq. (annie.wells@usdoj.gov); (d) counsel to the Ad Hoc Group of Senior Noteholders Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Marshall S. Huebner (marshall.huebner@davispolk.com), Elliot Moskowitz (elliot.moskowitz@davispolk.com), Angela M. Libby (angela.libby@davispolk.com), David Schiff (david.schiff@davispolk.com) and Aryeh Ethan Falk (aryeh.falk@davispolk.com); (e) counsel to the Ad Hoc Cross-Holder Group, White & Case LLP, 200 South Biscayne Boulevard, Suite 4900, Miami, FL 33131, Attn: Thomas E Lauria (tlauria@whitecase.com), Brian Pfeiffer (brian.pfeiffer@whitecase.com), 1221 Avenue of the Americas, New York, NY 10020, Attn: Glenn Kurtz (gkurtz@whitecase.com); (f) counsel to the Designated Buyer, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn: Kenneth M. Schneider (kschneider@paulweiss.com), Neil Goldman (ngoldman@paulweiss.com) and Andrew Parlen (aparlen@paulweiss.com); and (g) to the extent not listed herein, those parties requesting notice pursuant to Bankruptcy Rule 2002.

**PLEASE TAKE FURTHER NOTICE** that only those Objections that are timely filed, served and received will be considered at the Hearing. Failure to file a timely Objection may result in the entry of an order granting the relief requested in the Motion without further notice. Failure to attend the Hearing in person or by counsel may result in relief being

granted or denied upon default.  In the event that no Objection to the Motion is timely filed and served, the relief requested in the Motion may be granted without a hearing before the Court.

**PLEASE TAKE FURTHER NOTICE** that any party failing to timely file and serve an Objection on or before the Objection Deadline in accordance with this notice shall be forever barred from asserting any objection to the Motion with respect to the relief requested in the Buyer Protections Order.

---

### NO SUCCESSOR OR TRANSFEREE LIABILITY

The proposed Sale Order provides that the Designated Buyer will have no responsibility for any successor liability, including the following:

None of the Buyer or its Affiliates is a "successor" to, continuation of or alter ego of, the Debtor or its estate by reason of any theory of law or equity.  Neither Buyer nor any of its Affiliates shall have, assume, or be deemed to assume, or in any way be responsible for, any liability or obligation of any of the Debtor, its estate, or any of the Debtor's predecessors or affiliates; <u>provided</u> that, for the avoidance of doubt, the foregoing shall not discharge or otherwise modify any existing Liability of the Target Companies or the General Partner Entities.  The purchase of the SVB Capital Business by Buyer will not cause Buyer or any of its Affiliates to be deemed a successor to, combination of, or alter ego of, in any respect, the Debtor or its businesses, or incur any liability derived therefrom within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, antitrust, environmental, labor law (including any WARN Act), employment or benefits law, de facto merger, business continuation, substantial continuity, successor, vicarious, alter ego, derivative or transferee liability, veil piercing, escheat, continuity of enterprise, mere continuation, product line or other law, rule, regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtor's liability under such law, rule or regulation or doctrine, whether now known or unknown, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether matured or unmatured, whether contingent or noncontingent, whether liquidated or unliquidated, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables among the Debtor and its affiliates, and any taxes, arising, accruing or payable under, out of, in connection with or in any way relating to the cancellation of debt of the Debtor or its Affiliates, or in any way relating to the operation of the SVB Capital Business prior to the Closing Date.

All capitalized terms used in this section but otherwise not defined herein shall have the meanings set forth in the proposed Sale Order.  The summary descriptions in this notice are qualified in their entirety by the terms of the proposed Sale Order (including, without limitation, Paragraphs P and 23 (no successor liability) and 25–27 (prohibition on actions

against Buyer) thereof), and, to the extent of any inconsistencies between the Sale Order and the summary descriptions in this Notice, the Sale Order shall control in all respects.

**PLEASE TAKE FURTHER NOTICE** this Notice is subject to the fuller terms and conditions of the Motionand the Buyer Protections Order, and the Debtor encourages parties-in-interest to review such documents in their entirety.  Copies of the Motion and the Buyer Protections Order, as well as all related exhibits, including all other documents filed with the Court, are available (i) free of charge from the website of the Debtor's claims and noticing agent, Kroll Restructuring Administration ("Kroll"), at https://restructuring.ra.kroll.com/SVBFG and (ii) for a fee on the Court's electronic docket for this Chapter 11 Case at www.nysb.uscourts.gov (a PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov).

Dated: May 2, 2024
      New York, New York

*/s/ James L. Bromley*
James L. Bromley
Andrew G. Dietderich
Christian P. Jensen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone:   (212) 558-4000
Facsimile:   (212) 558-3588
E-mail:      bromleyj@sullcrom.com
           dietdericha@sullcrom.com
           jensenc@sullcrom.com

*Counsel to the Debtor*

Hearing Date:  May 16, 2024 at 2:00 p.m. ET
Objection Deadline:  May 10, 2024 at 4:00 p.m. ET

James L. Bromley
Andrew G. Dietderich
Christian P. Jensen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel to the Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re | Chapter 11 |
| SVB FINANCIAL GROUP,[1] | Case No. 23-10367 (MG) |
| Debtor. | |

---

## DEBTOR'S MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING BUYER PROTECTIONS, (B) SCHEDULING A SALE HEARING, (C) APPROVING FORM AND MANNER OF NOTICES FOR SALE OF THE SVB CAPITAL BUSINESS, (D) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (E) GRANTING RELATED RELIEF, AND (II)(A) APPROVING THE SVB CAPITAL PURCHASE AGREEMENT, (B) APPROVING THE SALE OF THE SVB CAPITAL BUSINESS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (C) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND (D) GRANTING RELATED RELIEF

SVB Financial Group, as debtor and debtor-in-possession (the "Debtor"), hereby

submits this motion (this "Motion") for entry of (a) an order, substantially in the form attached

hereto as Exhibit A (the "Buyer Protections Order"), pursuant to sections 105(a), 363, 364(c)(1),

365, 503(b), and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the

"Bankruptcy Code"), rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of

---

[1]    The last four digits of SVB Financial Group's tax identification number are 2278.

Bankruptcy Procedure (the "Bankruptcy Rules"), rules 2002-1, 6004-1, 6006-1, 9006-1 and

9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules")

and the *Guidelines for the Conduct of Asset Sales*, adopted by General Order M-331, dated

September 5, 2006, as amended by General Order M-383, dated November 18, 2009, and as

updated on June 17, 2013 (the "Sale Guidelines"), (i) approving the buyer protections for

Pinegrove Sierra HoldCo LLC, a Delaware limited liability company (the "Designated Buyer"),

as set forth in that certain Interest Purchase Agreement, dated as of May 2, 2024, by and between

the Debtor and the Designated Buyer, attached hereto as Exhibit C (together with any schedules

and exhibits thereto, and as may be amended or otherwise modified from time to time in

accordance with the terms thereof, the "Designated Buyer Agreement"),[2] (ii) scheduling a

hearing to approve the sale of the SVB Capital Business (the "Sale Hearing"), (iii) approving the

form and manner of notices of the Sale Transaction (as defined below) and Sale Hearing,

(iv) approving assumption and assignment procedures and (v) granting related relief and (b) an

order, substantially in the form attached hereto as Exhibit B (the "Sale Order"), pursuant to

sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006,

9007, 9008 and 9014, Local Rules 2002-1, 6004-1, 6006-1, 9006-1 and 9013-1 and the Sale

Guidelines, (i) approving the Designated Buyer Agreement, (ii) approving the sale of the SVB

Capital Business free and clear of any liens, claims, interests and encumbrances, (iii) authorizing

the assumption and assignment of certain executory contracts and unexpired leases and

(iv) granting related relief.  Concurrently with the filing of the Motion, the Debtor is also

submitting a *Motion to Shorten Notice with Respect to the Debtor's Motion for Entry of an Order*

---

[2] Capitalized terms used but not otherwise defined herein are to be given the meanings ascribed to them in the Designated Buyer Agreement.

*(I)(A) Approving Buyer Protections, (B) Scheduling a Sale Hearing, (C) Approving Form and Manner of Notices for Sale of the SVB Capital Business, (D) Approving Assumption and Assignment Procedures, and (E) Granting Related Relief* (the "Motion to Shorten Notice").

In support of this Motion, the Debtor submits the declaration of Marc Puntus attached hereto as Exhibit D (the "Puntus Declaration"). Certain facts supporting this Motion are set forth in the filed *Declaration of William C. Kosturos in Support of the Debtor's Chapter 11 Petition and First Day Pleadings* [D.I. 21] and *Supplemental Declaration of William C. Kosturos in Support of the Debtor's Chapter 11 Petition and First Day Pleadings* [D.I. 43] (collectively, the "First Day Declarations"). In further support of this Motion, the Debtor respectfully states as follows:

**Preliminary Statement**

1.        SVB Financial Group is a financial services company focusing on the innovation economy and offering financial products and services to clients across the United States and in key international markets. Prior to March 10, 2023, the Debtor's businesses and operations comprised four segments: (i) Silicon Valley Bank, a state-chartered bank; (ii) SVB Private, the private banking and wealth management division of Silicon Valley Bank; (iii) SVB Securities, an investment bank; and (iv) SVB Capital, a venture capital and credit investment platform. On March 10, 2023, the California Department of Financial Protection and Innovation closed Silicon Valley Bank and appointed the Federal Deposit Insurance Corporation as the receiver (the "FDIC-R") of Silicon Valley Bank. The FDIC-R subsequently transferred all deposits and substantially all assets of Silicon Valley Bank to a newly created, FDIC-R-operated bridge bank, Silicon Valley Bridge Bank, National Association. On March 17, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief commencing a case under chapter 11 of the Bankruptcy Code (this "Chapter 11 Case").

2.      By this Motion, the Debtor seeks approval of the sale of the SVB Capital Business (as defined below) and the buyer protections for the Designated Buyer with respect to such sale.  SVB Capital is a venture capital and credit investment platform with deep roots in the innovation economy.  SVB Capital manages approximately $9.8 billion of assets on behalf of third party limited partner investors and, on a more limited basis, the Debtor.  The SVB Capital family of funds comprises pooled investment vehicles such as direct venture funds that invest in companies and funds of funds that invest in other venture capital funds, as well as credit funds that provide lending and other financing solutions.  SVB Capital generates income for the Debtor primarily through investment returns, management fees and incentive allocations (or carried interest).

3.      As of the Petition Date, SVB Capital operated as a "virtual" subsidiary for the Debtor, without a formal non-debtor subsidiary legal entity.  Since the Petition Date, in order to continue operating this business in the ordinary course, the Debtor took several steps to consolidate the various operations that comprise SVB Capital.  The Debtor formed a new direct subsidiary, SVB Capital Holdco, LLC ("SVBC Holdco") to house the various operations of SVB Capital.  The Debtor also formed a wholly owned direct subsidiary of SVBC Holdco, SVB Capital Management, LLC ("SVBC ManCo") to serve as the investment advisor for SVB Capital funds and to directly employ all SVB Capital employees.  On August 29, 2023, the Debtor moved for entry of an order approving the assumption and assignment of investment advisory contracts (the "Advisory Contracts") to SVBC ManCo and to contribute to SVBC ManCo certain non-economic non-member manager interests in SVB Capital's Qualified Investor Funds (the "Manager Interests") [D.I. 534].  The Bankruptcy Court approved this motion on September 20, 2023 [D.I. 570], and on October 1, 2023, the Debtor assigned the Advisory Contracts and

-4-

Manager Interests to SVBC ManCo. Upon such assignment, SVBC ManCo became the

registered investment adviser for SVB Capital funds. The SVB Capital funds and general

partners are separate legal entities, distinct from the Debtor, and are not debtors in this

Chapter 11 Case.

4.      Since the announcement of the Debtor's review of its strategic alternatives

for SVB Capital prior to the commencement of this Chapter 11 Case, numerous parties have

expressed interest in acquiring the SVB Capital Business. Considering the interest expressed by

potential acquirers in the SVB Capital Business and the value of the business, the Debtor, in

consultation with its key creditor constituencies, has determined that pursuing a sale of the SVB

Capital Business is important to maximize the value of the Debtor's estate. As further described

below and in the Puntus Declaration, the Debtor, with the assistance of its investment banker,

Centerview Partners LLC ("Centerview"), has undertaken a comprehensive marketing process to

solicit interest in the SVB Capital Business from potential purchasers. After a robust and

extensive marketing process and negotiations in good faith and at arm's length, in consultation

with its key creditor constituencies, the Debtor selected the offer submitted by the Designated

Buyer as the highest or otherwise best offer that is binding and definitive that the Debtor has

received to date and entered into the Designated Buyer Agreement on May 2, 2024.

5.      Pursuant to the Designated Buyer Agreement, (a) the Debtor agreed to

(i) sell and assign to the Designated Buyer (A) a portion of the issued and outstanding equity

interests of the Target Companies and General Partner Entities and (B) all of the issued and

outstanding equity interests of each of Evergreen Fund, QIF 1 and QIF 7 that are each owned

directly or indirectly by the Debtor (such equity interests owned by the Debtor, the "Interests",

such portion of the Interests to be purchased by the Designated Buyer, the "Sale Interests" and

such portion of the Interests to be retained by the Debtor, the "Retained Interests") (and by extension, (x) a portion of the capital commitments that the Debtor holds through its equity interests in the General Partner Entities, Evergreen Fund, QIF 1 and QIF 7 and (y) a portion of the Debtor's rights and interests in carried interest, incentive allocations, promote interests, or other performance based profits interests that the Debtor holds through its equity interests in the General Partner Entities), (ii) assume and assign to the Designated Buyer the contracts on Section 1.6(a) of the Seller Disclosure Schedule (the "Assumed Contracts", and together with the "Sale Interests", the "SVB Capital Business"), and (b) the Designated Buyer agreed to purchase from the Debtor the SVB Capital Business, all on the terms and subject to the conditions set forth in the Designated Buyer Agreement (the foregoing, and all other transactions contemplated by the Designated Buyer Agreement, collectively, the "Sale Transaction").

6.      The Designated Buyer Agreement provides for bid protections payable upon termination of the Designated Buyer Agreement under certain circumstances, which were a material inducement for, and condition of, the Designated Buyer's firm commitment to proceed with the Sale Transaction while allowing the Debtor to pursue an alternative transaction in accordance with the terms of the Designated Buyer Agreement. Specifically, these include (a) a cash fee in an amount equal to $15,150,000 (the "Termination Fee"), (b) the reimbursement of reasonable out-of-pocket and documented fees and expenses (including fees and expenses of counsel) incurred by the Designated Buyer or its Affiliates in connection with or related to the evaluation, consideration, analysis, negotiation, diligence, documentation, execution, performance and enforcement of the Designated Buyer Agreement and the Sale Transaction in an amount up to $3,500,000 (the "Expense Reimbursement Amount"), and (c) in the event the Designated Buyer Agreement terminates as the result of a Superior Transaction (as defined

below) or the Debtor's certain material and/or intentional breach of the Designated Buyer

Agreement, up to $2,200,000 of documented fees and expenses incurred by Buyer or its

Affiliates in connection with an Evergreen Hedging Arrangement (as defined below) with an

initial term ending on or before June 30, 2024; provided that if the Evergreen Hedging

Arrangement is extended, the Hedging Reimbursement Cost will be increased by (i) up to

$2,200,000 of additional documented fees and expenses incurred in connection with the

Evergreen Hedging Arrangement for a period of 45 days following the initial term of the

Evergreen Hedging Arrangement (including the cost of extending the Evergreen Hedging

Arrangement for such 45 day period), and (ii) up to $2,200,000 (i.e., for a maximum Hedging

Reimbursement Cost of up to $6,600,000) of additional documented fees and expenses incurred

in connection with the Evergreen Hedging Arrangement following such 45 day period (including

the cost of extending the Evergreen Hedging Arrangement following such 45 day period) (the

"Hedge Reimbursement", together with the Termination Fee and Expense Reimbursement

Amount, the "Buyer Protections").

7.      Critically, the Debtor expressly retains the right under the Designated

Buyer Agreement to act as it may reasonably determine to be in the best interest of its estate and

in fulfilling its fiduciary duties, including by terminating the Designated Buyer Agreement to

pursue a transaction that the Debtor determines in good faith would reasonably be expected to be

superior for the Debtor and its creditors (a "Superior Transaction").

8.      Accordingly, the Debtor is seeking approval of the Buyer Protections to

secure the Designated Buyer's commitment to the Sale Transaction, which sets a floor for any

proposed Superior Transaction.  As set forth in the Motion to Shorten Notice in further detail,

due to the case milestones and desire to close the Sale Transaction as expeditiously as possible,

the Debtor is seeking approval of the Buyer Protections on an expedited basis. The Buyer

Protections are a product of extensive, arm's-length negotiations between the Debtor and the

Designated Buyer, are consistent with market terms for similar transactions, and are fair and

reasonable given the circumstances. The Debtor submits that the Buyer Protections and the other

relief requested herein satisfy the requirements of section 363 of the Bankruptcy Code and will

facilitate the sale of the SVB Capital Business for the highest or otherwise best value for the

benefit of all of the Debtor's stakeholders.

### Background

9.      On March 17, 2023, the Debtor filed with the Court a voluntary petition

for relief under the Bankruptcy Code. The Debtor continues to operate its businesses and

manage its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code. On March 28, 2023, William K. Harrington, the United States Trustee for

Region 2 (the "U.S. Trustee"), appointed an Official Committee of Unsecured Creditors (the

"UCC") pursuant to section 1102 of the Bankruptcy Code [D.I. 72].

10.     Additional factual background relating to the Debtor's business and the

commencement of this Chapter 11 Case is set forth in the First Day Declarations.

### Jurisdiction

11.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334. Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409. This

matter is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the

relief requested herein are sections 105(a), 363, 364(c)(1), 365, 503(b), and 507(a) of the

Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014, Local Rules 2002-

1, 6004-1, 6006-1, 9006-1 and 9013-1 and the Sale Guidelines.

**Relief Requested**

12.     By this Motion, the Debtor requests entry of (a) the Buyer Protections Order, substantially in the form attached hereto as Exhibit A, (i) approving the Buyer Protections, (ii) scheduling the Sale Hearing, (iii) approving the form of (x) notice of the Sale Transaction and Sale Hearing, substantially in the form attached as Exhibit 1 to the Buyer Protections Order (the "Sale Hearing Notice") and (y) notice to each relevant non-Debtor contract counterparty (each, a "Counterparty") to an Assumed Debtor Contract (as defined below) regarding the Debtor's potential assumption and assignment of such contract and the proposed Cure Amount (as defined below), substantially in the form attached as Exhibit 2 to the Buyer Protections Order, (iv) approving the procedures for the assumption and assignment of the Assumed Debtor Contracts and the determination of the Cure Amounts (the "Assumption and Assignment Procedures") and (v) granting related relief and (b) the Sale Order, substantially in the form attached hereto as Exhibit B, (i) approving the purchase agreement for the SVB Capital Business, (ii) approving the sale of the SVB Capital Business free and clear of any liens, claims, interests and encumbrances, (iii) authorizing the assumption and assignment of the Assumed Debtor Contracts in connection with the Sale Transaction and (iv) granting related relief.[3]

**Marketing Process**

13.     Since the announcement of the Debtor's strategic review prior to the commencement of this Chapter 11 Case, various financial and strategic counterparties globally have expressed interest to the Debtor and/or its advisors in a potential purchase of the SVB Capital Business.

---

[3]    The Debtor reserves the right to file and serve any supplemental pleading or declaration that the Debtor deems appropriate or necessary in its reasonable business judgment, including any pleading or declaration modifying disclosure in connection with relief sought in the form of certain Extraordinary Provisions (as defined below) in support of its request for entry of the Sale Order.

14.     Immediately following Centerview's retention by the Debtor effective
March 17, 2023, the Debtor and its advisors evaluated potential strategic alternatives for the SVB
Capital Business.  This has included a review of documents regarding the Debtor's businesses,
discussions with management of the Debtor and its affiliates, and coordination and initiation of
discussions with potential purchasers.  After careful consideration, the Debtor determined, in its
business judgment, that a marketing process should be conducted to maximize the value of the
SVB Capital Business.  *See* Puntus Declaration ¶ 10.

15.     The Debtor, with the assistance of Centerview, has undertaken a
comprehensive marketing process to solicit interest in the SVB Capital Business from potential
purchasers.  Centerview also developed an extensive, proprietary list of additional potential
acquirers and has conducted an outreach process to such potential acquirers.  Following the
commencement of this Chapter 11 Case in March 2023, the Debtor and its advisors received
indications of interest from more than 130 parties regarding an acquisition of the SVB Capital
Business, 60 of which executed non-disclosure agreements and were provided with access to a
first-round virtual data room with an overview of information regarding the SVB Capital
Business.  In late May 2023, 19 of the parties submitted first-round bids, eight of which were
granted access to additional diligence materials through a virtual data room and given access to
management via diligence meetings, the opportunity for in-person management presentations
and Q&A sessions.

16.     As more fully described in the Puntus Declaration, by late July 2023, three
parties had submitted interim bids, two of which were selected to move to the final round. Both
parties that had made it to the final round ultimately submitted final bids, one binding and one
non-binding (the "2023 Bids").

17.     The Debtor continued to negotiate with both parties throughout the fall of 2023, and received an additional bid from an interested party in late December 2023.  However, the Debtor ultimately determined, in the exercise of its business judgment and in consultation with its key creditor constituencies, that none of these bids exceeded the net present value of the Debtor continuing to operate the SVB Capital Business.  On January 9, 2024, it was publicly announced that the Debtor would retain ownership of the SVB Capital Business in order to retain the most value for the Debtor's estate.

18.     After the Debtor announced its intention to retain the SVB Capital Business, several potential bidders provided the Debtor with new non-binding offers for the SVB Capital Business (the "2024 Bids"), including the Designated Buyer.  The Debtor evaluated the 2024 Bids in consultation with its key creditor constituencies and their respective advisors, and the Debtor thereafter sought to improve the terms of the 2024 Bids.  The Debtor successfully negotiated for meaningful improvements in the terms of an offer received from the Designated Buyer.  After thoroughly considering the Designated Buyer's improved bid against alternatives (including the 2023 Bids, the other 2024 Bids and the value of continuing to operate the SVB Capital Business), the Debtor, in consultation with its advisors and key creditor constituencies, determined that the bid from the Designated Buyer was the highest or otherwise best offer that is binding and definitive for the SVB Capital Business.  Therefore, the Debtor determined to enter into the Designated Buyer Agreement.

19.     Throughout the marketing and sale process, the Debtor, with the assistance of its advisors, actively engaged with interested parties, responded to diligence requests and duly considered all indications of interest and bids received based on the merits of each.  The virtual

-11-

data room was comprehensive, supplemented throughout the marketing process, and ultimately contained over 3,000 diligence items.

20.    The Debtor's entry into the Designated Buyer Agreement with the Designated Buyer followed more than a year of engagement by the Debtor with various potential acquirers. For much of that time, the Debtor's marketing of the SVB Capital Business has been publicly known. The Debtor therefore believes that any interested party has been afforded a full, fair and reasonable opportunity to make a higher or otherwise better offer than the Designated Buyer to purchase the SVB Capital Business.

21.    The Debtor believes that the purchase price for the SVB Capital Business contemplated by the Designated Buyer Agreement is fair and reasonable. The Debtor and its advisors, in consultation with the Debtor's key creditor constituencies, ensured that a sale of the SVB Capital Business would reflect its fair market value by marketing the SVB Capital Business to the maximum extent possible under the circumstances. Any other known alternative to the proposed sale of the SVB Capital Business to Designated Buyer, including the Debtor's continued operation of the SVB Capital Business, would not result in a higher or otherwise better value to the estate and its stakeholders. Selling the SVB Capital Business will enable the Debtor to receive cash proceeds for distribution to creditors and avoid further expenses and complications relating to the continued operation of the SVB Capital Business. Further, the consideration for the SVB Capital Business will ensure that the Debtor will share in any upside outcome for the sold business under the Designated Buyer's ownership in the form of potentially enhanced returns on the Retained Interests that will continue to be held by the Debtor.

22.    The Debtor believes that proceeding with a sale of the SVB Capital Business in the time and manner set forth herein will maximize the value of the business for the

Debtor's estate.  In formulating the Buyer Protections and time periods contained in the

Designated Buyer Agreement, the Debtor and its professionals balanced the need to provide

adequate and appropriate notice to parties-in-interest and potential purchasers against the need to

provide for an expeditious, efficient and orderly sale.  Maximizing the value of the Debtor's

estate requires that the Debtor proceed swiftly to consummate the Sale Transaction and time is of

the essence.  Therefore, the Debtor has determined that pursuing the Sale Transaction in the

manner and within the time periods described herein is in the best interest of the Debtor's estate

and stakeholders.

**Summary of the Designated Buyer Agreement and Other Relief Requested**

I.    **Designated Buyer Agreement, Buyer Protections and Alternative Transactions**

23.    The Designated Buyer Agreement was extensively negotiated between the

parties at arm's length and in good faith, and confers several substantial benefits on the Debtor's

estate.  *See* Puntus Declaration ¶¶ 19, 22.  The Debtor submits that the terms of the Designated

Buyer Agreement are reasonable under the circumstances.  The Designated Buyer Agreement

represents a binding offer for the SVB Capital Business for a cash consideration of $340 million,

subject to certain adjustments as set forth in the Designated Buyer Agreement, along with

ongoing economic participation rights and a cash earn-out, while at the same time allowing the

opportunity for a Superior Transaction.  The Designated Buyer is a third-party purchaser and is

unrelated to the Debtor.  Neither the Designated Buyer, nor any of its affiliates, subsidiaries,

officers, directors, members, partners or principals is an "insider" of the Debtor, as that term is

defined in section 101(31) of the Bankruptcy Code.  The Debtor's entry into the Designated

Buyer Agreement was approved by the Restructuring Committee.  *See* Puntus Declaration ¶ 19.

Management of the SVB Capital Business is expected to remain in place following the closing of

the Sale Transaction, and the Buyer expects to negotiate a management incentive plan.

-13-

24.     Recognizing the Designated Buyer's substantial expenditure of time, energy and resources in connection with the proposed transaction set forth in the Designated Buyer Agreement, and the benefit that those efforts have provided to the Debtor, its estate, its creditors and other parties-in-interest, the Designated Buyer Agreement provides for customary buyer protections to the Designated Buyer, which are comprised of the Termination Fee and the Expense Reimbursement Amount.

25.     In addition, shortly after entry into the Designated Buyer Agreement, the Designated Buyer will enter into a Hedging Arrangement to protect itself against the risk of fluctuations in the prices of publicly traded securities held by the Evergreen Fund that the Designated Buyer will be exposed to during the interim period between the signing and closing of the Sale Transaction (the "Evergreen Hedging Arrangement"). In light of the risk that such Hedging Arrangement may become futile if the Debtor decides to pursue a Superior Transaction, the Debtor has agreed to reimburse the Designated Buyer for the cost of setting up, and if applicable, extending the Evergreen Hedging Arrangement in the event the Designated Buyer Agreement terminates as a result of a Superior Transaction or certain material and/or intentional breach of the Designated Buyer Agreement. In the event that Debtor is required to reimburse the Designated Buyer for the Evergreen Hedging Arrangement, the Designated Buyer is required to use commercially reasonable efforts to cause the Evergreen Hedging Arrangement to be assigned to the Debtor or its assignee for no additional consideration, such that the Debtor would get the economic benefits of the hedging arrangement.

26.     The Designated Buyer Agreement requires that the Termination Fee, the Expense Reimbursement Amount and the Hedge Reimbursement (i) constitute allowed superpriority administrative expense claims pursuant to sections 105(a), 364(c)(1), 503(b), and

-14-

507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code, superior in priority to all other similarly situated claims asserted or allowed in this Chapter 11 Case and (ii) be payable under the terms and conditions set forth therein.

27.    While the Debtor and the Restructuring Committee believe that the Sale Transaction will produce a fair and reasonable price for the SVB Capital Business, to ensure it did not close the door to higher or otherwise better offers, the Debtor has negotiated a "fiduciary out" and alternative transaction mechanism under the Designated Buyer Agreement.  Following the execution of the Designated Buyer Agreement, the Debtor will have the right to continue negotiations with any potential acquirer for the SVB Capital Business with whom the Debtor had engaged in negotiations in the three months immediately prior to the Debtor's entry into the Designated Buyer Agreement or from whom the Debtor received an unsolicited alternative transaction proposal.  Subsequent to entry into the Designated Buyer Agreement, the Debtor may also furnish information about the SVB Capital Business to an unsolicited bidder, subject to such bidder's entry into a qualifying confidentiality agreement, and consider such unsolicited alternative proposal in order to determine if such proposal would constitute a superior proposal. Critically, the Designated Buyer Agreement allows the Debtor to "take any action or to refrain from taking any action with respect to the Transactions to the extent that it determines in good faith, after consulting with outside counsel, that taking or failing to take such action would be inconsistent with its fiduciary obligations under applicable Law," including entering into a Superior Transaction for the SVB Capital Business, subject to prior written notice of such intent to, and in the absence of a matching offer from, the Designated Buyer.

28.     The following chart summarizes the key terms and conditions of the

Designated Buyer Agreement: [4, 5]

| Parties | Seller:  SVB Financial Group |
| --- | --- |
| | Buyer:  Pinegrove Sierra HoldCo LLC (the "Buyer") |
| | *See* **Designated Buyer Agreement, Preamble** |
| Assets to Be Purchased | (i) A portion of the issued and outstanding equity interests of the Target Companies and General Partner Entities and (ii) all of the issued and outstanding equity interests of each of Evergreen Fund, QIF 1 and QIF 7 that are each owned directly or indirectly by the Debtor (and by extension, (1) a portion of the capital commitments that the Debtor holds through its equity interests in the General Partner Entities, Evergreen Fund, QIF 1 and QIF 7 and (2) a portion of the Debtor's rights and interests in carried interest, incentive allocations, promote interests, or other performance based profits interests that the Debtor holds through its equity interests in the General Partner Entities). |
| | *See* **Designated Buyer Agreement, § Recitals** |
| Purchase Price | (a) (i) $340,000,000, multiplied by (ii) (A) 100% minus (B) the Client Deficit Percentage, *plus* (b) the Closing Cash Amount Adjustment, *plus* (c) the Closing Funded Commitment Amount, *minus* (d) the Closing Carried Interest Amount, *minus* (e) Closing Pre-9/30/23 Non-Evergreen Fund Capital Interest Amount, *minus* (f) Closing Post-9/30/23 Non-Evergreen Fund Budgeted Capital Interest Amount, *minus* (g) Closing Post-9/30/23 Non-Evergreen Fund Excess Capital Interest Amount, *minus* (h) Closing Evergreen Fund Capital Interest Amount, *minus* (i) the Closing Indebtedness Amount, *plus* (j) an amount equal to the Working Capital Overage (based on the Working Capital Estimate), if any, *plus* (k) an amount equal to the Working Capital Underage (based on the Working Capital Estimate), if any, *plus* (l) the aggregate amount of Permitted Intercompany Payables settled using amounts that would otherwise be included in Cash after the Execution Date and prior to 11:59 p.m. Eastern Time on the day immediately preceding the Closing, if any, *minus* (m) the Deposit Amount (to the extent the Deposit has been funded). |
| | *See* **Designated Buyer Agreement, § 1.1, Definitions** |
| Fundraising Payments | During the period following the Closing and prior to the date that is ten (10) years following the Closing (the "Fundraising Period"), Buyer will pay to the Debtor up to an aggregate of $10,000,000, to the extent required by Section 1.8 of the Designated Buyer Agreement: |
| | • If, at any time during the Fundraising Period, the amount of New Capital Raised equals or exceeds $750,000,000, Buyer will pay to the Debtor by wire transfer of immediately available funds to an account designated by the Debtor in writing, an amount equal to $5,000,000; and |
| | • If, at any time during the Fundraising Period, the amount of New Capital Raised equals or exceeds $1,500,000,000, Buyer will pay to the Debtor by |

---

[4]    This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Designated Buyer Agreement, the Designated Buyer Agreement shall govern in all respects.  Unless context indicates otherwise, capitalized terms used in this summary but not defined herein are to be given the meanings ascribed to them in the Designated Buyer Agreement.

[5]    **Note to Draft**:  Subject to updates based on the final version of the IPA.

| | |
|---|---|
| | wire transfer of immediately available funds to an account designated by the Debtor in writing, an amount equal to $5,000,000.<br><br>*See* **Designated Buyer Agreement, § 1.8** |
| **Closing Date** | The closing of purchase and sale provided for in the Designated Buyer Agreement (the "<u>Closing</u>") will take place at 9:00 a.m., Eastern Time, at the offices of Sullivan & Cromwell LLP, 125 Broad Street, New York, NY 10004 or remotely via electronic exchange of documents and signatures, on the third (3rd) Business Day following the satisfaction or waiver of the last condition to the Closing in Article VI of the Designated Buyer Agreement or at such other time or place as the Designated Buyer and the Debtor mutually agree (the "<u>Closing Date</u>").<br><br>*See* **Designated Buyer Agreement, § 1.3** |
| **Conditions to Closing** | In addition to customary closing conditions, the consummation of the Sale Transaction is subject to, among other things, (a) the entry of the Sale Order by the Bankruptcy Court and the Sale Order being in full force and effect and not subject to a stay; (b) the waiting period (and any extension thereof) applicable to the consummation of the Sale Transaction under the HSR Act shall have expired or been earlier terminated; and (c) the Debtor having obtained consents of Sponsored Funds to the extent required by the terms of the applicable Advisory Contracts, the applicable Fund Documentation or applicable Law for the consummation of the Sale Transaction that remain in effect as of the Closing, such that, the Client Deficit Percentage is no more than 20%.<br><br>*See* **Designated Buyer Agreement, Article VI** |
| **Escrow Deposit** | No later than forty-eight (48) hours after the entry of the Buyer Protections Order, the Buyer will deliver to Citibank, N.A. (the "<u>Escrow Agent</u>") a deposit (the "<u>Deposit</u>") in the amount of $50,500,000 (the "<u>Deposit Amount</u>" and the account into which such deposit is made, the "<u>Escrow Account</u>").<br><br>At the Closing, the Debtor and the Buyer will deliver a joint instruction to the Escrow Agent, instructing the Escrow Agent to release the Deposit to the Debtor.<br><br>Upon certain termination events specified in the Designated Buyer Agreement, the Deposit will be returned to the Buyer.<br><br>The Deposit will only constitute property of the Debtor in the event that such Deposit is released to the Debtor by the Escrow Agent in accordance with the terms of the Designated Buyer Agreement and the Escrow Agreement.<br><br>*See* **Designated Buyer Agreement, Recitals, §§ 1.2, 7.2** |
| **Assumption and Assignment of Executory Contracts** | At the Closing, the Debtor will assume and assign to the Buyer, and the Buyer will assume the entirety of the Debtor's right, title and interest in each contract listed on Section 1.6(a) of the Seller Disclosure Schedules as of the Closing (each such contract, an "<u>Assumed Contract</u>").<br><br>The Buyer will pay all Cure Costs in respect of the Assumed Contracts, which will not be the obligation, liability or responsibility of the Debtor. The Buyer has delivered evidence of the Buyer's ability to comply with section 365 of the Bankruptcy Code, including adequate assurance of future performance, in connection with the assumption and assignment of the Assumed Contracts.<br><br>During the period following the Execution Date and until the Closing Date, the Parties will consult with each other in good faith to determine whether an executory contract not initially included in Section 1.6(a) of the Seller Disclosure Schedules should be assumed and assigned to the Buyer in accordance with the Designated Buyer Agreement. |

-17-

| | *See* **Designated Buyer Agreement, § 1.6** |
|---|---|
| **Buyer Financing** | Prior to the execution of the Designated Buyer Agreement, the Buyer has delivered to the Debtor an Equity Commitment Letter from the Affiliates of the Buyer (each, a "Parent") confirming their commitment to provide cash equity to the Buyer in an aggregate amount equal to $350,000,000 (the "Equity Financing"). The Equity Commitment Letter provides that the Debtor is a third-party beneficiary of, and is entitled to enforce, such Equity Commitment Letter on the terms and conditions set forth therein.<br><br>*See* **Designated Buyer Agreement, § 3.6** |
| **Regulatory Approvals** | The Debtor and the Buyer will prepare and file as promptly as reasonably practicable all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as practicable all consents, clearances, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any Governmental Entity in order to consummate the Sale Transaction, including filings pursuant to the HSR Act with respect to the Sale Transaction. The Parties will use their reasonable best efforts to avoid (without any requirement to litigate or appeal) any judgment that would be reasonably expected to delay or otherwise prohibit consummation of the Sale Transaction, provided that the Debtor will not be required to take any actions that would have a material and adverse impact on the remainder of its assets (other than the Sale Interests).<br><br>The Buyer will use its reasonable best efforts to obtain all consents required to permit the satisfaction of the conditions in Article VI of the Designated Buyer Agreement, as promptly as reasonably practicable.<br><br>*See* **Designated Buyer Agreement, § 4.3** |
| **Alternative Transactions and Fiduciary-Out** | Subject to compliance with the covenants not to solicit Alternative Transaction Proposals pursuant to Section 4.16(a) of the Designated Buyer Agreement, the Debtor, its Affiliates and their respective Representatives will have the right to: (w) provide access to non-public information concerning the Target Companies, the General Partner Entities and the Sponsored Funds to any Person that submits an unsolicited Alternative Transaction Proposal and executes and delivers an Acceptable Confidentiality Agreement; (x) receive, respond to, and maintain and continue discussions or negotiations with respect to such unsolicited Alternative Transaction Proposals in order to determine if such Alternative Transaction Proposal constitutes a Superior Proposal; (y) provide access to non-public information concerning the Target Companies, the General Partner Entities and the Sponsored Funds and receive, respond to, and maintain and continue discussions or negotiations with respect to any existing Alternative Transaction Proposal outstanding as of the Execution Date or with respect to any party that has engaged in negotiations in the three months immediately before the date of the Designated Buyer Agreement regarding an Alternative Transaction Proposal prior to the Execution Date; and (z) enter into or continue discussions or negotiations with any creditor committee and/or the United States Trustee regarding the Sale Transaction or any unsolicited Alternative Transaction Proposal.<br><br>The Debtor will (i) provide notice of any Alternative Transaction Proposal received after the Execution Date to the Buyer within three (3) Business Days after the time of receiving such Alternative Transaction Proposal, (ii) provide to counsel to the Buyer a copy of any written Alternative Transaction Proposal (and notice and a description of any oral Alternative Transaction Proposal) within three (3) Business Day of the Seller Parties or their advisors receipt of such Alternative Transaction Proposal, (iii) notify the Buyer promptly (and in any event no later than twenty-four (24) hours following such determination) if the Restructuring Committee determines that an Alternative Transaction Proposal is a Superior Proposal, and (iv) promptly |

| | |
|---|---|
| | provide such information to counsel to the Buyer regarding such discussions or any actions or inaction as necessary to keep counsel to the Buyer reasonably contemporaneously informed as to the status and substance of the foregoing.<br><br>If the Debtor determines that an Alternative Transaction Proposal is a Superior Proposal, the Buyer will be provided four (4) Business Days after receipt of such notice to propose modifications to the Sale Transaction, and the Debtor will (x) if requested by the Buyer, engage in good faith in discussions and negotiations regarding such modifications, and (y) not terminate the Designated Buyer Agreement pursuant to Article VII thereof (Termination) unless and until such period has elapsed and the Restructuring Committee determines in good faith, after consultation with its financial advisors and its outside legal counsel (and taking into account any amendment or modification to the terms of the Sale Transaction that the Buyer has agreed to make) that such Alternative Transaction Proposal is a Superior Proposal and that the failure to take such action would be inconsistent with its fiduciary duties under applicable Law.<br><br>Nothing in the Designated Buyer Agreement will require the Debtor or the Restructuring Committee to take any action or to refrain from taking any action with respect to the Sale Transaction to the extent that it determines in good faith, after consulting with outside counsel, that taking or failing to take such action would be inconsistent with its fiduciary obligations under applicable Law. If the Debtor, in compliance with Section 4.16 of the Designated Buyer Agreement, determines to take or refrain from taking any action, the Buyer will be entitled to a similar right to receive notice and modify the Sale Transaction as described in the preceding paragraph.<br><br>***See* Designated Buyer Agreement, § 4.16** |
| **Buyer Protections** | In the event the Designated Buyer Agreement is terminated (i) upon consummation of an Alternative Transaction or (ii) as otherwise provided in Section 7.3 of the Designated Buyer Agreement, the Debtor will, without the requirement of any notice or demand from the Buyer, promptly, but in no event later than three (3) Business Days after the date of such termination of the Designated Buyer Agreement, pay or cause to be paid to the Buyer:<br><br>• Termination Fee: an amount in cash equal to $15,150,000 (3% of the aggregate value of the consideration for the SVB Capital Business); and<br><br>• Expense Reimbursement Amount: an amount equal to all reasonable out-of-pocket and documented fees and expenses (including fees and expenses of counsel) incurred by the Buyer or its Affiliates in connection with or related to the evaluation, consideration, analysis, negotiation, diligence, documentation, execution, performance and enforcement of the Designated Buyer Agreement and the Sale Transaction, in an amount not to exceed $3,500,000 in the aggregate.<br><br>• Hedge Reimbursement: up to $2,200,000 of documented fees and expenses incurred by Buyer or its Affiliates in connection with the Evergreen Hedging Arrangement with an initial term ending on or before June 30, 2024. If the Evergreen Hedging Arrangement is extended, the Hedge Reimbursement will be increased by (i) up to $2,200,000 of additional documented fees and expenses incurred in connection with the Evergreen Hedging Arrangement for a period of 45 days following the initial term of the Evergreen Hedging Arrangement (including the cost of such extension), and (ii) up to $2,200,000 (i.e., for a maximum Hedge Reimbursement of up to $6,600,000) of additional documented fees and expenses incurred in connection with the Evergreen Hedging Arrangement following such 45 day period (including the cost of such extension). |

| | |
|---|---|
| | The Termination Fee, the Expense Reimbursement Amount and the Hedge Reimbursement will constitute allowed superpriority administrative expense claims pursuant to sections 105(a), 364(c)(1), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code and such allowed superpriority administrative expense claim will be superior in priority to all other similarly situated claims asserted or allowed in the Bankruptcy Proceeding. *See* **Designated Buyer Agreement, § 7.3** |
| **Survival** | The parties agree that the representations, warranties and covenants will generally not survive the closing and that none of the parties will have any liability to each other after closing for any claim for breach of such representations, warranties or covenants. At and at all times after the Closing, in no event will the Buyer, on the one hand, or the Debtor, on the other hand, have any recourse against (a) the Debtor or any of the Seller Parties, or (b) the Buyer or any of the Buyer Parties, respectively, in each such case, with respect to any representation, warranty, covenant or agreement made by the Debtor or the Buyer, as applicable, in the Designated Buyer Agreement or in any other document contemplated thereby, or in any certificate delivered thereunder. Nothing in Section 8.1 of the Designated Buyer Agreement will limit any claim or action in respect of Fraud. *See* **Designated Buyer Agreement, § 8.1** |

## II.    **Extraordinary Provisions.**

29.    Section I.D of the Sale Guidelines provides that certain "Extraordinary Provisions" must be conspicuously disclosed in connection with the conduct of asset sales under section 363(b) of the Bankruptcy Code. The Debtor discloses that the relief sought herein may include the following Extraordinary Provision:

a. <u>Private Sale/No Competitive Bidding</u>. The Designated Buyer Agreement does not contemplate any further auction or competitive bidding process with respect to the sale of the SVB Capital Business. As described in more detail herein and in the Puntus Declaration, given the robust and thorough marketing process conducted so far, the Debtor does not believe that any further marketing process would yield material benefits. The Debtor has conducted extensive negotiations with the Designated Buyer and the purchase price is fair and reasonable. Moreover, the Debtor maintains the ability to exercise a "fiduciary out" under the Designated Buyer Agreement.

b. <u>Requested Findings as to Successor Liability</u>. The proposed Sale Order includes certain findings that the SVB Capital Business is being sold free of successor or similar liability, and that none of the Designated Buyer or its Affiliates is a successor or a mere continuation of the Debtor or its estate. *See* Sale Order ¶¶ P, 23. In light of the open process for the sale of the SVB Capital Business and the form and manner of the notice of this Motion (the "<u>Sale Notice</u>"), including that the Sale Notice contains

an express disclosure regarding successor liability findings in the Sale Order, the Debtor believes affected parties will have sufficient notice of the sale and, therefore, inclusion of successor liability findings in the Sale Order is appropriate and reasonable, especially balanced against the Sale Transaction's benefits to the Debtor's estate.

c. Relief from Bankruptcy Rule 6004(h).  In connection with the proposed Buyer Protections Order and Sale Order, the Debtor seeks waiver of the 14-day stay provided in Bankruptcy Rule 6004(h) on the grounds set forth below.

III.  **Proposed Noticing Procedures.**

30.  The Buyer Protections Order provides the following noticing procedures (collectively, the "Noticing Procedures"):

A.  Notice of the Sale Objection Deadline and Sale Hearing.

31.  Concurrently with the filing of this Motion, the Debtor will serve the Sale Notice by first-class mail (and/or by email, as applicable) upon the following parties or, in lieu thereof, their counsel, if known:  (a) the U.S. Trustee; (b) counsel to the UCC; (c) the Securities and Exchange Commission; (d) all taxing authorities having jurisdiction over the SVB Capital Business, including the Internal Revenue Service; (e) the United States Department of Justice; (f) the United States Attorney for the Southern District of New York; (g) the Federal Deposit Insurance Corporation; (h) the Board of Governors of the Federal Reserve System; (i) all persons and entities known by the Debtor to have expressed interest to the Debtor in acquiring all or a material portion of the SVB Capital Business during the past 12 months; (j) all persons and entities known by the Debtor to have asserted any lien, claim, interest or encumbrance on, in, to or against the SVB Capital Business (for whom identifying information and addresses are available to the Debtor); (k) the attorneys general for the states in which the Debtor conducts business; (l) any other applicable governmental entities or self-regulatory organizations; (m) the parties identified on the Debtor's list of 30 largest unsecured creditors; (n) the non-Debtor counterparties to all executory contracts that the Debtor proposes to assume or assume and assign

-21-

in connection with the Sale Transaction; and (o) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties"). On or about the same date, the Debtor shall post the Sale Notice on the Debtor's case information website (located at https://restructuring.ra.kroll.com/SVBFG) and publish the Sale Notice, with any modifications necessary for ease of publication, once in each of (i) the San Francisco Chronicle and (ii) *The Wall Street Journal* (national edition), to provide notice to any other potential interested parties.

32.     Within one business day after entry of the Buyer Protections Order, or as soon as reasonably practicable thereafter, the Debtor will serve the Sale Hearing Notice by first-class mail (and/or by email, as applicable) upon the Sale Notice Parties. On or about the same date, the Debtor shall post the Sale Notice on the Debtor's case information website (located at https://restructuring.ra.kroll.com/SVBFG) and publish the Sale Notice, with any modifications necessary for ease of publication, once in each of (i) the San Francisco Chronicle and (ii) *The Wall Street Journal* (national edition), to provide notice to any other potential interested parties.

33.     The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be provided.

34.     The Debtor submits that the Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the deadline for objections to the Sale Transaction (the "Sale Objection Deadline") and the time and location of the Sale Hearing. Accordingly, the Debtor requests that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rules 2002 and 6004 and Local Rule 2002-1.

IV.    **Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases.**

35.    In connection with the Sale Transaction, the Debtor anticipates that it may assume and assign to the Ultimate Buyer,[6] or its designated assignee(s), certain executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code.  Accordingly, the Debtor proposes that the assumption and assignment of executory contracts and unexpired leases in connection with the Sale Transaction be subject to the following Assumption and Assignment Procedures and requests that the Assumption and Assignment Procedures be approved by the Court pursuant to the Buyer Protections Order:

a.    Concurrently with filing this Motion, the Debtor will file with this Court and serve by first-class mail (and/or by email, as applicable) a notice, substantially in the form attached as Exhibit 2 to the Buyer Protections Order (each, an "Initial Assignment Notice") on each Counterparty to the Assumed Contracts, which the Debtor may, in its discretion, assume and assign to the Ultimate Buyer in connection with the Sale Transaction.

b.    The Initial Assignment Notice served on a Counterparty shall (i) identify each Assumed Contract then applicable to such Counterparty, (ii) set forth the proposed amount necessary to cure any default under the relevant Assumed Contract pursuant to section 365 of the Bankruptcy Code (the "Cure Amount") and (iii) inform such Counterparty of the requirement to file and duly serve any Contract Objections (as defined below) no later than the applicable Contract Objection Deadlines.

c.    If, following service of the Initial Assignment Notice, the Debtor identifies additional executory contracts and unexpired leases for assumption and assignment in connection with the Sale Transaction ("Additional Assumed Contracts," and, together with the Assumed Contracts, the "Assumed Debtor Contracts") or any previously proposed Cure Amounts are modified, the Debtor may file with this Court and serve by first-class mail (and/or by email, as applicable) a notice (a "Further Assignment Notice," and, together with the Initial Assignment Notices, the "Contract Notices") on each impacted Counterparty. Further Assignment Notices shall contain the same information as the Initial

---

[6]    "Ultimate Buyer" means the Designated Buyer or, in the event that the Debtor exercises its right to terminate the Designated Buyer Agreement in order to pursue a Superior Transaction, the buyer that submitted the highest or otherwise best offer for the SVB Capital Business (such buyer, the "Ultimate Buyer").

Assignment Notice. Further Assignment Notices may be filed and served at any time up to the closing of the Sale Transaction.

d.    Service of the Contract Notices shall not constitute an admission that an Assumed Debtor Contract is an executory contract or unexpired lease, or confirm that the Debtor is required to assume and assign such Assumed Debtor Contract.

e.    A Counterparty may file an objection to (i) the proposed Cure Amount, (ii) the proposed assumption and assignment of the Assumed Debtor Contracts, (iii) the adequate assurance of future performance provided by the Designated Buyer or (iv) whether applicable law excuses a Counterparty from accepting performance by, or rendering performance to, the Designated Buyer (each, a "Cure Objection"). In the event the Debtor enters into a Superior Transaction, a Counterparty may file an objection with respect to adequate assurance of future performance provided by the Ultimate Buyer and whether applicable law excuses a Counterparty from accepting performance by, or rendering performance to, the Ultimate Buyer (each, an "Assignee Objection," either a Cure Objection or an Assignee Objection, a "Contract Objection").

f.    Any Contract Objection must (i) be in writing; (ii) state with specificity the nature of such objection and, in the case of a Cure Objection, if disputed, the alleged Cure Amount and any and all defaults that must be cured or satisfied in order for such Assumed Debtor Contract to be assumed and assigned (with appropriate documentation in support thereof); (iii) comply with the terms of these Assumption and Assignment Procedures, the Bankruptcy Rules and the Local Rules; and (iv) be filed with this Court and properly served on the (A) counsel to William K. Harrington, the United States Trustee for Region 2, U.S. Department of Justice, Office of the U.S. Trustee, (B) counsel to the Debtor, (C) counsel to the UCC, (D) counsel to the Designated Buyer, (E) counsel to the Ultimate Buyer (if different than the Designated Buyer), (F) counsel to the Ad Hoc Group of Senior Noteholders (as defined in the *Verified Statement of Davis Polk & Wardwell LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [D.I. 149]), (G) counsel to the Ad Hoc Cross-Holder Group (as defined in the *Verified Statement of White & Case LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [D.I. 142]) and (H) all parties requesting notice in this Chapter 11 Case pursuant to Bankruptcy Rule 2002 (collectively, the "Objection Notice Parties").

g.    A Counterparty to an Assumed Debtor Contract may file and duly serve a Contract Objection by the following deadlines (each, a "Contract Objection Deadline"):

(i)    A Counterparty to an Assumed Contract included in an Initial Assignment Notice will have until the Sale Objection Deadline to file and duly serve a Cure Objection.

(ii)    A Counterparty to an Additional Assumed Contract included in a Further Assignment Notice will have until the later of the Sale Objection Deadline and

-24-

> 10 days after such Further Assignment Notice to file and duly serve a Cure
> Objection.

> (iii)   In the event the Debtor enters into a Superior Transaction, any Counterparty
> to an Assumed Debtor Contract may file and duly serve an Assignee
> Objection until the later of (A) 7 days after the date of the notice filed by the
> Debtor announcing the identity of the Ultimate Buyer and (B) with respect to
> an Additional Assumed Contract, 10 days after the date of the Further
> Assignment Notice which includes such Additional Assumed Contract.

h.      Any Counterparty who fails to timely file and properly serve a Contract Objection
(i) will be deemed to have forever waived and released any Contract Objection
and consented to the assumption and assignment of such Assumed Debtor
Contract on the terms set forth in the applicable Contract Notice, subject to the
occurrence of the closing of the Sale Transaction, and (ii) will be barred and
estopped forever from asserting or claiming against the Debtor or the Ultimate
Buyer that any additional amounts are due or defaults exist, or conditions to
assignment must be satisfied, under such Assumed Debtor Contract; provided,
however, that a Counterparty to an Assumed Debtor Contract shall not be barred
from seeking additional amounts on account of any defaults occurring between
the service of the latest served Contract Notice and the assumption of the
Assumed Debtor Contract.

i.      If no objections are received by the latest applicable Contract Objection Deadline
with respect to an Assumed Debtor Contract, then (i) the applicable Counterparty
shall be deemed to have consented to the assumption and assignment of such
Assumed Debtor Contract and the proposed Cure Amount shall be binding on the
applicable Counterparty for all purposes and will constitute a final determination
of the total Cure Amount required to be paid in connection with the assumption
and assignment of such contract, and (ii) the contract will be assumed and
assigned to the Ultimate Buyer as of the closing date of the Sale Transaction, as
approved by the Sale Order.

j.      If a Contract Objection is timely filed and properly served in accordance with
these Assumption and Assignment Procedures, the Debtor and the Counterparty
shall meet and confer in good faith to attempt to resolve any such objection
without Court intervention.  If the parties determine that the Contract Objection
cannot be resolved in a timely manner without judicial intervention, this Court
shall make all necessary determinations relating to such Contract Objection at the
applicable Contract Hearing (as defined below).

k.      A hearing with respect to Contract Objections timely and duly filed before the
Sale Objection Deadline shall be held at the Sale Hearing (the "Initial Contract
Hearing").  Hearings with respect to Contract Objections to Assumed Debtor
Contracts for which the applicable Contract Objection Deadlines are later than the
Sale Objection Deadline may be held on such dates as this Court may designate
(each, an "Additional Contract Hearing," and, together with the Initial Contract

-25-

Hearing, each, a "Contract Hearing").  Upon resolution of a Contract Objection,
provided that neither the Debtor nor the Ultimate Buyer have determined to
exclude the relevant contract from the Sale Transaction, and upon payment of the
applicable cure amount, if any, the contract will be deemed assumed and assigned
to the Ultimate Buyer as of the closing date of the Sale Transaction.  If this Court
determines at a Contract Hearing that a particular Assumed Debtor Contract
cannot be assumed and assigned for any reason, then such Assumed Debtor
Contract shall no longer be considered an Assumed Debtor Contract.

## **Basis for Relief**

I. **The Proposed Sale Satisfies the Requirements of Section 363 of the Bankruptcy
Code.**

36.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 363 does not provide a

standard establishing when it is appropriate for bankruptcy courts to authorize such a sale of a

debtor's assets.  Courts, however, have held that such a sale may be authorized under section

363(b) of the Bankruptcy Code if the Court finds a sound business purpose for the sale.  *See In re*

*Lionel Corp.*, 722 F.2d 1063, 1070–71 (2d Cir. 1983) ("[T]here must be some articulated

business justification, other than appeasement of major creditors, for using, selling or leasing

property out of the ordinary course of business before the bankruptcy judge may order such

disposition under section 363(b).").

37.    In evaluating whether a sale under section 363(b) is justified by a sound

business purpose, courts consider a variety of factors which essentially amount to a business

judgment test.  *See In re Glob. Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (citing

*Dai-Ichi Kangyo Bank, Ltd.* v. *Montgomery Ward Holding Corp. (In re Montgomery Ward*

*Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999)); *Official Comm. of Subordinated*

*Bondholders* v. *Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y.

1992) (holding that Delaware's business judgment rule principles have "vitality by analogy" in

-26-

chapter 11).  The business judgment rule "is a presumption that in making a business decision

the directors of a corporation acted on an informed basis, in good faith and in the honest belief

that the action taken was in the best interests of the company."  *In re Integrated Res.*, 147 B.R. at

656 (quoting *Smith* v. *Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

      A.    <u>A Sound Business Reason Exists for the Sale Transaction.</u>

      38.    The assessment of whether there are sufficient business reasons to justify a

particular sale depends on the "facts and circumstances" of each case.  *In re Allard*, No. 18-

14092 (MG), 2019 Bankr. LEXIS 2924, at *10 (Bankr. S.D.N.Y. Sep. 20, 2019).  Factors for a

bankruptcy court to consider include, without limitation:  "the proportionate value of the asset to

the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of

reorganization will be proposed and confirmed in the near future, the effect of the proposed

disposition on future plans of reorganization, the proceeds to be obtained from the disposition

vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the

proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing

in value."  *In re Lionel*, 722 F.2d at 1071.

      39.    As set forth above and in the Puntus Declaration, a strong business

justification exists for the sale of the SVB Capital Business as described herein to maximize the

value of such assets.  The Debtor entered into the Designated Buyer Agreement following a

comprehensive marketing process along with an evaluation of alternatives to a sale of the SVB

Capital Business, in consultation with its financial and legal advisors, the Restructuring

Committee and its key creditor constituencies.  After the execution of the Designated Buyer

Agreement and until the earlier of the closing of the Sale Transaction and the termination of the

Designated Buyer Agreement, the Debtor will be able to continue negotiating with the potential

buyers for the SVB Capital Business with whom the Debtor engaged in the three months

-27-

immediately before the date of the Designated Buyer Agreement to obtain a higher or otherwise better offer.  Importantly, the Debtor is permitted to take any action or refrain from taking any action to the extent required by its fiduciary duties, including entering into a Superior Transaction for the SVB Capital Business, subject to prior written notice of such intent to, and absence of a matching offer from, the Designated Buyer.  The sale of the SVB Capital Business, as contemplated by the Designated Buyer Agreement or any Superior Transaction, creates more value to the Debtor's estate than any know alternative path for the business, including the Debtor continuing to operate the SVB Capital Business through and following consummation of a chapter 11 plan.  The proceeds of the SVB Capital Business will be more readily available for distribution to creditors than under any chapter 11 plan and will provide value-maximizing and efficient recoveries for the Debtor's creditors.  *See* Puntus Declaration ¶ 17.

      B.     <u>The Noticing Procedures Are Reasonable and Appropriate.</u>

      40.     Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide creditors with 21 days' notice where the Debtor seeks to use, sell or lease property of the estate outside the ordinary course of business.  Bankruptcy Rule 2002(c) requires any such notice to include the time and place of any public sale and the deadline for any objections.  The Debtor submits that the Noticing Procedures described herein are reasonably calculated to provide parties interested in the SVB Capital Business and parties with potential liens and claims in the SVB Capital Business with adequate and timely notice of, among other things, the Sale Transaction and Sale Hearing.  Accordingly, the Debtor requests that the Court approve the Noticing Procedures and the form and manner of the Sale Hearing Notice.

C.    <u>The Sale Transaction Will Produce a Fair and Reasonable Purchase Price for the
SVB Capital Business.</u>

41.    As described above, the offer of the Designated Buyer is the culmination

of a competitive and exhaustive year-long sale process consisting of multiple marketing rounds

and a product of the extensive negotiations with the Designated Buyer.  In consultation with its

advisors, its creditor constituencies and the Restructuring Committee, the Debtor has determined

that the purchase price contemplated by the Designated Buyer Agreement is fair and reasonable.

42.    Additionally, the fiduciary out and alternative transaction mechanisms are

designed to ensure that no higher or otherwise better offers are currently available for the SVB

Capital Business, with the offer of the Designated Buyer serving as a floor for any overbids.

D.    <u>The Designated Buyer Should Be Entitled to the Good Faith Protections of
Section 363(m) of the Bankruptcy Code.</u>

43.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's

interest in property purchased from the debtor notwithstanding that authorization of the sale

conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section

363(m) provides, in relevant part, as follows:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] . . . does not affect the validity of a sale . . . to an
> entity that purchased . . . such property in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

44.    Section 363(m) "furthers the policy of finality in bankruptcy sales" and

"assists bankruptcy courts in maximizing the price for assets sold in such proceedings," *United

States* v. *Salerno*, 932 F.2d 117, 123 (2d Cir. 1991), by providing that "good faith transfers of

property will not be affected by the reversal or modification on appeal of an unstayed order,

whether or not the transferee knew of the pendency of the appeal," *Allstate Ins. Co.* v. *Hughes*,

-29-

174 B.R. 884, 888 (S.D.N.Y. 1994).  While the Bankruptcy Code does not define "good faith,"

the Second Circuit has held that a purchaser's good faith is shown by the integrity of such

purchaser's conduct during the course of the sale proceedings and that where there is a lack of

such integrity, a good faith finding may not be made.  *See, e.g.*, *Licensing By Paolo, Inc.* v.

*Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997) (holding that a "purchaser's good faith is

lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to

take grossly unfair advantage of other bidders'" (quoting *In re Rock Indus. Mach. Corp.*, 572

F.2d 1195, 1198 (7th Cir. 1978))); *see also Parker* v. *Motors Liquidation Co. (In re Motors

Liquidation Co.)*, 430 B.R. 65, 78 (S.D.N.Y. 2010) (applying the standard for a good faith

purchaser set forth in *In re Gucci*).

45.    The Debtor and the Designated Buyer have entered into the Designated

Buyer Agreement without collusion, in good faith and through arm's-length negotiations.  *See*

Puntus Declaration ¶ 21.  The Designated Buyer is not a current "insider" or "affiliate" as

defined in section 101 of the Bankruptcy Code.  The Designated Buyer has disclosed, and any

other parties participating in the bidding process for the SVB Capital Business are required to

disclose, their relationships with the Debtor and the Debtor's current or former officers and

directors.

46.    Based on the foregoing, the Debtor requests that the Court determine that

the Designated Buyer of the SVB Capital Business is a good faith purchaser entitled to the

protections of section 363(m) of the Bankruptcy Code.

## II.    **The Buyer Protections Have a Sound Business Purpose and Should Be Approved.**

47.    Approval of bid protections in connection with sales pursuant to

section 363 of the Bankruptcy Code has become an established practice in chapter 11 cases.  *See,

e.g.*, *In re Integrated Res.*, 147 B.R. at 659 (finding bid protections "are important tools to

encourage bidding and to maximize the value of the debtor's assets"); *In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) ("Bidder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer.").  Bid protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while also providing the debtor with the potential of obtaining an enhanced recovery through an alternative transaction wherein that fair price serves as the floor for other bids.

48.    Courts in this district analyze the appropriateness of bid protections under the business judgment rule.  *See In re Integrated Res.*, 147 B.R. at 656–60 (noting that "bankruptcy courts generally presume that the board's decision to agree to a break-up fee was a valid exercise of its business judgment").  In reviewing a debtor's business judgment to agree to bid protections, bankruptcy courts in this district consider the following questions:  (a) whether the relationship of the parties who negotiated a termination fee is tainted by self-dealing or manipulation; (b) whether the fee hampers, rather than encourages, bidding; and (c) whether the amount of the fee is unreasonable relative to the proposed purchase price.  *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014) (citing *In re Integrated Res.*, 147 B.R. at 657 and *In re Metaldyne Corp.*, 409 B.R. at 670).  To determine whether a termination fee encourages rather than hampers bidding, courts will look to see whether the fee: (i) attracts or retains a potentially successful bid; (ii) establishes a bid standard or minimum for other bidders to follow or (iii) attracts additional bidders.  *In re Integrated Res.*, 147 B.R. at 662.  In addition, a break-up fee should constitute a fair and reasonable percentage of the proposed purchase price and should be reasonably related to the prospective purchaser's risk, effort and expenses.  *Id*. at 662; *see also In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding

incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking").

49.    The Debtor submits that the Buyer Protections are appropriate under each of the *Genco* factors.   First, the Buyer Protections are the product of good faith, arm's-length negotiations between the Debtor and the Designated Buyer.  The Designated Buyer Agreement provisions relating to the Buyer Protections were considered carefully by the Debtor's advisors and approved by the Restructuring Committee.  *See* Puntus Declaration ¶ 19.

50.    Second, the Debtor believes that the Buyer Protections serve to encourage higher or otherwise better offers for the SVB Capital Business.  The Buyer Protections will enable the Debtor to secure an adequate floor for the SVB Capital Business and ensure that competing bids will be materially higher or otherwise better than the Designated Buyer's offer—a clear benefit to the Debtor's estate.  Further, the Debtor believes that the presence of the Designated Buyer may attract other potential buyers to bid for the SVB Capital Business, thereby maximizing the realizable value for the benefit of the Debtor's estate, creditors and other parties-in-interest.  The Buyer Protections were a material inducement for, and a condition of, the Designated Buyer's entry into the Designated Buyer Agreement.  The Designated Buyer would not have agreed to the Designated Buyer Agreement without the Buyer Protections, considering the time and resources expended by the Designated Buyer in conducting due diligence, negotiating and drafting, despite the fact that the Designated Buyer Agreement is subject to not only Court approval but also superior offers submitted by third parties.  *See* Puntus Declaration ¶ 18.  Without the Court authorizing the Debtor to offer the Buyer Protections to the Designated Buyer, the Debtor might lose the opportunity to obtain the highest or otherwise best

offer that is binding and definitive for the SVB Capital Business, and would lose the downside

protection provided by the existence of the Designated Buyer.

51.    Third, the Debtor believes that the Buyer Protections are reasonable and

appropriate in light of the size and nature of the transaction and the efforts that have been and

will be expended by the Designated Buyer.  To the extent payable, the Termination Fee

represents only 3% of the purchase price to be paid by the Designated Buyer, the Expense

Reimbursement Amount will not exceed $3,500,000.  To the extent payable, the Hedge

Reimbursement will not exceed $2,200,000 unless the Evergreen Hedging Arrangement gets

extended.  The Debtor will also receive the economic benefit of the Evergreen Hedging

Arrangement in the event that the Debtor is required the reimburse the Designated Buyer for that

expense.  Courts in this district have routinely approved bid protections similar to the proposed

Buyer Protections as reasonable and consistent with the type and range of bid protections

typically approved.  *See, e.g.*, *In re Purdue Pharma L.P.*, No. 19-23649 (SHL) (Bankr. S.D.N.Y.

Apr. 28, 2023), D.I. 5570 (approving a break-up fee equal to 3% of the purchase price and

expense reimbursement of up to 1% of the purchase price); *In re Genesis Global Holdco, LLC*,

No. 23-10063 (Bankr. S.D.N.Y. March 31, 2023), D.I. 192 (approving a break-up fee equal to

3% of the cash portion of the purchase price and expense reimbursement of up to $50,000); *In re

The Roman Catholic Diocese of Rockville Centre, New York*, No. 20-12345 (MG) (Bankr.

S.D.N.Y. Nov. 22, 2022), D.I. 1471 (authorizing the debtor to grant a breakup fee of up to 3% of

the stalking horse purchase price and expense reimbursement of up to the lesser of $500,000 and

0.7% of the purchase price); *In re Garrett Motion, Inc.*, No. 20-12212 (MEW) (Bankr. S.D.N.Y.

Oct. 24, 2020), D.I. 282 (approving a break-up fee of 3% of the purchase price and expense

reimbursement of up to 1% of the purchase price).

52.    Finally, the Debtor believes that the allowance of the Buyer Protections as superpriority administrative expenses in the circumstances where they become payable under the Designated Buyer Agreement is fair and reasonable, and should be authorized.  Courts in this jurisdiction have provided superpriority administrative expense status to break-up fees and expense reimbursements in the event that they become payable.  *See, e.g.*, *In re GBG USA*, No. 21-11369 (MEW) (Bankr. S.D.N.Y. Aug. 31, 2021) (approving treatment of break-up fee and expense reimbursement as superpriority administrative expenses); *In re K.G. IM, LLC*, No. 20-11723 (MG) (Bankr. S.D.N.Y. October 23, 2020) (same); *In re Aralez Pharmaceuticals US Inc.*, No. 18-12425 (MG) (Bankr. S.D.N.Y. Oct. 11, 2018) (same); *In re Cocoa Services, L.L.C.*, No. 17-11936 (JLG) (Bankr. S.D.N.Y. Aug. 14, 2017) (same); *see also* 11 U.S.C. § 364(c)(1) ("[T]he court . . . may authorize . . . the incurring of debt with priority over any or all administrative expenses of the kind specified in section  503(b) or 507(b) of this title.").

53.    As discussed above, the Designated Buyer's commitment to consummate the Sale Transaction provides substantial benefits to the Debtor's estate by securing a path forward that maximizes the value for its stakeholders.  Thus, the Buyer Protections are actual and necessary costs of preserving the Debtor's estate within the meaning of section 503(b) of the Bankruptcy Code.

54.    Accordingly, for the reasons set forth above, the Debtor submits that the Buyer Protections have a sound business purpose, are fair and are appropriate under the circumstances, and therefore should be approved and allowed as superpriority administrative expense claims.

III.    **The SVB Capital Business Should Be Sold Free and Clear of Liens, Claims,
Interests and Encumbrances Under Section 363(f) of the Bankruptcy Code.**

55.    In the interest of attracting the best offers, the Debtor requests

authorization to sell the SVB Capital Business free and clear of any liens, claims, encumbrances

and other interests in accordance with section 363(f) of the Bankruptcy Code, with any such

liens, claims, encumbrances and other interests attaching to the proceeds of the sale of the SVB

Capital Business.

56.    The sale of estate property free and clear of any interest is governed by

section 363(f) of the Bankruptcy Code, which provides:

> The trustee may sell property under subsection (b) or (c) of this
> section free and clear of any interest in such property of an entity
> other than the estate, only if—
>
> (1)    applicable nonbankruptcy law permits sale of such property
>        free and clear of such interest;
> (2)    such entity consents;
> (3)    such interest is a lien and the price at which such property is
>        to be sold is greater than the aggregate value of all liens on
>        such property;
> (4)    such interest is in bona fide dispute; or
> (5)    such entity could be compelled, in a legal or equitable
>        proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

57.    Section 363(f) of the Bankruptcy Code is drafted in the disjunctive:

approval of a proposed sale of assets free and clear of interests requires only that one of the five

requirements be satisfied with respect to each such interest.  *See In re Borders Grp., Inc.*, 453 B.R.

477, 483–84 (Bankr. S.D.N.Y. 2011); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) ("[I]f any of the

five conditions of § 363(f) are met, the [debtor] has the authority to conduct the sale free and clear of

all liens.").

-35-

58.    One or more of the standards set forth in section 363(f)(1)–(5) of the

Bankruptcy Code will apply to each creditor or to each claim or interest in the SVB Capital

Business asserted by such creditor.  All parties-in-interest will have sufficient opportunity to

object to the relief requested in this Motion, and parties that do not object or withdraw their

objections to the Sale Transaction or this Motion should be deemed to have consented to the Sale

Transaction and this Motion within the meaning of section 363(f)(2) of the Bankruptcy Code.  *In

re Borders Grp., Inc.*, 453 B.R. at 484 ("Under section 363(f)(2), a lienholder who receives notice

of a sale but does not object within the prescribed time period is deemed to consent to the

proposed sale, and assets thereafter may be sold free and clear of liens."); *In re Elliot*, 94 B.R. at

345–46.  With respect to any party that objects to the Sale Transaction and does not withdraw

such objection, the Debtor expects that it will be able to satisfy one or more of the other

conditions set forth in section 363(f).

59.    A sale of the SVB Capital Business free and clear of claims and interests

is necessary to maximize the value of offers to acquire the SVB Capital Business.  If the SVB

Capital Business is not sold free and clear of claims and interests, or if the Ultimate Buyer

would, or in the future could, be liable for any such claim or interest, the Debtor would be unable

to successfully market the SVB Capital Business without a significant reduction in price.  Such a

sale would provide substantially less value and certainty for the Debtor's estate.

60.    Furthermore, any lien or claim on, in, to or against the SVB Capital

Business existing immediately prior to the sale will attach to the sale proceeds with the same

validity, priority, force and effect as it had at such time, subject to the rights and defenses of the

Debtor or any party-in-interest.  The Debtor submits that holders of any claim or interest will be

sufficiently protected by the availability of the proceeds of the sale to satisfy their claims and

-36-

interests.  Accordingly, the Debtor submits that a sale of the SVB Capital Business free and clear of claims and interests is in the best interests of the Debtor's estate and stakeholders.

## IV. The Assumption and Assignment Procedures and the Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Approved.

61.    Section 365 of the Bankruptcy Code provides that a debtor-in-possession may generally assume and assign any executory contract or unexpired lease of the debtor, subject to approval of the court, if it:  (a) cures, or provides adequate assurance that it (or its assignee) will promptly cure, the applicable defaults and (b) provides adequate assurance of future performance under such contract or lease, including by its assignee.  11 U.S.C. § 365.  Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease.  *See, e.g.*, *Mission Prod. Holdings* v. *Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) (noting that a bankruptcy court will generally approve a debtor's choice to assume or reject an executory contract under the deferential business judgment rule); *NLRB* v. *Bildisco and Bildisco*, 465 U.S. 513, 523 (1984); *In re Gucci*, 193 B.R. 411, 415 (S.D.N.Y. 1996) ("A bankruptcy court reviewing a trustee's decision to assume or reject an executory contract should . . . apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume [it]."); *In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) ("A debtor may assume or reject an unexpired lease in accordance with 11 U.S.C. § 365(a) in the exercise of its best business judgment.").

62.    The "business judgment" standard is not a strict standard; it requires only a showing that either assumption or rejection of the executory contract will benefit the debtor's estate.  *See Orion Pictures*, 4 F.3d at 1098–99; *In re Balco Equities, Inc.*, 323 B.R. 85, 99 (Bankr. S.D.N.Y. 2005) ("In determining whether the debtor has employed reasonable business discretion, the court for the most part must only determine that the rejection will likely benefit

the estate." (quoting *In re G Survivor Corp.*, 171 B.R. 755, 758 (Bankr. S.D.N.Y. 1994), *aff'd*,

187 B.R. 111 (S.D.N.Y. 1995))); *see also In re Genco Shipping & Trading Ltd.*, 509 B.R. 455,

463 (Bankr. S.D.N.Y. 2014) ("A court will generally not second-guess a debtor's business

judgment regarding whether the assumption or rejection of a contract will benefit the debtor's

estate.").  Debtors are afforded significant discretion when requesting to assume or reject an

executory contract.  *See, e.g.*, *Androse Assocs. of Allaire, LLC* v. *Great Atl. & Pac. Tea Co. (In*

*re Great Atl. & Pac. Tea Co.)*, 472 B.R. 666, 673 (S.D.N.Y. 2012) (concluding that courts may

approve a debtor's lease assumption decision "[a]s long as assumption of a lease appears to

enhance a debtor's estate" and the debtor's decision is not "clearly erroneous, too speculative, or

contrary to the provisions of the Bankruptcy Code.").

63.    Assuming and assigning the Assumed Debtor Contracts to the Ultimate

Buyer pursuant to the Assumption and Assignment Procedures is an appropriate exercise of the

Debtor's business judgment.  In the event of a sale of the SVB Capital Business, the Assumed

Debtor Contracts will no longer have any value to the Debtor.  By assuming and assigning the

Assumed Debtor Contracts to the Ultimate Buyer, the Debtor will be able to maximize the value

of the Sale to its estate, while avoiding any damages claims that would arise from the rejection of

the Assumed Debtor Contracts.  The Debtor therefore submits that the assumption and

assignment to the Ultimate Buyer of the Assumed Debtor Contracts is an appropriate exercise of

the Debtor's business judgment and should be approved.

64.    The consummation of any Sale involving the assignment of an Assumed

Debtor Contract will be contingent upon the Debtor's compliance with the requirements of

section 365 of the Bankruptcy Code.  Section 365(b)(1) requires that any outstanding defaults

under the contract or lease to be assumed be cured or that the Debtor provide adequate assurance

-38-

that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  The Debtor's assumption and

assignment of Assumed Debtor Contracts will be contingent upon payment or reserve of Cure

Amounts and effective only upon the closing of the Sale.  As set forth above, the Debtor

proposes to file with the Court and serve on each Counterparty Contract Notices, which will set

forth the Debtor's good faith calculations of Cure Amounts with respect to each Assumed Debtor

Contract listed on such notice.  Counterparties will have the opportunity to file any objections to

the proposed assumption of their respective Assumed Debtor Contract.

65.    Additionally, section 365(f) of the Bankruptcy Code provides that "[t]he

trustee [or debtor-in-possession] may assign an executory contract or unexpired lease of the

debtor only if . . . adequate assurance of future performance by the assignee of such contract or

lease is provided, whether or not there has been a default in such contract or lease." Courts in this

district have held that "[a]dequate assurance of future performance are not words of art, but are

to be given practical, pragmatic construction." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr.

S.D.N.Y. 1982).  "What constitutes 'adequate assurance' is to be determined by factual

conditions.  *Id.*  The chief concern is "the assignee's ability to satisfy [its proposed] financial

obligations."  *Id.*  Adequate assurance does not, however, require "'an absolute guarantee of

performance'; rather, 'it must simply appear that the [payments] will be paid and other . . .

obligations met. . . . The emphasis is on protection.'"  *In re Great Atl. & Pac. Tea Co.*, 472 B.R.

at 674–75 (citing *In re M. Fine Lumber Co.*, 383 B.R. 565, 573 (Bankr. E.D.N.Y. 2008)).  Courts

have found that adequate assurance of future performance is provided when the assignee had the

financial resources and willingness to give the business a strong likelihood of success.  *In re

Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986); *see also In re Bronx-Westchester

Mack Corp.*, 20 B.R. 139, 143 (Bankr. S.D.N.Y. 1982) (determining that the assignee's financial

status and assumption of the debtor's ongoing obligations constituted adequate assurance of future performance).

66.     The Debtor submits that the Ultimate Buyer will be able to demonstrate its financial wherewithal to perform under the Assumed Debtor Contracts.  The Designated Buyer is a new company formed by an asset manager and a private investment partnership, each of which is financially healthy and will provide cash equity commitments to the Designated Buyer in connection with the Sale Transaction.  The Designated Buyer will be sufficiently capitalized and well situated to consummate the Sale Transaction and perform under the Assumed Debtor Contracts.  Given the minimum purchase price required for topping offers, the Ultimate Buyer, if different than the Designated Buyer, is expected to be a sophisticated and well-capitalized entity and therefore able to provide proof of adequate assurance.  Moreover, if the Ultimate Buyer is different than the Designated Buyer, any Counterparty will have 7 days after the notice announcing the identity of the Ultimate Buyer to file an objection to the adequate assurance provided by the Ultimate Buyer.  Thus, adequate assurance of future performance will be provided prior to the assumption and assignment of Assumed Debtor Contracts.

67.     In addition, to facilitate the assumption and assignment of Assumed Debtor Contracts, the Debtor further requests that the Court find that all applicable anti-assignment provisions, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such contract or lease, to be unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.  Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the

trustee may assign such contract or lease . . . ." 11 U.S.C. § 365(f)(1).  Section 365(f)(3) further

provides that:

> Notwithstanding a provision in an executory contract or unexpired
> lease of the debtor, or in applicable law that terminates or modifies,
> or permits a party other than the debtor to terminate or modify, such
> contract or lease or a right or obligation under such contract or lease
> on account of an assignment of such contract or lease, such contract,
> lease, right, or obligation may not be terminated or modified under
> such provision because of the assumption or assignment of such
> contract or lease by the trustee.

11 U.S.C. § 365(f)(3).

68.    Based on the foregoing, the Assumption and Assignment Procedures and

the Debtor's assumption and assignment of the Assumed Debtor Contracts satisfy the

requirements under section 365 of the Bankruptcy Code and should be approved.

### Bankruptcy Rules 6004(a), 6004(h) and 6006(d)

69.    The Debtor requests that the Court (a) find that notice of the Motion is

adequate under Bankruptcy Rule 6004(a) under the circumstances and (b) waive the 14-day stay

requirements under Bankruptcy Rules 6004(h) and 6006(d).  The proposed Sale Transaction

should be consummated as soon as practicable to allow the Debtor to maximize the value of the

SVB Capital Business, reduce closing uncertainty and expeditiously recover value for its estate

and stakeholders.  Accordingly, the Debtor requests that the Buyer Protections Order and the

Sale Order be effective immediately upon entry and that the 14-day stay imposed by Bankruptcy

Rules 6004(h) and 6006(d) be waived.

### Notice

70.    Notice of this Motion will be provided to the Sale Notice Parties.  The

Debtor submits that, in light of the nature of the relief requested, no other or further notice need

be provided.

-41-

**No Prior Request**

71.     No prior motion for the relief requested herein has been made to this or any other Court.

**Conclusion**

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court (a) enter the Buyer Protections Order, (b) enter, after the Sale Hearing, the Sale Order and (c) grant such other and further relief as is just and proper.

Dated: May 2, 2024
New York, New York

*/s/ James L. Bromley*
James L. Bromley
Andrew G. Dietderich
Christian P. Jensen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: bromleyj@sullcrom.com
      dietdericha@sullcrom.com
      jensenc@sullcrom.com

*Counsel to the Debtor*

## EXHIBIT A

**Proposed Buyer Protections Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____ x

In re                                    :        Chapter 11
                                         :
SVB FINANCIAL GROUP,[1]                   :        Case No. 23-10367 (MG)
                                         :
          Debtor.                        :
                                         :
_____ x

**ORDER (I) APPROVING BUYER PROTECTIONS, (II) SCHEDULING A SALE
HEARING, (III) APPROVING FORM AND MANNER OF NOTICES FOR SALE OF
THE SVB CAPITAL BUSINESS, (IV) APPROVING ASSUMPTION AND
ASSIGNMENT PROCEDURES AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of SVB Financial Group, as debtor and debtor-

in-possession (the "Debtor"), for entry of an order (this "Buyer Protections Order") (a) approving

the Termination Fee, the Expense Reimbursement Amount and the Hedge Reimbursement

(together, the "Buyer Protections"), as set forth in the Designated Buyer Agreement attached to

the Motion as Exhibit C, (b) scheduling the Sale Hearing, (c) approving the form and manner of

notices of the Sale and Sale Hearing, (d) approving the Assumption and Assignment Procedures

and (e) granting related relief; and this Court having jurisdiction to consider the Motion pursuant

to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431* from the

United States District Court for the Southern District of New York, dated January 31, 2012

(Preska, C.J.); and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and this

Court having found that proper and adequate notice of the Motion and the relief requested

therein has been provided in accordance with the Bankruptcy Rules and the Local Rules; and

_____

[1]    The last four digits of SVB Financial Group's tax identification number are 2278.

[2]    Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

that, except as otherwise ordered herein, no other or further notice is necessary; and objections

(if any) to the Motion having been withdrawn, resolved or overruled on the merits; and a hearing

(the "Buyer Protections Hearing") having been held to consider the relief requested in the

Motion and upon the record of the Buyer Protections Hearing and all of the proceedings had

before this Court; and this Court having found and determined that the relief sought in the

Motion is in the best interests of the Debtor, its estate, its creditors and all other parties in

interest; and that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.    Jurisdiction.  This Court has jurisdiction to consider the Motion pursuant

to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431* from the

United States District Court for the Southern District of New York, dated January 31, 2012

(Preska, C.J.).  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court

may enter a final order hereon under Article III of the U.S. Constitution.  Venue of this Chapter

11 Case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.    Statutory and Rule Predicates. The bases for the relief requested in the

Motion are sections 105(a), 363, 364(c)(1), 365, 503(b), and 507(a) of the Bankruptcy Code,

Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014, Local Rules 2002-1, 6004-1, 6006-1,

9006-1 and 9013-1 and the *Guidelines for the Conduct of Asset Sales*, adopted by General Order

M-331, dated September 5, 2006, as amended by General Order M-383, dated November 18,

2009, and as updated on June 17, 2013.

---

[3]    The findings of fact and the conclusions of law stated herein constitute this Court's findings of fact and
conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to
Bankruptcy Rule 9014.  Findings of fact shall be construed as conclusions of law and conclusions of law shall
be construed as findings of fact to the fullest extent of the law.

C.     Adequate Notice.  The Debtor's notice of the Motion and the Buyer

Protections Hearing and the proposed entry of this Buyer Protections Order was (a) appropriate

and reasonably calculated to provide all interested parties with timely and proper notice, (b) in

compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and

the Local Rules and (c) adequate and sufficient under the circumstances of this Chapter 11 Case,

and no other or further notice is required.  A reasonable opportunity to object or be heard

regarding the relief granted by this Buyer Protections Order has been afforded to all interested

persons and entities, including, but not limited to, the Sale Notice Parties.

D.     The Designated Buyer is a third-party purchaser and is unrelated to the

Debtor.  Neither the Designated Buyer, nor any of its affiliates, subsidiaries, officers, directors,

members, partners or principals is an "insider" of the Debtor, as that term is defined in section

101(31) of the Bankruptcy Code.

E.     Buyer Protections.  The Buyer Protections, consisting of the Termination

Fee, the Expense Reimbursement Amount and the Hedge Reimbursement, were negotiated in

good faith and at arm's length between the Debtor and the Designated Buyer.  The Buyer

Protections, as approved by this Buyer Protections Order, are fair and reasonable, provide a

benefit to the Debtor's estate and stakeholders and represent a prudent exercise of the Debtor's

sound business judgment.  The Buyer Protections are necessary to ensure that the Designated

Buyer will continue to pursue the Designated Buyer Agreement and the Sale Transaction.  The

Termination Fee, the Expense Reimbursement Amount and the Hedge Reimbursement, to the

extent payable under the Designated Buyer Agreement and this Buyer Protections Order, (a) are

actual and necessary costs and expenses of preserving the Debtor's estate within the meaning of

section 503(b) of the Bankruptcy Code; (b) shall be treated as allowed superpriority

administrative expense claims pursuant to sections 105(a), 364(c)(1), 503(b), and 507(a)(2) of

the Bankruptcy Code with priority over all other administrative expenses of the kind specified in

section 503(b) of the Bankruptcy Code and superior in priority to all other similarly situated

claims asserted or allowed in this Chapter 11 Case; (c) increase the likelihood that the Debtor

will receive the best possible price and terms for the SVB Capital Business; (d) are

commensurate to the real and substantial benefits conferred upon the Debtor's estate and

stakeholders by the Designated Buyer; and (e) are fair, reasonable and appropriate, including in

light of the nature of the Sale Transaction and the efforts and time that have been, and will be,

expended by the Designated Buyer.  The Buyer Protections are a material inducement for, and

condition of, the Designated Buyer's execution of the Designated Buyer Agreement.  Unless it is

assured that the Buyer Protections will be available, the Designated Buyer is unwilling to remain

obligated to the Sale Transaction or otherwise be bound under the Designated Buyer Agreement

(including the obligations to maintain its committed offer while such offer is subject to higher or

otherwise better offers).

    F.  The Debtor has demonstrated good and sufficient business reasons for this

Court to enter this Buyer Protections Order, and such good and sufficient reasons, which are set

forth in the Motion and on the record at the Buyer Protections Hearing, are incorporated herein

by reference and, among other things, form the basis for the findings of fact and conclusions of

law set forth herein.

    G.  The form and manner of notices to be delivered pursuant to the Noticing

Procedures, including the Sale Notice filed concurrently with the Motion and the Sale Hearing

Notice attached hereto as <u>Exhibit 1</u>, are (a) reasonably calculated to provide all interested parties

with timely and proper notice; (b) in compliance with all applicable requirements of the

-4-

Bankruptcy Code, the Bankruptcy Rules and the Local Rules and (c) adequate and sufficient

under the circumstances of this Chapter 11 Case.

H.      The Assumption and Assignment Procedures, and the Initial Assignment

Notice, substantially in the form attached hereto as <u>Exhibit 2</u>, are reasonably calculated to

provide each Counterparty to the Assumed Debtor Contracts with proper notice of (a) the

potential assumption and assignment of such Assumed Debtor Contracts, (b) the requirement that

each such Counterparty assert any Contract Objection prior to the applicable Contract Objection

Deadline or otherwise be barred from asserting such claims and (c) the procedures for the

assumption and assignment of the Assumed Debtor Contracts.

I.      The Noticing Procedures are deemed to be in compliance with the

requirements of Local Rule 6004-1.

J.      The legal and factual bases set forth in the Motion establish just cause for

the relief granted herein.  Entry of this Buyer Protections Order is in the best interests of the

Debtor and its estate, creditors, interest holders and all other parties in interest.

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      <u>Objections</u>.  All objections to the Motion solely as it relates to the relief

granted by this Buyer Protections Order that have not been adjourned, withdrawn or resolved are

overruled in all respects on the merits.

3.      <u>Buyer Protections</u>.  The Buyer Protections, on the terms set forth in the

Designated Buyer Agreement, are approved and shall be treated as allowed superpriority

administrative expense claims pursuant to sections 105(a), 364(c)(1), 503(b), and 507(a)(2) of

the Bankruptcy Code with priority over all other administrative expenses of the kind specified in

section 503(b) of the Bankruptcy Code and superior in priority to all other similarly situated

claims asserted or allowed in this Chapter 11 Case in accordance with the Designated Buyer

Agreement.  To the extent that any of the Termination Fee, the Expense Reimbursement Amount

or the Hedge Reimbursement becomes due, the Debtor is hereby authorized to pay in cash any

amounts owed to the Designated Buyer on account of the Termination Fee, the Expense

Reimbursement Amount or the Hedge Reimbursement, as applicable, in accordance with the

terms of the Designated Buyer Agreement without further action or order by the Court.

4.     Escrow Deposit.  As set forth in the Designated Buyer Agreement, no later

than forty-eight (48) hours after the entry of this Order, the Designated Buyer shall make or

cause to be made the Deposit with the Escrow Agent by wire transfer of immediately available

funds for deposit into the Escrow Account.

5.     Noticing Procedures.  The Noticing Procedures as set forth in this Buyer

Protections Order and the Motion, including the form of Sale Hearing Notice attached hereto as

Exhibit 1, are hereby approved.  Within one business day after entry of this Buyer Protections

Order, or as soon as reasonably practicable thereafter, the Debtor shall serve the Sale Hearing

Notice by first-class mail (and/or by email, as applicable) upon the Sale Notice Parties.  On or

about the same date, the Debtor is authorized to publish the Sale Hearing Notice on the Debtor's

case information website (located at https://restructuring.ra.kroll.com/SVBFG) and publish the

Sale Hearing Notice, with any modifications necessary for ease of publication, once in each of (i)

the *San Francisco Chronicle* and (ii) *The Wall Street Journal* (national edition), to provide notice

to any other potential interested parties.  Service of the Sale Notice and Sale Hearing Notice on

the Sale Notice Parties and publication thereof in the manner described in this Buyer Protections

Order constitutes good and sufficient notice of the Sale Hearing and the Debtor's proposed sale

of the SVB Capital Business, free and clear of any liens, claims, interests and encumbrances, pursuant to section 363(f) of the Bankruptcy Code.  No other or further notice is required.

6.      <u>Sale Objections</u>.  Objections to a Sale, including any objection to the sale of the SVB Capital Business free and clear of any liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code, or to entry of the Sale Order, must (a) be in writing and specify the nature of such objection, (b) state, with specificity, the legal and factual bases thereof, (c) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules and all applicable orders of this Court and (d) be filed with this Court and served on (i) counsel to William K. Harrington, the United States Trustee for Region 2, U.S. Department of Justice, Office of the U.S. Trustee, (ii) counsel to the Debtor, (iii) counsel to the UCC, (iv) counsel for the Designated Buyer, (v) counsel for the Ultimate Buyer (if different than the Designated Buyer), (vi) counsel to the Ad Hoc Group of Senior Noteholders (as defined in the *Verified Statement of Davis Polk & Wardwell LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [D.I. 149]), (vii) counsel to the Ad Hoc Cross-Holder Group (as defined in the *Verified Statement of White & Case LLP Pursuant to Bankruptcy Rule 2019* [D.I. 142]) and (viii) all parties requesting notice in this Chapter 11 Case pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Objection Notice Parties</u>"), so as to be received no later than (A) **May 29, 2024 at 4:00 p.m. (prevailing Eastern Time)**, or (B) in the event a buyer different than the Designated Buyer is selected as the Ultimate Buyer, and solely with respect to objections related to the identity of the Ultimate Buyer, the earlier of (1) two business days after the notice of the Ultimate Buyer is filed at 4:00 p.m. (prevailing Eastern Time) and (2) 10:00 a.m. (prevailing Eastern Time) on the day of the Sale Hearing.

7.      <u>Sale Hearing</u>.  The Sale Hearing shall be held in the United States

Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New

York, New York 10004 on **June 5, 2024 at 10 a.m. (prevailing Eastern Time)** and such other

dates as applicable; <u>provided</u>, <u>however</u>, that the Sale Hearing may be continued, adjourned or

modified by the Debtor by an announcement at a hearing before this Court and/or by filing a

notice on this Court's docket.

8.      <u>Assumption and Assignment Procedures</u>.  The following assumption and

assignment procedures (the "<u>Assumption and Assignment Procedures</u>") are hereby approved:

    a.  Concurrently with filing the Motion, the Debtor will file with this Court
        and serve by first-class mail (and/or by email, as applicable) a notice,
        substantially in the form attached as <u>Exhibit 2</u> hereto (each, an "<u>Initial
        Assignment Notice</u>") on each non-Debtor counterparty (each, a
        "<u>Counterparty</u>") to those certain executory contracts and unexpired leases
        that the Debtor may, in its discretion, assume and assign to the Ultimate
        Buyer in connection with a Sale Transaction (each, an "<u>Assumed
        Contract</u>").

    b.  The Initial Assignment Notice served on a Counterparty shall (i) identify
        each Assumed Contract then applicable to such Counterparty, (ii) set forth
        the proposed amount necessary to cure any default under the relevant
        Assumed Contract pursuant to section 365 of the Bankruptcy Code
        (the "<u>Cure Amount</u>") and (iii) inform such Counterparty of the
        requirement to file and duly serve any Contract Objections (as defined
        below) no later than the applicable Contract Objection Deadlines.

    c.  If, following service of the Initial Assignment Notice, the Debtor identifies
        additional executory contracts and unexpired leases for assumption and
        assignment in connection with the Sale Transaction ("<u>Additional Assumed
        Contracts</u>," and, together with the Assumed Contracts, the "<u>Assumed
        Debtor Contracts</u>") or any previously proposed Cure Amounts are
        modified, the Debtor may file with this Court and serve by first-class mail
        (and/or by email, as applicable) a notice (a "<u>Further Assignment Notice</u>,"
        and, together with the Initial Assignment Notices, the "<u>Contract Notices</u>")
        on each impacted Counterparty.  Further Assignment Notices shall contain
        the same information as the Initial Assignment Notice.  Further
        Assignment Notices may be filed and served at any time up to the closing
        of the Sale Transaction.

d.  Service of the Contract Notices shall not constitute an admission that an Assumed Debtor Contract is an executory contract or unexpired lease, or confirm that the Debtor is required to assume and assign such Assumed Debtor Contract.

e.  A Counterparty may file an objection to (i) the proposed Cure Amount, (ii) the proposed assumption and assignment of the Assumed Debtor Contracts, (iii) the adequate assurance of future performance provided by the Designated Buyer or (iv) whether applicable law excuses a Counterparty from accepting performance by, or rendering performance to, the Designated Buyer (each, a "Cure Objection").  In the event the Debtor enters into a Superior Transaction, a Counterparty may file an objection with respect to adequate assurance of future performance provided by the Ultimate Buyer and whether applicable law excuses a Counterparty from accepting performance by, or rendering performance to, the Ultimate Buyer (each, an "Assignee Objection", either a Cure Objection or an Assignee Objection, a "Contract Objection").

f.  Any Contract Objection must (i) be in writing; (ii) state with specificity the nature of such objection and, in the case of a Cure Objection, if disputed, the alleged Cure Amount and any and all defaults that must be cured or satisfied in order for such Assumed Debtor Contract to be assumed and assigned (with appropriate documentation in support thereof); (iii) comply with the terms of these Assumption and Assignment Procedures, the Bankruptcy Rules and the Local Rules; and (iv) be filed with this Court and properly served on the Objection Notice Parties.

g.  A Counterparty to an Assumed Debtor Contract may file and duly serve a Contract Objection by the following deadlines (each, a "Contract Objection Deadline"):

 (i)  A Counterparty to an Assumed Contract included in an Initial Assignment Notice will have until the Sale Objection Deadline to file and duly serve a Cure Objection.

 (ii)  A Counterparty to an Additional Assumed Contract included in a Further Assignment Notice will have until the later of the Sale Objection Deadline and 10 days after such Further Assignment Notice to file and duly serve a Cure Objection.

 (iii)  In the event the Debtor enters into a Superior Transaction, any Counterparty to an Assumed Debtor Contract may file and duly serve an Assignee Objection until the later of (A) 7 days after the date of the notice filed by the Debtor announcing the identity of the Ultimate Buyer and (B) with respect to an Additional Assumed Contract, 10 days after the date of the Further Assignment Notice which includes such Additional Assumed Contract.

h.  Any Counterparty who fails to timely file and properly serve a Contract Objection (i) will be deemed to have forever waived and released any Contract Objection and consented to the assumption and assignment of such Assumed Debtor Contract on the terms set forth in the applicable Contract Notice, subject to the occurrence of the closing of the Sale Transaction, and (ii) will be barred and estopped forever from asserting or claiming against the Debtor or the Ultimate Buyer that any additional amounts are due or defaults exist, or conditions to assignment must be satisfied, under such Assumed Debtor Contract; provided, however, that a Counterparty to an Assumed Debtor Contract shall not be barred from seeking additional amounts on account of any defaults occurring between the service of the latest served Contract Notice and the assumption of the Assumed Debtor Contract.

i.  If no objections are received by the latest applicable Contract Objection Deadline with respect to an Assumed Debtor Contract, then (i) the applicable Counterparty shall be deemed to have consented to the assumption and assignment of such Assumed Debtor Contract and the proposed Cure Amount shall be binding on the applicable Counterparty for all purposes and will constitute a final determination of the total Cure Amount required to be paid in connection with the assumption and assignment of such contract, and (ii) the contract will be assumed and assigned to the Ultimate Buyer as of the closing date of the Sale Transaction, as approved by the Sale Order.

j.  If a Contract Objection is timely filed and properly served in accordance with these Assumption and Assignment Procedures, the Debtor and the Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.  If the parties determine that the Contract Objection cannot be resolved in a timely manner without judicial intervention, this Court shall make all necessary determinations relating to such Contract Objection at the applicable Contract Hearing (as defined below).

k.  A hearing with respect to Contract Objections timely and duly filed before the Sale Objection Deadline shall be held at the Sale Hearing (the "Initial Contract Hearing").  Hearings with respect to Contract Objections to Assumed Debtor Contracts for which the applicable Contract Objection Deadlines are later than the Sale Objection Deadline may be held on such dates as this Court may designate (each, an "Additional Contract Hearing," and, together with the Initial Contract Hearing, each, a "Contract Hearing").  Upon resolution of a Contract Objection, provided that neither the Debtor nor the Ultimate Buyer have determined to exclude the relevant contract from the Sale Transaction, and upon payment of the applicable cure amount, if any, the contract will be deemed assumed and assigned to the Ultimate Buyer as of the closing date of the Sale Transaction.  If this Court determines at a Contract Hearing that a

particular Assumed Debtor Contract cannot be assumed and assigned for any reason, then such Assumed Debtor Contract shall no longer be considered an Assumed Debtor Contract.

9.      No parties interested in acquiring the SVB Capital Business, other than the Designated Buyer, shall be entitled to any expense reimbursement, break-up fee, termination fee or other similar fee or payment in connection with the sale or any other form of buyer protections.

10.      The Debtor is authorized and empowered to execute and deliver such documents, and to take and perform all actions necessary to implement and effectuate the relief granted in this Buyer Protections Order.

11.      All time periods set forth in this Buyer Protections Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

12.      The requirements set forth in Local Rule 9013-1(b) are satisfied.

13.      The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

14.      This Buyer Protections Order is immediately effective and enforceable, notwithstanding the possible applicability of Bankruptcy Rule 6004(h), Bankruptcy Rule 6006(d) or otherwise.

15.      The automatic stay set forth in section 362 of the Bankruptcy Code is modified, to the extent necessary, to permit the delivery of any notices under the Designated Buyer Agreement (including any notices of termination) and the termination of the Designated Buyer Agreement, if applicable, pursuant to its terms.

16.      This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the Motion or the implementation of this Buyer Protections Order.

**IT IS SO ORDERED.**

Dated: _____
       New York, New York

_____
The Honorable Martin Glenn
Chief United States Bankruptcy Judge

## EXHIBIT 1

**Sale Hearing Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— x

In re                                                          :  Chapter 11
                                                              :
SVB FINANCIAL GROUP,[1]                     :  Case No. 23-10367 (MG)
                                                              :
                          Debtor.                       :
                                                              :
———————————————————————— x

### NOTICE OF (I) PROPOSED SALE OF THE SVB CAPITAL BUSINESS FREE AND CLEAR OF ANY LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) SALE HEARING AND (III) RELATED DATES

        **PLEASE TAKE NOTICE** that on March 17, 2023, SVB Financial Group (the "Debtor") filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court").

        **PLEASE TAKE FURTHER NOTICE** that the Debtor has executed an Interest Purchase Agreement, dated as of May 2, 2024, by and between the Debtor and Pinegrove Sierra HoldCo LLC (the "Designated Buyer") for the purchase of the SVB Capital Business (the "Designated Buyer Agreement").  The Designated Buyer Agreement is subject to higher or otherwise better offers pursuant to the terms and provisions thereof.

        **PLEASE TAKE FURTHER NOTICE** that on May 2, 2024, the Debtor filed the *Debtor's Motion for Entry of Orders (I)(A) Approving Buyer Protections, (B) Scheduling a Sale Hearing, (C) Approving Form and Manner of Notices for Sale of the SVB Capital Business, (D) Approving Assumption and Assignment Procedures, and (E) Granting Related Relief, and (II)(A) Approving the SVB Capital Purchase Agreement, (B) Approving the Sale of the SVB Capital Business Free and Clear of Liens, Claims, Interests and Encumbrances, (C) Authorizing Assumption and Assignment of Executory Contracts and (D) Granting Related Relief* [D.I. __] (the "Motion")[2] with the Court seeking entry of orders, among other things, (i) scheduling a hearing to approve the sale of the SVB Capital Business and (ii) authorizing and approving the sale of the SVB Capital Business free and clear of any liens, claims, interests and encumbrances.

        **PLEASE TAKE FURTHER NOTICE** that on _____, 2024, the Court entered an order [D.I. __] (the "Buyer Protections Order") approving, among other things, certain buyer protections for the Designated Buyer with respect to its acquisition of SVB Capital Business and the form and manner of notices for the sale of SVB Capital Business.

---

[1]    The last four digits of SVB Financial Group's tax identification number are 2278.

[2]    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

SVB Capital is a venture capital and credit investment platform with deep roots in the innovation economy. SVB Capital manages approximately $9.8 billion of assets on behalf of third-party limited partner investors and, on a more limited basis, the Debtor. The SVB Capital family of funds comprises pooled investment vehicles such as direct venture funds that invest in companies and funds of funds that invest in other venture capital funds, as well as credit funds that provide lending and other financing solutions. SVB Capital generates income for the Debtor primarily through investment returns, management fees and incentive allocations (or carried interest).

**PLEASE TAKE FURTHER NOTICE** that the hearing to consider approval of the Sale (the "Sale Hearing") will be held before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York 10004 on June 5, 2024, at 10 a.m. (prevailing Eastern Time) and such other dates as applicable. The Sale Hearing may be adjourned or modified by the Debtor by an announcement of the adjourned date or modification at a hearing before the Court and/or by filing a notice on the Court's docket. At the Sale Hearing, the Debtor will seek approval of the sale of the SVB Capital Business to the Ultimate Buyer.

**PLEASE TAKE FURTHER NOTICE** that except as provided in any agreement with respect to a Sale approved by the Court, the Debtor shall seek to have the Court, through the Sale Order, approve the sale of all of the Debtor's right, title and interest in and to the assets subject thereto free and clear of any liens, claims, encumbrances and other interests pursuant to section 363(f) of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections ("Objections") to the relief requested in the Motion (other than relief granted by the Buyer Protections Order) must (i) be in writing and specify the nature of such objection, (ii) state, with specificity, the legal and factual bases thereof, (iii) comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York and (iv) be filed with the Court and (A) counsel to William K. Harrington, the United States Trustee for Region 2, U.S. Department of Justice, Office of the U.S. Trustee, Alexander Hamilton U.S. Custom House, One Bowling Green, Room 534, New York, New York 10004, Attn: Andrea B. Schwartz, Esq. (andrea.b.schwartz@usdoj.gov) and Annie Wells, Esq. (annie.wells@usdoj.gov); (B) counsel to the Debtor, Sullivan & Cromwell LLP, 125 Broad Street, New York, NY 10004, Attn: Christian P. Jensen (jensenc@sullcrom.com); (C) counsel to the Official Committee of Unsecured Creditors, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Ira S. Dizengoff (idizengoff@akingump.com) and Brad M. Kahn (bkahn@akingump.com) and 2001 K Street NW, Washington, DC 20006, Attn: James R. Savin (jsavin@akingump.com); (D) counsel to the Designated Buyer; (E) counsel to the Ultimate Buyer (if different than the Designated Buyer); (F) counsel to the Ad Hoc Group of Senior Noteholders, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Marshall S. Huebner (marshall.huebner@davispolk.com), Angela M. Libby (angela.libby@davispolk.com) and Aryeh Ethan Falk (aryeh.falk@davispolk.com); (E) counsel to the Ad Hoc Cross-Holder Group, 200 South Biscayne Boulevard, Suite 4900, Miami, FL 33131, Attn: Thomas E. Lauria (tlauria@whitecase.com) and Brian D. Pfeiffer (brian.pfeiffer@whitecase.com) and (G) all parties requesting notice in this Chapter 11 Case

pursuant to Bankruptcy Rule 2002 no later than (1) **May 29, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline") or (2) in the event a buyer different than the Designated Buyer is selected as the Ultimate Buyer, and solely with respect to objections related to the identity of the Ultimate Buyer, the earlier of (a) two business days after the notice of the Ultimate Buyer is filed at 4:00 p.m. (prevailing Eastern Time) and (b) 10:00 a.m. (prevailing Eastern Time) on the day of the Sale Hearing (the "Alternative Transaction Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that only those Objections that are timely filed, served and received will be considered at the Sale Hearing.  **Any party failing to timely file and serve an Objection to the Sale on or before the Sale Objection Deadline or Alternative Transaction Objection Deadline, as applicable, in accordance with this Notice shall be forever barred from asserting any objection to the Sale, including with respect to the transfer of the applicable assets free and clear of any liens, claims, encumbrances and other interests.**

---

**NO SUCCESSOR OR TRANSFEREE LIABILITY**

The proposed Sale Order provides that the Designated Buyer will have no responsibility for any successor liability, including the following:

None of the Buyer or its Affiliates is a "successor" to, continuation of or alter ego of, the Debtor or its estate by reason of any theory of law or equity.  Neither Buyer nor any of its Affiliates shall have, assume, or be deemed to assume, or in any way be responsible for, any liability or obligation of any of the Debtor, its estate, or any of the Debtor's predecessors or affiliates; provided that, for the avoidance of doubt, the foregoing shall not discharge or otherwise modify any existing Liability of the Target Companies or the General Partner Entities.  The purchase of the SVB Capital Business by Buyer will not cause Buyer or any of its Affiliates to be deemed a successor to, combination of, or alter ego of, in any respect, the Debtor or its businesses, or incur any liability derived therefrom within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, antitrust, environmental, labor law (including any WARN Act), employment or benefits law, de facto merger, business continuation, substantial continuity, successor, vicarious, alter ego, derivative or transferee liability, veil piercing, escheat, continuity of enterprise, mere continuation, product line or other law, rule, regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtor's liability under such law, rule or regulation or doctrine, whether now known or unknown, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether matured or unmatured, whether contingent or noncontingent, whether liquidated or unliquidated, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables among the Debtor and its affiliates, and any taxes, arising, accruing or payable under, out of, in connection with or in any way relating to the cancellation of debt of the Debtor or its Affiliates, or in any way relating to the operation of the SVB Capital Business prior to the Closing Date.

---

> All capitalized terms used in this section but otherwise not defined herein shall have the meanings set forth in the proposed Sale Order.  The summary descriptions in this notice are qualified in their entirety by the terms of the proposed Sale Order (including, without limitation, Paragraphs P and 23 (no successor liability) and 25–27 (prohibition on actions against Buyer) thereof), and, to the extent of any inconsistencies between the Sale Order and the summary descriptions in this Notice, the Sale Order shall control in all respects.

**PLEASE TAKE FURTHER NOTICE** that this Notice is subject to the fuller terms and conditions of the Motion and the Buyer Protections Order, with such Buyer Protections Order controlling in the event of any conflict, and the Debtor encourages parties in interest to review such documents in their entirety.  Copies of the Motion and the Buyer Protections Order, as well as all related exhibits, including all other documents filed with the Court, are available (i) free of charge from the website of the Debtor's claims and noticing agent, Kroll Restructuring Administration ("Kroll"), at https://restructuring.ra.kroll.com/SVBFG and (ii) for a fee on the Court's electronic docket for this Chapter 11 Case at www.nysb.uscourts.gov (a PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov).  In addition, copies of the Motion and the Buyer Protections Order may be requested from Kroll by email at svbfginfo@ra.kroll.com.

Dated: [●], 2024                         */s/ [DRAFT]*
New York, New York                  James L. Bromley
                                                    Andrew G. Dietderich
                                                    Christian P. Jensen
                                                    SULLIVAN & CROMWELL LLP
                                                    125 Broad Street
                                                    New York, NY 10004
                                                    Telephone: (212) 558-4000
                                                    Facsimile: (212) 558-3588
                                                    E-mail: bromleyj@sullcrom.com
                                                              dietdericha@sullcrom.com
                                                              jensenc@sullcrom.com


                                                    *Counsel to the Debtor*

## EXHIBIT 2

**Form of Initial Assignment Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x
                                                      :
In re                                                 :    Chapter 11
                                                      :
                                                      :    Case No. 23-10367 (MG)
SVB FINANCIAL GROUP,[1]                               :
                                                      :
                      Debtor.                         :
                                                      :
                                                      :
———————————————————— x

**NOTICE OF PROPOSED ASSUMPTION AND ASSIGNMENT OF EXECUTORY**
**CONTRACTS OR UNEXPIRED LEASES AND CURE AMOUNT**

        **You are receiving this Notice of Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amount (this "Notice of Assumption and Assignment") because you may be a counterparty to an executory contract or unexpired lease with SVB Financial Group, as debtor and debtor-in-possession (the "Debtor"). Please read this notice carefully as your rights may be affected.**

        **PLEASE TAKE NOTICE** that on March 17, 2023, SVB Financial Group (the "Debtor") filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court").

        **PLEASE TAKE FURTHER NOTICE** that the Debtor has executed an Interest Purchase Agreement, dated as of May 2, 2024, by and between the Debtor and Pinegrove Sierra HoldCo LLC (the "Designated Buyer") for the purchase of the SVB Capital Business (the "Designated Buyer Agreement"), including the assumption and assignment by the Debtor of certain executory contracts and unexpired leases. The Designated Buyer Agreement is subject to higher or otherwise better offers pursuant to the terms and provisions thereof.

        **PLEASE TAKE FURTHER NOTICE** that on May 2, 2024, the Debtor filed the *Debtor's Motion for Entry of Orders (I)(A) Approving Buyer Protections, (B) Scheduling a Sale Hearing, (C) Approving Form and Manner of Notices for Sale of the SVB Capital Business, (D) Approving Assumption and Assignment Procedures, and (E) Granting Related Relief, and (II)(A) Approving the SVB Capital Purchase Agreement, (B) Approving the Sale of the SVB Capital Business Free and Clear of Liens, Claims, Interests and Encumbrances, (C) Authorizing Assumption and Assignment of Executory Contracts and (D) Granting Related Relief* (the "Motion")[2] with the Court seeking entry of orders, among other things, (i) authorizing and approving procedures for the assumption and assignment of executory contracts and unexpired

———————————————————

[1]    The last four digits of SVB Financial Group's tax identification number are 2278.

[2]    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

leases in connection with the proposed Sale of the SVB Capital Business (the "Assumption and Assignment Procedures") and (ii) authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases.

**PLEASE TAKE FURTHER NOTICE** that, upon the closing of the Sale of the SVB Capital Business, the Debtor may assume and assign to the Ultimate Buyer certain executory contracts and unexpired leases (the "Assumed Contracts"). A list (the "Executory Contract List") (i) identifying each Assumed Contract applicable to each counterparty (a "Counterparty") and (ii) setting forth the proposed amount (the "Cure Amount") necessary to cure any default under the relevant Assumed Contract pursuant to section 365 of the Bankruptcy Code is attached hereto.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO A POTENTIAL ASSUMED CONTRACT.**

**IF YOU AGREE WITH THE ASSUMPTION AND ASSIGNMENT OF YOUR CONTRACT(S) AND THE PROPOSED CURE AMOUNT(S) LISTED IN THE EXECUTORY CONTRACT LIST WITH RESPECT TO YOUR POTENTIAL ASSUMED CONTRACT(S), YOU ARE NOT REQUIRED TO TAKE ANY FURTHER ACTION.**

**IF YOU DISAGREE WITH THE ASSUMPTION AND ASSIGNMENT OF YOUR CONTRACT(S) OR THE PROPOSED CURE AMOUNT(S) LISTED IN THE EXECUTORY CONTRACT LIST WITH RESPECT TO YOUR POTENTIAL ASSUMED CONTRACT(S), YOU MAY OBJECT TO THE ASSUMPTION AND ASSIGNMENT OR THE PROPOSED CURE AMOUNT.**

**PLEASE TAKE FURTHER NOTICE THAT SERVICE OF THIS NOTICE OF ASSUMPTION AND ASSIGNMENT DOES NOT CONSTITUTE AN ADMISSION THAT ANY CONTRACT OR LEASE ON THE EXECUTORY CONTRACT LIST IS AN EXECUTORY CONTRACT OR UNEXPIRED LEASE, OR THAT ANY SUCH CONTRACT OR LEASE WILL BE ASSUMED AND ASSIGNED BY THE DEBTOR.**

**PLEASE TAKE FURTHER NOTICE** that if, following service of this Notice of Assumption and Assignment, the Debtor identifies additional executory contracts and unexpired leases for assumption and assignment in connection with the Sale ("Additional Assumed Contracts," and, together with the Assumed Contracts, the "Assumed Debtor Contracts") or any previously proposed Cure Amounts are modified, the Debtor may file with this Court and serve by first-class mail (and/or by email, as applicable) a notice (a "Further Assignment Notice," and, together with the Initial Assignment Notices, the "Contract Notices") on each impacted Counterparty. Further Assignment Notices shall contain the same information as the Initial Assignment Notice. Further Assignment Notices may be filed and served at any time up to the closing of the Sale.

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider approval of the Sale (the "Sale Hearing") has been requested to be held before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern

District of New York, located at One Bowling Green, New York, New York 10004.  The Sale Hearing may be adjourned or modified by the Debtor by an announcement of the adjourned date or modification at a hearing before the Court and/or by filing a notice on the Court's docket.  At the Sale Hearing, the Debtor will seek approval of the sale of the SVB Capital Business to the Ultimate Buyer.

PLEASE TAKE FURTHER NOTICE that pursuant to the Assumption and Assignment Procedures, a Counterparty may file an objection to (i) the proposed Cure Amount, (ii) the proposed assumption and assignment of the Assumed Debtor Contracts, (iii) the adequate assurance of future performance provided by the Designated Buyer or (iv) whether applicable law excuses a Counterparty from accepting performance by, or rendering performance to, the Designated Buyer (each, a "Cure Objection").  In the event the Debtor enters into a Superior Transaction, a Counterparty may file an objection with respect to adequate assurance of future performance provided by the Ultimate Buyer and whether applicable law excuses a Counterparty from accepting performance by, or rendering performance to, the Ultimate Buyer (each, an "Assignee Objection," either a Cure Objection or an Assignee Objection, a "Contract Objection").

PLEASE TAKE FURTHER NOTICE that any Contract Objection must (i) be in writing; (ii) state with specificity the nature of such objection and, in the case of a Cure Objection, if disputed, the alleged Cure Amount and any and all defaults that must be cured or satisfied in order for such Assumed Debtor Contract to be assumed and assigned (with appropriate documentation in support thereof); (iii) comply with the terms of these Assumption and Assignment Procedures, the Bankruptcy Rules and the Local Rules; and (iv) be filed with this Court and properly served on the (A) counsel to William K. Harrington, the United States Trustee for Region 2, U.S. Department of Justice, Office of the U.S. Trustee, (B) counsel to the Debtor, (C) counsel to the Official Committee of Unsecured Creditors appointed in this Chapter 11 Case, (D) counsel for the Designated Buyer, (E) counsel for the Ultimate Buyer (if different than the Designated Buyer), (F) counsel to the Ad Hoc Group of Senior Noteholders (as defined in the *Verified Statement of Davis Polk & Wardwell LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [D.I. 149]), (G) counsel to the Ad Hoc Cross-Holder Group (as defined in the *Verified Statement of White & Case LLP Pursuant to Bankruptcy Rule 2019* [D.I. 142]) and (H) all parties requesting notice in this Chapter 11 Case pursuant to Bankruptcy Rule 2002.

PLEASE TAKE FURTHER NOTICE that a Contract Objection must be filed and duly served in accordance with the following deadlines (each, a "Contract Objection Deadline"):  (i) a Counterparty to an Assumed Contract included in an Initial Assignment Notice will have until the Sale Objection Deadline to file and duly serve a Cure Objection; (ii) a Counterparty to an Additional Debtor Contract included in a Further Assignment Notice will have until the later of the Sale Objection Deadline and 10 days after such Further Assignment Notice to file and duly serve a Cure Objection; and (iii) in the event the Debtor enters into a Superior Transaction, any Counterparty to an Assumed Debtor Contract may file and duly serve an Assignee Objection until the later of (A) 7 days after the date of the notice filed by the Debtor announcing the identity of the Ultimate Buyer and (B) with respect to an Additional Assumed

-3-

Contract, 10 days after the date of the Further Assignment Notice which includes such Additional Assumed Contract.

**PLEASE TAKE FURTHER NOTICE** that if no objections are received by the latest applicable Contract Objection Deadline with respect to an Assumed Debtor Contract, then (i) the applicable Counterparty shall be deemed to have consented to the assumption and assignment of such Assumed Debtor Contract and the proposed Cure Amount shall be binding on the applicable Counterparty for all purposes and will constitute a final determination of the total Cure Amount required to be paid in connection with the assumption and assignment of such contract, and (ii) the contract will be assumed and assigned to the Ultimate Buyer as of the closing date of the Sale, as approved by the Sale Order.

**PLEASE TAKE FURTHER NOTICE** that a hearing with respect to Contract Objections timely and duly filed before the Sale Objection Deadline shall be held at the Sale Hearing (the "Initial Contract Hearing").  Hearings with respect to Contract Objections to Assumed Debtor Contracts for which the applicable Contract Objection Deadlines are later than the Sale Objection Deadline may be held on such dates as this Court may designate (each, an "Additional Contract Hearing," and, together with the Initial Contract Hearing, each, a "Contract Hearing").  Upon resolution of a Contract Objection, provided that neither the Debtor nor the Ultimate Buyer have determined to exclude the relevant contract from the Sale, and upon payment of the applicable cure amount, if any, the contract will be deemed assumed and assigned to the Ultimate Buyer as of the closing date of the Sale.  If this Court determines at a Contract Hearing that a particular Assumed Debtor Contract cannot be assumed and assigned for any reason, then such Assumed Debtor Contract shall no longer be considered an Assumed Debtor Contract.

**PLEASE TAKE FURTHER NOTICE that any Counterparty to an Assumed Debtor Contract who fails to timely file and properly serve a Contract Objection in accordance with the Assumption and Assignment Procedures (i) will be deemed to have forever waived and released any Contract Objection and consented to the assumption and assignment of such Assumed Debtor Contract on the terms set forth in the applicable Notice of Assumption and Assignment, subject to the occurrence of the closing of the Sale, and (ii) will be barred and estopped forever from asserting or claiming against the Debtor or the Ultimate Buyer that any additional amounts are due or defaults exist, or conditions to assignment must be satisfied, under such Assumed Debtor Contract; provided, however, that a Counterparty to an Assumed Debtor Contract shall not be barred from seeking additional amounts on account of any defaults occurring between the service of the latest served Contract Notice and the assumption of the Assumed Debtor Contract.**

**PLEASE TAKE FURTHER NOTICE** that this Notice is subject to the fuller terms and conditions of the Motion and the Buyer Protections Order, with such Buyer Protections Order controlling in the event of any conflict, and the Debtor encourages parties in interest to review such documents in their entirety.  Copies of the Motion and Buyer Protections Order, as well as all related exhibits, including all other documents filed with the Court, are available (i) free of charge from the website of the Debtor's claims and noticing agent, Kroll Restructuring Administration ("Kroll"), at https://restructuring.ra.kroll.com/SVBFG and (ii) for a fee on the Court's electronic docket for this Chapter 11 Case at www.nysb.uscourts.gov (a

-4-

PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov).  In addition, copies of the Motion and the Buyer Protections Order may be requested from Kroll by email at svbfginfo@ra.kroll.com.


Dated: [●], 2024                          */s/ [DRAFT]*_____
New York, New York                        James L. Bromley
                                          Andrew G. Dietderich
                                          Christian P. Jensen
                                          SULLIVAN & CROMWELL LLP
                                          125 Broad Street
                                          New York, NY 10004
                                          Telephone: (212) 558-4000
                                          Facsimile: (212) 558-3588
                                          E-mail: bromleyj@sullcrom.com
                                                  dietdericha@sullcrom.com
                                                  jensenc@sullcrom.com


                                          *Counsel to the Debtor*

# EXHIBIT B

**Proposed Sale Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x
                                              :
In re                                         :        Chapter 11
                                              :
                                              :        Case No. 23-10367 (MG)
SVB FINANCIAL GROUP,[1]                       :
                                              :
              Debtor.                         :
                                              :
———————————————————— x

### ORDER (I) APPROVING THE SVB CAPITAL PURCHASE AGREEMENT, (II) APPROVING THE SALE OF THE SVB CAPITAL BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (III) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of SVB Financial Group, as debtor and debtor-in-possession (the "Debtor"), for entry of an order (this "Sale Order") (a) approving the Purchase Agreement for the SVB Capital Business (as defined below), (b) approving the sale of the SVB Capital Business free and clear of all liens, claims, interests and encumbrances, including all Liens, (c) authorizing the assumption and assignment of certain executory contracts and (d) granting related relief; and this Court having entered an order on [●], 2024 [D.I. [●]], approving the Buyer Protections and granting certain related relief (the "Buyer Protections Order"); and the Debtor having determined that [●] ("Buyer"), a [*jurisdiction of organization*] [*entity type*], submitted the highest or otherwise best offer for the SVB Capital Business; and a hearing on the sale of the SVB Capital Business (the "Sale Hearing") having been held on [●], 2024, to review and consider (a) the

---

[1]    The last four digits of SVB Financial Group's tax identification number are 2278.

[2]    Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in (a) the Motion, (b) the Buyer Protections Order (as defined below), or (c) the Purchase Agreement (as defined below), as applicable.

Motion and all relief requested therein and related thereto, (b) approval of the Debtor's entry into and performance under that certain Interest Purchase Agreement, dated as of May 2, 2024, by and among the Debtor and Buyer, a copy of which is attached hereto as <u>Exhibit A</u> (together with any schedules and exhibits thereto, and as may be amended or otherwise modified from time to time in accordance with the terms thereof, the "<u>Purchase Agreement</u>"), whereby, among other things, (i) the Debtor agreed to (A) sell and assign to the Designated Buyer (1) a portion of the issued and outstanding equity interests of the Target Companies and General Partner Entities and (2) all of the issued and outstanding equity interests of each of Evergreen Fund, QIF 1 and QIF 7 that are each owned directly or indirectly by the Debtor (such equity interests owned by the Debtor, the "<u>Interests</u>", such portion of the Interests to be purchased by the Designated Buyer, the "<u>Sale Interests</u>" and such portion of the Interests to be retained by the Debtor, the "<u>Retained Interests</u>") and by extension, (a) a portion of the capital commitments that the Debtor holds through its equity interests in the General Partner Entities and Evergreen Fund, QIF 1 and QIF 7 and (b) a portion of the Debtor's rights and interests in carried interest, incentive allocations, promote interests, or other performance based profits interests that the Debtor holds through its equity interests in the General Partner Entities), (B) assume and assign to the Designated Buyer the contracts on Section 1.6(a) of the Seller Disclosure Schedule (the "<u>Assumed Contracts</u>", and together with the "<u>Sale Interests</u>", the "<u>SVB Capital Business</u>"), and (ii) the Designated Buyer agreed to purchase from the Debtor the SVB Capital Business, all on the terms and subject to the conditions set forth in the Designated Buyer Agreement (the foregoing, and all other transactions contemplated by the Designated Buyer Agreement, collectively, the "<u>Sale Transaction</u>"), (c) the declaration of Marc Puntus filed at D.I. [●] in support of this Sale Order and (d) any objections thereto that were not resolved prior to the start of the Sale Hearing; and upon the record of the Sale Hearing and all of

the proceedings had before this Court; and this Court having jurisdiction to consider the Motion

pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431* from

the United States District Court for the Southern District of New York, dated January 31, 2012

(Preska, C.J.); and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and this

Court having found that proper and adequate notice of the Motion and the relief requested therein

has been provided in accordance with the Bankruptcy Rules and the Local Rules, and that, except

as otherwise expressly ordered herein, no other or further notice is necessary; and objections (if

any) to the Motion having been withdrawn or overruled on the merits; and after due deliberation

and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.    Jurisdiction and Venue.    This Court has jurisdiction over this matter

pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431* from

the United States District Court for the Southern District of New York, dated January 31, 2012

(Preska, C.J.).  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may

enter a final order hereon under Article III of the U.S. Constitution.  Venue of this Chapter 11 Case

and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.    Statutory and Rule Predicates.    The statutory and other legal predicates for

the relief requested in the Motion and for the approvals and authorizations set forth herein are

sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007,

9008 and 9014, Local Rules 2002-1, 6004-1, 6006-1, 9006-1 and 9013-1 and the *Guidelines for*

---

[3]    The findings of fact and the conclusions of law stated herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact.

*the Conduct of Asset Sales*, adopted by General Order M-331, dated September 5, 2006, as amended by General Order M-383, dated November 18, 2009, and as updated on June 17, 2013 (the "Sale Guidelines").

   C. Final Order.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rule 6004(h) and 6006(d), and to the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein and authorizes the immediate closing of the Sale Transaction contemplated hereby without regard to any stay or delay in its implementation.

   D. Sale Notice.  As shown by the affidavits of service filed with this Court and the representations or proffers made on the record at the Sale Hearing, the Debtor has provided due, good, proper, timely, reasonable, adequate, appropriate and sufficient notice of, and sufficient opportunity to object to, the Motion and the relief requested therein, the Buyer Protections, the Sale Hearing, the Sale Transaction (including the identity of Buyer), the Purchase Agreement, the proposed assumption and assignment of the Assumed Contracts and the proposed entry of this Sale Order, all in compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the procedural due process requirements of the United States Constitution, including (a) by providing actual written notice of the foregoing to the Sale Notice Parties and (b) by publishing the Sale Notice once in each of (i) the *San Francisco Chronicle* and (ii) *The Wall Street Journal* (national edition) on [●], 2024.  Such notice was good, proper, timely, reasonable, adequate, appropriate and sufficient under the circumstances of this Chapter 11 Case and no other or further notice is necessary or shall be required.

E.      <u>Opportunity to Object</u>.  A fair and reasonable opportunity to object to and be heard regarding the relief requested in the Motion and granted by this Sale Order, including, but not limited to, the Sale Transaction (including the identity of Buyer), the Purchase Agreement, and the assumption and assignment of the Assumed Contracts and the Cure Amounts (as defined below) has been afforded to all interested parties, including, but not limited to, the Sale Notice Parties.

F.      <u>Marketing and Sale Process</u>.  As demonstrated by evidence proffered or adduced and the representations of counsel at the Sale Hearing, the marketing and sale process was substantively and procedurally fair to all parties, was the result of arm's-length negotiations and provided a full, fair and reasonable opportunity for other parties to make an offer to purchase the SVB Capital Business.  The disclosures made by the Debtor concerning the Motion, the Purchase Agreement, the Sale Transaction, the assumption and assignment of the Assumed Contracts to Buyer, and the Sale Hearing were good, complete and adequate.  As demonstrated by testimony and any other evidence proffered or adduced at the Sale Hearing or submitted by affidavit or declaration at or prior to the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtor, in the sound exercise of its business judgment, conducted extensive and robust marketing efforts and a competitive sale process, in each case to the maximum extent practicable under the circumstances, through which the Debtor (a) afforded interested potential purchasers a full, fair and reasonable opportunity to submit their highest or otherwise best offer to purchase the SVB Capital Business, (b) provided potential purchasers sufficient information to enable them to make an informed judgment on whether to make an offer to purchase the SVB Capital Business and (c) considered any offers submitted in good faith and in accordance with its duties to stakeholders.

G.    <u>No Collusion</u>.  Buyer is not an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  The Purchase Agreement and the transactions contemplated thereby were negotiated, proposed and entered into by the Debtor and Buyer without collusion or fraud, in good faith and from arm's-length bargaining positions, and are substantively and procedurally fair to all parties.  Neither the Debtor nor Buyer has engaged in any conduct that would cause or permit the Purchase Agreement or the consummation of the Sale Transaction to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code, and accordingly neither the Debtor nor Buyer has violated section 363(n) of the Bankruptcy Code by any action or inaction.  Specifically, Buyer has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among potential purchasers.  The Sale Transactions, and as approved under this Sale Order, may not be avoided, and no damages may be assessed against Buyer or any other party under section 363(n) of the Bankruptcy Code or any other applicable bankruptcy or nonbankruptcy law.

H.    <u>Good Faith of Buyer</u>.  Buyer, and its officers, directors, employees, agents and representatives, each acted in good faith in connection with the Purchase Agreement, the Sale Transaction, and all matters related to the purchase of the SVB Capital Business.  Among other things, (a) Buyer recognized that the Debtor is free to deal with any other party interested in acquiring the SVB Capital Business, subject to the provisions of the Purchase Agreement; (b) Buyer complied with the provisions of the Buyer Protections Order; (c) Buyer agreed to subject its offer to a fiduciary out for the Debtor and its restructuring committee in the event it determines in good faith, after consulting with outside counsel, that taking or failing to take any action would be inconsistent with its fiduciary obligations under applicable law; (d) Buyer in no way induced or caused the filing of this Chapter 11 Case by the Debtor; (e) Buyer disclosed all material

6

payments to be made by Buyer to the Debtor and any other agreements or arrangements entered

into by Buyer and the Debtor in connection with the Sale Transaction and (f) no common identity

of officers, directors or controlling stockholders exists between Buyer and the Debtor.  Buyer is

purchasing the SVB Capital Business in good faith and for reasonably equivalent value and is a

good faith buyer within the meaning of section 363(m) of the Bankruptcy Code.  Buyer is therefore

entitled to all of the protections afforded under section 363(m), has proceeded in good faith in all

respects in connection with this proceeding, and would not have entered into the Purchase

Agreement and would not consummate the Sale Transaction if it was not granted all of the

protections afforded under section 363(m) of the Bankruptcy Code.

I.     <u>Highest or Otherwise Best Offer</u>.  The Debtor and its advisors, including,

without limitation, Centerview Partners LLC, thoroughly and fairly marketed the SVB Capital

Business, to the maximum extent practicable under the circumstances, and conducted the related

sale process in good faith and in a fair and open manner, soliciting offers to acquire the SVB

Capital Business from numerous parties.  The sale process was non-collusive, duly noticed and

provided a full, fair, reasonable and adequate opportunity for any interested party to make a higher

or otherwise better offer for the SVB Capital Business than that of Buyer.  The offer to purchase

the SVB Capital Business made by Buyer, on the terms and subject to the conditions set forth in

the Purchase Agreement: (a) was made in good faith; (b) is the highest or otherwise best offer

obtained for the SVB Capital Business and will provide a greater recovery for the Debtor's estate

than would be provided by any other reasonably available alternative; (c) is for fair, adequate and

sufficient consideration that constitutes reasonably equivalent value for the SVB Capital Business

being conveyed to Buyer; (d) is fair and reasonable; (e) is in the best interests of the Debtor's estate

and its creditors; and (f) would not have been made by Buyer absent the protections afforded to Buyer by the Buyer Protections Order and this Sale Order.

J.        The Debtor's determination that the Sale Transaction, pursuant to the Purchase Agreement, provides the highest or otherwise best offer for the SVB Capital Business, and its related decision to sell the SVB Capital Business to Buyer, each constitutes a reasonable, good-faith exercise of the Debtor's business judgment.  The facts and circumstances described in the Motion and the additional evidence adduced in connection with the Sale Hearing demonstrate the Debtor has articulated sound business reasons for consummating the Sale Transaction and for selling the SVB Capital Business outside of a chapter 11 plan.  It is a reasonable, good-faith exercise of the Debtor's business judgment to execute, deliver and consummate the Purchase Agreement and the related or ancillary agreements thereto or contemplated thereby (the "Ancillary Agreements") and the Sale Transaction, as authorized by this Sale Order.

K.        No *Sub Rosa* Plan.  The Sale Transaction, the Purchase Agreement and the other transactions contemplated thereby do not constitute a *sub rosa* chapter 11 plan.  The Sale Transaction neither impermissibly restructures the rights of the Debtor's creditors nor dictates the terms of any chapter 11 plan for the Debtor.

L.        Fair Consideration.  The consideration provided by Buyer to the Debtor in exchange for the transfer of the SVB Capital Business pursuant to the Purchase Agreement (a) is fair and reasonable, (b) constitutes the highest or otherwise best offer for the SVB Capital Business and (c) constitutes the provision of reasonably equivalent value, fair saleable value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act or any similar law (including common law) of the United States, any state, territory or possession of the United States, including

the District of Columbia, or any foreign jurisdiction (collectively, "Fraudulent Transfer Laws") to

the Debtor.  No other person or entity or group of entities has offered to purchase the SVB Capital

Business for higher or otherwise better value to the Debtor's estate than Buyer.  Approval of the

Purchase Agreement and the consummation of the Sale Transaction contemplated thereby is in the

best interests of the Debtor, its estate and its creditors.

M.    The Purchase Agreement was not entered into for the purpose of hindering,

delaying or defrauding creditors under the Bankruptcy Code or under any Fraudulent Transfer

Laws.  Neither the Debtor nor Buyer is entering into the Purchase Agreement or undertaking the

Sale Transaction fraudulently for the purpose of any applicable Fraudulent Transfer Laws.

N.    Corporate Power and Authority.  The Debtor and its subsidiaries have, to

the extent necessary and applicable, (a) all requisite corporate, limited liability company or similar

power and authority to execute and deliver the Purchase Agreement, the Ancillary Agreements

and all other documents contemplated thereby, (b) all requisite corporate, limited liability

company or similar power and authority as a corporation, limited liability company or other legal

entity to consummate the transactions contemplated by the Purchase Agreement and the Ancillary

Agreements and (c) taken all organizational action necessary to authorize and approve the

Purchase Agreement and the consummation of the Sale Transaction.  The Sale Transaction

contemplated by the Purchase Agreement has been duly and validly authorized by all necessary

corporate, limited liability company or other applicable action.  No consents or approvals, other

than those expressly provided for in the Purchase Agreement, are required for the Debtor to

consummate the Sale Transaction.

O.    Title to Assets.  The SVB Capital Business constitutes property of the

Debtor's estate and rights, title and interests thereto are currently vested in the Debtor's estate

pursuant to, and within the meaning of, section 541(a) of the Bankruptcy Code.  The transfer of

the Debtor's rights, title and interests to the SVB Capital Business to Buyer on the terms and

subject to the conditions of the Purchase Agreement and this Sale Order will be, as of the Closing,

a legal, valid and effective transfer of such rights, title and interests in the SVB Capital Business,

which transfer vests or will vest Buyer with all rights, title and interests of the Debtor to the SVB

Capital Business free and clear of all liens, claims, interests and encumbrances, including all Liens.

P.    <u>No Merger; No Successor Liability</u>.    Neither the Buyer nor any of its

Affiliates is a successor to or a mere continuation of the Debtor or its estate and there is no

continuity of enterprise or common identity between Buyer or its Affiliates and the Debtor.

Neither the Buyer nor any of its Affiliates is holding itself out to the public as a successor to or a

continuation of the Debtor or its estate.  Buyer and its Affiliates are not successors to the Debtor

or its estate by reason of any theory of law or equity, and the Sale Transaction does not amount to

a consolidation, succession, merger or de facto merger of Buyer or any of its Affiliates and the

Debtor.  Except as otherwise explicitly set forth in the Purchase Agreement, no sale, transfer or

other disposition of the SVB Capital Business pursuant to the Purchase Agreement will subject

Buyer or any of its Affiliates to any liability whatsoever, with respect to the Debtor or the operation

of its businesses prior to the Closing Date or by reason of such sale, transfer or other disposition,

including under the laws of the United States, any state, territory or possession thereof, or the

District of Columbia, or any foreign jurisdiction, based, in whole or in part, directly or indirectly,

on any, or any theory of, successor, vicarious, antitrust, environmental, revenue, pension, ERISA,

tax, labor (including any WARN Act), employment or benefits, de facto merger, business

continuation, substantial continuity, alter ego, derivative, transferee, veil piercing, escheat,

continuity of enterprise, mere continuation, product line or products liability or law, or other

applicable law, rule or regulation (including filing requirements under any such law, rule or regulation), or theory of liability, whether legal, equitable or otherwise.  Buyer would not have entered into the Purchase Agreement if the sale of the SVB Capital Business were not made free and clear of any successor liability of Buyer and its Affiliates.

       Q.    <u>Satisfaction of Section 363(f) Standards</u>.  The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full, and upon entry of this Sale Order, the Debtor is authorized to transfer all of its right, title and interest in and to the SVB Capital Business free and clear of all liens, claims, interests and encumbrances, including all Liens.  The Debtor may sell the SVB Capital Business free and clear of all liens, claims, interests and encumbrances, including all Liens, because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  Holders of any lien, claim, interest or encumbrance, including any Lien, against the Debtor, its estate or the SVB Capital Business who did not timely object, or who withdrew their objections, to the Sale Transaction or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. All other holders of liens, claims, interests and encumbrances, including any Liens, against the Debtor, its estate or the SVB Capital Business are adequately protected by having their liens, claims, interests and encumbrances, if any, in each instance against the Debtor, its estate or the SVB Capital Business, attach solely to the net cash proceeds of the Sale Transaction ultimately attributable to the SVB Capital Business in which such holder alleges a lien, claim, interest or encumbrance, in the same order of priority, with the same validity, force and effect that such lien, claim, interest or encumbrance had prior to the Sale Transaction, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

R.      Buyer would not have entered into the Purchase Agreement and would not consummate the Sale Transaction if the sale of the SVB Capital Business to Buyer were not free and clear of all liens, claims, interests and encumbrances, including all Liens.  Buyer will not consummate the Sale Transaction unless this Court expressly orders that neither Buyer nor the SVB Capital Business will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, or by payment, setoff, recoupment, or otherwise, directly or indirectly, any liens, claims, interests and encumbrances, including any Liens, asserted or assertable now or in the future against the SVB Capital Business.  The total consideration to be provided under the Purchase Agreement reflects Buyer's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363 of the Bankruptcy Code, with title to, interest in and possession of the SVB Capital Business free and clear of all liens, claims, interests and encumbrances, including all Liens.

S.      <u>Assumption and Assignment of the Assumed Contracts.</u>  The Debtor and Buyer have satisfied, to the extent necessary, the requirements of section 365 of the Bankruptcy Code, including subsections 365(b)(1)(A), 365(b)(1)(B) and 365(f), in connection with the assumption and assignment of the Assumed Contracts.  Buyer has demonstrated adequate assurance of future performance with respect to the Assumed Contracts pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  The assumption and assignment of the Assumed Contracts pursuant to the terms of this Sale Order is integral to the Purchase Agreement and is in the best interests of the Debtor and its estate, and represents the reasonable exercise of sound and prudent business judgment by the Debtor.  The Debtor or Buyer, as applicable, shall, to the extent necessary, provide compensation or adequate assurance of compensation, which amount will be paid to non-Debtor counterparties to Assumed Contracts for any actual pecuniary loss to

any such party resulting from a default prior to the date of assumption and assignment with respect to an Assumed Contract, within the meaning of sections 365(b)(1)(B) and 365(f)(2)(A) of the Bankruptcy Code. Except where an Assumed Contract is subject to an unresolved objection to the assumption and assignment of such Assumed Contract, payment of the Cure Amounts as set forth herein and Buyer's promise to perform the obligations under the Assumed Contracts after the Closing Date shall constitute any and all compensation due under sections 365(b)(1)(B) and 365(f)(2)(A) of the Bankruptcy Code and adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. The Assumed Contracts are assignable notwithstanding any provisions contained therein to the contrary.

T.    Except as otherwise set forth herein, any objections to the assumption and assignment of any of the Assumed Contracts to Buyer are hereby overruled. Any objections to the Cure Amounts are resolved as set forth herein. To the extent that any Counterparty failed to timely object to its Cure Amount or adequate assurance of future performance, such Counterparty is deemed to have consented to such Cure Amount and the assignment of its respective Assumed Contracts to Buyer.

U.    <u>Waiver of Bankruptcy Rules 6004(h) and 6006(d)</u>. Good and sufficient reasons for approval of the Purchase Agreement and the Sale Transaction have been articulated. The relief requested in the Motion, with respect to the sale of the SVB Capital Business, is in the best interests of the Debtor, its estate and its creditors. The Debtor has demonstrated both (a) good, sufficient and sound business purposes and justifications and (b) compelling circumstances for the Sale Transaction other than in the ordinary course of business, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code before, and outside of, a chapter 11 plan, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to

13

maximize the value of the Debtor's estate. Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with respect to the Sale Transaction. To maximize the value of the SVB Capital Business and preserve the viability of the business of the Target Companies and the General Partner Entities, it is essential that the Sale Transaction be consummated as soon as possible and, in any case, within the time constraints set forth in the Purchase Agreement. Time is of the essence in consummating the Sale Transaction and the Debtor and Buyer intend to close the Sale Transaction as soon as practicable. Given all of the circumstances of this Chapter 11 Case and the adequacy and fair value of the consideration under the Purchase Agreement, the proposed Sale Transaction constitutes a reasonable and sound exercise of the Debtor's business judgment and should be approved.

V.      The Purchase Agreement is a valid and binding contract among the Debtor and Buyer and shall be enforceable according to its terms. The consummation of the Sale Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m) and 365, to the extent applicable, and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

W.      Personally Identifiable Information. To the extent the Sale Transaction involves the sale of any personally identifiable information, as that term is defined in section 101(41A) of the Bankruptcy Code, with respect to which the Debtor, in connection with offering a product or service, disclosed to an individual a policy prohibiting the transfer of such personally identifiable information, such sale is consistent with such policy. Thus, the appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the Sale Transaction.

X.    <u>Legal and Factual Bases</u>.  The legal and factual bases set forth in the Motion and the evidence adduced in connection with the Sale Hearing establish just cause for the relief granted herein.  Entry of this Sale Order is in the best interests of the Debtor, its estate and its creditors.

IT IS HEREBY ORDERED THAT:

**A.    General Provisions**

1.    The Motion is GRANTED as set forth herein.

2.    All objections, responses, reservations of rights or requests for any continuances concerning the Motion or the relief requested therein with respect to the Purchase Agreement, the Sale Transaction (including the identity of Buyer), the entry of this Sale Order or the relief granted herein are resolved in accordance with the terms of this Sale Order or as set forth in the record of the Sale Hearing.  To the extent any such objections, responses, reservations of rights or requests for continuances were not otherwise withdrawn, waived, settled or resolved, any such objections, responses, reservations of rights and requests for continuances are hereby overruled and denied on the merits with prejudice.  All interested parties that failed to timely object are deemed to have consented to the relief granted herein for all purposes.

3.    Notice of the Motion, the Purchase Agreement, the Sale of the SVB Capital Business free and clear of all liens, claims, interests and encumbrances, including all Liens, the Sale Transaction, the Sale Hearing and the assumption and assignment of the Assumed Contracts and Cure Amounts was fair, equitable, proper and sufficient under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006, Local Rules 2002-1, 6004-1, 6006-1, 9006-1 and 9013-1, the Sale Guidelines, the Buyer Protections Order and other orders of this Court.

15

**B.**     **Approval of the Purchase Agreement**

4.      The Purchase Agreement and all ancillary documents, and all of the terms and conditions thereof, are hereby authorized and approved in all respects.  The failure to specifically include or make reference to any particular provision of the Purchase Agreement or any of the documents, agreements, or instruments related thereto or executed in connection therewith in this Sale Order shall not impair the effectiveness of such provision, document, agreement, or instrument, it being the intent of this Court that the Purchase Agreement and the Sale Transaction are authorized and approved in their entirety; provided, however, that this Sale Order shall govern if there is any inconsistency between the Purchase Agreement (including all Ancillary Agreements) and this Sale Order.

5.      Pursuant to sections 105(a), 363(b) and 363(f) of the Bankruptcy Code, without further order of the Court, the Debtor and its officers, employees, and agents are authorized, empowered, and directed to (i) take any and all actions that may be reasonably necessary, appropriate, or desirable to (a) consummate the Sale Transaction to Buyer pursuant to and in accordance with the terms and subject to the conditions of the Purchase Agreement and this Sale Order, (b) close the Sale Transaction as contemplated in the Purchase Agreement and this Sale Order and (c) execute and deliver, perform under, consummate and implement the Purchase Agreement and the Ancillary Agreements, including the assumption and assignment to Buyer of the Assumed Contracts, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the Sale Transaction, and (ii) take all further actions as may be reasonably (a) requested by Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to Buyer, or reducing to Buyer's possession, the SVB Capital Business or (b) necessary or appropriate to the performance of the obligations contemplated by the Purchase Agreement.  Buyer shall not be required to seek or obtain

relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Purchase Agreement or any Ancillary Agreement.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Sale Order; provided, however, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.  The Buyer and the Debtor shall have no obligation to close the Sale Transaction except as is contemplated and provided for in the Purchase Agreement.

6.      This Sale Order shall be binding in all respects upon the Debtor, its estate, all creditors of, and holders of equity interests in, the Debtor, any holders of liens, claims, interests and encumbrances, including any Liens, in, against or on all or any portion of the SVB Capital Business (whether known or unknown), Buyer and all successors and assigns of Buyer with respect to the SVB Capital Business and any trustees, if any, subsequently appointed in this Chapter 11 Case or upon a conversion of this Chapter 11 Case to a case under chapter 7 under the Bankruptcy Code, and notwithstanding any subsequent dismissal of the Chapter 11 Case.  This Sale Order and the Purchase Agreement shall inure to the benefit of the Debtor, its estate and creditors, Buyer and the respective successors and assigns of each of the foregoing.  Any trustee appointed under any provision of the Bankruptcy Code shall be authorized and directed to, without further order of the Court, (a) comply with the terms of the Purchase Agreement and (b) perform under the Purchase Agreement.

## C.    Consumption of the Sale Transaction

7.      Pursuant to sections 105(a), 363(b) and 363(f) of the Bankruptcy Code, the Debtor is authorized to transfer all of its rights, title and interests in the SVB Capital Business to Buyer at the Closing, on the terms and subject to the conditions of the Purchase Agreement, and such transfer shall constitute a legal, valid, binding and effective transfer of such rights, title and

interests in the SVB Capital Business and shall vest Buyer with all of the Debtor's rights, title and interests in the SVB Capital Business and, upon the Debtor's receipt of the Closing Purchase Price, on the terms and subject to the conditions of the Purchase Agreement, shall be free and clear of all liens, claims, interests and encumbrances, including all Liens, and successor or successor-in-interest liability asserted against the SVB Capital Business with all such liens, claims, interests and encumbrances to attach solely to the net cash proceeds ultimately attributable to the property against or in which such liens, claims, interests and encumbrances are asserted, subject to the terms thereof, with the same validity, force and effect, and in the same order of priority, which such liens, claims, interests and encumbrances now have against the SVB Capital Business, subject to any rights, claims and defenses the Debtor or its estate, as applicable, may possess with respect thereto. The provisions of this Sale Order authorizing and approving the transfer of the SVB Capital Business free and clear of any liens, claims, interests and encumbrances, including any Liens, shall be self-executing, and neither the Debtor nor Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Sale Order.

8.      A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any liens and other encumbrances, including any Liens, of record to the extent set forth herein.

9.      If any person or entity which has filed statements or other documents or agreements evidencing liens, claims, interests and encumbrances, including any Liens, in, against or on all or any portion of the SVB Capital Business shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements and any other documents

necessary for the purpose of documenting the release of all liens or interests, including any Liens, which the person or entity has or may assert with respect to all or any portion of the SVB Capital Business, the Debtor, Buyer and each of their respective officers, employees and agents are hereby authorized and empowered to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the SVB Capital Business.

10. This Sale Order is and shall be effective as a determination that, as of the Closing, any liens, claims, interests and encumbrances of any kind or nature whatsoever, including any Liens, existing as to the SVB Capital Business prior to the Closing, shall have been unconditionally released, discharged and terminated from the SVB Capital Business, and that the conveyances described herein have been effected. This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby authorized and directed to accept for filing any and all of the documents and instruments reasonably necessary or appropriate to consummate the Sale Transaction.

11. Any person or entity that is in possession as of the Closing of some or all of the property acquired by the Buyer pursuant to the Purchase Agreement is hereby directed to surrender possession of such property to Buyer upon the Closing.

**D.**    **Assumption and Assignment of Assumed Contracts**

12.    Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, and the payment of all Cure Amounts, if any, the Debtor's assumption and assignment to Buyer of the Assumed Contracts is hereby approved.

13.    The Debtor is hereby authorized and directed in accordance with section 365 of the Bankruptcy Code to (a) assume and assign to Buyer, effective upon the Closing of the Sale Transaction, the Assumed Contracts free and clear of all liens, claims, interests and encumbrances of any kind or nature whatsoever, including all Liens, and (b) execute and deliver to Buyer such documents or other instruments as Buyer deems may be necessary to assign and transfer the Assumed Contracts to Buyer.

14.    With respect to the Assumed Contracts: (a) each Assumed Contract is an executory contract or unexpired lease of nonresidential real property under section 365 of the Bankruptcy Code; (b) the Debtor may assume each of the Assumed Contracts in accordance with section 365 of the Bankruptcy Code; (c) the Debtor may assign each Assumed Contract in accordance with sections 363 and 365 of the Bankruptcy Code and any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the party to such Assumed Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions which are deemed void and of no force and effect solely with respect to this Sale; (d) upon payment of any Cure Amount, all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assignment to and assumption by Buyer of each Assumed Contract have been satisfied; (e) the Assumed Contracts shall be transferred and assigned to, and following the closing of the Sale Transaction remain in full force and effect for the benefit of, Buyer, notwithstanding any provision

in any such Assumed Contract (including those of the type described in sections 365(b)(2) and 365(f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, upon payment of the applicable Cure Amount, the Debtor shall be relieved from any further liability with respect to the Assumed Contracts after such assignment to and assumption by Buyer and (f) upon the Closing and payment of any Cure Amount, in accordance with sections 363 and 365 of the Bankruptcy Code, Buyer shall be fully and irrevocably vested in all rights, titles and interests of the Debtor in each Assumed Contract, free and clear of any liens, claims, interests and encumbrances, including any Liens.

15.    The Debtor is authorized to enter into any amendment of an Assumed Contract on terms acceptable to Buyer and agreed to by the Counterparty to such Assumed Contract in connection with the assumption and assignment of such Assumed Contract, and the assumption and assignment of the Assumed Contracts authorized by this Sale Order shall be of the Assumed Contracts, as so amended or modified.

16.    All defaults or other obligations of the Debtor under the Assumed Contracts arising or that have become due and not paid prior to the Closing that are required to be cured by section 365(b)(1) of the Bankruptcy Code (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by Buyer at or before the Closing through the payment of the Cure Amounts, if any.  To the extent that any Counterparty to an Assumed Contract did not object to its Cure Amount or adequate assurance of future performance by the Contract Objection Deadline, such Counterparty is deemed to have consented to such Cure Amount and the assumption and assignment of its respective Assumed Contracts from the Debtor to Buyer, and shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Amount.  Buyer shall enjoy all of the Debtor's

rights, benefits and privileges under the Assumed Contracts as of the Closing without the necessity

to obtain any non-Debtor parties' written consent to the assumption or assignment thereof, except

to the extent expressly contemplated in the Purchase Agreement.

17.    Unless a different amount has been agreed to by a Counterparty to an

Assumed Contract or otherwise ordered by this Court, the amount set forth in the [*Notice of

Proposed Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure

Amount* [D.I. [●]] and schedule attached as Exhibit A thereto, as served on each Counterparty to

an Assumed Contract (the "Cure Notice"), or any Further Assignment Notice (as defined below),

reflects the sole amounts necessary under section 365(b) of the Bankruptcy Code to cure all

monetary defaults under the Assumed Contracts to the extent such defaults remain outstanding as

of the Closing Date (collectively, the "Cure Amounts"), and no other amounts are or shall be due

in connection with the assumption by the Debtor and the assignment to Buyer of the Assumed

Contracts; provided, however, that a Counterparty to an Assumed Contract shall not be barred

from seeking additional amounts on account of any defaults occurring between the service of the

latest served Contract Notice and the assumption of the Assumed Contract.

18.    Notwithstanding anything to the contrary herein, if the Debtor identifies

additional executory contracts and unexpired leases for assumption and assignment in connection

with the Sale (each such contract or lease, an "Additional Assumed Contract")  or any previously

proposed Cure Amounts are modified, the Debtor may file with this Court and serve by first-class

mail (and/or by email, as applicable) (a "Further Assignment Notice") on each impacted

Counterparty.  Such Additional Assumed Contract shall be deemed an Assumed Contract under

this Sale Order provided that the applicable contract Counterparty does not object to the Further

Assignment Notice by the Further Assignment Objection Deadline (as defined below), and the

Cure Amount for that Additional Assumed Contract shall be as set forth in the Further Assignment

Notice unless a different amount is agreed to by the Debtor (or the Buyer, if applicable) and the

affected Counterparty in writing.  If an affected Counterparty objects to the Further Assignment

Notice with respect to its Additional Assumed Contract by the Further Assignment Objection

Deadline, then such Additional Assumed Contract shall only be treated as an Assumed Contract

upon either (i) the withdrawal of the applicable objection or (ii) further order of the Court. For

purposes of this paragraph 18, "Further Assignment Objection Deadline" shall mean 4:00 p.m.

(prevailing Eastern Time) on the date that is ten days after the filing and service of a Further

Assignment Notice (or the next Business Day if that date does not fall on a Business Day).

19.     Upon the Debtor's assumption and assignment of the Assumed Contracts to

Buyer under the provisions of this Sale Order and any additional orders of this Court and payment

of any Cure Amounts, no default shall exist under any Assumed Contract, and no Counterparty to

any Assumed Contract shall be permitted to (a) declare a default by Buyer under such Assumed

Contract or (b) otherwise take action against Buyer, in each case, as a result of the Debtor's

financial condition, bankruptcy or failure to perform any of its obligations under the relevant

Assumed Contract.  Each non-Debtor party to an Assumed Contract hereby is also forever barred,

estopped and permanently enjoined from (i) asserting against Buyer, the Debtor, its estate or its

property, any default or claim arising out of any indemnity obligation or warranties for acts or

occurrences arising prior to or existing as of the Closing, or, against Buyer, the Debtor or its estate,

or Buyer's or Debtor's property, any counterclaim, unexercised setoff or any other claim asserted

or assertable against the Debtor and (ii) imposing or charging against Buyer any rent accelerations,

assignment fees, increases or any other fees as a result of the Debtor's assumption and assignments

to Buyer of the Assumed Contracts.  The validity of such assumption and assignments of the

Assumed Contracts shall not be affected by any dispute between the Debtor and the counterparties

to the applicable Assumed Contracts and any disputes regarding the Cure Amount of any Assumed

Contract.

20.     Upon payment of the applicable Cure Amounts, if any, and assignment of

the applicable Assumed Contracts to Buyer, Buyer shall be deemed to be substituted for the Debtor

as a party to the applicable Assumed Contracts, and the Debtor and its estate shall have no further

liabilities or obligations with respect to any Assumed Contracts and all holders of such claims are

forever barred and estopped from asserting such claims against the Debtor, its successors or

assigns, or its and their property, assets or estates.

21.     The failure of the Debtor or Buyer to enforce at any time one or more terms

or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the

Debtor's and Buyer's rights to enforce every term and condition of the Assumed Contracts.

22.     In the event that the Sale Transaction does not close, none of the Assumed

Contracts shall be assumed or assigned by virtue of this Sale Order and shall remain subject to

further rejection, assumption and/or assignment in this Chapter 11 Case.

## E.     No Successor Liability

23.     None of the Buyer or its Affiliates is a "successor" to, continuation of or

alter ego of, the Debtor or its estate by reason of any theory of law or equity.  Neither Buyer nor

any of its Affiliates shall have, assume, or be deemed to assume, or in any way be responsible for,

any liability or obligation of any of the Debtor, its estate, or any of the Debtor's predecessors or

affiliates; provided that, for the avoidance of doubt, the foregoing shall not discharge or otherwise

modify any existing Liability of the Target Companies or the General Partner Entities.  The

purchase of the SVB Capital Business by Buyer will not cause Buyer or any of its Affiliates to be

deemed a successor to, combination of, or alter ego of, in any respect, the Debtor or its businesses,

or incur any liability derived therefrom within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, antitrust, environmental, labor law (including any WARN Act), employment or benefits law, de facto merger, business continuation, substantial continuity, successor, vicarious, alter ego, derivative or transferee liability, veil piercing, escheat, continuity of enterprise, mere continuation, product line or other law, rule, regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtor's liability under such law, rule or regulation or doctrine, whether now known or unknown, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether matured or unmatured, whether contingent or noncontingent, whether liquidated or unliquidated, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables among the Debtor and its affiliates, and any taxes, arising, accruing or payable under, out of, in connection with or in any way relating to the cancellation of debt of the Debtor, its Affiliates, or in any way relating to the operation of the SVB Capital Business prior to the Closing Date.

24.     Nothing in this Sale Order alters the Court's (i) *Order Authorizing the Assumption and Assignment of Certain Executory Contracts* [D.I. 570] or (ii) *Order Authorizing the Assumption and Assignment of Certain Executory Contracts* [D.I. 813].

## F.     Prohibition of Actions Against Buyer

25.     Except as expressly provided for in this Sale Order or the Purchase Agreement, Buyer shall not have any liability or other obligation or responsibility of the Debtor or any of its predecessors or Affiliates arising, accruing or payable under, out of, in connection with, or in any way relating to the SVB Capital Business prior to the Closing, including any liens,

claims, interests and encumbrances, including any Liens, that may become due or owing after the Closing Date but that arise out of or relate to any act, omission, circumstance, breach, default or other event occurring prior to the Closing Date. For the avoidance of doubt, nothing herein shall discharge or otherwise modify any existing Liability of the Target Companies or the General Partner Entities.

26.    Except as expressly otherwise set forth in the Purchase Agreement and this Sale Order, all persons and entities, including, but not limited to, all debt holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, employees, litigation claimants and other creditors, holding liens, claims, interests and encumbrances, including any Liens, against or in all or any portion of the SVB Capital Business hereby are forever barred, estopped and permanently enjoined from asserting against Buyer, its Affiliates, its successors or assigns, its property or the SVB Capital Business, such persons' or entities' liens, claims, interests and encumbrances, including any Liens, in and to the SVB Capital Business, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding against Buyer, its Affiliates, its successors or assigns or its assets or properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against Buyer, its Affiliates, its successors or assigns or its assets or properties; (c) creating, perfecting or enforcing any liens, claims, interests and encumbrances, including any Liens, against Buyer, its Affiliates, its successors or assigns or its assets or properties; (d) asserting any unexercised setoff or right of subrogation against any obligation due by Buyer, its Affiliates, its successors or assigns or its assets or properties; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order, or the agreements or actions contemplated or taken in respect thereof;

or (f) revoking, terminating or failing or refusing to transfer or renew any license, permit or authorization with respect to the SVB Capital Business, subject to paragraph 29 below. As of the Closing, each creditor is authorized and directed to execute such documents and take all other actions as may be necessary to release any liens, claims, interests and encumbrances, including any Liens, in or on the SVB Capital Business, as such liens, claims, interests and encumbrances may have been recorded or may otherwise exist. For the avoidance of doubt, nothing contained in this Sale Order shall be deemed to have waived, released or transferred any claims, causes of action or any other rights or remedies of the Debtor or its estate against: (i) any current or former director or officer of (A) the Debtor or (B) any current or former Affiliate of the Debtor (other than, after the Closing, the Target Companies, the General Partner Entities and their respective Subsidiaries); (ii) any current or former Affiliate of the Debtor (other than, after the Closing, the Target Companies, the General Partner Entities and their respective Subsidiaries); or (iii) Silicon Valley Bank, Silicon Valley Bridge Bank, N.A. or First-Citizens Bank & Trust Company.

27.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with (a) the ability of the Debtor to sell and transfer the SVB Capital Business to Buyer and (b) the ability of Buyer to acquire and take possession of the SVB Capital Business, in each case, in accordance with the terms of the Purchase Agreement and this Sale Order.

28.     Buyer has given substantial consideration under the Purchase Agreement for the benefit of the Debtor and its estate. The consideration given by Buyer shall constitute valid and valuable consideration for the sale of the SVB Capital Business free and clear of any potential liens, claims, interests and encumbrances, including any Liens. The consideration provided by

Buyer for the SVB Capital Business under the Purchase Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

29.     Nothing in this Sale Order or the Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to solely as the post-sale owner or operator of property after the date of this Sale Order.  In addition, nothing in this Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order.  Notwithstanding the foregoing, nothing in this paragraph 29 shall (a) be interpreted to deem Buyer or any of its Affiliates the successor to the Debtor under any state or federal law successor-liability doctrine with respect to any liabilities under police and regulatory statutes, laws or regulations; (b) be construed as a waiver by any party, including Buyer, of any applicable rights or defenses; or (c) be construed to create for any governmental entity any substantive right that does not already exist under law.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any right, license, trademark or other permission relating to the use of any property of the Debtor sold, transferred, or conveyed to the Buyer solely on account of the filing or pendency of this Chapter 11 Case.

30.     To the maximum extent available under applicable law and to the extent provided for under the Purchase Agreement, the Buyer shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the SVB Capital Business and, to the maximum extent available under applicable law and to the extent provided for under the Purchase Agreement, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been

transferred to Buyer as of the Closing; provided, however, that, for the avoidance of doubt, nothing in this Sale Order or the Purchase Agreement shall authorize the transfer to the Buyer of any government-issued license, permit, or registration, or governmental authorization or approval, or the discontinuation of any obligation thereunder, without the Buyer's compliance with all applicable legal requirements and approvals under non-bankruptcy law governing such transfer. To the maximum extent available under applicable law, all existing licenses or permits applicable to the Debtor's business shall remain in place for the Buyer's benefit until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures.

**G.    Other Provisions**

31.    The Deposit shall not constitute property of the Debtor unless and until such Deposit is released to the Debtor by the Escrow Agent in accordance with the terms of the Purchase Agreement and the Escrow Agreement. If the Purchase Agreement is terminated for any reason prior to Closing other than by the Debtor as contemplated in Sections 7.2(b) or 7.2(c) of the Purchase Agreement, then the Deposit shall be returned to Buyer within five Business Days of termination.

32.    The consideration provided by Buyer to the Debtor pursuant to the Purchase Agreement for the SVB Capital Business constitutes reasonably equivalent value, fair saleable value and fair consideration for the SVB Capital Business under the Fraudulent Transfer Laws.

33.    Buyer is undertaking the Sale Transaction without collusion and in good faith, within the meanings of sections 363(m) and (n) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction, unless such authorization and such Sale Transaction are duly stayed before the Closing pending such appeal. Buyer is a good-faith

buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

34.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) this Chapter 11 Case, (b) any subsequent chapter 7 cases into which this Chapter 11 Case may be converted or (c) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Sale Order.  In the event there is a conflict between this Sale Order and the Purchase Agreement or any Ancillary Agreement, this Sale Order shall control and govern.  Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.  To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in this Chapter 11 Case, the terms of this Sale Order shall control.

35.     Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply, and the Debtor and Buyer are authorized and empowered to close the Sale Transaction immediately upon entry of this Sale Order.

36.     The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of this Court; _provided_ that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate or any of the Debtor's creditors.

37. Notwithstanding anything to the contrary herein, none of the parties to the Purchase Agreement shall have an obligation to close the Sale Transaction until all conditions precedent in the Purchase Agreement to the parties' respective obligations to close the Sale Transaction have been met, satisfied or waived in accordance with the terms of the Purchase Agreement.

38. Pursuant to the terms of and subject to the conditions contained in Section 4.11 of the Purchase Agreement, following the Closing, the Debtor, its successors and assigns and any trustee in bankruptcy shall have access to the Books and Records for the specified purposes set forth in, and in accordance with, Section 4.11 of the Purchase Agreement, and the Debtor shall retain a copy of the Books and Records for the purposes set forth in Section 4.11 of the Purchase Agreement.

39. This Court shall retain exclusive jurisdiction to, among other things, interpret, implement and enforce the terms and provisions of this Sale Order and the Purchase Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale Transaction (including all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith).

40. The Purchase Agreement shall be in full force and effect, regardless of the Debtor's lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

41. No bulk sales law, bulk transfer law or any similar law of any state or other jurisdiction (including those relating to taxes other than Transfer Taxes) shall apply to the Sale

Transaction or this Sale Order. The Debtor and the Buyer waive, and shall hereby be deemed to have waived, any requirement of compliance with, and any claims related to non-compliance with, the provisions of any bulk sales law, bulk transfer law or similar law of any jurisdiction that may be applicable.

42.    The appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the Sale Transaction.

43.    Buyer is a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Sale Order and the Sale Transaction.

44.    Nothing in this Sale Order shall be deemed to waive, release, extinguish or estop the Debtor or its estate from asserting, or otherwise impair or diminish, any right (including any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any assets of the Debtor that are not the SVB Capital Business or any part thereof.

45.    All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

**IT IS SO ORDERED:**

Dated: _____
       New York, New York

_____
                        MARTIN GLENN
          Chief United States Bankruptcy Judge

32

**<u>EXHIBIT C</u>**

**Designated Buyer Agreement**

EXECUTION VERSION

**INTEREST PURCHASE AGREEMENT**

**by and between**

**SVB Financial Group**

**and**

**Pinegrove Sierra HoldCo LLC**

**Dated as of May 2, 2024**

<u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

**ARTICLE I**

**PURCHASE AND SALE; DEPOSIT; PAYMENT; CLOSING; CLOSING DELIVERIES**

1.1    Purchase and Sale ................................................................................................2
1.2    Deposit ...............................................................................................................3
1.3    Time and Place of Closing .................................................................................3
1.4    Deliveries at Closing ..........................................................................................3
1.5    Closing Statements .............................................................................................4
1.6    Assumption and Assignment of Certain Contracts ...........................................6
1.7    Tax Withholding .................................................................................................8
1.8    Fundraising Payments ........................................................................................8

**ARTICLE II**

**REPRESENTATIONS AND WARRANTIES OF THE SELLER**

2.1    Ownership of Interests .....................................................................................10
2.2    Organization, Good Standing and Qualification .............................................10
2.3    Capital Structure ..............................................................................................11
2.4    Authority; Approval ..........................................................................................11
2.5    Governmental Filings; No Violations ..............................................................12
2.6    Financial Statements. ........................................................................................12
2.7    Absence of Certain Changes ............................................................................13
2.8    Litigation ..........................................................................................................14
2.9    Service Provider Benefits ................................................................................14
2.10   Labor Matters ...................................................................................................16
2.11   Compliance with Laws; Registrations and Permits ........................................17
2.12   Material Contracts ............................................................................................21
2.13   Real Property ....................................................................................................23
2.14   Sufficiency of Assets .......................................................................................23
2.15   Taxes. ................................................................................................................23
2.16   Intellectual Property .........................................................................................25
2.17   Sponsored Funds ..............................................................................................26
2.18   Sponsor Commitments .....................................................................................29
2.19   Carried Interest .................................................................................................30
2.20   Plan Asset Matters ...........................................................................................30
2.21   Insurance ..........................................................................................................30
2.22   Brokers and Finders .........................................................................................30
2.23   Absence of Certain Business Practices ............................................................30
2.24   Related Party Transactions ..............................................................................31
2.25   Defense Production Act ....................................................................................32
2.26   No Other Representations or Warranties .........................................................32

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF THE BUYER

3.1    Organization, Good Standing and Qualification.................................................33
3.2    Authority; Approval............................................................................................33
3.3    Governmental Filings; No Violations..................................................................33
3.4    Litigation.............................................................................................................34
3.5    Compliance with Laws; Registration and Permits..............................................34
3.6    Equity Financing; Available Funds .....................................................................35
3.7    Investment Intent ................................................................................................36
3.8    Brokers and Finders ...........................................................................................36
3.9    No Other Representations or Warranties ............................................................36

## ARTICLE IV

### COVENANTS

4.1    Interim Operations of the Target Companies, General Partner Entities and
       Sponsored Funds .................................................................................................38
4.2    Cooperation and Efforts to Consummate Transactions; Status Updates; Milestones........42
4.3    Regulatory Filings/Approvals..............................................................................43
4.4    Third-Party Consents ..........................................................................................44
4.5    Access and Reports .............................................................................................45
4.6    Publicity ..............................................................................................................46
4.7    Service Provider Matters.....................................................................................46
4.8    Confidentiality ....................................................................................................47
4.9    Tax Matters. ........................................................................................................49
4.10   Intercompany Arrangements; Transition Services..............................................53
4.11   Maintenance of Books and Records ....................................................................55
4.12   Rebranding and Transitional Trademark License ...............................................55
4.13   Client Consents ...................................................................................................56
4.14   Further Assurances..............................................................................................57
4.15   Books and Records .............................................................................................58
4.16   No Solicitation ....................................................................................................58
4.17   Insurance .............................................................................................................60
4.18   Financing.............................................................................................................61
4.19   FCB License Agreement .....................................................................................62
4.20   Member Support and Consent Agreement...........................................................62
4.21   REF Hedging Arrangement .................................................................................62

## ARTICLE V

### BANKRUPTCY MATTERS

5.1    Bankruptcy Court Filings....................................................................................63
5.2    Buyer Protections Order; Sale Order ..................................................................64

## ARTICLE VI

### CONDITIONS

6.1    Conditions to Each Party's Obligation to Consummate the Transactions ........................64
6.2    Conditions to Obligations of the Buyer ..............................................................................65
6.3    Conditions to Obligations of the Seller...............................................................................66
6.4    Frustration of Closing Conditions.......................................................................................67

## ARTICLE VII

### TERMINATION

7.1    Termination..........................................................................................................................67
7.2    Effect of Termination; Closing Purchase Price Deposit ....................................................70
7.3    Termination Fee; Expense Reimbursement ........................................................................71

## ARTICLE VIII

### MISCELLANEOUS AND GENERAL

8.1    Survival ................................................................................................................................73
8.2    Entire Agreements; Amendment; Waiver...........................................................................73
8.3    Expenses ...............................................................................................................................74
8.4    Counterparts.........................................................................................................................74
8.5    Governing Law ....................................................................................................................74
8.6    Specific Performance ..........................................................................................................74
8.7    Submission to Jurisdiction; Consent to Service of Process; Waiver of Jury Trial ............75
8.8    Notices ..................................................................................................................................76
8.9    Severability ..........................................................................................................................77
8.10   Assignment; Third-Party Beneficiaries...............................................................................78
8.11   Non-Recourse ......................................................................................................................78
8.12   Interpretation; Construction ...............................................................................................79

<u>EXHIBITS</u>

Exhibit A – Definitions
Exhibit B – Target Companies, General Partner Entities, Evergreen Fund and Selected QIF Entities
Exhibit C – Sponsor Commitments
Exhibit D – Carried Interest
Exhibit E – Form of Buyer Protections Order
Exhibit F – Form of Sale Order
Exhibit G-1 – General Partner Entity Organizational Document Amendments
Exhibit G-2 – Target Company Organizational Document Amendments
Exhibit H – Member Support and Consent Agreement

Exhibit I – Transition Services
Exhibit J – Seller Trademarks
Exhibit K – Pre-Closing Restructuring
Exhibit L – Fund Instrument of Assignment
Exhibit M – Financial Statements

<u>SCHEDULES</u>

Seller Disclosure Schedule

## INTEREST PURCHASE AGREEMENT

THIS INTEREST PURCHASE AGREEMENT (including the Exhibits and Schedules hereto, each as amended or restated from time to time, this "<u>Agreement</u>"), dated as of May 2, 2024 (the "<u>Execution Date</u>"), is made by and between SVB Financial Group, a Delaware corporation (the "<u>Seller</u>"), and Pinegrove Sierra HoldCo LLC, a Delaware limited liability company (the "<u>Buyer</u>").  The Seller and the Buyer are collectively referred to as the "<u>Parties</u>" and individually as a "<u>Party</u>."

## RECITALS

**WHEREAS**, as of the Execution Date, the Seller is the direct or indirect owner of certain Equity Interests of the Target Companies, the General Partner Entities, the Evergreen Fund, QIF 1 and QIF 7, each listed in <u>Exhibit B</u>;

**WHEREAS**, on March 17, 2023, the Seller commenced voluntary proceedings under Chapter 11 of the Bankruptcy Code by filing a petition for relief in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") under the caption *In re SVB Financial Group* (Case No. 23-10367 (MG)) (the "<u>Bankruptcy Proceeding</u>");

**WHEREAS**, the Seller formed the Target Companies and General Partner Entities to act, as applicable, in the capacity or capacities of general partner, manager, managing member, management company and/or investment adviser, servicer, or holding company for one or more of the foregoing, with respect to the Sponsored Funds;

**WHEREAS**, the Seller has made certain capital commitments to the Sponsored Funds (including, for the avoidance of doubt, Evergreen Fund and QIF 1) and QIF 7, which are, in the case of Evergreen Fund, QIF 1 and QIF 7, funded and held directly by the Seller, and in the case of the other Sponsored Funds, funded and held indirectly by the Seller through a General Partner Entity, in each case as set forth on <u>Exhibit C</u> (collectively, the "<u>Sponsor Commitments</u>");

**WHEREAS**, the Seller is a recipient of Carried Interest from the General Partner Entities as set forth on <u>Exhibit D</u>;

**WHEREAS**, on September 20, 2023, the Bankruptcy Court entered an order (the "<u>Restructuring Order</u>") approving (a) the Seller's assumption of, and assignment to, SVB Capital Management, LLC (the "<u>Management Company</u>"), a Delaware limited liability company and a wholly owned subsidiary of the Seller registered with the U.S. Securities and Exchange Commission (the "<u>SEC</u>") as an investment adviser under the Investment Advisers Act of 1940 (the "<u>Advisers Act</u>"), the Advisory Contracts and (b) the contribution of the Seller's manager interests in the Qualified Investors Funds to the Management Company (the "<u>Restructuring</u>");

**WHEREAS**, prior to the Execution Date, the Seller completed the Restructuring, and the Management Company hired certain individuals providing services in support of the Seller's sponsorship and management of the Sponsored Funds;

**WHEREAS**, the Seller desires to sell to the Buyer, and the Buyer desires to purchase from the Seller, (i) a portion of the issued and outstanding Equity Interests of the Target

Companies and General Partner Entities and (ii) all of the issued and outstanding Equity Interests of each of Evergreen Fund, QIF 1 and QIF 7, that are each owned directly or indirectly by the Seller (such Equity Interests owned by the Seller, collectively, the "Interests", such portion of the Interests to be purchased by the Buyer, the "Sale Interests" and such portion of the Interests to be retained by the Seller, the "Retained Interests") (and by extension, a portion of the Sponsor Commitments that the Seller holds through its Interests in the General Partner Entities, Evergreen Fund, QIF 1 and QIF 7 and a portion of the Seller's rights and interest in the Carried Interest that the Seller holds through its Interests in the General Partner Entities) in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Bankruptcy Rules for the Southern District of New York, all upon the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Order;

WHEREAS, the division of the Interests into the Sale Interests and the Retained Interests shall be effected at Closing through the Organizational Document Amendments and shall be consistent with the terms set forth in Exhibits G-1 and G-2;

WHEREAS, at least ten (10) days prior to the Closing, the Sellers will effect the restructuring described in Exhibit K (the "Pre-Closing Restructuring");

WHEREAS, the Seller intends to seek entry of the Buyer Protections Order by the Bankruptcy Court upon the terms and subject to the conditions set forth herein and in the Buyer Protections Order;

WHEREAS, the execution and delivery of this Agreement and the Seller's ability to consummate the Transactions are subject to, among other things, the Bankruptcy Court's entry of the Sale Order under, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code;

WHEREAS, the Buyer has delivered to the Seller a duly executed Equity Commitment Letter pursuant to which each Parent, subject to the terms and conditions in the Equity Commitment Letter, has agreed to provide the Buyer the Equity Financing for the Transactions in the aggregate amount set forth therein; and

WHEREAS, the Seller and the Buyer desire to make certain representations, warranties, covenants and agreements in connection with this Agreement.

NOW, THEREFORE, in consideration of the premises, and of the representations, warranties, covenants and agreements contained herein, the Parties agree as follows:

## ARTICLE I

## PURCHASE AND SALE; DEPOSIT; PAYMENT; CLOSING; CLOSING DELIVERIES

1.1      Purchase and Sale.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Seller shall sell, assign, convey, transfer and deliver to the Buyer, and the Buyer shall purchase, assume and accept from the Seller, all of the Sale Interests, whether directly from the Seller or indirectly through the acquisition of the applicable

Target Company, free and clear of any Liens (other than any transfer restrictions imposed by federal and state securities Laws and Permitted Post-Closing Encumbrances), in exchange for the Closing Purchase Price, subject to adjustment pursuant to Section 1.5 (*Closing Statements*), the Post-Closing Payments (to the extent payable pursuant to Section 1.8 (*Fundraising Payments*)), and the economic entitlements provided for in the Organizational Document Amendments.

        1.2        Deposit.  Buyer shall, no later than forty-eight (48) hours after the entry of the Buyer Protections Order by the Bankruptcy Court, make, or cause to be made, a deposit (the "Deposit") with Citibank, N.A. (the "Escrow Agent") in the amount equal to $50,500,000 (the "Deposit Amount"), by wire transfer of immediately available funds for deposit into a separate segregated, interest bearing escrow account (the "Escrow Account") maintained by the Escrow Agent in accordance with the Buyer Protections Order and established pursuant to the Escrow Agreement. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Buyer, and, if the Closing occurs, shall be released in accordance with Section 1.4 (*Deliveries at Closing*), or if the Agreement is terminated in accordance with Article VII (*Termination*), be released to the Seller or returned to the Buyer in accordance with the applicable provisions of Article VII (*Termination*).

        1.3        Time and Place of Closing.  The closing of the purchase and sale provided for in this Agreement (the "Closing") will take place at 9:00 a.m., Eastern Time, at the offices of Sullivan & Cromwell LLP, 125 Broad Street, New York, NY 10004 or remotely via electronic exchange of documents and signatures, on the third (3rd) Business Day following the satisfaction or, to the extent permitted by applicable Law, waiver of the last condition in Article VI (*Conditions*) to be satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or, to the extent permitted by applicable Law, waiver of those conditions) or at such other time and place as the Buyer and the Seller mutually agree (the "Closing Date").

        1.4        Deliveries at Closing.

        (a)        By the Seller.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing (or at such later time as may be specified below), the Seller shall deliver or cause to be delivered to the Buyer:

        (i)        a properly completed and duly executed IRS Form W-9 (or successor form thereto) of the Seller;

        (ii)        the Fund Instrument of Assignment for all of the issued and outstanding Equity Interests of Evergreen Fund owned by the Seller, duly executed by the Seller;

        (iii)        the Fund Instrument of Assignment for all of the issued and outstanding Equity Interests of QIF 1 owned by the Seller, duly executed by the Seller;

        (iv)        the Fund Instrument of Assignment for all of the issued and outstanding Equity Interests of QIF 7 owned by the Seller, duly executed by the Seller;

(v)    a counterpart to a joint instruction to the Escrow Agent, instructing the Escrow Agent to release the Deposit to the Seller;

(vi)    the Organizational Document Amendments, duly executed by the applicable members of the Target Companies and General Partner Entities (including the Seller and the Management Company, as applicable); and

(vii)    the certificate contemplated by Section 6.2(e) (*Closing Certificate*).

(b)    By the Buyer.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Buyer shall deliver or cause to be delivered:

(i)    a counterpart to a joint instruction to the Escrow Agent, instructing the Escrow Agent to release the Deposit to the Seller;

(ii)    by wire transfer of immediately available funds to such bank account(s) of the Seller or its Affiliate as designated in writing by the Seller prior to the Closing, an amount equal to the Closing Purchase Price (such amount, the "Closing Payment");

(iii)    signature pages to the Organizational Document Amendments, duly executed by the Buyer or its designee; and

(iv)    the certificate contemplated by Section 6.3(c) (*Closing Certificate*).

1.5    Closing Statements.

(a)    Estimated Closing Statement.  No later than five (5) Business Days prior to the Closing Date, the Seller shall prepare and deliver to the Buyer a statement (the "Estimated Closing Statement"), together with supporting documentation used by the Seller in calculating the amounts set forth therein, setting forth a good faith estimate of the Closing Purchase Price and Closing Payment, including a good faith estimate of each of the Closing Purchase Price Components.

(b)    Closing Statement.  The Seller shall (i) consider in good faith any potential adjustments to the Estimated Closing Statement delivered by the Buyer to the Seller and (ii) address any arithmetic or calculation errors with respect to the Estimated Closing Statement presented by the Buyer, in each case, no later than two (2) Business Days prior to the Closing Date, and shall reissue a statement with such revisions that the Seller has determined are appropriate (the "Closing Statement") to the Buyer within one (1) Business Day prior to the Closing Date; provided that if the Buyer and the Seller fail to mutually agree upon revisions to the Estimated Closing Statement on or prior to the second (2nd) Business Day prior to the Closing Date, then (x) neither the Buyer nor the Seller shall delay the Closing because of such failure, (y) any revisions to the Estimated Closing Statement mutually agreed between the Buyer and the Seller shall be used in determination of the Closing Statement and the payment of the Closing Purchase Price and Closing Payment, and (z) as to any other items, the amounts set forth in the Closing Statement as determined by the Seller, without any adjustment, shall be the amounts used in the determination of the payment of the Closing Purchase Price and Closing Payment (and which shall be paid by

the Buyer to the Seller at Closing but shall be subject to adjustment in accordance with this Section 1.5 (*Closing Statements*)).

(c)    Final Closing Statement.  No later than sixty (60) days after the Closing Date, the Buyer shall deliver a statement to the Seller setting forth in reasonable detail with necessary supporting documentation its calculations of the Closing Purchase Price, including the Closing Purchase Price Components (the "Final Closing Statement").  If the Seller disagrees with the Buyer's calculations set forth in the Final Closing Statement, then the Seller may, within thirty (30) days after delivery of the Final Closing Statement, notify the Buyer of such disagreement in writing setting forth the Seller's calculation of the disputed amounts in reasonable detail, and the Seller and the Buyer shall, during the following twenty (20) days, use their reasonable best efforts to reach agreement on the disputed items or amounts.  If the Buyer and the Seller are unable to reach an agreement during such twenty (20) day period, they shall promptly engage and cause an independent accounting firm of nationally recognized standing reasonably satisfactory to the Buyer and the Seller (which independent accounting firm shall not have any material relationship with the Buyer or the Seller or any of their respective Subsidiaries) (the "Referee"), to promptly review this Agreement and the disputed items or amounts for the purpose of calculating any disputed calculation reflected on the Final Closing Statement.  In making such calculations, the Referee shall consider only those items or amounts in the Final Closing Statement as to which the parties have disagreed.  The Referee shall deliver to the Buyer and the Seller, as promptly as practicable (and in any event within sixty (60) days of the engagement of such accounting firm), a report setting forth calculations of any disputed calculations set forth on the Final Closing Statement, which calculations shall be final, conclusive and binding upon the parties hereto.  The cost of such review and report shall be allocated between the Seller and the Buyer in the same proportion that the aggregate amount of the items unsuccessfully disputed by each (as finally determined by the Referee) bears to the total amount of the disputed items.  The Seller and the Buyer shall reasonably cooperate with such accounting firm in preparation of such report, including providing copies of reasonably necessary books, records and work papers of the Seller and the Buyer, as applicable.

(d)    Within five (5) Business Days after the Final Closing Statement becomes final and binding upon the Parties pursuant to Section 1.5(c) (*Final Closing Statement*), unless the Closing Purchase Price equals the Closing Payment (in which case no payment will be made pursuant to this Section 1.5(d) (*Closing Statements*), one of the following payments shall be made:

(i)    If the Closing Purchase Price, as finally determined in accordance with the foregoing provisions of this Section 1.5 (*Closing Statements*), exceeds the Closing Payment (such amount, the "Closing Underpayment"), the Buyer shall pay, or cause to be paid, within five (5) Business Days of such determination, an aggregate amount equal to the Closing Underpayment to the Seller by wire transfer of immediately available funds.

(ii)    If the Closing Purchase Price, as finally determined in accordance with the foregoing provisions of this Section 1.5 (*Closing Statements*), is less than the Closing Payment (such amount, the "Closing Overpayment"), the Seller shall pay, or cause to be paid, within five (5) Business Days of such determination, an aggregate amount equal to the Closing Overpayment to the Buyer by wire transfer of immediately available funds.

(e)        Any payment made pursuant to this <u>Section 1.5</u> (*Closing Statements*) shall be treated as an adjustment to the Purchase Price for applicable Tax purposes, unless a different treatment is otherwise required by applicable Law.

1.6        <u>Assumption and Assignment of Certain Contracts</u>.

(a)        Subject to the provisions of this <u>Section 1.6</u> (*Assumption and Assignment of Certain Contracts*), section 365 of the Bankruptcy Code, the Buyer Protections Order, the Sale Order and any other applicable Order(s) of the Bankruptcy Court authorizing the assumption and assignment of such Contracts, at the Closing, the Seller shall assume and assign to the Buyer, and the Buyer shall assume, the entirety of the Seller's right, title and interest in each Contract listed on <u>Section 1.6(a)</u> of the Seller Disclosure Schedule as of the Closing, with respect to which an Order has been entered by the Bankruptcy Court (which may be the Sale Order) authorizing the assumption and assignment of such Contract (such Contracts collectively, the "<u>Assumed Contracts</u>").

(b)        If, at any time during the period beginning upon the Execution Date and prior to the Closing Date, either Party becomes aware of any Contract of the Seller used primarily by and for the benefit of the Target Companies, General Partner Entities or Sponsored Funds and not initially included in <u>Section 1.6(a)</u> of the Seller Disclosure Schedule (an "<u>Inadvertently Omitted Debtor Contract</u>"), such Party may provide written notice to the other Party of the existence of such Contract (an "<u>Assignment Notice</u>").  After receipt of an Assignment Notice, the Parties shall consult in good faith to determine whether such Contract is primarily used by and for the benefit of the Target Companies, General Partner Entities or Sponsored Funds.

(i)        If, after good faith consultation, (A) the Parties agree that a Contract subject to an Assignment Notice is primarily used by and for the benefit of the Target Companies, General Partner Entities or Sponsored Funds and (B) such Contract is not necessary to the reorganization of the Seller (as determined by the Seller in its sole discretion), the Seller shall provide to the Buyer the Seller's reasonable, good-faith estimate of the Cure Costs for such Inadvertently Omitted Debtor Contract, which amounts shall be subject to the Buyer's reasonable consent.  Upon the Buyer's receipt of the Seller's reasonable, good-faith estimate of the Cure Costs for an Inadvertently Omitted Debtor Contract, delivered in accordance with the immediately preceding sentence, such Contract shall be deemed an Assumed Contract, and the Seller shall give notice to the other parties to any such Contract pursuant to the assumption and assignment procedures set forth in the Buyer Protections Order.

(ii)        If, after good faith consultation, (A) the Parties disagree that a Contract subject to an Assignment Notice is primarily used by or for the benefit of the Target Companies, General Partner Entities or Sponsored Funds or (B) such Contract is necessary to the reorganization of the Seller (as determined by the Seller in its sole discretion), the Parties shall work in good faith and use commercially reasonable efforts to provide that, to the extent reasonably possible, the Target Companies, General Partner Entities or Sponsored Funds, as applicable, are able to continue to use such goods and services in the operation of their businesses, including, without limitation, entry into a subcontract for those goods and services used by the Target Companies, General Partner Entities or

Sponsored Funds, as applicable, until such time as the Buyer is able to procure replacement contracts for such goods or services or if earlier, until the end of the term of such Contract (<u>provided</u> that prior to terminating any such Contract or letting such Contract expire without renewal, the Seller will provide the Buyer an opportunity to assume the Contract).

(c)    The Buyer shall pay all Cure Costs in respect of the Assumed Contracts, which shall not be the obligation, liability or responsibility of the Seller.  The Buyer has delivered evidence of the Buyer's ability to comply with section 365 of the Bankruptcy Code, including adequate assurance of future performance, in connection with the assumption and assignment of the Assumed Contracts.  Upon written request by the Buyer, the Seller shall provide to the Buyer as promptly as practicable the proposed Cure Costs as of the date of such request with respect to any Contracts identified by the Buyer in such written request.

(d)    The Seller shall take commercially reasonable actions in order to effect the assumption and assignment to the Buyer of each Assumed Contract, including, to the extent applicable, by filing with the Bankruptcy Court one or more motions, each in form and substance reasonably acceptable to the Buyer, seeking authorization to assume and assign each Assumed Contract to the Buyer on the terms and conditions set forth herein pursuant to section 365 of the Bankruptcy Code, and by taking all actions reasonably necessary to facilitate any negotiations with the counterparties to such Contracts, and providing timely and proper notice of the proposed assumption and assignment of the Assumed Contracts to each applicable counterparty to such Contracts.

(e)    At the Closing, the Seller shall assign to the Buyer, and the Buyer shall assume, the entirety of the Seller's right, title and interest in and to each Contract listed on <u>Section 1.6(e)</u> of the Seller Disclosure Schedule (such Contracts collectively, the "<u>Non-Executory Assigned Contracts</u>" and, together with Assumed Contracts, the "<u>Assigned Contracts</u>"), in each case free and clear of any Liens other than any Permitted Post-Closing Encumbrances.

(f)    Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, the Buyer to the extent that such Contract is terminated by any party thereto, without violating the automatic stay, other than the Seller or expires by its terms, on or prior to such time as it is to be assigned to the Buyer hereunder and is not continued or otherwise extended upon assignment.

(g)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not effect the assignment or transfer of any Assigned Contract or any claim or right or any benefit arising thereunder) if: (i) after giving effect to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Buyer Protections Order, the Sale Order and any other applicable Order(s) of the Bankruptcy Court, an attempted assignment or transfer thereof (A) would be prohibited by applicable Law, (B) would be reasonably likely to subject the Seller, the Buyer, their respective Affiliates or any Representatives of the foregoing to civil or criminal liability or (C) without the approval, authorization, consent or waiver of, or granting or issuance of any license or permit by, any third party (each such action, a "<u>Necessary Consent</u>"), would constitute a breach, default or violation of such Assigned Contract or of any Law or Order or in any way adversely affect the rights of the Buyer with respect to such Assigned Contract; or (ii) the Bankruptcy Court has not entered an

Order approving such assignment or transfer (if applicable).  In such event, the Closing shall nonetheless take place on the terms and subject to the conditions set forth herein.  In the event that such assignment or transfer is subject to such Necessary Consent being obtained, until the expiration of the Necessary Consent Period, (A) the Seller and the Buyer will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Assigned Contract or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to the Buyer as the Buyer may reasonably request and (B) the Seller and the Buyer shall cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by the Seller and reasonably acceptable to the Buyer, including subleasing, subcontracting, licensing or sublicensing to the Buyer, all of the Seller's rights and obligations with respect to any such Assigned Contract (it being agreed that the existing terms and conditions under such Assigned Contract shall be deemed reasonably acceptable to the Buyer); provided, however, that, no Party will be obligated to (1) pay any consideration or make any other economic concession therefor to any third party from whom approval, authorization, consent or waiver is requested or (2) initiate any litigation or legal proceedings (other than the prosecution of the motion(s) seeking entry of the Buyer Protections Order and the Sale Order and authorization to assume and assign the Assumed Contracts as contemplated pursuant to this Section 1.6 (*Assumption and Assignment of Certain Contracts*)) to obtain any such approval, authorization, consent or waiver.  Upon satisfying any requisite objection and/or Necessary Consent requirement applicable to any such Assigned Contract after the Closing, such Assigned Contract shall promptly be transferred and assigned to the Buyer in accordance with the terms of this Agreement and the Bankruptcy Code.  If a Necessary Consent for an Assigned Contract is not obtained by the end of the Necessary Consent Period, then, to the extent applicable, such Assigned Contract shall not be assigned or transferred to the Buyer, without any adjustment to the Closing Purchase Price.

1.7    Tax Withholding.  The Buyer and/or any applicable withholding agent shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as Buyer and/or any applicable withholding agent is required to deduct and withhold with respect to the making of such payment under the Code, or any provision of state, local or non-U.S. Tax law.  The Buyer and/or any applicable withholding agent shall (i) notify the Seller at least five (5) Business Days prior to withholding any amounts under this Agreement other than in respect of amounts treated as compensation for Tax purposes or with respect to any withholding required by reason of the failure to timely deliver an IRS Form W-9 pursuant to Section 1.4(a)(i) and (ii) use commercially reasonable efforts to (A) cooperate with the Seller to minimize or eliminate any such withholding and (B) take into account any certificate or other document provided by the Seller that mitigates, reduces, eliminates or recovers any Tax (including withholding or deduction in respect of Taxes) that is or may be imposed with respect to the Transactions; provided that the Buyer and its Affiliates shall not be required to incur unreimbursed cost and expense in connection with the foregoing. To the extent that such amounts are so withheld and paid over to the proper Governmental Entity, such withheld and deducted amounts will be treated for all purposes of this Agreement as having been paid to the Seller.

1.8    Fundraising Payments.  During the period following the Closing and prior to the date that is ten (10) years following the Closing (the "Fundraising Period"), Buyer shall pay to Seller up to an aggregate of Ten Million Dollars ($10,000,000) (the "Maximum Amount"), to the extent required by this Section 1.8 (*Fundraising Payments*).

(a)    If, at any time during the Fundraising Period, the amount of New Capital Raised equals or exceeds seven hundred and fifty million dollars ($750,000,000), Buyer shall pay to Seller by wire transfer of immediately available funds to an account designated by the Seller in writing, an amount equal to five million dollars ($5,000,000) (the "First Payment"); and

(b)    If, at any time during the Fundraising Period, the amount of New Capital Raised equals or exceeds one billion five hundred million dollars ($1,500,000,000), Buyer shall pay to Seller by wire transfer of immediately available funds to an account designated by the Seller in writing, an amount equal to five million dollars ($5,000,000) (the "Second Payment", together with the First Payment, the "Post-Closing Payments", and each, a "Post-Closing Payment").

(c)    Upon the written request of Seller during the Fundraising Period (which request may be made not more than one (1) time in any twelve (12) month period (or, for so long as Seller is subject to periodic reporting obligations under the Exchange Act, not more than four (4) times in any twelve (12) month period), Buyer shall provide Seller with a good faith estimate of New Capital Raised as of the date of such written request. Buyer shall use its commercially reasonable efforts to provide such estimate within thirty (30) days of receipt of such written request from Seller. If Seller disagrees with Buyer's estimate of New Capital Raised, then Seller may notify Buyer of such disagreement in writing, describing the basis for Seller's dispute in reasonable detail. Seller and Buyer shall, during the following twenty (20) days, use their reasonable best efforts to reach agreement on the disputed items or amounts. If Buyer and Seller are unable to reach an agreement during such twenty (20) day period, they shall promptly engage and cause a Referee to promptly review such disputed items or amounts. The Referee shall deliver to Buyer and Seller, as promptly as practicable (and in any event, within sixty (60) days of the engagement of such Referee), a report setting forth its determination of such disputed items or amounts, which calculations shall be final, conclusive, and binding upon the Parties. The cost of such review and report shall be allocated between Seller and Buyer in the same proportion that the aggregate amount of the items unsuccessfully disputed by each (as finally determined by the Referee) bears to the total amount of the disputed items. Seller and Buyer shall reasonably cooperate with such Referee in the preparation of such report, including providing copies of any reasonably necessary books, records, and work papers of the Buyer and Seller as applicable.

(d)    Following the Closing, Buyer shall, and shall cause its Affiliates to, not take any action (or omit to take any action) for the primary purpose of frustrating, reducing or delaying the payment of a Post-Closing Payment, if any, or the achievement of the applicable New Capital Raised-based milestones to achieving such Post-Closing Payment, if any, contained in this Section 1.8 (*Fundraising Payments*).

(e)    The Buyer and Seller shall treat and report for applicable Tax and financial reporting purposes the payment of any Post-Closing Payment as payment of additional purchase price, except that, to the extent required by applicable Law, a portion of such Post-Closing Payment shall be treated and reported for such purposes by Buyer and Seller as interest, which portion shall be determined by using the appropriate applicable federal rate (as defined in Section 1274(d) of the Code and the Treasury Regulations promulgated thereunder).

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in the corresponding sections or sub-sections of the disclosure schedule delivered to the Buyer by the Seller prior to or simultaneously with the execution of this Agreement (the "Seller Disclosure Schedule"), the Seller represents and warrants to the Buyer as follows:

2.1     Ownership of Interests.  The Seller is the sole direct or indirect owner of the Interests. All Carried Interest is owned by the General Partner Entities. The Seller (or a Target Company) has good and valid title to all such Interests, free and clear of all Liens (other than any transfer restrictions imposed by federal and state securities Laws and Permitted Pre-Closing Encumbrances), and upon delivery by the Seller, or acquisition by the Buyer, of the Sale Interests at the Closing, good and valid title to the Sale Interests will pass to the Buyer or remain with the applicable Target Company.  The Sponsor Commitments are held by the Seller free and clear of any and all Liens.

2.2     Organization, Good Standing and Qualification.

(a)     The Seller (i) is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware, (ii) has all requisite corporate or similar power and authority to own, pledge or dispose of the Interests, (iii) has all requisite corporate or similar power and authority to carry on its business as presently conducted and (iv) is qualified to do business and, to the extent such concept is applicable, is in good standing as a foreign corporation or other legal entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except in the case of clause (iii) or (iv) where the failure to be so qualified or in good standing, would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole, or reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions.

(b)     Each of the Target Companies, General Partner Entities, Evergreen Fund, QIF 1 and QIF 7 (i) is a limited liability company or limited partnership duly organized, validly existing and in good standing under the Laws of the State of Delaware or the State of California, as applicable, (ii) has all requisite limited liability company, limited partnership or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and (iii) to the extent such concept is applicable, is in good standing as a foreign limited liability company, limited partnership or other legal entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except in the case of clause (ii) or (iii) where the failure to be so qualified or in good standing, would not reasonably be expected to be material to the Target Companies, General Partner Entities, Evergreen Fund, QIF 1 and QIF 7, taken as a whole or reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions.  The Seller has made available to the Buyer true, complete and correct copies of the certificates of formation or certificates of limited partnership and limited liability company agreements and limited partnership agreements, in each case, as amended, of the

Target Companies, General Partner Entities, Evergreen Fund, QIF 1 and QIF 7 prior to the Execution Date ("Organizational Documents"), and each as so delivered is in full force and effect.

2.3          Capital Structure.

(a)          The outstanding Equity Interests of each of the Target Companies, General Partner Entities, Evergreen Fund and QIF 7 is as set forth on Exhibit B.  Other than Equity Interests in the Evergreen Fund, QIF 1 and QIF 7 that constitute the Sale Interests, and Equity Interests in CP II, L.P., Strategic Investors Fund II, L.P., Strategic Investors Fund III, L.P., and Strategic Investors Fund IV, L.P., the Seller and its Affiliates (other than the General Partner Entities) do not directly or indirectly own any other Equity Interests in the Sponsored Funds.  All of the outstanding Interests have been duly authorized and are validly issued, fully paid and, to the extent applicable, nonassessable.  The Target Companies, General Partner Entities, Evergreen Fund, QIF 1 and QIF 7 do not have any outstanding bonds, debentures, notes or other obligations of indebtedness, the holders of which have the right to vote (or convert into or exercise for securities having the right to vote) with the equityholders of the Target Companies, General Partner Entities, Evergreen Fund, QIF 1 or QIF 7 on any matter.  Except for this Agreement and the Organizational Documents of the Target Companies, General Partner Entities, Evergreen Fund, QIF 1 and QIF 7, the Interests are not subject to any voting trust agreements, proxies or other Contracts with respect to the voting, purchase, repurchase, dividend rights, disposition or transfer of the Interests.

(b)          Except as set forth on Section 2.3(b) of the Seller Disclosure Schedule, there are no preemptive or other outstanding equity awards, rights, options, warrants, agreements, arrangements or commitments under which any Target Company, General Partner Entity, Evergreen Fund, QIF 1 or QIF 7 is or may become obligated to sell, or giving any Person a right to acquire or in any way dispose of, any Equity Interests of the Target Companies, General Partner Entities, Evergreen Fund, QIF 1 or QIF 7 or any securities or obligations exercisable or exchangeable for, or convertible into, any securities of the Target Companies, General Partner Entities, Evergreen Fund, QIF 1 or QIF 7, and no securities or obligations evidencing such rights are authorized, issued or outstanding.  Except for this Agreement and the respective Organizational Documents of the Target Companies, General Partner Entities, Evergreen Fund, QIF 1 and QIF 7, neither the Seller nor any of its Affiliates is party to any Contract with respect to the voting, purchase, dividend rights, disposition or transfer of the Interests.

(c)          (i) No Target Company or General Partner Entity has any Subsidiary, except that the Management Company is a wholly owned Subsidiary of SVB Capital Holdco, LLC, and (ii) no Target Company or General Partner Entity owns or holds the right to acquire any Equity Interests in any other Person, in each case other than the Equity Interests in the Sponsored Funds.

2.4          Authority; Approval.   Subject to the issuance of the Buyer Protections Order and the Sale Order:

(a)          the Seller has all requisite corporate or similar power and authority and has taken all organizational or similar action necessary in order to execute, deliver and perform its respective obligations under the Transaction Documents and to perform its covenants and obligations thereunder and to consummate the transactions contemplated thereby, including the Transactions; and

(b)      this Agreement has been duly executed and delivered by the Seller and, assuming that this Agreement constitutes the legal, valid and binding obligation of the Buyer, is a legal, valid and binding agreement of the Seller, enforceable against the Seller in accordance with its terms, subject to bankruptcy, insolvency, fraudulent conveyance, preferential transfer, reorganization, moratorium and similar Laws relating to or affecting creditors' rights and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) (the "Equitable Exception").

2.5          Governmental Filings; No Violations.

(a)      Other than the expirations of waiting periods and the filings, notices, reports, consents, registrations, approvals, Permits and authorizations required, as applicable, under the HSR Act, and subject to the issuance of the Buyer Protections Order and the Sale Order, no expirations of waiting periods under applicable Antitrust Laws are required and no notices, reports or other filings are required to be made by the Seller or any Target Company, General Partner Entity, Sponsored Fund, the Evergreen Fund or QIF 7, nor are any consents, registrations, approvals, Permits or authorizations required to be obtained by the Seller, any Target Company, General Partner Entity, Sponsored Fund or QIF 7 from, any Governmental Entity in connection with the execution, delivery and performance of this Agreement and the other Transaction Documents by the Seller, the Target Companies, the General Partner Entities or the Sponsored Funds, or the consummation of the Transactions; provided, however, that no representation or warranty is made with respect to waiting periods, authorizations, consents, registrations, Permits, approvals, notices, reports or filings with any Governmental Entity or Self-Regulatory Organization that, if not obtained or made, would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.

(b)      Except as set forth on Section 2.5(b) of the Seller Disclosure Schedule, the execution, delivery and performance of this Agreement and the other Transaction Documents by the Seller does not, and the consummation of the Transactions will not, conflict with, or result in any breach or violation of or default (with or without notice, lapse of time, or both) under, or give rise to any right of termination, cancellation or acceleration of any obligation under, or result in the creation of a Lien on any of the Interests or assets of the Target Companies, General Partner Entities or Sponsored Funds, under any provision of (i) the Organizational Documents of the Target Companies or General Partner Entities, (ii) subject to the receipt of applicable Client Consents, the Fund Documentation or Side Letters, (iii) subject to the Sale Order, any Material Contract, Lease or Permit or (iv) subject to the Buyer Protections Order or the Sale Order, and assuming (solely with respect to performance of this Agreement and the other Transaction Documents and consummation of the Transactions) compliance with the matters referred to in Section 2.5(a) (Governmental Filings; No Violations), any Laws to which the Seller is subject, except, in the case of clauses (ii), (iii), and (iv) above, for any breach, violation, default, termination, cancellation, acceleration or creation that would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.

2.6          Financial Statements.

(a)     The Financial Statements of the Management Company fairly present in all material respects the results of operations and financial positions of the Management Company on a combined basis as of the dates or for the periods indicated therein. The Financial Statements were prepared in accordance with generally accepted accounting standards and do not contain all of the required footnotes, financial statements and related disclosures required by GAAP. The Financial Statements are consistent in all material respects with the books and records of the Management Company. Except as set forth on Section 2.6(a) of the Seller Disclosure Schedule, the Management Company maintains with respect to its business systems of internal accounting controls designed to provide reasonable assurances regarding the reliability of financial reporting, including that (x) transactions are executed in accordance with management's general or specific authorizations, and (y) transactions are recorded as necessary to permit materially correct preparation of the Financial Statements and to maintain reasonably accurate accountability for its assets. The Management Company does not maintain any "off-balance sheet arrangements" within the meaning of Item 303 of Regulation S-K of the SEC.

(b)     Since the date of the Financial Statements, the Management Company does not have any Liabilities of a nature required to be reflected on a balance sheet prepared in accordance with generally accepted accounting standards, other than (i) Liabilities set forth on Section 2.6(b) of the Seller Disclosure Schedule, (ii) Liabilities incurred in the ordinary course of business and (iii) other Liabilities that would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities, and Sponsored Funds, taken as a whole, or reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions. Except as set forth on Section 2.6(b) of the Seller Disclosure Schedule, no Liability was transferred or assigned to, or otherwise assumed by, the Target Companies, General Partner Entities or Sponsored Funds as a result of the Restructuring.

2.7     Absence of Certain Changes.

(a)     Since December 31, 2023 through the date hereof, there has not occurred any Material Adverse Effect.

(b)     Since December 31, 2023 through the date hereof, except (v) as set forth on Section 2.7(b) of the Seller Disclosure Schedule, (w) for actions taken in compliance with the express terms of this Agreement, (x) as required by applicable Law, (y) in connection with any preparation for, or conduct of, the sales process resulting in this Agreement and the Transactions or (z) each of the Seller, the Target Companies and General Partner Entities has conducted its business in the ordinary course of business consistent with past practices and has not taken any actions that would require the consent of the Buyer under Sections 4.1(b)(i) (*change in Organizational Documents*), 4.1(b)(iii) (*acquisitions and mergers*), 4.1(b)(v) (*encumbrance of Interests*), 4.1(b)(vii) (*extraordinary distributions*), 4.1(b)(viii) (*Liens*), 4.1(b)(xii) (*Governmental Permit*), 4.1(b)(xiv) (*tax and accounting*), 4.1(b)(xv) (*settlements*), 4.1(b)(xvii) (*extraordinary Sponsor Commitments*), 4.1(b)(xix) (*key person or for cause events*), 4.1(b)(xx) (*funds in new strategies*) and 4.1(b)(xxii) (*REF Reinvestment Election Form*), and, to the Knowledge of the Seller, each Sponsored Fund has conducted its business in accordance with the Fund Documentation.

2.8        Litigation.  Except for the general pendency of the Bankruptcy Proceeding, Actions arising from or related to the Bankruptcy Proceeding and Actions that would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole, there are no Actions pending or, to the Knowledge of the Seller, threatened against the Seller or any of the Target Companies, General Partner Entities or Sponsored Funds with respect to the Interests or the ownership or operation of the assets of the Target Companies, General Partner Entities and Sponsored Funds, or which seeks to prevent, restrict, or prohibit the consummation of the Transactions, and, to the Knowledge of the Seller, there are no presently existing facts or circumstances that would constitute a reasonable basis therefor.

2.9        Service Provider Benefits.

(a)        Section 2.9(a)(i) of the Seller Disclosure Schedule sets forth a correct and complete list of each material Benefit Plan.  Section 2.9(a)(ii) of the Seller Disclosure Schedule sets forth a correct and complete list of each Benefit Plan that is sponsored or maintained by the Target Companies or is sponsored or maintained by the Seller or its Affiliate and, in each case, will be assumed by the Buyer at Closing for the benefit of the Continuing Service Providers (each, an "Acquired Seller Plan").

(b)        With respect to each material Benefit Plan and each ERISA Plan, the Seller has made available to the Buyer, to the extent applicable, correct and complete copies of (i) the Benefit Plan document, including any amendments thereto, (ii) the most recent summary plan description and a written description of such Benefit Plan if such plan is not set forth in a written document, (iii) all material correspondence to or from any Governmental Entity received in the last year with respect to any such material Benefit Plan, (iv) the most recent annual report on Form 5500 filed with the Department of Labor, (v) the most recent IRS determination or opinion letter received by the Target Companies, (vi) the most recent actuarial report or audited financial statement and (vii) all non-routine correspondence with the IRS or United States Department of Labor for any matter with respect to which material Liability to the Target Companies remains outstanding.

(c)        Except as would not be material to the Target Companies and General Partner Entities, taken as a whole, (i) each Benefit Plan (including any related trusts) has been established, operated and administered in compliance with its terms and applicable Laws, including ERISA and the Code and (ii) there are no pending or, to the Knowledge of the Seller, threatened claims (other than routine claims for benefits) or proceedings by, on behalf of or against any Benefit Plan (or, to the Knowledge of the Seller, any fiduciary thereof or service provider thereto) which would reasonably be expected to result in any Liability to the Target Companies or General Partner Entities, and no audit or other Action by a Governmental Entity is pending, or, to the Knowledge of the Seller, threatened with respect to such plan that would reasonably be expected to result in any material Liability to the Target Companies or General Partner Entities. Neither of Seller, Seller's Affiliates, nor, to the Knowledge of the Seller, any Benefit Plan or trustee, administrator or other third-party fiduciary or party-in-interest thereto has engaged in any breach of fiduciary responsibility or any non-exempt "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code), which would reasonably be expected to result in material Liability to the Target Companies and General Partner Entities. Seller

and its respective Affiliates have complied in all material respects with all obligations with respect to any COBRA Liabilities incurred prior to the date hereof.

(d)    Each ERISA Plan, if any, that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS or, with respect to a prototype plan, can rely on an opinion letter from the IRS issued to the prototype plan sponsor, and, to the Knowledge of the Seller, nothing has occurred with respect to the operation of any such plan which reasonably could be expected to result in the revocation of such favorable determination.

(e)    None of the Target Companies, General Partner Entities, or any ERISA Affiliate of the foregoing has, in the last six (6) years, contributed to (or had any obligation of any sort) or has incurred any Liability with respect to (i) a plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA (ii) a "multiemployer plan" (as defined in Sections 3(37) or 4001(a)(3) of ERISA) or (iii) a "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA).

(f)    Except as set forth on Section 2.9(f) of the Seller Disclosure Schedule, no Benefit Plan provides benefits or coverage in the nature of health or life insurance following retirement or other termination of employment other than coverage or benefits required to be provided under Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code or any other applicable Law.

(g)    The consummation of the transactions contemplated hereby will not, either alone or in combination with another event, (i) accelerate the time of payment or vesting of or increase the amount of compensation or benefits (including severance pay, retention bonus or change in control payment) due to any Service Provider of the Target Companies or General Partner Entities under any Benefit Plan, (ii) cause the Target Companies and General Partner Entities to transfer or set aside any assets to fund any benefits under any Acquired Seller Plan, (iii) result in the forgiveness of indebtedness or trigger of any funding obligation under any Acquired Seller Plan or (iv) impose any restrictions or limitations on the right of any of Seller, Buyer or their respective Affiliates to amend or terminate any Acquired Seller Plan.

(h)    The consummation of the transactions contemplated hereby will not, either alone or in combination with another event, result in the payment of any amount that would, individually or in combination with any other payment, constitute an "excess parachute payment" to any "disqualified individual" (each such term as defined in Section 280G of the Code), determined without regard to any arrangements implemented by or at the direction of either of the Buyer or any of its respective Affiliates. No Service Provider has any "gross up" agreements or other assurance of reimbursement for any Taxes resulting from any such "excess parachute payment" or with respect to any violation of Section 409A of the Code.

(i)    Each Acquired Seller Plan that constitutes a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code has at all times been in material compliance in both form and operation with the requirements of Section 409A of the Code.

2.10        Labor Matters.

(a)        The Target Companies and General Partner Entities are not a party to or bound by any collective bargaining agreement or other agreement with a labor union or like organization, and there are no pending nor, to the Knowledge of the Seller, threatened activities or proceedings by any individual or group of individuals, including representatives of any labor organizations or labor unions, to organize any service providers of the Target Companies or General Partner Entities, except as would not reasonably be expected to be material to the Target Companies and General Partner Entities taken as a whole, nor has there been any such activity since January 1, 2022.

(b)        There is no and, since October 1, 2023, there has not been any, pending or, to the Knowledge of the Seller, threatened strike, lockout, slowdown, work stoppage, unfair labor practice or other material labor dispute, arbitration or grievance, or unfair labor practice charges, grievances or labor complaints, in each case, by or with respect to the employees of any Target Company or General Partner Entity, except as would not reasonably be expected to be material to the Target Companies and General Partner Entities taken as a whole.  Except as would not reasonably be expected to be material to the Target Companies and General Partner Entities taken as a whole, the Target Companies and General Partner Entities are in compliance with all applicable Laws respecting labor, employment and employment practices, terms and conditions of employment, wages and hours and occupational safety and health, "mass layoffs" and "plant closings" (as those terms are defined in the WARN Act and similar state and local Laws), classification of independent contractors and workers' compensation.

(c)        With respect to any Service Provider, except as would not reasonably be expected to be material to the Target Companies and General Partner Entities taken as a whole, none of the Target Companies and General Partner Entities has any material Liability with respect to any misclassification of such Person as an independent contractor rather than as an employee, as an "exempt" employee rather than a "non-exempt" employee (within the meaning of the Fair Labor Standards Act of 1938, as amended) or with respect to such Person's status as a leased employee.

(d)        Except (i) as would not be material to the Target Companies, General Partner Entities and Sponsored Funds taken as a whole and (ii) in connection with the Receivership (as defined in Section 2.11 of the Seller Disclosure Schedule), there is no governmental investigation, audit or other similar proceeding pending or, to the Knowledge of Seller, threatened against the Target Companies and General Partner Entities by, on behalf of or relating to any current or former employees of the Target Companies, General Partner Entities or Sponsored Funds.

(e)        The Seller has provided to the Buyer a schedule that sets forth a recent, true, correct and complete list, as of the date of this Agreement, of all employees of the Target Companies and General Partner Entities and identifies the job title, work location, date of hire, exempt or non-exempt status, employment status (whether active, on furlough (temporary layoff) or on leave of absence, and the date such leave or furlough commenced), part-time or full-time status, union membership status, annual base salary or regular hourly wage rate.

2.11        Compliance with Laws; Registrations and Permits.

(a)        Except as set forth on Section 2.11(a) of the Seller Disclosure Schedule, and except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole, the respective businesses of the Target Companies, General Partner Entities and Sponsored Funds are, and since January 1, 2022 have been, in compliance with all Laws applicable to the respective businesses of the Target Companies, General Partner Entities and Sponsored Funds.  To the Knowledge of the Seller, there have been no material Advisers Act compliance violations with respect to the Management Company.

(b)        Each of the Target Companies, General Partner Entities and Sponsored Funds:

(i)                except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole, is not subject, and since January 1, 2022, has not been subject, to any pending investigation or investigation threatened in writing, or disciplinary proceedings by any Governmental Entity or Self-Regulatory Organization against it or any of its officers or directors; and

(ii)                except as set forth on Section 2.11(b)(ii) of the Seller Disclosure Schedule, and except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole, since January 1, 2022, has timely filed all reports, registrations and statements, together with any amendments required to be made with respect thereto, that were required to be filed under any applicable Law with any applicable Governmental Entity or Self-Regulatory Organization (the "Reports") and, as of their respective dates, the Reports complied in all material respects with the applicable statutes, rules, regulations and orders enforced or promulgated by the Governmental Entity or Self-Regulatory Organization with which they were filed.

(c)        Except as set forth on Section 2.11(c) of the Seller Disclosure Schedule, the Target Companies, General Partner Entities and Sponsored Funds own, hold or possess all licenses, approvals, registrations and other authorizations from a Governmental Entity that are necessary to entitle them to own or lease, operate and use their assets and to carry on and conduct their business substantially as conducted immediately prior to the date of this Agreement (herein collectively called "Governmental Permits"), or are in the process of obtaining such Governmental Permits within the time periods required by applicable Law, except for such Governmental Permits as to which the failure to so own, hold or possess them would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, as a whole.  The Target Companies, General Partner Entities and Sponsored Funds are in compliance in all material respects with the terms and conditions of the Governmental Permits.  All material Governmental Permits are in full force and effect, or are in the process of being obtained within the time periods required by applicable Law, and, to the Knowledge of the Seller, no suspension or cancellation of any of them is threatened.

(d)     Each of the Target Companies, General Partner Entities and Sponsored Funds and, to the Knowledge of the Seller, each of their respective officers and service providers who are required to be registered, licensed or qualified as an investment adviser, commodity trading adviser, commodity pool operator, transfer agent, registered representative, registered principal, or sales person (or in a similar capacity) with any Governmental Entity (including the SEC and CFTC) or any Self-Regulatory Organization are duly registered as such and such registrations are in full force and effect, or are in the process of being registered as such within the time periods required by applicable Law, except in each case for any failures to be so registered, licensed or qualified that would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, as a whole.  Each of the Target Companies, General Partner Entities and Sponsored Funds and, to the Knowledge of the Seller, each of their respective officers and service providers who are required to be registered, licensed or qualified as an investment adviser, commodity trading adviser, commodity pool operator, transfer agent, registered representative, registered principal, or sales person (or in a similar capacity) with any Governmental Entity (including the SEC and CFTC) or any Self-Regulatory Organization are in compliance with all applicable requirements of Law requiring any such registration, licensing or qualification, except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.

(e)     Each of the Target Companies and General Partner Entities that are required to be registered as investment advisers under the Advisers Act, or, the laws of any state or other jurisdiction, have timely filed all forms, reports, registration statements, schedules and other documents (including the Form ADV and Form PF), together with any amendments required to be made with respect thereto, that were required to be filed with any applicable Governmental Entity (including the SEC and CFTC) or any Self-Regulatory Organization and have paid all fees and assessments due and payable in connection therewith, except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies and General Partner Entities, taken as a whole. No Target Company or General Partner Entity is required to register as an "investment company" or has elected treatment as a "business development company" under the Investment Company Act of 1940, as amended ("Investment Company Act").

(f)     None of the Target Companies or General Partner Entities are or have been (i) a bank, trust company, broker-dealer, municipal adviser, commodity broker-dealer, real estate broker, insurance company, insurance broker or transfer agent within the meaning of any applicable Law, (ii) required to be registered, licensed or qualified as a bank, trust company, broker-dealer, municipal adviser, commodity broker-dealer, real estate broker, insurance company, insurance broker or transfer agent under any applicable Law or (iii) subject to any liability or disability by reason of any failure to be so registered, licensed or qualified, in each case, without a valid exemption therefrom.  To the Knowledge of the Seller, there is no pending Action concerning any failure by any Target Company or General Partner Entity to obtain any bank, trust company, broker-dealer, municipal advisor, commodity broker-dealer, real estate broker, insurance company, insurance broker or transfer agent registration, license or qualification.

(g)     Except with respect to matters that are unrelated to the Target Companies, General Partner Entities and the Sponsored Funds, none of the Target Companies, General Partner Entities, the Sponsored Funds or any employee, officer, director, partner, member, or any "person

associated with" (as defined in the Advisers Act) any of them, is, as of the date hereof, or within the last ten years has been, (i) subject to any cease and desist, censure or other disciplinary or similar order issued by, (ii) a party to any settlement agreement, consent agreement, memorandum of understanding or disciplinary agreement with, (iii) a party to any commitment letter or similar undertaking to, (iv) subject to any material order or directive by or (v) a recipient of any supervisory letter from, in each case, any applicable Governmental Entity (including the SEC or the CFTC) or any Self-Regulatory Authority, and, to the Knowledge of the Seller, none of them is threatened with the imposition or receipt of any of the foregoing.

(h)     No exemptive orders, "no-action" letters or similar exemptions or regulatory relief have been obtained from the SEC or any other Governmental Entity, nor are any requests pending therefor, by or with respect to any Target Company, General Partner Entity, Sponsored Fund or any employee, officer, director, partner, member or "person associated with" (as defined in the Adviser Act) any of them, in connection with the respective businesses of such entities.

(i)     Each of the Target Companies, General Partner Entities or Sponsored Funds that are required by applicable Law, to have certain written policies and procedures, including one or more formal codes of conduct, ethics, insider trading policies, personal trading or account dealing policies and other policies and procedures pursuant to the Advisers Act and other applicable Law (collectively, the "Compliance Policies"), have established and effectively implemented such Compliance Policies, and have complied in all material respects with the Compliance Policies. The Compliance Policies have been reasonably designed to comply with applicable Law in all material respects. There have been no violations of the Compliance Policies by any of the Target Companies, General Partner Entities or Sponsored Funds, to the extent such of the Target Companies, General Partner Entities or Sponsored Funds are required by applicable Law to comply with such Compliance Policies, except for such violations as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.  There have been no Actions threatened in writing by or before any Governmental Entity or Self-Regulatory Organization regarding any Specified Act against any Target Company or General Partner Entity or any employee, officer, director, partner, member or any "person associated with" (as defined in the Advisers Act) of any such entities.

(j)     Any brokerage policies (if any) employed by the Target Companies or General Partner Entities are in conformity in all material respects with applicable fiduciary duties as set forth under the Advisers Act (including the obligation to provide best execution to the Sponsored Funds), and the only products or services obtained by the Target Companies or General Partners Entities through the use of brokerage commissions have been "brokerage and research" services within the meaning of § 28(e) of the Exchange Act and the SEC and SEC staff interpretations thereunder, other than exceptions that would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.

(k)     None of the Target Companies, General Partner Entities or Sponsored Funds, and, to the Knowledge of the Seller, none of the employees, officers, directors, partners, members or any "person associated with" (as defined in the Advisers Act) acting on behalf of any

such entities: (i) has ever been indicted for or convicted of any felony or any crime involving fraud, misrepresentation or insider trading or (ii) is subject to any outstanding order barring, suspending or otherwise materially limiting the right of any such individual to engage in any activity conducted as part of the respective businesses of such entities as currently conducted. The Target Companies and General Partner Entities have no reasonable basis to believe that such individuals (1) are the subject of any ongoing investigation by any Governmental Entity or Self-Regulatory Organization for any felony or crime involving fraud, misrepresentation or insider trading; (2) were the subject of any such investigation by any Governmental Entity or Self-Regulatory Organization for any felony or crime involving fraud, misrepresentation or insider trading or (3) has ever been denied any Permit materially affecting such Person's ability to conduct any activity conducted as part of businesses of the respective businesses of such entities.

(l)      (i) Neither the Management Company, nor, to the Knowledge of the Seller, any "person associated with" (as defined in the Advisers Act) the Management Company who is required to be qualified, is subject to potential disqualification pursuant to Section 203 of the Advisers Act to serve as an investment adviser or as a person associated with a registered investment adviser and (ii) neither the Management Company, nor, to the Knowledge of the Seller, any of its Affiliates or any employee, officer, director, partner, member or any "person associated with" (as defined in the Advisers Act) thereof is subject to disqualification under Rule 506(d) of Regulation D under the Securities Act, in each case, except for any such disqualification (x) that would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole, or (y) with respect to which the Seller or another relevant Person has received a waiver, exemption or other relief from the SEC or another relevant Governmental Entity; nor is there any proceeding or investigation pending or, to the Knowledge of the Seller, threatened by any Governmental Entity that would result in any such disqualification, except for any such disqualifications that would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.

(m)      None of the Target Companies, General Partner Entities or Sponsored Funds, or any "covered associate" of any of them, has made a "contribution" to an "official" of a "government entity" (as such terms are defined in Rule 206(4)-5 of the Advisers Act) that would disqualify the Target Companies or General Partner Entities from providing investment advisory services for compensation to such government entity either directly or through a "covered investment pool", or otherwise result in a material violation of Rule 206(4)-5 of the Advisers Act.

(n)      Neither the Management Company, nor to the Knowledge of the Seller, any "associated person" or "principal" (as defined in the Commodity Exchange Act ("CEA") and CFTC rules) thereof who is required to be qualified, is disqualified from registration pursuant to either Section 8a(2) or 8a(3) of the CEA, in each case, except for any such disqualification (i) that would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole, or (ii) with respect to which the Seller or another relevant Person has received a waiver, exemption or other relief from the CFTC, a relevant Self-Regulatory Organization or another relevant Governmental Entity; nor is there any proceeding or investigation pending or, to the Knowledge of the Seller, threatened by any Governmental Entity or Self-Regulatory Organization that would result in any such disqualification, except for any such disqualifications that would not, individually or in the

aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.

(o)        Except as otherwise set forth on <u>Section 2.11(o)</u> of the Seller Disclosure Schedule, none of the Target Companies or General Partner Entities is a member of any exchange or clearing house or settlement system.

(p)        Each of the Target Companies and General Partner Entities, to the extent required by applicable Law, have adopted and operate, or are subject to, systems and controls reasonably designed to manage and control conflicts of interest and risks faced by it in its undertaking of their respective businesses in accordance with applicable Laws and has, to the Knowledge of the Seller, disclosed to its external auditors, to the extent required by applicable Law, any significant deficiency in the design or operation of such systems and controls, any breach of such systems or controls and any fraud or breach of applicable Law that involves management or other employees who have a significant role in the internal controls of the Target Companies and General Partner Entities.

(q)        Except as would not reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole, to the Knowledge of the Seller, no employee, officer, director, partner or member of, or "person associated with" (as defined in the Advisers Act), any Target Company or General Partner Entity, has committed or purported to commit any Target Company or General Partner Entity to any Contract that is not in accordance with the authority given to such employee, officer, director, partner or member of, or "person associated with" the Target Companies or General Partner Entities, as applicable, and, to the Knowledge of the Seller, none of the Target Companies or General Partner Entities or employee, officer, director, partner or member of, or "person associated with" the Target Companies or General Partner Entities, has committed any fraud upon any Sponsored Fund or has misappropriated any property or assets or falsified any records of any Sponsored Fund.

2.12        <u>Material Contracts</u>.

(a)        <u>Section 2.12(a)</u> of the Seller Disclosure Schedule sets forth a complete list, as of the Execution Date of each of the following Contracts to which one or more Target Companies or General Partner Entities is a party or by which it is bound (each, a "<u>Material Contract</u>") (excluding Benefit Plans, Fund Documentation, Side Letters and any Marketing Literature):

(i)        each Contract that contains a put, call, right of first refusal, right of first offer or similar right pursuant to which a Target Company or General Partner Entity could be required to, directly or indirectly, purchase or sell, as applicable, any securities, capital stock or other interests, assets or business of any Person;

(ii)        each Contract containing covenants that restrict the right of a Target Company or General Partner Entity to (A) engage in any business activity, (B) engage in any line of business or compete with any Person, or (C) conduct any activity in any geographic area;

(iii)         each Contract pursuant to which a Target Company or General Partner Entity (A) grants a third party any right in or to any material Intellectual Property owned by such Target Company or General Partner (other than non-exclusive licenses granted to customers or service providers in the ordinary course of business), or (B) receives any right to use Intellectual Property owned by a third party that is material to its business (other than licenses for "off-the-shelf" Software or other Software that is commercially available on non-discriminatory terms);

(iv)         each Contract granting any third party the exclusive right to develop, market, sell or distribute products or services of a Target Company or General Partner Entity;

(v)         each Contract relating to the borrowing of money by any Target Company, General Partner Entity or Sponsored Fund or the guarantee by any Target Company, General Partner Entity or Sponsored Fund of any such obligation that is or is reasonably expected to be material to the Target Companies, General Partner Entities or Sponsored Fund taken as a whole;

(vi)         each Contract creating or granting a Lien on any assets of a Target Company, General Partner Entity or Sponsored Fund, other than purchase money security interests in connection with the acquisition of equipment in the ordinary course of business consistent with past practice;

(vii)         each Contract for the purchase by a Target Company, General Partner Entity or Sponsored Fund of goods, products or services from suppliers which such Target Company, General Partner Entity or Sponsored Fund reasonably anticipates will involve the annual payment of more than $500,000 after the date of this Agreement;

(viii)         each Contract providing for commissions payable by a Target Company, General Partner Entity or Sponsored Fund to any agency, dealer, buying group, distributor, reseller, sales representative, marketing or other similar Person;

(ix)         each Government Contract;

(x)         each Contract under which any Target Company, General Partner Entity or Sponsored Fund has continuing material indemnification obligations to any Person, other than those entered into in the ordinary course of business consistent with past practice; and

(xi)         each Contract involving any resolution or settlement of any actual or threatened Actions within the past three (3) years of the date of this Agreement or pursuant to which any Target Company, General Partner Entity or Sponsored Fund has any material continuing obligations.

(b)         Except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities or Sponsored Funds, as a whole, each Material Contract is valid, binding and enforceable against the applicable Target Company, General Partner Entity or Sponsored Fund and, to the Knowledge of the Seller, the other

parties thereto. Each such Material Contract is in full force and effect, except as may be limited by the Equitable Exception.  There is no breach or violation of, or default under, any such Material Contract by a Target Company, General Partner Entity Sponsored Fund or the Seller as applicable, and no event has occurred that, with the lapse of time or the giving of notice or both, would constitute or give rise to a default or right of termination thereunder by a Target Company, General Partner Entity or Sponsored Fund as applicable, or, to the Knowledge of the Seller, any other party thereto, except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds as a whole.

2.13    Real Property.  The Target Companies, General Partner Entities and Sponsored Funds do not own, lease or sublease any material real property.

2.14    Sufficiency of Assets. The assets of the Target Companies, General Partner Entities and Sponsored Funds (excluding, for the avoidance of doubt, the Seller Trademarks), together with the Transition Services Agreement and the FCB License Agreement referenced in Section 4.1(b)(iii) of the Seller Disclosure Schedule, collectively constitute all of the properties, rights, interests and other tangible and intangible assets used by or reasonably necessary for the operation of their businesses as currently conducted in all material respects.

2.15    Taxes.

(a)    Each Target Company, General Partner Entity and Sponsored Fund has duly and timely filed (taking into account any extension of time within which to file) all income and other material Tax Returns required to be filed by it on or before the Closing Date, and all such Tax Returns are complete and accurate in all material respects, and each Target Company, General Partner Entity and Sponsored Fund has paid all material amounts of Taxes (whether or not shown as due on such Tax Returns).

(b)    Each Target Company, General Partner Entity and Sponsored Fund has complied in all material respects with all applicable Laws relating to the withholding of Taxes and have duly and timely withheld and paid over to the appropriate Tax authority all material amounts required to be so withheld and paid over under all applicable Laws with respect to any service provider, creditor or third party, except with respect to matters contested in good faith for which adequate reserves have been established in accordance with GAAP.

(c)    No Target Company, General Partner Entity or Sponsored Fund has waived any statute of limitations with respect to a material amount of Taxes or agreed to any extension of time with respect to a material Tax assessment or deficiency (other than pursuant to extensions of time to file Tax Returns obtained in the ordinary course of business) which would have effect after the Closing Date.

(d)    There are no pending audits, examinations, investigations or other proceedings in respect of material amounts of Taxes against any Target Company, General Partner Entity or Sponsored Fund and no audits, examinations, investigations or other proceedings in respect of material amounts of Taxes have been threatened in writing against any Target Company, General Partner Entity or Sponsored Fund.

(e)      No Target Company, General Partner Entity or Sponsored Fund has, in the past two years, received a written claim made by any Tax authority asserting that such Target Company, General Partner Entity or Sponsored Fund is or may be subject to taxation in a jurisdiction in which such Target Company, General Partner Entity or Sponsored Fund does not file Tax Returns.

(f)      No Target Company, General Partner Entity or Sponsored Fund has participated in a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2).

(g)      No Target Company, General Partner Entity or Sponsored Fund (i) is a party to or is otherwise bound by any Tax sharing, allocation or indemnification agreement or arrangement other than any such agreement or arrangement solely among Seller or its Affiliate, Target Company, General Partner Entity or Sponsored Funds that is currently in effect, except for such an agreement or arrangement entered into in the ordinary course of business and that is not primarily related to Taxes ("Tax Sharing Agreement"); provided that, for the avoidance of doubt, Tax Sharing Agreement shall not include any Organizational Documents of any General Partner Entity or Sponsored Fund, (ii) is or has been a member of an affiliated group filing a consolidated federal or analogous state or local income Tax Return (other than a group the common parent of which is a Target Company or General Partner Entity), or (iii) has any liability for the Taxes of any Person under Section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local or non-U.S. Law), as a transferee or successor by Contract or otherwise (other than an agreement or arrangement entered into in the ordinary course of business and that is not primarily related to Taxes).

(h)      Each Target Company, General Partner Entity and Sponsored Fund has been treated, since its formation, as a partnership or a disregarded entity for federal (and applicable state and local) income Tax purposes.

(i)      No Target Company, General Partner Entity or Sponsored Fund has made an election pursuant to Section 1101(g)(4) of the Bipartisan Budget Act of 2015 to have the new partnership audit regime apply to its Tax Returns filed for a taxable year beginning before January 1, 2018.

(j)      No Target Company, General Partner Entity or Sponsored Fund has any material liability for income Taxes or participates in any "pass-through entity tax," any composite state or local income Taxes, or any similar income Tax regime, including for this purpose any income Tax regime whereby a Target Company, General Partner Entity or Sponsored Fund pays or has elected to pay income Taxes so as to reduce (or provide a credit in respect of) income Taxes otherwise payable by its direct or indirect equity owners.

(k)      [Reserved].

(l)      The General Partner Entities have complied in all material respects with any obligations imposed on them with respect to Taxes under side letter agreements with limited partners (or other third-party investors) of the Sponsored Funds.

(m)     Seller and, to the Knowledge of the Seller, each other partner of the Target Company or General Partner Entity that is entitled to a "profits interest" in a Target Company or General Partner Entity for federal income Tax purposes has (i) timely filed an election under Section 83(b) of the Code with respect to such interest or (ii) the "profits interest" issued to each other partner of the Target Company or General Partner Entity holds an interest in the future profits of the Partnership satisfying the requirements for a partnership profits interest transferred in connection with the performance of services, as set forth in Internal Revenue Service Revenue Procedures 93-27 and 2001-43, or any future Internal Revenue Service guidance or other authority that supplements or supersedes the foregoing Revenue Procedures.

(n)     There are no unpaid advances or loans with respect to withholding Taxes or other Taxes specifically attributable to a partner of the Target Company, General Partner Entity or Sponsored Fund or other amounts which could reduce distributions to Buyer in a post-Closing Tax period pursuant to such Target Company, General Partner Entity or Sponsored Fund's Organizational Documents.

(o)     Notwithstanding anything herein to the contrary, except for the representations and warranties set forth in Section 2.6 (*Financial Statements*) (to the extent such representations and warranties relate to Tax matters), Section 2.9 (*Service Provider Benefits*) (to the extent such representations and warranties relate to Tax matters) and this Section 2.15 (*Taxes*), neither Seller nor any Target Company or any General Partner Entity makes, and each such party hereby expressly disclaims, any express or implied representations or warranties, statutory, common law or otherwise, of any nature, with respect to Taxes.

2.16     Intellectual Property.

(a)     The Target Companies, General Partner Entities and Sponsored Funds: (i) own the entire right, title and interest in and to, free and clear of all Liens (other than Permitted Pre-Closing Encumbrances), or have sufficient and valid rights to use, all material Business Intellectual Property necessary for their respective business as currently conducted, and (ii) have taken commercially reasonable actions to maintain and protect each item of material Intellectual Property owned by the Target Companies, General Partner Entities and Sponsored Funds.

(b)     Section 2.16(b) of the Seller Disclosure Schedule sets forth a true and complete list of all Intellectual Property owned by the Target Companies, General Partner Entities or Sponsored Funds that is registered with, issued by or the subject of a pending application before a Governmental Entity.  All of the material registrations, issuances and applications set forth on Section 2.16(b) of the Seller Disclosure Schedule are valid (to the Knowledge of the Seller), in full force and effect and have not expired or been cancelled, abandoned or otherwise terminated, and payment of all renewal and maintenance fees, costs and expenses in respect thereof, and all commercially reasonable filings related to such renewal and maintenance, that have come due on or before the date hereof, have been duly made.

(c)     The conduct of the Target Companies', General Partner Entities' and Sponsored Funds' respective businesses has not within the three (3) years preceding the date hereof and, as currently conducted, does not infringe, misappropriate or otherwise violate any Intellectual Property of any other Person in any material respect, and neither the Target Companies nor General

Partner Entities have received any written communication (including cease and desist letters or invitations to take a license) alleging the same. There is no Action pending or, to the Knowledge of the Seller, threatened (i) alleging any such infringement, misappropriation or violation of any Intellectual Property owned by the Target Companies, General Partner Entities or Sponsored Funds, or (ii) challenging the Target Companies' or General Partner Entities' rights in or to any Business Intellectual Property. To the Knowledge of the Seller, no Person is infringing or otherwise violating any Intellectual Property owned by the Target Companies, General Partner Entities or Sponsored Funds in any material respect.

(d)    The Target Companies, General Partner Entities and Sponsored Funds own or have a valid right to access and use all material Business IT Systems. The Business IT Systems (i) operate in all material respects in accordance with their documentation and functional specifications, (ii) are sufficient for the current needs of the businesses, and (iii) have not, since January 1, 2022, malfunctioned, failed or experienced any breakdowns, outages, continued substandard performance, security breaches, data corruption incidents or other adverse events, except as has not been and would not be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.

(e)    The Target Companies and General Partner Entities use commercially reasonable measures to protect the confidentiality, integrity and security of the Business IT Systems and all information stored or contained therein or transmitted thereby, as well as all Personal Data in the custody or control of the Target Companies and General Partner Entities, against any loss, unauthorized use, access, interruption, modification, or corruption and are designed to ensure that all Business IT Systems are free from any material bug, virus or malware.

(f)    The Target Companies and General Partner Entities are, and since January 1, 2022 have been, in compliance in material respects with all Privacy and Data Security Laws and the terms of all Contracts concerning the collection, storage and processing of Personal Data. To the Knowledge of the Seller, since January 1, 2022, none of the Target Companies or General Partner Entities has been subject to (i) any Security Incident, or (ii) any claim, investigation or complaint relating to its collection, use or processing of Personal Data or alleging the violation of any Privacy and Data Security Laws, in each case of (i) and (ii), except as has not been and would not be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.

2.17    Sponsored Funds.

(a)    Section 2.17(a) of the Seller Disclosure Schedule sets forth a correct and complete list of the Sponsored Funds as of the Execution Date, together with the jurisdiction of formation of each Sponsored Fund. No Sponsored Fund is advised by any Person serving in the capacity of primary adviser, sub-adviser or any other advisory role to such Sponsored Fund other than the Management Company or a General Partner Entity, as applicable. The Target Companies and General Partner Entities are entitled to receive all of the performance or incentive fees, performance allocations, management fees or other similar fees payable in respect of each of the Sponsored Funds, in each case, subject to and in accordance with the terms of the applicable Fund Documentation, except as have been modified by Side Letters, except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General

Partner Entities and Sponsored Funds, taken as a whole.  To the Knowledge of the Seller, no Sponsored Fund is, or at any time since its inception was, required to register as an investment company under the Investment Company Act. Since the date of its inception, each Sponsored Fund has been excluded from the definition of an investment company under the Investment Company Act by virtue of Section 3(c)(1) or Section 3(c)(7) thereof and <u>Section 2.17(a)</u> of the Seller Disclosure Schedule indicates the applicable exemption being relied upon for each Sponsored Fund and, for any Sponsored Fund relying on Section 3(c)(1) thereof, the number of "beneficial owners" (as determined under the Investment Company Act).

(b)     The Seller has made available to the Buyer all material Fund Documentation and Side Letters in effect as of the date of this Agreement.  None of the Seller, any Target Company, any General Partner Entity, nor, to the Knowledge of Seller, any investor of any Sponsored Fund is or has been in non-compliance with any Fund Documentation or Side Letters, except where such non-compliance would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.

(c)     Each Sponsored Fund has entered into a written Advisory Contract (which may, for the avoidance of doubt, be Fund Documentation) whereby the Management Company or a General Partner Entity, as applicable, serves as investment adviser, investment manager, investment sub-adviser, general partner, managing member, manager or in any capacity similar to any of the foregoing to such Sponsored Fund or is managed by the Management Company or a General Partner Entity.  Each such Advisory Contract is in full force and effect, except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.  Each Sponsored Fund currently is operated in compliance with its respective investment objectives, policies and restrictions, as set forth in the applicable Fund Documentation and Side Letters for such Sponsored Fund, except where such non-compliance would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.  Since their initial offering, the limited partner interests or other equity interests of each Sponsored Fund have been offered for sale pursuant to, and in compliance with, an exemption under the securities laws of each jurisdiction in which they have been sold or offered for sale, except where such non-compliance would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole. Each Sponsored Fund has made all filings required to be made with each jurisdiction in which it has offered or sold securities, in each case, except as would not reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.  All of the outstanding limited partner interests or other equity interests of each Sponsored Fund are duly authorized, validly issued, fully paid and nonassessable, and none of such limited partner interests or other equity interests have been issued in violation of any applicable Law or Contract, except in each case, as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.  The Marketing Literature of each Sponsored Fund and each quarterly and annual report (as applicable and if any) to the investors in each Sponsored Fund has at all times since the original offering of limited partner interests or other equity interests in such Sponsored Fund (as applicable) (i) complied in all material respects with all applicable Laws (including in relation to the distribution of such Marketing Literature) and (ii) did not contain any

untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in any material respect, in the light of the circumstances existing at the time they were delivered to prospective investors, not misleading, except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.  Each Sponsored Fund is and has been since its inception, operated in compliance with all applicable Law in all material respects. Each Sponsored Fund has been duly organized and is validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite corporate, partnership, limited liability company, or similar power and authority to conduct its business as currently conducted, except where the failure to be so organized, existing and in good standing (or the equivalent thereof) or to have such power or authority would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.

(d)     The audited balance sheets of each Sponsored Fund (to the extent such audited balance sheets have been prepared), as of the last day of the most recent three (3) fiscal years (or, if applicable, such lesser number for which available) of such Sponsored Fund, and the related income statements and statements of cash flows for the years then ended of each Sponsored Fund, as of the last day of its most recent quarter (if subsequent to the last day of its most recent fiscal year) have been prepared in accordance with GAAP, applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto) and fairly present in all material respects the financial position and financial results of each Sponsored Fund as of the dates thereof and for the periods then ended (subject to normal year-end adjustments in the case of any unaudited financial statements).  The Seller has provided to the Buyer true and correct copies of such balance sheets and related financial statements.

(e)     Section 2.17(e) of the Seller Disclosure Schedule sets forth a complete list of Contracts as of the Execution Date relating to the borrowing of money by any Sponsored Fund (the "Subscription Facilities").  Except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole, each Subscription Facility is valid, binding and enforceable against the applicable Sponsored Fund and each other party thereto, and is in full force and effect, except as may be limited by the Equitable Exception. There is no breach or violation of, or default under, any such Subscription Facility by a Sponsored Fund, or, to the Knowledge of the Seller, any other party thereto, and no event has occurred that, with the lapse of time or the giving of notice or both, would constitute or give rise to a default or right of termination thereunder by a Sponsored Fund, or, to the Knowledge of the Seller, any other party thereto, except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.

(f)     Section 2.17(f) of the Seller Disclosure Schedule sets forth a complete list of Contracts as of the Execution Date relating to the borrowing of money by any Subsidiary of a Sponsored Fund (the "Asset Financing Facilities").  Except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole, each Asset Financing Facility is valid, binding and enforceable against the applicable Subsidiary of the Sponsored Fund and, to the Knowledge of the Seller, each other party thereto, and is in full force and effect, except as may be limited by the

Equitable Exception. There is no breach or violation of, or default under, any such Asset Financing Facility by a Sponsored Fund, or, to the Knowledge of the Seller, any other party thereto, and no event has occurred that, with the lapse of time or the giving of notice or both, would constitute or give rise to a default or right of termination thereunder by a Sponsored Fund, or, to the Knowledge of the Seller, any other party thereto, except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole.

(g)    Other than as set forth on Section 2.17(g) of the Seller Disclosure Schedule, (i) no resolution or vote to undertake a Fund Material Event has been passed, (ii) no Sponsored Fund has received written (or to the Knowledge of the Seller, oral) notice requesting or demanding a meeting of investors at which such resolution would be proposed, (iii) to the Knowledge of the Seller, there exists no event, occurrence, condition or act that, with the giving of notice, the lapse of time or the happening of any other event or condition would reasonably be expected to give rise to any Fund Material Event (other than any no-fault termination or removal right), (iv) to the Knowledge of the Seller, there is no pending effort to effect any Fund Material Event and (v) no commitment period with respect to any Sponsored Fund is suspended or has been terminated early.

(h)    There are no outstanding general partner "give back" or "clawback" or similar Liabilities (as provided for in the Fund Documentation), and, to the Knowledge of the Seller, no such Liabilities have arisen in the past three (3) years and no such Liabilities are currently pending or reasonably expected to arise, with respect to any Sponsored Fund pursuant to any Fund Documentation or Side Letters.

(i)    The Target Companies, General Partner Entities and Sponsored Funds, maintain all material documentation necessary to form the basis for, or demonstrate the calculation of, performance figures appearing in Fund Documentation or Marketing Literature as required by Rule 204-2 under the Advisers Act.

(j)    The Base Date Revenue for each Sponsored Fund as set forth on Schedule 2.17(j) of the Seller Disclosure Schedule has been calculated in a manner consistent with the definition thereof.

(k)    The Track Record is true and correct in all material respects and can be substantiated with backup documentation relating thereto (including, without limitation, with respect to all "gross" and "net" calculations therein).  Neither the Seller nor any Target Company has granted any other Person a license or right to use the Track Record or other assets supporting the Track Record.

(l)    The Assignor Funds have authorized Sequoia to reinvest rollover contributions pursuant to REF Reinvestment Election Form and have not revoked or changed such authorization and no such revocation is currently pending or reasonably expected to arise with respect to the Evergreen Fund or any of the Assignor Funds.

2.18        Sponsor Commitments.  Exhibit C contains a list, as of the date set forth therein, of the (i) Sponsor Commitments setting forth the name of Evergreen Fund, QIF 1,

QIF 7 or the relevant General Partner Entity, as applicable, (ii) net asset value of the funded amount of the Sponsor Commitments and (iii) dollar amount of the unfunded Sponsor Commitments. Since September 30, 2023, except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole, all Sponsor Commitments have been funded in the ordinary course of business consistent with past practice.

2.19    Carried Interest.  Exhibit D contains a list, as of the date set forth therein, of the (i) dollar amount of the accrued Carried Interest, (ii) percentage of the Seller's rights and interests in the Carried Interest and (iii) Seller's share of the accrued Carried Interest balance. All Carried Interest owned by the Seller is held through the General Partner Entities.  Other than the Contracts set forth on Schedule 2.3(b) of the Seller Disclosure Schedule, there are no other agreements awarding or distributing Carried Interest to any other Person.

2.20    Plan Asset Matters.  No Target Company holds Plan Assets or is subject to any federal, state, local, non-U.S. or other laws, rules or regulations that are substantially similar to the fiduciary responsibility or prohibited transaction provisions of Title I of ERISA and/or Section 4975 of the Code ("Similar Laws").  No Sponsored Fund holds (and has never held) Plan Assets or is subject to (or has ever been subject to) Similar Laws.

2.21    Insurance.  Section 2.21 of the Seller Disclosure Schedule contains a list of all material insurance policies covering the Target Companies and the General Partner Entities, and their respective businesses, operations and assets (the "Seller Insurance Policies"). All of the Seller Insurance Policies are in full force and effect. Neither Seller nor any of its Affiliates has received any notice of cancellation or material premium increase or any other definitive indication that any Seller Insurance Policy is no longer in full force or effect or that the issuer of any such policy of insurance is not willing or able to perform its obligations thereunder. All premiums due on the Seller Insurance Policies have been paid, and none of Seller or its Affiliates are in default in any material respect with its obligations under the Seller Insurance Policies. There is no material proceeding pending under any of the Seller Insurance Policies as to which coverage has been denied or disputed by the underwriters of the Seller Insurance Policies.

2.22    Brokers and Finders.  Except for fees and expenses payable to Centerview Partners LLC, there are no fees or expenses payable by the Seller, the Target Companies or General Partner Entities to any investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of the Seller in connection with the Transactions.

2.23    Absence of Certain Business Practices.

(a)    Since January 1, 2021, each Target Company, General Partner Entity and Sponsored Fund and their respective directors, officers, and employees, and, to the Knowledge of the Seller, any other Person acting on their behalf has been and is in compliance with all applicable Specified Business Conduct Laws in all material respects.  Without limiting the foregoing, since January 1, 2021, no Target Company, General Partner Entity, or Sponsored Fund nor, to the Knowledge of the Seller, any of their respective directors, officers, or employees, nor any other Person acting on their behalf has (i) engaged in any business or dealings, directly or indirectly,

involving or relating to (x) any country or territory that is the target of comprehensive sanctions imposed by the United States, Canada, the European Union or the United Kingdom (including Cuba, Iran, North Korea, Syria, Venezuela, the Crimea region and the so-called Donetsk or Luhansk People's Republics) or (y) a Person that is designated on, or that is owned 50 percent or more by a Person that is designated on, any list of sanctioned parties maintained by the United States, Canada, the United Kingdom, or the European Union, including the list of Specially Designated Nationals and Blocked Persons maintained by OFAC; or (ii) paid, offered, promised, or authorized the payment of money or anything of value, directly or indirectly, to any Government Official, any political party, or any other Person for the purpose of influencing any act or decision or to secure any improper advantage.

(b)     No Target Company, General Partner Entity or Sponsored Fund, nor, to the Knowledge of the Seller, any of the directors, officers, agents, employees, partners, members or other persons acting on behalf of any of them have been party (i) to the use of any of the assets of any Target Company or General Partner Entity or Sponsored Fund for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity or to the making of any direct or indirect unlawful payment to government officials or employees from such assets, (ii) to the establishment or maintenance of any unlawful or unrecorded fund of monies or other assets, (iii) to the making of any false or fictitious entries in the books or records of any Target Company or General Partner Entity or Sponsored Fund, except as would not reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole, or (iv) to the making of any unlawful or undisclosed payment.

(c)     Since January 1, 2021, no Target Company, General Partner Entity or Sponsored Fund has (i) received written notice of or made a voluntary, mandatory or directed disclosure to any Governmental Entity relating to any actual or potential violation of any Specified Business Conduct Law directly by a Target Company, General Partner Entity or Sponsored Fund, (ii) conducted any internal investigation with respect to any actual or potential violation of any Specified Business Conduct Law, except as would not reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole, or (iii) been a party to or the subject of any pending or, to the Knowledge of the Seller, threatened Action or investigation by or before any Governmental Entity related to any actual or potential violation of any Specified Business Conduct Law.

2.24     Related Party Transactions.     Except for any (a) Benefit Plan, (b) Contracts relating to the ownership of Equity Interests held by such Persons directly or indirectly in the Target Companies, General Partner Entities or Sponsored Funds, (c) Fund Documentation, (d) the Organizational Documents of the Target Companies or the General Partner Entities, (e) agreements explicitly contemplated to be entered into pursuant to this Agreement, or (f) as set forth on Section 2.24 of the Seller Disclosure Schedule, there are no Contracts between any of the Target Companies, General Partner Entities, or Sponsored Funds on the one hand, and the Seller and its Affiliates (other than Target Companies, General Partner Entities and Sponsored Funds), any current or former officer, director, and any Related Party of any of the foregoing Persons on the other hand, pursuant to which any such Person (i) owes any amount to such Target Company, General Partner Entity or Sponsored Fund, nor does any Target Company, General Partner Entity or Sponsored Fund owe any amount to, or has committed to make any loan or extend or guarantee credit to or for the benefit of, any such Person, (ii) has purchased, acquired or leased

any property, rights or services from, or sold, transferred or leased any assets, property, rights or services to any of the Target Companies, General Partner Entities or Sponsored Funds (each of the foregoing, a "Related Party Transaction") or (iii)has been a party or otherwise subject to any Contract or other transaction with any of the Target Companies, General Partner Entities or Sponsored Funds.

2.25    Defense Production Act.  For purposes of Section 721 of the Defense Production Act of 1950, as amended, 50 U.S.C. § 4565, and the regulations promulgated thereunder, 31 C.F.R. Part 800, no Target Company or General Partner Entity(i) produces, designs, tests, manufactures, fabricates, or develops "critical technologies" as that term is defined in 31 C.F.R. § 800.215; (ii) performs the functions as set forth in column 2 of Appendix A to 31 C.F.R. part 800 with respect to "covered investment critical infrastructure"; or (iii) maintains or collects, directly or indirectly, "sensitive personal data" as that term is defined in 31 C.F.R. § 800.241.

2.26    No Other Representations or Warranties

(a)    Except for the representations and warranties contained in this Article II (*Representations and Warranties of the Seller*), neither the Seller nor any other Person makes any other express or implied representation or warranty with respect to the Seller, the Target Companies, the General Partner Entities, the Sponsored Funds, the Interests or the Transactions, and the Seller disclaims any other representations or warranties, whether made by the Seller, any of its Affiliates or any of its or their respective Representatives.  Except for the representations and warranties contained in this Article II (*Representations and Warranties of the Seller*), the Seller, on behalf of itself, the Target Companies, General Partner Entities and their respective Affiliates (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute or otherwise, with respect to the business, operations, assets, liabilities and conditions (financial or otherwise) of the Target Companies and General Partner Entities or with respect to the Interests (including any express or implied warranty of merchantability or fitness for a particular purpose) and (ii) disclaims all liability and responsibility for any other representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to the Buyer or its Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to the Buyer by any Representative of the Seller, the Target Companies, General Partner Entities or any of their Affiliates).  The Seller makes no representations or warranties to the Buyer regarding the probable success or profitability of the Target Companies or General Partner Entities.  The disclosure of any matter or item in any Schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter could result in a Material Adverse Effect.

(b)    The Seller acknowledges and agrees that, except for the representations and warranties expressly set forth in Article III (*Representations and Warranties of the Buyer*), neither the Buyer nor any other Person has made any express or implied representation or warranty with respect to the Transactions or with respect to the accuracy or completeness of any other information provided, or made available, to the Seller in connection with the Transactions and the Seller has not relied on any representation or warranty other than those expressly set forth in Article III (*Representations and Warranties of the Buyer*).

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants to the Seller as follows:

3.1        Organization, Good Standing and Qualification.  The Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of Delaware.  The Buyer has all requisite limited liability company or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and, to the extent such concept is applicable, is in good standing as a foreign legal entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, in each case, except where the failure to be so qualified or in good standing or to have such power or authority, would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions.

3.2        Authority; Approval.

(a)        The Buyer has all right, power and authority to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is or will become a party and has all requisite limited liability company or similar power and authority and has taken all organizational action necessary in order to execute, deliver and perform its obligations under this Agreement and the other Transaction Documents to which it is or will become a party and to consummate the Transactions.  No additional corporate or shareholder authorization or consent is required in connection with the execution, delivery and performance by the Buyer of this Agreement or any of the Transaction Documents to which it is or will become party.

(b)        This Agreement has been duly executed and delivered by the Buyer and, when executed and delivered by the Seller, will constitute a legal, valid and binding agreement of the Buyer enforceable against the Buyer in accordance with its terms, subject to the Equitable Exception.

3.3        Governmental Filings; No Violations.

(a)        Assuming the truth and accuracy of the representations and warranties made by Seller in Article II (*Representations and Warranties of the Seller*), and other than the expirations of waiting periods and the filings, notices, reports, consents, registrations, approvals, Permits and authorizations required under the HSR Act, no expirations of waiting periods under applicable Antitrust Laws are required and no notices, reports or other filings are required to be made by the Buyer with, nor are any consents, registrations, approvals, Permits or authorizations required to be obtained by the Buyer from, any Governmental Entity in connection with the execution, delivery and performance of this Agreement by the Buyer or the consummation of the Transactions, except those that the failure to make or obtain would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions.

(b)        Assuming the truth and accuracy of the representations and warranties made by Seller in Article II (*Representations and Warranties of the Seller*), the execution, delivery and performance of this Agreement and the other Transaction Documents by the Buyer does not, and the consummation of the Transactions will not, conflict with, or result in any breach or violation of, or default (with or without notice, lapse of time or both) under, or give rise to any right of termination, cancellation or acceleration of any obligations under, or result in the creation of a Lien on any of the assets of the Buyer under any provision of (i) the certificate of incorporation, by-laws or comparable governing documents of the Buyer, (ii) any Contract binding upon the Buyer, or (iii) assuming (solely with respect to the performance of this Agreement and the other Transaction Documents and consummation of the Transactions) compliance with the matters referred to in Section 3.3(a) (*Governmental Filings; No Violations*), any Laws to which the Buyer is subject, except, in the case of clauses (ii) and (iii) above, for any such breach, violation, default, termination, cancellation, acceleration or creation that would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions.

3.4        Litigation.  As of the Execution Date, there are no Actions pending or threatened in writing against the Buyer or any of its Affiliates, including, for the avoidance of doubt, Actions by a Governmental Entity, that would reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions.  As of the Execution Date, the Buyer is not a party to or subject to the provisions of any material Order that would, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions.

3.5        Compliance with Laws; Registration and Permits.

(a)        The Buyer and its Affiliates are in compliance with all Laws and any Self-Regulatory Organization rules applicable to the Buyer, except as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of the Buyer to consummate the Transactions.  The Buyer and its Affiliates have all Governmental Permits that are necessary to entitle them to own or lease, operate and use their assets and to carry on and conduct their business substantially as conducted immediately prior to the date of this Agreement.  The Buyer and its Affiliates and, to the knowledge of the Buyer, each of their respective officers and service providers who are required to be registered, licensed or qualified with a Governmental Entity or Self-Regulatory Organization are duly registered as such and such registrations are in full force and effect, or are in the process of being registered as such within the time periods required by applicable Law, except, in each case, for any instances of noncompliance or failure to hold a Governmental Permit or other registration, license or qualification which would not reasonably be expected to materially impair the ability of the Buyer to perform its obligations hereunder or prevent the consummation of any of the Transactions.

(b)        (i) Neither the Buyer nor any "person associated with" (as defined in the Advisers Act) the Buyer, is subject to potential disqualification pursuant to Section 203 of the Advisers Act to serve as an investment adviser or as a person associated with a registered investment adviser and (ii) neither the Buyer nor any of its Affiliates is subject to disqualification under Rule 506(d) of Regulation D under the Securities Act, in each case, except for any such disqualification with respect to which the Buyer or another relevant Person has received a waiver,

exemption or other relief from the SEC or another relevant Governmental Entity; nor is there any proceeding or investigation pending or threatened by any Governmental Entity that would result in any such disqualification, except for any such disqualifications that would not, individually or in the aggregate, reasonably be expected to be material to the Buyer.

3.6        Equity Financing; Available Funds.

(a)        The Buyer has delivered to the Seller a correct and complete copy of the executed equity commitment letter, dated as of the date hereof (the "Equity Commitment Letter") from the Affiliates of the Buyer (each, a "Parent") confirming their commitment to provide cash equity to the Buyer (including for purposes of funding the Deposit Amount, including on a termination prior to the funding of the Deposit) in the aggregate amount, and subject to the terms and conditions set forth therein (the "Equity Financing"). The Equity Commitment Letter provides that the Seller is a third-party beneficiary of, and is entitled to enforce, such Equity Commitment Letter on the terms and conditions set forth therein. The obligations of the Buyer under this Agreement are not contingent on the availability of any financing for, or related to, the Transactions. There are no side letters, understandings or other agreements or arrangements that would reasonably be expected to materially and adversely affect the Equity Financing to which the Buyer, the Sponsors, or, to the Knowledge of the Buyer, any other entity that is an Affiliate of the Buyer, is a party.

(b)        The Equity Commitment Letter is in full force and effect and is a valid and binding obligation of the Buyer and the other parties thereto, enforceable against the Buyer and the other parties thereto in accordance with its terms (subject to the Equitable Exception). The Equity Commitment Letter have not been amended or modified, and the commitments contained in the Equity Commitment Letter have not been withdrawn, rescinded or otherwise modified, and no such amendment, modification, withdrawal or rescission of the Equity Commitment Letter is contemplated or the subject of current discussions. No event has occurred that, with or without notice, lapse of time or both, would or would reasonably be expected to constitute a default, breach or failure to satisfy a condition precedent on the part of the Buyer, any of its Affiliates under the Equity Commitment Letter and the Buyer has no reason to believe that any of the conditions to the Equity Financing contemplated by the Equity Commitment Letter will not be satisfied on a timely basis. There are no conditions precedent directly or indirectly related to the funding of the full amount of the Equity Financing other than as expressly set forth in the Equity Commitment Letter. As of the date hereof, assuming the satisfaction of the conditions to the Buyer's obligation to consummate the Transactions, the Buyer has no reason to believe that any of the conditions to the Equity Financing will not be satisfied, nor that the full amount of the Equity Financing will not be available in full to the Buyer on the Closing Date. When funded in accordance with, and subject to, the terms and conditions of the Equity Commitment Letter, the Equity Financing alone will provide the Buyer with acquisition financing on the Closing Date sufficient to (i) pay the Closing Purchase Price on the terms contemplated by this Agreement, and (ii) pay all related fees and expenses of the Buyer and its Representatives incurred in connection with this Agreement and the consummation of the Transactions.

(c)        Upon the consummation of the Transactions, assuming (i) all of the representations and warranties made by the Seller in Article II (*Representations and Warranties of the Seller*) hereof are true and accurate, (ii) compliance by the Seller with the covenants

applicable to the Seller and its Affiliates contained in this Agreement, (iii) satisfaction of the conditions to the Buyer's obligations to consummate Transactions in Section 6.2 (*Conditions to Obligations of the Buyer*) and (iv) that the projections, estimates, forecasts, plans and predictions of the Seller made available to the Buyer were prepared in good faith and based on reasonable assumptions, (A) the Buyer will not be insolvent as defined in section 101 of the Bankruptcy Code, (B) the Buyer will not be left with unreasonably small capital, (C) the Buyer will not have incurred debts beyond its ability to pay such debts as they mature and (D) the capital of the Buyer will not be impaired.

3.7     Investment Intent.   The Buyer is financially sophisticated and understands that the Sale Interests have not been registered under the securities Laws of any jurisdiction, including the Securities Act, and may only be transferred pursuant to registration or an applicable exemption under all applicable Laws.  The Buyer is acquiring the Sale Interests for its own account, for the purpose of investment only and not with a view to, or for sale in connection with, any distribution thereof in violation of applicable Law.  The Buyer has not, directly or indirectly, offered the Sale Interests to anyone or solicited any offer to buy the Sale Interests from anyone, so as to bring such offer and sale of the Sale Interests by the Buyer within the registration requirements of the Securities Act or the securities Laws of any other jurisdiction.  The Buyer is an "accredited investor" within the meaning of Rule 501 under the Securities Act, and the Sale Interests that the Buyer receives hereunder shall be received only on behalf of itself and not for the account or benefit of any other person or entity.

3.8     Brokers and Finders.  Neither the Buyer nor any of its Subsidiaries, nor any of their respective directors or service providers (including any officers) has employed any broker, finder or investment bank or has incurred or will incur any obligation or liability for any brokerage fees, commissions or finders fees in connection with the Transactions.

3.9     No Other Representations or Warranties.

(a)     Except for the representations and warranties contained in this Article III (*Representations and Warranties of the Buyer*), neither the Buyer nor any other Person makes any other express or implied representation or warranty with respect to the Transactions, and the Buyer disclaims any other representations or warranties, whether made by the Buyer, any Affiliate of the Buyer or any of the Buyer's or its Affiliates' respective Representatives.

(b)     The Buyer acknowledges and agrees that, except for the representations and warranties expressly set forth in Article II (*Representations and Warranties of the Seller*), (i) no Seller nor any other Person has made any express or implied representation or warranty with respect to, or otherwise in connection with, the Transactions or with respect to the accuracy or completeness of any other information provided, or made available, to the Buyer in connection with the Transactions and the Buyer has not relied on any representation or warranty other than those expressly set forth in Article II (*Representations and Warranties of the Seller*), (ii) the Buyer has not executed or authorized the execution of this Agreement or any of the other Transaction Documents or entered into the Transactions in reliance upon, and hereby specifically disclaims reliance upon, any promise, statement, projection, forecast, representation or warranty whatsoever made or omitted to be made to the Buyer or any of its Affiliates, or their respective Representatives, including any such promise, statement, projection, forecast, representation or warranty as to the

condition, value, quality or prospects of each Target Company and General Partner Entity, or its assets or liabilities, including the Advisory Contracts, or any part thereof; and (iii) the Sale Interests are being transferred "as is", "where is" and "with all faults".  The Buyer acknowledges and agrees that, except for the representations and warranties expressly set forth in Article II (*Representations and Warranties of the Seller*), the Seller, on behalf of itself, the Target Companies, General Partner Entities, the Sponsored Funds, and their respective Affiliates (x) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute or otherwise, with respect to the business, operations, assets, liabilities and conditions (financial or otherwise) of the Target Companies and General Partner Entities or with respect to the Sale Interests (including any express or implied warranty of merchantability or fitness for a particular purpose) and (y) disclaims all liability and responsibility for any other representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to the Buyer or its Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to the Buyer by any Representative of the Seller or any of its Affiliates).  The Buyer acknowledges and agrees that the Seller makes no representations or warranties to the Buyer regarding the probable success or profitability of the Target Companies or General Partner Entities.

(c)    The Buyer (directly or through its Affiliates or Representatives) is an informed and sophisticated purchaser, and has engaged expert advisors that are experienced in the evaluation and acquisition of companies such as the Target Companies and General Partner Entities, as contemplated hereunder.   The Buyer (directly or through its Affiliates or Representatives) has undertaken such investigation as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement and each of the other Transaction Documents to which it is or will be a party, and the consummation of the transactions contemplated hereby or thereby.  The Buyer confirms that the Seller has provided the Buyer with the opportunity to ask questions of the officers and service providers of the Seller and its Affiliates and to acquire additional information about the Target Companies and General Partner Entities.

(d)    The Buyer acknowledges that it has conducted to its satisfaction an independent investigation of the business, operations, assets, liabilities and conditions (financial or otherwise) of the Target Companies and General Partner Entities.  In making its determination to proceed with the Transaction, Buyer has relied solely on (i) the results of its own independent investigation and (ii) the representations and warranties of the Seller expressly and specifically set forth in Article II (*Representations and Warranties of the Seller*).

(e)    The Buyer acknowledges and agrees that the enforceability of this Agreement against the Seller is subject to entry of the Buyer Protections Order and the Sale Order.

(f)    Notwithstanding anything in this Section 3.9 (*No Other Representations or Warranties*) or otherwise in this Agreement to the contrary, nothing in this Agreement shall limit, reduce, prohibit, disclaim or preclude any right of any Person to bring any Action against any Person (i) in respect of Fraud or (ii) arising from or under any other Transaction Document.

# ARTICLE IV

# COVENANTS

4.1        Interim Operations of the Target Companies, General Partner Entities and Sponsored Funds.

(a)        Except (i) as otherwise expressly required or permitted by this Agreement, (ii) as required by applicable Law, (iii) as authorized by any Order of the Bankruptcy Court, which Order is consistent with this Agreement or (iv) as otherwise set forth in Section 4.1(a) of the Seller Disclosure Schedule, during the period from the Execution Date to the earlier of the Closing Date and the termination of this Agreement in accordance with Article VII (*Termination*), the Seller shall use reasonable best efforts to cause (x) the Target Companies, General Partner Entities and Sponsored Funds to conduct their respective businesses and operations in the ordinary course of business consistent with past practice and to maintain and preserve their respective relationships and goodwill with investors, co-investors, clients, vendors, employees, service providers, and any other Persons having business dealings with them, and to maintain and preserve the Target Companies' and General Partner Entities' present business arrangements, organizations, assets and technology and (y) the Sponsored Funds to conduct their respective businesses and operations in accordance with the Fund Documentation in effect as of the Execution Date.

(b)        Notwithstanding Section 4.1(a) (*Interim Operations of the Target Companies, General Partner Entities*), except (A) as otherwise expressly required or permitted by this Agreement, (B) as required by applicable Law, (C) as authorized by any Order of the Bankruptcy Court, which Order is consistent with this Agreement, (D) as expressly permitted by the Fund Documentation and in the ordinary course, (E) as effected in connection with the Pre-Closing Restructuring, (F) as required by the Management Company and the General Partner Entities' fiduciary obligations to the Sponsored Funds, or (G) as otherwise set forth in Section 4.1(b) of the Seller Disclosure Schedule, the Seller shall cause each Target Company and General Partner Entity not to, without the prior written consent of the Buyer (which consent shall not be unreasonably withheld, conditioned or delayed; provided that such consent shall be deemed to have been given if the Seller, such Target Company or such General Partner Entity does not receive the Buyer's response within five (5) Business Days following the Buyer's receipt of the written request for such response from such Target Company or General Partner Entity), undertake any of the following actions in respect of the Target Companies and the General Partner Entities, and, where specified, the Sponsored Funds:

(i)        (x) adopt any change in the Organizational Documents of such Target Company or General Partner Entity, (y) adopt any material change in the Fund Documentation other than in the ordinary course of business or (z) adopt any material change to the carried interest schedules or exhibits attached to the Organizational Documents of each General Partner Entity, in each case;

(ii)        merge or consolidate with any other Person, or restructure, reorganize, dissolve, wind-down or completely or partially liquidate or otherwise enter into any agreements or arrangements, or change the capital structure of any Target Company, General Partner Entity or Sponsored Fund;

(iii)　　　　　directly or indirectly acquire assets outside of the ordinary course of business from any other Person, or acquire any business or Person, or division or portion thereof, by merger or consolidation, purchase of substantially all assets or equity interests or by any other manner, in each case, in any transaction or series of related transactions;

(iv)　　　　　transfer, sell, lease, license, mortgage, pledge, surrender, encumber, divest, cancel, abandon, fail to maintain or allow to lapse or expire or otherwise dispose of any of its material assets, properties, operations, product lines, businesses or interests therein, except for (A) sales or other dispositions of obsolete assets in the ordinary course of business consistent with past practice (including the expiration or lapse of Intellectual Property in the ordinary course of business) and (B) non-exclusive licenses, covenants not to sue and similar rights granted under or with respect to Intellectual Property in the ordinary course of business consistent with past practice, <u>provided</u> that such amounts may not exceed $250,000 in the aggregate;

(v)　　　　　issue, sell, pledge, dispose of, grant, transfer, encumber or authorize the issuance, sale, pledge, disposition, grant, transfer or encumbrance of, any Interests, or securities convertible or exchangeable into or exercisable for any shares of such Interests, or any options, warrants or other rights of any kind to acquire any shares of such Interests;

(vi)　　　　　reclassify, split, combine, subdivide or redeem, purchase or otherwise acquire, directly or indirectly, any Equity Interests, or other interests or securities convertible or exchangeable into or exercisable for any Equity Interests;

(vii)　　　　　declare, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its shares of capital stock or other equity interests or enter into any agreement with respect to the voting of its shares of capital stock or other equity interests; <u>provided</u> that the foregoing shall not limit or restrict in any way a dividend or other distribution of cash held by such Target Company or General Partner Entity that is not Restricted Cash, including any distribution of Carried Interest or distributions in respect of Sponsor Commitments, in each case solely to the extent that such action results in a reduction to the Closing Purchase Price in accordance with the terms of this Agreement;

(viii)　　　　　create or incur any Lien on assets of such Target Company or General Partner Entity (other than a Permitted Pre-Closing Encumbrance) material to such Target Company or General Partner Entity;

(ix)　　　　　create, incur, assume or guarantee any Indebtedness other than any Indebtedness incurred in the ordinary course of business;

(x)　　　　　assume or enter into any Contract that would have been required to be set forth on <u>Sections 2.12(a)(i)</u> (*purchase and sale rights*), <u>2.12(a)(ii)</u> (*restrictive covenants*), <u>2.12(a)(iv)</u> (*exclusive distribution rights*), <u>2.12(a)(vi)</u> (*Liens*), 2.12(a)(viii) (*commissions*), <u>2.12(a)(ix)</u> (*Government Contract*), <u>2.12(a)(x)</u> (*material indemnification obligations*) or <u>2.12(a)(xi)</u> (*settlement*) of the Seller Disclosure Schedule if it were in effect on the date hereof, or modify, amend, terminate, cancel, extend or grant any consent or

waiver under any such Material Contract, or any Contract that would have been required to be set forth on Sections 2.12(a)(i) (*purchase and sale rights*), 2.12(a)(ii) (*restrictive covenants*), 2.12(a)(iv) (*exclusive distribution rights*), 2.12(a)(vi) (*Liens*), 2.12(a)(viii) (*commissions*), 2.12(a)(ix) (*Government Contract*), 2.12(a)(x) (*material indemnification obligations*) or 2.12(a)(xi) (*settlement*) of the Seller Disclosure Schedule if it were in effect on the date hereof (other than any actions in the ordinary course), or modify, amend, terminate, cancel, extend or grant any consent or waiver under any material Contract of the Sponsored Funds to which only one or more Sponsored Funds (and not any Target Company or General Partner Entity (except in its capacity as general partner of a Sponsored Fund)) are parties, in each case, except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Companies, General Partner Entities and Sponsored Funds, taken as a whole;

(xi)        abandon, allow to lapse or fail to maintain any insurance policy that is required to be set forth on Section 2.21 of the Seller Disclosure Schedule, or modify, amend, terminate, cancel, extend or grant any consent or waiver under any such insurance policy (other than any immaterial consents or waivers in the ordinary course of business consistent with past practice);

(xii)        abandon, cancel, surrender, allow to expire or fail to renew any Governmental Permit;

(xiii)        make any loans, advances, guarantees or capital contributions to or investments in any Person other than make capital contributions to the Sponsored Funds to fulfill Sponsor Commitment obligations in the ordinary course of business consistent with past practice;

(xiv)        other than with respect to any Tax Returns of Seller or any of its Affiliates (other than a Target Company or General Partner Entity or Sponsored Fund or QIF 7), (A) make any changes with respect to its accounting policies, methods or procedures, except as required by changes in Law or GAAP; (B) change or revoke any material Tax election, (C) amend any material Tax Return, (D) settle any material Tax audit or proceeding, or (E) enter into any "closing agreement" within the meaning of Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign Law) with respect to a material Tax liability;

(xv)        waive, release, assign, settle or compromise any material Action relating to such Target Company, General Partner Entity or Sponsored Fund to the extent that such waiver, release, assignment, settlement or compromise (A) involves payments exceeding $500,000 in the aggregate or (B) imposes any binding obligation or restriction, whether contingent or realized, on the Interests and/or the Buyer;

(xvi)        except as required pursuant to the terms of any Benefit Plan in effect as of the Execution Date, or as otherwise required by applicable Law, (A) grant to any Service Provider any increase in compensation or benefits (including severance benefits), (B) grant, amend or modify the terms of any severance, retention, change in control, termination or similar compensation or benefits payable to any Service Provider, (C) grant,

amend or modify any equity, equity-based or other incentive awards held by any Service Provider, (D) hire, appoint or promote any Service Provider with an annual salary or wage rate or consulting fees in excess of $225,000, (D) terminate the employment of any Service Provider with an annual salary or wage rate or consulting fees in excess of $225,000 other than for cause, (E) take any action to increase or accelerate the vesting of, or payment of, any compensation or benefit under any Acquired Seller Plan, (F) increase the coverage or benefits under any Acquired Seller Plan or amend any Acquired Seller Plan or (G) amend or modify the terms of the Carried Interest Policy;

(xvii)     make any Sponsor Commitment other than in the ordinary course and consistent with past practice;

(xviii)     enter into any Side Letters outside of the ordinary course of business or enter into any Side Letters the terms of which are outside of the ordinary course of business;

(xix)     take any action or omit to take any action that would result in a "key person" or "for cause" event (or similar concept) under any Fund Documentation (excluding any action legally required of the Seller pursuant to an Order of the Bankruptcy Court, provided that Seller shall provide or cause the Management Company or the applicable General Partner Entity to provide prior written notice to the Buyer; provided further that if providing prior written notice to the Buyer is prejudicial to the Seller, then the Seller shall provide written notice to Buyer promptly after taking such action);

(xx)     raise any funds or launch or form any Sponsored Fund (or entry into any Contract or Side Letter in connection therewith) in any strategy that has not generated revenue for the Target Companies prior to the date hereof;

(xxi)     use any Cash to pay or repay any Indebtedness after 11:59 pm Eastern Time on the day immediately preceding the Closing and prior to the Closing;

(xxii)     change, revoke, terminate or otherwise amend, or cause any of the Assignor Funds to change, revoke, terminate or otherwise amend, the "Maximum Reinvestment Election Percentage" or other similar election set forth on the REF Reinvestment Election Form; or

(xxiii)     agree, authorize or commit to do any of the foregoing.

(c)     Nothing contained in this Agreement (i) is intended to give the Buyer, directly or indirectly, the right to control or direct the businesses or operations of any of the Target Companies, General Partner Entities or Sponsored Funds prior to the Closing Date or (ii) shall operate to prevent or restrict any act or omission by the Seller the taking of which is required by applicable Law or any Contract or Benefit Plan by which the Seller, a Target Company, a General Partner Entity or Sponsored Fund, as applicable, is bound as of the Execution Date.  Prior to the Closing Date, the Seller shall, and shall cause each Target Company and General Partner Entity to, exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over the business and operations of such Target Company, General Partner Entity or Sponsored Fund.

4.2         Cooperation and Efforts to Consummate Transactions; Status Updates; Milestones.

(a)         Cooperation and Efforts.  Upon the terms and subject to the conditions set forth in this Agreement, the Seller and the Buyer shall cooperate with each other and use (and shall cause their respective Affiliates and Subsidiaries to use) their respective reasonable best efforts to (i) take or cause to be taken all actions reasonably necessary or advisable on their part under this Agreement to consummate the Transactions as promptly as reasonably practicable in accordance with this Agreement, (ii) execute, acknowledge and deliver in proper form any further documents, certificates, agreements and other writings, and take such other action as such other Party may reasonably require, in order to effectively carry out the intent of the Transaction Documents (including the Organizational Document Amendments), (iii) make or cause to be made all registrations, filings, notifications, submissions and applications with, to give all notices to and to obtain any consents, governmental transfers, approvals, orders, qualifications and waivers from any Governmental Entity necessary for the consummation of the Transactions, (iv) not to take any action prior to the Closing that would reasonably be expected to prevent, materially impair or materially delay the consummation of the Transactions, except to the extent such action is otherwise expressly contemplated by this Agreement, (v) make or cause to be made all actions reasonably necessary (including the Organizational Document Amendments) to ensure that (A) the Seller shall solely be responsible for funding any general partner "give back" or "clawback" or similar Liabilities arising under the Fund Documentation or the Organizational Documents of the General Partner Entities that attach to Carried Interest or other amounts distributed to the General Partner Entities and received by the Seller prior to the Closing and (B) the Buyer and its Affiliates shall have the right to set off any portion of such amounts owed by the Seller in accordance with such Liabilities against any other distributions otherwise to be made to Seller in respect of its retained interest in the relevant General Partner Entity, (vi) cooperate with the other Party and take such actions as such other Party may reasonably request in connection with the consummation of the Transactions (including to effectuate that following the Closing, (A) Buyer (or its Affiliates) shall, directly or indirectly, have (x) the sole and full ownership of the Track Record, and the Books and Records of the Target Companies and General Partner Entities solely to the extent necessary to support the Track Record, and shall have (y) the right to reference the Track Record (including any "related performance" of one or more of the Sponsored Funds) and the related Books and Records in a manner consistent with applicable Law, in each case of clauses (x) and (y), to the extent reasonably necessary for the operation of the businesses of the Target Companies, General Partner Entities and the Sponsored Funds and (B) the Seller and its Affiliates shall not be permitted to reference the Track Record for use in any business that provides actively managed investment advisory services; provided, however Seller and its Affiliates shall be permitted to reference any pre-Closing Track Record in all other contexts in a manner consistent with applicable Law, (vii) cooperate with the Buyer and provide all registrations, filings, notifications, submissions and applications and execute, acknowledge and deliver in proper form any documents, certificates, agreements and other writings with respect to any compliance or regulatory requirements as reasonably requested by the Buyer, in each case, to the extent necessary for the Buyer and each Target Company, General Partner Entity and Sponsored Fund to comply with applicable Law, and (viii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transactions.

(b)    <u>Status Updates</u>.    Subject to applicable Laws and as required by any Governmental Entity, the Seller and the Buyer shall each keep the other apprised of the status of matters relating to the consummation of the Transactions, including promptly furnishing the other with copies of material or substantive notices or other communications (or where no such copies are available, a reasonably detailed description thereof) received by any Party, as the case may be, or any of its Subsidiaries or Affiliates, from any third party and/or any Governmental Entity with respect to the Transactions.

(c)    <u>Milestones</u>.    The Seller shall (or in the case of <u>Section 4.2(c)(ii)</u> and <u>Section 4.2(c)(iii)</u>, shall use commercially reasonable efforts to seek to) consummate the Transactions in accordance with the following milestones (the "<u>Milestones</u>") unless extended in writing by the Buyer:

(i)    by May 3, 2024, the Seller shall file the Sale Motion and a motion scheduling expedited hearing and shortening the time period for notice of a hearing on the Buyer Protections Order with the Bankruptcy Court;

(ii)    by the date that is twenty-five (25) days from the filing of the Buyer Protections motion, the Seller shall obtain entry of the Buyer Protections Order by the Bankruptcy Court, and such Buyer Protections Order shall not be subject to any stay; and

(iii)    by the date that is thirty (30) days from the entry of the Buyer Protections Order, the Seller shall obtain entry of the Sale Order by the Bankruptcy Court, and such Sale Order shall not be subject to any stay.

4.3    <u>Regulatory Filings/Approvals</u>.

(a)    <u>Submission of Filings and Notices</u>.

(i)    <u>Exchanging Information</u>.    The Seller, on the one hand, and the Buyer on the other, shall each, upon request by the other, furnish the other with all information concerning itself, its Subsidiaries, directors, officers, stockholders and, to the extent necessary, its Affiliates, and such other matters as may be reasonably necessary or advisable in connection with any statement, filing, notice or application made by or on behalf of the Parties or any of their respective Subsidiaries or, to the extent necessary, Affiliates, to any Governmental Entity in connection with the Transactions.

(ii)    <u>Initial Submissions</u>.    The Seller and the Buyer shall prepare and file as promptly as reasonably practicable all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as practicable all consents, clearances, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any Governmental Entity in order to consummate the Transactions.  Without limiting the foregoing, each of the Seller and the Buyer shall make or cause to be made its respective filing pursuant to the HSR Act with respect to the Transactions as promptly as reasonably practicable after the Execution Date.  The Parties shall use their respective commercially reasonable efforts to obtain early termination of any applicable waiting period, to the extent early termination is available, from the applicable Governmental Entities. Whether or not the Transactions are consummated, the Buyer shall be responsible for all filing fees

incurred in order to obtain any consent, clearance, registration, approval, permit or authorization or any expiration or termination of a waiting period pursuant to this <u>Section 4.3</u> (*Regulatory Filings/Approvals*).

(iii)  <u>Subsequent Submissions</u>.  The Parties shall, or shall cause their respective Subsidiaries and Affiliates to, promptly provide all documents requested by any Governmental Entity to the extent reasonably necessary or advisable to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from such Governmental Entity in order to consummate the Transactions.

(iv)  <u>Conduct of Interactions with Governmental Entities</u>.  Subject to applicable Laws relating to the exchange of information, the Parties shall, to the extent practicable, each consult with the other on and consider in good faith the views of the other in connection with, all the information relating to the Buyer, the Seller, the Target Companies, General Partner Entities and Sponsored Funds, as the case may be, and any of their respective Subsidiaries, that appears in any filing made with, or written materials submitted to, any Governmental Entity in connection with the Transactions.  In exercising the foregoing rights, the Parties shall act reasonably and as promptly as practicable. Notwithstanding the foregoing or anything in this Agreement to the contrary, the Buyer shall be entitled to direct any proceedings or negotiations with any Governmental Entity relating to any of the matters addressed in this <u>Section 4.3</u> (*Regulatory Filings/Approvals*), provided that the Buyer shall, to the extent permitted, afford the Seller a reasonable opportunity to participate therein.

(b)  <u>Efforts</u>.

(i)  Notwithstanding anything in this Agreement to the contrary, the Buyer shall use its reasonable best efforts to take or cause to be taken, any and all actions and do, or cause to be done, any and all things reasonably necessary, proper or advisable to avoid, eliminate and resolve each and every impediment and obtain all consents required to permit the satisfaction of the conditions in <u>Article VI</u> (*Conditions*), as promptly as reasonably practicable.

(ii)  Without limiting the generality of the foregoing, the Parties agree (A) to use their respective reasonable best efforts to avoid (but without any requirement to litigate or appeal) the entry of any permanent, preliminary or temporary injunction or other decree, decision, determination or judgment that would reasonably be expected to delay, restrain, prevent, enjoin or otherwise prohibit consummation of the Transactions and (B) that nothing in this <u>Section 4.3</u> (*Regulatory Filings/Approvals*) shall require the Seller to take any actions that would have a material and adverse impact on the remainder of the Seller's assets (other than the Sale Interests).

4.4  <u>Third-Party Consents</u>.

(a)  Upon the terms and subject to the conditions set forth in this Agreement, the Seller shall, and shall cause each Target Company, General Partner Entity and Sponsored Fund

to, use its reasonable best efforts to obtain any consents required by any Contracts set forth on Section 4.4(a) of the Seller Disclosure Schedule to which the Seller, a Target Company, a General Partner Entity or a Sponsored Fund is a party from third parties in connection with the consummation of the Transactions at or prior to the Closing.  In connection therewith, the Seller shall not, and shall cause each Target Company, General Partner Entity or Sponsored Fund, not to, (i) make any payment of a consent fee, "profit sharing" payment or other consideration (including increased or accelerated payments) or concede anything of monetary or economic value, (ii) amend, supplement or otherwise modify any such Contract or (iii) agree or commit to do any of the foregoing, in each case, for the purposes of giving, obtaining and/or effecting any third-party consents without the prior written consent of the Buyer, not to be unreasonably withheld.

(b)      Notwithstanding anything to the contrary contained herein, in no event shall any Party or any of their respective Affiliates be required to make any payments, incur any liability, commence any litigation or make any concessions to obtain any consents of third parties contemplated by this Section 4.4 (*Third-Party Consents*), and the failure to receive any such consents shall not be taken into account with respect to whether any conditions to the Closing set forth in Article VI (*Conditions*) shall have been satisfied.

4.5      Access and Reports.  Subject to applicable Law, upon reasonable advance notice, the Seller shall, and shall cause each Target Company, General Partner Entity and Sponsored Fund to, afford the Buyer's officers and other authorized Representatives reasonable access, during normal business hours from the Execution Date to the earlier of the Closing Date and the termination of this Agreement in accordance with Article VII (*Termination*), to employees, officers, service providers, properties, books, contracts and records of such Target Company, General Partner Entity or Sponsored Fund, as applicable, and, during such period, shall furnish promptly to the Buyer all information in the possession of Seller concerning its business, properties and personnel as the Buyer may reasonably request; provided that the foregoing shall not require the Seller, such Target Company, such General Partner Entity or such Sponsored Fund (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Seller, such Target Company, such General Partner Entity or such Sponsored Fund, as applicable, would result in the unauthorized disclosure of any trade secrets of third parties or violate any of its obligations with respect to confidentiality (if any Law applicable to such Target Company, General Partner Entity or Sponsored Fund requires such Target Company, General Partner Entity or Sponsored Fund to restrict or prohibit access to such information) or (ii) to disclose any privileged information or waive other privileges or protections of such Target Company, General Partner Entity or Sponsored Fund under applicable Law that would violate the terms of any non-disclosure agreement with a third party; provided, that, if the Seller, any Target Company, General Partner Entity or Sponsored Fund does not provide or cause to be provided access or information based on clauses (i) and (ii) above, then the Seller, such Target Company, such General Partner Entity or such Sponsored Fund shall (x) promptly provide written notice to the Buyer stating it is withholding information in reliance thereon; (y) take reasonable actions or implement arrangements (which could include, depending on the reasonableness thereof in the circumstances, entering into confidentiality agreements or joint defense agreements, obtaining the consent of third parties, redacting parts of documents, preparing "clean" summaries of information or limiting the availability of information to a "clean team" or to outside legal counsel) in order to make information available to the Buyer or to Buyer's Representatives to the extent reasonably possible; and (z) use reasonable best efforts to provide such information in a manner that does not jeopardize

such privilege, protection or applicable exceptions to disclosure; and provided, further, that the Buyer and its Representatives shall conduct any such activities (A) at their sole expense and (B) in such a manner as not to interfere unreasonably with the normal business or operations of such Target Company, General Partner Entity or Sponsored Fund.  All information received pursuant to this Section 4.5 (*Access and Reports*) shall be governed by the terms of the Confidentiality Agreement.

4.6       Publicity.   Except as required by the Bankruptcy Court in connection with the Bankruptcy Proceeding, with the exception of (i) the initial joint press release regarding the Transactions to be issued by the Seller and the Buyer, which shall be in forms mutually agreed by the Parties, (ii) any disclosure statement that the Seller may file in connection with the Bankruptcy Proceeding, (iii) communications by the Management Company or a General Partner Entity to limited partners or other investors of the Sponsored Funds, and (iv) any public disclosure issued by the Seller, a Target Company, a General Partner Entity, a Sponsored Fund or their respective Affiliates pursuant to their contractual obligations under any confidentiality agreement or as required by Law, the Buyer and the Seller will not issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval may not be unreasonably withheld, except that such consent shall not be required in connection with ordinary or required pleadings made by either Party in the Bankruptcy Court or if disclosure is otherwise required by applicable Law or by the Bankruptcy Court.  Each Party will use their respective reasonable best efforts, consistent with such applicable Law or Bankruptcy Court requirement, to provide advance notice to the other Party regarding such release, announcement or disclosure, and use commercially reasonable efforts to consult with the other Parties with respect to the text of any such required disclosure.

4.7       Service Provider Matters.

(a)       Notwithstanding anything to the contrary in this Agreement, (i) in no event shall Seller be deemed to sell, transfer, assign, convey or deliver any assets, rights and properties to the extent relating to any Benefit Plan that is not an Acquired Seller Plan, and (ii) neither Buyer nor any designee of any Buyer (as applicable) shall be obligated to assume, and does not assume, and hereby disclaims all of the following service-provider related Liabilities of Seller that are not Liabilities of the Target Companies, General Partner Entities or Sponsored Funds, including (I) payments or entitlements to any current or former employees, officers, directors or consultants of Seller (who are not also Service Providers), including wages, other remuneration, holiday or vacation pay, severance pay (statutory or otherwise), commission, post-employment medical or life obligations, pension contributions and insurance premiums, (II) any ERISA Affiliate Liability, (III) any Liability arising out of, relating to or resulting from the employment or termination of employment prior to the Closing of any current or former employee or independent contractor of Seller, (IV) any Liability for any action resulting from any of Seller's service providers' separations from service, including any severance or separation pay, (V) any Liability relating to or arising out of the employment practices of Seller or any of its Subsidiaries or Affiliates (other than the Target Companies, General Partner Entities or Sponsored Funds), including any violations by Seller or its Subsidiaries or Affiliates (other than the Target Companies, General Partner Entities or Sponsored Funds) of any labor or employment agreement, and (VI) any Liability arising out of, relating to or resulting from any Seller bonus plans, change of control plans, retention plans, key employee incentive plans or key employee retention plans.

(b)    The Buyer agrees that the service providers of the Management Company at the time of Closing who continue to remain employed with the Management Company, the Buyer or their Affiliates (the "Continuing Service Providers") immediately following the Closing shall, during the period commencing on the Closing Date and ending on the first anniversary of the Closing, be provided with (i) base salary or base wage that is no less favorable than the base salary or base wage provided by the Management Company to each such Continuing Service Provider immediately prior to the Closing and (ii) cash incentive compensation opportunities and employee benefits (excluding severance) that are substantially comparable in the aggregate to the cash incentive compensation opportunities and employee benefits (excluding severance) provided to such Continuing Service Provider immediately prior to the Closing.

(c)    The Buyer shall use commercially reasonable efforts to (i) cause any pre-existing conditions or limitations and eligibility waiting periods under any group health plans of the Buyer or its Affiliates to be waived with respect to the Continuing Service Providers and their eligible dependents, (ii) give each Continuing Service Provider credit for the plan year in which the Closing occurs towards applicable deductibles and annual out-of-pocket limits for medical expenses incurred prior to the Closing for which payment has been made and (iii) give each Continuing Service Provider service credit for such Continuing Service Provider's employment with the Seller, the Seller's Affiliates, and the Management Company for purposes of vesting, benefit accrual and eligibility to participate under each applicable benefit plan of the Buyer, as if such service had been performed with the Buyer, except for benefit accrual under defined benefit pension plans, for purposes of qualifying for subsidized early retirement benefits or to the extent it would result in a duplication of benefits.

(d)    Buyer shall assume and honor all Acquired Seller Plans in accordance with their terms.

(e)    Nothing contained in this Agreement is intended to (i) be treated as an amendment of any particular Benefit Plan, (ii) prevent the Buyer or any of its Affiliates from amending or terminating any of their benefit plans or, after the Closing, any Benefit Plan in accordance with their terms, (iii) prevent the Buyer, the Management Company or any of their Affiliates, after the Closing, from terminating the employment of any Continuing Service Provider, subject to following adequate procedures under applicable Law and compliance with this Section 4.7 (*Service Provider Matters*), or (iv) create any third-party beneficiary rights in any service provider of the Management Company, any beneficiary or dependent thereof, or any collective bargaining representative thereof, with respect to the compensation, terms and conditions of employment and/or benefits that may be provided to any Continuing Service Provider by the Buyer, the Management Company or any of their Affiliates or under any benefit plan which the Buyer, the Management Company or any of their Affiliates may maintain.

4.8    Confidentiality.

(a)    The terms of the Confidentiality Agreement, dated December 19, 2023 (the "Confidentiality Agreement"), between the Seller and the other parties thereto, are hereby incorporated by reference, *mutatis mutandis*, and, notwithstanding anything contained in the Confidentiality Agreement to the contrary, shall continue in full force and effect until (x) the Closing or (y) if this Agreement is validly terminated pursuant to

Article VII (*Termination*), the remainder of the term of the Confidentiality Agreement or for twelve (12) months after the date of such termination, whichever is longer.  As of the Closing, the Buyer's Affiliates' obligations under the Confidentiality Agreement shall automatically terminate. The Buyer acknowledges and understands that this Agreement, before it becomes otherwise publicly available, may be publicly filed in the Bankruptcy Court and with the SEC on Form 8-K, and further made available by the Seller in accordance with Section 4.16 (*No Solicitation*), and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to the Buyer, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.

(b)        Following the Closing Date, the Seller shall, and shall use reasonable best efforts to instruct its Affiliates and Representatives to (and Seller shall be responsible for violations of this Section 4.8(b) by such Affiliates and Representatives), keep confidential and not use any non-public, proprietary or confidential information and data about or otherwise relating to the business of the Buyer and its Affiliates (which shall include the Target Companies, the General Partner Entities and Sponsored Funds) ("Buyer Confidential Information") in the possession of Seller or any of its Affiliates or Representatives; provided, however, that Seller may disclose Buyer Confidential Information (i) with the prior consent of the Buyer, (ii) to its Affiliates and Representatives who need to know such information for the purpose of assisting the Seller in connection with the Transactions or the Bankruptcy Proceeding, so long as the Seller instructs such Affiliates and Representatives to treat the Buyer Confidential Information in a confidential manner and in accordance with the terms hereof, (iii) to a Governmental Entity if required by Law or legal process, or in connection with a judicial or administrative proceeding or examination, or (iv) to the extent necessary to enforce the Seller's rights under this Agreement or defend against any claims related to the Transactions. Notwithstanding the foregoing or anything to the contrary in this Agreement, the term "Buyer Confidential Information" will not include information that (A) becomes available to the Seller on a non-confidential basis from a source other than the Buyer or its Affiliates or Representatives, if such other source (x) lawfully obtained possession of such information and (y) is not known to the Party to be bound by a confidentiality obligation covering the relevant information or otherwise prohibited from disclosing the relevant information or (B) is or becomes generally available to the public (other than as a result of a breach by the Seller or its Affiliates or Representatives) or (C) was independently developed by Seller or its Representatives without use of Buyer Confidential Information. If Seller is required by applicable Law to divulge any Buyer Confidential Information, to the extent legally permissible, Seller shall provide Buyer with prompt written notice of each such request so that Buyer may, at Buyer's sole expense, seek an appropriate protective Order or other appropriate remedy, and Seller shall reasonably cooperate with Buyer (at Buyer's sole expense) to obtain a protective Order or other remedy; provided that, in the event that a protective Order or other remedy is not obtained, Seller shall furnish only that portion of such Buyer Confidential Information which, in the opinion of its counsel, Seller is legally compelled to disclose and shall exercise its commercially reasonable efforts to obtain reliable assurance that confidential treatment will be accorded any such Buyer Confidential Information so disclosed (except for any filings publicly filed (x) in the Bankruptcy Court and (y) with the SEC on Form 8-K).

(c)        For a period of two (2) years following the Closing Date, the Buyer shall, and shall use reasonable best efforts to instruct its Affiliates and Representatives to (and

Buyer shall be responsible for violations of this Section 4.8(c) by such Affiliates and Representatives), keep confidential any non-public, proprietary or confidential information and data of the Seller ("Seller Confidential Information") that the Seller furnishes or otherwise makes available to the Buyer, its Representatives or Affiliates whether before, on or after the date of this Agreement; provided, however, that the Buyer may disclose Seller Confidential Information (i) to its Affiliates, and Representatives who need to know such information for the purpose of assisting the Buyer in connection with the Transactions, so long as the Buyer instructs such Affiliates and Representatives to treat the Seller Confidential Information in a confidential manner and in accordance with the terms hereof, (ii) to a Governmental Entity if required by Law or legal process, or in connection with a judicial or administrative proceeding or examination, or (iii) to the extent necessary to enforce the Buyer's rights under this Agreement or defend against any claims related to the Transactions.  Notwithstanding the foregoing or anything to the contrary in this Agreement, the term "Seller Confidential Information" will not include information that (A) is or becomes available to the Buyer on a non-confidential basis from a source other than the Seller or its Affiliates or Representatives, if such other source (x) lawfully obtained possession of such information and (y) is not known to the Party to be bound by a confidentiality obligation covering the relevant information or otherwise prohibited from disclosing the relevant information or (B) is or becomes generally available to the public (other than as a result of a breach by the Buyer or its Affiliates or Representatives), (C) was independently developed by Buyer or its Representatives without use of Seller Confidential Information or (D) constitutes Buyer Confidential Information. If Buyer is required by applicable Law to divulge any Seller Confidential Information, to the extent legally permissible, Buyer shall provide Seller with prompt written notice of each such request so that Seller may, at Seller's sole expense, seek an appropriate protective Order or other appropriate remedy, and Buyer shall reasonably cooperate with Seller (at Seller's sole expense) to obtain a protective Order or other remedy; provided that, in the event that a protective Order or other remedy is not obtained, Buyer shall furnish only that portion of such Seller Confidential Information which, in the opinion of its counsel, Buyer is legally compelled to disclose and shall exercise its commercially reasonable efforts to obtain reliable assurance that confidential treatment will be accorded any such Seller Confidential Information so disclosed (except for any filings publicly filed (x) in the Bankruptcy Court and (y) with the SEC on Form 8-K).

4.9        Tax Matters.

(a)        The Seller will prepare and file income Tax Returns that relate solely to a Pre-Closing Period of the Target Companies, General Partner Entities, QIF 7, Sponsored Funds and their respective Subsidiaries. The Buyer and its Affiliates will prepare and file all other Tax Returns of the Target Companies, General Partner Entities, QIF 7, Sponsored Funds and their respective Subsidiaries, including, with respect to (i) any taxable period that includes (but does not end on) the Closing Date ("Straddle Period"), (ii) any taxable period beginning after the Closing Date and (iii) any non-income Tax Returns due after the Closing; provided that to the extent a Tax Return of the Target Companies, General Partner Entities, QIF 7, Sponsored Funds or their respective Subsidiaries relates to an income Tax Return with respect to a Straddle Period or until the Closing Purchase Price is finally determined in accordance with Section 1.5 (*Closing Statements*), any non-income Tax Return to the extent the Taxes relating thereto are taken into account in the calculation of the Closing Purchase Price, the Buyer and its Affiliates shall prepare such Tax Return in a manner consistent with past practice, except to the extent otherwise required by Applicable Law, and submit any such income Tax Return to the Seller for the Seller's review

and comment at least fifteen (15) Business Days prior to the due date (including validly obtained extensions) of such income Tax Return and any such non-income Tax Return to the Seller for the Seller's review and comment a reasonable period of time prior to the due date (including validly obtained extensions) of such Tax Return, and the Buyer and its Affiliates shall consider in good faith any reasonable comments made by the Seller and will not file such Tax Return without the prior written consent of the Seller (not to be unreasonably withheld, conditioned or delayed).

(b)        Tax Contests.

(i)        Subject to Section 4.9(c), the Seller will control any action, audit, exam, proceeding, litigation, notice of deficiency, or other adjustment, assessment or redetermination (a "Tax Contest") relating to any Target Company, General Partner Entity, Sponsored Fund, QIF 7, and/or any of their respective Subsidiaries that relate solely to income Taxes of the Seller, Target Company, General Partner Entity, Sponsored Fund, QIF 7 and/or any of their respective Subsidiaries for a Pre-Closing Period; provided that (i) the Seller will timely provide the Buyer copies of any written correspondence and other material communications from or with a Taxing Authority with respect to such income Tax Contest, (ii) to the extent such income Tax Contest is reasonably expected to affect the income Tax liability of the Buyer, the Buyer shall be entitled to participate in such income Tax Contests at its own expense, and (iii) the Seller shall not (and shall not allow the Target Companies, General Partner Entities, Sponsored Funds, QIF 7 or their respective Subsidiaries to) settle, resolve, or abandon such income Tax Contest without the Buyer's prior written consent, which shall not be unreasonably withheld, delayed, or conditioned.

(ii)        The Buyer will control all other Tax Contests (including, for the avoidance of doubt, any Tax Contests for a Straddle Period) relating to any Target Company, General Partner Entity, Sponsored Fund, QIF 7 and/or any of their respective Subsidiaries; provided that (i) the Buyer will timely provide the Seller copies of any written correspondence and other material communications from or with a Taxing Authority with respect to any such income Tax Contest, (ii) to the extent such income Tax Contest is reasonably expected to affect the income Tax liability of the Seller, the Seller shall be entitled to participate in such income Tax Contests at its own expense, and (iii) the Buyer shall not (and shall not allow the Target Companies, General Partner Entities, QIF 7, Sponsored Funds or their respective Subsidiaries to) settle, resolve, or abandon such Tax Contest without the Seller's prior written consent, which shall not be unreasonably withheld, delayed, or conditioned.

(iii)        The Seller and the Buyer shall cooperate with each other in good faith in the conduct of any Tax Contest with respect to the Target Companies, General Partner Entities, QIF 7, Sponsored Funds and their respective Subsidiaries.

(c)        Notwithstanding anything to the contrary in this Agreement, the Seller shall not be required to transfer to the Buyer any books, records or information to the extent they relate to Tax Returns or related records or workpapers concerning the Seller or any member of the Seller Tax Group, provided that, to the extent such Tax Returns, records or workpapers would otherwise be required to be provided hereunder, and to the extent commercially reasonable, the Seller shall use commercially reasonable efforts, upon reasonable request, to provide portions of

such Tax Returns, records or workpapers, or redacted versions thereof, to the extent relating solely to one or more Target Companies, General Partner Entities, QIF 7, Sponsored Funds and their respective Subsidiaries.  For the avoidance of doubt, this Section 4.9(c) (*Tax Matters*) will not require any Target Companies, General Partner Entities, QIF 7, Sponsored Funds or their respective Subsidiaries to take any actions that would reasonably be expected to prevent or delay the consummation of the Transactions.

(d)      The Seller or its designee shall be the "partnership representative" within the meaning of Section 6223 of the Code (or any analogous provision of federal, state or local law) with respect to the Target Companies, General Partner Entities, QIF 7 and Sponsored Funds for all Pre-Closing Periods of such entity as of the Execution Date and, unless otherwise required pursuant to this Agreement, shall be entitled to take all actions required or permitted under Law to be taken by the partnership representative. The Buyer or its designee shall be the "partnership representative" within the meaning of Section 6223 of the Code (or any analogous provision of federal, state or local law) with respect to the Target Companies, General Partner Entities, QIF 7 and Sponsored Funds for all Tax periods other than the Pre-Closing Period of such entity, and, unless otherwise required pursuant to this Agreement, shall be entitled to take all actions required or permitted under Law to be taken by the partnership representative.  Notwithstanding the foregoing, the Buyer, the Seller, the applicable partnership representative, the Target Companies, General Partner Entities, QIF 7 and Sponsored Funds (as applicable) shall take all actions necessary to make, and shall cause to be made, a "push-out" election under Section 6226 of the Code (or any analogous provision of federal, state or local law) with respect to any Taxes payable by the Target Companies, General Partner Entities, QIF 7 and Sponsored Funds (including, for the avoidance of doubt, with respect to the Pre-Closing Period and Straddle Periods and including any Taxes imposed on, or attributable to, the Target Companies, General Partner Entities or QIF 7 as a result of a Tax Contest of a Subsidiary, Sponsored Fund or its respective Subsidiaries).  The Buyer or its designee shall also be entitled to take all actions necessary to fulfill the obligation set forth in Section 4.9(g).

(e)      The Buyer, on the one hand, and Seller, on the other hand, agree to each bear fifty percent (50%) of all transfer, documentary, sales, use, stamp, recording, value-added, registration and other similar Taxes and all conveyance fees, recording fees and other similar charges (all including penalties, interest and other charges with respect thereto, collectively "Transfer Taxes") incurred in connection with the consummation of the Transactions.  Such Transfer Taxes shall be paid by the party responsible under applicable Law to pay such Transfer Taxes, and the applicable party shall reimburse the other for its share of such Transfer Taxes. The Buyer and the Seller shall cooperate in good faith in the filing of any Tax Returns for such Transfer Taxes by the party required to file such Tax Returns under applicable Law.

(f)      Within ninety (90) days after the final determination of the Closing Purchase Price, the Buyer shall prepare a schedule allocating the purchase price (as determined for U.S. federal income Tax purposes) among the Target Companies, General Partner Entities, Evergreen Fund, QIF 1 and QIF 7 to the extent applicable, and then further amongst the assets of each Target Company, General Partner Entity, QIF 7 and Sponsored Funds for U.S. federal income Tax purposes (including any allocation regarding Section 743 or Section 751 of the Code) in a manner consistent with Sections 755 and 1060 of the Code and any applicable Treasury Regulations promulgated thereunder and consistent with any allocation of the purchase price (as

determined for U.S. federal income Tax purposes) amongst the Buyer and any Person to whom the Buyer has assigned its rights and obligations under this Agreement in accordance with Section 8.10 (*Assignment; Third Party Beneficiaries*) (the "Draft Allocation") and shall deliver the Draft Allocation to the Seller for its review. If, within sixty (60) calendar days of the receipt of the Draft Allocation, the Seller shall not have objected in writing to such draft, the Draft Allocation shall become the Final Allocation, as defined below. If the Seller objects to the Draft Allocation in writing within such sixty (60) calendar-day period, the Buyer and the Seller shall negotiate in good faith to resolve any disputed items. Any allocation of the total consideration, as agreed upon by the Buyer and the Seller (the "Final Allocation"), shall be final and binding upon the parties. Any adjustment to the purchase price (as determined for U.S. federal income tax purposes) shall be allocated in accordance with the Final Allocation. Notwithstanding the foregoing, if the Seller timely notifies the Buyer of its objection to the Draft Allocation and the Buyer and the Seller are unable through negotiation to resolve their dispute regarding the Draft Allocation, then each party shall be permitted to make its own allocation to the extent permitted by applicable Law (for the avoidance of doubt, the Target Companies, General Partner Entities, Sponsored Funds and QIF 7 shall file allocations in accordance with the Buyer's allocation) and shall not be responsible for, or have any liability with respect to, the allocations used by the other party; provided, further, that if Seller (or its applicable Affiliate) and Buyer agree in writing to a resolution of certain but not all disputed items, such resolved disputed items shall be final and binding on Seller, Buyer and their respective Affiliates (including the Target Companies, General Partner Entities, Sponsored Funds and QIF 7).

(g)    The Target Companies shall cause an election under Section 754 of the Code to be made with respect to the Tax year which includes the Closing. The Organizational Documents of the General Partner Entities shall be amended, if necessary, to permit the General Partner Entities to make an election under Section 754 of the Code at the request of the Buyer or its respective Affiliates.

(h)    The Seller, Target Companies, General Partner Entities, QIF 7 and Sponsored Funds shall cause any Tax Sharing Agreement to be terminated effective as of the Closing.

(i)    From and after the Closing Date, the Buyer shall not, and shall cause each Target Company, General Partner Entity, QIF 7, Sponsored Fund and their respective Subsidiaries not to, except as otherwise required by applicable Law, without the prior written consent of the Seller (not to be unreasonably withheld, conditioned, or delayed), (i) amend or otherwise modify an income Tax Return of such Target Company, General Partner Entity, QIF 7, Sponsored Fund or their respective Subsidiaries with respect to a Pre-Closing Period or Straddle Period; (ii) make any income Tax election with respect to such Target Company, General Partner Entity, QIF 7, Sponsored Fund or their respective Subsidiaries (including an election under Section 336 or 338 of the Code or any similar provision of foreign, state or local Law) that relates to, or is retroactive to, a Pre-Closing Period or the pre-Closing portion of a Straddle Period; (iii) extend or waive, or cause to be extended or waived, any statute of limitations or other period for the assessment of any income Tax or deficiency with respect to any Pre-Closing Period or Straddle Period; (iv) adopt or change any income Tax accounting method or practice with respect to, or that has retroactive effect to, a Pre-Closing Period or Straddle Period; (v) make or initiate discussions, examinations or voluntary disclosures with any Taxing Authority or other Governmental Entity with respect to

income Tax matters related to the Target Company, General Partner Entity, QIF 7, Sponsored Fund and any of their respective Subsidiaries with respect to a Pre-Closing Period or Straddle Period; (vi) file any private letter ruling request or similar request with an Governmental Entity with respect to any income Taxes for a Pre-Closing Period or Straddle Period.

(j)     The Parties shall use commercially reasonable efforts to allocate, under applicable Tax Law, income, gains, losses, deductions or credits attributable to the Target Companies, General Partner Entities, QIF 7, Sponsored Funds or their respective Subsidiaries for the Tax year in which the Closing Date occurs between the Buyer and the Seller based on a closing of the books other than items outside the ordinary course of business that happens after the Closing Date; provided that to the extent such method is permitted by such applicable Tax Law, if any such items are derived by an entity or arrangement treated under applicable Tax Law as a partnership, disregarded entity, or similar flow-through entity, and the information reporting necessary to perform such allocation is limited, such items may be reasonably directly or indirectly allocated in good faith between the Seller or its Affiliates on the one hand, and the Buyer or its Affiliates on the other hand; provided, further, that any deductions or other Tax benefits arising from Company Expenses shall be allocated to a Pre-Closing Period or Straddle Period to the extent supportable at a "more like than not" level of comfort by the relevant Target Company, General Partner Entity, QIF 7, Sponsored Fund or their respective Subsidiaries tax return preparers.

(k)     The obligations of the Parties set forth in this Section 4.9 (*Tax Matters*) shall be unconditional and absolute and shall remain in effect without limitation as to time.

4.10     Intercompany Arrangements; Transition Services.

(a)     The Parties agree that, immediately prior to the Closing, any Intercompany Payables and/or Related Party Transactions, with the exception of the Seller Subscription Facility, the Specified Deferred Fees and the Permitted Intercompany Payables, between a Target Company, General Partner Entity or Sponsored Fund, on the one hand, and the Seller or any of its Affiliates (other than the Target Companies, General Partner Entities or Sponsored Funds), on the other hand, shall be cancelled effective as of immediately prior to the Closing. For the avoidance of doubt, any Tax items of income or gain resulting from the cancellation or termination of Intercompany Payables and/or Related Party Transactions pursuant to this Section 4.10(a) (*Intercompany Arrangements; Transition Services*), if any, shall be allocated to the beneficial owners (for federal income tax purposes) of the applicable Target Company, General Partner Entity or Sponsored Fund prior to the Closing (and not the Buyer).

(b)     Each of the Parties agrees that, immediately prior to the Closing, any contract, commitment or arrangement, with the exception of the Seller Subscription Facility, Specified Deferred Fees and the Permitted Intercompany Payables, between a Target Company, General Partner Entity or Sponsored Fund, on the one hand, and the Seller or any of its Affiliates (other than the Target Companies, General Partner Entities or Sponsored Funds), on the other hand, shall be terminated and be of no further force or effect and all obligations thereunder shall be extinguished, notwithstanding any terms thereof to the contrary.

(c)     The Parties agree that, prior to Closing, the Seller shall amend the Seller Subscription Facility to provide that the Seller Subscription Facility shall mature, and all

outstanding amounts thereunder shall become due and payable, at the earliest of (x) ninety (90) days following the Closing and (y) the closing of substitute subscription financing obtained by the Buyer or its Affiliates.

(d)    The Buyer acknowledges that Capital Partners IV, L.P. and Cap. Partners VI, L.P. (the "Deferred Funds") owe deferred management fees in the aggregate amount of $13,432,183, incurred on or prior to October 1, 2023, to the Seller (the "Deferred Management Fees").  The Buyer agrees to cause each Deferred Fund whose Client Consent has been obtained in accordance with Section 4.13 (*Client Consents*) to make payments to the Seller from and after the Closing, prior to the payment of any management fees to the Buyer, the Seller or any of their respective Affiliates, until fifty percent (50%) of the Deferred Management Fees attributable to such Deferred Fund (the "Specified Deferred Fees") have been paid to the Seller.  Following payment by a Deferred Fund of the Specified Deferred Fees attributable to such Deferred Fund to the Seller pursuant to the immediately preceding sentence, Buyer, the Deferred Funds and their respective Affiliates shall have no further obligation to the Seller with respect to the Deferred Management Fees attributable to such Deferred Fund.  Any Tax items of income, gain, loss or deduction attributable to the Deferred Management Fees shall be solely allocated to the Seller.

(e)    The Parties shall each cooperate and negotiate in good faith to promptly enter into a transition services agreement (the "Transition Services Agreement") following the date hereof, which shall become effective at the Closing Date and shall be substantially consistent with the terms set forth in Exhibit I attached hereto.  Following the date hereof, Buyer may identify and request any services, that the Target Companies, the General Partner Entities or their respective Subsidiaries receive from Seller or its Affiliates (other than the Target Companies, the General Partner Entities and the Sponsored Funds) as of the date hereof that are reasonably necessary to operate the business of the Target Companies, the General Partner Entities and the Sponsored Funds as operated as of the date hereof, and the Seller shall reasonably cooperate with Buyer to identify such services.  The Seller shall, and cause its Affiliates to, use reasonable best efforts to provide the Buyer with the same or similar services following the Closing Date at cost (with no element of profit), and, for a duration of no less than three (3) months after the Closing Date.  Subject to the last sentence of Section 4.13(a), the Parties agree that, following the Closing, pursuant to the Transition Services Agreement or otherwise, the Management Company shall reasonably cooperate with the Seller to assist with (i) the wind down of any Non-Consenting Clients (and their respective General Partner Entities, as applicable) for so long as reasonably necessary to fully dissolve such entities, and/or (ii) the management of any Non-Consenting Clients (and their respective General Partner Entities, as applicable) until the Seller's engagement of a suitable third-party investment adviser, in each case, as reasonably requested by Seller, at Seller's sole expense and in compliance with applicable Law.

(f)    No additional consideration shall be payable by, and no additional amounts or Liabilities shall be owed by or borne, the Buyer or any of its Affiliates (including the Target Companies, General Partner Entities and Sponsored Funds) to the Seller or any of its Affiliates in connection with the transactions effected pursuant to this Section 4.10 (*Intercompany Arrangements; Transition Services*) other than as set forth in this Section 4.10 (*Intercompany Arrangements; Transition Services*).

4.11      <u>Maintenance of Books and Records</u>.  After the Closing Date, the Buyer shall, until the sixth (6th) anniversary of the Closing Date, use reasonable best efforts to, subject to compliance with applicable Law, make available, maintain and retain all books, records, Track Records, other documents and electronically stored information of and relating to the Target Companies, General Partner Entities and their respective businesses in existence on the Closing Date (collectively, the "<u>Books and Records</u>") for inspection and copying by the Seller, any of the Seller's successors or assigns or any trustee in bankruptcy and, in each case, any of their respective Representatives upon reasonable notice, at the sole cost and expense of the requesting Person, and during normal business hours, solely as reasonably necessary for compliance with any obligation under (a) any applicable Law; (b) for the purposes of the preparation or amendment of Tax Returns, financial or court filings or reports of the Seller, (c) responding to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Entities, (d) prosecuting and defending any claims, objections and resolutions in the Bankruptcy Proceeding and (e) as is necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Proceeding; <u>provided</u>, that, the foregoing access shall not include any rights to information that (i) in the reasonable judgment of the Buyer, would result in the unauthorized disclosure of any trade secrets of third parties or violate any of its obligations with respect to confidentiality under any applicable Law, (ii) would result in the waiver of any attorney-client privilege or other privileges or protections under applicable Law or (iii) result in the disclosure of a trade secret. Notwithstanding the forgoing, prior to the sixth (6th) anniversary of the Closing Date, the Buyer shall not be restricted from destroying or otherwise disposing of any Books and Records relating to periods prior to the Closing Date so long as the Buyer provides the Seller reasonable notice thereof, and a reasonable opportunity to make copies of such Books and Records or any portion thereof, in each case at the Seller's sole cost and expense.

4.12      <u>Rebranding and Transitional Trademark License</u>.

(a)      To the extent any Seller Trademarks are used in the businesses of the Target Companies, General Partner Entities or Sponsored Funds as of the Closing, the Buyer shall, and shall cause the Target Companies, General Partner Entities and Sponsored Funds to, (i) within six (6) months following the Closing, take all actions necessary to change the name of the Target Companies, General Partner Entities and Sponsored Funds that includes any Seller Trademarks to a name that does not include such Trademarks or any Trademarks confusingly similar thereto, (ii) within six (6) months following the Closing, take all actions and execute all documents as may be necessary to evidence and record any such name changes, and (iii) upon expiration of the license granted pursuant to <u>Section 4.12(b)</u> (*Rebranding and Transitional Trademark License*), cease and discontinue all uses of any Seller Trademarks, and eliminate Seller Trademarks from, revise, paint over or otherwise permanently obscure the Seller Trademarks on any signage or other materials in the possession or under the control of the Buyer, the Target Companies, General Partner Entities or Sponsored Funds.  The Buyer shall not, and shall cause the Target Companies, General Partner Entities and Sponsored Funds not to, use any Seller Trademarks, or any Trademarks incorporating any Seller Trademarks or confusingly similar thereto, outside of the scope of the license granted pursuant to this <u>Section 4.12(a)</u> (*Rebranding and Transitional Trademark License*). Notwithstanding the foregoing, Seller agrees that Buyer has the right, at all times after the Closing, to use the Seller Trademarks: (i) solely to the extent required by applicable Law, (ii) in a neutral, non-trademark manner to describe the history of the business of the Target Companies, General Partner Entities and Sponsored Funds for informational purposes, which descriptions are factually

accurate, and (iii) on historical legal, financial and business agreements, documents and filings that, as of the Closing, contain or display the Seller Trademarks, which agreements, documents and filings are used solely for internal or archival purposes (and not public display), provided, that, at no time after the Closing shall the Target Companies, General Partner Entities or Sponsored Funds hold themselves out as being associated with or affiliated with the Seller with respect to the period after Closing.

(b)    To the extent any Seller Trademarks are used in the businesses of the Target Companies, General Partner Entities and Sponsored Funds as of the Closing, the Seller hereby grants to the Buyer, subject to the terms and conditions of this Agreement and effective as of the Closing, a non-exclusive, royalty-free, fully paid-up, non-transferable, irrevocable, non-sublicensable license for the Target Companies, General Partner Entities and Sponsored Funds to use such Seller Trademarks, for a period of six (6) months after the Closing, solely in a substantially similar manner to how such Trademarks were used in such business as of the Closing. All goodwill arising from any such use of the Seller Trademarks shall inure to the benefit of the Seller, and the quality of goods and services offered by the Target Companies, General Partner Entities and Sponsored Funds under the Seller Trademarks shall be at least as high as that of the Target Companies, General Partner Entities and Sponsored Funds during the twelve (12) months prior to the Closing.

4.13    Client Consents.

(a)    As soon as practicable following the entry of the Sale Order, the Seller will cause the relevant Target Companies, General Partner Entities or Sponsored Funds to send to each limited partner or other investor of each Closing Revenue Relevant Fund a notice (a "Form of Investor Consent and Disclosures") in a form as agreed between the Seller and the Buyer; provided that the parties shall use commercially reasonable efforts to agree on a Form of Investor Consent and Disclosures within ten (10) Business Days following the entry of the Sale Order. The Form of Investor Consent and Disclosures shall inform investors of the Transactions and the "assignment" or deemed "assignment" (as defined in the Advisers Act) of such Closing Revenue Relevant Fund's Advisory Contract resulting from the Transactions, and if applicable, shall notify the applicable governing body or representative of the Sponsored Funds, announcing entry into this Agreement and the proposed Transactions. Any Form of Investor Consent and Disclosures delivered pursuant to this Section shall be delivered in compliance in all material respects with applicable Law and the applicable Advisory Contract or other Fund Documentation. The Seller shall, and shall cause the Management Company or General Partner Entities, as applicable, to use reasonable best efforts to obtain the Client Consents. The Seller shall keep Buyer reasonably informed in a timely manner of all material developments involving obtaining the Client Consents, and Buyer shall have a reasonable opportunity to review and comment on all additional disclosure, notice or consent materials to be provided by any Target Company, General Partner Entity or Sponsored Fund to any Person, investor, limited partner or other applicable representative in connection with the Transactions. The Seller shall, and shall cause the Management Company or General Partner Entities, as applicable, to promptly upon their receipt, provide the Buyer with copies of any and all material written correspondence (other than any informal inquiries or similar communications) between such parties and any limited partner or investor in any Sponsored Fund, or any members of a governing body or the applicable representative counsel of any of the foregoing relating to the Transactions which may impact the obtaining of Client Consents, and

shall otherwise keep the Buyer reasonably informed in a timely manner of any material developments involving the obtaining of Client Consents. The Seller and the Buyer agree that the consent of each such Sponsored Fund to the Transactions shall be deemed to have been obtained for all purposes under this Agreement if the consent of such Sponsored Fund has been or, solely with respect to the Qualified Investors Funds, has deemed to have been, obtained in accordance with the applicable investor consent thresholds set forth in Section 4.13(a) of the Seller Disclosure Schedule. Seller, any Management Company, or any General Partner Entity shall not amend or revise any Advisory Contract or Fund Documentation or reduce or waive any fee or reimburse expenses payable under any Advisory Contract or Fund Documentation or offer or promise to any Sponsored Fund or any limited partner or other investor in any Sponsored Fund any reduced fee or other amendment in connection with obtaining any consent or otherwise in connection with the Transactions, or offer or make any payment or concession that would otherwise adversely affect the economic value of such Client relationship or materially modify any other term, in each case, without the prior written consent of the Buyer. If the Closing occurs but, notwithstanding its reasonable best efforts, Seller fails to obtain a Client Consent from a Sponsored Fund in accordance with the applicable investor consent threshold set forth in Section 4.13(a) of the Seller Disclosure Schedule (each, a "Non-Consenting Client"), it is understood and agreed that (i) Buyer shall not be required to purchase the portion of Seller's Equity Interests corresponding to the General Partner Entity of any such Non-Consenting Client(s); (ii) the Buyer shall not have any obligation to manage or advise any Non-Consenting Client or its respective General Partner Entity (except as may be reasonably requested by the Seller pursuant to Section 4.10(e)); (iii) Exhibit B attached hereto shall automatically be deemed amended to remove each such General Partner Entity and Non-Consenting Client; and (iv) the Closing Purchase Price shall be adjusted accordingly. For the avoidance of doubt, the Seller shall retain the applicable General Partner Entities and their entitlements to Carried Interest and capital interest in respect of any Non-Consenting Client.

(b)    The Seller and the Buyer agree that Section 4.13(a) of the Seller Disclosure Schedule sets forth the investors for which "negative" consent is permitted under the relevant Advisory Contract for the purposes of obtaining a Person's consent to the assignment of an advisory arrangement as a result of the Transactions pursuant to this Section 4.13 (*Client Consents*). The consent of such investors shall be deemed to have been obtained for all purposes under this Agreement to the Transactions if the Person receiving the written notice delivered pursuant to this Section 4.13 (*Client Consents*) has not objected to the Transactions within forty-five (45) days (or such other period as specified in the applicable Advisory Contract) following delivery of such notice.

(c)    The Seller and the Buyer agree that Section 4.13(c) of the Seller Disclosure Schedule sets forth the Sponsored Funds in which the investment period (or similar period as defined under the applicable Fund Documentation) has been suspended and the date as of which such suspension was effective. The Seller shall, and shall cause the Target Companies and General Partner Entities to, cooperate with the Buyer and its Affiliates and take or cause to be taken all actions reasonably necessary or advisable on their part (including, without limitation, seeking investor consent) to end any suspension of the investment period of such Sponsored Fund.

4.14    Further Assurances. The Parties shall execute and deliver, or shall cause to be executed and delivered, such documents and other instruments and shall take, or shall

cause to be taken, such further actions as may be reasonably required to carry out the provisions of this Agreement and give effect to the Transactions.

4.15       <u>Books and Records</u>.  To the extent the books, records, Track Records, other documents and electronically stored information of and relating to the Target Companies, General Partner Entities, Sponsored Funds and their respective businesses are not in possession by the Target Companies, General Partner Entities or Sponsored Funds as of the Execution Date, the Seller shall use reasonable best efforts to facilitate the transfer of such books, records, Track Records, other documents and electronically stored information to the respective Target Company, General Partner Entity or Sponsored Fund prior to the Closing Date.

4.16       <u>No Solicitation</u>.

(a)       Except as expressly permitted by this <u>Section 4.16</u> (*No Solicitation*), from the Execution Date to the earlier of the Closing Date and the termination of this Agreement in accordance with <u>Article VII</u> (*Termination*), the Seller will not, and will cause the Seller Parties and their respective Representatives not to, directly or indirectly, (i) initiate, solicit or knowingly encourage or knowingly facilitate any inquiries or requests for information with respect to, or the making of, any inquiry regarding, or any proposal or offer that constitutes, or could reasonably be expected to result in or lead to, any Alternative Transaction Proposal, (ii) engage in, continue or otherwise participate in any negotiations or discussions concerning, or provide access to its properties, books and records or any confidential information or data to, any Person relating to any proposal, offer, inquiry or request for information that constitutes, or could reasonably be expected to result in or lead to, any Alternative Transaction Proposal, (iii) approve, endorse or recommend any Alternative Transaction Proposal, (iv) execute or enter into, any letter of intent, memorandum of understanding, agreement in principle, confidentiality agreement (other than an Acceptable Confidentiality Agreement executed in accordance with <u>Section 4.16(b)</u> (*No Solicitation*)), merger agreement, acquisition agreement, exchange agreement, joint venture agreement, partnership agreement, option agreement or other similar agreement for or relating to any Alternative Transaction Proposal or (v) resolve or agree to do any of the foregoing; <u>provided</u>, that it is understood and agreed that any determination or action by the restructuring committee of the Seller's board of directors made in accordance with <u>Section 4.16(b)</u> (*No Solicitation*) or <u>Section 4.16(c)</u> (*No Solicitation*) shall not be deemed to be a breach or violation of this <u>Section 4.16(a)</u> (*No Solicitation*).  It is understood that any material violation of the restrictions contained in this <u>Section 4.16</u> (*No Solicitation*) by the Seller, any Seller Party, any Target Company, any General Partner Entity, any Sponsored Fund or any Representative thereof, shall be deemed to be a breach of this <u>Section 4.16</u> (*No Solicitation*) by the Seller.

(b)       Notwithstanding anything to the contrary in this Agreement, the Seller Parties and their respective Representatives shall have the right to: (w) provide access to non-public information concerning the Target Companies, the General Partner Entities and the Sponsored Funds to any Person that submits an unsolicited Alternative Transaction Proposal and executes and delivers an Acceptable Confidentiality Agreement; (x) receive, respond to, and maintain and continue discussions or negotiations with respect to such unsolicited Alternative Transaction Proposals in order to determine if such Alternative Transaction Proposal constitutes a Superior Proposal; (y) provide access to non-public information concerning the Target Companies, the General Partner Entities and the Sponsored Funds and receive, respond to, and maintain and

continue discussions or negotiations with respect to any existing Alternative Transaction Proposal outstanding as of the Execution Date or with respect to any party that has engaged in negotiations in the last three months regarding an Alternative Transaction Proposal prior to the Execution Date; and (z) enter into or continue discussions or negotiations with any creditor committee and/or the United States Trustee regarding the Transactions or any unsolicited Alternative Transaction Proposal, but only if Seller complies with the provisions of this Section 4.16(b) (*No Solicitation*). The Seller shall (i) provide notice of any Alternative Transaction Proposal received after the Execution Date to the Buyer within three (3) Business Days after the time of receiving such Alternative Transaction Proposal, (ii) provide to counsel to the Buyer a copy of any written Alternative Transaction Proposal (and notice and a description of any oral Alternative Transaction Proposal) within three (3) Business Day of the Seller Parties or their advisors receipt of such Alternative Transaction Proposal, (iii) notify the Buyer promptly (and in any event no later than twenty-four (24) hours following such determination) if the restructuring committee of the Seller's board of directors determines that an Alternative Transaction Proposal is a Superior Proposal, and (iv) promptly provide such information to counsel to the Buyer regarding such discussions or any actions or inaction pursuant to this Section 4.16 (*No Solicitation*) (including copies of any materials provided to, or provided by, Seller Parties with respect to the applicable Alternative Transaction) as necessary to keep counsel to the Buyer reasonably contemporaneously informed as to the status and substance of the foregoing. On or after the Execution Date, the Seller Parties shall not enter into a confidentiality or nondisclosure agreement with any Person that is not an Acceptable Confidentiality Agreement. If as of the Execution Date the Seller, any Target Company, any General Partner Entity or Sponsored Fund is party to an existing applicable confidentiality agreement with any Person that submits an unsolicited Alternative Transaction Proposal that bars the Seller, such Target Company, such General Partner Entity or such Sponsored Fund from providing a copy of any such written Alternative Transaction Proposal (or notice and a description of any oral Alternative Transaction Proposal), the Seller shall use reasonable best efforts to obtain the consent of such submitting Person to provide counsel to the Buyer a copy of such written Alternative Transaction Proposal (or notice and a description of any oral Alternative Transaction Proposal). If the Seller determines that an Alternative Transaction Proposal is a Superior Proposal, the Buyer shall be provided four (4) Business Days after receipt of such notice to propose modifications to the Transactions, and the Seller shall (x) if requested by the Buyer, engage in good faith in discussions and negotiations regarding such modifications, and (y) not terminate this Agreement pursuant to Article VII (*Termination*) unless and until such period has elapsed and the restructuring committee of the Seller's board of directors determines in good faith, after consultation with its financial advisors and its outside legal counsel (and taking into account any amendment or modification to the terms of the Transactions that the Buyer has agreed to make) that such Alternative Transaction Proposal is a Superior Proposal and that the failure to take such action would be inconsistent with its fiduciary duties under applicable Law.

(c)    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Seller or the restructuring committee of the Seller's board of directors to take any action or to refrain from taking any action with respect to the Transactions to the extent that it determines in good faith, after consulting with outside counsel, that taking or failing to take such action would be inconsistent with its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 4.16 (*No Solicitation*) shall not be deemed to constitute a breach of this Agreement. If the Seller, in compliance with this Section 4.16 (*No Solicitation*), determines to take or refrain from taking any action, it shall promptly (but, in any

event, within three (3) Business Days after such determination) provide written notice to the Buyer of such determination (which notice shall include a reasonable description of the action that the Seller has determined not to take or to not refrain from taking, as well as a reasonably detailed explanation for such determination), and the Buyer shall be provided five (5) Business Days after receipt of such notice to propose modifications to the Transactions, and the Seller shall (x) if requested by the Buyer, engage in good faith in discussions and negotiations regarding such modifications, and (y) not take such action unless and until such period has elapsed, and the restructuring committee of the Seller's board of directors determines in good faith, after consultation with its financial advisors and its outside legal counsel (and taking into account any amendment or modification to the terms of the Transactions that the Buyer has agreed to make) that the failure to take such action would be inconsistent with its fiduciary duties under applicable Law.

4.17        Insurance.

(a)        Seller shall, and shall cause each of its Affiliates to, use reasonable best efforts to (i) maintain the coverage provided to the Target Companies, General Partner Entities and Sponsored Funds and their respective businesses through the Seller Insurance Policies in full force and effect until the Closing, and (ii) prior to the Closing, report to the applicable third-party insurance provider under each such applicable Seller Insurance Policy all events, acts, errors, accidents, omissions, incidents, injuries or other forms of known occurrences to the extent relating to the each Target Company, General Partner Entity, Sponsored Fund or the properties, assets, operations, employees, officers or directors of such Target Company, General Partner Entity, Sponsored Fund, in each case, which occur prior to the Closing and are potentially covered by an occurrence-based Seller Insurance Policy to the same extent they would prior to the date hereof (collectively, the "Pre-Closing Occurrences").

(b)        From and after the Closing Date, (i) Seller shall, and shall cause each of its Affiliates to, use reasonable best efforts to report in good faith to the applicable third-party insurance provider all Pre-Closing Occurrences reasonably requested by Buyer, a Target Company, a General Partner Entity or Sponsored Fund, and otherwise reasonably cooperate with Buyer and its Affiliates to reasonably ensure that applicable claim reporting and other applicable material Seller Insurance Policy requirements are met, in each case with respect to Pre-Closing Occurrences that may reasonably be covered by a Seller Insurance Policy, (ii) Buyer shall cause each such Target Company, General Partner Entity and Sponsored Fund to comply with the terms of the applicable Seller Insurance Policy to the extent Seller has reasonably informed Buyer of such terms reasonably in advance of the time necessary to comply with such terms, (iii) Seller shall not, and shall cause its Affiliates not to, relinquish any of their respective rights, or take any actions (other than the making of claims under the Seller Insurance Policies) that could reasonably be expected to reduce or otherwise limit the available coverage for any Pre-Closing Occurrences under any of the Seller Insurance Policies, and (iv) Seller shall, and shall cause its applicable Affiliates to, use reasonable best efforts to obtain the benefit of the applicable insurance coverage under any applicable Seller Insurance Policy and pay such benefit to Buyer, net of any co-payments or other reasonable out-of-pocket costs and expenses reasonably incurred by Seller and its Affiliates in seeking such insurance proceeds (collectively, "Recovery Costs").  In no event shall Seller be obligated to maintain post-Closing claims-made tail coverage in the Seller Insurance Policies for the Pre-Closing Occurrences.  After the Closing, Seller shall not, and shall cause its

Affiliates to not, release, commute, buy back or otherwise eliminate (whether in whole or in part) insurance coverage under any of the applicable Seller Insurance Policies with respect to any such Pre-Closing Occurrences.

(c)     Notwithstanding anything in Section 4.17(b) to the contrary, with respect to each known Pre-Closing Occurrence as of the Closing potentially covered by a third-party claims-made insurance policy of Seller or its Affiliates (excluding each Target Company, General Partner Entity or Sponsored Fund) (each such policy, a "Seller Claims-Made Policy" and each such claim, a "Covered Known Claim"), Seller shall use reasonable best efforts to obtain insurance coverage for such Covered Known Claim under the Seller Claims-Made Policies as though such Seller Claims-Made Policy were a Seller Insurance Policy and the provisions of Section 4.17(b) shall apply to such Seller Claims-Made Policy mutatis mutandis (including, for the avoidance of doubt, with respect to netting and reimbursement of Recovery Costs).

4.18     Financing.   Subject to the other terms and conditions of this Agreement, the Buyer shall use reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to arrange and consummate the Equity Financing on the terms and conditions described in the Equity Commitment Letters, including using reasonable best efforts to (x) satisfy, or cause to be satisfied, on a timely basis, any conditions within Buyer's control to funding in the Equity Commitment Letters and (y) upon satisfaction of the conditions set forth in Article VI (Conditions) (other than those that, by their nature, are to be satisfied at the Closing, all of which are capable of being satisfied at the Closing), consummate the Equity Financing at or prior to the Closing.  Upon the reasonable written request of the Seller, Buyer shall provide Seller with a reasonable update of the status of its efforts to arrange the Equity Financing.  The Buyer shall promptly notify the Seller in writing (A) if there exists any actual or potential breach or default (or any event or circumstance that, with or without notice, lapse of time or both, would reasonably be expected to give rise to any material breach or default) by any party to the Equity Commitment Letters, (B) of the receipt by the Buyer or any Sponsor or any of their respective Representatives of any written or oral notice with respect to any potential or actual breach, default, termination or repudiation by any party to the Equity Commitment Letters or (C) if, for any reason, the Buyer no longer believes in good faith that it will be able to obtain all or any portion of the Equity Financing contemplated by the Equity Commitment Letters on the terms described therein.  The Buyer shall not consent to (a) any amendment or modification to, or any waiver of any provision under, the Equity Commitment Letters if such amendment, modification or waiver (i) decreases the aggregate amount of the Equity Financing, (ii) imposes new or additional conditions or otherwise expands any of the conditions to the receipt of the Equity Financing or (iii) would otherwise reasonably be expected to (A) prevent, jeopardize or delay the Closing, (B) make the funding of the Equity Financing materially less likely to occur or (C) adversely impact the ability of the Buyer to enforce its rights against the other parties to the Equity Commitment Letters, in each case without prior consent of the Seller.  The Buyer shall promptly furnish to the Seller a copy of any amendment, modification, waiver or consent of or relating to the Equity Commitment Letters.  The Buyer shall, and shall cause its Affiliates to, refrain from taking, directly or indirectly, any action that would reasonably be expected to result in the failure of any of the conditions contained in the Equity Commitment Letter or in any definitive agreement relating to the Equity Financing.

4.19        FCB License Agreement.  Seller shall, and shall cause its Affiliates, to negotiate in good faith and promptly enter into that certain FCB License Agreement (as defined in Section 4.1(b)(iii) of the Seller Disclosure Schedule), and to consummate the FCB Analytical Tools and Data Transfer as referenced in Section 4.1(b)(iii) of the Seller Disclosure Schedule, upon the consummation of the transactions contemplated by that Purchase and Sale Agreement, dated March 18, 2024, by and between First Citizens Global I Inc., First Citizens Global II, Inc., First Citizens BancShares, Inc., SVB Global Financial, Inc., SVB Global Services India LLP, and SVB Financial Group (the "SVB India Sale").  If the SVB India Sale is not consummated prior to the Closing Date, the Seller shall use its reasonable best efforts to enter into an agreement with First Citizens Bank and/or its applicable Affiliates and the Management Company to provide access to the tools and related data that are subject to the FCB Analytical Tools and Data Transfer until the closing of the SVB India Sale.

4.20        Member Support and Consent Agreement.  As soon as commercially practicable after the Execution Date, the Seller shall use reasonable best efforts to obtain, or cause the Management Company to obtain, the execution and delivery of a Member Support and Consent Agreement in substantially the form attached hereto as Exhibit H (with such changes as are agreed by the parties thereto) by each of the requisite members of certain of the General Partner Entities required to effect the Organizational Document Amendments with respect to such General Partner Entities, effective as of the Closing (the "Credit Fund Support Agreements").  The Buyer shall reasonably cooperate in good faith with the Seller to facilitate the receipt of such Credit Fund Support Agreements.  In the event that the Client Consent of the applicable Sponsored Funds have been obtained in accordance with Section 4.13 (*Client Consents*) but the Credit Fund Support Agreements are not executed and delivered and effective as of the Closing, Seller shall effect an alternative arrangement, reasonably acceptable to the Buyer, pursuant to which the applicable General Partner Entities' entitlements to Carried Interest and capital interest in respect of the Sponsored Funds managed by such General Partner Entities are transferred to the Buyer or its designee.  The Seller and the Management Company, as applicable, shall consent to the Organizational Document Amendments as long as such Organizational Document Amendments are substantially consistent with the terms set forth in Exhibits G-1 and G-2.

4.21        Evergreen Hedging Arrangement. Promptly following the date hereof, the Buyer may, in its discretion and (subject to the next sentence) at its sole expense, enter into a Hedging Arrangement to protect against the risk of fluctuations in the prices of publicly traded securities held by the Evergreen Fund during the period between the Execution Date and the Closing Date (the "Evergreen Hedging Arrangement").  Reasonable and documented expenses incurred by the Buyer in connection with entering into the Evergreen Hedging Arrangement (the "Evergreen Hedging Expenses") shall be subject to payment or reimbursement pursuant to Section 7.3(a)(i) (*Termination Fee; Expense Reimbursement*) in the event that this Agreement is terminated in the circumstances described in Section 7.3(a)(i) (*Termination Fee; Expense Reimbursement*).  In the event that the Evergreen Hedging Expenses are reimbursed pursuant to Section 7.3(a)(i) (*Termination Fee; Expense Reimbursement*), to the extent permitted by applicable Law and the terms of the Evergreen Hedging Arrangement, Buyer will use commercially reasonable efforts to cause the Evergreen Hedging Arrangement to be assigned to Seller or its designee for no additional consideration.

## ARTICLE V

## BANKRUPTCY MATTERS

5.1        Bankruptcy Court Filings.

(a)        As soon as reasonably practicable following the Execution Date and in accordance with the Milestones, the Seller shall file, or cause to be filed, any motions, pleadings, notices or proposed Orders necessary or advisable in order to enter the Buyer Protections Order and the Sale Order by the Bankruptcy Court.  From the Execution Date until the earliest of (i) the termination of this Agreement in accordance with the terms hereof, (ii) the entry of the Buyer Protections Order or the Sale Order, as applicable and (iii) the Closing Date, the Seller shall continue to pursue the entry of the Buyer Protections Order and the Sale Order by the Bankruptcy Court.

(b)        Each of the Seller and the Buyer shall (i) appear in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received from the Bankruptcy Court or any other party with respect to the Transactions.

(c)        The Parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, the Buyer Protections Order and the Sale Order.  The Seller shall promptly provide the Buyer and its outside legal counsel with copies of all notices, filings and orders of the Bankruptcy Court that the Seller has in its possession (or receives) pertaining to the Buyer Protections Order or the Sale Order, or related to any of the Transactions, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to the Buyer and its outside legal counsel.  The Seller shall provide draft copies of all material pleadings and documents regarding the Transactions that the Seller intends to file with or submit to the Bankruptcy Court or any governmental authority (including any regulatory authority), as applicable, to counsel to the Buyer as soon as reasonably practicable prior to the date when such Seller intends to file, submit or issue such document, but in no event less than two (2) days (or such shorter period as may be necessary in light of the exigent circumstances) prior to such filing date.  The form and substance of any such proposed filing with or submission to the Bankruptcy Court or any governmental authority (including any regulatory authority) shall be reasonably acceptable to the Buyer.  The Seller shall not seek any modification to the Buyer Protections Order or the Sale Order by the Bankruptcy Court or any other Governmental Entity of competent jurisdiction to which a decision relating to the Bankruptcy Proceeding has been appealed, in each case, without the prior written consent of the Buyer (not to be unreasonably withheld, conditioned or delayed).

(d)        If the Buyer Protections Order or the Sale Order are appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or argument shall be filed with respect to the Buyer Protections Order or the Sale Order), subject to rights otherwise arising from this Agreement, the

Seller shall use commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

5.2         Buyer Protections Order; Sale Order.

(a)         The Buyer and the Seller shall take all actions as may be reasonably necessary to cause each of the Buyer Protections Order and the Sale Order to be issued, entered and become a Final Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.  The Buyer agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Buyer Protections Order, the Sale Order and any other applicable Order(s) of the Bankruptcy Court required to effect the Transactions, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code and demonstrating that the Buyer is a "good faith" buyer under section 363(m) of the Bankruptcy Code.

(b)         The Buyer Protections Order shall, among other things, approve the Expense Reimbursement Amount, the Hedging Reimbursement Amount and the Termination Fee. The Sale Order shall, among other things, (i) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by the Seller of this Agreement, (B) the sale of the Sale Interests, the Sponsor Commitments and the Seller's rights and interest in the Carried Interest to the Buyer on the terms set forth herein and free and clear of all Liens (other than Permitted Post-Closing Encumbrances), (C) the performance by the Seller of its obligations under this Agreement, and (D) the assumption and assignment to the Buyer of the Assumed Contracts, (ii) find that (A) the Buyer is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code and (B) the Buyer is not a successor to the Seller and (iii) grant the Buyer the protections of section 363(m) of the Bankruptcy Code.

## ARTICLE VI

## CONDITIONS

6.1         Conditions to Each Party's Obligation to Consummate the Transactions.  The obligation of each Party to consummate the Transactions is subject to the satisfaction or waiver in writing by the Buyer and the Seller, at or prior to the Closing of each of the following conditions:

(a)         Regulatory Approvals and Deliverables. The waiting period (and any extension thereof) applicable to the consummation of the Transactions under the HSR Act shall have expired or been earlier terminated.

(b)         Orders.  No court, arbitrator, mediator or other Governmental Entity of competent jurisdiction shall have enacted, enforced, entered, issued or promulgated any Order or Law (whether temporary, preliminary or permanent) that is in effect and has the effect of making the Transactions illegal or otherwise prohibiting consummation of the Transactions.

(c)        Sale Order.  The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall be in full force and effect and not subject to a stay.

6.2        Conditions to Obligations of the Buyer.  The obligation of the Buyer to consummate the Transactions is also subject to the satisfaction or waiver in writing by the Buyer at or prior to the Closing of the following conditions:

(a)        Representations and Warranties.

(i)        The Seller Fundamental Representations (other than the representations and warranties of the Seller set forth in Sections 2.3(a) and 2.3(c)(i) (*Capital Structure*)) shall be true and correct in all material respects as of the Execution Date and as of the Closing as though made on and as of such date and time (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct in all material respects as of such earlier date).

(ii)        The representations and warranties of the Seller set forth in Sections 2.3(a) and 2.3(c)(i) (*Capital Structure*) shall be true and correct in all respects (other than any *de minimis* inaccuracy) as of the Execution Date and as of the Closing as though made on and as of such date and time (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct in all respects (other than any *de minimis* inaccuracy) as of such earlier date).

(iii)        The representations and warranties of the Seller set forth in Section 2.7(a) (*Absence of Certain Changes*) shall be true and correct in all respects as of the Execution Date.

(iv)        Other than the Seller Fundamental Representations and the representations and warranties of the Seller set forth in Section 2.7(a) (*Absence of Certain Changes*), all other representations and warranties of the Seller set forth in Article II (*Representations and Warranties of the Seller*) shall be true and correct (without giving effect to any materiality qualifiers, including "Material Adverse Effect," contained therein, except that materiality qualifiers will be given effect in any representation or warranty solely to the extent used to define items to be listed on a schedule (such as Contracts material to the business)) as of the Execution Date and as of the Closing as though made on and as of such date and time (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of any such representations and warranties to be so true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)        Performance of Obligations of the Seller.  The Seller shall have performed and complied in all material respects with all covenants required to be complied with and performed by it under this Agreement on or prior to the Closing Date, including satisfaction of all Milestones.

(c)        Client Consents. The Seller shall (i) have obtained Client Consents that remain in effect as of the Closing, such that, the Client Deficit Percentage is no greater than 20% and (ii) have provided Seller with reasonable evidence of such Client Consents.

(d)        No Material Adverse Effect. Since the date hereof, there shall not have occurred a Material Adverse Effect.

(e)        Closing Certificate.   The Buyer shall have received at the Closing a certificate signed on behalf of the Seller by a duly authorized officer (solely in his, her or their capacity as such and not in his, her or their personal capacity, and without personal liability), certifying that the conditions set forth in Section 6.2(a) (*Representations and Warranties*) Section 6.2(b) (*Performance of Obligations of the Seller*), Section 6.2(c) (*Client Consents*) and Section 6.2(d) (*No Material Adverse Effect*) have been satisfied.

6.3        Conditions to Obligations of the Seller. The obligation of the Seller to consummate the Transactions is also subject to the satisfaction or waiver in writing by the Seller at or prior to the Closing of the following conditions:

(a)        Representations and Warranties.

(i)        The representations and warranties of the Buyer set forth in Section 3.1 (*Organization, Good Standing and Qualification*) and Section 3.2 (*Authority; Approval*) shall be true and correct in all material respects as of the Closing as though made on and as of such date and time (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct in all material respects as of such earlier date).

(ii)       The other representations and warranties of the Buyer contained in Article III (*Representations and Warranties of the Buyer*) shall be true and correct (without giving effect to any materiality qualifiers contained therein) as of the Closing Date as though made on and as of such date and time (except to the extent that any such representation and warranty speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of any such representation and warranty to be so true and correct would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of the Buyer to consummate the Transactions.

(b)        Performance of Obligations of the Buyer. The Buyer shall have performed and complied with each of the covenants required to be complied with and performed by it under this Agreement on or prior to the Closing Date in all material respects.

(c)        Closing Certificate.   The Seller shall have received at the Closing a certificate signed on behalf of the Buyer by a duly authorized officer of the Buyer (solely in his, her or their capacity as such and not in his, her or their personal capacity, and without personal liability), certifying that the conditions set forth in Section 6.3(a) (*Conditions to Obligations of the Seller*) and Section 6.3(b) (*Conditions to Obligations of the Seller*) have been satisfied.

6.4    <u>Frustration of Closing Conditions</u>.  A Party may not rely on the failure of any condition set forth in <u>Section 6.2</u> (*Conditions to Obligations of the Buyer*) or <u>Section 6.3</u> (*Conditions to Obligations of the Seller*), as the case may be, to be satisfied if such failure was caused by such Party's breach of this Agreement.

## ARTICLE VII

## TERMINATION

7.1    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing:

(a)   by written agreement of the Buyer and the Seller;

(b)   automatically, upon the consummation of an Alternative Transaction, prior to the date on which the Bankruptcy Court enters the Sale Order;

(c)   by either the Buyer or the Seller, by giving written notice of such termination to the other Party, if:

(i)    the Closing has not occurred by 5:00 p.m., prevailing Eastern time, on the date that is the earlier of (x) 120 days from the date of entry of the Sale Order or (y) 210 days from the Execution Date (the "<u>Termination Date</u>"), which date may be extended by mutual agreement of the Parties or otherwise pursuant to <u>Section 7.1(d)(i)</u> (*Seller's Breach*) or <u>Section 7.1(e)(i)</u> (*Buyer's Breach*); <u>provided</u> that, if the Closing has not occurred on or before the Termination Date due to a material breach of any covenants or agreements contained in this Agreement by the Buyer or the Seller, as applicable, so as to cause any of the conditions of the other Party, as applicable, set forth in <u>Section 6.1</u> (*Conditions to Each Party's Obligation to Consummate the Transactions*), <u>Section 6.2</u> (*Conditions to Obligations of the Buyer*) or <u>Section 6.3</u> (*Conditions to Obligations of the Seller*) not to be satisfied, as applicable, then such breaching Party may not terminate this Agreement pursuant to this <u>Section 7.1(c)(i)</u> (*Termination Date*);

(ii)    there is in effect any Law or final non-appealable Order of a Governmental Entity of competent jurisdiction, enjoining or otherwise prohibiting the consummation of the Transactions (<u>it</u> <u>being</u> <u>agreed</u> that the Parties will promptly appeal any adverse determination which is not non-appealable and pursue such appeal in accordance with their respective obligations under this Agreement unless and until this Agreement is terminated pursuant to this <u>Section 7.1</u> (*Termination*));

(iii)   following the appointment of a trustee or examiner with expanded powers to operate or manage the affairs or reorganization of the Seller, or the dismissal or conversion of the Bankruptcy Proceeding to a case under Chapter 7 of the Bankruptcy Code; or

(iv)   (A) the restructuring committee of the Seller's board of directors determines in good faith, after consultation with outside counsel, that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with such

committee's fiduciary duties, (B) the Seller makes a public announcement that it intends to accept or pursue an Alternative Transaction or otherwise terminate this Agreement and/or its pursuit of the Transactions in reliance on the provisions of Section 4.16(c) (*No Solicitation*), (C) the Seller enters into one or more Alternative Transactions, or (D) the Bankruptcy Court approves an Alternative Transaction; provided that, in each case, the Seller may only exercise this termination right prior to the date on which the Bankruptcy Court enters the Sale Order and if it is not then in material breach of any covenant or agreement contained in Section 4.16 (*No Solicitation*), and provided, further, that Seller and Buyer have engaged in good faith negotiations, to the extent required by Section 4.16 (*No Solicitation*), to modify the terms and conditions of this Agreement such as to avoid termination;

(d)      by the Buyer, upon written notice to the Seller:

(i)      in the event of (x) a material breach by the Seller of any representation or warranty or any covenant or agreement contained in this Agreement that would result in any of the conditions set forth in Section 6.1 (*Conditions to Each Party's Obligation to Consummate the Transactions*), or Section 6.2 (*Conditions to Obligations of the Buyer*) not being satisfied if such breach remained uncured as of the Closing or (y) a material breach by the Seller of the Sale Order, and in each such case, such breach is incapable of being cured prior to the Termination Date or, if capable of being cured, such breach has not been cured within twenty (20) days after the giving of written notice by the Buyer to the Seller of such breach; provided that the Buyer is not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement; provided, further, that in the event that the Buyer provides such written notice to the Seller within twenty (20) days of the Termination Date, then the Termination Date shall be extended until the end of the twenty (20)-day cure period set forth in this Section 7.1(d)(i) (*Seller's Breach*);

(ii)      if the Buyer Protections Order or the Sale Order is materially amended, modified or supplemented without the Buyer's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) or is voided, reversed or vacated following entry by the Bankruptcy Court of the applicable order (provided that the Buyer shall not be able to terminate this Agreement pursuant to this Section 7.1(d)(ii) (*Modification of Buyer Protections Order or Sale Order*) if, prior to such termination, the applicable order shall have become a Final Order);

(iii)      if (A) any of the Target Companies, General Partner Entities or Sponsored Funds commences a voluntary case under any Bankruptcy Law, consents to the entry of an Order for relief in an involuntary case under any Bankruptcy Law, or consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee or similar official for a Target Company, General Partner Entity or Sponsored Fund or all or any portion of its assets or property or effects any assignment for the benefit of creditors, or (B) any court of competent jurisdiction enters a decree or Order for relief in respect of any Target Company, General Partner Entity or Sponsored Fund in any involuntary case under any Bankruptcy Law or for the appointment of a receiver, liquidator, assignee, custodian, trustee or similar official for a Target Company, General

Partner Entity or Sponsored Fund or any of its property or assets or for any winding up or liquidation of a Target Company, General Partner Entity or Sponsored Fund, in each case without the prior written consent of the Buyer;

(iv)         if (A) the Seller fails to file the Sale Motion and a motion scheduling expedited hearing and shortening the time period for notice of a hearing on the Buyer Protections Order with the Bankruptcy Court by May 3, 2024 (B) the Buyer Protections Order is not entered by May 23, 2024 or (C) the Sale Order is not entered by July 8, 2024;

(v)         if the Seller withdraws or seeks to withdraw any motion seeking approval of this Agreement and the Transactions or entry of the Buyer Protection Order or the Sale Order, or files any motion seeking approval of an Alternative Transaction or any restructuring, reorganization, liquidation or winding up, or plan of reorganization or liquidation that is an alternative to and/or materially inconsistent with one or more of the Transactions; or

(vi)         the Bankruptcy Court enters an order denying approval of the Transactions;

(e)         by the Seller, upon written notice to the Buyer:

(i)         in the event of (x) a material breach by the Buyer of any representation or warranty or any covenant or agreement contained in this Agreement that would result in any of the conditions set forth in Section 6.1 (*Conditions to Each Party's Obligation to Consummate the Transactions*) or Section 6.3 (*Conditions to Obligations of the Seller*) not being satisfied if such breach remained uncured as of the Closing or (y) a material breach by the Buyer of the Sale Order, and in each such case, such breach is incapable of being cured prior to the Termination Date or, if capable of being cured, such breach has not been cured within twenty (20) days after the giving of written notice by the Seller to the Buyer of such breach; provided that the Seller is not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement; provided, further, that in the event that the Seller provides such written notice to the Buyer within twenty (20) days of the Termination Date, then the Termination Date shall be extended until the end of the twenty (20)-day cure period set forth in this Section 7.1(e)(i) (*Buyer's Breach*); or

(ii)         (A) if all of the conditions set forth in Section 6.1 (*Conditions to Each Party's Obligation to Consummate the Transactions*) and Section 6.2 (*Conditions to Obligations of the Buyer*) have been satisfied or waived (other than those that, by their nature, are to be satisfied at the Closing, all of which are capable of being satisfied at the Closing), (B) the Seller has irrevocably confirmed by written notice to the Buyer that (1) all conditions set forth in Section 6.3 (*Conditions to Obligations of the Seller*) have been satisfied (other than those that, by their nature, are to be satisfied at Closing) or that it would be willing to waive any unsatisfied conditions in Section 6.3 (*Conditions to Obligations of the Seller*) if the Closing were to occur, and (2) it is ready, willing and able to consummate the Closing and (C) the Buyer fails to consummate the Closing within two (2) Business Days following the date the Closing should have occurred pursuant to

Section 1.3 (*Time and Place of Closing*); provided, however, that any purported termination by the Buyer pursuant to Section 7.1(c)(i) (*Termination Date*) shall be deemed to be a termination by the Seller pursuant to this Section 7.1(e)(ii) (*Buyer Failure to Close*) if the Seller is entitled to terminate this Agreement pursuant to this Section 7.1(e)(ii) (*Buyer Failure to Close* ) at the time of such termination.

7.2      Effect of Termination; Closing Purchase Price Deposit

(a)      In the event of termination of this Agreement pursuant to Section 7.1 (*Termination*), this Agreement shall become void and of no effect; provided, however, that the provisions set forth in this Section 7.2 (*Effect of Termination; Closing Purchase Price Deposit*), Section 7.3 (*Termination Fee; Expense Reimbursement*), Article VIII (*Miscellaneous and General*) and in the Confidentiality Agreement shall survive the termination of this Agreement; provided, further, that nothing in this Section 7.2 (*Effect of Termination; Closing Purchase Price Deposit*), shall be deemed to release the Seller from liability for any intentional and material breach of this Agreement prior to termination.  Subject to the last sentence of Section 7.2(c), nothing herein shall relieve either Party for Fraud.

(b)      If this Agreement is terminated:

(i)            pursuant to Section 7.1(e)(i) (*Buyer's Breach*); or

(ii)           pursuant to Section 7.1(e)(ii) (*Buyer Failure to Close*);

then the Seller shall retain the Deposit, together with all interest thereon, or if the Deposit has not yet been deposited, the Buyer shall make a payment to the Seller equal to the Deposit Amount within one (1) Business Day of such termination (and the obligation by the Buyer to pay such amount shall survive the termination of this Agreement).

(c)      Each of the Parties acknowledges and agrees that the agreements contained in this Section 7.2 (*Effect of Termination; Closing Purchase Price Deposit*) are an integral part of the Transactions and that, without these agreements, the other Party would not enter into this Agreement. Each of the Parties further acknowledges that the retention by the Seller of the Deposit (or payment to the Seller of the Deposit Amount) is not a penalty, but rather liquidated damages in a reasonable amount that will compensate the Seller, in the circumstances in which the Deposit or the Deposit Amount may be retained by or paid to the Seller for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision; provided that, for the avoidance of doubt, this Section 7.2(c) (*Effect of Termination; Closing Purchase Price Deposit*) shall not limit the rights of the Seller to pursue a grant of specific performance or other equitable relief pursuant to Section 8.6 (*Specific Performance*) prior to the termination of this Agreement; provided, however, that in no event will the Seller be entitled to both retention of the Deposit (or receipt of the Deposit Amount) and a grant of specific performance or other equitable relief pursuant to Section 8.6 (*Specific Performance*). The Parties acknowledge and agree that, in the event this Agreement is validly terminated by the Seller pursuant to Section 7.1 (*Termination*), the Seller's sole and exclusive remedies against the Buyer Parties or any of their respective Representatives for any

breach, loss or damage under, relating to or arising out of this Agreement or the Transactions, including as a result of the failure of the Transactions to be consummated for any breach or failure hereunder, shall be the retention of the Deposit or right to payment of the Deposit Amount, in each case, to the extent provided under this <u>Section 7.2(c)</u> (*Effect of Termination; Closing Purchase Price Deposit*), and none of the Buyer Parties or their respective Representatives shall have any further Liability or obligation to any Person relating to or arising out of this Agreement or the Transactions. Notwithstanding anything in this Agreement to the contrary, the Parties further acknowledge and agree that in no event (but excluding for the avoidance of doubt, any amounts payable by the Buyer at the Closing in accordance herewith) shall the aggregate liability of the Buyer and its Affiliates for monetary damages (including damages for fraud (including Fraud) or breach, whether willful, intentional, unintentional or otherwise or monetary damages in lieu of specific performance) under, or related to, this Agreement or the Transactions contemplated hereby, whether or not this Agreement is terminated, and regardless of the reason for any such termination, exceed an amount equal to the Deposit Amount.

(d)      If this Agreement is terminated for any reason prior to the Closing other than as contemplated by <u>Section 7.2(b)</u> (*Effect of Termination; Closing Purchase Price Deposit*), then the Deposit shall be returned to the Buyer and the Seller shall have no further recourse against the Buyer.

(e)      The Deposit shall only constitute property of the Seller in the event that such Deposit is released to the Seller by the Escrow Agent in accordance with the terms of this Agreement and the Escrow Agreement.

7.3      <u>Termination Fee; Expense Reimbursement</u>.

(a)      In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of the Seller:

(i)      if this Agreement is terminated pursuant to <u>Section 7.1(b)</u> (*Alternate Transaction*), <u>Section 7.1(c)(i)</u> (*Failure to Close By the Outside Date*), <u>Section 7.1(c)(iii)</u> (*Dismissal, Conversion, or Appointment of a Trustee*), <u>Section 7.1(c)(iv)</u> (*Fiduciary Out*), <u>Section 7.1(d)(ii)</u> (*Modification of Buyer Protections Order or Sale Order*), <u>Section 7.1(d)(iii)</u> (*Bankruptcy of Target Company, General Partner Entity, or Sponsored Fund*), <u>Section 7.1(d)(vi)</u> (*Entry of Order Denying Approval of Transactions*), or in the event of termination by the Buyer under <u>Section 7.1(d)(i)</u> (*Seller's Breach*) as a result of a material breach by the Seller of <u>Section 4.16</u> (*No Solicitation*) or an intentional breach by the Seller of any other representation, warranty, covenant or agreement contained in this Agreement, then the Seller shall, without the requirement of any notice or demand from the Buyer, promptly, but in no event later than three (3) Business Days after the date of such termination of this Agreement, pay or cause to be paid to the Buyer an amount equal to all reasonable out-of-pocket and documented fees and expenses (including fees and expenses of counsel) incurred by the Buyer or its Affiliates in connection with or related to the evaluation, consideration, analysis, negotiation, diligence, documentation, execution, performance and enforcement of this Agreement and the Transactions, in an aggregate amount not to exceed $3,500,000 (the "<u>Expense Reimbursement Amount</u>");

provided that solely in the event this Agreement is terminated pursuant to Section 7.1(b) (*Alternate Transaction*) or Section 7.1(d)(i) (*Seller's Breach*) as a result of a material breach by the Seller of Section 4.16 (*No Solicitation*) or an intentional breach by the Seller of any other representation, warranty, covenant or agreement contained in this Agreement, the Seller shall, without the requirement of any notice or demand from the Buyer, promptly, but in no event later than three (3) Business Days after the date of such termination of this Agreement, additionally pay or cause to be paid to the Buyer an amount equal to the Hedging Reimbursement Cost (the "Hedging Reimbursement Amount"); and

(ii)        if this Agreement is terminated pursuant to Section 7.1(b) (*Alternate Transaction*), Section 7.1(c)(iv) (*Fiduciary Out*), Section 7.1(d)(iii) (*Bankruptcy of Target Company, General Partner Entity or Sponsored Fund*) or in the event of termination by the Buyer under Section 7.1(d)(i) (*Seller's Breach*) as a result of a material breach by the Seller of Section 4.16 (*No Solicitation*) or an intentional breach by the Seller of any other representation, warranty, covenant or agreement contained in this Agreement, then, in addition to the Expense Reimbursement Amount (and if applicable, the Hedging Reimbursement Amount) payable under Section 7.3(a)(i) (*Expense Reimbursement Amount*), the Seller shall, without the requirement of any notice or demand from the Buyer, promptly, but in no event later than three (3) Business Days after the date of such termination of this Agreement, pay or cause to be paid to the Buyer the Termination Fee.

(b)        Each of the Parties acknowledges and agrees that (i) the agreements contained in this Section 7.3 (*Termination Fee; Expense Reimbursement*) are an integral part of this Agreement, (ii) in the absence of Seller's obligations to make these payments Buyer would not have entered into this Agreement, (iii) the Termination Fee, the Expense Reimbursement Amount and the Hedging Reimbursement Amount shall constitute allowed superpriority administrative expense claims pursuant to sections 105(a), 364(c)(1), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code and such allowed superpriority administrative expense claim shall be superior in priority to all other similarly situated claims asserted or allowed in the Bankruptcy Proceeding, and (iv) the Termination Fee, the Expense Reimbursement Amount and the Hedging Reimbursement Amount are not a penalty, but rather represent liquidated damages in a reasonable amount that will reasonably compensate Buyer in the circumstances in which the Termination Fee, the Expense Reimbursement Amount and/or the Hedging Reimbursement Amount, as applicable, is payable for the efforts and resources expended and opportunities foregone by Buyer while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.  The obligations of the Seller to pay the Termination Fee, the Expense Reimbursement Amount and the Hedging Reimbursement Amount shall survive the termination of this Agreement.

(c)        The Parties acknowledge and agree that, in the event this Agreement is validly terminated by the Buyer as set forth in Section 7.3(a) (*Termination Fee; Expense Reimbursement*), the Buyer's sole and exclusive remedies against the Seller Parties or any of their respective Representatives for any breach, loss or damage under, relating to or arising out of this Agreement or the Transactions, including as a result of the failure of the Transactions to be consummated for any breach or failure hereunder, shall be the Termination Fee, Expense

Reimbursement Amount and/or the Hedging Reimbursement Amount, as applicable, in each case, to the extent provided under this Section 7.3 (*Termination Fee; Expense Reimbursement*), and none of the Seller Parties or their respective Representatives shall have any further Liability or obligation to any Person relating to or arising out of this Agreement or the Transactions. For the avoidance of doubt, under no circumstances shall the Buyer be permitted or entitled to receive both (i) the remedy of specific performance to cause the Closing and (ii) the payment of the Termination Fee and/or the Expense Reimbursement Amount.

(d)     The Seller's obligation to pay the Expense Reimbursement Amount, the Hedging Reimbursement Amount and the Termination Fee pursuant to this Section 7.3 (*Termination Fee; Expense Reimbursement*) is subject to approval by the Bankruptcy Court. The Seller shall seek the Bankruptcy Court's approval of the Expense Reimbursement Amount, the Hedging Reimbursement Amount and the Termination Fee as set forth in this Section 7.3 (*Termination Fee; Expense Reimbursement*) in the Buyer Protections Order.

## ARTICLE VIII

## MISCELLANEOUS AND GENERAL

8.1     Survival.    The Parties agree that the representations, warranties, covenants or agreements contained in this Agreement will not survive the Closing (other than with respect to Section 1.5 (*Closing Statements*), Section 2.26 (*No Other Representations or Warranties*), Section 3.9 (*No Other Representations or Warranties*) and this Article VIII (*Miscellaneous and General*)), and none of the Parties will have any liability to each other after the Closing for any claim for breach of such representations, warranties, covenants or agreements, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) in respect thereof, in each case, which may be made, or Action instituted, after the Closing. Notwithstanding the foregoing, the covenants and agreements that by their terms are to be satisfied after the Closing Date shall survive until satisfied in accordance with their terms. At and at all times after the Closing, in no event shall the Buyer, on the one hand, or the Seller, on the other hand, have any recourse against (a) the Seller or any of the Seller Parties, or (b) the Buyer or any of the Buyer Parties, respectively, in each such case, with respect to any representation, warranty, covenant or agreement made by the Seller or the Buyer, as applicable, in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, except with respect to claims for breaches of covenants and agreements that by their terms are to be satisfied after the Closing Date. Notwithstanding the foregoing, nothing in this Section 8.1 shall limit any claim or Action in respect of Fraud.

8.2     Entire Agreements; Amendment; Waiver.    This Agreement and the Transaction Documents represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersede all prior discussions and agreements between the Parties with respect to the subject matter hereof. Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by both the Seller and the Buyer, or in the case of a waiver, by the Party granting the waiver. No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and

remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

8.3      Expenses.  Except as otherwise provided in this Agreement and whether or not the Transactions are consummated, all costs and expenses (including fees and expenses of counsel and financial advisors, if any) incurred in connection with this Agreement and the Transactions shall be paid by the Party incurring such costs and expenses.

8.4      Counterparts.  This Agreement may be executed in one or more counterparts (including by facsimile or other electronic means such as ".pdf" or ".jpg" files), each of which shall be deemed an original, and all of which shall constitute one and the same Agreement.

8.5      Governing Law.  This Agreement will be governed by and construed in accordance with the internal Laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws.

8.6      Specific Performance.

(a)      The Parties agree that irreparable damages would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce the terms and provisions of this Agreement without the necessity of posting bond or other security against it or proving damages, including without limitation specific performance of such covenants, promises or agreements (including to cause the Buyer to consummate the Closing and to make the payments contemplated by this Agreement) or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this Section 8.6 (*Specific Performance*) will be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(b)      It is acknowledged and agreed that the Seller shall be entitled to specific performance to (i) cause the payment of the amount equal to the Deposit Amount pursuant to Section 1.2 (*Deposit*) or Section 7.2(b) (*Effect of Termination; Closing Purchase Price Deposit*) (as applicable) (which terms shall be included in the terms of the Equity Commitment Letter) and (ii) fully enforce the terms of the Equity Commitment Letter against Sponsor and to cause the Equity Financing to be funded (including by requiring the Buyer to file and litigate one or more lawsuits against Parent in order to fully enforce Parent's obligations, and the rights of the Buyer thereunder) and to cause the Buyer to effect the Closing in accordance with Section 1.3 (*Time and Place of Closing*) and pay all amounts that may become due hereunder if (A) all of the conditions in Section 6.1 (*Conditions to Each Party's Obligation to Consummate the Transactions*) and Section 6.2 (*Conditions to Obligations of the Buyer*) have been satisfied or waived by the Buyer

(other than those conditions that by their terms are to be satisfied at the Closing (assuming the satisfaction of those conditions at such time if Closing were to occur at such time)), (B) all of the conditions in Section 6.3 (*Conditions to Obligations of the Seller*) have been satisfied or waived by the Seller (other than those conditions that by their terms are to be satisfied at the Closing (assuming the satisfaction of those conditions at such time if Closing were to occur at such time)), (C) the Buyer has not consummated the Closing by the date the Closing is required to have occurred in accordance with Section 1.3 (*Time and Place of Closing*), (D) the Seller has given irrevocable written notice to the Buyer that the Seller is ready, willing and able to take the actions within its control to consummate the Closing as of such date and within three (3) Business Days thereafter, and (E) the Buyer fails to consummate the Closing on or prior to the third Business Day following the date of delivery of such written notification described in the foregoing clause (E) by the Seller.  For the avoidance of doubt, notwithstanding anything in this Agreement (including this Section 8.6 (*Specific Performance*)) to the contrary, under no circumstances will the Seller, the Target Companies, the General Partner Entities or the Sponsored Funds (collectively with all of their respective Affiliates) be entitled to both monetary damages and a grant of specific performance or other equitable remedies that result in the funding of the Equity Financing and/or the consummation of the Closing by the Buyer.

(c)      The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by the Buyer or the Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of the Buyer or the Seller, as applicable, under this Agreement all in accordance with the terms of this Section 8.6 (*Specific Performance*).

8.7      Submission to Jurisdiction; Consent to Service of Process; Waiver of Jury Trial.

(a)      Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in Section 8.8 (*Notices*); provided, however, that if the Bankruptcy Proceeding has been closed pursuant to section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Action, in the courts of the State of New York located in the City of New York, Borough of Manhattan, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Action brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the Parties hereby consents to process being served by any other Party in any Action by delivery of a copy thereof in accordance with the provisions of Section 8.8 (*Notices*); provided, however, that such service will not be effective until the actual receipt thereof by the Party being served.

(c)    Each Party to this Agreement waives any right to trial by jury in any Action regarding this Agreement or any provision hereof.

8.8    Notices.  All notices and other communications to be given or made hereunder shall be in writing and shall be deemed to have been duly given or made on the date of delivery to the recipient thereof if received prior to 5:00 p.m. in the place of delivery and such day is a Business Day (or otherwise on the next succeeding Business Day) if (a) served by personal delivery or by an internationally recognized overnight courier to the Person or entity for whom it is intended, (b) delivered by registered or certified mail, return receipt requested, or (c) sent by email, as provided in this Section 8.8 (*Notices*); provided that no out-of-office replies or other automatically generated responses are received or is followed within one Business Day after email by dispatch pursuant to one of the other methods described herein:

To the Seller:

> SVB Financial Group
> 2100 Ross Avenue, 21st Floor
> Dallas, TX 75225
> Attn: Rafael Petrone
> E-mail: rpetrone@svbfg.com

With a copy to (which shall not constitute notice):

> Sullivan & Cromwell LLP
> 125 Broad Street
> New York, NY 10004-2498
> Attn:        James L. Bromley
>                 Jared M. Fishman
> Email Address: bromleyj@sullcrom.com
>                            fishmanj@sullcrom.com

To the Buyer:

> Pinegrove Sierra HoldCo LLC
> c/o Pinegrove Capital Partners LLC
> 2740 Sand Hill Road, Suite 700
> Menlo Park, CA 94025
> Attn: Brian Laibow
> Email: brian@pinegrovecp.com

> Pinegrove Sierra HoldCo LLC
> c/o Brookfield Sierra HoldCo LLC

Brookfield Place
250 Vesey Street, 15th Floor
New York, New York 10281
Attn: Mark Srulowitz
Email: msrulowitz@brookfield.com

and

Pinegrove Sierra HoldCo LLC
c/o SCHF (M) PV, L.P.
2800 Sand Hill Road, Suite 101
Menlo Park, CA 94025
Attn: Kevin Kelly
Email: kkelly@schf.com

With a copy to (which shall not constitute notice):

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn:          Kenneth M. Schneider
               Neil Goldman
               Andrew Parlen
Email Address:kschneider@paulweiss.com
               ngoldman@paulweiss.com
               aparlen@paulweiss.com

or to such other Person or addressees as may be designated in writing by the Party to receive such notice as provided above; provided, however, that copies shall be provided to outside counsel for convenience only, such copies shall not, in and of themselves, constitute notice and the failure to provide any such copy shall not alter the effectiveness of any notice or other communication otherwise duly made or given.

8.9       Severability.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority of competent jurisdiction to be invalid, void or unenforceable, or the application of such provision, covenant or restriction to any Person or any circumstance, is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision, covenant or restriction to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application of such provision, in any other jurisdiction and the remainder of the terms, provisions, covenants and restrictions of this

Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

8.10    <u>Assignment; Third-Party Beneficiaries</u>.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement will create or be deemed to create any third-party beneficiary rights in any Person or entity not a party to this Agreement.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either the Seller or the Buyer (by operation of law or otherwise) without the prior written consent of the other Party and any attempted assignment without the required consents will be void; <u>provided</u>, <u>however</u>, that (i) the Seller may assign some or all of its rights or delegate some or all of its obligations hereunder to successor entities (including any liquidating trust) pursuant to a Chapter 11 plan confirmed by the Bankruptcy Court without any other Party's consent and (ii) the Buyer may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more of its Affiliates, to Pinegrove Capital Partners LLC ("<u>Pinegrove</u>"), to one or more of its or Pinegrove's Affiliates, or to any investment fund or vehicle of or managed by Pinegrove, in each case, without any other Party's consent; <u>provided</u> that the Buyer shall remain jointly and severally liable with such assignee or designee.  No assignment or delegation of any obligations hereunder will relieve the Parties of any such obligations.  Upon any such permitted assignment, the references in this Agreement to the Seller or the Buyer will also apply to any such assignee unless the context otherwise requires.

8.11    <u>Non-Recourse</u>.  Notwithstanding anything to the contrary herein, (i) this Agreement may be enforced only against, and any Action based upon, arising out of, or related to, this Agreement or the transactions contemplated hereby may be brought only against, the entities that are expressly named as Parties and then only with respect to the specific obligations set forth herein with respect to such Party (ii) this Agreement shall be enforceable by any entity that is a successor-in-interest to the Seller in accordance with the effectiveness of a Chapter 11 plan confirmed by the Bankruptcy Court and (iii) with respect to each Party, no past, present or future director, officer, employee, incorporator, member, partner, shareholder, agent or Affiliate of such named Party, shall have any liability (whether in contract or tort, at law or in equity or otherwise, or based upon any theory that seeks to impose liability of a Party against its owners or Affiliates) for any one or more of the representations, warranties, covenants, agreements or other obligations or liabilities of such named Party or for any claim based on, arising out of, or related to, this Agreement or the Transactions.  The provisions of this <u>Section 8.11</u> (*Non-Recourse*) are intended to be for the benefit of, and enforceable by such Parties and each such Person shall be a third-party beneficiary of this <u>Section 8.11</u> (*Non-Recourse*).

8.12        Interpretation; Construction.

(a)        The table of contents and headings herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.  Where a reference in this Agreement is made to an Exhibit, Section or Schedule, such reference shall be to an Exhibit, Section or Schedule to this Agreement unless otherwise indicated.

(b)        If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).  The terms defined in the singular have a comparable meaning when used in the plural and vice versa.  The rule known as the *ejusdem generis* rule shall not apply, and, accordingly, general words introduced by the word "other" shall not be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things.  Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The word "or" shall not be exclusive.  Currency amounts referenced herein are in U.S. Dollars.  Any capitalized term used in any Schedule or Exhibit but not otherwise defined therein shall have the meaning given to them as set forth in this Agreement.  All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.  References to "written" or "in writing" include documents in electronic form or transmission by email.

(c)        All capitalized terms in this Agreement (including the Exhibits and Schedules hereto) shall have the meanings set forth in Exhibit A hereto, except as otherwise specifically provided herein.  Each of the other capitalized terms used in this Agreement has the meaning set forth where such term is first defined or, if no meaning is set forth, the meaning required by the context in which such term is used.

(d)        Except as otherwise specifically provided herein, all references in this Agreement to any Law include the rules and regulations promulgated thereunder, in each case as amended, re-enacted, consolidated or replaced from time to time and in the case of any such amendment, re-enactment, consolidation or replacement, reference herein to a particular provision shall be read as referring to such amended, re-enacted, consolidated or replaced provision and shall also include, unless the context otherwise requires, all applicable guidelines, bulletins or policies made in connection therewith; provided that, for purposes of any representations and warranties contained in this Agreement that are made as of a specific date, references to any Law shall be deemed to refer to such Law as amended as of such date.  Any agreement or instrument referred to herein means such agreement or instrument as from time to time amended, modified or supplemented, including by waiver or consent and all attachments thereto and instruments incorporated therein.

(e)        Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.  Whenever any action must be taken

hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(f)    The Parties drafted this Agreement jointly through the exchange of drafts hereof, so there shall be no presumption or burden of proof favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

(g)    The Seller has set forth information in the Seller Disclosure Schedule in a section of such Seller Disclosure Schedule that corresponds to the Section of this Agreement to which it relates.  The fact that any item of information is disclosed in any section or sub-section of the Seller Disclosure Schedule shall be deemed disclosure with respect to any other section or sub-section to which the relevance of such item is reasonably apparent based on a plain reading of such disclosure.  The headings contained in the Seller Disclosure Schedule are for convenience of reference only and shall not be deemed to modify or influence the interpretation of the information contained in the Seller Disclosure Schedule or this Agreement.  The Seller Disclosure Schedule is not intended to constitute, and shall not be construed as, an admission or indication that any such fact or item is required to be disclosed.  The Seller Disclosure Schedule shall not be deemed to expand in any way the scope or effect of any representations, warranties or covenants described in this Agreement.  Any fact or item, including the specification of any dollar amount, disclosed in the Seller Disclosure Schedule shall not by reason only of such inclusion be deemed to be material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement and matters reflected in the Seller Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected herein and may be included solely for informational purposes; and no Party shall use the fact of the setting of the amounts or the fact of the inclusion of any item in the Seller Disclosure Schedule in any dispute or controversy between the Parties as to whether any obligation, item or matter not described or included in the Seller Disclosure Schedule is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or is within or outside of the ordinary course of business.  No disclosure in the Seller Disclosure Schedule relating to any possible breach or violation of any Contract, Law or Order shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

*[Signature Page Follows]*

DocuSign Envelope ID: AAF48920-C662-4048-8B3F-63E5C3A2AFB7

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above.

**SELLER:**

**SVB Financial Group**

By: _____

Name: William Kosturos
Title: Chief Restructuring Officer

**BUYER**:

**Pinegrove Sierra HoldCo LLC**

By: _____

Name:    Anuj Ranjan
Title:    Vice President

[*Signature Page to Interest Purchase Agreement*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above.

**SELLER:**

**SVB Financial Group**

By: _____
Name:
Title:

**BUYER**:

**Pinegrove Sierra HoldCo LLC**

By: _____
Name:  Mark Srulowitz
Title: Vice President

*[Signature Page to Interest Purchase Agreement]*

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the meanings specified in this Exhibit A.

"Acceptable Confidentiality Agreement" means a confidentiality agreement that (i) contains confidentiality and standstill provisions on terms substantially similar to those contained in the Confidentiality Agreement (except for such changes specifically necessary in order for the Seller to be able to comply with its obligations under this Agreement and such non-material changes requested by the counterparty to ensure the confidentiality agreement is consistent with its organization's customary policies, procedures and practices with respect to confidentiality agreements) and (ii) does not bar or restrict the Seller, any Target Company, any General Partner Entity or Sponsored Fund from providing a copy of any written Alternative Transaction Proposal or a notice and a description of any oral Alternative Transaction Proposal, or any other information required by Section 4.16 (*No Solicitation*) to counsel to the Buyer.

"Acquired Seller Plan" has the meaning set forth in Section 2.9(a) (*Service Provider Benefits*).

"Action" means any civil, criminal or administrative action, suit, demand, claim, complaint, litigation, investigation, review, audit, formal proceeding, arbitration, hearing or other similar dispute.

"Adjusted Revenue Funds" means Strategic Investors Fund V-B, L.P., Strategic Investors Fund V-A Opportunity, L.P., Strategic Investors Fund VI-A, L.P., Strategic Investors Fund VII-A, L.P., Venture Overage Fund, L.P., Strategic Investors Fund VIII-A, L.P., Strategic Investors Fund IX-A, L.P., Strategic Investors Fund X-A, L.P., Sprout Endurance Partners, L.P. and Sprout Endurance Partners II, L.P.

"Advisers Act" has the meaning set forth in the Recitals.

"Advisory Contract" means a Contract, including, where applicable, the governing agreement of a Sponsored Fund, under which the Management Company or General Partner Entity provides investment advisory, investment management, investment sub-advisory or similar services for compensation, and the recipient of such services (including, for the avoidance of doubt, any Sponsored Fund), a "Client".

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, such Person; provided, that for purposes of this Agreement, a Sponsored Fund shall not be deemed an "Affiliate" of a Person merely by virtue of such Person managing or advising such vehicle, or acting as general partner, managing member or in a similar capacity with respect to such vehicle. As used in this definition, the term "controls" (including the terms "controlled by" and "under common control with") means possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through ownership of voting securities, by contract or otherwise. Notwithstanding anything to the contrary herein,

A-1

(a) prior to the Closing, the Target Companies and General Partner Entities shall not be "Affiliates" of the Buyer and (b) following the Closing, the Target Companies and General Partner Entities shall not be "Affiliates" of the Seller.

"Agreement" has the meaning set forth in the Preamble.

"Alternative Transaction" means (a) any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of all, or a material portion of, the Interests, the Sponsor Commitments and/or the Seller's rights and interest in the Carried Interest, other than as contemplated by this Agreement, or (b) any other transaction involving the Interests, the Sponsor Commitments or the Carried Interest that is an alternative to and/or materially inconsistent with one or more of the Transactions.

"Alternative Transaction Proposal" means any bona fide inquiry, proposal, offer, bid, term sheet, discussion, or agreement (whether in writing or oral) with respect to an Alternative Transaction.

"Antitrust Laws" means the Sherman Antitrust Act of 1890, the Clayton Act of 1914, the HSR Act and all other U.S. and non-U.S. antitrust, competition or other Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"Asset Financing Facilities" has the meaning set forth in Section 2.17(e) (*Sponsored Funds*).

"Assigned Contracts" has the meaning set forth in Section 1.6(e) (*Assumption and Assignment of Certain Contracts*).

"Assignment Notice" has the meaning set forth in Section 1.6(b) (*Assumption and Assignment of Certain Contracts*).

"Assignor Funds" means each of Capital Preferred Return Fund, L.P., Growth Partners, L.P., Sprout Endurance Partners, L.P., Strategic Investors Fund II, L.P., Strategic Investors Fund III, L.P., Strategic Investors Fund IV, L.P., Strategic Investors Fund V, L.P., Strategic Investors Fund VI, L.P., Strategic Investors Fund VII, L.P., Strategic Investors Fund VIII, L.P., Strategic Investors Fund IX Master, L.P., Strategic Investors Fund X Master, L.P. and any successors or assigns of an Assignor Fund's rights and obligations set forth in the relevant REF Reinvestment Election Form.

"Assumed Contracts" has the meaning set forth in Section 1.6(a) (*Assumption and Assignment of Certain Contracts*).

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Law" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement,

receivership, insolvency, reorganization or other similar debtor relief Laws of the United States or any other applicable jurisdiction from time to time in effect.

"Bankruptcy Proceeding" has the meaning set forth in the Recitals.

"Bankruptcy Rules" has the meaning set forth in the Recitals.

"Base Date" means March 31, 2024.

"Base Date Revenue" means, for the Clients collectively, the actual aggregate investment advisory, investment management, sub-advisory, general partner's share, priority profit share or other similar asset-based recurring fees (but excluding, for the avoidance of doubt, performance-based, incentive or contingent fees (such as Carried Interest), any distribution and servicing fees, securities lending fees, transaction revenues, fund administration fees or any reimbursed expenses) paid by such Clients to the Management Company or a General Partner Entity for the period commencing on April 1, 2023 and ending on March 31, 2024 (provided that (i) for each of the Adjusted Revenue Funds, a proxy for asset-based recurring fees shall be calculated as 0.5% of the aggregate capital commitments of such Adjusted Revenue Funds as of March 31, 2024 and (ii) for each of the Vintage Funds, a proxy for asset-based recurring fees shall be calculated as 1.0% of the lesser of (x) the net asset value as of the most recent quarter and (y) the aggregate capital commitments of such Vintage Fund, and (iii) for CP II, L.P., a proxy for asset-based recurring fees shall be calculated as 2.0% of the lesser of (x) the net asset value as of the most recent quarter and (y) the aggregate capital commitments of CP II, L.P.) (reduced by fee rebates, discounts, offsets or waivers or sub-advisor fees paid (or to be paid) by the Management Company, any Target Company or General Partner Entity to a Person other than a Target Company in respect of such fees, investment advisory, investment management, sub-advisory, general partner's share, priority profit share or other similar asset-based recurring fees, and net of placement fees paid (or that will be required to be paid) (including pursuant to a placement agent agreement or similar agreement) by the Management Company, any Target Company or General Partner Entity to a Person other than a Target Company or General Partner Entity) in respect of such Clients and the applicable period, in each case, determined reasonably and in good faith by the Management Company, Target Companies and General Partner Entities, and, other than with respect to the treatment of the Adjusted Revenue Funds, the Vintage Funds and CP II, L.P., calculated in accordance with generally accepted accounting standards. For purposes of calculating the Base Date Revenue attributable to any Client which pays investment advisory, investment management, sub-advisory, general partner's share, priority profit share or other similar asset-based recurring fees in a non-U.S. dollar currency, such Client's attributable share of the Base Date Revenue shall be calculated in U.S. dollars utilizing the spot rate as of the Base Date of such non-U.S. dollar currency to U.S. dollars.

"Benefit Plan" means any benefit or compensation plan, program, policy, practice, agreement, contract, arrangement or other obligation, whether or not in writing and whether or not funded, in each case, that is sponsored or maintained by, required to be contributed to, or with respect to which any potential liability is borne by Seller and its Subsidiaries or the Management Company for the benefit of any Service Provider. Benefit Plans include, but are not limited to, all "employee benefit plans" within the meaning of Section 3(3) of ERISA ("ERISA Plans"), any multiemployer plans as defined in section 3(37) of ERISA and any employment, consulting,

A-3

retirement, severance, termination or change in control agreements, deferred compensation, equity-based, incentive, bonus, supplemental retirement, profit-sharing, insurance, medical, welfare, fringe or other plans, benefits or remuneration of any kind whether written or unwritten, or funded or unfunded.

"Books and Records" has the meaning set forth in Section 4.11 (*Maintenance of Books and Records*).

"Business Day" means any day other than (a) a Saturday or a Sunday or (b) a day on which banking and savings and loan institutions are authorized or required by Law to be closed in New York, New York.

"Business Intellectual Property" means: (i) all Intellectual Property owned or purported to be owned by Target Companies, General Partner Entities and Sponsored Funds and (ii) all Intellectual Property that is used or held for use in or otherwise related to the respective businesses of the Target Companies, General Partner Entities and Sponsored Funds.

"Business IT Systems" means all information technology systems, including all computers, networks, hardware, middleware, firmware, servers, Software, databases, websites and equipment, used to process, store, maintain and operate data, information and functions used in connection with the businesses of the Target Companies, General Partner Entities and Sponsored Funds as currently conducted.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Confidential Information" has the meaning set forth in Section 4.8(b) (*Confidentiality*).

"Buyer Parties" means, collectively, (i) the Buyer, (ii) each of the current or former Affiliates of the Buyer, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

"Buyer Protections Order" means an order of the Bankruptcy Court substantially in the form attached as Exhibit E hereto, or otherwise in a form and substance acceptable to the Purchaser.

"Carried Interest" means carried interest, incentive allocations, promote interests or other performance-based profits interests of or in respect of a Sponsored Fund.

"Carried Interest Policy" means the SVB Financial Group Carried Interest Policy, dated September 21, 2023.

"Cash" of the Target Companies or General Partner Entities as of any date means cash, checks, money orders, marketable securities, short-term instruments and other cash equivalents (excluding Restricted Cash), funds in time and demand deposits or similar accounts; provided that Cash shall (without duplication) (x) be increased by checks, drafts and other similar

A-4

instruments in transit that have been received by, but not deposited into the bank accounts of, the Target Companies, (y) be reduced by the aggregate amount of all checks, drafts and other similar instruments issued and outstanding but uncleared as of such time and (z) exclude any cash items designated for the Sponsor Commitments.

"CEA" has the meaning set forth in Section 2.11(n) (*Compliance with Laws; Registrations and Permits*).

"CFTC" means the Commodity Futures Trading Commission.

"Chapter 11" means Chapter 11 of the Bankruptcy Code.

"Client" has the meaning set forth in the definition of "Advisory Contract."

"Client Consent" means the written affirmative consent (or, solely with respect to the Qualified Investors Funds, "negative" consent pursuant to the applicable Fund Documentation) of a Sponsored Fund to the assignment or transfer of general partner interest or carried interest partner interest, or a change of control of the adviser, the manager, the general partner or the carried interest partner with respect to a Sponsored Fund, or the continuation of, or compliance with, its Advisory Contract or Fund Documentation, in each case, resulting from the consummation of the Transactions if and to the extent required by the terms of such Advisory Contract, the applicable Fund Documentation or applicable Law, and in the manner required by the terms of such Advisory Contract, applicable Fund Documentation (including, for the avoidance of doubt, any applicable provisions in any Side Letter (including those elected by way of most favored nations terms) to the extent not otherwise waived) or applicable Law, including obtaining waivers of (or amendments to) any applicable restrictions or provisions contained in the Fund Documentation pertaining to an assignment, change of control, transfer of general partner interest or carried interest partner interest, termination of fund term or similar terms that apply to the Transactions.

"Client Consent Percentage" means a fraction (expressed as a percentage), the numerator of which is the Closing Revenue and the denominator of which is the Base Date Revenue.

"Client Deficit Percentage" means a percentage equal to (a) 95%, *minus* (b) the Client Consent Percentage; provided, that if the Client Consent Percentage is 95% or greater, then the Client Deficit Percentage shall be 0%; provided, further, that in no event shall the Client Deficit Percentage be higher than 35%.

"Closing" has the meaning set forth in Section 1.3 (*Time and Place of Closing*).

"Closing Carried Interest Amount" means 54% of payments or other distributions to the Seller from a General Partner Entity (other than the General Partner Entity for Evergreen Fund) in respect of Carried Interest at any time on and after September 30, 2023 and prior to the Closing Date.

"Closing Cash Amount" means an amount in dollars equal to (i) the Cash as of 11:59 p.m. Eastern Time on the day immediately preceding the Closing, minus (ii) the amount of

A-5

Cash used to pay or repay Indebtedness after 11:59 p.m. Eastern Time on the day immediately preceding the Closing and prior to the Closing.

"Closing Cash Amount Adjustment" means an amount (which may be positive or negative) in dollars equal to (i) the Closing Cash Amount, minus (ii) $3,478,000.

"Closing Date" has the meaning set forth in Section 1.3 (*Time and Place of Closing*).

"Closing Evergreen Fund Capital Interest Amount" means, 100% of payments or other distributions to the Seller from Evergreen Fund in respect of the applicable Sponsor Commitment at any time on and after September 30, 2023 and prior to the Closing Date.

"Closing Funded Commitment Amount" means an amount equal to the aggregate dollar amount funded by the Seller with respect to the Sponsor Commitments on and after September 30, 2023 and prior to the Closing to Evergreen Fund, QIF 1, QIF 7 and the General Partner Entities with respect to the Seller's capital commitment therein.

"Closing Indebtedness Amount" means an amount in dollars equal to the Indebtedness as of immediately prior to the Closing.

"Closing Overpayment" has the meaning set forth in Section 1.5(d)(ii) (*Closing Statements*).

"Closing Payment" has the meaning set forth in Section 1.4(b)(ii) (*Deliveries at Closing by the Buyer*).

"Closing Post-9/30/23 Non-Evergreen Fund Budgeted Capital Interest Amount" means, solely with respect to amounts up to $26 million in aggregate funded by the Seller on or after September 30, 2023 with respect to the Sponsor Commitments to the General Partner Entities (other than the General Partner Entity for Evergreen Fund), QIF 1 and QIF 7, (i) 100% of payments or other distributions to the Seller from such General Partner Entities in respect of such Sponsor Commitments until the amounts funded by the Seller prior to the Closing Date have been returned in full, *plus* (ii) 100% of payments or other distributions to the Seller from such General Partner Entities in respect of such Sponsor Commitments until the Seller has received a net internal rate of return of 20% on such funded amounts, *plus* (iii) 54% of any remaining payments or other distributions to the Seller from such General Partner Entities in respect of such Sponsor Commitments, in each case, at any time on and after September 30, 2023 and prior to the Closing Date.

"Closing Post-9/30/23 Non-Evergreen Fund Excess Capital Interest Amount" means, solely with respect to amounts (if any) in excess of $26 million in aggregate funded by the Seller on or after September 30, 2023 with respect to the Sponsor Commitments to the General Partner Entities (other than the General Partner Entity for Evergreen Fund), QIF 1 and QIF 7, 100% of payments or other distributions to the Seller from such General Partner Entities in respect of such Sponsor Commitments.

"Closing Pre-9/30/23 Non-Evergreen Fund Capital Interest Amount" means, solely with respect to amounts funded by the Seller prior to September 30, 2023 with respect to the Sponsor Commitments to the General Partner Entities (other than the General Partner Entity for Evergreen Fund), QIF 1 and QIF 7, 54% of payments or other distributions to the Seller from such General Partner Entities in respect of such Sponsor Commitments at any time on and after September 30, 2023 and prior to the Closing Date.

"Closing Purchase Price" means (a) (i) $340,000,000, multiplied by (ii) (A) 100% minus (B) the Client Deficit Percentage, *plus* (b) the Closing Cash Amount Adjustment, *plus* (c) the Closing Funded Commitment Amount, *minus* (d) the Closing Carried Interest Amount, *minus* (e) Closing Pre-9/30/23 Non-Evergreen Fund Capital Interest Amount, *minus* (f) Closing Post-9/30/23 Non-Evergreen Fund Budgeted Capital Interest Amount, *minus* (g) Closing Post-9/30/23 Non-Evergreen Fund Excess Capital Interest Amount, *minus* (h) Closing Evergreen Fund Capital Interest Amount, *minus* (i) the Closing Indebtedness Amount, *plus* (j) an amount equal to the Working Capital Overage (based on the Working Capital Estimate), if any, *plus* (k) an amount equal to the Working Capital Underage (based on the Working Capital Estimate), if any, *plus* (l) the aggregate amount of Permitted Intercompany Payables settled using amounts that would otherwise be included in Cash after the Execution Date and prior to 11:59 p.m. Eastern Time on the day immediately preceding the Closing, if any, *minus* (m) the Deposit Amount (to the extent the Deposit has been funded).

"Closing Purchase Price Components" means (i) the Client Deficit Percentage, (ii) the Closing Cash Amount Adjustment, (iii) the Closing Funded Commitment Amount, (iv) the Closing Carried Interest Amount, (v) the Closing Pre-9/30/23 Non-Evergreen Fund Capital Interest Amount, (vi) the Closing Post-9/30/23 Non-Evergreen Fund Budgeted Capital Interest Amount, (vii) Closing Post-9/30/23 Non-Evergreen Fund Excess Capital Interest Amount, (viii) the Closing Evergreen Fund Capital Interest Amount, (ix) the Closing Indebtedness Amount, (x) Closing Working Capital and the resulting Working Capital Overage or Working Capital Underage and (xi) the aggregate amount of Permitted Intercompany Payables actually unpaid and outstanding as of the Closing, if any.

"Closing Revenue" means, as of the date which is ten (10) Business Days prior to Closing (the "Determination Date"): the sum of (i) the Base Date Revenue; less (ii) the aggregate portion of the Base Date Revenue attributable to each Client whose Advisory Contract has been terminated on or following the date hereof or each Closing Revenue Relevant Fund for which Client Consents have not been obtained or have been revoked; less (iii) the aggregate portion of the Base Date Revenue attributable to each Client in respect of which, prior to the Closing, (a) any "key person" or "cause" event has been triggered (disregarding any requirement that a condition precedent of exercising such remedy requires the passage of time, notice and/or opportunity to cure) and (1) would give rise to the dissolution or termination of such Client, the investment period (or equivalent) of such Client or removal of the general partner (or equivalent entity), whether automatically or upon the election of investors therein and (2) the investors therein voted to remove the general partner (or equivalent entity) or terminate the investment period (or equivalent) or the investment period of such Client was terminated automatically, unless, in each case, such "key persons" or "cause" event has been cured or waived in accordance with the applicable Fund Documentation or as part of the applicable Client Consent, or the Buyer has agreed to waive such Event (as defined below) and such Client has not revoked its Client Consent, or (b) a no-fault

removal of the general partner (or equivalent entity) or dissolution or termination of such Client has occurred prior to the Closing (each such event described in the foregoing <u>clauses (a)</u> and <u>(b)</u>, an "<u>Event</u>"); plus (iv) in respect of any Client that held an initial closing after March 31, 2024, the actual aggregate investment advisory, investment management, sub-advisory, general partner's share, priority profit share or other similar asset-based recurring fees paid by such Client to the Management Company or any Target Company for the period commencing on the initial closing date of such Client and ending on the Determination Date (and otherwise calculated in the same manner as Base Date Revenue is calculated in respect of a Client) (so long as such Client was not subject to an Event prior to the Closing, and has not revoked its Client Consent prior to the Closing); plus (v) in respect of any Client that had held an initial closing as of March 31, 2024 and has accepted additional commitments from investors after March 31, 2024 but prior to the Determination Date, the actual aggregate investment advisory, investment management, sub-advisory, general partner's share or other similar asset-based recurring fees paid by such Client in respect of such additional commitments to the Management Company or any Target Company for the period commencing on the initial closing date of such additional commitments and ending on the Determination Date (and otherwise calculated in the same manner as Base Date Revenue is calculated in respect of a Client).

"<u>Closing Revenue Relevant Fund</u>" means each of the Sponsored Funds set forth on <u>Section 4.13</u> of the Seller Disclosure Schedule.

"<u>Closing Statement</u>" has the meaning set forth in <u>Section 1.5</u> (*Closing Statements*).

"<u>Closing Underpayment</u>" has the meaning set forth in <u>Section 1.5(d)(i)</u> (*Closing Statements*).

"<u>Closing Working Capital</u>" means the Working Capital as of 11:59 p.m. Eastern Time on the day immediately preceding the Closing.

"<u>Code</u>" means the Internal Revenue Code of 1986.

"<u>Company Expenses</u>" means, to the extent unpaid prior to the Closing Date (i) all fees, expenses and other liabilities incurred, paid or payable by the Target Companies, General Partner Entities or Sponsored Funds relating to the Sale Process, including legal, accounting, financial advisory and other advisory, transaction or consulting fees and expenses in connection with the Sale Process (including the Transactions) or (ii) transaction bonuses, retention bonuses, change-in-control payments, contractual or statutory severance or similar payments or benefits payable by any of the Target Companies, General Partner Entities or Sponsored Funds to any current or former director, manager, officer or employee of, or consultant, contractor or other service provider to, any of the Target Companies, General Partner Entities or Sponsored Funds conditioned on the consummation of the transactions contemplated by this Agreement, together with the employer portion of any employment, payroll or other similar Taxes related thereto (calculated as though all such amounts were payable on the Closing Date), but for the avoidance of doubt, excluding any "double-trigger" payments (including amounts payable as a result of any termination of employment or service that occurs on or after the Closing Date due to actions taken by the Buyer or any of its Affiliates after the Closing) and any other bonuses or payments that, in

each case, become payable after the Closing or under any arrangement established or entered into as a result of the Buyer's or any of its Affiliates' direction.

"Compliance Policies" has the meaning set forth in Section 2.11(i) (*Compliance with Laws; Registrations and Permits*).

"Confidentiality Agreement" has the meaning set forth in Section 4.8 (*Confidentiality*).

"Continuing Service Providers" has the meaning set forth in Section 4.7(b) (*Service Provider Matters*).

"Contract" means any agreement, undertaking, lease, license, contract, note, bond, mortgage, indenture, arrangement or other obligation.

"Covered Known Claim" has the meaning set forth in Section 4.17(c) (*Insurance*).

"Cure Costs" means monetary amounts that must be paid and obligations that otherwise must be satisfied under section 365 of the Bankruptcy Code in connection with the assumption and/or assignment of any Assumed Contract, as agreed upon by the Parties or determined by the Bankruptcy Court.

"Current Assets" means, as of any date of determination hereunder, the consolidated current assets, (excluding cash, checks, money orders, marketable securities, short-term instruments and other cash equivalents, funds in time and demand deposits or similar accounts) of the Target Companies and General Partner Entities.

"Current Liabilities" means, as of any date of determination hereunder, the consolidated current liabilities of the Target Companies and General Partner Entities.

"Deferred Funds" has the meaning set forth in Section 4.10(d) (*Intercompany Arrangements; Transition Services*).

"Deferred Management Fees" has the meaning set forth in Section 4.10(d) (*Intercompany Arrangements; Transition Services*).

"Deposit" has the meaning set forth in Section 1.2 (*Deposit*).

"Deposit Amount" has the meaning set forth in Section 1.2 (*Deposit*).

"Determination Date" has the meaning set forth in the definition of "Closing Revenue".

"Draft Allocation" has the meaning set forth in Section 4.9(f) (*Tax Matters*).

"Equitable Exception" has the meaning set forth in Section 2.4(b) (*Authority; Approval*).

"Equity Commitment Letter" has the meaning set forth in Section 3.6 (*Equity Financing; Available Funds*).

"Equity Financing" has the meaning set forth in Section 3.6 (*Equity Financing; Available Funds*).

"Equity Interests" means, with respect to any Person, (a) any shares of common stock or preferred stock (or any series thereof), any ordinary shares or preferred shares and any other equity securities, capital stock of such Person or any partnership, limited liability company, membership or similar interests in such Person, (b) any securities that are directly or indirectly convertible, exchangeable or exercisable into any such stock, shares, securities or interests, including any option, warrant or other right that would entitle any other Person to acquire any such stock, shares, securities or interests in such Person or (c) or any right that entitles any other Person to share in the equity, profits, earnings, losses or gains of such first Person (including stock appreciation, phantom stock, profit participation or other similar rights), in each case, however described and whether voting or non-voting.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means all employers (whether or not incorporated) that would be treated together with the Management Company as a "single employer" within the meaning of Section 414 of the Code.

"ERISA Affiliate Liability" means any obligation, Liability, or expense of Seller or any of its ERISA Affiliates (other than the Target Companies, General Partner Entities or Sponsored Funds) which arises under or relates to any Benefit Plan other than an Acquired Seller Plan that is subject to (i) Title IV of ERISA, Section 302 of ERISA, Section 412 of the Code or (ii) COBRA or any other statute or regulation that imposes Liability on a "controlled group" basis pursuant to Section 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA.

"ERISA Plans" has the meaning set forth in the definition of "Benefit Plan."

"Escrow Account" has the meaning set forth in Section 1.2 (*Deposit*).

"Escrow Agent" has the meaning set forth in Section 1.2 (*Deposit*).

"Escrow Agreement" means an escrow agreement with the Escrow Agent, in a form to be agreed upon by the Buyer and the Seller.

"Estimated Closing Statement" has the meaning set forth in Section 1.5 (*Closing Statements*).

"Event" has the meaning set forth in the definition of "Closing Revenue."

"Evergreen Fund" means the Redwood Evergreen Fund, L.P., a Delaware limited partnership.

"Evergreen Hedging Expenses" has the meaning set forth in Section 4.21 (*Evergreen Hedging Arrangement*).

"Exchange Act" means the Securities Exchange Act of 1934.

"Execution Date" has the meaning set forth in the Preamble.

"Expense Reimbursement Amount" has the meaning set forth in Section 7.3 (*Termination Fee; Expense Reimbursement.*).

"Final Allocation" has the meaning set forth in Section 4.9 (*Tax Matters*).

"Final Closing Statement" has the meaning set forth in Section 1.5 (*Closing Statements*).

"Final Order" means an Order (a) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur), or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject Order in all material respects without the possibility for further appeal thereon, (b) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall have expired (in cases in which such time period is capable of expiring), and (c) as to which no stay is in effect.

"Financial Statements" means those financial statements of the Management Company as of March 31, 2024 as provided to the Buyer and attached hereto as Exhibit M.

"First Payment" has the meaning set forth in Section 1.8(a) (*Fundraising Payments*).

"Form of Investor Consent and Disclosures" has the meaning set forth in Section 4.13(a) (*Client Consents*).

"Fraud" means, with respect to an express representation and warranty contained in this Agreement or any statement contained in any certificate delivered pursuant to this Agreement, that, at the time such representation and warranty or statement was made, (i) such representation and warranty or statement was materially inaccurate, (ii) a person had actual knowledge of the inaccuracy of such representation and warranty or statement, (iii) in making such representation and warranty or statement a person had the specific intent to induce another person to act or refrain from acting or otherwise deceive another person and (iv) such other person acted in reasonable reliance on such representation and warranty or statement.

"Fund Documentation" means, with respect to each Sponsored Fund, the limited partnership agreement or equivalent organizational document of such Sponsored Fund and any advisory, management or sub-advisory agreements with respect to such Sponsored Fund, together with the subscription agreements for such Sponsored Fund (excluding Side Letters and any Marketing Literature), in each case, that is in effect as of the date of this Agreement.

A-11

"<u>Fund Instrument of Assignment</u>" means that certain instrument of assignment, in the form set forth in <u>Exhibit L</u> hereto, with respect to all of the issued and outstanding Equity Interests of each of Evergreen Fund and QIF 7 owned by the Seller, to be executed contemporaneously with the Closing by the Seller.

"<u>Fund Material Event</u>" means (a) the removal of the managing general partner or the general partner (or any other entity, including any investment manager, acting in a similar capacity with respect to any Sponsored Fund) of a Sponsored Fund, (b) the termination or dissolution of a Sponsored Fund, other than following the sale of substantially all of the assets of the Sponsored Fund or in the discretion of such Sponsored Fund's general partner in accordance with the Fund Documentation, (c) the suspension and early termination of any commitment period or investment period of a Sponsored Fund, (d) the suspension of any withdrawal or redemption rights in respect of a Sponsored Fund or (e) the termination of any Advisory Contract that has a Material Adverse Effect.

"<u>Fundraising Period</u>" has the meaning set forth in <u>Section 1.8</u> (*Fundraising Payments*).

"<u>GAAP</u>" means United States generally accepted accounting principles.

"<u>General Partner Entity</u>" is a legal entity identified as such in <u>Exhibit B</u>.

"<u>Government Contract</u>" means any Contract, including any basic ordering agreement, blanket purchase agreement, letter contract, purchase order, task order or delivery order of any kind, and including all amendments, modifications and options thereunder or relating thereto, entered into between a Target Company, General Partner Entity or Sponsored Fund and: (i) any Governmental Entity, university, college, or other educational institution or research center; (ii) any prime contractor or expected prime contractor to any Governmental Entity (in its capacity as such); or (iii) any subcontractor or expected subcontractor (of any tier) with respect to any Contract described in clauses (i) and (ii) of this definition.

"<u>Government Official</u>" means an employee, officer, or representative of, or any Person otherwise acting in an official capacity for or on behalf of a Governmental Entity.

"<u>Governmental Entity</u>" means any federal, state, provincial, municipal, local or non-U.S. government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency, instrumentality, court or tribunal; <u>provided</u> that, for the avoidance of doubt, this definition shall not include any Self-Regulatory Organization.

"<u>Governmental Permits</u>" has the meaning set forth in <u>Section 2.11(c)</u> (*Compliance with Laws; Registrations and Permits*)."<u>HSR Act</u>" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"<u>Hedging Arrangement</u>" means any hedge, call, swap, collar, floor, cap, option, forward sale or purchase or other contract or similar arrangement (including any obligations to purchase or sell any commodity or security at a future date for a specific price) which is entered into to reduce or eliminate or otherwise protect against the risk of fluctuations in prices or rates.

A-12

"Hedging Reimbursement Cost" means up to $2,200,000 of documented fees and expenses incurred by Buyer or its Affiliates in connection with an Evergreen Hedging Arrangement with an initial term ending on or before June 30, 2024; provided that if the Evergreen Hedging Arrangement is extended, the Hedging Reimbursement Cost will be increased by (i) up to $2,200,000 of additional documented fees and expenses incurred in connection with the Evergreen Hedging Arrangement for a period of 45 days following the initial term of the Evergreen Hedging Arrangement (including the cost of extending the Evergreen Hedging Arrangement for such 45 day period), and (ii) up to $2,200,000 (*i.e.*, for a maximum Hedging Reimbursement Cost of up to $6,600,000) of additional documented fees and expenses incurred in connection with the Evergreen Hedging Arrangement following such 45 day period (including the cost of extending the Evergreen Hedging Arrangement following such 45 day period); provided, further, that the Buyer shall provide notice of any such extension to the Seller prior to such extension (provided, however, that failure to provide any such notice shall not in any way limit the Seller's obligations with respect to the Hedging Reimbursement Amount pursuant to Section 7.3(a)(i) (*Termination Fee; Expense Reimbursement*).

"Inadvertently Omitted Debtor Contract" has the meaning set forth in Section 1.6(b) (*Assumption and Assignment of Certain Contracts*).

"Indebtedness" means the following Liabilities of the Target Companies or General Partner Entities: (a) all Liabilities for borrowed money, (b) all Liabilities evidenced by notes, mortgages, bonds, debentures, debt securities, warrants, or other similar instruments, (c) the deferred purchase price of property, securities, assets or services (including earn-outs and similar obligations, post-closing "true-up" or price adjustment obligations, seller notes and similar Liabilities) whether or not contingent, in each case calculated as the maximum amount payable under or pursuant to the applicable obligation, (d) obligations for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar transaction, but only to the extent drawn upon at such time, (e) liabilities under capitalized leases excluding real property leases, (f) severance obligations with respect to any director, officer, employee or other service provider whose employment or service was terminated at any time prior to the Closing, plus the employer portion of any payroll, social security, unemployment and similar Taxes incurred in respect of such obligations, (g) interest rate protection, swap agreements, collar agreements, hedging arrangements, foreign currency exchange agreements and similar agreements and arrangements, (h) unfunded obligations with respect to nonqualified deferred compensation plan, defined benefit pension, termination indemnity, gratuity or similar plans or arrangements, (i) all obligations secured by a Lien on any property of the Target Companies or the General Partner Entities, (j) all Company Expenses; (k) all obligations of a type referred to in clauses (a) through (j) above which a Target Company or General Partner Entity has guaranteed or for which a Target Company or General Partner Entity is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, and (m) all accrued interest, prepayment penalties, make-whole payments and termination or breakage costs or penalties with respect to any indebtedness referred to in clauses (a) through (k) above.  Notwithstanding the foregoing, "Indebtedness" shall not include any amounts relating the borrowings or indebtedness in respect of the Subscription Facilities, and shall include any Intercompany Payables (other than the Permitted Intercompany Payables).

"Intellectual Property" means all intellectual property rights arising in any jurisdiction of the world, including in and to any of the following:  (a) trademarks, service marks,

trade dress, trade names, and other indicia of origin, applications and registrations for the foregoing, and all goodwill associated therewith and symbolized thereby (collectively, "Trademarks"); (b) inventions (whether or not patentable), discoveries, improvements, ideas, know-how, formulas, methodology, models, algorithms, systems, processes, technology, patents and patent applications, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, re-examinations, extensions and reissues; (c) trade secrets and rights in proprietary confidential information, in each case, to the extent protectable under applicable Law; (d) copyrightable works, works of authorship, Software (including interpretive code or source code, object code, development documentation, programming tools, drawings, specifications and data), copyrights, applications and registrations therefor, and renewals, extensions, restorations and reversions thereof and all moral rights thereof; (e) Internet domain names; (f) social media accounts, identifiers and designations; and (g) all other proprietary rights or similar rights recognized in any jurisdiction around the world.

"Intercompany Payables" means all account, note or loan payables recorded on the books of one or more Target Companies or General Partner Entities for goods or services purchased by or provided to the respective businesses of the Target Companies or General Partner Entities, or advances (cash or otherwise) or any other extensions of credit to one or more Target Companies, in each case, from the Seller or any of its Affiliates, whether current or non-current.

"Interests" has the meaning set forth in the Recitals.

"Investment Company Act" has the meaning set forth in Section 2.11(e) (*Compliance with Laws; Registrations and Permits*).

"IRS" means the Internal Revenue Service.

"Knowledge of the Seller" means the actual knowledge of the individuals set forth on Section 1.1 of the Seller Disclosure Schedule.

"Law" or "Laws" means any law, statute, ordinance, common law, rule, regulation, treaties, constitution, Order or other legal requirement enacted, issued, promulgated, enforced or entered by a Governmental Entity of competent jurisdiction.

"Lease" means leases, licenses, subleases and sublicenses (including any guaranties with respect thereto) under which a Target Company, General Partner Entity or Sponsored Fund occupies or has the right to occupy real property.

"Liability" means any and all debts, claims, liabilities, obligations, damages, fines, penalties, costs or expenses, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, or known or unknown.

"Lien" means any lien, charge, pledge, mortgage, easement, hypothecation, usufruct, deed of trust, security interest, claim or other encumbrance, other than, in each case, restrictions on transfer arising solely under applicable federal and state securities Laws.

"Management Company" has the meaning set forth in the Recitals.

"<u>Managing Partners</u>" means each of Aaron Gershenberg, Beau Laskey and Sulu Mamdani.

"<u>Marketing Literature</u>" includes all explanatory memoranda, private placement memoranda, offering documents, marketing documents, advertisements, sales literature, pitch books, fact sheets, due diligence questionnaires, track records or other presentations of performance, road show presentations, scheme particulars, key features documents, wrappers and prospectuses relating to any Sponsored Fund or to the services of the Management Company or any Target Company, in each case that were prepared, produced, issued or distributed to prospective or current investors in any Sponsored Fund or prospective or current Clients.

"<u>Material Adverse Effect</u>" means any change, development, circumstance, fact or effect that, individually or taken together with any other changes, developments, circumstances, facts or effects has been or  would reasonably be expected to be, materially adverse to (a) the financial condition, assets, liabilities, business operations, results of operations or prospects of the Target Companies, General Partner Entities and Sponsored Funds (taken as a whole) or (b) the ability of the Seller, Target Companies, General Partner Entities or Sponsored Funds to consummate the Transactions (or would prevent, materially delay or materially impair the consummation of the Transactions); <u>provided</u>, <u>however</u>, in the case of clause (a) of this definition, that none of the following, either alone or in combination, shall be deemed to constitute a Material Adverse Effect that is occurring, has occurred or would reasonably be expected to occur:

(a)    changes, developments, circumstances or facts in or with respect to the economy, credit, capital, securities or financial markets or political, regulatory or business conditions in the geographic markets in which the Target Companies, General Partner Entities or Sponsored Funds have operations or their products or services are sold;

(b)    changes, developments, circumstances, facts or effects generally affecting the industries, markets or geographical areas in which the Target Companies, General Partner Entities or Sponsored Funds have operations;

(c)    the negotiation, announcement, execution, pendency or performance of this Agreement or the Transactions or the Bankruptcy Proceeding, the identity of the Buyer or any of its Affiliates and any communication by the Buyer or any of its Affiliates of its plans or intentions (including in respect of service providers) with respect to any business of the Target Companies, General Partner Entities or Sponsored Funds, including any termination, reduction, loss or threatened loss of, or adverse change, development, circumstance or fact in or with respect to, the relationships of the Seller, the Management Company, Target Companies, General Partner Entities or Sponsored Funds, contractual or otherwise, with their respective customers, clients (including, with respect to the Advisory Contracts, the Sponsored Funds), investors, service providers, labor unions, labor organizations, works councils or similar organizations, suppliers, agents, contractors, partners, employees, distributors, financing sources, partners or similar relationships (provided that this clause (c) shall not apply to the representations and warranties set forth in <u>Section 2.5(b)</u> (*Governmental Filings; No Violations*), or the condition set forth in <u>Section 6.2(a)</u> (*Conditions to Obligations of the Buyer*) to the extent relating to such representations and warranties;

A-15

(d)    changes in or with respect to applicable accounting standards, including GAAP or in any Law of general applicability after the Execution Date;

(e)    any failure by the Target Companies, General Partner Entities or Sponsored Funds to meet any internal or public projections or forecasts or estimates of revenues or earnings; provided that any change, development, circumstance, fact or effect underlying such failure may be taken into account in determining whether a Material Adverse Effect is occurring, has occurred or would reasonably be expected to occur;

(f)    any change, development or effect resulting from acts of war (whether or not declared), sabotage, terrorism, military actions or the escalation of any of the foregoing, whether perpetrated or encouraged by a state or non-state actor or actors (other than cyberattacks), any weather or natural disaster, or any outbreak of illness or other public health event (or any measures taken in response thereto) or any other *force majeure* event (except to the extent causing any damage or destruction to or rendering unusable any material facility or property of the Target Companies General Partner Entity or Sponsored Fund), whether or not caused by any Person (other than the Target Companies, General Partner Entities, Sponsored Fund or any of their Affiliates or Representatives);

(g)    any actions taken or not taken by the Seller, the Target Companies or General Partner Entities with the Buyer's prior written consent or at the Buyer's written instruction; or

(h)    (i) any Action approved by, motion made before or orders of the Bankruptcy Court or a court of similar jurisdiction or (ii) the fact that the Seller is operating as a debtor-in-possession under the Bankruptcy Court or a court of similar jurisdiction,

provided, however, that, with respect to clauses (a), (b), (d) and (f) of this definition, such changes, developments or effects shall be taken into account in determining whether a "Material Adverse Effect" is occurring, has occurred or would reasonably be expected to occur to the extent it materially disproportionately and adversely affects the Target Companies, General Partner Entities or Sponsored Funds (taken as a whole) relative to other companies or businesses of similar size operating in the geographic markets in which the Target Companies, General Partner Entities or Sponsored Funds have operations (in which case only the incremental disproportionate impact may be taken into account, and then only to the extent otherwise permitted by this definition.

"Material Contract" has the meaning set forth in Section 2.12(a) (*Material Contracts*).

"Maximum Amount" has the meaning set forth in Section 1.8 (*Fundraising Payments*).

"Milestones" has the meaning set forth in Section 4.2(c) (*Milestones*).

"Necessary Consent" has the meaning set forth in Section 1.6(g) (*Assumption and Assignment of Certain Contracts*).

A-16

"Necessary Consent Period" means the period beginning on the Execution Date and ending on the earliest of: (i) the time that the Necessary Consent is obtained, (ii) the closing of the Bankruptcy Proceeding and (iii) the date that is twelve (12) months after the Closing Date.

"New Capital Raised" means the aggregate Specified Fund Commitments during the Fundraising Period (excluding any Specified Fund Commitments withdrawn or defaulted on prior to the date of such calculation, it being understood that once a Post-Closing Payment is made, it shall not be subject to refund or clawback solely because of a withdrawal or default of any Specified Fund Commitments).

"Non-Consenting Client" has the meaning set forth in Section 4.13 (*Client Consents*).

"Non-Executory Assigned Contracts" has the meaning set forth in Section 1.6(e) (*Assumption and Assignment of Certain Contracts*).

"OFAC" means the Office of Foreign Assets Control.

"Order" means any administrative decision or award, decree, injunction, judgment, order, quasi-judicial decision or award, ruling or writ of any arbitrator, mediator or Governmental Entity.

"Organizational Document Amendments" means amendments to the Organizational Documents of the Target Companies and General Partner Entities to give effect to the provisions set forth on Exhibit G-1 and Exhibit G-2 attached hereto, in each case in a form to be determined by the Buyer and substantially consistent with the terms set forth in Exhibit G-1 and Exhibit G-2 (subject to compliance with applicable Law).

"Organizational Documents" has the meaning set forth in Section 2.2(b) (*Organization, Good Standing and Qualification*).

"Parent" has the meaning set forth in Section 3.6 (*Equity Financing; Available Funds*).

"Parties" or "Party" has the meaning set forth in the Preamble.

"Permit" means all permits, licenses, franchises, variances, exemptions, orders, certifications, registrations and other authorizations, consents and approvals of all Governmental Entities necessary to conduct business.

"Permitted Intercompany Payables" means Intercompany Payables between a Target Company, General Partner Entity or Sponsored Fund, on the one hand, and the Seller or any of its Affiliates (other than the Target Companies, General Partner Entities or Sponsored Funds), on the other hand, incurred following the Execution Date and prior to the Closing in the ordinary course of business consistent with past practice in an aggregate amount not to exceed $500,000.

A-17

"<u>Permitted Post-Closing Encumbrances</u>" means any Liens that are not expunged, released, discharged or extinguished by the Sale Order (it being understood and agreed that the Sale Order will extinguish Encumbrances on the Sale Interests to the greatest extent permissible under the Bankruptcy Code).

"<u>Permitted Pre-Closing Encumbrances</u>" means (a) any Liens that are expressly permitted by the Sale Order to remain attached to the Sale Interests following the Closing, (b) any Lien on the Sale Interests that will be expunged, released, discharged or extinguished at the Closing by operation of the Sale Order and (c) non-exclusive licenses, covenants not to sue and similar rights granted with respect to Intellectual Property in the ordinary course of business consistent with past practice.

"<u>Person</u>" means any natural person and any corporation, company, partnership (general or limited), unincorporated association (whether or not having separate legal personality), trust or other entity.

"<u>Personal Data</u>" means information that (i) identifies or can be used to identify an individual; and (ii) is defined as "personal data", "personally identifiable information," "protected health information" or similar term under applicable Laws relating to privacy, data security or personal information.

"<u>Plan Assets</u>" means "plan assets" within the meaning of the Department of Labor regulation located at 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA.

"<u>Portfolio Investments</u>" means (a) the portfolio companies, securities or instruments in which a Sponsored Fund has actually invested, either directly or through intermediate vehicles formed to effectuate such holding, acquisition of or investment in such portfolio companies, or the securities or instruments distributed as a dividend thereon, in a reclassification with respect thereto or in an exchange therefor and (b) the Persons to which a Sponsored Fund has provided financing.

"<u>Post-Closing Payment</u>" has the meaning set forth in <u>Section 1.8(b)</u> (*Fundraising Payments*).

"<u>Pre-Closing Occurrences</u>" has the meaning set forth in <u>Section 4.17(a)</u> (*Insurance*).

"<u>Pre-Closing Period</u>" means all taxable years or other taxable periods that end on or before the Closing.

"<u>Pre-Closing Restructuring</u>" has the meaning set forth in the Recitals.

"<u>Privacy and Data Security Laws</u>" means Laws and binding industry standards applicable to the Target Companies, General Partner Entities and the Sponsored Funds relating to privacy, protection, or processing of Personal Data.

"<u>QIF 1</u>" means Qualified Investors Fund, LLC.

A-18

"QIF 7" means Qualified Investors Fund VII, LLC.

"Qualified Investors Funds" means (a) Qualified Investors Fund, LLC, (b) Qualified Investors Fund II, LLC, (c) Qualified Investors Fund III, LLC, (d) Qualified Investors Fund IV, LLC, (e) Qualified Investors Fund V, LLC and (f) Qualified Investors Fund VI, LLC.

"Recovery Costs" has the meaning set forth in Section 4.17(b) (*Insurance*).

"Referee" has the meaning set forth in Section 1.5(c) (*Closing Statements*). "Related Party" means, when used to indicate a relationship with any Person, (a) any immediate family member of such Person; (b) any Person who serves or served as a director, executive officer, partner, member or in a similar capacity of such Person or any of its Affiliates or (c) any Affiliate of the foregoing or any director, executive officer, general partner or managing member of such Affiliate.

"REF Reinvestment Election Form" means the Reinvestment Election Form by and among the Evergreen Fund, the Seller, Sequoia and the Assignor Funds, dated as of February 8, 2022, as may be amended, supplemented or modified from time to time.

"Related Party Transaction" has the meaning set forth in Section 2.24 (*Related Party Transactions*).

"Reports" has the meaning set forth in Section 2.11(b)(ii) (*Compliance with Laws; Registrations and Permits*).

"Representative" of a Person means any officer, director, employee or service provider of such Person or any investment banker, attorney, accountant or other advisor, agent or representative of such Person.

"Restricted Cash" means cash or cash equivalents that (a) are required to be held as cash or cash equivalents by a Target Company or General Partner Entity to satisfy any applicable regulatory or contractual requirements as of such date, (including amounts required to be held for potential margin calls or used as trading collateral); (b) constitute cash security deposits and other cash collateral posted with vendors, landlords and other parties; or (c) a Target Company or General Partner Entity is otherwise restricted from dividending or distributing to its shareholders or other equity interest holders prior to Closing pursuant to applicable Law or Contract, including letters of credit, credit support arrangements, or because such dividend or distribution would be heavily taxed.

"Restructuring" has the meaning set forth in the Recitals.

"Restructuring Order" has the meaning set forth in the Recitals.

"Retained Interests" has the meaning set forth in the Recitals.

"Sale Interests" has the meaning set forth in the Recitals.

A-19

"Sale Motion" means the motion seeking approval of the Transactions and entry of the Buyer Protections Order and the Sale Order, in form and substance acceptable to the Buyer, to which this Agreement shall be attached.

"Sale Order" means an order entered by the Bankruptcy Court substantially in the form attached as Exhibit F hereto, or otherwise in a form and substance acceptable to the Buyer.

"Sale Process" means all matters relating to the sale of the Target Companies, General Partner Entities or Sponsored Funds or all or any material portion of the Interests, the Sponsor Commitments and/or the Carried Interest and the review of strategic alternatives with respect thereto, and all activities in connection therewith, including matters relating to (i) the solicitation of proposals from and negotiations with third parties in connection with such sale, or (ii) the drafting, negotiation, execution or consummation of this Agreement or the transactions contemplated hereby.

"SEC" has the meaning set forth in the Recitals.

"Second Payment" has the meaning set forth in Section 1.8(b) (*Fundraising Payments*).

"Securities Act" means the Securities Act of 1933.

"Security Incident" means any material breach of security, successful phishing incident, ransomware or malware attack or other incident in which Personal Data controlled by any of the Target Companies, General Partner Entities or Sponsored Funds, or any third-party processing Personal Data on behalf of any of the Target Companies, General Partner Entities or Sponsored Funds, was accessed, disclosed or exfiltrated, in each case, in an unauthorized manner.

"Self-Regulatory Organization" means any domestic or non-U.S. securities exchange, commodities exchange, registered securities association, and any other board or body, whether United States or non-U.S., that is charged with the supervision or regulation of brokers, dealers, commodity pool operators, commodity trading advisors, designated contract market or other board of trade, futures exchange, futures commission merchants, electronic communication networks, investment companies or investment advisers.

"Seller" has the meaning set forth in the Preamble.

"Seller Claims-Made Policy" has the meaning set forth in Section 4.19(c) (*Insurance*).

"Seller Confidential Information" has the meaning set forth in Section 4.8(c) (*Confidentiality*).

"Seller Disclosure Schedule" has the meaning set forth in Article II (*Representations and Warranties of the Seller*).

A-20

"Seller Fundamental Representations" means Section 2.1 (*Ownership of Interests*), Section 2.2 (*Organization, Good Standing and Qualification*), Section 2.3 (*Capital Structure*), Section 2.4(a) (*Authority; Approval*) and Section 2.22 (*Brokers and Finders*).

"Seller Insurance Policies" has the meaning set forth in Section 2.21 (*Insurance*).

"Seller Parties" means, collectively, (i) the Seller, (ii) each of the current or former Affiliates of the Seller, and (iii) each of the current or former officers, directors, service providers, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

"Seller Subscription Facility" means that certain Subscription Facility scheduled as Subscription Facility 2 under Section 2.17(e) of the Seller Disclosure Schedule.

"Seller Tax Group" means any affiliated, consolidated, combined, unitary or similar group for Tax purposes which the Seller or any of its Affiliates is a member, other than such group solely between or among a Target Company, General Partner Entity and their Subsidiaries (if any).

"Seller Trademarks" means any Trademarks owned by the Seller or any of its Affiliates (other than the Target Companies, General Partner Entities or Sponsored Funds) as of the Closing Date, including the Trademarks listed on Exhibit J.

"Sequoia" means Sequoia Capital Fund Management, L.P. and its Affiliates.

"Service Provider" means any current or former service provider (whether full- or part-time and, including any officer) of the Management Company.

"Side Letter" means any agreement or instrument (other than Organizational Documents for the Sponsored Funds) between a Sponsored Fund and/or a General Partner Entity, on the one hand, and any investor of the relevant Sponsored Fund, on the other hand that provides for consideration (whether in the form of payments reimbursement, waivers, reductions, offsets, capacity rights, enhanced liquidity, enhanced transparency or otherwise) to investors or other Persons of any amounts, contingent or otherwise, based on the management or performance of such Fund or that otherwise have the effect or have had the effect of establishing rights under, or altering or supplementing the terms of any other Fund Documentation with respect to that investor, including all amendments, modifications and supplements thereto.

"Similar Laws" has the meaning set forth in Section 2.20 (*Plan Assets Matters*).

"Software" means all (a) computer programs, including all software implementation of algorithms, models and methodologies, whether in source code, object code, human readable form or other form, (b) descriptions, flow charts and other work products used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (c) all documentation including user manuals and other training documentation relating to any of the foregoing.

"Specified Acts" means harassment, abuse, discrimination or retaliation of any kind (including, but not limited to, sexual, racial, gender, sexual orientation, disability or age-related harassment, abuse or discrimination).

"Specified Business Conduct Laws" means (i) the U.S. Foreign Corrupt Practices Act of 1977, the UK Bribery Act of 2010 (to the extent applicable), and all other applicable anticorruption Laws, (ii) all Laws imposing trade sanctions on any Person, including, all Laws administered by OFAC, all sanctions Laws or embargos imposed or administered by the U.S. Department of State, the United Nations Security Council, Her Majesty's Treasury or the European Union (including its Member States) and all anti-boycott or anti-embargo Laws and (iii) all Laws relating to the import, export, re-export, transfer of information, data, goods, and technology, including the Export Administration Regulations administered by the U.S. Department of Commerce and the International Traffic in Arms Regulations administered by the U.S. Department of State.

"Specified Deferred Fees" has the meaning set forth in Section 4.10(d) (*Intercompany Arrangements; Transition Services*).

"Specified Fund Commitments" means, for each Specified Fund, the aggregate amount of bona fide third-party, full fee-paying capital commitments (excluding capital commitments of any Target Company, General Partner Entity and any Affiliates of the Buyer, or any defaulted third-party commitments) irrevocably accepted by such Specified Fund as of the applicable time of determination of the Specified Fund Commitments.

"Specified Funds" means any fund managed, sponsored or advised by the Management Company or the Buyer or any of their respective Affiliates that (i) (A) would be considered a "successor fund" (or equivalent) to any Sponsored Fund under the Fund Documentation of such Sponsored Fund without considering the impact of the substitution of the Buyer for the Seller as the general partner or the investment manager or (B) for which the Track Record or a material portion thereof is utilized in raising capital for such Specified Fund, and (ii) is launched after the Base Date. For the avoidance of doubt, Specified Funds shall not include any fund managed, sponsored or advised by an Affiliate of the Buyer, the primary investment strategy of which is secondaries transactions, general partner strategies or solutions, or special situations.

"Sponsor Commitment" has the meaning set forth in the Recitals.

"Sponsored Funds" means collectively, the funds, investment vehicles, managed accounts or other investment arrangements (including any parallel vehicles, accounts or arrangements or, where the context so requires, any collateralized loan obligations, business development companies, blank check companies, co-investment vehicles or alternative investment vehicles) now or hereafter, directly or indirectly, launched, formed, managed, sponsored, advised or co-advised in connection with the business of the Target Companies, including by the Management Company, and/or that have the Management Company or a General Partner Entity as their general partner, manager, discretionary investment advisor (and not, for the avoidance of doubt, as investment adviser with no discretionary management authority), discretionary co-advisor, or similar controlling entity (including, for the avoidance of doubt, Qualified Investors Fund, LLC); provided, that "Sponsored Funds" shall not include (i) any Portfolio Investments (or

intermediate holding vehicles thereof), (ii) with respect to any employees of the Management Company, any such investment fund, limited partnership, limited liability company, corporation or vehicle, account or arrangement established in connection with such Person's personal investment and business activities, including the entities established in connection with such Person's "family office" or (iii) any Benefit Plan; provided, further, that, notwithstanding anything to the contrary in this definition, and in each case except to the extent otherwise expressly specified in this Agreement, for purposes of the representations and warranties set forth in Sections 2.8 (*Litigation*), 2.15 (*Taxes*), and 2.23 (*Absence of Certain Business Practices*) and the covenants and agreements set forth in Section 4.1 (*Interim Operations of the Target Companies, General Partner Entities and Sponsored Funds*), and for purposes of any other provisions of this Agreement that reference such representations, warranties, covenants or agreements (including, without limitation, the closing conditions set forth in Section 6.2(a) (*Representations and Warranties*), Section 6.2(b) (*Performance of Obligations of the Seller*) and the termination right set forth in Section 7.1(d)(i) *(Material Breach by the Seller)*), QIF 7 shall be deemed to be a "Sponsored Fund".

"Straddle Period" has the meaning set forth in Section 4.9(a) (*Tax Matters*).

"Subscription Facilities" has the meaning set forth in Section 2.17(e) (*Sponsored Funds*).

"Subsidiary" means, with respect to any Person, any other Person of which at least a majority of the securities or equity interests having by their terms ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions is directly or indirectly owned or controlled by such Person and/or by one or more of its Subsidiaries.

"Superior Proposal" means an Alternative Transaction Proposal that the restructuring committee of the Seller's board of directors determines in good faith, upon advice of outside counsel, constitutes or could reasonably be expected to result in a Superior Transaction and the failure of the Seller to pursue such Alternative Transaction Proposal would be inconsistent with the fiduciary duties of the members of such board under applicable Law.

"Superior Transaction" means a transaction that the restructuring committee of the Seller's board of directors determines in good faith, based on the advice of outside counsel would reasonably be expected to be superior for the Seller and its creditors in comparison to the Transactions contemplated under this Agreement, taking into account factors such as the aggregate consideration offered by and conditionality of the respective transactions.

"SVB India Sale" has the meaning set forth in Section 4.19 (*FCB License Agreement*).

"Target Company" is a legal entity identified as such in Exhibit B.

"Tax" or "Taxes" means, whether disputed or not, any and all U.S. federal, state, local and foreign income taxes, levies, duties, fees and similar governmental charges, including, without limitation, profits, franchise, gross receipts, environmental, customs duty, capital stock, severances, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, production, value-added, occupancy and other taxes, duties or assessments of

A-23

any nature whatsoever, together with all interest, penalties and additions imposed with respect to such amounts and any interest in respect of such penalties and additions.

"Tax Contest" has the meaning set forth in Section 4.9(b) (*Tax Matters*).

"Tax Return" means any returns and reports (including elections, declarations, disclosures, schedules, estimates and information returns) or any other document supplied or required to be supplied to a Tax authority relating to Taxes.

"Tax Sharing Agreement" has the meaning set forth in Section 2.15(*Taxes*).

"Taxing Authority" means a Governmental Entity or any subdivision, agency, commission or authority thereof, having jurisdiction over the assessment, determination, collection or imposition of any Tax.

"Termination Date" has the meaning set forth in Section 7.1(c)(i) (*Termination*).

"Termination Fee" means a fee payable as set forth in this Agreement in an amount equal to $15,150,000.

"Track Record" means the investment track record of the Sponsored Funds.

"Trademarks" has the meaning set forth in the Intellectual Property definition.

"Transaction Documents" means this Agreement, the Transition Services Agreement, the Organizational Document Amendments, the Fund Instruments of Assignment and all other ancillary agreements to be entered into by, or documentation delivered by, any Party pursuant to this Agreement.

"Transactions" means the transactions contemplated by this Agreement.

"Transfer Taxes" has the meaning set forth in Section 4.9 (*Tax Matters*).

"Transition Services Agreement" has the meaning set forth in Section 4.10(e) (*Intercompany Arrangements; Transition Services*).

"Vintage Funds" mean Strategic Investors Fund, L.P., Strategic Investors Fund II, L.P., Strategic Investors Fund III, L.P., Growth Partners, L.P. and Strategic Investors Fund V-A, L.P.

"Working Capital" means, at any date, all Current Assets minus all Current Liabilities as of such date, as determined in accordance with generally accepted accounting standards.

"Working Capital Overage" means the amount (expressed as a positive number), if any, by which the Closing Working Capital exceeds the Working Capital Target Amount.

"Working Capital Target Amount" means an amount equal to $4,948,000.

A-24

"<u>Working Capital Underage</u>" means the amount (expressed as a negative number), if any, by which the Closing Working Capital falls below the Working Capital Target Amount.

A-25

## **EXHIBIT D**

**Puntus Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x

In re                                                    :          Chapter 11
                                                         :
                                                         :          Case No. 23-10367 (MG)
SVB FINANCIAL GROUP,[1]                                  :
                                                         :
            Debtor.                                      :
                                                         :
                                                         :
———————————————————— x

**DECLARATION OF MARC PUNTUS IN SUPPORT OF MOTION FOR ENTRY
OF ORDERS (I)(A) APPROVING BUYER PROTECTIONS, (B) SCHEDULING A
SALE HEARING, (C) APPROVING FORM AND MANNER OF NOTICES FOR
SALE OF THE SVB CAPITAL BUSINESS, (D) APPROVING ASSUMPTION AND
ASSIGNMENT PROCEDURES, AND (E) GRANTING RELATED RELIEF, AND
(II)(A) APPROVING THE SVB CAPITAL PURCHASE AGREEMENT,
(B) APPROVING THE SALE OF THE SVB CAPITAL BUSINESS FREE AND
CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES,
(C) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND (D) GRANTING RELATED RELIEF**

I, Marc Puntus, hereby declare as follows:

1.        I am a Partner in and Co-Head of the Debt Advisory and Restructuring

Practice of Centerview Partners LLC ("Centerview"), a financial advisory firm that maintains an

office at 31 West 52nd Street, New York, New York 10019, and is the Debtor's investment

banker.  Centerview is an independent investment banking firm providing financial advisory

services, including mergers and acquisitions and restructuring advice, across a broad range of

industries.  Centerview and its professionals have extensive experience with respect to the

reorganization and restructuring of distressed companies, both out-of-court and in Chapter 11

proceedings.  Centerview and its principals have advised debtors, lenders, committees, equity

holders, and acquirors in many complex financial reorganizations.  Centerview's professionals

have collectively advised on transactions representing over $300 billion in restructured debt.

---

[1]      The last four digits of SVB Financial Group's tax identification number are 2278.

2.      Prior to and since joining Centerview in 2011, I have advised companies in numerous in-court and out-of-court restructurings, recapitalizations, and reorganizations, and I have experience in structuring, negotiating, and executing sale transactions, including under section 363 of the Bankruptcy Code and pursuant to chapter 11 plans.  Before joining Centerview, I was a Managing Director and founder of Miller Buckfire & Co., an investment bank that provided financial advisory services to constituents in a broad range of restructuring and corporate transactions.  Prior to that, I was a member of the financial restructuring group of Dresdner Kleinwort Wasserstein ("DrKW").  Prior to joining DrKW, I was a Partner in the Business, Finance and Restructuring department of Weil, Gotshal & Manges LLP.  I received my B.S.B.A. *magna cum laude* from Georgetown University and my J.D. *cum laude* from Boston University School of Law.

3.      Centerview's professionals, including while employed at other firms, are providing or have provided financial advisory, investment banking, and other services in connection with the in-court restructuring of numerous companies, including the following: *See, e.g., In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. S.D.N.J. 2024), *In re Avaya Inc.*, No. 23-90088 (DRJ) (Bankr. S.D. Tex. 2023); *In re Diamond Sports Group, LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex. 2023); *In re Serta Simmons Bedding, LLC*, No. 23-90020 (DRJ) (Bankr. S.D. Tex. 2023); *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. 2022); *In re Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y. 2022); *In re Enjoy Technology, Inc.*, No. 22-10580 (JKS) (Bankr. D. Del. 2022); *In re Ultra Petroleum Corp.*, No. 20-32631 (MI) (Bankr. S.D. Tex. 2020); *In re Sungard Availability Services Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. 2019); *In re Blackhawk Mining LLC*, 19-11595 (LSS) (Bankr. D. Del. 2019); *In re Cloud Peak Energy Inc.*, No. 19-11047 (KG) (Bankr. D. Del. 2019); *In re CTI*

*Foods, LLC*, No. 19-10497 (CSS) (Bankr. D. Del 2019); *In re PG&E Corporation,* No. 19-

30088 (DM) (Bankr. N.D. Cal. 2019); *In re Westmoreland Coal Company*, No. 18-35672 (DRJ)

(Bankr. S.D. Tex. 2018); and *In re Synergy Pharmaceuticals Inc.*, No. 18-14010 (JLG) (Bankr.

S.D.N.Y. 2018).

       4.      Centerview was engaged by the Debtor in March 2023 to serve as its

investment banker to evaluate various strategic alternatives to maximize recoveries for the

Debtor's stakeholders.  Centerview has advised the Debtor throughout the Debtor's SVB Capital

sale and marketing process.  I have been involved as a senior member of the Centerview team

throughout our engagement.

       5.      I submit this declaration (this "Declaration") in support of (a) *Debtor's*

*Motion for Entry of Orders (I)(A) Approving Buyer Protections, (B) Scheduling a Sale Hearing,*

*(C) Approving Form and Manner of Notices for Sale of the SVB Capital Business, (D) Approving*

*Assumption and Assignment Procedures, and (E) Granting Related Relief, and (II)(A) Approving*

*the SVB Capital Purchase Agreement, (B) Approving the Sale of the SVB Capital Business Free*

*and Clear of Liens, Claims, Interests and Encumbrances, (C) Authorizing Assumption and*

*Assignment of Executory Contracts and (D) Granting Related Relief* (the "Motion")[2], (b) entry of

an order, a proposed form of which is attached as Exhibit A to the Motion, approving the Buyer

Protections and (c) entry of an order, a proposed form of which is attached as Exhibit B to the

Motion, (i) authorizing the Debtor to sell and assign to the Designated Buyer free and clear of

any liens, claims, interests and encumbrances, all on the terms and subject to conditions set forth

in the Designated Buyer Agreement, the SVB Capital Business, (ii) authorizing the Debtor to

assign to Designated Buyer the Assumed Contracts and (iii) granting related relief.

---

[2]    Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in (a) the Motion
or (b) the Designated Buyer Agreement, as applicable.

6.      Except as otherwise indicated, all facts set forth in this Declaration are based upon: (i) my personal knowledge, information and belief, or my opinion based upon experience, knowledge and information concerning the Debtor and its non-debtor affiliates; (ii) information learned from my review of relevant documents; and/or (iii) information supplied by members of the Debtor's management, employees of Centerview working directly with me or under my supervision, direction or control, and/or from the Debtor's other professionals and advisors.

7.      I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtor. I am not being compensated for this testimony other than through payments to be received by Centerview as a professional the Debtor has retained; none of those payments are specifically payable on account of this testimony. If I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

**A.      A Sound Business Justification Exists for the Sale Transaction.**

8.      I believe that the Debtor's entry into the Designated Buyer Agreement represents a sound exercise of the Debtor's business judgment and is in the best interests of the Debtor, its estate, creditors and other parties-in-interest. I believe that the Debtor's consummation of the Sale Transaction pursuant to the Designated Buyer Agreement and on the basis proposed in the Motion is appropriate in light of the facts and circumstances of this Chapter 11 Case. The Debtor has conducted an extensive marketing process for the SVB Capital Business, and the Designated Buyer Agreement includes a "fiduciary out" and alternative transaction mechanism. Following the execution of the Designated Buyer Agreement, the Debtor will have the right to continue negotiations with any potential acquirer for the SVB Capital Business with whom the Debtor had engaged in negotiations in the last three months, or from whom the Debtor received an alternative transaction proposal, prior to the Debtor's entry

-4-

into the Designated Buyer Agreement.  Subsequent to entry into the Designated Buyer

Agreement, the Debtor may also furnish information about the SVB Capital Business to an

unsolicited bidder, subject to such bidder's entry into a qualifying confidentiality agreement, and

consider such unsolicited alternative proposal in order to determine if such proposal would

constitute a superior proposal.  Mandating a formal auction process prior to approval of the Sale

Transaction would require the Debtor to incur additional costs and would not likely result in

additional value sufficient to justify the incurrence of such costs, especially given the extensive

marketing process that occurred prior to the Debtor's selection of the Designated Buyer.

**B.**      **The Sale Transaction Represents the Highest or Otherwise Best Offer for the SVB Capital Business.**

9.      Based on my experience, I believe the Debtor has thoroughly and fairly

marketed the SVB Capital Business to the maximum extent practicable under the circumstances,

and conducted the related sale process in good faith.  The Debtor worked collaboratively with its

key creditor constituencies throughout the sale process, keeping them informed of all significant

developments throughout.

10.      Centerview was engaged by the Debtor effective March 17, 2023 to serve

as its investment banker and evaluate various strategic alternatives to maximize recovery for the

Debtor's estate.  Immediately following Centerview's retention by the Debtor, the Debtor and its

advisors considered potential strategic alternatives for the SVB Capital Business.  This has

included a review of documents regarding the Debtor's businesses, discussions with management

of the Debtor and its affiliates, and coordination and initiation of discussions with potential

purchasers.  After careful consideration, the Debtor determined, in its business judgment, that a

marketing process should be conducted to maximize the value of the SVB Capital Business.

11.     In addition to responding to inbound interest and proactive outreaches to potential acquirers for the SVB Capital Business, Centerview assisted the Debtor in developing a process for the sale of the SVB Capital Business and to ensure that any sale of the SVB Capital Business would be for the highest or otherwise best value.  Based on my experience, the sale process was substantively and procedurally fair and provided a full, fair and reasonable opportunity for parties to make an offer to purchase the SVB Capital Business.

12.     The Debtor afforded all interested parties a reasonable time and opportunity to conduct due diligence on the SVB Capital Business and submit qualifying bids. The Debtor also provided many potential purchasers with confidential information to enable them to make an informed judgment on whether to bid on the SVB Capital Business.  Following the commencement of this Chapter 11 Case in March 2023, the Debtor and its advisors received interest from more than 130 parties regarding an acquisition of the SVB Capital Business.  These included unsolicited inbounds from many plausible potential strategic buyers as well as targeted outreach by Centerview on behalf of the Debtor.  Sixty of the parties that expressed interest in the SVB Capital Business executed non-disclosure agreements and were provided with access to a first-round virtual data room with an overview of information regarding the SVB Capital Business.  In late May 2023, 19 of those parties submitted first-round bids, eight of which were selected to receive access to additional diligence materials through a virtual data room and given access to management via diligence meetings, the opportunity for in-person management presentations and Q&A sessions.  By late July 2023, three parties had submitted interim bids, two of which were selected to move to the final round.  Both parties that had made it to the final round ultimately submitted final bids, one binding and one non-binding.

13.     The Debtor continued to negotiate with both parties throughout the fall of 2023, and received an additional bid from an interested party in late December 2023. However, the Debtor ultimately determined, after consultation with its advisors and key creditor constituencies, that none of these bids exceeded the net present value of the Debtor continuing to operate the SVB Capital Business.  On January 9, 2024, it was publicly announced that the Debtor would retain ownership of the SVB Capital Business in order to retain the most value for the Debtor's estate.

14.     Following the Debtor's announcement of its intention to retain the SVB Capital Business, multiple potential bidders provided the Debtor with new offers for the SVB Capital Business, including the Designated Buyer.  These potential bidders were provided access to diligence materials through the virtual data room, as well as access to management.  The Debtor evaluated the 2024 Bids in consultation with its creditor groups, and the Debtor thereafter sought to improve the terms of the 2024 Bids.  The Debtor successfully negotiated for meaningful improvements in the terms of an offer received from the Designated Buyer, and after thoroughly considering the Designated Buyer's improved bid against alternatives, including (i) the 2023 Bids, (ii) the other 2024 Bids and (iii) the value of continuing to operate the SVB Capital Business, the Debtor, in consultation with its advisors and key creditor constituencies, determined that the bid from the Designated Buyer was the highest or otherwise best offer for the SVB Capital Business.

15.     Throughout the marketing and sale process, the Debtor, with the assistance of Centerview and the Debtor's other advisors, actively engaged with interested parties, responded to diligence requests and duly considered all indications of interest and bids received

based on the merits of each.  The full virtual data room was comprehensive, supplemented

throughout the marketing process, and ultimately contained over 3,000 diligence items.

16.     On May 2, 2024, the Debtor and the Designated Buyer entered into the

Designated Buyer Agreement.  A copy of the Designated Buyer Agreement is attached as

Exhibit B to the Motion.  The consideration for the SVB Capital Business as set forth in the

Designated Buyer Agreement consists of cash consideration of $340 million, subject to certain

adjustments as set forth in the Designated Buyer Agreement, along with ongoing economic

participation rights and a cash earn-out.

17.     Based on my experience, involvement in the process and review of

available alternatives, it is my opinion that there is no higher or otherwise better binding,

definitive offer currently available for the SVB Capital Business.  The Debtor and its advisors

have actively engaged with potential purchasers for over a year, and I believe that interested

persons and entities have been afforded a full, fair and reasonable opportunity to make a higher

or otherwise better offer to purchase the SVB Capital Business. Further, the sale of the SVB

Capital Business, as contemplated by the Designated Buyer Agreement or any Superior

Transaction, creates more value to the Debtor's estate than any know alternative path for the

business, including the Debtor continuing to operate the SVB Capital Business through and

following consummation of a chapter 11 plan.  The proceeds of the SVB Capital Business will

be more readily available for distribution to creditors than under any chapter 11 plan and will

provide value-maximizing and efficient recoveries for the Debtor's creditors.

**C.**     **The Buyer Protections Are Fair and Reasonable and Should be Approved**

18.     The Designated Buyer Agreement provides for bid protections in the form

of the Termination Fee, the Expense Reimbursement Amount and the Hedge Reimbursement,

which are payable upon certain termination events.  The Hedge Reimbursement enables the

Designated Buyer, in the event of the termination of the Designated Buyer Agreement, to be reimbursed by the Debtor for certain costs related to entering into a hedging arrangement to protect against the risk of fluctuations in the prices of publicly traded securities held by the Evergreen Fund prior to the Closing Date.  In the event that Debtor is required to reimburse the Designated Buyer for the Evergreen Hedging Arrangement, Designated Buyer is required to use commercially reasonable efforts to cause the Evergreen Hedging Arrangement to be assigned to the Debtor or its assignee for no additional consideration, such that the Debtor would get the economic benefits of the hedging arrangement.

19.    The Buyer Protections represent a material inducement for, and were a condition of, the Designated Buyer's firm commitment to proceed with the Sale Transaction while allowing the Debtor to pursue an alternative transaction in accordance with the terms of the Designated Buyer Agreement.  The Designated Buyer would not have entered into the Designated Buyer Agreement— and in doing so, effectively provide a floor for any proposed Superior Transaction— without the Buyer Protections.

20.    The Buyer Protections were considered carefully by the Debtor's advisors and approved by the Restructuring Committee.  Further, the Buyer Protections were a product of extensive negotiations between the Debtor and the Designated Buyer at arm's-length, are consistent with market terms for similar transactions, and are fair and reasonable given the circumstances.  It is therefore my opinion that the Buyer Protections should be approved.

D.    <u>The Sale Transaction Will Produce a Fair and Reasonable Price for the SVB Capital Business.</u>

21.    I believe that the purchase price for the SVB Capital Business contemplated by the Designated Buyer Agreement is fair and reasonable.  The Debtor, with the assistance of Centerview, ensured that the sale of the SVB Capital Business would reflect its fair

market value by marketing the SVB Capital Business to the maximum extent possible under the circumstances.

22.     I believe that any other alternative to the Sale Transaction, including the Debtor's continued operation of the SVB Capital Business, would not result in a higher or otherwise better value to the estate and its stakeholders.  Selling the SVB Capital Business will enable the Debtor to receive cash proceeds for distribution to creditors and avoid further expenses and complications relating to the continued operation of the SVB Capital Business.  Further, the consideration for the SVB Capital Business will ensure that the Debtor will share in any upside outcome for the sold business under the Designated Buyer's ownership in the form of potentially enhanced returns on the Retained Interests that will continue to be held by the Debtor.

23.     In my role as the Debtor's financial advisor, I advised the Debtor on the negotiation of and reviewed the Designated Buyer Agreement and based on my experience, I believe the Designated Buyer Agreement is the result of extensive, arm's-length and good-faith negotiations between the parties thereto, and that such negotiations were free of any collusion.

**E.     The SVB Capital Business Should Be Sold Free and Clear of Any Liens.**

24.     I believe that not transferring the SVB Capital Business free and clear of all liens, claims, interests and encumbrances, would adversely affect the Debtor's efforts to maximize the value of the SVB Capital Business.  I believe that Designated Buyer would not have entered into the Designated Buyer Agreement and would not consummate the transactions contemplated thereby if the SVB Capital Business was not sold free and clear of all liens, claims, interests and encumbrances.

**F.     Designated Buyer Should Have No Successor Liability.**

25.     Designated Buyer is not a successor to, continuation of or alter ego of, the Debtor or its estate and there is no continuity of enterprise between Designated Buyer and the

-10-

Debtor as a result of any action taken in connection with the Sale Transaction.  It is my understanding that the Designated Buyer is not holding itself out to the public as a successor to or a continuation of the Debtor or its estate.  The Sale Transaction does not amount to a consolidation, succession, merger, or de facto merger of the Designated Buyer, on the one hand, and the Debtor or its estate, on the other hand.

26.     Accordingly, for the foregoing reasons, I believe that the Designated Buyer Agreement represents the highest or otherwise best offer for the SVB Capital Business and that the Sale Transaction will provide a greater recovery for the Debtor's estate than would be provided by any other reasonably available alternative.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information and belief.

Dated:  May 2, 2024
New York, New York

/s/ *Marc Puntus*
Marc Puntus
Partner
Centerview Partners LLC