James L. Bromley
Andrew G. Dietderich
Christian P. Jensen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel to the Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| SVB FINANCIAL GROUP,[1] | Case No. 23-10367 (MG) |
| Debtor. | |

**NOTICE OF FILING OF REVISED DISCLOSURE STATEMENT**
**AND RELATED APPENDICES AND EXHIBITS**

    **PLEASE TAKE NOTICE** that on January 26, 2024, SVB Financial Group, as debtor and debtor-in-possession (the "Debtor"), filed the *Debtor's Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [D.I. 826] (the "Plan"), and on February 7, 2024, the Debtor filed the *Disclosure Statement for Debtor's Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [D.I. 845] (the "Disclosure Statement").

    **PLEASE TAKE FURTHER NOTICE** that on the date hereof, the Debtor filed the *Debtor's First Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [D.I. 1086] (the "Amended Plan").

---

[1]    The last four digits of SVB Financial Group's tax identification number are 2278.

**PLEASE TAKE FURTHER NOTICE** that on the date hereof, the Debtor filed a revised Disclosure Statement (the "Revised Disclosure Statement"), attached hereto as Exhibit A. A blackline of the Revised Disclosure Statement marked against the Disclosure Statement is attached hereto as Exhibit B.

**PLEASE TAKE FURTHER NOTICE** that on the date hereof, the Debtor also filed (i) the Liquidation Analysis as Appendix B to the Revised Disclosure Statement, attached hereto as Exhibit C, (ii) the Financial Projections as Appendix D to the Revised Disclosure Statement, attached hereto as Exhibit D, (iii) the NewCo Value Overview and Liquidating Trust Assets as Appendix F to the Revised Disclosure Statement, attached hereto as Exhibit E and (iv) the Committee Letter as Exhibit C to the Revised Disclosure Statement, attached hereto as Annex 1.

**PLEASE TAKE FURTHER NOTICE** that the undersigned counsel will present the Revised Disclosure Statement to the Court at the hearing to be held on **May 16, 2024 at 10:00 a.m. (Prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and the Revised Proposed Order may be obtained from the Court's website, https://ecf.nysb.uscourts.gov, for a nominal fee, or obtained free of charge by accessing the website of the Debtor's claims and noticing agent, https://restructuring.ra.kroll.com/svbfg/.

Dated: May 3, 2024
New York, New York

*/s/ James L. Bromley*

James L. Bromley
Andrew G. Dietderich
Christian P. Jensen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: bromleyj@sullcrom.com
  dietdericha@sullcrom.com
  jensenc@sullcrom.com

*Counsel to the Debtor*

## EXHIBIT A

**Revised Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x
                                   :

In re                             :       Chapter 11
                                   :

SVB FINANCIAL GROUP,[1]    :       Case No. 23-10367 (MG)
                                   :

              Debtor.    :
                                   :

———————————————————— x

## DISCLOSURE STATEMENT FOR DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

James L. Bromley
Andrew G. Dietderich
Christian P. Jensen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:   (212) 558-4000
Facsimile:   (212) 558-3588
E-mail:      bromleyj@sullcrom.com
             dietdericha@sullcrom.com
             jensenc@sullcrom.com

Dated: May 3, 2024

---

**THIS IS NOT A SOLICITATION OF VOTES OF ACCEPTANCE OR REJECTION OF THE PLAN.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.**

---

**A SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF SVB FINANCIAL GROUP'S CHAPTER 11 PLAN.**

---

[1]    The last four digits of SVB Financial Group's tax identification number are 2278.

UNLESS EXTENDED BY THE DEBTOR (SUBJECT TO ANY CONSENT RIGHTS OF THE UCC AND THE REQUIRED AD HOC SENIOR NOTEHOLDER PARTIES), THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN TIME, ON JUNE [13], 2024 (THE "__VOTING DEADLINE__").

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS MAY [14], 2024 (THE "__VOTING RECORD DATE__").

---

**RECOMMENDATION BY THE DEBTOR**

The Restructuring Committee of the Board of Directors of SVB Financial Group has approved the transactions contemplated by the Plan (as defined herein) and believes that confirmation and consummation of the Plan is in the best interests of the Debtor's Estate and Holders of Claims and Interests. Accordingly, the Restructuring Committee of the Board of Directors of SVB Financial Group recommends that all Holders of Claims and Interests whose votes are being solicited submit ballots to accept the Plan.

---

THE RESTRUCTURING COMMITTEE OF THE DEBTOR'S BOARD OF DIRECTORS HAS APPROVED THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN AND THE TRANSACTIONS CONTEMPLATED AND DESCRIBED HEREIN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE CHAPTER 11 PLAN IT DESCRIBES HEREIN. NO PERSON SHOULD USE OR RELY ON THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT IS BEING DISTRIBUTED TO PARTIES-IN-INTEREST AS A SETTLEMENT PROPOSAL AND IS THEREFORE SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND OTHER APPLICABLE RULES, AND DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER IN CONNECTION WITH ANY PENDING, THREATENED AND POTENTIAL LITIGATION, ARBITRATIONS OR DISPUTES. THE DEBTOR AND ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS OR INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS OR INTERESTS.

IF THE BANKRUPTCY COURT DOES NOT CONFIRM THE CHAPTER 11 PLAN AND/OR THE CHAPTER 11 PLAN DOES NOT BECOME EFFECTIVE, NO PORTION OF THE CHAPTER 11 PLAN, INCLUDING ANY SETTLEMENTS, WILL BECOME EFFECTIVE.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN AND DOCUMENTS RELATED THERETO, STATUTORY PROVISIONS RELEVANT TO CONFIRMATION OF THE PLAN, EVENTS IN THIS CHAPTER 11 CASE AND FINANCIAL INFORMATION RELATED TO THE DEBTOR, NEWCO AND THE LIQUIDATING TRUST.  ALTHOUGH THE DEBTOR BELIEVES SUCH SUMMARIES ARE FAIR AND ACCURATE, THEY ARE QUALIFIED IN THEIR ENTIRETY BY SUCH DOCUMENTS AND STATUTORY PROVISIONS TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRETY OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.

FACTUAL INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.

THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED MATERIALLY SINCE THIS DISCLOSURE STATEMENT WAS FILED.  SUBJECT TO THE CONSENT RIGHTS SET FORTH IN THE RSA, THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE FINANCIAL PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE DEBTOR'S MANAGEMENT WITH THE ASSISTANCE OF THEIR FINANCIAL AND RESTRUCTURING ADVISORS. THESE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTOR'S CONTROL. THE DEBTOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.  FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED AND/OR MAY

**HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.**

**NO PERSON SHOULD RELY ON ANY OTHER INFORMATION THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED BY REFERENCE HEREIN.  THE DEBTOR HAS NOT AUTHORIZED ANYONE TO PROVIDE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.**

**EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  ANY PERSONS DESIRING ANY SUCH ADVICE OR OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.**

**UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE EXTENT SUCH EXEMPTIONS ARE AVAILABLE.  OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS TO THE EXTENT SUCH EXEMPTIONS ARE AVAILABLE.  IN ACCORDANCE WITH SECTION 1125(e) OF THE BANKRUPTCY CODE, A DEBTOR OR ANY OF ITS AGENTS THAT PARTICIPATES, IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY, OFFERED OR SOLD UNDER THE PLAN, OF THE DEBTOR, OF AN AFFILIATE PARTICIPATING IN A JOINT PLAN WITH THE DEBTOR, OR OF A NEWLY ORGANIZED SUCCESSOR TO THE DEBTOR UNDER THE PLAN, IS NOT LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE OFFER, ISSUANCE, SALE, OR PURCHASE OF SECURITIES.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  ANY REPRESENTATION TO THE**

**CONTRARY IS A CRIMINAL OFFENSE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**THE DEBTOR MAKES STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995, AS AMENDED.  THE DEBTOR CONSIDERS ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS REPRESENT THE DEBTOR'S ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTOR'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE MATERIALLY DIFFERENT FROM THOSE IT MAY PROJECT, AND THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENT.  THE DEBTOR EXPRESSLY CAUTIONS READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF SUCCESS OR THE DEBTOR'S ABILITY TO SATISFY ALL CLAIMS OR INTERESTS TO BE PAID UNDER THE PLAN.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT NEED TO BE CONSIDERED.  SEE <u>ARTICLE IX</u> OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM OR INTEREST TO ACCEPT THE PLAN.**

## TABLE OF CONTENTS

Page

**ARTICLE I. EXECUTIVE SUMMARY** ...................................................................1
    A.    **Purpose of this Disclosure Statement** ............................................2
    B.    **Recovery Analysis and Treatment of Claims and Interests** ...............3
    C.    **Voting on the Plan** ......................................................................10
    D.    **Confirmation of the Plan** ...........................................................12

**ARTICLE II. BACKGROUND** .......................................................................12
    A.    **Overview of the Debtor's Businesses** ...........................................12
    B.    **The Debtor's Corporate Structure and Global Operations** .............13
    C.    **Summary of the Debtor's Assets and Operations** .........................15
    D.    **Liabilities – The Debtor's Prepetition Funded Indebtedness** .........17
    E.    **Existing Preferred Stock** ...........................................................18
    F.    **Existing Common Stock** .............................................................19
    G.    **Factors Leading to the Commencement of This Chapter 11 Case** .................19

**ARTICLE III. SIGNIFICANT EVENTS AND INITIATIVES IN THIS CHAPTER 11 CASE** .................................................................................21
    A.    **Commencement of the Chapter 11 Case** ......................................21
    B.    **First Day Relief** ........................................................................21
    C.    **Appointment of the UCC** ............................................................23
    D.    **The Ad Hoc Group of Senior Noteholders** ..................................23
    E.    **The Ad Hoc Cross-Holder Group** ...............................................23
    F.    **Retention of Debtor Professionals** ..............................................24
    G.    **Schedules and Statements and 341 Meeting** ................................24
    H.    **Bar Dates and Claims Process** ...................................................24
    I.    **Assumption and Assignment of Executory Contracts to FCB and Non-debtor Subsidiaries** ....................................................25
    J.    **Claims Against the FDIC** ...........................................................26
    K.    **SVB Securities Sale** ...................................................................29
    L.    **SVB Capital Reorganization and Sale** ........................................30
    M.    **SVB India Sale** .........................................................................32
    N.    **The Restructuring Support Agreement** ........................................33
    O.    **Securities Lawsuits** ...................................................................34
    P.    **Investigation of Potential Estate Claims and Causes of Action** .......35

**ARTICLE IV. SUMMARY OF THE PLAN** ...................................................37
    A.    **Classification, Treatment and Voting of Claims and Interests** .........38
    B.    **The Liquidating Trust** ...............................................................45
    C.    **Implementation of the Plan** .......................................................56
    D.    **Provisions Regarding Governance of NewCo** ...............................64
    E.    **Executory Contracts and Unexpired Leases** ................................66
    F.    **Provisions Governing Distributions** ............................................69
    G.    **Settlement, Release, Injunction and Related Plan Provisions** .........76

4882-9472-4471 v.14

H.      Conditions Precedent ..................................................................................86

ARTICLE V. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE
PLAN ..............................................................................................................87
A.      The Confirmation Hearing ........................................................................88
B.      Confirmation Standards .............................................................................88
C.      Best Interests Test ......................................................................................90
D.      Financial Feasibility ..................................................................................93
E.      Acceptance by Impaired Classes ...............................................................93
F.      Confirmation Without Acceptance by All Impaired Classes ....................94
G.      MoffettNathanson Valuation and NewCo and Liquidating Trust Asset
        Overviews ...................................................................................................96
H.      Classification .............................................................................................96

ARTICLE VI. VOTING PROCEDURES ...................................................................96
A.      Parties-in-Interest Entitled to Vote ...........................................................99
B.      Classes under the Plan ...............................................................................99
C.      Form, Content, and Manner of Notices ...................................................100
D.      Voluntary Releases under the Plan ..........................................................101
E.      Voting Procedures ....................................................................................104

ARTICLE VII. EFFECT OF CONFIRMATION ......................................................107
A.      Binding Effect of Confirmation ..............................................................107
B.      Good Faith ...............................................................................................107

ARTICLE VIII. SECURITIES LAW MATTERS .....................................................107
A.      Bankruptcy Code Exemptions from Registration Requirements ............107
B.      Private Placement Exemptions ................................................................109

ARTICLE IX. CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO
VOTING ........................................................................................................112
A.      Certain Bankruptcy Law Considerations .................................................112
B.      Risks Related to the Debtor's Ongoing Operations during the Chapter
        11 Case .....................................................................................................119
C.      Risk Factors Relating to the SVB Capital Sale .......................................121
D.      Risk Factors Relating to a NewCo Transaction .......................................122
E.      Risk Factors Relating to NewCo Common Stock to Be Issued Under
        the Plan .....................................................................................................122
F.      Operational Risks for NewCo ..................................................................125
G.      Risk Factors Relating to Liquidating Trust Interests to Be Issued
        Under the Plan ..........................................................................................127
H.      Operational Risks for the Liquidating Trust ...........................................129
I.      Additional Risk Factors ...........................................................................131

ARTICLE X. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF
THE PLAN .....................................................................................................133
A.      Consequences to the Debtor .....................................................................136

vii

**B.**    **Consequences to U.S. Holders of Certain Claims and Interests**....................**141**

**C.**    **Consequences to the Non-U.S. Holders of Certain Claims and Interests**................................................................................................**150**

**D.**    **Tax Treatment of the Liquidating Trust and Holders of Liquidating Trust Interests**................................................................................**157**

**F.**    **Withholding on Distributions and Information Reporting**...........................**162**

**ARTICLE XI. RECOMMENDATION** ....................................................................................**162**

4882-9472-4471 v.14

<u>Appendices and Exhibits</u>

| | |
|---|---|
| <u>Appendix A</u> | Debtor's Plan of Reorganization under Chapter 11 of the Bankruptcy Code |
| <u>Appendix B</u> | Liquidation Analysis |
| <u>Appendix C</u> | Solicitation Procedures Order |
| <u>Appendix D</u> | Financial Projections |
| <u>Appendix E</u> | Restructuring Support Agreement |
| <u>Appendix F</u> | NewCo Value Overview and Liquidating Trust Assets |
| | |
| <u>[Exhibit A]</u> | [Debtor's Organizational Structure][2] |
| <u>[Exhibit B]</u> | [Illustrative Post-Emergence Organizational Structure][3] |
| <u>Exhibit C</u> | Committee Letter |

---

[2]   [**<u>NTD</u>**: To be filed with the Court in advance of Disclosure Statement hearing.]

[3]   [**<u>NTD</u>**: To be filed with the Court in advance of Disclosure Statement hearing.]

4882-9472-4471 v.14

# ARTICLE I.

# EXECUTIVE SUMMARY

On March 17, 2023 (the "Petition Date"), SVB Financial Group (the "Debtor") filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") (the "Chapter 11 Case").

Simultaneous with the filing of this Disclosure Statement, the Debtor filed the *Debtor's First Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (as may be further amended, supplemented or modified from time to time, including the Plan Supplement and all other exhibits and schedules thereto, in each case, as they may be further amended, modified or supplemented from time to time, the "Plan") [D.I. 1086]. The Plan is annexed hereto as Appendix A and is incorporated herein by reference.

The Plan provides for the formation of a liquidating trust (the "Liquidating Trust"), to which the Debtor will contribute certain assets, including but not limited to certain claims, causes of action, investment securities, limited partnership interests and cash, as agreed upon by the Debtor, the UCC and the Required Ad Hoc Senior Noteholder Parties under the terms of the Plan and Restructuring Support Agreement (the "RSA"). Upon the Effective Date, the Liquidating Trust will issue three classes of Liquidating Trust Interests and, subject to certain conditions described in the Plan, Holders of certain Classes of Claims and Interests will receive certain Liquidating Trust Interests in accordance with the priority of their Claims. In addition, the Plan provides that the Debtor may undertake certain restructuring transactions which, if effected, will result in a newly-formed Delaware corporation (or other business form as agreed upon under the terms of the Plan) owning, directly or indirectly, 100% of the equity interests in the Debtor. For purposes of the Plan and this Disclosure Statement, "NewCo" shall refer to, as applicable, (i) the Debtor as reorganized pursuant to and under the Plan and any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date or (ii) a newly-formed Delaware corporation (or other business form as agreed upon under the terms of the Plan) that owns or will own, directly or indirectly, 100% of the equity interests in the Debtor. NewCo will retain assets of the Debtor not otherwise contributed to the Liquidating Trust, including the equity interests in certain non-Debtor subsidiaries. NewCo will issue 100% of its new common equity interests to certain Holders of Allowed General Unsecured Claims, subject to dilution by any NewCo Transaction (as defined below).

The Plan and this Disclosure Statement are the result of extensive good faith and arms-length discussions and negotiations among the Debtor, the UCC and the Ad Hoc Group of Senior Noteholders (all terms as defined below). The Plan is a direct product of the RSA among the Debtor, the UCC and the Ad Hoc Group of Senior Noteholders, which RSA is attached hereto as Appendix E. The Debtor believes that the Plan will provide the highest and best recovery to Holders of Claims and Interests in the most efficient and expeditious manner possible. The Debtor submits that (i) through the Plan, Holders of Allowed Claims and Interests will obtain a recovery from the Debtor's Estate equal to or greater than the recovery that they would receive if the Debtor's assets were liquidated under chapter 7 of the Bankruptcy Code and

(ii) consummation of the Plan will maximize the recovery of the Holders of Allowed Claims and Interests.

Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan; *provided*, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), will have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

## A.    Purpose of this Disclosure Statement

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization.  Chapter 11 helps a company maximize recovery to all stakeholders.  The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying claims against, and interests in, the debtor.  Confirmation of a plan by a bankruptcy court binds the debtor and any creditor or interest holder of the debtor.  Subject to certain limited exceptions, the order approving confirmation of a plan enjoins parties from enforcing any debt that arose prior to the date of confirmation of the plan or from bringing any causes of action against the debtor in connection with such debt.

In general, a plan (a) divides claims and interests into separate classes, (b) specifies the property or other distributions that each class is to receive under the plan and (c) contains provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "interests," rather than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and interests in more than one class.

The Debtor submits this *Disclosure Statement for Debtor's First Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code for the purpose of soliciting votes on the proposed Plan.  The purpose of this Disclosure Statement is to provide the Holders of Claims and Interests who are entitled, and will be solicited, to vote on the Plan with information of a kind and in sufficient detail, to make an informed decision on whether to accept or reject the Plan.  Pursuant to section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited only after a Bankruptcy Court-approved written disclosure statement has been provided to each creditor or interest holder who is entitled to vote on the Plan.

This Disclosure Statement includes, among other things, information pertaining to the Debtor's prepetition business operations and financial history and the events leading up to the Chapter 11 Case.  In addition, an overview of the Plan is included, which overview sets forth certain terms and provisions of the Plan, the effects of Confirmation of the Plan, certain risk factors associated with the Plan and the manner in which distributions will be made under the Plan.  This Disclosure Statement also discusses the Confirmation process and the procedures for voting, which procedures must be followed by the Holders of Claims and Interests entitled to vote under the Plan for their votes to be counted.

**B.**     **Recovery Analysis and Treatment of Claims and Interests**

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Section 4 of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  For each Class, the Plan describes (a) the underlying Claim or Interest, (b) the recovery available to the Holders of Claims or Interests in that Class under the Plan, (c) whether the Class is Impaired under the Plan, meaning that each Holder will receive less than full value on account of its Claim or Interest or that the rights of Holders under law will be altered in some way and (d) the form of any consideration (*e.g.*, Cash, Liquidating Trust Interests, NewCo Common Stock or a combination thereof) that Holders will receive on account of their respective Claims or Interests.

Subject to the terms set forth in Section 4 of the Plan and as further described in Article IV.C.5—*NewCo Common Stock* below, Holders of Claims in Classes 3(a) and 3(b) may be entitled to receive (a) to the extent such Holder certifies that it is a Qualified Holder, NewCo Common Stock or (b) to the extent that such Holder Certifies that it is a Non-Qualified Holder, Cash equal to the value of the NewCo Common Stock that such Holder would have received if such Holder were a Qualified Holder.  Accordingly, each such Holder must provide a certification as to its status as (x) a Qualified Holder or (y) a Non-Qualified Holder in order to receive its distribution as described in clause (a) or (b) of the previous sentence, respectively. The procedures for providing such certification are described further in Article IV.C.5—*NewCo Common Stock* below.

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Other Administrative Claims, Ad Hoc Noteholder Group Expenses, Senior Note Trustee Expenses, Subordinated Note Trustee Expenses, Professional Fee Claims and Priority Tax Claims, which will generally be paid in Cash when approved by the Bankruptcy Court or in the ordinary course on or after the Effective Date.

**1.**     **Classification of Claims and Interests**

The classification of Claims and Interests pursuant to the Plan is as follows:

| Class | Designation | Status | Voting Rights |
|-------|-------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3(a) | Senior Note Claims | Impaired | Entitled to Vote |
| 3(b) | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Subordinated Note Claims | Impaired | Entitled to Vote |
| 5 | Preferred Equity Interests | Impaired | Entitled to Vote |
| 6 | Common Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

| Class | Designation | Status | Voting Rights |
|-------|-------------|--------|---------------|
| 8 | Intercompany Claims and Intercompany Interests | Impaired or Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

### 2.      Recovery Analysis Summary

The table below provides a summary of the classification, treatment and estimated recoveries of Claims and Interests under the Plan.  This information is provided in summary form for illustrative purposes only, is subject to material change based on contingencies related to the claims reconciliation process, recoveries obtained by the Liquidating Trust in liquidating the Liquidating Trust Assets and the post-Effective Date financial performance of NewCo, and is qualified in its entirety by reference to the provisions of the Plan.  Amounts assumed for purposes of projected recoveries are estimates only.  Actual recoveries received under the Plan may differ materially from the projected recoveries.  For a more detailed description of the treatment of Claims and Interests under the Plan, *see* Article IV below—*Summary of the Plan*. To the extent any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.  For a complete description of the Debtor's classification and treatment of Claims and Interests, reference should be made to the Plan.

THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.

SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY RANGE[5] | |
|-------|-----------|---------------------------|-------------------------------------|---|
| | | | **Plan** | **Liquidation** |
| 1 | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its | N/A | 100% | 100% |

---

[4]    Estimated Allowed Claims dollar amounts reflected in millions.

[5]    Estimated percent recovery ranges reflect the estimated recovery range for each class under the Plan and liquidation scenarios.  The estimated recovery ranges provided in this table reflect the low and high ends of projected recoveries under "Scenario A," "Scenario B" and "Scenario C" as set forth in the Liquidation Analysis (as defined below) set forth on Appendix B to this Disclosure Statement.  Scenarios A, B and C reflect a range of outcomes of the Debtor's ongoing litigation with the FDIC (as defined below).  For additional information, please refer to Article V.C.2–*The Debtor's Liquidation Analysis*.

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY RANGE[5] | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| | Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim will receive, at the Debtor's option (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed):  (a) payment in full in Cash; (b) delivery of the collateral securing its Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | | | |
| 2 | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim will receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | $0.0[6] | 100% | 100% |
| 3(a) | Except to the extent that a Holder of an Allowed Senior Note Claim agrees to a less favorable treatment (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed), in full and final satisfaction, settlement, release | $3,329.0 | 41%–96% | 30%–85% |

---

[6]    The Estimated Allowed Claims in Class 2 are less than $1,000.00 in the aggregate.

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY RANGE[5] | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| | and discharge of and in exchange for its Allowed Senior Note Claim, each Holder of an Allowed Senior Note Claim will receive (a)(i) if and solely to the extent such Holder is a Qualified Holder, its Pro Rata share (together with all Holders receiving Distributions in NewCo Common Stock) of the NewCo Common Stock subject to dilution by any NewCo Transaction or (ii) if and solely to the extent such Holder is a Non-Qualified Holder, Cash in an amount equal to the value of the NewCo Common Stock it would be entitled to receive if it were a Qualified Holder, (b) its Pro Rata share (together with all Holders receiving Distributions of the Class A Trust Units) of the Class A Trust Units and (c) payment by the Debtor in Cash of the Senior Note Trustee Expenses, to the extent not otherwise paid by the Debtor under the Plan. | | | |
| 3(b) | Except to the extent that a Holder of an Allowed Other General Unsecured Claim agrees to a less favorable treatment (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed), in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other General Unsecured Claim, each Holder of an Allowed Other General Unsecured Claim will receive:<br><br>(a) (i)(A) if and solely to the extent such Holder is a Qualified Holder, its Pro Rata share | $180.4 | 41%–96% | 30%–85% |

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY RANGE[5] | |
|---|---|---|---|---|
| | | | **Plan** | **Liquidation** |
| | (together with all Holders receiving Distributions in NewCo Common Stock) of the NewCo Common Stock subject to dilution by any NewCo Transaction or (B) if and solely to the extent such Holder is a Non-Qualified Holder, Cash in an amount equal to the value of the NewCo Common Stock it would be entitled to receive if it were a Qualified Holder, and (ii) its Pro Rata share (together with all Holders receiving Distributions of the Class A Trust Units) of the Class A Trust Units; or

(b) if such Holder elects on the applicable ballot, the GUC Cash-Out with respect such Claim. | | | |
| 4 | Except to the extent that a Holder of an Allowed Subordinated Note Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Subordinated Note Claim, each Holder of an Allowed Subordinated Note Claim will receive its Pro Rata share of (a) the Class B Trust Units in an aggregate amount equal to such Holder's Allowed Subordinated Note Claim and (b) payment by the Debtor in Cash of the Subordinated Note Trustee Expenses, to the extent not otherwise paid by the Debtor under the Plan. | $104.5 | 0% | 0% |

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY RANGE[5] | |
|---|---|---|---|---|
| | | | **Plan** | **Liquidation** |
| 5 | Except to the extent that a Holder of an Allowed Preferred Equity Interest agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Preferred Equity Interest, each Holder of an Allowed Preferred Equity Interest will receive its Pro Rata share of the Class C Trust Units. | $3,700.0 | 0% | 0% |
| 6 | No Holder of a Common Equity Interest will receive any Distributions on account of its Common Equity Interest.  On and after the Effective Date, all Common Equity Interests will be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of such Interests will not receive or retain any distribution, property, or other value on account of such Interests. | N/A | 0% | 0% |
| 7 | No Holder of a Section 510(b) Claim will receive any Distributions on account of its Section 510(b) Claim. On and after the Effective Date, all Section 510(b) Claims will be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive or retain any distribution, property, or other value on account of such Claims. | N/A | 0% | 0% |

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY RANGE[5] | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| 8 | On and after the Effective Date, each Intercompany Claim and each Intercompany Interest will be (a) canceled, released, and discharged, (b) Reinstated, (c) converted to equity, or (d) otherwise set off, settled, or distributed, in each case at the option of the Debtor with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed. | N/A[7] | 0% | 0% |

### 3.    GUC Cash-Out

As set forth in Section 4.2 of the Plan, certain Holders of Other General Unsecured Claim are eligible to elect to receive the "GUC Cash-Out." The GUC Cash-Out provides each Holder of an Allowed Other General Unsecured Claim with an option to elect to receive its Distribution in Cash in an amount equal to 45% of (i) the Allowed value of such Claim or (ii) $11,000,000 of such Claim, if such Claim exceeds $11,000,000, in either case, in full satisfaction of such Claim. To the extent that the Holder of an Allowed Other General Unsecured Claim that exceeds $11,000,000 elects to receive the GUC Cash-Out, such Holder agrees to reduce such Claim to $11,000,000.

**To receive the GUC Cash-Out, each eligible Holder of an Other General Unsecured Claim must complete Item 3 on the applicable ballot and return such ballot in accordance with the procedures set forth in the Solicitation Procedures Order (as defined below), as further described in <u>Article VI</u>—*Voting Procedures* below. If an eligible Holder of an Other General Unsecured Claim fails to complete the GUC Cash-Out election, set forth on Item 3 of the applicable Ballot, or fails to return such Ballot in accordance with the procedures set forth in the Solicitation Procedures Order by the deadlines provided therein, such Holder will be deemed to have irrevocably relinquished and waived its right to receive the GUC Cash-Out. All eligible Holders of Other General Unsecured Claims should carefully review the procedures set forth in the Solicitation Procedures Order.**

---

[7]    As of the date of this Disclosure Statement, certain of the Debtor's foreign subsidiaries are in the process of being wound down under applicable law. In connection with such wind down processes, certain *de minimis* Intercompany Claims held by the Debtor's foreign subsidiaries are expected to be settled prior to the Effective Date.

C.    **Voting on the Plan**

1.    **Parties-in-Interest Entitled to Vote**

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan. Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is conclusively presumed to have accepted the plan, and the plan proponent need not solicit such holder's vote. Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan. For a detailed description of the treatment of Claims and Interests under the Plan, refer to <u>Article IV</u> below—*Summary of the Plan*.

Classes 1 and 2 are Unimpaired under, and conclusively presumed under section 1126(f) of the Bankruptcy Code to have accepted, the Plan.

Classes 3(a), 3(b), 4 and 5 are Impaired under, and entitled to vote to accept or reject, the Plan.

Classes 6 and 7 are Impaired under, and deemed under section 1126(g) of the Bankruptcy Code to have rejected, the Plan.

Class 8 is Impaired or Unimpaired under, and deemed under section 1126(f) or 1126(g) of the Bankruptcy Code, as applicable, to have accepted or rejected the Plan.

Except as described in <u>Article V</u> below—*Statutory Requirements for Confirmation of the Plan*, the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each Impaired Class accept the Plan. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in such class that have voted to accept or reject the plan. Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds in dollar amount of interests in such class that have voted to accept or reject the plan. Holders of claims or interests who fail to vote are deemed neither to accept nor to reject the Plan. For a more detailed description of the requirements for confirmation of the Plan, refer to <u>Article V</u> below—*Statutory Requirements for Confirmation of the Plan*.

Even if the Plan has not been accepted by all Impaired Classes entitled to vote, section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan,

provided that the Plan has been accepted by at least one Impaired Class of creditors. Notwithstanding the failure of an Impaired Class to accept the Plan, the Plan can be confirmed by a procedure commonly known as cram-down, provided the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, refer to Article V below—*Statutory Requirements for Confirmation of the Plan*.

> ## 2.    Submitting a Ballot

If you are the record Holder of a Claim or Interest in a Class entitled to vote on the Plan, accompanying this Disclosure Statement is a ballot (the "Ballot") for voting to accept or reject the Plan.

Classes 3(a), 3(b), 4 and 5 are entitled to, or are being solicited to, vote to accept or reject the Plan.  If you are entitled to or are being solicited to vote, you should carefully review this Disclosure Statement, including the attached appendices and the instructions accompanying your Ballot or Ballots.  Then, indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot or Ballots and return the Ballot or Ballots to Kroll Restructuring Administration LLC (the "Solicitation Agent" or "Kroll") or by submitting a Ballot or Ballots through the online electronic ballot portal (as described on the Ballot) maintained by Kroll.  If you are a Beneficial Holder[8] of Claims or Interests in Classes 3(a), 4 or 5 and received a Ballot for Beneficial Holders (a "Beneficial Holder Ballot"), you must return the Beneficial Holder Ballot to your broker or other nominee, or the agent of a broker or other nominee (each of the foregoing, a "Nominee"), in accordance with the instructions provided by your Nominee, who will then submit a master ballot on your behalf.

As described herein, the Ballot or Election Form (as defined below), as applicable, contains an election for a Holder who rejects the Plan, a Holder abstaining from voting on the Plan, or a Holder deemed to accept the Plan, to opt out of the third-party releases contained in Section 12.9 of the Plan.  If applicable, each Holder of a Claim or Interest that does not timely make the opt-out election on its Ballot or Election Form will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties.

The notices of non-voting status for Holders of Claims or Interests that are deemed to reject the Plan contain an election to opt in to the third-party releases contained in Section 12.9 of the Plan.  Holders of Claims or Interests that are deemed to reject the Plan but who affirmatively opt in to the third-party releases provided by the Plan by checking the box on the applicable Election Form indicating that they opt in to grant the third-party releases provided in the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties.

---

[8]    A "Beneficial Holder" means a beneficial owner of publicly traded securities whose Claims or Interests have not been satisfied prior to the Record Date pursuant to Court order or otherwise, as reflected in the records maintained by the Nominees holding through the respective indenture trustee or transfer agent (as applicable).

For further information, refer to Article VI—*Voting Procedures* below, and the Solicitation Procedures Order attached hereto as Appendix C.

Ballots cast by Holders in Classes entitled to vote must be actually received by the Solicitation Agent by 5:00 p.m. Eastern Time on June [17], 2024.  Ballots received after the Voting Deadline will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected.

For further information, refer to Article VI—*Voting Procedures* below.

### 3.  Recommendation

**The Debtor believes that confirmation and consummation of the Plan is in the best interests of the Debtor's Estate and Holders of Claims and Interests.  Accordingly, the Debtor recommends that Holders of Claims and Interests entitled to vote on the Plan vote to accept it.**

## D.  Confirmation of the Plan

### 1.  Plan Objection Deadline

Objections to Confirmation of the Plan must be filed with the Bankruptcy Court and served so as to be actually received on or before 4:00 p.m., Eastern Time on June [18], 2024. Unless objections to the Confirmation are timely served and filed in compliance with the Solicitation Procedures Order, they will not be considered by the Bankruptcy Court.

### 2.  Confirmation Hearing

The Bankruptcy Court has scheduled the hearing to consider confirmation (the "Confirmation") of the Plan (the "Confirmation Hearing") at 10:00 a.m. on June [25], 2024, Eastern Time.  The Confirmation Hearing may be adjourned by the Bankruptcy Court or the Debtor without further notice other than by announcement in open court and/or notice(s) of adjournment filed on the docket with the Bankruptcy Court's permission.

## ARTICLE II.

## BACKGROUND

## A.  Overview of the Debtor's Businesses

The principal business of the Debtor is diversified financial services with a focus on the innovation economy.  Through the Debtor's various subsidiaries and divisions, the Debtor has long offered a diverse set of banking and financial products and services to clients across the United States and in key international innovation markets.  Prior to March 10, 2023, the Debtor owned and operated Silicon Valley Bank ("SVB"), a California-chartered bank, through which the Debtor offered commercial and private banking products and services.  On March 10, 2023, the California banking authorities closed SVB and appointed the Federal Deposit Insurance

Corporation (the "FDIC") as receiver ("FDIC-R1").  The circumstances leading to the receivership are described in more detail below.

Following the closure of SVB, the Debtor's primary business lines were SVB Capital, the venture capital and credit investment arm of the Debtor, which focuses on funds management on behalf of third-party limited partner investors and the Debtor and SVB Securities LLC ("SVB Securities"), an investment bank.  SVB Securities provided investment banking services and provided equity research coverage, especially with respect to healthcare and technology companies.  On October 2, 2023, the Debtor consummated a sale of SVB Securities to a bidder group led by members of SVB Securities management, the circumstances of which are described in more detail below.

## B.    The Debtor's Corporate Structure and Global Operations

### 1.    Silicon Valley Bank

Prior to March 10, 2023, the Debtor operated SVB.  SVB was a commercial bank that offered credit, treasury management, foreign exchange, trade finance, and other services to clients in key innovation markets.  SVB was the Debtor's primary operating subsidiary and a core element of the Debtor's business.  SVB directly employed all of the Debtor's personnel, who provided services to the Debtor and its various businesses via intercompany services arrangements (the "Services Agreement").  SVB was also custodian of most of the books, records, and other data related to the Debtor's business.

On March 10, 2023, the California Department of Financial Protection and Innovation (the "CA DFPI") closed SVB and appointed the FDIC-R1 as receiver.  The FDIC-R1 subsequently transferred all deposits and substantially all assets of SVB to a newly created, FDIC-operated bridge bank, Silicon Valley Bridge Bank, National Association (the "Bridge Bank").  On March 27, 2023, the Office of the Comptroller of the Currency closed Bridge Bank and appointed the FDIC as receiver for Bridge Bank ("FDIC-R2"), and First Citizens BancShares, Inc. ("FCB Parent") announced that it had entered into an agreement with FDIC-R2 and the FDIC in its corporate capacity ("FDIC-C") to assume all remaining deposit liabilities of Bridge Bank and to purchase approximately $72 billion of assets from Bridge Bank at a discount of $16.5 billion.  As of the time of this Disclosure Statement, the legacy banking business of SVB is now operated as a division of FCB Parent's subsidiary bank, First-Citizens Bank & Trust Company ("FCB").

### 2.    SVB Capital

SVB Capital is the venture capital and credit investment arm of the Debtor.  SVB Capital focuses primarily on funds management and, as of the Petition Date, managed over $9.8 billion of funds on behalf of third-party limited partner investors and, on a more limited basis, the Debtor.  The SVB Capital family of funds is comprised of pooled investment vehicles such as direct venture funds that invest in companies and funds of funds that invest in other venture capital funds, as well as debt funds that provide lending and other financing solutions.  SVB Capital generates income for the Debtor primarily through investment returns and management fees.

Historically and as of the Petition Date, SVB Capital operated as a "virtual" subsidiary for the Debtor, without a singular non-debtor subsidiary legal entity. To continue operating this business in the ordinary course, the Debtor took steps to consolidate the various operations that comprise SVB Capital in new legal entities, as explained in more detail below.

On May 2, 2024, the Debtor announced that it had entered into an agreement to sell SVB Capital to Pinegrove Sierra HoldCo LLC ("<u>SVBC Designated Buyer</u>"). As explained in more detail in <u>Article III.L.2</u> below, on May 2, 2024, the Debtor filed a motion seeking approval from the Bankruptcy Court for this sale, and as of the date of this Disclosure Statement, the sale of SVB Capital remains pending.

### 3. SVB Securities LLC

SVB Securities was an investment bank focused on the innovation market and, as of the Petition Date, operated as a wholly owned subsidiary of the Debtor held by the intermediate holding company, SVB Securities Holdings. SVB Securities provided investment banking services across the healthcare and technology sectors. SVB Securities also provided equity research coverage of over 360 healthcare and technology companies through another SVB Securities Holdings subsidiary, MoffettNathanson LLC. SVB Securities focused on product and service offerings in capital raising, M&A advisory, structured finance, equity research, sales and trading.

On June 18, 2023, the Debtor announced that it had entered into an agreement to sell SVB Securities (excluding MoffettNathanson LLC) to its management group. As explained in more detail below, on July 5, 2023, the Bankruptcy Court approved this sale, and the sale of SVB Securities closed on October 2, 2023. The Debtor continues to own the equity interests in MoffettNathanson LLC, a non-debtor subsidiary.

### 4. SVB Global Services India LLP

SVB Global Services India LLP ("<u>SVB India</u>"), was an IT and operations services provider for Silicon Valley Bank and its Affiliates, including the Debtor, based in Bangalore, India and, as of the Petition Date, operated as a wholly owned subsidiary of the Debtor. Prior to the commencement of this Chapter 11 Case, SVB India developed technology projects and services, and engaged in development and support for core functional areas of the Debtor including technology, human resources, finance and loan operations. After the placement of SVB into receivership and the commencement of this Chapter 11 Case, SVB India continued to provide back-office functions primarily to Bridge Bank, and later to FCB as the purchaser of legacy SVB assets.

On March 20, 2024, the Debtor announced that it had entered into an agreement to sell SVB India to affiliates of FCB. As explained in more detail below, on April 10, 2024, the Bankruptcy Court approved this sale, and the sale of SVB India is expected to close in the second quarter of 2024.

C.      **Summary of the Debtor's Assets and Operations**

1.      **Assets**[9]

In addition to the businesses described above, the Debtor holds a variety of other assets, including (i) investment securities, warrants and investments in SVB Capital funds (ii) Cash and (iii) certain Retained Causes of Action including Claims and Causes of Action against the FDIC-C and the FDIC-Rs (as defined below) and potential Claims and Causes of Action against the Debtor's Related Parties.

(a)      **Investment Securities**

The Debtor holds certain direct equity investments in a variety of public and private companies, with a total book value of approximately $240.1 million and certain limited partner interests across over 130 funds of approximately $118.4 million.  Certain of the Debtor's direct investments are held indirectly through its wholly-owned subsidiary, SVB Investments Holdings, Inc.

(b)      **Warrants**

The Debtor holds certain warrants and other derivative investments in a variety of public and private companies.  The warrant portfolio includes over 4,700 warrant positions representing over 3,000 issuers, with a total book value of approximately $311.2 million.  The Debtor's 50 largest warrant issuers account for approximately $142.6 million of the Debtor's total warrant portfolio.  The derivative investments represent conversion rights with a book value of approximately $10.9 million.

(c)      **Investments in SVB Capital Funds**

The Debtor holds capital and carried interest positions in certain fund of funds, credit funds and direct funds managed by SVB Capital with a total book value of approximately $496.4 million.  The book value of these interests are $412.3 million, $54.5 million and $29.6 million for SVB Capital's fund of funds, credit funds and direct funds, respectively.  As described below in Article III.L—*SVB Capital Reorganization and Sale*, as of the date of this Disclosure Statement, the SVB Capital Sale (defined below) remains pending, and the consummation of the SVB Capital Sale would impact the value retained by the Debtor in the SVB Capital funds described in this paragraph.

(d)      **Other Assets**

The Debtor and its non-debtor subsidiaries collectively hold approximately $264.5 million in Cash.  The Debtor also indirectly holds equity interests in a number of foreign entities through its wholly-owned subsidiary, SVB Global Financial, Inc.  These indirect foreign subsidiaries are in the process of being wound down under applicable local law.

---

[9]      Asset values in this Article II.C.1 are reflected as of March 31, 2024.

Additionally, as discussed in further detail below, the Debtor has certain Claims and Causes of Action against the FDIC-C and the FDIC-Rs (as defined below), pursuant to which the Debtor may seek to recover the approximately $1.93 billion in funds that were on deposit at SVB at the time that SVB was placed into receivership.  Further, the Debtor and the UCC have been investigating potential Claims and Causes of Action against the Debtor's Related Parties relating to the closure of SVB.

### 2.    The Debtor's Board of Directors

The following table lists the Debtor's directors and their respective positions on the Petition Date.

| Name | Position |
|---|---|
| Beverly Kay Matthews | Chair of the Board of Directors and Director |
| Greg Becker[10] | President, Chief Executive Officer and Director |
| Eric A. Benhamou | Director |
| Elizabeth Burr | Director |
| Richard D. Daniels | Director |
| Alison Davis | Director |
| Joel P. Friedman | Director |
| Thomas King | Director |
| Jeffrey N. Maggioncalda | Director |
| Mary J. Miller | Director |
| Kate D. Mitchell | Director |
| Garen K. Staglin | Director |

### (a)    Restructuring Committee

On March 13, 2023, the Debtor announced that its board of directors (the "Board") appointed a restructuring committee (the "Restructuring Committee") consisting of five (5) independent directors to explore strategic alternatives for the Debtor and its various businesses, assets and investments.  The Restructuring Committee was delegated certain authority with respect to the restructuring of the Debtor, and the Restructuring Committee's initial members were Eric Benhamou, Tom King, Kay Matthews, Mary Miller and Kate Mitchell.  Joel Friedman was appointed to the Restructuring Committee after the Petition Date.

### (b)    Director Appointments and the Special Committee

On July 13, 2023, the Board increased the number of directors from 11 to 13 and appointed Steven G. Panagos and C. Allen Parker as directors.  The Board determined that Mr. Panagos and Mr. Parker are independent directors as defined by the listing standards of NASDAQ.  On July 13, 2023, the Board also formed a special committee (the "Special Committee"), which would be initially comprised of Mr. Panagos and Mr. Parker.  The Special Committee was delegated authority to consider all matters brought to the Board for which a

---

[10]    On April 19, 2023, Mr. Becker resigned from the Debtor's Board and from his positions as President and Chief Executive Officer.

majority of the directors are conflicted.  In addition, Mr. Panagos and Mr. Parker were contemporaneously appointed to the Restructuring Committee.

**3.      Debtor Employees**

As of the Petition Date, the Debtor did not directly employ any individual. Instead, services were performed for the Debtor by employees and other service providers of the former Bridge Bank in accordance with the Services Agreement.  Since the Petition Date, the Debtor has hired a number of employees to provide ordinary course services to the Debtor through its wholly owned direct subsidiary SVBFG Employee Holdco LLC ("EmployeeCo"). As of the date of this Disclosure Statement, EmployeeCo has six (6) employees.

**D.      Liabilities – The Debtor's Prepetition Funded Indebtedness**

As of the Petition Date, the Debtor had approximately $3.37 billion in aggregate outstanding funded indebtedness.  All of the Debtor funded indebtedness is unsecured.

**1.      The Senior Notes**

On September 10, 2020, the Debtor entered into an indenture (the "Base Indenture") with U.S. Bank National Association, as trustee (the "Senior Notes Trustee"), pursuant to which the Debtor has from time to time issued various series of unsecured notes (the "Senior Notes").  On April 28, 2022, the Debtor and the Senior Notes Trustee entered into a first supplemental indenture, supplementing and amending the Base Indenture (together with the Base Indenture, the "Indenture").  The outstanding Senior Notes include the following:

    i.      On January 29, 2015, the Debtor issued $350 million in principal amount of 3.50% Senior Notes due in January 2025.

    ii.     On June 5, 2020, the Debtor issued $500 million in principal amount of 3.125% Senior Notes due in June 2030.

    iii.    On February 2, 2021, the Debtor issued $500 million in principal amount of 1.800% Senior Notes due February 2031.

    iv.    On May 13, 2021, the Debtor issued $500 million in principal amount of 2.100% Senior Notes due May 2028.

    v.     On October 28, 2021, the Debtor issued $650 million in principal amount of 1.800% Senior Notes due October 2026.

    vi.    On April 29, 2022, the Debtor issued $350 million in principal amount of 4.435% Senior Fixed Rate/Floating Rate Notes due April 2028.

    vii.   On April 29, 2022, the Debtor issued $450 million in principal amount of 4.570% Senior Fixed Rate/Floating Rate Notes due April 2033.

The Senior Notes remained outstanding as of the Petition Date.

2.     **Boston Private Trusts**

On July 1, 2021, the Debtor acquired Boston Private Financial Holdings, Inc. ("Boston Private Holdings"), and assumed certain liabilities related to its assumption of two statutory trusts (the "Trusts") in connection with the transaction. The Trusts, Boston Private Capital Trust I ("Trust I") and Boston Private Capital Trust II ("Trust II") were formed for the purpose of issuing trust preferred securities and investing the proceeds in junior subordinated debentures issued by Boston Private Holdings. The Trusts' only assets are the junior subordinated debentures issued to each Trust by Boston Private Holdings.

In connection with the Debtor's acquisition of Boston Private Holdings and the Trusts, the Debtor also assumed Boston Private Holdings' obligations under certain guarantee agreements, providing that the Debtor would serve as guarantor with respect to the trust preferred securities issued by the Trusts. With respect to Trust I, as of the Petition Date, there were less than $1 million of trust preferred securities outstanding. With respect to Trust II, as of the Petition Date, there were approximately $103 million of trust preferred securities outstanding. The trust preferred securities issued by Trust I pay interest quarterly and have a fixed distribution rate of 4.875%. The quarterly distributions are cumulative. The effective interest rate for the junior subordinated debentures was 4.875%. The junior subordinated convertible debentures mature on October 1, 2034. The trust preferred securities issued by Trust II pay interest quarterly based on a floating three-month rate of LIBOR plus 1.68% which are cumulative. The effective interest rate on the junior subordinated debentures was 2.676%. The junior subordinated debentures mature on December 30, 2035.

E.     **Existing Preferred Stock**

The Debtor is authorized to issue 20 million shares of $0.001 par value preferred stock. As of the Petition Date, the Debtor had issued approximately 350,000 shares of Series A Preferred Stock,[11] 7,500 shares of Series B Preferred Stock,[12] 10,000 shares of Series C Preferred Stock,[13] 10,000 shares of Series D Preferred Stock[14] and 6,000 shares of Series E Preferred Stock.[15]

On March 10, 2023, NASDAQ halted trading in the Debtor's depositary shares, each representing a 1/40th interest in a share of the Series A Preferred Stock of which

---

[11]    "Series A Preferred Stock" means the 5.250% fixed-rate series A non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series A Certificate of Designation dated December 9, 2019.

[12]    "Series B Preferred Stock" means the 4.100% Fixed-to-Reset series B non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series B Certificate of Designation dated February 2, 2021.

[13]    "Series C Preferred Stock" means the 4.000% Fixed-to-Reset series C non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series C Certificate of Designation dated May 13, 2021.

[14]    "Series D Preferred Stock" means the 4.250% Fixed-to-Reset series D non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series D Certificate of Designation dated October 28, 2021.

[15]    "Series E Preferred Stock" means the 4.7000% Fixed-to-Reset series D non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series E Certificate of Designation dated October 28, 2021.

approximately 14,000,000 were issued as of the Petition Date, which were traded on NASDAQ under the ticker "SIVBP".

## F.    Existing Common Stock

The Debtor is authorized to issue 150 million shares of $0.001 par value stock common stock ("Existing Common Stock"), of which approximately 59,200,925 shares were issued as of the Petition Date.  Prior to March 10, 2023, the Debtor traded on NASDAQ under the ticker "SIVB".  On March 10, 2023, NASDAQ halted trading in the Debtor's Existing Common Stock.  NASDAQ later removed the Debtor's Existing Common Stock and Series A Preferred Stock from listing, effective as of March 28, 2023.  NASDAQ's determination was based on the following factors:  (1) the events described in Article III—*Significant Events and Initiatives in This Chapter 11 Case*; (2) concerns regarding the residual equity interest of the existing listed securities holders; and (3) concerns about the Debtor's ability to sustain compliance with all requirements for continued listing on NASDAQ.  The Debtor did not appeal NASDAQ's decision.

Following the removal of the Debtor's Existing Common Stock and Series A Preferred Stock from NASDAQ, equity in the Debtor became eligible to be quoted on the OTC Pink quotation system.  To be quoted on this system, a market maker must sponsor the security and comply with SEC Rule 15c2-11 before it can initiate a quote in a specific security.  Since March 28, 2023, the Debtor's Existing Common Stock and Series A Preferred Stock have been trading on the OTC Pink Market under the tickers "SIVBQ" and "SIVPQ" respectively.

## G.    Factors Leading to the Commencement of This Chapter 11 Case

### 1.    Silicon Valley Bank

For many years, SVB was a premier bank for the emerging technologies sector.  The end of 2020 marked a period of significant cash inflow for this sector, with record rates of venture investment and private financings, high levels of IPO and M&A activity and inflows from the federal "Paycheck Protection Program", all of which contributed to a flood of deposits into SVB.  SVB invested a portion of those deposits in U.S. Treasuries and long-dated mortgage-backed securities.  In the several years before 2022, interest rates remained low: the benchmark interest rate was near zero, and the Federal Reserve Board of Governors (the "Federal Reserve") had not raised it since 2018.

That trend ended in early 2022.  In March 2022, rising inflation led to the Federal Reserve's decision to raise the federal interest rate by 25 basis points.  In the twelve month period after March 2022, the Federal Reserve hiked interest rates seven more times.  By March 2023, the benchmark interest rate had nearly broken 5%.  As interest rates rose, the rates of investment activity seen in 2020 slowed, bond prices fell, and the market value of SVB's investment portfolio dropped.  At the same time, SVB began to experience a meaningful decrease in deposit levels and a shift in deposit mix as customers burned through cash and sought higher interest products while investment and exit opportunities were very limited, resulting in lower inflows and increased rate of withdrawals.

On March 8, 2023, working with outside advisors, SVB announced the sale of substantially all of its "Available for Sale" securities portfolio, resulting in an after-tax loss of $1.8 billion.  Although the sale replaced long dated securities with low interest rates with short term securities with higher interest rates, and SVB announced plans to simultaneously raise capital, the market reacted negatively.  After the announcement, on March 9, 2023, the Debtor's stock price dropped significantly and SVB's customers scrambled to withdraw their money, resulting in a bank run where nearly 25% of deposits were withdrawn in a single day.  The next day, the CA DFPI closed SVB and appointed the FDIC-R1.

This Disclosure Statement is not intended to contain a complete or definite statement respecting SVB's closure, or to bind any person or party.  The cause(s) of SVB's closure and receivership have been and continue to be the subject of government investigations and reports[16], congressional testimony[17], certain previously filed securities lawsuits[18], and may

---

[16]  *See, e.g.*, Michael S. Barr, Board of Governors of the Federal Reserve System, Review of the Federal Reserve's Supervision and Regulation of Silicon Valley Bank (Apr. 28, 2023), https://www.federalreserve.gov/publications/files/svb-review-20230428.pdf; U.S. Government Accountability Office, GAO-23-106736; Bank Regulation: Preliminary Review of Agency Actions Related to March 2023 Bank Failures (Apr. 28, 2023), https://www.gao.gov/assets/gao-23-106736.pdf; Department of Financial Protection & Innovation, Review of DFPI's Oversight and Regulation of Silicon Valley Bank (May 8, 2023), https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/05/Review-of-DFPIs-Oversight-and-Regulation-of-Silicon-Valley-Bank.pdf; Office of Inspector General, Board of Governors of the Federal Reserve System, 2023-SR-B-013, Material Loss Review of Silicon Valley Bank (Sept. 25, 2023), https://oig.federalreserve.gov/reports/board-material-loss-review-silicon-valley-bank-sep2023.pdf.

[17]  *See, e.g.*, Examining the Failures of Silicon Valley Bank and Signature Bank, Hearing before U.S. Senate Committee on Banking, Housing, and Urban Affairs (2023) (testimony of Gregory W. Becker, former CEO of Silicon Valley Bank; Scott A. Shay, co-founder and former Chairman of Signature Bank; and Eric R. Howell, former President of Signature Bank), https://www.banking.senate.gov/hearings/examining-the-failures-of-silicon-valley-bank-and-signature-bank; Continued Oversight Over Regional Bank Failures, Hearing before U.S. House of Representatives Subcommittees on Financial Services and Monetary Policy and Oversight and Investigations (2023) (testimony of Gregory Becker, former CEO of Silicon Valley Bank; Scott Shay, co-founder and former Chairman of Signature Bank; Michael Roffler, former CEO and President of First Republic Bank; The Honorable Adrienne Harris, Superintendent of New York Department of Financial Services; and The Honorable Clothilde Hewlett, Commissioner of Department of Financial Protection and Innovation), https://democrats-financialservices.house.gov/events/eventsingle.aspx?EventID=410427#Webcast; Bank Regulation: Preliminary Review of Agency Actions Related to March 2023 Bank Failures, Hearing before U.S. House of Representatives Subcommittee on Oversight and Investigations, Committee on Financial Services (2023) (statement of Michael E. Clements, director of Financial Markets and Community Investment, U.S. Government Accountability Office), https://www.c-span.org/video/?528024-1/governmentaccountability-office-official-testifies-bank-failures.

[18]  *See In re SVB Financial Group Securities Litigation*, Case No. 3:23-cv-01097-JD (N.D. Cal. Filed as *Vanipenta* v. *SVB Financial Group* on Mar. 13, 2023); *Snook* v. *SVB Financial Group*, Case No. 3:23-cv-01173-VC (N.D. Cal. Filed Mar. 15, 2023); *Siddiqui* v. *Becker*, Case No. 4:23-cv-01228-HSG (N.D. Cal. Filed Mar. 17, 2023); *City of Hialeah Employees Retirement System* v. *Becker*, Case No. 3:23-cv-01697-JD (N.D. Cal. Filed Apr. 7, 2023); *International Union of Operating Engineers Local 132 Pension Fund* v. *SVB Financial Group*, Case No. 3:23-cv-01962-TLT (N.D. Cal. Filed Apr. 24, 2023); *Stevenson* v. *Becker*, 4:23-cv-02277-HSG (N.D. Cal. Filed May 10, 2023); *Rossi* v. *Becker*, Case No. 4:23-cv-02335-HSG (N.D. Cal. Filed May 12, 2023); *Lodato* v. *Becker*, No. 3:23-cv-4551 (N.D. Cal. Filed Sept. 5, 2023); *TIAA-CREF Inv. Mgmt., LLC* v. *Becker*, No. 3:24-cv-00478-CRB (N.D. Cal. Filed Jan. 25, 2024).

be the subject of further post-confirmation litigation proceedings. The Debtor takes no position herein on the foregoing statements and allegations made or to be made.

### 2. Restructuring Discussions and Decision to File for Chapter 11

The SVB receivership had two important consequences for the Debtor. First, the receivership removed the Debtor's primary operating subsidiary, depriving the Debtor of a key source of liquidity, business infrastructure and personnel. Second, the receivership triggered default clauses under certain of the Debtor's debt documents. These circumstances led the Debtor to start contingency planning and evaluation of strategic alternatives.

On March 13, 2023, the Debtor's Board announced its appointment of the Restructuring Committee. That same day, the Restructuring Committee appointed as Chief Restructuring Officer William Kosturos, Managing Director and Vice-Chair of the Alvarez & Marsal U.S. Restructuring Practice. Over the course of several days, the Board received and reviewed the recommendations of management and of its various advisors regarding the Debtor's available strategic alternatives, including a bankruptcy proceeding under the provisions of the Bankruptcy Code. After review and discussion of the information presented, the Board determined that it was in the best interests of the Debtor, its creditors and other stakeholders to prepare to file for chapter 11 protection.

On the evening of March 16, 2023, the Board voted to commence this Chapter 11 Case on an emergency basis. Early the next morning, the Debtor filed a voluntary petition for relief under the Bankruptcy Code.

## ARTICLE III.

## SIGNIFICANT EVENTS AND INITIATIVES IN THIS CHAPTER 11 CASE

The following is a general summary of significant events since the Petition Date, including a discussion of the Debtor's restructuring and business initiatives.

### A. Commencement of the Chapter 11 Case

The commencement of a chapter 11 case creates an estate that is composed of all of the legal and equitable interests of the debtor as of that date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." Following the Petition Date, the Debtor continues to operate its businesses as debtor and debtor-in-possession.

### B. First Day Relief

On the Petition Date, the Debtor filed a number of "first day" motions and applications designed to ease the Debtor's transition into Chapter 11, maximize the value of the Debtor's assets and minimize the effects of the commencement of the Chapter 11 Case. On March 22 and 24, 2023, the Bankruptcy Court entered orders granting the first-day motions, allowing the Debtor to continue certain normal business activities not specifically authorized

under the Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval.  In particular, the Bankruptcy Court entered orders:

- on an interim basis, (i) authorizing, but not directing, the Debtor, in its sole discretion, to (a) continue to use its cash management system, including existing bank accounts, (b) pay or honor certain prepetition obligations related thereto and (c) continue to use existing business letterhead, purchase orders, invoices, envelopes, promotional materials and other business forms and correspondence and (ii) authorizing, but not directing, the Debtor to continue to perform investment activities with its affiliates and third parties on a postpetition basis in the ordinary course of business and consistent with historical practice; and (d) extending the time to comply with the requirements of section 345(b) of the Bankruptcy Code [D.I. 70];

- (i) authorizing, but not directing, the Debtor, in its sole discretion, to maintain a list of creditors in lieu of submitting a formatted mailing matrix and (ii) establishing procedures for notifying parties of the commencement of this Chapter 11 Case [D.I. 55];

- (i) extending the time for the Debtor to file its schedules and statements by 20 days, (ii) extending the time for the Debtor to file its 2015.3 report to the date that is two days from the initial date set for the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code and (iii) modifying the requirements to file the list of equity security holders and serve notice of commencement on all equity holders [D.I. 53];

- on an interim basis, authorizing, but not directing, the Debtor, in its sole discretion, to (i) pay the prepetition compensation and benefits obligations and (ii) maintain the employee compensation and benefits and pay related administrative obligations [D.I. 71];

- on an interim basis, (i) establishing notice and objection procedures related to certain transfers of equity securities and declarations of worthlessness for federal or state tax purposes with respect existing common or preferred stock or any beneficial ownership thereof; and (ii) directing that any purchase, sale, or other transfer of common or preferred stock in violation of the procedures set forth will be null and void *ab initio* [D.I. 57]; and

- authorizing the retention and appointment of Kroll as claims and noticing agent and administrative advisor [D.I.s 54, 135].

On April 27, 2023, the Bankruptcy Court also entered final orders with respect to the Debtor's cash management system [D.I. 132] and treatment of the Debtor's net operating losses [D.I. 136].  On June 29, 2023, the Bankruptcy Court also entered a final order with

authorizing payment of certain prepetition employee compensation and benefit programs [D.I. 372].

In addition, the commencement of the Debtor's Chapter 11 Case triggered the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions by creditors, the enforcement of all liens against property of the Debtor and the commencement or continuation of prepetition litigation against the Debtor. Subject to limited exceptions, the automatic stay will remain in effect until the Effective Date of the Plan.

## C.    Appointment of the UCC

On March 28, 2023, the Official Committee of Unsecured Creditors (the "UCC") was appointed by William K. Harrington, the United States Trustee for Region 2 (the "U.S. Trustee") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Case [D.I. 72]. The initial members of the UCC were Tata Consultancy Services Limited, U.S. Bank National Association (as Indenture Trustee), Wilmington Trust Company (as Indenture Trustee), Satagopan Rajagopalan and Cousins Fund II Phoenix I, LLC. On September 19, 2023, the UCC was reconstituted to four members: U.S. Bank National Association (as Indenture Trustee), Wilmington Trust Company (as Indenture Trustee), Satagopan Rajagopalan and Cousins Fund II Phoenix I, LLC.

The UCC selected Akin Gump Strauss Hauer & Feld LLP as its legal counsel, Cole Schotz, P.C. as efficiency and conflicts counsel, Berkeley Research Group, LLC as its financial advisor and Lazard Frères & Co. LLC as its investment banker. The Bankruptcy Court approved the UCC's retentions of these professional advisors [D.I. 295, 296, 338, 499].

The UCC is a party to the RSA and has agreed to support the Plan.

## D.    The Ad Hoc Group of Senior Noteholders

On May 3, 2023, a group of certain holders, or investment advisors managing or acting on behalf of holders of certain Senior Notes and Preferred Stock issued by the Debtor (the "Ad Hoc Group of Senior Noteholders") filed a verified statement pursuant to Bankruptcy Rule 2019 [D.I. 149]. On July 21, 2023, the Ad Hoc Group of Senior Noteholders filed a first supplemental verified statement pursuant to Bankruptcy Rule 2019 [D.I. 434]. The Ad Hoc Group of Senior Noteholders retained Davis Polk & Wardwell LLP as counsel.

## E.    The Ad Hoc Cross-Holder Group

On April 28, 2023, a group of holders, or investment advisors, sub-advisors, or managers of holders, of certain Senior Notes and preferred stock issued by the Debtor (the "Ad Hoc Cross-Holder Group") filed a verified statement pursuant to Bankruptcy Rule 2019 [D.I. 142]. On July 20, 2023, the Ad Hoc Cross-Holder Group filed a first amended verified statement pursuant to Bankruptcy Rule 2019 [D.I. 432]. The Ad Hoc Cross-Holder Group retained White & Case LLP as counsel.

### F.      Retention of Debtor Professionals

The Debtor retained, and the Bankruptcy Court approved the retentions of, the following advisors in the Chapter 11 Case, among others:  (i) Sullivan & Cromwell LLP, as legal counsel to the Debtor; (ii) Alvarez & Marsal North America, LLC, to provide the Debtor a chief restructuring officer and certain additional personnel; (iii) Centerview Partners LLC ("Centerview"), as investment banker; (iv) Jenner & Block LLP as conflicts counsel; (v) Kroll, as claims and noticing agent and administrative advisor; (vi) Huron Consulting Services, LLC as financial advisor; (vii) Lincoln Partners Advisors LLC, as valuation advisor; and (vii) Ernst & Young LLP, as tax advisor [D.I. 54, 80, 81, 83, 110, 135, 138, 246, 248, 304, 591, 664, 759, 763, 853].

On April 5, 2023, the Debtor filed with the Bankruptcy Court the *Debtor's Motion for Entry of an Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code, Bankruptcy Rule 2016 and Local Rule 2016-1 Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals* [D.I. 85] (the "Interim Compensation Motion").  The Interim Compensation Motion was approved by the Bankruptcy Court on April 27, 2023 [D.I. 134].  In approving the Interim Compensation Motion, the Bankruptcy Court established procedures for the fee application process and payment of professionals retained by the Debtor and any statutory committees appointed in the case.

On April 5, 2023, the Debtor filed with the Bankruptcy Court the *Debtor's Motion for Entry of an Order Implementing Certain Procedures to Retain, Compensate and Reimburse Professionals Utilized in the Ordinary Course of Business* [D.I. 86] (the "Ordinary Course Professionals Motion").  The Ordinary Course Professionals Motion was approved by the Bankruptcy Court on April 28, 2023 [D.I. 139].  In so doing, the Bankruptcy Court established procedures for the employment and compensation of certain ordinary course professionals used by the Debtor in connection with ongoing business operations.

### G.      Schedules and Statements and 341 Meeting

Pursuant to section 521 of the Bankruptcy Code, Bankruptcy Rule 1007(c), and orders of the Bankruptcy Court granting extensions of time, on May 22, 2023, the Debtor filed (i) schedules of assets and liabilities, (ii) a schedule of executory contracts and unexpired leases, and (iii) a statement of financial affairs (collectively, the "Schedules") [D.I.s 261, 262].

On May 31, 2023, the U.S. Trustee conducted a meeting of creditors pursuant to section 341 of the Bankruptcy Code (the "341 Meeting").

### H.      Bar Dates and Claims Process

On June 29, 2023, the Bankruptcy Court entered an order, which, among other things, (i) established August 11, 2023, at 4:00 p.m., Eastern Time, as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code), including claims pursuant to section 503(b)(9) of the Bankruptcy Code (the "General Bar Date"); (ii) established September 14, 2023, at 4:00 p.m., Eastern Time, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) (the "Governmental Bar Date") to file proofs of claim (such date, together with the General Bar Date, the "Bar Dates"); (iii) established the

later of (a) the General Bar Date and (b) 4:00 p.m., Eastern Time, on the date that is 30 days from the date that notice of the applicable amendment or supplement to the applicable schedules is served on such entity as the amended bar date and (iv) approved the form and manner of notice of the Bar Dates [D.I. 373].

To facilitate the claims reconciliation process, on November 13, 2023, the Debtor filed a motion (the "Claims Objections Procedures Motion") for leave to file omnibus objections to claims and establishing related procedures [D.I. 672].  On November 30, 2023, the Bankruptcy Court entered an order granting the Claims Objections Procedures Motion, authorizing the Debtor to file omnibus claims objections on various grounds [D.I. 713].

The Debtor received 1,274 proofs of claim, totaling approximately $5.5 billion, timely filed by the General Bar Date.  In addition, the Debtor received 20 proofs of claim by governmental units totaling approximately $1.7 billion timely filed by the Governmental Bar Date.  As of the date of this Disclosure Statement, the Debtor has filed four (4) omnibus claims objections [D.I.s 768, 812, 908, 1021]. The Bankruptcy Court has entered three (3) orders sustaining certain of the Debtor's omnibus claims objections [D.I.s 817, 897, 1029].

## I.    Assumption and Assignment of Executory Contracts to FCB and Non-debtor Subsidiaries

Since the Petition Date, the Debtor and its advisors have engaged in a process to collect, review and analyze the contracts to which the Debtor was a party.  The Debtor and its advisors have determined that many of those agreements do not relate to the operations of the Debtor or its non-debtor subsidiaries.  Specifically, a significant volume of those contracts concern operations solely relevant to the former SVB, now operated by FCB, as successor in interest to the relevant businesses of SVB.  The Debtor has consulted with FCB to determine which contracts are expected to be used in the respective ongoing operations of FCB and the Debtor.  During that process, the Debtor has considered, among other things, the ongoing value and projected costs of maintaining such contracts.

Ultimately, the Debtor determined in its business judgment that its continuing operations do not depend on nor derive value from hundreds of contracts that involved products and services entirely related to the operations of the former SVB.  Accordingly, the Debtor has assumed and assigned approximately 890 executory contracts related to the operations of the former SVB to FCB.  Likewise, the Debtor determined in its business judgment that its continuing operations did not depend on nor derive value from the premises of certain leases. Therefore, the Debtor moved to assume and assign, and the Bankruptcy Court approved the assumption and assignment of, hundreds of executory contracts and over 40 leases to FCB, thereby conserving the Debtor's resources, streamlining its operations and avoiding unnecessary obligations [D.I.s 330, 369, 386, 426, 466, 492, 501, 554, 568, 592, 609, 640, 641, 644, 670, 676, 706, 707, 714, 715, 764, 765, 784, 785, 814, 815, 858, 859, 860, 861, 892, 894, 895, 896, 898, 944, 1030].

Where the Debtor has determined that it does not require or derive value from certain contracts, and FCB does not desire for such contracts to be assumed and assigned, the Debtor has moved to reject such contracts in order to avoid incurring unnecessary administrative

expenses during the pendency of the Chapter 11 Case.  To date, the Debtor has rejected approximately 400 executory contracts [D.I.s 253, 370, 500, 569, 571, 642, 716, 762, 816, 893, 945, 1031].

Finally, the Debtor has also determined that certain of the Debtor's contracts are required for the operations of its non-debtor subsidiaries and affiliates, including SVB Capital. In such cases, the Debtor has moved to assume and assign such contracts to the applicable non-debtor subsidiaries, including SVBC ManCo, as discussed in further detail below.  To date, the Debtor has assumed and assigned approximately 70 contracts and unexpired leases to its current and former non-Debtor subsidiaries, including approximately 25 contracts to SVB Securities before the sale of the SVB Securities business (described in more detail below) [D.I.s 426, 534, 570, 588, 643, 783, 813].

## J.    Claims Against the FDIC

As discussed above, on Friday, March 10, 2023, the CA DFPI ordered that SVB be closed and requested that the FDIC be appointed as receiver of SVB.  On that date, the FDIC agreed to act as receiver of SVB.  At the opening of business on March 10, 2023, the Debtor had on deposit with SVB approximately $2.1 billion in cash residing in three separate deposit accounts (the "Deposit Accounts").  Those funds constituted the substantial majority of the Debtor's cash.  As of March 10, 2023, the deposits at SVB were insured through the FDIC's deposit insurance fund (the "Deposit Insurance Fund") to a maximum of $250,000 (the "FDIC Insurance Cap").  On March 12, 2023, the Secretary of the Treasury, upon the written recommendation of the Board of Governors of the Federal Reserve and the Board of Directors of the FDIC and after consultation with the President of the United States, invoked the systemic risk exception ("SRE") under the Federal Deposit Insurance Act to guarantee payment of all deposits at SVB – over and above the FDIC Insurance Cap – in consideration of the systemic risk facing the nation's banking system.

Consistent with the March 12, 2023 invocation of the SRE, from Monday, March 13, 2023 through midday on Thursday, March 16, 2023, the Debtor had access to its accounts and deposits, which had been transferred by the FDIC-R1 to the Bridge Bank.  On March 15, 2023 and the morning of March 16, 2023, the Debtor initiated over $150 million in wire transfers from its accounts, which wire transfers were honored by the Bridge Bank.  Wire transfers initiated by the Debtor during the afternoon of March 16, 2023 and on March 17, 2023, however, were denied by the Bridge Bank at the instruction of FDIC-R1.  No explanation was given to the Debtor for the denial of such wires.

On the morning of Friday, March 17, 2023, the Debtor commenced its chapter 11 proceeding by filing a voluntary petition with the Bankruptcy Court.  Shortly after the Petition Date, the FDIC-R1 informed the Debtor that pursuant to 12 U.S.C. § 1822(d), which authorizes the FDIC to withhold a portion of a deposit up to the $250,000 FDIC Insurance Cap as may be required to pay a liability of the depositor, the Deposit Accounts had been put on hold by FDIC-R1.  The FDIC-R1 subsequently informed the Debtor that the Debtor would have to file a proof of claim in the receivership proceeding to recover any of the $1.93 billion that was present in the Deposit Accounts at the time the Debtor's access to the accounts was denied—notwithstanding the prior invocation of the SRE.

1.      **The Adversary Proceeding**

On July 9, 2023, the Debtor commenced an adversary proceeding against the FDIC (i) in its capacity as FDIC-C, (ii) in its capacity as FDIC-R1 and (iii) in its capacity as FDIC-R2 (the FDIC-R1 and FDIC-R2 together, the "<u>FDIC-Rs</u>") (the "<u>Adversary Proceeding</u>"). *See SVB Financial Group* v. *Federal Deposit Insurance Corp.*, *et al.*, No. 23-01137 (MG) (Bankr. S.D.N.Y.).  As against the FDIC-C, the Debtor asserts a turnover claim pursuant to section 542 of the Bankruptcy Code and Bankruptcy Rule 7001, seeking to compel the FDIC-C to turn over the approximately $1.93 billion on deposit in the Debtor's accounts at Bridge Bank (the "<u>Account Funds</u>") from the Deposit Insurance Fund, as well as other related relief.  The Debtor also asserts claims in the alternative against FDIC-R1 and FDIC-R2 for turnover of the Debtor's Account Funds pursuant to section 542 of the Bankruptcy Code and Bankruptcy Rule 7001.  Against all three FDIC entities, the Debtor asserts claims for violation of the automatic stay under section 362(a) of the Bankruptcy Code and for declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.*, requesting a declaration that neither the FDIC-C nor either of the FDIC-Rs has a right of setoff against the amount of the Account Funds, or in the alternative, that any right of setoff is limited to amounts for which there is mutuality of obligation between the Debtor and the FDIC-C, FDIC-R1, or FDIC-R2, respectively.

On August 11, 2023, all three FDIC entities filed motions under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, seeking to dismiss the Adversary Proceeding.  On the same day, the FDIC-R1 filed a motion to withdraw the reference from the Bankruptcy Court pursuant to 28 U.S.C. § 157(d); that motion was subsequently joined by the FDIC-C and FDIC-R2.  The motion to withdraw the reference was docketed in the United States District Court for the Southern District of New York and assigned to Judge John P. Cronan on August 15, 2023.  *See SVB Fin. Grp.* v. *FDIC*, No. 23-cv-07218 (JPC) (S.D.N.Y.).  In light of the motion to withdraw the reference, on September 14, 2023, the Bankruptcy Court adjourned *sine die* a hearing on all pending motions in the Adversary Proceeding.  On December 13, 2023, Judge Cronan granted the motion to withdraw the reference.  To date, no court has ruled on the FDIC's motions to dismiss.  On January 15, 2024, the Debtor submitted a letter—joined by the UCC, the Ad Hoc Group of Senior Noteholders, and the Ad Hoc Cross-Holder Group—requesting that Judge Cronan stay the Adversary Proceeding pending further developments in the Debtor's parallel actions against the FDIC.  On January 25, 2024, Judge Cronan adjourned *sine die* the oral argument on the pending motions to dismiss and directed the parties to provide the court with updates on any material developments in the Adversary Proceeding, including, by no later than March 10, 2024, an update on any other proceedings by the Debtor against the FDIC-C or either of the FDIC-Rs.  The Debtor—again joined by the UCC, the Ad Hoc Group of Senior Noteholders, and the Ad Hoc Cross-Holder Group—submitted a Letter Motion to Judge Cronan on March 10, 2024, providing updates on actions the Debtor initiated against the FDIC-C and FDIC-Rs in the United States District Court for the Northern District of California (discussed below).  The Letter Motion also requested that Judge Cronan stay the action for 180 days.  As of the date of this Disclosure Statement, the Debtor's request for a stay remains pending.

2.      **FDIC-C Proceedings**

On June 26, 2023, the Debtor sent a letter to the FDIC-C demanding access to, or payment of, its $1.93 billion Account Funds as required by the Treasury Secretary's invocation

of the systemic risk exception.  On September 19, 2023, the FDIC-C sent the Debtor a letter stating that it intended to treat the Debtor's June 26 letter as a deposit claim under 12 U.S.C. § 1821(f), and on October 20, 2023, the FDIC-C denied the Debtor's claim for its Account Funds.

   The Debtor filed a complaint against the FDIC-C in the United States District Court for the Northern District of California on December 19, 2023, to seek relief from the FDIC-C's withholding of the Account Funds and to protect the Debtor's rights in the event that section 1821(f) is found to apply to the Debtor's claims against the FDIC-C.  That action is currently pending before Judge Beth Labson Freeman at *SVB Financial Group* v. *Federal Deposit Insurance Corporation, in Its Corporate Capacity*, No. 23-cv-06543 (BLF) (N.D. Cal.) (the "<u>FDIC-C Action</u>").  In the FDIC-C Action, Debtor brings eight claims for, *inter alia*, Administrative Procedures Act ("<u>APA</u>") review of the FDIC-C's wrongful denial of Debtor's claim for its $1.93 billion in account funds, declaratory judgment, turnover of Debtor's Account Funds, violation of the automatic stay of section 362(a) of the Bankruptcy Code, violations of the Debtor's due process rights, and violation of the Freedom of Information Act ("<u>FOIA</u>").

   On March 4, 2024, the FDIC-C filed a partial motion to dismiss Counts I, II, III, IV, V, VII, and VIII of Debtor's complaint.  The Debtor's opposition to the partial motion to dismiss is due on May 20, 2024.  The hearing on the FDIC-C's partial motion to dismiss is set for July 11, 2024.  On March 21, 2024, the parties participated in a case management conference before Judge Freeman.  Following the case management conference, Judge Freeman stayed summary judgment briefing on Count VI of Debtor's complaint until after the Court rules on the pending partial motion to dismiss the complaint's other counts.  On April 1, 2024, FDIC-C served the Debtor with the purported administrative record underlying its October 20, 2023 denial of the Debtor's claim for the Account Funds.  On April 2, 2024, the FDIC-C filed a motion to stay discovery pending resolution of the partial motion to dismiss, which the Debtor opposed on April 16, 2024.  On April 29, 2024, the Court denied the FDIC-C's motion to stay discovery.

### 3.  Proceedings with the FDIC-Rs

   On July 11, 2023, the Debtor filed a protective proof of claim with each of the FDIC-R1 and FDIC-R2 regarding the Account Funds, which the FDIC-Rs each separately disallowed on January 5, 2024.  The Notice of Disallowance of Claim received by the Debtor from the FDIC-R1 states that "[t]he deposit claim is denied as not proven to the satisfaction of the receiver due to the receiver's defenses. All other claims are denied as speculative, unsupportable, or otherwise not proven to the satisfaction of the receiver."  [D.I. 800].  The Notice of Disallowance of Claim received by the Debtor from the FDIC-R2 states that "[t]he deposit claim is denied as not proven to the satisfaction of the receiver because it is not a liability of the FDIC as receiver for Silicon Valley Bridge Bank. All other claims are denied as speculative, unsupportable, or otherwise not proven to the satisfaction of the receiver." [D.I. 800].

   On March 5, 2024, the Debtor filed a complaint against the FDIC-R1 and FDIC-R2 in the United States District Court for the Northern District of California.  Shortly thereafter, the Debtor moved in the FDIC-C Action to have the two cases related.  Judge Freeman granted

the motion on March 21, 2024.  The action against the FDIC-Rs is now pending before Judge Freeman at *SVB Financial Group* v. *Federal Deposit Insurance Corporation, as Receiver for Silicon Valley Bank et al*, No. 24-cv-01321 (BLF) (N.D. Cal.) (the "FDIC-R Action").  In the FDIC-R Action, the Debtor asserts twelve claims for, *inter alia*, breach of contract, estoppel, conversion, turnover of the Debtor's Account Funds, violation of the automatic stay of section 362(a) of the Bankruptcy Code, violations of certain provisions of the California Financial Code and of the National Bank Act, declaratory judgment, and violations of the Debtor's due process rights.  The FDIC-Rs' deadline to answer, move to dismiss, or otherwise respond to the complaint is May 7, 2024.

**K.    SVB Securities Sale**

**1.    SVB Securities Bidding Procedures**

The Debtor and its advisors developed bidding and auction procedures for the marketing and sale of certain assets in this Chapter 11 Case in an orderly and value maximizing manner (the "Bidding Procedures").  On April 27, 2023, the Debtor filed the *Debtor's Motion for Entry of Orders (I)(A) Approving Bid Procedures and the Form and Manner of Notices for the Sale of SVB Securities and (B) Scheduling Auction(s) and Sale Hearing(s), (II) Approving the Sale(s) Free and Clear of Liens, Claims, Interests and Encumbrances and (III) Granting Related Relief* [D.I. 137] (the "SVB Securities Bidding Procedures Motion").  On May 17, 2023, the Bankruptcy Court entered the *Order (A) Approving Bid Procedures and the Form and Manner of Notices for the Sale of SVB Securities, (B) Scheduling Auction(s) and Sale Hearing(s) and (C) Granting Related Relief* [D.I. 250] (the "Bidding Procedures Order"), approving the SVB Securities Bidding Procedures Motion.

**2.    Postpetition Marketing Process for SVB Securities**

Following the Petition Date and in accordance with the Bidding Procedures Order, the Debtor and its advisors engaged in discussions with various interested parties regarding a sale of the SVB Securities business.  The Debtor and its advisors conducted an extensive marketing process of the SVB Securities business, including, among other things, engaging with twenty-nine (29) interested parties.  Seven of these parties executed non-disclosure agreements and were granted access to a virtual data room with an overview of information regarding the SVB Securities business.  The Debtor's management gave five (5) management presentations to interested parties and, along with the Debtor's advisors, participated in numerous calls with interested parties to address diligence and related topics.

Two bidders submitted non-binding indications of interest for the SVB Securities business or portions thereof and were provided with access to additional diligence materials through a virtual data room.  The Debtor's marketing process ultimately yielded one binding bid (the "SVBS Bid") from Saffron Buyer LLC ("SVBS Buyer"), an acquisition vehicle established by certain members of the senior management team of SVB Securities and certain funds managed by The Baupost Group, L.L.C.

### 3.    SVBS Bid

On June 2, 2023, the Debtor adjourned the scheduled auction and sale hearing as permitted under the Bidding Procedures Order [D.I. 307], and during the additional time afforded by such adjournment, the Debtor sought to improve the terms of the SVBS Bid.  The Debtor successfully negotiated for meaningful improvements in the terms of SVBS Buyer's bid, and after thoroughly considering SVBS Buyer's improved bid against alternatives, in consultation with the Debtor's advisors, the Debtor determined that the bid from SVBS Buyer was the highest or otherwise best bid for the SVB Securities business, cancelled the auction and declared SVBS Buyer as the successful bidder [D.I. 335].

As set forth in the purchase agreement for the SVBS Bid, the consideration for the SVB Securities business consisted of (i) a cash purchase price of $55 million, (ii) a payoff of certain subordinated debt held by SVB Securities (in the approximate amount of $26 million), (iii) the assumption of certain transferred liabilities, including significant deferred compensation obligations, (iv) a synthetic equity instrument initially representing a 5% equity interest in the direct parent of SVBS Buyer and (v) certain other payments payable at closing (subject to certain adjustments).  On July 5, 2023, the Bankruptcy Court approved the sale of the SVB Securities business to SVBS Buyer and entered the *Order (I) Authorizing the Debtor to Sell the SVB Securities Business by (A) Causing Non-Debtor Subsidiary to Sell Membership Interests in Certain Non-Debtor Entities that Operate the SVB Securities Business and Certain Related Assets and (B) Selling Certain Related Assets of the Debtor Free and Clear of All Liens, Claims, Interests and Encumbrances and (II) Granting Related Relief* [D.I. 393].  The sale closed on October 2, 2023 [D.I. 583].

MoffettNathanson LLC was not included in the sale, and the Debtor continues to own the equity interests in that entity.  The Plan contemplates that MoffettNathanson LLC will be a direct or indirect subsidiary of NewCo upon the Effective Date.

## L.    SVB Capital Reorganization and Sale

### 1.    SVB Capital Strategic Alternatives Review

As noted above, SVB Capital historically operated as a "virtual" subsidiary for the Debtor, without a formal non-debtor subsidiary legal entity.  Since the Petition Date, in order to continue operating this business in the ordinary course, the Debtor took several steps to consolidate the various operations that comprise SVB Capital (collectively, the "SVB Capital Reorganization").  The Debtor formed a new direct subsidiary, SVB Capital Holdco, LLC ("SVBC Holdco") to house the various operations of SVB Capital.  The Debtor also formed a wholly owned direct subsidiary of SVBC Holdco, SVB Capital Management, LLC ("SVBC ManCo") to serve as the investment advisor for SVB Capital funds and to directly employ all SVB Capital employees.  On August 29, 2023, the Debtor moved for entry of an order approving the assumption and assignment of investment advisory contracts (the "Advisory Contracts") to SVBC ManCo and to contribute certain non-economic non-member manager interests in SVB Capital's Qualified Investor Funds (the "Manager Interests") [D.I. 534].  The Bankruptcy Court approved this motion on September 20, 2023 [D.I. 570], and on October 1, 2023, the Debtor

assigned the Advisory Contracts and Manager Interests to SVBC ManCo.  Upon such assignment, SVBC ManCo became the registered investment adviser for SVB Capital funds.

In parallel with the SVB Capital Reorganization, the Debtor and its advisors considered a range of strategic alternatives with respect to SVB Capital and conducted an extensive marketing process of the SVB Capital business during the summer and fall of 2023 (the "SVB Capital Marketing Process").  The Debtor and its advisors engaged in discussions with many interested parties regarding a sale of the SVB Capital business.  [•] of these parties (the "Potential Bidders") executed non-disclosure agreements and were granted access to a virtual data room with an overview of information regarding the SVB Capital business. In the fall of 2023, the Debtor negotiated substantive bids received from two interested parties (the "2023 Bids"), but determined that neither bid exceeded the net present value of the Debtor continuing to operate the SVB Capital business.

As a result, on January 9, 2024, the Debtor announced that it had determined, in consultation with its advisors and creditor constituencies, that retaining the SVB Capital business would result in superior value creation opportunities, and created a new operating committee to oversee all aspects of the business.  The SVB Capital business is currently overseen by its operating committee and operates through SVBC ManCo, SVB Capital's registered investment adviser and the Debtor's indirect subsidiary.

## 2.    SVB Capital Sale

Following the Debtor's announcement of its intention to retain the SVB Capital business, multiple Potential Bidders provided the Debtor with new offers for the SVB Capital business (the "2024 Bids").  The Debtor evaluated the 2024 Bids, and the Debtor thereafter sought to improve the terms of certain of the 2024 Bids.  The Debtor successfully negotiated for meaningful improvements in the terms of an offer received from SVBC Designated Buyer, and after thoroughly considering SVBC Designated Buyer's improved bid against alternatives, including (i) the other 2024 Bids, (ii) the 2023 Bids and (iii) the value of continuing to operate the SVB Capital business, the Debtor, in consultation with its advisors and key creditor constituencies, determined that the bid from SVBC Designated Buyer was the highest or otherwise best offer for the SVB Capital business.

Accordingly, on May 2, 2024, the Debtor and SVBC Designated Buyer entered into an interest purchase agreement (the "SVBC Purchase Agreement"), providing for the sale of the SVB Capital business (the "SVB Capital Sale") to SVBC Designated Buyer, subject to certain terms and conditions.

As set forth in the SVBC Purchase Agreement, the consideration for the SVB Capital business currently consists of cash consideration of $340 million, subject to certain adjustments as set forth in the SVBC Purchase Agreement, along with ongoing economic participation rights and a cash earn-out.  On May 2, 2024, the Debtor filed the *Debtor's Motion for Entry of Orders (I)(A) Approving Buyer Protections, (B) Scheduling a Sale Hearing, (C) Approving Form and Manner of Notices for Sale of the SVB Capital Business, (D) Approving the Assumption and Assignment Procedures, and (E) Granting Related Relief, and (II)(A) Approving the SVB Capital Purchase Agreement, (B) Approving the Sale of the SVB*

*Capital Business Free and Clear of Liens, Claims, Interests and Encumbrances, (C) Authorizing the Assumption and Assignment of Executory Contracts and (D) Granting Related Relief* [D.I. 1082] (the "SVB Capital Sale Motion").  The Capital Sale Motion seeks, among other things: (i) approval of the Debtor's entry into the SVBC Purchase Agreement, (ii) approval of certain buyer protections for SVBC Designated Buyer and (iii) approval of the procedures relating to the SVB Capital Sale and the related sale hearing.

As of the date of this Disclosure Statement, the SVB Capital Sale remains pending.  Hearings to approve the buyer protections set forth in the SVB Capital Sale Motion for SVBC Designated Buyer and the SVB Capital Sale are expected to occur in May and June 2024 and prior to a hearing on confirmation of the Plan.  Additional information relating to the pending SVB Capital Sale can be found at https://restructuring.ra.kroll.com/svbfg/.

**M.    SVB India Sale**

In June 2023, following its acquisition of certain assets of Bridge Bank, FCB notified the Debtor of its interest in purchasing SVB India to achieve synergies with the SVB business that SVB India had serviced and that continued to account for a substantial majority of SVB India's operations.  Over the following months, the Debtor engaged in conversations with FCB about a potential sale of SVB India and also reached out to and held discussions with other potential strategic buyers in an effort to obtain a higher or otherwise better offer for SVB India. The Debtor, however, did not receive any indications of interest from those other parties.

In August 2023, First Citizens Global I, Inc., First Citizens Global II, Inc. and FCB Parent (together, the "SVB India Buyers") submitted an offer to purchase SVB India.  In the subsequent several months, the Debtor engaged in arm's-length, good-faith negotiations with SVB India Buyers regarding the terms of a sale of SVB India.  The Debtor, in consultation with the Restructuring Committee, considered SVB India Buyers' seriousness of interest in acquiring, and financial capacity to acquire, SVB India, SVB India Buyers' positioning as the most logical acquiror for a business that currently predominantly services SVB India Buyers' and its affiliates, the purchase price offered and strategic alternatives for SVB India.  Ultimately, the Debtor, in the exercise of its business judgment and upon the approval and recommendation of the Restructuring Committee, concluded that a sale to SVB India Buyers would maximize the value of SVB India for the Debtor's estate.

As set forth in the purchase agreement for SVB India, the consideration for SVB India was $21.8 million in cash, subject to deduction of up to $8.9 million for outstanding postpetition obligations owed by the Debtor and its Affiliates to FCB as of the closing date and a holdback of $2 million for an indemnity escrow fund and $3 million for a repatriation escrow fund.  On March 3, 2024, the Debtor filed the *Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to Sell SVB India by (A) Selling Partnership Interests in SVB India Free and Clear of All Liens, Claims, Interests and Encumbrances and (B) Causing Non-Debtor Subsidiary to Sell Partnership Interests in SVB India; (II) Approving the Debtor's Entry Into, and Performance Under, the Purchase and Sale Agreement; (III) Authorizing Assumption and Assignment of Certain Contracts; and (IV) Granting Related Relief* [D.I. 929].  On April 10, 2024, the Bankruptcy Court entered the *Order (I) Authorizing the Debtor to Sell SVB India by (A) Selling Partnership Interests in SVB India Free and Clear of All Liens, Claims, Interests and*

*Encumbrances and (B) Causing Non-Debtor Subsidiary to Sell Partnership Interests in SVB India; (II) Approving the Debtor's Entry Into, and Performance Under, the Purchase and Sale Agreement; (III) Authorizing Assumption and Assignment of Certain Contracts; and (IV) Granting Related Relief* [D.I. 1028].

## N.    The Restructuring Support Agreement

Throughout the Chapter 11 Case, the Debtor has worked tirelessly to build consensus among key creditor constituencies on the terms of a plan of reorganization. Sustained, substantive engagement with the UCC, the Ad Hoc Group of Senior Noteholders and the Ad Hoc Cross-Holder Group has allowed the Debtor to drive significant progress in this case to date. After months of hard-fought negotiations, the Debtor was able to reach resolution with two of these constituencies: the UCC and the Ad Hoc Group of Senior Noteholders.  On January 9, 2024, the Debtor announced that it had entered into the RSA with the UCC and members of the Ad Hoc Group of Senior Noteholders then holding 48.7% of the aggregate outstanding principal amount of the Senior Notes [D.I. 798] (collectively, the "<u>RSA Parties</u>").  As of the date of this Disclosure Statement, members of the Ad Hoc Group of Senior Noteholders holding in excess of 65.19% of the Senior Notes Claims have executed the RSA. Appended to the RSA was a term sheet for a proposed plan of reorganization ("<u>Plan Term Sheet</u>").

The RSA provides for a fair and confirmable plan that the Debtor believes will lead to a swift and consensual resolution of the Chapter 11 Case and represents the RSA Parties' mutual support and commitment with respect to the Debtor's proposed Plan to facilitate the consensual emergence of the Debtor from chapter 11.  The RSA provides that the Debtor will implement the Restructuring Transactions in accordance with certain milestones by which, absent extension or waiver in writing, and subject to the Bankruptcy Court's availability, (a) the Debtor must file the Plan and Disclosure Statement; (b) holders of more than two-thirds of the aggregate outstanding principal amount of the Senior Notes must become party to the RSA; (c) the Bankruptcy Court shall have entered an order to pay certain professional fees and expenses, subject to the terms of the RSA; (d) the Bankruptcy Court shall have entered the Disclosure Statement Order; (e) the Bankruptcy Court shall have entered the Confirmation Order; and (f) the Effective Date shall have occurred.

Pursuant to the terms of the RSA, the RSA Parties also made various commitments to continue support of the Debtor's emergence from chapter 11.  For instance, the RSA Parties mutually committed to using commercially reasonable efforts to support the consummation and implementation of the Restructuring Transactions (as defined below), among other affirmative and negative covenants.  Second, the terms of the RSA outline various consent rights to facilitate consensus building among the RSA Parties, such as consent rights related to any change in the Debtor's tax election and related decisions, the Debtor's interactions with the Internal Revenue Service (the "<u>IRS</u>"), and matters regarding the claims and Causes of Action of the Debtor against certain related parties of the Debtor and against the FDIC-R1, FDIC-R2 and FDIC-C.  Finally, the Plan Term Sheet represented consensus on several key terms of the Plan, including, for instance:  the classification and treatment of Claims and Interests and the formation of NewCo and the Liquidating Trust.  The foregoing summary of the RSA is qualified in its entirety by reference to the RSA, attached hereto as Appendix E.

## O.    Securities Lawsuits

Following the Petition Date, at least seven class-action lawsuits have been filed asserting violations of the Exchange Act and/or the Securities Act by the Debtor, certain of the Debtor's current and former directors and officers, underwriters of certain of the Debtor's securities offerings, the Debtor's former auditor, and/or certain director-controlled entities.[19]

On November 30, 2023, the U.S. District Court for the Northern District of California entered an order consolidating five class-action lawsuits (*Vanipenta*, *Snook*, *Siddiqui*, *City of Hialeah Employees Retirement System*, and *IUOE Local 132*) under the caption *In re SVB Financial Group Securities Litigation*, No. 3:23-cv-01097 (N.D. Cal.) ("*Norges*") and appointing Norges Bank and Sjunde AP-Fonden as lead plaintiffs [*Norges*, D.I. 82].[20]  On January 16, 2024, the *Norges* plaintiffs filed a six-count, 290-page amended complaint (which also attaches over 100 pages of exhibits) asserting claims under the Securities Act and/or the Exchange Act against certain of the Debtor's directors and officers, underwriters, and auditor [*Norges*, D.I. 88]. Briefing on the defendants' motions to dismiss the amended complaint is scheduled to be completed by May 24, 2024.

On August 1, 2023, individual plaintiff Jane Lodato filed a complaint in the Superior Court of the State of California, County of San Mateo, asserting fraud and breach of fiduciary duty claims against certain of the Debtor's directors and officers. On September 5, 2023, the action was removed to the Northern District of California. *Lodato* v. *Becker*, No. 3:23-cv-04551 (N.D. Cal. 2023). A hearing on plaintiff's motion to remand the lawsuit to state court is scheduled for June 6, 2024.

On January 25, 2024, Teachers Insurance and Annuity Association of America and certain of its subsidiaries, funds and accounts filed a complaint asserting Exchange Act and/or Securities Act claims against certain of the Debtor's directors and officers, and underwriters.  *TIAA-CREF Inv. Mgmt., LLC* v. *Becker*, No. 3:24-cv-00478 (N.D. Cal.) (together with the aforementioned class action lawsuits and *Lodato*, the "Securities Lawsuits").  By

---

[19]    The class-action lawsuits are *Vanipenta* v. *SVB Financial Group*, Case No. 3:23-cv-01097-JD (N.D. Cal. filed Mar. 13, 2023); *Snook* v. *SVB Financial Group*, Case No. 3:23-cv-01173-VC (N.D. Cal. Filed Mar. 15, 2023); *Siddiqui* v. *Becker*, Case No. 4:23-cv-01228-HSG (N.D. Cal. Filed Mar. 17, 2023); *City of Hialeah Employees Retirement System* v. *Becker*, Case No. 3:23-cv-01697-JD (N.D. Cal. Filed Apr. 7, 2023); *Int'l Union of Operating Engineers Local 132 Pension Fund* v. *SVB Financial Group*, Case No. 3:23-cv-01962-TLT (N.D. Cal. Filed Apr. 24, 2023); *Stevenson* v. *Becker*, 4:23-cv-02277-HSG (N.D. Cal. Filed May 10, 2023); *Rossi* v. *Becker*, Case No. 4:23-cv-02335-HSG (N.D. Cal. Filed May 12, 2023) ("*Rossi I*"); and *Rossi* v. *DeChellis*, 4:24-cv-01674-HSG (N.D. Cal. Filed Mar. 18, 2024) ("*Rossi II*") (collectively, the "Class Action Lawsuits").

[20]    The *Norges* court declined to consolidate two class action lawsuits, *Stevenson* and *Rossi I*, which had been removed from state court and were the subject of pending motions to remand.  On March 28, 2024, the U.S. District Court for the Northern District of California entered an order denying the motions to remand the *Stevenson and Rossi I* litigation.  On April 11, 2024, the District Court entered a stipulation and order certifying an interlocutory appeal of its March 28 remand order to the U.S. Court of Appeals for the Ninth Circuit under 28 U.S.C. § 1292(b) and staying the proceedings in district court in the *Stevenson* and *Rossi I* litigation while the appeal is pending.  On April 22, 2024, the Plaintiffs in *Stevenson* and *Rossi I* sought permission to proceed with an interlocutory appeal from the U.S. Court of Appeals for the Ninth Circuit, which request is currently pending. Under an April 16, 2024 stipulation and order, the March 28 remand order and April 11 order were extended to the *Rossi II* litigation.

stipulation of the parties, the *TIAA-CREF* action is stayed pending a ruling on the motions to dismiss the *Norges* amended complaint.

The insurers under the Debtor's D&O Insurance Policies are currently reimbursing some of these defendants for their costs of defense, and (subject to policy defenses and other claims against the D&O Insurance Policies as described below) the insurers may be responsible for payment of future settlements or liabilities (if any) established in the Securities Lawsuits.

## P.    Investigation of Potential Estate Claims and Causes of Action

As described in Article II.G.1 above, the causes of SVB's closure and receivership, including whether its closure and receivership were preventable and/or foreseeable, have been the subject of several publicly released governmental investigations and reports, as well as multiple instances of Congressional testimony. The Debtor, acting at the direction of the Special Committee, has been conducting an extensive evaluation of the factors, prepetition conduct, and events that led to SVB's closure and the Debtor's Chapter 11 Case. The UCC also has been conducting an extensive investigation into the factors, prepetition conduct, and events that led to the Debtor's Chapter 11 Case. The Debtor's and the UCC's evaluations continue. The UCC and the Debtor have coordinated numerous aspects of their respective investigations and evaluations, including joint interviews of a significant number of witnesses, in an effort to protect the Debtor's estate.

In connection with their respective investigations and evaluations, the UCC and the Debtor obtained permission from the Bankruptcy Court to seek discovery under Bankruptcy Rule 2004 from, among others, forty-one current or former directors, officers, and employees of the Debtor, six advisors and other third parties, and First Citizens Bank, which is in possession of the majority of the Debtor's prepetition books and records [D.I. 345, 346, 659]. In connection with these requests, the UCC and the Debtor also obtained permission to receive confidential supervisory information from the Federal Reserve, the CA DFPI, the Federal Reserve Bank of San Francisco, and the FDIC-C.

The evaluation and investigation included a review and analysis of publicly available information concerning SVB, including reports from the Federal Reserve and the U.S. Government Accountability Office surrounding the closure and receivership of SVB, documents and communications that have been made publicly available in connection with those reports, and public testimony from relevant personnel. The UCC also obtained access to certain documents from the Debtor on a consensual basis, and the Debtor and UCC received (and continue to receive) numerous productions of documents from First Citizens Bank, from certain current and former employees, officers and directors of the Debtor, and from McKinsey & Co., BlackRock, Goldman Sachs, Curinos, KPMG, and Ernst & Young, entities that provided prepetition services to the Debtor and/or SVB. In addition, the Debtor has access to more than 10 million pages of documents provided by First Citizens Bank, which the Debtor has been able to review in connection with its evaluation, but as to which its ability to share or use those documents presently remains limited by the FDIC and/or other governmental entities.

As described in more detail in Article III.J above, the FDIC in each of its capacities has taken the position that the Debtor's $1.93 billion claim for its Account Funds need not be honored by the FDIC in each such capacity. For example, among other arguments, the FDIC-R1 has asserted that, pursuant to 12 U.S.C. § 1822(d) and common law, it has a right to setoff against the Debtor's Account Funds claim for any amounts owed to SVB by the Debtor [D.I. 145].[21] On May 2, 2024, the FDIC-R1 filed a *Statement Regarding Its Defensive Setoff Rights Against SVB Financial Group* in the FDIC-R Action ("Setoff Statement"),[22] which asserts defensive rights to setoff against the Debtor's Account Fund claim based on allegations that the Debtor (1) aided, abetted and conspired in various breaches of fiduciary duty by SVB's directors and officers, resulting in billions of dollars of damages that exceed the amount of the Debtor's Account Funds claim; (2) is liable for unjust enrichment, breach of California Corporate Code §§ 500-501, and fraudulent transfer with respect to (i) dividends by SVB to SVBFG when SVB was experiencing financial distress and was in need of liquidity, resulting in damages of $294 million, and (ii) a sale of equity warrants by SVB to SVBFG at below fair market value prices, resulting in damages of $130 million; and (3) failed to turn over to the FDIC-R1 an unspecified amount of tax refunds held in trust under a tax sharing agreement and applicable law. The Debtor (acting through the Special Committee) has evaluated and will continue to evaluate the basis for the FDIC-R1's claims. To date, the Debtor has not identified any conduct on the part of the Debtor or its officers, directors, or employees that would give rise to a setoff right against the Debtor's Account Funds claim, and the Debtor intends to vigorously oppose the FDIC-R1's claims on any and all supportable grounds.

The UCC and Debtor are each still evaluating whether colorable causes of action may exist against one or more prepetition officers or directors of the Debtor, as well as against certain third parties. The UCC and Debtor continue to evaluate the strengths and weaknesses of any potential claims, as well as anticipated defenses.

The primary source of any recovery on claims against any prepetition officers or directors of the Debtor is expected to be the Debtor's D&O Insurance Policies, whose policy limits aggregated to roughly $210 million as of the Petition Date. It must be noted, however, that the Debtor shared the coverage under its D&O Insurance Policies with SVB, and the FDIC has indicated that it also may pursue claims that would be covered by the D&O Insurance Policies. In addition, the plaintiffs in the Securities Lawsuits are pursuing claims that may be covered by the D&O Insurance Policies, and the value of the D&O Insurance Policies has been and continues to be eroded by the payment of defense costs. As a result of the eroding value of the D&O Insurance Policies and what are expected to be significant competing claims for coverage, the Debtor cannot estimate with any level of precision the amount of insurance proceeds that could be expected to be available to pay any of the estate's claims against any covered parties, should any such claims exist.

---

[21]  The Debtor has previously challenged the existence of mutuality necessary for setoff, arguing that FDIC-R1 cannot exercise a setoff claim against amounts that are owed to the Debtor by the FDIC-C, a separate juridical entity. *See SVB Fin. Group* v. *FDIC*, Adv. 23-1137, D.I. 1 ¶¶ 12, 54. The FDIC-R2 has affirmatively disclaimed any right to setoff. *See SVB Fin. Group* v. *FDIC*, Adv. 23-1137, D.I. 71 at 5 ("FDIC-R2 has no right of setoff against the Deposit Account liabilities nor has it asserted a right of setoff.").

[22]  FDIC-R Action [D.I. 29]. A notice of the Setoff Statement was also filed in the Chapter 11 Case [D.I. 1081].

As governmental investigations are continuing and information continues to be developed and the Debtor continues its own evaluation, the Debtor (acting at the direction of the Special Committee) is not in a position at this time to recommend a release of any claims against any prepetition officers or directors, or third parties, arising from prepetition conduct. As a result of the foregoing, it is expected that with the exception of any Claims that are subject to a release described in Article IV.G below, all potential claims will be preserved under the Plan and will be transferred to the Liquidating Trust, as described in Article IV.B below.

## ARTICLE IV.

## SUMMARY OF THE PLAN

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying Claims against, and Interests in, a debtor. Confirmation of a plan makes the plan binding upon the debtor, any issuer of securities under the plan and any creditor of, or equity Holder in, the debtor, whether or not such creditor or equity Holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the effective date of the plan and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the Holders of Claims or Interests in certain classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are conclusively presumed to accept the plan. Accordingly, a debtor need not solicit votes from the Holders of Claims or Interests in such classes. A chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any Claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are impaired will be solicited to vote to accept or reject the plan.

Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. To satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtor is submitting this Disclosure Statement to Holders of Claims and Interests against the Debtor who are entitled to vote to accept or reject the Plan.

The classification and treatment of Claims and Interests; implementation of the Plan; provisions governing Distributions; effect of Confirmation, including the release, injunction and related provisions; and treatment of Executory Contracts and Unexpired Leases are summarized below. For all other provisions relating to the Plan, including among other things, acceptance or rejection of the Plan, conditions precedent to effectiveness of the Plan, modification, revocation or withdrawal of the Plan, and retention of jurisdiction, please refer to the Plan attached hereto as Appendix A.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN.  THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY AND IS SUBJECT TO THE PLAN AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.  REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR UNDER THE PLAN.  UPON THE OCCURRENCE OF THE EFFECTIVE DATE, THE PLAN AND ALL SUCH DOCUMENTS WILL BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR AND ITS ESTATE AND ALL OTHER PARTIES-IN-INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

STATEMENTS AS TO THE RATIONALE UNDERLYING THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ARE NOT INTENDED TO, AND SHALL NOT, WAIVE, COMPROMISE OR LIMIT ANY RIGHTS, CLAIMS OR CAUSES OF ACTION IN THE EVENT THE PLAN IS NOT CONFIRMED.

## A.    Classification, Treatment and Voting of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, the Plan divides claims and interests into Classes and sets forth the treatment for each Class (other than administrative expense claims, which, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be and have not been classified).  The Debtor is also required, under section 1122 of the Bankruptcy Code, to classify claims against and interests in the Debtor into Classes that contain claims and interests that are substantially similar to the other claims and interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest.  The Debtor believes that it has complied with such standard.  If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the holders of claims and interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is Allowed in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

The Debtor believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Debtor's classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtor intends, in accordance with the terms of the Plan and the RSA, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation. Any such reclassification could materially adversely affect Holders of Claims and Interests by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan. EXCEPT AS SET FORTH IN THE PLAN AND THE RSA, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM OR INTERESTS AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM OR INTEREST PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM OR INTEREST REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

Any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors. The projected recoveries are based on information available to the Debtor as of the date hereof and reflect the Debtor's views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Debtor believes that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

## 1.    Claims Classification and Voting Status

All Claims and Interests, except for certain Claims addressed in Section 3 of the Plan, are classified as set forth in Section 4 of the Plan, which is summarized below. In accordance with section 1123(a)(1) of the Bankruptcy Code, and as set forth in Section 3 of the Plan, the Plan does not classify Other Administrative Claims, Ad Hoc Noteholder Group

Expenses, Senior Note Trustee Expenses, Subordinated Note Trustee Expenses, Professional Fee Claims and Priority Tax Claims, and such Claims will be paid in accordance with the procedures set forth in Section 3 of the Plan.

The following table designates the Classes of Claims against and Interests in the Debtor, as applicable, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan and (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or presumed to accept or deemed to reject the Plan.[23] Each Holder of a Claim or Interest in an Impaired Class that is entitled to vote on the Plan as of the Voting Record Date pursuant to Section 4 of the Plan shall be entitled to vote to accept or reject the Plan.  The classification of Claims and Interests pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3(a) | Senior Note Claims | Impaired | Entitled to Vote |
| 3(b) | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Subordinated Note Claims | Impaired | Entitled to Vote |
| 5 | Preferred Equity Interests | Impaired | Entitled to Vote |
| 6 | Common Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Claims and Intercompany Interests | Impaired or Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

**2.      Treatment of Claims and Interests**

Class 1 – Other Secured Claims

(a)      *Classification*:  Class 1 consists of all Other Secured Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim will receive, at the Debtor's option (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed): (a) payment in full in Cash; (b) delivery of the collateral securing its Allowed Other Secured Claim and payment of any interest required under

---

[23]    The information in the table is provided in summary form, and is qualified in its entirety by Section 4.2 of the Plan.

section 506(b) of the Bankruptcy Code; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)     *Voting*:  Claims in Class 1 are Unimpaired.  Each Holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Other Secured Claims is entitled to vote to accept or reject the Plan.

Class 2 – Other Priority Claims

(a)     *Classification*:  Class 2 consists of all Other Priority Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim will receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

(c)     *Voting*:  Claims in Class 2 are Unimpaired.  Each Holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of an Other Priority Claim is entitled to vote to accept or reject the Plan.

Class 3(a) – Senior Note Claims

(a)     *Classification*:  Class 3(a) consists of all Senior Note Claims.

(b)     *Allowance*:  Senior Note Claims will be Allowed in the aggregate outstanding principal amount of $[3,300,000,000.00], *plus* accrued and unpaid interest to and including the Petition Date at the non-default contract rate.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Senior Note Claim agrees to a less favorable treatment (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed), in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Senior Note Claim, each Holder of an Allowed Senior Note Claim will receive (a)(i) if and solely to the extent such Holder is a Qualified Holder, its Pro Rata share (together with all Holders receiving Distributions in NewCo Common Stock) of the NewCo Common Stock subject to dilution by any NewCo Transaction or (ii) if and solely to the extent such Holder is a Non-Qualified Holder, Cash in an amount equal to the value of the NewCo Common Stock it would be entitled to receive if it were a Qualified Holder, (b) its Pro Rata share (together with all Holders

receiving Distributions of the Class A Trust Units) of the Class A Trust Units and (c) payment by the Debtor in Cash of the Senior Note Trustee Expenses, to the extent not otherwise paid by the Debtor under the Plan.

(d)     *Voting*:  Claims in Class 3(a) are Impaired.  Each Holder of an Allowed Senior Note Claim is entitled to vote to accept or reject the Plan.

Class 3(b) – Other General Unsecured Claims

(a)     *Classification*:  Class 3(b) consists of all Other General Unsecured Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other General Unsecured Claim agrees to a less favorable treatment (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed), in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other General Unsecured Claim, each Holder of an Allowed Other General Unsecured Claim will receive:

> (a) (i)(A) if and solely to the extent such Holder is a Qualified Holder, its Pro Rata share (together with all Holders receiving Distributions in NewCo Common Stock) of the NewCo Common Stock subject to dilution by any NewCo Transaction or (B) if and solely to the extent such Holder is a Non-Qualified Holder, Cash in an amount equal to the value of the NewCo Common Stock it would be entitled to receive if it were a Qualified Holder, and (ii) its Pro Rata share (together with all Holders receiving Distributions of the Class A Trust Units) of the Class A Trust Units; or

> (b) if such Holder elects on the applicable ballot, the GUC Cash-Out with respect such Claim.

(c)     *Voting*:  Claims in Class 3(b) are Impaired.  Each Holder of an Allowed Other General Unsecured Claim is entitled to vote to accept or reject the Plan.

Class 4 – Subordinated Note Claims

(a)     *Classification*:  Class 4 consists of all Subordinated Note Claims.

(b)     *Allowance*:  Subordinated Note Claims will be Allowed in the aggregate outstanding principal amount of $[104,492,871.02], *plus* accrued and unpaid interest to and including the Petition Date at the non-default contract rate.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Subordinated Note Claim agrees to a less favorable treatment, in full and final

satisfaction, settlement, release and discharge of and in exchange for its Allowed Subordinated Note Claim, each Holder of an Allowed Subordinated Note Claim will receive its Pro Rata share of (a) the Class B Trust Units in an aggregate amount equal to such Holder's Allowed Subordinated Note Claim and (b) payment by the Debtor in Cash of the Subordinated Note Trustee Expenses, to the extent not otherwise paid by the Debtor under the Plan.

(d)     *Voting*:  Claims in Class 4 are Impaired.  Each Holder of an Allowed Subordinated Note Claim is entitled to vote to accept or reject the Plan.

Class 5 – Preferred Equity Interests

(a)     *Classification*:  Class 5 consists of all Preferred Equity Interests.

(b)     *Allowance*:  Preferred Equity Interests will be Allowed in an amount equal to the Liquidation Preference per share, together with an amount equal to all dividends (if any) that have been declared but not paid prior to the date of distributions (but without regard to any undeclared dividends).

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Preferred Equity Interest agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Preferred Equity Interest, each Holder of an Allowed Preferred Equity Interest will receive its Pro Rata share of the Class C Trust Units.

(d)     *Voting*:  Claims in Class 5 are Impaired.  Each Holder of an Allowed Preferred Equity Interest is entitled to vote to accept or reject the Plan.

Class 6 – Common Equity Interests

(a)     *Classification*:  Class 6 consists of all Common Equity Interests.

(b)     *Treatment*:  No Holder of a Common Equity Interest will receive any Distributions on account of its Common Equity Interest.  On and after the Effective Date, all Common Equity Interests will be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of such Interests will not receive or retain any distribution, property, or other value on account of such Interests.

(c)     *Voting*:  Interests in Class 6 are Impaired.  Each Holder of a Common Equity Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of a Common Equity Interest is entitled to vote to accept or reject the Plan.

Class 7 – Section 510(b) Claims

(a)     *Classification*:  Class 7 consists of all Section 510(b) Claims.

(b)     *Treatment*:  No Holder of a Section 510(b) Claim will receive any Distributions on account of its Section 510(b) Claim.  On and after the Effective Date, all Section 510(b) Claims will be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive or retain any distribution, property, or other value on account of such Claims.

(c)     *Voting*:  Claims in Class 7 are Impaired.  Each Holder of a Section 510(b) Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of a Section 510(b) Claim is entitled to vote to accept or reject the Plan.

Class 8 – Intercompany Claims and Intercompany Interests

(a)     *Classification*:  Class 8 consists of all Intercompany Claims and Intercompany Interests.

(b)     *Treatment*:  On and after the Effective Date, each Intercompany Claim and each Intercompany Interest will be (a) canceled, released, and discharged, (b) Reinstated, (c) converted to equity, or (d) otherwise set off, settled, or distributed, in each case at the option of the Debtor with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed.

(c)     *Voting*:  Claims and Interests in Class 8 are Impaired or Unimpaired.  Each Holder of an Intercompany Claim or an Intercompany Interest is conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code.  No Holder of an Intercompany Claim or an Intercompany Interest is entitled to vote to accept or reject the Plan.

**3.     Acceptance by Impaired Classes**

Pursuant to sections 1126(c) and (d) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, (i) an Impaired Class of Claims will have accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of such Class entitled to vote that actually vote on the Plan have voted to accept the Plan and (ii) an Impaired Class of Interests will have accepted the Plan if the Holders of at least two-thirds in dollar amount of such Class entitled to vote that actually vote on the Plan have voted to accept the Plan.

If Holders of Claims or Interests in a particular Impaired Class of Claims or Interests were given the opportunity to vote to accept or reject the Plan, but no Holders of Claims or Interests in such Impaired Class voted to accept or reject the Plan, then such Class will be deemed to have accepted the Plan.

4. **Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court solely for voting purposes as of the date of the Confirmation Hearing will be deemed eliminated from the Plan for purposes of (i) voting to accept or reject the Plan and (ii) determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

5. **Special Provisions Regarding Unimpaired Claims**

Except as otherwise specifically provided in the Plan, the Liquidating Trust will have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses which the Debtor now has or had immediately prior to the Petition Date as if the Chapter 11 Case had not been commenced, and all of the Liquidating Trust's legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Case had not been commenced.  Unless Allowed, Claims that are Unimpaired will remain as Disputed Claims under the Plan.

6. **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

If there is one or more rejecting Class of Claims or Interests, the Debtor will seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any such rejecting Class or Classes.  Subject to Sections 14 and 16.4 of the Plan, the Debtor reserves the right to amend the Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

B. **The Liquidating Trust**

1. **The Liquidating Trust Agreement**

On or before the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement.  The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties and authorities do not affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.  Notwithstanding anything in the Liquidating Trust Agreement to the contrary, the Liquidating Trust will be structured and operate in a manner that does not require registration of the Liquidating Trust under the Investment Company Act.

2. **Purpose of the Liquidating Trust**

The Liquidating Trust will be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets, in accordance with section 301.7701-4(d) of the U.S. Treasury regulations (the "Treasury Regulations"), with no objective to continue or engage in the

conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  The Liquidating Trust will be deemed a successor-in-interest of the Debtor to the maximum extent necessary for the Liquidating Trust to execute its purpose, and will not otherwise be deemed a successor-in-interest to the Debtor for any purpose other than as specifically set forth in the Plan or in the Liquidating Trust Agreement.

3.  **Liquidating Trust Assets**

On the Effective Date, the Liquidating Trust Assets will be deemed irrevocably transferred to the Liquidating Trust or entities to be formed by the Liquidating Trust, in each case in accordance with the Restructuring Transactions Memorandum and without any further action of NewCo, the Debtor or its subsidiaries or any of their respective managers, employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives.  The Liquidating Trust Assets will vest in the Liquidating Trust, free and clear of all Liens, Claims, charges, rights, or other encumbrances subject to and in accordance with the Plan and the Liquidating Trust Agreement.  For purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust will not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer.  Such transfer will be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtor and its predecessors, successors and assigns, and each other Entity released pursuant to Section 12.9 of the Plan will be discharged and released from all liability with respect to the delivery of such distributions.  Upon the transfer of the Liquidating Trust Assets and pursuant to the Liquidating Trust Agreement, the Debtor will have no reversionary or further interest in or with respect to the Liquidating Trust Assets.

After the Effective Date, the Liquidating Trust may, in its reasonable discretion, contribute all or a portion of the Liquidating Trust Assets to an entity (i) wholly owned by the Liquidating Trust and (ii) treated as corporations for U.S. federal income tax purposes (each such entity, a "Blocker Corporation"); *provided* that, the Liquidating Trust will evaluate any such transfer based on the relative tax costs and other tax consequences to the Liquidating Trust Beneficiaries of contributing such assets as compared to if such assets were not contributed to a Blocker Corporation.

To the extent that any cash refunds of Taxes transferred by NewCo to the Liquidating Trust is subsequently disallowed or required to be returned to the applicable Tax Authority, the Liquidating Trust will be liable for any amounts payable by NewCo to the applicable Tax Authority as a result of such disallowance or requirement and will promptly repay, or cause to be repaid, the amount of such refund, together with any interest, penalties or other additional amounts imposed by such Tax Authority, to NewCo.

4.  **Administration of the Liquidating Trust**

The business and affairs of the Liquidating Trust will be managed by or under the direction of the Liquidating Trust Board.  On the Effective Date, the Liquidating Trust Board will be appointed by the Required Ad Hoc Senior Noteholder Parties in a manner reasonably

acceptable to the UCC.  Following the Effective Date, the appointment and removal of the members of the Liquidating Trust Board will be governed by the Liquidating Trust Agreement.

The Liquidating Trust will have all the rights, powers and duties necessary to carry out its responsibilities under the Plan and the Confirmation Order.  For the avoidance of doubt, these powers will include, to the extent applicable, the power to assert, enforce, release, or waive any privilege or any defense (including as to any privilege that the Debtor held prior to the Effective Date).  The Liquidating Trust will be the exclusive representative of the Debtor's Estate for the purposes of 31 U.S.C. § 3713(b) and section 1123(b)(3)(B) of the Bankruptcy Code and receiver, trustee or assignee of all or substantially all the property or business pursuant to 26 U.S.C. § 6012(b)(3).

In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, and subject to the terms of the Confirmation Order, the Plan and the Liquidating Trust Agreement, the Liquidating Trust will, among other things, have the following rights and powers:  (i) to hold, manage, convert to Cash, and distribute the Liquidating Trust Assets to holders of Liquidating Trust Interests, including (x) prosecuting and resolving the claims and Retained Causes of Action belonging to the Liquidating Trust and (y) reducing, from time to time, the amount of Liquidating Trust Assets held in the Disputed Claims Reserves and returning such amounts to the Liquidating Trust, *provided*, for the avoidance of doubt, that any investment powers of the Liquidating Trust, other than those reasonably necessary to maintain the value of the assets and to further the liquidating purpose of the trust, must be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills, (ii) to sell, transfer, lease, encumber, or otherwise dispose of the Liquidating Trust Assets, (iii) to investigate, prosecute, settle and/or abandon rights, causes of action, or litigation of the Liquidating Trust, including Avoidance Actions, (iv) to disburse funds in the Professional Fee Reserve, the Liquidating Trust Disputed Claims Reserve, and the Liquidating Trust Disputed GUC Cash-Out Claims Reserve in accordance with the Liquidating Trust Agreement, which will be consistent with the Plan, (v) to distribute Liquidating Trust Interest from the Liquidating Trust Disputed Interests Reserve in accordance with the Liquidating Trust Agreement, which will be consistent with the Plan, (vi) to distribute NewCo Common Stock from the NewCo Disputed Claims Reserve in accordance with the Shared Services Agreement and the Liquidating Trust Agreement, as applicable, which will be consistent with the Plan, (vii) to file all Tax Returns and tax and regulatory forms, returns, reports, and other documents required with respect to the Liquidating Trust and any Disputed Claims Reserve, (viii) to object to Claims, and manage, control, prosecute, and/or settle on behalf of the Liquidating Trust, objections to Claims on account of which the Distribution Agent will be responsible (if Allowed) for making distributions under the Plan, (ix) to take all actions necessary and create any document necessary to implement the Plan, (x) to act as a signatory to the Debtor for all purposes, including those associated with the novation of contracts or other obligations arising out of the sales of the Debtor's assets, and (xi) to take all necessary actions and file all appropriate motions to obtain an order closing the Chapter 11 Case.  Under no circumstance may any person on the Liquidating Trust Board serve on the board of directors of any Affiliate of the Liquidating Trust.

5.      **Substitution in Pending Legal Actions**

On the Effective Date, the Liquidating Trust will be deemed to be substituted as the party to any pending litigation of a Retained Cause of Action in which the Debtor is a party and will be authorized, but not required, to file notices or other pleadings in such actions to effectuate its substitution for the Debtor.  Such substitution will not result in holders of Claims, including litigation Claims, against the Debtor receiving greater rights in or against the Liquidating Trust than they are otherwise entitled to under the Plan and Liquidating Trust Agreement on account of such Claims.

6.      **Distribution of Liquidating Trust Assets**

i.      From time to time (but no less frequently than annually), the Liquidating Trust will distribute to the Liquidating Trust Beneficiaries on account of their Liquidating Trust Interests in accordance with Section 5.6 of the Plan all unrestricted Cash on hand; *provided*, that in no event will the Liquidating Trust be required to distribute amounts reasonably necessary to (A) meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (B) pay reasonable incurred or anticipated expenses (including, but not limited to, any Taxes imposed on or payable by the Liquidating Trust or in respect of the Liquidating Trust Assets), or (C) satisfy other liabilities incurred or anticipated by the Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement.

ii.     The Liquidating Trust will issue class A trust units (the "Class A Trust Units"), class B trust units (the "Class B Trust Units") and class C trust units (the "Class C Trust Units") to Holders of Claims and Interests in accordance with Sections 4.2 and 11.8 of the Plan.

iii.    The Class A Trust Units will be issued to Holders of Allowed General Unsecured Claims (other than Holders of Allowed General Unsecured Claims that elect to receive the GUC Cash-Out) with an initial distribution preference of $[•],[24] which will accrete at an annual rate of 12%.  The Class B Trust Units and the Class C Trust Units will receive no distributions until the distribution preference (including, for the avoidance of doubt, any accretion thereto) of the Class A Trust Units has been satisfied in full.

---

[24]    [**NTD**:  To be calculated at the face amount (including accrued and unpaid interest on the Senior Notes as of the Petition Date) of all Allowed General Unsecured Claims *minus* amount of the Allowed General Unsecured Claims satisfied by the GUC Cash-Out and *minus* the value of NewCo Common Stock distributable to Classes 3(a) and 3(b) under the Plan (taking into the effect of any NewCo Transactions); *provided* that the determination of such value shall be acceptable to the Debtor, the UCC, and the Required Ad Hoc Senior Noteholder Parties and shall take into account any NewCo Transactions to be consummated on or prior to the Effective Date.]

iv.   The Class B Trust Units will be issued to Holders of Allowed
Subordinated Note Claims with an initial distribution preference to be
calculated at the face amount of the Allowed Subordinated Note Claims,
which Class B Trust Units will accrete at an annual rate of 12%.

v.    The Class C Trust Units will be issued to Holders of Allowed Preferred
Equity Interests and will receive no distributions until the distribution
preference (including, for the avoidance of doubt, any accretion thereto) of
the Class B Trust Units has been satisfied in full.

vi.   After satisfaction of the Class A and Class B Trust Units in full, the Class
C Trust Units will be entitled to 100% of Liquidating Trust distributions.

**7.    Costs and Expenses of the Liquidating Trust**

The individuals serving as or comprising the Liquidating Trust Board will be
entitled to reasonable compensation in an amount consistent with that of similar functionaries in
similar roles and paid out of the Liquidating Trust Assets.  The fees and expenses incurred by the
Liquidating Trust Board on or after the Effective Date and any reasonable compensation and
expense reimbursement claims (including attorney fees and expenses) made by the Liquidating
Trust Board in connection with such Liquidating Trust Board's duties will be paid without any
further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the
Liquidating Trust Assets.  Fees and expenses incurred in connection with the prosecution and
settlement of any Claims will be considered costs and expenses of the Liquidating Trust.

The Debtor, NewCo, the Delaware Trustee and the Liquidating Trust Board, as
applicable, will not be required to give any bond or surety or other security for the performance
of its duties unless otherwise ordered by the Bankruptcy Court.  In the event that the Delaware
Trustee or the Liquidating Trust Board is so ordered after the Effective Date, all costs and
expenses of procuring any such bond or surety will be paid for with Cash from the Liquidating
Trust Assets.

**8.    Retention of Professionals/Employees by the Liquidating Trust Board**

The Liquidating Trust Board may appoint officers or other representative agents
of the Liquidating Trust, including a Liquidating Trust manager and a secretary, to serve as
agents to the Liquidating Trust and carry out the purpose of the Liquidating Trust.  The
Liquidating Trust Board will have the right to hire employees and retain the services of
attorneys, accountants, and other professionals, subject to any limitations imposed by the
Liquidating Trust Board, that are necessary to assist the Liquidating Trust Board in the
performance of their duties without Bankruptcy Court approval.  Without limiting the foregoing,
the Liquidating Trust Board may retain any professional that represented parties in interest in the
Chapter 11 Case.

**9.    Liquidating Trust Disputed Claims Reserve**

On or after the Effective Date, the Liquidating Trust will be authorized, but not
directed, to establish one or more Liquidating Trust Disputed Claims Reserves.  After the

Effective Date, the Liquidating Trust may, in its sole discretion, hold any property to be distributed pursuant to the Plan, in the same proportions and amounts as provided for in the Plan, in the Liquidating Trust Disputed Claims Reserve in trust for the benefit of the Holders of Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Other Priority Claims, Disputed Other Secured Claims and Disputed General Unsecured Claims (other than Disputed GUC Cash-Out Claims) ultimately determined to be Allowed after the Effective Date; *provided* that the Liquidating Trust will use reasonable effort to allocate sufficient property for the Liquidating Trust Disputed Claims Reserves.  The Liquidating Trust will distribute such amounts (net of any expenses, including any Taxes relating thereto or otherwise payable by the Liquidating Trust Disputed Claims Reserve), as provided under the Plan, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date.  Amounts remaining in the Liquidating Trust Disputed Claims Reserve, if any, after the resolution of all applicable Disputed Claims and the satisfaction of all applicable Allowed Disputed Claims will promptly be transferred to the Liquidating Trust, without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

**10.    Liquidating Trust Disputed GUC Cash-Out Claims Reserve**

On or after the Effective Date, the Liquidating Trust will establish the Liquidating Trust Disputed GUC Cash-Out Claims Reserve.  On or after the Effective Date, the Liquidating Trust will place Cash in the Liquidating Trust Disputed GUC Cash-Out Claims Reserve in trust for the benefit of the Holders of Disputed GUC Cash-Out Claims ultimately determined to be Allowed after the Effective Date, in an amount, as reasonably determined by the Liquidating Trust (and with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties), sufficient to satisfy the GUC Cash-Out for such GUC Cash-Out Claims to the extent such Claims are Allowed after the Effective Date.  The Liquidating Trust will distribute such amounts (net of any expenses, including any Taxes relating thereto or otherwise payable by the Liquidating Trust Disputed GUC Cash-Out Claims Reserve), as provided herein, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date; *provided* that, to the extent the Cash held in such Liquidating Trust Disputed GUC Cash-Out Claims Reserve is insufficient to fund the GUC Cash-Out for any GUC Cash-Out Claim when Allowed, such GUC Cash-Out Claim will receive its Distribution in accordance with Section 4.2.4(ii)(a) of the Plan as though it had not elected the GUC Cash-Out; *provided further* that Cash remaining in the Liquidating Trust Disputed GUC Cash-Out Claims Reserve, if any, after the resolution of all applicable Disputed GUC Cash-Out Claims and the satisfaction of all applicable Allowed Disputed GUC Cash-Out Claims will promptly be transferred to the Liquidating Trust, without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

**11.    Liquidating Trust Disputed Interests Reserve**

On or after the Effective Date, the Liquidating Trust will be authorized, but not directed, to establish one or more Liquidating Trust Disputed Interests Reserves.  After the Effective Date, the Liquidating Trust may, in its sole discretion, hold any property to be

distributed pursuant to the Plan (other than NewCo Common Stock), in the same proportions and amounts as provided for in the Plan, in the Liquidating Trust Disputed Interests Reserve in trust for the benefit of the Holders of Disputed General Unsecured Claims (other than Disputed GUC Cash-Out Claims), Disputed Subordinated Note Claims and Disputed Preferred Equity Interests ultimately determined to be Allowed after the Effective Date; *provided* that the Liquidating Trust will use reasonable effort to allocate sufficient property for the Liquidating Trust Disputed Interests Reserves.  The Liquidating Trust will distribute such amounts (net of any expenses, including any Taxes relating thereto or otherwise payable by the Liquidating Trust Disputed Interests Reserve), as provided under the Plan, as such Claims or Interests are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims or Interests as such amounts would have been distributable had such Claims or Interests been Allowed Claims or Interests as of the Effective Date.  Amounts remaining in the Liquidating Trust Disputed Interests Reserve, if any, after the resolution of all applicable Disputed Claims or Interests and the satisfaction of all applicable Allowed Disputed Claims and Interests, if any, will promptly be transferred to the Liquidating Trust, without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

## 12.    NewCo Disputed Claims Reserve

On or after the Effective Date, the Liquidating Trust will be authorized, but not directed, to establish one or more NewCo Disputed Claims Reserves, and such NewCo Disputed Claims Reserves will be deemed transferred to the Liquidating Trust or entities to be formed by the Liquidating Trust, in each case in accordance with the Restructuring Transactions Memorandum and without any further action of NewCo, the Debtor or its subsidiaries or any of their respective managers, employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives.  After the Effective Date, the Liquidating Trust may, in its sole discretion, hold any NewCo Common Stock to be distributed pursuant to the Plan, in the same proportions and amounts as provided for in the Plan, in the NewCo Disputed Claims Reserve in trust for the benefit of the Holders of Disputed General Unsecured Claims (other than Disputed GUC Cash-Out Claims) ultimately determined to be Allowed after the Effective Date; *provided* that the Liquidating Trust will use reasonable effort to allocate sufficient property for the NewCo Disputed Claims Reserves.  The Liquidating Trust will distribute such amounts (net of any expenses, including any Taxes relating thereto or otherwise payable by the NewCo Disputed Claims Reserve), as provided under the Plan, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims or Interest as of the Effective Date.  Amounts remaining in the NewCo Disputed Claims Reserve, if any, after the resolution of all applicable Disputed Claims and the satisfaction of all applicable Allowed Disputed Claims, if any, will promptly be transferred to NewCo, without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

## 13.    Federal Income Tax Treatment of the Liquidating Trust

### (a)    Liquidating Trust Assets Treated as Owned by Creditors

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not

contested by the Liquidating Trust Board), for all United States federal income tax purposes, all parties (including the Debtor, the Liquidating Trust Board and the Liquidating Trust Beneficiaries) will treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as (i) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to the Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims or Interests, which will be treated as transferred to the applicable Disputed Claims Reserve), followed by (ii) the transfer by such beneficiaries to the Liquidating Trust of the Liquidating Trust Assets (other than to the extent Liquidating Trust Assets are allocable to any Disputed Claims Reserve) in exchange for Liquidating Trust Interests. Accordingly, the Liquidating Trust Beneficiaries will be treated for United States federal income tax purposes as the grantors and deemed owners of their respective share of the Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to any Disputed Claims Reserve, discussed below). The foregoing treatment will also apply, to the extent permitted by applicable law, for state and local income tax purposes.

However, there can be no assurance that the IRS or other applicable government entities would not take a contrary position. If the IRS or other applicable government entities were to challenge successfully the classification of the Liquidating Trust, the U.S. federal (and applicable state and local) income tax consequences to the Liquidating Trust could vary from those discussed herein. *See* Article X below—*Certain U.S. Federal Income Tax Consequences of the Plan*.

### (b)    Tax Reporting

i.     The Liquidating Trust Board will file Tax Returns for the Liquidating Trust treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) (excluding any Disputed Claims Reserve, which will be reported in accordance with Section 5.13.2.iv of the Plan) and in accordance with Section 5.13 of the Plan. The Liquidating Trust Board also will annually send to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income Tax Returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income Tax Returns. The Liquidating Trust Board will also file (or cause to be filed) any other statement, return or disclosure relating to the Liquidating Trust or any Disputed Claims Reserve that is required by any Governmental Unit.

ii.    As soon as reasonably practicable after Liquidating Trust Assets are transferred to the Liquidating Trust, the Liquidating Trust Board will make a good faith valuation of Liquidating Trust Assets, and will make all such values available from time to time, to the extent relevant, and such values will be used consistently by all parties to the Liquidating Trust (including the Debtor, the Liquidating Trust Board and Liquidating Trust Beneficiaries) for all United States federal income tax purposes.

iii.    Allocations of Liquidating Trust taxable income among the Liquidating Trust Beneficiaries (other than to the extent such taxable income is allocable to any Disputed Claims Reserve) will be determined by reference to the manner in which an amount of cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, other than assets allocable to any Disputed Claims Reserve) to the holders of the Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets (other than the assets allocable to any Disputed Claims Reserve). The tax book value of the Liquidating Trust Assets for purpose of this paragraph will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

iv.    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trust Board of a private letter ruling if the Liquidating Trust Board so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trust Board), the Liquidating Trust Board will (A) timely elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Liquidating Trust Board, the Debtor, and the Liquidating Trust Beneficiaries) will report for United States federal, state and local income tax purposes consistently with the foregoing.

v.    The Liquidating Trust Board will be responsible for payment, out of the Liquidating Trust Assets, of any Taxes imposed on the trust or its assets, including any Disputed Claims Reserve; *provided* that, any Disputed Claims Reserve will bear all Taxes allocable to such Disputed Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims or Interests in any Disputed Claims Reserve is insufficient to pay the portion of any such Taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims or Interests (including any income that may arise upon the distribution of the assets of any Disputed Claims Reserve), such Taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of such Disputed Claims or Interests, (ii) paid with the proceeds from a sale of the assets of the applicable Disputed Claims Reserve or

(iii) to the extent such Disputed Claims or Interests have subsequently
been resolved, deducted from any amounts otherwise distributable by the
Liquidating Trust Board as a result of the resolution of such Disputed
Claims or Interests.

vi.    The Liquidating Trust Board may request an expedited determination of
Taxes of the Liquidating Trust, any Disputed Claims Reserve, or the
Debtor under section 505(b) of the Bankruptcy Code for all Tax Returns
filed for, or on behalf of, the Liquidating Trust for all taxable periods
through the dissolution of the Liquidating Trust.

**(c)    Tax Withholdings by Liquidating Trust Board**

The Liquidating Trust Board may withhold and pay to the appropriate Tax
Authority all amounts required to be withheld pursuant to the IRC or any provision of any
foreign, state or local tax law with respect to any payment or distribution to the holders of
Liquidating Trust Interests.  All such amounts withheld and paid to the appropriate Tax
Authority (or placed in escrow pending resolution of the need to withhold) will be treated as
amounts distributed to such holders of Liquidating Trust Interests for all purposes of the
Liquidating Trust Agreement; *provided* that any amount placed in escrow pending resolution of
the need to withhold that is deemed to exceed the amount required to be withheld will be
distributed to the applicable holders of Liquidating Trust Interests as soon as reasonably
practicable following the determination of the withholding requirement.  The Liquidating Trust
Board will be authorized to collect such tax information from the holders of Liquidating Trust
Interests (including social security numbers or other tax identification numbers) as in its sole
discretion the Liquidating Trust Board deems necessary to effectuate the Plan, the Confirmation
Order, and the Liquidating Trust Agreement.  In order to receive distributions under the Plan, all
holders of Liquidating Trust Interests (including holders of Allowed Senior Note Claims,
Allowed Other General Unsecured Claims, Allowed Subordinated Note Claims and Allowed
Preferred Equity Interests, who, in each case, deliver a release in accordance with the provisions
of Section 12.9 of the Plan) will be required to identify themselves to the Liquidating Trust
Board and provide tax information and the specifics of their holdings, to the extent the
Liquidating Trust Board deems appropriate in the manner and in accordance with the procedures
from time to time established by the Liquidating Trust Board for these purposes.  This
identification requirement generally applies to all holders, including those who hold their
securities in street name.  The Liquidating Trust Board may refuse to make a distribution to any
holder of a Liquidating Trust Interest that fails to furnish such information in a timely fashion,
and until such information is delivered, and may treat such holder's Liquidating Trust Interests
as disputed; *provided, however*, that, if such information is not furnished to the Liquidating Trust
Board within six (6) months of the original request to furnish such information, no further
distributions will be made to the holder of such Liquidating Trust Interest; and, *provided, further*,
that, upon the delivery of such information by a holder of a Liquidating Trust Interest, the
Liquidating Trust Board will make such distribution to which the holder of the Liquidating Trust
Interest is entitled, without additional interest occasioned by such holder's delay in providing tax
information; and, *provided, further*, that if the Liquidating Trust Board fails to withhold in
respect of amounts received or distributable with respect to any such holder and the Liquidating
Trust Board is later held liable for the amount of such withholding, such holder will reimburse

the Liquidating Trust Board for such liability (to the extent such amounts were actually distributed to such holder).

### (d)    Dissolution

The Liquidating Trust Board and the Liquidating Trust will be discharged or dissolved, as the case may be, upon the earlier to occur of (i) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and the Liquidating Trust Agreement, (ii) the Liquidating Trust Board determines that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit and (iii) all distributions required to be made by the Liquidating Trust Board under the Plan and the Liquidating Trust Agreement having been made; *provided*, *however*, in no event will the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth (5th) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trust Board that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.  If at any time the Liquidating Trust Board determines, in reliance upon such professionals as the Liquidating Trust Board may retain, that the expense of administering the Liquidating Trust (and any Disputed Claims Reserve) so as to make a final distribution to its beneficiaries is likely to exceed the value of the assets remaining in the Liquidating Trust, the Liquidating Trust Board may apply to the Bankruptcy Court for authority to (a) reserve any amount necessary to dissolve the Liquidating Trust (and any Disputed Claims Reserve), (b) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under section 501(a) of the IRC, (C) not a "private foundation", as defined in section 509(a) of the IRC, and (D) that is unrelated to the Debtor, NewCo, the Liquidating Trust and any insider of the foregoing and (c) dissolve the Liquidating Trust (and any Disputed Claims Reserve).

### 14.    Indemnification of Liquidating Trust Board

The Liquidating Trust Agreement will provide for the indemnification of the Liquidating Trust Board, the individual(s) comprising the Liquidating Trust Board, the Delaware Trustee and certain other individuals as may be set forth therein.  Any indemnification claim of the Liquidating Trust Board (and the other parties entitled to indemnification under this subsection) will be satisfied solely from the Liquidating Trust Assets.  The Liquidating Trust may obtain, at the expense of the Liquidating Trust and with funds from the Liquidating Trust Assets, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Liquidating Trust Board or any employees of the Liquidating Trust.

### 15.    Exculpation Relating to the Liquidating Trust

No Holder of a Claim or Interest or any other party in interest will have, or otherwise pursue, any Claim or Cause of Action against the Liquidating Trust Board, the

Liquidating Trust, or the consultants or professionals thereof (for each of the foregoing, solely in the performance of their duties) for making payments and distributions in accordance with the Plan and the Liquidating Trust Agreement or for fulfilling any functions incidental to implementing the provisions of the Plan or the Liquidating Trust Agreement, except for any acts or omissions that are the result of fraud, gross negligence or willful misconduct.

### 16.    Abandonment of Liquidating Trust Assets

Subject to the Liquidating Trust Agreement, after the Effective Date, the Liquidating Trust Board may abandon any Liquidating Trust Assets which the Liquidating Trust Board determines in its reasonable discretion to be of *de minimis* value or burdensome to the Liquidating Trust.

## C.    Implementation of the Plan

### 1.    Operations Between the Confirmation Date and Effective Date

During the period from the Confirmation Date through and until the Effective Date the Debtor may continue to operate its businesses as debtor-in-possession in the ordinary course in a manner consistent with past practice in all material respects, and as otherwise necessary to consummate the Plan, subject to the terms and conditions of the RSA and all applicable orders of the Bankruptcy Court and the consent rights set forth in the RSA, the Plan and any other Definitive Documents.

### 2.    Sources of Cash for Plan Distributions

Cash payments or cash distributions to be made hereunder on the Effective Date will be funded from the existing Cash of the Debtor and the Cash proceeds of a NewCo Transaction, as applicable.

### 3.    NewCo Transaction

If at any time prior to the Effective Date, the Debtor determines in good faith and consistent with its fiduciary duties (and with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties) that a sale, private placement or rights offering of some or all of the assets or equity of NewCo to one or more third parties, including through a Plan Sponsor Transaction, pursuant to sections 1129 and 363 of the Bankruptcy Code (any such transaction, a "NewCo Transaction"), will maximize the value of NewCo and is in the best interests of the Estate, such NewCo Transaction will be consummated pursuant to the Plan, subject to approval by the Bankruptcy Court pursuant to the Confirmation Order or another order of the Bankruptcy Court; *provided* that the Debtor may only enter into a NewCo Transaction that results in the Debtor receiving proceeds from such NewCo Transaction with a value no less than the value attributed by the Plan to the NewCo equity or assets that are subject to such NewCo Transaction.

Following Confirmation, without further order or approval of the Bankruptcy Court and subject to any applicable consent rights set forth in the Restructuring Support Agreement, the Debtor may in good faith make modifications to the Plan to maximize the value of all or some of the assets or equity of NewCo in connection with a NewCo Transaction (if

any); provided that such modifications do not materially and adversely affect the treatment of Holders of Claims or Interests and are otherwise permitted under section 1127(b) of the Bankruptcy Code.

### 4.    Exemption from Registration

The Debtor believes that, subject to certain exceptions described below, various provisions of the Securities Act, the Bankruptcy Code and applicable state securities laws ("Blue Sky Laws") exempt from federal and state securities registration requirements (i) the offering, issuance, exchange, distribution or sale of securities pursuant to the Definitive Documents and (ii) subsequent transfers of such securities.

The Liquidating Trust Interests to be distributed to the Liquidating Trust Beneficiaries pursuant to the Plan will be transferrable as set forth in the Liquidating Trust Agreement.  The Liquidating Trust Interests will not be listed on any national exchange and will have the consent and voting rights provided in the Liquidating Trust Agreement.  The Liquidating Trust and the Liquidating Trust Board will not take any steps to facilitate the development of a trading market in the Liquidating Trust Interests.

### (a)    Section 1145

Except with respect to any Person that is an underwriter as defined in section 1145(b) of the Bankruptcy Code, the issuance of the Liquidating Trust Interests to Liquidating Trust Beneficiaries under the Plan and the issuance of NewCo Common Stock to Holders of Allowed General Unsecured Claims under the Plan will be exempt from registration under Section 5 of the Securities Act (and any applicable Blue Sky Laws) under section 1145(a)(1) of the Bankruptcy Code.

Section 1145(a)(1) of the Bankruptcy Code exempts the issuance, offer, sale, and distribution of securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if the following three principal requirements are satisfied:  (a) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.

The issuance and distribution of the NewCo Common Stock and the Liquidating Trust Interests satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance and distribution are exempt from registration under the Securities Act and any state or local law requiring registration.  To the extent any "offer or sale" of NewCo Common Stock may be deemed to have occurred, such offer or sale is made under the Plan and in exchange for Claims against the Debtor, or principally in exchange for such Claims and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code.  The availability of the exemptions under section 1145 of the Bankruptcy Code or any other applicable securities laws will not be a condition to occurrence of the Effective Date of the Plan.

To the extent section 1145 of the Bankruptcy Code is applicable, the securities to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) in general are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtor as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act.  In addition, securities governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of the various states; however, the availability of such exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration in any given instance.

Notwithstanding the foregoing, any securities or instruments issued under the Plan in reliance on section 1145(a) of the Bankruptcy Code remain subject to:  (x) compliance with any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments; (y) the restrictions in the applicable NewCo Organizational Documents and the Liquidating Trust Agreement, as applicable, on the transferability of such securities and instruments and (z) any other applicable regulatory approval.  Specifically, in an attempt to minimize the likelihood of an additional ownership change occurring after the Effective Date, the charter of NewCo will contain a restriction limiting the accumulation (and disposition) of shares by persons (and certain groups of persons acting in concert) owning (actually or constructively), or who would own (immediately before or after such acquisition), 4.99 percent of any class of stock of NewCo (with certain adjustments), and requiring approval of NewCo's Board for any such transfers.

**(b)    [Section 4(a)(2)]**

[To the extent securities are issued pursuant to the Plan or the other Definitive Documents in reliance on section 4(a)(2) of the Securities Act ("Section 4(a)(2)"), the offering, issuance, exchange, or distribution of such securities pursuant to the Plan or the other Definitive Documents will be conducted in a manner that is exempt from, among other things, the registration requirements of section 5 of the Securities Act.  Section 4(a)(2) exempts from section 5's registration requirements transactions not involving a public offering, and Regulation D under the Securities Act ("Regulation D") provides a safe harbor under Section 4(a)(2) for transactions that meet certain requirements, including that the investors participating therein qualify as "accredited investors" within the meaning of Rule 501 under Regulation D ("Accredited Investors").  Such offering, issuance, exchange or distribution will be structured to be available only to Holders who certify that they are Accredited Investors and who submit documentation allowing verification of their status as Accredited Investors.  Any such securities will be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and will only be transferable if registered under the Securities Act or if transferred pursuant to an exemption from the registration requirements of the Securities Act and other applicable securities laws.]

(c)    **DTC**

Should NewCo and/or the Liquidating Trust elect on or after the Effective Date to reflect any ownership of the NewCo Common Stock or the Liquidating Trust Interests, as applicable, through the facilities of DTC, such Entity need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of transfers, exercise, removal of restrictions, or conversion of NewCo Common Stock or the Liquidating Trust Interests, as applicable, under applicable U.S. federal, state or local securities laws.

DTC will be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the NewCo Common Stock or the Liquidating Trust Interests, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the NewCo Common Stock or the Liquidating Trust Interests, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

**5.    NewCo Common Stock**

On the Effective Date, NewCo will issue 100% of the NewCo Common Stock to Holders of Allowed General Unsecured Claims and the NewCo Disputed Claims Reserve, subject to dilution by any NewCo Transaction.

All of the NewCo Common Stock issued pursuant to the Plan will be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of NewCo Common Stock under the Plan will be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the NewCo Organizational Documents and other instruments evidencing or relating to such distribution or issuance, as applicable, which terms and conditions will bind each Entity receiving such distribution or issuance. For the avoidance of doubt, the acceptance of NewCo Common Stock by any Holder of any Claim or Interest will be deemed as such Holder's agreement to the NewCo Organizational Documents, as may be amended or modified from time to time following the Effective Date in accordance with their terms.

To the extent practicable, as determined in good faith by the Debtor and the Required Ad Hoc Senior Noteholder Parties, NewCo will: (a) emerge from this Chapter 11 Case as a non-publicly reporting company on the Effective Date and not be subject to SEC reporting requirements under Sections 12 or 15 of the Exchange Act, or otherwise; (b) not be voluntarily subjected to any reporting requirements promulgated by the SEC; except, in each case, as otherwise may be required pursuant to the applicable organizational documents or applicable law; (c) not be required to list the NewCo Common Stock on a U.S. stock exchange; (d) timely file or otherwise provide all required filings and documentation to allow for the termination and/or suspension of registration with respect to SEC reporting requirements under the Exchange Act prior to the Effective Date; and, (e) to the extent requested by the Required Ad Hoc Senior

Noteholder Parties, make good faith efforts to ensure DTC eligibility of securities issued by NewCo in connection with the Plan (other than any securities required by the terms of any agreement to be held on the books of an agent and not in DTC).

### (a)    NewCo Common Stock Cash-Out

As set forth in the Plan, certain Holders of Senior Note Claims and Other General Unsecured Claims that are Non-Qualified Holders will be entitled to receive, in lieu of NewCo Common Stock, Cash Distributions in an amount equal to the value of the NewCo Common Stock such Holders would be entitled to if such Holder were a Qualified Holder; *provided* that any such Non-Qualified Holder must provide a certification of its status as a Non-Qualified Holder in order to receive any such Distribution.

### (b)    NewCo Common Stock Cash-Out Certification

Prior to the Distribution to any Holder of a Senior Note Claim or Other General Unsecured Claim of, as applicable, (a) NewCo Common Stock or (b) Cash (not including any Cash Distribution in connection with the GUC Cash-Out) in an amount equal to the value of the NewCo Common Stock it would be entitled to if it were a Qualified Holder (such Distributions described in the preceding clause (a) or (b), as applicable, a "NewCo Distribution"), such Holder will be required to deliver to the Distribution Agent, [within 60 days] following the Distribution Agent's request (or such longer period as the Distribution Agent may determine in its reasonable discretion (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed)), a certification that such Holder (x) is a Qualified Holder or (y) is a Non-Qualified Holder (such request, the "Qualified Holder Certification Request").  If a Holder entitled to receive a NewCo Distribution fails to provide such certification [within 60 days] of receiving the Qualified Holder Certification Request, such Holder's NewCo Distribution will be deemed to be an Unclaimed Distribution and such Holder's Claim may be canceled, discharged and forever barred in accordance with Section 10.5 of the Plan, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.

To the extent that, during the six (6) month period following the designation of any NewCo Distribution as an Unclaimed Distribution, the Holder entitled to receive such NewCo Distribution provides a certification to the Distribution Agent that such Holder (x) is a Qualified Holder or (y) is a Non-Qualified Holder, such Holder may thereafter receive its distribution pursuant to the terms of the Plan.

### 6.    Deemed Holders of Subordinated Note Claims

The BP Trust I Declaration of Trust provides that BP Trust I will automatically terminate upon the bankruptcy of SVBFG, as successor by merger to BPFH.[25]  Upon such termination of BP Trust I, the terms of the BP Trust I Preferred Securities require the administrative trustee of the trust to distribute to holders of the BP Trust I Preferred Securities the BP Trust I Junior Subordinated Debentures having a principal amount equal to the liquidation

---

[25]    *See* Section 8.1(a)(i) of the BP Trust I Declaration of Trust.

amount per security plus accumulated and unpaid distributions thereon to the date of payment, after satisfaction of liabilities to creditors of BP Trust I as provided by applicable law.[26] For purposes of the Plan, holders of the BP Trust I Preferred Securities will be deemed to hold the BP Trust I Junior Subordinated Debentures and thus such holders will be deemed to hold the BP Trust I Claims.

The BP Trust II Declaration of Trust provides that BP Trust II will dissolve upon the bankruptcy of SVBFG, as successor by merger to BPFH.[27] Upon such dissolution of BP Trust II, the terms of the BP Trust II Capital Securities require the institutional trustee of the trust to distribute to holders of the BP Trust II Capital Securities the BP Trust II Junior Subordinated Debentures on a pro rata basis, after satisfaction of liabilities to creditors of BP Trust II as provided by applicable law.[28] For purposes of the Plan, holders of the BP Trust II Capital Securities will be deemed to hold the BP Trust II Junior Subordinated Debentures and thus such holders will be deemed to hold the BP Trust II Claims.

## 7.  Organizational Existence

Except as otherwise provided in the Plan and the Restructuring Transactions Memorandum, the Debtor will, as a subsidiary of NewCo or as NewCo, as applicable, continue to exist after the Effective Date as a separate legal Entity, with all the powers of a corporation or other form of organization, as applicable, under the laws of its jurisdiction of organization and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under the law of the applicable state or other jurisdiction.

## 8.  Cancellation of Existing Interests, Existing Indebtedness and Related Agreements

On the Effective Date, except as otherwise specifically provided for in the Plan, all rights of any Holder of Interests in the Debtor, including options or warrants to purchase Interests, or obligating the Debtor to issue, transfer or sell Interests of the Debtor, will be canceled.

Upon the indefeasible payment in full in Cash of all Allowed Other Secured Claims, or promptly thereafter, Holders of such Allowed Claims will deliver to the Debtor or, after the Effective Date, the Liquidating Trust, any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Claim that may reasonably be required in order to terminate any related financing statements, mortgages, mechanic's liens, or *lis pendens*, and take any and all other steps reasonably requested by the Debtor or, after the Effective Date, the Liquidating Trust, that are necessary to cancel and/or extinguish any Liens or security interests securing such Holder's Claim; *provided*, *however*, that the Debtor or the Liquidating Trust, as applicable, will be solely responsible for all costs and expenses associated with any of the foregoing actions or requests.

---

[26] *See* Annex I, Section 3 of the BP Trust I Declaration of Trust.

[27] *See* Section 7.1(a)(ii) of the BP Trust II Declaration of Trust.

[28] *See* Annex I, Section 3 of the BP Trust II Declaration of Trust.

On the Effective Date, except as otherwise provided in the Plan, the obligations of the Debtor under the respective Indentures, and any certificate, share, bond, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of the Debtor giving rise to any Claim or Interest will be canceled, without any need for a Holder to take further action with respect thereto, and the Debtor and the Liquidating Trust will not have any continuing obligations thereunder; *provided,* that notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of an Allowed Claim or Interest will continue in effect solely for (i) purposes of enabling such Holder to receive distributions under the Plan on account of such Allowed Claim or Interest as provided in the Plan; and (ii) permit the Indenture Trustees to make or assist in making, as applicable, distributions pursuant to the Plan and deduct therefrom such reasonable compensation, fees and expenses (a) due to the Indenture Trustees, or (b) incurred by the Indenture Trustees in making such distributions. Except as provided in the Plan, on the Effective Date, the Indenture Trustees and their respective agents, successors and assigns will be automatically and fully discharged of their duties and obligations associated with the respective Indentures. The commitments and obligations of the Holders of the Senior Note Claims and Subordinated Note Claims to extend any further or future credit or financial accommodations to the Debtor, its subsidiaries or assigns under the Indentures, respectively, will fully terminate and be of no further force or effect on the Effective Date.

## 9. Additional Implementing Transactions

On or prior to the Effective Date, the Debtor and the Liquidating Trust will, in accordance with the RSA and subject to any applicable consent rights thereunder, enter into any transaction and will take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable, the issuance of all securities, notes, instruments, certificates and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, entity formations, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions, including any restructuring transaction contemplated by the RSA, including any NewCo Transaction (collectively, the "Restructuring Transactions").

The Confirmation Order will, and will be deemed to, pursuant to sections 105, 363, 1123 and 1141 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan, including any NewCo Transaction.

## 10. Section 1146 Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers from the Debtor to NewCo, the Liquidating Trust or to any other Entity, pursuant to, in contemplation of, or in connection with the Plan (including any transfer pursuant to: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor, the Liquidating Trust, NewCo or Affiliates of NewCo, including, without limitation, the NewCo Common Stock and the Liquidating Trust Interests; (ii) the creation, modification, consolidation, assumption, termination, refinancing and/or recording of

-62-

any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment or recording of any lease or sublease; (iv) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan) will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents will, and will be directed to, forgo the collection of any such tax, recordation fee or government assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or government assessment.  The Bankruptcy Court will retain specific jurisdiction with respect to these matters.

### 11.    Effectuating Documents and Further Transactions

The Debtor or, after the Effective Date, the Liquidating Trust and NewCo, as applicable, may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.  The secretary and any assistant secretary of the Debtor, NewCo or the Liquidating Trust will be authorized to certify or attest to any of the foregoing actions.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtor will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable law, and without any requirement of further action by the shareholders, directors, managers or partners of the Debtor, or the need for any approvals, authorizations, actions or consents.

On the Effective Date, the Liquidating Trust Agreement, any other organizational document of the Liquidating Trust and the NewCo Organizational Documents will become effective and deemed binding without further action from any Person or Entity (other than the relevant consents required by under the RSA) and will be binding and enforceable upon each of the parties thereto.

### 12.    Abandonment of SVB Stock

Unless otherwise agreed in writing by the UCC and the Ad Hoc Group of Senior Noteholders, at least one day prior to the Effective Date, the Debtor will abandon all of its equity interests in, including all of the common stock of, Silicon Valley Bank (and all entities and arrangements that are treated as a single entity with successor(s) to Silicon Valley Bank for U.S. federal income tax purposes) and take a corresponding worthless stock deduction for U.S. federal income tax and all applicable state and local tax purposes pursuant to a court order permitting the Debtor to abandon such equity interests that the Debtor will request in advance of the Effective Date.

### 13. Preservation of Retained Causes of Action

Except as provided in the Plan, the Confirmation Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trust or NewCo, as applicable, will retain and may enforce any Retained Causes of Action that the Estate may hold against any Entity. The Liquidating Trust or NewCo, as applicable, may pursue any such Retained Causes of Action in accordance with the Plan and the Liquidating Trust Agreement, as applicable. The Debtor's inclusion or failure to include or describe with sufficient specificity any Retained Causes of Action in the Plan or in the Plan Supplement will not be deemed an admission, denial or waiver of any Retained Causes of Action that the Debtor or the Estate may hold. The Debtor intends to preserve all Retained Causes of Action. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to the Retained Causes of Action upon or after entry of the Confirmation Order on the Effective Date of the Plan based on the Plan or the Confirmation Order, including any argument of waiver on account of the failure to include or describe with sufficient specificity any Retained Causes of Action in the Plan or in the Plan Supplement.

## D. Provisions Regarding Governance of NewCo

### 1. Organizational Action

On and after the Effective Date, the adoption, filing, approval, and ratification, as necessary, of all corporate, or related actions contemplated hereby for NewCo will be deemed authorized and approved in all respects. Without limiting the foregoing, such actions may include: (i) the adoption of the NewCo Organizational Documents, (ii) the nomination, election, or appointment, as the case may be, of officers, directors and managers for NewCo, (iii) the issuance of the securities contemplated by the Plan or other Definitive Documents and (iv) the Restructuring Transactions to be effectuated pursuant to the Plan and the RSA.

Upon the occurrence of the Effective Date, all matters provided for in the Plan involving the organizational structure of the Debtor or NewCo, or any corporate action required by the Debtor or NewCo in connection with the Plan, will be deemed to have occurred in accordance with the Restructuring Transactions Memorandum and will be in effect, without any requirement of further action by the security holders or directors of the Debtor or NewCo or by any other stakeholder or any other corporate action.

On and after the Effective Date, the appropriate officers of NewCo and members of the board of directors of NewCo are authorized and directed to issue, execute, deliver, file, and record any and all agreements, documents, securities, deeds, bills of sale, conveyances, releases, and instruments contemplated by the Plan in the name of and on behalf of NewCo and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## 2.      NewCo Organizational Documents

On the Effective Date, the NewCo Organizational Documents will be adopted automatically by NewCo and its subsidiaries.  On or promptly after the Effective Date, NewCo and its subsidiaries may file their respective NewCo Organizational Documents and other applicable agreements with the applicable Secretaries of State or other applicable authorities in their respective states, provinces, or countries of incorporation or formation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or formation.

After the Effective Date, NewCo and each of its subsidiaries may amend and restate its limited liability company agreement, certificate of incorporation, limited partnership agreement, and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the NewCo Organizational Documents, as applicable.

In addition, from and after the Effective Date, the NewCo Organizational Documents will contain certain transfer restrictions in relation to the transfer of NewCo Common Stock.  Specifically, the NewCo Organizational Documents will provide that, without the approval of the NewCo Board, (i) no Person will be permitted to acquire, whether directly or indirectly, and whether in one transaction or a series of transactions, NewCo Common Stock, to the extent that after giving effect to such purported acquisition the purported acquirer or any other Person by reason of the purported acquirer's acquisition would become a Substantial Holder (as defined below) of any class of stock of NewCo; (ii) no Substantial Holder may acquire, directly or indirectly, any shares of NewCo stock without the consent of a majority of the NewCo Board; and (iii) no Substantial Holder may dispose, directly or indirectly, of any shares of NewCo stock without the consent of a majority of the NewCo Board.  A "Substantial Holder" is a person that owns (as determined for applicable U.S. federal income tax purposes) 4.99 percent of any class of stock of NewCo, including any instrument treated as stock for the applicable U.S. federal income tax purposes.

## 3.      Shared Services Agreement

Upon the Effective Date, NewCo and the Liquidating Trust may enter into a Shared Services Agreement.  The terms of the Shared Services Agreement (if any) will be acceptable to each of the Debtor, the Required Ad Hoc Senior Noteholder Parties and the UCC. Confirmation of the Plan will be deemed (a) approval of the Shared Services Agreement (if any), and (b) authorization for NewCo and the Liquidating Trust to enter into and perform under the Shared Services Agreement (if any).

## 4.      Directors and Officers of NewCo

On the Effective Date, the management, control and operation of NewCo will become the general responsibility of the board of directors of NewCo or such other governing body as provided in the NewCo Organizational Documents.

On the Effective Date, the term of the Current Directors and other governing bodies of the Debtor will be deemed to have resigned, such Current Directors will cease to hold office or have any authority from or after such time, in each case without further notice to or

order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity, and such Current Directors will be replaced by the NewCo Board (or, if the reorganized Debtor is not governed by a board, will be governed and managed as set forth in its applicable NewCo Organizational Documents).

The classification and composition of the NewCo Board will be consistent with applicable non-bankruptcy law and the terms of the NewCo Organizational Documents.  In the Plan Supplement, to the extent known, the Debtor will disclose, pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of the Persons proposed to serve on the NewCo Board.  The NewCo Board members will serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of the NewCo Organizational Documents.

Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not discharge, impair or otherwise modify any advancement, indemnity or other obligations arising under the D&O Insurance Policies.  In addition, after the Effective Date, neither the Liquidating Trust nor NewCo will terminate all or any portion of the coverage under the D&O Insurance Policies with respect to conduct occurring prior to the Effective Date, and subject to and in accordance in all respects with the terms of the D&O Liability Insurance Policies, all directors and officers of the Debtor who served in such capacity at any time prior to the Effective Date will be entitled from the insurers to the full benefits of any such D&O Liability Insurance Policy, if any, including any prepaid extended reporting period, regardless of whether such directors and officers remain in such positions after the Effective Date.

As of the Effective Date, NewCo will be authorized to procure and maintain directors' and officers' liability insurance policies for the benefit of its directors, officers, members, trustees and managers in the ordinary course of business.

## E.    Executory Contracts and Unexpired Leases

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, all Executory Contracts and Unexpired Leases will be deemed automatically rejected as of the Effective Date in accordance with sections 365 and 1123 of the Bankruptcy Code, other than (a) Executory Contracts or Unexpired Leases that, as of the Effective Date, are the subject of a pending motion to assume, or for which a notice of assumption has been filed pursuant to the assumption and assignment procedures approved by the Bankruptcy Court, (b) any Executory Contract or Unexpired Leases listed in the Schedule of Assumed Executory Contracts and Unexpired Leases, or (c) have been previously assumed, assumed and assigned or rejected by the Debtor.

Entry of the Confirmation Order by the Bankruptcy Court will constitute an order approving the assumptions, assumption and assignment, or rejections, as applicable, of such Executory Contracts and Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.

Executory Contracts and Unexpired Leases assumed pursuant to the Plan or by Bankruptcy Court order will revest in and be fully enforceable by NewCo or the Liquidating

Trust in accordance with their terms, except as such terms may have been modified by the Debtor and the applicable counterparty, or by order of the Bankruptcy Court.  To the maximum extent permitted by Law, the transactions contemplated by the Plan will not constitute a "change of control" or "assignment" (or terms with similar effect) under any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan, or any other transaction, event, or matter that would (a) result in a violation, breach or default under such Executory Contract or Unexpired Lease, (b) increase, accelerate or otherwise alter any obligations, rights or liabilities of the Debtor, the Liquidating Trust or NewCo, as applicable, under such Executory Contract or Unexpired Lease, or (c) result in the creation or imposition of a Lien upon any property or asset of the Debtor, the Liquidating Trust or NewCo, as applicable, pursuant to the applicable Executory Contract or Unexpired Lease. Any consent or advance notice required under such Executory Contract or Unexpired Lease in connection with assumption or assumption and assignment thereof will be deemed satisfied by Confirmation. Any provision of any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan that requires (i) the consent or approval of one or more lessors or other parties, or (ii) the payment of any fees or obligations, in order for the Debtor to pledge, grant, sell, assign, or otherwise transfer any such Executory Contract or Unexpired Lease, or the proceeds thereof, or other collateral related thereto, will be deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provisions of any such Executory Contracts or Unexpired Leases will have no force and effect with respect to the pledge, grant, sale, assignment, or other transfer thereof, or the proceeds thereof, or other collateral related thereto, in accordance with the terms of the Plan.

In connection with the transfer and vesting of any Debtor's investments assets in the Liquidating Trust or NewCo, any related investment agreements, including shareholder and lockup agreements, will be deemed assumed and assigned to the applicable transferee and deemed listed as an Executory Contract on the Schedule of Assumed Executory Contracts and Unexpired Leases.

The Debtor or the Liquidating Trust, as applicable, reserves the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases, including to add or remove any Executory Contracts and Unexpired Leases, at any time up to and including forty-five (45) days after the Effective Date upon notice to the affected counterparty.

### 2.    Objections to and Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

To the extent a monetary default exists under an Executory Contract or Unexpired Lease proposed to be assumed or assumed and assigned pursuant to the Plan, such monetary default will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the applicable Cure Cost by the Debtor, NewCo or the Liquidating Trust, as applicable, on the Effective Date or promptly thereafter, in the ordinary course of business, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.

Objections to the assumption of any Executory Contract or Unexpired Lease or any applicable Cure Cost will be made in accordance with the Solicitation Procedures Order.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise will result in the full release and satisfaction of any Claims held by the non-Debtor Entity party thereto against, or defaults, including bankruptcy-related defaults, by, the Debtor arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of the assumption; *provided*, *however*, that the counterparty to such Executory Contract or Unexpired Lease may seek additional amount(s) on account of any defaults occurring between the filing of the notice of assumption and the occurrence of the Effective Date of the Plan.

Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed will be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

**3.      Modifications, Amendments, Supplements, Restatements or Other Agreements**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed, assumed and assigned, or rejected will include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case will not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims or Interests that may arise in connection therewith.

**4.      Reservation of Rights**

Nothing contained in the Plan, nor the Debtor's delivery of a notice of proposed assumption of a contract or lease to the applicable contract and lease counterparties, will constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor, NewCo or the Liquidating Trust would have any liability thereunder.

Notwithstanding any non-bankruptcy law to the contrary, the Debtor, NewCo or the Liquidating Trust expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the Debtor from counterparties to rejected Executory Contracts or Unexpired Leases.

**F.       Provisions Governing Distributions**

**1.       Distribution Agents**

        The Debtor, in its reasonable discretion (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed), or, after the Effective Date, the Liquidating Trust (and, with respect to the distribution of NewCo Common Stock, NewCo), in their respective sole discretion, will have the authority, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder.  To the extent the Debtor or the Liquidating Trust, as applicable, determines to utilize a Distribution Agent to facilitate any distributions, such Distribution Agent would first be required to:  (i) affirm its obligation to facilitate the prompt distribution of any documents, (ii) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan and (iii) waive any right or ability to set off, deduct from or assert any Lien or other encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent.

        Notwithstanding any provision in the Plan to the contrary, distributions to the Holders of Senior Note Claims and Subordinated Note Claims will be made to or at the direction of the respective Indenture Trustees, which will act as Distribution Agent (or direct the Distribution Agent) for distributions to the Holders of Senior Note Claims and Subordinated Note Claims, respectively, in accordance with the Plan and the applicable Indentures.

        The Debtor or the Liquidating Trust, as applicable, may pay to the Distribution Agents all of their reasonable and documented fees and expenses without the need for any approvals, authorizations, actions or consents of the Bankruptcy Court or otherwise.  At the request of counsel to the Debtor or the Liquidating Trust, as applicable, Distribution Agents will submit detailed invoices to counsel to the Debtor or the Liquidating Trust for all fees and expenses for which the Distribution Agents seek reimbursement, and the Debtor or the Liquidating Trust, as applicable, will pay those amounts that it, in its sole discretion, deems reasonable, and will object in writing to those fees and expenses, if any, that the Debtor or the Liquidating Trust, as applicable, deem to be unreasonable.  In the event that the Debtor or the Liquidating Trust, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtor or the Liquidating Trust, as applicable, and such Distribution Agent will endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtor or the Liquidating Trust, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party will be authorized to move to have such dispute heard by the Bankruptcy Court.

**(a)       Powers of the Distribution Agent**

        The Distribution Agent will be empowered to:  (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby, (iii) employ professionals to represent it with respect to its responsibilities and (iv) exercise such other powers as may be vested in the

Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

**2.        Timing and Delivery of Distributions**

**(a)        Timing**

Except as otherwise expressly provided herein, distributions to be made under the Plan will be made on (i) the later of (a) the Effective Date and (b) the date that a Claim or Interest becomes an Allowed Claim or Interest, or (ii) such other date that is determined by the Debtor (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed) or, after the Effective Date, the Liquidating Trust, in accordance with the Plan. The Liquidating Trust may commence distributions to beneficiaries of the Estate at any time after the Effective Date, subject to the terms of the Plan, the Liquidating Trust Agreement and the Confirmation Order.

**(b)        *De Minimis* Distributions**

Notwithstanding any other provision of the Plan, none of the Debtor, the Liquidating Trust or any Distribution Agent will have any obligation to make any distributions under the Plan with a value of less than $50, unless a written request therefor is received by the Distribution Agent from the relevant recipient within 120 days after the later of (i) the Effective Date and (ii) the date such Claim or Interest becomes an Allowed Claim or Interest. Such undistributed amounts will revert to the Debtor or the Liquidating Trust, as applicable. Upon such reversion, the relevant Allowed Claim or Interest of less than $50 (and any Claim or Interest on account of such *de minimis* distributions) will be automatically deemed satisfied, discharged, and forever barred, notwithstanding any federal or state escheat laws to the contrary. For the avoidance of doubt, Section 10.2.2 of the Plan will not apply to Distributions to any Holder of an Allowed General Unsecured Claim who timely elects to receive the GUC Cash-Out option.

**(c)        Record Date and Delivery of Distributions**

Distributions will only be made to the record holders of Allowed Claims and Interests as of the Confirmation Date (the "Distribution Record Date"). On the Confirmation Date, the Claims Register and Stock Register will be closed and the Distribution Agent will be authorized and entitled to recognize only those Holders of Claims and Interests listed on the Claims Register and Stock Register as of the close of business on the Confirmation Date. Notwithstanding the foregoing, if a Claim or Interest is transferred twenty (20) or fewer days before the Confirmation Date, the Distribution Agent, at the direction of the Debtor or, after the Effective Date, the Liquidating Trust, will make distributions to the transferee (rather than the transferor) only to the extent practical, and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. The Distribution Record Date will not apply to publicly held securities deposited with DTC and, in connection with any Distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtor, NewCo or the Liquidating Trust, as applicable, will be entitled to recognize and deal for

all purposes under the Plan with Holders of Claims and Interests in each Class to the extent consistent with the customary practices of DTC used in connection with such distributions.

If any dispute arises as to the identity of a Holder of an Allowed Claim or Interest that is entitled to receive a distribution pursuant to the Plan, the Distribution Agent may, in lieu of making such distribution to such Entity, make the distribution into an escrow account until the disposition thereof is determined by Final Order or by written agreement among the interested parties to such dispute. Distributions made after the Confirmation Date to Holders of Disputed Claims or Interests that are not Allowed Claims or Interests as of the Confirmation Date, but which later become Allowed Claims or Interests, will be deemed to have been made on the Confirmation Date.

Except as otherwise provided herein, the Distribution Agent, at the direction of the Debtor or the Liquidating Trust, as applicable, will make all Distributions required under the Plan to Holders of Allowed Claims or Interests. Except as otherwise provided herein, and notwithstanding any authority to the contrary, Distributions to Holders of Allowed Claims or Interests will be made to Holders of record as of the Confirmation Date by the Distribution Agent, as appropriate: (i) to the signatory set forth on any Proof of Claim filed by such Holder or other representative identified therein (or at the last known address of such Holder if no Proof of Claim is filed or if the Debtor, the Liquidating Trust or the Distribution Agent have been notified in writing of a change of address) or (ii) at the address set forth in any written notice of change of address delivered to the Notice and Claims Agent. The Distribution Agent and the Notice and Claims Agent will not incur any liability whatsoever on account of the delivery of any Distributions under the Plan.

## 3.    Manner of Payment Under the Plan

### (a)    Cash Payments

At the Distribution Agent's option, any Cash payment may be made by check, wire transfer or any other customary payment method.

### (b)    Notes Distribution

As applicable, the Indenture Trustees may transfer or direct the transfer of such Distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with the respective Holders of such Claims to the extent consistent with the customary practices of DTC.

For the avoidance of doubt, DTC will be considered a single Holder with respect to Distributions made on account of the Senior Note Claims and Subordinated Note Claims. The Indenture Trustees will have no duties, responsibilities, or liability relating to any form of Distribution that is not DTC eligible, *provided* that the Indenture Trustees will use commercially reasonable efforts to cooperate with the Debtor, the Liquidating Trust, or NewCo, as applicable, to the extent that a Distribution is not DTC eligible.

Notwithstanding anything to the contrary herein, such Distributions will be subject in all respect to any rights of the Indenture Trustees to assert a charging lien against such Distributions. All Distributions to be made to Holders of Senior Note Claims and Subordinated Note Claims through DTC will be made eligible for Distributions through the facilities of DTC and, for the avoidance of doubt, under no circumstances will the Indenture Trustees be responsible for making or required to make any Distribution under the Plan to Holders of Senior Note Claims and Subordinated Note Claims if such Distribution is not eligible to be distributed through the facilities of DTC.

Upon the final distribution on account of the Senior Note Claims or Subordinated Note Claims, (i) the Senior Notes or Subordinated Notes, as applicable, will thereafter be deemed to be worthless, and (ii) at the request of the respective Indenture Trustee, DTC will take down the relevant position relating to the Senior Notes or Subordinated Notes, as applicable, without any requirement of indemnification or security on the part of the Debtor, the Liquidating Trust, NewCo, or the Indenture Trustees.

### (c)    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Claim entitled to a distribution under the Plan is based upon any obligation or instrument that is treated for U.S. federal income tax purposes as indebtedness of the Debtor and accrued but unpaid interest thereon, such distribution will be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### (d)    Compliance Matters

In connection with the Plan, to the extent applicable, the Debtor, NewCo, the Liquidating Trust and the Distribution Agent will comply with all Tax withholding and reporting requirements imposed on them by any federal, state, local or foreign Tax law, and all distributions pursuant hereto will be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtor, NewCo, the Liquidating Trust and the Distribution Agent will be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind, liquidating a portion of the distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. For purposes of the Plan, any withheld amount (or property) paid to the applicable Tax Authority will be treated as if paid to the applicable claimant. The Liquidating Trust reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances. Distributions in full or partial satisfaction of Allowed Claims will be allocated first to trust fund-type taxes, then to other taxes, and then to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that has accrued on such Claims. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a Distribution pursuant to the Plan will have responsibility for any Taxes imposed by any Governmental Unit, including income, withholding, and other Taxes, on account of such

Distribution.  Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, not to make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder will reimburse such party.  The Distribution Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply with such a request within one hundred and eighty (180) days after the request is made, the amount of such Distribution will irrevocably revert to the Debtor or the Liquidating Trust and any Claim in respect of such Distribution will be discharged and forever barred from assertion against the Debtor, the Liquidating Trust or its respective property.

(e)      <b>Foreign Currency Exchange Rate</b>

Except as otherwise provided herein or in an order of the Bankruptcy Court, or as agreed to by any Holder and either the Debtor (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed) or, after the Effective Date, the Liquidating Trust, any Claim or Interest asserted in a currency other than U.S. dollars will be automatically deemed converted, as of the Effective Date, to the equivalent U.S. dollar value using the exchange rate on the first Business Day prior to the Petition Date, as quoted at 4:00 p.m. (New York time), at the mid-range spot rate of exchange for the applicable foreign currency as published in *The Wall Street Journal*, National Edition, on the first Business Day after the Petition Date; *provided* that instead of such automatic conversion, the Debtor may instead elect, subject to the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties (not to be unreasonably withheld, conditioned or delayed) to make payments on account of any such Claim or Interest pursuant to the Plan in the applicable foreign currency.

(f)      <b>Fractional Payments and Distributions</b>

Whenever the Plan would otherwise call for, with respect to a particular Entity, payment of a fraction of a dollar, the actual payment will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash to be distributed under the Plan remain undistributed as a result of the aforementioned rounding, such Cash will be treated as an Unclaimed Distribution.

(g)      <b>Fractional Shares or Units</b>

No fractional shares of NewCo Common Stock or fractional units of Liquidating Trust Interest will be distributed under the Plan.  When any distribution pursuant to the Plan on account of an Allowed Claim or Interest would otherwise result in the issuance or delivery of a number of shares of NewCo Common Stock or a number of units of Liquidating Trust Interest that is not a whole number, the actual distribution of shares of NewCo Common Stock or units of Liquidating Trust Interest will be rounded to the next lower whole number with no further payment or other distribution therefor (i.e., no consideration will be provided in lieu of fractional shares of NewCo Common Stock or fractional units of Liquidating Trust Interests that are rounded down).  The total number of shares of NewCo Common Stock or units of Liquidating

-73-

Trust Interest to be distributed to holders of Allowed Claims and Interests will be adjusted downward as necessary to account for the rounding provided in Section 10.3.7 of the Plan. For distribution purposes, including rounding, DTC will be treated as a single Holder.

### 4.    Undeliverable Distributions

If any distribution is returned as undeliverable, (i) the Debtor or the Liquidating Trust, as applicable, may, but will not be required to, make reasonable efforts to determine the address for such Holder and (ii) no further distribution to such Holder will be made unless and until the Liquidating Trust or the Distribution Agent is notified in writing of the then-current address of such Holder, at which time such distribution will be made to such Holder not less than 30 days thereafter. Undeliverable distributions will remain in the possession of the Liquidating Trust or the Distribution Agent until such time as such distribution becomes deliverable or such distribution reverts to the Liquidating Trust, or is canceled pursuant to Section 10.5 of the Plan, and will not be supplemented with any interest, dividends or other accruals of any kind.

### 5.    Reversion

Any distribution under the Plan that is an Unclaimed Distribution for a period of six months thereafter, will be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution will revest in the Liquidating Trust; *provided*, *however*, that any Unclaimed Distributions consisting of NewCo Common Stock shall, after such six month period, promptly be transferred to NewCo, without any further notice to, action, order or approval of the Bankruptcy Court or by any other Entity. Upon such revesting or such transfer, the Claim or Interest of any Holder or its successors and assigns with respect to such property will be canceled, discharged and forever barred, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary. The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions will apply with equal force to distributions that are issued by the Liquidating Trust, NewCo or the Distribution Agent made pursuant to any indenture or Certificate, notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned or unclaimed property law.

### 6.    Claims or Interests Paid by Third Parties

No distributions under the Plan will be made on account of an Allowed Claim that is payable under one of the Debtor's Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.

Except as otherwise provided in the Plan, payments to Holders of Claims covered by an Insurance Policy and otherwise payable under the Plan will be made from the proceeds of such Insurance Policy in accordance with the provisions of any such applicable Insurance Policy. Nothing contained in the Plan will constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including Insurers, nor will anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by Insurers.

To the extent a Creditor receives a payment on account of a Claim from a party that is not the Debtor, the Liquidating Trust, NewCo or a Distribution Agent on account of such Claim, the Debtor or the Liquidating Trust, as applicable, will be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim by the amount of the third-party payment, and such Claim will be disallowed or deemed satisfied, as applicable, to the extent of such third-party payment without an objection having to be filed, but subject to the filing of a notice with the Bankruptcy Court and service of such notice on any affected Creditor.  Any Creditor that receives full or partial payment on account of such Claim from an Entity that is not the Debtor, the Liquidating Trust, NewCo or a Distribution Agent will provide notice of the date and amount of such payment to the Debtor or, after the Effective Date, the Liquidating Trust and NewCo within five (5) Business Days of receipt of such payment.  Such Creditor will repay and/or return to the Debtor or, after the Effective Date, the Liquidating Trust or NewCo any Distribution received on account of the portion of its Claim that was satisfied by such third-party payment within thirty (30) days.

**7.      Setoffs**

Except as otherwise provided herein, a Final Order of the Bankruptcy Court, or as agreed to by the Holder and the Liquidating Trust or NewCo, each as applicable, pursuant to the Bankruptcy Code (including section 553 thereof), applicable non-bankruptcy law, or such terms as may be agreed to by the Holder and the Liquidating Trust or NewCo, as applicable, the Liquidating Trust or NewCo, as applicable, may, without any further notice to, or action, order or approval of the Bankruptcy Court, set off against any Allowed Claim or Interest and the distributions to be made on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any claim, right and Cause of Action of any nature that the Liquidating Trust or NewCo, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such claim, right or Cause of Action against such Holder has not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided* that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan will constitute a waiver or release by the Debtor, the Liquidating Trust or NewCo, as applicable, of any such Claims or Interests, rights and Causes of Action that the Debtor or the Liquidating Trust may possess against or in such Holder.  In no event will any Person or Entity be entitled to set off any Claim or Interest against any Claim or Interest, right, or Cause of Action of the Debtor, the Liquidating Trust or NewCo, as applicable, in any judicial or administrative proceeding, unless such Person or Entity has filed a Proof of Claim in this Chapter 11 Case preserving such setoff and a Final Order of the Bankruptcy Court has been entered, authorizing and approving such setoff.

**8.      No Postpetition Interest on Claims**

Unless otherwise specifically provided for in the Plan or the Confirmation Order, required by applicable law, or agreed to by the Debtor or, after the Effective Date, the Liquidating Trust or NewCo, as applicable, no Holder of a Claim or Interest against the Debtor will be entitled to interest accruing on or after the Petition Date with respect to such Claim or Interest, notwithstanding any dispute or other delay with respect to any distribution.  For the avoidance of doubt, the foregoing does not apply to any interest accretion on the Liquidating Trust Interests provided under the Plan.

9.      **No Payment Over the Full Amount; Single Satisfaction**

In no event will a Holder of a Claim or Interest receive more than the full payment of such Claim or Interest.  To the extent any Holder has received payment in full with respect to a Claim or Interest, such Claim or Interest will be expunged without an objection to such Claim or Interest having been filed and without any further notice to or action, order or approval of the Bankruptcy Court.

G.      **Settlement, Release, Injunction and Related Plan Provisions**

1.      **Vesting of Assets**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan or in the Confirmation Order, upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtor will vest in NewCo or its subsidiaries or the Liquidating Trust (or entities to be formed by the Liquidating Trust), as applicable, in accordance with the Plan and the Restructuring Transactions Memorandum, free and clear of all Claims, Liens, encumbrances, charges and Interests.  All Liens, Claims, encumbrances, charges and Interests will be deemed fully released and discharged as of the Effective Date, except as otherwise provided in the Plan or the Confirmation Order.  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, each of NewCo and the Liquidating Trust may, as applicable, operate its businesses and may use, acquire, and dispose of property and the Liquidating Trust may settle and compromise Claims and Interests, in each case without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code with respect to the Debtor.

The transfer of information to the Liquidating Trust will not result in the destruction or waiver of any applicable work product, attorney-client, or other applicable privilege (the "Privileges").  Further, with respect to any Privileges:  (i) Privileges are transferred to the Liquidating Trust to the extent necessary to enable the Liquidating Trust Board to perform its duties to administer the Liquidating Trust and for no other reason, (ii) such Privileges will be preserved and not waived (except as the Liquidating Trust Board may affirmatively elect to waive such Privileges), and (iii) no information subject to a Privilege will be publicly disclosed by the Liquidating Trust or communicated to any Person not entitled to receive such information or in a manner that would diminish the protected status of any such information, except following a waiver of such Privilege pursuant to (ii) above or pursuant to the specific terms of the Plan and the Confirmation Order and the Liquidating Trust Agreement.

2.      **Compromise and Settlement of Claims and Controversies**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions, releases and other benefits provided pursuant to the Plan, upon the Effective Date, the provisions of the Plan will constitute a good-faith compromise of all Claims, Interests, Causes of Action and controversies relating to the contractual, legal and subordination rights that a Holder of an Allowed Claim or Interest may

have against the Debtor, or any distribution to be made on account of such an Allowed Claim or Interest. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtor and its Estate and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice or action, order or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trust may compromise and settle Claims against it and Causes of Action against other entities.

### 3.    Subordinated Claims

The allowance, classification and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account, conform to, and satisfy the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto; *provided*, *however*, that the Debtor and the Liquidating Trust reserve the right to reclassify or modify the treatment of any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto, unless otherwise provided in a settlement agreement concerning such Allowed Claim or Interest. For the avoidance of doubt, the Distributions to the Holders of Subordinated Note Claims under the Plan are in settlement and compromise of any contractual, legal and equitable subordination rights relating to such Subordinated Note Claims, and all claims to turnover, release or payment of such Distributions are expressly waived hereby.

### 4.    Release of Liens

Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement or document created pursuant to the Plan or the Confirmation Order, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, indefeasible payment and satisfaction in full in cash of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate will be fully released, settled, discharged and compromised, and all rights, titles and interests of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate will revert to the Debtor and its successors and assigns, in each case, without any further approval of the Bankruptcy Court and without any action or filing being required to be made by the Debtor. The Debtor, or after the Effective Date, the Liquidating Trust will be authorized to file any necessary or desirable documents to evidence such release in the name of the party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges or other security interests. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department will constitute good and sufficient evidence of, but will not be required to effect, the termination of such Liens.

5.      **Discharge**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Restructuring Transactions Memorandum, the Confirmation Order or in any contract, instrument, or other agreement or document created pursuant to the Plan or the Confirmation Order, the distributions, rights, and treatments that are provided in the Plan or the Confirmation Order will be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims against, Interests in, and Causes of Action against the Debtor, NewCo and the Liquidating Trust of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against Liabilities of, Liens on, obligations of, rights against, and interests in, the Debtor or any of its assets or properties, regardless of whether any property will have been distributed or retained pursuant to the Plan and the Confirmation Order on account of such Claims or Interests, including demands, Liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case, whether or not (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtor or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the chapter 11 cases will be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order will be a judicial determination of the discharge of all Claims against, Causes of Action against, and Interests in the Debtor, NewCo or the Liquidating Trust, subject to the occurrence of the Effective Date.

6.      **Term of Injunction or Stays**

Unless otherwise provided herein, any injunction or stay arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code or otherwise that is in existence on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) will remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.  All injunctions or stays contained in the Plan or the Confirmation Order will remain in full force and effect in accordance with their terms.

7.      **Release by the Debtor**

**For good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate the administration of the Chapter 11 Case and the implementation of the transactions contemplated by the Plan, on and after the Effective Date, each of the Released Parties including the Debtor Released Parties but excluding each other Related Party of the Debtor will be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever, and permanently released and discharged by the Debtor, NewCo, the Liquidating Trust and the Debtor's Estate, including any successor and assign to the Debtor, NewCo, the Liquidating Trust or any**

Estate representative, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims, in each case asserted or assertable on behalf of the Debtor, NewCo or the Liquidating Trust, and their respective successors, assigns, and representatives, or that any Entity or party claiming under or through the Debtor or its Estate, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including those that any of the Debtor, NewCo, the Liquidating Trust or the Debtor's Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or any other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, NewCo, the Liquidating Trust, the Estate, the conduct of the businesses of the Debtor, the Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any security of the Debtor, NewCo or the Liquidating Trust, the release or discharge of any mortgage, lien or security interest, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the administration of Claims and Interests prior to or during the Chapter 11 Case, the negotiation, formulation, preparation, dissemination, implementation, administration, confirmation and/or effectuation of the RSA (and each prior version thereof), the Plan, any plan supplement, any disclosure statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to intercompany claims and intercompany settlements, any action or omission as an officer, director, agent, representative, fiduciary, controlling Person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of such Released Party to the extent such act or omission is determined by a final order in a court of competent jurisdiction to have constituted gross negligence, willful misconduct, fraud, or a criminal act. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Releases in Section 12.7 of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan and, further, will constitute the Bankruptcy Court's finding that the Debtor Release in Section 12.7 of the Plan is: (a) given in exchange for good and valuable consideration provided by the applicable Released Parties, including the applicable Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good-faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtor and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and

opportunity for hearing; (f) a bar to the assertion by the Debtor, NewCo, the Liquidating Trust, or the Debtor's Estate of any claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release; (g) essential to the Confirmation of the Plan; and (h) a prudent exercise of the Debtor's business judgment.

Notwithstanding the foregoing, nothing contained in Section 12.7 of the Plan will be deemed to release any Retained Causes of Action, including any Claims and Causes of Action against any Debtor Related Parties other than those Debtor Related Parties identified on Exhibit [•] to the Plan.

8.      **Exculpation**

Upon entry of the Confirmation Order, each of the Exculpated Parties will be deemed to have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and in a manner consistent with the Disclosure Statement, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations in connection with all of their respective activities relating to support and consummation of the Plan, including the negotiation, execution, delivery, and performance of the RSA and are entitled to the protections of section 1125(e) of the Bankruptcy Code and all other applicable protections and rights provided in the Plan. Without limiting the generality of the foregoing, upon entry of the Confirmation Order, the Debtor and its directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring advisors and other professional advisors, representatives and agents will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with the solicitation.

As of the Effective Date, to the fullest extent permissible under any applicable laws and without affecting, expanding or limiting the releases contained in Section 12 of the Plan, and except as otherwise provided herein, the Exculpated Parties will neither have nor incur any liability arising on or after the Petition Date to any Entity for any act or omission in connection with, relating to or arising out of (i) this Chapter 11 Case; (ii) the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation and/or consummation of the RSA (and each prior version thereof), any disclosure statement, the Plan, any plan supplement, and any related contract, instrument, release or other agreement or document created or entered into in connection therewith (including the solicitation of votes for the Plan or other actions taken in furtherance of confirmation or consummation of the Plan, including the issuance of any securities under or in connection with the Plan) or in connection with any other obligations arising under the Plan or the obligations assumed hereunder; or (iii) the settlement of Claims or renegotiation of Executory Contracts or Unexpired Leases, other than liability resulting from any act or omission that is determined by final order in a court of competent jurisdiction to have constituted gross negligence, willful misconduct, fraud or a criminal act.  In all respects, such Entities will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; *provided*,

*however*, that nothing in the Plan or Confirmation Order will relieve the Exculpated Parties from their obligations under postpetition transactions, agreements or instruments that have not been expressly canceled by the Plan.

Notwithstanding the foregoing, nothing contained in Section 12.8 of the Plan will be deemed to exculpate any party from liability with respect to any Retained Causes of Action or other Claims or Causes of Action related to actions or inactions occurring prior to the Petition Date, including any Claims and Causes of Action against any Debtor Related Parties other than those Debtor Related Parties identified on Exhibit [•] to the Plan.

9.      **Voluntary Release by Holders of Claims and Interests**

For good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate the administration of the Chapter 11 Case, the implementation of the reorganization contemplated by the Plan, the release of mortgages, liens and security interests on property of the Estate, and distributions made pursuant to the Plan, on and after the Effective Date, to the fullest extent permitted by applicable law, the Releasing Parties (regardless of whether a Releasing Party is a Released Party), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, will be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtor, NewCo or the Liquidating Trust and any of its or their successors, assigns, and representatives, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtor, NewCo, the Liquidating Trust or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, NewCo, the Liquidating Trust, the Estate, the conduct of the businesses of the Debtor, this Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any security of the Debtor, NewCo or the Liquidating Trust, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the administration of Claims and Interests prior to or during this Chapter 11 Case, the negotiation, formulation, preparation, dissemination, implementation, administration, confirmation and/or effectuation of the RSA (and each prior version thereof), the Plan, any plan supplement, any disclosure statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to intercompany claims or intercompany settlements, any action or omission as an officer, director, agent, representative, fiduciary, controlling Person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent

such act or omission is determined by a final order in a court of competent jurisdiction to have constituted gross negligence, willful misconduct, fraud, or a criminal act.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not constitute a release by the Debtor of any of its Related Parties other than the Debtor Released Parties nor will they release any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Section 12.9 of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, will constitute the Bankruptcy Court's finding that the releases set forth in Section 12.9 of the Plan is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released pursuant to Section 12.9 of the Plan; (e) in the best interests of the Debtor and its Estate; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action of any kind whatsoever released pursuant to Section 12.9 of the Plan.

For the avoidance of doubt, notwithstanding anything to the contrary in Section 12.9 of the Plan, the releases set forth above will not release the rights of Holders of Allowed Claims to receive the treatment of their Claims as provided in the Plan and otherwise to enforce the terms of the Plan, all of which rights are fully preserved.

10.    Injunction

Except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons or Entities who have held, hold or may hold (i) Claims or Interests that arose prior to the Effective Date, (ii) Causes of Action that have been released pursuant to Sections 12.7 and 12.9 of the Plan or are subject to exculpation pursuant to Section 12.8 of the Plan (but only to the extent of the exculpation provided in Section 12.8 of the Plan), or (iii) Claims, Interests or Causes of Action that are otherwise discharged, satisfied, stayed, or terminated pursuant to the terms of the Plan and all other parties-in-interest seeking to enforce such Claims, Interests or Causes of Action are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim (including a Section 510(b) Claim) against or such Interest in the Debtor, NewCo or the Liquidating Trust, or property of the Debtor, NewCo or the Liquidating Trust, other than to enforce any right to a distribution pursuant to the Plan, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor, NewCo or the Liquidating Trust or property of the Debtor, NewCo or the Liquidating Trust with respect to any such Claim or Interest, other than to enforce any right to a

distribution pursuant to the Plan, (c) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Debtor, NewCo or the Liquidating Trust, or against the property or interests in property of the Debtor, NewCo or the Liquidating Trust with respect to any such Claim or Interest, other than to enforce any right to a distribution pursuant to the Plan, or (d) asserting any right of setoff (except for setoffs validly exercised prepetition) or subrogation of any kind against any obligation due from the Debtor, NewCo or the Liquidating Trust, or against the property or interests in property of the Debtor, NewCo or the Liquidating Trust, with respect to any such Claim or Interest.  Such injunction will extend to any successors or assignees of the Debtor, NewCo or the Liquidating Trust and their respective properties and interests in properties.

With respect to claims or Causes of Action that have not been released, discharged, or are not subject to exculpation, no Person or Entity may commence or pursue a claim or Cause of Action of any kind against the Debtor, NewCo, the Liquidating Trust, any Exculpated Party, or any Released Party that relates to any act or omission occurring from the Petition Date to the Effective Date in connection with, relating to, or arising out of, in whole or in part, the Chapter 11 Case (including the filing and administration thereof), the Debtor, the governance, management, transactions, ownership, or operation of the Debtor, the purchase, sale, exchange, issuance, termination, repayment, extension, amendment, or rescission of any debt instrument or security of the Debtor, NewCo, or the Liquidating Trust, the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party, the restructuring of any Claim or Interest before or during the Chapter 11 Case, any other in- or out-of-court restructuring efforts of the Debtor; any intercompany transactions, any Restructuring Transaction, the RSA, the formulation, preparation, dissemination, negotiation, or filing of the RSA and the Definitive Documents, or any other contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, or any of the other Definitive Documents, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), without the Bankruptcy Court (a) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim and (b) specifically authorizing such Entity to bring such Claim or Cause of Action.  To the extent the Bankruptcy Court would have jurisdiction over such colorable Claim or Cause of Action, the Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate such underlying Claim or Cause of Action should it permit such Claim or Cause of Action to proceed.

11.    **Scope of Releases**

Each Person providing releases under the Plan, including the Debtor, NewCo, the Liquidating Trust, the Debtor's Estate and the Releasing Parties, will be

deemed to have granted the releases set forth in the Plan notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of such release.

For the avoidance of doubt, nothing herein, including the releases, waivers, and exculpations provided in Sections 12.7–12.9 of the Plan, will constitute a release, waiver, discharge, or limitation of any kind of (i) any Retained Causes of Action, including any Claims or Causes of Action against Debtor Related Parties other than those Debtor Related Parties identified on Exhibit [•] to the Plan or (ii) any rights, liabilities, or obligations arising under the Plan or any other agreement, document or instrument executed in connection with the Plan.

Notwithstanding any language to the contrary contained in this Disclosure Statement, the Plan or the Confirmation Order, no provision of the Plan will (i) preclude the SEC from enforcing its police or regulatory powers or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceeding or investigations against any non-Debtor (other than NewCo or the Liquidating Trust) in any forum; *provided* that the foregoing sentence does not (x) limit the scope of discharge granted to the Debtor, NewCo or the Liquidating Trust under sections 524 and 1141 of the Bankruptcy Code or (y) diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code.

As to any Specified Governmental Unit, nothing in the Plan or the Confirmation Order limits or expands the scope of discharge, release or injunction to which the Debtor, NewCo or the Liquidating Trust are entitled to under the Bankruptcy Code, if any.  The discharge, release, and injunction provisions contained in the Plan and the Confirmation Order are not intended and should not be construed to bar any Specified Governmental Unit from, subsequent to the entry of the Confirmation Order, pursuing any police or regulatory action (except to the extent the applicable Bar Date bars the Specified Governmental Unit from pursuing prepetition Claims).

Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, nothing in the Plan or the Confirmation Order will discharge, release, impair or otherwise preclude: (1) any liability to any Specified Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of any Specified Governmental Unit arising on or after the Effective Date; (3) any valid right of setoff or recoupment of any Specified Governmental Unit against the Debtor; or (4) any liability of the Debtor, NewCo or the Liquidating Trust under police or regulatory statutes or regulations to any Specified Governmental Unit as the owner, lessor, lessee or operator of property that such Person or Entity owns, operates or leases after the Confirmation Date.  Nor will anything in the Confirmation Order or the Plan:  (i) enjoin or otherwise bar any Specified Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any

**court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by any Specified Governmental Unit are discharged or otherwise barred by the Confirmation Order, the Plan or the Bankruptcy Code.**

**Moreover, nothing in the Confirmation Order or the Plan will release or exculpate any non-Debtor, including any Released Parties and/or Exculpated Parties but excluding the Debtor, NewCo or the Liquidating Trust, from any liability to any Specified Governmental Unit, including but not limited to any liabilities arising under the IRC, the environmental laws, or the criminal laws, nor will anything in the Confirmation Order or the Plan enjoin any Specified Governmental Unit from bringing any claim, suit, action or other proceeding against any non-Debtor (other than NewCo or the Liquidating Trust) for any liability whatsoever; *provided* that the foregoing sentence will not (x) limit the scope of discharge granted to the Debtor, NewCo or the Liquidating Trust under sections 524 and 1141 of the Bankruptcy Code or (y) diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code.**

**Nothing contained in the Plan or the Confirmation Order will be deemed to determine the tax liability of any Person or Entity, including but not limited to the Debtor, NewCo or the Liquidating Trust, nor will the Plan or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution or entity, including the federal tax consequences of this Plan, nor will any language in the Plan or the Confirmation Order be deemed to expressly expand or diminish the jurisdiction of the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment under the Bankruptcy Code and 28 U.S.C. §§ 157, 1334.**

12.    **Preservation of Causes of Action**

Except as expressly provided in Section 12 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtor, NewCo or the Liquidating Trust may have or that the Debtor, NewCo or the Liquidating Trust, as applicable, may choose to assert on behalf of the Estate under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including (i) any and all Causes of Action or Claims against any Person or Entity, to the extent such Person or Entity asserts a cross-claim, counterclaim and/or claim for setoff that seeks affirmative relief against the Debtor, NewCo or the Liquidating Trust, and in each case, its officers, directors or representatives or (ii) the turnover of any property of the Estate to the Debtor, NewCo or the Liquidating Trust.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor, NewCo or the Liquidating Trust, as applicable, will not pursue any and all available Causes of Action against them.  The Debtor, NewCo or the Liquidating Trust expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.

Except as set forth in Section 12 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment

of any rights or Causes of Action that the Debtor had immediately prior to the Petition Date or the Effective Date against or regarding any Claim or Interest left Unimpaired by the Plan. The Liquidating Trust will have, retain, reserve, and be entitled to assert all such rights and Causes of Action, including any actions specifically enumerated in the Schedule of Retained Causes of Action, as fully as if the Chapter 11 Case had not been commenced, and all of the Liquidating Trust's legal and equitable rights respecting any Claim or Interest left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.

Except as set forth in Section 12 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order will be deemed to release any post-Effective Date obligations of any party under the Plan, or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, including pursuant to Section 12 of the Plan or a Final Order, the Liquidating Trust expressly reserves all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches will apply to such Causes of Action upon, after, or as a consequence of the Confirmation or occurrence of the Effective Date.

## H.    Conditions Precedent

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied on or prior to the Effective Date or waived in accordance with Section 13.2 of the Plan:

i.      The RSA shall not have been terminated, and shall remain in full force and effect, and no event or occurrence shall have occurred that, with the passage of time or the giving of notice, would give rise to the right of the Required Ad Hoc Senior Noteholder Parties or the UCC to terminate the RSA;

ii.     All Definitive Documents for the Restructuring Transactions contemplated by the RSA to be executed and delivered on or before the Effective Date shall have been executed and delivered and remain in full force and effect;

iii.    The Bankruptcy Court shall have entered the Confirmation Order which shall be a Final Order;

iv.     The Debtor shall have filed the final version of the Plan, including all of the schedules, documents, and exhibits contained therein, and the Plan Supplement in a manner consistent in all material respects with the RSA and the Plan;

v.      The Debtor shall have obtained all applicable authorizations, consents, regulatory approvals, rulings, or documents that are necessary to

implement and effectuate the Plan (and all applicable waiting periods have expired);

vi.     The Debtor shall have implemented the Restructuring Transactions and all other transactions contemplated in the RSA (subject to, and in accordance with, the consent rights set forth therein) and the Plan to be implemented on or before the Effective Date;

vii.    No governmental entity or federal or state court of competent jurisdiction has enacted, issued, promulgated, enforced or entered any law or order (whether temporary, preliminary or permanent), in any case which is in effect and which prevents or prohibits consummation of the Plan, and no governmental entity has instituted any action or proceeding (which remains pending at what would otherwise be the Effective Date) seeking to enjoin, restrain or otherwise prohibit consummation of the transactions contemplated by the Plan;

viii.   All Ad Hoc Noteholder Group Expenses, Senior Note Trustee Expenses and Subordinated Note Trustee Expenses have been paid in full in Cash as provided in the RSA;

ix.     All professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses in full after the Effective Date shall have been placed in a professional fee escrow account as set forth in, and in accordance with, the Plan; and

x.      All Claims asserted by the IRS or any other Tax Authority shall have been resolved in a manner acceptable to the Required Ad Hoc Senior Noteholder Parties and the UCC or estimated by the Bankruptcy Court for the purpose of Plan distributions at an amount acceptable to the Required Ad Hoc Senior Noteholder Parties and the UCC.

Except as set forth in the Plan and the RSA, the Debtor, with the prior written consent (e-mail being sufficient) of the Required Ad Hoc Senior Noteholder Parties and the UCC, may waive any of the conditions set forth in Section 13.1 of the Plan at any time, without any notice to any other parties-in-interest or the Bankruptcy Court and without any formal action other than proceeding to confirm and/or consummate the Plan.  The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## ARTICLE V.

## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code include: (i) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and

equitable" as to the rejecting Impaired Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that: (i) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (ii) the Debtor has complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (iii) the Plan has been proposed in good faith.

The following is a brief summary of the process of the Confirmation of the Plan. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

## A.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing at which the Debtor will seek confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to the Confirmation of the Plan.

**THE CONFIRMATION HEARING IS SCHEDULED TO BE HELD ON JUNE [25], 2024 AT [10]:00 A.M. EASTERN TIME, BEFORE THE HONORABLE MARTIN GLENN, CHIEF UNITED STATES BANKRUPTCY JUDGE. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTOR WITHOUT FURTHER NOTICE OTHER THAN BY ANNOUNCEMENT IN OPEN COURT AND/OR NOTICE(S) OF ADJOURNMENT FILED ON THE DOCKET WITH THE BANKRUPTCY COURT'S PERMISSION.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE APPLICABLE PARTIES SO AS TO BE ACTUALLY RECEIVED ON OR BEFORE 4:00 P.M. EASTERN TIME ON JUNE [18], 2024 IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER, THEY WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## B.    Confirmation Standards

To confirm the Plan, the Bankruptcy Court must find that the requirements of section 1129 of the Bankruptcy Code have been satisfied. The Debtor believes that section 1129 has been satisfied because, among other things:

a.    the Plan complies with the applicable provisions of the Bankruptcy Code;

b.    the Debtor, as plan proponent, has complied with the applicable provisions of the Bankruptcy Code;

c.      the Plan has been proposed in good faith and not by any means forbidden by law;

d.      any payment made or promised under the Plan for services or for costs and expenses in or in connection with this Chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

e.      with respect to each Class of Impaired Claims or Interests, each Holder of a Claim or Interest in such Class has either accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code (*see* Article V.C—*Best Interests Test*);

f.      each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such class pursuant to section 1129(b) of the Bankruptcy Code;

g.      except to the extent that the Holder of a certain Claim under section 3.1.1 of the Plan has agreed or will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative Expense Claims will be paid in full in Cash on the Effective Date;

h.      except to the extent that a holder of an Allowed Other Priority Claim has agreed to a different treatment of such Claim, each such Holder will receive Cash in an amount equal to the Allowed amount of such Claim, or treatment in any other manner so that such Claim will otherwise be rendered Unimpaired, (a) on the Effective Date or as soon as reasonably practicable thereafter; (b) if an Other Priority Claim is Allowed after the Effective Date, on the date such Other Priority Claim is Allowed or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtor or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court;

i.      except to the extent that the applicable Holder of an Allowed Priority Tax Claim has been paid by the Debtor before the Effective Date, or such Holder agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim will receive, on account of such Allowed Priority Tax Claim, at the option of the Debtor or, after the Effective Date, the Liquidating Trust (i) payment in full in Cash made (a) on or as soon as reasonably practicable after the Effective Date or (b) on the date such payment is due in the ordinary course of business, (ii) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other amounts and in such other manner as may be

determined by the Bankruptcy Court to provide the Holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim;

j.      at least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class;

k.      Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan (*see* <u>Article V.D</u>—*Financial Feasibility*); and

l.      all fees payable under section 1930 of title 28 of the United States Code will be paid as of the Effective Date of the Plan.

## C.      Best Interests Test

### 1.      Explanation of the Best Interests Test

Pursuant to section 1129(a)(7) of the Bankruptcy Code, Confirmation of the Plan requires that, with respect to each Class of Impaired Claims or Interests, each Holder of a Claim or Interest in such Class either (a) accepts the Plan or (b) receives or retains under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code (this latter clause is known as the "<u>Best Interests Test</u>").

To determine the probable distribution to Holders of Claims and Interests in each Impaired Class if the Debtor was liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation.

The Debtor's chapter 7 liquidation value would consist primarily of the cash held by the Debtor at the time of the conversion to a chapter 7 liquidation, the proceeds resulting from the sale of the Debtor's remaining assets and properties by a chapter 7 trustee and Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised or settled. The gross cash proceeds available for distribution would be reduced by the costs and expenses of the chapter 7 liquidation and any additional Administrative Expense Claims that might arise as a result of the chapter 7 cases. Costs and expenses incurred as a result of the chapter 7 liquidation would include, among other things, the fees payable to a trustee in bankruptcy and the fees payable to attorneys and other professionals engaged by such trustee. Additional Administrative Expense Claims could arise by reason of, among other things, the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtor during the pendency of the Chapter 11 Case. Such Administrative Expense Claims and any other Administrative Expense Claims that might arise in a liquidation case or

result from this Chapter 11 Case, such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Claims.

To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a chapter 7 liquidation of the Debtor's assets and properties, after subtracting the amounts attributable to the costs, expenses and Administrative Expense Claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired Classes under the Plan.  If the hypothetical chapter 7 liquidation distribution to Holders of Claims or Interests in any non-consenting Impaired Class is greater than the distributions to be received by such parties under the Plan, then the Plan is not in the best interests of the Holders of Claims or Interests in such Impaired Class.

## 2.    The Debtor's Liquidation Analysis

Amounts that a Holder of Claims and Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtor prepared by the Debtor's management with the assistance of their restructuring advisors, and attached to this Disclosure Statement as Appendix B (the "Liquidation Analysis").

As described in the Liquidation Analysis, underlying this analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtor's management, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the Debtor's control.  The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change.  Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis.

The Liquidation Analysis was developed solely for purposes of the formulation and negotiation of the Plan and to enable Holders of Claims or Interests entitled to vote under the Plan to make an informed judgment about the Plan, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtor or any of its affiliates.

Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner.  The Debtor does not intend and does not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events.  Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of actual future results.

In deciding whether to vote to accept or reject the Plan, Holders of Claims or Interests must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

### 3. Application of the Best Interests Test to the Liquidation Analysis of the Debtor

Notwithstanding the difficulties in quantifying with precision the recoveries to Holders of Claims and Interests, the Debtor believes that, based on a comparison between the recoveries under the Plan and the Liquidation Analysis, the Debtor's proposed Plan satisfies the requirements of the Best Interests Test. As the Plan and the Liquidation Analysis indicate, Confirmation of the Plan will provide each Holder of an Allowed Claim or Interest in an Impaired Class with a recovery that is equal to or greater than the value of distributions to Holders in such Class if the Chapter 11 Case was converted to a case under chapter 7 of the Bankruptcy Code. Under the Plan, Holders of Allowed Administrative Expense Claims, Priority Tax Claims, Other Secured Claims and Other Priority Claims will receive payment in full on their Claims on the Effective Date or as soon thereafter as their Claims are Allowed. Thus, all Holders of such Claims are in the same or better position under the Plan as they would be in a liquidation under chapter 7. Similarly, Holders of Allowed Senior Note Claims and Other General Unsecured Claims (other than such Holders that timely elect to receive the GUC Cash-Out) will receive a combination of Liquidating Trust Interests and NewCo Common Stock, with an estimated recovery that exceeds the projected recovery to Holders of such Claims in a chapter 7 liquidation, as set forth in the Liquidation Analysis. Further, Holders of Allowed Subordinated Note Claims and Preferred Equity Interests will also receive Liquidating Trust Interests under the Plan, which will enable them to receive distributions from the Liquidating Trust after the distribution preference (including, for the avoidance of doubt, any accretion thereto) of the Class A Trust Units has been satisfied in full, and in the case of Holders of Allowed Preferred Equity Interests, after the distribution preference (including, for the avoidance of doubt, any accretion thereto) of the Class B Trust Units has also been satisfied in full. As reflected in the Liquidation Analysis, the recovery to the Holders of such Claims and Interests is the same or better than the recovery than it would be in a case under chapter 7. Finally, under either the Plan or in a liquidation under chapter 7, Holders of Common Equity Interests are expected to receive no recovery on account of their Interests, and accordingly, Holders of such Common Equity Interests are in the same position as they would be in a case under chapter 7.

Further, a chapter 7 liquidation would require the Debtor's Estate to incur additional costs and expenses, including fees payable to the chapter 7 trustee and fees that may be payable to attorneys or other professionals retained by the chapter 7 trustee. Such costs and expenses would be paid in full from the proceeds of the liquidation of the Debtor's Estate in chapter 7, if any, before the balance of those proceeds would be made available to Holders of Allowed Claims and Interests.

Finally, liquidating the Debtor's Estate under chapter 7 would not provide a timely distribution to Holders of Allowed Claims and Interests because of the potential added time and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtor's Estate.

Accordingly, the Debtor believes that the Plan will allow the realization of greater value for their respective Impaired Classes than a hypothetical liquidation.

D.      **Financial Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation of the Plan, that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Debtor or the need for further financial reorganization, unless such liquidation or reorganization is contemplated by the Plan.

To determine whether the Plan meets this feasibility requirement, the Debtor, with the assistance of its advisors, has analyzed its ability to meet its obligations under the Plan.  As part of this analysis, the Debtor has prepared projected consolidated balance sheet, income statement, and statement of cash flows for NewCo (the "NewCo Financial Projections") which, together with the assumptions on which they are based, are set forth in Appendix D of this Disclosure Statement.  As further described below in Article V.G—*MoffettNathanson Valuation and NewCo and Liquidating Trust Asset Overviews*, the Debtor's advisors have also prepared valuation analysis for NewCo and the Liquidating Trust, include a projected balance sheet for the Liquidating Trust.  Creditors and other interested parties should review Article IX—*Certain Risk Factors to be Considered Prior to Voting* for a discussion of certain factors that may affect the future financial performance of NewCo and the Liquidating Trust.

Based upon the Financial Projections, the Debtor believes that NewCo will be a viable operation following the Chapter 11 Case, that NewCo and the Liquidating Trust will be able to make all payments required under the Plan, and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

E.      **Acceptance by Impaired Classes**

Except as described in Article V.F—*Confirmation Without Acceptance by All Impaired Classes*, the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each Impaired Class accept the Plan.  A class of claims that is unimpaired under the Plan is conclusively presumed to have accepted the Plan and, therefore, solicitation of acceptances with respect to such class is not required.  Under section 1124 of the Bankruptcy Code, a class is impaired under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met.  Under section 1126(d) of the Bankruptcy Code, a class of interests will have voted to accept the plan only if two-thirds in amount of the interests that actually vote to accept or reject the plan cast their ballots in favor of acceptance.  Holders of claims or interests who fail to vote are deemed neither to accept nor to reject the plan.

In addition to these voting requirements, section 1129 of the Bankruptcy Code requires that a plan be accepted by each Holder of a claim or interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each Holder of a claim or interest in such class.  *See* <u>Article V.C</u>—*Best Interests Test*.  Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code discussed below.  *See* <u>Article V.F</u>—*Confirmation Without Acceptance by All Impaired Classes* below.

## F.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, provided that the Plan has been accepted by at least one Impaired Class of creditors. Notwithstanding the failure of an Impaired Class to accept the Plan, the Plan will be confirmed in a procedure commonly known as cram-down, so long as the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan.  Pursuant to Section 6.5 of the Plan, the Debtor reserves the right to seek confirmation under section 1129(b) of the Bankruptcy Code if necessary.

### 1.    Unfair Discrimination

The Plan does not "discriminate unfairly" for the purposes of section 1129 of the Bankruptcy Code if the Plan gives substantially equivalent treatment to each Class of equal rank; in determining whether a plan discriminates unfairly, courts take into account a number of factors, including the effect of applicable subordination agreements between parties.

### 2.    Fair and Equitable

The "fair and equitable" test applies to Classes of different priority and status and includes the general requirement that no Class of Claims or Interests receive more than 100 percent of the amount of the Allowed Claims or Interests in the Class. As to the dissenting Class, the test sets different standards depending upon the type of Claims or Interests in the Class.

The condition that the Plan be fair and equitable includes the following requirements as applicable:

      a.    with respect to a non-accepting Class of Secured Claims, that:  (i) the Holders of such Secured Claims retain the Liens securing such Claims to the extent of the Allowed amount of the Secured Claims, whether the property subject to the liens is retained by the Debtor or transferred to another entity under the Plan, (ii) each Holder of a Secured Claim in the Class receives deferred cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date, at least equivalent to the value of such Secured Claim Holder's interest in the Debtor's property subject to the Liens, or (iii) the property securing the Secured Claim is sold free and clear of Liens with such Liens to attach to the proceeds of the sale, and such Liens on proceeds to receive treatment consistent with clause (i) or (ii) above;

b.      with respect to a non-accepting Class of General Unsecured Claims, that either:  (i) the Plan provide that each Claim Holder in such Class receive or retain, on account of such Claim, property of a value, as of the Effective Date, equal to the Allowed amount of such Claim or (ii) no Holder of any Claim or Interest that is junior to the Claims or Interests of such Class receive or retain any property under the Plan on account of such junior Claim or Interest; and

c.      with respect to a non-accepting Class of Interests, that either:  (i) the Plan provide that each Holder of an Interest in such Class receive or retain under the Plan, on account of such Interest, property of a value, as of the Effective Date, equal to the greater of:  (1) the Allowed amount of any fixed liquidation preference to which such Holder is entitled; (2) any fixed redemption price to which such Holder is entitled or (3) the value of such Interest or (ii) if the Class does not receive property in the amount required under (i), no Class of Interests junior to the non-accepting Class receive a distribution under the Plan.

**3.      Confirmation of the Plan Pursuant to Section 1129(b)**

The Debtor may seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class presumed to reject the Plan, and reserves the right to do so with respect to any other rejecting Class of Claims, and/or modify the Plan subject to the consent rights set forth in the RSA.  Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation of the Plan by the acceptance of the Plan by at least one Class that is Impaired under the Plan.

The Debtor submits that the Plan does not "discriminate unfairly" for the purposes of section 1129(b) of the Bankruptcy Code.  The Debtor believes that, under the Plan, all impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  Accordingly, the Debtor believes that the Plan does not discriminate unfairly as to any impaired Class of Claims or Interests.

The Debtor submits that the Plan is "fair and equitable" for the purposes of section 1129(b) of the Bankruptcy Code because, as set forth above and in the Plan, the Holders of Claims in Classes 5 (Preferred Equity Interests), 6 (Common Equity Interests), 7 (Section 510(b) Claims) and 8 (Intercompany Claims and Intercompany Interests) may not receive a distribution equal to the Allowed amount of their Claims or Interests, as applicable, but no Holders of Claims or Interests junior to these Classes will receive a distribution under the Plan on account of such junior Claims or Interests.

Therefore, the requirements of section 1129(b) of the Bankruptcy Code would be satisfied in the event that the Debtor is required to cram down.

G.       **MoffettNathanson Valuation and NewCo and Liquidating Trust Asset Overviews**

The Debtor's advisors have prepared an analysis of the projected assets of NewCo and the Liquidating Trust as of June 30, 2024 (under the headings "NewCo Value Overview" and "Liquidating Trust Assets", respectively, which is attached to this Disclosure Statement as Appendix F. In addition to the projections with respect to NewCo and Liquidating Trust Assets, the Debtor's investment banker, Centerview, has prepared an independent valuation analysis with respect to the value of MoffettNathanson LLC, which is included in Appendix F under the heading "MoffettNathanson Valuation Analysis" (the "Valuation Analysis"). The Valuation Analysis should be considered in conjunction with the Risk Factors discussed in Article IX– *Certain Risk Factors to be Considered Prior to Voting*, and the Financial Projections. Holders of Claims and Interests should carefully review the information in Appendix F in its entirety.

H.       **Classification**

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divides the different claims (excluding administrative claims and certain other categories of claims) against, and equity interests in, a debtor into separate classes based upon their legal nature. Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtor believes that the Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan. Accordingly, the classification of Claims and Interests in the Plan complies with section 1122 of the Bankruptcy Code.

## ARTICLE VI.

## VOTING PROCEDURES

On [•], the Bankruptcy Court entered an order, among other things, approving this Disclosure Statement, approving procedures for soliciting votes on the Plan, approving the form of the solicitation documents and various other notices, setting the Voting Record Date (as defined below), the Voting Deadline, the Release Election Deadline (as defined below) and the date of the Confirmation Hearing and establishing the relevant objection deadlines and procedures associated with Confirmation of the Plan, including the proposed assumption or assumption and assignment of certain of the Debtor's Executory Contracts and Unexpired Leases (the "Solicitation Procedures Order").[29]

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan and make any other elections or representations required pursuant to the Plan. To ensure your vote is counted, you must complete, date, sign, and promptly mail the Ballot enclosed with the notice to the Solicitation Agent or complete your Ballot using the online portal maintained by the Solicitation Agent, or if you are a Beneficial Holder of Claims or

---

[29]    Capitalized terms in this Article VI not otherwise defined in this Disclosure Statement or the Plan will have the meanings ascribed to them in the Solicitation Procedures Order.

Interests in Classes 3(a), 4 or 5 who has received a Beneficial Holder Ballot, you must return the Beneficial Holder Ballot to your Nominee, in each case indicating your decision to accept or reject the Plan in the boxes provided.

As described in <u>Article IV.G</u>—*Settlement, Release, Injunction and Related Plan Provisions* herein and Section 12 of the Plan, Holders of Claims or Interests that vote to accept the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties.

The Ballot and Election Forms contain an election for a Holder who rejects the Plan, a Holder abstaining from voting on the Plan, or a Holder deemed to accept the Plan, to opt out of the third-party releases contained in Section 12.9 of the Plan.  All Holders of Claims or Interests (i) that vote to reject the Plan or (ii) that abstain from voting on the Plan, and do not affirmatively opt out of the third-party releases provided by the Plan by checking the box on the applicable Ballot indicating that they opt not to grant the third-party releases provided in the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties.  Holders of Claims or Interests deemed to accept the Plan and who do not affirmatively opt out of the third-party releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt out of the third-party releases provided in the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties.

Holders of Class 3(b) Other General Unsecured Claims may elect to receive the GUC Cash-Out in an amount equal to 45% of the lesser of (a) the Allowed amount of such Claim and (b) $11,000,000.  To the extent an Other General Unsecured Claim exceeds $11,000,000, the Holder of such Claim electing to receive the GUC Cash-Out agrees to reduce such Claim to $11,000,000; *provided*, *however*, that an Other General Unsecured Claim originally Allowed in an amount in excess of $11,000,000 may not be sub-divided into multiple claims of $11,000,000 or less and receive the GUC Cash-Out; *provided further*, that a Holder's GUC Cash-Out election may not be modified, withdrawn or provided at a later date.  A Holder's election as set forth on its Ballot shall be binding.  In making the GUC Cash-Out election, the applicable Holder acknowledges that by electing to receive the GUC Cash-Out, such Holder's treatment is in lieu of any other treatment such Holder may have received as a Holder of a Class 3(b) Other General Unsecured Claim pursuant to Section 4.2.4 of the Plan.  **If an eligible Holder of an Other General Unsecured Claim fails to complete the GUC Cash-Out election, set forth on Item 3 of the applicable Ballot, or fails to return such Ballot in accordance with the procedures set forth in the Solicitation Procedures Order by the deadlines provided therein, such Holder will be deemed to have irrevocably relinquished and waived its right to receive the GUC Cash-Out.**

The notices of non-voting status for Holders of Claims or Interests that are deemed to reject the Plan contains an election to opt in to the third-party releases contained in Section 12.9 of the Plan.  Holders of Claims or Interests that are deemed to reject the Plan but who affirmatively opt in to the third-party releases provided by the Plan by checking the box on the applicable Election Form indicating that they opt in to grant the third-party releases provided in the Plan.

The Solicitation Procedures Order, a copy of which is attached hereto as Appendix C, should be read in conjunction with this Article VI—*Voting Procedures* of this Disclosure Statement.  For the purposes of Article VI—*Voting Procedures* of this Disclosure Statement, capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Solicitation Procedures Order.

If you have any questions about (i) the procedures for voting your Claim or with respect to the packet of materials that you have received or (ii) the amount of your Claim, please contact the Debtor's Solicitation Agent at https://restructuring.ra.kroll.com/svbfg/.  If you wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement or other solicitation documents, you can obtain them from the Debtor's case information website (located at https://restructuring.ra.kroll.com/svbfg/) or by requesting a copy from the Debtor's Solicitation Agent, who can be reached at (833) 570-5297 (Domestic, Toll-Free), +1 (646) 440-4782 (International), or by email at svbinfo@ra.kroll.com.

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code.  In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law and, under Bankruptcy Rule 3020(b)(2), it may make such a determination without receiving evidence if no objection is timely filed.

In particular, and as described in more detail below, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that:  (a) the Plan has been accepted by the requisite votes of all Classes of Impaired Claims unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes; (b) the Plan is "feasible," meaning there is a reasonable probability that the Debtor will be able to perform its obligations under the Plan; and (c) the Plan is in the "best interests" of all Holders of Claims and Interests, meaning that all such Holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

The Bankruptcy Court must find that all conditions mentioned above are met before it can confirm the Plan.  Thus, even if all classes of Impaired Claims accept the Plan by the requisite votes, the Bankruptcy Court must still make an independent finding that the Plan satisfies these requirements of the Bankruptcy Code, that the Plan is feasible, and that the Plan is in the best interests of the Holders of Claims against and Interests in the Debtor.

UNLESS THE BALLOT BEING FURNISHED IS TIMELY RECEIVED BY THE SOLICITATION AGENT ON OR PRIOR TO 5:00 P.M. EASTERN TIME ON JUNE [17], 2024, TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED TO BE SUBMITTED WITH SUCH BALLOT, THE DEBTOR WILL REJECT SUCH BALLOT AS INVALID AND, ACCORDINGLY, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THE DEBTOR RESERVES THE RIGHT, IN ITS SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW ANY SUCH BALLOTS TO BE COUNTED.  IN NO CASE SHOULD A BALLOT OR ANY OF THE CERTIFICATES BE DELIVERED TO THE DEBTOR OR ANY OF ITS ADVISORS.

A.      **Parties-in-Interest Entitled to Vote**

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless:  (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is conclusively presumed to have accepted the plan, and the plan proponent need not solicit such holder's vote.  Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan.  For a detailed description of the treatment of Claims and Interests under the Plan, refer to <u>Article IV</u>—*Summary of the Plan*.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

B.      **Classes under the Plan**

1.      **Voting Classes**

Classes 3(a) (Senior Note Claims), 3(b) (Other General Unsecured Claims), 4 (Subordinated Notes Claims), and 5 (Preferred Equity Interests) are Impaired and entitled to receive distributions under the Plan and, thus, are entitled to vote to accept or reject the Plan. Consistent with the procedures described in the Solicitation Procedures Motion and below in <u>Article VI.D</u>—*Voluntary Releases under the Plan*, each Holder of a Claim or Interest in Classes 3(a), 3(b), 4 and 5 that does not vote in favor of the Plan will be given an opportunity to opt out of the voluntary release in Section 12.9 of the Plan.

2.      **Non-Voting Classes**

Claims in Classes 1 (Other Secured Claims) and 2 (Other Priority Claims), and, to the extent such Claims or Interests are reinstated, Class 8 (Intercompany Claims and Intercompany Interests) (such Classes, the "<u>Unimpaired Non-Voting Classes</u>"), are unimpaired and conclusively presumed under section 1126(f) of the Bankruptcy Code to accept the Plan and, accordingly, are not entitled to vote.  Consistent with the procedures described in the Solicitation Procedures Motion and below in <u>Article VI.D</u>—*Voluntary Releases under the Plan*, Holders of Claims or Interest in Unimpaired Non-Voting Classes will be given an opportunity to opt out of

the voluntary, third-party release in Section 12.9 of the Plan or indicate their consent to such release by abstaining from opting out.

Claims and Interests in Classes 6 (Common Equity Interests) and 7 (Section 510(b) Claims), and, to the extent such Claims or Interests are not reinstated, Class 8 (Intercompany Claims and Intercompany Interests) (the "Impaired Non-Voting Classes," and together with the Unimpaired Non-Voting Classes, the "Non-Voting Classes"), will not receive any distributions under the Plan and are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code and, accordingly, are not entitled to vote.  Consistent with the procedures described in the Solicitation Procedures Motion and below in Article VI.D—*Voluntary Releases under the Plan*, Holders of Claims or Interest in Impaired Non-Voting Classes will be given an opportunity to opt in to the voluntary third-party release in Section 12.9 of the Plan.

## C.    Form, Content, and Manner of Notices

### 1.    Solicitation Packages for Voting Classes

As set forth in the Solicitation Procedures Order, the Debtor will distribute, or cause to be distributed, a solicitation package to each Holder of a Claim entitled to vote on the Plan (a "Solicitation Package").  The Solicitation Packages will contain:

    a.  the cover letter to the Solicitation Package, which describes the contents of the Solicitation Package and recommends all Holders of Claims and Interests in the Voting Classes accept the Plan;

    b.  a letter prepared by the UCC recommending that all Holders of General Unsecured Claims and Subordinated Note Claims vote to accept the Plan, which is attached hereto as Exhibit C (the "Committee Letter");

    c.  the Confirmation Hearing Notice;

    d.  the Solicitation Procedures Order (without accompanying exhibits), as entered;

    e.  instructions detailing how to access copies of the Disclosure Statement and Plan on the Solicitation Agent's website and how to request hard copies of the Disclosure Statement and Plan;

    f.  the applicable Ballot with detailed voting instructions and a pre-addressed, postage pre-paid return envelope[30]; and

    g.  such other materials as the Bankruptcy Court may direct.

---

[30]   Service of the Solicitation Package by electronic mail to Holders for which email addresses are available, as well as to beneficial holders of Class 3(a) Senior Note Claims, Class 4 Subordinated Note Claims and Class 5 Preferred Equity Interests, will not contain a pre-addressed, postage pre-paid return envelope.

### 2.    Notices for Non-Voting Classes

Under section 1126(f) of the Bankruptcy Code, classes that are not impaired under a plan are deemed to accept the plan.  Classes 1 (Secured Claims) and 2 (Other Priority Claims) are Unimpaired under the Plan and deemed under section 1126(f) of the Bankruptcy Code to accept the Plan.  Classes 6 (Common Equity Interests) and 7 (Section 510(b) Claims) and 8 (Intercompany Claims / Intercompany Interests) are Impaired under the Plan and deemed to reject the Plan.  The votes of these respective Classes to accept or reject the Plan will not be solicited.

As set forth in the Solicitation Procedures Order, in lieu of a Solicitation Package, such Holders in Unimpaired Classes will only receive, within three business days after the Solicitation Procedures Order has been entered, (a) the Confirmation Hearing Notice (as defined in the Solicitation Procedures Order) and (b) a notice of unimpaired status, in each case by electronic service where possible (the "Notice of Unimpaired Status").  In addition, as set forth in the Solicitation Procedures Order, in lieu of a Solicitation Package, non-voting Holders in Classes 6 and 7 will only receive, on or before the Solicitation Mailing Deadline by electronic mail where possible, (a) the Confirmation Hearing Notice and (b) a notice of impaired non-voting status, in each case by electronic service where possible (together with the Notice of Unimpaired Status, the "Non-Voting Notices").

The Non-Voting Notices will provide the applicable Holders with instructions for viewing or obtaining a copy of the Plan, Disclosure Statement and Order, as required by Bankruptcy Rule 3017(d).  In addition, the Non-Voting Notices will include an election form annexed to such notice (the "Election Form") to permit Holders to opt in to or out of the voluntary, third-party release in Section 12.9 of the Plan, as further described below in Article VI.D—*Voluntary Releases under the Plan.*  The Election Form contains the full text of the voluntary, third-party release in Section 12.9 of the Plan and provides instructions for opting in to or out of such release.  The deadline for Holders of Claims and Interests to opt in to or out of the voluntary, third-party release contained in Section 12.9 of the Plan is June [17], 2024 at 5:00 p.m. Eastern Time (the "Release Election Deadline").  The Election Form also includes clear instructions regarding how to submit the Election Form and a pre-addressed, postage pre-paid return envelope.

Election Forms received after the Release Election Deadline will not be considered for purposes of determining whether such Holders have elected to opt in to or out of the voluntary, third-party release contained in Section 12.9 of the Plan.

### D.    Voluntary Releases under the Plan

The voluntary, third-party release and injunction language in Section 12 of the Plan is described above in Article IV.G of this Disclosure Statement.

**HOLDERS OF CLAIMS OR INTERESTS WILL RECEIVE EITHER A BALLOT OR ELECTION FORM, IN EACH CASE, TO ALLOW SUCH HOLDER TO OPT OUT OF OR OPT IN TO THE VOLUNTARY, THIRD-PARTY RELEASE CONTAINED IN SECTION 12.9 OF THE PLAN BY CLEARLY MARKING THE "OPT**

OUT" OR "OPT IN" BOX, AS APPLICABLE, ON THE BALLOT OR ELECTION
FORM PROVIDED TO SUCH HOLDER.

HOLDERS OF CLAIMS IN CLASSES 1 AND 2 WILL EACH RECEIVE
AN ELECTION FORM ALLOWING SUCH HOLDERS TO OPT OUT OF THE
VOLUNTARY, THIRD-PARTY RELEASE CONTAINED IN SECTION 12.9 OF THE
PLAN BY CLEARLY MARKING THE "OPT OUT" BOX ON THE ELECTION FORM
PROVIDED TO SUCH HOLDER.

HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 3(A), 3(B), 4 OR 5
WILL EACH RECEIVE A BALLOT, WHICH WILL ALLOW HOLDERS WHO
(I) VOTE TO REJECT THE PLAN OR (II) ABSTAIN FROM VOTING ON THE PLAN,
TO OPT OUT OF THE VOLUNTARY, THIRD-PARTY RELEASE CONTAINED IN
SECTION 12.9 OF THE PLAN BY CLEARLY MARKING THE "OPT OUT" BOX ON
THE BALLOT PROVIDED TO SUCH HOLDER.

HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 6 AND 7 WILL
EACH RECEIVE AN ELECTION FORM ALLOWING SUCH HOLDERS TO OPT IN
TO THE VOLUNTARY, THIRD-PARTY RELEASE CONTAINED IN SECTION 12.9
OF THE PLAN BY CLEARLY MARKING THE "OPT IN" BOX ON THE ELECTION
FORM PROVIDED TO SUCH HOLDER.

ALL (I) HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 1 AND 2
WHO DO NOT PROPERLY CHECK THE "OPT-OUT" BOX ON A TIMELY
SUBMITTED ELECTION FORM, (II) HOLDERS OF CLAIMS OR INTERESTS IN
CLASSES 3(A), 3(B), 4 OR 5 WHO (X) VOTE TO REJECT THE PLAN OR
(Y) ABSTAIN FROM VOTING ON THE PLAN AND DO NOT PROPERLY CHECK
THE "OPT OUT" BOX ON A TIMELY SUBMITTED BALLOT, AND (III) HOLDERS
OF CLAIMS OR INTERESTS IN CLASSES 6 AND 7 WHO PROPERLY CHECK THE
"OPT-IN" BOX ON THE APPLICABLE AND TIMELY SUBMITTED ELECTION
FORM, WILL BE RELEASING PARTIES FOR PURPOSES OF SECTION 12.9 OF THE
PLAN.

The Debtor submits that the releases and accompanying opt-out procedures (as
described in this Article VI–*Voting Procedures*) are consistent with practices of courts in this
jurisdiction. Courts in this jurisdiction often find that releases pursuant to a settlement are
appropriate. *See*, *e.g.*, *In re Garrett Motion Inc.*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. Apr.
26, 2021), D.I. 1161 (approving releases pursuant to sections 363 and 1123(b)(3) of the
Bankruptcy Code and Bankruptcy Rule 9019); *In re Bally Total Fitness Holding Corp.*, 2007
WL 2779438, at *12 (Bankr. S.D.N.Y. Sept. 17, 2007) ("To the extent that a release or other
provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall
constitute an order under Bankruptcy Rule 9019 approving such compromise."); *In re Spiegel,
Inc.*, 2005 WL 1278094, at *11 (Bankr. S.D.N.Y. May 25, 2005) (approving releases pursuant to
section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a)). Furthermore, the
voluntary, third-party releases and accompanying opt out procedures are consistent with similar
elections that have been approved by courts in this district in similar situations. *See, e.g.*, *In re
Avianca Holdings S.A.*, 632 B.R. 124, 136 n.11 (Bankr. S.D.N.Y. 2021) (approving opt out

procedures with respect to third-party releases) (collecting cases); *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Nov. 9, 2023), D.I. 3972 (approving opt out procedures for certain classes); *In re Endo Int'l plc*, No. 22-22549 (JLG) (Bankr. S.D.N.Y. Jan. 12, 2024), D.I. 3549 (conditionally approving opt out procedures for certain classes).

Likewise, exculpation provisions that extend to non-estate fiduciaries are also regularly approved. *See, e.g.*, *In re Oneida Ltd.*, 351 B.R. 79, 94 n.22 (Bankr. S.D.N.Y. 2006) (considering an exculpation provision covering a number of prepetition actors with respect to certain prepetition actions, as well as postpetition activity); *In re Celsius Network LLC,* No. 22-10964 (MG) (Bankr. S.D.N.Y. Nov. 9, 2023) [D.I. 3972] (confirming plan which exculpated certain non-estate fiduciaries); *In re All Year Holdings Limited,* No. 21-12051 (MG) (Bankr. S.D.N.Y. Jan. 31, 2023) [D.I. 352] (approving plan exculpation provision providing for exculpation for certain non-estate fiduciaries); *In re Evergreen Garden Mezz LLC*, No. 21-10335 (MG) (Bankr. S.D.N.Y. Nov. 5, 2021) [D.I. 222] (same); *In re Avianca Holdings S.A.,* No. 20-11133 (MG) (Bankr. S.D.N.Y. Nov. 2, 2021) [D.I. 2300] (approving exculpation of both estate fiduciaries and non-estate fiduciaries); *In re Residential Cap. LLC*, Case No. 12-12020 (MG) 2013 WL 12161584, at *13 (Bankr. S.D.N.Y. Dec. 11, 2013) (approving exculpation for parties that were "instrumental to the successful prosecution of the Chapter 11 Cases or their resolution pursuant to the Plan, and/or provided a substantial contribution to the Debtors"); *see also* Tr. of Hr'g at 69, *In re Celsius Network LLC* [D.I. 3999] ("If [non-estate fiduciaries] are facing the threat of lawsuits by other disgruntled creditors who don't agree with what they did, it makes it very hard to achieve a consensual result. For those reasons, I think what historically may have been viewed as exculpation just for estate fiduciaries has extended beyond that to other active participants in the plan process. We may not agree with that, but I mean, that's what I think, where the law has moved"). In approving these provisions, courts consider a number of factors, including whether the beneficiaries of the exculpation have participated in good faith in negotiating in the plan and bringing it to fruition, and whether the provision is integral to the plan. *In re Bearing Point, Inc.*, 435 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decision makers."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (same), aff'd, *In re DBSD N. Am., Inc.*, No. 09-10156, 2010 WL 1223109 (S.D.N.Y. May 24, 2010), aff'd in part, rev'd in part, 634 F.3d 79 (2d Cir. 2011); *In re Bally Total Fitness Holding Corp.*, 2007 WL 2779438, at *8 (Bankr. S.D.N.Y. Sept. 17, 2007) (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31, 2003) (approving an exculpation provision where it "was an essential element of the [p]lan formulation process and negotiations"); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

**E.      Voting Procedures**

**1.      Ballots**

The record date for voting on the Plan is May [14], 2024 (the "Voting Record Date").  Accordingly, only Holders of Claims or Interests who have timely filed a Proof of Claim as of the Voting Record Date and that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

In voting for or against the Plan, please use (i) only the Ballot sent to you with this Disclosure Statement or (ii) the online electronic ballot portal.  If you are a Holder of a Claim in Class 3(a), 3(b), 4, or 5 and did not receive a Ballot, if your Ballot is damaged or lost or if you have any questions concerning voting procedures, please contact the Solicitation Agent at (833) 570-5297 (Domestic, Toll-Free), +1 (646) 440-4782 (International), or by email at svbinfo@ra.kroll.com.

If you are a Holder of an Other General Unsecured Claim in Class 3(b), you will receive a Ballot that includes an election option (in Item 3, titled "GUC Cash-Out Election") to elect to receive the GUC Cash-Out in an amount equal to 45% of the lesser of (a) the Allowed amount of such Claim and (b) $11,000,000.  To the extent the Other General Unsecured Claim amount listed in Item 1 of the Ballot exceeds $11,000,000, a Holder of such Claim may, by making the GUC Cash-Out election, agree to reduce such Claim to $11,000,000.  **In making the GUC Cash-Out election, the applicable Holder acknowledges that by electing to receive the GUC Cash-Out, such Holder's treatment is in lieu of any other treatment that such Holder may have received as a Holder of a Class 3(b) Other General Unsecured Claim pursuant to Section 4.2.4 of the Plan.**

**2.      Submitting Ballots**

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete and submit your Ballot in accordance with the instructions in your Ballot.

To be counted, all Ballots must be properly executed, completed and delivered by: (i) first-class mail (using the reply envelope provided in the Solicitation Package or otherwise), (ii) overnight mail, (iii) hand delivery or (iv) the online electronic ballot portal (as described on the Ballot), in each case so that they are actually received NO LATER THAN 5:00 P.M. EASTERN TIME ON JUNE [17], 2024 by the Solicitation Agent.  If you are submitting a Ballot via first-class mail, it should be sent to:

SVB Financial Group Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11233

If you are submitting a Ballot via hand delivery or overnight mail, it should be sent to:

SVB Financial Group Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11233

If you are submitting a Ballot via the online electronic ballot portal:
Visit the Solicitation Agent's website at https://restructuring.ra.kroll.com/svbfg/, click on the
["Submit E-Ballot, Opt Out or Opt In Form"] section of the Debtor's website and follow the
instructions to submit your electronic Ballot.

If you are a Beneficial Holder of Claims or Interests in Classes 3(a), 4 or 5 and
received a Beneficial Holder Ballot, you must return the Beneficial Holder Ballot to your
Nominee, in accordance with the instructions provided by your Nominee, who will then submit a
master ballot on your behalf.  Return the Beneficial Holder Ballot to your Nominee as promptly
as possible and in sufficient time to allow such Nominee to process your instructions and return a
completed master ballot to the Notice and Claims Agent by the Voting Deadline.

EACH NOMINEE SHOULD ADVISE ITS APPLICABLE HOLDERS TO RETURN THEIR
BENEFICIAL HOLDER BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY
THE NOMINEE TO ALLOW THE NOMINEE TO PREPARE AND RETURN THE MASTER
BALLOT TO THE NOTICE AND CLAIMS AGENT SO THAT IT IS ACTUALLY
RECEIVED BY THE NOTICE AND CLAIMS AGENT ON OR BEFORE THE VOTING
DEADLINE.

The method of delivery of Ballots to be sent to the Solicitation Agent is at the
election and risk of each Holder of a Claim or Interest.  Except as otherwise provided in the Plan,
such delivery will be deemed made only when Debtor's Solicitation Agent actually receives the
original executed Ballot.  In all cases, sufficient time should be allowed to assure timely delivery.
For submissions via first-class mail, overnight courier or hand delivery, original, executed
Ballots are required.  Ballots will not be accepted by facsimile transmission, electronic mail or
other electronic means of transmission (except via the Solicitation Agent's e-ballot platform).
Ballots received after the Voting Deadline will not be counted or considered for any purpose in
determining whether the Plan has been accepted or rejected.

Ballots must be signed, legible, and contain sufficient information to identify the
Holder of the Claim.

Ballots must be clearly marked to either accept or reject the Plan (but not both)
and may not partially accept or partially reject the Plan.

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-
fact, officer of a corporation or other person acting in a fiduciary or representative capacity, such
person must indicate such capacity when signing the Ballot and, if required or requested by the
Debtor's Solicitation Agent, the Debtor or the Bankruptcy Court, must submit proper evidence to
the requesting party to so act on behalf of such Holder.  In addition, you must provide your name
and mailing address if it is different from that set forth on the attached mailing label or if no such
mailing label is attached to this Ballot.

No Ballot should be sent to the Debtor, or the Debtor's financial or legal advisors, agents or representatives (other than the Solicitation Agent), and if so sent will not be counted. If no Holders of Claims or Interests in a particular Class that is entitled to vote on the Plan vote to accept or reject the Plan, then such Class will be deemed to accept the Plan.

Except as provided in the Solicitation Procedures Order and subject in all respect to the RSA, after the Voting Deadline, no Ballot may be withdrawn or modified without the prior consent of the Debtor.  If multiple Ballots are received from the same Holder with respect to the same Claim or Interest prior to the Voting Deadline, the last Ballot timely received will supersede and revoke any earlier received Ballots; *provided*, *however*, where ambiguity exists with respect to which Ballot was the latest dated, the Solicitation Agent has the right to determine the appropriate tabulation of such Ballot and to contact the respective Holder to determine such Holder's intent in connection therewith.

Subject to certain restrictions and requirements set forth in section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan and the RSA, the Debtor may alter, amend or modify the Plan, including the Plan Supplement, without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date.  After the Confirmation Date and before substantial consummation of the Plan, the Debtor may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, including the Plan Supplement, the Disclosure Statement or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and effects of the Plan.

Except as set forth in the Plan, after the Confirmation Date, but before the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan, including the Plan Supplement, without further order or approval of the Bankruptcy Court, subject to all applicable consent rights (including those set forth in the RSA); provided, that such adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or Interests and are otherwise permitted under section 1127(b) of the Bankruptcy Code.

Entry of a Confirmation Order shall mean that all modifications and amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code, and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 3. Voting

A Holder of a Claim or Interest entitled to vote on the Plan may vote to accept or reject the Plan only if no party-in-interest has objected to such Claim or Interest (or the Claim or Interest has been Allowed subsequent to any objection or estimated for voting purposes).

# ARTICLE VII.

## EFFECT OF CONFIRMATION

### A.    Binding Effect of Confirmation

Unless otherwise expressly provided in the Plan, Confirmation will bind the Debtor and all Holders of Claims and Interests to the provisions of the Plan, whether or not the Claim or Interest of any such Holder is impaired under the Plan and whether or not any such Holder of a Claim or Interest has accepted the Plan and will have the effect of converting all Claims and Interests into rights to receive the treatment specified in <u>Article IV</u>—*Summary of the Plan*.

### B.    Good Faith

Confirmation of the Plan will constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code and (ii) all solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

# ARTICLE VIII.

## SECURITIES LAW MATTERS

### A.    Bankruptcy Code Exemptions from Registration Requirements

#### 1.    Issuance

The Plan provides for the issuance of Liquidating Trust Interests and NewCo Common Stock (collectively, the "<u>Securities</u>") without registration under the Securities Act or any similar law in reliance upon section 1145 of the Bankruptcy Code to the extent such exemption is available (any Securities issued pursuant to section 1145, the "<u>1145 Securities</u>"). The Debtor believes that the Securities are "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and applicable state securities laws.  Except with respect to a Person that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code, section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.  The Debtor believes that the issuance and distribution of the 1145 Securities satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

To the extent that Persons who receive any Securities pursuant to the Plan are deemed to be "underwriters," the issuance of Securities to such Persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Section 1145(b)(1) of the Bankruptcy Code defines four types of "underwriters" (except with respect to "ordinary trading transactions" of an entity that is not an "issuer"):

(i) Persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

(ii) Persons who offer to sell securities offered under a plan for the Holders of such securities;

(iii) Persons who offer to buy such securities from the Holders of such securities, if the offer to buy is:

(A) with a view to distributing such securities and

(B) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(iv) a Person who is an "issuer" with respect to the securities as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an "underwriter" under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means to possess, directly or indirectly, the power to direct or cause to direct management and policies of a Person, whether through owning voting securities, contract, or otherwise.

Whether or not any particular Person would be deemed to be an "underwriter" with respect to the Securities or any other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtor expresses no view as to whether any particular Person receiving any Securities or other securities under the Plan would be an "underwriter" with respect to such Securities or other securities.

Persons who would otherwise be deemed to be "underwriters" may, however, receive securities without registration under the Securities Act or any similar law in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act and/or

Regulation D promulgated thereunder, to the extent such exemption is then available, as described in "Private Placement Exemption" below.

### 2.      Subsequent Transfers

To the extent section 1145 of the Bankruptcy Code is applicable, 1145 Securities to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) in general are freely tradable and transferable by any initial recipient thereof.  1145 Securities governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of the various states; however, the availability of such exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration in any given instance.  Notwithstanding the foregoing, any securities or instruments issued under the Plan in reliance on section 1145(a) of the Bankruptcy Code remain subject to:  (x) compliance with any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments; (y) the restrictions in the applicable NewCo Organizational Documents and the Liquidating Trust Agreement, as applicable, on the transferability of such securities and instruments[31] and (z) any other applicable regulatory approval.

## B.      Private Placement Exemptions

### 1.      Issuance

The Plan provides that, to the extent section 1145 of the Bankruptcy Code is not applicable, certain securities may be issued without registration under the Securities Act or any similar law in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder (the "4(a)(2) Securities").  To the extent such securities are issued pursuant to the Plan or the other Definitive Documents, the offering, issuance, exchange, or distribution of those securities will be conducted in a manner that is exempt from, among other things, the registration requirements of section 5 of the Securities Act.  Section 4(a)(2) exempts from section 5's registration requirements transactions not involving a public offering, and Regulation D provides a safe harbor under Section 4(a)(2) for transactions that meet certain requirements, including that the investors participating therein qualify as Accredited Investors.

Section 4(a)(2) provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act.

---

[31]    As described in Article IV.C.4(a)—*Implementation of the Plan* and Article X.A.4(a)(iv)—*Consequences to the Debtor*, in an attempt to minimize the likelihood of an additional ownership change occurring after the Effective Date, the charter of NewCo will contain a restriction limiting the accumulation (and disposition) of shares of persons (and certain groups acting in concert) owning (actually or constructively), or who would own (immediately before or after such acquisition), 4.99 percent of any class of stock of NewCo (with certain adjustments), and requiring approval of NewCo's Board for any such transfers.

Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act.

The issuance of 4(a)(2) Securities will be subject to the respective Blue Sky Laws of the various states; the availability of any Blue Sky Laws exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration in any given instance.

###   2.    Subsequent Transfers

Because the 4(a)(2) Securities would not be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, they would be deemed "restricted securities" (within the meaning of Rule 144 under the Securities Act) that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available.

The Debtor does not plan to register the 4(a)(2) Securities. Thus, persons who receive 4(a)(2) Securities will not be permitted to offer, sell or otherwise transfer their 4(a)(2) Securities except pursuant to an available exemption from registration.

All persons who receive 4(a)(2) Securities will be required to agree that they will not offer, sell or otherwise transfer any 4(a)(2) Securities other than pursuant to an effective registration statement under the Securities Act or an available exemption from registration thereunder.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period whether or not there is current public information regarding the issuer. Adequate current public information is available for a reporting issuer if the issuer has filed all periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934 during the twelve months preceding the sale of the restricted securities. If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available. The Debtor currently expects that NewCo will not be a reporting issuer and will make certain information publicly available to allow resales under Rule 144 by non-affiliates when the six-month holding period expires (approximately six months after the emergence date).

An affiliate may resell restricted securities after the six-month holding period if at the time of the sale certain current public information regarding the issuer is available. As noted above, the Debtor currently expects that this information requirement will be satisfied. The

affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the greater of 1% of the average weekly reported volume of trading in such restricted securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction.  The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted securities except in certain situations.  Third, if the sale exceeds 5,000 restricted securities or has an aggregate sale price greater than $50,000, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144.  The sale must occur within three months of filing the notice unless an amended notice is filed.

To the extent 4(a)(2) Securities are issued, the Debtor believes that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least six months after the Effective Date.  Accordingly, each holder of 4(a)(2) Securities would be required to hold its 4(a)(2) Securities for at least six months and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, unless such sale is made pursuant to an effective registration statement under the Securities Act.

To the extent 4(a)(2) Securities are issued, such securities will be issued  in uncertified form and each book-entry statement evidencing the 4(a)(2) Securities will bear a restrictive legend.  Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Security will be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], AND HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT PURSUANT TO THE EXEMPTION FROM REGISTRATION UNDER THE ACT PROVIDED BY RULE 144 THEREUNDER, WHEN AVAILABLE OR ANOTHER AVAILABLE EXEMPTION FROM REGISTRATION."

NewCo will reserve the right to require certification or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities.  NewCo will also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144 or another available exemption from registration.

Resales of 4(a)(2) Securities will be subject to the respective Blue Sky Laws of the various states; the availability of any Blue Sky Laws exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration in any given instance.

Any persons receiving "restricted securities" under the Plan, or any persons who believe they may be, or be deemed by the SEC to be, affiliates of the issuer of any applicable securities under the Plan, should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NEITHER THE DEBTOR NOR NEWCO MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN.  THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

## ARTICLE IX.

### CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS OR INTERESTS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**A.    Certain Bankruptcy Law Considerations**

**1.    General**

While the Debtor believes that the remainder of the Chapter 11 Case will be of relatively short duration, the Debtor cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Case it is impossible to predict with certainty the amount of time that the Debtor may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have a material adverse effect on the Debtor's business and the value of its Estate.  A delay in the bankruptcy proceedings will also involve additional expense and may divert some of the attention of the Debtor's management away from maximizing the value of the Estate.

### 2.    Plan Confirmation

The Debtor can make no assurances that it will receive the requisite acceptances to confirm that Plan or that the conditions to Confirmation will be satisfied or waived.  Further, if the requisite acceptances are not received, the Debtor may seek to accomplish an alternative restructuring and obtain acceptances to an alternative plan of reorganization for the Debtor or otherwise, that may not have the support of the Holders of Claims or Interests and/or may be required to liquidate these Estates under chapter 7 or 11 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Holders of Claims or Interests as those proposed in the Plan.

A non-accepting Holder of a Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it concludes that any of the statutory requirements for Confirmation have not been met.  If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtor will be able to restructure and what, if anything, Holders of Claims or Interests against the Debtor would ultimately receive with respect to their Claims or Interests.

The Debtor, subject to the terms and conditions of the Plan and the RSA, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Subject to the terms and conditions of the Plan and the RSA, any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to any such non-accepting Class, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 3.    Objections to Classification of Claims and Interests

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtor.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtor believes that all Claims and Interests have been appropriately classified in the Plan.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtor would, subject to the RSA, seek (i) to modify the Plan to provide for whatever classification might be required for Confirmation and (ii) to use the acceptances received from any Holder of Claims or Interests pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims or Interests, although subject to the notice and hearing requirements of the Bankruptcy Code, could materially adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There

can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtor will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

**4.** **Risks Related to Possible Objections to the Plan**

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. Although the Debtor believes that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party-in-interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

**5.** **Risk of Non-Approval by the Bankruptcy Court of the Restructuring Transactions**

There can be no assurance that the Debtor will be able to obtain approval and complete the proposed Restructuring Transactions, or any other significant reorganization transaction, including as a result of objections from our stakeholders. Such objections from stakeholders could result from stakeholders' preference for an alternative plan of reorganization.

If the Debtor is unable to complete the proposed Restructuring Transactions in the Chapter 11 Case, it may be necessary to seek additional funding sources, or convert from the chapter 11 reorganization process to a chapter 7 liquidation process. If the proposed Restructuring Transactions are completed, it may not generate the anticipated or desired outcomes (including with respect to consideration received).

Even if the Restructuring Transactions are implemented, the Debtor will continue to face a number of risks, including certain risks that are beyond the Debtor's control, such as changes in economic conditions and changes in the Debtor's industry. As a result, there is no guarantee that the Restructuring Transactions will achieve the Debtor's stated goals.

**6.** **Risk of Nonoccurrence of the Effective Date**

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As set forth in Section 13 of the Plan, the Effective Date of the Plan is subject to the satisfaction (or waiver) of a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place, and it is unclear what distributions, if any, Holders of Allowed Claims or Interests would receive with respect to their Allowed Claims or Interests.

7. **Closing of the Restructuring Transactions Is Dependent on a Number of Conditions that May Not Occur**

The closing of the Restructuring Transactions in connection with consummation of the Plan remains contingent on a number of conditions, including regulatory approvals if necessary. There is a risk that the Debtor will be unable to satisfy or waive all conditions to closing the Restructuring Transactions.

8. **Nonconsensual Confirmation**

In the event that any impaired class of claims or interests does not accept a Chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting class. The Debtor believes that the Plan satisfies these requirements, and the Debtor may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

9. **Plan Modifications**

The Debtor, subject to the terms and conditions of the Plan, reserves the right to modify the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any class junior to a non-accepting class than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

10. **Filing of a Competing Plan**

At the outset of a chapter 11 case, the Bankruptcy Code provides a debtor with the exclusive right to file a plan of reorganization and prohibits third parties from proposing a plan. The Debtor retained the exclusive right to propose the Plan through and including January 26, 2024, and the Debtor filed the Plan within the Debtor's exclusive filing period.

On April 24, 2024, the Debtor filed the *Debtor's Third Motion for an Order Extending the Exclusive Period During Which Only the Debtor May Solicit Acceptances of a Chapter 11 Plan* [D.I. 1060] (the "Third Exclusivity Extension Motion"), requesting a further extension of the exclusive period during which only the Debtor may solicit acceptances of a chapter 11 plan (the "Exclusive Solicitation Period") from April 25, 2024 for an additional 75 days through and including July 9, 2024, with an option, subject to the consent of certain creditor groups, to extend for an additional 30 days through and including August 8, 2024. Pursuant to Local Rule 9006-2, the Debtor's Exclusive Solicitation Period is automatically extended upon the filing of the Third Exclusivity Extension Motion until such motion is resolved. The Third Exclusivity Extension Motion is currently scheduled to be heard at the Debtor's omnibus hearing

on June 5, 2024. If the exclusivity period expires, or if the Bankruptcy Court terminates the Debtor's exclusive right, there may be a material adverse effect on the Debtor's ability to have the Plan confirmed, because third parties may prosecute competing plans.

### 11.    The Debtor May Object to the Amount or Classification of a Claim or Interest

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 12.    Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims or Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims or Interests to be subordinated to other Allowed Claims or Interests. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims or Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes. The estimated Claims or Interests and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims or Interests may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims or Interests may vary from the estimated Claims or Interests contained in this Disclosure Statement. Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims or Interests that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims or Interests under the Plan.

### 13.    The Debtor May Fail to Satisfy the Solicitation Requirements Requiring a Re-Solicitation

To satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), the Debtor will be delivering the Solicitation Package to all Holders of Claims and Interests as of the Voting Record Date in the Classes entitled to vote. Accordingly, the Debtor believes that the solicitation is proper under section 1125 of the Bankruptcy Code. The Debtor cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, the Confirmation of the Plan could be denied. If the Bankruptcy Court were to conclude that the Debtor did not satisfy the solicitation requirements, then the Debtor may seek to re-solicit votes to accept or reject the Plan or to solicit votes from one or more Classes that were not previously solicited. The Debtor cannot provide any assurances that such a re-solicitation would be successful. Re-solicitation

could delay or jeopardize confirmation of the Plan.  Non-confirmation of the Plan could result in a protracted Chapter 11 Case.

### 14.    Certain Creditors May Bring Litigation Against the Debtor

Even if the Debtor receives the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.  Further, third parties, including certain of the Debtor's creditors, may bring litigation against the Debtor during the course of this Chapter 11 Case, the outcome of which is uncertain.  Although the Debtor believes the Plan satisfies all of the requirements necessary for Confirmation by the Bankruptcy Court, creditors and other parties-in-interest may bring objections to challenge Confirmation of the Plan.

### 15.    The Total Amount of Allowed General Unsecured Claims May Be Higher Than Anticipated by the Debtor

With respect to Holders of Allowed General Unsecured Claims, the claims filed against the Debtor's Estate may be significantly higher than the Debtor has estimated.  There can be no assurance that the estimated amount of Claims is correct, and the actual Allowed amounts of Claims may differ from estimates.  The estimated amounts are subject to certain risks, uncertainties and assumptions.  Should one or more of these risks or uncertainties materialize or should underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated therein.

### 16.    The Total Amount of Allowed Administrative and Priority Claims May Be Higher or the Amount of Distributable Cash May Be Lower Than Anticipated by the Debtor

The amount of Cash the Debtor ultimately receives on account of the Restructuring Transactions and from other sources prior to and following the Effective Date may be lower than anticipated.  Additionally, Allowed Administrative Expense Claims and Allowed Priority Claims maybe higher than anticipated.  Accordingly, there is a risk that the Debtor will not be able to pay in full in cash all Administrative Expense Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan of reorganization.

### 17.    Third-Party Offers

The Debtor may receive inquiries or offers from third parties related to the disposition of all or a substantial amount of their assets, including NewCo and/or SVB Capital, which the Debtor may choose to pursue (in accordance with, as applicable, the terms set forth in Section 7.3 of the Plan and in any order approving a sale of the SVB Capital business).

### 18.    Conversion into Chapter 7 Case

If the Bankruptcy Court finds that it would be in the best interest of the Holders of Claims or Interests, the Bankruptcy Court may convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities under the Bankruptcy Code.  The Debtor believes that liquidation under chapter 7 would result in

significantly smaller distributions being made to creditors than those provided in a chapter 11 plan because of (a) the likelihood that assets would have to be sold in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee and (c) additional expenses and claims, some of which would be entitled to priority.

### 19. The Results of an Actual Chapter 7 Liquidation May Be Different from the Liquidation Analysis

Underlying the Liquidation Analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtor's management and advisors, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtor. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis. Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed or, alternatively, may have been unanticipated.

### 20. Plan Releases, Injunctions and Exculpation Provisions May Not Be Approved

There can be no assurance that the Plan releases, injunctions and exculpation provisions, as provided in Section 12 of the Plan, will be granted. Furthermore, the releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties and Exculpated Parties) provided in the Plan are subject to objection by parties in interest. Failure of the Bankruptcy Court to grant such relief may result in a plan of reorganization that differs from the Plan or the Plan not being confirmed.

### 21. The Amount and Timing of Available Distributions, if Any, May Vary

While the Debtor has attempted to project what it believes are likely distributions, if any, to be made to parties holding Allowed Claims and Interests, there can be no certainty that the projections will be accurate and that Holders will receive the distributions described in the Plan. The projections will necessarily be affected by, among other things, recoveries generated in connection with the liquidation of certain of the Debtor's remaining assets (including, without limitation, the recoveries, if any, on the account of the Retained Causes of Action), the outcome of objections to Claims or Interests, resolution of litigation, and the cost and expenses of such actions and generally administering and winding down (as applicable) the Debtor's Estate. Additionally, the timing of actual distributions to Holders of Allowed Claims or Interests may be affected by many factors that cannot be predicted. Therefore, the Debtor cannot guarantee the timing of any recovery on account of Allowed Claims or Interests.

**B.**  **Risks Related to the Debtor's Ongoing Operations during the Chapter 11 Case**

    **1.**  **The Debtor Will Be Subject to Risks and Uncertainties Associated with the Chapter 11 Case**

For the duration of the Chapter 11 Case, the Debtor's ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (i) ability to develop, confirm, and consummate the Plan; (ii) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Case from time to time; (iii) ability to maintain relationships with vendors, service providers, customers, employees, current and prospective investors, and other third parties; (iv) ability to maintain contracts that are critical to the Debtor's operations; (v) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtor; (vi) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtor to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Case to a chapter 7 proceeding; and (vii) the actions and decisions of the Debtor's creditors and other third parties who have interests in the Chapter 11 Case that may be inconsistent with the Debtor's plans.

These risks and uncertainties could affect the Debtor's business and operations in various ways.  For example, negative events associated with the Chapter 11 Case could adversely affect the Debtor's relationships with service providers, investors and other third parties, which, in turn, could materially adversely affect the Debtor's operations and financial condition.  Also, the Debtor will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtor's ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Case, the Debtor cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Case that may be inconsistent with the Debtor's plans.

    **2.**  **Operating in Bankruptcy for a Long Period of Time May Harm the Debtor's Business**

The Debtor's future results will be dependent upon the successful Confirmation and implementation of the Plan.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtor's business, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Case continue, the Debtor's management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.  In addition, the longer the proceedings related to the Chapter 11 Case continues, the more likely it is that investors and other third parties will lose confidence in the Debtor's ability to reorganize its businesses successfully and will seek to establish alternative commercial relationships.

3.     **Undue Delay in Confirmation May Disrupt Operation of the Debtor**

Although the Plan is designed to minimize the length of the Chapter 11 Case, it is impossible to predict with certainty the amount of time that the Debtor may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed.

The continuation of the Chapter 11 Case, particularly if the Plan is not confirmed in the time frame currently contemplated, could materially adversely affect operations. If Confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Case could result in, among other things, increased costs for professional fees and other case expenses. In addition, a prolonged Chapter 11 Case would require senior management to spend a significant amount of time and effort dealing with the Debtor's financial reorganization instead of focusing on the operation of the Debtor's businesses.

The uncertainty surrounding a prolonged Chapter 11 Case could have other adverse effects on the Debtor, including limiting the Debtor's ability to retain key employees; affecting the perception of the Debtor's business by regulators, investors, and lenders; and reducing the Debtor's assets and/or liquidity.

4.     **The Debtor's Ongoing Liquidity Needs May Impact Recoveries**

The Debtor has incurred significant professional fees and other costs in connection with the Chapter 11 Case and expects to continue to incur further professional fees and costs throughout the remainder of this Chapter 11 Case. The Debtor cannot guarantee that cash on hand will be sufficient to continue to fund its operations and allow the Debtor to satisfy obligations related to the Chapter 11 Case until the Debtor is able to emerge from bankruptcy protection. Accordingly, depending on how long the Chapter 11 Case continues, the recoveries that Holders of Claims or Interests are estimated to receive will be impacted by the Debtor's ongoing liquidity requirements. The Debtor faces uncertainty regarding the adequacy of its liquidity and capital resources. The Debtor's liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) its ability to maintain adequate cash on hand; (b) its ability to confirm and consummate the Plan; and (c) the ultimate cost, duration, and outcome of this Chapter 11 Case. The Debtor's ability to maintain adequate liquidity depends, in part, upon general economic, financial, competitive, regulatory and other factors beyond the Debtor's control.

5.     **Risks Related to Loss of Key Personnel**

The Debtor's operations, including the SVB Capital business, are dependent on a relatively small group of key management personnel. The Debtor's Chapter 11 Case has created distractions and uncertainty for key personnel and employees, and the Debtor has suffered significant attrition since the Petition Date. Personnel retention was further complicated by the fact that as of the Petition Date, personnel were almost all employed by the former Silicon Valley Bank. Because competition for experienced personnel can be significant and it is difficult to hire as a debtor in Chapter 11, the Debtor may be unable to find acceptable replacements with comparable skills and experience. The loss of such key personnel could adversely affect the Debtor's ability to lead this Chapter 11 Case to resolution by consummating the Plan. In

addition, the loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtor's ability to fulfill responsibilities related to its Chapter 11 Case and emerge successfully therefrom.

## C.     Risk Factors Relating to the SVB Capital Sale

### 1.     The Bankruptcy Court May Not Approve the SVB Capital Sale

The Debtor's Plan currently contemplates the successful consummation of the SVB Capital Sale, which remains pending as of the date of this Disclosure Statement.  The Bankruptcy Court may not approve the SVB Capital Sale, and the failure to obtain the Bankruptcy Court's approval of the NewCo Transaction could prevent the Debtor from consummating the Plan and the transactions contemplated thereby.  If the SVB Capital Sale is not approved (whether on the terms set forth in the SVB Capital Sale Motion or on other terms), a substantial portion of the SVB Capital business and SVB Capital assets would become assets of NewCo on the Effective Date and would have an impact on the operational risks that NewCo faces.

### 2.     The Debtor May Not Satisfy Closing Conditions in Connection with the SVB Capital Sale

Even if the SVB Capital Sale is approved by the Bankruptcy Court, the Debtor may not satisfy all of the closing conditions relating to the SVB Capital Sale.  A failure to satisfy any of the closing conditions to the SVB Capital Sale could prevent the SVB Capital Sale from being consummated, or could impact the consideration that the Debtor receives in connection with consummation of such sale.

### 3.     The Debtor May Not Successfully Consummate the SVB Capital Sale

Even if the SVB Capital Sale is approved by the Bankruptcy Court, the Debtor may not successfully consummate the SVB Capital Sale, whether due to a failure to satisfy all of the closing conditions relating to the SVB Capital Sale or other events outside of the Debtor's control.  If the SVB Capital Sale is not consummated, then the Debtor may amend certain terms of the Plan, including the GUC Cash-Out and other distributions contemplated by the Plan.

### 4.     There May Not Be Sufficient Cash to Provide for the Cash Distributions Pursuant the Plan

If the SVB Capital Sale is not approved by the Bankruptcy Court, or if the SVB Capital Sale is approved, but is not consummated, then the Debtor will not receive the Cash consideration contemplated under the Purchase Agreement.  If the Debtor does not receive the Cash consideration component of the consideration set forth in the Purchase Agreement, then the Debtor may not have sufficient cash to execute the Restructuring Transactions, including the GUC Cash-Out and payments contemplated pursuant to Section 4.2 of the Plan providing for Cash payments to certain Holders in lieu of NewCo Common Stock.

5. **The Consideration the Debtor Will Receive from the SVB Capital Sale May Include Contingent Consideration**

In connection with the SVB Capital Sale, the Debtor or Liquidating Trust may receive contingent consideration, including certain royalties and retained interests in the SVB Capital funds.  The Debtor has included its projections with respect to such contingent consideration in Appendix D to this Disclosure Statement; however, the actual value of such consideration may be materially different than actual future results.  *See* Article IX.H.1—*Risks Associated with Financial Projections* for additional risks related to the Liquidating Trust's financial projections.

D. **Risk Factors Relating to a NewCo Transaction**

1. **The Debtor May Effectuate a NewCo Transaction**

The Debtor, the Required Ad Hoc Senior Noteholder Parties and the UCC shall continue to work together in good faith to evaluate opportunities to maximize the value of all or some of the assets or equity of NewCo in a NewCo Transaction.  If the Debtor enters into a NewCo Transaction, the value of NewCo Common Stock distributed pursuant to the Plan may be reduced, or if all of the assets or equity of NewCo are sold, NewCo Common Stock may not distributed pursuant to the Plan.

2. **The Bankruptcy Court May Not Approve the NewCo Transaction**

The Bankruptcy Court may not approve the NewCo Transaction.  Failure to obtain the Bankruptcy Court's approval of the NewCo Transaction could prevent the Debtor from consummating the Plan and the transactions contemplated thereby.

E. **Risk Factors Relating to NewCo Common Stock to Be Issued Under the Plan**

1. **Potential Dilution**

The ownership percentage represented by the NewCo Common Stock distributed on the Effective Date under the Plan to the Holders General Unsecured Claims will be subject to dilution (i) by any NewCo Transaction (as applicable) and (ii) from any other shares that may be issued post-emergence, including Holders of Claims that are Disputed as of the Effective Date.

In the future, similar to all companies, additional equity financings or other share issuances by NewCo could adversely affect the value of the NewCo Common Stock issuable upon such conversion.  The amount of dilution effected by any of the foregoing could be material.

2. **Equity Interests Subordinated to NewCo's Indebtedness**

In any subsequent liquidation, dissolution, or winding-up of NewCo, the NewCo Common Stock would rank below all debt claims against NewCo, and as a result, holders of the NewCo Common Stock would not be entitled to receive any payment or other distribution of

assets upon the liquidation, dissolution or winding-up of NewCo until after all of NewCo's obligations to its debt holders have been satisfied.

### 3.    Implied Valuation of NewCo Common Stock May Not Represent Trading Value of NewCo Common Stock

Any implied valuation of the NewCo Common Stock stated herein or in the Plan is not intended to represent the trading value of NewCo Common Stock and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates, (b) conditions in the financial markets, (c) the anticipated value of the initial securities of creditors receiving NewCo Common Stock under the Plan, some of which may prefer to liquidate their investment rather than hold it on a long-term basis, and (d) other factors that generally influence prices of securities. Factors unrelated to NewCo's actual operating performance and other factors not possible to predict could affect the market price of the NewCo Common Stock. Accordingly, the implied value of the securities to be issued, stated herein and in the Plan, should not be construed as reflecting values that will be attained for the NewCo Common Stock in the private markets.

### 4.    No Dividends

NewCo may not pay any dividends on the NewCo Common Stock and may instead retain any future cash flows for debt reduction and to support its operations. As a result, the success of an investment in the NewCo Common Stock may depend entirely upon any future appreciation in the value of the NewCo Common Stock. There is no guarantee that the NewCo Common Stock will appreciate in value or even maintain its initial value.

### 5.    No Public Market for NewCo Common Stock

There is no public market for the NewCo Common Stock and there can be no assurance as to the development or liquidity of any market for the NewCo Common Stock. The Plan does not contemplate that the NewCo Common Stock will be listed upon any national securities exchange or any over-the-counter market after the Effective Date. If a trading market does not develop, is not maintained, or remains inactive, holders of the NewCo Common Stock may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, NewCo. In addition, on the Effective Date, it is expected that the NewCo will not be required under U.S. securities laws to file any reports with the SEC or otherwise provide financial or other information to the public which may further impair liquidity and prevent brokers or dealers from publishing quotations and that the ownership and transfer of the NewCo Common Stock will be subject to limitations set out in the charter of NewCo. This means that a holder of NewCo Common Stock may not be able to sell its NewCo Common Stock to raise money for immediate or future needs.

6. **Significant Holders of NewCo Common Stock**

Certain Holders of Allowed Claims are expected to acquire a significant ownership interest in the NewCo Common Stock pursuant to the Plan. If such Holders were to act as a group, such Holders may be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders. This concentration of ownership could also facilitate or hinder a negotiated change of control of NewCo and, consequently, have an impact upon the value of the NewCo Common Stock.

7. **The Equity Value of NewCo Common Stock May Not Represent the Trading Value of NewCo Common Stock**

The equity value of NewCo set forth on <u>Appendix F</u> is not intended to represent the trading value of NewCo Common Stock in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities. The actual market price of the NewCo Common Stock may be volatile. Many factors, including factors unrelated to the NewCo's actual operating performance, could cause the market price of NewCo Common Stock to rise or fall. Accordingly, the implied value of the NewCo Common Stock to be issued, as set forth herein and in the Plan, does not necessarily reflect values that may be attained for these securities in the public or private markets.

8. **The NewCo Organizational Documents May Limit the Rights of Holders of NewCo Common Stock**

The NewCo Organizational Documents may contain certain provisions that limit the rights of holders of the NewCo Common Stock. In particular, the NewCo Organizational Documents may include provisions relating to (a) the corporate governance of NewCo, the election of the board of directors, and the duties of directors and officers, (b) transfer restrictions with respect to NewCo Common Stock (including tag-along rights and drag-along rights), (c) voting rights of NewCo Common Stock, (d) information rights provided to Holders of NewCo Common Stock, and (e) related rights and obligations. There is no guarantee that any holder of the NewCo Common Stock will be able to freely transfer its NewCo Common Stock immediately after the Effective Date or will become able to freely transfer such NewCo Common Stock in the future. Minority holders of NewCo Common Stock may have very limited protections and virtually no ability to influence management of the business of NewCo.

In addition, from and after the Effective Date, the NewCo Organizational Documents will contain certain transfer restrictions in relation to the transfer of NewCo Common Stock. Specifically, the NewCo Organizational Documents will provide that, without the approval of the NewCo Board, (i) no Person will be permitted to acquire, whether directly or indirectly, and whether in one transaction or a series of transactions, NewCo Common Stock, to the extent that after giving effect to such purported acquisition the purported acquirer or any

other Person by reason of the purported acquirer's acquisition would become a Substantial Holder of any class of stock of NewCo; (ii) no Substantial Holder may acquire, directly or indirectly, any shares of NewCo stock without the consent of a majority of the NewCo Board; and (iii) no Substantial Holder may dispose, directly or indirectly, of any shares of NewCo stock without the consent of a majority of the NewCo Board.

**F.      Operational Risks for NewCo**

**1.      The Debtor's Financial Projections and Other Forward-Looking Statements Are Subject to Inherent Uncertainty Due to the Numerous Assumptions upon Which They Are Based**

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended.  Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims or Interests in the various Classes that might be allowed.

The Plan relies upon the Financial Projections that are based on numerous assumptions including, without limitation, the timing, Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of NewCo and the Liquidating Trust, financial industry performance, general business and economic conditions, competition, adequate financing, absence of material claims, the ability to make necessary capital expenditures, use of unrestricted cash, the ability to control future operating expenses, and other matters, many of which will be beyond the control of NewCo and the Liquidating Trust and some or all of which may not materialize.  Particular uncertainties with respect to NewCo's operations and financial results arise from the risks and uncertainties relating to changes in the demand for NewCo's financial services; legislation and regulations relating to the financial markets; operational factors; fluctuations in the amount of cash NewCo will generate from operations, or amounts that the Liquidating Trust will generate through the liquidation of the Liquidating Trust Assets, and numerous other matters of national, regional and global scale, including those of a political, economic, business, competitive or regulatory nature.

The Financial Projections represent management's view based on currently known facts, the successful Confirmation and implementation of the Plan and hypothetical assumptions regarding NewCo's future operations and ability to finance such operations; they do not guarantee NewCo's future financial performance.  Actual financial results will be subject to a number of factors, including general business and economic conditions, and other matters, many of which will be beyond the control of NewCo and may differ materially from the Financial Projections.  Therefore, the Financial Projections should not be relied upon as an assurance of the actual results that will occur.  Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization implemented will occur or, even if they do occur, that they will have the anticipated effects on NewCo and its business or operations or on the Liquidating Trust.  The failure of any such results or developments to materialize as

anticipated could materially adversely affect the successful execution of any plan of reorganization.

Except with respect to the Financial Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement and the Plan do not reflect any events that might occur subsequent to the date hereof. Such events could have a material impact on the information contained in this Disclosure Statement and the Plan. Neither the Debtor, NewCo nor the Liquidating Trust intend to update the Financial Projections. The Financial Projections therefore may not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Financial Projections.

In addition, if the Debtor emerges from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtor's operating plans pursuant to a plan of reorganization. The Debtor also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtor's balance sheets. The Debtor's financial results after the application of fresh start accounting also may be different from historical trends.

Finally, this Disclosure Statement was not approved by the Securities and Exchange Commission.

**2.      Risks Pertaining to Access to Capital Markets**

NewCo may require additional capital in the future to finance its growth and development, satisfy regulatory compliance obligations, and meet general working capital needs. NewCo's capital requirements will depend on many factors, including acceptance of and demand for NewCo's services, the extent to which NewCo invests in new technology and personnel and the status and timing of these developments. If NewCo's access to capital were to become constrained significantly, or if costs of capital increased significantly, due to lowered credit ratings, prevailing industry conditions, the solvency of customers, a material decline in demand for services, the volatility of the capital markets or other factors, NewCo's financial condition, results of operations and cash flows could be adversely affected.

**3.      NewCo May be Subject to Certain Exchange Act Reporting Requirements**

The Debtor is currently subject to reporting requirements under the Exchange Act, and as of the Effective Date, NewCo may be or may in the future become subject to reporting obligations under the Exchange Act. Due to the limited size and scope of NewCo's ongoing operations post-Effective Date, compliance with such reporting requirements may be burdensome and may adversely impact NewCo's financial performance. Compliance with the reporting requirements under the Exchange Act may subject NewCo to additional regulatory risks that NewCo would not otherwise face as a non-reporting company.

4.    **NewCo May Be Adversely Affected by Potential Litigation**

In the future, NewCo may become party to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect NewCo's financial results.  In the ordinary course of business, NewCo may be party to a number of lawsuits, investigations and disputes (some of which involve substantial amounts claimed) arising out of current and historical business, commercial transactions, prior acquisitions and divestitures, employment, employee benefits plans, intellectual property, antitrust, and other matters.  The costs incurred in connection with such lawsuits, investigations and disputes can be substantial and result in the diversion of the NewCo's attention and resources.  It is not possible to predict the potential litigation that NewCo may become party to, nor the final resolution of such litigation.  The impact of any such lawsuits, investigations and disputes on NewCo's business and financial stability, however, could be material.

5.    **Tax Risks**

NewCo's future results of operations could be adversely affected by changes in the effective tax rate as a result of a change in the mix of earnings in countries with differing statutory tax rates, changes in tax laws, regulations and judicial rulings (or changes in the interpretation thereof), changes in generally accepted accounting principles, changes in the valuation of deferred tax assets and liabilities, the results of audits and examinations of previously filed tax returns and continuing assessments of NewCo's tax exposures and various other governmental enforcement initiatives.  NewCo's tax expense includes estimates of tax reserves and reflects other estimates and assumptions, including assessment of NewCo's future earnings which could impact the valuation of the deferred tax assets.  Changes in tax laws or regulations may increase tax uncertainty and may adversely impact NewCo's provision for income taxes.

Furthermore, NewCo's ability to utilize certain tax attributes, including net operating loss carryforwards, is uncertain.  Even if NewCo is able to utilize certain tax attributes, the resulting impact of those tax attributes is uncertain.

For a discussion of certain U.S. federal income tax considerations to NewCo, the Debtor and certain holders of Claims and Interests in connection with the implementation of the Plan, *see* Article X below—*Certain U.S. Federal Income Tax Consequences of the Plan*.

G.    **Risk Factors Relating to Liquidating Trust Interests to Be Issued Under the Plan**

1.    **Risks Associated with Absence of Any Established Trading Market for Liquidating Trust Interests**

With regard to any private sales of the Liquidating Trust Interests after the Effective Date, neither the Liquidating Trust nor the Liquidating Trust Board will take steps designed to facilitate the development of a secondary market in the Liquidating Trust Interests.  Neither the Liquidating Trust nor the Liquidating Trust Board intend for an active trading market for the Liquidating Trust Interests to develop.  It may be difficult to sell the Liquidating Trust

Interests at an attractive price. The price at which the Liquidating Trust Interests could be sold may be below the original cost of the holders of the Liquidating Trust Interests, and the holders of the Liquidating Trust Interests may not be able to sell the Liquidating Trust Interests at all. This means that a holder of a Liquidating Trust Interest may not be able to sell its Liquidating Trust Interests to raise money for immediate or future needs.

### 2.  Potential Dilution

The ownership percentage represented by the Liquidating Trust Interests distributed on the Effective Date under the Plan to the Holders of Allowed General Unsecured Claims, Allowed Subordinated Note Claims and Preferred Equity Interests will be subject to dilution from any other units that may be issued post-emergence, if any, including Holders of Claims or Interests that are Disputed as of the Effective Date.

In the future, unit issuances by the Liquidating Trust could adversely affect the value of the Liquidating Trust Interests. The amount of dilution effected by the foregoing could be material. Furthermore, the Liquidating Trust could issue additional Liquidating Trust Interests with a distribution preference over the Liquidating Trust Interests that will be distributed on the Effective Date under the Plan to the Holders of Allowed General Unsecured Claims, Allowed Subordinated Note Claims and Preferred Equity Interests.

The Class A Trust Units issued to Holders of Allowed General Unsecured Claims (other than Holders of Allowed General Unsecured Claims that elect to receive the GUC Cash-Out) will receive a distribution preference of $[•], which will accrete at an annual rate of 12%. Given that the Class B Trust Units and the Class C Trust Units will receive no distributions until the distribution preference of the Class A Trust Units has been satisfied in full, including any accretion thereto, delays in distributions from the Liquidating Trust may reduce distributions to holders of Class B Trust Units and Class C Trust Units. The Class B Trust Units issued to Holders of Allowed Subordinated Note Claims will receive a distribution preference to be calculated at the face amount of the Allowed Subordinated Note Claims, which will accrete at an annual rate of 12%. Given that the Class C Trust Units will receive no distributions until the distribution preferences of the Class A Trust Units and Class B Trust Units have been satisfied in full, including any accretion thereto, delays in distributions from the Liquidating Trust may reduce distributions to holders of Class C Trust Units.

### 3.  The Liquidating Trust May be Required to Register Under the Investment Company Act, Which Would Increase Its Regulatory Burden and Negatively Affect the Value of the Liquidating Trust Interest

The Liquidating Trust may be required to register as an investment company under the Investment Company Act. While the Debtor takes the position that the Liquidating Trust should not be required to register under the Investment Company Act and that the Liquidating Trust is not subject to the Investment Company Act, the SEC may disagree and could require registration of the Liquidating Trust either immediately or at some point in the future. As a result, there could be an increased regulatory burden on the Liquidating Trust which could negatively affect the value of the Liquidating Trust Interests.

### H.    Operational Risks for the Liquidating Trust

#### 1.    Risks Associated with Financial Projections

The Debtor's management, with the assistance of their financial advisors, have prepared the Financial Projections based on certain assumptions, as set forth in Appendix D hereto.  The Financial Projections represent the management's view based on currently known facts, the successful Confirmation and implementation of the Plan and hypothetical assumptions regarding the Liquidating Trust.  Actual financial results will be subject to a number of factors, including general business and economic conditions, and other matters, many of which will be beyond the control of the Liquidating Trust Board and may differ materially from the Financial Projections.  The Liquidating Trust may not be able to liquidate the Liquidating Trust Assets in the timeframe or at prices that are consistent with the Financial Projections and as envisioned under the Plan, the Liquidating Trust Agreement and this Disclosure Statement after the Effective Date.

#### 2.    The Timing and Outcome of the FDIC Litigation Is Uncertain and Has a Significant Impact on the Liquidating Trust

The Debtor is party to litigation against the FDIC with respect to the FDIC Claims, in which the Debtor seeks the return of approximately $1.93 billion in its deposits held by the former SVB at the time of its receivership.  This litigation is currently taking place in two venues with respect to the FDIC-C, FDIC-R1 and FDIC-R2: (i) the United States District Court for the Southern District of New York (the "SDNY Proceeding") and (ii) the United States District Court for the Northern District of California (together with the SDNY Proceeding, the "FDIC Proceedings").  The FDIC disputes the Debtor's allegations and is defending itself in the FDIC Proceedings.  Additional proceedings regarding the FDIC Claims in additional venues may be filed before a hearing is held regarding confirmation of the Debtor's Plan.

The outcome of the FDIC Proceedings will have a significant impact on the value of the Liquidating Trust.  A material portion of the ultimate recoveries, if any, to be obtained by the Liquidating Trust on behalf of Holders of Allowed Claims in Classes 3(a), 3(b), 4 and 5 are contingent on the resolution of the FDIC Claims.  However, any recovery on account of the FDIC Claims is highly speculative.  The FDIC Proceedings may result in a range of outcomes, including settlements, which could significantly affect the value of the Liquidating Trust.  Additionally, the timing of any resolution of the FDIC Proceedings is impossible to predict, which may also adversely impact the value of the Liquidating Trust.  The FDIC Claims feature complex and novel questions of law and of fact and the FDIC Proceedings (including those proceedings regarding the FDIC Claims that may be filed in the future) are procedurally complicated.  While the Debtor believes in the merits of its lawsuits, these circumstances make it impossible to predict the resolution of the FDIC Proceedings (or similar lawsuits regarding the FDIC Claims) or the timing thereof.

3.     **The Timing and Outcome of Litigation Relating to the Retained Causes of Action is Uncertain and May have a Significant Impact on the Liquidating Trust**

Pursuant to the Plan, certain Retained Causes of Action will be transferred to the Liquidating Trust.  The outcome of any litigation involving the Retained Causes of Action may have a significant impact on the value of the Liquidating Trust.  Additionally, the timing of any resolution of litigation involving the Retained Causes of Action is impossible to predict, which may also have a significant impact on the value of the Liquidating Trust.  The Retained Causes of Action include Claims and Causes of Action that involve complex factual and legal issues and that may be procedurally complicated.  These circumstances make it impossible to predict the resolution of any litigation involving the Retained Causes of Action or the timing thereof.

4.     **Liquidating Trust Expenses May Exceed Current Expectations**

The ultimate amount of Cash available to distribute to the holders of Liquidating Trust Interests depends, in part, on the manner in which the Liquidating Board operates the Liquidating Trust and the expenses that it incurs in doing so.  Such expenses may include, without limitation, the reasonable and necessary expenses of administering the Liquidating Trust, including the costs to liquidate the Liquidating Trust Assets, investigate and prosecute the FDIC Claims, investigate and prosecute the Retained Causes of Action and make distributions.  If the Liquidating Trust incurs professional or other expenses in excess of current expectations, the amount of distributable assets remaining to provide distributions to the holders of Liquidating Trust Interests will decrease.

5.     **The Liquidating Trust May be Subject to Certain Exchange Act Reporting Requirements**

The Debtor is currently subject to reporting requirements under the Exchange Act, and as of the Effective Date, NewCo may be or may in the future become subject to reporting obligations under the Exchange Act.  Compliance with such reporting requirements may be burdensome and may adversely impact the Liquidating Trust's financial performance.  Compliance with the reporting requirements under the Exchange Act may subject the Liquidating Trust to additional regulatory risks that the Liquidating Trust would not otherwise face as a non-reporting company.

6.     **The Liquidating Trust May Be Adversely Affected by Potential Litigation**

In the future, the Liquidating Trust may become party to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Liquidating Trust's financial results.  It is not possible to predict the potential litigation that the Liquidating Trust may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Liquidating Trust's businesses and financial stability, however, could be material.

### 7.      Tax Risks

There are a number of material income tax considerations, risks, and uncertainties associated with the Liquidating Trust.  Holders of Claims or Interests and other interested parties should read carefully the discussion of certain U.S. federal income tax consequences of the Plan set forth in Article X below—*Certain U.S. Federal Income Tax Consequences of the Plan*.

## I.      Additional Risk Factors

### 1.      The Financial Information is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit Was Performed

In preparing this Disclosure Statement, the Debtor relied on financial data derived from its books and records that was available at the time of such preparation.  Although the Debtor has used its reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtor believes that such financial information fairly reflects its financial condition, the Debtor is unable to warrant or represent that the financial information contained in this Disclosure Statement (or in any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

### 2.      The Debtor Could Amend, Waive, Modify or Withdraw the Plan

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtor, subject to the terms of the Plan and the RSA.  Further, the Debtor reserves the right, prior to the Confirmation of the Plan or substantial consummation thereof, subject to the provisions of section 1127 of the Bankruptcy Code and applicable law and the terms of the RSA, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan.  The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.  Holders of Claims and Interests will receive notice of such amendments or waivers as required by applicable law and the Bankruptcy Court.  If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtor seeks (in accordance with the terms of the RSA) to modify the Plan, the previously solicited acceptances will be valid only if (a) all classes of adversely affected creditors and interest holders accept the modification in writing or (b) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

### 3.      There is a Risk of Termination of the RSA

To the extent that events giving rise to termination of the RSA occur, the RSA may terminate prior to the Confirmation or the Effective Date, which could result in the loss of support for the Plan by important creditor constituencies, which could adversely affect the Debtor's ability to confirm and consummate the Plan.  If the Plan is not consummated, there can be no assurance that the Chapter 11 Cases would not be converted to chapter 7 liquidation cases

or that any new chapter 11 plan would be as favorable to Holders of Claims or Interests as the current Plan.

### 4.    No Representations Outside the Disclosure Statement Are Authorized

No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Disclosure Statement.  Any representations or inducements made to secure your vote for acceptance or rejection of the Plan that are other than those contained in, or included with, the Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

### 5.    Certain Tax Consequences

For a discussion of certain U.S. federal income tax considerations to NewCo, the Debtor and certain holders of Claims and Interests in connection with the implementation of the Plan, *see* <u>Article X</u> below—*Certain U.S. Federal Income Tax Consequences of the Plan.*

### 6.    No Legal or Tax Advice Is Provided by the Disclosure Statement

The contents of the Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.  The Disclosure Statement is not legal advice to you.  The Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 7.    No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or Holders of Claims or Interests.

### 8.    Failure to Identify Projected Objections

No reliance should be placed on the fact that a projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtor may seek to investigate, file, and prosecute Claims and may object to Claims and Interests after Confirmation and consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims and Interests.

### 9.    Information Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors

Counsel to and other advisors retained by the Debtor have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement.  Also, as of the Petition Date, much of the information relevant to this Disclosure Statement was not in the Debtor's possession due to the seizure and receivership of the former Silicon Valley Bank, as

described above.  Counsel to the Debtor and other advisors have retained by the Debtor have engaged in significant efforts to retrieve documents and other material not in the Debtor's possession at the time of the Petition Date, but may not have copies of all books and records. Further, these advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, but they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

### 10.    Risk of the Inability to Obtain Regulatory Approval

The closing of the Restructuring Transactions may be subject to regulatory review in the United States.  The failure of any governmental or regulatory unit to grant an approval could prevent or limit consummation of the Restructuring Transactions and Confirmation of the Plan.

### 11.    Governmental Laws, Regulations and Actions Could Adversely Affect the Debtor

The Debtor is subject to various federal, state and local laws, orders and regulations.  Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal fines and penalties or the imposition of injunctive relief.

Future compliance with laws and regulations, including environmental, production, transportation, sales, rate and tax rules and regulations, and any changes to such laws or regulations, may reduce the Debtor's profitability and have a material adverse effect on its financial position, liquidity and cash flows.  Such laws and regulations may require more stringent and costly measures.

### 12.    The Debtor Has No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

## ARTICLE X.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtor, NewCo and certain Holders of Claims or Interests.  Except as otherwise indicated, this discussion assumes that the Restructuring Transactions are consummated pursuant to the Plan.  The following summary does not address the U.S. federal income tax consequences to Holders who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or who are deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury regulations, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect), so as to result in U.S. federal income tax consequences different from those summarized herein. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The U.S. federal income tax consequences of the contemplated Plan and the Restructuring Transactions are complex and subject to significant uncertainties. As discussed further below, the Debtor has requested a private letter ruling from the IRS with respect to certain, but not all, of the U.S. federal income tax consequences relating to the Plan and does not presently intend to seek any additional rulings from the IRS with respect to the remaining tax aspects of the Plan, subject to the discussion below. There is no assurance that a favorable ruling will be obtained, and the consummation of the Plan is not conditioned upon the issuance of such a ruling. Moreover, the private letter ruling will rely on certain facts, assumptions, representations and undertakings from the Debtor, which, if incorrect or inaccurate, may jeopardize the Debtor's ability to rely on such private letter ruling. The discussion below is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, and that a court would not sustain, a different position than any position discussed herein. If the IRS successfully challenges any aspect of the tax treatments described below, adverse U.S. federal income tax consequences may result.

This summary does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor, NewCo, Holders of Claims or Interests or to Liquidating Trust Beneficiaries in light of their individual circumstances. This summary does not address the non-U.S., state, or local tax consequences of the contemplated Plan and the Restructuring Transactions, nor does it address all of the U.S. federal income tax consequences of the transactions that might be relevant to special classes of taxpayers in light of their particular circumstances (*e.g.*, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, cooperatives, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold their Claims or Interest through, S corporations or other pass-through entities for U.S. federal income tax purposes, persons who received their Claims or Interests pursuant to the exercise of an employee stock option or otherwise as compensation, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that elect to use the mark-to-market method of tax accounting for their securities or commodities, persons subject to special tax accounting rules under section 451(b) of the IRC, persons whose Claims or Interests are part of a straddle, hedging, constructive sale, or conversion transaction, or part of a "synthetic security" or other integrated financial transaction, U.S. expatriates, persons whose Claims or Interests are described in Article IV.F.6—*Claims or Interests Paid by* Third Parties, or foreign persons or entities (except to the extent set forth below)). In addition, this discussion does not address the alternative minimum tax (including the corporate alternative minimum tax), the "Medicare" tax on net investment income, or U.S. federal taxes other than income taxes. Unless otherwise indicated, this discussion assumes that all Claims, Interests and NewCo Common Stock are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the IRC and that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax

purposes in accordance with their respective forms.  This summary does not discuss differences in tax consequences to Holders of Claims or Interests that otherwise act or receive consideration in a capacity other than as a Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.

As used herein, the term "U.S. Holder" means, with respect to Claims, Interests, NewCo Common Stock or Liquidating Trust Interests, a beneficial owner that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

For purposes of this discussion, the term "Non-U.S. Holder" means, with respect to Claims, Interests, NewCo Common Stock or Liquidating Trust Interests, a beneficial owner that is, for U.S. federal income tax purposes, not a U.S. Holder and not a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes).  Non-U.S. Holders are subject to special U.S. federal income tax provisions, some of which are discussed below.

If a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of Claims, Interests, NewCo Common Stock or Liquidating Trust Interests, the tax treatment of a partner (or other beneficial owner) in such partnership (or such other pass-through entity) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partnership (or other pass-through entity).  If you are a partner (or other beneficial owner) in such a partnership (or other pass-through entity) holding any such instruments, you should consult your own tax advisor.

***THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON YOUR INDIVIDUAL CIRCUMSTANCES.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.***

A.      **Consequences to the Debtor**

1.      **The Debtor's Consolidated Tax Group**

For U.S. federal income tax purposes and immediately prior to the Restructuring Transactions, the Debtor is the common parent of an affiliated group of corporations that files a consolidated U.S. federal income tax return (the "Tax Group").  The Debtor's Tax Group includes SVB in receivership, even though SVB is under the effective control of the FDIC.  Accordingly, the income, profit, gain, loss and deductions of SVB while under the FDIC's effective control affect the Debtor's U.S. federal taxable income until such time as SVB is deconsolidated from the Tax Group (as described below).

2.      **Cancellation of Indebtedness**

In general, absent an exception, a debtor will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration (as determined for U.S. federal income tax purposes) less than the adjusted issue price of such indebtedness.  Generally, under section 108 of the IRC, a debtor is not required to include COD Income in gross income if the debtor is under the jurisdiction of a court in a case under the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, in general, the IRC provides that the debtor must reduce certain of its tax attributes—including carryforward and current year net operating losses ("NOL"), capital loss carryforwards, tax credits, and tax basis in assets (but not below the amount of liabilities to which the debtor remains subject)—by the amount of any COD Income incurred but excluded from income under section 108 of the IRC.

If advantageous, a debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.  Where a debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of a debtor and other members of the group also be reduced.  Any reduction in tax attributes in respect of COD Income incurred does not occur until the end of the taxable year and after such attributes have been applied.

The ultimate amount of COD Income incurred by the Debtor in connection with the implementation of the Plan will depend on, among other things, the final amount of Cash and the fair market value of any other property (including NewCo Common Stock and Liquidating Trust Interests) distributed to Holders of Claims.  Certain of these figures cannot be known with certainty until after the Effective Date.  Accordingly, the amount of COD Income that the Debtor may incur is uncertain, but may be significant.

3.      **Transfer of Liquidating Trust Assets to the Liquidating Trust**

Pursuant to the Plan, on or before the Effective Date, the Debtor will transfer the Liquidating Trust Assets to the Liquidating Trust, on behalf of the respective Holders of Claims and Interests comprising the Liquidating Trust Beneficiaries.  The transfer of the Liquidating Trust Assets by the Debtor pursuant to the Plan may result in the recognition of gain, loss, income, or deduction by the Debtor, depending in part on the value of the Liquidating Trust

Assets on the Effective Date and the Debtor's tax basis in the Liquidating Trust Assets. Subject to the impact of any Restructuring Transactions, the implementation of which is subject to change, and subject to the receipt of a favorable ruling discussed below regarding the character of the Stock Loss (defined below), the Debtor anticipates that any tax deductions incurred in the year that includes the Effective Date should be available to offset the Tax Group's taxable income (inclusive of any gain or income recognized upon transfer of assets pursuant to the Plan) incurred during such year, subject to the ownership change rules of the IRC discussed below (or other limitations as provided under the IRC). Due to the lack of guidance with respect to the sale or other taxable disposition of Retained Causes of Action, there can be no assurance that a subsequent resolution of such claims or Causes of Action could not result in additional income to the Debtor, which may or may not be able to be offset by the tax attributes of the Tax Group.

### 4.    Potential Limitations on NOL Carryforwards and Other Tax Attributes

#### (a)    Section 382

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Tax Group's ability to use any remaining tax attributes post-emergence may be subject to certain limitations under sections 382 and 383 of the IRC.

Under sections 382 and 383 of the IRC, if the Debtor undergoes an "ownership change," the amount of any remaining NOL, section 163(j) carryforwards, tax credit carryforwards, net unrealized built-in losses ("NUBIL"), and possibly certain other attributes of the Debtor allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation (discussed below). For this purpose, if a corporation (or consolidated group) has a NUBIL at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the five-year period beginning on the ownership change date (up to the amount of the original NUBIL) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation (discussed below). In general, a corporation's (or consolidated group's) NUBIL will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change. The NUBIL of a consolidated group generally is calculated on a consolidated basis, subject to special rules. Based on facts and circumstances not yet known to the Debtor as of the date of this Disclosure Statement, it is currently uncertain whether the Tax Group would have a NUBIL immediately prior to the Effective Date.

The rules of section 382 of the IRC are complex, but as a general matter, the Debtor anticipates that the issuance of NewCo Common Stock pursuant to the terms of the Plan will result in an ownership change of the Tax Group for these purposes, and that the Tax Group's use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC applies. In addition, it is possible there could be a subsequent ownership change after the Effective Date, which would further limit the Debtor's NOL. Lastly, because a corporation can experience multiple ownership changes, it is possible that certain of

the Tax Group's tax attributes (including any built-in loss in the stock of SVB) are subject to one or more additional section 382 limitations that could adversely impact the Tax Group's ability to utilize such tax attributes.

### (i)    General Section 382 Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, or 3.37 percent for an ownership change during April 2024). The annual limitation may be increased to the extent that the Tax Group recognizes certain built-in gains in its assets during the five-year period following the ownership change, or is treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65, but only to the extent that the Tax Group had a "net unrecognized built-in gain" overall in its assets at the time of the ownership change. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

If the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is generally reduced to zero, thereby precluding any utilization of the Pre-Change Losses (absent any increases due to recognized built-in gains).

Notwithstanding the above and as discussed below, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (ii)    Abandonment of SVB Stock

The Debtor anticipates that it (i) has a substantial tax basis in its stock investment in SVB[32] and (ii) will claim a worthless stock deduction (the "Stock Loss") at a time when the Debtor believes that such stock investment is worthless. In order for the Debtor to claim the Stock Loss with respect to the SVB stock, the stock investment in SVB must be worthless and certain other conditions must be met, such as SVB ceasing to be a member of the Tax Group, at which point the Tax Group's consolidated NOL attributable to SVB (as determined under the relevant Treasury Regulations, at the end of the taxable year, after taking into account the Tax Group's income for such year) would no longer be available to the Tax Group. The Stock Loss (subject to the receipt of a favorable ruling discussed below), along with other possible deductions incurred in the same taxable year, is anticipated to result in a substantial NOL for the taxable year in which the Effective Date occurs. The Debtor has requested a private letter ruling from the IRS that the character of the Stock Loss is ordinary. There can be no assurance that a

---

[32]    Solely for purposes of the discussion of the U.S. federal income tax consequences herein, references to SVB includes references to certain entities treated as successors to SVB for U.S. federal income tax purposes.

favorable ruling will be obtained, and the consummation of the Plan is not conditioned upon the issuance of such a ruling.  Moreover, the private letter ruling will rely on certain facts, assumptions, representations and undertakings from the Debtor, which, if incorrect or inaccurate, may jeopardize the Debtor's ability to rely on such private letter ruling.  If the character of the Stock Loss is capital rather than ordinary, then such capital loss generally would only be available to offset capital gains.

The Debtor currently anticipates realizing the Stock Loss by abandoning its stock investment in SVB *prior* to (but in the same taxable year as) the Effective Date.  If the Debtor abandons its stock investment in SVB prior to (but in the same taxable year as) the Effective Date, a portion of the NOL may not be subject to the annual limitation resulting from the implementation of the Plan, even if a change in ownership occurs on the Effective Date of the Plan, because the resulting NOL (determined after taking into account other activities occurring in the taxable year that includes the Effective Date) would be pro-rated between the pre- and post-change portions of the taxable year, such that the post-change portion would not be treated as a Pre-Change Loss described above.

However, based on facts and circumstances not yet known to the Debtor as of the date of this Disclosure Statement (including whether the Debtor has a NUBIL as of the Effective Date), the Debtor may, subject to any applicable consent rights set forth in the RSA to amend the Plan, abandon its stock investment in SVB *after* the Effective Date, in which case the NOL resulting from a post-Effective Date abandonment may be treated as a post-change loss.  Such determination is subject to significant uncertainties, including with respect to facts relating to the activities of SVB after the commencement of the receivership.  Accordingly, even if the Debtor were to abandon its stock investment in SVB after the Effective Date and treat the Stock Loss as a post-change loss, there can be no assurance that the IRS will not assert that such Stock Loss will be subject to section 382 limitations.  Irrespective of whether the abandonment occurs before or after the Effective Date, the availability of the NOL attributable to the Stock Loss described above, would be subject to, among other things, (i) reduction under the tax rules applicable to COD Income, and (ii) any applicable limitations imposed by the ownership change rules of the IRC such as those discussed above, and may be further limited to the extent that the Debtor had undergone an ownership change prior to the Effective Date.

### (iii)    Special Bankruptcy Exception

With respect to the possible ownership change that could occur on the Effective Date, an exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors," together with certain pre-change shareholders, of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  If the requirements of the 382(l)(5) Exception are satisfied, the ownership change resulting from the consummation of the Plan would not result in a limitation on the Debtor's Pre-Change Losses, but, instead, NOL carryforwards and section 163(j) carryforwards would be reduced as if no deductions were claimed for interest paid or accrued by the Debtor, with respect to indebtedness that was satisfied with NewCo Common Stock pursuant to the Plan, during any taxable year ending during the three-year period preceding the taxable year in which the Effective Date occurs and during the

part of the taxable year prior to and including the Effective Date. If the 382(l)(5) Exception applies and the Debtor undergoes another ownership change within two years after the Effective Date, then the Debtor's Pre-Change Losses as of the second ownership change would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception") with respect to the ownership change resulting from the consummation of the chapter 11 plan. Under the 382(l)(6) Exception, the annual limitation on the Debtor's Pre-Change Losses will be calculated by multiplying the applicable "long-term tax-exempt rate" by the lesser of (a) the value of the NewCo Common Stock (with certain adjustments) immediately after the ownership change or (b) the value of the Debtor's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that a debtor corporation is not required to reduce its NOL carryforwards and section 163(j) carryforwards as under the 382(l)(5) Exception. Additionally, a debtor corporation may undergo a subsequent change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses, in which case the resulting limitation from a subsequent ownership change would be determined under the regular rules for ownership changes.

Whether the Plan qualifies for the 382(l)(5) Exception is unclear and depends on a number of factors that are not yet known, including the existence of any rights offering or a similar transaction as part of a NewCo Transaction, and may require the receipt of one or more additional rulings from the IRS. Moreover, it is possible that the Restructuring Transactions, when finally determined if implemented as part of the Plan, will not be consistent with the 382(l)(5) Exception. Finally, even if the Debtor does qualify, the Debtor may, if it so desires, elect not to have the exception apply and instead apply the 382(l)(6) Exception.

### (iv)    Risk of Subsequent Ownership Changes

In an attempt to minimize the likelihood of a subsequent ownership change occurring after the Effective Date, the charter of NewCo will contain a restriction limiting the accumulation (and disposition) of shares by persons (and certain groups of persons acting in concert) who own or would own (actually or constructively) immediately before or after such acquisition or disposition, 4.99 percent of any class of stock of NewCo (with certain adjustments), and requiring the approval of the NewCo Board for any such transfers. Nevertheless, it is possible that NewCo could undergo a subsequent ownership change, either by events within or outside of the control of the NewCo Board, *e.g.*, indirect changes in the ownership of persons treated as owning 5 percent or more of the stock of NewCo (by value). In the event of a subsequent ownership change of NewCo, all or part of the NOL (or other relevant tax attributes) would become subject to an annual limitation or disallowed entirely, depending on, among other things, if the 382(l)(5) Exception applies to the Plan and whether such ownership change occurs within a certain period of time after the Effective Date.

**(b)    Other Provisions**

Aside from the objective limitations of section 382 of the IRC, the IRS may disallow, pursuant to section 269 of the IRC, the subsequent use of a corporation's losses following an acquisition of control of a corporation by one or more persons if the principal purpose of the acquisition is the avoidance or evasion of tax by securing a tax benefit which such person(s) or the corporation would not otherwise enjoy.  Accordingly, if the principal purpose of any group of persons (including Holders of Claims or Interests in connection with the Plan) in acquiring control of the Debtor is to obtain the use of the NOL, the IRS could disallow the use of the full NOL (*i.e.*, which may include *both* the pre-change portion that would be subject to the annual section 382 limitation and the post-change unlimited portion).  Other provisions of the IRC may also preclude the use of a corporation's NOL and certain tax attributes in other ways under certain circumstances.

**5.    Other Income and Uncertainty of Debtor's Tax Treatment**

The Debtor may incur other income for U.S. federal income tax purposes in connection with the Plan that, unlike COD Income, generally will not be excluded from the Debtor's U.S. federal taxable income.  In addition, the U.S. federal income tax considerations relating to the Plan are complex and subject to uncertainties.  No assurance can be given that the IRS will agree with the Debtor's interpretations of the tax rules applicable to, or tax positions taken with respect to, the transactions undertaken to effectuate the Plan.  If the IRS were to successfully challenge any such interpretation or position, the Debtor may recognize additional taxable income for U.S. federal income tax purposes, and the Debtor may not have sufficient deductions, losses or other attributes for U.S. federal income tax purposes to fully offset such income.

In addition, until the Debtor abandons the stock of SVB, SVB while under the receivership of the FDIC generally will continue to be a member of the Tax Group for U.S. federal income tax purposes, and the actions of SVB while under the FDIC's effective control could affect the Debtor's U.S. federal taxable income as well as the positions taken with respect to any transactions implemented in connection with the Plan.  No assurance can be given that the FDIC will not take any action with respect to SVB that would adversely affect the tax consequences described in this Disclosure Statement.

**B.    Consequences to U.S. Holders of Certain Claims and Interests**

Pursuant to the Plan, except to the extent that any Holder of an Allowed Claim or Interest agrees to less favorable treatment: Holders of Allowed General Unsecured Claims will receive Class A Trust Units, NewCo Common Stock and/or Cash (subject to certain elections and adjustments), in complete and final satisfaction of their respective Claims; Holders of Allowed Subordinated Note Claims will receive Class B Trust Units and Cash sufficient to satisfy the Subordinated Note Trustee Expenses (subject to certain elections and adjustments), in complete and final satisfaction of their respective Claims; and Holders of Preferred Equity Interests will receive Class C Trust Units, in complete and final satisfaction of their respective Interests.

As discussed below (*see* Article XD—*Tax Treatment of the Liquidating Trust and Holders of Liquidating Trust Interests*), it is intended that the Liquidating Trust qualify as a "grantor trust" for U.S. federal income tax purposes. Accordingly, it is intended that each Holder of an Allowed Claim or Interest receiving a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust Assets (consistent with its economic rights in the trust). Pursuant to the Plan, the Liquidating Trust (as provided in the Plan) will in good faith value the assets transferred to the Liquidating Trust, and all parties to the Liquidating Trust (including Holders of Claims and Interests receiving Liquidating Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes. However, the IRS or another taxing authority may disagree with such valuation and assert a different valuation, which, if sustained, could result in adverse tax consequences to such parties.

The U.S. federal income tax consequences to a Holder of an Allowed Claim who receives NewCo Common Stock will depend, in part, on whether such Claim constitutes a "security" of the Debtor for U.S. federal income tax purposes (as discussed in more detail below). The term "security" is not defined in the IRC or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. One of the most significant factors considered in determining whether a particular debt obligation is a "security" is its original term. In general, debt obligations issued with a weighted average maturity at issuance of five years or less (*e.g.*, trade debt and revolving credit obligations) do not constitute "securities," whereas debt obligations with a weighted average maturity at issuance of ten years or more constitute "securities." Accordingly, certain Allowed Claims may qualify as "securities" while others may not.

*You are urged to consult your own tax advisor regarding the characterization as "securities" for U.S. federal income tax purposes of your Claim and the consequences of such treatment.*

1. **Holders of Senior Note Claims (Class 3(a)) and Other General Unsecured Claims (Class 3(b)) and of Subordinated Note Claims (Class 4)**

The below discussion in this Article X.B.1 applies with respect to Holders who only hold Allowed Claims within a single Class of Claims. For a discussion with respect to Holders who hold Allowed Claims or Interests in multiple Classes of Claims or Interests, see Article X.B.3—*Holders of Multiple Classes of Allowed Claims and Interests* below.

(a) **Gain or Loss – In General**

If an Allowed Claim is not a "security," or if a Holder does not receive any consideration that constitutes stock or a "security" of NewCo in exchange for such Holder's Allowed Claim (for example, a Holder that only receives cash in exchange for Allowed Claims), then the exchanging Holder of such Claim will generally recognize gain or loss (although any loss with respect to such a Claim might be deferred until all Disputed Claims are resolved) in an

amount equal to the difference, between (i) the sum of the amount of any Cash and the fair market value of all other consideration received (if any), including NewCo Common Stock and any undivided interest in the Liquidating Trust Assets (other than any amounts received in respect of any Claim for accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest).  The deduction of capital losses is subject to certain limitations.

In the event of a subsequent disallowance of a Disputed Claim, it is possible that a Holder of a previously Allowed Claim may be taxed, as such Disputed Claims are resolved, and such Holder effectively becomes entitled to an increased share of the assets held in the Liquidating Trust or an increased number of shares of NewCo Common Stock.  The imputed interest provisions of the IRC may apply to treat a portion of such increased share or any additional distributions (*e.g.*, the redistribution among Holders of Allowed Claims of undeliverable distributions) as imputed interest.  In addition, it is possible that any loss realized by a Holder in satisfaction of an Allowed Claim may be deferred until all Disputed Claims in such Holder's class are determined and such Holder's share can no longer increase, and with respect to certain Allowed Claims , a portion of any gain realized may be deferred under the "installment method" of reporting. Holders are urged to consult their tax advisors regarding the possibility for deferral, and the ability to elect out of the installment method of reporting any gain realized in respect of their Claims.

A Holder's aggregate tax basis in any NewCo Common Stock and/or undivided interest in the Liquidating Trust Assets received in satisfaction of a Claim, if any, will equal the amount taken into account in respect of such notes, stock or undivided interest in determining the Holder's amount realized.  A Holder's holding period in such debt, stock or undivided interest generally will begin the day following the Effective Date.

The fair market value of the Liquidating Trust Interests is contingent in part on the outcome of certain Retained Causes of Action included in the Liquidating Trust Assets.  It is therefore plausible that, instead of the treatment described above, a U.S. Holder could treat the transaction as an "open" transaction for U.S. federal income tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of any recoveries under Retained Causes of Action included in the Liquidating Trust Assets.  The U.S. federal income tax consequences of treating the consummation of the Plan as an open transaction are uncertain and highly complex, and a U.S. Holder should consult with its own tax advisor if it believes open transaction treatment might be appropriate.

(b)     **Recapitalization Treatment**

The receipt of any NewCo Common Stock and any other instrument that constitutes stock or a "security" of the Debtor (such as potentially any Subscription Rights, discussed further below in Article X.B.1(e)—*Tax Treatment of the Potential NewCo Transaction*)] by a Holder in partial satisfaction of an Allowed Claim that constitutes a "security" for U.S. federal income tax purposes generally would qualify as a "recapitalization" for U.S. federal income tax purposes.  In such event, each such Holder generally will not recognize any loss upon the exchange of its Claim, but will generally recognize a gain (computed as discussed in the preceding section) to the extent of any Cash and the fair market value of all

-143-

other consideration received, including its undivided interest in the Liquidating Trust Assets received (other than to the extent received in respect of a Claim for accrued but unpaid interest, or attributable to the receipt of any instrument that constitutes stock or a "security" of the Debtor such as potentially Subscription Rights, if any). The treatment of distributions in respect of a Claim for accrued but unpaid interest is discussed in the next section.

In a recapitalization exchange, a Holder's aggregate tax basis in any NewCo Common Stock and any other instrument that constitutes stock or a "security" of the Debtor (such as potentially any Subscription Rights, discussed further below in Article X.B.1(e)—*Tax Treatment of the Potential NewCo Transaction*) received in respect of an Allowed Claim that constitutes a "security" will equal the Holder's adjusted tax basis in such Claim (including any Claim for accrued but unpaid interest); increased by any gain recognized or interest income received in respect of such Claim; and decreased by the amount of any Cash and the fair market value of its undivided interest in the Liquidating Trust Assets received and any deductions claimed in respect of any previously accrued but unpaid interest. The aggregate tax basis should be allocated among the stock and "securities" of the Debtor received in accordance with their relative fair market values as of the Effective Date.

In a recapitalization exchange, a Holder's holding period in any NewCo Common Stock and any other instrument that constitutes stock or a "security" of the Debtor (such as potentially any Subscription Rights, discussed further below in Article X.B.1(e)—*Tax Treatment of the Potential NewCo Transaction*) received will include the Holder's holding period in the Claim exchanged therefor, except to the extent of its undivided interest in the Liquidating Trust Assets or any NewCo Common Stock received in respect of a Claim for accrued but unpaid interest (which will commence a new holding period).

A Holder's tax basis in its undivided interest in the Liquidating Trust Assets (other than any instrument that constitutes a "security" of the Debtor such as potentially Subscription Rights (as defined below), if any) will equal the fair market value of such interest, and the Holder's holding period generally will begin the day following the Effective Date.

### (c)  Consideration Received in Satisfaction of Accrued Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a Holder of an Allowed Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income). For purposes of this paragraph and related discussions above, "interest accrued" during a holding period includes original issue discount ("OID") accrued over the course of such holding period. Conversely, a Holder may be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full. The Plan provides that consideration received in respect of a Claim is generally allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to any Claim for accrued but unpaid interest. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. Holders are urged to consult their tax advisors regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID, if applicable) and the

character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for U.S. federal income tax purposes.

### (d)    Character of Gain or Loss

Where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Allowed Claim constitutes a capital asset in the hands of the Holder, how long the Claim has been held, whether the Claim was acquired at a market discount, and whether and to what extent the Holder previously claimed a bad debt deduction.  A Holder that purchased its Claims from a prior Holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the IRC.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the Holder's adjusted tax basis in the debt instrument immediately after the acquisition is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, or (b) in the case of a debt instrument issued with original issue discount, its revised issue price, in each case, by at least a *de minimis* amount.  The de minimis amount is equal to 0.25% of the sum of all remaining payments to be made on the debt instrument from the date of such acquisition, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity.  Under these rules, gain recognized on the exchange of Claims (other than in respect of a Claim exchanged for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the Holder, on a constant yield basis) during the Holder's period of ownership, unless the Holder elected to include the market discount in income as it accrued.  If a Holder of Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange in the case of a taxable exchange.

In the case of an exchange of any Claims that qualifies as a recapitalization, any accrued market discount that is not included in income should be applied to any stock or "securities" received in the exchange (such as the NewCo Common Stock or Subscription Rights (as defined below), if applicable), such that any gain recognized by a Holder upon a subsequent disposition of such stock or "securities" would generally be treated as ordinary income to the extent of any accrued market discount not previously included in income.  If a Holder of such Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts should be carried over to the stock or "securities" received in the exchange to the extent that any accrued market discount is applied to stock or such "securities" and should become deductible upon a subsequent disposition of such stock or "securities."  To date, specific Treasury Regulations implementing these rules have not been issued.

**(e)        Tax Treatment of the Potential NewCo Transaction**

The characterization of a potential NewCo Transaction will depend on the ultimate structure of such NewCo Transaction, which has not yet been determined as of the date of this Disclosure Statement.  Moreover, even upon the determination of the final structure of a particular NewCo Transaction, the tax consequences of such NewCo Transaction may be subject to uncertainty.  For example, if NewCo issues rights to purchase additional NewCo Common Stock in a rights offering (such rights, "Subscription Rights"), the characterization of such Subscription Rights and their subsequent exercise for U.S. federal income tax purposes—as simply the exercise of options to acquire the underlying stock or, alternatively, as an integrated transaction pursuant to which the underlying stock is acquired directly in partial satisfaction of a Holder's Allowed Claim —is uncertain.

If the Subscription Rights are not disregarded as transitory in an integrated transaction analysis and are treated as separate property (for example, characterized as options), then the Holder's tax basis in the Subscription Rights received depends on whether the receipt of such Subscription Rights qualifies as a recapitalization.  To the extent that both the Subscription Rights and the Allowed Claims exchanged therefor constitute "securities" of NewCo, then the Holder's tax basis and holding period in the Subscription Rights is generally determined as described above in Article X.B.1(b)—*Recapitalization Treatment*.  If either the Holder's Claims or the Subscription Rights received in exchange do not constitute "securities," then the Holder's tax basis in the Subscription Rights received should be equal to the fair market value of such Subscription Rights when received.  A Holder's holding period in the Subscription Rights generally should commence the day following the Effective Date.  A Holder's holding period in the additional NewCo Common Stock received upon exercise of a Subscription Right generally should commence the day following the exercise of the applicable Subscription Right.

It is uncertain whether a Holder that does not exercise a Subscription Right should be treated as receiving anything of additional value in respect of its Allowed Claims.  If the Holder is treated as having received a Subscription Right of value (despite its subsequent lapse), such that it obtains a tax basis in the right, the Holder generally would recognize a loss to the extent of the Holder's tax basis in the Subscription Right upon the lapse or expiration of such right.  In general, such loss would be a capital loss, and long-term or short-term, depending upon whether the requisite holding period was satisfied (taking into account that the receipt of the Subscription Rights in partial satisfaction of a Claim could be part of a recapitalization exchange, even if the right goes unexercised, such that the Holder may carry over the holding period in its Claim).

If the Subscription Rights are disregarded as transitory in an integrated transaction analysis and a Holder's acquisition of NewCo Common Stock in the rights offering is treated as occurring directly in connection with partial satisfaction of a Holder's Allowed Claims, the Holder's tax treatment also depends on whether such acquisition of NewCo Common  Stock in exchange for Allowed Claims qualifies as a  recapitalization.  If, in such integrated transaction, the Holder's receipt of the NewCo Common Stock is pursuant to a recapitalization, then the Holder could have a split basis and holding period in the additional NewCo Common Stock received upon exercise of a Subscription Right (for example, part carryover basis and holding period, with respect to the portion of the additional NewCo Common Stock attributable to the

value of the Subscription Rights, and part new, with respect to the portion of the additional NewCo Common Stock that is attributable to the exercise price of the Subscription Right). If the Holder's receipt of the NewCo Common Stock is not pursuant to a recapitalization (because, for example, the Holder's Allowed Claim does not constitute "securities"), then the Holder's aggregate tax basis in the NewCo Common Stock received upon exercise of a Subscription Right should be equal to the sum of (i) the amount paid for the additional NewCo Common Stock and (ii) the Holder's tax basis in any additional NewCo Common Stock that is treated as directly acquired in partial satisfaction of the Holder's Allowed Claim. A Holder's holding period in the NewCo Common Stock received generally should commence the day following the Effective Date.

Regardless of whether the Subscription Rights are disregarded or not, however, a Holder of Subscription Rights generally would not recognize any gain or loss upon the exercise of such Subscription Rights (beyond the gain or loss recognized in respect of its Claim, as described above). In addition, if either the Subscription Rights or, under an integrated transaction analysis, the additional NewCo Common Stock acquired, is treated as received as part of a recapitalization exchange, any gain recognized upon a subsequent disposition of the additional NewCo Common Stock may be treated as ordinary income to the extent of any carryover of accrued market discount not previously included in income (*see* Article X.B.1(d)—*Character of Gain or Loss*).

## 2.    Holders of Preferred Equity Interests (Class 5)

The below discussion in this Article X.B.2 applies with respect to Holders who only hold Preferred Equity Interests and no other Claim or Interest. For a discussion with respect to Holders who hold Allowed Claims or Interests in multiple Classes of Claims or Interests, see Article X.B.3—*Holders of Multiple Classes of Allowed Claims and Interests* below.

### (a)    Gain or Loss – In General

The exchanging Holder of Allowed Interests will generally recognize capital gain or loss (although any loss with respect to such Interest might be deferred until all Disputed Interests are resolved) in an amount equal to the difference, between (i) the sum of the amount of any Cash, and the fair market value of all other consideration received, including an undivided interest in the Liquidating Trust Assets (other than any amounts received in respect of accrued but unpaid dividends) and (ii) the Holder's adjusted tax basis in its Interests. Such capital gain will be long-term capital gain if at the time of the exchange, the U.S. Holder's holding period of the Allowed Interests was more than one year. Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates. The deduction of capital losses is subject to certain limitations.

In the event of a subsequent disallowance of a Disputed Interest, it is possible that a Holder of a previously Allowed Interest may be taxed as such Disputed Interests are resolved, and such Holder effectively becomes entitled to an increased share of the assets held in the Liquidating Trust. The imputed interest provisions of the IRC may apply to treat a portion of such increased share or any additional distributions (*e.g.*, the redistribution among Holders of Allowed Interests of undeliverable distributions) as imputed interest. In addition, it is possible

that any loss realized by a Holder in satisfaction of an Allowed Interest may be deferred until all Disputed Interest in such Holder's class are determined and such Holder's share can no longer increase, and with respect to certain Allowed Interests, a portion of any gain realized may be deferred under the "installment method" of reporting. Holders are urged to consult their tax advisors regarding the possibility for deferral, and the ability to elect out of the installment method of reporting any gain realized in respect of their Interests.

A Holder's aggregate tax basis in any undivided interest in the Liquidating Trust Assets received in satisfaction of an Interest will equal the amount taken into account in respect of such undivided interest in determining the Holder's amount realized. A Holder's holding period in such undivided interest generally will begin the day following the Effective Date.

The fair market value of the Liquidating Trust Interests is contingent in part on the outcome of certain Retained Causes of Action included in the Liquidating Trust Assets. It is therefore plausible that, instead of the treatment described above, a U.S. Holder could treat the transaction as an "open" transaction for U.S. federal income tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of any recoveries under Retained Causes of Action included in the Liquidating Trust Assets. The U.S. federal income tax consequences of treating the consummation of the Plan as an open transaction are uncertain and highly complex, and a U.S. Holder should consult with its own tax advisor if it believes open transaction treatment might be appropriate.

### 3.     Holders of Multiple Classes of Allowed Claims and Interests

The below discussion in this Article X.B.3 applies with respect to Holders who hold Allowed Claims or Interests in more than one Class of Claims or Interests (for example, a Holder who holds both Senior Notes and Preferred Equity Interests).

The U.S. federal income tax treatment of an exchanging Holder who holds Allowed Claims or Interests in multiple Classes of Claims or Interests is uncertain. If such Holder is treated as having separate exchanges for each Class of Claims or Interests for U.S. federal income tax purposes, the tax treatments described above in Article X.B.1 and Article X.B.2 would generally apply. However, the U.S. federal income tax treatment for a Holder of multiple Classes of Claims or Interests may be different from the tax treatment with respect to Holders who hold Allowed Claims or Interests in only a single Class of Claims or Interests if such Holder is treated as exchanging all Classes of Claims or Interests for all consideration received in a single exchange. For example, an exchanging Holder who only holds Preferred Equity Interests will generally recognize capital gain or loss as described above in Article X.B.2, subject to the qualifications and limitations therein. However, an exchanging Holder who holds both Preferred Equity Interests and Senior Notes that are "securities" may be limited from recognizing any loss if the exchange of Preferred Equity Interests and Senior Notes, taken as a whole, is treated as a recapitalization for U.S. federal income tax purposes. In addition, irrespective of whether such exchange of both Preferred Equity Interests and Senior Notes qualify as a recapitalization, such Holder may also be treated as receiving ordinary income or dividend income (rather than capital gain), to the extent of (i) consideration received in respect of a Claim for accrued but unpaid interest, (ii) consideration received in respect of an Interest for accrued but unpaid dividends or (iii) such Holder's ratable share of the Debtor's earnings and

profits, if the receipt of property other than NewCo Common Stock is treated as such dividends under Section 302(d) or Section 356(a)(2) of the IRC.

The U.S. federal income tax treatment of an exchanging Holder who holds Allowed Claims or Interests in multiple Classes of Claims or Interests is complex and depends on a number of factors, some of which are unclear under applicable law, including whether any such Claims being exchanged constitute "securities", whether such Holder receives any NewCo Common Stock or Subscription Rights and the extent to which Section 302(d) or Section 356(a)(2) of the IRC applies. Holders that hold Claims or Interests in multiple Classes of Claims or Interests are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of the consummation of the Plan.

**4.    Ownership and Disposition of NewCo Common Stock Received Under the Plan**

**(a)    Distributions on NewCo Common Stock**

Cash distributions with respect to the NewCo Common Stock generally will be treated as taxable dividends to the extent allocable to NewCo's current and/or accumulated earnings and profits as determined under U.S. federal income tax principles ("Earnings and Profits") and will be includible in income by the Holder when received. To the extent the amount of any distribution exceeds available Earnings and Profits with respect to such distribution, the excess will be applied against and will reduce the Holder's adjusted tax basis (on a dollar-for-dollar basis) in respect of the stock as to which the distribution was made, but not below zero. Any remaining excess will be treated as gain from the sale or exchange of such stock.

Dividends are generally taxed as ordinary income; however, dividends received by non-corporate Holders may qualify for taxation at lower rates applicable to long-term capital gains, provided certain holding period and other requirements are satisfied. The length of time that a shareholder has held stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. Non-corporate Holders are urged to consult their own tax advisors regarding the applicability of such lower rates under their particular factual situation. Subject to applicable limitations, a distribution to a corporate shareholder that is treated as a dividend for U.S. federal income tax purposes may qualify for the dividends received deduction. No assurance can be given that NewCo will have sufficient Earnings and Profits (as determined for U.S. federal income tax purposes) to cause distributions to be treated as dividends and thus eligible for a dividends received deduction. Corporate Holders may be eligible for the dividends received deduction if certain holding period and taxable income requirements are satisfied, in which case the amount of the deduction is dependent on the percent of NewCo (by vote and value) that the corporate Holder owns. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed. Finally, the tax consequences of the receipt of a dividend by a corporate Holder may be different if the dividend is treated as an "extraordinary dividend" under applicable rules.

**(b)        Sale, Redemption, or Repurchase of NewCo Common Stock**

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption (other than a redemption treated as a distribution for U.S. federal income tax purposes under section 302(d) of the IRC, in which case the consequences described above under "Distributions on NewCo Common Stock" would generally apply), or other taxable disposition of the NewCo Common Stock.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder's holding period of the sold NewCo Common Stock was more than one year.  Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to limitations.

Notwithstanding the foregoing, any gain recognized by a Holder upon a subsequent taxable disposition of any NewCo Common Stock received in respect of an Allowed Claim against the Debtor (or any stock or property received for such stock in a later tax-free exchange) would be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to the Claim or any ordinary loss allowed to the Holder upon satisfaction of the Claim for which NewCo Common Stock was received, less any income (other than interest income) recognized by the Holder upon satisfaction of the Claim, and (ii) with respect to a cash-basis Holder, also any amounts which would have been included in its gross income if the Holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

In addition, as discussed above, in the event of an exchange of Allowed Claims that qualifies as a recapitalization for U.S. federal income tax purposes, a portion of any gain recognized upon a subsequent disposition of any NewCo Common Stock received may be treated as ordinary income to the extent of any carryover of accrued market discount not previously included in income.

**C.        Consequences to the Non-U.S. Holders of Certain Claims and Interests**

As discussed above, it is intended that each Holder of an Allowed Claim or Interest receiving a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust Assets (consistent with its economic rights in the trust).  This Article X.C describes certain U.S. federal income tax consequences of the Plan to the Non-U.S. Holders of certain Claims and Interests.  The same general considerations discussed above at the beginning of Article X.B—*Consequences to U.S. Holders of Certain Claims and Interests*, prior to the discussion in Article X.B.1—*Holders of Senior Note Claims (Class 3(a)) and Other General Unsecured Claims (Class 3(b)) and of Subordinated Note Claims (Class 4)*, apply to Non-U.S. Holders.  Further, the amount and character of each item of income, deduction, gain, or loss is generally determined in the same manner as set forth above in connection with U.S. Holders. However, as discussed in greater detail below, the Non-U.S. Holders may be subject to U.S. federal income tax rules that specifically apply to non-U.S. persons.  For example, special rules may apply to non-U.S. Holders of a U.S. real property holding corporation ("USRPHC").  The Debtor does not believe that it is, and does not believe NewCo will be, a USRPHC, in light of the nature of its assets and business operations, but no formal study has been or will be conducted

and no assurance can be given in this regard.  Unless indicated otherwise, the remainder of this discussion assumes that the Debtor has not been, and NewCo will not be, a USRPHC.

Generally, unless a documented exception applies, a Non-U.S. Holder of an Allowed Claim or Interest may be subject to a 30 percent withholding tax on the gross amount of certain U.S. source income and gain received in connection with the Plan, or in connection with such Holder's ownership of any NewCo Common Stock or Liquidating Trust Interests.  A Non-U.S. Holder may be eligible for a reduction of, or exemption from, withholding tax if such holder qualifies for benefits under a U.S. tax treaty and provides the withholding agent with the documentation necessary to make such treaty claim (*i.e.*, an IRS Form W-8BEN or W-8BEN-E or other applicable documentation, signed under the penalties of perjury) (a "<u>Valid Treaty Claim</u>").  Additionally, a Non-U.S. Holder may be exempt from withholding if such income is effectively connected with a United States trade or business of the Non-U.S. Holder ("<u>ECI</u>") and the Non-U.S. Holder provides the withholding agent with a properly executed IRS Form W-8ECI ("<u>Valid ECI Withholding Exemption</u>").  The result of a Valid ECI Withholding Exemption is that the Non-U.S. Holder will be subject to tax on its U.S. source income on a net basis.  Non-U.S. Holders are urged to consult their tax advisors regarding the availability of making a Valid Treaty Claim or Valid ECI Withholding Exemption.

Non-U.S. Holders must provide the certifications described above (*e.g.*, IRS Forms W-8BEN, W-8BEN-E, and W-8ECI) to the applicable withholding agent prior to receiving a payment that would be subject to U.S. withholding tax and must update such certifications periodically.  Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for an exemption or a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  The reporting obligations of the Liquidating Trust and Liquidating Trust Beneficiaries with respect to the Non-U.S. Holders is discussed below in <u>Article XD.3</u>—*General Tax Reporting by the Liquidating Trust and Liquidating Trust Beneficiaries*.

1.    **Holders of Senior Note Claims (Class 3(a)) and Other General Unsecured Claims (Class 3(b)) and of Subordinated Note Claims (Class 4)**

The below discussion in this <u>Article X.C.1</u> applies with respect to Holders who only hold Allowed Claims within a single Class of Claims.  For a discussion with respect to Holders who hold Allowed Claims or Interests in multiple Classes of Claims or Interests, see <u>Article X.C.3</u>—*Holders of Multiple Classes of Allowed Claims and Interests* below.

(a)    **Gain or Loss on the Exchange**

Whether a Non-U.S. Holder realizes gain or loss pursuant to the transactions undertaken as part of the Plan and the amount and character of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders as discussed in <u>Article X.B.1(a)</u>—*Gain or Loss – In General*, <u>Article X.B.1(b)</u>—*Recapitalization Treatment*, and <u>Article X.B.1(d)</u>—*Character of Gain or Loss* above.

Subject to the discussion below with respect to accrued interest and OID, any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless:

1. the Non-U.S. Holder is a nonresident alien individual who was present in the United States for 183 days or more during the individual's taxable year within which the Effective Date occurs and certain other conditions are met;

2. such gain is ECI (and, if an applicable U.S. income tax treaty applies, such gain is attributable to a permanent establishment of such Non-U.S. Holder in the United States); or

3. such gain is realized by a Non-U.S. Holder on the exchange of an Interest as part of the Plan, and the Debtor is or has been a USRPHC and certain conditions are met.

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty if a Valid Treaty Claim is made) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.

If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. A Valid ECI Withholding Exemption can be made to exempt the Non-U.S. Holder from withholding tax. In addition, if such Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its dividend equivalent amount as defined in section 884(a) of the IRC.

If the third exception applies, although as discussed above, the Debtor believes NewCo has not been or will be a USRPHC, the Non-U.S. Holder generally will be subject to U.S. federal income tax to the extent of any gain realized, and withholding at a rate of 15 percent on the gross amount realized, on the exchange of an Interest that is not characterized as a dividend for U.S. federal income tax purposes, unless certain exceptions apply.

**(b)** **Consideration Received in Satisfaction of Accrued Interest or OID**

The treatment of any consideration received pursuant to the Plan by a Non-U.S. Holder of an Allowed Claim that is received in satisfaction of interest accrued during its holding period (including any OID, in the case of a Claim) is generally determined in the same manner as set forth above in connection with a U.S. Holder in Article X.B.1(c)—*Consideration Received in Satisfaction of Accrued Interest or OID*. Such payments to a Non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally a properly executed IRS Form W-8BEN or W-8BEN-E, although a U.S. taxpayer identification number and documentary evidence issued by foreign governmental authorities to prove residence in the

foreign country, may also be required) establishing that the Non-U.S. Holder is not a U.S. person, unless:

- the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of stock of the Debtor;

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtor (each, within the meaning of the IRC);

- the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the IRC; or

- such accrued interest or OID is ECI (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected Earnings and Profits that are attributable to the accrued but unpaid interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for an exemption from withholding tax with respect to interest that is not ECI generally will be subject to withholding of U.S. federal tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but unpaid interest on such Non-U.S. Holder's Claims. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

(c)     **Tax Treatment of the Potential NewCo Transaction**

The rules described above under Article X.B.1(e)—*Tax Treatment of the Potential NewCo Transaction*, generally apply with respect to a Non-U.S. Holder. However, on lapse or disposition of a Subscription Right, any gain or loss would not be subject to U.S. federal income tax unless (a) the Non-U.S. Holder is a nonresident alien individual who was present in the United States for 183 days or more during the individual's taxable year within which the lapse or disposition and certain other requirements are met, (b) such gain or loss is ECI or (c) NewCo is or has been a USRPHC and certain conditions are met. As discussed above, the Debtor does not believe that NewCo has been or will be a USRPHC.

## 2.    Holders of Preferred Equity Interests (Class 5)

The below discussion in this <u>Article X.C.2</u> applies with respect to Holders who only hold Preferred Equity Interests and no other Claim or Interest.  For a discussion with respect to Holders who hold Allowed Claims or Interests in multiple Classes of Claims or Interests, see <u>Article X.C.3</u>—*Holders of Multiple Classes of Allowed Claims and Interests* below.

### (a)    Gain or Loss on the Exchange

Whether a Non-U.S. Holder realizes gain or loss pursuant to the transactions undertaken as part of the Plan and the amount and character of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders as discussed above in <u>Article X.B.2(a)</u>—*Gain or Loss – In General*.

Any gain realized by a Non-U.S. Holder on the exchange of its Interests generally will not be subject to U.S. federal income taxation unless:

- the Non-U.S. Holder is a nonresident alien individual who was present in the United States for 183 days or more during the individual's taxable year within which the Effective Date occurs and certain other conditions are met;

- such gain is ECI (and, if an applicable U.S. income tax treaty applies, such gain is attributable to a permanent establishment of such Non-U.S. Holder in the United States); or

- such gain is realized by a Non-U.S. Holder on the exchange of an Interest as part of the Plan, and the Debtor is or has been a USRPHC and certain conditions are met.

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty if a Valid Treaty Claim is made) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.

If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.  A Valid ECI Withholding Exemption can be made to exempt the Non-U.S. Holder from withholding tax.  In addition, if such Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its dividend equivalent amount as defined in section 884(a) of the IRC.

If the third exception applies, although as discussed above, the Debtor believes the NewCo has not been or will be a USRPHC, the Non-U.S. Holder generally will be subject to U.S. federal income tax to the extent of any gain realized, and withholding at a rate of 15 percent on the gross amount realized, on the exchange of an Interest that is not characterized as a dividend for U.S. federal income tax purposes, unless certain exceptions apply.

### 3. Holders of Multiple Classes of Allowed Claims and Interests

The below discussion in this Article X.C.3 applies with respect to Holders who hold Allowed Claims or Interests in more than one Class of Claims or Interests (for example, a Holder who holds both Senior Notes and Preferred Equity Interests).

The U.S. federal income tax treatment of an exchanging Holder who holds Allowed Claims or Interests in multiple Classes of Claims or Interests is uncertain. If such Holder is treated as having separate exchanges for each Class of Claims or Interests for U.S. federal income tax purposes, the tax treatments described above in Article X.C.1 and Article X.C.2 would generally apply. However, the U.S. federal income tax treatment for a Holder of multiple Classes of Claims or Interests may be different from the tax treatment with respect to Holders who hold Allowed Claims or Interests in only a single Class of Claims or Interests if such Holder is treated as exchanging all Classes of Claims or Interests for all consideration received in a single exchange. For example, an exchanging Holder who only holds Preferred Equity Interests will generally recognize capital gain or loss as described above in Article X.C.2—*Holders of Preferred Equity Interests (Class 5)*, subject to the qualifications and limitations therein. However, an exchanging Holder who holds both Preferred Equity Interests and Senior Notes that are "securities" may be limited from recognizing any loss if the exchange of Preferred Equity Interests and Senior Notes, taken as a whole, is treated as a recapitalization for U.S. federal income tax purposes. In addition, irrespective of whether such exchange of both Preferred Equity Interests and Senior Notes qualify as a recapitalization, such Holder may also be treated as receiving ordinary dividend income (rather than capital gain), to the extent of (i) consideration received in respect of a Claim for accrued but unpaid interest, (ii) consideration received in respect of an Interest for accrued but unpaid dividends or (iii) such Holder's ratable share of the Debtor's earnings and profits, if the receipt of property other than NewCo Common Stock is treated as dividends such under Section 302(d) or Section 356(a)(2) of the IRC. In such cases, such amounts treated as interest or dividends may be subject to U.S. federal withholding tax or branch profits tax in a manner similar to such taxes imposed on consideration received in satisfaction of accrued but unpaid interest described above in Article X.C.1(b)—*Consideration Received in Satisfaction of Accrued Interest or OID* or imposed on dividends paid with respect to NewCo Common Stock described below in Article X.C.4(a)—*Distributions on NewCo Common Stock*.

The U.S. federal income tax treatment of an exchanging Holder who holds Allowed Claims or Interests in multiple Classes of Claims or Interests is complex and depends on a number of factors, some of which are unclear under applicable law, including whether any such Claims being exchanged constitute "securities" and whether such Holder receives any NewCo Common Stock or Subscription Rights and the extent to which Section 302(d) or Section 356(a)(2) of the IRC applies. Holders that hold Claims or Interests in multiple Classes of Claims or Interests are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of the consummation of the Plan.

4. **Ownership and Disposition of NewCo Common Stock Received Under the Plan**

(a) **Distributions on NewCo Common Stock**

The treatment of distributions with respect to the NewCo Common Stock is generally determined in the same manner as set forth above in connection with U.S. Holders as discussed above in <u>Article X.B.4(a)</u>—*Distributions on NewCo Common Stock*.  Except as described below, dividends paid with respect to NewCo Common Stock held by a Non-U.S. Holder that are not eligible for a Valid ECI Withholding Exemption will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty if a Valid Treaty Claim is made).  In addition, a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected Earnings and Profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).As discussed above, although the Debtor believes NewCo has not been nor will be a USRPHC, if NewCo is a USRPHC, distributions to a Non-U.S. Holder that are not treated as dividends may be subject to U.S. federal income tax and will generally be subject to withholding by NewCo at a rate of 15 percent to the extent they are not treated as dividends, unless certain exceptions apply.

(b) **Sale, Redemption, or Repurchase of NewCo Common Stock**

The treatment of sale, redemption or repurchase of NewCo Common Stock is generally determined in the same manner as set forth above in connection with U.S. Holders as discussed above in <u>Article X.B.4(b)</u>—*Sale, Redemption, or Repurchase of NewCo Common Stock*.  A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a Cash redemption) of NewCo Common Stock unless:

- such Non-U.S. Holder is a nonresident alien individual who was present in the United States for 183 days or more during the individual's taxable year within which the disposition occurs;

- a Valid ECI Withholding Exemption is made with respect to such gain; or

- the issuer of such NewCo Common Stock is or has been a USRPHC and certain conditions are met.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty if a Valid Treaty Claim is made) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Equity Interests.

If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to Earnings and Profits effectively connected with a U.S. trade or business that is attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

As discussed above, the Debtor does not believe that NewCo has been or will be a USRPHC.

## D.    Tax Treatment of the Liquidating Trust and Holders of Liquidating Trust Interests

### 1.    Tax Classification of the Liquidating Trust

As described above, the Liquidating Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (*i.e.*, the Liquidating Trust Beneficiaries are deemed to own the assets of the trust, and all of the trust's income and loss is taxed directly to the Liquidating Trust Beneficiaries). Pursuant to the Plan, all parties (including, without limitation, the Debtor, the Liquidating Trust Board, the Liquidating Trust and the Liquidating Trust Beneficiaries) will be required to treat, for U.S. federal income tax purposes, the Liquidating Trust as a grantor trust of which the Liquidating Trust Beneficiaries are the owners and grantors. The following discussion assumes that the Liquidating Trust will be so respected for U.S. federal income tax purposes. However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. Although the Liquidating Trust will be structured with the intention of complying with guidelines established by the IRS in Revenue Procedure 94-45, 1994-2 C.B. 684, for the formation of liquidating trusts, no opinion of counsel has been requested, and the Liquidating Trust may or may not obtain a ruling from the IRS, concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to successfully challenge the classification of the Liquidating Trust, the U.S. federal income tax consequences to the Liquidating Trust and/or the Holders of Allowed Claims or Interests could vary from those discussed herein (including the potential for imposition of tax on the net income of the Liquidating Trust at the entity level, in addition to taxation at the level of the Liquidating Trust Beneficiaries).

### 2.    Tax Treatment of the Disputed Claims Reserve

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trust of a private letter ruling if the Liquidating Trust so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trust Board), the Liquidating Trust will (A) timely elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (a "DOF"), and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If the Liquidating Trust properly files a tax election to treat a Disputed Claims Reserve as a DOF, then the DOF may be

treated as a separate taxable entity for U.S. federal income tax purposes (rather than a pass-through tax entity) and will be treated as the owner of all assets that it holds for U.S. federal income tax purposes. A DOF will generally be taxed for U.S. federal income tax purposes as either (a) a C corporation, unless all the assets transferred to the DOF by or on behalf of any transferors are passive investments assets, or (b) a "qualified settlement fund" within the meaning of section 468B of the IRC and the applicable Treasury Regulations thereunder (a "QSF"), if all the assets transferred to the DOF by or on behalf of any transferors are passive investment assets. A DOF that is taxable as a QSF is generally subject to taxation at the maximum rate applicable to estates and trusts under section l(e) of the IRC (which is currently 37% for taxable years beginning before January 1, 2026, and 39.6% thereafter) on its "modified gross income." The "modified gross income" is the QSF's gross income under section 61 of the IRC as modified by the rules detailed in Treasury Regulation sections 1.468B-2(b) and 1.468B-9. It is anticipated that any NewCo Disputed Claims Reserve will be treated as a DOF that is taxable as a QSF. Any Liquidating Trust Disputed Claims Reserve and any Liquidating Trust Disputed Interests Reserve may also be treated as a DOF taxable as a QSF, depending on facts and circumstances not yet determined as of the date of this Disclosure Statement, including the specific nature of the assets transferred to any such reserve.

The Liquidating Trust will be responsible for payment, out of the Liquidating Trust Assets, of any Taxes imposed on the Liquidating Trust or the Liquidating Trust Assets, including any Disputed Claims Reserve (which is required under the Plan to bear all Taxes attributable to such Disputed Claims Reserve). In the event, and to the extent, any Cash retained on account of Disputed Claims in a Disputed Claims Reserve is insufficient to pay the portion of any such Taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, such Disputed Claims (including any income that may arise upon any distribution of the assets of the applicable Disputed Claims Reserve), such Taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, (ii) paid with the proceeds from a sale of the assets of the applicable Disputed Claims Reserve or (iii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidating Trust as a result of the resolution of such Disputed Claims. Therefore, the tax liability of a Disputed Claims Reserve may reduce the amount of property otherwise distributable upon the resolution of any Disputed Claims.

### 3.    General Tax Reporting by the Liquidating Trust and Liquidating Trust Beneficiaries

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trust Board), for all U.S. federal income tax purposes, all parties (including, without limitation, the Debtor, the Liquidating Trust, the Liquidating Trust Board and the Liquidating Trust Beneficiaries) must treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as (i) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to the Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to any Disputed Claims Reserve), followed by (ii) the transfer by the Liquidating Trust Beneficiaries to the Liquidating Trust of the Liquidating Trust Assets (other than to the extent Liquidating Trust Assets are allocable to any Disputed Claims Reserve) in exchange for Liquidating Trust Interests. Accordingly, all parties must treat the

Liquidating Trust as a grantor trust of which the Liquidating Trust Beneficiaries are the owners and grantors, and treat the Liquidating Trust Beneficiaries as the direct owners of an undivided interest in the Liquidating Trust Assets (other than the Liquidating Trust Assets allocable to any Disputed Claims Reserve), consistent with their economic interests therein, for all U.S. federal income tax purposes. Holders are urged to consult their tax advisor regarding any subsequent year's adjustments for the elimination of obligations to Holders of Disputed Claims and their replacement with a smaller amount of Allowed Claims that are then paid out of the Liquidating Trust Assets and for any increase in the economic interests in the Liquidating Trust Assets to the Liquidating Trust Beneficiaries as a result of any accretion to the distribution preference on certain Liquidating Trust Interests or increases in the value of the Liquidating Trust Assets distributable to certain Liquidating Trust Beneficiaries, the treatment of which is unclear. For example, it is possible that an accretion to the distribution preference on certain Liquidating Trust Interests may, in certain situations, be viewed as a shift in the deemed ownership of the underlying Liquidating Trust Assets that could give rise to income to the Holders of such Liquidating Trust Interests for U.S. federal income tax purposes. As soon as reasonably practicable after the Liquidating Trust Assets are transferred to the Liquidating Trust, the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Liquidating Trust (including, without limitation, the Debtor, the Liquidating Trust, the Liquidating Trust Board and the Liquidating Trust Beneficiaries) for all U.S. federal income tax purposes.

Allocations of Liquidating Trust taxable income among the Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to any Disputed Claims Reserve) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, other than assets allocable to any Disputed Claims Reserve) to the Holders of the Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets . The tax book value of the Liquidating Trust Assets for purposes of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

Taxable income or loss allocated to Liquidating Trust Beneficiaries will generally be treated as income or loss with respect to such Holder's undivided interest in the Liquidating Trust Assets , and *not* as income or loss with respect to its prior Allowed Claim or Interest. The character of any income and the character and ability to use any loss will depend on the Liquidating Trust Assets and the particular situation of the Liquidating Trust Beneficiary. With respect to any Liquidating Trust Beneficiary that is a Non-U.S. Holder, the Liquidating Trust may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate and whether the Non-U.S. Holder has timely delivered a Valid Treaty

Claim or a Valid ECI Withholding Exemption), subject to the discussions regarding withholding above in Article X.C—*Consequences to the Non-U.S. Holders of Certain Claims and Interests*.

Whether the Liquidating Trust Beneficiaries would be treated as holding any rights regarding FDIC Proceedings (or similar lawsuits regarding the FDIC Claims) as capital assets and the timing and character of any income, gain or loss recognized upon recovery from the FDIC Proceedings (or similar lawsuits regarding the FDIC Claims) is subject to some uncertainty.  While not free from doubt, the Debtor expects such income, gain or loss be treated as capital gain or loss to the Liquidating Trust Beneficiaries.  However, such position is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different characterization.  Depending on the specific nature of the Liquidating Trust Assets and the particular Liquidating Trust Beneficiary's individual circumstances, the character of any income or gain recognized with respect to such Liquidating Trust Beneficiary's undivided interest in the Liquidating Trust Assets may be ordinary or capital, and such Liquidating Trust Beneficiary's ability to use losses (if any) from the implementation of the Plan may be limited (for example, if the Plan gives rise to capital losses to a Holder as discussed above in Article X.B.1(a)—*Gain or Loss – In General*, then the ability to use such capital losses to offset ordinary income arising from Liquidating Trust Assets would be limited).

The U.S. federal income tax obligations of a Holder that is subject to U.S. federal income tax with respect to its Liquidating Trust Interest are not dependent on the Liquidating Trust distributing any Cash or other proceeds.  Thus, such a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the Liquidating Trust's income even if the Liquidating Trust does not make a concurrent distribution to the Holder.  In general, other than in respect of Cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a Holder's Allowed Claim or Interest), a Distribution of Cash by the Liquidating Trust will not be separately taxable to a Liquidating Trust Beneficiary since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Liquidating Trust).  Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the Liquidating Trust on account of Disputed Claims.

In addition, a Non-U.S. Holder may determine that some of the taxable income or loss allocated to such Non-U.S. Holder from the Liquidating Trust is properly treated as ECI.  In such case, provided that the Non-U.S. Holder timely delivers a Valid ECI Withholding Exemption to the withholding agent, such Non-U.S. Holder will generally be taxed on such ECI under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above.  As discussed above in Article IV.B.3—*Liquidating Trust Assets*, the Liquidating Trust may, in its reasonable discretion, contribute all or a portion of the Liquidating Trust Assets, including such assets that may generate such ECI, to a Blocker Corporation in order to avoid such ECI from being allocated to Liquidating Trust Beneficiaries.  However, no assurance can be provided that a Liquidating Trust Beneficiary will not be allocated any ECI.

The Liquidating Trust will comply with all applicable governmental withholding requirements. Thus, as noted above, in the case of any Liquidating Trust Beneficiaries that are not U.S. persons, the Liquidating Trust may be required to withhold up to 30 percent of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate or exemption pursuant to an applicable income tax treaty and if the Non-U.S. Holder timely delivers a Valid Treaty Claim). Significantly, as discussed above, a Liquidating Trust Beneficiary is treated for U.S. federal income tax purposes as holding an undivided interest in the underlying assets of the Liquidating Trust. Accordingly, any amounts received by the Liquidating Trust, the economic benefit of which inures to a Liquidating Trust Beneficiary on the basis described above with respect to the allocation of income, is treated as received by the beneficiary in respect of the underlying asset, and *not* in respect of its Allowed Claim or Interest.

The Liquidating Trust is subject to certain tax return and reporting requirements, and the Liquidating Trust Board (which shall act as the Liquidating Trust trustee under Revenue Procedure 94-45) is generally expected to furnish to each Liquidating Trust Beneficiary a tax information statement following the end of each taxable year. A Liquidating Trust Beneficiary that takes a reporting position on its U.S. federal income tax return that is different from any position reflected in the information return filed by the Liquidating Trust Board, including the aforementioned tax information statement provided to the Liquidating Trust Beneficiary, may be required to notify the IRS of such inconsistency. Holders should consult their tax advisors with respect to the U.S. federal income tax consequences of taking a different position than is reported by the Liquidating Trust Board.

***Holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Liquidating Trust.***

**E.    FATCA**

Pursuant to sections 1471 through 1474 of the IRC (commonly referred to as "FATCA"), foreign financial institutions (which term includes most foreign hedge funds, private equity funds, mutual funds, securitization vehicles and other investment vehicles) and certain other non-financial foreign entities who do not comply with certain information reporting rules with respect to their U.S. account holders, investors or owners may be subject to a 30% withholding tax with respect to any payments of U.S.-source interest or dividends (which may include dividends on shares of NewCo Common Stock). Foreign financial institutions and non-financial foreign entities subject to the FATCA regime located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules. Under certain circumstances, a U.S. Holder or Non-U.S. Holder might be eligible for refunds or credits of such taxes. U.S. Holders and Non-U.S. Holders are urged to consult with their own tax advisors regarding the effect, if any, of the FATCA provisions to them based on their particular circumstances.

**F.**      **Withholding on Distributions and Information Reporting**

Payments of interest or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the Liquidating Trust Assets or NewCo Common Stock may be subject to "backup withholding" if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding.  Backup withholding is not an additional tax.  Any amounts deducted and withheld generally should be allowed as a refund or credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS.  Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner.  Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions.  Information may also be required to be provided to the IRS concerning payments, unless an exemption applies.  Holders of Claims and Interests should consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.  The Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds.  Holders of Claims and Interests should consult their tax advisors regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on their tax returns.

*THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.*

## ARTICLE XI.

## RECOMMENDATION

In the opinion of the Debtor, the Plan is preferable to the alternatives described herein.  Therefore, the Debtor recommends that Holders of Claims and Interests entitled to vote on the Plan vote to accept it.

Dated:  [•], 2024

Respectfully submitted,

SVB Financial Group.

By: _____
Name:
Title:

## Appendix A

**Debtor's First Amended Plan of Reorganization
under Chapter 11 of the Bankruptcy Code**

# **Appendix B**

## **Liquidation Analysis**

## **Appendix C**

**Solicitation Procedures Order**

[*To come.*]

## **Appendix D**

**Financial Projections**

**<u>Appendix E</u>**

**Restructuring Support Agreement**

**<u>Appendix F</u>**

**NewCo Value Overview and Liquidating Trust Assets**

## **Exhibit A**

**Debtor's Organizational Structure**

[*To come.*]

## **Exhibit B**

**Illustrative Post-Emergence Organizational Structure**

[*To come.*]

**<u>Exhibit C</u>**

**Committee Letter**

## EXHIBIT B

**Blackline**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————— x
                                              :
In re                                         :        Chapter 11
                                              :
SVB FINANCIAL GROUP,[1]                       :        Case No. 23-10367 (MG)
                                              :
                        Debtor.               :
                                              :
                                              :
————————————————————— x

### DISCLOSURE STATEMENT FOR DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

James L. Bromley
Andrew G. Dietderich
Christian P. Jensen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:    (212) 558-4000
Facsimile:    (212) 558-3588
E-mail:        bromleyj@sullcrom.com
                dietdericha@sullcrom.com
                jensenc@sullcrom.com

Dated: ~~February 7~~May 3, 2024

---

**THIS IS NOT A SOLICITATION OF VOTES OF ACCEPTANCE OR REJECTION OF THE PLAN.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT**

---

**A SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF SVB FINANCIAL GROUP'S CHAPTER 11 PLAN.**

---

[1]    The last four digits of SVB Financial Group's tax identification number are 2278.

S&C Draft of February 1, 2024
PRIVILEGED AND CONFIDENTIAL

> **UNLESS EXTENDED BY THE DEBTOR (SUBJECT TO ANY CONSENT RIGHTS OF THE UCC AND THE REQUIRED AD HOC SENIOR NOTEHOLDER PARTIES), THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN TIME, ON ~~APRIL~~JUNE [~~25~~13], 2024 (THE "<u>VOTING DEADLINE</u>").**
>
> **THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS ~~4:00 P.M. ON MARCH [15~~MAY [14], 2024 (THE "<u>VOTING RECORD DATE</u>").**

> **RECOMMENDATION BY THE DEBTOR**
>
> **The Restructuring Committee of the Board of Directors of SVB Financial Group has approved the transactions contemplated by the Plan (as defined herein) and believes that confirmation and consummation of the Plan is in the best interests of the Debtor's Estate and Holders of Claims and Interests. Accordingly, the Restructuring Committee of the Board of Directors of SVB Financial Group recommends that all Holders of Claims and Interests whose votes are being solicited submit ballots to accept the Plan.**

THE RESTRUCTURING COMMITTEE OF THE DEBTOR'S BOARD OF DIRECTORS HAS APPROVED THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN AND THE TRANSACTIONS CONTEMPLATED AND DESCRIBED HEREIN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE CHAPTER 11 PLAN IT DESCRIBES HEREIN. NO PERSON SHOULD USE OR RELY ON THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT IS BEING DISTRIBUTED TO PARTIES-IN-INTEREST AS A SETTLEMENT PROPOSAL AND IS THEREFORE SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND OTHER APPLICABLE RULES, AND DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER IN CONNECTION WITH ANY PENDING, THREATENED AND POTENTIAL LITIGATION, ARBITRATIONS OR DISPUTES. THE DEBTOR AND ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS OR INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS OR INTERESTS.

IF THE BANKRUPTCY COURT DOES NOT CONFIRM THE CHAPTER 11 PLAN AND/OR THE CHAPTER 11 PLAN DOES NOT BECOME EFFECTIVE, NO

**PORTION OF THE CHAPTER 11 PLAN, INCLUDING ANY SETTLEMENTS, WILL BECOME EFFECTIVE.**

**THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN AND DOCUMENTS RELATED THERETO, STATUTORY PROVISIONS RELEVANT TO CONFIRMATION OF THE PLAN, EVENTS IN THIS CHAPTER 11 CASE AND FINANCIAL INFORMATION RELATED TO THE DEBTOR, NEWCO AND THE LIQUIDATING TRUST. ALTHOUGH THE DEBTOR BELIEVES SUCH SUMMARIES ARE FAIR AND ACCURATE, THEY ARE QUALIFIED IN THEIR ENTIRETY BY SUCH DOCUMENTS AND STATUTORY PROVISIONS TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRETY OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.**

**FACTUAL INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.**

**THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED MATERIALLY SINCE THIS DISCLOSURE STATEMENT WAS FILED. SUBJECT TO THE CONSENT RIGHTS SET FORTH IN THE RSA, THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED DISCLOSURE STATEMENT FROM TIME TO TIME.**

**THE FINANCIAL PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE DEBTOR'S MANAGEMENT WITH THE ASSISTANCE OF THEIR FINANCIAL AND RESTRUCTURING ADVISORS. THESE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTOR'S CONTROL. THE DEBTOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL**

**NOT MATERIALIZE.  FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING
SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS
WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED AND/OR MAY
HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE
EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR
MATERIALLY BENEFICIAL MANNER.  THE FINANCIAL PROJECTIONS,
THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER
ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.**

**NO PERSON SHOULD RELY ON ANY OTHER INFORMATION THAN
THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR
INCORPORATED BY REFERENCE HEREIN.  THE DEBTOR HAS NOT
AUTHORIZED ANYONE TO PROVIDE ANY INFORMATION ABOUT OR
CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS
DISCLOSURE STATEMENT.**

**EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE ON
THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE
STATEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT.  THIS
DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS,
FINANCIAL OR TAX ADVICE.  ANY PERSONS DESIRING ANY SUCH ADVICE OR
OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.**

**UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE
SECURITIES DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION
UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE
"SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, IN
RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE
BANKRUPTCY CODE TO THE EXTENT SUCH EXEMPTIONS ARE AVAILABLE.
OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE
EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS TO THE EXTENT SUCH
EXEMPTIONS ARE AVAILABLE.  IN ACCORDANCE WITH SECTION 1125(e) OF
THE BANKRUPTCY CODE, A DEBTOR OR ANY OF ITS AGENTS THAT
PARTICIPATES, IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE
PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR
PURCHASE OF A SECURITY, OFFERED OR SOLD UNDER THE PLAN, OF THE
DEBTOR, OF AN AFFILIATE PARTICIPATING IN A JOINT PLAN WITH THE
DEBTOR, OR OF A NEWLY ORGANIZED SUCCESSOR TO THE DEBTOR UNDER
THE PLAN, IS NOT LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR
VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING
THE OFFER, ISSUANCE, SALE, OR PURCHASE OF SECURITIES.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN
ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND
BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR
STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.
THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED**

**BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**THE DEBTOR MAKES STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995, AS AMENDED.  THE DEBTOR CONSIDERS ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS REPRESENT THE DEBTOR'S ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTOR'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE MATERIALLY DIFFERENT FROM THOSE IT MAY PROJECT, AND THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENT.  THE DEBTOR EXPRESSLY CAUTIONS READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF SUCCESS OR THE DEBTOR'S ABILITY TO SATISFY ALL CLAIMS OR INTERESTS TO BE PAID UNDER THE PLAN.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT NEED TO BE CONSIDERED.  SEE ARTICLE IX OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM OR INTEREST TO ACCEPT THE PLAN.**

# TABLE OF CONTENTS

Page

**ARTICLE I. EXECUTIVE SUMMARY** .............................................. 1
  A.    **Purpose of this Disclosure Statement** ....................... 2
  B.    **Recovery Analysis and Treatment of Claims and Interests** .... 3
  C.    **Voting on the Plan** .................................... ~~6~~10
  D.    **Confirmation of the Plan** ............................. ~~8~~12

**ARTICLE II. BACKGROUND** ....................................... ~~9~~12
  A.    **Overview of the Debtor's Businesses** ................... ~~9~~12
  B.    **The Debtor's Corporate Structure and Global Operations** .. ~~9~~13
  C.    **Summary of the Debtor's Assets and Operations** ......... ~~10~~15
  D.    **Liabilities – The Debtor's Prepetition Funded Indebtedness** .. ~~12~~17
  E.    **Existing Preferred Stock** .............................. ~~14~~18
  F.    **Existing Common Stock** ................................. ~~14~~19
  G.    **Factors Leading to the Commencement of This Chapter 11 Case** .. ~~15~~19

**ARTICLE III. SIGNIFICANT EVENTS AND INITIATIVES IN THIS CHAPTER 11 CASE** .. ~~17~~21
  A.    **Commencement of the Chapter 11 Case** ................... ~~17~~21
  B.    **First Day Relief** ..................................... ~~17~~21
  C.    **Appointment of the UCC** ............................... ~~18~~23
  D.    **The Ad Hoc Group of Senior Noteholders** ............... ~~19~~23
  E.    **The Ad Hoc Cross-Holder Group** ........................ ~~19~~23
  F.    **Retention of Debtor Professionals** .................... ~~19~~24
  G.    **Schedules and Statements and 341 Meeting** ............. ~~20~~24
  H.    **Bar Dates and Claims Process** ......................... ~~20~~24
  I.    **Assumption and Assignment of Executory Contracts to FCB and Non-debtor Subsidiaries** ......... ~~20~~25
  ~~J.    Investigation of Potential Estate Claims and Causes of Action~~ .. ~~21~~
  ~~K~~J.    **Claims Against the FDIC** ............................ ~~22~~26
  ~~L~~K.    **SVB Securities Sale** ............................... ~~24~~29
  ~~M~~L.    **SVB Capital Reorganization and ~~Strategic Alternatives Review~~ Sale** .. ~~25~~30
  M.    **SVB India Sale** ....................................... 32
  N.    **The Restructuring Support Agreement** .................. ~~26~~33
  O.    **Securities Lawsuits** .................................. 34
  P.    **Investigation of Potential Estate Claims and Causes of Action** .. 35

**ARTICLE IV. SUMMARY OF THE PLAN** ............................. ~~27~~37
  A.    **Classification, Treatment and Voting of Claims and Interests** .. ~~28~~38
  B.    **The Liquidating Trust** ................................ ~~30~~45
  C.    **Implementation of the Plan** ........................... ~~40~~56
  D.    **Provisions Regarding Governance of NewCo** ............. ~~48~~64
  E.    **Executory Contracts and Unexpired Leases** ............. ~~50~~66
  F.    **Provisions Governing Distributions** ................... ~~52~~69

i

G.    Settlement, Release, Injunction and Related Plan Provisions ................ ~~59~~76
H.    Conditions Precedent ................................................................................ ~~68~~86

ARTICLE V. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE
PLAN .............................................................................................................. ~~70~~87
A.    The Confirmation Hearing ....................................................................... ~~70~~88
B.    Confirmation Standards ........................................................................... ~~71~~88
C.    Best Interests Test .................................................................................... ~~72~~90
D.    Financial Feasibility ................................................................................ ~~75~~93
E.    Acceptance by Impaired Classes .............................................................. ~~75~~93
F.    Confirmation Without Acceptance by All Impaired Classes .................... ~~76~~94
G.    MoffettNathanson Valuation~~78~~ and NewCo and Liquidating Trust Asset Overviews 96
H.    Classification ........................................................................................... ~~78~~96

ARTICLE VI. VOTING PROCEDURES ................................................................. ~~78~~96
A.    Parties-in-Interest Entitled to Vote ......................................................... ~~80~~99
B.    Classes under the Plan ............................................................................. ~~81~~99
C.    Form, Content, and Manner of Notices .................................................... ~~82~~100
D.    Voluntary Releases under the Plan .......................................................... ~~83~~101
E.    Voting Procedures .................................................................................... ~~85~~104

ARTICLE VII. EFFECT OF CONFIRMATION ..................................................... ~~88~~107
A.    Binding Effect of Confirmation ............................................................... ~~88~~107
B.    Good Faith ................................................................................................ ~~88~~107

ARTICLE VIII. SECURITIES LAW MATTERS ..................................................... ~~88~~107
A.    Bankruptcy Code Exemptions from Registration Requirements .............. ~~88~~107
B.    Private Placement Exemptions ................................................................. ~~91~~109

ARTICLE IX. CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO
VOTING ........................................................................................................ ~~93~~112
A.    Certain Bankruptcy Law Considerations ................................................. ~~94~~112
B.    Risks Related to the Debtor's Ongoing Operations during the
Chapter 11 Case ....................................................................................... ~~99~~119
C.    Risk Factors Relating to the SVB Capital Sale ........................................ 121
~~C~~D.    Risk Factors Relating to a NewCo Transaction ....................................... ~~101~~122
~~D~~E.    Risk Factors Relating to NewCo Common Stock to Be Issued Under
the Plan .................................................................................................... ~~102~~122
~~E~~F.    Operational Risks for NewCo ................................................................... ~~104~~125
~~F~~G.    Risk Factors Relating to Liquidating Trust Interests to Be Issued
Under the Plan .......................................................................................... ~~106~~127
~~G~~H.    Operational Risks for the Liquidating Trust ............................................ ~~107~~129
~~H~~I.    Additional Risk Factors ........................................................................... ~~109~~131

ARTICLE X. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF
THE PLAN .................................................................................................... ~~112~~133
A.    Consequences to the Debtor ..................................................................... ~~114~~136

ii

| | | |
|---|---|---|
| B. | Consequences to U.S. Holders of Certain Claims and Interests | ~~121~~141 |
| C. | Consequences to the Non-U.S. Holders of Certain Claims and Interests | 150 |
| ~~C~~D. | Tax Treatment of the Liquidating Trust and Holders of Liquidating Trust Interests | ~~130~~157 |
| ~~D~~F. | Withholding on Distributions and Information Reporting | ~~134~~162 |

**ARTICLE XI. RECOMMENDATION** ................................................ ~~135~~162

4882-9472-4471 v.14

Appendices and Exhibits

| | |
|---|---|
| Appendix A | Debtor's Plan of Reorganization under Chapter 11 of the Bankruptcy Code |
| Appendix B | Liquidation Analysis |
| Appendix C | Solicitation Procedures Order |
| Appendix D | Financial Projections |
| Appendix E | Restructuring Support Agreement |
| Appendix F | NewCo Value Overview and Liquidating Trust Assets |

| | |
|---|---|
| [Exhibit A] | [Debtor's Organizational Structure][2] |
| [Exhibit B] | [Illustrative Post-Emergence Organizational Structure][3] |
| [Exhibit C] | [Committee Letter][2] |

---

[2]    **[NTD**: To be filed with the Court in advance of Disclosure Statement hearing.]

[3]    **[NTD**: To be filed with the Court in advance of Disclosure Statement hearing.]

[2]    **[NTD**:  Letter to be filed with the Court in advance of Disclosure Statement hearing.]

iv

# ARTICLE I.~~ARTICLE I~~

## EXECUTIVE SUMMARY

On March 17, 2023 (the "Petition Date"), SVB Financial Group (the "Debtor") filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") (the "Chapter 11 Case").

~~On January 26, 2024~~Simultaneous with the filing of this Disclosure Statement, the Debtor filed the *Debtor's First Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (as may be further amended, supplemented or modified from time to time, including the Plan Supplement and all other exhibits and schedules thereto, in each case, as they may be further amended, modified or supplemented from time to time, the "Plan") [D.I. ~~826~~1086].  The Plan is annexed hereto as Appendix A and is incorporated herein by reference.

The Plan provides for the formation of a liquidating trust (the "Liquidating Trust"), to which the Debtor will contribute certain assets, including but not limited to certain claims, causes of action, investment securities, limited ~~partner~~partnership interests~~,~~ and cash, as agreed upon by the Debtor, the UCC and the Required Ad Hoc Senior Noteholder Parties under the terms of the Plan and Restructuring Support Agreement (the "RSA").  Upon the Effective Date, the Liquidating Trust will issue three classes of Liquidating Trust Interests and, subject to certain conditions described in the Plan, Holders of certain Classes of Claims and Interests will receive certain Liquidating Trust Interests in accordance with the priority of their Claims.  In addition, the Plan provides that the Debtor may undertake certain restructuring transactions which, if effected, will result in a newly-formed Delaware corporation (or other business form as agreed upon under the terms of the Plan) owning, directly or indirectly, 100% of the equity interests in the Debtor.  For purposes of the Plan and this Disclosure Statement, "NewCo" shall refer to, as applicable, (i) the Debtor as reorganized pursuant to and under the Plan and any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date or (ii) a newly-formed Delaware corporation (or other business form as agreed upon under the terms of the Plan) that owns or will own, directly or indirectly, 100% of the equity interests in the Debtor.  NewCo will retain assets of the Debtor not otherwise contributed to the Liquidating Trust, including the equity interests in certain non-Debtor subsidiaries.  NewCo ~~or one of its wholly-owned subsidiaries will issue debt to the Liquidating Trust and NewCo~~ will issue 100% of its new common equity interests to certain Holders of Allowed General Unsecured Claims, subject to dilution by any NewCo Transaction (as defined below).

The Plan and this Disclosure Statement are the result of extensive good faith and arms-length discussions and negotiations among the Debtor, the UCC and the Ad Hoc Group of Senior Noteholders (all terms as defined below).  The Plan is a direct product of the RSA among the Debtor, the UCC and the Ad Hoc Group of Senior Noteholders, which RSA is attached hereto as Appendix E.  The Debtor believes that the Plan will provide the highest and best recovery to Holders of Claims and Interests in the most efficient and expeditious manner possible.  The Debtor submits that (i) through the Plan, Holders of Allowed Claims and Interests will obtain a recovery from the Debtor's Estate equal to or greater than the recovery that they would receive if the Debtor's assets were liquidated under chapter 7 of the Bankruptcy Code and

(ii) consummation of the Plan will maximize the recovery of the Holders of Allowed Claims and Interests.

Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan; *provided*, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), will have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

## A.    Purpose of this Disclosure Statement

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization.  Chapter 11 helps a company maximize recovery to all stakeholders.  The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying claims against, and interests in, the debtor.  Confirmation of a plan by a bankruptcy court binds the debtor and any creditor or interest holder of the debtor.  Subject to certain limited exceptions, the order approving confirmation of a plan enjoins parties from enforcing any debt that arose prior to the date of confirmation of the plan or from bringing any causes of action against the debtor in connection with such debt.

In general, a plan (a) divides claims and interests into separate classes, (b) specifies the property or other distributions that each class is to receive under the plan and (c) contains provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "interests," rather than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and interests in more than one class.

The Debtor submits this *Disclosure Statement for Debtor's First Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code for the purpose of soliciting votes on the proposed Plan.  The purpose of this Disclosure Statement is to provide the Holders of Claims and Interests who are entitled, and will be solicited, to vote on the Plan with information of a kind and in sufficient detail, to make an informed decision on whether to accept or reject the Plan.  Pursuant to section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited only after a Bankruptcy Court-approved written disclosure statement has been provided to each creditor or interest holder who is entitled to vote on the plan.

This Disclosure Statement includes, among other things, information pertaining to the Debtor's prepetition business operations and financial history and the events leading up to the Chapter 11 Case.  In addition, an overview of the Plan is included, which overview sets forth certain terms and provisions of the Plan, the effects of Confirmation of the Plan, certain risk factors associated with the Plan and the manner in which distributions will be made under the Plan.  This Disclosure Statement also discusses the Confirmation process and the procedures for voting, which procedures must be followed by the Holders of Claims and Interests entitled to vote under the Plan for their votes to be counted.

**B.      Recovery Analysis and Treatment of Claims and Interests**

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Section 4 of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  For each Class, the Plan describes (a) the underlying Claim or Interest, (b) the recovery available to the Holders of Claims or Interests in that Class under the Plan, (c) whether the Class is Impaired under the Plan, meaning that each Holder will receive less than full value on account of its Claim or Interest or that the rights of Holders under law will be altered in some way and (d) the form of any consideration (*e.g.*, Cash, Liquidating Trust Interests, NewCo Common Stock or a combination thereof) that Holders will receive on account of their respective Claims or Interests.

Subject to the terms set forth in Section 4 of the Plan and as further described in Article IV.C.5—*NewCo Common Stock* below, Holders of Claims in Classes 3(a) and 3(b) may be entitled to receive (a) to the extent such Holder certifies that it is a Qualified Holder, NewCo Common Stock or (b) to the extent that such Holder Certifies that it is a Non-Qualified Holder, Cash equal to the value of the NewCo Common Stock that such Holder would have received if such Holder were a Qualified Holder.  Accordingly, each such Holder must provide a certification as to its status as (x) a Qualified Holder or (y) a Non-Qualified Holder in order to receive its distribution as described in clause (a) or (b) of the previous sentence, respectively. The procedures for providing such certification are described further in Article IV.C.5—*NewCo Common Stock* below.

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Other Administrative Claims, Ad Hoc Noteholder Group Expenses, Senior Note Trustee Expenses, Subordinated Note Trustee Expenses, Professional Fee Claims and Priority Tax Claims, which will generally be paid in Cash when approved by the Bankruptcy Court or in the ordinary course on or after the Effective Date.

**1.      Classification of Claims and Interests**

The classification of Claims and Interests pursuant to the Plan is as follows:

| Class | Designation | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3(a) | Senior Note Claims | Impaired | Entitled to Vote |
| 3(b) | ~~Senior Note Claims and~~ Other General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Subordinated Note Claims | Impaired | Entitled to Vote |
| 5 | Preferred Equity Interests | Impaired | Entitled to Vote |
| 6 | Common Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

| Class | Designation | Status | Voting Rights |
|-------|-------------|--------|---------------|
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Claims and Intercompany Interests | Impaired or Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

**2.**     **Recovery Analysis Summary**

The table below provides a summary of the classification, treatment and estimated recoveries of Claims and Interests under the Plan.  This information is provided in summary form for illustrative purposes only, is subject to material change based on contingencies related to the claims reconciliation process, recoveries obtained by the Liquidating Trust in liquidating the Liquidating Trust Assets and the post-Effective Date financial performance of NewCo, and is qualified in its entirety by reference to the provisions of the Plan.  Amounts assumed for purposes of projected recoveries are estimates only.  Actual recoveries received under the Plan may differ materially from the projected recoveries.  For a more detailed description of the treatment of Claims and Interests under the Plan, *see* Article IV below—*Summary of the Plan*. To the extent any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.  For a complete description of the Debtor's classification and treatment of Claims and Interests, reference should be made to the Plan.

THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.

SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY RANGE[5] | |
|---|---|---|---|---|
| | | | **Plan** | **Liquidation** |
| 1 | ~~Each~~Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim will receive, at the Debtor's option (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed):  (a) payment in full in Cash; (b) delivery of the collateral securing its Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with | [•]N/A | 100% | [•]100% |

---

[4]    Estimated Allowed Claims dollar amounts reflected in millions.

[5]    Estimated percent recovery ranges reflect the estimated recovery range for each class under the Plan and liquidation scenarios.  The estimated recovery ranges provided in this table reflect the low and high ends of projected recoveries under "Scenario A," "Scenario B" and "Scenario C" as set forth in the Liquidation Analysis (as defined below) set forth on Appendix B to this Disclosure Statement.  Scenarios A, B and C reflect a range of outcomes of the Debtor's ongoing litigation with the FDIC (as defined below).  For additional information, please refer to Article V.C.2–*The Debtor's Liquidation Analysis*.

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY RANGE[5] | |
|---|---|---|---|---|
| | | | **Plan** | **Liquidation** |
| | section 1124 of the Bankruptcy Code. | | | |
| 2 | ~~Each~~Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim will receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | [•]$0.0[6] | 100% | [•]100% |
| 3(a) | ~~Each~~Except to the extent that a Holder of an Allowed ~~General Unsecured~~Senior Note Claim agrees to a less favorable treatment (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed), in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Senior Note Claim, each Holder of an Allowed Senior Note Claim will receive (a)(i) if and solely to the extent such Holder is a Qualified Holder, its Pro Rata share ~~of (a) 100%~~together with all Holders receiving Distributions in NewCo Common Stock) of the NewCo Common Stock subject to dilution by any NewCo Transaction~~, (b) 100%~~ or (ii) if and solely to the extent such Holder is a Non-Qualified Holder, | [•]$3,329.0 | [•]41%–96% | [•]30%–85% |

[6]    The Estimated Allowed Claims in Class 2 are less than $1,000.00 in the aggregate.

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY RANGE[5] | |
|---|---|---|---|---|
| | | | **Plan** | **Liquidation** |
| | Cash in an amount equal to the value of the NewCo Common Stock it would be entitled to receive if it were a Qualified Holder, (b) its Pro Rata share (together with all Holders receiving Distributions of the Class A Trust Units) of the Class A Trust Units and (c) payment by the Debtor in Cash sufficient to satisfy of the Senior Note Trustee Expenses, to the extent not otherwise paid by the Debtor; [*provided*, that in lieu of the foregoing, Holders of Allowed General Unsecured Claims will have the ability to elect to receive Cash in lieu of the foregoing distributions in an amount and on terms to be agreed to by the Debtor, the UCC and the Required Ad Hoc Senior Noteholder Parties (the "GUC Cash Out").]³ under the Plan. | | | |
| 3(b) | Except to the extent that a Holder of an Allowed Other General Unsecured Claim agrees to a less favorable treatment (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed), in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other General Unsecured Claim, each Holder of an Allowed Other General Unsecured Claim will receive: | $180.4 | 41%–96% | 30%–85% |

---

³   The Debtor, the UCC and the Required Ad Hoc Senior Noteholder Parties intend for the terms and amount of the GUC Cash Out to be agreed and disclosed prior to the hearing on approval of the Disclosure Statement.

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY RANGE[5] | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| | (a) (i)(A) if and solely to the extent such Holder is a Qualified Holder, its Pro Rata share (together with all Holders receiving Distributions in NewCo Common Stock) of the NewCo Common Stock subject to dilution by any NewCo Transaction or (B) if and solely to the extent such Holder is a Non-Qualified Holder, Cash in an amount equal to the value of the NewCo Common Stock it would be entitled to receive if it were a Qualified Holder, and (ii) its Pro Rata share (together with all Holders receiving Distributions of the Class A Trust Units) of the Class A Trust Units; or

(b) if such Holder elects on the applicable ballot, the GUC Cash-Out with respect such Claim. | | | |
| 4 | ~~Each~~Except to the extent that a Holder of an Allowed Subordinated Note Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Subordinated Note Claim, each Holder of an Allowed Subordinated Note Claim will receive its Pro Rata share of (a) ~~100% of~~the Class B Trust Units in an aggregate amount equal to such Holder's Allowed Subordinated Note Claim and (b) payment by the Debtor in Cash ~~sufficient to satisfy~~of the Subordinated Note Trustee Expenses, to the extent not otherwise paid by the | [•]$104.5 | [•]0% | [•]0% |

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY RANGE[5] | |
|---|---|---|---|---|
| | | | **Plan** | **Liquidation** |
| | Debtor under the Plan. | | | |
| 5 | ~~Each~~Except to the extent that a Holder of an Allowed Preferred Equity Interest agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Preferred Equity Interest, each Holder of an Allowed Preferred Equity Interest will receive its Pro Rata share of ~~100% of~~ the Class C Trust Units. | [•]$3,700.0 | [•]0% | [•]0% |
| 6 | ~~All~~No Holder of a Common Equity Interest will receive any Distributions on account of its Common Equity Interest.  On and after the Effective Date, all Common Equity Interests will be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of such Interests will not receive or retain any distribution, property, or other value on account of such Interests. | [•]N/A | [•]0% | [•]0% |
| 7 | ~~All~~No Holder of a Section 510(b) Claim will receive any Distributions on account of its Section 510(b) Claim.  On and after the Effective Date, all Section 510(b) Claims will be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive or retain any distribution, property, or other value on account of such Claims. | [•]N/A | [•]0% | [•]0% |

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY RANGE[5] | |
|---|---|---|---|---|
| | | | **Plan** | **Liquidation** |
| 8 | ~~Each~~On and after the Effective Date, each Intercompany Claim and each Intercompany Interest will be (a) canceled, released, and discharged, (b) Reinstated, (c) converted to equity, or (d) otherwise set off, settled, or distributed, in each case at the option of the Debtor with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed. | [•]N/A[7] | [•]0% | [•]0% |

**3.    GUC Cash-Out**

As set forth in Section 4.2 of the Plan, certain Holders of Other General Unsecured Claim are eligible to elect to receive the "GUC Cash-Out."  The GUC Cash-Out provides each Holder of an Allowed Other General Unsecured Claim with an option to elect to receive its Distribution in Cash in an amount equal to 45% of (i) the Allowed value of such Claim or (ii) $11,000,000 of such Claim, if such Claim exceeds $11,000,000, in either case, in full satisfaction of such Claim.  To the extent that the Holder of an Allowed Other General Unsecured Claim that exceeds $11,000,000 elects to receive the GUC Cash-Out, such Holder agrees to reduce such Claim to $11,000,000.

**To receive the GUC Cash-Out, each eligible Holder of an Other General Unsecured Claim must complete Item 3 on the applicable ballot and return such ballot in accordance with the procedures set forth in the Solicitation Procedures Order (as defined below), as further described in Article VI—*Voting Procedures* below.  If an eligible Holder of an Other General Unsecured Claim fails to complete the GUC Cash-Out election, set forth on Item 3 of the applicable Ballot, or fails to return such Ballot in accordance with the procedures set forth in the Solicitation Procedures Order by the deadlines provided therein, such Holder will be deemed to have irrevocably relinquished and waived its right to receive the GUC Cash-Out.  All eligible Holders of Other General Unsecured Claims should carefully review the procedures set forth in the Solicitation Procedures Order.**

---

[7]    As of the date of this Disclosure Statement, certain of the Debtor's foreign subsidiaries are in the process of being wound down under applicable law.  In connection with such wind down processes, certain *de minimis* Intercompany Claims held by the Debtor's foreign subsidiaries are expected to be settled prior to the Effective Date.

C.    **Voting on the Plan**

1.    **Parties-in-Interest Entitled to Vote**

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is conclusively presumed to have accepted the plan, and the plan proponent need not solicit such holder's vote.  Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan.  For a detailed description of the treatment of Claims and Interests under the Plan, refer to <u>Article IV</u> below—*Summary of the Plan*.

Classes 1 and 2 are Unimpaired under, and conclusively presumed under section 1126(f) of the Bankruptcy Code to have accepted, the Plan.

Classes ~~3-5~~3(a), 3(b), 4 and 5 are Impaired under, and entitled to vote to accept or reject, the Plan.

Classes 6 and 7 are Impaired under, and deemed under section 1126(g) of the Bankruptcy Code to have rejected, the Plan.

Class 8 is Impaired or Unimpaired under, and deemed under section 1126(f) or 1126(g) of the Bankruptcy Code, as applicable, to have accepted or rejected the Plan.

Except as described in <u>Article V</u> below—*Statutory Requirements for Confirmation of the Plan*, the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each Impaired Class accept the Plan.  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in such class that have voted to accept or reject the plan.  Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds in dollar amount of interests in such class that have voted to accept or reject the plan.  Holders of claims or interests who fail to vote are deemed neither to accept nor to reject the Plan.  For a more detailed description of the requirements for confirmation of the Plan, refer to <u>Article V</u> below—*Statutory Requirements for Confirmation of the Plan*.

Even if the Plan has not been accepted by all Impaired Classes entitled to vote, section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan,

provided that the Plan has been accepted by at least one Impaired Class of creditors. Notwithstanding the failure of an Impaired Class to accept the Plan, the Plan can be confirmed by a procedure commonly known as cram-down, provided the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan. For a more detailed description of the requirements for confirmation of a nonconsensual plan, refer to Article V below—*Statutory Requirements for Confirmation of the Plan*.

    **2.**       **Submitting a Ballot**

       If you are the record Holder of a Claim or Interest in a Class entitled to vote on the Plan, accompanying this Disclosure Statement is a ballot (the "Ballot") for voting to accept or reject the Plan.

       Classes 3(a), 3(b), 4 and 5 are entitled to, or are being solicited to, vote to accept or reject the Plan. If you are entitled to or are being solicited to vote, you should carefully review this Disclosure Statement, including the attached appendices and the instructions accompanying your Ballot or Ballots. Then, indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot or Ballots and return the Ballot or Ballots to Kroll Restructuring Administration LLC (the "Solicitation Agent" or "Kroll") or by submitting a Ballot or Ballots through the online electronic ballot portal (as described on the Ballot) maintained by Kroll. If you are a Beneficial Holder[48] of Claims or Interests in Classes 3(a), 4 or 5 and received a Ballot for Beneficial Holders (a "Beneficial Holder Ballot"), you must return the Beneficial Holder Ballot to your broker or other nominee, or the agent of a broker or other nominee (each of the foregoing, a "Nominee"), in accordance with the instructions provided by your Nominee, who will then submit a master ballot on your behalf.

       As described herein, the Ballot or Election Form (as defined below), as applicable, contains an election for a Holder who rejects the Plan, a Holder abstaining from voting on the Plan, or a Holder deemed to accept the Plan, to opt out of the third-party releases contained in Section 12.9 of the Plan. If applicable, each Holder of a Claim or Interest that does not timely make the opt-out election on its Ballot or Election Form will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties.

       The notices of non-voting status for Holders of Claims or Interests that are deemed to reject the Plan contain an election to opt in to the third-party releases contained in Section 12.9 of the Plan. Holders of Claims or Interests that are deemed to reject the Plan but who affirmatively opt in to the third-party releases provided by the Plan by checking the box on the applicable Election Form indicating that they opt in to grant the third-party releases provided in the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties.

---

[48]  A "Beneficial Holder" means a beneficial owner of publicly traded securities whose Claims or Interests have not been satisfied prior to the Record Date pursuant to Court order or otherwise, as reflected in the records maintained by the Nominees holding through the respective indenture trustee or transfer agent (as applicable).

For further information, refer to Article VI below—*Voting Procedures* below, and the Solicitation Procedures Order attached hereto as Appendix C.

Ballots cast by Holders in Classes entitled to vote must be actually received by the Solicitation Agent by 5:00 p.m. Eastern Time on ~~April~~June [~~25~~17], 2024.  Ballots received after the Voting Deadline will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected.

For further information, refer to Article VI below—*Voting Procedures* below.

### 3.    Recommendation

**The Debtor believes that confirmation and consummation of the Plan is in the best interests of the Debtor's Estate and Holders of Claims and Interests.  Accordingly, the Debtor recommends that Holders of Claims and Interests entitled to vote on the Plan vote to accept it.**

## D.    Confirmation of the Plan

### 1.    Plan Objection Deadline

Objections to Confirmation of the Plan must be filed with the Bankruptcy Court and served so as to be actually received on or before 4:00 p.m., Eastern Time on ~~April~~June [~~30~~18], 2024.  Unless objections to the Confirmation are timely served and filed in compliance with the Solicitation Procedures Order, they will not be considered by the Bankruptcy Court.

### 2.    Confirmation Hearing

The Bankruptcy Court has scheduled the hearing to consider confirmation (the "Confirmation") of the Plan (the "Confirmation Hearing") at ~~[10]:00 a.m~~10:00 a.m. on ~~May~~June [~~7~~25], 2024, Eastern Time.  The Confirmation Hearing may be adjourned by the Bankruptcy Court or the Debtor without further notice other than by announcement in open court and/or notice(s) of adjournment filed on the docket with the Bankruptcy Court's permission.

## ARTICLE II.~~ARTICLE II~~

## BACKGROUND

## A.    Overview of the Debtor's Businesses

The principal business of the Debtor is diversified financial services with a focus on the innovation economy.  Through the Debtor's various subsidiaries and divisions, the Debtor has long offered a diverse set of banking and financial products and services to clients across the United States and in key international innovation markets.  Prior to March 10, 2023, the Debtor owned and operated Silicon Valley Bank ("SVB"), a California-chartered bank, through which the Debtor offered commercial and private banking products and services.  On March 10, 2023, the California banking authorities closed SVB and appointed the Federal Deposit Insurance

Corporation (the "FDIC") as receiver ("FDIC-R1").  The circumstances leading to the receivership are described in more detail below.

Following the closure of SVB, the Debtor's primary business lines were SVB Capital, the venture capital and credit investment arm of the Debtor, which focuses on funds management on behalf of third-party limited partner investors and the Debtor and SVB Securities LLC ("SVB Securities"), an investment bank.  SVB Securities provided investment banking services and provided equity research coverage, especially with respect to healthcare and technology companies.  On October 2, 2023, the Debtor consummated a sale of SVB Securities to a bidder group led by members of SVB Securities management, the circumstances of which are described in more detail below.

## B.    The Debtor's Corporate Structure and Global Operations

### 1.    Silicon Valley Bank

Prior to March 10, 2023, the Debtor operated SVB.  SVB was a commercial bank that offered credit, treasury management, foreign exchange, trade finance, and other services to clients in key innovation markets.  SVB was the Debtor's primary operating subsidiary and a core element of the Debtor's business.  SVB directly employed all of the Debtor's personnel, who provided services to the Debtor and its various businesses via intercompany services arrangements (the "Services Agreement").  SVB was also custodian of most of the books, records, and other data related to the Debtor's business.

On March 10, 2023, the California Department of Financial Protection and Innovation (the "CA DFPI") closed SVB and appointed the FDIC-R1 as receiver.  The FDIC-R1 subsequently transferred all deposits and substantially all assets of SVB to a newly created, FDIC-operated bridge bank, Silicon Valley Bridge Bank, National Association (the "Bridge Bank").  On March 27, 2023, the Office of the Comptroller of the Currency closed Bridge Bank and appointed the FDIC as receiver for Bridge Bank ("FDIC-R2"), and First Citizens BancShares, Inc. ("FCB Parent") announced that it had entered into an agreement with FDIC-R2 and the FDIC in its corporate capacity ("FDIC-C") to assume all remaining deposit liabilities of Bridge Bank and to purchase approximately $72 billion of assets from Bridge Bank at a discount of $16.5 billion.  As of the time of this Disclosure Statement, the legacy banking business of SVB is now operated as a division of FCB Parent's subsidiary bank, First-Citizens Bank & Trust Company ("FCB").

### 2.    SVB Capital

SVB Capital is the venture capital and credit investment arm of the Debtor.  SVB Capital focuses primarily on funds management and, as of the Petition Date, managed over $[9.5]9.8 billion of funds on behalf of third-party limited partner investors and, on a more limited basis, the Debtor.  The SVB Capital family of funds is comprised of pooled investment vehicles such as direct venture funds that invest in companies and funds of funds that invest in other venture capital funds, as well as debt funds that provide lending and other financing solutions.  SVB Capital generates income for the Debtor primarily through investment returns and management fees.

Historically and as of the Petition Date, SVB Capital operated as a "virtual" subsidiary for the Debtor, without a singular non-debtor subsidiary legal entity. To continue operating this business in the ordinary course, the Debtor took steps to consolidate the various operations that comprise SVB Capital in new legal entities, as explained in more detail below.

On May 2, 2024, the Debtor announced that it had entered into an agreement to sell SVB Capital to Pinegrove Sierra HoldCo LLC ("SVBC Designated Buyer"). As explained in more detail in Article III.L.2 below, on May 2, 2024, the Debtor filed a motion seeking approval from the Bankruptcy Court for this sale, and as of the date of this Disclosure Statement, the sale of SVB Capital remains pending.

### 3. SVB Securities LLC

SVB Securities was an investment bank focused on the innovation market and, as of the Petition Date, operated as a wholly owned subsidiary of the Debtor held by the intermediate holding company, SVB Securities Holdings. SVB Securities provided investment banking services across the healthcare and technology sectors. SVB Securities also provided equity research coverage of over 360 healthcare and technology companies through another SVB Securities Holdings subsidiary, MoffettNathanson LLC. SVB Securities focused on product and service offerings in capital raising, M&A advisory, structured finance, equity research, sales and trading.

On June 18, 2023, the Debtor announced that it had entered into an agreement to sell SVB Securities (excluding MoffettNathanson LLC) to its management group. As explained in more detail below, on July 5, 2023, the Bankruptcy Court approved this sale, and the sale of SVB Securities closed on October 2, 2023. The Debtor continues to own the equity interests in MoffettNathanson LLC, a non-debtor subsidiary.

### 4. SVB Global Services India LLP

SVB Global Services India LLP ("SVB India"), was an IT and operations services provider for Silicon Valley Bank and its Affiliates, including the Debtor, based in Bangalore, India and, as of the Petition Date, operated as a wholly owned subsidiary of the Debtor. Prior to the commencement of this Chapter 11 Case, SVB India developed technology projects and services, and engaged in development and support for core functional areas of the Debtor including technology, human resources, finance and loan operations. After the placement of SVB into receivership and the commencement of this Chapter 11 Case, SVB India continued to provide back-office functions primarily to Bridge Bank, and later to FCB as the purchaser of legacy SVB assets.

On March 20, 2024, the Debtor announced that it had entered into an agreement to sell SVB India to affiliates of FCB. As explained in more detail below, on April 10, 2024, the Bankruptcy Court approved this sale, and the sale of SVB India is expected to close in the second quarter of 2024.

### C. Summary of the Debtor's Assets and Operations

1.    **Assets**[9]

In addition to the businesses described above, the Debtor holds a variety of other assets, including (i) investment securities, warrants and investments in SVB Capital funds (ii) Cash and (iii) certain Retained Causes of Action including Claims and Causes of Action against the FDIC-C and the FDIC-Rs (as defined below) and potential Claims and Causes of Action against the Debtor's Related Parties.

(a)    **Investment Securities**

The Debtor holds certain direct equity investments in a variety of public and private companies, with a total book value of approximately $~~231.7~~240.1 million and certain limited partner interests across over 130 funds of approximately $~~124.9 million.~~118.4 million. Certain of the Debtor's direct investments are held indirectly through its wholly-owned subsidiary, SVB Investments Holdings, Inc.

(b)    **Warrants**

The Debtor holds certain warrants and other derivative investments in a variety of public and private companies.  The warrant portfolio includes over ~~4,800~~4,700 warrant positions representing over ~~3,100~~3,000 issuers, with a total book value of approximately $~~316.6~~311.2 million.  The Debtor's 50 largest warrant issuers account for approximately $~~141.8~~142.6 million of the Debtor's total warrant portfolio.  The derivative investments represent conversion rights with a book value of approximately $~~12.7~~10.9 million.

(c)    **Investments in SVB Capital Funds**

The Debtor holds capital and carried interest positions in certain ~~Fund of Funds, Credit~~fund of funds, credit funds and ~~Direct~~direct funds managed by SVB Capital with a total book value of approximately $~~462.5~~496.4 million.  The book value of these interests are $~~377.7~~412.3 million, $~~50.7~~54.5 million and $~~34.1~~29.6 million for ~~Fund of Funds, Credit~~SVB Capital's fund of funds, credit funds and ~~Direct~~direct funds, respectively.  As described below in Article III.L—*SVB Capital Reorganization and Sale*, as of the date of this Disclosure Statement, the SVB Capital Sale (defined below) remains pending, and the consummation of the SVB Capital Sale would impact the value retained by the Debtor in the SVB Capital funds described in this paragraph.

~~(d) Other Assets~~

(d)    **Other Assets**

~~As of the date of this Disclosure Statement, the~~The Debtor and its non-debtor subsidiaries collectively ~~held~~hold approximately $~~320~~264.5 million in Cash.  The Debtor also indirectly holds equity interests in a number of foreign entities through its wholly-owned

---

[9]    Asset values in this Article II.C.1 are reflected as of March 31, 2024.

subsidiary, SVB Global Financial, Inc.  These indirect foreign subsidiaries are in the process of being wound down under applicable local law.

Additionally, as discussed in further detail below, the Debtor has certain Claims and Causes of Action against the FDIC-C and the FDIC-Rs (as defined below), pursuant to which the Debtor may seek to recover the approximately $1.93 billion in funds that were on deposit at SVB at the time that SVB was placed into receivership.  Further, the Debtor and the UCC have been investigating potential Claims and Causes of Action against the Debtor's Related Parties relating to the closure of SVB.

**2.    The Debtor's Board of Directors**

The following table lists the Debtor's directors and their respective positions on the Petition Date.

| Name | Position |
|---|---|
| Beverly Kay Matthews | Chair of the Board of Directors and Director |
| Greg Becker[510] | President, Chief Executive Officer and Director |
| Eric A. Benhamou | Director |
| Elizabeth Burr | Director |
| Richard D. Daniels | Director |
| Alison Davis | Director |
| Joel P. Friedman | Director |
| Thomas King | Director |
| Jeffrey N. Maggioncalda | Director |
| Mary J. Miller | Director |
| Kate D. Mitchell | Director |
| Garen K. Staglin | Director |

**(a)    Restructuring Committee**

On March 13, 2023, the Debtor announced that its board of directors (the "Board") appointed a restructuring committee (the "Restructuring Committee") consisting of five (5) independent directors to explore strategic alternatives for the Debtor and its various businesses, assets and investments.  The Restructuring Committee was delegated certain authority with respect to the restructuring of the Debtor, and the Restructuring Committee's initial members were Eric Benhamou, Tom King, Kay Matthews, Mary Miller and Kate Mitchell.  Joel Friedman was appointed to the Restructuring Committee after the Petition Date.

**(b)    Director Appointments and the Special Committee**

On July 13, 2023, the Board increased the number of directors from 11 to 13 and appointed Steven G. Panagos and C. Allen Parker as directors.  The Board determined that

---

[510]  On April 19, 2023, Mr. Becker resigned from the Debtor's Board and from his positions as President and Chief Executive Officer.

Mr. Panagos and Mr. Parker are independent directors as defined by the listing standards of NASDAQ.  On July 13, 2023, the Board also formed a special committee (the "Special Committee"), which would be initially comprised of Mr. Panagos and Mr. Parker.  The Special Committee was delegated authority to consider all matters brought to the Board for which a majority of the directors are conflicted.  In addition, Mr. Panagos and Mr. Parker were contemporaneously appointed to the Restructuring Committee.

### 3.    Debtor Employees

As of the Petition Date, the Debtor did not directly employ any individual. Instead, services were performed for the Debtor by employees and other service providers of the former Bridge Bank in accordance with the Services Agreement.  Since the Petition Date, the Debtor has hired a number of employees to provide ordinary course services to the Debtor through its wholly owned direct subsidiary SVBFG Employee Holdco LLC ("EmployeeCo"). As of the date of this Disclosure Statement, EmployeeCo has six (6) employees.

## D.    Liabilities – The Debtor's Prepetition Funded Indebtedness

As of the Petition Date, the Debtor had approximately $3.37 billion in aggregate outstanding funded indebtedness.  All of the Debtor funded indebtedness is unsecured.

### 1.    The Senior Notes

On September 10, 2020, the Debtor entered into an indenture (the "Base Indenture") with U.S. Bank National Association, as trustee (the "Senior Notes Trustee"), pursuant to which the Debtor has from time to time issued various series of unsecured notes (the "Senior Notes").  On April 28, 2022, the Debtor and the Senior Notes Trustee entered into a first supplemental indenture, supplementing and amending the Base Indenture (together with the Base Indenture, the "Indenture").  The outstanding Senior Notes include the following:

i.    On January 29, 2015, the Debtor issued $350 million in principal amount of 3.50% Senior Notes due in January 2025.

ii.    On June 5, 2020, the Debtor issued $500 million in principal amount of 3.125% Senior Notes due in June 2030.

iii.    On February 2, 2021, the Debtor issued $500 million in principal amount of 1.800% Senior Notes due February 2031.

iv.    On May 13, 2021, the Debtor issued $500 million in principal amount of 2.100% Senior Notes due May 2028.

v.    On October 28, 2021, the Debtor issued $650 million in principal amount of 1.800% Senior Notes due October 2026.

vi.    On April 29, 2022, the Debtor issued $350 million in principal amount of 4.435% Senior Fixed Rate/Floating Rate Notes due April 2028.

vii.    On April 29, 2022, the Debtor issued $450 million in principal amount of 4.570% Senior Fixed Rate/Floating Rate Notes due April 2033.

The Senior Notes remained outstanding as of the Petition Date.

### 2.    Boston Private Trusts

On July 1, 2021, the Debtor acquired Boston Private Financial Holdings, Inc. ("Boston Private Holdings"), and assumed certain liabilities related to its assumption of two statutory trusts (the "Trusts") in connection with the transaction. The Trusts, Boston Private Capital Trust I ("Trust I") and Boston Private Capital Trust II ("Trust II") were formed for the purpose of issuing trust preferred securities and investing the proceeds in junior subordinated debentures issued by Boston Private Holdings. The Trusts' only assets are the junior subordinated debentures issued to each Trust by Boston Private Holdings.

In connection with the Debtor's acquisition of Boston Private Holdings and the Trusts, the Debtor also assumed Boston Private Holdings' obligations under certain guarantee agreements, providing that the Debtor would serve as guarantor with respect to the trust preferred securities issued by the Trusts. With respect to Trust I, as of the Petition Date, there were less than $1 million of trust preferred securities outstanding. With respect to Trust II, as of the Petition Date, there were approximately $103 million of trust preferred securities outstanding. The trust preferred securities issued by Trust I pay interest quarterly and have a fixed distribution rate of 4.875%. The quarterly distributions are cumulative. The effective interest rate for the junior subordinated debentures was 4.875%. The junior subordinated convertible debentures mature on October 1, 2034. The trust preferred securities issued by Trust II pay interest quarterly based on a floating three-month rate of LIBOR plus 1.68% which are cumulative. The effective interest rate on the junior subordinated debentures was 2.676%. The junior subordinated debentures mature on December 30, 2035.

## E.    Existing Preferred Stock

The Debtor is authorized to issue 20 million shares of $0.001 par value preferred stock. As of the Petition Date, the Debtor had issued approximately 350,000 shares of Series A Preferred Stock,[611] 7,500 shares of Series B Preferred Stock,[712] 10,000 shares of Series C

---

[611] "Series A Preferred Stock" means the 5.250% fixed-rate series A non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series A Certificate of Designation dated December 9, 2019.

[712] "Series B Preferred Stock" means the 4.100% Fixed-to-Reset series B non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series B Certificate of Designation dated February 2, 2021.

Preferred Stock,[813] 10,000 shares of Series D Preferred Stock[914] and 6,000 shares of Series E Preferred Stock.[1015]

On March 10, 2023, NASDAQ halted trading in the Debtor's depositary shares, each representing a 1/40th interest in a share of the Series A Preferred Stock of which approximately 14,000,000 were issued as of the Petition Date, which were traded on NASDAQ under the ticker "SIVBP".

## F.    Existing Common Stock

The Debtor is authorized to issue 150 million shares of $0.001 par value stock common stock ("Existing Common Stock"), of which approximately 59,200,925 shares were issued as of the Petition Date. Prior to March 10, 2023, the Debtor traded on NASDAQ under the ticker "SIVB". On March 10, 2023, NASDAQ halted trading in the Debtor's Existing Common Stock. NASDAQ later removed the Debtor's Existing Common Stock and Series A Preferred Stock from listing, effective as of March 28, 2023. NASDAQ's determination was based on the following factors: (1) the events described in Article III—*Significant Events and Initiatives in This Chapter 11 Case*; (2) concerns regarding the residual equity interest of the existing listed securities holders; and (3) concerns about the Debtor's ability to sustain compliance with all requirements for continued listing on NASDAQ. The Debtor did not appeal NASDAQ's decision.

Following the removal of the Debtor's Existing Common Stock and Series A Preferred Stock from NASDAQ, equity in the Debtor became eligible to be quoted on the OTC Pink quotation system. To be quoted on this system, a market maker must sponsor the security and comply with SEC Rule 15c2-11 before it can initiate a quote in a specific security. Since March 28, 2023, the Debtor's Existing Common Stock and Series A Preferred Stock have been trading on the OTC Pink Market under the tickers "SIVBQ" and "SIVPQ" respectively.

## G.    Factors Leading to the Commencement of This Chapter 11 Case

### 1.    Silicon Valley Bank

For many years, SVB was a premier bank for the emerging technologies sector. The end of 2020 marked a period of significant cash inflow for this sector, with record rates of venture investment and private financings, high levels of IPO and M&A activity and inflows from the federal "Paycheck Protection Program", all of which contributed to a flood of deposits into SVB. SVB invested a portion of those deposits in U.S. Treasuries and long-dated mortgage-backed securities. In the several years before 2022, interest rates remained low: the

---

[813] "Series C Preferred Stock" means the 4.000% Fixed-to-Reset series C non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series C Certificate of Designation dated May 13, 2021.

[914] "Series D Preferred Stock" means the 4.250% Fixed-to-Reset series D non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series D Certificate of Designation dated October 28, 2021.

[1015] "Series E Preferred Stock" means the 4.7000% Fixed-to-Reset series D non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series E Certificate of Designation dated October 28, 2021.

benchmark interest rate was near zero, and the Federal Reserve Board of Governors (the "Federal Reserve") had not raised it since 2018.

That trend ended in early 2022. In March 2022, rising inflation led to the Federal Reserve's decision to raise the federal interest rate by 25 basis points. In the twelve month period after March 2022, the Federal Reserve hiked interest rates seven more times. By March 2023, the benchmark interest rate had nearly broken 5%. As interest rates rose, the rates of investment activity seen in 2020 slowed, bond prices fell, and the market value of SVB's investment portfolio dropped. At the same time, SVB began to experience a meaningful decrease in deposit levels and a shift in deposit mix as customers burned through cash and sought higher interest products while investment and exit opportunities were very limited, resulting in lower inflows and increased rate of withdrawals.

On March 8, 2023, working with outside advisors, SVB announced the sale of substantially all of its "Available for Sale" securities portfolio, resulting in an after-tax loss of $1.8 billion. Although the sale replaced long dated securities with low interest rates with short term securities with higher interest rates, and SVB announced plans to simultaneously raise capital, the market reacted negatively. After the announcement, on March 9, 2023, the Debtor's stock price dropped significantly and SVB's customers scrambled to withdraw their money, resulting in a bank run where nearly 25% of deposits were withdrawn in a single day. The next day, the CA DFPI closed SVB and appointed the FDIC-R1.

This Disclosure Statement is not intended to contain a complete or definite statement respecting SVB's closure, or to bind any person or party. The cause(s) of SVB's closure and receivership have been and continue to be the subject of government investigations and reports[116], congressional testimony[117], certain previously filed securities class action

---

[116] *See, e.g.*, Michael S. Barr, Board of Governors of the Federal Reserve System, Review of the Federal Reserve's Supervision and Regulation of Silicon Valley Bank (Apr. 28, 2023), https://www.federalreserve.gov/publications/files/svb-review-20230428.pdf; U.S. Government Accountability Office, GAO-23-106736; Bank Regulation: Preliminary Review of Agency Actions Related to March 2023 Bank Failures (Apr. 28, 2023), https://www.gao.gov/assets/gao-23-106736.pdf; Department of Financial Protection & Innovation, Review of DFPI's Oversight and Regulation of Silicon Valley Bank (May 8, 2023), https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/05/Review-of-DFPIs-Oversight-and-Regulation-of-Silicon-Valley-Bank.pdf; Office of Inspector General, Board of Governors of the Federal Reserve System, 2023-SR-B-013, Material Loss Review of Silicon Valley Bank (Sept. 25, 2023), https://oig.federalreserve.gov/reports/board-material-loss-review-silicon-valley-bank-sep2023.pdf.

[117] *See, e.g.*, Examining the Failures of Silicon Valley Bank and Signature Bank, Hearing before U.S. Senate Committee on Banking, Housing, and Urban Affairs (2023) (testimony of Gregory W. Becker, former CEO of Silicon Valley Bank; Scott A. Shay, co-founder and former Chairman of Signature Bank; and Eric R. Howell, former President of Signature Bank), https://www.banking.senate.gov/hearings/examining-the-failures-of-silicon-valley-bank-and-signature-bank; Continued Oversight Over Regional Bank Failures, Hearing before U.S. House of Representatives Subcommittees on Financial Services and Monetary Policy and Oversight and Investigations (2023) (testimony of Gregory Becker, former CEO of Silicon Valley Bank; Scott Shay, co-founder and former Chairman of Signature Bank; Michael Roffler, former CEO and President of First Republic Bank; The Honorable Adrienne Harris, Superintendent of New York Department of Financial Services; and The Honorable Clothilde Hewlett, Commissioner of Department of Financial Protection and Innovation),

~~complaints[13]~~lawsuits[18], and may be the subject of further post-confirmation litigation proceedings.  The Debtor takes no position herein on the foregoing statements and allegations made or to be made.

### 2.      Restructuring Discussions and Decision to File for Chapter 11

The SVB receivership had two important consequences for the Debtor.  First, the receivership removed the Debtor's primary operating subsidiary, depriving the Debtor of a key source of liquidity, business infrastructure and personnel.  Second, the receivership triggered default clauses under certain of the Debtor's debt documents.  These circumstances led the Debtor to start contingency planning and evaluation of strategic alternatives.

On March 13, 2023, the Debtor's Board announced its appointment of the Restructuring Committee.  That same day, the Restructuring Committee appointed as Chief Restructuring Officer William Kosturos, Managing Director and Vice-Chair of the Alvarez & Marsal U.S. Restructuring Practice.  Over the course of several days, the Board received and reviewed the recommendations of management and of its various advisors regarding the Debtor's available strategic alternatives, including a bankruptcy proceeding under the provisions of the Bankruptcy Code.  After review and discussion of the information presented, the Board determined that it was in the best interests of the Debtor, its creditors and other stakeholders to prepare to file for chapter 11 protection,

---

https://democrats-financialservices.house.gov/events/eventsingle.aspx?EventID=410427#Webcast; Bank Regulation: Preliminary Review of Agency Actions Related to March 2023 Bank Failures, Hearing before U.S. House of Representatives Subcommittee on Oversight and Investigations, Committee on Financial Services (2023) (statement of Michael E. Clements, director of Financial Markets and Community Investment, U.S. Government Accountability Office), https://www.c-span.org/video/?528024-1/governmentaccountability-office-official-testifies-bank-failures.

~~[13]   *See In re SVB Financial Group Securities Litigation*, Case No. 3:23-cv-01097-JD (N.D. Cal. Filed as *Vanipenta* v. *SVB Financial Group* on Mar. 13, 2023); *Snook* v. *SVB Financial Group*, Case No. 3:23-cv-01173-VC (N.D. Cal. Filed Mar. 15, 2023); *Siddiqui* v. *Becker*, Case No. 4:23-cv-01228-HSG (N.D. Cal. Filed Mar. 17, 2023); *City of Hialeah Employees Retirement System* v. *Becker*, Case No. 3:23-cv-01697-JD (N.D. Cal. Filed Apr. 7, 2023); *International Union of Operating Engineers Local 132 Pension Fund* v. *SVB Financial Group*, Case No. 3:23-cv-01962-TLT (N.D. Cal. Filed Apr. 24, 2023); *Stevenson* v. *Becker*, 4:23-cv-02277-HSG (N.D. Cal. Filed May 10, 2023); *Rossi* v. *Becker*, Case No. 4:23-cv-02335-HSG (N.D. Cal. Filed May 12, 2023); *TIAA-CREF Inv. Mgmt., LLC* v. *Becker*, No. 3:24-cv-00478-CRB (N.D. Cal. Filed Jan. 25, 2024).~~

[18]   *See In re SVB Financial Group Securities Litigation*, Case No. 3:23-cv-01097-JD (N.D. Cal. Filed as *Vanipenta* v. *SVB Financial Group* on Mar. 13, 2023); *Snook* v. *SVB Financial Group*, Case No. 3:23-cv-01173-VC (N.D. Cal. Filed Mar. 15, 2023); *Siddiqui* v. *Becker*, Case No. 4:23-cv-01228-HSG (N.D. Cal. Filed Mar. 17, 2023); *City of Hialeah Employees Retirement System* v. *Becker*, Case No. 3:23-cv-01697-JD (N.D. Cal. Filed Apr. 7, 2023); *International Union of Operating Engineers Local 132 Pension Fund* v. *SVB Financial Group*, Case No. 3:23-cv-01962-TLT (N.D. Cal. Filed Apr. 24, 2023); *Stevenson* v. *Becker*, 4:23-cv-02277-HSG (N.D. Cal. Filed May 10, 2023); *Rossi* v. *Becker*, Case No. 4:23-cv-02335-HSG (N.D. Cal. Filed May 12, 2023); *Lodato* v. *Becker*, No. 3:23-cv-4551 (N.D. Cal. Filed Sept. 5, 2023); *TIAA-CREF Inv. Mgmt., LLC* v. *Becker*, No. 3:24-cv-00478-CRB (N.D. Cal. Filed Jan. 25, 2024).

On the evening of March 16, 2023, the Board voted to commence this Chapter 11 Case on an emergency basis. Early the next morning, the Debtor filed a voluntary petition for relief under the Bankruptcy Code.

## ARTICLE III.~~ARTICLE III~~

### SIGNIFICANT EVENTS AND INITIATIVES IN THIS CHAPTER 11 CASE

The following is a general summary of significant events since the Petition Date, including a discussion of the Debtor's restructuring and business initiatives.

### A.     Commencement of the Chapter 11 Case

The commencement of a chapter 11 case creates an estate that is composed of all of the legal and equitable interests of the debtor as of that date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." Following the Petition Date, the Debtor continues to operate its businesses as debtor and debtor-in-possession.

### B.     First Day Relief

On the Petition Date, the Debtor filed a number of "first day" motions and applications designed to ease the Debtor's transition into Chapter 11, maximize the value of the Debtor's assets and minimize the effects of the commencement of the Chapter 11 Case. On March 22 and 24, 2023, the Bankruptcy Court entered orders granting the first-day motions, allowing the Debtor to continue certain normal business activities not specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval. In particular, the Bankruptcy Court entered orders:

- on an interim basis, (i) authorizing, but not directing, the Debtor, in its sole discretion, to (a) continue to use its cash management system, including existing bank accounts, (b) pay or honor certain prepetition obligations related thereto and (c) continue to use existing business letterhead, purchase orders, invoices, envelopes, promotional materials and other business forms and correspondence and (ii) authorizing, but not directing, the Debtor to continue to perform investment activities with its affiliates and third parties on a ~~post-petition~~postpetition basis in the ordinary course of business and consistent with historical practice; and (d) extending the time to comply with the requirements of section 345(b) of the Bankruptcy Code [D.I. 70];

- (i) authorizing, but not directing, the Debtor, in its sole discretion, to maintain a list of creditors in lieu of submitting a formatted mailing matrix and (ii) establishing procedures for notifying parties of the commencement of this Chapter 11 Case [D.I. 55];

- (i) extending the time for the Debtor to file its schedules and statements by 20 days, (ii) extending the time for the Debtor to file its 2015.3 report to the date that is two days from the initial date set for the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code and (iii) modifying the requirements to file the list of equity security holders and serve notice of commencement on all equity holders [D.I. 53];

- on an interim basis, authorizing, but not directing, the Debtor, in its sole discretion, to (i) pay the prepetition compensation and benefits obligations and (ii) maintain the employee compensation and benefits and pay related administrative obligations [D.I. 71];

- on an interim basis, (i) establishing notice and objection procedures related to certain transfers of equity securities and declarations of worthlessness for federal or state tax purposes with respect existing common or preferred stock or any beneficial ownership thereof; and (ii) directing that any purchase, sale, or other transfer of common or preferred stock in violation of the procedures set forth will be null and void *ab initio* [D.I. 57]; and

- authorizing the retention and appointment of Kroll as claims and noticing agent and administrative advisor [D.I.s 54, 135].

On April 27, 2023, the Bankruptcy Court also entered final orders with respect to the Debtor's cash management system [D.I. 132] and treatment of the Debtor's net operating losses [D.I. 136]. On June 29, 2023, the Bankruptcy Court also entered a final order with authorizing payment of certain prepetition employee compensation and benefit programs [D.I. 372].

In addition, the commencement of the Debtor's Chapter 11 Case triggered the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions by creditors, the enforcement of all liens against property of the Debtor and the commencement or continuation of prepetition litigation against the Debtor. Subject to limited exceptions, the automatic stay will remain in effect until the Effective Date of the Plan.

## C.    Appointment of the UCC

On March 28, 2023, the Official Committee of Unsecured Creditors (the "UCC") was appointed by William K. Harrington, the United States Trustee for Region 2 (the "U.S. Trustee") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Case [D.I. 72]. The initial members of the UCC were Tata Consultancy Services Limited, U.S. Bank National Association (as Indenture Trustee), Wilmington Trust Company (as Indenture Trustee), Satagopan Rajagopalan and Cousins Fund II Phoenix I, LLC. On September 19, 2023, the UCC was reconstituted to four members: U.S.

Bank National Association (as Indenture Trustee), Wilmington Trust Company (as Indenture Trustee), Satagopan Rajagopalan and Cousins Fund II Phoenix I, LLC.

The UCC selected Akin Gump Strauss Hauer & Feld LLP as its legal counsel, Cole Schotz, P.C. as efficiency and conflicts counsel, Berkeley Research Group, LLC as its financial advisor and Lazard Frères & Co. LLC as its investment banker.  The Bankruptcy Court approved the UCC's retentions of these professional advisors [D.I. 295, 296, 338, 499].

The UCC is a party to the RSA and has agreed to support the Plan.

**D.    The Ad Hoc Group of Senior Noteholders**

On May 3, 2023, a group of certain holders, or investment advisors managing or acting on behalf of holders of certain Senior Notes and Preferred Stock issued by the Debtor (the "Ad Hoc Group of Senior Noteholders") filed a verified statement pursuant to Bankruptcy Rule 2019 [D.I. 149].  On July 21, 2023, the Ad Hoc Group of Senior Noteholders filed a first supplemental verified statement pursuant to Bankruptcy Rule 2019 [D.I. 434].  The Ad Hoc Group of Senior Noteholders retained Davis Polk & Wardwell LLP as counsel.

**E.    The Ad Hoc Cross-Holder Group**

On April 28, 2023, a group of holders, or investment advisors, sub-advisors, or managers of holders, of certain Senior Notes and preferred stock issued by the Debtor (the "Ad Hoc Cross-Holder Group") filed a verified statement pursuant to Bankruptcy Rule 2019 [D.I. 142].  On July 20, 2023, the Ad Hoc Cross-Holder Group filed a first amended verified statement pursuant to Bankruptcy Rule 2019 [D.I. 432].  The Ad Hoc Cross-Holder Group retained White & Case LLP as counsel.

**F.    Retention of Debtor Professionals**

The Debtor retained, and the Bankruptcy Court approved the retentions of, the following advisors in the Chapter 11 Case, among others:  (i) Sullivan & Cromwell LLP, as legal counsel to the Debtor; (ii) Alvarez & Marsal North America, LLC, to provide the Debtor a chief restructuring officer and certain additional personnel; (iii) Centerview Partners LLC ("Centerview"), as investment banker; (iv) Jenner & Block LLP as conflicts counsel; (v) Kroll, as claims and noticing agent and administrative advisor; (vi) Huron Consulting Services, LLC as financial advisor; and (vii) Lincoln Partners Advisors LLC, as valuation advisor; and (vii) Ernst & Young LLP, as tax advisor [D.I. 54, 80, 81, 83, 110, 135, 138, 246, 248, 304, 591, 664, 759, 763].  The Debtor proposed the retention of Ernst & Young LLP as its tax advisor, but as of the date of this Disclosure Statement, this retention has not yet been approved., 853].

On April 5, 2023, the Debtor filed with the Bankruptcy Court the *Debtor's Motion for Entry of an Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code, Bankruptcy Rule 2016 and Local Rule 2016-1 Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals* [D.I. 85] (the "Interim Compensation Motion").  The Interim Compensation Motion was approved by the Bankruptcy Court on April 27, 2023 [D.I. 134].  In approving the Interim Compensation Motion, the

Bankruptcy Court established procedures for the fee application process and payment of professionals retained by the Debtor and any statutory committees appointed in the case.

On April 5, 2023, the Debtor filed with the Bankruptcy Court the *Debtor's Motion for Entry of an Order Implementing Certain Procedures to Retain, Compensate and Reimburse Professionals Utilized in the Ordinary Course of Business* [D.I. 86] (the "Ordinary Course Professionals Motion"). The Ordinary Course Professionals Motion was approved by the Bankruptcy Court on April 28, 2023 [D.I. 139]. In so doing, the Bankruptcy Court established procedures for the employment and compensation of certain ordinary course professionals used by the Debtor in connection with ongoing business operations.

## G.     Schedules and Statements and 341 Meeting

Pursuant to section 521 of the Bankruptcy Code, Bankruptcy Rule 1007(c), and orders of the Bankruptcy Court granting extensions of time, on May 22, 2023, the Debtor filed (i) schedules of assets and liabilities, (ii) a schedule of executory contracts and unexpired leases, and (iii) a statement of financial affairs (collectively, the "Schedules") [D.I.s 261, 262].

On May 31, 2023, the U.S. Trustee conducted a meeting of creditors pursuant to section 341 of the Bankruptcy Code (the "341 Meeting").

## H.     Bar Dates and Claims Process

On June 29, 2023, the Bankruptcy Court entered an order, which, among other things, (i) established August 11, 2023, at 4:00 p.m., Eastern Time, as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code), including claims pursuant to section 503(b)(9) of the Bankruptcy Code (the "General Bar Date"); (ii) established September 14, 2023, at 4:00 p.m., Eastern Time, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) (the "Governmental Bar Date") to file proofs of claim (such date, together with the General Bar Date, the "Bar Dates"); (iii) established the later of (a) the General Bar Date and (b) 4:00 p.m., Eastern Time, on the date that is 30 days from the date that notice of the applicable amendment or supplement to the applicable schedules is served on such entity as the amended bar date and (iv) approved the form and manner of notice of the Bar Dates [D.I. 373].

To facilitate the claims reconciliation process, on November 13, 2023, the Debtor filed a motion (the "Claims Objections Procedures Motion") for leave to file omnibus objections to claims and establishing related procedures [D.I. 672]. On November 30, 2023, the Bankruptcy Court entered an order granting the Claims Objections Procedures Motion, authorizing the Debtor to file omnibus claims objections on various grounds [D.I. 713].

The Debtor received 1,274 proofs of claim, totaling approximately $5.5 billion, timely filed by the General Bar Date. In addition, the Debtor received 20 proofs of claim by governmental units totaling approximately $1.7 billion timely filed by the Governmental Bar Date. As of the date of this Disclosure Statement, the Debtor has filed four (4) omnibus claims objections [D.I.s 768, 812, 908, 1021]. The Bankruptcy Court has entered three (3) orders sustaining certain of the Debtor's omnibus claims objections [D.I.s 817, 897, 1029].

I.    **Assumption and Assignment of Executory Contracts to FCB and Non-debtor Subsidiaries**

Since the Petition Date, the Debtor and its advisors have engaged in a process to collect, review and analyze the contracts to which the Debtor was a party. The Debtor and its advisors have determined that many of those agreements do not relate to the operations of the Debtor or its non-debtor subsidiaries. Specifically, a significant volume of those contracts concern operations solely relevant to the former SVB, now operated by FCB, as successor in interest to the relevant businesses of SVB. The Debtor has consulted with FCB to determine which contracts are expected to be used in the respective ongoing operations of FCB and the Debtor. During that process, the Debtor has considered, among other things, the ongoing value and projected costs of maintaining such contracts.

Ultimately, the Debtor determined in its business judgment that its continuing operations do not depend on nor derive value from hundreds of contracts that involved products and services entirely related to the operations of the former SVB. Accordingly, the Debtor has assumed and assigned approximately 550890 executory contracts related to the operations of the former SVB to FCB. Likewise, the Debtor determined in its business judgment that its continuing operations did not depend on nor derive value from the premises of certain leases. Therefore, the Debtor moved to assume and assign, and the Bankruptcy Court approved the assumption and assignment of, hundreds of executory contracts and over 40 leases to FCB, thereby conserving the Debtor's resources, streamlining its operations and avoiding unnecessary obligations [D.I.s 330, 369, 386, 426, 466, 492, 501, 534, 554, 568, 570, 588, 592, 609, 640, 641, 643, 644, 670, 676, 706, 707, 714, 715, 764, 765, 783, 784, 785, 813, 814, 815, 858, 859, 860, 861, 892, 894, 895, 896, 898, 944, 1030].

Where the Debtor has determined that it does not require or derive value from certain contracts, and FCB does not desire for such contracts to be assumed and assigned, the Debtor has moved to reject such contracts in order to avoid incurring unnecessary administrative expenses during the pendency of the Chapter 11 Case. To date, the Debtor has rejected approximately 320400 executory contracts [D.I.s 253, 370, 500, 569, 571, 642, 716, 762, 816, 893, 945, 1031].

Finally, the Debtor has also determined that certain of the Debtor's contracts are required for the operations of its non-debtor subsidiaries and affiliates, including SVB Capital. In such cases, the Debtor has moved to assume and assign such contracts to the applicable non-debtor subsidiaries, including SVBC ManCo, as discussed in further detail below. To date, the Debtor has assumed and assigned approximately 70 contracts and unexpired leases to its current and former non-Debtor subsidiaries, including approximately 25 contracts to SVB Securities before the sale of the SVB Securities business (described in more detail below) [D.I.s 426, 534, 570, 588, 643, 783, 813].

**J. Investigation of Potential Estate Claims and Causes of Action**

The UCC has coordinated with the Debtor (acting at the direction of the Special Committee) to conduct an investigation into the prepetition conduct and events that led to the Debtor's Chapter 11 Case. In connection with that investigation, the UCC obtained documents

from the Debtor on a consensual basis, and the UCC and Debtor obtained permission from the Bankruptcy Court to seek discovery under Bankruptcy Rule 2004 from forty-one (41) current or former directors, officers and employees of the Debtor, six advisors and other third parties, and First Citizens Bank, which is in possession of the majority of the Debtor's prepetition books and records, among other parties [D.I. 345, 346, 659].  In connection with these requests, the UCC and Debtor also obtained permission to receive confidential supervisory information from the Federal Reserve, the CA DFPI, and the Federal Reserve Bank of San Francisco.  The investigation also included the review and analysis of publicly available information concerning SVB, including reports from the Federal Reserve and the U.S. Government Accountability Office surrounding the closure and receivership of SVB, as well as documents and communications that have been made publicly available in connection with those reports, and public testimony from relevant personnel.  The UCC has also coordinated with the Special Committee to conduct informal interviews of certain relevant individuals.

In connection with their investigation, the UCC and Debtor (acting at the direction of the Special Committee) are analyzing potentially valuable claims and causes of action that may be brought for the benefit of the Debtor's estate.  Potential claims, other than those that are subject to a release as set forth on Exhibit [•] to the Plan, are preserved under the Plan and shall be transferred to the Liquidating Trust, as set forth in Article IV—*Summary of the Plan* below.

## J. ~~K.~~ Claims Against the FDIC

As discussed above, on Friday, March 10, 2023, the CA DFPI ordered that SVB be closed and requested that the FDIC be appointed as receiver of SVB.  On that date, the FDIC agreed to act as receiver of SVB.  At the opening of business on March 10, 2023, the Debtor had on deposit with SVB approximately $2.1 billion in cash residing in three separate deposit accounts (the "Deposit Accounts").  Those funds constituted the substantial majority of the Debtor's cash.  As of March 10, 2023, the deposits at SVB were insured through the FDIC's deposit insurance fund (the "Deposit Insurance Fund") to a maximum of $250,000 (the "FDIC Insurance Cap").  On March 12, 2023, the Secretary of the Treasury, upon the written recommendation of the Board of Governors of the Federal Reserve and the Board of Directors of the FDIC and after consultation with the President of the United States, invoked the systemic risk exception ("SRE") under the Federal Deposit Insurance Act to guarantee payment of all deposits at SVB – over and above the FDIC Insurance Cap – in consideration of the systemic risk facing the nation's banking system.

Consistent with the March 12, 2023 invocation of the SRE, from Monday, March 13, 2023 through midday on Thursday, March 16, 2023, the Debtor had access to its accounts and deposits, which had been transferred by the FDIC-R1 to the Bridge Bank.  On March 15, 2023 and the morning of March 16, 2023, the Debtor initiated over $150 million in wire transfers from its accounts, which wire transfers were honored by the Bridge Bank.  Wire transfers initiated by the Debtor during the afternoon of March 16, 2023 and on March 17, 2023, however, were denied by the Bridge Bank at the instruction of FDIC-R1.  No explanation was given to the Debtor for the denial of such wires.

On the morning of Friday, March 17, 2023, the Debtor commenced its chapter 11 proceeding by filing a voluntary petition with the Bankruptcy Court. Shortly after the Petition Date, the FDIC-R1 informed the Debtor that pursuant to 12 U.S.C. § 1822(d), which authorizes the FDIC to withhold a portion of a deposit up to the $250,000 FDIC Insurance Cap as may be required to pay a liability of the depositor, the Deposit Accounts had been put on hold by FDIC-R1. The FDIC-R1 subsequently informed the Debtor that the Debtor would have to file a proof of claim in the receivership proceeding to recover any of the $1.93 billion that was present in the Deposit Accounts at the time the Debtor's access to the accounts was denied—notwithstanding the prior invocation of the SRE.

### 1.    The Adversary Proceeding

On July 9, 2023, the Debtor commenced an adversary proceeding against the FDIC (i) in its capacity as FDIC-C, (ii) in its capacity as FDIC-R1 and (iii) in its capacity as FDIC-R2 (the FDIC-R1 and FDIC-R2 together, the "FDIC-Rs") (the "Adversary Proceeding"). *See SVB Financial Group* v. *Federal Deposit Insurance Corp.*, *et al.*, No. 23-01137 (MG) (Bankr. S.D.N.Y.). As against the FDIC-C, the Debtor asserts a turnover claim pursuant to section 542 of the Bankruptcy Code and Bankruptcy Rule 7001, seeking to compel the FDIC-C to turn over the approximately $1.93 billion on deposit in the Debtor's accounts at Bridge Bank (the "Account Funds") from the Deposit Insurance Fund, as well as other related relief. The Debtor also asserts claims in the alternative against FDIC-R1 and FDIC-R2 for turnover of the Debtor's Account Funds pursuant to section 542 of the Bankruptcy Code and Bankruptcy Rule 7001. Against all three FDIC entities, the Debtor asserts claims for violation of the automatic stay under section 362(a) of the Bankruptcy Code and for declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.*, requesting a declaration that neither the FDIC-C nor either of the FDIC-Rs has a right of setoff against the amount of the Account Funds, or in the alternative, that any right of setoff is limited to amounts for which there is mutuality of obligation between the Debtor and the FDIC-C, FDIC-R1, or FDIC-R2, respectively.

On August 11, 2023, all three FDIC entities filed motions under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, seeking to dismiss the Adversary Proceeding. On the same day, the FDIC-R1 filed a motion to withdraw the reference from the Bankruptcy Court pursuant to 28 U.S.C. § 157(d). That motion; that motion was subsequently joined by the FDIC-C and FDIC-R2. The motion to withdraw the reference was docketed in the United States District Court for the Southern District of New York and assigned to Judge John P. Cronan on August 15, 2023. *See SVB Fin. Grp.* v. *FDIC*, No. 23-cv-07218 (JPC) (S.D.N.Y.). In light of the motion to withdraw the reference, on September 14, 2023, the Bankruptcy Court adjourned *sine die* a hearing on all pending motions in the Adversary Proceeding. On December 13, 2023, Judge Cronan granted the motion to withdraw the reference. To date, no court has ruled on the FDIC's motions to dismiss. On January 15, 2024, the Debtor submitted a letter—joined by the UCC, the Ad Hoc Group of Senior Noteholders, and the Ad Hoc Cross-Holder Group—requesting that Judge Cronan stay the Adversary Proceeding pending further developments in the Debtor's parallel actions against the FDIC. On January 25, 2024, Judge Cronan adjourned *sine die* the oral argument on the pending motions to dismiss and directed the parties to provide the court with updates on any material developments in the Adversary Proceeding, including, by no later than March 10, 2024, an update on any other proceedings by the Debtor against the FDIC-C or either of the FDIC-Rs. The Debtor—again

joined by the UCC, the Ad Hoc Group of Senior Noteholders, and the Ad Hoc Cross-Holder Group—submitted a Letter Motion to Judge Cronan on March 10, 2024, providing updates on actions the Debtor initiated against the FDIC-C and FDIC-Rs in the United States District Court for the Northern District of California (discussed below).  The Letter Motion also requested that Judge Cronan stay the action for 180 days.  As of the date of this Disclosure Statement, the Debtor's request for a stay remains pending.

### 2.      FDIC-C Proceedings

On June 26, 2023, the Debtor sent a letter to the FDIC-C demanding access to, or payment of, its $1.93 billion Account Funds as required by the Treasury Secretary's invocation of the systemic risk exception.  On September 19, 2023, the FDIC-C sent the Debtor a letter stating that it intended to treat the Debtor's June 26 letter as a deposit claim under 12 U.S.C. § 1821(f), and on October 20, 2023, the FDIC-C denied the Debtor's claim for its Account Funds. On December 19, 2023, the

The Debtor commenced an action filed a complaint against the FDIC-C in the United States District Court for the Northern District of California on December 19, 2023, to seek relief from the FDIC-C's withholding of the Account Funds and to protect the Debtor's rights in the event that section 1821(f) is found to apply to the Debtor's claims against the FDIC-C.  That action is currently pending before Judge Beth Labson Freeman at *SVB Financial Group* v. *Federal Deposit Insurance Corporation, in Its Corporate Capacity*, No. 23-cv-06543 (BLF) (N.D. Cal.). As of the date of this Disclosure Statement, the FDIC-C has not answered or otherwise responded to the Debtor's complaint in that action. (the "FDIC-C Action").  In the FDIC-C Action, Debtor brings eight claims for, *inter alia*, Administrative Procedures Act ("APA") review of the FDIC-C's wrongful denial of Debtor's claim for its $1.93 billion in account funds, declaratory judgment, turnover of Debtor's Account Funds, violation of the automatic stay of section 362(a) of the Bankruptcy Code, violations of the Debtor's due process rights, and violation of the Freedom of Information Act ("FOIA").

On March 4, 2024, the FDIC-C filed a partial motion to dismiss Counts I, II, III, IV, V, VII, and VIII of Debtor's complaint.  The Debtor's opposition to the partial motion to dismiss is due on May 20, 2024.  The hearing on the FDIC-C's partial motion to dismiss is set for July 11, 2024.  On March 21, 2024, the parties participated in a case management conference before Judge Freeman.  Following the case management conference, Judge Freeman stayed summary judgment briefing on Count VI of Debtor's complaint until after the Court rules on the pending partial motion to dismiss the complaint's other counts.  On April 1, 2024, FDIC-C served the Debtor with the purported administrative record underlying its October 20, 2023 denial of the Debtor's claim for the Account Funds.  On April 2, 2024, the FDIC-C filed a motion to stay discovery pending resolution of the partial motion to dismiss, which the Debtor opposed on April 16, 2024.  On April 29, 2024, the Court denied the FDIC-C's motion to stay discovery.

### 3.      Proceedings with the FDIC-Rs

On July 11, 2023, the Debtor filed a protective proof of claim with each of the FDIC-R1 and FDIC-R2 regarding the Account Funds, which the FDIC-Rs each separately

disallowed on January 5, 2024. The Notice of Disallowance of Claim received by the Debtor from the FDIC-R1 states that "[t]he deposit claim is denied as not proven to the satisfaction of the receiver due to the receiver's defenses. All other claims are denied as speculative, unsupportable, or otherwise not proven to the satisfaction of the receiver." [D.I. 800]. The Notice of Disallowance of Claim received by the Debtor from the FDIC-R2 states that "[t]he deposit claim is denied as not proven to the satisfaction of the receiver because it is not a liability of the FDIC as receiver for Silicon Valley Bridge Bank. All other claims are denied as speculative, unsupportable, or otherwise not proven to the satisfaction of the receiver." [D.I. 800]. Under 12 U.S.C. § 1821(d)(6)(A), the Debtor may "file suit on [its] claim" within 60 days of "the date of any notice of disallowance" in either the United States District Court for the Northern District of California or the United States District Court for the District of Columbia. That deadline falls on March 5, 2024.

On March 5, 2024, the Debtor filed a complaint against the FDIC-R1 and FDIC-R2 in the United States District Court for the Northern District of California. Shortly thereafter, the Debtor moved in the FDIC-C Action to have the two cases related. Judge Freeman granted the motion on March 21, 2024. The action against the FDIC-Rs is now pending before Judge Freeman at *SVB Financial Group* v. *Federal Deposit Insurance Corporation, as Receiver for Silicon Valley Bank et al*, No. 24-cv-01321 (BLF) (N.D. Cal.) (the "FDIC-R Action"). In the FDIC-R Action, the Debtor asserts twelve claims for, *inter alia*, breach of contract, estoppel, conversion, turnover of the Debtor's Account Funds, violation of the automatic stay of section 362(a) of the Bankruptcy Code, violations of certain provisions of the California Financial Code and of the National Bank Act, declaratory judgment, and violations of the Debtor's due process rights. The FDIC-Rs' deadline to answer, move to dismiss, or otherwise respond to the complaint is May 7, 2024.

### K. ~~L.~~ SVB Securities Sale

#### 1.    SVB Securities Bidding Procedures

The Debtor and its advisors developed bidding and auction procedures for the marketing and sale of certain assets in this Chapter 11 Case in an orderly and value maximizing manner (the "Bidding Procedures"). On April 27, 2023, the Debtor filed the *Debtor's Motion for Entry of Orders (I)(A) Approving Bid Procedures and the Form and Manner of Notices for the Sale of SVB Securities and (B) Scheduling Auction(s) and Sale Hearing(s), (II) Approving the Sale(s) Free and Clear of Liens, Claims, Interests and Encumbrances and (III) Granting Related Relief* [D.I. 137] (the "SVB Securities Bidding Procedures Motion"). On May 17, 2023, the Bankruptcy Court entered the *Order (A) Approving Bid Procedures and the Form and Manner of Notices for the Sale of SVB Securities, (B) Scheduling Auction(s) and Sale Hearing(s) and (C) Granting Related Relief* [D.I. 250] (the "Bidding Procedures Order"), approving the SVB Securities Bidding Procedures Motion.

#### 2.    ~~Post-Petition~~ Postpetition Marketing Process for SVB Securities

Following the Petition Date and in accordance with the Bidding Procedures Order, the Debtor and its advisors engaged in discussions with various interested parties regarding a sale of the SVB Securities business. The Debtor and its advisors conducted an

extensive marketing process of the SVB Securities business, including, among other things, engaging with twenty-nine (29) interested parties.  Seven of these parties executed non-disclosure agreements and were granted access to a virtual data room with an overview of information regarding the SVB Securities business.  The Debtor's management gave five (5) management presentations to interested parties and, along with the Debtor's advisors, participated in numerous calls with interested parties to address diligence and related topics.

Two bidders submitted non-binding indications of interest for the SVB Securities business or portions thereof and were provided with access to additional diligence materials through a virtual data room.  The Debtor's marketing process ultimately yielded one binding bid (the "SVBS Bid") from Saffron Buyer LLC ("SVBS Buyer"), an acquisition vehicle established by certain members of the senior management team of SVB Securities and certain funds managed by The Baupost Group, L.L.C.

### 3.    SVBS Bid

On June 2, 2023, the Debtor adjourned the scheduled auction and sale hearing as permitted under the Bidding Procedures Order [D.I. 307], and during the additional time afforded by such adjournment, the Debtor sought to improve the terms of the SVBS Bid.  The Debtor successfully negotiated for meaningful improvements in the terms of SVBS Buyer's bid, and after thoroughly considering SVBS Buyer's improved bid against alternatives, in consultation with the Debtor's advisors, the Debtor determined that the bid from SVBS Buyer was the highest or otherwise best bid for the SVB Securities business, cancelled the auction and declared SVBS Buyer as the successful bidder [D.I. 335].

As set forth in the purchase agreement for the SVBS Bid, the consideration for the SVB Securities business consisted of (i) a cash purchase price of $55 million, (ii) a payoff of certain subordinated debt held by SVB Securities (in the approximate amount of $26 million), (iii) the assumption of certain transferred liabilities, including significant deferred compensation obligations, (iv) a synthetic equity instrument initially representing a 5% equity interest in the direct parent of SVBS Buyer and (v) certain other payments payable at closing (subject to certain adjustments).  On July 5, 2023, the Bankruptcy Court approved the sale of the SVB Securities business to SVBS Buyer and entered the *Order (I) Authorizing the Debtor to Sell the SVB Securities Business by (A) Causing Non-Debtor Subsidiary to Sell Membership Interests in Certain Non-Debtor Entities that Operate the SVB Securities Business and Certain Related Assets and (B) Selling Certain Related Assets of the Debtor Free and Clear of All Liens, Claims, Interests and Encumbrances and (II) Granting Related Relief* [D.I. 393].  The sale closed on October 2, 2023 [D.I. 583].

MoffettNathanson LLC was not included in the sale, and the Debtor continues to own the equity interests in that entity.  The Plan contemplates that MoffettNathanson LLC will be a direct or indirect subsidiary of NewCo upon the Effective Date.

**L.** **M.** **SVB Capital Reorganization and Sale**

1. **SVB Capital Strategic Alternatives Review**

As noted above, SVB Capital historically operated as a "virtual" subsidiary for the Debtor, without a formal non-debtor subsidiary legal entity. Since the Petition Date, in order to continue operating this business in the ordinary course, the Debtor took several steps to consolidate the various operations that comprise SVB Capital (collectively, the "SVB Capital Reorganization"). The Debtor formed a new direct subsidiary, SVB Capital Holdco, LLC ("SVBC Holdco") to house the various operations of SVB Capital. The Debtor also formed a wholly owned direct subsidiary of SVBC Holdco, SVB Capital Management, LLC ("SVBC ManCo") to serve as the investment advisor for SVB Capital funds and to directly employ all SVB Capital employees. On August 29, 2023, the Debtor moved for entry of an order approving the assumption and assignment of investment advisory contracts (the "Advisory Contracts") to SVBC ManCo and to contribute certain non-economic non-member manager interests in SVB Capital's Qualified Investor Funds (the "Manager Interests") [D.I. 534]. The Bankruptcy Court approved this motion on September 20, 2023 [D.I. 570], and on October 1, 2023, the Debtor assigned the Advisory Contracts and Manager Interests to SVBC ManCo. Upon such assignment, SVBC ManCo became the registered investment adviser for SVB Capital funds.

In parallel with the SVB Capital Reorganization, the Debtor and its advisors considered a range of strategic alternatives with respect to SVB Capital and conducted an extensive marketing process of the SVB Capital business. On during the summer and fall of 2023 (the "SVB Capital Marketing Process"). The Debtor and its advisors engaged in discussions with many interested parties regarding a sale of the SVB Capital business. [•] of these parties (the "Potential Bidders") executed non-disclosure agreements and were granted access to a virtual data room with an overview of information regarding the SVB Capital business. In the fall of 2023, the Debtor negotiated substantive bids received from two interested parties (the "2023 Bids"), but determined that neither bid exceeded the net present value of the Debtor continuing to operate the SVB Capital business.

As a result, on January 9, 2024, the Debtor announced that it had determined, in consultation with its advisors and creditor constituencies, that retaining the SVB Capital business would result in superior value creation opportunities, and created a new operating committee to oversee all aspects of the business. The SVB Capital business is currently overseen by its operating committee and operates through SVBC ManCo, SVB Capital's registered investment adviser and the Debtor's indirect subsidiary.

The Plan contemplates that SVBC Holdco and SVBC ManCo will be direct or indirect subsidiaries of NewCo upon the Effective Date.

2. **SVB Capital Sale**

Following the Debtor's announcement of its intention to retain the SVB Capital business, multiple Potential Bidders provided the Debtor with new offers for the SVB Capital business (the "2024 Bids"). The Debtor evaluated the 2024 Bids, and the Debtor thereafter sought to improve the terms of certain of the 2024 Bids. The Debtor successfully negotiated for

meaningful improvements in the terms of an offer received from SVBC Designated Buyer, and after thoroughly considering SVBC Designated Buyer's improved bid against alternatives, including (i) the other 2024 Bids, (ii) the 2023 Bids and (iii) the value of continuing to operate the SVB Capital business, the Debtor, in consultation with its advisors and key creditor constituencies, determined that the bid from SVBC Designated Buyer was the highest or otherwise best offer for the SVB Capital business.

Accordingly, on May 2, 2024, the Debtor and SVBC Designated Buyer entered into an interest purchase agreement (the "SVBC Purchase Agreement"), providing for the sale of the SVB Capital business (the "SVB Capital Sale") to SVBC Designated Buyer, subject to certain terms and conditions.

As set forth in the SVBC Purchase Agreement, the consideration for the SVB Capital business currently consists of cash consideration of $340 million, subject to certain adjustments as set forth in the SVBC Purchase Agreement, along with ongoing economic participation rights and a cash earn-out.  On May 2, 2024, the Debtor filed the *Debtor's Motion for Entry of Orders (I)(A) Approving Buyer Protections, (B) Scheduling a Sale Hearing, (C) Approving Form and Manner of Notices for Sale of the SVB Capital Business, (D) Approving the Assumption and Assignment Procedures, and (E) Granting Related Relief, and (II)(A) Approving the SVB Capital Purchase Agreement, (B) Approving the Sale of the SVB Capital Business Free and Clear of Liens, Claims, Interests and Encumbrances, (C) Authorizing the Assumption and Assignment of Executory Contracts and (D) Granting Related Relief* [D.I. 1082] (the "SVB Capital Sale Motion").  The Capital Sale Motion seeks, among other things: (i) approval of the Debtor's entry into the SVBC Purchase Agreement, (ii) approval of certain buyer protections for SVBC Designated Buyer and (iii) approval of the procedures relating to the SVB Capital Sale and the related sale hearing.

As of the date of this Disclosure Statement, the SVB Capital Sale remains pending.  Hearings to approve the buyer protections set forth in the SVB Capital Sale Motion for SVBC Designated Buyer and the SVB Capital Sale are expected to occur in May and June 2024 and prior to a hearing on confirmation of the Plan.  Additional information relating to the pending SVB Capital Sale can be found at https://restructuring.ra.kroll.com/svbfg/.

**M.    SVB India Sale**

In June 2023, following its acquisition of certain assets of Bridge Bank, FCB notified the Debtor of its interest in purchasing SVB India to achieve synergies with the SVB business that SVB India had serviced and that continued to account for a substantial majority of SVB India's operations.  Over the following months, the Debtor engaged in conversations with FCB about a potential sale of SVB India and also reached out to and held discussions with other potential strategic buyers in an effort to obtain a higher or otherwise better offer for SVB India.  The Debtor, however, did not receive any indications of interest from those other parties.

In August 2023, First Citizens Global I, Inc., First Citizens Global II, Inc. and FCB Parent (together, the "SVB India Buyers") submitted an offer to purchase SVB India.  In the subsequent several months, the Debtor engaged in arm's-length, good-faith negotiations with SVB India Buyers regarding the terms of a sale of SVB India.  The Debtor, in consultation with

the Restructuring Committee, considered SVB India Buyers' seriousness of interest in acquiring, and financial capacity to acquire, SVB India, SVB India Buyers' positioning as the most logical acquiror for a business that currently predominantly services SVB India Buyers' and its affiliates, the purchase price offered and strategic alternatives for SVB India.  Ultimately, the Debtor, in the exercise of its business judgment and upon the approval and recommendation of the Restructuring Committee, concluded that a sale to SVB India Buyers would maximize the value of SVB India for the Debtor's estate.

As set forth in the purchase agreement for SVB India, the consideration for SVB India was $21.8 million in cash, subject to deduction of up to $8.9 million for outstanding postpetition obligations owed by the Debtor and its Affiliates to FCB as of the closing date and a holdback of $2 million for an indemnity escrow fund and $3 million for a repatriation escrow fund.  On March 3, 2024, the Debtor filed the *Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to Sell SVB India by (A) Selling Partnership Interests in SVB India Free and Clear of All Liens, Claims, Interests and Encumbrances and (B) Causing Non-Debtor Subsidiary to Sell Partnership Interests in SVB India; (II) Approving the Debtor's Entry Into, and Performance Under, the Purchase and Sale Agreement; (III) Authorizing Assumption and Assignment of Certain Contracts; and (IV) Granting Related Relief* [D.I. 929].  On April 10, 2024, the Bankruptcy Court entered the *Order (I) Authorizing the Debtor to Sell SVB India by (A) Selling Partnership Interests in SVB India Free and Clear of All Liens, Claims, Interests and Encumbrances and (B) Causing Non-Debtor Subsidiary to Sell Partnership Interests in SVB India; (II) Approving the Debtor's Entry Into, and Performance Under, the Purchase and Sale Agreement; (III) Authorizing Assumption and Assignment of Certain Contracts; and (IV) Granting Related Relief* [D.I. 1028].

## N.    The Restructuring Support Agreement

Throughout the Chapter 11 Case, the Debtor has worked tirelessly to build consensus among key creditor constituencies on the terms of a plan of reorganization.  Sustained, substantive engagement with the UCC, the Ad Hoc Group of Senior Noteholders and the Ad Hoc Cross-Holder Group has allowed the Debtor to drive significant progress in this case to date.  After months of hard-fought negotiations, the Debtor was able to reach resolution with two of these constituencies: the UCC and the Ad Hoc Group of Senior Noteholders.  On January 9, 2024, the Debtor announced that it had entered into the RSA with the UCC and members of the Ad Hoc Group of Senior Noteholders then holding 48.7% of the aggregate outstanding principal amount of the Senior Notes [D.I. 798] (collectively, the "RSA Parties").  As of the date of this Disclosure Statement, members of the Ad Hoc Group of Senior Noteholders holding in excess of 65.19% of the Senior Notes Claims have executed the RSA. Appended to the RSA was a term sheet for a proposed plan of reorganization ("Plan Term Sheet").

The RSA provides for a fair and confirmable plan that the Debtor believes will lead to a swift and consensual resolution of the Chapter 11 Case and represents the RSA Parties' mutual support and commitment with respect to the Debtor's proposed Plan to facilitate the consensual emergence of the Debtor from chapter 11.  The RSA provides that the Debtor will implement the Restructuring Transactions in accordance with certain milestones by which, absent extension or waiver in writing, and subject to the Bankruptcy Court's availability, (a) the Debtor must file the Plan and Disclosure Statement; (b) holders of more than two-thirds of the

aggregate outstanding principal amount of the Senior Notes must become party to the RSA; (c) the Bankruptcy Court shall have entered an order to pay certain professional fees and expenses, subject to the terms of the RSA; (d) the Bankruptcy Court shall have entered the Disclosure Statement Order; (e) the Bankruptcy Court shall have entered the Confirmation Order; and (f) the Effective Date shall have occurred.

Pursuant to the terms of the RSA, the RSA Parties also made various commitments to continue support of the Debtor's emergence from chapter 11. For instance, the RSA Parties mutually committed to using commercially reasonable efforts to support the consummation and implementation of the Restructuring Transactions (as defined below), among other affirmative and negative covenants. Second, the terms of the RSA outline various consent rights to facilitate consensus building among the RSA Parties, such as consent rights related to any change in the Debtor's tax election and related decisions, the Debtor's interactions with the Internal Revenue Service (the "IRS"), and matters regarding the claims and Causes of Action of the Debtor against certain related parties of the Debtor and against the FDIC-R1, FDIC-R2 and FDIC-C. Finally, the Plan Term Sheet represented consensus on several key terms of the Plan, including, for instance:  the classification and treatment of Claims and Interests, and the formation of NewCo and the Liquidating Trust, and the issuance of NewCo Debt.  The foregoing summary of the RSA is qualified in its entirety by reference to the RSA, attached hereto as Appendix E.

**O.    Securities Lawsuits**

Following the Petition Date, at least seven class-action lawsuits have been filed asserting violations of the Exchange Act and/or the Securities Act by the Debtor, certain of the Debtor's current and former directors and officers, underwriters of certain of the Debtor's securities offerings, the Debtor's former auditor, and/or certain director-controlled entities.[19]

On November 30, 2023, the U.S. District Court for the Northern District of California entered an order consolidating five class-action lawsuits (*Vanipenta, Snook, Siddiqui, City of Hialeah Employees Retirement System*, and *IUOE Local 132*) under the caption *In re SVB Financial Group Securities Litigation*, No. 3:23-cv-01097 (N.D. Cal.) ("*Norges*") and appointing Norges Bank and Sjunde AP-Fonden as lead plaintiffs [*Norges*, D.I. 82].[20]  On January 16, 2024,

---

[19]    The class-action lawsuits are *Vanipenta* v. *SVB Financial Group*, Case No. 3:23-cv-01097-JD (N.D. Cal. filed Mar. 13, 2023); *Snook* v. *SVB Financial Group*, Case No. 3:23-cv-01173-VC (N.D. Cal. Filed Mar. 15, 2023); *Siddiqui* v. *Becker*, Case No. 4:23-cv-01228-HSG (N.D. Cal. Filed Mar. 17, 2023); *City of Hialeah Employees Retirement System* v. *Becker*, Case No. 3:23-cv-01697-JD (N.D. Cal. Filed Apr. 7, 2023); *Int'l Union of Operating Engineers Local 132 Pension Fund* v. *SVB Financial Group*, Case No. 3:23-cv-01962-TLT (N.D. Cal. Filed Apr. 24, 2023); *Stevenson* v. *Becker*, 4:23-cv-02277-HSG (N.D. Cal. Filed May 10, 2023); *Rossi* v. *Becker*, Case No. 4:23-cv-02335-HSG (N.D. Cal. Filed May 12, 2023) ("*Rossi I*"); and *Rossi* v. *DeChellis*, 4:24-cv-01674-HSG (N.D. Cal. Filed Mar. 18, 2024) ("*Rossi II*") (collectively, the "Class Action Lawsuits").

[20]    The *Norges* court declined to consolidate two class action lawsuits, *Stevenson* and *Rossi I*, which had been removed from state court and were the subject of pending motions to remand.  On March 28, 2024, the U.S. District Court for the Northern District of California entered an order denying the motions to remand the *Stevenson and Rossi I* litigation.  On April 11, 2024, the District Court entered a stipulation and order certifying an interlocutory appeal of its March 28 remand order to the U.S. Court of Appeals for the Ninth Circuit under 28 U.S.C. § 1292(b) and staying the proceedings in district court in the *Stevenson* and *Rossi I* litigation while

the *Norges* plaintiffs filed a six-count, 290-page amended complaint (which also attaches over 100 pages of exhibits) asserting claims under the Securities Act and/or the Exchange Act against certain of the Debtor's directors and officers, underwriters, and auditor [*Norges*, D.I. 88]. Briefing on the defendants' motions to dismiss the amended complaint is scheduled to be completed by May 24, 2024.

On August 1, 2023, individual plaintiff Jane Lodato filed a complaint in the Superior Court of the State of California, County of San Mateo, asserting fraud and breach of fiduciary duty claims against certain of the Debtor's directors and officers. On September 5, 2023, the action was removed to the Northern District of California. *Lodato* v. *Becker*, No. 3:23-cv-04551 (N.D. Cal. 2023). A hearing on plaintiff's motion to remand the lawsuit to state court is scheduled for June 6, 2024.

On January 25, 2024, Teachers Insurance and Annuity Association of America and certain of its subsidiaries, funds and accounts filed a complaint asserting Exchange Act and/or Securities Act claims against certain of the Debtor's directors and officers, and underwriters. *TIAA-CREF Inv. Mgmt., LLC* v. *Becker*, No. 3:24-cv-00478 (N.D. Cal.) (together with the aforementioned class action lawsuits and *Lodato*, the "Securities Lawsuits"). By stipulation of the parties, the *TIAA-CREF* action is stayed pending a ruling on the motions to dismiss the *Norges* amended complaint.

The insurers under the Debtor's D&O Insurance Policies are currently reimbursing some of these defendants for their costs of defense, and (subject to policy defenses and other claims against the D&O Insurance Policies as described below) the insurers may be responsible for payment of future settlements or liabilities (if any) established in the Securities Lawsuits.

**P.      Investigation of Potential Estate Claims and Causes of Action**

As described in Article II.G.1 above, the causes of SVB's closure and receivership, including whether its closure and receivership were preventable and/or foreseeable, have been the subject of several publicly released governmental investigations and reports, as well as multiple instances of Congressional testimony.  The Debtor, acting at the direction of the Special Committee, has been conducting an extensive evaluation of the factors, prepetition conduct, and events that led to SVB's closure and the Debtor's Chapter 11 Case.  The UCC also has been conducting an extensive investigation into the factors, prepetition conduct, and events that led to the Debtor's Chapter 11 Case.  The Debtor's and the UCC's evaluations continue. The UCC and the Debtor have coordinated numerous aspects of their respective investigations and evaluations, including joint interviews of a significant number of witnesses, in an effort to protect the Debtor's estate.

---

the appeal is pending.  On April 22, 2024, the Plaintiffs in *Stevenson* and *Rossi I* sought permission to proceed with an interlocutory appeal from the U.S. Court of Appeals for the Ninth Circuit, which request is currently pending.  Under an April 16, 2024 stipulation and order, the March 28 remand order and April 11 order were extended to the *Rossi II* litigation.

In connection with their respective investigations and evaluations, the UCC and the Debtor obtained permission from the Bankruptcy Court to seek discovery under Bankruptcy Rule 2004 from, among others, forty-one current or former directors, officers, and employees of the Debtor, six advisors and other third parties, and First Citizens Bank, which is in possession of the majority of the Debtor's prepetition books and records [D.I. 345, 346, 659].  In connection with these requests, the UCC and the Debtor also obtained permission to receive confidential supervisory information from the Federal Reserve, the CA DFPI, the Federal Reserve Bank of San Francisco, and the FDIC-C.

The evaluation and investigation included a review and analysis of publicly available information concerning SVB, including reports from the Federal Reserve and the U.S. Government Accountability Office surrounding the closure and receivership of SVB, documents and communications that have been made publicly available in connection with those reports, and public testimony from relevant personnel.  The UCC also obtained access to certain documents from the Debtor on a consensual basis, and the Debtor and UCC received (and continue to receive) numerous productions of documents from First Citizens Bank, from certain current and former employees, officers and directors of the Debtor, and from McKinsey & Co., BlackRock, Goldman Sachs, Curinos, KPMG, and Ernst & Young, entities that provided prepetition services to the Debtor and/or SVB.  In addition, the Debtor has access to more than 10 million pages of documents provided by First Citizens Bank, which the Debtor has been able to review in connection with its evaluation, but as to which its ability to share or use those documents presently remains limited by the FDIC and/or other governmental entities.

As described in more detail in Article III.J above, the FDIC in each of its capacities has taken the position that the Debtor's $1.93 billion claim for its Account Funds need not be honored by the FDIC in each such capacity.  For example, among other arguments, the FDIC-R1 has asserted that, pursuant to 12 U.S.C. § 1822(d) and common law, it has a right to setoff against the Debtor's Account Funds claim for any amounts owed to SVB by the Debtor [D.I. 145].[21]  On May 2, 2024, the FDIC-R1 filed a *Statement Regarding Its Defensive Setoff Rights Against SVB Financial Group* in the FDIC-R Action ("Setoff Statement"),[22] which asserts defensive rights to setoff against the Debtor's Account Fund claim based on allegations that the Debtor (1) aided, abetted and conspired in various breaches of fiduciary duty by SVB's directors and officers, resulting in billions of dollars of damages that exceed the amount of the Debtor's Account Funds claim; (2) is liable for unjust enrichment, breach of California Corporate Code §§ 500-501, and fraudulent transfer with respect to (i) dividends by SVB to SVBFG when SVB was experiencing financial distress and was in need of liquidity, resulting in damages of $294 million, and (ii) a sale of equity warrants by SVB to SVBFG at below fair market value prices, resulting in damages of $130 million; and (3) failed to turn over to the FDIC-R1 an unspecified amount of tax refunds held in trust under a tax sharing agreement and applicable law.  The

---

[21]    The Debtor has previously challenged the existence of mutuality necessary for setoff, arguing that FDIC-R1 cannot exercise a setoff claim against amounts that are owed to the Debtor by the FDIC-C, a separate juridical entity.  *See SVB Fin. Group* v. *FDIC*, Adv. 23-1137, D.I. 1 ¶¶ 12, 54.  The FDIC-R2 has affirmatively disclaimed any right to setoff. *See SVB Fin. Group* v. *FDIC*, Adv. 23-1137, D.I. 71 at 5 ("FDIC-R2 has no right of setoff against the Deposit Account liabilities nor has it asserted a right of setoff.").

[22]    FDIC-R Action [D.I. 29].  A notice of the Setoff Statement was also filed in the Chapter 11 Case [D.I. 1081].

Debtor (acting through the Special Committee) has evaluated and will continue to evaluate the basis for the FDIC-R1's claims. To date, the Debtor has not identified any conduct on the part of the Debtor or its officers, directors, or employees that would give rise to a setoff right against the Debtor's Account Funds claim, and the Debtor intends to vigorously oppose the FDIC-R1's claims on any and all supportable grounds.

The UCC and Debtor are each still evaluating whether colorable causes of action may exist against one or more prepetition officers or directors of the Debtor, as well as against certain third parties. The UCC and Debtor continue to evaluate the strengths and weaknesses of any potential claims, as well as anticipated defenses.

The primary source of any recovery on claims against any prepetition officers or directors of the Debtor is expected to be the Debtor's D&O Insurance Policies, whose policy limits aggregated to roughly $210 million as of the Petition Date. It must be noted, however, that the Debtor shared the coverage under its D&O Insurance Policies with SVB, and the FDIC has indicated that it also may pursue claims that would be covered by the D&O Insurance Policies. In addition, the plaintiffs in the Securities Lawsuits are pursuing claims that may be covered by the D&O Insurance Policies, and the value of the D&O Insurance Policies has been and continues to be eroded by the payment of defense costs. As a result of the eroding value of the D&O Insurance Policies and what are expected to be significant competing claims for coverage, the Debtor cannot estimate with any level of precision the amount of insurance proceeds that could be expected to be available to pay any of the estate's claims against any covered parties, should any such claims exist.

As governmental investigations are continuing and information continues to be developed and the Debtor continues its own evaluation, the Debtor (acting at the direction of the Special Committee) is not in a position at this time to recommend a release of any claims against any prepetition officers or directors, or third parties, arising from prepetition conduct. As a result of the foregoing, it is expected that with the exception of any Claims that are subject to a release described in Article IV.G below, all potential claims will be preserved under the Plan and will be transferred to the Liquidating Trust, as described in Article IV.B below.

## ARTICLE IV.~~ARTICLE IV~~

## SUMMARY OF THE PLAN

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying Claims against, and Interests in, a debtor. Confirmation of a plan makes the plan binding upon the debtor, any issuer of securities under the plan and any creditor of, or equity Holder in, the debtor, whether or not such creditor or equity Holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the effective date of the plan and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the Holders of Claims or Interests in certain classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are conclusively presumed to accept the plan. Accordingly, a debtor need not solicit votes from the Holders of Claims or Interests in such classes. A chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any Claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are impaired will be solicited to vote to accept or reject the plan.

Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. To satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtor is submitting this Disclosure Statement to Holders of Claims and Interests against the Debtor who are entitled to vote to accept or reject the Plan.

The classification and treatment of Claims and Interests; implementation of the Plan; provisions governing Distributions; effect of Confirmation, including the release, injunction and related provisions; and treatment of Executory Contracts and Unexpired Leases are summarized below. For all other provisions relating to the Plan, including among other things, acceptance or rejection of the Plan, conditions precedent to effectiveness of the Plan, modification, revocation or withdrawal of the Plan, and retention of jurisdiction, please refer to the Plan attached hereto as <u>Appendix A</u>.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY AND IS SUBJECT TO THE PLAN AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN. REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR UNDER THE PLAN. UPON THE OCCURRENCE OF THE EFFECTIVE DATE, THE PLAN AND ALL SUCH DOCUMENTS WILL BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR AND ITS ESTATE AND ALL OTHER PARTIES-IN-INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR

ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE
PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

STATEMENTS AS TO THE RATIONALE UNDERLYING THE
TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ARE NOT INTENDED
TO, AND SHALL NOT, WAIVE, COMPROMISE OR LIMIT ANY RIGHTS, CLAIMS OR
CAUSES OF ACTION IN THE EVENT THE PLAN IS NOT CONFIRMED.

## A.    Classification, Treatment and Voting of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the
claims and interests of a debtor's creditors and equity interest holders.  In accordance with
section 1123 of the Bankruptcy Code, the Plan divides claims and interests into Classes and sets
forth the treatment for each Class (other than administrative expense claims, which, pursuant to
section 1123(a)(1) of the Bankruptcy Code, need not be and have not been classified).  The
Debtor is also required, under section 1122 of the Bankruptcy Code, to classify claims against
and interests in the Debtor into Classes that contain claims and interests that are substantially
similar to the other claims and interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for
each claim or interest of a particular class unless the claim holder or interest holder agrees to a
less favorable treatment of its claim or interest.  The Debtor believes that it has complied with
such standard.  If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of
the Plan if the holders of claims and interests affected do not consent to the treatment afforded
them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim
or Interest falls within the description of that Class and is classified in other Classes to the extent
that any portion of the Claim or Interest falls within the description of such other Classes.  A
Claim or Interest also is placed in a particular Class for the purpose of receiving distributions
pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that
Class and such Claim or Interest has not been paid, released or otherwise settled prior to the
Effective Date.

The Debtor believes that the Plan has classified all Claims and Interests in
compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.
It is possible that a Holder of a Claim or Interest may challenge the Debtor's classification of
Claims and Interests and that the Bankruptcy Court may find that a different classification is
required for the Plan to be confirmed.  If such a situation develops, the Debtor intends, in
accordance with the terms of the Plan and the RSA, to make such permissible modifications to
the Plan as may be necessary to permit its Confirmation.  Any such reclassification could
materially adversely affect Holders of Claims and Interests by changing the composition of one
or more Classes and the vote required of such Class or Classes for approval of the Plan.
EXCEPT AS SET FORTH IN THE PLAN AND THE RSA, UNLESS SUCH MODIFICATION
OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A
HOLDER OF A CLAIM OR INTERESTS AND REQUIRES RESOLICITATION,
ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM OR INTEREST

PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM OR INTEREST REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

Any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors.  The projected recoveries are based on information available to the Debtor as of the date hereof and reflect the Debtor's views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below.  The Debtor believes that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests.  The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan.  Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

1.    **Claims Classification and Voting Status**

The classification of Claims and Interests pursuant to the Plan is as follows:

All Claims and Interests, except for certain Claims addressed in Section 3 of the Plan, are classified as set forth in Section 4 of the Plan, which is summarized below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, and as set forth in Section 3 of the Plan, the Plan does not classify Other Administrative Claims, Ad Hoc Noteholder Group Expenses, Senior Note Trustee Expenses, Subordinated Note Trustee Expenses, Professional Fee Claims and Priority Tax Claims, and such Claims will be paid in accordance with the procedures set forth in Section 3 of the Plan.

The following table designates the Classes of Claims against and Interests in the Debtor, as applicable, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan and (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or presumed to accept or deemed to reject the Plan.[23]  Each Holder of a Claim or Interest in an Impaired Class that is entitled to vote on the Plan as of the Voting Record Date pursuant to Section 4 of the Plan shall be entitled to vote to accept or reject the Plan.  The classification of Claims and Interests pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

---

[23]    The information in the table is provided in summary form, and is qualified in its entirety by Section 4.2 of the Plan.

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3(a) | Senior Note Claims | Impaired | Entitled to Vote |
| 3(b) | ~~Senior Note Claims and~~ Other General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Subordinated Note Claims | Impaired | Entitled to Vote |
| 5 | Preferred Equity Interests | Impaired | Entitled to Vote |
| 6 | Common Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Claims and Intercompany Interests | Impaired or Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

**2.      Treatment of Claims and Interests**

Class 1 – Other Secured Claims

(a)      *Classification*:  Class 1 consists of all Other Secured Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim will receive, at the Debtor's option (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed): (a) payment in full in Cash; (b) delivery of the collateral securing its Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting*:  Claims in Class 1 are Unimpaired.  Each Holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Other Secured Claims is entitled to vote to accept or reject the Plan.

Class 2 – Other Priority Claims

(a)      *Classification*:  Class 2 consists of all Other Priority Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final

satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim will receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

(c)    *Voting*:  Claims in Class 2 are Unimpaired.  Each Holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of an Other Priority Claim is entitled to vote to accept or reject the Plan.

Class 3(a) – Senior Note Claims

(a)    *Classification*:  Class 3(a) consists of all Senior Note Claims.

(b)    *Allowance*:  Senior Note Claims will be Allowed in the aggregate outstanding principal amount of $[3,300,000,000.00], *plus* accrued and unpaid interest to and including the Petition Date at the non-default contract rate.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed Senior Note Claim agrees to a less favorable treatment (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed), in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Senior Note Claim, each Holder of an Allowed Senior Note Claim will receive (a)(i) if and solely to the extent such Holder is a Qualified Holder, its Pro Rata share (together with all Holders receiving Distributions in NewCo Common Stock) of the NewCo Common Stock subject to dilution by any NewCo Transaction or (ii) if and solely to the extent such Holder is a Non-Qualified Holder, Cash in an amount equal to the value of the NewCo Common Stock it would be entitled to receive if it were a Qualified Holder, (b) its Pro Rata share (together with all Holders receiving Distributions of the Class A Trust Units) of the Class A Trust Units and (c) payment by the Debtor in Cash of the Senior Note Trustee Expenses, to the extent not otherwise paid by the Debtor under the Plan.

(d)    *Voting*:  Claims in Class 3(a) are Impaired.  Each Holder of an Allowed Senior Note Claim is entitled to vote to accept or reject the Plan.

Class 3(b) – Other General Unsecured Claims

(a)    *Classification*:  Class 3(b) consists of all Other General Unsecured Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other General Unsecured Claim agrees to a less favorable treatment (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed), in full and final

satisfaction, settlement, release and discharge of and in exchange for its Allowed Other General Unsecured Claim, each Holder of an Allowed Other General Unsecured Claim will receive:

(a) (i)(A) if and solely to the extent such Holder is a Qualified Holder, its Pro Rata share (together with all Holders receiving Distributions in NewCo Common Stock) of the NewCo Common Stock subject to dilution by any NewCo Transaction or (B) if and solely to the extent such Holder is a Non-Qualified Holder, Cash in an amount equal to the value of the NewCo Common Stock it would be entitled to receive if it were a Qualified Holder, and (ii) its Pro Rata share (together with all Holders receiving Distributions of the Class A Trust Units) of the Class A Trust Units; or

(b) if such Holder elects on the applicable ballot, the GUC Cash-Out with respect such Claim.

(c)     *Voting*:  Claims in Class 3(b) are Impaired.  Each Holder of an Allowed Other General Unsecured Claim is entitled to vote to accept or reject the Plan.

Class 4 – Subordinated Note Claims

(a)     *Classification*:  Class 4 consists of all Subordinated Note Claims.

(b)     *Allowance*:  Subordinated Note Claims will be Allowed in the aggregate outstanding principal amount of $[104,492,871.02], *plus* accrued and unpaid interest to and including the Petition Date at the non-default contract rate.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Subordinated Note Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Subordinated Note Claim, each Holder of an Allowed Subordinated Note Claim will receive its Pro Rata share of (a) the Class B Trust Units in an aggregate amount equal to such Holder's Allowed Subordinated Note Claim and (b) payment by the Debtor in Cash of the Subordinated Note Trustee Expenses, to the extent not otherwise paid by the Debtor under the Plan.

(d)     *Voting*:  Claims in Class 4 are Impaired.  Each Holder of an Allowed Subordinated Note Claim is entitled to vote to accept or reject the Plan.

Class 5 – Preferred Equity Interests

(a)     *Classification*:  Class 5 consists of all Preferred Equity Interests.

(b)    *Allowance*:  Preferred Equity Interests will be Allowed in an amount equal to the Liquidation Preference per share, together with an amount equal to all dividends (if any) that have been declared but not paid prior to the date of distributions (but without regard to any undeclared dividends).

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed Preferred Equity Interest agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Preferred Equity Interest, each Holder of an Allowed Preferred Equity Interest will receive its Pro Rata share of the Class C Trust Units.

(d)    *Voting*:  Claims in Class 5 are Impaired.  Each Holder of an Allowed Preferred Equity Interest is entitled to vote to accept or reject the Plan.

Class 6 – Common Equity Interests

(a)    *Classification*:  Class 6 consists of all Common Equity Interests.

(b)    *Treatment*:  No Holder of a Common Equity Interest will receive any Distributions on account of its Common Equity Interest.  On and after the Effective Date, all Common Equity Interests will be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of such Interests will not receive or retain any distribution, property, or other value on account of such Interests.

(c)    *Voting*:  Interests in Class 6 are Impaired.  Each Holder of a Common Equity Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of a Common Equity Interest is entitled to vote to accept or reject the Plan.

Class 7 – Section 510(b) Claims

(a)    *Classification*:  Class 7 consists of all Section 510(b) Claims.

(b)    *Treatment*:  No Holder of a Section 510(b) Claim will receive any Distributions on account of its Section 510(b) Claim.  On and after the Effective Date, all Section 510(b) Claims will be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive or retain any distribution, property, or other value on account of such Claims.

(c)    *Voting*:  Claims in Class 7 are Impaired.  Each Holder of a Section 510(b) Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of a Section 510(b) Claim is entitled to vote to accept or reject the Plan.

Class 8 – Intercompany Claims and Intercompany Interests

(a)    *Classification*:  Class 8 consists of all Intercompany Claims and Intercompany Interests.

(b)    *Treatment*:  On and after the Effective Date, each Intercompany Claim and each Intercompany Interest will be (a) canceled, released, and discharged, (b) Reinstated, (c) converted to equity, or (d) otherwise set off, settled, or distributed, in each case at the option of the Debtor with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed.

(c)    *Voting*:  Claims and Interests in Class 8 are Impaired or Unimpaired.  Each Holder of an Intercompany Claim or an Intercompany Interest is conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code.  No Holder of an Intercompany Claim or an Intercompany Interest is entitled to vote to accept or reject the Plan.

**3.    Acceptance by Impaired Classes**

Pursuant to sections 1126(c) and (d) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, (i) an Impaired Class of Claims will have accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of such Class entitled to vote that actually vote on the Plan have voted to accept the Plan and (ii) an Impaired Class of Interests will have accepted the Plan if the Holders of at least two-thirds in dollar amount of such Class entitled to vote that actually vote on the Plan have voted to accept the Plan.

If Holders of Claims or Interests in a particular Impaired Class of Claims or Interests were given the opportunity to vote to accept or reject the Plan, but no Holders of Claims or Interests in such Impaired Class voted to accept or reject the Plan, then such Class will be deemed to have accepted the Plan.

**4.    Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court solely for voting purposes as of the date of the Confirmation Hearing will be deemed eliminated from the Plan solely for purposes of (i) voting to accept or reject the Plan and (ii) determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**5.    Special Provisions Regarding Unimpaired Claims**

Except as otherwise specifically provided in the Plan, the Liquidating Trust will have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses which the Debtor now has or had immediately prior to the

Petition Date as if the Chapter 11 Case had not been commenced, and all of the Liquidating Trust's legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Case had not been commenced.  Unless Allowed, Claims that are Unimpaired will remain as Disputed Claims under the Plan.

**6.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

If there is one or more rejecting Class of Claims or Interests, the Debtor will seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any such rejecting Class or Classes.  Subject to Sections 14 and 16.4 of the Plan, the Debtor reserves the right to amend the Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**B.    The Liquidating Trust**

**1.    The Liquidating Trust Agreement**

On or before the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement.  The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties and authorities do not affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.  Notwithstanding anything in the Liquidating Trust Agreement to the contrary, the Liquidating Trust will be structured and operate in a manner that does not require registration of the Liquidating Trust under the Investment Company Act of 1940 or render it subject to the SEC reporting requirements under Sections 12 or 15 of the Exchange Act.

**2.    Purpose of the Liquidating Trust**

The Liquidating Trust will be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets, in accordance with section 301.7701-4(d) of the U.S. Treasury regulations (the "Treasury Regulations"), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  The Liquidating Trust will be deemed a successor-in-interest of the Debtor to the maximum extent necessary for the Liquidating Trust to execute its purpose, and will not otherwise be deemed a successor-in-interest to the Debtor for any purpose other than as specifically set forth in the Plan or in the Liquidating Trust Agreement.

**3.    Liquidating Trust Assets**

On the Effective Date, the Liquidating Trust Assets will be deemed irrevocably transferred to the Liquidating Trust or entities to be formed by the Liquidating Trust, in each case in accordance with the Restructuring Transactions Memorandum and without any further action of NewCo, the Debtor or its subsidiaries or any of their respective managers, employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives.  The

Liquidating Trust Assets will vest in the Liquidating Trust, free and clear of all Liens, Claims, charges, rights, or other encumbrances subject to and in accordance with the Plan and the Liquidating Trust Agreement.  For purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust will not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer.  Such transfer will be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtor and its predecessors, successors and assigns, and each other Entity released pursuant to Section 12.9 of the Plan will be discharged and released from all liability with respect to the delivery of such distributions.  Upon the transfer of the Liquidating Trust Assets and pursuant to the Liquidating Trust Agreement, the Debtor will have no reversionary or further interest in or with respect to the Liquidating Trust Assets.

After the Effective Date, the Liquidating Trust may, in its reasonable discretion, contribute all or a portion of the Liquidating Trust Assets to ~~one or more entities~~an entity (i) wholly owned by the Liquidating Trust and (ii) treated as corporations for U.S. federal income tax purposes (each such entity, a "<u>Blocker Corporation</u>"); *provided* that, the Liquidating Trust will evaluate any such transfer based on the relative tax costs and other tax consequences to the Liquidating Trust Beneficiaries of contributing such assets as compared to if such assets were not contributed to a Blocker Corporation.

To the extent that any cash refunds of Taxes transferred by NewCo to the Liquidating Trust is subsequently disallowed or required to be returned to the applicable Tax Authority, the Liquidating Trust will be liable for any amounts payable by NewCo to the applicable Tax Authority as a result of such disallowance or requirement and will promptly repay, or cause to be repaid, the amount of such refund, together with any interest, penalties or other additional amounts imposed by such Tax Authority, to NewCo.

**4.      Administration of the Liquidating Trust**

The business and affairs of the Liquidating Trust will be managed by or under the direction of the Liquidating Trust Board.  On the Effective Date, the Liquidating Trust Board will be appointed by the Required Ad Hoc Senior Noteholder Parties in a manner reasonably acceptable to the UCC.  Following the Effective Date, the appointment and removal of the members of the Liquidating Trust Board will be governed by the Liquidating Trust Agreement.

The Liquidating Trust will have all the rights, powers and duties necessary to carry out its responsibilities under the Plan and the Confirmation Order.  For the avoidance of doubt, these powers will include, to the extent applicable, the power to assert, enforce, release, or waive any privilege or any defense (including as to any privilege that the Debtor held prior to the Effective Date).  The Liquidating Trust will be the exclusive representative of the Debtor's Estate for the purposes of 31 U.S.C. § 3713(b) and section 1123(b)(3)(B) of the Bankruptcy Code and receiver, trustee or assignee of all or substantially all the property or business pursuant to 26 U.S.C. § 6012(b)(3).

In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, and subject to the terms of the Confirmation Order, the Plan and the Liquidating Trust Agreement, the Liquidating Trust will, among other things, have the following rights and powers:  (i) to hold, manage, convert to Cash, and distribute the Liquidating Trust Assets to holders of Liquidating Trust Interests, including (x) prosecuting and resolving the claims and Retained Causes of Action belonging to the Liquidating Trust and (y) reducing, from time to time, the amount of Liquidating Trust Assets held in the Disputed Claims Reserves and returning such amounts to the Liquidating Trust, *provided*, for the avoidance of doubt, that any investment powers of the Liquidating Trust, other than those reasonably necessary to maintain the value of the assets and to further the liquidating purpose of the trust, must be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills, (ii) to sell, transfer, lease, encumber, or otherwise dispose of the Liquidating Trust Assets, (iii) to investigate, prosecute, settle and/or abandon rights, causes of action, or litigation of the Liquidating Trust, including Avoidance Actions, (iv) to disburse funds in the Professional Fee Reserve, the Liquidating Trust Disputed Claims Reserve, and the Liquidating Trust Disputed GUC Cash-Out Claims Reserve in accordance with the Liquidating Trust Agreement, which will be consistent with the Plan, (v) to distribute Liquidating Trust Interest from the Liquidating Trust Disputed Interests Reserve in accordance with the Liquidating Trust Agreement, which will be consistent with the Plan, (vi) to distribute NewCo Common Stock from the NewCo Disputed Claims Reserve in accordance with the Shared Services Agreement and the Liquidating Trust Agreement, as applicable, which will be consistent with the Plan, (vii) to file all Tax Returns and tax and regulatory forms, returns, reports, and other documents required with respect to the Liquidating Trust and any Disputed Claims Reserve, (viii) to object to Claims, and manage, control, prosecute, and/or settle on behalf of the Liquidating Trust, objections to Claims on account of which the Distribution Agent will be responsible (if Allowed) for making distributions under the Plan, (ix) to take all actions necessary and create any document necessary to implement the Plan, (x) to act as a signatory to the Debtor for all purposes, including those associated with the novation of contracts or other obligations arising out of the sales of the Debtor's assets, and (xi) to take all necessary actions and file all appropriate motions to obtain an order closing the Chapter 11 Case.  Under no circumstance may any person on the Liquidating Trust Board serve on the board of directors of any Affiliate of the Liquidating Trust.

## 5.    Substitution in Pending Legal Actions

On the Effective Date, the Liquidating Trust will be deemed to be substituted as the party to any pending litigation of a Retained Cause of Action in which the Debtor is a party and will be authorized, but not required, to file notices or other pleadings in such actions to effectuate its substitution for the Debtor. Such substitution will not result in holders of Claims, including litigation Claims, against the Debtor receiving greater rights in or against the Liquidating Trust than they are otherwise entitled to under the Plan and Liquidating Trust Agreement on account of such Claims.

## 6.    Distribution of Liquidating Trust Assets

i.    From time to time (but no less frequently than annually), the Liquidating Trust will distribute to the Liquidating Trust Beneficiaries on account of

their Liquidating Trust Interests in accordance with Section 5.6 of the Plan all unrestricted Cash on hand; *provided*, that in no event will the Liquidating Trust be required to distribute amounts reasonably necessary to (A) meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (B) pay reasonable incurred or anticipated expenses (including, but not limited to, any Taxes imposed on or payable by the Liquidating Trust or in respect of the Liquidating Trust Assets), or (C) satisfy other liabilities incurred or anticipated by the Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement.

ii.     The Liquidating Trust will issue class A trust units (the "Class A Trust Units"), class B trust units (the "Class B Trust Units") and class C trust units (the "Class C Trust Units") to Holders of Claims and Interests in accordance with Sections 4.2~~Error! Reference source not found.~~ and 11.8 of the Plan.

iii.    The Class A Trust Units will be issued to Holders of Allowed General Unsecured Claims (other than Holders of Allowed General Unsecured Claims that elect to ~~participate in~~receive the GUC Cash-Out) with an initial distribution preference of $[•],[24] which will accrete at an annual rate of 12%.  The Class B Trust Units and the Class C Trust Units will receive no distributions until the distribution preference (including, for the avoidance of doubt, any accretion thereto) of the Class A Trust Units has been satisfied in full.

iv.     The Class B Trust Units will be issued to Holders of Allowed Subordinated Note Claims with an initial distribution preference to be calculated at the face amount of the Allowed Subordinated Note Claims, which Class B Trust Units will accrete at an annual rate of 12%.

v.      The Class C Trust Units will be issued to Holders of Allowed Preferred Equity Interests and will receive no distributions until the distribution preference (including, for the avoidance of doubt, any accretion thereto) of the Class B Trust Units has been satisfied in full.

---

[24] [**NTD**:  To be calculated at the face amount (including accrued and unpaid interest on the Senior Notes as of the Petition Date) of ~~the~~all Allowed General Unsecured Claims ~~receiving Class A Trust Units,~~ *minus* amount of the Allowed General Unsecured Claims satisfied by the GUC Cash-Out and *minus* the value of NewCo Common Stock ~~distributed to Holders of Allowed General Unsecured Claims~~distributable to Classes 3(a) and 3(b) under the Plan (taking into the effect of any NewCo Transactions); *provided* that the determination of such value ~~will~~shall be acceptable to the Debtor, the UCC, and the Required Ad Hoc Senior Noteholder Parties and ~~will~~shall take into account any NewCo ~~Transaction(s)~~Transactions to be consummated on or prior to the Effective Date.~~ Calculation of the Class A distribution preference and determination of value of NewCo Common Stock to be included in an updated version of the Disclosure Statement filed with the Court in advance of the Disclosure Statement hearing.~~]

vi.     After satisfaction of the Class A and Class B Trust Units in full, the Class C Trust Units will be entitled to 100% of Liquidating Trust distributions.

**7.     Costs and Expenses of the Liquidating Trust**

The individuals serving as or comprising the Liquidating Trust Board will be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles and paid out of the Liquidating Trust Assets.  The fees and expenses incurred by the Liquidating Trust Board on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including attorney fees and expenses) made by the Liquidating Trust Board in connection with such Liquidating Trust Board's duties will be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Liquidating Trust Assets.  Fees and expenses incurred in connection with the prosecution and settlement of any Claims will be considered costs and expenses of the Liquidating Trust.

The Debtor, NewCo, the Delaware Trustee and the Liquidating Trust Board, as applicable, will not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  In the event that the Delaware Trustee or the Liquidating Trust Board is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety will be paid for with Cash from the Liquidating Trust Assets.

**8.     Retention of Professionals/Employees by the Liquidating Trust Board**

The Liquidating Trust Board may appoint officers or other representative agents of the Liquidating Trust, including a Liquidating Trust manager and a secretary, to serve as agents to the Liquidating Trust and carry out the purpose of the Liquidating Trust.  The Liquidating Trust Board will have the right to hire employees and retain the services of attorneys, accountants, and other professionals, subject to any limitations imposed by the Liquidating Trust Board, that are necessary to assist the Liquidating Trust Board in the performance of their duties without Bankruptcy Court approval.  Without limiting the foregoing, the Liquidating Trust Board may retain any professional that represented parties in interest in the Chapter 11 Case.

**9.     Liquidating Trust Disputed Claims Reserve**

On or after the Effective Date, the Liquidating Trust will be authorized, but not directed, to establish one or more Liquidating Trust Disputed Claims Reserves.  After the Effective Date, the Liquidating Trust may, in its sole discretion, hold any property to be distributed pursuant to the Plan, in the same proportions and amounts as provided for in the Plan, in the Liquidating Trust Disputed Claims Reserve in trust for the benefit of the Holders of Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Other Priority Claims ~~and~~, Disputed Other Secured Claims and Disputed General Unsecured Claims (other than Disputed GUC Cash-Out Claims) ultimately determined to be Allowed after the Effective Date; *provided* that the Liquidating Trust will use reasonable effort to allocate sufficient property for the Liquidating Trust Disputed Claims Reserves.  The Liquidating Trust will distribute such amounts (net of any expenses, including any ~~taxes~~Taxes relating thereto or otherwise payable by the Liquidating Trust Disputed Claims Reserve), as provided under the Plan, as such Claims are

resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date. Amounts remaining in the Liquidating Trust Disputed Claims Reserve, if any, after the resolution of all applicable Disputed Claims and the satisfaction of all applicable Allowed Disputed Claims will promptly be transferred to the Liquidating Trust, without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

### **10.** **Liquidating Trust Disputed GUC Cash-Out Claims Reserve**

On or after the Effective Date, the Liquidating Trust will establish the Liquidating Trust Disputed GUC Cash-Out Claims Reserve. On or after the Effective Date, the Liquidating Trust will place Cash in the Liquidating Trust Disputed GUC Cash-Out Claims Reserve in trust for the benefit of the Holders of Disputed GUC Cash-Out Claims ultimately determined to be Allowed after the Effective Date, in an amount, as reasonably determined by the Liquidating Trust (and with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties), sufficient to satisfy the GUC Cash-Out for such GUC Cash-Out Claims to the extent such Claims are Allowed after the Effective Date. The Liquidating Trust will distribute such amounts (net of any expenses, including any Taxes relating thereto or otherwise payable by the Liquidating Trust Disputed GUC Cash-Out Claims Reserve), as provided herein, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date; *provided* that, to the extent the Cash held in such Liquidating Trust Disputed GUC Cash-Out Claims Reserve is insufficient to fund the GUC Cash-Out for any GUC Cash-Out Claim when Allowed, such GUC Cash-Out Claim will receive its Distribution in accordance with Section 4.2.4(ii)(a) of the Plan as though it had not elected the GUC Cash-Out; *provided further* that Cash remaining in the Liquidating Trust Disputed GUC Cash-Out Claims Reserve, if any, after the resolution of all applicable Disputed GUC Cash-Out Claims and the satisfaction of all applicable Allowed Disputed GUC Cash-Out Claims will promptly be transferred to the Liquidating Trust, without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

### **11.** **~~10.~~ Liquidating Trust Disputed Interests Reserve**

On or after the Effective Date, the Liquidating Trust will be authorized, but not directed, to establish one or more Liquidating Trust Disputed Interests Reserves. After the Effective Date, the Liquidating Trust may, in its sole discretion, hold any property to be distributed pursuant to the Plan (other than NewCo Common Stock), in the same proportions and amounts as provided for in the Plan, in the Liquidating Trust Disputed Interests Reserve in trust for the benefit of the Holders of Disputed General Unsecured Claims (other than Disputed GUC Cash-Out Claims), Disputed Subordinated Note Claims and Disputed Preferred Equity Interests ultimately determined to be Allowed after the Effective Date; *provided* that the Liquidating Trust will use reasonable effort to allocate sufficient property for the Liquidating Trust Disputed Interests Reserves. The Liquidating Trust will distribute such amounts (net of any expenses, including any ~~taxes~~Taxes relating thereto or otherwise payable by the Liquidating Trust Disputed Interests Reserve), as provided under the Plan, as such Claims or Interests are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such

Claims or Interests as such amounts would have been distributable had such Claims or Interests been Allowed Claims or Interests as of the Effective Date.  Amounts remaining in the Liquidating Trust Disputed Interests Reserve, if any, after the resolution of all applicable Disputed Claims or Interests and the satisfaction of all applicable Allowed Disputed Claims and Interests, if any, will promptly be transferred to the Liquidating Trust, without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

### 12.    ~~11.~~NewCo Disputed Claims Reserve

On or after the Effective Date, the Liquidating Trust will be authorized, but not directed, to establish one or more NewCo Disputed Claims Reserves, and such NewCo Disputed Claims Reserves will be deemed transferred to the Liquidating Trust or entities to be formed by the Liquidating Trust, in each case in accordance with the Restructuring Transactions Memorandum and without any further action of NewCo, the Debtor or its subsidiaries or any of their respective managers, employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives.  After the Effective Date, the Liquidating Trust may, in its sole discretion, hold any NewCo Common Stock to be distributed pursuant to the Plan, in the same proportions and amounts as provided for in the Plan, in the NewCo Disputed Claims Reserve in trust for the benefit of the Holders of Disputed General Unsecured Claims (other than Disputed GUC Cash-Out Claims) ultimately determined to be Allowed after the Effective Date; *provided* that the Liquidating Trust will use reasonable effort to allocate sufficient property for the NewCo Disputed Claims Reserves.  The Liquidating Trust will distribute such amounts (net of any expenses, including any ~~taxes~~Taxes relating thereto or otherwise payable by the NewCo Disputed Claims Reserve), as provided under the Plan, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims or Interest as of the Effective Date.  Amounts remaining in the NewCo Disputed Claims Reserve, if any, after the resolution of all applicable Disputed Claims and the satisfaction of all applicable Allowed Disputed Claims, if any, will promptly be transferred to NewCo, without any further notice, to, action, order, or approval of the Bankruptcy Court or by any other Entity.

### 13.    ~~12.~~Federal Income Tax Treatment of the Liquidating Trust

#### (a)    Liquidating Trust Assets Treated as Owned by Creditors

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trust Board), for all United States federal income tax purposes, all parties (including the Debtor, the Liquidating Trust Board and the Liquidating Trust Beneficiaries) will treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as (i) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to the Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims or Interests, which will be treated as transferred to the applicable Disputed Claims Reserve), followed by (ii) the transfer by such beneficiaries to the Liquidating Trust of the Liquidating Trust Assets (other than to the extent Liquidating Trust Assets are allocable to any Disputed Claims Reserve) in exchange for Liquidating Trust Interests.  Accordingly, the Liquidating Trust Beneficiaries will be treated for United States

federal income tax purposes as the grantors and deemed owners of their respective share of the Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to any Disputed Claims Reserve, discussed below).  The foregoing treatment will also apply, to the extent permitted by applicable law, for state and local income tax purposes.

However, there can be no assurance that the IRS or other applicable government entities would not take a contrary position.  If the IRS or other applicable government entities were to challenge successfully the classification of the Liquidating Trust, the U.S. federal (and applicable state and local) income tax consequences to the Liquidating Trust could vary from those discussed herein. *See* Article X below—*Certain U.S. Federal Income Tax Consequences of the Plan*.

**(b)    Tax Reporting**

i.      The Liquidating Trust Board will file Tax Returns for the Liquidating Trust treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) (excluding any Disputed Claims Reserve, which will be reported in accordance with Section ~~5.12.2~~5.13.2.iv of the Plan) and in accordance with Section ~~5.12~~5.13 of the Plan.  The Liquidating Trust Board also will annually send to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income ~~tax returns~~Tax Returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income ~~tax returns~~Tax Returns.  The Liquidating Trust Board will also file (or cause to be filed) any other statement, return or disclosure relating to the Liquidating Trust or any Disputed Claims Reserve that is required by any Governmental Unit.

ii.     As soon as reasonably practicable after Liquidating Trust Assets are transferred to the Liquidating Trust, the Liquidating Trust Board will make a good faith valuation of Liquidating Trust Assets, and will make all such values available from time to time, to the extent relevant, and such values will be used consistently by all parties to the Liquidating Trust (including the Debtor, the Liquidating Trust Board and Liquidating Trust Beneficiaries) for all United States federal income tax purposes.

iii.    Allocations of Liquidating Trust taxable income among the Liquidating Trust Beneficiaries (other than to the extent such taxable income is allocable to any Disputed Claims Reserve) will be determined by reference to the manner in which an amount of cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, other than assets allocable to any Disputed Claims Reserve) to the

holders of the Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust.  Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne ~~in~~immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets (other than the assets allocable to any Disputed Claims Reserve).  The tax book value of the Liquidating Trust Assets for purpose of this paragraph will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the ~~Tax Code~~IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

iv.    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trust Board of a private letter ruling if the Liquidating Trust Board so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trust Board), the Liquidating Trust Board will (A) timely elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Liquidating Trust Board, the Debtor, and the Liquidating Trust Beneficiaries) will report for United States federal, state and local income tax purposes consistently with the foregoing.

v.    The Liquidating Trust Board will be responsible for payment, out of the Liquidating Trust Assets, of any Taxes imposed on the trust or its assets, including any Disputed Claims Reserve; *provided* that, any Disputed Claims Reserve will bear all Taxes allocable to such Disputed Claims Reserve.  In the event, and to the extent, any Cash retained on account of Disputed Claims or Interests in any Disputed Claims Reserve is insufficient to pay the portion of any such Taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims or Interests (including any income that may arise upon the distribution of the assets of any Disputed Claims Reserve), such Taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of such Disputed Claims or Interests, (ii) paid with the proceeds from a sale of the assets of the applicable Disputed Claims Reserve or (iii) to the extent such Disputed Claims or Interests have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidating Trust Board as a result of the resolution of such Disputed Claims or Interests.

vi.    The Liquidating Trust Board may request an expedited determination of Taxes of the Liquidating Trust, any Disputed Claims Reserve, or the Debtor under section 505(b) of the Bankruptcy Code for all Tax Returns

filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

**(c)    Tax Withholdings by Liquidating Trust Board**

The Liquidating Trust Board may withhold and pay to the appropriate Tax Authority all amounts required to be withheld pursuant to the ~~Tax Code~~IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of Liquidating Trust Interests.  All such amounts withheld and paid to the appropriate Tax Authority (or placed in escrow pending resolution of the need to withhold) will be treated as amounts distributed to such holders of Liquidating Trust Interests for all purposes of the Liquidating Trust Agreement; *provided* that any amount placed in escrow pending resolution of the need to withhold that is deemed to exceed the amount required to be withheld will be distributed to the applicable holders of Liquidating Trust Interests as soon as reasonably practicable following the determination of the withholding requirement.  The Liquidating Trust Board will be authorized to collect such tax information from the holders of Liquidating Trust Interests (including social security numbers or other tax identification numbers) as in its sole discretion the Liquidating Trust Board deems necessary to effectuate the Plan, the Confirmation Order, and the Liquidating Trust Agreement.  In order to receive distributions under the Plan, all holders of Liquidating Trust Interests (including holders of Allowed Senior Note Claims, Allowed Other General Unsecured Claims, Allowed Subordinated Note Claims and Allowed Preferred Equity Interests, who, in each case, deliver a release in accordance with the provisions of Section 12.9 of the Plan) will be required to identify themselves to the Liquidating Trust Board and provide tax information and the specifics of their holdings, to the extent the Liquidating Trust Board deems appropriate in the manner and in accordance with the procedures from time to time established by the Liquidating Trust Board for these purposes.  This identification requirement generally applies to all holders, including those who hold their securities in street name.  The Liquidating Trust Board may refuse to make a distribution to any holder of a Liquidating Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered, and may treat such holder's Liquidating Trust Interests as disputed; *provided*, *however*, that, if such information is not furnished to the Liquidating Trust Board within six (6) months of the original request to furnish such information, no further distributions will be made to the holder of such Liquidating Trust Interest; and, *provided*, *further*, that, upon the delivery of such information by a holder of a Liquidating Trust Interest, the Liquidating Trust Board will make such distribution to which the holder of the Liquidating Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; and, *provided*, *further*, that if the Liquidating Trust Board fails to withhold in respect of amounts received or distributable with respect to any such holder and the Liquidating Trust Board is later held liable for the amount of such withholding, such holder will reimburse the Liquidating Trust Board for such liability (to the extent such amounts were actually distributed to such holder).

**(d)    Dissolution**

The Liquidating Trust Board and the Liquidating Trust will be discharged or dissolved, as the case may be, upon the earlier to occur of (i) all ~~distributions required to be made by~~of the Liquidating Trust ~~Board under~~Assets have been distributed pursuant to the Plan and the

Liquidating Trust Agreement have been made, and (ii) the Liquidating Trust Board determines that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit and (iii) all distributions required to be made by the Liquidating Trust Board under the Plan and the Liquidating Trust Agreement having been made; *provided*, *however*, in no event will the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth (5th) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trust Board that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets. If at any time the Liquidating Trust Board determines, in reliance upon such professionals as the Liquidating Trust Board may retain, that the expense of administering the Liquidating Trust (and any Disputed Claims Reserve) so as to make a final distribution to its beneficiaries is likely to exceed the value of the assets remaining in the Liquidating Trust, the Liquidating Trust Board may apply to the Bankruptcy Court for authority to (a) reserve any amount necessary to dissolve the Liquidating Trust (and any Disputed Claims Reserve), (b) donate any balance to a charitable organization (A) described in section 501(c)(3) of the Tax CodeIRC, (B) exempt from United States federal income tax under section 501(a) of the Tax CodeIRC, (C) not a "private foundation", as defined in section 509(a) of the Tax CodeIRC, and (D) that is unrelated to the Debtor, NewCo, the Liquidating Trust and any insider of the foregoing and (c) dissolve the Liquidating Trust (and any Disputed Claims Reserve).

### 14.    (e) Indemnification of Liquidating Trust Board

The Liquidating Trust Agreement will provide for the indemnification of the Liquidating Trust Board, the individual(s) comprising the Liquidating Trust Board, the Delaware Trustee and certain other individuals as may be set forth therein. Any indemnification claim of the Liquidating Trust Board (and the other parties entitled to indemnification under this subsection) will be satisfied solely from the Liquidating Trust Assets. The Liquidating Trust may obtain, at the expense of the Liquidating Trust and with funds from the Liquidating Trust Assets, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Liquidating Trust Board or any employees of the Liquidating Trust.

### 15.    (f) Exculpation Relating to the Liquidating Trust

No Holder of a Claim or Interest or any other party in interest will have, or otherwise pursue, any Claim or Cause of Action against the Liquidating Trust Board, the Liquidating Trust, or the consultants or professionals thereof (for each of the foregoing, solely in the performance of their duties) for making payments and distributions in accordance with the Plan and the Liquidating Trust Agreement or for fulfilling any functions incidental to implementing the provisions of the Plan or the Liquidating Trust Agreement, except for any acts or omissions that are the result of fraud, gross negligence or willful misconduct.

**16.** ~~(g)~~ **Abandonment of Liquidating Trust Assets**

Subject to the Liquidating Trust Agreement, after the Effective Date, the Liquidating Trust Board may abandon any Liquidating Trust Assets which the Liquidating Trust Board determines in its reasonable discretion to be of *de minimis* value or burdensome to the Liquidating Trust.

**C.    Implementation of the Plan**

**1.    Operations Between the Confirmation Date and Effective Date**

During the period from the Confirmation Date through and until the Effective Date the Debtor may continue to operate its businesses as debtor-in-possession in the ordinary course in a manner consistent with past practice in all material respects, and as otherwise necessary to consummate the Plan, subject to the terms and conditions of the RSA and all applicable orders of the Bankruptcy Court and the consent rights set forth in the RSA, the Plan and any other Definitive Documents.

**2.    Sources of Cash for Plan Distributions**

Cash payments or cash distributions to be made hereunder on the Effective Date will be funded from the existing Cash of the Debtor and the Cash proceeds of a NewCo Transaction, ~~if any~~as applicable.

**3.    NewCo Transaction**

If at any time prior to the Effective Date, the Debtor determines in good faith and consistent with its fiduciary duties (and with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties) that a sale, private placement or rights offering of some or all of the assets or equity of NewCo to one or more third parties, including through a Plan Sponsor Transaction, pursuant to sections 1129 and 363 of the Bankruptcy Code (any such transaction, a "NewCo Transaction"), will maximize the value of NewCo and is in the best interests of the Estate, such NewCo Transaction will be consummated pursuant to the Plan, subject to approval by the Bankruptcy Court pursuant to the Confirmation Order or another order of the Bankruptcy Court; *provided* that the Debtor may only enter into a NewCo Transaction that results in the Debtor receiving proceeds from such NewCo Transaction with a value no less than the value attributed by the Plan to the NewCo equity or assets that are subject to such NewCo Transaction.

~~The Debtor, the Required Ad Hoc Senior Noteholder Parties and the UCC will continue to work together in good faith to evaluate opportunities to maximize the value of all or some of the assets or equity of NewCo, including through a rights offering, marketing process, private placement, or otherwise (any such transaction, a "NewCo Transaction").  The terms of any such NewCo Transaction will be acceptable to each of the Debtor, the Required Ad Hoc Senior Noteholder Parties and the UCC.~~   Following Confirmation, without further order or approval of the Bankruptcy Court and subject to any applicable consent rights set forth in the ~~RSA~~Restructuring Support Agreement, the Debtor may in good faith make modifications to the Plan to maximize the value of all or some of the assets or equity of NewCo in connection with a NewCo Transaction (if any); provided that such modifications do not materially and adversely

affect the treatment of Holders of Claims or Interests and are otherwise permitted under section 1127(b) of the Bankruptcy Code.

### 4.    Exemption from Registration

The Debtor believes that, subject to certain exceptions described below, various provisions of the Securities Act, the Bankruptcy Code and applicable state securities laws ("Blue Sky Laws") exempt from federal and state securities registration requirements (i) the offering, issuance, exchange, distribution or sale of securities pursuant to the Definitive Documents and (ii) subsequent transfers of such securities.

The Liquidating Trust Interests to be distributed to the Liquidating Trust Beneficiaries pursuant to the Plan will be transferrable as set forth in the Liquidating Trust Agreement.  The Liquidating Trust Interests will not be listed on any national exchange and will have the consent and voting rights provided in the Liquidating Trust Agreement.  The Liquidating Trust and the Liquidating Trust Board will not take any steps to facilitate the development of a trading market in the Liquidating Trust Interests.

### (a)    Section 1145

Except with respect to any Person that is an underwriter as defined in section 1145(b) of the Bankruptcy Code, the issuance of the Liquidating Trust Interests to Liquidating Trust Beneficiaries under the Plan and the issuance of NewCo Common Stock to Holders of Allowed General Unsecured Claims under the Plan ~~shall~~will be exempt from registration under Section 5 of the Securities Act (and any applicable Blue Sky Laws) under section 1145(a)(1) of the Bankruptcy Code.

Section 1145(a)(1) of the Bankruptcy Code exempts the issuance, offer, sale, and distribution of securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if the following three principal requirements are satisfied:  (a) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.

The issuance and distribution of the NewCo Common Stock and the Liquidating Trust Interests satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance and distribution are exempt from registration under the Securities Act and any state or local law requiring registration.  To the extent any "offer or sale" of NewCo Common Stock may be deemed to have occurred, such offer or sale is made under the Plan and in exchange for Claims against the Debtor, or principally in exchange for such Claims and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code.  The availability of the exemptions under section 1145 of the Bankruptcy Code or any other applicable securities laws will not be a condition to occurrence of the Effective Date of the Plan.  To the extent section 1145 of the Bankruptcy Code is applicable, the securities to be issued under the

Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) in general are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtor as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act. In addition, securities governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of the various states; however, the availability of such exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration in any given instance.

Notwithstanding the foregoing, any securities or instruments issued under the Plan in reliance on section 1145(a) of the Bankruptcy Code remain subject to: (x) compliance with any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments; (y) the restrictions in the applicable NewCo Organizational Documents and the Liquidating Trust Agreement, as applicable, on the transferability of such securities and instruments and (z) any other applicable regulatory approval. Specifically, in an attempt to minimize the likelihood of an additional ownership change occurring after the Effective Date, the charter of NewCo will contain a restriction limiting the accumulation (and disposition) of shares by persons (and certain groups of persons acting in concert) owning (actually or constructively), or who would own (immediately before or after such acquisition), 4.99 percent of any class of stock of NewCo (with certain adjustments), and requiring approval of NewCo's Board for any such transfers.

**(b)    [Section 4(a)(2)]**

[To the extent securities are issued pursuant to the Plan or the other Definitive Documents in reliance on section 4(a)(2) of the Securities Act ("Section 4(a)(2)"), the offering, issuance, exchange, or distribution of such securities pursuant to the Plan or the other Definitive Documents will be conducted in a manner that is exempt from, among other things, the registration requirements of section 5 of the Securities Act. Section 4(a)(2) exempts from section 5's registration requirements transactions not involving a public offering, and Regulation D under the Securities Act ("Regulation D") provides a safe harbor under Section 4(a)(2) for transactions that meet certain requirements, including that the investors participating therein qualify as "accredited investors" within the meaning of Rule 501 under Regulation D ("Accredited Investors"). Such offering, issuance, exchange or distribution will be structured to be available only to Holders who certify that they are Accredited Investors and who submit documentation allowing verification of their status as Accredited Investors. Any such securities will be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and will only be transferable if registered under the Securities Act or if transferred pursuant to an exemption from the registration requirements of the Securities Act and other applicable securities laws.]

**(c)    DTC**

Should NewCo and/or the Liquidating Trust elect on or after the Effective Date to reflect any ownership of the NewCo Common Stock or the Liquidating Trust Interests, as applicable, through the facilities of DTC, such Entity need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of transfers, exercise, removal of restrictions, or conversion of NewCo Common Stock or the Liquidating Trust Interests, as applicable, under applicable U.S. federal, state or local securities laws.

DTC ~~shall~~will be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the NewCo Common Stock or the Liquidating Trust Interests, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the NewCo Common Stock or the Liquidating Trust Interests, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

~~**5. NewCo Debt**~~

~~On the Effective Date, unless otherwise agreed by the Required Ad Hoc Senior Noteholder Parties in connection with a NewCo Transaction, NewCo or its direct or indirect subsidiary will issue debt (the "NewCo Debt") to the Liquidating Trust in an aggregate principal amount equal to $[•].¹⁵ Without limiting the foregoing, the issuer of NewCo Debt will pay, as and when due, all fees, expenses, losses, damages, indemnities and other amounts provided under the NewCo Debt Documents.  The principal terms of the NewCo Debt will be set forth in the Plan Supplement.~~

~~Confirmation of the Plan will be deemed (a) approval of the NewCo Debt and all transactions contemplated hereby and thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the issuer of NewCo Debt in connection therewith, including the payment of all fees, expenses, losses, damages, indemnities and other amounts provided for by the NewCo Debt Documents and the granting of liens or provision of guarantees by the issuer of NewCo Debt, its direct or indirect parents or any of its subsidiaries to secure the NewCo Debt and (b) authorization for the issuer of NewCo Debt and the Liquidating Trust to enter into and perform under the NewCo Debt Documents.  The NewCo Debt Documents will constitute legal, valid, binding and authorized obligations of the issuer of NewCo Debt, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the NewCo Debt Documents are being extended, and will be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, will not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any~~

---

~~¹⁵    **[NTD**:  Aggregate principal amount to be agreed by the Debtor, the UCC, and the Required Ad Hoc Senior Noteholder Parties reflecting 70-80% of the total enterprise value of NewCo, or a lesser amount agreed by the Debtor, the UCC, and the Required Ad Hoc Senior Noteholder Parties.]~~

~~purposes whatsoever, and will not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.~~

**5.**    ~~6.~~ **NewCo Common Stock**

On the Effective Date, NewCo will issue 100% of the NewCo Common Stock to Holders of Allowed General Unsecured Claims and the NewCo Disputed Claims Reserve, subject to dilution by any NewCo Transaction.

All of the NewCo Common Stock issued pursuant to the Plan will be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of NewCo Common Stock under the Plan will be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the NewCo Organizational Documents and other instruments evidencing or relating to such distribution or issuance, as applicable, which terms and conditions will bind each Entity receiving such distribution or issuance. For the avoidance of doubt, the acceptance of NewCo Common Stock by any Holder of any Claim or Interest will be deemed as such Holder's agreement to the NewCo Organizational Documents, as may be amended or modified from time to time following the Effective Date in accordance with their terms.

To the extent practicable, as determined in good faith by the Debtor and the Required Ad Hoc Senior Noteholder Parties, NewCo will: (a) emerge from this Chapter 11 Case as a non-publicly reporting company on the Effective Date and not be subject to SEC reporting requirements under Sections 12 or 15 of the Exchange Act, or otherwise; (b) not be voluntarily subjected to any reporting requirements promulgated by the SEC; except, in each case, as otherwise may be required pursuant to the applicable organizational documents or applicable law; (c) not be required to list the NewCo Common Stock on a U.S. stock exchange; (d) timely file or otherwise provide all required filings and documentation to allow for the termination and/or suspension of registration with respect to SEC reporting requirements under the Exchange Act prior to the Effective Date; and, (e) to the extent requested by the Required Ad Hoc Senior Noteholder Parties, make good faith efforts to ensure DTC eligibility of securities issued by NewCo in connection with the Plan (other than any securities required by the terms of any agreement to be held on the books of an agent and not in DTC).

**(a)    NewCo Common Stock Cash-Out**

As set forth in the Plan, certain Holders of Senior Note Claims and Other General Unsecured Claims that are Non-Qualified Holders will be entitled to receive, in lieu of NewCo Common Stock, Cash Distributions in an amount equal to the value of the NewCo Common Stock such Holders would be entitled to if such Holder were a Qualified Holder; *provided* that any such Non-Qualified Holder must provide a certification of its status as a Non-Qualified Holder in order to receive any such Distribution.

**(b)    NewCo Common Stock Cash-Out Certification**

Prior to the Distribution to any Holder of a Senior Note Claim or Other General Unsecured Claim of, as applicable, (a) NewCo Common Stock or (b) Cash (not including any Cash Distribution in connection with the GUC Cash-Out) in an amount equal to the value of the

NewCo Common Stock it would be entitled to if it were a Qualified Holder (such Distributions described in the preceding clause (a) or (b), as applicable, a "NewCo Distribution"), such Holder will be required to deliver to the Distribution Agent, [within 60 days] following the Distribution Agent's request (or such longer period as the Distribution Agent may determine in its reasonable discretion (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed)), a certification that such Holder (x) is a Qualified Holder or (y) is a Non-Qualified Holder (such request, the "Qualified Holder Certification Request").  If a Holder entitled to receive a NewCo Distribution fails to provide such certification [within 60 days] of receiving the Qualified Holder Certification Request, such Holder's NewCo Distribution will be deemed to be an Unclaimed Distribution and such Holder's Claim may be canceled, discharged and forever barred in accordance with Section 10.5 of the Plan, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.

To the extent that, during the six (6) month period following the designation of any NewCo Distribution as an Unclaimed Distribution, the Holder entitled to receive such NewCo Distribution provides a certification to the Distribution Agent that such Holder (x) is a Qualified Holder or (y) is a Non-Qualified Holder, such Holder may thereafter receive its distribution pursuant to the terms of the Plan.

### 6. ~~7.~~ Deemed Holders of Subordinated Note Claims

The BP Trust I Declaration of Trust provides that BP Trust I will automatically terminate upon the bankruptcy of SVBFG, as successor by merger to BPFH.[1625] Upon such termination of BP Trust I, the terms of the BP Trust I Preferred Securities require the administrative trustee of the trust to distribute to holders of the BP Trust I Preferred Securities the BP Trust I Junior Subordinated Debentures having a principal amount equal to the liquidation amount per security plus accumulated and unpaid distributions thereon to the date of payment, after satisfaction of liabilities to creditors of BP Trust I as provided by applicable law.[1726] For purposes of the Plan, holders of the BP Trust I Preferred Securities will be deemed to hold the BP Trust I Junior Subordinated Debentures and thus such holders will be deemed to hold the BP Trust I Claims.

The BP Trust II Declaration of Trust provides that BP Trust II will dissolve upon the bankruptcy of SVBFG, as successor by merger to BPFH.[1827] Upon such dissolution of BP Trust II, the terms of the BP Trust II Capital Securities require the institutional trustee of the trust to distribute to holders of the BP Trust II Capital Securities the BP Trust II Junior Subordinated Debentures on a pro rata basis, after satisfaction of liabilities to creditors of BP Trust II as provided by applicable law.[1928] For purposes of the Plan, holders of the BP Trust II Capital

---

[1625] *See* Section 8.1(a)(i) of the BP Trust I Declaration of Trust.

[1726] *See* Annex I, Section 3 of the BP Trust I Declaration of Trust.

[1827] *See* Section 7.1(a)(ii) of the BP Trust II Declaration of Trust.

[1928] *See* Annex I, Section 3 of the BP Trust II Declaration of Trust.

Securities will be deemed to hold the BP Trust II Junior Subordinated Debentures and thus such holders will be deemed to hold the BP Trust II Claims.

### 7. 8. Organizational Existence

Except as otherwise provided in the Plan and the Restructuring Transactions Memorandum, the Debtor will, or as a subsidiary of NewCo will, or as NewCo, as applicable, continue to exist after the Effective Date as a separate legal Entity, with all the powers of a corporation or other form of organization, as applicable, under the laws of its jurisdiction of organization and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under the law of the applicable state or other jurisdiction.

### 8. 9. Cancellation of Existing Interests, Existing Indebtedness and Related Agreements

On the Effective Date, except as otherwise specifically provided for in the Plan, all rights of any Holder of Interests in the Debtor, including options or warrants to purchase Interests, or obligating the Debtor to issue, transfer or sell Interests of the Debtor, will be canceled.

Upon the indefeasible payment in full in Cash of all Allowed Other Secured Claims, or promptly thereafter, Holders of such Allowed Claims will deliver to the Debtor or, after the Effective Date, the Liquidating Trust, any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Claim that may reasonably be required in order to terminate any related financing statements, mortgages, mechanic's liens, or *lis pendens*, and take any and all other steps reasonably requested by the Debtor or, after the Effective Date, the Liquidating Trust, that are necessary to cancel and/or extinguish any Liens or security interests securing such Holder's Claim; *provided*, *however*, that the Debtor or the Liquidating Trust, as applicable, will be solely responsible for all costs and expenses associated with any of the foregoing actions or requests.

On the Effective Date, except as otherwise provided in the Plan, the obligations of the Debtor under the respective Indentures, and any certificate, share, bond, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of the Debtor giving rise to any Claim or Interest will be canceled, without any need for a Holder to take further action with respect thereto, and the Debtor and the Liquidating Trust will not have any continuing obligations thereunder; *provided,* that notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of an Allowed Claim or Interest will continue in effect solely for (i) purposes of enabling such Holder to receive distributions under the Plan on account of such Allowed Claim or Interest as provided in the Plan; and (ii) permit the Indenture Trustees to make or assist in making, as applicable, distributions pursuant to the Plan and deduct therefrom such reasonable compensation, fees and expenses (a) due to the Indenture Trustees, or (b) incurred by the Indenture Trustees in making such distributions. Except as provided in the Plan, on the Effective Date, the Indenture Trustees and their respective agents, successors and assigns will be automatically and fully discharged of their duties and obligations associated with the respective Indentures. The commitments and obligations of the Holders of the Senior Note

Claims and Subordinated Note Claims to extend any further or future credit or financial accommodations to the Debtor, its subsidiaries or assigns under the Indentures, respectively, will fully terminate and be of no further force or effect on the Effective Date.

### 9.    10. Additional Implementing Transactions

On or prior to the Effective Date, the Debtor and the Liquidating Trust will, in accordance with the RSA and subject to any applicable consent rights thereunder, enter into any transaction and will take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable, the issuance of all securities, notes, instruments, certificates and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, entity formations, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions, including any restructuring transaction contemplated by the RSA, including any NewCo Transaction (collectively, the "Restructuring Transactions").

The Confirmation Order will, and will be deemed to, pursuant to sections 105, 363 and, 1123 and 1141 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan, including any NewCo Transaction.

### 10.    11. Section 1146 Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers from the Debtor to NewCo, the Liquidating Trust or to any other Entity, pursuant to, in contemplation of, or in connection with the Plan (including any transfer pursuant to:  (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor, the Liquidating Trust, NewCo or Affiliates of NewCo, including, without limitation, the NewCo Common Stock, NewCo Debt and the Liquidating Trust Interests; (ii) the creation, modification, consolidation, assumption, termination, refinancing and/or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment or recording of any lease or sublease; (iv) the grant of collateral as security for the NewCo Debt; or (v) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan) will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents will, and will be directed to, forgo the collection of any such tax, recordation fee or government assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the

payment of any such tax, recordation fee or government assessment.  The Bankruptcy Court will retain specific jurisdiction with respect to these matters.

### 11.   ~~12.~~ Effectuating Documents and Further Transactions

The Debtor or, after the Effective Date, the Liquidating Trust and NewCo, as applicable, may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.  The secretary and any assistant secretary of the Debtor, NewCo or the Liquidating Trust will be authorized to certify or attest to any of the foregoing actions.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtor will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable law, and without any requirement of further action by the shareholders, directors, managers or partners of the Debtor, or the need for any approvals, authorizations, actions or consents.

On the Effective Date, the Liquidating Trust Agreement, any other organizational document of the Liquidating Trust and the NewCo Organizational Documents will become effective and deemed binding without further action from any Person or Entity (other than the relevant consents required by under the RSA) and will be binding and enforceable upon each of the parties thereto.

### 12.   ~~13.~~ Abandonment of SVB Stock

~~At~~Unless otherwise agreed in writing by the UCC and the Ad Hoc Group of Senior Noteholders, at least one day prior to the Effective Date, the Debtor will abandon all of its equity interests in, including all of the common stock of, Silicon Valley Bank (and all entities and arrangements that are treated as a single entity with successor(s) to Silicon Valley Bank for U.S. federal income tax purposes) and take a corresponding worthless stock deduction for U.S. federal income tax and all applicable state and local tax purposes pursuant to a court order permitting the Debtor to abandon such equity interests that the Debtor will request in advance of the Effective Date.

### 13.   ~~14.~~ Preservation of Retained Causes of Action

Except as provided in the Plan, the Confirmation Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trust or NewCo, as applicable, will retain and may enforce any Retained Causes of Action that the Estate may hold against any Entity.  The Liquidating Trust or NewCo, as applicable, may pursue any such Retained Causes of Action in accordance with the Plan and the Liquidating Trust Agreement, as applicable.  The Debtor's inclusion or failure to include or describe with sufficient specificity any Retained Causes of Action in the Plan or in the Plan Supplement will not be deemed an admission, denial or waiver of any Retained Causes of Action that the Debtor or the Estate may hold.  The Debtor intends to preserve all Retained Causes of Action.  No preclusion doctrine,

including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to the Retained Causes of Action upon or after entry of the Confirmation Order on the Effective Date of the Plan based on the Plan or the Confirmation Order, including any argument of waiver on account of the failure to include or describe with sufficient specificity any Retained Causes of Action in the Plan or in the Plan Supplement.

**D.     Provisions Regarding Governance of NewCo**

**1.     Organizational Action**

On and after the Effective Date, the adoption, filing, approval, and ratification, as necessary, of all corporate, or related actions contemplated hereby for NewCo will be deemed authorized and approved in all respects.  Without limiting the foregoing, such actions may include:  (i) the adoption of the NewCo Organizational Documents, (ii) the nomination, election, or appointment, as the case may be, of officers, directors and managers for NewCo, (iii) the issuance of the securities contemplated by the Plan or other Definitive Documents and (iv) the Restructuring Transactions to be effectuated pursuant to the Plan and the RSA.

Upon the occurrence of the Effective Date, all matters provided for in the Plan involving the organizational structure of the Debtor or NewCo, or any corporate action required by the Debtor or NewCo in connection with the Plan, will be deemed to have occurred in accordance with the Restructuring Transactions Memorandum and will be in effect, without any requirement of further action by the security holders or directors of the Debtor or NewCo or by any other stakeholder or any other corporate action.

On and after the Effective Date, the appropriate officers of NewCo and members of the board of directors of NewCo are authorized and directed to issue, execute, deliver, file, and record any and all agreements, documents, securities, deeds, bills of sale, conveyances, releases, and instruments contemplated by the Plan in the name of and on behalf of NewCo and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**2.     NewCo Organizational Documents**

On the Effective Date, the NewCo Organizational Documents will be adopted automatically by NewCo and its subsidiaries.  On or promptly after the Effective Date, NewCo and its subsidiaries may file their respective NewCo Organizational Documents and other applicable agreements with the applicable Secretaries of State or other applicable authorities in their respective states, provinces, or countries of incorporation or formation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or formation.

After the Effective Date, NewCo and each of its subsidiaries may amend and restate its limited liability company agreement, certificate of incorporation, limited partnership agreement, and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the NewCo Organizational Documents, as applicable.

In addition, from and after the Effective Date, the NewCo Organizational Documents will contain certain transfer restrictions in relation to the transfer of NewCo Common Stock. Specifically, the NewCo Organizational Documents will provide that, without the approval of the NewCo Board, (i) no Person will be permitted to acquire, whether directly or indirectly, and whether in one transaction or a series of transactions, NewCo Common Stock, to the extent that after giving effect to such purported acquisition the purported acquirer or any other Person by reason of the purported ~~acquirer's~~acquirer's acquisition would become a Substantial Holder (as defined below) of any class of stock of NewCo; (ii) no Substantial Holder may acquire, directly or indirectly, any shares of NewCo stock without the consent of a majority of the NewCo Board; and (iii) no Substantial Holder may dispose, directly or indirectly, of any shares of NewCo stock without the consent of a majority of the NewCo Board. A "Substantial Holder" is a person that owns (as determined for applicable U.S. federal income tax purposes) 4.99 percent of any class of stock of NewCo, including any instrument treated as stock for the applicable U.S. federal income tax purposes.

### 3.    Shared Services Agreement

Upon the Effective Date, NewCo and the Liquidating Trust may enter into a Shared Services Agreement. The terms of the Shared Services Agreement (if any) will be acceptable to each of the Debtor, the Required Ad Hoc Senior Noteholder Parties and the UCC. Confirmation of the Plan will be deemed (a) approval of the Shared Services Agreement (if any), and (b) authorization for NewCo and the Liquidating Trust to enter into and perform under the Shared Services Agreement (if any).

### 4.    Directors and Officers of NewCo

On the Effective Date, the management, control and operation of NewCo will become the general responsibility of the board of directors of NewCo or such other governing body as provided in the NewCo Organizational Documents.

On the Effective Date, the term of the Current Directors and other governing bodies of the Debtor will be deemed to have resigned, such Current Directors will cease to hold office or have any authority from or after such time, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity, and such Current Directors will be replaced by the NewCo Board (or, if the reorganized Debtor is not governed by a board, will be governed and managed as set forth in its applicable NewCo Organizational Documents).

The classification and composition of the NewCo Board will be consistent with applicable non-bankruptcy law and the terms of the NewCo Organizational Documents. In the Plan Supplement, to the extent known, the Debtor will disclose, pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of the Persons proposed to serve on the NewCo Board. The NewCo Board members will serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of the NewCo Organizational Documents.

Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not discharge, impair or otherwise modify any advancement, indemnity or other obligations arising under the D&O Insurance Policies.  In addition, after the Effective Date, ~~none of the Debtor,~~ neither the Liquidating Trust ~~or~~ nor NewCo will terminate ~~or otherwise reduce~~ all or any portion of the coverage under the D&O Insurance Policies with respect to conduct occurring prior to the Effective Date, and subject to and in accordance in all respects with the terms of the D&O Liability Insurance Policies, all directors and officers of the Debtor who served in such capacity at any time prior to the Effective Date will be entitled from the insurers to the full benefits of any such ~~policy~~ D&O Liability Insurance Policy, if any, including any prepaid extended reporting period, regardless of whether such directors and officers remain in such positions after the Effective Date.

As of the Effective Date, NewCo will be authorized to procure and maintain directors' and officers' liability insurance policies for the benefit of its directors, officers, members, trustees and managers in the ordinary course of business.

## E.    Executory Contracts and Unexpired Leases

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, all Executory Contracts and Unexpired Leases will be deemed automatically rejected as of the Effective Date in accordance with sections 365 and 1123 of the Bankruptcy Code, other than (a) Executory Contracts or Unexpired Leases that, as of the Effective Date, are the subject of a pending motion to assume, or for which a notice of assumption has been filed pursuant to the assumption and assignment procedures approved by the Bankruptcy Court, (b) any Executory Contract or Unexpired Leases listed in the Schedule of Assumed Executory Contracts and Unexpired Leases, or (c) have been previously assumed, assumed and assigned or rejected by the Debtor.

Entry of the Confirmation Order by the Bankruptcy Court will constitute an order approving the assumptions, assumption and assignment, or rejections, as applicable, of such Executory Contracts and Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.

Executory Contracts and Unexpired Leases assumed pursuant to the Plan or by Bankruptcy Court order will revest in and be fully enforceable by NewCo or the Liquidating Trust in accordance with their terms, except as such terms may have been modified by the Debtor and the applicable counterparty, or by order of the Bankruptcy Court.  To the maximum extent permitted by Law, the transactions contemplated by the Plan will not constitute a "change of control" or "assignment" (or terms with similar effect) under any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan, or any other transaction, event, or matter that would (a) result in a violation, breach or default under such Executory Contract or Unexpired Lease, (b) increase, accelerate or otherwise alter any obligations, rights or liabilities of the Debtor, the Liquidating Trust or NewCo, as applicable, under such Executory Contract or Unexpired Lease, or (c) result in the creation or imposition of a Lien upon any property or asset of the Debtor, the Liquidating Trust or NewCo, as applicable, pursuant to the applicable Executory Contract or Unexpired Lease. Any consent or advance

notice required under such Executory Contract or Unexpired Lease in connection with assumption or assumption and assignment thereof will be deemed satisfied by Confirmation. Any provision of any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan that requires (i) the consent or approval of one or more lessors or other parties, or (ii) the payment of any fees or obligations, in order for the Debtor to pledge, grant, sell, assign, or otherwise transfer any such Executory Contract or Unexpired Lease, or the proceeds thereof, or other collateral related thereto, will be deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provisions of any such Executory Contracts or Unexpired Leases will have no force and effect with respect to the pledge, grant, sale, assignment, or other transfer thereof, or the proceeds thereof, or other collateral related thereto, in accordance with the terms of the Plan.

In connection with the transfer and vesting of any Debtor's investments assets in the Liquidating Trust (or any entity formed by the Liquidating Trust) or NewCo (or its subsidiary), any related investment agreements, including shareholder and lockup agreements, will be deemed assumed and assigned to the applicable transferee and deemed listed as an Executory Contract on the Schedule of Assumed Executory Contracts and Unexpired Leases.

The Debtor or the Liquidating Trust, as applicable, reserves the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases, including to add or remove any Executory Contracts and Unexpired Leases, at any time up to and including forty-five (45) days after the Effective Date upon notice to the affected counterparty.

## 2. Objections to and Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

To the extent a monetary default exists under an Executory Contract or Unexpired Lease proposed to be assumed or assumed and assigned pursuant to the Plan, such monetary default will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the applicable Cure Cost by the Debtor, NewCo or the Liquidating Trust, as applicable, on the Effective Date or promptly thereafter, in the ordinary course of business, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.

Objections to the assumption of any Executory Contract or Unexpired Lease or any applicable Cure Cost will be made in accordance with the Solicitation Procedures Order.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise will result in the full release and satisfaction of any Claims held by the non-Debtor Entity party thereto against, or defaults, including bankruptcy-related defaults, by, the Debtor arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of the assumption; *provided*, *however*, that the counterparty to such Executory Contract or Unexpired Lease may seek additional amount(s) on account of any defaults occurring between the filing of the notice of assumption and the occurrence of the Effective Date of the Plan.

Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed will be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### 3. Modifications, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed, assumed and assigned, or rejected will include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case will not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims or Interests that may arise in connection therewith.

### 4. Reservation of Rights

Nothing contained in the Plan, nor the Debtor's delivery of a notice of proposed assumption of a contract or lease to the applicable contract and lease counterparties, will constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor, NewCo or the Liquidating Trust would have any liability thereunder.

Notwithstanding any non-bankruptcy law to the contrary, the Debtor, NewCo or the Liquidating Trust expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the Debtor from counterparties to rejected Executory Contracts or Unexpired Leases.

## F. Provisions Governing Distributions

### 1. Distribution Agents

The Debtor, in its reasonable discretion (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed), or, after the Effective Date, the Liquidating Trust (and, with respect to the distribution of NewCo Common Stock, NewCo), in their respective sole discretion, will have the authority, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder.  To the extent the Debtor or the Liquidating Trust, as applicable, determines to utilize a Distribution Agent to facilitate any distributions, such Distribution Agent would first be required to:  (i) affirm its obligation to facilitate the prompt distribution of any documents, (ii) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions

required under the Plan and (iii) waive any right or ability to set off, deduct from or assert any Lien or other encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent.

Notwithstanding any provision in the Plan to the contrary, distributions to the Holders of Senior Note Claims and Subordinated Note Claims will be made to or at the direction of the respective Indenture Trustees, which will act as Distribution Agent (or direct the Distribution Agent) for distributions to the Holders of Senior Note Claims and Subordinated Note Claims, respectively, in accordance with the Plan and the applicable Indentures.

The Debtor or the Liquidating Trust, as applicable, may pay to the Distribution Agents all of their reasonable and documented fees and expenses without the need for any approvals, authorizations, actions or consents of the Bankruptcy Court or otherwise.  At the request of counsel to the Debtor or the Liquidating Trust, as applicable, Distribution Agents will submit detailed invoices to counsel to the Debtor or the Liquidating Trust for all fees and expenses for which the Distribution Agents seek reimbursement, and the Debtor or the Liquidating Trust, as applicable, will pay those amounts that it, in its sole discretion, deems reasonable, and will object in writing to those fees and expenses, if any, that the Debtor or the Liquidating Trust, as applicable, deem to be unreasonable.  In the event that the Debtor or the Liquidating Trust, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtor or the Liquidating Trust, as applicable, and such Distribution Agent will endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtor or the Liquidating Trust, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party will be authorized to move to have such dispute heard by the Bankruptcy Court.

(a)    **Powers of the Distribution Agent**

The Distribution Agent will be empowered to:  (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby, (iii) employ professionals to represent it with respect to its responsibilities and (iv) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.    **Timing and Delivery of Distributions**

(a)    **Timing**

Except as otherwise expressly provided herein, distributions to be made under the Plan will be made on (i) the later of (a) the Effective Date and (b) the date that a Claim or Interest becomes an Allowed Claim or Interest, or (ii) such other date that is determined by the Debtor (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed) or, after the Effective Date, the Liquidating Trust, in accordance with the Plan.  The Liquidating Trust may commence distributions to

beneficiaries of the Estate at any time after the Effective Date, subject to the terms of the Plan, the Liquidating Trust Agreement and the Confirmation Order.

**(b)** ***De Minimis* Distributions**

Notwithstanding any other provision of the Plan, ~~neither~~none of the Debtor, the Liquidating Trust ~~nor~~or any Distribution Agent will have any obligation to make any distributions under the Plan with a value of less than $50, unless a written request therefor is received by the Distribution Agent from the relevant recipient within 120 days after the later of (i) the Effective Date and (ii) the date such Claim or Interest becomes an Allowed Claim or Interest. Such undistributed amounts will revert to the Debtor or the Liquidating Trust, as applicable. Upon such reversion, the relevant Allowed Claim or Interest of less than $50 (and any Claim or Interest on account of such *de minimis* distributions) will be automatically deemed satisfied, discharged, and forever barred, notwithstanding any federal or state escheat laws to the contrary. For the avoidance of doubt, Section 10.2.2 of the Plan will not apply to Distributions to any Holder of an Allowed General Unsecured Claim who timely ~~exercises its~~elects to receive the GUC Cash-Out option.

**(c)**     **Record Date and Delivery of Distributions**

Distributions will only be made to the record holders of Allowed Claims and Interests as of the Confirmation Date (the "Distribution Record Date"). On the Confirmation Date, the Claims Register and Stock Register will be closed and the Distribution Agent will be authorized and entitled to recognize only those Holders of Claims and Interests listed on the Claims Register and Stock Register as of the close of business on the Confirmation Date. Notwithstanding the foregoing, if a Claim or Interest is transferred twenty (20) or fewer days before the Confirmation Date, the Distribution Agent, at the direction of the Debtor or, after the Effective Date, the Liquidating Trust, will make distributions to the transferee (rather than the transferor) only to the extent practical, and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. The Distribution Record Date will not apply to publicly held securities deposited with DTC and, in connection with any Distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtor, NewCo or the Liquidating Trust, as applicable, will be entitled to recognize and deal for all purposes under the Plan with Holders of Claims and Interests in each Class to the extent consistent with the customary practices of DTC used in connection with such distributions.

If any dispute arises as to the identity of a Holder of an Allowed Claim or Interest that is entitled to receive a distribution pursuant to the Plan, the Distribution Agent may, in lieu of making such distribution to such Entity, make the distribution into an escrow account until the disposition thereof is determined by Final Order or by written agreement among the interested parties to such dispute. Distributions made after the Confirmation Date to Holders of Disputed Claims or Interests that are not Allowed Claims or Interests as of the Confirmation Date, but which later become Allowed Claims or Interests, will be deemed to have been made on the Confirmation Date.

Except as otherwise provided herein, the Distribution Agent, at the direction of the Debtor or the Liquidating Trust, as applicable, will make all Distributions required under the Plan to Holders of Allowed Claims or Interests.  Except as otherwise provided herein, and notwithstanding any authority to the contrary, Distributions to Holders of Allowed Claims or Interests will be made to Holders of record as of the Confirmation Date by the Distribution Agent, as appropriate:  (i) to the signatory set forth on any Proof of Claim filed by such Holder or other representative identified therein (or at the last known address of such Holder if no Proof of Claim is filed or if the Debtor, the Liquidating Trust or the Distribution Agent have been notified in writing of a change of address) or (ii) at the address set forth in any written notice of change of address delivered to the Notice and Claims Agent.  The Distribution Agent and the Notice and Claims Agent will not incur any liability whatsoever on account of the delivery of any Distributions under the Plan.

**3.      Manner of Payment Under the Plan**

**(a)      Cash Payments**

At the Distribution Agent's option, any Cash payment may be made by check, wire transfer or any other customary payment method.

**(b)      Notes Distribution**

As applicable, the Indenture Trustees may transfer or direct the transfer of such Distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with the respective Holders of such Claims to the extent consistent with the customary practices of DTC.

For the avoidance of doubt, DTC will be considered a single Holder with respect to Distributions made on account of the Senior Note Claims and Subordinated Note Claims.  The Indenture Trustees will have no duties, responsibilities, or liability relating to any form of Distribution that is not DTC eligible, *provided* that the Indenture Trustees will use commercially reasonable efforts to cooperate with the Debtor, the Liquidating Trust, or NewCo, as applicable, to the extent that a Distribution is not DTC eligible.

Notwithstanding anything to the contrary herein, such Distributions will be subject in all respect to any rights of the Indenture Trustees to assert a charging lien against such Distributions.  All Distributions to be made to Holders of Senior Note Claims and Subordinated Note Claims through DTC will be made eligible for Distributions through the facilities of DTC and, for the avoidance of doubt, under no circumstances will the Indenture Trustees be responsible for making or required to make any Distribution under the Plan to Holders of Senior Note Claims and Subordinated Note Claims if such Distribution is not eligible to be distributed through the facilities of DTC.

Upon the final distribution on account of the Senior Note Claims or Subordinated Note Claims, (i) the Senior Notes or Subordinated Notes, as applicable, will thereafter be deemed to be worthless, and (ii) at the request of the respective Indenture Trustee, DTC will take down the relevant position relating to the Senior Notes or Subordinated Notes, as applicable,

without any requirement of indemnification or security on the part of the Debtor, the Liquidating Trust, NewCo, or the Indenture Trustees.

### (c)    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Claim entitled to a distribution under the Plan is based upon any obligation or instrument that is treated for U.S. federal income tax purposes as indebtedness of the Debtor and accrued but unpaid interest thereon, such distribution will be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### (d)    Compliance Matters

In connection with the Plan, to the extent applicable, the Debtor, NewCo, the Liquidating Trust and the Distribution Agent will comply with all Tax withholding and reporting requirements imposed on them by any federal, state, local or foreign Tax law, and all distributions pursuant hereto will be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtor, NewCo, the Liquidating Trust and the Distribution Agent will be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind, liquidating a portion of the distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. For purposes of the Plan, any withheld amount (or property) paid to the applicable Tax Authority will be treated as if paid to the applicable claimant. The Liquidating Trust reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances. Distributions in full or partial satisfaction of Allowed Claims will be allocated first to trust fund-type taxes, then to other taxes, and then to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that has accrued on such Claims. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a Distribution pursuant to the Plan will have responsibility for any Taxes imposed by any Governmental Unit, including income, withholding, and other Taxes, on account of such Distribution. Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, not to make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder will reimburse such party. The Distribution Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within one hundred and eighty (180) days after the request is made, the amount of such Distribution will irrevocably revert to the Debtor or the Liquidating Trust and any Claim in respect of such Distribution will be discharged and forever barred from assertion against the Debtor, the Liquidating Trust or its respective property.

### (e)    Foreign Currency Exchange Rate

Except as otherwise provided herein or in an order of the Bankruptcy Court, or as agreed to by any Holder and either the Debtor (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed) or, after the Effective Date, the Liquidating Trust, any Claim or Interest asserted in a currency other than U.S. dollars will be automatically deemed converted, as of the Effective Date, to the equivalent U.S. dollar value using the exchange rate on the first Business Day prior to the Petition Date, as quoted at 4:00 p.m. (New York time), at the mid-range spot rate of exchange for the applicable foreign currency as published in *The Wall Street Journal*, National Edition, on the first Business Day after the Petition Date; *provided* that instead of such automatic conversion, the Debtor may instead elect, subject to the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties (not to be unreasonably withheld, conditioned or delayed) to make payments on account of any such Claim or Interest pursuant to the Plan in the applicable foreign currency.

### (f)    Fractional Payments and Distributions

Whenever the Plan would otherwise call for, with respect to a particular Entity, payment of a fraction of a dollar, the actual payment will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash to be distributed under the Plan remain undistributed as a result of the aforementioned rounding, such Cash will be treated as an Unclaimed Distribution.

### (g)    Fractional Shares or Units

No fractional shares of NewCo Common Stock or fractional units of Liquidating Trust Interest will be distributed under the Plan.  When any distribution pursuant to the Plan on account of an Allowed Claim or Interest would otherwise result in the issuance or delivery of a number of shares of NewCo Common Stock or a number of units of Liquidating Trust Interest that is not a whole number, the actual distribution of shares of NewCo Common Stock or units of Liquidating Trust Interest will be rounded to the next lower whole number with no further payment or other distribution therefor (i.e., no consideration will be provided in lieu of fractional shares of NewCo Common Stock or fractional units of Liquidating Trust Interests that are rounded down).  The total number of shares of NewCo Common Stock or units of Liquidating Trust Interest to be distributed to holders of Allowed Claims and Interests will be adjusted downward as necessary to account for the rounding provided in Section 10.3.7 of the Plan.  For distribution purposes, including rounding, DTC will be treated as a single Holder.

### 4.    Undeliverable Distributions

If any distribution is returned as undeliverable, (i) the Debtor or the Liquidating Trust, as applicable, may, but will not be required to, make reasonable efforts to determine the address for such Holder and (ii) no further distribution to such Holder will be made unless and until the Liquidating Trust or the Distribution Agent is notified in writing of the then-current address of such Holder, at which time such distribution will be made to such Holder not less than 30 days thereafter.  Undeliverable distributions will remain in the possession of the Liquidating Trust or the Distribution Agent until such time as such distribution becomes deliverable or such

distribution reverts to the Liquidating Trust, or is canceled pursuant to Section 10.5 of the Plan, and will not be supplemented with any interest, dividends or other accruals of any kind.

### 5.    Reversion

Any distribution under the Plan that is an Unclaimed Distribution for a period of six months thereafter, will be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution will revest in the Liquidating Trust; *provided, however*, that any Unclaimed Distributions consisting of NewCo Common Stock shall, after such six month period, promptly be transferred to NewCo, without any further notice to, action, order or approval of the Bankruptcy Court or by any other Entity.  Upon such revesting or such transfer, the Claim or Interest of any Holder or its successors and assigns with respect to such property will be canceled, discharged and forever barred, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.  The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions will apply with equal force to distributions that are issued by the Liquidating Trust, NewCo or the Distribution Agent made pursuant to any indenture or Certificate, notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned or unclaimed property law.

### 6.    Claims or Interests Paid by Third Parties

No distributions under the Plan will be made on account of an Allowed Claim that is payable under one of the Debtor's Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.

Except as otherwise provided in the Plan, payments to Holders of Claims covered by an Insurance Policy and otherwise payable under the Plan will be made from the proceeds of such Insurance Policy in accordance with the provisions of any such applicable Insurance Policy. Nothing contained in the Plan will constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including Insurers, nor will anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by Insurers.

To the extent a Creditor receives a payment on account of a Claim from a party that is not the Debtor, the Liquidating Trust, NewCo or a Distribution Agent on account of such Claim, the Debtor or the Liquidating Trust, as applicable, will be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim by the amount of the third-party payment, and such Claim will be disallowed or deemed satisfied, as applicable, to the extent of such third-party payment without an objection having to be filed, but subject to the filing of a notice with the Bankruptcy Court and service of such notice on any affected Creditor.  Any Creditor that receives full or partial payment on account of such Claim from an Entity that is not the Debtor, the Liquidating Trust, NewCo or a Distribution Agent will provide notice of the date and amount of such payment to the Debtor or, after the Effective Date, the Liquidating Trust and NewCo within five (5) Business Days of receipt of such payment.  Such Creditor will repay and/or return to the Debtor or, after the Effective Date, the Liquidating Trust or NewCo any

Distribution received on account of the portion of its Claim that was satisfied by such third-party payment within thirty (30) days.

**7.      Setoffs**

Except as otherwise provided herein, a Final Order of the Bankruptcy Court, or as agreed to by the Holder and the Liquidating Trust or NewCo, each as applicable, pursuant to the Bankruptcy Code (including section 553 thereof), applicable non-bankruptcy law, or such terms as may be agreed to by the Holder and the Liquidating Trust or NewCo, as applicable, the Liquidating Trust or NewCo, as applicable, may, without any further notice to, or action, order or approval of the Bankruptcy Court, set off against any Allowed Claim or Interest and the distributions to be made on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any claim, right and Cause of Action of any nature that the Liquidating Trust or NewCo, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such claim, right or Cause of Action against such Holder has not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided* that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan will constitute a waiver or release by the Debtor, the Liquidating Trust or NewCo, as applicable, of any such Claims or Interests, rights and Causes of Action that the Debtor or the Liquidating Trust may possess against or in such Holder.  In no event will any Person or Entity be entitled to set off any Claim or Interest against any Claim or Interest, right, or Cause of Action of the Debtor, the Liquidating Trust or NewCo, as applicable, in any judicial or administrative proceeding, unless such Person or Entity has filed a Proof of Claim in this Chapter 11 Case preserving such setoff and a Final Order of the Bankruptcy Court has been entered, authorizing and approving such setoff.

**8.      No Postpetition Interest on Claims**

Unless otherwise specifically provided for in the Plan or the Confirmation Order, required by applicable law, or agreed to by the Debtor or, after the Effective Date, the Liquidating Trust or NewCo, as applicable, no Holder of a Claim or Interest against the Debtor will be entitled to interest accruing on or after the Petition Date with respect to such Claim or Interest, notwithstanding any dispute or other delay with respect to any distribution.  For the avoidance of doubt, the foregoing does not apply to any interest accretion on the Liquidating Trust Interests provided under the Plan.

**9.      No Payment Over the Full Amount; Single Satisfaction**

In no event will a Holder of a Claim or Interest receive more than the full payment of such Claim or Interest.  To the extent any Holder has received payment in full with respect to a Claim or Interest, such Claim or Interest will be expunged without an objection to such Claim or Interest having been filed and without any further notice to or action, order or approval of the Bankruptcy Court.

G.    **Settlement, Release, Injunction and Related Plan Provisions**

1.    **Vesting of Assets**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan or in the Confirmation Order, upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtor will vest in NewCo or its subsidiaries or the Liquidating Trust (or entities to be formed by the Liquidating Trust), as applicable, in accordance with the Plan and the Restructuring Transactions Memorandum, free and clear of all Claims, Liens, encumbrances, charges and Interests.  All Liens, Claims, encumbrances, charges and Interests will be deemed fully released and discharged as of the Effective Date, except as otherwise provided in the Plan or the Confirmation Order.  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, each of NewCo and the Liquidating Trust may, as applicable, operate its businesses and may use, acquire, and dispose of property and the Liquidating Trust may settle and compromise Claims and Interests, in each case without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code with respect to the Debtor.

The transfer of information to the Liquidating Trust will not result in the destruction or waiver of any applicable work product, attorney-client, or other applicable privilege (the "Privileges").  Further, with respect to any Privileges:  (i) Privileges are transferred to the Liquidating Trust to the extent necessary to enable the Liquidating Trust Board to perform its duties to administer the Liquidating Trust and for no other reason, (ii) such Privileges will be preserved and not waived (except as the Liquidating Trust Board may affirmatively elect to waive such Privileges), and (iii) no information subject to a Privilege will be publicly disclosed by the Liquidating Trust or communicated to any Person not entitled to receive such information or in a manner that would diminish the protected status of any such information, except following a waiver of such Privilege pursuant to (ii) above or pursuant to the specific terms of the Plan and the Confirmation Order and the Liquidating Trust Agreement.

2.    **Compromise and Settlement of Claims and Controversies**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions, releases and other benefits provided pursuant to the Plan, upon the Effective Date, the provisions of the Plan will constitute a good-faith compromise of all Claims, Interests, Causes of Action and controversies relating to the contractual, legal and subordination rights that a Holder of an Allowed Claim or Interest may have against the Debtor, or any distribution to be made on account of such an Allowed Claim or Interest.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtor and its Estate and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice or action, order or approval of the Bankruptcy Court, after the

Effective Date, the Liquidating Trust may compromise and settle Claims against it and Causes of Action against other entities.

### 3.    Subordinated Claims

The allowance, classification and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account, conform to, and satisfy the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto; *provided*, *however*, that the Debtor and the Liquidating Trust reserve the right to reclassify or modify the treatment of any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto, unless otherwise provided in a settlement agreement concerning such Allowed Claim or Interest.  For the avoidance of doubt, the Distributions to the Holders of Subordinated Note Claims under the Plan are in settlement and compromise of any contractual, legal and equitable subordination rights relating to such Subordinated Note Claims, and all claims to turnover, release or payment of such Distributions are expressly waived hereby.

### 4.    Release of Liens

Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement or document created pursuant to the Plan or the Confirmation Order, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, indefeasible payment and satisfaction in full in cash of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate will be fully released, settled, discharged and compromised, and all rights, titles and interests of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate will revert to the Debtor and its successors and assigns, in each case, without any further approval of the Bankruptcy Court and without any action or filing being required to be made by the Debtor.  The Debtor, or after the Effective Date, the Liquidating Trust will be authorized to file any necessary or desirable documents to evidence such release in the name of the party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges or other security interests.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department will constitute good and sufficient evidence of, but will not be required to effect, the termination of such Liens.

### 5.    Discharge

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Restructuring Transactions Memorandum, the Confirmation Order or in any contract, instrument, or other agreement or document created pursuant to the Plan or the Confirmation Order, the distributions, rights, and treatments that are provided in the Plan or the Confirmation Order shall will be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims against, Interests in, and Causes of Action against the Debtor, NewCo and the Liquidating Trust of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or

unknown, against Liabilities of, Liens on, obligations of, rights against, and interests in, the Debtor or any of its assets or properties, regardless of whether any property ~~shall~~will have been distributed or retained pursuant to the Plan and the Confirmation Order on account of such Claims or Interests, including demands, Liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case, whether or not (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtor or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the chapter 11 cases ~~shall~~will be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order ~~shall~~will be a judicial determination of the discharge of all Claims against, Causes of Action against, and Interests in the Debtor, NewCo or the Liquidating Trust, subject to the occurrence of the Effective Date.

6.    **Term of Injunction or Stays**

Unless otherwise provided herein, any injunction or stay arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code or otherwise that is in existence on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) will remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay. All injunctions or stays contained in the Plan or the Confirmation Order will remain in full force and effect in accordance with their terms.

7.    **Release by the Debtor**

**For good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate the administration of the Chapter 11 Case and the implementation of the transactions contemplated by the Plan, on and after the Effective Date, each of the Released Parties including the Debtor Released Parties but excluding each other Related Party of the Debtor will be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever, and permanently released and discharged by the Debtor, NewCo, the Liquidating Trust and the Debtor's Estate, including any successor and assign to the Debtor, NewCo, the Liquidating Trust or any Estate representative, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims, in each case asserted or assertable on behalf of the Debtor, NewCo or the Liquidating Trust, and their respective successors, assigns, and representatives, or that any Entity or party claiming under or through the Debtor or its Estate, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or**

state securities laws or otherwise, including those that any of the Debtor, NewCo, the Liquidating Trust or the Debtor's Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the ~~holder~~Holder of any Claim or Interest or any other ~~Person~~Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, NewCo, the Liquidating Trust, the Estate, the conduct of the businesses of the Debtor, the Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any security of the Debtor, NewCo or the Liquidating Trust, the release or discharge of any mortgage, lien or security interest, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the administration of Claims and Interests prior to or during the Chapter 11 Case, the negotiation, formulation, preparation, dissemination, implementation, administration, confirmation and/or effectuation of the RSA (and each prior version thereof), the Plan, any plan supplement, any disclosure statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to intercompany claims and intercompany settlements, any action or omission as an officer, director, agent, representative, fiduciary, controlling Person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of such Released Party to the extent such act or omission is determined by a final order in a court of competent jurisdiction to have constituted gross negligence, willful misconduct, fraud, or a criminal act. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Releases in Section 12.7 of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan and, further, will constitute the Bankruptcy Court's finding that the Debtor Release in Section 12.7 of the Plan is: (a) given in exchange for good and valuable consideration provided by the applicable Released Parties, including the applicable Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good-faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtor and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a bar to the assertion by the Debtor, NewCo, the Liquidating Trust, or the Debtor's Estate of any claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release; (g) essential to the Confirmation of the Plan; and (h) a prudent exercise of the Debtor's business judgment.

Notwithstanding the foregoing, nothing contained in Section 12.7 of the Plan will be deemed to release any Retained Causes of Action, including any Claims and Causes of Action against any Debtor Related Parties other than those Debtor Related Parties identified on Exhibit [•] to the Plan.

8.      **Exculpation**

**Upon entry of the Confirmation Order, each of the Exculpated Parties will be deemed to have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and in a manner consistent with the Disclosure Statement, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations in connection with all of their respective activities relating to support and consummation of the Plan, including the negotiation, execution, delivery, and performance of the RSA and are entitled to the protections of section 1125(e) of the Bankruptcy Code and all other applicable protections and rights provided in the Plan. Without limiting the generality of the foregoing, upon entry of the Confirmation Order, the Debtor and its directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring advisors and other professional advisors, representatives and agents will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with the solicitation.**

**As of the Effective Date, to the fullest extent permissible under any applicable laws and without affecting, expanding or limiting the releases contained in Section 12 of the Plan, and except as otherwise provided herein, the Exculpated Parties will neither have nor incur any liability arising on or after the Petition Date to any Entity for any act or omission in connection with, relating to or arising out of (i) this Chapter 11 Case; (ii) the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation and/or consummation of the RSA (and each prior version thereof), any disclosure statement, the Plan, any plan supplement, and any related contract, instrument, release or other agreement or document created or entered into in connection therewith (including the solicitation of votes for the Plan or other actions taken in furtherance of confirmation or consummation of the Plan, including the issuance of any securities under or in connection with the Plan) or in connection with any other obligations arising under the Plan or the obligations assumed hereunder; or (iii) the settlement of Claims or renegotiation of Executory Contracts or Unexpired Leases, other than liability resulting from any act or omission that is determined by final order in a court of competent jurisdiction to have constituted gross negligence, willful misconduct, fraud or a criminal act. In all respects, such Entities will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; *provided*, *however*, that nothing in the Plan or Confirmation Order will relieve the Exculpated Parties from their obligations under postpetition transactions, agreements or instruments that have not been expressly canceled by the Plan.**

**Notwithstanding the foregoing, nothing contained in Section 12.8 of the Plan will be deemed to exculpate any party from liability with respect to any Retained Causes of Action or other Claims or Causes of Action related to actions or inactions occurring prior to the Petition Date, including any Claims and Causes of Action against any Debtor**

Related Parties other than those Debtor Related Parties identified on Exhibit [•] to the Plan.

9.      Voluntary Release by Holders of Claims and Interests

For good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate the administration of the Chapter 11 Case, the implementation of the reorganization contemplated by the Plan, the release of mortgages, liens and security interests on property of the Estate, and distributions made pursuant to the Plan, on and after the Effective Date, to the fullest extent permitted by applicable law, the Releasing Parties (regardless of whether a Releasing Party is a Released Party), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, will be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtor, NewCo or the Liquidating Trust and any of its or their successors, assigns, and representatives, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtor, NewCo, the Liquidating Trust or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, NewCo, the Liquidating Trust, the Estate, the conduct of the businesses of the Debtor, this Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any security of the Debtor, NewCo or the Liquidating Trust, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the administration of Claims and Interests prior to or during this Chapter 11 Case, the negotiation, formulation, preparation, dissemination, implementation, administration, confirmation and/or effectuation of the RSA (and each prior version thereof), the Plan, any plan supplement, any disclosure statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to intercompany claims or intercompany settlements, any action or omission as an officer, director, agent, representative, fiduciary, controlling Person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a final order in a court of competent jurisdiction to have constituted gross negligence, willful misconduct, fraud, or a criminal act.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not constitute a release by the Debtor of any of its Related Parties other than the Debtor Released Parties nor will they release any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction,

or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Section 12.9 of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, will constitute the Bankruptcy Court's finding that the releases set forth in Section 12.9 of the Plan is:  (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released pursuant to Section 12.9 of the Plan; (e) in the best interests of the Debtor and its Estate; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action of any kind whatsoever released pursuant to Section 12.9 of the Plan.

For the avoidance of doubt, notwithstanding anything to the contrary in Section 12.9 of the Plan, the releases set forth above will not release the rights of Holders of Allowed Claims to receive the treatment of their Claims as provided in the Plan and otherwise to enforce the terms of the Plan, all of which rights are fully preserved.

10.    Injunction

Except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons or Entities who have held, hold or may hold (i) Claims or Interests that arose prior to the Effective Date, (ii) Causes of Action that have been released pursuant to Sections 12.7 and 12.9 of the Plan or are subject to exculpation pursuant to Section 12.8 of the Plan (but only to the extent of the exculpation provided in Section 12.8 of the Plan), or (iii) Claims, Interests or Causes of Action that are otherwise discharged, satisfied, stayed, or terminated pursuant to the terms of the Plan and all other parties-in-interest seeking to enforce such Claims, Interests or Causes of Action are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim (including a Section 510(b) Claim) against or such Interest in the Debtor, NewCo or the Liquidating Trust, or property of the Debtor, NewCo or the Liquidating Trust, other than to enforce any right to a distribution pursuant to the Plan, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor, NewCo or the Liquidating Trust or property of the Debtor, NewCo or the Liquidating Trust with respect to any such Claim or Interest, other than to enforce any right to a distribution pursuant to the Plan, (c) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Debtor, NewCo or the Liquidating Trust, or against the property or interests in property of the Debtor, NewCo or the Liquidating Trust with respect to any such Claim or Interest, other than to enforce any right to a distribution pursuant to the Plan, or (d) asserting any right of setoff (except for setoffs validly exercised prepetition) or subrogation of any kind against any obligation due from the Debtor, NewCo or the Liquidating Trust, or against the property or interests in property of the

Debtor, NewCo or the Liquidating Trust, with respect to any such Claim or Interest.  Such injunction will extend to any successors or assignees of the Debtor, NewCo or the Liquidating Trust and their respective properties and interests in properties.

With respect to claims or Causes of Action that have not been released, discharged, or are not subject to exculpation, no Person or Entity may commence or pursue a claim or Cause of Action of any kind against the Debtor, NewCo, the Liquidating Trust, any Exculpated Party, or any Released Party that relates to any act or omission occurring from the Petition Date to the Effective Date in connection with, relating to, or arising out of, in whole or in part, the Chapter 11 Case (including the filing and administration thereof), the Debtor, the governance, management, transactions, ownership, or operation of the Debtor, the purchase, sale, exchange, issuance, termination, repayment, extension, amendment, or rescission of any debt instrument or security of the Debtor, NewCo, or the Liquidating Trust, the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party, the restructuring of any Claim or Interest before or during the Chapter 11 Case, any other in- or out-of-court restructuring efforts of the Debtor; any intercompany transactions, any Restructuring Transaction, the RSA, the formulation, preparation, dissemination, negotiation, or filing of the RSA and the Definitive Documents, or any other contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, or any of the other Definitive Documents, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), without the Bankruptcy Court (a) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim and (b) specifically authorizing such ~~Person or~~ Entity to bring such Claim or Cause of Action.  To the extent the Bankruptcy Court would have jurisdiction over such colorable Claim or Cause of Action, the Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate such underlying Claim or Cause of Action should it permit such Claim or Cause of Action to proceed.

11.    **Scope of Releases**

Each Person providing releases under the Plan, including the Debtor, NewCo, the Liquidating Trust, the Debtor's Estate and the Releasing Parties, will be deemed to have granted the releases set forth in the Plan notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such

releases to those claims or causes of action actually known or suspected to exist at the time of execution of such release.

For the avoidance of doubt, nothing herein, including the releases, waivers, and exculpations provided in Sections 12.7–12.9 of the Plan, will constitute a release, waiver, discharge, or limitation of any kind of (i) any Retained Causes of Action, including any Claims or Causes of Action against Debtor Related Parties other than those Debtor Related Parties identified on Exhibit [•] to the Plan or (ii) any rights, liabilities, or obligations arising under the Plan or any other agreement, document or instrument executed in connection with the Plan.

Notwithstanding any language to the contrary contained in this Disclosure Statement, the Plan or the Confirmation Order, no provision of the Plan will (i) preclude the SEC from enforcing its police or regulatory powers or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceeding or investigations against any non-Debtor (other than NewCo or the Liquidating Trust) in any forum; *provided* that the foregoing sentence does not (x) limit the scope of discharge granted to the Debtor, NewCo or the Liquidating Trust under sections 524 and 1141 of the Bankruptcy Code or (y) diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code.

As to any Specified Governmental Unit, nothing in the Plan or the Confirmation Order limits or expands the scope of discharge, release or injunction to which the Debtor, NewCo or the Liquidating Trust are entitled to under the Bankruptcy Code, if any.  The discharge, release, and injunction provisions contained in the Plan and the Confirmation Order are not intended and should not be construed to bar any Specified Governmental Unit from, subsequent to the entry of the Confirmation Order, pursuing any police or regulatory action (except to the extent the applicable Bar Date bars the Specified Governmental Unit from pursuing prepetition Claims).

Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, nothing in the Plan or the Confirmation Order will discharge, release, impair or otherwise preclude: (1) any liability to any Specified Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of any Specified Governmental Unit arising on or after the Effective Date; (3) any valid right of setoff or recoupment of any Specified Governmental Unit against the Debtor; or (4) any liability of the Debtor, NewCo or the Liquidating Trust under police or regulatory statutes or regulations to any Specified Governmental Unit as the owner, lessor, lessee or operator of property that such Person or Entity owns, operates or leases after the Confirmation Date.  Nor will anything in the Confirmation Order or the Plan:  (i) enjoin or otherwise bar any Specified Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by any Specified Governmental Unit are discharged or otherwise barred by the Confirmation Order, the Plan or the Bankruptcy Code.

**Moreover, nothing in the Confirmation Order or the Plan will release or exculpate any non-Debtor, including any Released Parties and/or Exculpated Parties but excluding the Debtor, NewCo or the Liquidating Trust, from any liability to any Specified Governmental Unit, including but not limited to any liabilities arising under the IRC, the environmental laws, or the criminal laws, nor will anything in the Confirmation Order or the Plan enjoin any Specified Governmental Unit from bringing any claim, suit, action or other proceeding against any non-Debtor (other than NewCo or the Liquidating Trust) for any liability whatsoever; *provided* that the foregoing sentence will not (x) limit the scope of discharge granted to the Debtor, NewCo or the Liquidating Trust under sections 524 and 1141 of the Bankruptcy Code or (y) diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code.**

**Nothing contained in the Plan or the Confirmation Order will be deemed to determine the tax liability of any Person or Entity, including but not limited to the Debtor, NewCo or the Liquidating Trust, nor will the Plan or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution or entity, including the federal tax consequences of this Plan, nor will any language in the Plan or the Confirmation Order be deemed to expressly expand or diminish the jurisdiction of the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment under the Bankruptcy Code and 28 U.S.C. §§ 157, 1334.**

12.    **Preservation of Causes of Action**

Except as expressly provided in Section 12 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtor, NewCo or the Liquidating Trust may have or that the Debtor, NewCo or the Liquidating Trust, as applicable, may choose to assert on behalf of the Estate under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including (i) any and all Causes of Action or Claims against any Person or Entity, to the extent such Person or Entity asserts a cross-claim, counterclaim and/or claim for setoff that seeks affirmative relief against the Debtor, NewCo or the Liquidating Trust, and in each case, its officers, directors or representatives or (ii) the turnover of any property of the Estate to the Debtor, NewCo or the Liquidating Trust.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor, NewCo or the Liquidating Trust, as applicable, will not pursue any and all available Causes of Action against them.  The Debtor, NewCo or the Liquidating Trust expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.

Except as set forth in Section 12 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtor had immediately prior to the Petition Date or the Effective Date against or regarding any Claim or Interest left Unimpaired by the Plan.  The Liquidating Trust will have, retain, reserve, and be entitled to assert all such rights and Causes of Action, including any actions specifically enumerated in the Schedule of Retained Causes of

Action, as fully as if the Chapter 11 Case had not been commenced, and all of the Liquidating Trust's legal and equitable rights respecting any Claim or Interest left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.

Except as set forth in Section 12 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order will be deemed to release any post-Effective Date obligations of any party under the Plan, or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, including pursuant to Section 12 of the Plan or a Final Order, the Liquidating Trust expressly reserves all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches will apply to such Causes of Action upon, after, or as a consequence of the Confirmation or occurrence of the Effective Date.

## H.    Conditions Precedent

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied on or prior to the Effective Date or waived in accordance with Section 13.2 of the Plan:

  i.  The RSA shall not have been terminated, and shall remain in full force and effect, and no event or occurrence shall have occurred that, with the passage of time or the giving of notice, would give rise to the right of the Required Ad Hoc Senior Noteholder Parties or the UCC to terminate the RSA;

  ii.  All Definitive Documents for the Restructuring Transactions contemplated by the RSA to be executed and delivered on or before the Effective Date shall have been executed and delivered and remain in full force and effect;

  iii.  The Bankruptcy Court shall have entered the Confirmation Order which shall be a Final Order;

  iv.  The Debtor shall have filed the final version of the Plan, including all of the schedules, documents, and exhibits contained therein, and the Plan Supplement in a manner consistent in all material respects with the RSA and the Plan;

  v.  The Debtor shall have obtained all applicable authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan (and all applicable waiting periods have expired);

vi.    The Debtor shall have implemented the Restructuring Transactions and all other transactions contemplated in the RSA (subject to, and in accordance with, the consent rights set forth therein) and the Plan to be implemented on or before the Effective Date;

vii.   No governmental entity or federal or state court of competent jurisdiction has enacted, issued, promulgated, enforced or entered any law or order (whether temporary, preliminary or permanent), in any case which is in effect and which prevents or prohibits consummation of the Plan, and no governmental entity has instituted any action or proceeding (which remains pending at what would otherwise be the Effective Date) seeking to enjoin, restrain or otherwise prohibit consummation of the transactions contemplated by the Plan;

viii.  All Ad Hoc Noteholder Group Expenses, Senior Note Trustee Expenses and Subordinated Note Trustee Expenses have been paid in full in Cash as provided in the RSA;

ix.    All professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses in full after the Effective Date shall have been placed in a professional fee escrow account as set forth in, and in accordance with, the Plan; and

x.     All Claims asserted by the IRS or any other Tax Authority shall have been resolved in a manner acceptable to the Required Ad Hoc Senior Noteholder Parties and the UCC or estimated by the Bankruptcy Court for the purpose of Plan distributions at an amount acceptable to the Required Ad Hoc Senior Noteholder Parties and the UCC.

Except as set forth in the Plan and the RSA, the Debtor, with the prior written consent (e-mail being sufficient) of the Required Ad Hoc Senior Noteholder Parties and the UCC, may waive any of the conditions set forth in Section 13.1 of the Plan at any time, without any notice to any other parties-in-interest or the Bankruptcy Court and without any formal action other than proceeding to confirm and/or consummate the Plan. The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## ARTICLE V.ARTICLE V

## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code include: (i) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that: (i) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (ii) the Debtor has complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (iii) the Plan has been proposed in good faith.

The following is a brief summary of the process of the Confirmation of the Plan. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

## A.      The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing at which the Debtor will seek confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to the Confirmation of the Plan.

**THE CONFIRMATION HEARING IS SCHEDULED TO BE HELD ON ~~MAY~~JUNE [~~7~~25], 2024 AT [10]:00 A.M. EASTERN TIME, BEFORE THE HONORABLE MARTIN GLENN, CHIEF UNITED STATES BANKRUPTCY JUDGE. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTOR WITHOUT FURTHER NOTICE OTHER THAN BY ANNOUNCEMENT IN OPEN COURT AND/OR NOTICE(S) OF ADJOURNMENT FILED ON THE DOCKET WITH THE BANKRUPTCY COURT'S PERMISSION.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE APPLICABLE PARTIES SO AS TO BE ACTUALLY RECEIVED ON OR BEFORE 4:00 P.M. EASTERN TIME ON ~~APRIL~~JUNE [~~30~~18], 2024 IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER, THEY WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## B.      Confirmation Standards

To confirm the Plan, the Bankruptcy Court must find that the requirements of section 1129 of the Bankruptcy Code have been satisfied. The Debtor believes that section 1129 has been satisfied because, among other things:

a.      the Plan complies with the applicable provisions of the Bankruptcy Code;

b.      the Debtor, as plan proponent, has complied with the applicable provisions of the Bankruptcy Code;

c.    the Plan has been proposed in good faith and not by any means forbidden by law;

d.    any payment made or promised under the Plan for services or for costs and expenses in or in connection with this Chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

e.    with respect to each Class of Impaired Claims or Interests, each Holder of a Claim or Interest in such Class has either accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code (*see* Article V.C—*Best Interests Test*);

f.    each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such class pursuant to section 1129(b) of the Bankruptcy Code;

g.    except to the extent that the Holder of a certain Claim under section 3.1.1 of the Plan has agreed or will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative Expense Claims will be paid in full in Cash on the Effective Date;

h.    except to the extent that a holder of an Allowed Other Priority Claim has agreed to a different treatment of such Claim, each such Holder will receive Cash in an amount equal to the Allowed amount of such Claim, or treatment in any other manner so that such Claim will otherwise be rendered Unimpaired, (a) on the Effective Date or as soon as reasonably practicable thereafter; (b) if an Other Priority Claim is Allowed after the Effective Date, on the date such Other Priority Claim is Allowed or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtor or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court;

i.    except to the extent that the applicable Holder of an Allowed Priority Tax Claim has been paid by the Debtor before the Effective Date, or such Holder agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim ~~shall~~will receive, on account of such Allowed Priority Tax Claim, at the option of the Debtor or, after the Effective Date, the Liquidating Trust (i) payment in full in Cash made (a) on or as soon as reasonably practicable after the Effective Date or (b) on the date such payment is due in the ordinary course of business, (ii) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other amounts and in such other manner as may be

determined by the Bankruptcy Court to provide the Holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim;

j.      at least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class;

k.      Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan (*see* Article V.D—*Financial Feasibility*); and

l.      all fees payable under section 1930 of title 28 of the United States Code will be paid as of the Effective Date of the Plan.

## C.      Best Interests Test

### 1.      Explanation of the Best Interests Test

Pursuant to section 1129(a)(7) of the Bankruptcy Code, Confirmation of the Plan requires that, with respect to each Class of Impaired Claims or Interests, each Holder of a Claim or Interest in such Class either (a) accepts the Plan or (b) receives or retains under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code (this latter clause is known as the "Best Interests Test").

To determine the probable distribution to Holders of Claims and Interests in each Impaired Class if the Debtor was liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation.

The Debtor's chapter 7 liquidation value would consist primarily of the cash held by the Debtor at the time of the conversion to a chapter 7 liquidation, the proceeds resulting from the sale of the Debtor's remaining assets and properties by a chapter 7 trustee and Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised or settled.  The gross cash proceeds available for distribution would be reduced by the costs and expenses of the chapter 7 liquidation and any additional Administrative Expense Claims that might arise as a result of the chapter 7 cases.  Costs and expenses incurred as a result of the chapter 7 liquidation would include, among other things, the fees payable to a trustee in bankruptcy and the fees payable to attorneys and other professionals engaged by such trustee. Additional Administrative Expense Claims could arise by reason of, among other things, the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtor during the pendency of the Chapter 11 Case.  Such Administrative Expense Claims and any other Administrative Expense Claims that might arise in a liquidation case or

result from this Chapter 11 Case, such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Claims.

To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a chapter 7 liquidation of the Debtor's assets and properties, after subtracting the amounts attributable to the costs, expenses and Administrative Expense Claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired Classes under the Plan. If the hypothetical chapter 7 liquidation distribution to Holders of Claims or Interests in any non-consenting Impaired Class is greater than the distributions to be received by such parties under the Plan, then the Plan is not in the best interests of the Holders of Claims or Interests in such Impaired Class.

### 2. The Debtor's Liquidation Analysis

Amounts that a Holder of Claims and Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtor prepared by the Debtor's management with the assistance of their restructuring advisors, and attached to this Disclosure Statement as Appendix B (the "Liquidation Analysis").[20]

As described in the Liquidation Analysis, underlying this analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtor's management, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the Debtor's control. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis.

The Liquidation Analysis was developed solely for purposes of the formulation and negotiation of the Plan and to enable Holders of Claims or Interests entitled to vote under the Plan to make an informed judgment about the Plan, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtor or any of its affiliates.

Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtor does not intend and does not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events. Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of actual future results.

---

[20]  [NTD: Liquidation analysis to be included in an updated version of the Disclosure Statement filed in advance of the Disclosure Statement hearing.]

In deciding whether to vote to accept or reject the Plan, Holders of Claims or Interests must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

### 3.    Application of the Best Interests Test to the Liquidation Analysis of the Debtor

Notwithstanding the difficulties in quantifying with precision the recoveries to Holders of Claims and Interests, the Debtor believes that, based on a comparison between the recoveries under the Plan and the Liquidation Analysis, the Debtor's proposed Plan satisfies the requirements of the Best Interests Test. [As the Plan and the Liquidation Analysis indicate, Confirmation of the Plan will provide each Holder of an Allowed Claim or Interest in an Impaired Class with a recovery that is equal to or greater than the value of distributions to Holders in such Class if the Chapter 11 Case was converted to a case under chapter 7 of the Bankruptcy Code.  Under the Plan, Holders of Allowed Administrative Expense Claims, Priority Tax Claims, Other Secured Claims and Other Priority Claims will receive payment in full on their Claims on the Effective Date or as soon thereafter as their Claims are Allowed.  Thus, all Holders of such Claims are in the same or better position under the Plan as they would be in a liquidation under chapter 7.  Similarly, Holders of Allowed Senior Note Claims and Other General Unsecured Claims (other than such Holders that timely elect to participate inreceive the GUC Cash-Out) will receive a combination of Liquidating Trust Interests and NewCo Common Stock, with an estimated recovery that exceeds the projected recovery to Holders of such Claims in a chapter 7 liquidation, as set forth in the Liquidation Analysis.  Further, Holders of Allowed Subordinated Note Claims and Preferred Equity Interests will also receive Liquidating Trust Interests under the Plan, which will enable them to receive distributions from the Liquidating Trust after the distribution preference (including, for the avoidance of doubt, any accretion thereto) of the Class A Trust Units has been satisfied in full, and in the case of Holders of Allowed Preferred Equity Interests, after the distribution preference (including, for the avoidance of doubt, any accretion thereto) of the Class B Trust Units has also been satisfied in full.  As reflected in the Liquidation Analysis, the recovery to the Holders of such Claims and Interests is the same or better than the recovery than it would be in a case under chapter 7.  Finally, under either the Plan or in a liquidation under chapter 7, Holders of Common Equity Interests are expected to receive no recovery on account of their Interests, and accordingly, Holders of such Common Equity Interests are in the same position as they would be in a case under chapter 7.

Further, a chapter 7 liquidation would require the Debtor's Estate to incur additional costs and expenses, including fees payable to the chapter 7 trustee and fees that may be payable to attorneys or other professionals retained by the chapter 7 trustee.  Such costs and expenses would be paid in full from the proceeds of the liquidation of the Debtor's Estate in chapter 7, if any, before the balance of those proceeds would be made available to Holders of Allowed Claims and Interests.

Finally, liquidating the Debtor's Estate under chapter 7 would not provide a timely distribution to Holders of Allowed Claims and Interests because of the potential added time and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtor's Estate.

Accordingly, the Debtor believes that the Plan will allow the realization of greater value for their respective Impaired Classes than a hypothetical liquidation.

## D.    Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation of the Plan, that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Debtor or the need for further financial reorganization, unless such liquidation or reorganization is contemplated by the Plan.

To determine whether the Plan meets this feasibility requirement, the Debtor, with the assistance of its advisors, has analyzed its ability to meet its obligations under the Plan.  As part of this analysis, the Debtor has prepared [projected consolidated balance sheet, income statement, and statement of cash flows for NewCo and the Liquidating Trust] (the "NewCo Financial Projections") which, together with the assumptions on which they are based, are set forth in Appendix D of this Disclosure Statement.  As further described below in Article V.G—*MoffettNathanson Valuation and NewCo and Liquidating Trust Asset Overviews*, the Debtor's advisors have also prepared valuation analysis for NewCo and the Liquidating Trust, include a projected balance sheet for the Liquidating Trust.  Creditors and other interested parties should review Article IX—*Certain Risk Factors to be Considered Prior to Voting* for a discussion of certain factors that may affect the future financial performance of NewCo and the Liquidating Trust.

Based upon the Financial Projections, the Debtor believes that NewCo will be a viable operation following the Chapter 11 Case, that NewCo and the Liquidating Trust will be able to make all payments required under the Plan, and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

## E.    Acceptance by Impaired Classes

Except as described in Article V.F—*Confirmation Without Acceptance by All Impaired Classes*, the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each Impaired Class accept the Plan.  A class of claims that is unimpaired under the Plan is conclusively presumed to have accepted the Plan and, therefore, solicitation of acceptances with respect to such class is not required.  Under section 1124 of the Bankruptcy Code, a class is impaired under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met.  Under section 1126(d) of the Bankruptcy Code, a class of interests will have voted to accept the plan only if two-thirds in amount of the interests that actually vote

to accept or reject the plan cast their ballots in favor of acceptance.  Holders of claims or interests who fail to vote are deemed neither to accept nor to reject the plan.

In addition to these voting requirements, section 1129 of the Bankruptcy Code requires that a plan be accepted by each Holder of a claim or interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each Holder of a claim or interest in such class.  *See* Article V.C—*Best Interests Test*.  Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code discussed below.  *See* Article V.F—*Confirmation Without Acceptance by All Impaired Classes* below.

## F.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, provided that the Plan has been accepted by at least one Impaired Class of creditors. Notwithstanding the failure of an Impaired Class to accept the Plan, the Plan will be confirmed in a procedure commonly known as cram-down, so long as the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan. Pursuant to Section 6.5 of the Plan, the Debtor reserves the right to seek confirmation under section 1129(b) of the Bankruptcy Code if necessary.

### 1.    Unfair Discrimination

The Plan does not "discriminate unfairly" for the purposes of section 1129 of the Bankruptcy Code if the Plan gives substantially equivalent treatment to each Class of equal rank; in determining whether a plan discriminates unfairly, courts take into account a number of factors, including the effect of applicable subordination agreements between parties.

### 2.    Fair and Equitable

The "fair and equitable" test applies to Classes of different priority and status and includes the general requirement that no Class of Claims or Interests receive more than 100 percent of the amount of the Allowed Claims or Interests in the Class. As to the dissenting Class, the test sets different standards depending upon the type of Claims or Interests in the Class.

The condition that the Plan be fair and equitable includes the following requirements as applicable:

a.    with respect to a non-accepting Class of Secured Claims, that:  (i) the Holders of such Secured Claims retain the Liens securing such Claims to the extent of the Allowed amount of the Secured Claims, whether the property subject to the liens is retained by the Debtor or transferred to another entity under the Plan, (ii) each Holder of a Secured Claim in the Class receives deferred cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date, at least equivalent to the value of such Secured Claim Holder's interest in the Debtor's property subject to the Liens, or (iii) the property securing the

Secured Claim is sold free and clear of Liens with such Liens to attach to the proceeds of the sale, and such Liens on proceeds to receive treatment consistent with clause (i) or (ii) above;

b.      with respect to a non-accepting Class of General Unsecured Claims, that either: (i) the Plan provide that each Claim Holder in such Class receive or retain, on account of such Claim, property of a value, as of the Effective Date, equal to the Allowed amount of such Claim or (ii) no Holder of any Claim or Interest that is junior to the Claims or Interests of such Class receive or retain any property under the Plan on account of such junior Claim or Interest; and

c.      with respect to a non-accepting Class of Interests, that either: (i) the Plan provide that each Holder of an Interest in such Class receive or retain under the Plan, on account of such Interest, property of a value, as of the Effective Date, equal to the greater of: (1) the Allowed amount of any fixed liquidation preference to which such Holder is entitled; (2) any fixed redemption price to which such Holder is entitled or (3) the value of such Interest or (ii) if the Class does not receive property in the amount required under (i), no Class of Interests junior to the non-accepting Class receive a distribution under the Plan.

**3.      Confirmation of the Plan Pursuant to Section 1129(b)**

The Debtor may seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class presumed to reject the Plan, and reserves the right to do so with respect to any other rejecting Class of Claims, and/or modify the Plan subject to the consent rights set forth in the RSA. Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation of the Plan by the acceptance of the Plan by at least one Class that is Impaired under the Plan.

The Debtor submits that the Plan does not "discriminate unfairly" for the purposes of section 1129(b) of the Bankruptcy Code. The Debtor believes that, under the Plan, all impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtor believes that the Plan does not discriminate unfairly as to any impaired Class of Claims or Interests.

The Debtor submits that the Plan is "fair and equitable" for the purposes of section 1129(b) of the Bankruptcy Code because, as set forth above and in the Plan, the Holders of Claims in Classes 5 (Preferred Equity Interests), 6 (Common Equity Interests), 7 (Section 510(b) Claims) and 8 (Intercompany Claims and Intercompany Interests) may not receive a distribution equal to the Allowed amount of their Claims or Interests, as applicable, but

no Holders of Claims or Interests junior to these Classes will receive a distribution under the Plan on account of such junior Claims or Interests.

Therefore, the requirements of section 1129(b) of the Bankruptcy Code would be satisfied in the event that the Debtor is required to cram down.

**G.    MoffettNathanson Valuation and NewCo and Liquidating Trust Asset Overviews**

[•][21]

The Debtor's advisors have prepared an analysis of the projected assets of NewCo and the Liquidating Trust as of June 30, 2024 (under the headings "NewCo Value Overview" and "Liquidating Trust Assets", respectively, which is attached to this Disclosure Statement as Appendix F.  In addition to the projections with respect to NewCo and Liquidating Trust Assets, the Debtor's investment banker, Centerview, has prepared an independent valuation analysis with respect to the value of MoffettNathanson LLC, which is included in Appendix F under the heading "MoffettNathanson Valuation Analysis" (the "Valuation Analysis").  The Valuation Analysis should be considered in conjunction with the Risk Factors discussed in Article IX–*Certain Risk Factors to be Considered Prior to Voting*, and the Financial Projections. Holders of Claims and Interests should carefully review the information in Appendix F in its entirety.

**H.    Classification**

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divides the different claims (excluding administrative claims and certain other categories of claims) against, and equity interests in, a debtor into separate classes based upon their legal nature.  Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtor believes that the Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan.  Accordingly, the classification of Claims and Interests in the Plan complies with section 1122 of the Bankruptcy Code.

**ARTICLE VI.**~~ARTICLE VI~~

**VOTING PROCEDURES**

On [•], the Bankruptcy Court entered an order, among other things, approving this Disclosure Statement, approving procedures for soliciting votes on the Plan, approving the form of the solicitation documents and various other notices, setting the Voting Record Date (as defined below), the Voting Deadline, the Release Election Deadline (as defined below) and the date of the Confirmation Hearing and establishing the relevant objection deadlines and

---

[21]    **[NTD:** Valuation description to be included in an updated version of the Disclosure Statement filed with the Court in advance of the Disclosure Statement hearing.**]**

procedures associated with Confirmation of the Plan, including the proposed assumption or assumption and assignment of certain of the Debtor's Executory Contracts and Unexpired Leases (the "Solicitation Procedures Order").[2229]

   If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan and make any other elections or representations required pursuant to the Plan.  To ensure your vote is counted, you must complete, date, sign, and promptly mail the Ballot enclosed with the notice to the Solicitation Agent or complete your Ballot using the online portal maintained by the Solicitation Agent, or if you are a Beneficial Holder of Claims or Interests in Classes 3(a), 4 or 5 who has received a Beneficial Holder Ballot, you must return the Beneficial Holder Ballot to your Nominee, in each case indicating your decision to accept or reject the Plan in the boxes provided.

   As described in ~~Error! Reference source not found.~~  ~~*Error! Reference source not found.*~~ *Article IV.G—Settlement, Release, Injunction and Related Plan Provisions* herein and Section 12 of the Plan, Holders of Claims or Interests that vote to accept the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties.

   The Ballot and Election Forms contain an election for a Holder who rejects the Plan, a Holder abstaining from voting on the Plan, or a Holder deemed to accept the Plan, to opt out of the third-party releases contained in Section 12.9 of the Plan.  All Holders of Claims or Interests (i) that vote to reject the Plan or (ii) that abstain from voting on the Plan, and do not affirmatively opt out of the third-party releases provided by the Plan by checking the box on the applicable Ballot indicating that they opt not to grant the third-party releases provided in the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties.  Holders of Claims or Interests deemed to accept the Plan and who do not affirmatively opt out of the third-party releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt out of the third-party releases provided in the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties.

   Holders of Class 3(b) Other General Unsecured Claims may elect to receive the GUC Cash-Out in an amount equal to 45% of the lesser of (a) the Allowed amount of such Claim and (b) $11,000,000.  To the extent an Other General Unsecured Claim exceeds $11,000,000, the Holder of such Claim electing to receive the GUC Cash-Out agrees to reduce such Claim to $11,000,000; *provided*, *however*, that an Other General Unsecured Claim originally Allowed in an amount in excess of $11,000,000 may not be sub-divided into multiple claims of $11,000,000 or less and receive the GUC Cash-Out; *provided further*, that a Holder's GUC Cash-Out election may not be modified, withdrawn or provided at a later date.  A Holder's election as set forth on its Ballot shall be binding.  In making the GUC Cash-Out election, the applicable Holder acknowledges that by electing to receive the GUC Cash-Out, such Holder's

---

[2229] Capitalized terms in this Article VI not otherwise defined in this Disclosure Statement or the Plan will have the meanings ascribed to them in the Solicitation Procedures Order.

treatment is in lieu of any other treatment such Holder may have received as a Holder of a Class 3(b) Other General Unsecured Claim pursuant to Section 4.2.4 of the Plan. **If an eligible Holder of an Other General Unsecured Claim fails to complete the GUC Cash-Out election, set forth on Item 3 of the applicable Ballot, or fails to return such Ballot in accordance with the procedures set forth in the Solicitation Procedures Order by the deadlines provided therein, such Holder will be deemed to have irrevocably relinquished and waived its right to receive the GUC Cash-Out.**

The notices of non-voting status for Holders of Claims or Interests that are deemed to reject the Plan contains an election to opt in to the third-party releases contained in Section 12.9 of the Plan. Holders of Claims or Interests that are deemed to reject the Plan but who affirmatively opt in to the third-party releases provided by the Plan by checking the box on the applicable Election Form indicating that they opt in to grant the third-party releases provided in the Plan.

The Solicitation Procedures Order, a copy of which is attached hereto as Appendix C, should be read in conjunction with this Article VI—*Voting Procedures* of this Disclosure Statement. For the purposes of Article VI—*Voting Procedures* of this Disclosure Statement, capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Solicitation Procedures Order.

If you have any questions about (i) the procedures for voting your Claim or with respect to the packet of materials that you have received or (ii) the amount of your Claim, please contact the Debtor's Solicitation Agent at https://restructuring.ra.kroll.com/svbfg/. If you wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement or other solicitation documents, you can obtain them from the Debtor's case information website (located at https://restructuring.ra.kroll.com/svbfg/) or by requesting a copy from the Debtor's Solicitation Agent, who can be reached at (833) 570-5297 (Domestic, Toll-Free), +1 (646) 440-4782 (International), or by email at svbinfo@ra.kroll.com.

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law and, under Bankruptcy Rule 3020(b)(2), it may make such a determination without receiving evidence if no objection is timely filed.

In particular, and as described in more detail below, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that: (a) the Plan has been accepted by the requisite votes of all Classes of Impaired Claims unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes; (b) the Plan is "feasible," meaning there is a reasonable probability that the Debtor will be able to perform its obligations under the Plan; and (c) the Plan is in the "best interests" of all Holders of Claims and Interests, meaning that all such Holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

The Bankruptcy Court must find that all conditions mentioned above are met before it can confirm the Plan. Thus, even if all classes of Impaired Claims accept the Plan by

the requisite votes, the Bankruptcy Court must still make an independent finding that the Plan satisfies these requirements of the Bankruptcy Code, that the Plan is feasible, and that the Plan is in the best interests of the Holders of Claims against and Interests in the Debtor.

UNLESS THE BALLOT BEING FURNISHED IS TIMELY RECEIVED BY THE SOLICITATION AGENT ON OR PRIOR TO 5:00 P.M. EASTERN TIME ON APRIL JUNE [25 17], 2024, TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED TO BE SUBMITTED WITH SUCH BALLOT, THE DEBTOR WILL REJECT SUCH BALLOT AS INVALID AND, ACCORDINGLY, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THE DEBTOR RESERVES THE RIGHT, IN ITS SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW ANY SUCH BALLOTS TO BE COUNTED.  IN NO CASE SHOULD A BALLOT OR ANY OF THE CERTIFICATES BE DELIVERED TO THE DEBTOR OR ANY OF ITS ADVISORS.

## A.    Parties-in-Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless:  (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is conclusively presumed to have accepted the plan, and the plan proponent need not solicit such holder's vote.  Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan.  For a detailed description of the treatment of Claims and Interests under the Plan, refer to Article IV—*Summary of the Plan*.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

## B.    Classes under the Plan

### 1.    Voting Classes

Classes 3 (a) (Senior Note Claims and ), 3(b) (Other General Unsecured Claims), 4 (Subordinated Notes Claims), and 5 (Preferred Equity Interests) are Impaired and entitled to receive distributions under the Plan and, thus, are entitled to vote to accept or reject the Plan.

Consistent with the procedures described in the Solicitation Procedures Motion and below in ~~Article VI.D~~Article VI.D—*Voluntary Releases under the Plan*, each Holder of a Claim or Interest in Classes 3(a), 3(b), 4 and 5 that does not vote in favor of the Plan will be given an opportunity to opt out of the voluntary release in Section 12.9 of the Plan.

### 2.    Non-Voting Classes

Claims in Classes 1 (Other Secured Claims) and 2 (Other Priority Claims), and, to the extent such Claims or Interests are reinstated, Class 8 (Intercompany Claims and Intercompany Interests) (such Classes, the "Unimpaired Non-Voting Classes"), are unimpaired and conclusively presumed under section 1126(f) of the Bankruptcy Code to accept the Plan and, accordingly, are not entitled to vote.  Consistent with the procedures described in the Solicitation Procedures Motion and below in ~~Article VI.D~~Article VI.D—*Voluntary Releases under the Plan*, Holders of Claims or Interest in Unimpaired Non-Voting Classes will be given an opportunity to opt out of the voluntary, third-party release in Section 12.9 of the Plan or indicate their consent to such release by abstaining from opting out.

Claims and Interests in Classes 6 (Common Equity Interests) and 7 (Section 510(b) Claims), and, to the extent such Claims or Interests are not reinstated, Class 8 (Intercompany Claims and Intercompany Interests) (the "Impaired Non-Voting Classes," and together with the Unimpaired Non-Voting Classes, the "Non-Voting Classes"), will not receive any distributions under the Plan and are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code and, accordingly, are not entitled to vote.  Consistent with the procedures described in the Solicitation Procedures Motion and below in ~~Article VI.D~~Article VI.D—*Voluntary Releases under the Plan*, Holders of Claims or Interest in Impaired Non-Voting Classes will be given an opportunity to opt in to the voluntary third-party release in Section 12.9 of the Plan.

## C.    Form, Content, and Manner of Notices

### 1.    Solicitation Packages for Voting Classes

As set forth in the Solicitation Procedures Order, the Debtor will distribute, or cause to be distributed, a solicitation package to each Holder of a Claim entitled to vote on the Plan (a "Solicitation Package").  The Solicitation Packages will contain:

a.   the cover letter to the Solicitation Package, which describes the contents of the Solicitation Package and recommends all Holders of Claims and Interests in the Voting Classes accept the Plan;

b.   a letter prepared by the UCC recommending that all Holders of General Unsecured Claims and Subordinated Note Claims vote to accept the Plan, which is attached hereto as Exhibit [C] (the "Committee Letter");

c.   the Confirmation Hearing Notice;

d.  the Solicitation Procedures Order (without accompanying exhibits), as entered;

e.  instructions detailing how to access copies of the Disclosure Statement and Plan on the Solicitation Agent's website and how to request hard copies of the Disclosure Statement and Plan;

f.  the applicable Ballot with detailed voting instructions and a pre-addressed, postage pre-paid return envelope<sup>2330</sup>; and

g.  such other materials as the Bankruptcy Court may direct.

### 2.  Notices for Non-Voting Classes

Under section 1126(f) of the Bankruptcy Code, classes that are not impaired under a plan are deemed to accept the plan.  Classes 1 (Secured Claims) and 2 (Other Priority Claims) are Unimpaired under the Plan and deemed under section 1126(f) of the Bankruptcy Code to accept the Plan.  Classes 6 (Common Equity Interests) and 7 (Section 510(b) Claims) and 8 (Intercompany Claims / Intercompany Interests) are Impaired under the Plan and deemed to reject the Plan.  The votes of these respective Classes to accept or reject the Plan will not be solicited.

As set forth in the Solicitation Procedures Order, in lieu of a Solicitation Package, such Holders in Unimpaired Classes will only receive, within three business days after the Solicitation Procedures Order has been entered, (a) the Confirmation Hearing Notice (as defined in the Solicitation Procedures Order) and (b) a notice of unimpaired status, in each case by electronic service where possible (the "Notice of Unimpaired Status").  In addition, as set forth in the Solicitation Procedures Order, in lieu of a Solicitation Package, non-voting Holders in Classes 6 and 7 will only receive, on or before the Solicitation Mailing Deadline by electronic mail where possible, (a) the Confirmation Hearing Notice and (b) a notice of impaired non-voting status, in each case by electronic service where possible (together with the Notice of Unimpaired Status, the "Non-Voting Notices").

The Non-Voting Notices will provide the applicable Holders with instructions for viewing or obtaining a copy of the Plan, Disclosure Statement and Order, as required by Bankruptcy Rule 3017(d).  In addition, the Non-Voting Notices will include an election form annexed to such notice (the "Election Form") to permit Holders to opt in to or out of the voluntary, third-party release in Section 12.9 of the Plan, as further described below in ~~Article VI.D~~Article VI.D—*Voluntary Releases under the Plan*.  The Election Form contains the full text of the voluntary, third-party release in Section 12.9 of the Plan and provides instructions for opting in to or out of such release.  The deadline for Holders of Claims and Interests to opt in to or out of the voluntary, third-party release contained in Section 12.9 of the Plan is ~~April~~June [~~25~~17], 2024 at 5:00 p.m. Eastern Time (the "Release Election Deadline").  The Election Form

---

<sup>2330</sup> Service of the Solicitation Package by electronic mail to Holders for which email addresses are available, as well as to beneficial holders of Class 3(a) Senior Note Claims, Class 4 Subordinated Note Claims and Class 5 Preferred Equity Interests, will not contain a pre-addressed, postage pre-paid return envelope.

also includes clear instructions regarding how to submit the Election Form and a pre-addressed, postage pre-paid return envelope.

Election Forms received after the Release Election Deadline will not be considered for purposes of determining whether such Holders have elected to opt in to or out of the voluntary, third-party release contained in Section 12.9 of the Plan.

**D.        Voluntary Releases under the Plan**

The voluntary, third-party release and injunction language in Section 12 of the Plan is described above in ~~Article IVG~~Article IV.G of this Disclosure Statement.

**HOLDERS OF CLAIMS OR INTERESTS WILL RECEIVE EITHER A BALLOT OR ELECTION FORM, IN EACH CASE, TO ALLOW SUCH HOLDER TO OPT OUT OF OR OPT IN TO THE VOLUNTARY, THIRD-PARTY RELEASE CONTAINED IN SECTION 12.9 OF THE PLAN BY CLEARLY MARKING THE "OPT OUT" OR "OPT IN" BOX, AS APPLICABLE, ON THE BALLOT OR ELECTION FORM PROVIDED TO SUCH HOLDER.**

**HOLDERS OF CLAIMS IN CLASSES 1 AND 2 WILL EACH RECEIVE AN ELECTION FORM ALLOWING SUCH HOLDERS TO OPT OUT OF THE VOLUNTARY, THIRD-PARTY RELEASE CONTAINED IN SECTION 12.9 OF THE PLAN BY CLEARLY MARKING THE "OPT OUT" BOX ON THE ELECTION FORM PROVIDED TO SUCH HOLDER.**

**HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 3(A), 3(B), 4 OR 5 WILL EACH RECEIVE A BALLOT, WHICH WILL ALLOW HOLDERS WHO (I) VOTE TO REJECT THE PLAN OR (II) ABSTAIN FROM VOTING ON THE PLAN, TO OPT OUT OF THE VOLUNTARY, THIRD-PARTY RELEASE CONTAINED IN SECTION 12.9 OF THE PLAN BY CLEARLY MARKING THE "OPT OUT" BOX ON THE BALLOT PROVIDED TO SUCH HOLDER.**

**HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 6 AND 7 WILL EACH RECEIVE AN ELECTION FORM ALLOWING SUCH HOLDERS TO OPT IN TO THE VOLUNTARY, THIRD-PARTY RELEASE CONTAINED IN SECTION 12.9 OF THE PLAN BY CLEARLY MARKING THE "OPT IN" BOX ON THE ELECTION FORM PROVIDED TO SUCH HOLDER.**

**ALL (I) HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 1 AND 2 WHO DO NOT PROPERLY CHECK THE "OPT-OUT" BOX ON A TIMELY SUBMITTED ELECTION FORM, (II) HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 3(A), 3(B), 4 OR 5 WHO (X) VOTE TO REJECT THE PLAN OR (Y) ABSTAIN FROM VOTING ON THE PLAN AND DO NOT PROPERLY CHECK THE "OPT OUT" BOX ON A TIMELY SUBMITTED BALLOT, AND (III) HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 6 AND 7 WHO PROPERLY CHECK THE "OPT-IN" BOX ON THE APPLICABLE AND TIMELY SUBMITTED ELECTION**

**FORM, WILL BE RELEASING PARTIES FOR PURPOSES OF SECTION 12.9 OF THE PLAN.**

The Debtor submits that the releases and accompanying opt-out procedures (as described in this <u>Article VI</u>–*Voting Procedures*) are consistent with practices of courts in this jurisdiction. Courts in this jurisdiction often find that releases pursuant to a settlement are appropriate. *See, e.g.*, *In re Garrett Motion Inc.*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. Apr. 26, 2021), D.I. 1161 (approving releases pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019); *In re Bally Total Fitness Holding Corp.*, 2007 WL 2779438, at *12 (Bankr. S.D.N.Y. Sept. 17, 2007) ("To the extent that a release or other provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); *In re Spiegel, Inc.*, 2005 WL 1278094, at *11 (Bankr. S.D.N.Y. May 25, 2005) (approving releases pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a)). Furthermore, the voluntary, third-party releases and accompanying opt out procedures are consistent with similar elections that have been approved by courts in this district in similar situations. *See, e.g.*, *In re Avianca Holdings S.A.*, 632 B.R. 124, 136 n.11 (Bankr. S.D.N.Y. 2021) (approving opt out procedures with respect to third-party releases) (collecting cases); *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Nov. 9, 2023), D.I. 3972 (approving opt out procedures for certain classes); *In re Endo Int'l plc*, No. 22-22549 (JLG) (Bankr. S.D.N.Y. Jan. 12, 2024), D.I. 3549 (conditionally approving opt out procedures for certain classes).

Likewise, exculpation provisions that extend to non-estate fiduciaries are also regularly approved. *See, e.g.*, *In re Oneida Ltd.*, 351 B.R. 79, 94 n.22 (Bankr. S.D.N.Y. 2006) (considering an exculpation provision covering a number of prepetition actors with respect to certain prepetition actions, as well as postpetition activity); *In re Celsius Network LLC,* No. 22-10964 (MG) (Bankr. S.D.N.Y. Nov. 9, 2023) [D.I. 3972] (confirming plan which exculpated certain non-estate fiduciaries); *In re All Year Holdings Limited,* No. 21-12051 (MG) (Bankr. S.D.N.Y. Jan. 31, 2023) [D.I. 352] (approving plan exculpation provision providing for exculpation for certain non-estate fiduciaries); *In re Evergreen Garden Mezz LLC*, No. 21-10335 (MG) (Bankr. S.D.N.Y. Nov. 5, 2021) [D.I. 222] (same); *In re Avianca Holdings S.A.,* No. 20-11133 (MG) (Bankr. S.D.N.Y. Nov. 2, 2021) [D.I. 2300] (approving exculpation of both estate fiduciaries and non-estate fiduciaries); *In re Residential Cap. LLC*, Case No. 12-12020 (MG) 2013 WL 12161584, at *13 (Bankr. S.D.N.Y. Dec. 11, 2013) (approving exculpation for parties that were "instrumental to the successful prosecution of the Chapter 11 Cases or their resolution pursuant to the Plan, and/or provided a substantial contribution to the Debtors"); *see also* Tr. of Hr'g at 69, *In re Celsius Network LLC* [D.I. 3999] ("If [non-estate fiduciaries] are facing the threat of lawsuits by other disgruntled creditors who ~~don't~~don't agree with what they did, it makes it very hard to achieve a consensual result. For those reasons, I think what historically may have been viewed as exculpation just for estate fiduciaries has extended beyond that to other active participants in the plan process. We may not agree with that, but I mean, ~~that's~~that's what I think, where the law has moved"). In approving these provisions, courts consider a number of factors, including whether the beneficiaries of the exculpation have participated in good faith in negotiating in the plan and bringing it to fruition, and whether the provision is integral to the plan. *In re Bearing Point, Inc.*, 435 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get recoveries they desire; seek vengeance

against other parties, or simply wish to second guess the decision makers."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (same), aff'd, *In re DBSD N. Am., Inc.*, No. 09-10156, 2010 WL 1223109 (S.D.N.Y. May 24, 2010), aff'd in part, rev'd in part, 634 F.3d 79 (2d Cir. 2011); *In re Bally Total Fitness Holding Corp.*, 2007 WL 2779438, at *8 (Bankr. S.D.N.Y. Sept. 17, 2007) (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31, 2003) (approving an exculpation provision where it "was an essential element of the [p]lan formulation process and negotiations"); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

## E.    Voting Procedures

### 1.    Ballots

The record date for voting on the Plan is ~~4:00 p.m. Eastern Time on March [15~~May [14], 2024 (the "Voting Record Date").  Accordingly, only Holders of Claims or Interests who have timely filed a Proof of Claim as of the Voting Record Date and that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

In voting for or against the Plan, please use (i) only the Ballot sent to you with this Disclosure Statement or (ii) the online electronic ballot portal.  If you are a Holder of a Claim in Class 3(a), 3(b), 4, or 5 and did not receive a Ballot, if your Ballot is damaged or lost or if you have any questions concerning voting procedures, please contact the Solicitation Agent at (833) 570-5297 (Domestic, Toll-Free), +1 (646) 440-4782 (International), or by email at svbinfo@ra.kroll.com.

If you are a Holder of an Other General Unsecured Claim in Class 3(b), you will receive a Ballot that includes an election option (in Item 3, titled "GUC Cash-Out Election") to elect to receive the GUC Cash-Out in an amount equal to 45% of the lesser of (a) the Allowed amount of such Claim and (b) $11,000,000.  To the extent the Other General Unsecured Claim amount listed in Item 1 of the Ballot exceeds $11,000,000, a Holder of such Claim may, by making the GUC Cash-Out election, agree to reduce such Claim to $11,000,000.  **In making the GUC Cash-Out election, the applicable Holder acknowledges that by electing to receive the GUC Cash-Out, such Holder's treatment is in lieu of any other treatment that such Holder may have received as a Holder of a Class 3(b) Other General Unsecured Claim pursuant to Section 4.2.4 of the Plan.**

### 2.    Submitting Ballots

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete and submit your Ballot in accordance with the instructions in your Ballot.

To be counted, all Ballots must be properly executed, completed and delivered by: (i) first-class mail (using the reply envelope provided in the Solicitation Package or otherwise), (ii) overnight mail, (iii) hand delivery or (iv) the online electronic ballot portal (as described on the Ballot), in each case so that they are actually received NO LATER THAN 5:00 P.M.

EASTERN TIME ON ~~APRIL~~JUNE [~~25~~17], 2024 by the Solicitation Agent.  If you are submitting a Ballot via first-class mail, it should be sent to:

> SVB Financial Group Ballot Processing Center
> c/o Kroll Restructuring Administration LLC
> 850 Third Avenue, Suite 412
> Brooklyn, NY 11233

If you are submitting a Ballot via hand delivery or overnight mail, it should be sent to:

> SVB Financial Group Ballot Processing Center
> c/o Kroll Restructuring Administration LLC
> 850 Third Avenue, Suite 412
> Brooklyn, NY 11233

If you are submitting a Ballot via the online electronic ballot portal: Visit the Solicitation Agent's website at https://restructuring.ra.kroll.com/svbfg/, click on the ["Submit E-Ballot, Opt Out or Opt In Form"] section of the Debtor's website and follow the instructions to submit your electronic Ballot.

If you are a Beneficial Holder of Claims or Interests in Classes 3(a), 4 or 5 and received a Beneficial Holder Ballot, you must return the Beneficial Holder Ballot to your Nominee, in accordance with the instructions provided by your Nominee, who will then submit a master ballot on your behalf.  Return the Beneficial Holder Ballot to your Nominee as promptly as possible and in sufficient time to allow such Nominee to process your instructions and return a completed master ballot to the Notice and Claims Agent by the Voting Deadline.

EACH NOMINEE SHOULD ADVISE ITS APPLICABLE HOLDERS TO RETURN THEIR BENEFICIAL HOLDER BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW THE NOMINEE TO PREPARE AND RETURN THE MASTER BALLOT TO THE NOTICE AND CLAIMS AGENT SO THAT IT IS ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT ON OR BEFORE THE VOTING DEADLINE.

The method of delivery of Ballots to be sent to the Solicitation Agent is at the election and risk of each Holder of a Claim or Interest.  Except as otherwise provided in the Plan, such delivery will be deemed made only when Debtor's Solicitation Agent <u>actually receives</u> the original executed Ballot.  In all cases, sufficient time should be allowed to assure timely delivery. For submissions via first-class mail, overnight courier or hand delivery, original, executed Ballots are required.  Ballots will not be accepted by facsimile transmission, electronic mail or other electronic means of transmission (except via the Solicitation Agent's e-ballot platform). Ballots received after the Voting Deadline will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected.

Ballots must be signed, legible, and contain sufficient information to identify the Holder of the Claim.

Ballots must be clearly marked to either accept or reject the Plan (but not both) and may not partially accept or partially reject the Plan.

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or other person acting in a fiduciary or representative capacity, such person must indicate such capacity when signing the Ballot and, if required or requested by the Debtor's Solicitation Agent, the Debtor or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, you must provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to this Ballot.

No Ballot should be sent to the Debtor, or the Debtor's financial or legal advisors, agents or representatives (other than the Solicitation Agent), and if so sent will not be counted. If no Holders of Claims or Interests in a particular Class that is entitled to vote on the Plan vote to accept or reject the Plan, then such Class will be deemed to accept the Plan.

Except as provided in the Solicitation Procedures Order and subject in all respect to the RSA, after the Voting Deadline, no Ballot may be withdrawn or modified without the prior consent of the Debtor.  If multiple Ballots are received from the same Holder with respect to the same Claim or Interest prior to the Voting Deadline, the last Ballot timely received will supersede and revoke any earlier received Ballots; *provided*, *however*, where ambiguity exists with respect to which Ballot was the latest dated, the Solicitation Agent has the right to determine the appropriate tabulation of such Ballot and to contact the respective Holder to determine such Holder's intent in connection therewith.

Subject to certain restrictions and requirements set forth in section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan and the RSA, the Debtor may alter, amend or modify the Plan, including the Plan Supplement, without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date.  After the Confirmation Date and before substantial consummation of the Plan, the Debtor may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, including the Plan Supplement, the Disclosure Statement or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and effects of the Plan.

Except as set forth in the Plan, after the Confirmation Date, but before the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan, including the Plan Supplement, without further order or approval of the Bankruptcy Court, subject to all applicable consent rights (including those set forth in the RSA); provided, that such adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or Interests and are otherwise permitted under section 1127(b) of the Bankruptcy Code.

Entry of a Confirmation Order shall mean that all modifications and amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the

Bankruptcy Code, and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**3.    Voting**

A Holder of a Claim or Interest entitled to vote on the Plan may vote to accept or reject the Plan only if no party-in-interest has objected to such Claim or Interest (or the Claim or Interest has been Allowed subsequent to any objection or estimated for voting purposes).

## ARTICLE VII.~~ARTICLE VII~~

### EFFECT OF CONFIRMATION

**A.    Binding Effect of Confirmation**

Unless otherwise expressly provided in the Plan, Confirmation will bind the Debtor and all Holders of Claims and Interests to the provisions of the Plan, whether or not the Claim or Interest of any such Holder is impaired under the Plan and whether or not any such Holder of a Claim or Interest has accepted the Plan and will have the effect of converting all Claims and Interests into rights to receive the treatment specified in Article IV—*Summary of the Plan*.

**B.    Good Faith**

Confirmation of the Plan will constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code and (ii) all solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## ARTICLE VIII.~~ARTICLE VIII~~

### SECURITIES LAW MATTERS

**A.    Bankruptcy Code Exemptions from Registration Requirements**

**1.    Issuance**

The Plan provides for the issuance of Liquidating Trust Interests and NewCo Common Stock (collectively, the "Securities") without registration under the Securities Act or any similar law in reliance upon section 1145 of the Bankruptcy Code to the extent such exemption is available (any Securities issued pursuant to section 1145, the "1145 Securities"). The Debtor believes that the Securities are "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and applicable state securities laws. Except with respect to a Person that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code, section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a

joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.  The Debtor believes that the issuance and distribution of the 1145 Securities satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

To the extent that Persons who receive any Securities pursuant to the Plan are deemed to be "underwriters," the issuance of Securities to such Persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Section 1145(b)(1) of the Bankruptcy Code defines four types of "underwriters" (except with respect to "ordinary trading transactions" of an entity that is not an "issuer"):

(i) Persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

(ii) Persons who offer to sell securities offered under a plan for the Holders of such securities;

(iii) Persons who offer to buy such securities from the Holders of such securities, if the offer to buy is:

(A) with a view to distributing such securities and

(B) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(iv) a Person who is an "issuer" with respect to the securities as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an "underwriter" under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means to possess, directly or indirectly, the power to direct or cause to direct management and policies of a Person, whether through owning voting securities, contract, or otherwise.

Whether or not any particular Person would be deemed to be an "underwriter" with respect to the Securities or any other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtor expresses no view as to whether any particular Person receiving any Securities or other securities under the Plan would be an "underwriter" with respect to such Securities or other securities.

Persons who would otherwise be deemed to be "underwriters" may, however, receive securities without registration under the Securities Act or any similar law in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder, to the extent such exemption is then available, as described in "Private Placement Exemption" below.

### 2. Subsequent Transfers

To the extent section 1145 of the Bankruptcy Code is applicable, 1145 Securities to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) in general are freely tradable and transferable by any initial recipient thereof. 1145 Securities governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of the various states; however, the availability of such exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration in any given instance. Notwithstanding the foregoing, any securities or instruments issued under the Plan in reliance on section 1145(a) of the Bankruptcy Code remain subject to: (x) compliance with any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments; (y) the restrictions in the applicable NewCo Organizational Documents and the Liquidating Trust Agreement, as applicable, on the transferability of such securities and instruments[24][31] and (z) any other applicable regulatory approval.

### B. Private Placement Exemptions

### 1. Issuance

The Plan provides that, to the extent section 1145 of the Bankruptcy Code is not applicable, certain securities may be issued without registration under the Securities Act or any similar law in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder (the "4(a)(2) Securities"). To the extent such securities are issued pursuant to the Plan or the other Definitive Documents, the

---

[24][31] As described in ~~Article Article IVC.4(a)~~Article IV.C.4(a)—*Implementation of the Plan* and ~~Article Article XA.5(a)(iv)~~Article X.A.4(a)(iv)—*Consequences to the Debtor*, in an attempt to minimize the likelihood of an additional ownership change occurring after the Effective Date, the charter of NewCo will contain a restriction limiting the accumulation (and disposition) of shares of persons (and certain groups acting in concert) owning (actually or constructively), or who would own (immediately before or after such acquisition), 4.99 percent of any class of stock of NewCo (with certain adjustments), and requiring approval of NewCo's Board for any such transfers.

offering, issuance, exchange, or distribution of those securities will be conducted in a manner that is exempt from, among other things, the registration requirements of section 5 of the Securities Act.  Section 4(a)(2) exempts from section 5's registration requirements transactions not involving a public offering, and Regulation D provides a safe harbor under Section 4(a)(2) for transactions that meet certain requirements, including that the investors participating therein qualify as Accredited Investors.

Section 4(a)(2) provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act.

The issuance of 4(a)(2) Securities will be subject to the respective Blue Sky Laws of the various states; the availability of any Blue Sky Laws exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration in any given instance.

## 2. Subsequent Transfers

Because the 4(a)(2) Securities would not be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, they would be deemed "restricted securities" (within the meaning of Rule 144 under the Securities Act) that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available.

The Debtor does not plan to register the 4(a)(2) Securities.  Thus, persons who receive 4(a)(2) Securities will not be permitted to offer, sell or otherwise transfer their 4(a)(2) Securities except pursuant to an available exemption from registration.

All persons who receive 4(a)(2) Securities will be required to agree that they will not offer, sell or otherwise transfer any 4(a)(2) Securities other than pursuant to an effective registration statement under the Securities Act or an available exemption from registration thereunder.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met.  These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer.  An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period whether or not there is current public information regarding the issuer.  Adequate current public information is available for a reporting issuer if the issuer has filed all periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934 during the twelve months preceding the sale of the restricted securities.  If the issuer

is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available. The Debtor currently expects that NewCo will not be a reporting issuer and will make certain information publicly available to allow resales under Rule 144 by non-affiliates when the six-month holding period expires (approximately six months after the emergence date).

An affiliate may resell restricted securities after the six-month holding period if at the time of the sale certain current public information regarding the issuer is available. As noted above, the Debtor currently expects that this information requirement will be satisfied. The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the greater of 1% or the average weekly reported volume of trading in such restricted securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted securities except in certain situations. Third, if the sale exceeds 5,000 restricted securities or has an aggregate sale price greater than $50,000, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice unless an amended notice is filed.

To the extent 4(a)(2) Securities are issued, the Debtor believes that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least six months after the Effective Date. Accordingly, each holder of 4(a)(2) Securities would be required to hold its 4(a)(2) Securities for at least six months and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, unless such sale is made pursuant to an effective registration statement under the Securities Act.

To the extent 4(a)(2) Securities are issued, such securities will be issued in uncertified form and each book-entry statement evidencing the 4(a)(2) Securities ~~shall~~will bear a restrictive legend. Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Security will be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], AND HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT PURSUANT TO THE EXEMPTION FROM REGISTRATION UNDER THE ACT PROVIDED BY RULE 144 THEREUNDER, WHEN AVAILABLE OR ANOTHER AVAILABLE EXEMPTION FROM REGISTRATION."

[NewCo] will reserve the right to require certification or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the

4(a)(2) Securities.  [NewCo] will also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144 or another available exemption from registration.

Resales of 4(a)(2) Securities will be subject to the respective Blue Sky Laws of the various states; the availability of any Blue Sky Laws exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration in any given instance.

Any persons receiving "restricted securities" under the Plan, or any persons who believe they may be, or be deemed by the SEC to be, affiliates of the issuer of any applicable securities under the Plan, should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NEITHER THE DEBTOR NOR NEWCO MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN.  THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

## ARTICLE IX.ARTICLE IX

### CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS OR INTERESTS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

A.    **Certain Bankruptcy Law Considerations**

1.    **General**

While the Debtor believes that the remainder of the Chapter 11 Case will be of relatively short duration, the Debtor cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Case it is impossible to predict with certainty the amount of time that the Debtor may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have a material adverse effect on the Debtor's business and the value of its Estate.  A delay in the bankruptcy proceedings will also involve additional expense and may divert some of the attention of the Debtor's management away from maximizing the value of the Estate.

2.    **Plan Confirmation**

The Debtor can make no assurances that it will receive the requisite acceptances to confirm that Plan or that the conditions to Confirmation will be satisfied or waived.  Further, if the requisite acceptances are not received, the Debtor may seek to accomplish an alternative restructuring and obtain acceptances to an alternative plan of reorganization for the Debtor or otherwise, that may not have the support of the Holders of Claims or Interests and/or may be required to liquidate these Estates under chapter 7 or 11 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Holders of Claims or Interests as those proposed in the Plan.

A non-accepting Holder of a Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it concludes that any of the statutory requirements for Confirmation have not been met.  If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtor will be able to restructure and what, if anything, Holders of Claims or Interests against the Debtor would ultimately receive with respect to their Claims or Interests.

The Debtor, subject to the terms and conditions of the Plan and the RSA, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Subject to the terms and conditions of the Plan and the RSA, any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to any such non-accepting Class, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

3.    **Objections to Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtor.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to

the other Claims or Interests of such Class.  The Debtor believes that all Claims and Interests have been appropriately classified in the Plan.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtor would, subject to the RSA, seek (i) to modify the Plan to provide for whatever classification might be required for Confirmation and (ii) to use the acceptances received from any Holder of Claims or Interests pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims or Interests, although subject to the notice and hearing requirements of the Bankruptcy Code, could materially adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtor will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

## 4.    Risks Related to Possible Objections to the Plan

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtor believes that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party-in-interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

## 5.    Risk of Non-Approval by the Bankruptcy Court of the Restructuring Transactions

There can be no assurance that the Debtor will be able to obtain approval and complete the proposed Restructuring Transactions, or any other significant reorganization transaction, including as a result of objections from our stakeholders.  Such objections from stakeholders could result from stakeholders' preference for an alternative plan of reorganization.

If the Debtor is unable to complete the proposed Restructuring Transactions in the Chapter 11 Case, it may be necessary to seek additional funding sources, or convert from the chapter 11 reorganization process to a chapter 7 liquidation process.  If the proposed Restructuring Transactions are completed, it may not generate the anticipated or desired outcomes (including with respect to consideration received).

Even if the Restructuring Transactions are implemented, the Debtor will continue to face a number of risks, including certain risks that are beyond the Debtor's control, such as changes in economic conditions and changes in the Debtor's industry.  As a result, there is no guarantee that the Restructuring Transactions will achieve the Debtor's stated goals.

6.        **Risk of Nonoccurrence of the Effective Date**

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.  As set forth in Section 13 of the Plan, the Effective Date of the Plan is subject to the satisfaction (or waiver) of a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place, and it is unclear what distributions, if any, Holders of Allowed Claims or Interests would receive with respect to their Allowed Claims or Interests.

7.        **Closing of the Restructuring Transactions Is Dependent on a Number of Conditions that May Not Occur**

The closing of the Restructuring Transactions in connection with consummation of the Plan remains contingent on a number of conditions, including regulatory approvals if necessary.  There is a risk that the Debtor will be unable to satisfy or waive all conditions to closing the Restructuring Transactions.

8.        **Nonconsensual Confirmation**

In the event that any impaired class of claims or interests does not accept a Chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting class.  The Debtor believes that the Plan satisfies these requirements, and the Debtor may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

9.        **Plan Modifications**

The Debtor, subject to the terms and conditions of the Plan, reserves the right to modify the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any class junior to a non-accepting class than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

10.       9. Filing of a Competing Plan

At the outset of a chapter 11 case, the Bankruptcy Code provides a debtor with the exclusive right to file a plan of reorganization and prohibits third parties from proposing a plan.  The Debtor has retained the exclusive right to propose the Plan through and including January 26, 2024. The, and the Debtor filed the Plan within the Debtor's exclusive filing period.

~~Debtor now has the exclusive right to solicit votes on the Plan through and including March 26~~*On April 24, 2024, the Debtor filed the Debtor's Third Motion for an Order Extending the Exclusive Period During Which Only the Debtor May Solicit Acceptances of a Chapter 11 Plan [D.I. 1060] (the "Third Exclusivity Extension Motion"), requesting a further extension of the exclusive period during which only the Debtor may solicit acceptances of a chapter 11 plan (the "Exclusive Solicitation Period") from April 25, 2024 for an additional 75 days through and including July 9, 2024, with an option, subject to the consent of certain creditor groups, to extend for an additional 30 days through and including August 8, 2024.  Pursuant to Local Rule 9006-2, the Debtor's Exclusive Solicitation Period is automatically extended upon the filing of the Third Exclusivity Extension Motion until such motion is resolved.  The Third Exclusivity Extension Motion is currently scheduled to be heard at the Debtor's omnibus hearing on June 5*, 2024.  If the exclusivity period expires, or if the Bankruptcy Court terminates the Debtor's exclusive right, there may be a material adverse effect on the Debtor's ability to have the Plan confirmed, because third parties may ~~propose~~prosecute competing plans.

### 11. ~~10.~~ The Debtor May Object to the Amount or Classification of a Claim or Interest

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 12. ~~11.~~ Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims or Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims or Interests to be subordinated to other Allowed Claims or Interests.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims or Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.  The estimated Claims or Interests and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims or Interests may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims or Interests may vary from the estimated Claims or Interests contained in this Disclosure Statement.  Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims or Interests that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims or Interests under the Plan.

### 13. ~~12.~~ The Debtor May Fail to Satisfy the Solicitation Requirements Requiring a Re-Solicitation

To satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), the Debtor will be delivering the Solicitation Package to all Holders of Claims and Interests as of the Voting Record Date in the Classes entitled to vote. Accordingly, the Debtor believes that the solicitation is proper under section 1125 of the Bankruptcy Code. The Debtor cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, the Confirmation of the Plan could be denied. If the Bankruptcy Court were to conclude that the Debtor did not satisfy the solicitation requirements, then the Debtor may seek to re-solicit votes to accept or reject the Plan or to solicit votes from one or more Classes that were not previously solicited. The Debtor cannot provide any assurances that such a re-solicitation would be successful. Re-solicitation could delay or jeopardize confirmation of the Plan. Non-confirmation of the Plan could result in a protracted Chapter 11 Case.

### 14. ~~13.~~ Certain Creditors May Bring Litigation Against the Debtor

Even if the Debtor receives the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan. Further, third parties, including certain of the Debtor's creditors, may bring litigation against the Debtor during the course of this Chapter 11 Case, the outcome of which is uncertain. Although the Debtor believes the Plan satisfies all of the requirements necessary for Confirmation by the Bankruptcy Court, creditors and other parties-in-interest may bring objections to challenge Confirmation of the Plan.

### 15. ~~14.~~ The Total Amount of Allowed General Unsecured Claims May Be Higher Than Anticipated by the Debtor

With respect to Holders of Allowed General Unsecured Claims, the claims filed against the Debtor's Estate may be significantly higher than the Debtor has estimated. There can be no assurance that the estimated amount of Claims is correct, and the actual Allowed amounts of Claims may differ from estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize or should underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated therein.

### 16. ~~15.~~ The Total Amount of Allowed Administrative and Priority Claims May Be Higher or the Amount of Distributable Cash May Be Lower Than Anticipated by the Debtor

The amount of Cash the Debtor ultimately receives on account of the Restructuring Transactions and from other sources prior to and following the Effective Date may be lower than anticipated. Additionally, Allowed Administrative Expense Claims and Allowed Priority Claims maybe higher than anticipated. Accordingly, there is a risk that the Debtor will not be able to pay in full in cash all Administrative Expense Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan of reorganization.

### 17. ~~16.~~ Third-Party Offers

The Debtor may receive inquiries or offers from third parties related to the disposition of all or a substantial amount of their assets, including NewCo and/or SVB Capital,

which the Debtor may choose to pursue (in accordance with, as applicable, the terms set forth in Section 7.3 of the Plan and in any order approving a sale of the SVB Capital business).

### 18. ~~17.~~ Conversion into Chapter 7 Case

If the Bankruptcy Court finds that it would be in the best interest of the Holders of Claims or Interests, the Bankruptcy Court may convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities under the Bankruptcy Code. The Debtor believes that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided in a chapter 11 plan because of (a) the likelihood that assets would have to be sold in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee and (c) additional expenses and claims, some of which would be entitled to priority.

### 19. ~~18.~~ The Results of an Actual Chapter 7 Liquidation May Be Different from the Liquidation Analysis

Underlying the Liquidation Analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtor's management and advisors, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtor. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis. Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed or, alternatively, may have been unanticipated.

### 20. ~~19.~~ Plan Releases, Injunctions and Exculpation Provisions May Not Be Approved

There can be no assurance that the Plan releases, injunctions and exculpation provisions, as provided in Section 12 of the Plan, will be granted. Furthermore, the releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties and Exculpated Parties) provided in the Plan are subject to objection by parties in interest. Failure of the Bankruptcy Court to grant such relief may result in a plan of reorganization that differs from the Plan or the Plan not being confirmed.

### 21. ~~20.~~ The Amount and Timing of Available Distributions, if Any, May Vary

While the Debtor has attempted to project what it believes are likely distributions, if any, to be made to parties holding Allowed Claims and Interests, there can be no certainty that the projections will be accurate and that Holders will receive the distributions described in the Plan. The projections will necessarily be affected by, among other things, recoveries generated in connection with the liquidation of certain of the Debtor's remaining assets (including, without limitation, the recoveries, if any, on the account of the Retained Causes of Action), the outcome of objections to Claims or Interests, resolution of litigation, and the cost and expenses of such

actions and generally administering and winding down (as applicable) the Debtor's Estate. Additionally, the timing of actual distributions to Holders of Allowed Claims or Interests may be affected by many factors that cannot be predicted. Therefore, the Debtor cannot guarantee the timing of any recovery on account of Allowed Claims or Interests.

**B.      Risks Related to the Debtor's Ongoing Operations during the Chapter 11 Case**

**1.      The Debtor Will Be Subject to Risks and Uncertainties Associated with the Chapter 11 Case**

For the duration of the Chapter 11 Case, the Debtor's ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (i) ability to develop, confirm, and consummate the Plan; (ii) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Case from time to time; (iii) ability to maintain relationships with vendors, service providers, customers, employees, current and prospective investors, and other third parties; (iv) ability to maintain contracts that are critical to the Debtor's operations; (v) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtor; (vi) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtor to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Case to a chapter 7 proceeding; and (vii) the actions and decisions of the Debtor's creditors and other third parties who have interests in the Chapter 11 Case that may be inconsistent with the Debtor's plans.

These risks and uncertainties could affect the Debtor's business and operations in various ways. For example, negative events associated with the Chapter 11 Case could adversely affect the Debtor's relationships with service providers, investors and other third parties, which, in turn, could materially adversely affect the Debtor's operations and financial condition. Also, the Debtor will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtor's ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Case, the Debtor cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Case that may be inconsistent with the Debtor's plans.

**2.      Operating in Bankruptcy for a Long Period of Time May Harm the Debtor's Business**

The Debtor's future results will be dependent upon the successful Confirmation and implementation of the Plan. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtor's business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Case continue, the Debtor's management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. In addition, the longer the proceedings related to the Chapter 11 Case continues, the more likely it is that

investors and other third parties will lose confidence in the Debtor's ability to reorganize its businesses successfully and will seek to establish alternative commercial relationships.

### 3.        Undue Delay in Confirmation May Disrupt Operation of the Debtor

Although the Plan is designed to minimize the length of the Chapter 11 Case, it is impossible to predict with certainty the amount of time that the Debtor may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed.

The continuation of the Chapter 11 Case, particularly if the Plan is not confirmed in the time frame currently contemplated, could materially adversely affect operations. If Confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Case could result in, among other things, increased costs for professional fees and other case expenses. In addition, a prolonged Chapter 11 Case would require senior management to spend a significant amount of time and effort dealing with the Debtor's financial reorganization instead of focusing on the operation of the Debtor's businesses.

The uncertainty surrounding a prolonged Chapter 11 Case could have other adverse effects on the Debtor, including limiting the Debtor's ability to retain key employees; affecting the perception of the Debtor's business by regulators, investors, and lenders; and reducing the Debtor's assets and/or liquidity.

### 4.        The Debtor's Ongoing Liquidity Needs May Impact Recoveries

The Debtor has incurred significant professional fees and other costs in connection with the Chapter 11 Case and expects to continue to incur further professional fees and costs throughout the remainder of this Chapter 11 Case. The Debtor cannot guarantee that cash on hand will be sufficient to continue to fund its operations and allow the Debtor to satisfy obligations related to the Chapter 11 Case until the Debtor is able to emerge from bankruptcy protection. Accordingly, depending on how long the Chapter 11 Case continues, the recoveries that Holders of Claims or Interests are estimated to receive will be impacted by the Debtor's ongoing liquidity requirements. The Debtor faces uncertainty regarding the adequacy of its liquidity and capital resources. The Debtor's liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) its ability to maintain adequate cash on hand; (b) its ability to confirm and consummate the Plan; and (c) the ultimate cost, duration, and outcome of this Chapter 11 Case. The Debtor's ability to maintain adequate liquidity depends, in part, upon general economic, financial, competitive, regulatory and other factors beyond the Debtor's control.

### 5.        Risks Related to Loss of Key Personnel

The Debtor's operations, including the SVB Capital business, are dependent on a relatively small group of key management personnel. The Debtor's Chapter 11 Case has created distractions and uncertainty for key personnel and employees, and the Debtor has suffered significant attrition since the Petition Date. Personnel retention was further complicated by the fact that as of the Petition Date, personnel were almost all employed by the former Silicon Valley Bank. Because competition for experienced personnel can be significant and it is difficult to hire as a debtor in Chapter 11, the Debtor may be unable to find acceptable replacements with

comparable skills and experience.  The loss of such key personnel could adversely affect the Debtor's ability to lead this Chapter 11 Case to resolution by consummating the Plan.  In addition, the loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtor's ability to fulfill responsibilities related to its Chapter 11 Case and emerge successfully therefrom.

## C.    Risk Factors Relating to the SVB Capital Sale

### 1.    The Bankruptcy Court May Not Approve the SVB Capital Sale

The Debtor's Plan currently contemplates the successful consummation of the SVB Capital Sale, which remains pending as of the date of this Disclosure Statement.  The Bankruptcy Court may not approve the SVB Capital Sale, and the failure to obtain the Bankruptcy Court's approval of the NewCo Transaction could prevent the Debtor from consummating the Plan and the transactions contemplated thereby.  If the SVB Capital Sale is not approved (whether on the terms set forth in the SVB Capital Sale Motion or on other terms), a substantial portion of the SVB Capital business and SVB Capital assets would become assets of NewCo on the Effective Date and would have an impact on the operational risks that NewCo faces.

### 2.    The Debtor May Not Satisfy Closing Conditions in Connection with the SVB Capital Sale

Even if the SVB Capital Sale is approved by the Bankruptcy Court, the Debtor may not satisfy all of the closing conditions relating to the SVB Capital Sale.  A failure to satisfy any of the closing conditions to the SVB Capital Sale could prevent the SVB Capital Sale from being consummated, or could impact the consideration that the Debtor receives in connection with consummation of such sale.

### 3.    The Debtor May Not Successfully Consummate the SVB Capital Sale

Even if the SVB Capital Sale is approved by the Bankruptcy Court, the Debtor may not successfully consummate the SVB Capital Sale, whether due to a failure to satisfy all of the closing conditions relating to the SVB Capital Sale or other events outside of the Debtor's control.  If the SVB Capital Sale is not consummated, then the Debtor may amend certain terms of the Plan, including the GUC Cash-Out and other distributions contemplated by the Plan.

### 4.    There May Not Be Sufficient Cash to Provide for the Cash Distributions Pursuant the Plan

If the SVB Capital Sale is not approved by the Bankruptcy Court, or if the SVB Capital Sale is approved, but is not consummated, then the Debtor will not receive the Cash consideration contemplated under the Purchase Agreement.  If the Debtor does not receive the Cash consideration component of the consideration set forth in the Purchase Agreement, then the Debtor may not have sufficient cash to execute the Restructuring Transactions, including the GUC Cash-Out and payments contemplated pursuant to Section 4.2 of the Plan providing for Cash payments to certain Holders in lieu of NewCo Common Stock.

### 5. The Consideration the Debtor Will Receive from the SVB Capital Sale May Include Contingent Consideration

In connection with the SVB Capital Sale, the Debtor or Liquidating Trust may receive contingent consideration, including certain royalties and retained interests in the SVB Capital funds.  The Debtor has included its projections with respect to such contingent consideration in Appendix D to this Disclosure Statement; however, the actual value of such consideration may be materially different than actual future results.  *See* Article IX.H.1—*Risks Associated with Financial Projections* for additional risks related to the Liquidating Trust's financial projections.

### D. ~~C.~~ Risk Factors Relating to a NewCo Transaction

#### 1. The Debtor May Effectuate a NewCo Transaction

The Debtor, the Required Ad Hoc Senior Noteholder Parties and the UCC shall continue to work together in good faith to evaluate opportunities to maximize the value of all or some of the assets or equity of NewCo in ~~the~~a NewCo Transaction.  If the Debtor enters into a NewCo Transaction, the value of NewCo Common Stock distributed pursuant to the Plan may be reduced, or if all of the assets or equity of NewCo are sold, NewCo Common Stock may not distributed pursuant to the Plan.

#### 2. The Bankruptcy Court May Not Approve the NewCo Transaction

The Bankruptcy Court may not approve the NewCo Transaction.  Failure to obtain the Bankruptcy Court's approval of the NewCo Transaction could prevent the Debtor from consummating the Plan and the transactions contemplated thereby.

### E. ~~D.~~ Risk Factors Relating to NewCo Common Stock to Be Issued Under the Plan

#### 1. Potential Dilution

The ownership percentage represented by the NewCo Common Stock distributed on the Effective Date under the Plan to the Holders General Unsecured Claims will be subject to dilution (i) by any NewCo Transaction (as applicable) and (ii) from any other shares that may be issued post-emergence, including Holders of Claims that are Disputed as of the Effective Date.

In the future, similar to all companies, additional equity financings or other share issuances by NewCo could adversely affect the value of the NewCo Common Stock issuable upon such conversion.  The amount of dilution effected by any of the foregoing could be material.

#### 2. Equity Interests Subordinated to NewCo's Indebtedness

In any subsequent liquidation, dissolution, or winding-up of NewCo, the NewCo Common Stock would rank below all debt claims against NewCo, ~~including, without limitation, the NewCo Debt.  As~~and as a result, holders of the NewCo Common Stock would not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution or

winding-up of NewCo until after all of NewCo's obligations to its debt holders have been satisfied.

### 3. Implied Valuation of NewCo Common Stock May Not Represent Trading Value of NewCo Common Stock

Any implied valuation of the NewCo Common Stock stated herein or in the Plan is not intended to represent the trading value of NewCo Common Stock and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates, (b) conditions in the financial markets, (c) the anticipated value of the initial securities of creditors receiving NewCo Common Stock under the Plan, some of which may prefer to liquidate their investment rather than hold it on a long-term basis, and (d) other factors that generally influence prices of securities. Factors unrelated to NewCo's actual operating performance and other factors not possible to predict could affect the market price of the NewCo Common Stock. Accordingly, the implied value of the securities to be issued, stated herein and in the Plan, should not be construed as reflecting values that will be attained for the NewCo Common Stock in the private markets.

### 4. No Dividends

NewCo may not pay any dividends on the NewCo Common Stock and may instead retain any future cash flows for debt reduction and to support its operations. As a result, the success of an investment in the NewCo Common Stock may depend entirely upon any future appreciation in the value of the NewCo Common Stock. There is no guarantee that the NewCo Common Stock will appreciate in value or even maintain its initial value.

### 5. No Public Market for NewCo Common Stock

There is no public market for the NewCo Common Stock and there can be no assurance as to the development or liquidity of any market for the NewCo Common Stock. The Plan does not contemplate that the NewCo Common Stock will be listed upon any national securities exchange or any over-the-counter market after the Effective Date. If a trading market does not develop, is not maintained, or remains inactive, holders of the NewCo Common Stock may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, NewCo. In addition, on the Effective Date, it is expected that the NewCo will not be required under U.S. securities laws to file any reports with the SEC or otherwise provide financial or other information to the public which may further impair liquidity and prevent brokers or dealers from publishing quotations and that the ownership and transfer of the NewCo Common Stock will be subject to limitations set out in the charter of NewCo. This means that a holder of NewCo Common Stock may not be able to sell its NewCo Common Stock to raise money for immediate or future needs.

6.    **Significant Holders of NewCo Common Stock**

Certain Holders of Allowed Claims are expected to acquire a significant ownership interest in the NewCo Common Stock pursuant to the Plan.  If such Holders were to act as a group, such Holders may be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders.  This concentration of ownership could also facilitate or hinder a negotiated change of control of NewCo and, consequently, have an impact upon the value of the NewCo Common Stock.

7.    **The Equity Value of NewCo Common Stock May Not Represent the Trading Value of NewCo Common Stock**

The equity value of NewCo set forth on Appendix F is not intended to represent the trading value of NewCo Common Stock in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities.  The actual market price of the NewCo Common Stock may be volatile.  Many factors, including factors unrelated to the NewCo's actual operating performance, could cause the market price of NewCo Common Stock to rise or fall.  Accordingly, the implied value of the NewCo Common Stock to be issued, as set forth herein and in the Plan, does not necessarily reflect values that may be attained for these securities in the public or private markets.

8.    ~~7.~~ **The NewCo Organizational Documents May Limit the Rights of Holders of NewCo Common Stock**

The NewCo Organizational Documents may contain certain provisions that limit the rights of holders of the NewCo Common Stock.  In particular, the NewCo Organizational Documents may include provisions relating to (a) the corporate governance of NewCo, the election of the board of directors, and the duties of directors and officers, (b) transfer restrictions with respect to NewCo Common Stock (including tag-along rights and drag-along rights), (c) voting rights of NewCo Common Stock, (d) information rights provided to Holders of NewCo Common Stock, and (e) related rights and obligations.  There is no guarantee that any holder of the NewCo Common Stock will be able to freely transfer its NewCo Common Stock immediately after the Effective Date or will become able to freely transfer such NewCo Common Stock in the future.  Minority holders of NewCo Common Stock may have very limited protections and virtually no ability to influence management of the business of NewCo.

In addition, from and after the Effective Date, the NewCo Organizational Documents will contain certain transfer restrictions in relation to the transfer of NewCo Common Stock.  Specifically, the NewCo Organizational Documents will provide that, without the approval of the NewCo Board, (i) no Person will be permitted to acquire, whether directly or indirectly, and whether in one transaction or a series of transactions, NewCo Common Stock, to the extent that after giving effect to such purported acquisition the purported acquirer or any

other Person by reason of the purported ~~acquirer's~~ acquirer's acquisition would become a Substantial Holder of any class of stock of NewCo; (ii) no Substantial Holder may acquire, directly or indirectly, any shares of NewCo stock without the consent of a majority of the NewCo Board; and (iii) no Substantial Holder may dispose, directly or indirectly, of any shares of NewCo stock without the consent of a majority of the NewCo Board.

**F.**    ~~E.~~ **Operational Risks for NewCo**

**1.    The Debtor's Financial Projections and Other Forward-Looking Statements Are Subject to Inherent Uncertainty Due to the Numerous Assumptions upon Which They Are Based**

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended. Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims or Interests in the various Classes that might be allowed.

The Plan relies upon the Financial Projections that are based on numerous assumptions including, without limitation, the timing, Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of NewCo and the Liquidating Trust, financial industry performance, general business and economic conditions, competition, adequate financing, absence of material claims, the ability to make necessary capital expenditures, use of unrestricted cash, the ability to control future operating expenses, and other matters, many of which will be beyond the control of NewCo and the Liquidating Trust and some or all of which may not materialize. Particular uncertainties with respect to NewCo's operations and financial results arise from the risks and uncertainties relating to changes in the demand for NewCo's financial services; legislation and regulations relating to the financial markets; operational factors; fluctuations in the amount of cash NewCo will generate from operations, or amounts that the Liquidating Trust will generate through the liquidation of the Liquidating Trust Assets, and numerous other matters of national, regional and global scale, including those of a political, economic, business, competitive or regulatory nature.

The Financial Projections represent management's view based on currently known facts, the successful Confirmation and implementation of the Plan and hypothetical assumptions regarding NewCo's future operations and ability to finance such operations; they do not guarantee NewCo's future financial performance. Actual financial results will be subject to a number of factors, including general business and economic conditions, and other matters, many of which will be beyond the control of NewCo and may differ materially from the Financial Projections. Therefore, the Financial Projections should not be relied upon as an assurance of the actual results that will occur. Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization implemented will occur or, even if they do occur, that they will have the anticipated effects on NewCo and its business or operations or on the Liquidating Trust. The failure of any such results or developments to materialize as

anticipated could materially adversely affect the successful execution of any plan of reorganization.

Except with respect to the Financial Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement and the Plan do not reflect any events that might occur subsequent to the date hereof. Such events could have a material impact on the information contained in this Disclosure Statement and the Plan. Neither the Debtor, NewCo nor the Liquidating Trust intend to update the Financial Projections. The Financial Projections therefore may not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Financial Projections.

In addition, if the Debtor emerges from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtor's operating plans pursuant to a plan of reorganization. The Debtor also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtor's balance sheets. The Debtor's financial results after the application of fresh start accounting also may be different from historical trends.

Finally, this Disclosure Statement was not approved by the Securities and Exchange Commission.

## 2.    Risks Pertaining to Access to Capital Markets

NewCo may require additional capital in the future to finance its growth and development, satisfy regulatory compliance obligations, and meet general working capital needs. NewCo's capital requirements will depend on many factors, including acceptance of and demand for NewCo's services, the extent to which NewCo invests in new technology and personnel and the status and timing of these developments. If NewCo's access to capital were to become constrained significantly, or if costs of capital increased significantly, due to lowered credit ratings, prevailing industry conditions, the solvency of customers, a material decline in demand for services, the volatility of the capital markets or other factors, NewCo's financial condition, results of operations and cash flows could be adversely affected.

## 3.    NewCo May be Subject to Certain Exchange Act Reporting Requirements

The Debtor is currently subject to reporting requirements under the Exchange Act, and as of the Effective Date, NewCo may be or may in the future become subject to reporting obligations under the Exchange Act. Due to the limited size and scope of NewCo's ongoing operations post-Effective Date, compliance with such reporting requirements may be burdensome and may adversely impact NewCo's financial performance. Compliance with the reporting requirements under the Exchange Act may subject NewCo to additional regulatory risks that NewCo would not otherwise face as a non-reporting company.

### 4. ~~3.~~ NewCo May Be Adversely Affected by Potential Litigation

In the future, NewCo may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect NewCo's financial results. In the ordinary course of business, NewCo may be party to a number of lawsuits, investigations and disputes (some of which involve substantial amounts claimed) arising out of current and historical business, commercial transactions, prior acquisitions and divestitures, employment, employee benefits plans, intellectual property, antitrust, and other matters. The costs incurred in connection with such lawsuits, investigations and disputes can be substantial and result in the diversion of the NewCo's attention and resources. It is not possible to predict the potential litigation that NewCo may become party to, nor the final resolution of such litigation. The impact of any such lawsuits, investigations and disputes on NewCo's business and financial stability, however, could be material.

### 5. ~~4.~~ Tax Risks

NewCo's future results of operations could be adversely affected by changes in the effective tax rate as a result of a change in the mix of earnings in countries with differing statutory tax rates, changes in tax laws, regulations and judicial rulings (or changes in the interpretation thereof), changes in generally accepted accounting principles, changes in the valuation of deferred tax assets and liabilities, the results of audits and examinations of previously filed tax returns and continuing assessments of NewCo's tax exposures and various other governmental enforcement initiatives. NewCo's tax expense includes estimates of tax reserves and reflects other estimates and assumptions, including assessment of NewCo's future earnings which could impact the valuation of the deferred tax assets. Changes in tax laws or regulations may increase tax uncertainty and may adversely impact NewCo's provision for income taxes.

Furthermore, NewCo's ability to utilize certain tax attributes, including net operating loss carryforwards, is uncertain. Even if NewCo is able to utilize certain tax attributes, the resulting impact of those tax attributes is uncertain.

For a discussion of certain U.S. federal income tax considerations to NewCo, the Debtor and certain holders of Claims and Interests in connection with the implementation of the Plan, *see* Article X below—*Certain U.S. Federal Income Tax Consequences of the Plan*.

### G. ~~F.~~ Risk Factors Relating to Liquidating Trust Interests to Be Issued Under the Plan

#### 1. Risks Associated with Absence of Any Established Trading Market for Liquidating Trust Interests

With regard to any private sales of the Liquidating Trust Interests after the Effective Date, neither the Liquidating Trust nor the Liquidating Trust Board will take steps designed to facilitate the development of a secondary market in the Liquidating Trust Interests. Neither the Liquidating Trust nor the Liquidating Trust Board intend for an active trading market for the Liquidating Trust Interests to develop. It may be difficult to sell the Liquidating Trust

Interests at an attractive price. The price at which the Liquidating Trust Interests could be sold may be below the original cost of the holders of the Liquidating Trust Interests, and the holders of the Liquidating Trust Interests may not be able to sell the Liquidating Trust Interests at all. This means that a holder of a Liquidating Trust Interest may not be able to sell its Liquidating Trust Interests to raise money for immediate or future needs.

### 2.    Potential Dilution

The ownership percentage represented by the Liquidating Trust Interests distributed on the Effective Date under the Plan to the Holders of Allowed General Unsecured Claims, Allowed Subordinated Note Claims and Preferred Equity Interests will be subject to dilution from any other units that may be issued post-emergence, if any, including Holders of Claims or Interests that are Disputed as of the Effective Date.

In the future, unit issuances by the Liquidating Trust could adversely affect the value of the Liquidating Trust Interests. The amount of dilution effected by the foregoing could be material. Furthermore, the Liquidating Trust could issue additional Liquidating Trust Interests with a distribution preference over the Liquidating Trust Interests that will be distributed on the Effective Date under the Plan to the Holders of Allowed General Unsecured Claims, Allowed Subordinated Note Claims and Preferred Equity Interests.

The Class A Trust Units issued to Holders of Allowed General Unsecured Claims (other than Holders of Allowed General Unsecured Claims that elect to ~~participate in~~receive the GUC Cash-Out) will receive a distribution preference of $[••], which will accrete at an annual rate of 12%. Given that the Class B Trust Units and the Class C Trust Units will receive no distributions until the distribution preference of the Class A Trust Units has been satisfied in full, including any accretion thereto, delays in distributions from the Liquidating Trust may reduce distributions to holders of Class B Trust Units and Class C Trust Units. The Class B Trust Units issued to Holders of Allowed Subordinated Note Claims will receive a distribution preference to be calculated at the face amount of the Allowed Subordinated Note Claims, which will accrete at an annual rate of 12%. Given that the Class C Trust Units will receive no distributions until the distribution preferences of the Class A Trust Units and Class B Trust Units have been satisfied in full, including any accretion thereto, delays in distributions from the Liquidating Trust may reduce distributions to holders of Class C Trust Units.

### 3.    The Liquidating Trust May be Required to Register Under the Investment Company Act, Which Would Increase Its Regulatory Burden and Negatively Affect the Value of the Liquidating Trust Interest

The Liquidating Trust may be required to register as an investment company under the Investment Company Act. While the Debtor takes the position that the Liquidating Trust should not be required to register under the Investment Company Act and that the Liquidating Trust is not subject to the Investment Company Act, the SEC may disagree and could require registration of the Liquidating Trust either immediately or at some point in the future. As a result, there could be an increased regulatory burden on the Liquidating Trust which could negatively affect the value of the Liquidating Trust Interests.

### H.    ~~G.~~ Operational Risks for the Liquidating Trust

#### 1.    Risks Associated with Financial Projections

The Debtor's management, with the assistance of their financial advisors, have prepared the Financial Projections based on certain assumptions, as set forth in Appendix D hereto.  The Financial Projections represent the management's view based on currently known facts, the successful Confirmation and implementation of the Plan and hypothetical assumptions regarding the Liquidating Trust.  Actual financial results will be subject to a number of factors, including general business and economic conditions, and other matters, many of which will be beyond the control of the Liquidating Trust Board and may differ materially from the Financial Projections.  The Liquidating Trust may not be able to liquidate the Liquidating Trust Assets in the timeframe or at prices that are consistent with the Financial Projections and as envisioned under the Plan, the Liquidating Trust Agreement and this Disclosure Statement after the Effective Date.

#### 2.    The Timing and Outcome of the FDIC Litigation Is Uncertain and Has a Significant Impact on the Liquidating Trust

The Debtor is party to litigation against the FDIC with respect to the FDIC Claims, in which the Debtor seeks the return of approximately $1.93 billion in its deposits held by the former SVB at the time of its receivership.  This litigation is currently taking place in two venues with respect to the FDIC-C, FDIC-R1 and FDIC-R2: (i) the United States District Court for the Southern District of New York~~, with respect to the FDIC-C, FDIC-R1 and FDIC-R2~~ (the "SDNY Proceeding") and (ii) the United States District Court for the Northern District of California~~, solely with respect to the FDIC-C~~ (together with the SDNY Proceeding, the "FDIC Proceedings").  The FDIC disputes the Debtor's allegations and is defending itself in the FDIC Proceedings.  Additional proceedings regarding the FDIC Claims in additional venues may be filed before a hearing is held regarding confirmation of the Debtor's Plan.

The outcome of the FDIC Proceedings will have a significant impact on the value of the Liquidating Trust.  A material portion of the ultimate recoveries, if any, to be obtained by the Liquidating Trust on behalf of Holders of Allowed Claims in Classes 3(a), 3(b), 4 and 5 are contingent on the resolution of the FDIC Claims.  However, any recovery on account of the FDIC Claims is highly speculative.  The FDIC Proceedings may result in a range of outcomes, including settlements, which could significantly affect the value of the Liquidating Trust.  Additionally, the timing of any resolution of the FDIC Proceedings is impossible to predict, which may also adversely impact the value of the Liquidating Trust.  The FDIC Claims feature complex and novel questions of law and of fact and the FDIC Proceedings (including those proceedings regarding the FDIC Claims that may be filed in the future) are procedurally complicated.  While the Debtor believes in the merits of its lawsuits, these circumstances make it impossible to predict the resolution of the FDIC Proceedings (or similar lawsuits regarding the FDIC Claims) or the timing thereof.

3. **The Timing and Outcome of Litigation Relating to the Retained Causes of Action is Uncertain and May have a Significant Impact on the Liquidating Trust**

Pursuant to the Plan, certain Retained Causes of Action will be transferred to the Liquidating Trust.  The outcome of any litigation involving the Retained Causes of Action may have a significant impact on the value of the Liquidating Trust.  Additionally, the timing of any resolution of litigation involving the Retained Causes of Action is impossible to predict, which may also have a significant impact on the value of the Liquidating Trust.  The Retained Causes of Action include Claims and Causes of Action that involve complex factual and legal issues and that may be procedurally complicated.  These circumstances make it impossible to predict the resolution of any litigation involving the Retained Causes of Action or the timing thereof.

4. **Liquidating Trust Expenses May Exceed Current Expectations**

The ultimate amount of Cash available to distribute to the holders of Liquidating Trust Interests depends, in part, on the manner in which the Liquidating Board operates the Liquidating Trust and the expenses that it incurs in doing so.  Such expenses may include, without limitation, the reasonable and necessary expenses of administering the Liquidating Trust, including the costs to liquidate the Liquidating Trust Assets, investigate and prosecute the FDIC Claims, investigate and prosecute the Retained Causes of Action and make distributions.  If the Liquidating Trust incurs professional or other expenses in excess of current expectations, the amount of distributable assets remaining to provide distributions to the holders of Liquidating Trust Interests will decrease.

5. **The Liquidating Trust May be Subject to Certain Exchange Act Reporting Requirements**

The Debtor is currently subject to reporting requirements under the Exchange Act, and as of the Effective Date, NewCo may be or may in the future become subject to reporting obligations under the Exchange Act.  Compliance with such reporting requirements may be burdensome and may adversely impact the Liquidating Trust's financial performance.  Compliance with the reporting requirements under the Exchange Act may subject the Liquidating Trust to additional regulatory risks that the Liquidating Trust would not otherwise face as a non-reporting company.

6. 5. **The Liquidating Trust May Be Adversely Affected by Potential Litigation**

In the future, the Liquidating Trust may become party to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Liquidating Trust's financial results.  It is not possible to predict the potential litigation that the Liquidating Trust may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Liquidating Trust's businesses and financial stability, however, could be material.

**7.    6. Tax Risks**

There are a number of material income tax considerations, risks, and uncertainties associated with the Liquidating Trust.  Holders of Claims or Interests and other interested parties should read carefully the discussion of certain U.S. federal income tax consequences of the Plan set forth in Article X below—*Certain U.S. Federal Income Tax Consequences of the Plan*.

**I.    II. Additional Risk Factors**

**1.    The Financial Information is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit Was Performed**

In preparing this Disclosure Statement, the Debtor relied on financial data derived from its books and records that was available at the time of such preparation.  Although the Debtor has used its reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtor believes that such financial information fairly reflects its financial condition, the Debtor is unable to warrant or represent that the financial information contained in this Disclosure Statement (or in any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

**2.    The Debtor Could Amend, Waive, Modify or Withdraw the Plan**

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtor, subject to the terms of the Plan and the RSA.  Further, the Debtor reserves the right, prior to the Confirmation of the Plan or substantial consummation thereof, subject to the provisions of section 1127 of the Bankruptcy Code and applicable law and the terms of the RSA, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan.  The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.  Holders of Claims and Interests will receive notice of such amendments or waivers as required by applicable law and the Bankruptcy Court.  If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtor seeks (in accordance with the terms of the RSA) to modify the Plan, the previously solicited acceptances will be valid only if (a) all classes of adversely affected creditors and interest holders accept the modification in writing or (b) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

**3.    There is a Risk of Termination of the RSA**

To the extent that events giving rise to termination of the RSA occur, the RSA may terminate prior to the Confirmation or the Effective Date, which could result in the loss of support for the Plan by important creditor constituencies, which could adversely affect the Debtor's ability to confirm and consummate the Plan.  If the Plan is not consummated, there can be no assurance that the Chapter 11 Cases would not be converted to chapter 7 liquidation cases

or that any new chapter 11 plan would be as favorable to Holders of Claims or Interests as the current Plan.

### 4.    No Representations Outside the Disclosure Statement Are Authorized

No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Disclosure Statement.  Any representations or inducements made to secure your vote for acceptance or rejection of the Plan that are other than those contained in, or included with, the Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

### 5.    Certain Tax Consequences

For a discussion of certain U.S. federal income tax considerations to NewCo, the Debtor and certain holders of Claims and Interests in connection with the implementation of the Plan, *see* Article X below—*Certain U.S. Federal Income Tax Consequences of the Plan*.

### 6.    No Legal or Tax Advice Is Provided by the Disclosure Statement

The contents of the Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.  The Disclosure Statement is not legal advice to you.  The Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 7.    No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or Holders of Claims or Interests.

### 8.    Failure to Identify Projected Objections

No reliance should be placed on the fact that a projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtor may seek to investigate, file, and prosecute Claims and may object to Claims and Interests after Confirmation and consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims and Interests.

### 9.    Information Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors

Counsel to and other advisors retained by the Debtor have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement.  Also, as of the Petition Date, much of the information relevant to this Disclosure Statement was not in the Debtor's possession due to the seizure and receivership of the former Silicon Valley Bank, as

described above.  Counsel to the Debtor and other advisors have retained by the Debtor have engaged in significant efforts to retrieve documents and other material not in the Debtor's possession at the time of the Petition Date, but may not have copies of all books and records. Further, these advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, but they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

### 10.     Risk of the Inability to Obtain Regulatory Approval

The closing of the Restructuring Transactions may be subject to regulatory review in the United States.  The failure of any governmental or regulatory unit to grant an approval could prevent or limit consummation of the Restructuring Transactions and Confirmation of the Plan.

### 11.     Governmental Laws, Regulations and Actions Could Adversely Affect the Debtor

The Debtor is subject to various federal, state and local laws, orders and regulations.  Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal fines and penalties or the imposition of injunctive relief.

Future compliance with laws and regulations, including environmental, production, transportation, sales, rate and tax rules and regulations, and any changes to such laws or regulations, may reduce the Debtor's profitability and have a material adverse effect on its financial position, liquidity and cash flows.  Such laws and regulations may require more stringent and costly measures.

### 12.     The Debtor Has No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

## ARTICLE X.ARTICLE X

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtor, NewCo and certain U.S. Holders (as defined below) of Claims or Interests.  Except as otherwise indicated, this discussion assumes that the Restructuring Transactions are consummated pursuant to the Plan.  The following summary does not address the U.S. federal income tax consequences to Holders who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or who are deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "~~Tax Code~~IRC"), the Treasury regulations, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect), so as to result in U.S. federal income tax consequences different from those summarized herein. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The U.S. federal income tax consequences of the contemplated Plan and the Restructuring Transactions are complex and subject to significant uncertainties. As discussed further below, the Debtor has requested a private letter ruling from the IRS with respect to certain, but not all, of the U.S. federal income tax consequences relating to the Plan and does not presently intend to seek any additional rulings from the IRS with respect to the remaining tax aspects of the Plan, subject to the discussion below. There is no assurance that a favorable ruling will be obtained, and the consummation of the Plan is not conditioned upon the issuance of such a ruling. Moreover, the private letter ruling will rely on certain facts, assumptions, representations and undertakings from the Debtor, which, if incorrect or inaccurate, may jeopardize the Debtor's ability to rely on such private letter ruling. The discussion below is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, ~~or~~and that a court would not sustain, a different position than any position discussed herein. If the IRS successfully challenges any aspect of the tax treatments described below, adverse U.S. federal income tax consequences may result.~~–~~

This summary does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor, NewCo ~~or to~~, Holders of Claims or Interests or to Liquidating Trust Beneficiaries in light of their individual circumstances. This summary does not address the non-U.S., state, or local tax consequences of the contemplated Plan and the Restructuring Transactions, nor does it address all of the U.S. federal income tax consequences of the transactions that might be relevant to special classes of taxpayers in light of their particular circumstances (*e.g.*, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, cooperatives, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold their Claims or Interest through, S corporations or other pass-through entities for U.S. federal income tax purposes, persons who received their Claims or Interests pursuant to the exercise of an employee stock option or otherwise as compensation, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that elect to use the mark-to-market method of tax accounting for their securities~~, and~~ or commodities, persons subject to special tax accounting rules under section 451(b) of the IRC, persons whose Claims or Interests are part of a straddle, hedging, constructive sale, or conversion transaction, or part of a "synthetic security" or other integrated financial transaction, U.S. expatriates, persons whose Claims or Interests are described in Article IV.F.6—*Claims or Interests Paid by Third Parties*, or foreign persons or entities (except to the extent set forth below)). In addition, this discussion does not address the alternative minimum tax (including the corporate alternative minimum tax), the "Medicare" tax on net investment income, or U.S. federal taxes other than income taxes. Unless otherwise indicated, this discussion assumes that all Claims~~and~~, Interests~~, and~~ NewCo Common Stock ~~and NewCo Debt~~ are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the ~~Tax Code~~IRC and that the various debt and other arrangements to which the

Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their respective forms. This summary does not discuss differences in tax consequences to Holders of Claims or Interests that otherwise act or receive consideration in a capacity other than ~~any other~~as a Holder of a Claim or ~~Interests~~Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.

As used herein, the term "U.S. Holder" means, with respect to Claims, Interests, NewCo Common Stock or ~~NewCo Debt~~Liquidating Trust Interests, a beneficial owner that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

For purposes of this discussion, the term "Non-U.S. Holder" means, with respect to Claims, Interests, NewCo Common Stock or Liquidating Trust Interests, a beneficial owner that is, for U.S. federal income tax purposes, not a U.S. Holder and not a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes). Non-U.S. Holders are subject to special U.S. federal income tax provisions, some of which are discussed below.

If a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of Claims ~~or~~, Interests, NewCo Common Stock or Liquidating Trust Interests, the tax treatment of a partner (or other beneficial owner) in such partnership (or such other pass-through entity) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partnership (or other pass-through entity). If you are a partner (or other beneficial owner) in such a partnership (or other pass-through entity) holding any such instruments, you should consult your own tax advisor.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON YOUR INDIVIDUAL CIRCUMSTANCES. ALL HOLDERS OF CLAIMS OR INTERESTS ARE**

*URGED TO CONSULT THEIR TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.*

**A.    Consequences to the Debtor**

**1.    ~~Characterization of Certain Restructuring Transactions~~The Debtor's Consolidated Tax Group**

For U.S. federal income tax purposes and immediately prior to ~~certain~~the Restructuring Transactions ~~discussed below~~, the Debtor is the common parent of an affiliated group of corporations ~~which~~that files a consolidated U.S. federal income tax return (the "Tax Group"). The Debtor's Tax Group includes SVB in receivership, even though SVB is under the effective control of the FDIC. Accordingly, the income, profit, gain, loss and deductions of SVB while under the FDIC's effective control affect the Debtor's U.S. federal taxable income until such time as SVB is deconsolidated from the Tax Group (as described below).

~~On or prior to the Effective Date, the Debtor may undertake a series of Restructuring Transactions as a result of which NewCo (an entity treated as a C corporation for U.S. federal income tax purposes) will own 100 percent of the equity interests in the Debtor, the Debtor is converted from a Delaware corporation to a Delaware limited liability company (or other business form as agreed upon under the terms of the Plan) disregarded as separate from its owner for U.S. federal income tax purposes and the equity owners of Debtor immediately prior to such reorganization become equity owners of NewCo immediately thereafter (collectively, the "Debtor F Reorganization"). It has not yet been decided whether the Debtor would undertake the Debtor F Reorganization.~~

~~If effected, the Debtor F Reorganization is intended to be treated as a reorganization under section 368(a)(1)(F) of the Tax Code. Section 368(a)(1)(F) of the Tax Code provides that a reorganization includes a mere change in identity, form, or place of organization of one corporation, however effected. Furthermore, the Tax Code and Treasury Regulations provide that, in the case of a reorganization qualifying under section 368(a)(1)(F) of the Tax Code, the resulting corporation will generally be treated for purposes of the Tax Code the same as the transferor corporation would have been treated had there been no reorganization. Accordingly, except as otherwise described herein, (a) the Debtor F Reorganization is not expected to give rise to any taxable gain or loss to the Debtor or the shareholders of the Debtor, (b) NewCo will generally succeed to Debtor's income tax attributes (including net operating losses ("NOL") and tax basis and holding period in assets) and (c) the basis and holding period of NewCo stock received by the Debtor's equity owners in the Debtor F Reorganization is expected to be equal to the basis and holding period of the Interests in the Debtor exchanged therefor. This characterization is subject to some uncertainty and is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different characterization.~~

~~The remainder of this discussion assumes that the Debtor F Reorganization is not consummated or (if effected) qualifies under section 368(a)(1)(F) of the Tax Code, and unless~~

specified otherwise, references to the "Debtor" in this Article X shall include a reference to NewCo for U.S. federal income tax purposes.

Whether or not the Debtor effects the Debtor F Reorganization, the Debtor may undertake one or more additional Restructuring Transactions in order to implement the Plan. For example, in order to ensure that the implementation of the Plan is a fully taxable transaction for U.S. federal income tax purposes to the U.S. Holders of Claims or Interests, the Debtor may undertake certain Restructuring Transactions in order to have each of NewCo Debt and NewCo Common Stock be issued by different affiliates that indirectly wholly own the Debtor. The details of such Restructuring Transactions, if any, are yet to be determined as of the date of this Disclosure Statement and the U.S. federal income tax consequences of any such Restructuring Transactions are expected to be complex and subject to additional uncertainty. Such additional Restructuring Transactions may result in adverse consequences to the Debtor if the IRS disagrees with any of the positions taken with respect to such transactions.

### 2.    Cancellation of Indebtedness

In general, absent an exception, a debtor will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration (as determined for U.S. federal income tax purposes) less than the adjusted issue price of such indebtedness. ~~Under~~Generally, under section 108 of the ~~Tax Code~~IRC, a debtor is not required to include COD Income in gross income if the debtor is under the jurisdiction of a court in a case under the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, in general, the ~~Tax Code~~IRC provides that the debtor must reduce certain of its tax attributes—including carryforward and current year net operating losses ("NOL"), capital loss carryforwards, tax credits, and tax basis in assets (but not below the amount of liabilities to which the debtor remains subject)—by the amount of any COD Income incurred but excluded from income under section 108 of the ~~Tax Code~~IRC.

If advantageous, ~~the borrower~~a debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes. Where ~~the borrower~~a debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of ~~the borrower~~a debtor and other members of the group also be reduced. Any reduction in tax attributes in respect of COD Income incurred does not occur until the end of the taxable year and after such attributes have been applied.

The ultimate amount of COD Income incurred by the Debtor in connection with the implementation of the ~~chapter 11 plan~~Plan will depend on, among other things, the ~~issue price of NewCo Debt, the~~final amount of ~~cash~~Cash and the fair market value of any other property (including NewCo Common Stock and Liquidating Trust Interests) distributed to Holders of Claims. Certain of these figures cannot be known with certainty until after the Effective Date. Accordingly, the amount of COD Income that the Debtor may incur is uncertain, but may be significant.

### 3. Treatment of the NewCo Debt

The Debtor presently expects and intends that NewCo Debt will be treated as debt of its issuer for U.S. federal income tax purposes. However, the terms of NewCo Debt have not been finalized, and depending on the final terms, other characterizations of NewCo Debt are possible, which may have an adverse impact on NewCo and the Tax Group. There can be no assurance that the IRS would agree with the Debtor's intended characterization of NewCo Debt. The remainder of this disclosure assumes that NewCo Debt is properly characterized as debt of its issuer for U.S. federal income tax purposes, unless otherwise indicated.

### 3. 4. Transfer of Liquidating Trust Assets to the Liquidating Trust

Pursuant to the Plan, on or before the Effective Date, the Debtor will transfer the Liquidating Trust Assets to the Liquidating Trust, on behalf of the respective Holders of Claims and Interests comprising the Liquidating Trust Beneficiaries. The transfer of the Liquidating Trust Assets by the Debtor pursuant to the Plan may result in the recognition of gain or, loss, income, or deduction by the Debtor, depending in part on the value of the Liquidating Trust Assets on the Effective Date and the Debtor's tax basis in the Liquidating Trust Assets. Subject to the impact of any Restructuring Transactions to be determined, the implementation of which is subject to change, and subject to the receipt of a favorable ruling discussed below regarding the character of the Stock Loss (defined below), the Debtor anticipates that, any current year tax deductions incurred in the year that includes the Effective Date should be available to offset the Tax Group's taxable income (inclusive of any gain or income recognized upon transfer of assets pursuant to the Plan) incurred during such year, subject to the ownership change rules of the Tax Code, IRC discussed below (or other limitations as provided under the Tax Code IRC). Due to the lack of guidance with respect to the sale or other taxable disposition of Retained Causes of Action, there can be no assurance that a subsequent resolution of such claims or Causes of Action could not result in additional income to the Debtor, which may or may not be able to be offset by the tax attributes of the Tax Group.

### 4. 5. Potential Limitations on NOL Carryforwards and Other Tax Attributes

#### (a)    Section 382

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Tax Group's ability to use any remaining tax attributes post-emergence may be subject to certain limitations under sections 382 and 383 of the Tax Code IRC.

Under sections 382 and 383 of the Tax Code IRC, if the Debtor undergoes an "ownership change," the amount of any remaining NOL, section 163(j) carryforwards, tax credit carryforwards, net unrealized built-in losses ("NUBIL"), and possibly certain other attributes of the Debtor allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation (discussed below). For this purpose, if a corporation (or consolidated group) has a NUBIL at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions

attributable to such built-in losses) recognized during the five-year period beginning on the ownership change date (up to the amount of the original NUBIL) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation (discussed below).  In general, a corporation's (or consolidated group's) NUBIL will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.  It~~It~~The NUBIL of a consolidated group generally is calculated on a consolidated basis, subject to special rules.  Based on facts and circumstances not yet known to the Debtor as of the date of this Disclosure Statement, it is currently uncertain whether the Tax Group would have a NUBIL immediately prior to the Effective Date.

The rules of section 382 of the ~~Tax Code~~IRC are complex, but as a general matter, the Debtor anticipates that the issuance of NewCo Common Stock pursuant to the terms of the Plan will result in an ownership change of the Tax Group for these purposes, and that the Tax Group's use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the ~~Tax Code~~IRC applies.  In addition, it is possible there could be a subsequent ownership change after the Effective Date, which would further limit the Debtor's NOL.  Lastly, because a corporation can experience multiple ownership changes, it is possible that certain of the Tax Group's tax attributes (including any built-in loss in the stock of SVB) are subject to one or more additional section 382 limitations that could adversely impact the Tax Group's ability to utilize ~~its~~such tax attributes.

### (i)    General Section 382 Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, or ~~3.81~~3.37 percent for an ownership change during ~~February~~April 2024).  The annual limitation may be increased to the extent that the Tax Group recognizes certain built-in gains in its assets during the five-year period following the ownership change, or is treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65, but only to the extent that the Tax Group had a "net unrecognized built-in gain" overall in its assets at the time of the ownership change.  Section 383 of the ~~Tax Code~~IRC applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

If the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is generally reduced to zero, thereby precluding any utilization of the ~~corporation's~~ Pre-Change Losses (absent any increases due to recognized built-in gains).

Notwithstanding the above and as discussed below, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.~~.~~

### (ii)    Abandonment of SVB Stock

The Debtor ~~currently expects to take advantage of at least a portion of the tax loss that is anticipated to result from the Debtor abandoning its equity investment in SVB[25] for U.S. federal income tax purposes.  Specifically, the Debtor~~ anticipates that it (i) has a substantial tax basis in its stock investment in SVB. ~~The Debtor anticipates taking such~~[32] and (ii) will claim a worthless stock deduction (the "Stock Loss") at a time when the Debtor believes that such stock investment is worthless.  In ~~addition to the investment in SVB stock being worthless, in~~ order for the Debtor to claim the ~~worthless stock deduction (the~~ "Stock Loss"~~)~~ with respect to ~~all or part of~~ the SVB stock, ~~also meet~~ be worthless and the stock investment in SVB must be worthless and certain other conditions must be met, such as SVB ceasing to be a member of the Tax Group, at which point the Tax Group's consolidated NOL attributable to SVB (as determined under the relevant Treasury Regulations, at the end of the taxable year, after taking into account the Tax Group's income for such year) would no longer be available to the Tax Group.  The Stock Loss (subject to the receipt of a favorable ruling discussed below), ~~together~~along with other possible deductions incurred in ~~connection with the implementation of the Plan~~the same taxable year, is anticipated to result in a substantial NOL for the taxable year in which the Effective Date occurs.  The Debtor has requested a private letter ruling from the IRS that the character of the Stock Loss is ordinary.  There can be no assurance that a favorable ruling will be obtained, and the consummation of the Plan is not conditioned upon the issuance of such a ruling.  Moreover, the private letter ruling will rely on certain facts, assumptions, representations and undertakings from the Debtor, which, if incorrect or inaccurate, may jeopardize the Debtor's ability to rely on such private letter ruling.  If the character of the Stock Loss is capital rather than ordinary, then such capital loss generally would only be available to offset capital gains.

The Debtor currently anticipates realizing the Stock Loss by abandoning its ~~equity~~stock investment in SVB *prior to* (but in the same taxable year as) the Effective Date.  If the Debtor abandons its ~~equity~~stock investment in SVB prior to (but in the same taxable year as) the Effective Date, a ~~substantial~~portion of the NOL may not be subject to the annual limitation resulting from the implementation of the Plan, even if a change in ownership occurs on the Effective Date of the Plan, because the resulting NOL (determined after taking into account other activities occurring in the taxable year that includes the Effective Date) would be pro-rated between the pre- and post-change portions of the taxable year, such that the post-change portion would not be treated as a Pre-Change Loss described above.~~—~~

---

~~[25]   Solely for purposes of the discussion of the U.S. federal income tax consequences herein, references to SVB includes references to certain entities treated as successors to SVB for U.S. federal income tax purposes.~~

[32]   Solely for purposes of the discussion of the U.S. federal income tax consequences herein, references to SVB includes references to certain entities treated as successors to SVB for U.S. federal income tax purposes.

However, based on facts and circumstances not yet known to the Debtor as of the date of this Disclosure Statement (including whether the Debtor has a NUBIL as of the Effective Date), the Debtor may, subject to any applicable consent rights set forth in the RSA to amend the Plan, abandon its ~~equity~~stock investment in SVB *after* the Effective Date, in which case the NOL resulting from a post-Effective Date abandonment may be treated as a post-change loss. Such determination is subject to significant uncertainties, including with respect to facts relating to the activities of SVB after the commencement of the receivership. Accordingly, even if the Debtor were to abandon its ~~equity~~stock investment in SVB after the Effective Date and treat the Stock Loss as a post-change loss, there can be no assurance that the IRS will not assert that such Stock Loss will ~~not~~ be subject to section 382 limitations. Irrespective of whether the abandonment occurs before or after the Effective Date, the availability of the NOL attributable to the Stock Loss described above, would be subject to, among other things, (i) reduction under the tax rules applicable to COD Income, and (ii) any applicable limitations imposed by the ownership change rules of the ~~Tax Code,~~IRC such as those discussed above, and may be further limited to the extent that the Debtor had undergone an ownership change prior to the Effective Date.~~.~~

### (iii)    Special Bankruptcy Exception

With respect to the possible ownership change that could occur on the Effective Date, an exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors," together with certain pre-change shareholders, of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, the ownership change resulting from the consummation of the ~~chapter 11 plan~~Plan would not result in a limitation on the Debtor's Pre-Change Losses, but, instead, NOL carryforwards and section 163(j) carryforwards would be reduced ~~by the amount of any interest~~as if no deductions ~~were~~ claimed for interest paid or accrued by the Debtor ~~during the three taxable years preceding~~, with respect to indebtedness that was satisfied with NewCo Common Stock pursuant to the Plan, during any taxable year ending during the three-year period preceding the taxable year in which the Effective Date~~,~~ occurs and during the part of the taxable year prior to and including the Effective Date~~, in respect of all debt converted into stock pursuant to the Plan~~. If the 382(l)(5) Exception applies and the Debtor undergoes another ownership change within two years after the Effective Date, then the Debtor's Pre-Change Losses ~~thereafter~~as of the second ownership change would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception") with respect to the ownership change resulting from the consummation of the chapter 11 plan. Under the 382(l)(6) Exception, the annual limitation on the Debtor's Pre-Change Losses will be calculated by ~~reference to~~multiplying the applicable "long-term tax-exempt rate" by the lesser of (a) the value of the NewCo Common Stock (with certain adjustments) immediately after the ownership change or (b) the value of the ~~NewCo's~~Debtor's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that

undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that~~, under it,~~ a debtor corporation is not required to reduce its NOL carryforwards ~~by the amount of interest deductions claimed within the prior three-year period, and~~ and section 163(j) carryforwards as under the 382(l)(5) Exception.  Additionally, a debtor corporation may undergo a subsequent change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.  ~~The~~, in which case the resulting limitation ~~if~~ from a subsequent ownership change ~~were to occur after the Effective Date~~ would be determined under the regular rules for ownership changes.

Whether the ~~chapter 11 plan~~ Plan qualifies for the 382(l)(5) Exception is unclear and depends on a number of factors that are not yet known, including the existence of any rights offering or a similar transaction as part of a NewCo Transaction, and may require the receipt of one or more additional rulings from the IRS.  Moreover, it is possible that the Restructuring Transactions, when finally determined if implemented as part of the Plan, will not be consistent with the 382(l)(5) Exception.  Finally, even if the Debtor does qualify, the Debtor may, if it so desires, elect not to have the exception apply and instead apply the 382(l)(6) Exception.

### (iv)    Risk of Subsequent Ownership Changes

In an attempt to minimize the likelihood of ~~an additional~~ a subsequent ownership change occurring after the Effective Date, the charter of NewCo will contain a restriction limiting the accumulation (and disposition) of shares by persons (and certain groups of persons acting in concert) ~~owning~~ who own or would own (actually or constructively)~~, or who would own (~~ immediately before or after such acquisition~~)~~ or disposition, 4.99 percent of any class of stock of NewCo (with certain adjustments), and requiring the approval of ~~NewCo's~~ the NewCo Board for any such transfers.  Nevertheless, it is possible that NewCo could undergo ~~an additional~~ a subsequent ownership change, either by events within or outside of the control of the NewCo Board, *e.g.*, indirect changes in the ownership of persons treated as owning 5 percent or more of the stock of NewCo (by value).  ~~Also, in the unlikely event that NewCo Debt is recharacterized as equity of NewCo, transfers of such debt might be taken into account for purposes of section 382.   In such event, subsequent transfers of NewCo Debt potentially could result in an ownership change of NewCo after the Effective Date.~~  In the event of a subsequent ownership change of NewCo, all or part of the NOL (or other relevant tax attributes) would become subject to an annual limitation or disallowed entirely, depending on, among other things, if the 382(l)(5) Exception applies to the Plan and whether such ownership change occurs within a certain period of time after the Effective Date.

### (b)    Other Provisions

Aside from the objective limitations of section 382 of the ~~Tax Code~~ IRC, the IRS may disallow, pursuant to section 269 of the ~~Tax Code~~ IRC, the subsequent use of a corporation's losses following an acquisition of control of a corporation by one or more persons if the principal purpose of the acquisition is the avoidance or evasion of tax by securing a tax benefit which such person(s) or the corporation would not otherwise enjoy.  Accordingly, if the principal purpose of any group of persons (including Holders of Claims or Interests in connection with the Plan) in acquiring control of ~~NewCo~~ the Debtor is to obtain the use of the

NOL, the IRS could disallow the use of the full NOL (*i.e.*, which may include *both* the pre-change portion that would be subject to the annual section 382 limitation and the post-change unlimited portion).  Other provisions of the ~~Tax Code~~IRC may also preclude the use of a corporation's NOL and certain tax attributes in other ways under certain circumstances.

**5.    6.  Other Income and Uncertainty of Debtor's Tax Treatment**

The Debtor may incur other income for U.S. federal income tax purposes in connection with the Plan that, unlike COD Income, generally will not be excluded from the Debtor's U.S. federal taxable income.  In addition, the U.S. federal income tax considerations relating to the Plan are complex and subject to uncertainties.  No assurance can be given that the IRS will agree with the Debtor's interpretations of the tax rules applicable to, or tax positions taken with respect to, the transactions undertaken to ~~effect~~effectuate the Plan.  If the IRS were to successfully challenge any such interpretation or position, the Debtor may recognize additional taxable income for U.S. federal income tax purposes, and the Debtor may not have sufficient deductions, losses or other attributes for U.S. federal income tax purposes to fully offset such income.

In addition~~, because SVB is under the receivership of FDIC~~, until the Debtor abandons the stock of SVB, SVB while under the receivership of the FDIC generally will continue to be a member of the Tax Group for U.S. federal income tax purposes, and the actions of SVB while under the FDIC's effective control could affect the Debtor's U.S. federal taxable income as well as the positions taken with respect to any transactions implemented in connection with the Plan.  No assurance can be given that the FDIC will not take any action with respect to SVB that would adversely affect the tax consequences described in this Disclosure Statement.

**B.    Consequences to U.S. Holders of Certain Claims and Interests**

Pursuant to the Plan, except to the extent that any Holder of an Allowed Claim or Interest agrees to less favorable treatment: Holders of Allowed General Unsecured Claims will receive Class A ~~Liquidating~~ Trust Units, NewCo Common Stock and/or ~~cash~~Cash (subject to certain elections and adjustments), in complete and final satisfaction of their respective Claims; Holders of Allowed Subordinated Note Claims will receive Class B ~~Liquidating~~ Trust Units and ~~cash~~Cash sufficient to satisfy the Subordinated Note Trustee Expenses (subject to certain elections and adjustments), in complete and final satisfaction of their respective Claims; and Holders of Preferred Equity Interests will receive Class C ~~Liquidating~~ Trust Units, in complete and final satisfaction of their respective ~~Claims~~Interests.

As discussed below (*see* ~~Article XB.7    Consequences of Owning and Disposing of NewCo Debt Received Under the Plan~~

~~Article XD    As discussed further below in Article XC    Tax Treatment of the Liquidating Trust and Holders of Liquidating Trust Interests, the Liquidating Trust Beneficiaries are treated as directly owning the Liquidating Trust Assets (except for any assets that are allocable to any Disputed Claims Reserve).  Among such Liquidating Trust Assets is NewCo Debt to be issued pursuant to the Plan.  The following discussion summarizes certain U.S.~~

federal income tax considerations to the Liquidating Trust Beneficiaries as a result of being treated as owning such NewCo Debt for U.S. federal income tax purposes.

The discussion of NewCo Debt assumes that NewCo Debt will be treated as debt and will not have terms that will require NewCo Debt to be treated under special rules, such as rules regarding "contingent debt payment instruments" within the meaning of Treasury Regulation section 1.1275-4 ("CPDI"). However, there can be no assurance that the IRS will agree with the Debtor's intended characterization of NewCo Debt, and the rules surrounding debt, such as the CPDI rules, are complex and subject to uncertainties. Additionally, the terms of NewCo Debt have not been finalized and depending on the final terms, alternative characterizations of NewCo Debt could result in the Holders' of NewCo Debt experiencing tax consequences that are different from, and possibly adverse compared to, those discussed in this summary. The Liquidating Trust Beneficiaries are urged to consult their tax advisors regarding potential tax consequences of being treated as owning and disposing of NewCo Debt.

**(a) Interest on NewCo Debt**

A Holder generally will be required to recognize and include in gross income qualified stated interest on NewCo Debt as ordinary income at the time it is paid or accrued on NewCo Debt in accordance with such holder's method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" means stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate or, subject to certain conditions, based on one or more interest indices. It is possible that the final terms of the NewCo Debt may permit, or require, interest to be entirely "paid-in-kind" and therefore not provide for any qualified stated interest.

If the "issue price" (as discussed below) of NewCo Debt is less than the stated redemption price at maturity within the meaning of section 1273 of the Tax Code and the Treasury Regulations thereunder (including any interest that can be "paid-in-kind") and the difference is equal to or more than a *de minimis* amount (as set forth in the Tax Code and the applicable Treasury Regulations), NewCo Debt will be treated as issued with OID, and a U.S. Holder will be required to include the difference in income as ordinary income as it accrues (in accordance with a constant yield method, as set forth in the applicable Treasury Regulations), in advance of the receipt of any cash in respect of the OID, regardless of whether and when the U.S. Holder receives cash payments of interest. Accordingly, a U.S. Holder could be treated as receiving income in advance of a corresponding receipt of cash.

The determination of the "issue price" of NewCo Debt will depend, in part, on whether NewCo Debt or any Allowed Claims are treated as traded on an "established market" at any time during the 31-day period ending 15 days after the transfer of Liquidating Trust Assets to the Liquidating Trust. In general, a debt instrument (or the property exchanged therefor) will be treated as traded on an established market if at any time during the aforementioned 31-day period there is (a) a "sales price" for an executed purchase or sale of the debt instrument (or the property exchanged therefor) during the 31-day period appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (b) a "firm" price quote for the debt instrument (or the property exchanged therefor) is available from at least one broker, dealer or

pricing service and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the debt instrument; or (e) an "indicative" price quote for the debt instrument (or the property exchanged therefor) is available from at least one broker, dealer or pricing service for property and the price quote is not a firm quote. The issue price of a debt instrument that is traded on an established market or that is issued for another debt instrument so traded would be the fair market value of such debt instrument, if such debt instrument is treated as traded on an established market, or such other debt instrument, if the first instrument is not treated as traded on an established market and the other debt instrument is treated as traded on an established market, on the issue date as determined by such trading. The issue price of a debt instrument that is neither so traded nor issued for another debt instrument so traded would be its stated redemption price at maturity.

If neither NewCo Debt nor the Allowed Claims (with respect to which NewCo Debt is deemed to have been received) are treated as traded on an established market within the meaning of the applicable Treasury Regulations, the "issue price" of NewCo Debt should generally equal the stated redemption price at maturity of such NewCo Debt. However, if NewCo Debt or any Allowed Claims (with respect to which NewCo Debt is deemed to have been received) are treated as traded on an established market within the meaning of the applicable Treasury Regulations, the issue price of NewCo Debt would be the fair market value, at the time of the exchange, (1) of NewCo Debt if it is treated as publicly traded or (2) of any Allowed Claims (with respect to which NewCo Debt is deemed to have been received) if they are treated as publicly traded and NewCo Debt is not treated as publicly traded.

The rules regarding OID are complex and the rules described above may not apply in all cases. Holders should consult their own tax advisors regarding the potential application to NewCo Debt of the OID rules and the consequences thereof.

**(b) Sale, Exchange, Retirement, Redemption, or Other Taxable Disposition of NewCo Debt**

Upon the actual or deemed sale, exchange, retirement, redemption or other taxable disposition of NewCo Debt, a U.S. Holder generally will recognize gain or loss equal to the difference between (i) the amount realized on the actual or deemed disposition (other than any amounts attributable to accrued but unpaid stated interest, which will be taxable as ordinary income for U.S. federal income tax purposes to the extent not previously included in income) and (ii) the U.S. Holder's adjusted tax basis in NewCo Debt.

Generally, gain or loss recognized will be capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has been treated as holding such NewCo Debt for longer than one year. Non-corporate taxpayers generally are subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations under the Tax Code. Holders should consult their tax advisors regarding the deductibility of capital losses in their particular circumstances.

*Tax Treatment of the Liquidating Trust and Holders of Liquidating Trust Interests*), it is intended that the Liquidating Trust qualify as a "grantor trust" for U.S. federal income tax purposes. Accordingly, it is intended that each Holder of an Allowed Claim

Subordinated Claim or Interest receiving a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust Assets (consistent with its economic rights in the trust), including NewCo Debt held by the Liquidating Trust.  Pursuant to the Plan, the Liquidating Trust (as provided in the Plan) will in good faith value the assets transferred to the Liquidating Trust, and all parties to the Liquidating Trust (including Holders of Claims and Interests receiving Liquidating Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes.  However, the IRS or another taxing authority may disagree with such valuation and assert a different valuation, which, if sustained, could result in adverse tax consequences to such parties.

The U.S. federal income tax consequences to a Holder of an Allowed Claim or Interest who receives (or is deemed to receive via such Holder's interests in the Liquidating Trust, as discussed further below) NewCo Debt or NewCo Common Stock will differ depending on the ultimate structure adopted to implement the Plan.  If the structure adopted to implement the Plan is intended to result in a taxable transaction to the Holder, then the consequences to such Holder are generally as discussed below in Article XB.1 — *Gain or Loss In General*.  Alternatively, if the structure adopted to implement the Plan results in a "recapitalization" of NewCo for U.S. federal tax purposes, and certain other conditions are met, a Holder's loss, if any, in respect of its Claims or Interests would generally be deferred and a Holder would only be required to recognize taxable gain to the extent of the amount of "boot" received in the recapitalization, as described in more detail below.

Even where a structure is intended to potentially result in a recapitalization transaction The U.S. federal income tax consequences to a Holder of an Allowed Claim who receives NewCo Debt or NewCo Common Stock, whether the transaction qualifies as such also depends will depend, in part, on whether such Claim or NewCo Debt constitutes a "security" of NewCo the Debtor for U.S. federal income tax purposes (as discussed in more detail below).  The term "security" is not defined in the Tax Code IRC or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions.  The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not.  One of the most significant factors considered in determining whether a particular debt obligation is a "security" is its original term.  In general, debt obligations issued with a weighted average maturity at issuance of five years or less (*e.g.*, trade debt and revolving credit obligations) do not constitute "securities," whereas debt obligations with a weighted average maturity at issuance of ten years or more constitute "securities."  Accordingly, certain Allowed General Unsecured Claims and Subordinated Claims may qualify as "securities" while others may not.  The U.S. federal income tax treatment of NewCo Debt, the terms of which have not yet been finalized as of the date of this Disclosure Statement, is unclear.  Although the debt status of NewCo Debt is uncertain, the Debtor expects that NewCo Debt will be treated as "securities" of its issuer; accordingly, the remainder of this disclosure assumes NewCo Debt are "securities" of its issuer.  If an Allowed Claim constitutes a "security" and the structure adopted to implement the Plan is intended to result in a recapitalization transaction to the Holder of such Claim (to the extent permitted by law), then the consequences to such Holder are generally as discussed below in Article XB.2 — *Recapitalization Treatment*.  If an Allowed

Claim does not constitute a "security," then the consequences to the Holder of such Claim are generally as discussed below in Article XB.1 — *Gain or Loss – In General.*

***You are urged to consult your own tax advisor regarding the characterization as "securities" for U.S. federal income tax purposes of your Claim and/or NewCo Debt and the consequences of such treatment.***

**1.   Holders of Senior Note Claims (Class 3(a)) and Other General Unsecured Claims (Class 3(b)) and of Subordinated Note Claims (Class 4)**

The below discussion in this Article X.B.1 applies with respect to Holders who only hold Allowed Claims within a single Class of Claims. For a discussion with respect to Holders who hold Allowed Claims or Interests in multiple Classes of Claims or Interests, see Article X.B.3—*Holders of Multiple Classes of Allowed Claims and Interests* below.

**(a)   1. Gain or Loss – In General**

If the Debtor (subject to the applicable consent rights set forth in the RSA) structures the Plan to qualify for taxable treatment, or if thean Allowed Claim is not a "security," it is generally intended thator if a Holder does not receive any consideration that constitutes stock or a "security" of NewCo in exchange for such Holder's Allowed Claim (for example, a Holder that only receives cash in exchange for Allowed Claims), then the exchanging Holder of such Claim will generally recognize gain or loss (although any loss with respect to such a Claim or Interest might be deferred until all Disputed Claims or Interests are resolved) in an amount equal to the difference, between (i) the sum of the amount of any cash, the issue price of NewCo Debt,Cash and the fair market value of all other consideration received (if any), including NewCo Common Stock and any undivided interest in the Liquidating Trust Assets (other than any amounts received in respect of any Claim for accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in its Claim or Interest (other than any tax basis attributable to accrued but unpaid interest). The deduction of capital losses is subject to certain limitations.

In the event of a subsequent disallowance of a Disputed Claim, it is possible that a Holder of a previously Allowed Claim or Interest may be taxed, as such Disputed Claims are resolved, and such Holder effectively becomes entitled to an increased share of the assets held in the Liquidating Trust or an increased number of shares of NewCo Common Stock. The imputed interest provisions of the Tax CodeIRC may apply to treat a portion of such increased share or any additional distributions (*e.g.*, the redistribution among Holders of Allowed Claims of undeliverable distributions) as imputed interest. In addition, it is possible that any loss realized by a Holder in satisfaction of an Allowed Claim or Interest may be deferred until all Disputed Claims in such Holder's class are determined and such Holder's share can no longer increase, and with respect to certain claimsAllowed Claims , a portion of any gain realized may be deferred under the "installment method" of reporting. Holders are urged to consult their tax advisors regarding the possibility for deferral, and the ability to elect out of the installment method of reporting any gain realized in respect of their Claims or Interests.

A Holder's aggregate tax basis in any NewCo Debt, NewCo Common Stock and/or undivided interest in the Liquidating Trust Assets received in satisfaction of a Claim, if

any, will equal the amount taken into account in respect of such notes, stock or undivided interest in determining the Holder's amount realized.  A Holder's holding period in such debt, stock or undivided interest generally will begin the day following the Effective Date.

The fair market value of the Liquidating Trust Interests is contingent in part on the outcome of certain Retained Causes of Action included in the Liquidating Trust Assets.  It is therefore plausible that, instead of the treatment described above, a U.S. Holder could treat the transaction as an "open" transaction for U.S. federal income tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of any recoveries under Retained Causes of Action included in the Liquidating Trust Assets.  The U.S. federal income tax consequences of treating the consummation of the Plan as an open transaction are uncertain and highly complex, and a U.S. Holder should consult with its own tax advisor if it believes open transaction treatment might be appropriate.

### (b) ~~2.~~ Recapitalization Treatment

~~Unless the structure adopted to implement the Plan is intended to result in a taxable transaction to the Holders, as described above, the~~ The receipt of any NewCo ~~Debt (if NewCo Debt constitutes "securities" of NewCo), NewCo~~ Common Stock and any other instrument that constitutes stock or a "security" of ~~NewCo~~ the Debtor (such as potentially any Subscription Rights, discussed further below in ~~0    *Tax Treatment of the Potential NewCo Transaction*)~~ Article X.B.1(e)—*Tax Treatment of the Potential NewCo Transaction*)] by a Holder in partial satisfaction of an Allowed ~~General Unsecured Claim or Allowed Subordinated Note~~ Claim that constitutes a "security" for U.S. federal income tax purposes generally would qualify as a "recapitalization" for U.S. federal income tax purposes.  In such event, each such Holder generally will not recognize any loss upon the exchange of its Claim, but will generally recognize ~~any~~ a gain (computed as discussed in the preceding section) to the extent of any ~~cash~~ Cash and the fair market value of all other consideration received, including its undivided interest in the Liquidating Trust Assets received (other than to the extent received in respect of a Claim for accrued but unpaid interest, or attributable to the receipt of any instrument that constitutes stock or a "security" of ~~NewCo~~ the Debtor such as potentially ~~NewCo Debt or~~ Subscription Rights, if any).  The treatment of distributions in respect of a Claim for accrued but unpaid interest is discussed in the next section.

In a recapitalization exchange, a Holder's aggregate tax basis in any NewCo ~~Debt (if NewCo Debt constitutes "securities" of NewCo), NewCo~~ Common Stock and any other instrument that constitutes stock or a "security" of ~~NewCo~~ the Debtor (such as potentially any Subscription Rights, discussed further below in ~~0~~ Article X.B.1(e)— *Tax Treatment of the Potential NewCo Transaction* *Tax Treatment of the Potential NewCo Transaction*) received in respect of an Allowed Claim that constitutes a "security" will equal the Holder's adjusted tax basis in such Claim (including any Claim for accrued but unpaid interest)~~,~~; increased by any gain recognized or interest income received in respect of such Claim~~,~~; and decreased by the amount of any ~~cash~~ Cash and the fair market value of ~~any share of~~ its undivided interest in the Liquidating Trust Assets ~~(other than any instrument that constitutes a "security" of NewCo such as potentially NewCo Debt)~~ received and any deductions claimed in respect of any previously accrued but unpaid interest. The aggregate tax basis should be allocated among the stock and

"securities" of ~~NewCo~~the Debtor received in accordance with their relative fair market values as of the Effective Date.

In a recapitalization exchange, a Holder's holding period in any NewCo ~~Debt (if NewCo Debt constitutes "securities" of NewCo), NewCo~~ Common Stock and any other instrument that constitutes stock or a "security" of ~~NewCo~~the Debtor (such as potentially any Subscription Rights, discussed further below in 0Article X.B.1(e) ~~Tax Treatment of the Potential NewCo Transaction~~Tax Treatment of the Potential NewCo Transaction) received will include the Holder's holding period in the Claim exchanged therefor, except to the extent of ~~any~~its undivided interest in the Liquidating Trust Assets or any NewCo Common Stock received in respect of a Claim for accrued but unpaid interest (which will commence a new holding period).

A Holder's tax basis in its undivided interest in the Liquidating Trust Assets (other than any instrument that constitutes ~~stock or~~a "security" of ~~NewCo~~the Debtor such as potentially ~~NewCo Debt or~~ Subscription Rights (as defined below), if any) will equal the fair market value of such interest, and the Holder's holding period generally will begin the day following the Effective Date.

### (c)    ~~3.~~Consideration Received in Satisfaction of Accrued Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a Holder of ~~a~~an Allowed Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income). For purposes of this paragraph and related discussions above, "interest accrued" during a holding period includes original issue discount ("OID") accrued over the course of such holding period. Conversely, a Holder may be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full. The Plan provides that consideration received in respect of a Claim is generally allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to any Claim for accrued but unpaid interest. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. Holders are urged to consult their tax advisors regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID, if applicable) and the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for U.S. federal income tax purposes.

### (d)    ~~4.~~Character of Gain or Loss

Where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Allowed Claim ~~or Interest~~ constitutes a capital asset in the hands of the Holder, how long the Claim ~~or Interest~~ has been held, whether the Claim ~~or Interest~~ was acquired at a market discount, and whether and to what extent the Holder previously claimed a bad debt deduction. A Holder that purchased its Claims from a prior Holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the ~~Tax Code. A Holder that~~

purchased its Claim from a prior Holder will be IRC.  In general, a debt instrument is considered to have purchased such Claim been acquired with "market discount" if it is acquired other than on original issue and if the Holder's adjusted tax basis in its Claim is less than the the debt instrument immediately after the acquisition is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, or (b) in the case of a debt instrument issued with original issue discount, its revised issue price of such Claim, in each case, by at least a *de minimis* amount.  The de minimis amount is equal to 0.25% of the sum of all remaining payments to be made on the debt instrument from the date of such acquisition, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity.  Under these rules, gain recognized on the exchange of Claims (other than in respect of a Claim exchanged for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the Holder, on a constant yield basis) during the Holder's period of ownership, unless the Holder elected to include the market discount in income as it accrued.  If a Holder of Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange in the case of a taxable exchange.

In the case of an exchange of any Claims that qualifies as a recapitalization, any accrued market discount that is not included in income should be applied to any stock or "securities" received in the exchange (such as the New NewCo Common Stock, NewCo Debt, if applicable, or Subscription Rights (as defined below), if applicable), such that any gain recognized by a Holder upon a subsequent disposition of such stock or "securities" would generally be treated as ordinary income to the extent of any accrued market discount not previously included in income.  If a Holder of such Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts should be carried over to the stock or "securities" received in the exchange to the extent that any accrued market discount is applied to stock or such "securities" and should become deductible upon a subsequent disposition of such stock or "securities."  To date, specific Treasury Regulations implementing these rules have not been issued.

### (e)    5. Tax Treatment of the Potential NewCo Transaction

The characterization of a potential NewCo Transaction will depend on the ultimate structure of such NewCo Transaction, which has not yet been determined as of the date of this Disclosure Statement.  Moreover, even upon the determination of the final structure of a particular NewCo Transaction, the tax consequences of such NewCo Transaction may be subject to uncertainty.  For example, if NewCo issues rights to purchase additional NewCo Common Stock in a rights offering (such rights, "Subscription Rights"), the characterization of such Subscription Rights and their subsequent exercise for U.S. federal income tax purposes—as simply the exercise of options to acquire the underlying stock or, alternatively, as an integrated transaction pursuant to which the underlying stock is acquired directly in partial satisfaction of a Holder's Allowed Claim or Interests—is uncertain.

–If the Subscription Rights are not disregarded ~~in such~~as transitory in an integrated transaction analysis and are treated as separate property (for example, characterized as options), then the Holder's tax basis in the Subscription Rights received depends on whether the ~~structure adopted to implement the Plan~~receipt of such Subscription Rights qualifies as a recapitalization~~, discussed above.  If the Holder's receipt of~~.  To the extent that both the Subscription Rights ~~is pursuant to a recapitalization transaction and is a "security,"~~and the Allowed Claims exchanged therefor constitute "securities" of NewCo, then the Holder's tax basis and holding period in the Subscription Rights is generally determined as described above in ~~Article XB.2   *Recapitalization Treatment*.  If~~Article X.B.1(b)—*Recapitalization Treatment*.  If either the Holder's ~~receipt of~~Claims or the Subscription Rights ~~is not pursuant to a recapitalization or is pursuant to a recapitalization but is not a "security~~received in exchange do not constitute "securities," then the Holder's tax basis in the Subscription Rights received should be equal to the fair market value of such Subscription Rights when received.  ~~Regardless of the characterization, however, a Holder of~~A Holder's holding period in the Subscription Rights generally ~~would not recognize any gain or loss upon the exercise of such Subscription Rights (beyond the gain or loss recognized in respect of its Claim or Interests, as described above).~~should commence the day following the Effective Date.  A Holder's ~~aggregate tax basis~~holding period in the additional NewCo Common Stock received upon exercise of a Subscription Right ~~should be equal to the sum of (i) the amount paid for the additional NewCo Common Stock and (ii) the Holder's tax basis, if any, in~~generally should commence the day following the exercise of the applicable Subscription Right.

It is uncertain whether a Holder that does not exercise a Subscription Right should be treated as receiving anything of additional value in respect of its Allowed Claims.  If the Holder is treated as having received a Subscription Right of value (despite its subsequent lapse), such that it obtains a tax basis in the right, the Holder generally would recognize a loss to the extent of the Holder's tax basis in the Subscription Right upon the lapse or expiration of such right.  In general, such loss would be a capital loss, and long-term or short-term, depending upon whether the requisite holding period was satisfied (taking into account that the receipt of the Subscription Rights in partial satisfaction of a Claim could be part of a recapitalization exchange, even if the right goes unexercised, such that the Holder may carry over the holding period in its Claim).

If the Subscription Rights ~~or, alternatively, under~~are disregarded as transitory in an integrated transaction analysis, and a Holder's acquisition of NewCo Common Stock in the rights offering is treated as occurring directly in connection with partial satisfaction of a Holder's Allowed Claims, the Holder's tax treatment also depends on whether such acquisition of NewCo Common  Stock in exchange for Allowed Claims qualifies as a  recapitalization.  If, in such integrated transaction, the Holder's receipt of the NewCo Common Stock is pursuant to a recapitalization, then the Holder could have a split basis and holding period in the additional NewCo Common Stock received upon exercise of a Subscription Right (for example, part carryover basis and holding period, with respect to the portion of the additional NewCo Common Stock attributable to the value of the Subscription Rights, and part new, with respect to the portion of the additional NewCo Common Stock that is attributable to the exercise price of the Subscription Right).  If the Holder's receipt of the NewCo Common Stock is not pursuant to a recapitalization (because, for example, the Holder's Allowed Claim does not constitute "securities"), then the Holder's aggregate tax basis in the NewCo Common Stock received upon

exercise of a Subscription Right should be equal to the sum of (i) the amount paid for the additional NewCo Common Stock and (ii) the Holder's tax basis in any additional NewCo Common Stock that is treated as directly acquired in partial satisfaction of the Holder's Allowed Claim.  A Holder's holding period in the ~~additional~~ NewCo Common Stock received ~~upon exercise of a Subscription Right~~ generally should commence the day following the Effective Date~~, unless the Subscription Right is disregarded and the Holder is instead treated as receiving for its Allowed Claim a portion of the additional NewCo Common Stock acquired equal in value to the Subscription Rights.   In the latter event, the Holder could have a split holding period (part carry over to the extent of a portion of the additional NewCo Common Stock equal to the value of the Subscription Rights, and part new, to the extent of the remaining value of the NewCo Common Stock otherwise received~~.

Regardless of whether the Subscription Rights are disregarded or not, however, a Holder of Subscription Rights generally would not recognize any gain or loss upon the exercise of ~~the~~such Subscription Rights~~) if the receipt of the additional stock was part of a "recapitalization" exchange for U.S. federal income tax purposes~~ (beyond the gain or loss recognized in respect of its Claim, as described above).  In addition, if either the Subscription Rights or, under an integrated transaction analysis, the additional NewCo Common Stock acquired, is treated as received as part of a recapitalization exchange, any gain recognized upon a subsequent disposition of the additional NewCo Common Stock may be treated as ordinary income to the extent of any carryover of accrued market discount not previously included in income (*see* ~~preceding section~~Article X.B.1(d)—*Character of Gain or Loss*).

~~It is uncertain whether a Holder that does not exercise a Subscription Right should be treated as receiving anything of additional value in respect of its Claim or Interests.   If the Holder is treated as having received a Subscription Right of value (despite its subsequent lapse), such that it obtains a tax basis in the right, the Holder generally would recognize a loss to the extent of the Holder's tax basis in the Subscription Right upon the lapse or expiration of such right.   In general, such gain or loss would be a capital gain or loss, long-term or short-term, depending upon whether the requisite holding period was satisfied (taking into account that the receipt of the Subscription Rights in partial satisfaction of a Claim could be part of a recapitalization exchange, even if the right goes unexercised, such that the Holder may carry over the holding period in its Claim).~~

**2.**     **Holders of Preferred Equity Interests (Class 5)**

The below discussion in this Article X.B.2 applies with respect to Holders who only hold Preferred Equity Interests and no other Claim or Interest.  For a discussion with respect to Holders who hold Allowed Claims or Interests in multiple Classes of Claims or Interests, see Article X.B.3—*Holders of Multiple Classes of Allowed Claims and Interests* below.

**(a)**     **Gain or Loss – In General**

The exchanging Holder of Allowed Interests will generally recognize capital gain or loss (although any loss with respect to such Interest might be deferred until all Disputed Interests are resolved) in an amount equal to the difference, between (i) the sum of the amount of any Cash, and the fair market value of all other consideration received, including an undivided

interest in the Liquidating Trust Assets (other than any amounts received in respect of accrued but unpaid dividends) and (ii) the Holder's adjusted tax basis in its Interests.  Such capital gain will be long-term capital gain if at the time of the exchange, the U.S. Holder's holding period of the Allowed Interests was more than one year.  Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates.  The deduction of capital losses is subject to certain limitations.

In the event of a subsequent disallowance of a Disputed Interest, it is possible that a Holder of a previously Allowed Interest may be taxed as such Disputed Interests are resolved, and such Holder effectively becomes entitled to an increased share of the assets held in the Liquidating Trust.  The imputed interest provisions of the IRC may apply to treat a portion of such increased share or any additional distributions (*e.g.*, the redistribution among Holders of Allowed Interests of undeliverable distributions) as imputed interest.  In addition, it is possible that any loss realized by a Holder in satisfaction of an Allowed Interest may be deferred until all Disputed Interest in such Holder's class are determined and such Holder's share can no longer increase, and with respect to certain Allowed Interests, a portion of any gain realized may be deferred under the "installment method" of reporting. Holders are urged to consult their tax advisors regarding the possibility for deferral, and the ability to elect out of the installment method of reporting any gain realized in respect of their Interests.

A Holder's aggregate tax basis in any undivided interest in the Liquidating Trust Assets received in satisfaction of an Interest will equal the amount taken into account in respect of such undivided interest in determining the Holder's amount realized.  A Holder's holding period in such undivided interest generally will begin the day following the Effective Date.

The fair market value of the Liquidating Trust Interests is contingent in part on the outcome of certain Retained Causes of Action included in the Liquidating Trust Assets.  It is therefore plausible that, instead of the treatment described above, a U.S. Holder could treat the transaction as an "open" transaction for U.S. federal income tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of any recoveries under Retained Causes of Action included in the Liquidating Trust Assets.  The U.S. federal income tax consequences of treating the consummation of the Plan as an open transaction are uncertain and highly complex, and a U.S. Holder should consult with its own tax advisor if it believes open transaction treatment might be appropriate.

### 3.    Holders of Multiple Classes of Allowed Claims and Interests

The below discussion in this Article X.B.3 applies with respect to Holders who hold Allowed Claims or Interests in more than one Class of Claims or Interests (for example, a Holder who holds both Senior Notes and Preferred Equity Interests).

The U.S. federal income tax treatment of an exchanging Holder who holds Allowed Claims or Interests in multiple Classes of Claims or Interests is uncertain.  If such Holder is treated as having separate exchanges for each Class of Claims or Interests for U.S. federal income tax purposes, the tax treatments described above in Article X.B.1 and Article X.B.2 would generally apply.  However, the U.S. federal income tax treatment for a Holder of multiple Classes of Claims or Interests may be different from the tax treatment with

respect to Holders who hold Allowed Claims or Interests in only a single Class of Claims or Interests if such Holder is treated as exchanging all Classes of Claims or Interests for all consideration received in a single exchange.  For example, an exchanging Holder who only holds Preferred Equity Interests will generally recognize capital gain or loss as described above in Article X.B.2, subject to the qualifications and limitations therein.  However, an exchanging Holder who holds both Preferred Equity Interests and Senior Notes that are "securities" may be limited from recognizing any loss if the exchange of Preferred Equity Interests and Senior Notes, taken as a whole, is treated as a recapitalization for U.S. federal income tax purposes.  In addition, irrespective of whether such exchange of both Preferred Equity Interests and Senior Notes qualify as a recapitalization, such Holder may also be treated as receiving ordinary income or dividend income (rather than capital gain), to the extent of (i) consideration received in respect of a Claim for accrued but unpaid interest, (ii) consideration received in respect of an Interest for accrued but unpaid dividends or (iii) such Holder's ratable share of the Debtor's earnings and profits, if the receipt of property other than NewCo Common Stock is treated as such dividends under Section 302(d) or Section 356(a)(2) of the IRC.

The U.S. federal income tax treatment of an exchanging Holder who holds Allowed Claims or Interests in multiple Classes of Claims or Interests is complex and depends on a number of factors, some of which are unclear under applicable law, including whether any such Claims being exchanged constitute "securities", whether such Holder receives any NewCo Common Stock or Subscription Rights and the extent to which Section 302(d) or Section 356(a)(2) of the IRC applies.  Holders that hold Claims or Interests in multiple Classes of Claims or Interests are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of the consummation of the Plan.

### 4.  ~~6.~~ Ownership and Disposition of NewCo Common Stock Received Under the Plan

**(a)    Distributions on NewCo Common Stock**

Cash distributions with respect to the NewCo Common Stock generally will be treated as taxable dividends to the extent allocable to ~~the Reorganized Debtor's~~NewCo's current and/or accumulated earnings and profits as determined under U.S. federal income tax principles ("Earnings and Profits") and will be includible in income by the Holder when received.  To the extent the amount of any distribution exceeds available Earnings and Profits with respect to such distribution, the excess will be applied against and will reduce the Holder's adjusted tax basis (on a dollar-for-dollar basis) in respect of the stock as to which the distribution was made, but not below zero.  Any remaining excess will be treated as gain from the sale or exchange of such stock.

Dividends are generally taxed as ordinary income; however, dividends received by non-corporate Holders may qualify for taxation at lower rates applicable to long-term capital gains, provided certain holding period and other requirements are satisfied.  The length of time that a shareholder has held stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions.  Non-corporate Holders are urged to consult their own tax advisors regarding the applicability of such lower rates under their particular

factual situation. Subject to applicable limitations, a distribution to a corporate shareholder that is treated as a dividend for U.S. federal income tax purposes may qualify for the dividends received deduction. No assurance can be given that the Debtor NewCo will have sufficient Earnings and Profits (as determined for U.S. federal income tax purposes) to cause distributions to be treated as dividends and thus eligible for a dividends received deduction. The Corporate Holders may be eligible for the dividends received deduction is only available if certain holding period and taxable income requirements are satisfied, in which case the amount of the deduction is dependent on the percent of NewCo (by vote and value) that the corporate Holder owns. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed. Finally, the tax consequences of the receipt of a dividend by a corporate shareholder Holder may be different if the dividend is treated as an "extraordinary dividend" under applicable rules.

**(b)    Sale, Redemption, Or Repurchase of NewCo Common Stock**

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, exchange, or redemption (other than a redemption treated as a distribution for U.S. federal income tax purposes under section 302(d) of the Tax Code IRC, in which case the consequences described above under "Distributions on NewCo Common Stock" would generally apply), or other taxable disposition of the NewCo Common Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the Holder's holding period of the sold NewCo Common Stock for was more than one year. Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to limitations.

Notwithstanding the foregoing, any gain recognized by a Holder upon a subsequent taxable disposition of any NewCo Common Stock received in respect of a an Allowed Claim against the Debtor (or any stock or property received for such stock in a later tax-free exchange) would be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to the Claim or any ordinary loss allowed to the Holder upon satisfaction of the Claim for which NewCo Common Stock was received, less any income (other than interest income) recognized by the Holder upon satisfaction of the Claim, and (ii) with respect to a cash-basis Holder, also any amounts which would have been included in its gross income if the Holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

In addition, as discussed above, in the event of an exchange of Allowed Claims that qualifies as a recapitalization for U.S. federal income tax purposes, a portion of any gain recognized upon a subsequent disposition of any NewCo Common Stock received may be treated as ordinary income to the extent of any carryover of accrued market discount not previously included in income.

**C.    Consequences to the Non-U.S. Holders of Certain Claims and Interests**

As discussed above, it is intended that each Holder of an Allowed Claim or Interest receiving a beneficial interest in the Liquidating Trust will be treated for U.S. federal

income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust Assets (consistent with its economic rights in the trust).  This Article X.C describes certain U.S. federal income tax consequences of the Plan to the Non-U.S. Holders of certain Claims and Interests.  The same general considerations discussed above at the beginning of Article X.B—*Consequences to U.S. Holders of Certain Claims and Interests*, prior to the discussion in Article X.B.1—*Holders of Senior Note Claims (Class 3(a)) and Other General Unsecured Claims (Class 3(b)) and of Subordinated Note Claims (Class 4)*, apply to Non-U.S. Holders.  Further, the amount and character of each item of income, deduction, gain, or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.  However, as discussed in greater detail below, the Non-U.S. Holders may be subject to U.S. federal income tax rules that specifically apply to non-U.S. persons.  For example, special rules may apply to non-U.S. Holders of a U.S. real property holding corporation ("USRPHC").  The Debtor does not believe that it is, and does not believe NewCo will be, a USRPHC, in light of the nature of its assets and business operations, but no formal study has been or will be conducted and no assurance can be given in this regard.  Unless indicated otherwise, the remainder of this discussion assumes that the Debtor has not been, and NewCo will not be, a USRPHC.

Generally, unless a documented exception applies, a Non-U.S. Holder of an Allowed Claim or Interest may be subject to a 30 percent withholding tax on the gross amount of certain U.S. source income and gain received in connection with the Plan, or in connection with such Holder's ownership of any NewCo Common Stock or Liquidating Trust Interests.  A Non-U.S. Holder may be eligible for a reduction of, or exemption from, withholding tax if such holder qualifies for benefits under a U.S. tax treaty and provides the withholding agent with the documentation necessary to make such treaty claim (*i.e.*, an IRS Form W-8BEN or W-8BEN-E or other applicable documentation, signed under the penalties of perjury) (a "Valid Treaty Claim").  Additionally, a Non-U.S. Holder may be exempt from withholding if such income is effectively connected with a United States trade or business of the Non-U.S. Holder ("ECI") and the Non-U.S. Holder provides the withholding agent with a properly executed IRS Form W-8ECI ("Valid ECI Withholding Exemption").  The result of a Valid ECI Withholding Exemption is that the Non-U.S. Holder will be subject to tax on its U.S. source income on a net basis.  Non-U.S. Holders are urged to consult their tax advisors regarding the availability of making a Valid Treaty Claim or Valid ECI Withholding Exemption.

Non-U.S. Holders must provide the certifications described above (*e.g.*, IRS Forms W-8BEN, W-8BEN-E, and W-8ECI) to the applicable withholding agent prior to receiving a payment that would be subject to U.S. withholding tax and must update such certifications periodically.  Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for an exemption or a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  The reporting obligations of the Liquidating Trust and Liquidating Trust Beneficiaries with respect to the Non-U.S. Holders is discussed below in Article X.D.3—*General Tax Reporting by the Liquidating Trust and Liquidating Trust Beneficiaries.*

1.      **Holders of Senior Note Claims (Class 3(a)) and Other General Unsecured Claims (Class 3(b)) and of Subordinated Note Claims (Class 4)**

The below discussion in this Article X.C.1 applies with respect to Holders who only hold Allowed Claims within a single Class of Claims.  For a discussion with respect to Holders who hold Allowed Claims or Interests in multiple Classes of Claims or Interests, see Article X.C.3—*Holders of Multiple Classes of Allowed Claims and Interests* below.

(a)     **Gain or Loss on the Exchange**

Whether a Non-U.S. Holder realizes gain or loss pursuant to the transactions undertaken as part of the Plan and the amount and character of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders as discussed in Article X.B.1(a)—*Gain or Loss – In General*, Article X.B.1(b)—*Recapitalization Treatment*, and Article X.B.1(d)—*Character of Gain or Loss* above.

Subject to the discussion below with respect to accrued interest and OID, any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless:

1.  the Non-U.S. Holder is a nonresident alien individual who was present in the United States for 183 days or more during the individual's taxable year within which the Effective Date occurs and certain other conditions are met;

2.  such gain is ECI (and, if an applicable U.S. income tax treaty applies, such gain is attributable to a permanent establishment of such Non-U.S. Holder in the United States); or

3.  such gain is realized by a Non-U.S. Holder on the exchange of an Interest as part of the Plan, and the Debtor is or has been a USRPHC and certain conditions are met.

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty if a Valid Treaty Claim is made) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.

If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.  A Valid ECI Withholding Exemption can be made to exempt the Non-U.S. Holder from withholding tax.  In addition, if such Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its dividend equivalent amount as defined in section 884(a) of the IRC.

If the third exception applies, although as discussed above, the Debtor believes NewCo has not been or will be a USRPHC, the Non-U.S. Holder generally will be subject to

U.S. federal income tax to the extent of any gain realized, and withholding at a rate of 15 percent on the gross amount realized, on the exchange of an Interest that is not characterized as a dividend for U.S. federal income tax purposes, unless certain exceptions apply.

**(b)    Consideration Received in Satisfaction of Accrued Interest or OID**

The treatment of any consideration received pursuant to the Plan by a Non-U.S. Holder of an Allowed Claim that is received in satisfaction of interest accrued during its holding period (including any OID, in the case of a Claim) is generally determined in the same manner as set forth above in connection with a U.S. Holder in Article X.B.1(c)—*Consideration Received in Satisfaction of Accrued Interest or OID*.  Such payments to a Non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally a properly executed IRS Form W-8BEN or W-8BEN-E, although a U.S. taxpayer identification number and documentary evidence issued by foreign governmental authorities to prove residence in the foreign country, may also be required) establishing that the Non-U.S. Holder is not a U.S. person, unless:

- the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of stock of the Debtor;

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtor (each, within the meaning of the IRC);

- the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the IRC; or

- such accrued interest or OID is ECI (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected Earnings and Profits that are attributable to the accrued but unpaid interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for an exemption from withholding tax with respect to interest that is not ECI generally will be subject to withholding of U.S. federal tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but unpaid interest on such Non-U.S. Holder's Claims.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for

payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### (c)    Tax Treatment of the Potential NewCo Transaction

The rules described above under Article X.B.1(e)—*Tax Treatment of the Potential NewCo Transaction*, generally apply with respect to a Non-U.S. Holder. However, on lapse or disposition of a Subscription Right, any gain or loss would not be subject to U.S. federal income tax unless (a) the Non-U.S. Holder is a nonresident alien individual who was present in the United States for 183 days or more during the individual's taxable year within which the lapse or disposition and certain other requirements are met, (b) such gain or loss is ECI or (c) NewCo is or has been a USRPHC and certain conditions are met. As discussed above, the Debtor does not believe that NewCo has been or will be a USRPHC.

### 2.    Holders of Preferred Equity Interests (Class 5)

The below discussion in this Article X.C.2 applies with respect to Holders who only hold Preferred Equity Interests and no other Claim or Interest. For a discussion with respect to Holders who hold Allowed Claims or Interests in multiple Classes of Claims or Interests, see Article X.C.3—*Holders of Multiple Classes of Allowed Claims and Interests* below.

### (a)    Gain or Loss on the Exchange

Whether a Non-U.S. Holder realizes gain or loss pursuant to the transactions undertaken as part of the Plan and the amount and character of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders as discussed above in Article X.B.2(a)—*Gain or Loss – In General.*

Any gain realized by a Non-U.S. Holder on the exchange of its Interests generally will not be subject to U.S. federal income taxation unless:

- the Non-U.S. Holder is a nonresident alien individual who was present in the United States for 183 days or more during the individual's taxable year within which the Effective Date occurs and certain other conditions are met;

- such gain is ECI (and, if an applicable U.S. income tax treaty applies, such gain is attributable to a permanent establishment of such Non-U.S. Holder in the United States); or

- such gain is realized by a Non-U.S. Holder on the exchange of an Interest as part of the Plan, and the Debtor is or has been a USRPHC and certain conditions are met.

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty if a Valid Treaty Claim

is made) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.

If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.  A Valid ECI Withholding Exemption can be made to exempt the Non-U.S. Holder from withholding tax.  In addition, if such Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its dividend equivalent amount as defined in section 884(a) of the IRC.

If the third exception applies, although as discussed above, the Debtor believes the NewCo has not been or will be a USRPHC, the Non-U.S. Holder generally will be subject to U.S. federal income tax to the extent of any gain realized, and withholding at a rate of 15 percent on the gross amount realized, on the exchange of an Interest that is not characterized as a dividend for U.S. federal income tax purposes, unless certain exceptions apply.

### 3.    Holders of Multiple Classes of Allowed Claims and Interests

The below discussion in this Article X.C.3 applies with respect to Holders who hold Allowed Claims or Interests in more than one Class of Claims or Interests (for example, a Holder who holds both Senior Notes and Preferred Equity Interests).

The U.S. federal income tax treatment of an exchanging Holder who holds Allowed Claims or Interests in multiple Classes of Claims or Interests is uncertain.  If such Holder is treated as having separate exchanges for each Class of Claims or Interests for U.S. federal income tax purposes, the tax treatments described above in Article X.C.1 and Article X.C.2 would generally apply.  However, the U.S. federal income tax treatment for a Holder of multiple Classes of Claims or Interests may be different from the tax treatment with respect to Holders who hold Allowed Claims or Interests in only a single Class of Claims or Interests if such Holder is treated as exchanging all Classes of Claims or Interests for all consideration received in a single exchange.  For example, an exchanging Holder who only holds Preferred Equity Interests will generally recognize capital gain or loss as described above in Article X.C.2—*Holders of Preferred Equity Interests (Class 5),* subject to the qualifications and limitations therein.  However, an exchanging Holder who holds both Preferred Equity Interests and Senior Notes that are "securities" may be limited from recognizing any loss if the exchange of Preferred Equity Interests and Senior Notes, taken as a whole, is treated as a recapitalization for U.S. federal income tax purposes.  In addition, irrespective of whether such exchange of both Preferred Equity Interests and Senior Notes qualify as a recapitalization, such Holder may also be treated as receiving ordinary dividend income (rather than capital gain), to the extent of (i) consideration received in respect of a Claim for accrued but unpaid interest, (ii) consideration received in respect of an Interest for accrued but unpaid dividends or (iii) such Holder's ratable share of the Debtor's earnings and profits, if the receipt of property other than NewCo Common Stock is treated as dividends such under Section 302(d) or Section 356(a)(2) of the IRC.  In such cases, such amounts treated as interest or dividends may be subject to U.S. federal withholding tax or branch profits tax in a manner similar to such taxes imposed on consideration received in satisfaction of accrued but unpaid interest described above in Article X.C.1(b)—*Consideration Received in Satisfaction of Accrued Interest or OID* or imposed on dividends paid with respect to

NewCo Common Stock described below in Article X.C.4(a)—*Distributions on NewCo Common Stock.*

The U.S. federal income tax treatment of an exchanging Holder who holds Allowed Claims or Interests in multiple Classes of Claims or Interests is complex and depends on a number of factors, some of which are unclear under applicable law, including whether any such Claims being exchanged constitute "securities" and whether such Holder receives any NewCo Common Stock or Subscription Rights and the extent to which Section 302(d) or Section 356(a)(2) of the IRC applies. Holders that hold Claims or Interests in multiple Classes of Claims or Interests are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of the consummation of the Plan.

**4.** ~~**7. Consequences of Owning and Disposing**~~**Ownership and Disposition** of NewCo ~~**Debt**~~**Common Stock** Received Under the Plan

~~As discussed further below in Article XC — *Tax Treatment of the Liquidating Trust and Holders of Liquidating Trust Interests*, the Liquidating Trust Beneficiaries are treated as directly owning the Liquidating Trust Assets (except for any assets that are allocable to any Disputed Claims Reserve). Among such Liquidating Trust Assets is NewCo Debt to be issued pursuant to the Plan. The following discussion summarizes certain U.S. federal income tax considerations to the Liquidating Trust Beneficiaries as a result of being treated as owning such NewCo Debt for U.S. federal income tax purposes.~~

~~The discussion of NewCo Debt assumes that NewCo Debt will be treated as debt and will not have terms that will require NewCo Debt to be treated under special rules, such as rules regarding "contingent debt payment instruments" within the meaning of Treasury Regulation section 1.1275-4 ("CPDI"). However, there can be no assurance that the IRS will agree with the Debtor's intended characterization of NewCo Debt, and the rules surrounding debt, such as the CPDI rules, are complex and subject to uncertainties. Additionally, the terms of NewCo Debt have not been finalized and depending on the final terms, alternative characterizations of NewCo Debt could result in the Holders' of NewCo Debt experiencing tax consequences that are different from, and possibly adverse compared to, those discussed in this summary. The Liquidating Trust Beneficiaries are urged to consult their tax advisors regarding potential tax consequences of being treated as owning and disposing of NewCo Debt.~~

**(a)** ~~**(c) Interest**~~**Distributions** on NewCo ~~**Debt**~~**Common Stock**

The treatment of distributions with respect to the NewCo Common Stock is generally determined in the same manner as set forth above in connection with U.S. Holders as discussed above in Article X.B.4(a)—*Distributions on NewCo Common Stock.* Except as described below, dividends paid with respect to NewCo Common Stock held by a Non-U.S. Holder that are not eligible for a Valid ECI Withholding Exemption will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty if a Valid Treaty Claim is made). In addition, a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected Earnings and Profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax

under an applicable income tax treaty).As discussed above, although the Debtor believes NewCo has not been nor will be a USRPHC, if NewCo is a USRPHC, distributions to a Non-U.S. Holder that are not treated as dividends may be subject to U.S. federal income tax and will generally be subject to withholding by NewCo at a rate of 15 percent to the extent they are not treated as dividends, unless certain exceptions apply.

A Holder generally will be required to recognize and include in gross income qualified stated interest on NewCo Debt as ordinary income at the time it is paid or accrued on NewCo Debt in accordance with such holder's method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" means stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate or, subject to certain conditions, based on one or more interest indices. It is possible that the final terms of the NewCo Debt may permit, or require, interest to be entirely "paid-in-kind" and therefore not provide for any qualified stated interest.

If the "issue price" (as discussed below) of NewCo Debt is less than the stated redemption price at maturity within the meaning of section 1273 of the Tax Code and the Treasury Regulations thereunder (including any interest that can be "paid-in-kind") and the difference is equal to or more than a *de minimis* amount (as set forth in the Tax Code and the applicable Treasury Regulations), NewCo Debt will be treated as issued with OID, and a U.S. Holder will be required to include the difference in income as ordinary income as it accrues (in accordance with a constant yield method, as set forth in the applicable Treasury Regulations), in advance of the receipt of any cash in respect of the OID, regardless of whether and when the U.S. Holder receives cash payments of interest. Accordingly, a U.S. Holder could be treated as receiving income in advance of a corresponding receipt of cash.

The determination of the "issue price" of NewCo Debt will depend, in part, on whether NewCo Debt or any Allowed Claims are treated as traded on an "established market" at any time during the 31-day period ending 15 days after the transfer of Liquidating Trust Assets to the Liquidating Trust. In general, a debt instrument (or the property exchanged therefor) will be treated as traded on an established market if at any time during the aforementioned 31-day period there is (a) a "sales price" for an executed purchase or sale of the debt instrument (or the property exchanged therefor) during the 31-day period appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (b) a "firm" price quote for the debt instrument (or the property exchanged therefor) is available from at least one broker, dealer or pricing service and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the debt instrument; or (c) an "indicative" price quote for the debt instrument (or the property exchanged therefor) is available from at least one broker, dealer or pricing service for property and the price quote is not a firm quote. The issue price of a debt instrument that is traded on an established market or that is issued for another debt instrument so traded would be the fair market value of such debt instrument, if such debt instrument is treated as traded on an established market, or such other debt instrument, if the first instrument is not treated as traded on an established market and the other debt instrument is treated as traded on an established market, on the issue date as determined by such trading. The

issue price of a debt instrument that is neither so traded nor issued for another debt instrument so traded would be its stated redemption price at maturity.

If neither NewCo Debt nor the Allowed Claims (with respect to which NewCo Debt is deemed to have been received) are treated as traded on an established market within the meaning of the applicable Treasury Regulations, the "issue price" of NewCo Debt should generally equal the stated redemption price at maturity of such NewCo Debt.  However, if NewCo Debt or any Allowed Claims (with respect to which NewCo Debt is deemed to have been received) are treated as traded on an established market within the meaning of the applicable Treasury Regulations, the issue price of NewCo Debt would be the fair market value, at the time of the exchange, (1) of NewCo Debt if it is treated as publicly traded or (2) of any Allowed Claims (with respect to which NewCo Debt is deemed to have been received) if they are treated as publicly traded and NewCo Debt is not treated as publicly traded.

The rules regarding OID are complex and the rules described above may not apply in all cases.  Holders should consult their own tax advisors regarding the potential application to NewCo Debt of the OID rules and the consequences thereof.

**(b)  (d) Sale, ~~Exchange, Retirement,~~ Redemption, or ~~Other Taxable Disposition~~Repurchase of NewCo ~~Debt~~Common Stock**

Upon the actual or deemed sale, exchange, retirement, redemption or other taxable disposition of NewCo Debt, a U.S. Holder generally will recognize gain or loss equal to the difference between (i) the amount realized on the actual or deemed disposition (other than any amounts attributable to accrued but unpaid stated interest, which will be taxable as ordinary income for U.S. federal income tax purposes to the extent not previously included in income) and (ii) the U.S. Holder's adjusted tax basis in NewCo Debt.

Generally, gain or loss recognized will be capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has been treated as holding such NewCo Debt for longer than one year.  Non-corporate taxpayers generally are subject to a reduced federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations under the Tax Code.  Holders should consult their tax advisors regarding the deductibility of capital losses in their particular circumstances.

The treatment of sale, redemption or repurchase of NewCo Common Stock is generally determined in the same manner as set forth above in connection with U.S. Holders as discussed above in Article X.B.4(b)—*Sale, Redemption, or Repurchase of NewCo Common Stock*.  A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a Cash redemption) of NewCo Common Stock unless:

- such Non-U.S. Holder is a nonresident alien individual who was present in the United States for 183 days or more during the individual's taxable year within which the disposition occurs;

- a Valid ECI Withholding Exemption is made with respect to such gain; or

- the issuer of such NewCo Common Stock is or has been a USRPHC and certain conditions are met.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty if a Valid Treaty Claim is made) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Equity Interests.

If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to Earnings and Profits effectively connected with a U.S. trade or business that is attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

As discussed above, the Debtor does not believe that NewCo has been or will be a USRPHC.

**D.**    ~~C.~~ **Tax Treatment of the Liquidating Trust and Holders of Liquidating Trust Interests**

1.    **Tax Classification of the Liquidating Trust**

As described above, the Liquidating Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (*i.e.*, the Liquidating Trust Beneficiaries are deemed to own the assets of the trust, and all of the trust's income and loss is taxed directly to the Liquidating Trust Beneficiaries). Pursuant to the Plan, all parties (including, without limitation, the Debtor, the Liquidating Trust Board, the Liquidating Trust and the Liquidating Trust Beneficiaries) will be required to treat, for U.S. federal income tax purposes, the Liquidating Trust as a grantor trust of which the Liquidating Trust Beneficiaries are the owners and grantors. The following discussion assumes that the Liquidating Trust will be so respected for U.S. federal income tax purposes. However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. Although the Liquidating Trust will be structured with the intention of complying with guidelines established by the IRS in Revenue Procedure 94-45, 1994-2 C.B. 684, for the formation of liquidating trusts, no opinion of counsel has been requested, and the Liquidating Trust may or may not obtain a ruling from the IRS, concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to successfully challenge the classification of the Liquidating Trust, the U.S. federal income tax consequences to the Liquidating Trust and/or the Holders of Allowed Claims or Interests could vary from those discussed herein (including the potential for imposition of tax on the net income of the

Liquidating Trust at the entity level, in addition to taxation at the level of the Liquidating Trust Beneficiaries).

### 2.    Tax Treatment of the Disputed Claims Reserve

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trust of a private letter ruling if the Liquidating Trust so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trust Board), the Liquidating Trust will (A) timely elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (a "DOF"), and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  If the Liquidating Trust properly files a tax election to treat a Disputed Claims Reserve as a DOF, then the DOF may be treated as a separate taxable entity for U.S. federal income tax purposes (rather than a pass-through tax entity) and will be treated as the owner of all assets that it holds for U.S. federal income tax purposes.  A DOF will generally be taxed for U.S. federal income tax purposes as either (a) a C corporation, unless all the assets transferred to the DOF by or on behalf of any transferors are passive investments assets, or (b) a "qualified settlement fund" within the meaning of section 468B of the ~~Tax Code~~IRC and the applicable Treasury Regulations thereunder (a "QSF"), if all the assets transferred to the DOF by or on behalf of any transferors are passive investment assets.  A DOF that is taxable as a QSF is generally subject to taxation at the maximum rate applicable to estates and trusts under section l(e) of the ~~Tax Code~~IRC (which is currently 37% for taxable years beginning before January 1, 2026, and 39.6% thereafter) on its "modified gross income."  The "modified gross income" is the QSF's gross income under section 61 of the ~~Tax Code~~IRC as modified by the rules detailed in Treasury Regulation sections 1.468B-2(b) and 1.468B-9.  It is anticipated that any NewCo Disputed Claims Reserve will be treated as a DOF that is taxable as a QSF. Any Liquidating Trust Disputed Claims Reserve and any Liquidating Trust Disputed Interests Reserve may also be treated as a DOF taxable as a QSF, depending on facts and circumstances not yet determined as of the date of this Disclosure Statement, including the specific nature of the assets transferred to any such reserve.

The Liquidating Trust will be responsible for payment, out of the Liquidating Trust Assets, of any Taxes imposed on the Liquidating Trust or the Liquidating Trust Assets, including any Disputed Claims Reserve (which is required under the Plan to bear all Taxes attributable to such Disputed Claims Reserve).  In the event, and to the extent, any Cash retained on account of Disputed Claims in a Disputed Claims Reserve is insufficient to pay the portion of any such Taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, such Disputed Claims (including any income that may arise upon any distribution of the assets of the applicable Disputed Claims Reserve), such Taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, (ii) paid with the proceeds from a sale of the assets of the applicable Disputed Claims Reserve or (iii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidating Trust as a result of the resolution of such Disputed Claims.  Therefore, the tax liability of a Disputed Claims Reserve may reduce the amount of property otherwise distributable upon the resolution of any Disputed Claims.

3.    **General Tax Reporting by the Liquidating Trust and Liquidating Trust Beneficiaries**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trust Board), for all U.S. federal income tax purposes, all parties (including, without limitation, the Debtor, the Liquidating Trust, the Liquidating Trust Board and the Liquidating Trust Beneficiaries) must treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as (i) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to the Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to any ~~Liquidating Trust~~ Disputed Claims Reserve ~~or Liquidating Trust Disputed Interests Reserve~~), followed by (ii) the transfer by the Liquidating Trust Beneficiaries to the Liquidating Trust of the Liquidating Trust Assets (other than to the extent Liquidating Trust Assets are allocable to any ~~Liquidating Trust~~ Disputed Claims Reserve ~~or Liquidating Trust Disputed Interests Reserve~~) in exchange for Liquidating Trust Interests. Accordingly, all parties must treat the Liquidating Trust as a grantor trust of which the Liquidating Trust Beneficiaries are the owners and grantors, and treat the Liquidating Trust Beneficiaries as the direct owners of an undivided interest in the Liquidating Trust Assets (other than the Liquidating Trust Assets allocable to any ~~Liquidating Trust~~ Disputed Claims Reserve ~~or Liquidating Trust Disputed Interests Reserve~~), consistent with their economic interests therein, for all U.S. federal income tax purposes. Holders are urged to consult their tax advisor regarding any subsequent year's adjustments for the elimination of obligations to Holders of Disputed Claims and their replacement with a smaller amount of Allowed Claims that are then paid out of the Liquidating Trust Assets~~.~~

and for any increase in the economic interests in the Liquidating Trust Assets to the Liquidating Trust Beneficiaries as a result of any accretion to the distribution preference on certain Liquidating Trust Interests or increases in the value of the Liquidating Trust Assets distributable to certain Liquidating Trust Beneficiaries, the treatment of which is unclear. For example, it is possible that an accretion to the distribution preference on certain Liquidating Trust Interests may, in certain situations, be viewed as a shift in the deemed ownership of the underlying Liquidating Trust Assets that could give rise to income to the Holders of such Liquidating Trust Interests for U.S. federal income tax purposes. As soon as reasonably practicable after the Liquidating Trust Assets are transferred to the Liquidating Trust, the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Liquidating Trust (including, without limitation, the Debtor, the Liquidating Trust, the Liquidating Trust Board and the Liquidating Trust Beneficiaries) for all U.S. federal income tax purposes.

Allocations of Liquidating Trust taxable income among the Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to any ~~Liquidating Trust~~Disputed Claims Reserve ~~or Liquidating Trust Disputed Interest Reserve~~) shall be determined by reference to the manner in which an amount of ~~cash~~Cash representing such taxable income would be distributed (were such ~~cash~~Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, other than assets allocable to any ~~Liquidating Trust~~

Disputed Claims Reserve or Liquidating Trust Disputed Interests Reserve) to the Holders of the Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for purposes of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax CodeIRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

Taxable income or loss allocated to Liquidating Trust Beneficiaries will generally be treated as income or loss with respect to such Holder's undivided interest in the Liquidating Trust Assets, and *not* as income or loss with respect to its prior Allowed Claim or Interest. The character of any income and the character and ability to use any loss will depend on the Liquidating Trust Assets and the particular situation of the Liquidating Trust Beneficiary. Certain U.S. federal income tax considerations forWith respect to any Liquidating Trust Beneficiary that is a Non-U.S. Holder, the Liquidating Trust Beneficiaries with respect to NewCo Debt are discussed above in Article XB.7—*Consequences of Owning and Disposing of NewCo Debt Received Under the Plan.* In addition, whethermay be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate and whether the Non-U.S. Holder has timely delivered a Valid Treaty Claim or a Valid ECI Withholding Exemption), subject to the discussions regarding withholding above in Article X.C—*Consequences to the Non-U.S. Holders of Certain Claims and Interests.*

Whether the Liquidating Trust Beneficiaries would be treated as holding any rights regarding FDIC Proceedings (or similar lawsuits regarding the FDIC Claims) as capital assets and the timing and character of any income, gain or loss recognized upon recovery from the FDIC Proceedings (or similar lawsuits regarding the FDIC Claims) is subject to some uncertainty. While not free from doubt, the Debtor expects such income, gain or loss be treated as capital gain or loss to the Liquidating Trust Beneficiaries. However, such position is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different characterization. Depending on the specific nature of the Liquidating Trust Assets and the particular Liquidating Trust Beneficiary's individual circumstances, the character of any income or gain recognized with respect to such Liquidating Trust Beneficiary's undivided interest in the Liquidating Trust Assets may be ordinary or capital, and such Liquidating Trust Beneficiary's ability to use losses (if any) from the implementation of the Plan may be limited (for example, if the Plan gives rise to capital losses to a Holder as discussed above in Article XB.1—*Gain or Loss—In General*Article X.B.1(a)—*Gain or Loss—In General*, then the ability to use such capital losses to offset ordinary income arising from Liquidating Trust Assets would be limited).

The U.S. federal income tax obligations of a Holder that is subject to U.S. federal income tax with respect to its Liquidating Trust Interest are not dependent on the Liquidating Trust distributing any cashCash or other proceeds. Thus, such a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the Liquidating Trust's income even if the Liquidating Trust does not make a concurrent distribution to the Holder. In general, other

than in respect of ~~cash~~Cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a Holder's Allowed Claim or Interest), a Distribution of ~~cash~~Cash by the Liquidating Trust will not be separately taxable to a Liquidating Trust Beneficiary since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the ~~cash~~Cash was earned or received by the Liquidating Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of ~~cash~~Cash originally retained by the Liquidating Trust on account of Disputed Claims.

In addition, a Non-U.S. Holder may determine that some of the taxable income or loss allocated to such Non-U.S. Holder from the Liquidating Trust is properly treated as ECI. In such case, provided that the Non-U.S. Holder timely delivers a Valid ECI Withholding Exemption to the withholding agent, such Non-U.S. Holder will generally be taxed on such ECI under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above. As discussed above in Article IV.B.3—*Liquidating Trust Assets*, the Liquidating Trust may, in its reasonable discretion, contribute all or a portion of the Liquidating Trust Assets, including such assets that may generate such ECI, to a Blocker Corporation in order to avoid such ECI from being allocated to Liquidating Trust Beneficiaries. However, no assurance can be provided that a Liquidating Trust Beneficiary will not be allocated any ECI.

The Liquidating Trust will comply with all applicable governmental withholding requirements. Thus, as noted above, in the case of any Liquidating Trust Beneficiaries that are not U.S. persons, the Liquidating Trust may be required to withhold up to 30 percent of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate or exemption pursuant to an applicable income tax treaty and if the Non-U.S. Holder timely delivers a Valid Treaty Claim). Significantly, as discussed above, a Liquidating Trust Beneficiary is treated for U.S. federal income tax purposes as holding an undivided interest in the underlying assets of the Liquidating Trust. Accordingly, any amounts received by the Liquidating Trust, the economic benefit of which inures to a Liquidating Trust Beneficiary on the basis described above with respect to the allocation of income, is treated as received by the beneficiary in respect of the underlying asset, and *not* in respect of its Allowed Claim. ~~*As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders; accordingly, such*~~ or Interest.

The Liquidating Trust is subject to certain tax return and reporting requirements, and the Liquidating Trust Board (which shall act as the Liquidating Trust trustee under Revenue Procedure 94-45) is generally expected to furnish to each Liquidating Trust Beneficiary a tax information statement following the end of each taxable year. A Liquidating Trust Beneficiary that takes a reporting position on its U.S. federal income tax return that is different from any position reflected in the information return filed by the Liquidating Trust Board, including the aforementioned tax information statement provided to the Liquidating Trust Beneficiary, may be required to notify the IRS of such inconsistency. Holders should consult their tax advisors with

respect to the U.S. federal income tax consequences of taking a different position than is reported by the Liquidating Trust Board.

*Holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Liquidating Trust.*

**E.     FATCA**

Pursuant to sections 1471 through 1474 of the IRC (commonly referred to as "FATCA"), foreign financial institutions (which term includes most foreign hedge funds, private equity funds, mutual funds, securitization vehicles and other investment vehicles) and certain other non-financial foreign entities who do not comply with information reporting rules with respect to their U.S. account holders, investors or owners may be subject to a 30% withholding tax with respect to any payments of U.S.-source interest or dividends (which may include dividends on shares of NewCo Common Stock).  Foreign financial institutions and non-financial foreign entities subject to the FATCA regime located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.  Under certain circumstances, a U.S. Holder or Non-U.S. Holder might be eligible for refunds or credits of such taxes.  U.S. Holders and Non-U.S. Holders are urged to consult with their own tax advisors regarding the effect, if any, of the FATCA provisions to them based on their particular circumstances.

**F.     ~~D.~~ Withholding on Distributions and Information Reporting**

Payments of interest or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the ~~Liquidation~~ Liquidating Trust Assets or NewCo Common Stock may be subject to "backup withholding" if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding.  Backup withholding is not an additional tax.  Any amounts deducted and withheld generally should be allowed as a refund or credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS.  Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions.  Information may also be required to be provided to the IRS concerning payments, unless an exemption applies.  Holders of Claims and Interests should consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.  The Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds.  Holders of Claims and Interests should consult their tax advisors regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on their tax returns.

***THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.***

## ARTICLE XI.~~ARTICLE XI~~

## RECOMMENDATION

In the opinion of the Debtor, the Plan is preferable to the alternatives described herein.  Therefore, the Debtor recommends that Holders of Claims and Interests entitled to vote on the Plan vote to accept it.

Dated: ~~February 7~~[•], 2024

Respectfully submitted,

SVB Financial Group.

By: _____
    Name:
    Title:

**<u>Appendix A</u>**

**Debtor's <u>First Amended</u> Plan of Reorganization
under Chapter 11 of the Bankruptcy Code**

## Appendix B

**Liquidation Analysis**

*[To come.]*

## Appendix C

**Solicitation Procedures Order**

[*To come.*]

**<u>Appendix D</u>**

**Financial Projections**

[*To come.*]

## **Appendix E**

### **Restructuring Support Agreement**

**Appendix F**

**NewCo Value Overview and Liquidating Trust Assets**

## Exhibit A

### Debtor's Organizational Structure

[*To come.*]

## __Exhibit B__

**Illustrative Post-Emergence Organizational Structure**

[*To come.*]

**<u>Exhibit C</u>**

**<u>Committee Letter</u>**

**<u>EXHIBIT C</u>**

**Liquidation Analysis**

## Appendix B

## Liquidation Analysis

### 1)       Introduction

Often referred to as the "<u>best interest of creditors</u>" test, section 1129(a)(7) of the Bankruptcy Code[1] requires that the Bankruptcy Court find, as a condition to confirmation of the Plan, that each holder of an impaired Claim or Equity Interest must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtor's assets were to be liquidated under chapter 7 of the Bankruptcy Code on the Effective Date (the "<u>Liquidation Analysis</u>"). In determining whether the Best Interests Test has been met, the dollar amount that would be generated from a hypothetical liquidation of the Debtor's assets in a chapter 7 proceeding must be determined.

This Liquidation Analysis was prepared by the Debtor with assistance from its financial advisors and represents the Debtor's best estimate of the cash proceeds, net of liquidation related costs, which would be available for distribution to the Holders of Claims and Interests if the Debtor were to be liquidated in chapter 7 cases that do not preserve the going concern value of the Debtor's estate ("<u>Estate</u>").

To conduct the Liquidation Analysis, the Debtor and its advisors have:

- estimated the cash proceeds (the "<u>Liquidation Proceeds</u>") that a chapter 7 trustee (the "<u>Trustee</u>") would generate if the Debtor's chapter 11 case were converted to a chapter 7 case on June 30, 2024 ("<u>Liquidation Date</u>") and the assets of the Debtor's estate were liquidated or sold;

- determined the distribution (the "<u>Liquidation Distribution</u>") that each holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and

- compared each holder's Liquidation Distribution to the estimated distribution under the Plan ("<u>Plan Distribution</u>") that such holders would receive if the Plan were confirmed and consummated.

As the Liquidation Analysis is a hypothetical analysis based on certain assumptions, certain aspects may vary from the Plan, as discussed in the Disclosure Statement, including asset values. The Liquidation Analysis is based upon certain estimates and assumptions discussed herein and in the Disclosure Statement, which should be read in conjunction with the Liquidation Analysis.

**THE INFORMATION SET FORTH IN THIS LIQUIDATION ANALYSIS IS PRELIMINARY AND IS SUBJECT TO MODIFICATION AND SUPPLEMENTATION**

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

**BY THE DEBTOR AT ANY TIME UP TO THE CONFIRMATION HEARING.  THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTOR WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION UNDER CHAPTER 7, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE ESTIMATED HERE.**

**2)      Basis of Presentation**

The Liquidation Analysis has been prepared assuming that the Debtor's chapter 7 liquidation would commence on the Liquidation Date, which is the assumed effective date of the Debtor's chapter 11 plan.  The pro forma values referenced herein are projected as of June 30, 2024.  The Debtor assumes the Liquidation Date to be a reasonable proxy for the projected Effective Date of the Plan.

The Liquidation Analysis represents an estimate of recovery values and percentages based on a hypothetical liquidation if a chapter 7 trustee were appointed by the Bankruptcy Court to convert assets into cash.  The determination of the hypothetical proceeds from the liquidation of assets is a highly uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtor's management team and its advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtor and its management team.  The Liquidation Analysis should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety, as well as the notes and assumptions set forth below.

The Liquidation Analysis assumes a timeline in which:

I.       Certain portions of the Debtor's operations, including SVB Securities Holdings, will be sold as a going concern.  This assumes that the purchase price for the hypothetical sale would be agreed by 12/31/24.

II.      Substantially all other assets will be liquidated (e.g. warrant portfolio, direct equity investments, third party fund investments, retained SVB Capital carried interest).  This is assumed to occur over six months following the Liquidation Date (the "Asset Sale Period").

The cessation of business in a liquidation is likely to trigger certain claims that otherwise would not exist under a Plan absent a liquidation.  Examples of these types of claims include various potential employee claims, unpaid chapter 11 administrative claims, contract rejection claims and unexpired lease rejection claims.  Some of these claims could be significant and may be entitled to priority in payment over general unsecured claims.  The Liquidation Analysis does not include estimates for the tax consequences, both federal and state, that may be triggered upon the liquidation and sale events of assets in the manner described above.

**3)      Liquidation Process**

The Debtor's liquidation would be conducted pursuant to chapter 7 of the Bankruptcy Code, with the Trustee managing the bankruptcy Estate to maximize recovery in an expedited process.  The Trustee's initial step would be to develop a liquidation plan to generate proceeds

from the sale of entity specific assets for distribution to creditors.  The three major components of the liquidation are as follows:

I.    Generation of cash proceeds

    a)    Sale of SVB Securities Holdings which includes its subsidiary MoffettNathanson LLC ("Going Concern Sale")

    b)    Sale of all remaining investment assets

    c)    Liquidation of the remaining portion of assets not accompanying the Going Concern Sale (e.g. prepaid expenses, accounts receivable, tax refunds, etc.)

    d)    Collection of cash from litigation related to contingent assets

II.   Costs related to the liquidation process, such as corporate support, personnel retention costs, and Trustee and professional fees.

III.  Distribution of net proceeds to claimants in accordance with the priority scheme under chapter 7 of the Bankruptcy Code.

**4)    Distribution of Net Proceeds to Claimants**

Any available net proceeds would be allocated to Holders of Claims against, and Interests in, the Debtor in accordance with section 726 of the Bankruptcy Code—*i.e.*, the priority scheme applicable in a chapter 7 proceeding.

- ***Secured Claims:*** Secured Claims including Secured Tax Claims, if any

- ***Other Priority Claims:*** Including but not limited to trade-related administrative claims, priority tax claims, claims arising under section 503(b)(9) of the Bankruptcy Code and post-petition accrued and unpaid chapter 11 professional fees

- ***General Unsecured Claims:*** Non-priority liabilities including prepetition trade payables and various unsecured liabilities including contract rejection damage claims

- ***Subordinated Note Claims:*** BP Trust I Claims and BP Trust II Claims

- ***Preferred Equity Interests:*** preferred equity interests in Debtor

- ***Common Equity Interests:*** common equity interests in Debtor

**5)    Conclusion**

The Debtor has determined, as summarized in the following analysis, upon the Effective Date, the Plan will provide all Holders of Claims and Interests with a recovery (if any) that is not less than what such holders would receive pursuant to a liquidation of the Debtor under chapter 7

of the Bankruptcy Code, and as such believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

*[Remainder of page intentionally left blank]*

## Notes to the Liquidation Analysis

- The Liquidation Analysis considers the Debtor entering chapter 7 on June 30, 2024, assumed to be a reasonable proxy for the projected Effective Date.

## Gross Liquidation Proceeds

| Summary of Distributable Value | | | | |
|---|---|---|---|---|
| ($'s in millions) | | Low | Mid | High |
| Proceeds from Continuing Operations: | | | | |
| SVBSH | [1] | 19.5 | 19.5 | 19.5 |
| Proceeds from Continuing Operations | | 19.5 | 19.5 | 19.5 |
| Proceeds from Remaining Assets: | | | | |
| Investments | [2] | 311.6 | 337.5 | 363.4 |
| Warrants | [3] | 190.0 | 205.4 | 220.7 |
| Wind-Down of Foreign Subsidiaries | [4] | 5.9 | 5.9 | 5.9 |
| Other Assets | [5] | 63.8 | 70.7 | 77.6 |
| Proceeds from Remaining Assets (excl. cash) | | 571.3 | 619.5 | 667.7 |
| Proceeds from Contingent Assets | | | | |
| Claims Against the FDIC | | -- | 966.9 | 1,933.8 |
| Causes of Action | | -- | -- | -- |
| Proceeds from Contingent Assets | [6] | -- | 966.9 | 1,933.8 |
| **Gross Distributable Value** | | **590.8** | **1,605.9** | **2,621.0** |

## Note 1 – Sale of SVB Securities Holdings

- Key assumptions to the valuation include:

  - Sale includes all SVB Securities Holdings assets including MoffettNathanson LLC with the exception of certain investment fund assets which are included in Investment Assets

  - Sale completed within six months of Liquidation Date

  - Buyer assumes all liabilities

## Note 2 – Investment Assets

- Assumes that certain third party funds, direct equity investments and retained SVB Capital carried interest are liquidated from 60% to 70% of book value within six months of Liquidation Date. Discount range based on recent secondary market transactions of limited partnership interests in privately held venture capital funds as well as the trading discount to book value for general partnership interests in publicly traded venture capital funds.

-5-

- Other investments include public and private equity securities from warrants, certain investment fund assets and warrant receivables and assumes recoveries from 60% to 100% of book value within six months of Liquidation Date.

## Note 3 - Warrants

- Assumes liquidation of warrants in private companies at 60% to 70% of book value within six months of Liquidation Date. Valuation discount utilized based on direct equity investment portfolio given comparable nature of security underlying warrants (private company equity).

- Assumes warrants in public companies with a stock price above the strike price are exercised and sold (stock value at prevailing market rates).

## Note 4 – Wind-Down of Foreign Subsidiaries

- Represents remaining cash proceeds of foreign subsidiaries distributed to SVBFG upon completion of wind-down in their respective jurisdictions.

## Note 5 – Other Assets

- Represents recoveries on prepaid expenses, accounts receivable, tax refunds, professional fee retainers, consumer loans and intellectual property.

## Note 6 – Contingent Assets

- Represents an illustrative range of recoveries from litigation related to claims against the FDIC.

### Net Distributable Value

| Gross Distributable Value to Net Distributable Value | | | | |
|---|---|---|---|---|
| ($'s in millions) | | | | |
| **Gross Distributable Value** | | **590.8** | **1,605.9** | **2,621.0** |
| **Liquidation Adjustments:** | | | | |
| Cash at Liquidation Date | [7] | 539.4 | 539.4 | 539.4 |
| Operating Cash Flow During Wind-Down Period | [8] | 26.3 | 26.3 | 26.3 |
| Wind-Down Costs | [9] | (5.7) | (5.7) | (5.7) |
| Retention Costs | [10] | (3.8) | (3.8) | (3.8) |
| Chapter 7 Trustee Fees | [11] | (11.3) | (21.5) | (31.6) |
| Estate Professional Fees | [12] | (14.8) | (16.0) | (17.2) |
| Pursuit of Causes of Action | [13] | (12.5) | (12.5) | (12.5) |
| Total Liquidation Adjustments | | 517.6 | 506.3 | 494.9 |
| **Net Distributable Value** | | **1,108.4** | **2,112.2** | **3,115.9** |

## Note 7 – Cash at Liquidation Date

- Represents the Debtor's projected cash at the Liquidation Date.

**Note 8 – Operating Cash Flow During Wind-Down Period**

- Represents cash flow generated by the Debtor through the Asset Sale Period.

**Note 9 – Wind-Down Costs**

- Represents corporate support functions that would be required to wind down the estate during the Asset Sale Period and costs associated with maintaining a reduced workforce thereafter to wind-down the remaining operations and satisfy final liabilities of the Debtor.

**Note 10 – Retention Costs**

- To maximize recoveries on remaining assets, minimize number of claims and generally oversee an orderly liquidation, the Trustee will need to continue to employ certain employees of the Debtor and its affiliates through the Asset Sale Period.

- The Liquidation Analysis includes a retention bonus of 50% of total post-conversion compensation for all post-Liquidation Date employees.

**Note 11 – Chapter 7 Trustee Fees**

- Trustee fees necessary to facilitate the sale of the Debtor's businesses are assumed to be 1% of gross distributable value plus cash at Liquidation Date. These fees would be used for developing marketing materials and facilitating the solicitation process for the parties, in addition to general administrative expenses, such as the Trustee's compensation.

**Note 12 – Estate Professional Fees**

- Represents fees necessary to effectuate an orderly sale and liquidation of the Debtor.

- Assumes professional fees of 2.5% of Proceeds from continuing operations plus proceeds from remaining assets for the 24-month post-conversion period.  Fees could be significantly more or less depending on complexity and length of the liquidation process.

**Note 13 – Pursuit of Causes of Action**

- Represents estimated litigation cost to pursue causes of action.

*[Remainder of page intentionally left blank]*

# Debtor Waterfall

| Debtor Waterfall | | | | | | | |
|---|---|---|---|---|---|---|---|
| *($'s in millions)* | | Recovery (%) | | | Recovery ($) | | |
| **Summary Waterfall** | Amount | Low | Mid | High | Low | Mid | High |
| Net Liquidation Proceeds Available for Distribution | | | | | 1,108.4 | 2,112.2 | 3,115.9 |
| **Other Priority Claims** | | | | | | | |
| Cures | 0.2 | 100% | 100% | 100% | 0.2 | 0.2 | 0.2 |
| Priority Taxes | 0.1 | 100% | 100% | 100% | 0.1 | 0.1 | 0.1 |
| 503(b)(9) | 0.0 | 100% | 100% | 100% | 0.0 | 0.0 | 0.0 |
| Accrued and Unpaid Chapter 11 Professional Fees | 98.5 | 100% | 100% | 100% | 98.5 | 98.5 | 98.5 |
| Less: Total Other Priority Claims | 98.8 | 100% | 100% | 100% | 98.8 | 98.8 | 98.8 |
| Proceeds Available After Admin Claims | | | | | 1,009.6 | 2,013.4 | 3,017.1 |
| **General Unsecured Claims** | | | | | | | |
| Bondholder Claims | 3,329.0 | 29% | 57% | 86% | 957.7 | 1,909.9 | 2,862.0 |
| Other Unsecured Claims | 180.4 | 29% | 57% | 86% | 51.9 | 103.5 | 155.1 |
| Total General Unsecured Claims | 3,509.4 | 29% | 57% | 86% | 1,009.6 | 2,013.4 | 3,017.1 |
| Proceeds Available After General Unsecured Claims | | | | | -- | -- | -- |
| **Subordinated Notes Claims** | | | | | | | |
| BP Trust I and BP Trust II Debentures | 104.5 | 0% | 0% | 0% | -- | -- | -- |
| Total Subordinated Notes Claims | 104.5 | 0% | 0% | 0% | -- | -- | -- |
| **Preferred Equity Interests** | | | | | | | |
| Preferred Equity Interests | 3,700.0 | 0% | 0% | 0% | -- | -- | -- |
| Total Preferred Equity Interests | 3,700.0 | 0% | 0% | 0% | -- | -- | -- |

*[Remainder of page intentionally left blank]*

## Claims Detail

| Summary Claims and Interests | | Amount |
|---|---|---|
| ($'s in millions) | | |
| Cures | | 0.2 |
| Priority Taxes | | 0.1 |
| 503(b)(9) | | 0.0 |
| Accrued and Unpaid Chapter 11 Professional Fees | | 98.5 |
| **Other Priority Claims** | **[14]** | **98.8** |
| **Bondholder Claims** | **[15]** | **3,329.0** |
| Employee Claims | | 110.5 |
| Lease Claims | | 25.6 |
| Contract Claims | | 27.8 |
| Government & Tax Claims | | 10.5 |
| Other Unsecured Claims | | 6.0 |
| **Total General Unsecured Claims** | **[15]** | **180.4** |
| **Subordinated Note Claims** | **[16]** | **104.5** |
| **Preferred Equity Interests** | **[17]** | **3,700.0** |
| **Total Estimated Claims and Interests** | | **7,412.7** |

## Note 14 – Other Priority Claims

- **Cures:** Represents amounts to cure costs required to maintain the continuing operations in order to maximize asset value in a hypothetical sale.

- **Priority Taxes:** Estimated tax claims granted priority status.

- **Claims arising under section 503(b)(9) of the Bankruptcy Code:** Represents outstanding obligations related to goods delivered within 20 days of the petition date and not paid by the Debtors through vendor settlements prior to the wind-down.

- **Accrued and Unpaid Chapter 11 Professional Fees**: Represents estimated accrued and unpaid professional fees related to Chapter 11 professionals at the Liquidation Date.

## Note 15 – General Unsecured Claims

- **Bondholder Claims:** Includes estimated accrued interest as of the Petition Date.

- **Government & Tax Claims:** Represents estimate related to government entities and income taxes from various federal, state and local taxing authorities.

- **Contract Rejection Claims:** Represents claims associated with rejected operating contracts not required for continuing operations.

- **Lease Rejection Claims:** Represents claims associated with rejecting leases.

- **Employee Claims:** Represents claims from employees, primarily related to deferred compensation agreements.

- **Other Unsecured Claims:** Represents claims for insurance, litigation, ordinary course professionals and prepetition trade claims.

## Note 16 – Subordinated Note Claims

- **Subordinated Note Claims:** Represents claims for par and accrued interest as of the Petition Date for the Subordinated Note Claims.

## Note 17 – Preferred Equity Interests

- Represents principal amount of preferred equity.

*[Remainder of page intentionally left blank]*

## **Best Interests Test**

- The below table compares class recoveries between the Debtor's Liquidation Analysis and Plan Distributions assuming 3 different illustrative outcomes for the Debtor's claims against the FDIC

  - Scenario A: 0% recovery

  - Scenario B: 50% recovery

  - Scenario C: 100% recovery

|  | Scenario A | | Scenario B | | Scenario C | |
|---|---|---|---|---|---|---|
|  | Plan | Liquidation | Plan | Liquidation | Plan | Liquidation |
| Other Priority Claims | 100% | 100% | 100% | 100% | 100% | 100% |
| General Unsecured Claims | 41% | 30% | 69% | 57% | 96% | 85% |
| Subordinated Notes Claims | 0% | 0% | 0% | 0% | 0% | 0% |
| Preferred Equity Interests | 0% | 0% | 0% | 0% | 0% | 0% |

# EXHIBIT D

**Financial Projections**

## Appendix D

## FINANCIAL PROJECTIONS[1]

As a condition to Confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that Confirmation is not likely to be followed by either a liquidation or the need to further reorganize the Debtor. In accordance with this condition and in order to assist each holder of a Claim in determining whether to vote to accept or reject the Plan, the Debtor's management team ("Management"), with the assistance of their advisors, developed financial projections (the "Financial Projections") to support the feasibility of the Plan.

The Financial Projections were prepared by Management, with assistance from the Debtor's financial advisors, and are based on a number of assumptions made by Management, within the bounds of their knowledge of the business, assets and operations, with respect to the future performance of the Debtor's assets and operations.

Although Management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, there can be no assurance that such assumptions will be realized.

The Financial Projections were not prepared with a view toward compliance with Generally Accepted Accounting Principles ("GAAP") in the United States. An independent auditor has not examined, compiled, or performed any procedures with respect to the prospective financial information contained in this Appendix and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability.

### *Safe Harbor Under the Private Securities Litigation Reform Act of 1995*

The Financial Projections contain certain statements that are "forward-looking" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtor and Management with respect to the timing of, completion of, and scope of the current restructuring, Plan, Debtor's business plan, and market conditions, and the Debtor's or NewCo's future liquidity, as well as the assumptions upon which such statements are based. While the Debtor believes that the expectations are based upon reasonable assumptions within the bounds of its knowledge of its business and operations, parties-in-interest are cautioned that any such forward-looking statements are not guarantees of future performance, involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

### *Accounting Policies*

The Financial Projections have been prepared using accounting policies that are consistent with those applied in the Debtor's historical financial statements. However, the Financial Projections do not reflect any adjustments that would be necessary to implement "fresh-start" accounting

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement.

pursuant to ASC 852-10, including but not limited to detailed asset valuations and reassessment of the useful lives of depreciable and amortizable assets.

### Summary of Significant Assumptions

The Debtor, with the assistance of its financial advisors, prepared the Financial Projections of NewCo for July 2024 to December 2028. The Financial Projections are based on a number of assumptions with respect to the future performance of the Debtor's assets and operations. Although these Financial Projections have been prepared in good faith and are believed to be reasonable, it is important to note that the Debtor can provide no assurance that the Financial Projections will be realized. As described in detail in Article IX of the Disclosure Statement, a variety of risk factors could affect the financial results and should be considered. The Financial Projections should be reviewed in conjunction with a review of these assumptions, including the qualifications and footnotes set forth herein.

### General Assumptions

The Debtor operates on a calendar year and the Financial Projections assume that the Effective Date will be June 30, 2024 and that the NewCo operating entity will continue to conduct operations substantially similar to its current business. In addition, the Financial Projections take into account the current market environment in which the Debtor competes, including many economic and financial forces that are beyond the control of the Debtor and management.

The Financial Projections assume that a sale of SVB Capital, the venture capital and credit investment arm of the Debtor which focuses on funds management, will occur prior to the Effective Date.

MoffettNathanson, an equity research company providing coverage of the media, internet and communications sectors, is assumed to be contributed to NewCo. MoffettNathanson generates income for the Debtor primarily through subscription fees for its investment research.

Other assets of NewCo include SVB Securities Holdings LLC ("SVBSH"), the direct parent of MoffettNathanson that will remain the direct parent of MoffettNathanson in the NewCo structure, and the tax attributes of the Debtor, including tax refund receivables.

The Financial Projections were prepared by Management with input from the leadership of MoffettNathanson and take into consideration historical trends, economic factors and market outlooks. These Financial Projections have been reviewed by the Restructuring Committee of the Debtor's Board of Directors.

### Risk Factors

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control. Many factors could cause actual results, performance, or achievements to differ materially from any future results, performance, or achievements expressed or implied by these forward-looking statements. Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in Article IX of the Disclosure Statement and the assumptions described herein.

**NewCo**

**Projected Statement of Operations (Unaudited)**

| ($s in Thousands) | Jul-Dec '24 | | 2025 | | 2026 | | 2027 | | 2028 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| SVBSH Revenue | $ | 11,000 | $ | 22,660 | $ | 23,320 | $ | 23,980 | $ 24,640 |
| **Expenses** | | | | | | | | | |
| Operating Expense: | | | | | | | | | |
| SVBSH Compensation Expense | $ | (7,428) | $ | (13,241) | $ | (13,627) | $ | (14,013) | $ (14,399) |
| SVBSH Non-Compensation Expense | | (1,618) | | (3,333) | | (3,430) | | (3,528) | (3,625) |
| Total Operating Expense | $ | (9,046) | $ | (16,575) | $ | (17,058) | $ | (17,540) | $ (18,023) |
| Restructuring & Administrative Expense | $ | (5,370) | $ | (5,499) | $ | (3,501) | $ | (3,606) | $ (3,714) |
| Total Expenses | $ | (14,416) | $ | (22,074) | $ | (20,558) | $ | (21,146) | $ (21,737) |
| **EBITDA** | $ | **(3,416)** | $ | **586** | $ | **2,762** | $ | **2,834** | $ **2,903** |
| Total Depreciation & Amortization | | (48) | | (96) | | (4) | | – | – |
| Interest Income | | 491 | | 1,601 | | 2,175 | | 2,047 | 2,154 |
| **Pre-Tax Income** | $ | **(2,973)** | $ | **2,092** | $ | **4,933** | $ | **4,880** | $ **5,057** |

*Fiscal Year Ending 12/31,*

## *Notes to Projected Statement of Operations*

### *Revenue*

Revenue represents fees earned for subscriptions for the MoffettNathanson's investment research. The forecast assumes the customer base remains at current levels and revenues grow at 3% year over year.

### *Compensation Expense*

SVBSH Compensation Expense represents salaries, benefits, payroll taxes and bonuses for the employees of MoffettNathanson. Expenses grow at 3% year over year.

### *Non-Compensation Operating Expense*

Non-compensation operating expenses of MoffettNathanson represent forecasted vendor spend, occupancy expense and other expenses necessary to operate the businesses.

### *Restructuring and Administrative Expense*

Restructuring and Administrative Expense includes professional fees, tax compliance fees, insurance, staff compensation and other expenses necessary to support NewCo.

### *Interest Income*

Interest income represents interest earned on balance sheet cash.

**NewCo**
**Projected Consolidated Balance Sheet (Unaudited)**

| ($s in Thousands) | Fiscal Year Ending 12/31, | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2024 | | 2025 | | 2026 | | 2027 | | 2028 | |
| **Assets** | | | | | | | | | | |
| Cash | $ | 29,871 | $ | 66,005 | $ | 62,264 | $ | 58,876 | $ | 64,137 |
| Goodwill & Intangible Assets | | 77,829 | | 77,829 | | 77,829 | | 77,829 | | 77,829 |
| Other Assets | | 51,412 | | 6,714 | | 6,098 | | 5,469 | | 4,823 |
| **Total Assets** | $ | 159,112 | $ | 150,548 | $ | 146,191 | $ | 142,174 | $ | 146,788 |
| Accrued Compensation & Benefits | $ | 34,129 | $ | 24,070 | $ | 15,395 | $ | 7,128 | $ | 7,335 |
| Other Liabilities | | 10,969 | | 10,372 | | 9,758 | | 9,126 | | 8,477 |
| Contingent Tax Receivables | | 47,375 | | 47,375 | | 47,375 | | 47,375 | | 47,375 |
| **Total Liabilities** | $ | 92,473 | $ | 81,817 | $ | 72,527 | $ | 63,630 | $ | 63,187 |
| **Shareholders' Equity** | $ | 66,639 | $ | 68,731 | $ | 73,664 | $ | 78,544 | $ | 83,601 |
| **Total Liabilities and Shareholders' Equity** | $ | 159,112 | $ | 150,548 | $ | 146,191 | $ | 142,174 | $ | 146,788 |

### Notes to Consolidated Balance Sheet

### Cash

NewCo is estimated to have $23.1 million cash balance at emergence.

### Goodwill and Intangible Assets

Goodwill represents historic purchase price accounting related to MoffettNathanson before "fresh-start" accounting adjustments, as applicable. Intangible assets consist of customer relationships, pipeline and trade names.

### Other Assets

Other assets primarily include subscription revenues receivable by MoffettNathanson and tax refunds. The subscription revenues receivable forecast assumes ordinary course collections. Tax refunds are forecast to be collected in the ordinary course and subject to ongoing tax audit.

### Accrued Compensation and Benefits

Accrued compensation and benefits represent year end accruals for annual employee bonuses and the SVBSH 2021 Acquisition Earn-Out.

### Other Liabilities

Other liabilities include accounts payable and lease liabilities.

### Contingent Tax Receivables

Contingent Tax Receivables payable to Liquidating Trust, corresponding to projected tax refunds receivable.

**NewCo**
**Projected Consolidated Free Cash Flow (Unaudited)**

| ($s in Thousands) | Jul-Dec '24 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|
| | | | For the FYE 12/31, | | |
| Opening Cash | $    23,072 | $    29,871 | $    66,005 | $    62,264 | $    58,876 |
| SVBSH Collections | 13,843 | 22,658 | 23,318 | 23,978 | 24,638 |
| Other Receipts | 3,367 | 44,008 | – | – | – |
| Interest Income | 491 | 1,601 | 2,175 | 2,047 | 2,154 |
| Total Receipts | $    17,702 | $    68,267 | $    25,493 | $    26,024 | $    26,792 |
| Compensation & Benefits Expense | $    (3,914) | $    (14,801) | $    (13,803) | $    (13,779) | $    (14,192) |
| Other Operating Expenses | (1,618) | (3,333) | (3,430) | (3,528) | (3,625) |
| SVBSH 2021 Acquisition Earn-Out | – | (8,500) | (8,500) | (8,500) | – |
| Restructuring & Administrative Expense | (5,370) | (5,499) | (3,501) | (3,606) | (3,714) |
| Operating Disbursements | $    (10,902) | $    (32,133) | $    (29,234) | $    (29,412) | $    (21,531) |
| **Net Cash Flows** | $    6,799 | $    36,134 | $    (3,741) | $    (3,388) | $    5,261 |
| **Ending Cash Balance: NewCo** | $    29,871 | $    66,005 | $    62,264 | $    58,876 | $    64,137 |

*Notes to Projected Statement of Cash Flow*

*Operating Disbursements*

SVBSH 2021 Acquisition Earn-Out per Membership Interest Purchase Agreement dated December 10, 2021.

## **EXHIBIT E**

**NewCo Value Overview and Liquidating Trust Assets**

<u>**APPENDIX F**</u>

<u>**NEWCO VALUE OVERVIEW**</u>

**THE DETAILS SET FORTH HEREIN REPRESENT THE ESTIMATED DISTRIBUTABLE VALUE OF NEWCO EQUITY AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE ESTIMATED VALUE OF THE NEWCO EQUITY SET FORTH HEREIN DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE OF NEWCO THIS INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.**

| NewCo Equity Summary | | | |
|---|---|---|---|
| *($ in millions)* | | | |
| **Assets** | | | **Notes** |
| **MoffettNathanson** | $ | 32.8 | *[1]* |
| **Other Assets & Liabilities** | | | |
| Tax Receivable | $ | 47.4 | *[2]* |
| NOL Benefit on Existing Taxable Income | | 9.0 | *[3]* |
| Forecasted Professional Fees and Shared Service Costs | | (9.1) | *[4]* |
| Obligation under Contingent Tax Receivables to Liquidating Trust | | (47.4) | *[5]* |
| **Net Other Assets and Liabilities** | $ | (0.1) | |
| **Total Net Assets** | $ | 32.7 | |

**NewCo Equity Summary Notes:**

[1] The range of total equity value for MoffettNathanson, which takes into account the total enterprise value *less* the estimated net debt outstanding (including earnout payments) as of the Effective Date, is estimated to be between approximately $26 million and $40 million, with an estimated midpoint of $33 million.

[2] Represents estimated tax refunds on NewCo's balance sheet, estimated as of 6/30/24.

[3] Represents the net present value of potential cash tax savings for MoffettNathanson utilizing a 15.5% weighted average cost of capital assuming sufficient NOL capacity to offset 80% of MoffettNathanson's taxable income through 2060.

[4]    Represents estimate of total professional fees and shared service cost allocations until estimated tax receivables are collected by 2025.

[5]    Represents obligation under Contingent Tax Receivables to the Liquidating Trust related to receipts of tax refunds at NewCo.

## MOFFETTNATHANSON VALUATION ANALYSIS

### A.    Disclaimer

**THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED DISTRIBUTABLE VALUE FOR MOFFETTNATHANSON AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS.**

### B.    Valuation Estimate

In connection with developing the Plan, the Debtor directed its investment banker, Centerview, to estimate the going-concern value of MoffettNathanson LLC ("MoffettNathanson"). This analysis has been prepared for the Debtor's sole use and is based on information provided to Centerview by the Debtor.

Based on financial projections provided by the Debtor and subject to the disclaimers and the descriptions of Centerview's methodology set forth herein, and solely for purposes of the Plan, Centerview estimates the total enterprise value of MoffettNathanson to be within the range of approximately $26 million to $39 million as of June 30, 2024 with an estimated midpoint of $32 million.[1] The range of total equity value, which takes into account the total enterprise value less the estimated net debt outstanding (including earnout payments) as of the Effective Date, was estimated by Centerview to be between approximately $26 million and $40 million with an estimated midpoint of $33 million.

In preparing the estimated total enterprise value for MoffettNathanson, Centerview: (1) reviewed certain historical financial information of MoffettNathanson for recent years and interim periods provided by the Debtor; (2) met with certain members of MoffettNathanson's senior management to discuss MoffettNathanson's operations and future prospects; (3) reviewed publicly available financial data and considered the market values of public companies deemed by Centerview to be generally comparable to MoffettNathanson; (4) considered certain economic and industry information relevant to MoffettNathanson; (5) prepared discounted cash flow analyses based on the financial projections, utilizing various discount rates and assumptions in the calculation of terminal values; (6) considered the value assigned to certain precedent change-of-control transactions for businesses deemed by Centerview to be similar to those of the Debtor; and (7) conducted such other analyses as Centerview deemed appropriate.

Although Centerview conducted a review and analysis of MoffettNathanson, including its projection and business plans, Centerview relied on the accuracy and completeness of all financial and other information furnished to it by the Debtor and by other firms retained by the Debtor and on certain publicly available information as to which Centerview does not have independent knowledge.

---

[1]    The endpoints of the range of estimated total enterprise value represent the arithmetic means of the endpoints of the ranges from the valuation methodologies utilized by Centerview.

The financial projections provided by the Debtor to Centerview are for fiscal years 2024 through 2028. Centerview has relied on the Debtor's representation and warranty that the financial projections provided by the Debtor to Centerview (1) have been prepared in good faith, (2) are based on fully disclosed assumptions which, in light of the circumstances under which they were made, are reasonable, (3) reflect the Debtor's best currently available estimates, and (4) reflect the good faith judgments of the Debtor. Centerview does not offer an opinion as to the attainability of the financial projections. The future results of MoffettNathanson are dependent upon various factors, many of which are beyond the control or knowledge of the Debtor, and consequently are inherently difficult to project. MoffettNathanson's actual future results may differ materially (positively or negatively) from the financial projections and as a result, the actual total enterprise value of the MoffettNathanson may be significantly higher or lower than the estimated range herein.

No independent evaluations or appraisals of the Debtor's assets were sought or obtained in connection with Centerview's valuation. Centerview did not conduct an independent investigation into any of the legal, tax, pension or accounting matters affecting the Debtor, and therefore makes no representations as to their impact on the Debtor's financial statements.

### C.    <u>Valuation Considerations</u>

This valuation is based upon information available to, and analyses undertaken by, Centerview as of June 30, 2024, and reflects, among other factors discussed below, the current financial market conditions and the inherent uncertainty today as to the achievement of the financial projections. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. For purposes of this valuation, Centerview has assumed that no material changes that would affect value will occur between the date of this Disclosure Statement and the assumed Effective Date. Events and conditions subsequent to June 30, 2024, including but not limited to updated projections, as well as other factors, could have a substantial impact upon the MoffettNathanson's enterprise value. Neither Centerview nor the Debtor has any obligation to update, revise, or reaffirm the valuation.

This valuation also reflects a number of assumptions, including a successful reorganization of the Debtor's businesses and finances in a timely manner, achieving the forecasts reflected in the financial projections, the minimum amount of cash required to operate MoffettNathanson, market conditions and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein. Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the enterprise value of the MoffettNathanson.

Further, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (i) prevailing interest rates; (ii) conditions in the financial markets; (iii) the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and (iv) other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Chapter 11 cases or by other factors not possible to predict.

Accordingly, the total enterprise value ascribed in the analysis does not purport to be an estimate of the post-reorganization market trading value of NewCo, MoffettNathanson or any of their securities.  Such trading value may be materially different from the total enterprise value ranges associated with Centerview's valuation analysis.  There can be no assurance, and the Debtor does not anticipate, that a trading market will develop for the NewCo Common Stock.  The estimates of value for MoffettNathanson do not necessarily reflect the values that may be attainable in public or private markets.  Furthermore, in the event that the actual distributions in the Chapter 11 cases differ from those the Debtor assumed in its recovery analysis, the actual recovery of holders of Claims in Impaired Classes could be significantly higher or lower than estimated by the Debtor.

The estimate of total enterprise value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of MoffettNathanson's operations or changes in the financial markets.  Additionally, these estimates of value represent hypothetical enterprise of MoffettNathanson as the continuing operator, and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.  Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder.  The value of an operating business such as MoffettNathanson is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

Centerview's estimated valuation range of MoffettNathanson does not constitute a recommendation to any holder of Allowed Claims or Interests as to how such person should vote or otherwise act with respect to the Plan.  The estimated value of MoffettNathanson set forth herein does not constitute an opinion as to the fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.  Because valuation estimates are inherently subject to uncertainties, none of the Debtor, Centerview or any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.

## LIQUIDATING TRUST ASSETS

**THE DETAILS SET FORTH HEREIN REPRESENT THE ESTIMATED BALANCE SHEET VALUES OF THE LIQUIDATING TRUST ASSETS, AT THE EFFECTIVE DATE, AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS.**

**Liquidating Trust Assets**

*($ in millions)*

**Assets** *Notes*

| | Scenarios | | | |
|---|---|---|---|---|
| | A | B | C | |
| Receivable From FDIC | $ - | $ 966.9 | $ 1,933.8 | [1] |
| Available Cash | 439.1 | 439.1 | 439.1 | [2] |
| Investment Securities | 389.5 | 389.5 | 389.5 | [3] |
| Warrants & Other Derivatives | 326.0 | 326.0 | 326.0 | [4] |
| Other Assets | 43.0 | 43.0 | 43.0 | [5] |
| SVB Capital Fund Investments | 118.7 | 118.7 | 118.7 | [6] |
| Management Fee Royalty | 41.4 | 41.4 | 41.4 | [7] |
| SVB Capital New Fundraising Consideration | 5.0 | 5.0 | 5.0 | [8] |
| Contingent Tax Receivables | 47.4 | 47.4 | 47.4 | [9] |
| **Total Assets** | **$ 1,410.2** | **$ 2,377.1** | **$ 3,344.0** | |

**Liquidating Trust Summary Notes:**

Liquidating Trust assets above based on estimated 6/30/24 balance sheet values.  Final recovery values may vary based on the timing of, and ultimate realization of, value of Liquidating Trust assets.

[1]  For reference purposes only, Scenarios A, B and C reflect three of the possible outcomes from the pursuit of Claims and Causes of Action against the FDIC relating to the recovery of funds that were present in the Deposit Accounts at the time the Debtor's access to the accounts was denied.  Scenario A reflects a 0% recovery of the funds; Scenario B reflects a 50% recovery of the funds; and Scenario C reflects 100% recovery of the funds.  Because the pursuit of Claims and Causes of Action against the FDIC regarding the Deposit Accounts are ongoing, the estimated amounts receivable from the FDIC under Scenarios A, B, and C may vary from the actual amounts receivable.

[2]  "Available Cash" reflects estimated SVB Financial Group balance sheet cash at the Effective Date.

[3]   "Investment Securities" primarily reflects investments in venture capital and private equity funds, debt funds, and private and public portfolio companies, including public equity securities held as a result of equity warrant assets exercised.  Certain balance sheet values of private portfolio companies reflect valuations performed by Lincoln International.

[4]   "Warrant & Other Derivatives" reflects warrants and conversion rights in private and public companies.

[5]   "Other Assets" includes various receivables, prepaid assets, and investments in foreign subsidiaries.

[6]   "SVB Capital Fund Investments" reflects the estimated present value of 46% of retained carry and capital interest pursuant to terms of the SVB Capital Purchase Agreement.

[7]   "Management Fee Royalty" reflects estimated present value of 15.5% of management fee royalty for existing SVB Capital funds pursuant to terms of the SVB Capital Purchase Agreement.

[8]   "SVB Capital New Fundraising Consideration" reflects 50% credit for total potential consideration related to new fundraising activity at SVB Capital pursuant to the terms of the SVB Capital Purchase Agreement.

[9]   "Contingent Tax Receivables" reflects value of estimated tax refunds to be received at NewCo.

**<u>ANNEX 1</u>**

**Committee Letter**

Official Committee of Unsecured Creditors of
SVB Financial Group

c/o Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036

[•], 2024

**To:     All Unsecured Creditors of SVB Financial Group, Case No. 23-10367 (MG)**

The Official Committee of Unsecured Creditors (the "Creditors' Committee")[1] of SVB Financial Group (the "Debtor") is providing this letter to unsecured creditors to recommend that each unsecured creditor **vote to accept** the Debtor's plan of reorganization as set forth in the *Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [ECF No. [•]] (the "Plan")[2] and as further described in the related disclosure statement [ECF No. [•]] (the "Disclosure Statement").[3] As the official representative of all unsecured creditors in the Debtor's Chapter 11 Case (as defined below), the Creditors' Committee believes that the Plan is fair and provides unsecured creditors with the best possible recovery under the circumstances, and recommends that all unsecured creditors vote to accept the Plan in accordance with the instructions set forth on the applicable Ballots.

On March 17, 2023, the Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Chapter 11 Case"). On March 28, 2023, the United States Trustee for the Southern District of New York appointed the Creditors' Committee to represent the interests of unsecured creditors in the Chapter 11 Case. The Creditors' Committee selected Akin Gump Strauss Hauer & Feld LLP as its legal counsel, Cole Schotz P.C. as efficiency and conflicts counsel, Berkeley Research Group, LLC as its financial advisor and Lazard Frères & Co. LLC as its investment banker. The Bankruptcy Court approved the Creditors' Committee's retentions of these professional advisors. [ECF Nos. 295, 296, 338, 499].

Since its appointment, the Creditors' Committee has played an active role in the Chapter 11 Case, with its focus being maximizing recovery for the Debtor's unsecured creditors. The Creditors' Committee was heavily involved in the negotiation and formulation of the Plan, which efforts led to the Creditors' Committee becoming a party to that certain Restructuring Support Agreement with the Debtor and the Ad Hoc Noteholder Group. Pursuant to the Restructuring Support Agreement, the Creditors' Committee is obligated, among other things, to support the Plan and the confirmation thereof.

---

[1] The Creditors' Committee currently consists of: (i) U.S. Bank National Association, as Indenture Trustee; (ii) Wilmington Trust Company, as Indenture Trustee; (iii) Mr. Satagopan Rajagopalan; and (iv) Cousins Fund II Phoenix I, LLC.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan, as applicable.

[3] You are receiving the Plan and Disclosure Statement from the Debtor in the same package as this letter.

The Creditors' Committee believes that the Plan provides a structure that will result in the highest and best possible recovery for unsecured creditors:

- First, the Plan preserves the priority "waterfall" for holders of claims and interests against the Debtor, ensuring that holders of unsecured claims will have the opportunity to recover as much as possible on account of their claims before any junior classes of claims or interests receive any distributions. Accordingly, any potential recoveries arising from, among other things, monetization of the Debtor's assets and claims to recover the Debtor's almost $2 billion in deposit amounts from the FDIC, which will be assets of the Liquidating Trust, will go first to pay unsecured creditors who hold Liquidating Trust Interests.

- Second, the Plan provides that eligible Holders of Allowed Other General Unsecured Claims may elect to receive cash in lieu of NewCo Common Stock or Liquidating Trust Interests in an amount equal to 45% of their claim. The "GUC Cash-Out" was heavily negotiated by the Creditors' Committee and provides unsecured creditors who do not wish to receive interests in NewCo[4] or the Liquidating Trust (including any interests in any proceeds of litigation against the FDIC) the ability to receive cash distributions sooner and to have certainty as to the quantum of their recovery. In evaluating whether to elect to receive the GUC Cash-Out, unsecured creditors should consider the risk factors set forth in the Disclosure Statement regarding NewCo Common Stock and Liquidating Trust Interests, including with respect to the potential trading market for the NewCo Common Stock or Liquidating Trust Interests, the risks surrounding the FDIC litigation and other estate claims and causes of action, and the tax implications of holding NewCo Common Stock and Liquidating Trust Interests.

- Third, the Plan preserves certain claims and causes of action that may be brought for the benefit of the Debtor's estate and its unsecured creditors, including any claims and causes of action that may be asserted against the Debtor's current and former officers and directors and other parties. Such claims and causes of action have been the subject of an investigation conducted by the Creditors' Committee and, under the Plan, any such claims and causes action will be transferred to the Liquidating Trust that will seek to maximize their value.

- Finally, the Plan is designed to preserve the value of the Debtor's potentially valuable tax attributes to the maximum extent possible.

The specific treatment provisions for unsecured creditors and summary information regarding recoveries for unsecured claims are set forth in Article IV of the Plan. The Creditors' Committee believes that the proposed treatment of unsecured creditors under the Plan is fair, equitable and in the best interests of the Debtor's unsecured creditors. The Creditors' Committee further believes that any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses, which, in turn, would result in smaller distributions on account of unsecured claims asserted against the Debtor.

---

[4] As described in more detail in the Plan and Disclosure Statement, certain Holders may receive cash in lieu of NewCo interests in the event they are not a "qualified purchaser" or an "accredited investor" under applicable law.

The Creditors' Committee further believes that the releases contained in the Plan are appropriately tailored to preserve the value of potentially valuable claims and causes of action that may be asserted for the benefit of unsecured creditors, including claims and causes of action relating to (i) recovering the Debtor's deposit accounts from the FDIC and (ii) the prepetition conduct and events that led to the Chapter 11 Case.  As noted above, among other things, the Creditors' Committee has negotiated to place such claims and causes of action in the Liquidating Trust that will seek to maximize their value for the benefit of the Debtor's unsecured creditors.

For the reasons described above, as a representative of all of the Debtor's unsecured creditors, the Creditors' Committee supports the Plan and believes that the Plan is in the best interests of the Debtor's unsecured creditors as a whole.  Accordingly, the Creditors' Committee urges all unsecured creditors to vote to accept the Plan.

PLEASE NOTE THAT THE CREDITORS' COMMITTEE REPRESENTS THE INTERESTS OF UNSECURED CREDITORS AS A WHOLE AND DOES NOT REPRESENT THE INDIVIDUAL INTERESTS OF ANY PARTICULAR UNSECURED CREDITOR.  EACH CREDITOR MUST MAKE ITS OWN INDEPENDENT DETERMINATION AS TO WHETHER THE PLAN IS ACCEPTABLE TO THAT CREDITOR AND SHOULD CONSULT WITH ITS OWN LEGAL AND/OR FINANCIAL ADVISOR IN CONNECTION THEREWITH.

The foregoing is not intended as a substitute for the Disclosure Statement.  All unsecured creditors should read the Plan and Disclosure Statement in its entirety, and then make their own respective independent decisions as to whether the Plan is acceptable.  Among other things, the Plan and Disclosure Statement describes in detail: (i) events leading to the Debtor's filing for bankruptcy; (ii) events that occurred during the course of the Chapter 11 Case; (iii) the terms of the Plan, including the anticipated distributions that will be made to unsecured creditors; and (iv) instructions for voting on the Plan.

In addition to the Disclosure Statement and Plan, all unsecured creditors should review the Plan Supplement materials.  The Debtor will file a Plan Supplement containing certain exhibits and documents relevant to the implementation of the Plan.  The Plan Supplement will be filed on or prior to [•].  Once filed, you may access the Plan Supplement on the website of the Debtor's Solicitation Agent, instructions for accessing which are in the Disclosure Statement.

The Debtor has provided you with a Ballot to vote to accept or reject the Plan.  To have your vote counted, you must complete and return the Ballot in accordance with the procedures set forth therein and in the accompanying Plan and Disclosure Statement.  **PLEASE READ THE DIRECTIONS ON THE BALLOT CAREFULLY AND COMPLETE YOUR BALLOT IN ITS ENTIRETY BEFORE RETURNING IT TO THE DEBTOR'S SOLICITATION AGENT**.

Your timely vote is important, as only those unsecured creditors that timely vote on the Plan will have their vote counted for purposes of determining whether creditors have accepted the Plan.  The Creditors' Committee supports approval of the Plan and recommends that you timely **vote to accept** the Plan in accordance with the procedures established by the Bankruptcy Court.

If you have any questions about completing your Ballot, please contact Kroll Restructuring Administration LLC, the Debtor's Solicitation Agent by either (833) 570-5297 (U.S. toll-free) or +1 (646) 440-4782 (international), or emailing svbinfo@ra.kroll.com.

Very truly yours,

Attorneys for the Creditors' Committee
**Akin Gump Strauss Hauer & Feld LLP**

By: _____

       James R. Savin, Esq.