**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

In re:                                                                          **FOR PUBLICATION**

      SVB FINANCIAL GROUP,                                Chapter 11

                                          Case No. 23-10367 (MG)

                           Debtor.

------------------------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER DENYING MOTIONS OF MORGAN STANLEY, CHRISTOPHER COOPER AND ANTHONY DECHELLIS FOR LEAVE TO FILE LATE PROOFS OF CLAIM PURSUANT TO BANKRUPTCY RULES 3003(c) AND 9006(b)(1)

*A P P E A R A N C E S :*

JENNER & BLOCK LLP
*Conflicts Attorneys for the Debtor*
353 N. Clark Street
Chicago, Illinois 60654
By:    Vincent E. Lazar, Esq.
        Landon S. Raiford, Esq.

1155 Avenue of the Americas
New York, New York 10036
By:    Marc Hankin, Esq.
        Carl Wedoff, Esq.

SHEARMAN & STERLING LLP
*Attorney for Morgan Stanley & Co. LLC*
599 Lexington Avenue
New York, New York 10022
By:    Daniel Lewis, Esq.

GOODWIN PROCTER LLP
*Attorneys for Christopher Cooper*
620 Eighth Avenue
New York, New York 10018
By:    Howard S. Steel, Esq.
        Alexander J. Nicas, Esq.
        Artem Skorostensky, Esq.

FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
*Attorneys for Anthony DeChellis*
7 Times Square
New York, New York 10036
By:    Jason C. Rubinstein, Esq.
       Michael S. Palmieri, Esq.
       Dania Bardavid, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

One of the core tenets of bankruptcy law is the prompt and effectual administration and

settlement of a debtor's estate within a limited period of time.  *See In re Best Prods. Co., Inc.*,

140 B.R. 353, 356 (Bankr. S.D.N.Y. 1992) (citing *Katchen v. Landy*, 382 U.S. 323 (1966)).

Thus, bar dates, which fix the time within which proofs of claim or interest may be filed, are

"critically important." *In re Lehman Bros. Holdings, Inc.*, 433 B.R. 113, 119 (Bankr. S.D.N.Y.

2010) (citing *In re Musicland Holding Corp.*, 356 B.R. 603, 607 (Bankr. S.D.N.Y. 2006)); *see*

FED. R. BANKR. P. 3003(c)(3) (requiring a court to establish bar dates).  Indeed, it is the bar date

order that "enabl[es] the parties in interest to ascertain with reasonable promptness the identity of

those making claims against the estate and the general amount of the claims, a necessary step in

achieving the goal of successful reorganization." *Best Prods.*, 140 B.R. at 357 (citation omitted).

Compliance with a bar date is therefore imperative.  "[T]he legal system would groan under the

weight of a regimen of uncertainty in which time limitations were not rigorously enforced."

*Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115,

123 (2d Cir. 2005) (quoting *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 335, 367–68 (2d Cir.

2003)).  Therefore, it is for this reason—as well as a need for finality—that the Second Circuit

adheres to a strict observance of bar dates, and "[c]reditors act at their peril where they fail to

adequately investigate and pursue their rights." *Lehman*, 433 B.R. at 126.

2

Pending before the Court are the three contested motions (collectively, the "Motions") of Morgan Stanley & Co. LLC ("Morgan Stanley," and its motion, the "Morgan Stanley Motion," ECF Doc. # 921), Christopher Cooper ("Cooper" and his motion, the "Cooper Motion," ECF Doc. # 923), and Anthony DeChellis ("DeChellis," and his motion, the "DeChellis Motion," ECF Doc. # 925 and, together with Morgan Stanley and Cooper, the "Movants"). Each of the Motions, filed roughly seven months after the August 11, 2023 general bar date (the "General Bar Date"), seeks authorization to amend or supplement an existing proof of claim, as applicable, or leave to file a late proof of claim:

- The Morgan Stanley Motion seeks entry of an order granting a *nunc pro tunc* extension of Morgan Stanley's time to file a proof of claim to within 14 days of a decision granting relief.[1] (Morgan Stanley Motion ¶¶ 3, 24.)

- The Cooper Motion seeks entry of an order granting *nunc pro tunc* extension of Cooper's time to file a proof of claim to within 14 days of a decision granting relief. (Cooper Motion ¶ 33.)

- The DeChellis Motion seeks entry of an order (i) permitting DeChellis to file a "supplemental" proof of claim[2] or (ii) granting a *nunc pro tunc* extension of DeChellis's time to file a proof of claim to within 14 days of a decision granting relief. (DeChellis Motion ¶ 17, 32.)

On April 5, 2024, SVB Financial Group, (the "Debtor") filed a "consolidated" objection to the Motions (the "Consolidated Objection," ECF Doc. # 1008) in which the Official

---

[1]    The Morgan Stanley Motion also seeks entry of an order permitting Morgan Stanley to amend proof of claim no. 1032 (the "Morgan Stanley Original Claim"), an unliquidated general unsecured claim filed by Goldman Sachs & Co. LLC ("Goldman Sachs") on behalf of itself, BofA Securities Inc., Keefe, Bruyette & Woods, Inc., and Morgan Stanley on August 10, 2023. (*See* Morgan Stanley Original Claim, Addendum at 1.) At the hearing held on May 16, 2024, Morgan Stanley indicated that it no longer seeks to amend the Morgan Stanley Original Claim. (*See* May 16, 2024 Hr'g Tr. at 124:16–20 ("[W]e don't seek to amend. We recognize that it doesn't easily relate back to the other proof of claim, and that we would need to file . . . a new proof of claim.").) Accordingly, the Court will not address this relief.

[2]    DeChellis filed proofs of claim nos. 10, 110, and 493. Proof of claim no. 493, filed on July 28, 2023 in the general unsecured amount of $2,352,141.63, amends and supersedes proofs of claim nos. 10 and 110 (the "DeChellis Amended Proof of Claim"). On January 17, 2024, the Court entered an order (ECF Doc. # 817) disallowing and expunging proofs of claim nos. 10 and 110 as being duplicative of proof of claim no. 493. The DeChellis Amended Proof of Claim reserves DeChellis's right to amend or supplement the claim further. (DeChellis Amended Proof of Claim, Addendum ¶ 9.)

Committee of Unsecured Creditors (the "Committee") joined (the "Committee Joinder," ECF Doc. # 1011).

On May 9, 2024, each of Morgan Stanley, Cooper, and DeChellis filed a reply in further support of their respective Motions.  (*See Reply to Objection to Motion of Morgan Stanley & Co. LLC for Order Granting Leave to File Late Proof of Claim Pursuant to Bankruptcy Rules 3003(c) and 9006(b)(1)*, ECF Doc. # 1113 (the "Morgan Stanley Reply"); *Reply of Christopher Cooper in Support of Motion for Order Granting Leave to File Late Proof of Claim Pursuant to Bankruptcy Rules 3003(c) and 9006(b)(1)*, ECF Doc. # 1116 (the "Cooper Reply"); *Reply in Further Support of Motion for Order Granting Leave to File Late Proof of Claim Pursuant to Bankruptcy Rules 3003(c) and 9006(b)(1)*, ECF Doc. # 1117 (the "DeChellis Reply").)  On May 16, 2024, the Court held a hearing on the Motions.

For the reasons discussed, the Court **DENIES** the Motions.

## I.    BACKGROUND

### A.  Generally

#### 1.  The Merger

On July 1, 2021, the Debtor acquired Boston Private Financial Holdings, Inc. ("Boston Private") pursuant to a merger transaction (the "Merger") between Boston Private and the Debtor with the Debtor continuing as the surviving corporation.  (Cooper Motion ¶ 1.)  As set forth in section 2.01 of the merger agreement (the "Merger Agreement," Morgan Stanley Motion, Ex. E), Silicon Valley Bank, as the "Surviving Bank," shall be "responsible for all of the liabilities of every kind and description of each of the merging banks existing as of the Effective Time, including all deposits, accounts, debts, obligations and contracts thereof . . . ."  (Morgan Stanley Motion ¶ 2.)

4

Additionally, the Merger Agreement also provides that each shareholder of Boston Private stock has the right to receive cash and shares of the Debtor's common stock. (Cooper Motion ¶ 2.) Therefore, as part of this stock-for-stock exchange, the Debtor issued (i) an amended registration statement (the "Registration Statement") filed with the U.S. Securities and Exchange Commission ("SEC") on March 16, 2021, which the SEC declared effective on March 17, 2021; and (ii) a prospectus filed on Form 424B3 dated March 17, 2021 that was subsequently mailed to Boston Private shareholders on or about March 19, 2021 (collectively, with the "Registration Statement," the "Offering Materials"). (*Id.*)

Cooper and DeChellis are two former executives of Boston Private, and Morgan Stanley served as the underwriter that advised Boston Private in connection with the Merger. (Consolidated Objection at 1.)

2.    Pre-Petition Litigation Relating to the Merger

In connection with the Merger, on September 20, 2021, lead plaintiff Richard Savoy commenced a putative class action lawsuit on behalf of himself and all similarly situated former public Boston Private shareholders against Boston Private, DeChellis, and other former members of Boston Private's Board of Directors. *See* Class Action Complaint at 1, *Savoy v. Boston Priv. Fin. Holdings, Inc.*, 626 F. Supp. 3d 242 (D. Mass. 2022) (No. 1:21-cv-11537), 2021 WL 4264768. While also a former Boston Private executive, Cooper was not named.

The complaint, as amended (the "Savoy Complaint," ECF Doc. # 1008-2), alleged violations of sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9. *See Savoy*, 626 F. Supp. at 245 (describing the Savoy Complaint). Specifically, the Savoy Complaint claimed that Boston Private's proxy solicitations concerning its approval of the Merger contained "false or misleading statements, omissions, and half-truths."

5

*Id.* Such statements were allegedly material and intended to "suppress shareholder opposition and consolidate support for a deal." (Savoy Complaint ¶ 4.) Additionally, the Savoy Complaint also alleged that individual defendants were liable pursuant to section 20(a) of the Exchange Act. *Savoy*, 626 F. Supp. 3d at 245.

Ultimately, the Savoy Complaint was dismissed on pleading grounds pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995. *See id.* at 249–53 (discussing the court's reasoning in dismissing the Savoy Complaint). Nonetheless, the dismissal decision sheds light on the contentious state of affairs leading up to the Merger. As discussed therein, a day after the proposed Merger was announced, HoldCo Asset Management, LP ("HoldCo"), Boston Private's fourth largest shareholder, issued public letters and press releases detailing its concerns with the Merger that culminated into a "pitched proxy battle." *Id.* at 246; *see also id.* at 251 (describing the proxy battle as "contentious"). HoldCo contended that Boston Private failed to conduct a competitive process to maximize value for shareholders as there were three companies other than the Debtor who expressed interest in a potential transaction with Boston Private. *Id.* at 246–47. HoldCo also asserted that Boston Private's board cut a bad deal for shareholders, and DeChellis possessed a conflict of interest. *Id.* at 246.

Aside from competing proxy statements filed by Boston Private and HoldCo, the decision also notes that there were eight civil lawsuits filed by Boston Private shareholders, including one filed by lead plaintiff Richard Savoy in February 2021, alleging that "Boston Private's proxy filings omitted various facts." *Id.* In response, Boston Private provided subsequent written communication that included supplemental disclosures, and the civil lawsuits were later voluntarily dismissed. *Id.*

6

3. <u>The Debtor's Chapter 11 Case</u>

On March 17, 2023 (the "Petition Date"), the Debtor filed a voluntary petition (the "Petition," ECF Doc. # 1) for relief under chapter 11 of the Bankruptcy Code.  The Debtor remains in possession of its property and continues to operate and maintain its organization as debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.  (Consolidated Objection ¶ 2.) On March 28, 2023, the United States Trustee appointed the Committee.  (*Id.* ¶ 3 (citing ECF Doc. # 72).)

On June 29, 2023, the Court entered an order (the "Bar Date Order," ECF Doc. # 373), establishing August 11, 2023 as the General Bar Date.  On July 6, 2023, the Debtor caused the Notice of Deadline Requiring Filing of Proofs of Claim on or Before August 11, 2023 (the "Bar Date Notice") and Proof of Claim Form to be served on Morgan Stanley and DeChellis via first-class mail.  (*See Affidavit of Service of Herb Baer Regarding Bar Date Notice and Proof of Claim Form*, ECF Doc. # 457.)  On July 10, 2023, the Debtor published a notice of the General Bar Date in *USA Today (National Edition)* and the *San Francisco Chronicle*.  (*See Notice of Certification of Publication of Tariful Huq Regarding Notice of Deadlines for Filing Proofs of Claim*, ECF Doc. # 413.)

On January 26, 2024, the Debtor filed its plan of reorganization (the "Plan," ECF Doc. # 826) and, on February 7, 2024, the accompanying disclosure statement (the "Disclosure Statement," ECF Doc. # 845), both of which were subsequently amended.  A hearing on the Disclosure Statement, as amended (the "Second Amended Disclosure Statement," ECF Doc. # 1144), and the Plan it relates to, the "Second Amended Plan," ECF Doc. # 1143) was held on May 16, 2024, the same day as the hearing on these Motions.

On May 30, 2024, the Court entered an order (ECF Doc. # 1172) approving a further modified version of the Second Amended Disclosure Statement (the "Solicitation Disclosure Statement," ECF Doc. # 1179).

4. Post-Petition Securities Class Action Lawsuits

In the aftermath of Silicon Valley Bank's collapse and the Debtor's chapter 11 petition, several securities class action complaints were filed concerning securities offerings by the Debtor. (Cooper Motion ¶ 4.) "At a high level, these actions alleged violations of the federal securities laws, specifically misrepresentations and omissions by [the Debtor], its officers, directors, underwriters, and auditors, arising from various events, statements, and [the Debtor's] filings with the SEC, in the lead up to [the Debtor's] bankruptcy." (*Id.*) These proceedings include:

- The consolidated securities putative class action (the "Consolidated Class Action") captioned *In re SVB Fin. Sec. Litig.*, No. 3:23-cv-01097-JD (N.D. Cal. filed Mar. 13, 2023) filed by lead plaintiffs Norges Bank and Sjunde AP-Fonden against Morgan Stanley, among others.[3] (Cooper Motion ¶ 4; DeChellis Motion ¶ 6; *see Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws* (the "Consolidated Class Action Complaint," Case No. 3:23-cv-01097-JD, ECF Doc. # 88).)

- The putative class action (the "*Hialeah* Class Action") captioned *City of Hialeah Emps. Ret. Sys. v. Becker*, No. 3:23-cv-01697-JD (N.D. Cal. filed Apr. 7, 2023) filed by the City of Hialeah Employees Retirement System and others against Morgan Stanley, other underwriters of several securities offerings by the Debtor, and several former officers and directors of the Debtor. (Morgan Stanley Motion ¶¶ 1, 6.)

- The putative class action (the "April 2023 *Rossi* Class Action" and the related complaint, the "April 2023 *Rossi* Complaint") captioned *Rossi v. Becker, et al.*, Case No. 23-cv-414120 (Cal. Superior Ct., filed April 14, 2023) filed by Stephen Rossi against certain of the Debtor's former directors and officers, among others, alleging misrepresentations in

---

[3]     While the initial lawsuit was commenced pre-petition, the case was subsequently consolidated with four other later-filed cases, including the *Hialeah* Class Action that was filed post-petition. (*See Order Consolidating Cases, Appointing Lead Plaintiff, and Setting Case Schedule*, Case No. 3:23-cv-01097-JD, ECF Doc. # 82.) Following consolidation on November 30, 2023, the Consolidated Class Action Complaint was filed on January 16, 2024 and names Morgan Stanley as a defendant. (*See* Consolidated Class Action Complaint ¶ 380.) As set forth in the Consolidated Class Action Complaint, Norges Bank is the central bank of Norway while Sjunde AP-Fonden is a Swedish public pension fund. (*Id.* ¶¶ 32–33.)

the Offering Materials relating to the Merger.[4]  (Morgan Stanley Motion at 2, n.5; DeChellis Motion ¶ 7.)

While Morgan Stanley is named as a defendant in the Consolidated and *Hialeah* Class Actions, neither Cooper nor DeChellis are named in any of the foregoing lawsuits.  (*See* Cooper Motion ¶ 4 ("Neither Cooper, nor Boston Private, nor any other director or officer of Boston Private was named as a defendant" in any of the post-petition securities class actions, including the Consolidated, *Hialeah*, and May 2023 *Rossi* Class Actions); DeChellis Motion ¶¶ 6–7 (stating the same with respect to DeChellis, including the Consolidated and *Hialeah* Class Actions); *see also* Morgan Stanley Motion ¶ 8 (indicating that Morgan Stanley was not named as a defendant in the April 2023 *Rossi* Class Action).)  Notably, all of the foregoing lawsuits were filed prior to the General Bar Date.

On February 15, 2024, however, Morgan Stanley, Cooper, and DeChellis were named defendants in a new putative class action lawsuit (the "2024 *Rossi* Class Action") by Stephen Rossi.  (Cooper Motion ¶ 6.)  The complaint (the "2024 *Rossi* Complaint") asserts claims based on alleged misrepresentations in connection with the Merger, specifically with respect to statements made in the Offering Materials.  (Morgan Stanley Motion ¶ 2.)  These claims are "[s]ubstantively identical" to those asserted in the April 2023 *Rossi* Class Action.  (*Id.*; DeChellis Motion ¶ 8 (noting that—except for naming DeChellis, another former Boston Private officer, and Morgan Stanley as defendants—the "claims and allegations in the [2024 *Rossi* Class Action] are identical to those asserted against the SVBFG defendants in the [the April 2023 *Rossi* Class Action]").)  Thus, it is the lawsuit that serves as the catalyst for the Movants' requested relief.

---

[4]    Instead of the April 2023 *Rossi* Class Action, Cooper cites to a separate securities class action captioned *Rossi v. Becker, et al.*, Case No. 3:23-cv-2335 (Cal. Superior Ct. filed May 12, 2023) that was filed in May 2023 (the "May 2023 *Rossi* Class Action").  (Cooper Motion ¶ 4.)  Cooper indicates that this lawsuit concerns the "same subject matter" as the 2024 *Rossi* Class Action but was asserted against different defendants.  (*See id.* ¶ 30.)

### B. The Morgan Stanley Motion

The Morgan Stanley Original Claim, predicated on Morgan Stanley's contribution and indemnification rights relating to the *Hialeah* Class Action, was timely filed on its behalf by Goldman Sachs. As a result of the 2024 *Rossi* Class Action, however, Morgan Stanley now seeks to file a late proof of claim.[5] (Morgan Stanley Motion ¶¶ 3, 11.)

Morgan Stanley asserts that it is entitled to the relief sought because (i) it could not have anticipated the "unprecedented" theory of liability set forth in the 2024 *Rossi* Complaint, and (ii) the filing of the late claim would not otherwise prejudice the Debtor. (*Id.* ¶ 11.) This "unprecedented" theory of liability is that Morgan Stanley should face underwriter liability because it served as a financial advisor to Boston Private. (*Id.* ¶ 2.) In the event Morgan Stanley is found liable in the 2024 *Rossi* Class Action, it believes it would possess claims for contribution against the Debtor in addition to claims for indemnification pursuant to a financial advisory engagement letter between Morgan Stanley and Boston Private, dated December 31, 2020 (the "Engagement Letter," Morgan Stanley Proposed Claim, Ex. 1). (*See also id.* (citing to section 2.01 of the Merger Agreement, which provides that Silicon Valley Bank "shall be responsible for all . . . liabilities . . . of each of the merging banks existing as of the Effective Time . . . .").)

In light of the foregoing, Morgan Stanley argues that its failure to act meets the "excusable neglect" standard of Federal Bankruptcy Rule 9006(b)(1), which contemplates that a court may, where appropriate, accept late filings "caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." (*Id.* ¶¶ 15, 21 (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388 (1993)

---

[5]     As discussed, Morgan Stanley is no longer seeking to amend the Morgan Stanley Original Claim. (*See supra* note 1 and accompanying text.)

[hereinafter *Pioneer*]).)  Specifically, Morgan Stanley asserts that all four factors set forth by the

Supreme Court in *Pioneer* for permitting post-bar date claims weigh in favor of allowing it to file

its proof of claim:

- *first*, filing the proof of claim will not prejudice the Debtor because (i) the Plan has not
  been confirmed such that the Debtor and interested parties are in the same position as
  they would have been if the proof of claim was timely filed, (ii) the claims asserted
  against Morgan Stanley are indistinguishable from those asserted in the April 2023 *Rossi*
  Class Action where the Debtor already is subject to potential contribution claims, and (iii)
  the Court has already granted permission for defense costs to be advanced to the earlier-
  named defendants under the Debtor's directors' and officers' insurance policies (such
  policies, "D&O Insurance");

- *second*, there was no delay by Morgan Stanley in filing a claim and, even if there had
  been a delay, there would be no impact on any judicial proceeding;

- *third*, there is good cause for any delay that, in any event, is excusable because Morgan
  Stanley only recently learned of the 2024 *Rossi* Complaint and could not have anticipated
  its unprecedented theory of liability; and

- *fourth*, there is no argument that Morgan Stanley failed to act in good faith.

(*Id.* ¶¶ 16–24.)

Attached to the Morgan Stanley Motion is (i) a proposed order (the "Morgan Stanley

Proposed Order") as Exhibit A; (ii) the 2024 *Rossi* Complaint as Exhibit B; (iii) the April 2023

*Rossi* Complaint as Exhibit C; (iv) Morgan Stanley's proposed late-filed claim (the "Morgan

Stanley Proposed Claim") as Exhibit D; and (v) the merger agreement between the Debtor and

Boston Private (the "Merger Agreement") as Exhibit E.

### C.  The Cooper Motion

Cooper previously served as the Head of Legal and Corporate Secretary of Boston

Private and did not join the Debtor as an employee following the Merger.  (Cooper Motion ¶ 1.)

On February 29, 2024, Cooper was served with the 2024 *Rossi* Complaint and learned he was

named as a defendant.  (*Id.* ¶¶ 1, 16.)  Unlike Morgan Stanley or DeChellis, however, he did not

file a claim against the Debtor before the General Bar Date.  Therefore, Cooper seeks leave to

11

file a late proof of claim in connection with the 2024 *Rossi* Complaint in order to "secure his

rights to contribution, indemnity, and advancement of expenses from the [Debtor]." (*Id.* ¶¶ 1, 9.)

In connection with the claims set forth in the 2024 *Rossi* Complaint, Cooper asserts that

he had no role in preparing the Offering Materials and was not otherwise responsible for any of

the statements made therein. (*Id.* ¶ 3.)  He indicates that the "only attenuated tie" between

himself and the Offering Materials is a letter he signed in his capacity as Corporate Secretary on

behalf of the Board of Directors of Boston Private, which the Debtor included in the Offering

Materials. (*Id.*)  Such letter specified only the "time, place, and proposals to be decided at a

special meeting of Boston Private shareholders, as well as other information related to the then-

proposed Merger." (*Id.*)

However, Cooper believes that, to the extent he is found liable in the 2024 *Rossi* Class

Action, he will possess (i) contribution claims against the Debtor under governing securities

laws[6] and (ii) claims for indemnification and attorneys' fees and other costs against the Debtor

pursuant to section 6.6 of the Merger Agreement.[7] (*Id.* ¶¶ 7– 8).  Cooper argues that he is

---

[6]    The 2024 *Rossi* Complaint asserts claims under sections 11 and 12 of the Securities Act of 1933 (the "Securities Act"), which Cooper believes provide him with statutory and implied contribution claims against the Debtor. (Cooper Motion, Ex. F ¶ 13 (the "Cooper Proposed Claim").)  Specifically, section 11(f) of the Securities Act of 1933 provides that "every person who becomes liable to make any payment under this section may recover contribution as in cases of contract from any person who, if sued separately, would have been liable to make the same payment, unless the person who has become liable was, and the other was not, guilty of fraudulent misrepresentation."  15 U.S.C. § 77k(f).  Moreover, Cooper indicates that "multiple courts have recognized an implied right of contribution arising under section 12 of the Securities Act (codified at 15 U.S.C. § 77l)." (Cooper Proposed Claim ¶ 15.)

[7]    Section 6.6 of the Merger Agreement provides that:

> From and after the Effective Time [of the Merger], the Surviving Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law, each present and former director, officer or employee of Boston Private and its Subsidiaries (in each case, when acting in such capacity) (collectively, the "Boston Private Indemnified Parties") against any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, damages or liabilities incurred in connection with any threatened or actual claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, whether arising before or after the Effective Time [of the Merger], arising in whole or in part out of, or pertaining to, (i) the fact that such person is or was a director,

entitled to the relief sought primarily because (i) he was never served with the motion to

establish the General Bar Date or the Bar Date Order, and (ii) he had no reason to expect, nor

could he have anticipated, the claims asserted against him in the 2024 *Rossi* Complaint.  (*Id.* ¶

18.)  Indeed, he notes that none of the securities class action complaints concerning the Debtor's

securities offerings predating the 2024 *Rossi* Class Action named him, Boston Private, or any

other director or officer of Boston Private as a defendant.  (*Id.* ¶ 4.)  Additionally, none of these

lawsuits involved allegations concerning the veracity of disclosures by or relating to Boston

Private.  (*Id.*)

        In support of his request for leave to file a late proof of claim, Cooper argues, much like

Morgan Stanley, that he satisfies the "excusable neglect" standard of Rule 9006(b)(1) of the

Federal Rules of Bankruptcy Procedure.  (*See, e.g.*, *id.* ¶¶ 9–10.)  He indicates that each of the

*Pioneer* factors weighs in his favor:

- *first*, filing the proof of claim will not prejudice the Debtor because (i) the Plan has not been confirmed such that the Debtor and unsecured creditors would be in the same position as if his claim had been timely filed, (ii) the mere prospect of having to pay a legitimate claim does not constitute "prejudice" under *Pioneer*, (iii) other similarly situated creditors would receive a windfall if relief is not granted, (iv) granting relief would not result in a "mountain of new claims" since the 2024 *Rossi* Complaint involves

---

officer, or employee of Boston Private or any of its Subsidiaries or (ii) matters existing or occurring at or prior to the Effective Time [of the Merger], including matters, acts or omissions occurring in connection with the approval of this [Merger] Agreement and the consummation of the transactions contemplated hereby; and the Surviving Corporation shall also advance expenses as incurred by such Boston Private Indemnified Party to the same extent as such persons are entitled to advancement of expenses as of the date of this Agreement by Boston Private pursuant to the Boston Private Articles of Organization, Boston Private's Bylaws, the governing or organizational documents of any Boston Private Subsidiary and any indemnification agreements in existence as of the date hereof that have been disclosed to SVB Financial; provided that the Boston Private Indemnified Party to whom expenses are advanced provides an undertaking (in a reasonable and customary form) to repay such advances if it is ultimately determined that such Boston Private Indemnified Party is not entitled to indemnification.

(Merger Agreement § 6.6.)

specific parties and the claims are limited in scope, and (v) Cooper has sought coverage for his defense fees and costs from Boston Private's and the Debtor's D&O Insurance;[8]

- *second*, there was no delay by Cooper in filing a claim and, even if there had been a delay, there would be no impact on any judicial proceeding;

- *third,* there is good cause for any delay because Cooper only recently learned of the *Rossi* Complaint and could not have anticipated the claims asserted therein prior to the General Bar Date—which notably do not identify any alleged misconduct by him or Boston Private, but rather seek to hold him liable for the Debtor's alleged misconduct; and

- *fourth,* there is no argument that Cooper has not acted in good faith as he could not have been expected to file a proof of claim in connection with defending against claims concerning the Debtor in the Debtor's SEC filings relating to the Merger "particularly when he did not sign the Registration Statement, was not involved in the preparation of the Offering Materials, and the alleged misstatements identified in the [2024] *Rossi* [C]omplaint are attributed to [the Debtor], not to Cooper or to Boston Private."

(*Id.* ¶¶ 22–33.)  Therefore, Cooper argues that it would have been "unreasonable" to have expected him to file a claim for contribution, indemnity, and advancement of expenses prior to the General Bar Date.  (*Id.* ¶ 30.)

Attached to the Cooper Motion is (i) the 2024 *Rossi* Complaint as Exhibit A; (ii) the Merger Agreement as Exhibit B; (iii) the bylaws of Boston Private (the "Boston Private Bylaws") as Exhibit C; (iv) Boston Private's articles of incorporation (the "Boston Private Articles of Incorporation") as Exhibit D; (v) a proposed order (the "Cooper Proposed Order") granting the relief sought as Exhibit E; and (vi) the Cooper Proposed Claim, as Exhibit F, which asserts an unliquidated claim against the Debtor for "indemnification and advancement of expenses, as well as contribution" in connection with the 2024 *Rossi* Class Action.

---

[8]    In the Cooper Reply, Cooper discloses that he received confirmation that Boston Private's D&O Insurance will cover Cooper's defense costs related to litigating the 2024 *Rossi* Complaint.  (Cooper Reply ¶ 3.)  At the May 16th hearing, Cooper's counsel clarified that such insurance would cover "his advancement of defense costs."  (May 16, 2024 Hr'g Tr. at 116:14–16.)

### D.  The DeChellis Motion

DeChellis previously served as the Chief Executive Officer ("CEO") and President of Boston Private and, following the Merger, became the CEO of SVB Private, Silicon Valley Bank's private banking and wealth management division.  (DeChellis Motion ¶¶ 1, 4.)  As noted, DeChellis filed the DeChellis Amended Proof of Claim on July 28, 2023, which seeks over $2.3 million "owed to him pursuant to agreements he entered into with [the Debtor] and under his deferred compensation plan."  (*Id.* ¶ 5.)  As set forth in the DeChellis Amended Proof of Claim, DeChellis reserved the right to amend or supplement the claim "at any time, including after any bar date, in any manner, and/or to file additional proofs of claim for any additional claims which may be based on the same or additional documents or grounds of liability, or based on additional facts learned following further investigation."  (DeChellis Amended Proof of Claim, Addendum ¶ 9.)

As with Cooper, DeChellis learned of the 2024 *Rossi* Class Action when he was served on February 29, 2024.  (*Id.* ¶ 15.)  Accordingly, DeChellis seeks leave to file a supplemental proof of claim or, in the alternative, for an extension of time to file a claim for unliquidated and partially contingent contribution, indemnity, and advancement of expenses against the Debtor in connection with the 2024 *Rossi* Complaint.  (*Id.* ¶¶ 11, 17.)

Similar to Cooper, DeChellis asserts that he lacked responsibility for any statements the Debtor made about itself in the Offering Materials.  (*Id.* ¶ 3.)  Indeed, he argues that his only "attenuated tie" to the Offering Materials was a letter he signed, which recommended that Boston Private shareholders approve the Merger.  (*Id.*)  In the DeChellis Motion, DeChellis also highlights the disclaimer in the Offering Materials, which states that the Debtor and Boston

Private have each "supplied all information contained or incorporated by reference into this proxy statement/prospectus" relating to themselves.  (*Id.* (quoting the Offering Materials).)

As with Cooper, DeChellis believes that he possesses both contribution and indemnification claims against the Debtor in the event he is found liable for claims asserted in the 2024 *Rossi* Complaint pursuant to section 6.6(a) of the Merger Agreement and applicable bylaws and certificates of incorporation.  (*Id.* ¶ 1 (indicating that section 6.6(a) of the Merger Agreement requires the Debtor to "indemnify and advance legal expenses for former Boston Private officers, directors, and employees, including DeChellis"); *id.* ¶ 4 (providing that DeChellis was "entitled to indemnification and advancement" from the Debtor pursuant to the Debtor's bylaws); *id.* ¶ 10 (stating that DeChellis possesses statutory and implied contribution claims under governing securities laws and claims for indemnification and advancement under the Merger Agreement and applicable bylaws and articles of incorporation); *see also id.* ¶ 1 (noting that, prior to the Merger, he was entitled to indemnification and advancement from Boston Private pursuant to Boston Private Bylaws and Boston Private Articles of Incorporation).)

Additionally, for reasons virtually identical to Cooper, DeChellis argues that he too meets the "excusable neglect" standard under *Pioneer*.  (*Id.* ¶¶ 21–32.)  He discloses that he too sought coverage for his defense costs and expenses from Boston Private's and the Debtor's D&O Insurance.[9]  (*Id.* ¶ 25.)  DeChellis further indicates that he immediately engaged counsel upon being made aware of the 2024 *Rossi* Complaint and could not have been expected to file a claim in defending against claims concerning the Debtor where "he did not sign and was not

---

[9]    In the DeChellis Reply, Boston Private's D&O insurer has confirmed on a preliminary basis that it would provide coverage for DeChellis's defense of the 2024 *Rossi* Complaint.  (DeChellis Reply ¶ 17.)

responsible for the filings in question and the alleged misstatements . . . are [otherwise] attribut[able] to [the Debtor]." (*Id.* ¶ 32.)

Attached to the DeChellis Motion is (i) the DeChellis Amended Proof of Claim as Exhibit A; (ii) the April 2023 *Rossi* Complaint as Exhibit B; (iii) the 2024 *Rossi* Complaint as Exhibit C; (iv) a proposed order, as Exhibit D, granting the relief sought; and (v) a proposed supplemental proof of claim (the "DeChellis Proposed Claim") as Exhibit E.

### E. The Debtor's Consolidated Objection

The Debtor opposes the Motions on grounds that the Movants' claims accrued before the Petition Date, the 2024 *Rossi* Class Action was foreseeable, and the Movants' delay in filing their claims is unjustified. (Consolidated Objection at 1.) Indeed, the Debtor harps on the Movants' stature as "highly sophisticated parties" who were aware of the Debtor's bankruptcy and claims process as well as the Movants' prior involvement in shareholder disputes in 2021 and 2022 that would have rendered the 2024 *Rossi* Class Action foreseeable. (*Id.*; *see also id.* ¶ 18.) Focusing on the *Pioneer* factors, and specifically the third factor—the reason for delay—the Debtor argues that the Movants should not be permitted to amend their preexisting claims or file new ones as the "Movants' stated reason for failing to comply with the [Bar Date Order]" fails to satisfy the Second Circuit's standard for excusable neglect. (*Id.* ¶¶ 11–12.)

*First*, the Debtor asserts that Movants' late claims for indemnification and contribution cannot be excused. With respect to the Movants' claims for indemnification, the Debtor notes that each of the underlying facts and circumstances alleged in the 2024 *Rossi* Class Action existed prior to the Petition Date, including the existing contracts, organizational documents, and the Merger. (*Id.* ¶ 13.) Therefore, Movants were aware that they were entitled to seek indemnification from the Debtor before the expiration of the Bar Date and, pursuant to governing

Second Circuit law, excusable neglect does not excuse the failure to timely file claims for

indemnification.  (*Id.* (citing to *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333 (2d Cir. 2018)).)

Along the same lines, the Debtor argues that Movants' claims for contribution cannot

succeed where a creditor's failure to comply with a bar date stemmed from a "mistaken

assumption or belief regarding future events."  (Consolidated Objection ¶ 14 (citing to the *Enron*

court's refusal to find excusable neglect "on the basis of what turned out to be an erroneous

assumption" (quoting *Enron*, 419 F.3d at 128)).)  Indeed, the 2024 *Rossi* Complaint was "totally

foreseeable," particularly in light of the Savoy Complaint, and the Movants' cited cases in

support of the relief sought are "factually distinguishable" from the case at hand.  (*Id.* ¶¶ 15–17.)

Here, Movants—"highly sophisticated parties represented by elite law firms"—were "well aware

that the [Merger] was highly controversial from the outset," and it was reasonable to expect them

to "proactively assert their known rights" in one of "the most highly publicized corporate

bankruptcies of this decade."  (*Id.* ¶¶ 17–19.)

*Second*, the Debtor rejects Movants' contentions that allowing them to file late claims

would not prejudice the Debtor's reorganization process.  (*Id.* ¶ 20.)  Further, the Debtor argues

that, even without prejudice, the Movants' failure to provide a valid reason for delay is alone

sufficient for the Court to deny them leave to file late claims.  (*Id.* ¶ 21.)

*Third,* the Debtor states that the remaining *Pioneer* factors—good faith and length of

delay—are neutral and "do not move the needle either way in this case."  (*Id.* ¶ 22.)  While

generally not determinative, the Debtor indicates that it has no reason to believe that the Movants

lack good faith.  (*Id.*)

*Fourth*, the Debtor argues that, as a threshold matter, neither Morgan Stanley's nor

DeChellis's proposed proofs of claim relate back to any timely filed proofs of claim as they arise

18

out of separate documents and transactions.  (*Id.* ¶ 24.)  Additionally, the Movants have made no attempt to show otherwise.  (*Id.* ¶ 26 (stating that neither claimant has attempted to show that the requirements of the "relation-back" test are satisfied).)  Accordingly, the Debtor asserts that neither Morgan Stanley nor DeChellis have timely preserved their purported right to assert a claim for indemnification or contribution as "blanket" reservations of rights do not permit claimants to file untimely, unrelated claims.  (*Id.* ¶¶ 27–28.)

*Finally*, the Debtor argues Cooper received ample notice of the General Bar Date.  (*Id.* ¶ 29.)  The Debtor states that while it did not serve Cooper a copy of the Bar Date Notice because he was an "unknown" creditor at the time, the Debtor provided him and other unknown creditors with constructive notice of the General Bar Date when it published the Bar Date Notice in two national newspapers.  (*Id.*)  The Debtor notes that Cooper does not argue that he was unaware of the Debtor's bankruptcy filing and his "failure to monitor the bankruptcy docket weighs heavily against a finding of excusable neglect."  (*Id.*)

Annexed to the Consolidated Objection is (i) a Financial Times news article entitled "The Activist Hedge Fund Who Warned Early About Silicon Valley Bank," dated March 13, 2023, as Exhibit A; and (ii) the Savoy Complaint as Exhibit B.

### F.  Committee's Joinder

In the Committee Joinder, the Committee states that it agrees with the Debtor that Movants have failed to meet their burden to establish that their noncompliance with the Bar Date Order is the result of excusable neglect.  (Committee Joinder ¶ 3.)  The Committee also shares the Debtor's concern that granting the Motions would result in "additional late claim litigation that may hinder the Debtor's reorganization efforts."  (*Id.*)

19

### G.  The Morgan Stanley Reply

At the outset, the Morgan Stanley Reply indicates that it is undisputed that the Court possesses the discretion to permit a late-filed proof of claim, that the relevant issue is whether Morgan Stanley has demonstrated "excusable neglect" under *Pioneer* (discussed below), and that the "length of delay" and "good faith" *Pioneer* factors are not determinative.  (Morgan Stanley Reply ¶¶ 1–3.)

In connection with the "reason for delay" *Pioneer* factor, Morgan Stanley asserts that the Debtor's reliance on *In re Motors Liquidation Co.*, 598 B.R. 744 (Bankr. S.D.N.Y. 2019) is misplaced.  (*Id.* ¶¶ 4–6.)  Morgan Stanley contends that the case is both procedurally and factually inapposite since it involved a motion brought nine years after the bankruptcy plan was consummated, and the claimant there was involved in the case "around the very liabilities that were the subject of the proof of claim."  (*Id.* ¶¶ 5–6.)  The Morgan Stanley Proposed Claim, it argues, stems not from a lack of diligence, but rather from the 2024 *Rossi* Complaint's "unprecedented" legal theory that is otherwise contrary to SEC guidance.  (*Id.* ¶ 9.)  Therefore, it could not have been expected to "file a protective claim for a case when it was not sued—and could not properly be sued."  (*Id.*)

In addition, Morgan Stanley disputes the relevancy of the Savoy Complaint and criticisms of the Merger in the press, stating that neither would have put it on notice of the claims asserted in the 2024 *Rossi* Complaint.  (*Id.* ¶ 10.)  The court's decision *In re BuildNet*, 2003 WL 22078079 (Bankr. M.D.N.C. Aug. 26, 2003) case, Morgan Stanley contends, is instructive here and supports a finding that the Morgan Stanley Motion should be granted.  (*Id.* ¶ 11.)

As for the "prejudice to the debtor" *Pioneer* factor, Morgan Stanley argues that the allowance of any late-filed proof of claim always carries a risk for prejudice against the Debtor

20

and, in any event, a finding of prejudice cannot be premised on "unsupported speculation or hypothetical harm." (*Id.* ¶ 12.) As the Debtor remains in the process of objecting to claims and no plan has been confirmed, *Meadows v. AMR Corp.*, 539 B.R. 246 (S.D.N.Y. 2015), this case, it argues, is distinguishable. (*Id.* ¶ 13.) In closing, Morgan Stanley indicates that the "Debtor does not dispute that the lawsuit filed almost a year ago that did not name Morgan Stanley as a defendant already put the Debtor on notice of, and left the Debtor subject to, potential contribution claims in respect of the claims now asserted against Morgan Stanley." (*Id.* ¶ 15.)

### H. The Cooper Reply

The Cooper Reply argues that the "judicial guideposts" of "equity, balancing of interests, and elasticity" provide the Court with "flexibility to find, after evaluation all relevant circumstances," that Cooper's failure to timely file a proof of claim was the product of excusable neglect. (Cooper Reply ¶¶ 1–2.) Cooper asserts that the Debtor would not be prejudiced if the Cooper Proposed Claim were permitted to be filed as (i) this case is in its "nascent" stages with no disclosure statement or plan in place (*id.* ¶¶ 3, 8–9); (ii) there is no support for the notion that permitting the filing of the Cooper Proposed Claim would "open the floodgates" (*id.* ¶¶ 3, 9–10); (iii) there would be little impact on the Debtor's estate, creditor recoveries, and administration of the estate since Cooper has received confirmation that Boston Private's D&O Insurance would cover his defense costs in connection with the 2024 *Rossi* Complaint (*id.* ¶ 3); and (iv) the Cooper Proposed Claim would not add additional uncertainty to the case (*id.* ¶ 11).

Additionally, Cooper asserts that he had "legally valid reasons" for his delay in filing a proof of claim since he was unaware "his claims existed until after . . . the General Bar Date." (*Id.* ¶¶ 4, 13.) Namely, Cooper could not have foreseen being named a defendant in the 2024 *Rossi* Complaint as (i) he had never been previously named a defendant in lawsuits relating to

the Merger, including the Savoy Complaint; (ii) the allegations relate to misrepresentations about

the Debtor's misrepresentations about itself; (iii) Cooper had no role in preparing the Offering

Materials; (iv) Cooper was only an employee of Boston Private and was never employed by the

Debtor; and (v) his only involvement was signing a letter that alerted Boston Private

shareholders of the time, place, and proposals to be decided at a Boston Private shareholder

meeting.  (*Id.* ¶¶ 4, 15–17.)  The Debtor, Cooper argues, has also otherwise failed to cite to any

case law that supports denying his motion.  (*Id.* ¶¶ 16, 19.)  He contends it is undisputed that his

claim for contribution arose after the General Bar Date since he only learned of the claim when

he was named in the 2024 *Rossi* Complaint, which established his liability.  (*Id.* ¶¶ 18, 20

(quoting *SPV Osus*, 882 F.3d at 340–41).)

        Notably, Cooper highlights that he did not receive actual notice of the General Bar Date,

and the Debtor's failure to consider him a known creditor entitled to such notice cuts against any

argument that he should have expected to be sued.  (*Id.* ¶¶ 5, 22–23.)  He rejects the notion that

awareness of a bankruptcy filing equates to an awareness of a bar date.  (*Id.* ¶ 24.)

        Finally, as to the remaining *Pioneer* factors of "good faith" and "length of delay," Cooper

states that he had no good faith reason to suspect that he would have been named a defendant in

"any lawsuit related to [the Debtor]," and it is unquestionable that once named, he "acted

expeditiously to protect his interests."  (*Id.* ¶¶ 6, 21.)

        **I.    The DeChellis Reply**

        At the outset, the DeChellis Reply characterizes the *Pioneer* excusable neglect inquiry as

one of an "elastic" and "equitable" nature.  (DeChellis Reply ¶ 9; *see also id.* ¶ 10 (citing to other

cases adopting a flexible application of *Pioneer* instead of the "hard line" approach adopted in

*Enron*).)  Within this framework, echoing arguments raised in the Morgan Stanley and Cooper

Replies, DeChellis rejects any notion that permitting his late claim would prejudice the Debtor or "open the floodgates" to other claims. (*Id.* ¶¶ 2, 12, 14–15). Moreover, permitting the DeChellis Proposed Claim to proceed would lead only to an "incremental" but "negligible" increase in uncertainty, and, in any event, Boston Private's D&O insurer has preliminarily confirmed that it would provide coverage for DeChellis's defense costs. (*Id.* ¶¶ 16–17.) DeChellis notes that no plan has been confirmed, and at least 15 proofs of claim filed by former directors and officers of the Debtor are pending in this case, each of them asserting unliquidated claims for indemnification, advancement, and contribution. (*Id.* ¶¶ 3, 16.)

Additionally, similar to Morgan Stanley and Cooper, DeChellis indicates that his "reason for delay"—lack of foreseeability—establishes excusable neglect. (*Id.* ¶ 19.) Specifically, DeChellis adopts the position that he could not have reasonably foreseen to be considered liable for the Debtor's alleged misrepresentations about itself in connection with the Merger. (*Id.* ¶¶ 4, 19.) Among other things, he did not sign the relevant filings and "none of the lawsuits arising out of [the Debtor's] collapse mentioned DeChellis or alleged any misconduct attributable to him or Boston Private." (*Id.* ¶¶ 4, 19; *see also* ¶ 22 ("None of those lawsuits alleged that SVBFG's collapse had anything to do with Boston Private or was caused by DeChellis or Boston Private in any way.").) Expecting him to have filed a protective proof of claim by the General Bar Date in such a circumstance would have been unreasonable. (*Id.*)

DeChellis rejects the Debtor's assertions that his claims arose out of pre-petition contracts and events since his claims did not arise out of the Merger. (*Id.* ¶ 20.) Rather, his claims for indemnification, advancement, and contribution arise out of the 2024 *Rossi* Complaint, which was unforeseeable and commenced months after the passage of the General Bar Date. (*Id.*) Moreover, the Debtor's suggestion that prior "controversy" surrounding the

Merger, including the filing of the Savoy Complaint, should have put DeChellis on notice are

without merit.  (*Id.* ¶ 23.)  The Debtor indicates that the Savoy Complaint is "radically different"

from prior lawsuits both in nature (as it did not involve alleged misstatements about the Debtor)

and in timing and disposition (as it was a putative class action dismissed for failing to state a

claim, months before the Debtor entered bankruptcy).  (*Id.* ¶¶ 24–25.)  DeChellis further argues

that the 2024 *Rossi* Complaint's naming of him as a defendant was also entirely out of his

control.  (*Id.* ¶ 26.)

 With respect to his contribution claim in particular, DeChellis argues that the Debtor's

reliance on *Enron* and *Motors Liquidation* is misplaced since his contribution claim did not exist

and was not foreseeable as of the General Bar Date.  (*Id.* ¶¶ 27–29.)  Therefore, any protective

claim would have rested on hypothetical liabilities.  (*Id.* ¶ 29.)

 As for his indemnification and advancement claims, DeChellis argues any protective

filings would have been objected to as being "hypothetical."  (*Id.* ¶ 30.)  Further, he asserts that

the Debtor's reliance on *SPV Osus* for the principle that excusable neglect does not excuse the

failure to file a proof of claim for indemnification liability by the bar date, is also misplaced.  (*Id.*

¶ 31.)  DeChellis argues that the portion of *SPV Osus* the Debtor relies on is *dicta* and is itself

based on *dicta* in other cases that are distinguishable and inapposite.  (*Id.* ¶ 31.)  Additionally, no

amount of diligence on the part of DeChellis would have put him on notice.  (*Id.* ¶ 32.)

 Finally, DeChellis argues that equity weighs in favor of allowing him to file a late proof

of claim.  Denial of the DeChellis Motion would lead to an "unjust" and inequitable result as

former directors and officers of the Debtor would be entitled to indemnification, advancement,

and contribution from the Debtor while DeChellis would lack similar recourse.  (*Id.* ¶ 34.)

## II.    LEGAL STANDARD

### A.  Late-Filed Proofs of Claim

Bankruptcy Rule 9006(b)(1) governs the filing of proofs of claim after a bar date.  *See*

*Enron*, 419 F.3d at 121.  Bankruptcy Rule 9006 states in part:

> [W]hen an act is required or allowed to be done at or within a specified
> period by these rules or by a notice given thereunder or by order of court,
> the court for cause shown may at any time in its discretion . . . on motion
> made after the expiration of the specified period permit the act to be done
> where the failure to act was the result of excusable neglect.

FED. R. BANKR. P. 9006(b)(1).  Thus, "a proof of claim filed after the bar date will only be

permitted if the failure to file before the bar date 'was the result of excusable neglect.'"  *In re*

*Motors Liquidation Co.*, 600 B.R. 482, 487–88 (Bankr. S.D.N.Y. 2019), *aff'd*, No. 19-CV-5666

(JMF), 2020 WL 3120379 (S.D.N.Y. June 12, 2020).

In *Pioneer*, "[t]he Supreme Court . . . interpreted 'excusable neglect' to be a flexible

standard—one that can include 'inadvertence, mistake, or carelessness, as well as by intervening

circumstances beyond the party's control.'"  *Lehman*, 433 B.R. at 119 (quoting *Pioneer*, 507

U.S. at 395).  "However, 'the determination is at bottom an equitable one' that must take

'account of all relevant circumstances surrounding the party's omission.'"  *Id*. (quoting *Pioneer*,

507 U.S. at 395).  The *Pioneer* Court established four factors to assist bankruptcy courts in

evaluating excusable neglect: (1) the danger of prejudice to the debtor; (2) the length of the delay

and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it

was within the reasonable control of the movant; and (4) whether the movant acted in good faith.

*Pioneer*, 507 U.S. at 395.  "The Second Circuit strictly observes bar dates and has adopted what

has been characterized as a 'hard line' in applying the *Pioneer* test," meaning that this Court

should focus its analysis "primarily on the reason for the delay, and specifically whether the

25

delay was in the reasonable control of the movant." *Lehman*, 433 B.R. at 119–20 (quoting

*Enron*, 419 F.3d at 122).

### B.  Amending a Proof of Claim Post-Bar Date

Where a bar date has passed and a creditor seeks to file an amended proof of claim, "the

decision to allow the amendment of the claim is committed to the discretion of the bankruptcy

judge." *In re Asia Glob. Crossing, Ltd.*, 324 B.R. 503, 507 (Bankr. S.D.N.Y. 2005) (internal

citations omitted).  In the Second Circuit, amendment to a claim is

> freely allowed where the purpose is to cure a defect in the claim as originally
> filed, to describe the claim with greater particularity, or to plead a new
> theory of recovery on the facts set forth in the original claim.  However, the
> court must subject post bar date amendments to careful scrutiny to assure
> that there was no attempt to file a new claim under the guise of amendment.

*Integrated Res., Inc. v. Ameritrust Co., N.A. (In re Integrated Res., Inc.)*, 157 B.R. 66, 70

(S.D.N.Y. 1993) (citations omitted).

Courts apply a two-step inquiry when considering whether to allow post-bar date

amendments to proofs of claim.  *See Enron*, 419 F.3d at 133; *In re Barquet Grp. Inc.*, 477 B.R.

454, 464 (Bankr. S.D.N.Y. 2012), *aff'd*, 486 B.R. 68 (Bankr. S.D.N.Y. 2012).  First, the court

must determine "whether there was a timely assertion of a similar claim or demand evidencing

an intention to hold the estate liable." *Enron*, 419 F.3d at 133 (citations omitted).  A claim

satisfies this first prong if it: "1) corrects a defect of form in the original claim; 2) describes the

original claim with greater particularity; or 3) pleads a new theory of recovery on the facts set

forth in the original claim." *Id.* (quoting *In re McLean Indus., Inc.*, 121 B.R. 704, 708 (Bankr.

S.D.N.Y. 1990)).  In other words, the amendment must relate back to the original proof of claim.

If this "relation back" inquiry is satisfied, courts then examine whether it would be

equitable to allow the amendment. *Id.* (citing *Integrated Res.*, 157 B.R. at 70).  Courts consider

the following five equitable factors in determining whether to allow an amendment: (i) undue

prejudice to opposing party; (ii) bad faith or dilatory behavior on the part of the claimant; (iii)

whether other creditors would receive a windfall were the amendment not allowed; (iv) whether

other claimants might be harmed or prejudiced; and (v) the justification for the inability to file

the amended claim at the time the original claim was filed. *Integrated Res.*, 157 B.R. at 70

(citation omitted); *Enron*, 419 F.3d at 133. "The critical consideration is whether the opposing

party will be unduly prejudiced by the amendment." *Integrated Res.*, 157 B.R. at 70 (citation

omitted).

### C. Adequacy of Notice

Creditors must be afforded notice "reasonably calculated, under all the circumstances to

apprise" them of the pendency of a bar date. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339

U.S. 306, 314 (1950). If a debtor that files for chapter 11 bankruptcy protection does not give

"reasonable notice" to a creditor of the bankruptcy proceeding and of the applicable bar date, the

creditor's proof of claim cannot be constitutionally discharged. *Grant v. U.S. Home Corp. (In re*

*U.S.H. Corp. of N.Y.)*, 223 B.R. 654, 658 (Bankr. S.D.N.Y. 1998). Generally, notice of the

debtor's bankruptcy proceeding is not enough to put creditors on notice of the claim bar date.

*City of New York v. N.Y., N.H. & H.R. Co.*, 344 U.S. 293, 297 (1953) ("Nor can the bar order

against [the creditor] be sustained because of the [creditor's] knowledge that reorganization of

the [debtor] was taking place in the court . . . . [E]ven creditors who have knowledge of a

reorganization have a right to assume that the statutory 'reasonable notice' will be given them

before their claims are forever barred."). *But see In re AMR Corp.*, 492 B.R. 660, 666 (Bankr.

S.D.N.Y. 2013) (noting that a creditor who was sophisticated, represented by counsel, and aware

of the chapter 11 cases by virtue of an automatic stay put in place on its prepetition litigation

should have monitored the bankruptcy case and docket).

27

"To determine whether notice was reasonably given, '[t]he proper inquiry is whether the [noticing party] acted reasonably in selecting means likely to inform persons affected, not whether [a particular party] actually received notice.'" *In re Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.*, 471 B.R. 331, 339 (Bankr. S.D.N.Y. 2012) (quoting *Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir. 1988)) (alterations in original). What type of notice is reasonable or adequate depends on whether a creditor is "known" or "unknown" to the debtor. *U.S.H. Corp. of N.Y.*, 223 B.R. at 658. If a creditor is "known" to a debtor, actual notice of a debtor's bankruptcy filing and bar date must be given to the creditor in order to achieve a legally effective discharge of the creditor's claim. *See Chemetron Corp. v. Jones*, 72 F.3d 341, 345 (3d Cir. 1995) (citing *City of New York*, 344 U.S. at 296); *In re Drexel Burnham Lambert Grp., Inc.*, 151 B.R. 674, 680 (Bankr. S.D.N.Y. 1993) (providing that, for known creditors, adequate notice requires actual written notice of the bankruptcy filing and of the bar date). If the creditor is "unknown" to the debtor, however, constructive notice, including publication notice, is generally sufficient. *Chemetron*, 72 F.3d at 346 (citing *In re Thomson McKinnon Sec., Inc.*, 130 B.R. 717, 719–20 (Bankr. S.D.N.Y. 1991)); *Mullane*, 339 U.S. at 317 (indicating that constructive notice may be satisfied through publication notice).

The Supreme Court has explained that a "known" creditor includes both a claimant whose identity is actually known to the debtor or a claimant whose identity is "reasonably ascertainable" by the debtor. *See Chemetron*, 72 F.3d at 346 (quoting *Tulsa Pro. Collection Serv., Inc. v. Pope*, 485 U.S. 478, 490 (1988)) (explaining that claimants must be reasonably ascertainable, not reasonably foreseeable). As the *Drexel Burnham* court put it,

> Known creditors are defined as creditors that a debtor knew of, or should have known of, when serving notice of the bar date. Among known creditors may be parties who have made a demand for payment against a debtor in one form or another before the compilation of a debtor's

> schedules.   Typically, a known creditor may have engaged in some
> communication with a debtor concerning the existence of the creditor's
> claim.  This communication by itself does not necessarily make the creditor
> known.  Direct knowledge based on a demand for payment is not, however,
> required for a claim to be considered "known."  A known claim arises from
> facts that would alert the reasonable debtor to the possibility that a claim
> might reasonably be filed against it.

*Drexel Burnham*, 151 B.R. at 681.

In contrast, an "unknown" creditor is a creditor whose identity or claim is not "reasonably ascertainable" or is merely "conceivable, conjectural or speculative." *Thomson*, 130 B.R. at 720 (citing *Charter Crude Oil Co. v. Petroleos Mexicanos (In re Charter Co.)*, 125 B.R. 650, 655 (M.D. Fla. 1991)); *see Mullane*, 339 U.S. at 317 (noting that it was reasonable to dispense with more certain notice to claimants "whose interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to the knowledge [of the debtor in possession]").

Whether a creditor's identity is "reasonably ascertainable" is contingent upon whether such creditor may be "identified through 'reasonably diligent efforts.'" *U.S.H. Corp. of N.Y.*, 223 B.R. at 659 (quoting *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n.4 (1983)). However, such reasonable diligence "does not require 'impracticable and extended searches" or a "duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it." *Id.* (quoting *Mullane*, 339 U.S. at 317 and *Charter Co.*, 125 B.R. at 654)); *Drexel Burnham*, 151 B.R. at 681 ("A debtor need not be omnipotent or clairvoyant . . . [but] is obligated, however, to undertake more than a cursory review of its records and files to ascertain its known creditors."). Rather than a "vast, open-ended investigation," a debtor is only required to perform a "careful examination" of its own books and records. *Chemetron*, 72 F.3d at 346–47 (citations omitted). In other words, a debtor is not expected to "notify[] every possible creditor, no matter how speculative their claim might be." *Charter Co.*, 126 B.R. at 656 (citations

29

omitted).  Thus, "what is reasonable depends on the particular facts of each case."  *U.S.H. Corp. of N.Y.*, 223 B.R. at 659; *see also Drexel Burnham*, 151 B.R. at 680 ("Reasonable diligence in ferreting out known creditors will, of course, vary in different contexts and may depend on the nature of the property interest held by the debtor.") (citations omitted).

## III.    DISCUSSION

Each of the Movants had notice of the General Bar Date and, for the reasons discussed, has failed to establish that their inaction rises to "excusable neglect" under *Pioneer*.  *See Lehman*, 433 B.R. at 119 ("The party seeking an extension of time bears the burden of proving excusable neglect.") (citation omitted).  Accordingly, the Movants will not be permitted to file the late proofs of claim they seek.

### A.  Movants Had Notice of the General Bar Date

As a threshold matter, each of the Movants possessed proper notice of the General Bar Date.  Both Morgan Stanley and DeChellis were served with copies of the Bar Date Notice via first-class mail, and each filed timely proofs of claims in this chapter 11 case.  As for Cooper, however, the matter is disputed.

Cooper contends that he is a "known" creditor who should have received actual notice and contests the Debtor's characterization of him as an "unknown" creditor.  (*Compare* Cooper Reply ¶¶ 22–23 (indicating that Cooper was a "known creditor" who should have received and was entitled to actual notice) *with* Consolidated Objection ¶ 29 (stating that the Debtor "did not serve a copy of the bar date notice on Mr. Cooper because he was not a known creditor at that time").)  In making this assertion, Cooper attempts to turn the Debtor's arguments on their heads.[10]

---

[10]     At the May 16th hearing, counsel for Cooper suggested that the Court should focus more on the Debtor's "completely contradictory" arguments than on the "known" vs. "unknown" distinction.  (*See* May 16, 2024 Hr'g Tr.

*First*, he maintains that, if it is true that the Merger was so "highly contentious" that Cooper should have expected to be sued (and therefore, file a claim in this chapter 11 case), the "Debtor should [also] have expected Cooper to have a claim against the Debtor relat[ing] to or arising from the Merger." (Cooper Reply ¶ 23.) *Second*, Cooper also contends that if his indemnification claim arose from pre-petition contracts and organizational documents, then facts existed that should have alerted the Debtor "to the possibility that a claim might reasonably be filed against it." (*Id.* (quoting *Drexel Burnham*, 151 B.R. at 681).)

Therefore, Cooper argues that the Debtor, "by its own admission," establishes that he is a "known creditor who was entitled to actual notice" since his claim "was reasonably ascertainable by the Debtor." (*Id.*; *see also* May 16, 2024 Hr'g Tr. at 117:1–2, 12–16, 20–22 ("What . . . we're hearing from SVB in their papers are contradictory arguments . . . . [A]s you're evaluating excusable neglect . . . the Court should apply the equities consistent with *Pioneer* when balancing what type of notice Mr. Cooper provided or received against the reasons for why he did not timely file a proof of claim. . . . And as a core tenant for why Your Honor should deny his late-filed proof of claim because of those contradictory arguments.").)

Cooper's assertion that the Debtor is making "contradictory arguments," however, misses the mark as to what is required of a debtor. Generally, "[a]n 'unknown' creditor is one whose 'interests are either conjectural or future or, *although they could be discovered upon investigation, do not in due course come to knowledge [of the debtor]*.'" *U.S.H. Corp. of N.Y.*, 223 B.R. at 659 (quoting *Mullane*, 339 U.S. at 317) (emphasis added). The focus, therefore, is whether the Debtor could have reasonably ascertained the identity of Cooper as a creditor

---

at 116:19–20 ("On the known versus unknown creditor dispute, Your Honor, to some degree I don't necessarily want to weigh in."); *id.* at 116:23–117:2 ("We certainly believe that factual notice was required but, to some degree, that almost misses the point . . . [the Court should] step back and evaluate excusable neglect. What, I think, we're hearing from SVB in their papers are contradictory arguments.").) The Court disagrees.

through a review of its "own books and records."  *Id.*  "Debtors cannot be required to provide

actual notice to anyone who potentially could have been affected by their actions; such a

requirement would completely vitiate the important goal of prompt and effectual administration

and settlement of debtors' estates."  *Id.* (citation omitted).  Therefore, unless it was evident from

the Debtor's books and records that Cooper may possess a claim against the Debtor, the

contentious or uncontentious nature of the Merger is irrelevant as to the Debtor, and Cooper has

not established otherwise.  *See Best Prods.*, 140 B.R. at 358 (noting that other than a review of

its own books and records, "a debtor is not required to search elsewhere for those who might

have been injured." (citing *In re Waterman S.S. Corp.*, 59 B.R. 724, 727 (Bankr. S.D.N.Y.

1986))).

Similarly, Cooper's argument that the relevant pre-petition contracts and organizational

documents should have put the Debtor on notice is also unavailing.  Cooper indicates that his

indemnification rights stem from the Merger Agreement and the "operative operational

documents of Boston Private."  (May 16, 2024 Hr'g Tr. at 128:14–17; *see also* Cooper Motion ¶

8 (indicating that section 6.6 of the Merger Agreement obligates the Debtor to indemnify Cooper

and advance his attorneys fees and other costs).)  Nonetheless, he states that he had "very limited

involvement in the actual [M]erger itself."  (May 16, 2024 Hr'g Tr. at 115:24.)

To the extent the Merger Agreement and "operative operational documents of Boston

Private" were indeed part of the Debtor's books and records, which Cooper has not indicated is

the case one way or another, it is unclear how the Debtor would have considered him a "known"

creditor if his only "attenuated tie" was his "signature [that] appeared on a notice of a

shareholder meeting . . . sent to Boston Private shareholders."  (*Id.* at 115:24–116:2 (indicating

that his signature reflected the "extent of his involvement"); Cooper Motion ¶ 3 (indicating that

Cooper had only an "attenuated tie").) This, coupled with the undisputed fact that Cooper did

not become an employee of the Debtor following the Merger, supports a finding that Cooper was

an "unknown" creditor. (*See* Consolidated Objection ¶ 29 (stating that Cooper was "not a known

creditor" at the time the Bar Date Notices were served); Cooper Motion ¶ 1 (indicating that

Cooper did not join the Debtor as an employee); May 16, 2024 Hr'g Tr. at 116:3–9 ("Mr. Cooper

. . . was not employed by SVB once the [M]erger closed. So . . . from an insurance perspective –

a D&O insurance perspective . . . Mr. Cooper we do not believe can avail himself of any of the

D&O insurance that's available to SVB officers or directors").)

　　　　Accordingly, it is unclear how the Debtor could have been aware of the "possibility that a

claim might reasonably be filed against it." *Drexel Burnham*, 151 B.R. at 681. Rather,

expecting the Debtor to consider him a "known" creditor would require the Court to venture into

the realm of "conceivable, conjectural or speculative." *Thomson*, 130 B.R. at 720 (citing

*Charter Co.*, 125 B.R. at 655). And, in any event, even a "debtor's obligation to give actual

notice to known creditors does not absolve a creditor of its duty to file a proof of claim, or at

least a protective proof of claim, to take part in the bankruptcy process." *Drexel Burnham*, 151

B.R. at 681 n.3 (citing to *The Mary*, 13 U.S. 126, 145 (1815) for the proposition that "it is the

part of common prudence for all those who have any interest in [a thing], to guard that interest . .

. .")).

　　　　As the Court concludes that Cooper was indeed an "unknown" creditor, the Court also

finds that publication notice of the General Bar Date in two national newspapers was sufficient

to put Cooper on notice. *See Mullane*, 339 U.S. at 317 (providing that constructive notice to

unknown creditors may be satisfied via publication notice). Therefore, each of the Movants,

including Cooper, had notice of the General Bar Date.

B. **Excusable Neglect**

    1.  <u>Application of *Pioneer* Generally</u>

As a preliminary matter, while the parties agree that *Pioneer* is the governing standard, certain of the Movants dispute the manner in which it should be applied. (*See* Morgan Stanley Reply ¶ 2 ("The parties agree that the relevant issue is whether Morgan Stanley demonstrated 'excusable neglect' and that this entails consideration of the four factors determined by the Supreme Court in [*Pioneer*]."); May 16, 2024 Hr'g Tr. at 113:7–10 (suggesting that the standard is "slightly in dispute" as "SVB argues that the Court should adopt a hard line when applying the *Pioneer* test").). Specifically, DeChellis and Cooper, citing to *Enron*, assert that the Court should adopt a "flexible" and "elastic" approach in applying *Pioneer*. (*See* Cooper Reply ¶ 1 (stating that the *Pioneer* is "flexible" and a "somewhat elastic concept" (citing *Enron*, 419 F.3d at 121)); DeChellis Reply ¶¶ 5, 9–10 (indicating that the excusable neglect inquiry is "essentially 'elastic'" and "equitable" in nature (citing *Enron*, 419 F.3d at 121–22)); *see also* May 16, 2024 Hr'g Tr. at 103:20–22 ("As the Court knows well, excusable neglect is an elastic concept and entails an equitable analysis that considers all the relevant circumstances."); *id.* at 114:9–13 ("[C]ourts in the Second Circuit have said, excusable neglect is an elastic concept not strictly related to certain causes or situations.").)

However, as DeChellis and Cooper acknowledge, the *Enron* court went on further to state that the Second Circuit has nonetheless "'taken a hard line' in applying the *Pioneer* test." *Enron*, 419 F.3d at 122. Indeed, the *Enron* court acknowledged that "other courts have, for the most part, adopted a similar 'hard line' to applying *Pioneer* that emphasizes the reason for the delay." *Id.* at 123–24 (citing authorities from the First Circuit, Eighth Circuit, Ninth Circuit and Tenth

Circuit as well as the Western District of Texas and Eastern District of Pennsylvania, among others).

This Court, bound by the Second Circuit, has done no different, and DeChellis and Cooper have failed to persuade the Court why it should do otherwise.[11] *See, e.g.*, *In re Motors Liquidation Co.*, 619 B.R. 63, 74 (Bankr. S.D.N.Y. 2020) ("The Second Circuit strictly observes bar dates and has adopted what has been characterized as a 'hard line' in applying the *Pioneer* test,' meaning that this Court should focus its analysis 'primarily on the reason for the delay, and specifically whether the delay was in the reasonable control of the movant.'" (quoting *Lehman*, 433 B.R. at 119–20)); *AMR*, 492 B.R. at 666 ("The Second Circuit has adopted a strict standard on excusable neglect . . . [which] focuses primarily on the reason for the claimant's delay . . . .") (citations omitted)); *see also* May 16, 2024 Hr'g Tr. at 125:8–9 (indicating that the Court has "pretty much followed the hard-line approach").

Therefore, against this backdrop, the Court will now address each of the *Pioneer* factors.

## 2. The Risk of Prejudice Weighs in Favor of the Debtor

Generally, the prejudice factor "calls for consideration of the overall negative effect, if any, on a debtor and its estate resulting from allowing a late claim." *Lehman*, 433 B.R. at 120. Courts should avoid finding prejudice based on speculation or hypothetical harms and instead draw conclusions of prejudice from the facts in evidence. *Id.* In making such a determination, a

---

[11]     Each of the Movants also appeal to principles of equity in support of the relief sought. (*See* Morgan Stanley Motion ¶ 23 (arguing that equity weighs in favor of permitting a late-filed claim); Cooper Motion ¶ 31 (same); DeChellis Motion ¶ 31 (same).) In the DeChellis Reply, DeChellis takes it a step further and argues that denying him an opportunity to file a late proof of claim would be "unjust and unequitable" as other former directors and officers of the Debtor would be entitled to indemnification, advancement, and contribution from the Debtor when he is not. (DeChellis Reply ¶ 34.) However, DeChellis fails to acknowledge that such former directors and officers may be entitled to such in the first place because they complied with the General Bar Date when he did not. The *Pioneer* test and the determination of whether neglect is "excusable" is already "at bottom an equitable one, taking account of all relevant circumstances the party's omission." *Pioneer*, 507 U.S. at 395. And, for reasons that will be discussed, the *Pioneer* factors weigh against a finding of excusable neglect as to DeChellis.

court should look to, for example, "the size of a late claim in relation to the estate, whether a disclosure statement or plan has been filed, and the disruptive effect permitting the late claim would have on plan formation." *Id.* (citing *In re Keene Corp.*, 188 B.R. 903, 910 (Bankr. S.D.N.Y. 1995)).

Prejudice to a debtor may not be "traceable to the filing of any single additional claim but to the impact of permitting exceptions that will encourage others to seek similar leniency." *Lehman*, 433 B.R. at 121. "Allowing even a single late claim risks inspiring similar efforts from creditors who also missed the bar date." *Motors Liquidation*, 598 B.R. at 758 (citing *Meadows*, 539 B.R. at 252). As this court has previously stated:

> [D]etermining whether a given creditor's "neglect" is sufficiently "excusable" frequently entails time-consuming litigation at great expense to the estate. The mere prospect of litigating additional motions to file post-bar-date proofs of claim is enough to prejudice the debtor. *In re Keene Corp.*, 188 B.R. 903, 913 (Bankr. S.D.N.Y. 1995) (finding "the legal fees the estate would potentially expend in litigating [late claims] supports a finding of prejudice").

*Motors Liquidation*, 619 B.R. at 80 (quoting *Motors Liquidation*, 598 B.R. at 759) (citation in original).

It goes without saying that ascertaining the "foreseeable impact of late-filed claims . . . [remains] an uncertain process that 'require[s] a certain amount of crystal ball gazing.'" *Lehman*, 433 B.R. at 120 (quoting *Enron*, 419 F.3d at 130) (alterations in original). And, engaging in this forward-looking practice, while challenging in any case, is particularly difficult in complex cases such as this one. *See, e.g.*, *id.* (discussing the difficulties associated with assessment of potential prejudice in a case involving claims filed in the aggregate amount of $899 billion).

As of the General Bar Date, the Debtor has received 1,274 timely-filed proofs of claim, totaling approximately $5.5 billion. (Solicitation Disclosure Statement at 25.) In addition, the

Debtor has also received 20 timely-filed proofs of claim filed by governmental units in the total approximate amount of $1.7 billion.  (*Id.*)  Resolution of claims filed in this chapter 11 case will undoubtedly require a substantial effort.  Indeed, in recognition of such, the Court entered a procedural order that granted the Debtor leave to file omnibus objections to claims so as to facilitate the process while simultaneously reducing the size of the docket and conserving judicial resources.  (*See Order Approving (I) Omnibus Claims Objection Procedures and (II) Omnibus Claims Satisfaction Procedures*, ECF Doc. # 713.)

Here, the Debtor believes that its reorganization efforts "would be hamstrung if it is forced to litigate a Rule 9006(b) motion every time any tangentially co-liable third party is sued in connection with matters arising from SVB Financial's collapse."  (Consolidated Objection ¶ 20.)  It argues that permitting the late-filed claims would contribute to "significant uncertainty regarding the extent of its liabilities at this critical juncture in its reorganization efforts as it attempts to confirm a proposed chapter 11 plan."  (*Id.* citing to *In re Enron Corp.*, No. 01-16034 (AJG), 2007 WL 610404, at *10 (Bankr. S.D.N.Y. Feb. 23, 2007), which found prejudice to the debtor based on the potential that similarly situated, contingent claimants would seek similar relief and thereby disrupt confirmation of the debtor's already-proposed chapter 11 plan.).)  The Court agrees.

Presently, the Debtor has commenced a claims reconciliation process,[12] received approval of its Second Amended Disclosure Statement, and is presently gearing up for plan confirmation, which is scheduled to begin on July 15, 2024.  *Compare with In re Roman Cath. Diocese of Rockville Centre, New York*, No. 20-12345 (MG), 2023 WL 4497418, at *9 (Bankr.

---

[12]    As of the date of the Second Amended Disclosure Statement, the Debtor has filed five omnibus claims objections (ECF Doc. ## 768, 812, 908, 1021, 1099), and the Court has entered four orders sustaining certain of the Debtor's omnibus claims objections.  (Solicitation Disclosure Statement at 25.)

S.D.N.Y. July 12, 2023) (distinguishing *AMR* and finding it inapplicable where the debtor was "still ostensibly far from confirming a plan").  The fact that there has not been a confirmed plan in this case yet, as Movants contend, is alone insufficient for the Movants to prevail on this factor.[13]  *See AMR*, 492 B.R. at 667 (rejecting the contention that a late proof of claim would not impact the judicial administration of a case where debtors had not filed a plan and disclosure statement at the time movant filed its motion).  Indeed, whether or not a disclosure statement or plan has been filed in the chapter 11 case is only one of several considerations a court may account for in determining whether prejudice exists.  *See Lehman*, 433 B.R. at 120 (noting that, in addition to whether a disclosure statement or plan is on file, courts should also consider claim size and any potential disruption to plan formation) (citing *Keene*, 188 B.R. at 910).

As recognized in *Lehman*, enforcement of a bar date order is an "essential part of the orderly administration of the claims that have been filed in compliance with that order." *Lehman*, 433 B.R. at 121.  The Debtor has a crucial interest in maintaining the integrity of the Bar Date Order and "bringing closure to the class of timely filed claims."  *Id.*  "Indeed, if a late claim was permitted so long as it was filed before the plan, the bar date would serve little purpose."  *See AMR*, 492 B.R. at 667.

Contrary to Movants' assertions then, inclusion of these late-filed claims would "inject . . . 'uncertainty' into the Debtor's reorganization efforts" as additional claims the Debtor would need to address and reconcile.  (Cooper Reply ¶ 11.)  Even if the impact may, at the end of the day be monetarily "negligible" in light of possible insurance coverage, there is impact

---

[13]    Morgan Stanley also contends that *Meadows*, 539 B.R. 246 is distinguishable since it involved a movant who sought to file three late amended proofs of claim "years after the confirmation of the debtors' reorganization plan."  (Morgan Stanley Reply ¶ 13 (quoting *Meadows*, 539 B.R. at 252).)  However, in reaching its ruling, the *Meadows* court considered the overall impact to the debtors if the late-filed claims were permitted.  *See Lehman*, 433 B.R. at 120 (stating that the prejudice factor requires consideration of the "overall negative effect, if any, on a debtor and its estate resulting from allowing a late claim.").  Here, the Court is doing the same, and the lack of a confirmed plan alone does not foreclose a finding of prejudice to the Debtor.

nonetheless and such impact is noteworthy.[14]   *See Enron*, 419 F.3d at 129 (rejecting movant's

contention that late inclusion of its claim would have *de minimis* impact given the "vastness" of

debtor's bankruptcy case since it "ignores the arduous process of valuing assets, validating

claims, and negotiating a compromise among a host of creditors").

DeChellis himself acknowledges that if his late-filed claims for indemnification and

advancement were permitted to proceed, his claims are "admittedly, unliquidated because

DeChellis's defense against the [2024] *Rossi* Complaint has only recently begun, and

DeChellis's contribution claim is both unliquidated and contingent as there has been no ruling as

to his liability." (DeChellis Reply ¶ 16.) In other words, there is uncertainty as to both the

timing and the amount of the Debtor's liability on account of the DeChellis Proposed Claim.

Similarly, both the Morgan Stanley Proposed Claim and Cooper Proposed Claim are also

unliquidated. (*See* Morgan Stanley Proposed Claim, Addendum ¶ 3 (asserting claims for, among

other things, "rights of repurchase, indemnity, contribution, subrogation, and/or reimbursement

for amounts that have been liquidated, unliquidated . . . or otherwise contingent and arising from

or related to existing, potential, or threatened litigation arising from or related to existing[,]

potential, or threatened litigation arising from or related to the Merger"); *id.* ¶ 4 (reserving the

---

[14]     The actual extent of such D&O Insurance coverage is also unclear. Each of the Movants has suggested that
there may be D&O Insurance coverage that could assist in covering defense costs. (*See, e.g.*, Morgan Stanley
Motion ¶ 16 (noting that the Court already "granted permission for the advancement of defense costs to . . . earlier-
named defendants from the Debtor's insurance policies"); Cooper Reply ¶ 3 (indicating that Cooper received
confirmation that Boston Private's D&O Insurance will cover his defense costs in connection with the 2024 *Rossi*
Complaint); DeChellis Reply ¶ 17 (stating that Boston Private's D&O Insurance "will be contributing to his defense
costs").) However, it remains unsettled whether such insurance coverage is definite and whether it would mitigate,
in full or in part, any defense costs the Debtor would otherwise be responsible for. (*See* Morgan Stanley Motion ¶¶
16, 18 (failing to indicate whether the Court's relief allowing advancement to earlier-named defendants could be
extended to Morgan Stanley in connection with the 2024 *Rossi* Complaint); May 16, 2024 Hr'g Tr. at 116:11–14
(noting that Cooper only received an "*initial* indication from the insurer for Boston Private . . . [that] he is covered
under the D&O [I]nsurance") (emphasis added); *id.* at 109:19–24 (confirming that DeChellis received "*preliminary*
determination of coverage by a D&O insurer" but "submit[s] . . . that's not sufficient to—that his claims here are
still important. And there may be instances, for whatever reason, that—these are large claims that are asserted
against him in the Rossi complaint") (emphasis added).)

right for Morgan Stanley to "specify the amount of [its] contingent, unmatured and/or unliquidated claims as they become non-contingent and/or unliquidated"); Cooper Motion ¶ 10 (requesting permission to file the Cooper Proposed Claim for "unliquidated . . . claims against the Debtor"); DeChellis Motion ¶ 11 (same).)  Permitting these late claims to proceed in this chapter 11 case would require the Debtor to expend resources to address them in the claims reconciliation process and delay the finality that courts have recognized is of vital importance in a chapter 11 case.

Moreover, the Merger, Silicon Valley Bank's collapse, and the Debtor's entry into chapter 11 were each highly publicized matters from which substantial litigation has arisen and will likely continue to arise.  It does not require much to recognize that permitting the Movants to file late claims could entice others to do the same.  In other words, prejudice is foreseeable.[15]

The Savoy Complaint, for example, while different from the 2024 *Rossi* Complaint, nonetheless asserts claims relating to Merger against DeChellis and a number of other former Boston Private directors.  (*See* Savoy Complaint ¶¶ 2, 12–21.)  While the Savoy Complaint was ultimately dismissed, it does not foreclose the possibility that former Boston Private directors and other parties involved in the Merger could be sued at some later point in connection with the Merger.  Indeed, a review of the claims register reflects that none these defendants— Stephen M. Waters, Mark F. Furlong, Joseph C. Guyaux, Deborah F. Kuenstner, Gloria C. Larson, Kimberly S. Stevenson, Luis A. Ubinas, and Lizabeth H. Zlatkus—have filed proofs of claim in this case

---

[15]    Morgan Stanley also argues that there is no prejudice to the Debtor since the 2023 *Rossi* Complaint, which did not name Morgan Stanley as a defendant, "already put the Debtor on notice of, and left the Debtor subject to, potential contribution claims in respect of, the claims now asserted against Morgan Stanley."  (Morgan Stanley Motion ¶ 18.)  This is unpersuasive in light of the potential for other creditors to follow suit if these late claims were allowed to proceed in this chapter 11 case.

yet. Thus, permitting the filing of late claims here would undoubtedly expose the Debtor "to the risk of a virtually never-ending claims resolution process." *Lehman*, 433 B.R. at 127.

Accordingly, the Court is unpersuaded that permitting the Movants to file late claims would not result in a "floodgates" situation as only the Movants have sought to, at this point, file late proofs of claim. (*See* Morgan Stanley Reply ¶ 12; Cooper Reply ¶ 3; DeChellis Reply ¶ 14.) Indeed, in recognition of the potential that additional claims may be filed against Morgan Stanley in connection with the Merger, the Morgan Stanley Proposed Claim, in fact, includes a protective component that encompasses claims "arising from or related to existing potential, or threatened litigation arising from or related to the Merger." (Morgan Stanley Proposed Claim ¶ 3.)

Therefore, based on the foregoing, this factor weighs against a finding of excusable neglect and in favor of the Debtor.

### 3.  The Length of Delay Weighs in Favor of the Debtor

The Second Circuit has held that there is no bright-line rule governing when the lateness of a claim will be deemed "substantial." *Motors Liquidation*, 619 B.R. at 78 (citing *Enron*, 419 F.3d at 128). As this Court has recognized, some courts have allowed claims two years after the bar date, while others have rejected claims filed only a day late. *Id.* The focus remains on the "degree to which the delay might disrupt the judicial administration of that particular case." *AMR*, 492 B.R. at 667. Determination of lateness of a claim is not made in a vacuum but is "considered [with]in the context of the proceeding as a whole" and accounts, to some extent, "the creditor's explanation for the delay." *Enron*, 419 F.3d at 128–29; *see also id.* at 129 ("[A] long delay (presumably more likely in most circumstances to occasion more disruption) with a strong explanation might be more acceptable than a short delay with a weak explanation—even if both explanations are credible."). Thus, as relevant considerations, courts will look to "the

length of delay, the complexity of the case, and the progress made in a case" with none being dispositive on its own. *AMR*, 492 B.R. at 667.

The focus remains, however, on the impact to the judicial administration of a case. *See id.* (deeming a request to file a late claim five months after the bar date order and more than three months after the bar date "significant" for its potential impact on the judicial administration of the debtors' cases). Movants themselves concede that in looking at the length of delay, a court must also consider its impact on the administration of a case. (*See* Morgan Stanley Motion ¶ 19 ("The length of delay in time is only given meaning by its effect on the administration of the case." (quoting *In re Lyondell Chem. Co.*, 543 B.R. 400, 411 (Bankr. S.D.N.Y. 2016))); Cooper Motion ¶ 28 (same); DeChellis Motion ¶ 27 (same); Cooper Reply ¶ 21 (stating that the length of delay "cannot be divorced from the effect the delay has on the administration of the case.").)

Here, the Movants filed the Motions roughly seven months after the General Bar Date on March 15, 2024. (Consolidated Objection ¶ 7.) While the Debtor attests that this factor is neutral to the *Pioneer* analysis, the Court disagrees. (*See id.* ¶¶ 22–23.) Presently, the Debtor is in the midst of both a claims reconciliation process and a plan confirmation process. *See AMR*, 492 B.R. at 667 (rejecting the argument that judicial administration of the chapter 11 case would not be impacted because the debtors had not filed a plan and disclosure statement at the time the movant filed its motion). As already discussed, permitting such late-filed claims would be prejudicial to the Debtor in its reorganization efforts.

The Movants nonetheless argue that this factor weighs in their favor because there was no delay on their part in filing the Motions after they were made aware of the 2024 *Rossi* Complaint. However, this argument is unavailing. As will be discussed below, the Court is unpersuaded by the Movants' articulated reasons for their delay, and the focus of this factor

remains on the degree to which the judicial administration of a debtor's estate will be impacted if the late claims were allowed to be filed.

Accordingly, this factor—while not otherwise dispositive—weighs in favor of the Debtor. The Movants have failed to show that asserting these claims seven months after the General Bar Date would not disrupt the administration of the Debtor's chapter 11 case.

### 4. The Reason for Delay Weighs in Favor of the Debtor

Typically, excusable neglect is "tough to demonstrate under *Pioneer*." *Lehman*, 433 B.R. at 127. This is especially so when a bar date order, such as the one here, is clear. *Id.* "Parties are held to a high standard of care and only the slightest flexibility is available for 'rights lost because they have been slept on.'" *Id.* (quoting *Silivanch*, 333 F.3d at 368). The "reason for delay" serves as the central focus of the excusable neglect inquiry with a particular emphasis on "whether the delay was in the reasonable control of the movant." *In re Motors Liquidation Co.*, 576 B.R. 761, 775 (Bankr. S.D.N.Y. 2017) (noting the Second Circuit's "hard line" approach to *Pioneer* requires a "focus . . . 'primarily on the reason for the delay, and specifically whether the delay was in the reasonable control of the movant'" (quoting *Lehman*, 433 B.R. at 119–120))).

Generally, "creditors must bear the responsibility for investigating and performing reasonable diligence to identify those claims that they have against the debtors in bankruptcy." *Lehman*, 433 B.R. at 126. "Neglect in filing a claim before the expiration of a clear bar date is excusable when the creditor, after conducting a reasonable amount of diligence, is justifiably confused or uncertain as to whether a particular transaction giving rise to a claim is or is not subject to the bar date order." *Id.*; *see also id.* at 127 (noting that excusable neglect is found in "instances where creditors consciously endeavored to comply with the bar date" as opposed to a "lack of care or thoughtful attention to the preparation and filing of their proofs of claim").

Therefore, a creditor seeking to file a late claim "must explain the circumstances surrounding the delay in order to supply the Court with sufficient context to fully and adequately address the reason for delay factor and the ultimate determination of whether equities support the conclusion of excusable neglect." *In re Enron Creditors Recovery Corp.*, 370 B.R. 90, 103 (Bankr. S.D.N.Y. 2007) (citing *Pioneer*, 507 U.S. at 388).

Here, the thrust of each of the Movants' reason for delay is essentially the same: the Movants could not have anticipated being named a defendant in the 2024 *Rossi* Complaint. (*See, e.g.*, Morgan Stanley Motion ¶ 16; Cooper Motion ¶ 18; DeChellis Motion ¶ 17.) As the specific facts for each Movant vary, the Court will address each Movant in turn.

### a. Morgan Stanley

Morgan Stanley asserts that it lacked notice or was unaware that a lawsuit would be brought against it in connection with the Merger since (i) it was not named in the April 2023 *Rossi* Complaint, and (ii) the 2024 *Rossi* Complaint advanced "unprecedented" theories of liability against Morgan Stanley that are "contrary to SEC guidance." (Morgan Stanley Motion ¶ 22; *see also* Morgan Stanley Reply ¶ 9 (arguing that the timing of its proof of claim was "not a result of a lack of diligence").) Morgan Stanley's arguments are unavailing.

As a creditor generally, Morgan Stanley bears the burden of "investigating and performing reasonable diligence to identify . . . claims that [it] may have against the [Debtor]." *Lehman*, 433 B.R. at 126. The onus on Morgan Stanley is even greater as it is not merely a sophisticated creditor, but also one that is represented by counsel. *See Motors Liquidation*, 598 B.R. at 758 ("In analyzing the reason for the delay, courts also 'take into account the movant's sophistication.'" (citation omitted)); *see also AMR*, 492 B.R. at 666 (accounting for a movant's status as a "sophisticated party" with counsel in finding that movant had a duty to monitor the

bankruptcy case). Morgan Stanley, therefore, possessed the ability to act with "greater diligence" to ascertain what other claims it may have against the Debtor in addition to claims relating to the *Hialeah* Class Action. *See Lehman*, 433 B.R. at 126 (denying movants' requests to file late claims as "each had the ability to act with 'greater diligence' to investigate and determine what claims could be asserted"). And, such "greater diligence" should have led Morgan Stanley, without much difficulty, to suspect that other potential lawsuits could be filed against it relating to the Merger. (*See, e.g.*, May 16, 2024 Hr'g Tr. at 106:22–25 ("[I]n many cases . . . with public companies that are caught up in circumstances, not even to the extent that SVB has been, I see these protective proofs of . . . claim that are filed.").)

The Merger, which both the April 2023 and 2024 *Rossi* Complaints relate to, predates not only the General Bar Date but the Debtor's chapter 11 case entirely. Morgan Stanley's Engagement Letter describes the scope of its role as financial advisor to Boston Private and illustrates the extent of its involvement in the Merger. Specifically, Morgan Stanley was tasked with providing "financial advice and assistance in connection with the Transaction, including, as appropriate, advice and assistance with respect to defining objectives, performing valuation analyses, structuring, planning and negotiating the Transaction, and reviewing any shareholder matters in connection with the approval of the Transaction" (Morgan Stanley Proposed Claim, Ex. 1; *see also* May 16, 2024 Hr'g Tr. at 122:12–14 (indicating that Morgan Stanley, as financial adviser to Boston Private, provided Boston Private with a fairness opinion).)

Morgan Stanley's mere involvement in the Merger along with the Merger's highly contentious nature should have more than put Morgan Stanley on notice that claims relating to the Merger may be brought against it irrespective of whether such claims ultimately, as a substantive matter, possess any merit. *See, e.g.*, *Savoy*, 626 F. Supp. 3d at 246 (detailing the

highly contentious proxy battle leading up to the Merger); *id.* (noting eight civil lawsuits were filed by Boston Private shareholders in connection with the proxy statements Boston Private issued relating to the Merger that ultimately, were voluntarily dismissed).

The Court, therefore, rejects Morgan Stanley's contentions that it could not have been expected to file a protective proof of claim, and that the Savoy Complaint and "criticisms of the [M]erger" are "less relevant because . . . those criticisms had nothing to do with what is alleged in the 2024 [*Rossi*] Complaint."  (Morgan Stanley Reply ¶ 9 (arguing it would be "unduly burdensome and impractical" to expect Morgan Stanley to file protective claims based on "potential phantasms of liability" when it was not and could not be properly sued (quoting *In re PT-1 Communcs., Inc.*, 292 B.R. 482, 489 (E.D.N.Y. 2003))); *id.* ¶ 10 (discussing the irrelevancy of the Savoy Complaint and the controversy surrounding the Merger).)  They are relevant as they—and the filings of the April 2023 *Rossi* Complaint and the 2024 *Rossi* Complaint themselves—reflect the degree of controversy surrounding the Merger.[16]  And all of the foregoing, other than the 2024 *Rossi* Complaint, occurred prior to the passage of the General Bar Date.  Moreover, the Morgan Stanley Proposed Claim is itself predicated, in part, on "potential phantasms of liability" as it encompasses claims asserted against Morgan Stanley that arise from potential and even threatened litigation relating to the Merger.  (*See* Morgan Stanley Proposed Claim, Addendum ¶ 3.)

It was well within Morgan Stanley's control and ability to timely file a protective claim in this chapter 11 case as illustrated by the timely filing of the Morgan Stanley Original Claim.  Simply because Morgan Stanley was not named in the April 2023 *Rossi* Complaint, which

---

[16]    Cooper has indicated that a third complaint was filed by Stephen Rossi before the General Bar Date—the May 2023 *Rossi* Complaint—which concerns the same subject matter as the 2024 *Rossi* Complaint.  (*See supra* note 4 and accompanying text.)

Morgan Stanley concedes is "substantively identical" to the 2024 *Rossi* Complaint, does not

foreclose the possibility that it would never be named.  (*See* Morgan Stanley Motion ¶ 2.)

Moreover, simply because specific legal theories or claims were not previously asserted

does not mean that they would never be asserted.  Absent "unusual and compelling

circumstances," bar date orders need to be "uniformly enforced," and creditors are expected to

file claims to protect their interests.  *Lehman*, 433 B.R. at 127; *Drexel Burnham*, 151 B.R. at 681

n.3 (noting that a creditor possesses a "duty to file a proof of claim, or at least a protective proof

of claim, to take part in the bankruptcy process"); *see also In re DPH Holdings Corp.*, 434 B.R.

77 (S.D.N.Y. 2010) (holding that the movant lacked excusable neglect since it should have filed

a contingent claim to protect its interest as there was "always a risk that based upon changed

circumstances, and the debtor's exercise of its business judgment" that the movant would possess

a claim).

As the Second Circuit has recognized, "[e]xcusable neglect does not excuse the failure to

file proof of claim for an indemnification liability by the bar date."  *SPV Osus*, 882 F.3d at 341

(citing *Sealink Funding Ltd. v. Bear Stearns & Co. Inc.*, No. 12 Civ. 1397, 2012 WL 4784450, at

*3 (S.D.N.Y. Oct. 9, 2012); *Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*, 2011 WL

4965150, at *5 (S.D.N.Y. Oct. 19, 2011)).[17]  With respect to claims for contribution, on the other

hand, the *SPV* court states:

> Unlike indemnification claims, contribution claims do not accrue until after
> liability is established.  A party may not know of a *potential* contribution
> claim until sued, which may be years after bankruptcy proceedings have
> commenced.  . . . This lack of notice forms, at a minimum, a credible basis

---

[17]    Each of the Movants also seeks to distinguish *Allstate* and *Sealink*, which the *SPV* court relies upon in
support on grounds that the cases (i) center on "related to" jurisdiction, not late proofs of claim, and (ii) either
decline to speculate on or acknowledge the possibility that a bankruptcy court may excuse a late filing.  (Morgan
Stanley Motion at 9 n.9; Cooper Motion at 13 n.7; DeChellis at 13 n.5.)  However, it does not change the fact that
the Second Circuit has made explicit that excusable neglect does not excuse the failure to file a claim for
indemnification.

for defendants to petition the bankruptcy court for leave to file a late proof
of claim based on excusable neglect.

*SPV Osus*, 882 F.3d at 340–41 (emphasis added and citations omitted).  The focus, therefore,

remains on whether a party was aware of the possibility that such claims could exist, and a party

need not wait until it is sued to file a claim for contribution.

Morgan Stanley cites to both *PT-1 Communs.*, 292 B.R. 482 and *BuildNet*, 2003 WL

22078079 for the proposition that it could not have been expected to file a protective proof of

claim when it had no reason to believe it possessed potential liability until after the General Bar

Date.  (Morgan Stanley Motion ¶ 23.)  These cases from other jurisdictions, which predate the

Second Circuit's decision in *Enron Corp.* as well as this Court's decision in *Lehman*, are

distinguishable.

The *PT-1* court determined that good reason for delay existed where a movant had no

reason to conclude that it had a claim against the debtor based on facts it knew prior to the bar

date.  *PT-1 Communs.*, 292 B.R. at 489.  Similarly, in *BuildNet*, the facts and circumstances

giving rise to movants' claims arose only after a post-petition issue was raised regarding the

"mismanagement or irregularity in the management of the affairs of the Debtors by current or

former officers and directors of the Debtor."  *BuildNet*, 2003 WL 22078079, at *1.  It was not

until the issuance of the examiner's preliminary report five months after the bar date, which

involved the investigation into facts relating to misconduct or mismanagement, that identified the

existence of potential claims.  *Id.* at *3.

In contrast, Morgan Stanley's claims stem from the Merger and the Engagement Letter,

which both predate the Petition Date and were known to Morgan Stanley as of the General Bar

Date.  *Lehman* is particularly instructive here.  In *Lehman*, two movants sought to file late claims

on grounds that they were unaware of their guarantee claims until after the bar date.  *Lehman*,

48

433 B.R. at 125–26.  The *Lehman* court concluded that the guarantee claims, while initially

unknown, were "certainly . . . not unknowable," and "with the exercise of reasonable diligence,

could have [been] discovered."  *Id.* at 126.  The same goes for Morgan Stanley.

Accordingly, Morgan Stanley's argument that it was not on notice that a lawsuit like the

2024 *Rossi* Complaint could be brought against it is without merit, and there is no valid reason

for its delay.

> b.  *Cooper*

Cooper asserts that he possesses good reason for delay as he did not receive actual notice

of the General Bar Date and was neither aware nor had reason to suspect that claims would be

asserted against him in connection with the Merger.  (Cooper Motion ¶ 30.)  As the Court has

already established that Cooper received notice of the General Bar Date, the Court need only

address whether Cooper's other asserted reasons for his delay satisfy *Pioneer*.  For the reasons

discussed, the Court concludes they do not.

As the former Head of Legal and Corporate Secretary at Boston Private, Cooper, like

Morgan Stanley, is a sophisticated party that is represented by counsel.  Presumably an attorney

himself, Cooper, quite simply, should have known better.  The Merger and relevant contracts—

including the Boston Private Bylaws, Boston Private Articles of Incorporation, and the Merger

Agreement—all preceded the Debtor's chapter 11 case and were known to Cooper.  Cooper's

reliance, therefore, on *PT-1* and *BuildNet*, like Morgan Stanley, is also unavailing.

The Merger, as already discussed, was highly controversial from the get-go and involved

a contentious and "pitched proxy battle," including eight civil lawsuits commenced by Boston

Private shareholders as well as subsequent class action lawsuits such as the April 2023 *Rossi*

Complaint and the Savoy Complaint.  *See Savoy*, 626 F. Supp. 3d at 246 (describing the lead up

to the Merger). Moreover, Silicon Valley Bank's collapse and the Debtor's entry into chapter 11 were also both highly publicized events, which Cooper himself concedes "definitively put potential plaintiffs on notice of potential Securities Act claims." (Cooper Reply ¶ 10.) As the Debtor put it, it should have been "extremely predictable that disgruntled shareholders would scrutinize the Debtor's mergers and investor disclosures and pursue aggressive litigation against former executives, financial advisors, and anyone else who might conceivably constitute a potential source of recovery." (Consolidated Reply ¶ 18.) Cooper makes much ado about his involvement being limited to a single signature on a letter that was included in the Offering Materials. (Cooper Motion ¶ 3.) However, Cooper signed the letter in his capacity as Corporate Security and *on behalf of* the board of directors of Boston Private. (*Id.* (emphasis added).) Against a backdrop of high contention and publicity, Cooper should have been aware of the possibility that claims could be brought against him.

Therefore, for the same reasons as Morgan Stanley, it was well within Cooper's control and ability to timely file a protective claim in this chapter 11 case. Reasonable diligence should have made him aware that claims could be asserted against him in connection with the Merger by virtue of his position at Boston Private and the fact he was involved in the Merger at all. Indeed, the Savoy Complaint, while different from the 2024 *Rossi* Complaint, asserted claims against several of his former Boston Private colleagues, including DeChellis, in connection with the Merger. As with Morgan Stanley, just because Cooper was not initially named does not mean he would never be named, and there is no reason why Cooper could not have timely filed a claim in this chapter 11 to protect his interests. Therefore, Cooper's assertions that it was entirely unforeseeable he could be exposed to litigation in connection with the Merger are unpersuasive, and the Court finds that there is no good reason for his delay.

c.  *DeChellis*

DeChellis similarly asserts that he had no reason to expect nor anticipate the
"unprecedented claims" asserted against him in the 2024 *Rossi* Complaint.  (DeChellis Motion
¶¶ 17, 30.)  Like Cooper, DeChellis argues that he too only possessed an "attenuated tie" to the
Merger, a single signature on a letter to Boston Private shareholders recommending that they
approve the Merger.  (DeChellis Motion ¶ 3.)  Nonetheless, for the same reasons as Morgan
Stanley and Cooper, the Court is unpersuaded that DeChellis has established good reason for his
delay.

DeChellis, like the other Movants, is a sophisticated party with counsel.  Previously, he
served as the CEO of Boston Private before becoming the CEO of SVB Private.  DeChellis was
named a defendant in the pre-petition Savoy Complaint, which while different from the 2024
*Rossi* Complaint, nonetheless related to the Merger.  The highly controversial Merger and the
relevant contracts—including the Boston Private Bylaws, the Boston Private Articles of
Incorporation, the Merger Agreement, and the Debtor's bylaws—all existed prior to the
commencement of this chapter 11 case.  Therefore, for the same reasons as Morgan Stanley and
Cooper, the foregoing should have more than put DeChellis on notice that lawsuits may be filed
against him.

In one of the "most highly publicized corporate bankruptcies of this decade," reasonable
diligence would also have enabled DeChellis to identify possible claims he may or want to
preserve against the Debtor.  (Consolidated Objection ¶ 18.)  Thus, it was well within his control
and ability to timely file a protective claim in this chapter 11 case.  Indeed, DeChellis has already
filed three claims in this chapter 11 case, two of which have been disallowed and expunged as
being duplicative of the DeChellis Amended Proof of Claim.

DeChellis not being named in prior lawsuits—or was named but in connection with claims "radically different" than those asserted in the 2024 *Rossi* Complaint—does not preclude him from ever being named or from such claims ever being brought. The point is that he could be named (although it may not be known at the time by whom) and claims could be brought (although the specific nature and substance of such allegations may also be unknown). DeChellis, as with other creditors, is expected to file claims to protect his interests. *See, e.g.*, *DPH*, 434 B.R. 77 (noting that the movant should have filed a contingent claim to protect its interest since there was always a risk of changed circumstances that would allow a claim to arise after the bar date). Contrary to DeChellis's arguments, he does not need to be "clairvoyant or paranoid"; rather, he simply needed to be diligent. (DeChellis Reply ¶ 26.) And such diligence should have led him to be aware of the possibility that these claims could exist.

To address this, DeChellis contends that he is not asserting claims "arising out of or based on the Merger" and states, instead, that his claims for indemnification, advancement, and contribution "arise out of the [2024] *Rossi* action" itself. (DeChellis Reply ¶ 20.) However, as set forth in the DeChellis Proposed Claim, DeChellis indicates that his "rights to indemnification and advancement" from the Debtor are predicated on the following: (i) the Boston Private Bylaws and Articles of Incorporation; (ii) the Merger Agreement; and (iii) the Debtor's bylaws. (*See* DeChellis Proposed Claim ¶ 5 ("Claimant was entitled to indemnification and advancement of expenses from Boston Private pursuant to Boston Private's Bylaws and its Articles of Organization."); *id.* ¶ 8 (stating that the Merger Agreement "independently required SVBFG to provide indemnification and advancement of attorneys' fees and other costs for the then current and former officers, directors, and employees of Boston Private—including the Claimant"); *id.* ¶ 10 (indicating that, after he became CEO of SVB Private, he was also "entitled to

52

indemnification and advancement from SVBFG pursuant to SVBFG's Bylaws").  Therefore,

DeChellis's argument is without merit.

Accordingly, DeChellis has failed to establish that good reason exists for his delay.

### 5.  Good Faith is Not Dispositive

As to the fourth and final factor, the Debtor concedes that there is no reason to suggest

that the Movants acted in bad faith.  (*See* Consolidated Objection ¶ 22.)  Even so, the presence of

good faith is rarely a determinative factor in the *Pioneer* analysis.  *See Motors Liquidation*, 619

B.R. at 80 ("And rarely in the decided cases is the absence of good faith at issue.") (quoting

*Silivanch*, 333 F.3d at 366).  Therefore, this factor is not dispositive.

### C.  DeChellis's Request for File a Supplemental Claim

DeChellis's request to file a supplemental claim is effectively a request to further amend

the DeChellis Amended Claim after the passage of the General Bar Date.  Generally, a claim

may be amended post-bar date if the amendment relates back to an original proof of claim.

Courts will first look to "whether there was [a] timely assertion of a similar claim or demand

evidencing an intent to hold a debtor's estate liable."  *Enron*, 419 F.3d at 133 (quoting *Integrated

Res.*, 157 B.R. at 70) (alterations in original). An amendment will "meet this threshold if it '1)

corrects a defect of form in the original claim; 2) describes the original claim with greater

particularity; or 3) pleads a new theory of recovery on the facts set forth in the original claim.'"

*Id.* (quoting *McLean Indus., Inc.*, 121 B.R. at 708).

Here, DeChellis filed the DeChellis Amended Proof of Claim on July 28, 2023, which

seeks over $2.3 million "owed to him pursuant to agreements he entered into with [the Debtor]

and under his deferred compensation plan."  (DeChellis Motion ¶ 5.)  Pursuant to the DeChellis

Motion, DeChellis now seeks to file the DeChellis Proposed Claim as a separate, unliquidated

claim against the Debtor for indemnification, contribution, and advancement of expenses in connection with the 2024 *Rossi* Complaint.  (*Id.* ¶ 17.)  The DeChellis Proposed Claim does not "supplement" the DeChellis Amended Proof of Claim, but rather seeks to assert a new claim entirely.  (*See* May 16, 2024 Hr'g Tr. at 104:13–14 (conceding that DeChellis is "seeking to file a different claim, yes.").)  Therefore, as the DeChellis Proposed Claim does not relate back to the DeChellis Amended Proof of Claim, DeChellis's request to file a "supplemental" proof of claim also cannot be granted.

## IV.    <u>CONCLUSION</u>

For the reasons discussed, the Court **DENIES** the Motions.

**IT IS SO ORDERED.**

Dated:    June 7, 2024
          New York, New York

                                              *Martin Glenn*
                                    _____
                                         MARTIN GLENN
                               Chief United States Bankruptcy Judge