**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------------x

In re:                                                    **NOT FOR PUBLICATION**

      **SVB FINANCIAL GROUP,**                         Chapter 11

                                                                   Case No. 23-10367 (MG)

                               Debtor.

---------------------------------------------------------------------------x

**MEMORANDUM OPINION AND ORDER SUSTAINING DEBTOR'S THIRD OMNIBUS OBJECTIONS TO THE HELLER, XU AND NORFLEET CLAIMS AND OVERRULING WITHOUT PREJUDICE THE SIXTH OMNIBUS OBJECTION TO THE ZWOLFER CLAIM**

*A P P E A R A N C E S :*

SULLIVAN & CROMWELL LLP
*Attorneys for the Debtor*
125 Broad Street
New York, New York 10004
By:    James L. Bromley, Esq.
          Andrew G. Dietderich, Esq.
          Christian P. Jensen, Esq.

TIMOTHY HELLER
*Pro se Creditor*

ADRIAN NORFLEET
*Pro se Creditor*

FRANK XU
*Pro se Creditor*

ROBERT ZWOLFER
*Pro se Creditor*

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

I.    BACKGROUND ................................................................................................................ 6

  A.    The Chapter 11 Filing and the Bar Date Order .......................................................... 6

  B.    The Severance Claimants ............................................................................................ 8

    1.    The Heller, Norfleet, and Xu Claims ...................................................................... 8

      a.    In General......................................................................................................... 8

      b.    The Heller Claim ............................................................................................. 9

      c.    The Norfleet Claim ....................................................................................... 11

      d.    The Xu Claim................................................................................................. 12

    2.    The Zwolfer Claim ................................................................................................ 13

  C.    The Third Omnibus Claims Objection (Heller, Norfleet, and Xu) .......................... 14

    1.    The Objection, Responses Received, and the Debtor's Reply .............................. 14

    2.    Responses Received ............................................................................................... 14

      a.    The First Heller Response .............................................................................. 14

      b.    The First Xu Response ................................................................................... 15

      c.    The First Norfleet Response .......................................................................... 16

    3.    The Debtor's Reply ............................................................................................... 16

    4.    Other Relevant Procedural History ....................................................................... 17

    5.    The MOL as to the Heller, Xu, and Norfleet Claims ........................................... 18

    6.    Responses to the MOL .......................................................................................... 20

      a.    The Second Heller Response ......................................................................... 20

      b.    The Second Xu Response .............................................................................. 21

      c.    The Second Norfleet Response ...................................................................... 22

    7.    The MOL Reply to Heller, Xu, and Norfleet MOL Responses ........................... 22

  D.    The Sixth Claims Objection (Zwolfer) .................................................................... 23

    1.    The Sixth Claims Objection .................................................................................. 23

    2.    First Zwolfer Response ......................................................................................... 24

    3.    Other Relevant Procedural History ....................................................................... 25

    4.    The MOL as to the Zwolfer Claim........................................................................ 26

      a.    Additional Background Regarding the Zwolfer Claim.................................. 26

      b.    Argument ....................................................................................................... 27

    5.    The Second Zwolfer Response to the MOL........................................................... 28

6.    The MOL Reply to the Second Zwolfer Response ............................................ 29

II.    LEGAL STANDARD ................................................................................................ 31

III.    DISCUSSION ............................................................................................................ 33

A.    The Heller Claim ................................................................................................ 33

1.    Heller is Recovering Severance Payments From the FDIC .......................... 33

2.    In Any Event, Heller's SRA is Unenforceable ............................................. 34

a.    The Heller SRA was Executed on March 10, 2023 ................................. 34

b.    Heller's SRA is Unenforceable Against the Debtor ............................... 36

B.    The Xu Claim ..................................................................................................... 40

1.    Xu Possessed the Ability to Accept Debtor's Offer ..................................... 41

2.    Xu's SRA is Unenforceable Against the Debtor ........................................... 42

C.    The Norfleet Claim ............................................................................................ 46

1.    Norfleet Did Not Repudiate the SRA ........................................................... 47

2.    Norfleet's SRA is Unenforceable as to the Debtor ...................................... 48

D.    The Zwolfer Claim ............................................................................................. 51

1.    Choice of Law Analysis ............................................................................... 51

2.    The MOU is Likely an Enforceable Contract and Not a Mere Agreement to Agree ..... 52

3.    Conditions Precedent Analysis ..................................................................... 58

a.    The SRA .................................................................................................. 60

b.    The Separation Date ............................................................................... 63

IV.    CONCLUSION .......................................................................................................... 65

Pending before the Court are the claims (each, a "Claim," and collectively, the

"Adjourned Severance Claims" and the holders of such claims, the "Severance Claimants") of

the following creditors, which were subject to the third omnibus claims objection (the "Third

Claims Objection," ECF Doc. # 908) and sixth omnibus claims objection (the "Sixth Claims

Objection," ECF Doc. # 1182, and together with the Third Claims Objection, the "Claims

Objections") of the SVB Financial Group (the "Debtor"):

| Claimant[1] | Date Filed | Claim No. | Asserted Claim Amount | Claims Objection | Basis of Debtor's Objection |
|---|---|---|---|---|---|
| Timothy Heller | 8/8/2023 | 838 | $145,385.00 | Third | No Liability |
| Adrian Norfleet | 5/15/2023 | 42 | $22,565.00 | Third | No Liability |
| Frank Xu | 8/7/2023 | 789 | $43,846.00 | Third | No Liability |
| Robert Zwolfer | 6/14/2023 | 107 | $459,452.00 | Sixth | No Liability |

The Claims Objections seek entry of orders disallowing and expunging the Adjourned Claims from the Debtor's claims register in their entirety on "no liability" grounds. (*See* Third Claims Objection at 1–2; Sixth Claims Objection at 1–2; *see also Memorandum of Law in Support of Debtor's Third and Sixth Omnibus Objections to Proofs of Claim Solely with Respect to Certain Severance Claims* (the "MOL," ECF Doc. # 1404) at 2 ("Having obtained the relevant discovery, which confirms that a meeting of the minds did not occur for the severance agreements alleged by the Severance Claimants, Debtor now moves for the Court to disallow the [Adjourned] Severance Claims and expunge them from the claims register in their entirety.").) Annexed to the Claims Objections are (i) a proposed orders granting the respective Claims Objection, as originally contemplated, as Exhibits A; and (ii) declarations of Holden Bixler (the "Third Omnibus Bixler Declaration" and "Sixth Omnibus Bixler Declaration" as applicable), managing director at Alvarez & Marsal North America LLC, in support of the respective Claims Objection as Exhibits B.

With respect to the Third Claims Objection, the Debtor received, among other things, (i) formal responses from Xu (the "First Xu Response," ECF Doc. # 948) and Heller (the "First Heller Response," ECF Doc. # 971), and (ii) an informal response from Norfleet (the "First

---

[1]     Each of the Severance Claimants will be individually referred to by his or her last name, and each of their claims will be referred to as "[CLAIMANT LAST NAME] Claim."

Norfleet Response" and together with the First Xu Response and the First Heller Response, the "Third Omnibus Responses").  On April 5, 2024, the Debtor filed a reply (the "Third Omnibus Reply," ECF Doc. # 1009) that addresses the Third Omnibus Responses.  (*See* Third Omnibus Reply at 1 (responding to the First Xu Response, the First Heller Response and "other informal responses").)  Annexed to the Third Omnibus Reply is a supplemental declaration of Holden Bixler (the "Third Omnibus Supplemental Bixler Declaration") as Exhibit A.

With respect to the Sixth Claims Objection, in addition to responses filed by other creditors, the Debtor received a formal response from Zwolfer (the "First Zwolfer Response," ECF Doc. # 1209).  A copy of the Memorandum of Understanding (the "MOU") between Zwolfer and Laura Cushing, SVB's Chief Human Resources Officer, was annexed to the First Zwolfer Response as Exhibit 1.

On August 20, 2024, the Debtor filed the MOL pursuant to the Court-approved briefing schedule (the "8/19/24 So-Ordered Letter," ECF Doc. # 1400) with respect to the Adjourned Severance Claims.  Annexed to the MOL are (i) a proposed order sustaining the Third and Sixth Claims Objections as to the Severance Claims as Exhibit A and (ii) the declaration of Holden Bixler in support of the relief sought (the "MOL Bixler Declaration," ECF Doc. # 1404-2) as Exhibit B.

On August 29, 2024, Heller filed a response (the "Second Heller Response," ECF Doc. # 1432), which was entered on the Court's docket on August 30, 2024.  That same day, the Court also docketed a letter response from Xu, dated August 26, 2024 (the "Second Xu Response," ECF Doc. # 1435).

On September 3, 2024, the Debtor filed a reply to responses received to the MOL (the "MOL Reply," ECF Doc. # 1444).  Annexed to the MOL Reply as Exhibit A is the supplemental

declaration of Holden Bixler (the "MOL Reply Bixler Declaration," ECF Doc. # 1444-1), which includes copies of responses the Debtor received from Norfleet as Exhibit 1 (the "Second Norfleet Response," ECF Doc. # 1444-2) and Zwolfer as Exhibit 2 (the "Second Zwolfer Response," ECF Doc. # 1444-3).[2]

On September 5, 2024, the Court held a hearing on the Claims Objections.

For the reasons discussed below, the Third Claims Objection is **SUSTAINED** as to the Heller, Xu, and Norfleet Claims, which shall be expunged from the claims register. The Objection to the Zwolfer Claim is **OVERRULED WITHOUT PREJUDICE**, subject to further proceedings regarding the circumstances surrounding the signing of the SRA.

## I.    BACKGROUND

### A.  The Chapter 11 Filing and the Bar Date Order

Prior to March 10, 2023, the Debtor's primary businesses and operations were comprised of Silicon Valley Bank ("SVB" or the "Bank"), a state-chartered bank; SVB Capital, a venture capital and credit investment platform that focuses on funds management; and SVB Securities LLC, an investment bank. (MOL ¶ 1.) SVB and its affiliates directly employed all personnel that performed work for Debtor or any of Debtor's subsidiaries; the Debtor did not have employees of its own. (*Id.*) The work was performed pursuant to intercompany services agreements and other SVB policies and procedures. (*Id.*)

On March 10, 2023 (the "Closure Date"), the California Department of Financial Protection and Innovation ("DFPI") issued an order closing SVB, and on the same day DFPI appointed the FDIC as receiver of Silicon Valley Bank ("FDIC-R1"). (*Id.* ¶ 2.) After the Closure Date, on March 12, 2023, FDIC-R1 transferred all of SVB's deposits to Silicon Valley

---

[2]    A copy of the Second Zwolfer Response was also separately docketed at ECF Doc. # 1445 on September 4, 2024.

Bridge Bank, N.A. ("Bridge Bank").  (*Id.*)  Bridge Bank and the FDIC later entered into an

agreement with First Citizens Bank & Trust ("FCB") effective March 27, 2023 to transfer all of

Bridge Bank's deposits and loans to FCB (the "First Citizens Transaction").  (*Id.*)

On March 17, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for chapter

11 relief under the Bankruptcy Code.  (*Id.* ¶ 3.)  On June 29, 2023, the Court entered an order

establishing certain dates and deadlines for filing proofs of claims (the "Bar Date Order," ECF

Doc. # 373).  (Third Claims Objection ¶ 3.)  Specifically, the Bar Date Order established, among

other things, (a) August 11, 2023 at 4:00 p.m. as the bar date for entities other than governmental

units to file proofs of claim against the Debtor that arose before the Petition Date, including,

subject to the exceptions, secured claims, unsecured priority claims, unsecured nonpriority

claims, and claims pursuant to section 503(b)(9) of the Bankruptcy Code (the "General Bar

Date"); and (b) September 14, 2023 at 4:00 p.m. as the bar date for governmental units to file

proofs of claim against the Debtor (the "Governmental Bar Date").  (Bar Date Order ¶¶ 3, 4.)

The bar date for any claim that arises from the rejection of an executory contract or unexpired

lease is (i) the later of (A) the General Bar Date and (B) the date that is 30 days after the effective

date of rejection for such executory contract or unexpired lease; or (ii) any date this Court may

fix in the applicable order authorizing the rejection of an executory contract or unexpired lease.

(Third Claims Objection ¶ 3.)

On August 2, 2024, the Court entered an order (ECF Doc. # 1379) confirming the

Debtor's *Second Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (as

may be amended, modified, or supplemented from time to time, the "Plan").  (MOL ¶ 3.)  The

Debtor continues to operate its businesses and manage its properties as a debtor-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code pending its emergence from

chapter 11 pursuant to the confirmed Plan. (*Id.*)

**B. The Severance Claimants**

The Severance Claimants are all former employees of SVB who separated from SVB

and/or its subsidiaries or, in the case of Zwolfer, agreed to eventually separate from SVB, in the

weeks before the Closure Date. (*Id.* ¶ 4.) All Severance Claimants allege that Debtor is

obligated to make severance payments to them under purported agreements related to their

separation from SVB. (*Id.*) The facts specific to each of their claims are discussed below.

1. The Heller, Norfleet, and Xu Claims

*a. In General*

Heller, Norfleet and Xu bring claims for severance payments on the basis of Separation

and Release Agreements (each, an "SRA" and collectively, the "SRAs") that they allege are

binding upon Debtor. (*Id.* ¶ 5; *see* Heller Claim at 2 (noting that the claim "[a]rises out of a

Separation and Release Agreement containing confidentiality provisions"); Xu Claim at 2

(stating that the basis of the claim is "[s]everance pay . . . not paid . . . per the Separation and

Release Agreement"); Norfleet Claim at 4–9 (including as support a copy of the Separation and

Release Agreement she signed).) The SRAs are form agreements that generally provide that the

terminated employee will receive a severance payment in exchange for the employee's

agreement to release SVB Financial Group and all of its subsidiaries and affiliates from all

causes of action. (MOL ¶ 5.) Each were provided copies of the SRAs on February 7, 2023, but

did not immediately sign the SRAs. (*Id.* ¶ 6.) Specifically, the Debtor indicates that Heller and

Xu sought to negotiate with SVB for higher severance pay while Norfleet delayed submitting her

8

signature to SVB.  (*Id.*)  Meanwhile, Heller attributed this delay to the Debtor.[3]  (*See* First Heller

Response at 1 ("Debtor repeatedly delayed the process, ultimately resulting in the [SRA] not

being fully executed and Claimant not receiving severance pay.").)

On the Closure Date and after the DFPI announced that it had taken possession of SVB

and appointed FDIC-R1 as receiver, Heller, Norfleet, and Xu sent signed copies of the SRAs to

former SVB employees that were, at the time, operating under the control of the FDIC.  (*Id.* ¶¶

7–8.)  The Debtor discloses that, in the days following SVB's closure and placement into

receivership, there was news coverage "about the impact of the FDIC receivership and SVB and

its operations."  (*Id.* ¶ 9.)  Such news coverage highlighted, among other things, the following:

- the FDIC "added a few new employees to its payroll late Friday, taking on workers from shuttered Silicon Valley Bank, at least for a few weeks, as it serves as a receiver of the collapsed lending institution" (*id.* ¶ 9 (quoting MOL Bixler Declaration, Ex. 18 (March 11, 2023 Bloomberg Law article)); and

- typically in an FDIC takeover, "the employees of the failed bank are kept on to help with the transition," and the FDIC had offered SVB employees 45 days of employment (*id.* (quoting MOL Bixler Declaration, Ex. 18 (March 13–14, 2023 CNN news coverage)).

### b.  The Heller Claim

Heller was terminated by SVB on February 7, 2023.  (*See* First Heller Response at 2.)

Before his termination, Heller made "several complaints with SVB Employee Relations alleging

Hostile Work Environment" and, upon termination, "lodged a complaint with SVB Relations

which represented it would conduct an investigation of the allegations."  (*Id.*)

On February 22, 2023, Heller emailed Roxanne Ruiz, a former SVB employee, inquiring

whether there "ha[d] been any progress or resolution on [their] conversations about [his]

termination and severance" as it was his understanding that an investigation "would be started

---

[3]      Xu did not offer an explanation in the Xu Response, and Norfleet later disclosed that she did not immediately sign the SRA due to a "personal tragedy."  (Second Norfleet Response at 1.)

ASAP." (MOL Bixler Declaration, Ex. 2 at 2 (copies of email correspondence).) He followed

up again on March 1, 2023 and March 3, 2023. (*Id.*) The Debtor represents that, as of March 3,

2023, an investigation into Heller's allegations was already underway. (*See* MOL ¶ 10.) Heller

noted in his March 3, 2023 correspondence that the March 24, 2023 deadline to execute the SRA

was approaching and that he would "need to review any outcomes of the investigation with [his]

legal counsel." (*Id.*) Ruiz responded on March 7, 2023, stating that she was "extremely busy"

and would get back to Heller as soon as possible. (*Id.*; *see also* First Heller Response at 10.)

On March 10, 2023, Heller emailed Ruiz to inquire again as to the status of his

complaint. (MOL Bixler Declaration, Ex. 2 at 2.) Later that day, Heller emailed a signed copy

of the SRA to Kristi Newton and Robert Zwolfer and also signed the SRA at 12:27 p.m. via

DocuSign. (*See id.*, Ex. 3 at 2; First Heller Response at 14–15.) The DocuSign portal indicates

that Heller's signed SRA was sent to Robert Zwolfer on March 17, 2023 at 1:27 p.m. and that

Zwolfer still "need[ed] to sign." (First Heller Response at 15.) The Debtor submits that, as of

March 10, 2023 at 8:39 a.m., however, the Debtor was no longer affiliated with SVB and none of

SVB's employees, including Zwolfer, were affiliated with the Debtor nor possessed authority to

execute the SRA on behalf of the Debtor.[4] (MOL ¶ 11.)

On March 14, 2023, Heller emailed SVB's HR Service Center, stating that he had not

"gotten any confirmation that [the SRA] was received or countersigned." (MOL Bixler

Declaration, Ex. 4.) The attached email correspondence does not reflect that Heller received a

response. (*See id.*)

On March 31, 2023, Judith E. Galeano ("Galeano") of law firm Mowery Youell &

Galeano, Ltd., counsel to Heller, emailed a letter dated March 30, 2023 to Laura Cushing, "Chief

---

[4]       At the hearing on September 5, 2024, Debtor's counsel stated on the record that the Bank was closed
"effective 9 a.m. Pacific Time." (Sept. 5, 2024 Hr'g Tr. at 18:2–3.)

Human Resources Officer" at "Silicon Valley Bank," regarding Heller's SRA.  (*Id.*, Ex. 5 (copy

of the March 31, 2023 email correspondence); *id.*, Ex. 6 (copy of the attached letter).)  In the

letter, Galeano alleged that Heller's termination was "decidedly retaliatory in nature," and that

"[a]s a result, he lodged an internal complaint with Employee Relations which represented it

would conduct an investigation of the allegations."  (*Id.*, Ex. 6 at 1.)  According to Galeano,

"[b]ecause of the purported internal investigation being conducted by SVB, Mr. Heller and

Employee Relations agreed that Mr. Heller would not immediately execute the [SRA] until the

investigation was complete and he was aware of SVB's finding."  (*Id.*)  She further notes that

"SVB repeatedly delayed its investigation," which "attributed to Mr. Heller's delay in executing

the [SRA]."  (*Id.*)  In light of the foregoing, Galeano argued that Heller's severance payments

under the SRA "must be given administrative expense priority treatment."  (*Id.* at 2.)

On June 5, 2023, Heller filed the Heller Claim, which he asserts "arises out of the

termination of his employment" and his and the Debtor's entry into an SRA.  (Heller Claim at 5.)

He acknowledges in his response to the Third Claims Objection (discussed in greater detail

below) that "SVB did not execute their portion of the [SRA] on March 17, 2023 and instead filed

for Chapter 11 protection."  (First Heller Response at 2.)

### c.  The Norfleet Claim

The Debtor submits that Norfleet was provided an SRA on February 7, 2023, which she

signed on March 10, 2023.  (MOL ¶ 15; *see also* Norfleet Claim at 9 (signature page reflecting

Norfleet's signature, dated March 10, 2023).)  On March 10, 2023, Kimberly Lam of SVB's HR

Service Center confirmed receipt of the SRA in an email and indicated that there was a "7-day

revocation before [the SRA] goes to HR to sign."  (MOL Bixler Declaration, Ex. 8 at 1.)  Ms.

Lam further states that, "[o]nce the [SRA] is completed, [Norfleet] will receive a copy back and

[they] will process [her] payment," which she should receive "on the check [sic] SVB pay

period." (*Id.*) The Debtor indicates that the documents FCB produced did not include a

DocuSign record for Norfleet that indicated the time at which she submitted and transmitted the

SRA. (MOL ¶ 15.)

On May 9, 2023, Norfleet filed the Norfleet Claim for severance pay in connection with

"services performed." (Norfleet Claim at 2.) Attached to the Norfleet Claim is a copy of her

SRA that only reflects her signature. (*Id.* at 9.) On the signature page to the SRA, Norfleet

wrote that her SRA was signed "in [her] duress" and noted that the SRA "do[es] not indicate

vacation accumulated, not received." (*Id.*)

### d. The Xu Claim

On February 7, 2023, Xu was provided a copy of the SRA. (*See* First Xu Response at 1.)

After receiving his receipt of the SRA, Xu emailed William Rhodes, a former SVB employee on

February 27, 2023, taking issue with the "three-months severance pay" he was offered, which he

believed was "considerably below a reasonable pay." (MOL Bixler Declaration, Ex. 10 at 4.)

On March 1, Steve Sprague ("Sprague"), one of SVB's internal audit HR business partners,

explained to Xu that his severance pay was "based on [his] length of service with SVB and [his]

job level" and was otherwise "non-negotiable." (*Id.* at 3.) Xu replied nonetheless that he

continued to have "concerns about the severance amount" and stated that "severance should be

negotiable." (*Id.* at 1.)

On March 7, 2023, Kellie MacKenzie ("MacKenzie"), another internal audit HR business

partner for SVB, notified Xu that his severance pay was based on SVB's severance policy, which

needed to be applied "consistently" and asked for further clarification regarding the

"circumstances specific to [his] experience with SVB" and his "important concern." (*Id.*) The

Debtor indicates that Xu did not respond to MacKenzie's request and, on March 10, 2023, signed

the SRA and sent it to the former SVB. (MOL ¶ 18; *see also* Xu Claim at 10 (signature page reflecting Xu's signature on the SRA, dated March 10, 2023).)

On March 14, 2023, Xu emailed MacKenzie and Sprague, notifying them that he had executed the SRA and that "HR will need to complete the process." (MOL Bixler Declaration, Ex. 11 at 4.) He further asked that they notify him when the process was completed. (*Id.*) On March 20, 2023, Xu contacted MacKenzie again to notify her that he still "ha[d] not received [a] response to the issue of not getting severance pay from either contact." (*Id.* at 3.) MacKenzie notified Xu that she was not "given a timeline or any information on payment" and indicated that HR Service would reach out once they had further information. (*Id.*)

On April 19, 2023, Xu was directed to contact Debtor's counsel regarding payment of his severance and, on June 15, 2023, was further directed to file a proof of claim for "severance/separation pay or COBRA benefits against [the Debtor]" with the Debtor's claims agent to the extent he believed he had a claim. (*Id.* at 1–2.)

On August 7, 2023, Xu filed the Xu Claim for severance pay that was "not paid to the laid-off employee as per the [SRA]." (Xu Claim at 2.) Attached to the Xu Claim is a copy of his SRA that only reflects his signature. (*See id.* at 10.)

### 2. The Zwolfer Claim

On February 3, 2023, Zwolfer executed the MOU with Laura Cushing, SVB's Chief Human Resources Officer. (MOL ¶ 20.) The MOU memorialized the parties' "understanding" regarding Zwolfer's transition from SVB as the Head of Partnerships & Solutions and the separation benefits offered to him. (First Zwolfer Response at 3.) Notably, payments to Zwolfer under the MOU were contingent on the parties entering a SRA. (*Id.*) However, the parties did not execute a SRA, and, therefore, the Debtor asserts that it has no obligation to make payment to Zwolfer. (MOL ¶ 68.) Meanwhile, Zwolfer argues that he was not provided an opportunity to

13

execute the SRA.  (First Zwolfer Response ¶¶ 2,4.)  On June 14, 2023, Zwolfer filed the Zwolfer

Claim, asserting a claim in the amount of $459,452.00.  (Claim No. 107.)

### C.  The Third Omnibus Claims Objection (Heller, Norfleet, and Xu)

#### 1.  The Objection, Responses Received, and the Debtor's Reply

The Debtor objected to each of the Heller, Norfleet, and Xu Claims in the Third Claims

Objection on "No Liability" grounds and sought entry of an order disallowing and expunging

each from the Debtor's claims register in its entirety.  For each, the Debtor indicated that, based

on a review of its books and records, the underlying severance agreements were "nonexecuted,"

rendering the Debtor "not liable for the [respective] Claimant's assertions."  (Third Claims

Objection, Ex. 1 at 5, 8, 11.)  The Debtor submitted that these claims, along with other "No

Liability" claims, "unjustifiably encumber[ed] the Debtor's asset pool and hinder[ed] the

equitable treatment of legitimate creditors."  (*Id.* ¶ 18.)  In support, the Debtor pointed to section

502(b)(1) of the Bankruptcy Code, which provides that a claim may not be allowed to the extent

that "such claim is unenforceable against the debtor."  (*Id.* ¶ 16 (quoting 11 U.S.C. § 502(b)(1)).)

#### 2.  Responses Received

##### a.  *The First Heller Response*

On March 28, 2024, Heller, appearing *pro se*, filed the First Heller Response, opposing

the disallowance and expungement of his proof of claim.  The First Heller Response states that

he had made "several attempts to execute the [SRA], thus making severance payable," but it was

the Debtor who "repeatedly delayed the process, ultimately resulting in the [SRA] not being fully

executed and [him] not receiving severance pay."  (First Heller Response at 1.)

Heller states that he had agreed with SVB Employee Relations that he would not sign the

SRA "until Employee Relations concluded its internal investigation regarding [Heller's]

complaints of retaliation for reporting a Hostile Work Environment."  (*Id.* at 2.)  Indeed, he had

until March 24, 2023 to execute the SRA.  (*Id.*)  However, Heller states that "SVB Employee Relations repeatedly delayed the internal investigation over the next month despite promises of completing it within a few days in early February[] 2023."  (*Id.*)  He also made "multiple inquires showing intent to execute his portion of the [SRA] in a timeframe which would have made severance payable."  (*Id.*)

Nonetheless, Heller executed the SRA on March 10, 2023 despite no response from SVB Employee Relations, and SVB failed to execute its portion of the SRA on March 17, 2023 despite its obligation to do so.  (*Id.* ("Per the terms of the [SRA], SVB was to execute their portion of the Agreement on March 17, 2023.").)

Annexed to the First Heller Response are copies of (i) Heller's SRA; (ii) certain email correspondence between Heller and Roxanne Ruiz; (iii) certain email correspondence between Heller and SVB's HR Service Center; and (iv) a DocuSign portal receipt pertaining to the execution of his SRA.

### b.  The First Xu Response

On March 25, 2024, Xu filed the First Xu Response, opposing the Third Claims Objection as it relates to his proof of claim.  He indicated that SVB "should still be liable for [his] severance payment" since (i) SVB was "obligated to execute the severance payment within 5 days of the executed [SRA]"; (ii) his severance payment constituted part of the "bank['s] actions to vitalize its financial health and preserve asset values" and was therefore an administrative expense pursuant to section 507(a)(2) of the Bankruptcy Code; and (iii) there were "moral implications" to SVB's failure to pay such severance payment, which "has added tremendous financial hardship to [him] and [his] family."  (First Xu Response at 1.)

15

### c. The First Norfleet Response

No information was provided to the Court regarding Norfleet's informal response, and Norfleet did not otherwise file a formal response. (*See* MOL ¶ 26.)

### 3. The Debtor's Reply

On April 5, 2024, the Debtor filed the Third Omnibus Reply which responded to, among other things, the First Heller and First Xu Responses as well as any other "informal responses," which the Debtor collectively addressed as the "Severance Agreement Responses." (*See* Third Omnibus Reply at 1.)

As set forth in the Third Omnibus Reply, following a review of the Debtor's records and correspondences with FCB, the Debtor found "no evidence that any of the severance agreements referenced in the Severance Agreement Responses were ever countersigned by the Debtor." (*Id.* ¶ 2.) This was notwithstanding the "multiple times" the Debtor and its advisors corresponded with FCB to "try to locate any records evidencing execution of the severance agreements by or on behalf of the Debtor." (*Id.*)

The Debtor further noted that the SRAs for Heller and Xu were executed on March 10, 2023, the Closure Date when SVB was placed into receivership, such that there was "no authorized officer in a position to act for the Debtor to execute those agreements on the Debtor's behalf." (*Id.*) Additionally, the Debtor also highlighted that each of the SRAs contained "standard language providing for a seven-day revocation period by the signing employee." (*Id.*) Therefore, the Debtor contends that, on the Petition Date, "each draft separation agreement therefore still had the possibility of being revoked, and could not have become binding on the Debtor." (*Id.*)

In light of the foregoing, the Debtor maintained that the Third Claims Objection should be sustained as to these claims pursuant to section 502(b)(1) of the Bankruptcy Code, which

holds that "any claim that is unenforceable against [a] debtor and property of [a] debtor should not be allowed." (*Id.* ¶ 5.)

          4.  Other Relevant Procedural History

On April 9, 2024, the Court held a hearing on the Third Claims Objection and entered an order (ECF Doc. # 1029) sustaining the Third Claims Objection, in part, with respect to the claims identified therein.  The Court's order, however, excluded the claims of Heller, Xu, and Norfleet.  (*See Order Overruling in Part Third Omnibus Objection to Claims*, ECF Doc. # 1025.)  Specifically, the Court determined that there were "contested issues of fact and law concerning the claims and objections" as to the Heller, Xu, and Norfleet Claims that could not be resolved without more factual information.  (*See* ECF Doc. # 1025 at 2.)  At issue with respect to these claims, the Court indicated, was "whether binding contracts were formed when the claimants signed and returned the severance agreements to the Bank before the receivership began, even though the contracts were not countersigned by the Debtor or the Bank." (*Id.* at 3.)  Accordingly, the Court directed the parties to confer with each other and overruled the Third Claims Objection as to the Heller, Xu, and Norfleet Claims without prejudice.  (*Id.* at 4.)

Following the Court's order, the Debtor sought discovery from FCB relating to Heller, Norfleet, and Xu's separation of employment from SVB.  (MOL ¶ 29.)  On May 13, 2024, the Court authorized the Debtor to serve discovery requests on FCB relating to any severance agreements between—on the one hand—Heller, Xu, and Norfleet and—on the other hand— former employees of SVB and employees of Bridge Bank and FCB (the "First FCB Discovery Request").  (*See Ex Parte Order Pursuant to Bankruptcy Code Section 105 and Federal Rules of Bankruptcy Procedure Rule 2004 Authorizing Discovery,* ECF Doc. # 1128.)  The Debtor indicates that FCB subsequently provided the Debtor with documents and communications relating to the Heller, Xu, and Norfleet Claims.  (MOL ¶ 32.)

5.  The MOL as to the Heller, Xu, and Norfleet Claims

The Debtor indicates that it and Heller, Xu, and Norfleet have had an opportunity to review the documents FCB produced.  (*Id.*)  It is the Debtor's position that the information confirms that a meeting of the minds did not occur for the severance agreements alleged by Heller, Xu, and Norfleet.  (*Id.* at 2.)  Accordingly, the Debtor now moves for the Court to disallow the Heller, Xu, and Norfleet Claims and expunge them from the claims register in their entirety.  (*Id.*)

With respect to Heller whose SRA is governed by Ohio law, the Debtor argues that Heller has failed to demonstrate that the parties entered into a binding contract.  (MOL ¶ 43; *see* First Heller Response at 7 ("This [SRA] shall be governed by Ohio law, without regard to its choice of law principles.").)  Specifically, the Debtor contends the following:

- to the extent the "initial form of [SRA]" constituted an offer to Heller, the ongoing negotiations regarding Heller's hostile work environment complaints constituted a rejection of that offer, and Heller made clear that there was "no deal until the investigation was complete" such that no binding agreement was formed when he submitted his signed copy of the SRA on March 10, 2023 (MOL ¶¶ 44–45);

- to the extent Heller's submission of the signed SRA on March 10, 2023 constituted a new offer, there was no binding agreement because the Debtor never accepted that offer (*id.* ¶ 46);

- Heller's acceptance of the Debtor's purported offer (to the extent one existed) was not communicated to the Debtor prior to the Closure Date, the Petition Date, or the SRA's expiration, effectively rescinding any purported offer from the Debtor as the Debtor had no employees with authority as of March 10, 2023 to execute or accept the SRA (*id.* ¶ 47); and

- the Debtor's signature on the SRA was "necessary for its enforceability" as it was clear to Heller and the Debtor that the SRA needed to be "fully executed before it became binding on the Debtor," and there is no record that the Debtor ever signed the SRA despite the additional factual discovery (*id.* ¶¶ 48–49).

Similarly, the Debtor asserts that Norfleet's SRA, which is governed by Massachusetts law, is also unenforceable for many of the same reasons.  (*Id.* ¶¶ 51, 53; *see also* Norfleet Claim

at 7 (indicating that Massachusetts law governs).)  The Debtor maintains that no binding

agreement was formed since Norfleet's acceptance was not communicated to the Debtor prior to

the Closure Date, the Petition Date, or the stated SRA expiration date, and no former SVB

employee had the authority to bind the Debtor as of March 10, 2023 when Norfleet signed and

submitted her SRA.  (MOL ¶ 53.)  Additionally, much like Heller, it was clear to all parties that

the Debtor's signature was "necessary to effectuate the agreement."  (*Id.* ¶¶ 54–55.)  Lastly,

Norfleet's assertion that she signed the SRA under "duress" as reflected in the Norfleet Claim,

the Debtor argues, constitutes "an unequivocal repudiation of the [SRA] that was directly

communicated to the Debtor" and that she did not believe the SRA was valid.  (*Id.* ¶ 56.)

Norfleet's basis for her repudiation, the Debtor notes, was "tied to the consideration offered in

exchange for her waiver of claims . . . [and] was a material component of the [SRA]."  (*Id.*)

Finally, the Debtor argues that the Xu Claim also fails for similar reasons.  (*Id.* ¶ 62.)

The Debtor contends that Xu rejected the purported offer set forth in Xu's SRA, which is

governed by California law, on "multiple occasions."  (*Id.* ¶¶ 58, 62–63; *see also* First Xu

Response at 9 (indicating that California law applies to Xu's SRA).)  Moreover, even if Xu's

continued negotiations with the Debtor did not constitute a rejection of the initial offer, his

acceptance was not communicated to the Debtor before the "offer expired by its terms and/or

was withdrawn as a result of changed circumstances."  (MOL ¶ 64.)  Xu did not sign his SRA

until March 10, 2023 when SVB employees lacked authority to receive the acceptance on the

Debtor's behalf.  (*Id.*)  Again, much like Heller and Norfleet, the Debtor also did not sign Xu's

SRA, and the terms and form of the SRA made clear that both parties' signatures were required

to effectuate the SRA, which he himself acknowledged in his March 14, 2023 email

correspondence.  (*Id.* ¶ 65.)

6. Responses to the MOL

*a. The Second Heller Response*

In response to the MOL, Heller filed the Second Heller Response, requesting that the Court overrule the Third Claims Objection with prejudice and order that his SRA be upheld and he be awarded his full severance in the amount of $145,385.00. (Second Heller Response at 6.) Heller alleges that the Debtor made "several objectively false statements with no evidence or backing" and "omitted documents which clearly support [his] assertions and disprove Debtor's claims." (*Id.* at 1.)

*First,* he contends that he signed the SRA on March 9, 2023 (not March 10, 2023) and communicated with SVB's HR Service Center that same day, rendering the contract binding the day before SVB went into receivership with the FDIC on March 10, 2023. (*Id.* at 2.) As a result, he also contests the Debtor's assertion that he "suddenly changed course" and only signed the SRA after DFPI took over. (*Id.* at 3.) Heller indicates that he, in fact, sent a signed SRA, dated March 9, 2023, to Kristi Newton and Robert Zwolfer on March 10, 2023 at 12:05 p.m. ET, confirming his intent to sign the SRA before SVB's entry into receivership. (*Id.* at 4.) At no point was he aware of or made aware of SVB's closure.

*Second*, Heller argues that Debtor's assertions that it owes nothing to him are without basis given that the FDIC has allowed his claim and stated it would be paid in full with proceeds from the liquidation of SVB's assets. (*Id.* at 2.)

*Third*, Heller clarifies that it was his Employee Relations contact, Roxanne Ruiz, who suggested that he delay executing the SRA since (i) signing the SRA would result in him forfeiting his rights to make future claims, and (ii) Ms. Ruiz suggested that there may be a way for Heller to maintain his employment in light of, among other things, potential other opportunities. (*Id.* at 3.) Accordingly, he contests the Debtor's suggestion that he sought to

"renegotiate the [SRA] for more money or different terms," which he believes otherwise lacks support.  (*Id.*)

*Fourth*, Heller argues that the requirement to execute the SRA via DocuSign "contradicted the instructions in the [SRA]," noting that the submission process of severance claims generally was "convoluted and contradictory."  (*Id.* at 5.)  Moreover, Heller believes that the discussion in the MOL concerning Zwolfer's employment status and the need for his countersignature to be "irrelevant" as the SRA merely required Heller to return the signed document to his HR Representative.  (*Id.*)

Annexed to the Second Heller Objection are copies of (i) an SRA, reflecting Heller's signature, dated Mar. 10, 2023, with a DocuSign header; (ii) an SRA, reflecting Heller's signature, dated Mar. 9, 2023, without a DocuSign header; (iii) email correspondence from Roxanne Ruiz, dated Mar. 7, 2023; (iv) email correspondence from Heller in response, dated Mar. 9, 2023; (v) email correspondence from Heller to SVB's HR Service Center, dated Mar. 9, 2023; (vi) email correspondence from Heller to Kristi Newton and Robert Zwolfer, dated Mar. 10, 2023 at 12:05 p.m.; (vii) a DocuSign portal receipt for Heller's SRA, reflecting his signature on Mar. 10, 2023 at 12:27 p.m. and Zwolfer's need to sign; (viii) email correspondence from an individual at SVB's HR Service Center, dated Mar. 10, 2023; (ix) a letter from the FDIC to Heller, dated Dec. 5, 2023 (the "December 2023 FDIC Letter"); (x) SVB's Disclosure of Information to Affected Employees; (xi) the First Heller Response; and (xii) the *Order Overruling in Part Third Omnibus Objection to Claims* (ECF Doc. # 1025).

### b.  The Second Xu Response

The Second Xu Response maintains that the Debtor is liable for his severance payment for the following reasons: (i) his SRA constitutes an administrative expense under section 507(a)(2) of the Bankruptcy Code as an "actual, necessary cost[] and expense[] of preserving the

debtor's assets"; (ii) SVB violated the California Worker Adjustment and Retaining Notification Act, which requires 60 days written notice for "mass layoffs or closings," providing him with only 27 days of written notice; (iii) SVB's "initiat[ion]" and delivery of the SRA to Xu on January 10, 2023 signals a "clear 'manifestation or expression' for the validity of the [SRA]"; (iv) "assent or mutuality" may be established in ways other than a signature; (v) the idea that Xu's SRA was not executed is a mere "assumption [and] not a fact" as there is no support from the "HR system audit trail supporting the claim that the [SRA] was not executed after [Xu] signed"; and (vi) any delay in Xu signing the SRA was a result of "SVB HR's negligence and game-playing tactics to deter [the] severance victim." (Second Xu Response at 1–2.)

### c.  The Second Norfleet Response

Annexed to the MOL Reply Bixler Declaration as Exhibit 1 is a copy of the Second Norfleet Response, a letter that Norfleet sent to Debtor's counsel. The Second Norfleet Response indicates that she did not immediately sign the SRA "due to [a] personal tragedy" that occurred "within the same time period." (Second Norfleet Response at 1.) She clarifies that her use of the word "duress" was not an indication that she was "not planning, nor would not sign the [SRA]" as there was "no disagreement on [her] part with the severance offered." (*Id.*) Accordingly, she asks that her requested severance be paid and not otherwise denied as "there was no indication that the funds would not be received." (*Id.* at 1–2.)

### 7.  The MOL Reply to Heller, Xu, and Norfleet MOL Responses

The MOL Reply reiterates the same arguments asserted in the MOL as to the Heller, Xu, and Norfleet Claims. Specifically, the MOL Reply contends that no agreement was formed because there was no mutual assent regarding the purported agreements, acceptance was not timely communicated to Debtor, and the agreements were never executed by Debtor. (MOL Reply at 2.) With respect to Heller, the Debtor maintains that it has no obligation to make

severance payments because "(i) there was no meeting of the minds with respect to Heller's [SRA], (ii) Heller did not communicate his acceptance of the [SRA] to Debtor before the offer expired or was withdrawn, and (iii) Debtor did not sign the [SRA], which was a requirement to enforceability recognized by both parties." (*Id.* ¶ 1.)  Moreover, the Second Heller Response indicates that payments owed to Heller under his SRA were "liabilities of the Bank—and therefore the FDIC—not Debtor." (*Id.*)

As for Norfleet, the MOL Reply provides that her SRA is not binding because her acceptance "was not timely communicated to Debtor, Debtor's signature was necessary to effectuate the agreement, and Norfleet repudiated the [SRA]." (*Id.* ¶ 10.)

Finally, as to Xu, the Debtor maintains that his SRA is also not binding because Xu rejected the Debtor's offer on multiple occasions, did not communicate his acceptance to the Debtor, and the Debtor never signed the agreement. (*Id.* ¶ 14.)  Nothing in the Second Xu Response, the Debtor believes, refutes any of the Debtor's arguments set forth in the MOL. (*Id.*)

### D.  The Sixth Claims Objection (Zwolfer)

#### 1.  The Sixth Claims Objection

The Debtor first objected to the Zwolfer Claim in the Sixth Claims Objection. Specifically, the Debtor categorized the Zwolfer Claim as a "No Liability Claim" and sought to disallow and expunge it in full. (Sixth Claims Objection ¶ 23.)  The Debtor summarized that Zwolfer had filed a proof of claim seeking to recover benefits related to an alleged severance agreement. (*Id.*)  However, the supporting documentation annexed to the Zwolfer Claim showed that "any separation benefits [were] contingent upon the claimant entering into a separation and general release of claims agreement." (*Id.*)  Zwolfer, however, had deferred on the "execution of such separation and general release of claims agreement until he terminate[d] his relationship

with SVB Financial Group." (*Id.*)  The Debtor maintained that it did not have a record of the

executed SRA and Zwolfer had not provided a copy.  (*Id.*)  As a result, the Debtor concluded that

Zwolfer was not entitled to the benefits asserted in the Zwolfer claim.

### 2. First Zwolfer Response

Zwolfer objects to the Sixth Claims Objection.  The First Zwolfer Response notes that

Zwolfer "signed and executed" a MOU with the Debtor's Chief Human Resources Officer on

February 3, 2023.  (First Zwolfer Response ¶ 1.)  Notably, the MOU expressly states that the

"[Debtor's] obligation to pay the separation benefits . . . is contingent upon [Zwolfer] entering

into a confidential Separation and General Release of Claims Agreement." (*Id.* at 4.)  In the next

line, the MOU reads "[Debtor] acknowledge[s] [Zwolfer's] desire to defer executing such an

agreement until you terminate your relationship with [Debtor]."  (*Id.*)  Zwolfer maintains that he

was not provided an opportunity to execute the SRA.  (*Id.* ¶¶ 2,4.)  Additionally, Zwolfer states

that the MOU itself contains release language, but he was not provided anything in return for

granting this release.  (*Id.* ¶ 3.)

Zwolfer notes that he "immediately" provided the executed MOU to the "firm's legal

team"[5] who were working with outside counsel following the bank's failure and bankruptcy.  (*Id.*

¶ 4.)  Zwolfer emphasizes that he was not given an opportunity to sign the SRA when the

relationship between the parties ended, and he was not paid the Separation Benefits (defined

below).  (*Id.*)  From March to June 2023, Zwolfer inquired about receiving payment, but these

efforts were unsuccessful, and he was instructed to file a claim in the bankruptcy case.  (*Id.* ¶ 5.)

On June 14, 2023, Zwolfer filed claim no. 107, providing the fully executed MOU.  (*Id.* ¶ 6.)

---

[5]      The term "firm" is undefined in the First Zwolfer Response, so it is not clear whether it refers to SVB or
SVBFG.

Zwolfer states that the Separation Benefits were "negotiated formulaically, utilizing the firm's Severance Policy." (*Id.* ¶ 7.)  Specifically, the Separation Benefits capture: "one year of salary ($340,000), a pro-rated bonus paid at 7 /12 of yearly bonus target ($99,161), and additional outplacement benefits ([c]ombined COBRA expense coverage for one year and Outplacement Assistance with an outside firm totaling $20,291)." (*Id.* ¶ 7.)

Lastly, Zwolfer asserts that he could have left the firm in February 2023, and received full payment. (*Id.* ¶ 8.)  Instead, he acted in good faith and agreed to stay on until July 2023 to assist with the transition of his role. (*Id.*)  Even after March 10, 2023, Zwolfer continued to assist SVBFG with HR activities "throughout much of 2023." (*Id.* ¶ 9.)  The First Zwolfer Response concludes that Zwolfer met all his obligations outlined in the MOU, but the Debtor failed to uphold its promises. (*Id.* ¶ 8.)

  3. <u>Other Relevant Procedural History</u>

On July 1, 2024, the Court heard the Debtor's Sixth Claims Objection.  Notably, the hearing on certain claims included in the Sixth Claims Objection (*i.e.*, the Zwolfer Claim, Leung Claim, Cresa Claim, and the Westriver Claim) was adjourned to a later date. (*See* ECF Doc. ## 1124, 1322.)  On July 2, 2024, the Court entered the *Order Sustaining Debtor's Sixth Omnibus Objection to Claims*, which removed the adjourned claims from the relevant exhibits. (ECF Doc. # 1251.)

The Debtor notes it adjourned the hearing on the Zwolfer Claim based on the Court's earlier ruling with respect to the Heller, Norfleet, and Xu Claims in order to secure additional discovery from FCB. (MOL ¶ 31.)  On June 25, the Debtor filed the second *Ex Parte Motion for Entry of an Order Pursuant to Bankruptcy Code Section 105 and Federal Rules of Bankruptcy Procedure Rule 2004 Authorizing Discovery* (the "Second FCB Discovery Motion," ECF Doc. # 1225.)  The Debtor sought documents from FCB related to Zwolfer's separation from SVB.

25

(*Id.*)  The Court granted the Second FCB Discovery Motion on July 1, 2024.  (*See* ECF Doc.
# 1242.)

### 4. The MOL as to the Zwolfer Claim

#### a. *Additional Background Regarding the Zwolfer Claim*

The MOL corroborates most of the background outlined in the First Zwolfer Response.
Specifically, the Debtor acknowledges the Separation Benefits provided in the MOU but
emphasizes that such benefits were "expressly contingent upon Zwolfer 'entering into [the
SRA].'"  (MOL ¶ 21.)  The Debtor also notes the MOU's explicit acknowledgement of
Zwolfer's "desire to defer executing such an agreement" until he terminated his relationship with
the Debtor.  (*Id.*)  Additionally, the Debtor emphasizes that Zwolfer concedes in his response that
the SRA was never signed by the parties.  (*Id.*)

The MOL also provides additional context regarding the parties' relationship.  Before
Zwolfer's employment ended, the California Department of Financial Protection and Innovation
took possession over SVB, and the FDIC was appointed as the bank's receiver.  (*Id.* ¶ 22.)  Later,
the Bridge Bank and the FDIC entered an agreement with First Citizens Bank & Trust ("FCB")
effective March 27, 2023 to transfer all of Bridge Bank's deposits and loans to FCB (the "First
Citizens Transaction").  (*Id.* ¶ 22.)  As part of the First Citizens Transaction, several former SVB
employees (including Zwolfer) were offered positions with FCB.  (*Id.*)  Zwolfer was "an active
FCB employee" from March 27, 2023, until March 8, 2024.  (*Id.*)

When Zwolfer's employment with FCB was terminated, he entered into a Position
Elimination Agreement and Release with FCB on March 8, 2024.  (*Id.* ¶ 23.)  FCB offered
Zwolfer "$78,462.00 in total special separation payment, in addition to outplacement services, in
exchange for signing the Position Elimination Agreement and Release."  (*Id.*)  Additionally, the
Debtor notes that under a section titled "Other Provisions," FCB provided Zwolfer with "two

$50,000 payments for '2023 Long Term Cash Award Grant' and 'Retention,' which appear to have been made payable in March 2024. (*Id.*) The Debtor notes that when Zwolfer filed his claim on June 14, 2023, he was employed by FCB. (*Id.* ¶ 24.)

   *b. Argument*

  The Debtor re-asserts that Zwolfer does not have a valid claim against the Debtor. First, the Debtor notes that the MOU does not contain a choice of law provision. (*Id.* ¶ 67.) However, given that Zwolfer is a Colorado resident and "appears to have been employed by SVB and FCB in Colorado," the Debtor notes that Colorado law applies to determine the validity of the Zwolfer Claim. (*Id.*)

  The Debtor later argues that the payment of the Separation Benefits was clearly contingent on the "condition precedent" that the parties execute the SRA, which had been deferred per Zwolfer's request. (*Id.* ¶ 68.) The MOL states that under Colorado law, "performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused." (*Id.* (citing *Valentine v. James River Ins. Co.*, No. 22-1323, 2023 U.S. App. LEXIS 32879, at *4 (10th Cir. Dec. 13, 2023)). Here, the Debtor emphasizes that the SRA was never executed, and, therefore, the Debtor has no obligation to pay the Separation Benefits. (*Id.*) Separately, the Debtor suggests that payment of the Separation Benefits was also conditioned on Zwolfer's "continued employment with SVB through July 14, 2023." (*Id.*) Zwolfer, however, was not employed by SVB until that date. Accordingly, the Debtor concludes that these two independent grounds indicate that the Zwolfer Claim is meritless.

  Finally, the Debtor claims that the MOU was merely an unenforceable agreement to agree. The MOU acknowledges that the Separation Benefits were conditioned on the "general release and waiver of claims;" however, the MOU did not provide additional detail on the scope and substance of these releases. (*Id.* ¶ 69.) Instead, critical terms such as "which claims Zwolfer

agreed to waive, which entities the waiver applied to, whether there were any exceptions to the waiver, the terms governing the confidentiality requirement of such waiver or whether there were any further conditions on Zwolfer's right to the severance payments" were left to be dealt with in the SRA. (*Id.*) Accordingly, the Debtor concludes that the MOU is not an enforceable contract because the essential terms of the agreement remained ambiguous.

### 5.    The Second Zwolfer Response to the MOL

In the Second Zwolfer Response, Zwolfer states that the MOU is an "an executed contractual agreement" between the parties and intended to provide him with a "smooth exit and transition from the firm, while also protecting his rights as an employee." (Second Zwolfer Response ¶ 1.) Zwolfer also notes that the second to last paragraph of the MOU expressly states that the Debtor was obligated to "pay separation benefits, contingent upon entering into a confidential [SRA] upon termination of relationship with SVBFG." (*Id.* ¶ 3.) However, he was not provided with such an opportunity when the relationship ended on March 10, 2023. (*Id.*) Separately, the Second Zwolfer Response emphasizes that the MOU separately provides a release, but the Debtor did not provide "anything in return for that release." (*Id.* ¶ 3.)

Later, Zwolfer asserts that his subsequent employment with FCB was irrelevant to his claim against the Debtor. (*Id.* ¶ 4.) Zwolfer took the FCB job as a father of two college aged children and to mitigate the impact of his unemployment. (*Id.*) Notably, Zwolfer emphasizes that the separation benefits provided by FCB varied "greatly" from those offered by the Debtor. (*Id.*)

As noted in the First Zwolfer Response, Zwolfer re-states that that he "immediately provided documentation of the executed [MOU] to members of SVBFG's Legal team" as they were working through the bankruptcy process. (*Id.* ¶ 5.) He did so on March 11 and the

subsequent week of March 13.  (*Id.*)  However, he was "never provided an opportunity to sign the [SRA] . . . ."  (*Id.*)

Additionally, Zwolfer disputes that the July 14 separation date outlined in the MOU was a condition precedent to the payment of the Separation Benefits.  (*Id. ¶ 6.*)  The Second Zwolfer Response notes that the "third paragraph of the MOU [(*i.e.*, the garden leave language")] . . . clearly shows the intention of full payment should continued employment not be required prior to July 14, 2024."  (*Id.*)

Notably, Zwolfer argues that as the Head of Partnerships and Solutions he held a senior HR position and was "was intimately knowledgeable of the structure of SVB's Separation and Severance Agreements."  (*Id. ¶ 7.*)  The Second Zwolfer Response claims that the SRA's followed a "strictly designed template" and it was common practice to provide the SRA to an employee "who had a future dated exit from the firm."  (*Id.*)  Zwolfer concludes that it is a "misrepresentation" to argue that the separation terms did not exist.  (*Id.*)

Finally, Zwolfer re-emphasizes that the Separation Benefits in the MOU were "formulaic" and negotiated using the "firm's Severance Policy."  (*Id. ¶ 8.*)  He maintains that this further shows the standardization of the process.  (*Id.*)

### 6.  The MOL Reply to the Second Zwolfer Response

The MOL Reply generally re-asserts the Debtor's arguments from the MOL.  The Debtor maintains that the Zwolfer Claim should be denied because the Separation Benefits were "conditioned on Zwolfer working at SVB through July 14, 2023[6], and the parties entering into a confidential [SRA], neither of which occurred."  (MOL Reply ¶ 19.)  The Debtor also states that the MOU was an "unenforceable agreement to agree."  (*Id.*)

---

[6]    The MOL Reply states that the MOU established a separation date of July 14, 2024; however, the MOU set the separation date as July 14, 2023.  (*See* First Zwolfer Response at 3.)

First, the Debtor disagrees with Zwolfer's assertion that the terms of the SRA were "determined formulaically." (*Id.* ¶ 20.) The MOL Reply asserts that the Court cannot assume that the SRA between the parties would have "adhered to the 'strictly designed template' used for other terminated employees." (*Id.*) Importantly, the Debtor, in the same paragraph, notes Zwolfer's allegation that he was not provided an opportunity to sign the SRA. (*Id.*) However, the MOL Reply does not engage or respond to that point. Later, the Debtor maintains that the MOU only "acknowledged the amount of Zwolfer's contemplated severance pay." (*Id.* ¶ 21.) Borrowing from the MOL, the Debtor states that the MOU did not discuss the "the scope of Zwolfer's waiver of claims." (*Id.*) Accordingly, the Debtor concludes that the MOU is an agreement to agree that is "unenforceable under any state's law." (*Id.*)

Second, the Debtor maintains that the July 14 separation date was indeed a condition. (*Id.* ¶ 22.) Specifically, the Debtor states that the "garden leave" contemplated in the MOU guaranteed his compensation but did not implicate the Separation Benefits. (*Id.*)

Third, the Debtor asserts that the MOU does not contain language affording Zwolfer the chance to sign the SRA on the "final day of employment." (*Id.* ¶ 23.) And even if it did, the Debtor re-asserts that such language would "constitute an unenforceable agreement to agree." (*Id.*)

Fourth, the Debtor disputes that the MOU contained a separate release of claim for which it did not provide any consideration. (*Id.* ¶ 24.) The MOL Reply notes that the referenced provision states that "[Zwolfer] was provided an opportunity to discuss his employment with Debtor's chief human resources officer or general counsel, and that at the time of signing, he did not allege or believe that Debtor's actions, or the actions of any of its agents or employees, were retaliatory, discriminatory or otherwise unlawful or improper." (*Id.*) The Debtor concludes that

the language in the MOU does not create a waiver of possible claims based on unlawful behavior. (*Id.*)

Finally, the Debtor emphasizes that the parties' entry into the SRA was a condition precedent, and the parties did not execute an SRA. (*Id.* ¶ 25.) The MOL Reply maintains that Zwolfer does not dispute this condition or show that the condition was not satisfied. (*Id.*) The Debtor argues that it is "irrelevant" that Zwolfer provided the MOU to the Debtor's lawyers because the MOU does not entitle him to severance benefits. (*Id.*) Accordingly, the Debtor concludes that it does not have an obligation to provide the Separation Benefits.

## II.    <u>LEGAL STANDARD</u>

Section 502 of the Bankruptcy Code provides that "[a] claim or interest, proof of which is filed under section 501 of [the Bankruptcy Code], is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502. Bankruptcy Rule 3007(c) and 3007(d) provide that, under certain circumstances, or with Court approval, more than one claim may be joined in a single objection. FED. R. BANKR. P. 3007(c)–(d).[7]

As set forth in Bankruptcy Rule 3001(f), a proof of claim executed and filed in accordance with Bankruptcy Rule 3001 shall constitute *prima facie* evidence of the validity and amount of claim. *See In re Residential Cap.*, 501 B.R. 531, 538 (Bankr. S.D.N.Y. 2013). "Failure to attach the documentation required by Rule 3001 will result in the loss of the *prima facie* validity of the claim." *In re Minbatiwalla*, 424 B.R. 104, 112 (Bankr. S.D.N.Y. 2010). *See also In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 n.13, 553 (Bankr. S.D.N.Y. 2000) (citing Bankruptcy Rule 3001(f) in analysis of debtors' objection to former tenant's proof of claim and

---

[7]    The order establishing the certain omnibus claims objections procedures (ECF Doc. # 713) provides a list of certain grounds upon which the Debtor is authorized to join claims in a single omnibus objection.

granting partial summary judgment with respect to the objection where there were no material

facts in dispute).

To receive the benefit of *prima facie* validity, however, "the proof of claim must set forth

the facts necessary to support the claim." *In re Marino*, 90 B.R. 25, 28 (Bankr. D. Conn. 1988)

(citations and internal quotation marks omitted) (holding that claimant's proof of claim was not

entitled to the presumption of *prima facie* validity because it did not set forth the necessary

facts); *see also* FED. R. BANKR. P. 3001(c)(1) (requiring claimant to provide documentation

where claim is based on a writing).

On the whole, "[a]n objecting party 'bears the initial burden of production and must

provide evidence showing the claim is legally insufficient' under 11 U.S.C. § 502." *In re

Lehman Bros. Holdings, Inc.*, 519 B.R. 47, 53–54 (Bankr. S.D.N.Y. 2014) (quoting *In re

Arcapita Bank B.S.C.(c)*, 508 B.R. 814, 817 (S.D.N.Y. 2014)).  A party objecting to the proof of

claim must only provide evidence sufficient to negate the *prima facie* validity of the claim by

refuting one or more of the facts in the filed claim.  *See In re Waterman S.S. Corp.*, 200 B.R.

770, 774–75, 777 (Bankr. S.D.N.Y. 1996) (reopening discovery into asbestos claims due to

insufficient information upon which to determine validity of claims); *In re Allegheny Int'l, Inc.*,

954 F.2d 167, 173–74 (3d Cir. 1992); *see also In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr.

S.D.N.Y. 2009*), aff'd*, No. 09 Civ. 2229 (DC), 2010 WL 234827, at *3 (S.D.N.Y. Jan. 22, 2010)

(same); *In re Adelphia Commc'ns Corp.*, Case No. 02-41729 (REG), 2007 WL 601452, at *5

(Bankr. S.D.N.Y. Feb. 20, 2007); *Rockerfeller*, 272 B.R. at 539 (same).

Once this occurs, "the burden reverts to the claimant to prove the validity of the claim by

a preponderance of the evidence."  *In re WorldCom, Inc*., No. 02-13533 (AJG), 2005 WL

3832065, at *4, *9 (Bankr. S.D.N.Y. 2005) (citing Bankruptcy Rule 3001(f) and holding that

claimant did not meet its burden to prove validity of anticipatory breach and unjust enrichment

claims, but that further evidence was needed to assess the merits of lack of good faith claim)

(quoting *Allegheny Int'l*, 954 F.2d at 173–74); *see also In re St. Johnsbury Trucking Co.*, 206

B.R. 318, 323, 328 (Bankr. S.D.N.Y. 1997) (citing Bankruptcy Rule 3001(f) and allowing claim

where debtor failed to refute any of the material facts in proof of claim).

Generally, the claimant must prove the claim and not sit back while the objector attempts

to disprove it.  *See In re Bennett,* 83 B.R. 248, 252 (Bankr. S.D.N.Y. 1988) (holding that debtor

presented sufficient evidence to rebut the *prima facie* validity of claimant's claim and that

claimant failed to prove claim by a preponderance of credible evidence).  "Federal pleading

standards apply when assessing the validity of a proof of claim."  *In re Residential Cap.*, No. 12-

12020, 2015 WL 4747860, *7 (Bankr. S.D.N.Y. 2015).  Although "[claims] drafted by *pro*

*se* [claimants] are to be construed liberally, [ ] they must nonetheless be supported by specific

and detailed factual allegations sufficient to provide the court and the defendant with 'a fair

understanding of what the [claimant] is complaining about and . . . whether there is a legal basis

for recovery.'"  *Kimber v. GMAC Mortgage, LLC (In re Residential Cap., LLC),* 489 B.R. 489,

494 (Bankr. S.D.N.Y.2013) (ellipsis in original) (quoting *Iwachiw v. New York City Bd. of*

*Elections,* 126 F. App'x. 27, 29 (2d Cir. 2005)).  Courts look to applicable nonbankruptcy law to

determine whether a claim is allowable by law. *Residential Cap.*, 2015 WL 4747860, at *7.

## III.    DISCUSSION

### A.  The Heller Claim

#### 1.   Heller is Recovering Severance Payments From the FDIC

Heller states in the Second Heller Response that "the FDIC, as Receiver of SVB on

March 10, 2023, found that [Heller's] claim must be ALLOWED and would be paid during the

liquidation of assets from the Debtor."  (Second Heller Response at 6.)  In support of this, Heller

includes a copy of a letter from the FDIC, dated December 5, 2023, in the Second Heller

Response, which notified Heller that:

> The FDIC as Receiver for Silicon Valley Bank has reviewed [Heller's] general unsecured claim ("claim") against the receivership and is pleased to notify [him] that it has ALLOWED [his] claim.
>
> [Heller's] claim in the amount of $145,385.00 has been entered on the Receiver's records as Certificate No. 51070. This letter represents the formal record of [his] allowed claim against the Failed Institution. ***As the Receiver liquidates the assets of the receivership, [he] may periodically receive payments on [his] claim through dividends. The Receiver will pay any dividends in accordance with the priorities established by applicable law. 12 U.S.C. 1821(d)(11)(A).***

(December 2023 FDIC Letter at 1 (emphasis added).)  Heller represents that this amount

constitutes his severance payment in the SRA.  (*See* Second Heller Response at 6 (requesting that

the Court "order that the terms of the [SRA] be upheld and award [Heller] his full severance in

the amount of $145,385, therefore upholding the FDIC's decision that [Heller's] claim must be

paid").)  Accordingly, as Heller is already recovering the amounts he seeks in the Heller Claim

from the FDIC, the Heller Claim is unenforceable against the Debtor as the claim has been

satisfied.  Heller will not be permitted to obtain a double recovery on account of a single

obligation.

### 2.   In Any Event, Heller's SRA is Unenforceable

Notwithstanding the foregoing, the Third Claims Objection is also sustained as to the

Heller Claim because the Heller SRA is unenforceable against the Debtor.

#### a.   The Heller SRA was Executed on March 10, 2023

As an initial matter, Heller argues in the Second Heller Response that he signed the SRA

on March 9, 2023 as opposed to March 10, 2023.  (*See* Second Heller Response at 2 ("The

simple truth is, Claimant signed the [SRA] on March 9, 2023, and communicated with SVB's

HR Service Center on the same day regarding the Severance Agreement . . . .").)  In support of

this, Heller attaches two copies of the SRA to the Second Heller Response, one of which he

signed with a date of March 9, 2023 (*id.* at 13–18) and a second which he signed with a date of

March 10, 2023 (*id.* at 7–12). The latter of the two includes a DocuSign Envelope identification

number in the header. (*See id.*)

However, Heller's own prior statements before this Court regarding the execution date of

the SRA belie this. In the First Heller Response, Heller states in plain terms that he "***executed

the [SRA] on March 10, 2023***, despite no response from SVB Employee Relations." (First

Heller Response at 2 (emphasis added).) Indeed, he attaches a copy of the SRA in question,

which reflects a signature date of March 10, 2023. (*Id.* at 9.) Moreover, in the First Heller

Response, Heller attaches a copy of the DocuSign portal that he describes as a "[r]eceipt

indicating ***Mr. Heller's signature on the [SRA] on March 10, 2023***." (*Id.* at 3 (emphasis

added).) A copy of this same receipt is included in the Second Heller Response as well. (Second

Heller Response at 27.) Finally, Heller's own counsel in March 2023 wrote a letter to Silicon

Valley Bank, stating that Heller "did execute and return the [SRA] to SVB on or about March

10, 2023." (MOL Bixler Declaration, Ex. 6 at 2.)

Heller indicates that he "sent the signed [SRA] dated March 9, 2023 to [Kristi Newton

and Robert Zwolfer] at 12:05pm ET on March 10, 2023 . . . confirming [his] intent to sign the

[SRA] before the [Closure Date]." (Second Heller Response at 4.) Heller, however, fails to note

his subsequent email to Ms. Newton and Zwolfer later that day where he directed them to

"[p]lease disregard [his] previous email . . . [as he had] been informed by the HR Service Center

to use DocuSign to complete this." (MOL Bixler Declaration, Ex. 3.) Moreover, the timestamp

on the DocuSign portal receipt, which Heller includes with both the First and Second Heller

Responses, reflects that he signed his SRA on March 10, 2023 at 12:27 p.m., after SVB was

closed on March 10, 2023 at 8:39 a.m.  (*See* First Heller Response at 15; Second Heller

Response at 27.)

Accordingly, Heller's assertion that he actually signed the SRA on March 9, 2023 is

without merit, and Heller's SRA was executed, by his own admission, on March 10, 2023 after

SVB was closed.

### b.  *Heller's SRA is Unenforceable Against the Debtor*

Having established that Heller's SRA was executed on March 10, 2023, the remaining

question is whether Heller's SRA is binding on the Debtor.[8]  Under Ohio law, which governs

Heller's SRA, the "[e]ssential elements of a contract include an offer, acceptance, contractual

capacity, consideration . . . , a manifestation of mutual assent and legality of object and of

consideration." *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2022) (citation omitted); *see also*

*N. Side Bank & Trust Co. v. Trinity Aviation, LLC*, 153 N.E.3d 889, 894 (Ohio Ct. App. 2020)

(indicating that a "meeting of the minds between the contracting parties must occur,

demonstrated by offer, acceptance, and consideration" for an express contract to exist).

"Manifestation of mutual assent to an exchange requires that each party either make a promise or

begin or render a performance.  The manifestation of assent may be made wholly or partly by

written or spoken words or by other acts or by the failure to act." *Ford v. Tandy Transp., Inc.*,

620 N.E.2d 996, 1006 (Ohio Ct. App. 1993) (citations omitted).  Generally, the party asserting

---

[8]      The Debtor argues that, to the extent the SRA constituted an offer from the Debtor, Heller's "ongoing
negotiations with Debtor regarding the SVB internal investigation into his hostile work environment complaints"
resulted in a rejection of this offer "as a matter of law."  (MOL ¶ 44.)  In support of this, the Debtor states that the
"only reasonable inference" from communications with Heller was that "Heller was awaiting the conclusion of the
investigation to determine whether he believed he was entitled to ***greater*** severance for the release of his alleged
hostile work environment claims."  (*Id.* (emphasis added).)  Heller clarifies in the Second Heller Response, however,
that he was, in fact, delaying signing the SRA because "signing the [SRA] would forfeit [his] rights to make any
future claims; and . . . there might be a way to maintain [his] employment."  (Second Heller Response at 3.)  The
language of the SRA supports this.  Section 13 of the SRA includes an affirmation that the individual has "not
reported internally to Employer any allegations of wrongdoing by Employer or its officers."  (First Heller Response
at 8.)  As there is nothing in the documentation before the Court that clearly indicates that Heller was renegotiating
the terms of his severance, the Debtor's argument is unpersuasive.

the existence of a contract generally bears the burden of proof.  *Wilhelm v. Coverstone*, 118

N.E.3d 970, 979 (Ohio Ct. App. 2018).

Both the Debtor and Heller agree that Heller's SRA was never countersigned by the

Debtor.  The Debtor indicates that, following a review of the documentation and information

FCB provided, it determined that none of the SRAs referenced in the MOL, including Heller's

SRA, were executed by or on behalf of the Debtor.  (MOL Bixler Declaration ¶ 6; *see id.* ¶ 7

(describing the subpoenas the Debtor served on FCB that sought documents relating to Heller,

Norfleet, and Xu).)  Likewise, Heller concedes that the SRA was "not . . . fully executed" as

"SVB did not execute their portion of the [SRA] on March 17, 2023, and instead filed for

Chapter 11 protection."  (First Heller Response at 1–2.)

While "[t]he existence of a valid contract does not necessarily require the signature of all

parties to the contract," it is nonetheless "well-established that courts will give effect to the

manifest intent of the parties where there is clear evidence demonstrating that the parties did not

intend to be bound by the terms of an agreement until formalized in a written document and

signed by both."  *Estate of Battle-King v. Heartland of Twinsburg*, No. 110023, 2021 WL

2765950, at *6 (Ohio Ct. App. 2021) (quoting *Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel.

Co.*, 375 N.E.2d 410, 413 (Ohio 1978)).

Here, at the time the SRA was distributed to Heller for signature, it was clear to both the

Debtor and Heller that a necessary condition to the enforceability of the contract was the

signature of both parties.  (*See* MOL ¶ 49.)  Indeed, Heller acknowledges in the First Heller

Response that "[p]er the terms of the [SRA], ***SVB was to execute their portion of the [SRA] on

March 17, 2023***."  (First Heller Response at 2 (emphasis added); *see also id.* at 15 (reflecting

that Heller's SRA was sent to Zwolfer for signature on March 17, 2023 and that Zwolfer

"need[ed] to sign").)  The DocuSign portal receipt, provided in both the First and Second Heller

Responses, includes a "statement from SVB defining the process and timeline for signing the

[SRA]." (*Id.* at 3.)  The statement provides:

> Hi, ***Please find attached your [SRA] for signature.***  You can sign and return
> the [SRA], at any time, but no later than March 24, 2023, should you decide
> to sign.  After your signature, the document will be forwarded to HR for
> signature after the seven (7) day revocation period.  You will be notified
> when the document has been fully executed.  Please make sure to download
> and save or print your completed [SRA] when notified by the HR Service
> Center via Docusign.  ***Once your [SRA] is fully signed, your severance will
> be processed for payment and will receive your severance within 2 pay
> periods of the date the document was completed***.

(*Id.* at 15 (emphasis added); Second Heller Response at 27 (same).)  Indeed, prior to Heller

signing the SRA, an email from Kimberly Lam of the HR Service Center, dated March 10, 2023

at 12:15 p.m., notified Heller that, to submit his signed SRA, the "Docusign link [he] received on

2/7/23 [was] for [his] virtual signature.  Once . . . sign[ed], there will be a 7-day revocation

period before it is sent to . . . Head of Partnerships & Solutions." (First Heller Response at 14.)

In accordance with the foregoing, Heller sent an email on March 14, 2023, seeking confirmation

that his signed SRA was "received in good order" as he had "not gotten any confirmation that it

was received or countersigned." (MOL Bixler Declaration, Ex. 4.)  As both Heller and the

Debtor were of the mutual understanding that both signatures were required in order for him to

receive his severance payment, the SRA is not binding against the Debtor.

It must also be noted that Heller did not return his signed SRA until after SVB went into

receivership on March 10, 2023 at 8:39 a.m., upon which the Debtor's relationship to SVB and

all former SVB employees was severed, including those who previously served as authorized

officers.  (MOL ¶¶ 11, 47; MOL Bixler Declaration ¶ 6 (indicating that the Debtor never had

employees of its own and, upon SVB entering receivership, lost access to all of SVB's

employees); *see also Disclosure Statement for Debtor's Second Amended Plan of*

*Reorganization Under Chapter 11 Plan of the Bankruptcy Code* (ECF Doc. # 1179) at 13 ("SVB

directly employed all of the Debtor's personnel, who provided services to the Debtor and its

various businesses").)  As of that point in time, those employees were now under the control of

the FDIC, which effectively "step[ped] into the shoes" of SVB.  *O'Melveny & Myers v. F.D.I.C.*,

512 U.S. 79, 86 (1994) (citations and internal quotation marks omitted); *see also Fed. Deposit*

*Ins. Corp. v. Ernst & Young LLP*, 374 F.3d 579, 581 (7th Cir. 2004) ("FDIC-Receiver steps into

the shoes of the failed bank and is bound by the rules that the bank itself would encounter in

litigation.").

Generally, the "manifestation of assent by the offeree constitutes the acceptance," which

needs to be communicated to the offeror.  *Tandy*, 620 N.E.2d at 1006; *Shapnick v. LCA-Vision,*

*Inc.*, No. 1:03-CV-71, 2005 WL 1364633, at *4 (S.D. Ohio June 8, 2005) (requiring an offeree's

acceptance of a contract to be communicated to the offeror in order for it to be effective) (citing

*Toro v. Geyer*, 117 N.E.2d 620, 621 (Ohio Ct. App. 1951)).  Therefore, as the Debtor indicates,

all individuals Heller interacted with concerning his SRA after his submission on March 10,

2023 were former SVB employees acting under the control of the FDIC and lacked authority to

act on the Debtor's behalf.  (*See* MOL ¶ 47.)  As a result, Heller did not communicate his

acceptance of the SRA to the Debtor on March 10, 2023 nor is there any evidence from either the

Debtor or Heller that Heller communicated such acceptance did prior to the Petition Date or

March 24, 2023, the deadline to sign the SRA.

Accordingly, for the foregoing reasons, the Heller SRA is unenforceable against the

Debtor.

### B. The Xu Claim

Under California law, which governs Xu's SRA, the "essential elements of a contract are: 1. Parties capable of contracting; 2. Their consent; 3. A lawful object; and, 4. A sufficient cause or consideration." *Aton Ctr., Inc. v. United Healthcare Ins. Co.*, 311 Cal. Rptr. 3d 564, 581 (Ct. App. 2023) (internal quotation marks omitted) (quoting CAL. CIV. CODE § 1550 (West 1872)). The consent of the parties, or mutual assent, is typically "manifested by an offer communicated to the offeree and an acceptance communicated to the offeror." *Donovan v. RRL Corp.*, 27 P.3d 702, 709 (Cal. 2001), *as modified* (Sept. 12, 2001). In determining whether mutual assent exists, courts will use an "objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Levy v. Only Cremations for Pets, Inc.*, 271 Cal. Rptr. 3d 250, 256 (Ct. App. 2020) (internal quotation marks omitted) (quoting *DeLeon v. Verizon Wireless, LLC*, 143 Cal. Rptr. 3d 810, 820 (Ct. App. 2012)); *see also Aton*, 311 Cal. Rptr. 3d at 581 (stating the same).

Generally, "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *City of Moorpark v. Moorpark Unified Sch. Dist.*, 819 P.2d 854, 860 (Cal. 1991) (citations omitted). "The determination of whether a particular communication constitutes an operative offer, rather than an inoperative step in the preliminary negotiation of a contract, depends upon all the surrounding circumstances." *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 784 (9th Cir. 2012) (quoting *Donovan*, 27 P.3d at 709). "[T]he pertinent inquiry is whether the individual to whom the communication was made had reason to believe that it was intended as an offer." *Id.*

40

1. <u>Xu Possessed the Ability to Accept Debtor's Offer</u>

As an initial matter, the Debtor contends that Xu had rejected the offer contained in the SRA "on multiple occasions" and, therefore, had "no ability to accept Debtor's offer." (MOL ¶¶ 62–63.) In support, the Debtor cites to Xu's attempts to renegotiate the amount of severance he would be receiving if he executed the SRA, describing it as being "unreasonably low," among other things, and arguing that "severance should be negotiable." (*Id.*) While it is the case that, under California law, "[i]t is hornbook law that an unequivocal rejection by an offeree, communicated to the offeror, terminates the offer," *Glaser, Weil, Fink, Jacobs & Shapiro, LLP v. Goff*, 125 Cal. Rptr. 3d 26, 39 (Ct. App. 2011) *as modified on denial of reh'g* (May 6, 2011), an original offer may still be accepted if the offeror makes clear that the original offer remains in effect. *See Santa Monica Unified Sch. Dist. v. Persh*, 85 Cal. Rptr. 463, 467 (Ct. App. 1970) (holding that despite subsequent counteroffers, the original offer could still be acted upon by acceptance since the offeror indicated so and "[n]o one doubts that one who has made an offer can disregard or refuse the counter-offer, and by a return communication make his original offer once more fully operative." (quoting 1 Corbin on Contracts § 92)); *see also Landberg v. Landberg*, 101 Cal. Rptr. 335, 345 (Ct. App. 1972) (stating that the only exception to the rule that an attempt to exercise an option on terms varying from the offer constitutes a rejection of the original offer and a counteroffer is "whether the optionor in his original offer, or the optionee in his counteroffer, states that, in spite of the counteroffer, the original offer shall not be terminated").

Here, it was communicated to Xu that, notwithstanding his attempts to renegotiate the amount of severance he would be receiving under the SRA, Xu could still accept and sign the SRA any time until March 24, 2023. In an email to Xu, dated March 1, 2023, Sprague explained that the amount of severance pay was "non-negotiable" but stated further that:

> ***If you decide not to sign the Separation Agreement, you will not receive
> the Severance Pay or other benefits described in the Separation
> Agreement.***  Beyond that, there are no adverse consequences associated
> with choosing not to sign the Separation Agreement.  ***Please confirm with
> your severance agreement, but my understanding is that you have until
> March 24th to consider whether or not you want to sign***.

(MOL Bixler Declaration, Ex. 10 at 3 (emphasis added).)  In other words, despite Xu seeking to
modify the amounts he would be receiving under the SRA, it was clear that Xu could still sign
and accept the SRA up through March 24, 2023.  Accordingly, the Debtor's contention that Xu
lacked the ability to accept Debtor's offer is unpersuasive.

### 2.  Xu's SRA is Unenforceable Against the Debtor

As with Heller and Norfleet, the Debtor argues that Xu's SRA is unenforceable against
the Debtor because (i) Xu waited until March 10, 2023 when the Debtor was no longer affiliated
with SVB, and (ii) it was understood by all parties that only Xu's execution would be insufficient
to create a binding obligation on the Debtor.  (MOL ¶¶ 64–65; MOL Reply ¶ 14.)  Each is
addressed in turn.

*First*, acceptance of an offer, under California law, must be communicated to the offeror.
*See Russell v. Union Oil Co.*, 86 Cal. Rptr. 424, 427 (Ct. App. 1970) ("Acceptance of an offer,
which may be manifested by conduct as well as by words, must be expressed or communicated
by the offeree to the offeror.") (citation omitted).  Here, it is unclear from the face of Xu's SRA
whether he submitted his SRA prior to or after the closure of the Bank (*i.e.*, the point at which
the Debtor's relationship to SVB and all former SVB employees were severed).  At the hearing
held on September 5, 2024, however, Xu disclosed to the Court that he submitted his SRA
"electronically" at, what he believes was, "approximately [around] the same time" as when he
heard the news that DFPI had taken over the Bank.  (Sept. 5, 2024 Hr'g Tr. at 30:9–11, 30:22–

31:1.)  In other words, he submitted his SRA after the closure of the Bank was publicly announced.

Therefore, at the time of Xu's submission of his SRA, the Debtor's relationship to SVB and all former SVB employees were severed, including those who previously served as authorized officers.  (*See* MOL Bixler Declaration ¶ 6 (indicating that the Debtor lacked employees of its own, all of whom were employees of the Bank or one of its affiliates who the Debtor lost access to after the Bank was placed into receivership); *see also Disclosure Statement for Debtor's Second Amended Plan of Reorganization Under Chapter 11 Plan of the Bankruptcy Code* (ECF Doc. # 1179) at 13 ("SVB directly employed all of the Debtor's personnel, who provided services to the Debtor and its various businesses").)  As discussed, those employees were now under the control of the FDIC.  *O'Melveny*, 512 U.S. at 86 (stating that the FDIC, as receiver, "steps into the shoes" of the failed bank (citations omitted)); *Ernst & Young*, 374 F.3d at 581 (7th Cir. 2004) (same).  Like Heller, none of the employees Xu communicated with possessed the authority to receive Xu's acceptance on the Debtor's behalf.  Moreover, there is no evidence that Xu communicated his acceptance of the SRA to the Debtor before the deadline for him to accept the SRA expired on March 24, 2023 or the Petition Date.  (*See* MOL ¶ 64.)  Accordingly, Xu's acceptance of the SRA was not communicated to the Debtor.

*Second*, while a contract need not be signed to indicate mutual assent, if the parties intended that a contract needed to be fully executed to be effective, then such a contract is not enforceable unless signed by all parties.  *See Mitchell v. Exhibition Foods, Inc.*, 229 Cal. Rptr. 535, 545 (Ct. App. 1986) ("The fact that [the] contract was not formalized in a writing signed by both sides has no bearing on the existence or validity of that contract."); *Roth v. Garcia Marquez*, 942 F.2d 617, 626 (9th Cir. 1991) ("[I]f the evidence shows that the signatures of other

parties were required as one of the conditions of the completed agreement, it is incomplete and not binding upon those who sign until the others sign." (quoting 1 B. WITKIN, SUMMARY OF CALIFORNIA LAW, CONTRACTS § 143 (9th ed. 1987)).

"When an agreement lacks a signature, the Court looks to the intent of the parties to determine whether a contract was formed." *Gonzalez v. Oplaai LLC*, No. 2:23-CV-06192-SB-E, 2023 WL 11195911, at *2 (C.D. Cal. Dec. 19, 2023). In making such an inquiry, courts have looked to (i) whether a non-signing party has performed, which can create a binding contract; (ii) whether a signing party has demonstrated intent to not be bound until all parties sign "by, for example, expressly requiring mutual signatures as a condition precedent in the contract"; and (iii) whether a party has waived any condition precedent by expressing an intent to proceed with the agreement even if the condition has not been fulfilled. *Id.* at *2 (citations omitted). Generally, however, "[a] contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." *Barroso v. Ocwen Loan Servicing, LLC*, 146 Cal. Rptr. 3d 90, 99 (Ct. App. 2012) (internal quotation marks omitted) (quoting CAL. CIV. CODE § 1643 (West 1872)).

Here, there is no evidence that supports that the Debtor intended to be bound under the SRA. It is, in the first instance, the Debtor's non-performance—the failure to pay Xu his severance—that serves as the basis for this dispute. In any event, none of the employees Xu interacted with after the Closure Date possessed the authority to receive Xu's acceptance of the SRA.

Additionally, Xu recognized that the Debtor's countersignature was necessary in order for the SRA to be effective. Xu initially disputed at the September 5 hearing that he was aware

of a countersignature requirement.  (*See, e.g.*, Sept. 5, 2024 Hr'g Tr. at 29:13–18 ("I don't recall

any specific mentioning that says that this document or agreement has to be countersigned to be

executed."); *id.* at 29:23–25 ("[T]here's nowhere actually specifically mentioned how the

document or the agreement needs to be executed.").)  However, Xu also acknowledged that it

was "[his] understanding . . . at that time was [that] as soon as [he] signed . . . ***there [was] a***

***waiting period and for the agreement to be*** to be [sic] ***executed***."[9]  (*Id.* at 29:15–18 (emphasis

added).)  He further stated that he was "kept informed by . . . HR" that he had "plenty of time"

and, specifically, "forty-five days before ***we*** can execute this agreement."  (*Id.* at 31:7–11

(emphasis added).)  Indeed, Xu confirmed this understanding in an email correspondence, dated

March 14, 2023, where he reached out to Sprague and Kelli MacKenzie and notified them that he

signed the SRA "last week," acknowledged that "***HR will need to complete the process***," and

asked if he could be notified "when this [process] can be completed so [he] can receive [his]

severance."  (MOL Bixler Declaration, Ex. 11 at 5 (emphasis added).)  In other words, Xu

understood that the SRA would not be in effect until a process had taken place and the agreement

had been executed.  *See Gonzalez*, 2023 WL 11195911, at *3 (requiring, in the context of a

signing party seeking to demonstrate an intent to not be bound by its signature, that such party

"provide evidence that it understood the agreement would not take effect until some condition

precedent was met (such as the signature of all other parties).").

Moreover, as the Debtor states, the "terms and forms of the [SRA] indicate both parties'

signatures were required to effectuate the agreement."  (MOL ¶ 65.)  Section 16 of the SRA

provided that severance would be paid if Xu worked through the last date of his employment,

---

[9]    The SRA established a 7-day revocation period whereby Xu possessed the right to revoke his acceptance of
the SRA "for a period of seven (7) days" after signing, following which the SRA would "become enforceable only
upon expiration of this revocation period without [his] prior revocation.  (Xu Claim at 6.)

and he signed the SRA prior to that date.  (*See* Xu Claim at 9.)  Meanwhile, the signature page to

the SRA included signature lines for both Xu and Zwolfer, in his capacity as Head of

Partnerships & Solutions, to countersign on behalf of the Debtor.[10]  (*See id.* at 10.)  Zwolfer's

signature line, which was identical to Xu's but for their names and the inclusion of Zwolfer's

title, included a heading that said, "ACKNOWLEDGED AND AGREED."  (*Id.*)  Indeed, Xu

conceded that there was a place for SVB to sign in the SRA and stated that, "[a]s far from [his]

perspective, that's a signature [sic] seems like from both sides."  (Sept. 5, 2024 Hr'g Tr. at

32:13–15.)

Accordingly, in light of the foregoing, the Court **SUSTAINS** the Third Claims Objection

as to the Xu Claim.[11]

### C.  The Norfleet Claim

Under Massachusetts law, which governs Norfleet's SRA, the "essential elements of a

contract are an offer, acceptance, and an exchange of consideration or meeting of the minds."

*McCormick v. Lischynsky*, 539 F. Supp. 3d 225, 237 (D. Mass. 2021) (quoting *Vadnais v. NSK*

*Steering Sys. Am., Inc.*, 675 F. Supp. 2d 205, 207 (D. Mass. 2009)).  Contract formation

generally requires "a bargain in which there is a manifestation of mutual asset to the exchange."

*I & R Mech., Inc. v. Hazelton Mfg. Co.*, 817 N.E.2d 799, 802 (Mass. App. Ct. 2004) (citations

omitted).  Parties are generally required to give their "mutual assent by having 'a meeting of the

minds' on the same proposition on the same terms at the same time."  *Id.* (citations omitted).  A

---

[10]    As further indicia, the SRA also provides that the SRA "may only be changed in writing [with] any change
. . . signed by both [parties]."  (Xu Claim at 8.)

[11]    Xu also asserts a number of other arguments including, among other things, that his SRA constitutes an
administrative expense under section 507(a)(2) of the Bankruptcy Code and allegations that SVB violated the
California Worker Adjustment and Retaining Notification Act.  (Second Xu Response at 1–2.)  With respect to the
former, as the Court has already determined that the Third Claims Objection is sustained, this argument does not
need to be addressed.  As to the latter, that statute only applies in certain circumstances that are not present here.
*See* CAL. LAB. CODE §§ 1400.5, 1401.

manifestation of this mutual assent "between contracting parties generally consists of an offer by

one and the acceptance of it by the other." *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS

§ 22(1) (1981)).  An offer is the "manifestation of willingness to enter into a bargain made in

such a way as to justify the other person in understanding that his assent will conclude the

agreement" and will "ripen into a binding contract when . . . accepted." *Id.* (citations omitted).

Meanwhile, acceptance is deemed to have occurred when "the offeree gives the return requested

in the offer." *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS § 50(1) (1981)).

A party seeking to enforce an agreement under Massachusetts law bears the burden of

proving a contract's existence. *See Ottaway Newspaper Co. v. Harless*, 1996 Mass. App. Div.

115 (Mass. Dist. Ct. 1996) (finding that the burden of proof rested on the plaintiff to establish the

existence of a contractual relationship between the parties); *Canney v. New England Tel. and Tel.

Co.*, 228 N.E.2d 723, 727 (Mass. 1967) ("Where the existence of a contract is in issue, the

burden is on the plaintiff to show it was made.").

### 1.  Norfleet Did Not Repudiate the SRA

As an initial matter, the Debtor contends that Norfleet's handwritten note on her SRA,

which was appended to her proof of claim, constitutes an "unequivocal repudiation of the [SRA]

that was directly communicated to Debtor" and renders the SRA unenforceable against the

Debtor.  (MOL ¶ 56.)  Specifically, Norfleet wrote that she signed her SRA in "duress," and the

SRA failed to account for "vacation accumulated, not received."  (Norfleet Claim at 9.)

Under Massachusetts law, repudiation is "a statement by [an] obligor to [an] obligee

indicating that the obligor will commit a breach that would of itself give the obligee a claim for

damages for total breach . . . ."  *Burlington Landmark Assocs., LLC v. RHI Holdings, Inc.*, 27 F.

Supp. 2d 95, 99 (D. Mass. 1998) (modifications in original) (quoting RESTATEMENT (SECOND) OF

CONTRACTS § 250(a) (1981)).  Additionally, to "repudiate an agreement on the on the ground

47

that it had been made under duress, a party must ***complain promptly of the coercive statements***

***that it claims had forced it into the contract***." *Beaconsfield Townhouse Condominium Trust v.*

*Zussman*, 733 N.E.2d 141, 146 (Mass. App. Ct. 2000) (emphasis added). If a contract was

entered into under economic duress in particular, such agreement is "not binding and may be

avoided ***at the option of the party coerced***." *Gen. Motors Corp. v. Firepond, Inc.*, No. 014525,

2003 WL 21960673, at *3 (Mass. Super. July 3, 2003) (emphasis added).

The Debtor, nonetheless, backtracked on its arguments, stating at the September 5, 2024

hearing that it "take[s] Ms. Norfleet's claim at face value that the additional comments . . . that it

was signed under duress and that the amounts were incorrect [and] may not have been attempt at

repudiation." (Sept. 5, 2024 Hr'g Tr. at 49:15–19.) However, it maintains that her handwritten

note "does show that she did not believe that the agreement was accurate, that it was not an

acceptance of the debtor's offer, and that the debtor's offer was wrong." (*Id.* at 49:19–22.)

Norfleet clarified, however, that her use of the word "duress" was "not an indication that [she]

was not planning, nor would not sign the severance agreement," and there was "no disagreement

on [her] part with the severance offered." (Second Norfleet Response at 1.) Moreover,

Norfleet's handwritten note makes no reference to any "coercive statements" made that forced

her to sign as is otherwise required to repudiate an agreement on grounds of duress.

Accordingly, the Debtor's argument is unpersuasive.

### 2. Norfleet's SRA is Unenforceable as to the Debtor

With respect to Norfleet's SRA, the Debtor makes similar arguments. Specifically, the

Debtor argues that (i) Norfleet's acceptance was not timely communicated to the Debtor, and (ii)

the Debtor's signature was necessary to effectuate the SRA. (MOL ¶¶ 53–54; MOL Reply ¶ 10.)

Each is addressed in turn.

*First*, under Massachusetts law, "[i]t is . . . a basic rule of contract law that both the offer and acceptance must be communicated if a binding agreement is to be formed." *D'Agostino* v. *Fed. Ins. Co.*, 969 F. Supp. 2d 116, 131 (D. Mass. 2013) (citation omitted). Like Xu, there is lack of clarity whether Norfleet signed her SRA before or after the closure of SVB on March 10, 2023. (*See* MOL ¶¶ 11, 53.) At the September 5, 2024 hearing, the Debtor maintained that Norfleet's SRA was signed after the closure of the Bank.[12] (*See id.* at 17:11–16 ("I believe the record shows that each of the releases executed by the claimant was submitted after the . . . California [DFPI] had closed the bank. I think the bank never opened for business on March 10th. It was closed and placed under FDIC receivership."). Norfleet did not dispute this and stated that she signed her SRA on "the morning of" March 10th and subsequently received confirmation from HR later that evening that her signed SRA was received. (*See* Sept. 5, 2024 Hr'g Tr. at 36:13; 38:4–11; *see also* MOL Bixler Declaration, Ex. 8 (reflecting that the HR Service Center confirmed receipt at 7:21 p.m. on March 10, 2023).)

Therefore, as with Xu, Norfleet did not timely communicate her acceptance of the SRA to the Debtor. At the time of Norfleet's submission of her SRA, like Xu, the Debtor's relationship with SVB and all former SVB employees had been severed, and none of the employees Norfleet interacted with possessed the authority to receive Norfleet's acceptance on the Debtor's behalf. As there is also no evidence that she communicated her acceptance prior to the Petition Date or the March 24 deadline for her to sign the SRA, Norfleet's acceptance was not communicated to the Debtor.

*Second*, in determining whether mutual assent exists, courts will generally look to what parties "say and do." *See Salem Laundry Co.* v. *New England Teamsters & Trucking Indus.*

---

[12]     The Debtor indicates that Norfleet's handwritten note that her SRA was signed in her "duress" suggests that it was signed after the closure of the Bank was announced. (MOL ¶ 15.)

*Pension Fund*, 829 F.2d 278, 280 (1st Cir. 1987).  Indeed, "[p]arties may "agree on every term in a contract, yet not be bound until they sign a written agreement, if they so indicate." *Id.*  "A written contract, signed by only one party, may be binding and enforceable even without the other party's signature if the other party manifests acceptance." *Haufler v. Zotos*, 845 N.E.2d 322, 331 (Mass. 2006) (citations omitted).

Here, as with Xu, there is no evidence that the Debtor intended to be bound under the SRA as it is the Debtor's non-performance that serves as the basis for the Norfleet Claim. Moreover, as already discussed, there were no employees at the time of Norfleet's submission who possessed the authority to receive Norfleet's acceptance of the SRA.

In addition, Norfleet was aware of the requirement that the Debtor's signature was required for the SRA to be effective.  The March 10, 2023 email from Kimberly Lam at the HR Service Center to Norfleet, which confirmed receipt of Norfleet's SRA, notified her that a 7-day revocation period had now commenced "before [the SRA] goes to ***HR to sign***."  (MOL Bixler Declaration, Ex. 8 (emphasis added).)  Ms. Lam further indicated that "***[o]nce the agreement is completed***, [Norfleet] will receive a copy back and [they] will process [her] payment." (*Id.* (emphasis added)).  Norfleet responded simply, "Thank you for your response, it is much appreciated." (*Id.*)  Thus, Norfleet understood that additional steps needed to take place prior to her SRA becoming effective.  Norfleet confirmed this at the September 5, 2024 hearing, stating that she received from HR "[a] confirmation that they received my agreement and ***that it would be signed*** . . . [and] I would receive my payment on the next pay period." (Sept. 5, 2024 Hr'g Tr. at 37:1–5 (emphasis added).)

Additionally, Norfleet's SRA contains the same provisions as Xu's that indicate that both parties' signatures were required to effectuate the agreement.  Section 16 of Norfleet's SRA

50

provides that severance would be paid if Norfleet worked through the last date of her employment, and she signed the SRA prior to that date.  (*See* Norfleet Claim at 8.)  Like Xu, Norfleet's SRA also includes signature lines for both Norfleet and Zwolfer, in his capacity as Head of Partnerships & Solutions, to countersign on behalf of the Debtor with the headings "ACKNOWLEDGED AND AGREED."  (*See id.* at 9.)

Accordingly, in light of the foregoing, the Court **SUSTAINS** the Third Claims Objection as to the Norfleet Claim.

### D.  The Zwolfer Claim

#### 1.  Choice of Law Analysis

Under New York choice of law principles, the MOU is governed by Colorado law.  The Debtor accurately points out that the MOU does not have a choice of law provision.  (MOL ¶ 67.)  As a result, the Court must determine which state's law to apply to the contract.  As a general matter, bankruptcy courts apply the forum state's choice of law principles.  *See In re Adelphia Commc'ns Corp.*, 638 B.R. 506, 513 (Bankr. S.D.N.Y. 2022), reconsideration denied, 639 B.R. 657 (Bankr. S.D.N.Y. 2022) (citing *Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 601-02 (2d Cir. 2001) ("[B]ankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state.")).  Here, New York is the forum state, so New York choice of law principles are applicable.  Under New York choice of law rules, "the interpretation and validity of a contract is governed by the law of the jurisdiction which is the 'center of gravity' of the transaction."  *Longo v. KeyBank Nat'l Ass'n*, 357 F. Supp. 3d 263, 270 (S.D.N.Y. 2019) (citing *Alderman v. Pan Am World Airways*, 169 F.3d 99, 103 (2d Cir. 1999)); *see also In re J.T. Moran Fin. Corp.*, 147 B.R. 335, 339 (Bankr. S.D.N.Y. 1992) ("Under New York choice of law rules the jurisdiction having the greatest interest will be applied.").  Zwolfer is a resident of Colorado and appears to have worked

in Colorado while employed by both SVB and FCB.  Accordingly, Colorado law applies because it is the relevant center of gravity.

2.  <u>The MOU is Likely an Enforceable Contract and Not a Mere Agreement to Agree</u>

The MOU is likely an enforceable contract and not a mere agreement to agree.  In the MOL, the Debtor alleges that the MOU was simply an "unenforceable agreement to agree" because the document did not clarify the scope of the "general release and waiver of claims." (MOL ¶ 69.)  The Debtor maintains that these terms are essential to the agreement between the parties, and, therefore, the parties could not have arrived at an enforceable contract absent clarity on such key terms.  However, the Debtor's argument is unpersuasive for at least two reasons. First, the Debtor fails to comprehensively analyze the issue as directed by Colorado case law. And second, the Debtor's statements in the MOL regarding the SRA suggest that the terms of the general release and waiver of claims were not unclear.

First, *Gates Corp. v. Bando Chem. Indus., Ltd.*, 4 F. App'x 676, 678 (10th Cir. 2001) is instructive here.  In *Gates Corp.*, the Tenth Circuit, applying Colorado law, considered whether the memorandum of understanding (the "Memorandum") between the plaintiffs and defendants (together, the "Parties") was an "enforceable contract . . . or . . . merely an agreement to agree." *Id.* at 682.  The Parties had been involved in contentious litigation dating back almost 10 years before they decided to discuss a settlement.  *Id.*  Ultimately, they arrived at the Memorandum; however, the relationship soured again, and the defendants filed a motion to enforce the settlement as outlined in the Memorandum.  *Id.*  The plaintiffs maintained the Memorandum was not enforceable.  *Id.*  The district court granted the motion and an appeal followed.  The Tenth Circuit affirmed the district court's ruling and found the Memorandum was an enforceable settlement agreement.

52

The Tenth Circuit applied a two-pronged framework to appraise the Memorandum, focusing on: (1) whether the Parties "intended it to be a binding contract"; and (2) whether "its terms [were] specific enough to constitute a contract." *Id.* at 682 (citing *New York Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405, 409 (10th Cir. 1996).).  First, the circuit court analyzed the parties' intent, noting that in the case of a writing a court must focus on the "face of the writing itself" to make a determination.  *Id.*  The opinion emphasized that "[a] written document reflects the parties' intent to contract ***when it identifies the consideration for which the parties bargained and contains their signatures***." *Id.* at 683.  However, a writing can be classified as an "agreement to agree" if the parties "only settl[e] the terms of an agreement into which they formally proposed to enter after all its particulars had been adjusted, and by which alone they intended to be bound." *Id.* (citing *Pierce v. Marland Oil Co.*, 278 P. 804, 806 (Colo. 1929)).  Notably, however, the Tenth Circuit emphasized that the intention to craft a "more formal writing" was not sufficient by itself to revoke the binding authority of the initial agreement.  *Id.*

The circuit court found that the Parties had intended to enter a binding contract.  *Id.*  First, the Parties had identified nine items as the consideration they had bargained for, and stated they had "reached an agreement" on them.  *Id.*  Second, representatives for each party had authority to settle the lawsuit and both had signed the Memorandum, which indicated mutual assent to the nine terms.  *Id.*  Third, while the Memorandum noted the Parties had "agreed in principle to settle" and intended to craft a more formal writing, this alone did not "prevent the Memorandum from having binding force without some other indication the parties did not intend it to have such force." *Id.*  And the parties made no such indication.  *Id.*  Finally, the context of the Memorandum (*i.e.*, that the Parties had expressly met to settle the case, and the defendants had

escrowed funds as required by the Memorandum) supported the binding authority of the document. Accordingly, the Tenth Circuit found that the Parties intended to be bound.

Second, the circuit court assessed the specificity of the Memorandum's terms, finding them sufficiently definite. A contract's essential terms must be "definite" for it to be enforceable. *Id.* at 684. And if "the writing leaves the agreement of the parties vague and indefinite as to an essential element thereof, it is no contract and cannot be made one by parol." *Id.* (citing *Greater Serv. Homebuilders' Inv. Ass'n v. Albright*, 293 P. 345, 348–49 (Colo.1930) (en banc) (quotation marks and citations omitted).). Critically, "[e]ssential terms are 'determined from the intention of the parties as disclosed upon consideration of all surrounding facts and circumstances there prevailing.'" *Gates Corp.*, 4 Fed. Appx. at 684 (citation omitted).

In *Gates Corp.*, the Tenth Circuit determined that the nine terms were all settled and definite, and none were inherently contradictory or redundant. *Id.* Notably, the Memorandum also authorized the Parties' signatories to settle any disputes related to the terms. *Id.* The circuit court noted that the plaintiffs had argued the term "future technology issues" was indefinite, but it found that the district court had not abused its discretion by deciding the term was not essential. *Id.* at 685. The circuit court also noted that the plaintiffs were confusing definiteness (a contract formation question) with ambiguity (a contract interpretation question) and determined that an ambiguity did not "prevent the formation of an enforceable contract." *Id.* The *Gates Corp.* court emphasized that the essential terms of a settlement agreement were "manifestation of agreement (an offer and acceptance) on payment, release, and case dismissal terms (the consideration) between parties who have the capacity and authority to agree." *Id.* at 685-86 (citation omitted). The district court had found seven of the nine terms met the essential elements (excluding the future technologies issues) and the Tenth Circuit noted it would not

54

"derail a settlement agreement expressly resolving payment, release, and dismissal terms because of alleged disputes over additional terms." *Id.* at 686.

The facts of the Zwolfer Claim, like *Gates Corp.*, suggest that the MOU is likely an enforceable contract. First, Zwolfer and the Debtor both likely intended to be bound by the MOU. As an initial matter, neither party has briefed this issue; however, the face of the writing itself suggests that the parties intended to contract. The MOU has two main separation terms: (1) the Separation Benefits, and (2) entry into the SRA. (*See* First Zwolfer Response at 4.) The focus and brevity of the MOU indicates that the Debtor and Zwolfer concentrated on these two considerations. (*Id.*) And the MOU expressly states that it "memorialize[s] [the Debtor and Zwolfer's] ***conversations and agreement*** regarding [Zwolfer's] separation from the position of Head of Partnerships & Solutions with SVB." (*Id.* at 3.) As a result, it appears that the parties reached an agreement on the issues they had bargained for as captured in the MOU. (*Id.*) Moreover, the MOU was signed by Zwolfer and Laura Cushing, SVB's Chief Human Resources Officer. (*Id.* at 4.) Both parties had the authority to sign the MOU, and by doing so they indicated their mutual assent to the terms listed therein. Also, while the Debtor suggests that certain of the MOU's terms were intended to be formalized in a later agreement (*i.e.*, the SRA), that alone is insufficient to negate the MOU's binding power. (MOL ¶ 69.) The Debtor should have provided other indications from the parties supporting the position that the MOU did not have such force. Here, like *Gates Corp.*, there are no such other indications. Instead, the MOU expressly states that it reflects the agreement of the parties. Lastly, the context in which the MOU was signed further supports that it was meant to be binding. Specifically, Zwolfer and Ms. Cushing intended to finalize Zwolfer's separation from the company and entered the MOU with the goal of amicably ending the parties' professional relationship. (*See* MOL ¶ 21 ("[Ms.

55

Cushing] provided [Zwolfer] with the MOU regarding his transition from SVB.")  This factual

background implies that each party sought finality, which in turn requires the MOU to have some

binding power.

Second, the MOU's terms are likely sufficiently definite.  The Debtor emphasizes that the

payment of the Separation Benefits to Zwolfer was conditioned on the execution of an SRA

which would include "a general release and waiver of claim."  (MOL ¶ 69.)  The MOL goes on

to argue that since the SRA was not executed, there is no clarity on the scope of the

contemplated releases and waivers.  (*Id.*)  Specifically, the Debtor notes that the MOU does not

discuss "which claims Zwolfer agreed to waive, which entities the waiver applied to, whether

there were any exceptions to the waiver, the terms governing the confidentiality requirement of

such waiver or whether there were any further conditions on Zwolfer's right to the severance

payments."  (*Id.*)  The Debtor suggests that there is no basis to contemplate the releases and

waivers, and that each SRA is unique to the individual employee.  But that is not the case.

Earlier in the MOL, the Debtor acknowledges that "[t]he [SRAs] are ***form agreements
that generally provide that the terminated employee will receive a severance payment in
exchange for the employee's agreement to release SVB Financial Group and all of its
subsidiaries and affiliates from all causes of action***."  (MOL ¶ 5.)  And at the hearing on

September 5, 2024, Debtor's counsel reaffirmed this position by stating "***the releases are form
agreements*** [that] generally provide a terminated employee . . .  severance payment in exchange

for a general waiver of claims against the debtor and its affiliates."  (*See* September 5, 2024 Hr'g

Tr. at 16:1-4.)  Additionally, the Norfleet and Xu SRAs that are attached as exhibits to the MOL

Bixler Declaration show that these agreements are substantially similar with respect to the scope

of the releases and waivers.  (*See* MOL Bixler Declaration Ex. 7; *id*. Ex. 9.).  The differences

between the Norfleet and Xu SRAs are the names of the claimants, the severance pay amounts, and references to state laws that correspond to the claimant's location.

The Court acknowledges that under Colorado law, parties to a contract must "agree on all essential terms to form a contract." *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 766 (10th Cir 2019) (citing *Fed. Lumber Co. v. Wheeler*, 643 P.2d 31, 36 (Colo. 1981)). And that such terms "must be sufficiently definite to enable the court to determine whether the contract has been performed or not." *Id.* (citing *Stice v. Peterson*, 355 P.2d 948, 952 (Colo. 1960)). Specifically, it must be that "further negotiations are not required to work out important and essential terms." *New York Life Ins. Co. v. K N Energy, Inc.*, 80 F3d 405, 409 (10th Cir 1996) (citations omitted). However, the Colorado Supreme Court has also recognized that "[t]he primary goal of contract interpretation is to determine and give effect to the intention of the parties." *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1149 (10th Cir. 2000) (citing *USI Properties East, Inc. v. Simpson*, 938 P.2d 168, 173 (Colo.1997)). As a result, "[w]hen the language in a contract is too uncertain to gather from it what the parties intended, the courts cannot enforce it." *Bill Barrett Corp.*, 918 F.3d at 766 (citation omitted). Notably, a court must determine the intent of the parties from the "language of the instrument itself and extraneous evidence of intent is only admissible where there is an ambiguity in the terms of the agreement." *Atl. Richfield Co.*, 226 F.3d at 1149.

Here the Court is confronted with a contract where an essential term (*i.e.*, Zwolfer's specific releases and waivers of claims) is not defined but described with reference to the SRA which is seemingly a form agreement with little substantive difference between iterations. As analyzed in detail above, the MOU indicates that both parties intended it to have binding power and amicably end their professional relationship. The document describes the Separation

Benefits and separation terms in detail and clarifies the conditions for payment. It also contains the parties' signatures and affirms their agreement regarding the separation as memorialized in the MOU. Taken as whole, the language of the MOU is not too uncertain to obfuscate the parties' intentions and prevent a court from enforcing it. The situation in this case is different from a circumstance where the essential terms in the contract are not only unknown but unknowable without further negotiation. Accordingly, the Court rejects the Debtor's argument that the MOU lacked specificity with respect to the contemplated releases and waivers since these terms followed the form SRA language. The SRA's standard releases and waivers were readily available to the Debtor and familiar to Zwolfer in his capacity as Head of Partnerships and Solutions. The Court acknowledges that each SRA necessarily requires personalization to correspond to the location of the specific employee, but the overall scope and format of the SRAs appear to be standardized so as to bring the terms within fair contemplation of both parties.

### 3.  Conditions Precedent Analysis[13]

The Debtor asserts that its obligation to provide Separation Benefits to Zwolfer was contingent on the parties entering a SRA. The parties, however, consensually deferred signing the SRA and ultimately did not execute an SRA. Accordingly, the Debtor concludes that it has no obligation to provide payment to Zwolfer. While intuitively appealing, the Debtor's argument ignores the "prevention doctrine," which states that a promisor cannot excuse its obligations by hindering or preventing the occurrence of a condition precedent. *Am. Ins. Co. v.*

---

[13]    The conditions precedent analysis that follows is relevant to the Zwolfer Claim but not to the Claims of Heller, Xu and Norfleet. Zwolfer has an MOU signed by both the Debtor and Zwolfer before the Debtor filed its Chapter 11 case. There is no question about the authority of each party to enter into Zwolfer MOU. Heller, Xu and Norfleet, on the other hand, have no agreement signed by SVB. The Debtor has shown that after the Chapter 11 Petition was filed, the Debtor's employees had no authority to sign the SRAs.

*Pine Terrace Homeowners Ass'n,* No. 120CV00654DDDMDB, 2023 WL 6796163, at *5 (D.

Colo. June 12, 2023).  Zwolfer indicates that he was not provided an opportunity to sign the SRA

despite requesting to do so.  (*See* First Zwolfer Response ¶¶ 2,4; *see also* September 5, 2024

Hr'g Tr. at 43:16-21 ("So when my last day happened, which was March 10th, so as soon as the

bank went into receivership, at that point, I should have received a separation agreement to sign.

I did not receive that.  I reached out both to our legal department verbally.  I talked to them on

phone calls.  There's [sic] emails where I actually spoke with them."), 44:14-15 ("So I wasn't

able to sign the separation agreement because I never got it on that last day.").)  The Debtor

claims that it did not have an obligation to provide the SRA on the date Zwolfer was terminated,

which is March 10, 2023.  (MOL at 10.)  Specifically, the Debtor maintains that the MOU only

states that Zwolfer "desire[d]" to defer executing [the SRA] until he "terminated [his]

relationship with [Debtor]" and "Zwolfer's preferences are not the Debtor's promises."  (MOL

Reply ¶ 23.)  The Court, however, determines that the MOU does not provide the Debtor with a

carte blanche to hold the SRA hostage and deliberately obstruct the signing of the SRA.  And the

Debtor fails to illuminate the factual circumstances regarding the delay in signing the SRA

despite being on notice of the situation before the Petition Date.

Ultimately, the Debtor does not consider the potential application of prevention doctrine

or clarify if it intentionally prevented Zwolfer from signing the SRA.  These ambiguities prevent

the Court from expunging the Zwolfer Claim.  Accordingly, the Zwolfer Claim Objection is

**DENIED WITHOUT PREJUDICE**.  The Court urges the Debtor and Zwolfer to engage in

mediation in an effort to resolve the dispute.  If the Debtor elects to renew an objection to the

Zwolfer Claim, it will have to further develop the record consistent with the analysis contained in

this Opinion.

### a. The SRA

The Debtor's obligation to pay Separation Benefits was expressly conditioned on entry into the SRA; however, it is unclear whether the Debtor obstructed the execution of the SRA to excuse its obligation. In contract law, a condition precedent is "an act or event, other than a lapse of time, which must exist or occur before a duty of immediate performance of a promise arises." *Aponte v. Allstate Fire & Cas. Ins. Co.*, No. 1:21-CV-01601-CNS-SKC, 2023 WL 129693, at *2 (D. Colo. Jan. 9, 2023) (citing *Soicher v. State Farm Mut. Auto. Ins. Co.*, 351 P.3d 559, 564 (Colo. App. 2015)); *see also B-B Co. v. Piper Jaffray & Hopwood, Inc.*, 931 F.2d 675, 678 (10th Cir. 1991) (same) (citation omitted); *Hurt v. New York Life Ins. Co.*, 51 F.2d 936, 938 (10th Cir. 1931) (stating that "a condition precedent may be either a condition which must be performed before the agreement of the parties shall become a binding contract [], or a condition which must be fulfilled before the duty to perform a provision of an existing contract arises") (citation omitted).

Here, entry into the SRA was a condition precedent to the Debtor's obligation to provide Separation Benefits. (*See* First Zwolfer Response at 3 (". . . [the Debtor is] prepared to offer you the following Separation Benefits with a total value of $459,452 (less applicable withholdings) *in exchange for* your entering into a confidential Separation and Release Agreement . . ."); *see also id.* at 4 ("You understand and agree that [the Debtor's] obligation to pay the separation benefits described above *is contingent upon* you entering into a confidential Separation and General Release of Claims Agreement.") (emphasis added)). It is uncontested that Zwolfer decided to defer executing the SRA, and the SRA was ultimately not executed by both parties. (*Id.* "[The Debtor] acknowledge[s] [Zwolfer's] desire to defer executing [the SRA] until [Zwolfer] terminate[s] [his] relationship with SVBFG.") Nevertheless, prevention doctrine may excuse the condition precedent if the Debtor deliberately prevented the execution of the SRA.

60

Prevention doctrine cures contractual imbalances by prohibiting promisors from obstructing the fulfillment of contractual conditions to excuse their obligations. Prevention doctrine has been generally recognized and applied by courts in Colorado. *See e.g.*, *Grubb v. DXP Enterprises, Inc.*, 85 F.4th 959, 967 (10th Cir. 2023) (applying Oklahoma law and noting "if a contractual benefit for party A depends on the occurrence of a condition under the control of party B, party B may be in breach of contract if it acts in bad faith to prevent the occurrence of the condition"); *Digital Ally, Inc. v. Z3 Tech., LLC*, 754 F.3d 802, 810 (10th Cir. 2014) (applying Nebraska law and noting "a condition is excused if the occurrence of the condition is prevented by the party whose [contractual obligations are] dependent upon the condition. . . . In other words, 'if a promisor prevents or hinders the occurrence of a condition precedent, the condition is excused.'") (citations omitted); *Baroness Small Ests., Inc. v. Round Hill Cellars*, No. 10-CV-01999-MSK-CBS, 2011 WL 6152969, at *4 (D. Colo. Dec. 12, 2011) ("The prevention doctrine is a generally recognized principle of contract law that provides that if one party prevents or hinders the other party's ability to perform, the other party's failure to perform is excused.") (citation omitted); *New Design Constr. Co. v. Hamon Contractors, Inc*., 215 P.3d 1172, 1184 (Colo. App. 2008) (same); *Montemayor v. Jacor Commc'ns, Inc.*, 64 P.3d 916, 920 (Colo. App. 2002) ("When 'a promisor is himself the cause of the failure of performance of a condition upon which his own liability depends, he cannot take advantage of that failure.'") (citation omitted). Notably, the Supreme Court has also applied prevention doctrine. *See Jones v. United States*, 96 U.S. 24, 27 (1877) ("For, where the right to demand the performance of a certain act depends on the execution by the promisee of a condition precedent or prior act, it is clear that the readiness and offer of the latter to fulfil the condition, and the hindrance of its performance by the

promisor, are in law equivalent to the completion of the condition precedent, and will render the promisor liable upon his contract.") (citation omitted).

The application of prevention doctrine requires a fact intensive inquiry to determine whether the actions of a contract party qualify as intentional obstruction of contract conditions. Here, Zwolfer has alleged that the Debtor may have obstructed the execution of the SRA, which was a condition precedent to the payment of the Separation Benefits. (*See* First Zwolfer Response ¶ 2 ("[The] opportunity to execute [the SRA] was never provided."; *see also id.* ¶ 4 ("Robert Zwolfer was never provided an opportunity to sign the aforementioned agreed upon [SRA] when the relationship ended, nor was he provided the agreed upon Separation Payment amount."). These statements alone are insufficient to establish that the Debtor acted in bad faith to intentionally prevent the fulfillment of a contractual condition. However, these statements suggest that Zwolfer was denied a chance to execute the SRA at several points following the parties' entry into the MOU. And while Zwolfer voluntarily "deferred" executing the SRA at the time of the MOU, deferment implies that the execution of the SRA was a matter of time. Furthermore, the MOU expressly acknowledges Zwolfer's desire that the entry into the SRA be deferred until "[Zwolfer] ***terminate[d] [his] relationship*** with SVBFG." (*Id.* at 4.) (emphasis added). However, Zwolfer claims that he was not provided an opportunity to sign the SRA when the parties terminated their relationship on March 10 and the subsequent period (*e.g.*, March 11 and the week of March 13, and before March 27 when Zwolfer moved to FCB). As noted earlier, the Debtor attempts to explain its inaction by claiming "Zwolfer's preferences are not the Debtor's promises" but that explanation is insufficient.

Notably, the Debtor has not provided additional details on Zwolfer's allegations and has not discussed why the SRA was not provided to him (before or after his termination date) and

whether such delay was intentional.  The Court acknowledges that the Debtor was in the midst of

a historical bank collapse and dealing with significant problems, including preparing for a

complex bankruptcy filing, during the period Zwolfer was attempting to move forward with the

SRA.  As a result, the Court does not imply bad faith on the Debtor.  Nevertheless, the Court

does not have enough information to determine whether prevention doctrine applies to excuse

the SRA condition precedent.  Accordingly, the Zwolfer Claim shall remain on the claims

register as the parties clarify the factual circumstances.

### b.  The Separation Date

The Debtor also argues that the Separation Benefits were "conditioned on [Zwolfer's]

continued employment with SVB through July 14, 2023," which was unsatisfied.  (MOL ¶ 68.)

But that argument is unpersuasive.  While the MOU states that the parties had agreed on a

separation date of July 14, 2023,[14] it does not clearly establish that this was a condition

precedent.  (*See* First Zwolfer Response at 3 ("We mutually agree that your separation from

employment with SVB will be July 14, 2023"); *see also id.* at 4 ("we would like you to continue

working actively in your role through your last day of employment, July 14, 2023, continuing to

lead the HR team and assist with any transition duties for a new leader who may join us during

this time period").  At several points, the MOU explicitly discusses the conditions for the

Separation Benefits, and each time the *only* express condition precedent is the parties' entry into

the SRA.  (*Id.* at 3 (stating the Separation Benefits are "in exchange for" entering the SRA); *see

also id.* at 4 (emphasizing that the Separation Benefits were "contingent upon [] entering into a

confidential [SRA]").

---

[14]        Subject to a consensual four-week extension.  (First Zwolfer Response at 3.)

As a general matter, courts will not read in a condition precedent to avoid forfeiture. *See, e.g.*, *Sec. Mut. Cas. Co. v. Century Cas. Co.*, 531 F.2d 974, 978 (10th Cir. 1976) ("We noted above that Colorado law does not favor construing ambiguous terms as conditions precedent. A construction as covenants rather than conditions is desirable because it avoids forfeitures."); *R.N. Robinson & Son, Inc. v. Ground Imp. Techniques*, 31 F. Supp. 2d 881, 886 (D. Colo. 1998) ("[C]onditions precedent are 'generally looked upon with disfavor'. . . . Thus, 'an interpretation is preferred that will reduce the obligee's risk of forfeiture, unless the event is within the obligee's control or the circumstances indicate that he had assumed the risk.' Colorado has adopted this policy to avoid the 'potentially harsh effects of a forfeiture that can result. . . .'") (citations omitted); *Dinnerware Plus Holdings, Inc. v. Silverthorne Factory Stores, LLC*, 128 P.3d 245, 247 (Colo. App. 2004) ("Because they create a risk of forfeiture if they do not occur, conditions precedent are not favored and will not be given effect unless established by clear and unequivocal language. If there is any doubt as to the parties' intention, a contract clause is to be interpreted as a promise rather than a condition, so as to avoid the harsh results of forfeiture against a party who has no control over the occurrence of the condition.") (citation omitted). Accordingly, the parties here should have clarified whether the separation date was a condition precedent, as they had with the SRA condition, but they did not do so. The Court will not create a condition precedent where the MOU has left is ambiguous.

Moreover, the Debtor's argument that the separation date was a condition precedent is undermined by other language in the MOU. Specifically, the MOU contemplates placing Zwolfer on a "garden leave" to "further assist with the transition." (First Zwolfer Response at 3.) Zwolfer's compensation and benefits would have remained intact through a possible leave, but the Debtor's goal was to "avoid that outcome." (*Id.*) The fact that the Debtor was prepared to

64

practically terminate Zwolfer before July 14 through a garden leave undermines its current

argument that the separation date was an express contractual condition.  At best, the separation

date was a promise.  Additionally, the Debtor's position with respect to the separation date

attempts to penalize Zwolfer for moving to FCB during the Debtor's bankruptcy and amid

ongoing layoffs.  The MOL notes that several employees were offered and accepted positions

with FCB at the same time as Zwolfer.  (MOL ¶ 22.)  Zwolfer's move to FCB and his eventual

termination and entry into a Position Elimination Agreement and Release with FCB have no

bearing on the Debtor's unrelated obligations to Zwolfer under the MOU.  Accordingly, the

Debtor's separation date argument is unpersuasive.

In sum, the condition precedent to the Debtor's obligation to provide Separation Benefits

were not fulfilled in this case, but such failure may not relieve the Debtor's contractual duties.

Under prevention doctrine, the Court may excuse the condition precedent if the Debtor

intentionally prevented or hindered the execution of the SRA to avoid paying the Separation

Benefits.  The Court, however, cannot make this determination based on the existing record.

## IV.    <u>CONCLUSION</u>

For the reasons discussed, the Third Claims Objection is **SUSTAINED** as to the Heller,

Xu, and Norfleet Claims, which shall be expunged from the claims register.  The Objection to

the Zwolfer Claim is **OVERRULED WITHOUT PREJUDICE.**

**IT IS SO ORDERED.**

Dated:  September 17, 2024
        New York, New York

_Martin Glenn_
MARTIN GLENN
Chief United States Bankruptcy Judge