**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
In re:                                                                      **FOR PUBLICATION**

       SVB FINANCIAL GROUP,                                Chapter 11

                                                            Case No. 23-10367 (MG)

                                Debtor.
------------------------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER SUSTAINING
### DEBTOR'S THIRD OMNIBUS OBJECTION TO THE SIMONS CLAIM

*A P P E A R A N C E S :*

SULLIVAN & CROMWELL LLP
*Attorneys for the Debtor*
125 Broad Street
New York, New York 10004
By:    James L. Bromley, Esq.
        Andrew G. Dietderich, Esq.
        Christian P. Jensen, Esq.

FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
*Attorneys for Paul M. Simons*
7 Times Square
New York, New York 10036
By:    Michael S. Palmieri, Esq.
        Ian C. Bruckner, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

       Pending before the Court is the third omnibus claims objection (the "Claims Objection,"

ECF Doc. # 908) of SVB Financial Group (the "Debtor") to proof of claim no. 652 filed by Paul

M. Simons ("Simons" and his claim, the "Simons Claim") in the total amount of $427,595.46 on

August 3, 2023.[1] The Claims Objection seeks entry of an order disallowing and expunging the

---

[1]     The Simons Claim amends and supersedes proof of claim no. 7, which has been expunged on such grounds pursuant to the *Order Sustaining Debtor's First Omnibus Objection to Claims* (ECF Doc. # 817). The Claims Objection sought to expunge numerous claims on several bases, including "no liability," duplicative, amended, and

Simons Claims from the Debtor's claims register in its entirety on "no liability" grounds.  (*See* Claims Objection at 1–2; see also *Debtor's Memorandum of Law in Support of Debtor's Third Omnibus Objection to Proofs of Claim Solely with Respect to Paul M. Simons' Proof of Claim* (the "MOL"), ECF Doc. # 1426 at 3 ("Debtor now moves for the Court to disallow Simons' claim and expunge it from the claims register entirely.").)  Annexed to the Claims Objection are (i) a proposed order granting the Claims Objection, as originally contemplated, as Exhibit A, and (ii) the supporting declaration of Holden Bixler (the "Third Omnibus Bixler Declaration"), managing director at Alvarez & Marsal North America LLC, as Exhibit B.

In addition to other creditors, the Debtor received a formal response from Simons (the "First Simons Response," ECF Doc. # 997).  Annexed to the First Simons Response are (i) a copy of the Simons Claim as Exhibit A; (ii) relevant excerpts from the Debtor's February 11, 2011 Form S-4 Registration Statement as Exhibit B; (iii) email correspondence from April 9–10, 2023 as Exhibit C; (iv) email correspondence dated February 16, 2023 as Exhibit D; (v) email correspondence from February 17 through March 22, 2023 as Exhibit E; (vi) a copy of proof of claim no. 7, Simons's prior claim, as Exhibit F, which includes as an exhibit, a copy of his Severance Agreement (defined below) dated March 10, 2023; (vii) email correspondence from April 9, 2023 as Exhibit G; (viii) email correspondence from September 5–6, 2023 as Exhibit H; (ix) the FDIC's October 13, 2023 notice of claim disallowance as Exhibit I; and (x) Simons's document production requests that were served on the Debtor as Exhibit J.

While the Debtor filed a reply (the "Omnibus Reply," ECF Doc. # 1009) to responses received in connection with the Claims Objection, the Omnibus Reply did not address the First

---

insufficient documentation grounds.  (*See generally* Claims Objection.)  The Claims Objection to the Simons Claim was adjourned several times to permit the parties to conduct discovery.  (*See* ECF Doc. # 1400.)  This Opinion addresses only the Simons Claim.

Simons Response, and the hearing on the Claims Objection as to the Simons Claim was adjourned. On August 29, 2024, the Debtor filed the MOL with respect to the Simons Claim pursuant to the Court-approved briefing schedule. (*See* ECF Doc. # 1400.) Annexed to the MOL are (i) a proposed order sustaining the Claims Objection as to the Simons Claim as Exhibit A, and (ii) the declaration of Holden Bixler in support of the relief sought (the "MOL Bixler Declaration," ECF Doc. # 1426-2) as Exhibit B.

On September 19, 2024, Simons filed a response (the "Second Simons Response," ECF Doc. # 1473) and, on September 26, 2024, the Debtor filed its reply (the "MOL Reply," ECF Doc. # 1486).

For the reasons discussed below, the Court **SUSTAINS** the Claims Objection to the Simons Claim and **EXPUNGES** the Simons Claim from the claims register.

## I.    BACKGROUND

The collapse of Silicon Valley Bank ("SVB" or the "Bank") on March 10, 2023, when the FDIC was appointed receiver, had many unfortunate consequences for a large swath of stakeholders, including employees, shareholders and bondholders of the parent company, and many others. The financial system in the United States was itself threatened. For former employees, such as Paul Simons, expectations of large severance payments were thwarted through no fault of the employees. But, in this case, applicable state and bankruptcy laws do not support imposing the alleged obligations on the chapter 11 Debtor.

### A.  The Chapter 11 Filing and the Bar Date Order

Prior to March 10, 2023, the Debtor's primary businesses and operations were comprised of SVB, a state-chartered bank; SVB Capital, a venture capital and credit investment platform that focuses on funds management; and SVB Securities LLC, an investment bank. (MOL ¶ 1.)

3

SVB and its affiliates directly employed all personnel that performed work for the Debtor or any of Debtor's subsidiaries; the Debtor did not have employees of its own. (*Id.*) The work was performed pursuant to intercompany services agreements and other SVB policies and procedures. (*Id.*)

Before 9:00 a.m. (PST) on March 10, 2023 (the "Closure Date"), the California Department of Financial Protection and Innovation ("DFPI") announced it had taken possession of SVB and appointed the FDIC to serve as receiver of Silicon Valley Bank ("FDIC-R1"). (*Id.* ¶ 2.) The Debtor submits that this severed the Debtor's affiliation with SVB. (*Id.*) After the Closure Date, on March 12, 2023, FDIC-R1 transferred all of SVB's deposits to Silicon Valley Bridge Bank, N.A. ("Bridge Bank"). (*Id.* ¶ 3.)

On March 17, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for chapter 11 relief under the Bankruptcy Code. (*Id.* ¶ 4.) On June 29, 2023, the Court entered an order establishing certain dates and deadlines for filing proofs of claims (the "Bar Date Order," ECF Doc. # 373). (Claims Objection ¶ 3.) Specifically, the Bar Date Order established, among other things, (i) August 11, 2023 at 4:00 p.m. as the bar date for entities other than governmental units to file proofs of claim against the Debtor that arose before the Petition Date, including, subject to certain exceptions, secured claims, unsecured priority claims, unsecured nonpriority claims, and claims pursuant to section 503(b)(9) of the Bankruptcy Code (the "General Bar Date"); and (ii) September 14, 2023 at 4:00 p.m. as the bar date for governmental units to file proofs of claim against the Debtor (the "Governmental Bar Date"). (Bar Date Order ¶¶ 3, 4.)

On August 2, 2024, the Court entered an order (ECF Doc. # 1379) confirming the Debtor's *Second Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time, the "Plan"). (MOL ¶ 4.) The

Debtor continues to operate its businesses and manage its properties as a debtor-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code pending its emergence from

chapter 11 pursuant to the confirmed Plan.  (*Id.*)

### B.  The Simons Claim

#### 1.  In General

Simons, a wealth management professional, previously served as the president of wealth

management at Boston Private Financial Holdings, Inc. ("Boston Private").  (First Simons

Response ¶¶ 1, 4.)  Simons became head of SVB Access at SVB Private, the Debtor's private

bank, in 2021 when the Debtor acquired Boston Private.  (*Id.* ¶ 4; *see* MOL ¶ 5 ("Simons joined

SVB in 2021 following Debtor's acquisition of Boston Private Wealth LLC.").)  There is no

dispute that Simons served as an employee of SVB.  (*Id.*; *see also* First Simons Response at 85

("[M]y employment, my paychecks, and my termination were with, from, and by Silicon Valley

Bank.").)

#### 2.  The February 16, 2023 Notification Letter

On February 16, 2023, Simons was notified via Zoom that his employment was to be

terminated as part of a restructuring of leadership at SVB Private.  (First Simons Response ¶ 6.)

That same day, he received a letter (the "Notification Letter") from Laura Cushing who served as

SVB's Chief Human Resources Officer at the time.  (*Id.* at 22.)  She notified Simons that "due to

organizational restructuring, SVB Financial Group . . . ha[d] decided to separate and terminate

[his] employment."  (*Id.* at 22.)  Included with the Notification Letter was a copy of a

Confidential Separation Agreement and Release (the "Severance Agreement") for him to sign.[2]

---

[2]    The Simons Objection also makes note of the Debtor's Form S-4 that was filed on February 11, 2021.
(First Simons Response ¶ 5.)  The Form S-4 "acknowledged [the Debtor's] obligation to pay severance and other
compensation to Simons and other Boston Private executives pursuant to the Executive Vice President Pay Plan if

(*Id.* ¶ 6.)  As Simons highlights, the Severance Agreement was between him and the Debtor.
(Second Simons Response ¶ 13.)

The Notification Letter informed Simons that, while his projected last day of work would

be March 3, he would be paid through his "termination date" of March 17, 2023.  (First Simons

Response ¶ 6; *id.* at 22.)  Notably, Simons was further advised that his employment preceding his

last day would "remain at-will," and if he "remain[ed] employed until [his] termination date," he

would be "eligible" for severance payments based on and in accordance with the Severance

Agreement.  (*Id.* ¶ 6.)  Specifically, any severance pay Simons would be eligible for, Cushing

noted, would be "contingent upon both [his] continued employment until it is terminated in

accordance with the [Notification Letter] *and* [his] signing of the [Severance Agreement]."  (*Id.*

(emphasis added).)  If Simons ultimately chose to sign the Severance Agreement, Cushing made

clear that the Severance Agreement could only be "sign[ed] and return[ed] . . . *on or after the*

*termination date, but not prior to*."  (*Id.* (emphasis added).)

Both the Debtor and Simons indicate that the Notification Letter, along with a copy of

the Severance Agreement, was attached to a February 16, 2023 email from Linda Spearman-

Scott, who the Debtor indicates is now a "former SVB employee."  (*Id.* at 50; MOL ¶ 7.)

Spearman-Scott told Simons that the Severance Agreement contained provisions for six months

of salary, a *pro rata* portion of his "2023 Bonus," and six months of healthcare coverage and

outplacement services.  (First Simons Response at 50.)  To receive any of the foregoing,

however, Spearman-Scott made clear that Simons had to sign the Severance Agreement.  (*Id.*)

She notified Simons that he would have 45 days to review the Severance Agreement and its

they were to be terminated." (*Id.*)  Specifically, the Form S-4 "provided amounts (based on hypothetical
assumptions) and calculation methodology for cash severance and perquisites/benefits, including COBRA, that
would be due to Simons if Boston Private's Executive Vice President Severance Pay Plan applied." (*Id.*)

terms, and if he chose to sign, consistent with the Notification Letter, he would "need to wait until on or after March 17." (*Id.*) Spearman-Scott stated that "[w]e will send a Docu[S]ign for your signature." (*Id.*) Lastly, Spearman-Scott also notified Simons that she would send him a compensation statement on March 1, 2023 relating to his 2022 bonus pay that was "not subject to the release" set forth in the Severance Agreement. (*Id.*)

The original version of the Severance Agreement (the "February 16 Severance Agreement") attached to Spearman-Scott's February 16, 2023 email, which was not signed by the Debtor, offered Simons, as severance, a lump sum payment of $225,000, which was approximately equal to six months of his regular pay, plus an additional $101,250, representing a *pro rata* amount of Simons's 2023 bonus. (MOL Bixler Declaration, Ex. 8.) It also included various non-compete restrictions that prevented Simons from working for Debtor's competitors, as well as certain conditions precedent. (MOL ¶¶ 8–9.) These conditions precedent include the requirement for Simons to sign and return the agreement within 45 days from receipt and Simons not revoking his signature to the Severance Agreement. (MOL Bixler Declaration, Ex. 8 § 19 ("Employee has [45] days from receipt . . . to sign . . . and return it to [the Debtor]."); *see also id.* § 4 ("In consideration for Employee signing and not revoking his signature . . . [the Debtor] agrees to provide Employee with . . . payment and benefits that Employee would not otherwise be entitled to . . . .").)

Notably, the February 16 Severance Agreement provides, in a "WHEREAS" clause, that the "Employee will separate from employment with [the Debtor] on March 17, 2023," which it defines as the "Separation Date."[3] (*Id.* at 1.) Consistent with the Notification Letter, Exhibit A

---

[3]    Simons notes that the Severance Agreement made clear that he separated from his employment on March 17, 2023, and that he was terminated without cause. (First Simons Response ¶ 14.)

to the February 16 Severance Agreement conditions Simons's eligibility for severance pay

"subject to the employee's continued employment until the date determined for the separation."

(*Id.* at 12.)  Many of the benefits set forth in the Severance Agreement are computed from the

Separation Date.  (*See, e.g.*, *id.* § 1 ("Regardless of whether Employee signs . . . Employee will

receive (i) his regular salary, minus lawful deductions, through the Separation Date"); *id.* § 4(a)

(stating that Simons will receive $225,000, which is approximately equivalent to six months of

his regular base salary "as of the Separation Date").)

Shortly after receiving Spearman-Scott's email, Simons requested a meeting on February

16 to "discuss the deficiencies [t]herein," and a Zoom meeting was scheduled for Spearman-

Scott and Simons to meet.  (*Id.*, Ex. 9 at 1; *id.*, Ex. 10.)  On February 17, 2023, Spearman-Scott

requested Simons to send "full" documentation supporting "what [he] said [he] signed regarding

the merger agreement as well as the e-mail that [he] indicated was sent by Chris Edmunds

Waters [sic] regarding the 90 day notice."  (*Id.*, Ex. 11.)  Simons complied and provided

Spearman-Scott with the requested documentation.  (*See id.*, Exs. 12–13 (copies of documents

Simons emailed to Spearman-Scott).)

Subsequently, Lydia Crawford, an HR Representative for Partnerships and Solutions at

SVB at the time, emailed Simons various documents related to his separation, including copies

of the Notification Letter and an unsigned February 16 Severance Agreement.  (MOL ¶ 13.)

Crawford reiterated that, if Simons chose to accept the Severance Agreement, the Severance

Agreement would be "sent to [him] via DocuSign for his signature on March 17, 2023."  (MOL

Bixler Declaration, Ex. 14.)

### 3.  Subsequent Iterations of the Severance Agreement

On February 24, 2023, Simons emailed Spearman-Scott, requesting a "response" to their

conversation a week prior to which she ultimately responded that it would take at least another

day given the "[s]everal levels of consideration for anything that we do." (*Id.*, Ex. 17 at 2.)

Simons followed up again on February 27, 2023, stating "I need a response soon as this should

be fairly straightforward based on facts and circumstances.  I appreciate your efforts but need a

resolution here, preferably an amicable one as I stated when we last spoke." (*Id.* at 1.)

On February 28, 2023, Spearman-Scott and Simons were scheduled to meet over Zoom

again. (*Id.*, Ex. 18.)  The Debtor indicates that, after the meeting, Spearman-Scott provided

Simons with a copy of his "2022 Year-End Compensation Statement" as promised in her

February 16 email. (MOL ¶ 15.)  The statement provided that Simons's 2022 compensation

totaled $771,017, comprised of $450,000 in base pay and $321,017 in bonus pay pursuant to

SVB's Incentive Compensation Plan. (MOL Bixler Declaration, Ex. 20.)

Following receipt of this information, Simons questioned the proposed bonus payment

amount, requesting a time to discuss and stating that amounts he receive "should have nothing to

do with [his] separation but only [his] actual performance in 2022." (*Id.*, Ex. 21.)  This, he

continued, is "[a]ll the moreso [sic] given that [his] total comp target [was] disproportionate in

equity, which [he didn't] get" and further alleged that he was "deeply exploited in 2022 for [his]

level of responsibility, contribution, and performance." (*Id.*)

On March 1, 2023, Spearman-Scott notified Simons that she would meet with him the

following day when she would "have [his] agreement changes." (*Id.*, Ex. 22.)  Another Zoom

meeting was scheduled, and the Debtor indicates that, following this meeting, Spearman-Scott

provided Simons with a revised version of the Severance Agreement (the "March 2 Severance

Agreement"). (MOL ¶ 17; MOL Bixler Declaration, Exs. 23–24.)  Simons noted that, in this

version of the Severance Agreement, "all of the non-compete language and reference to prior

agreements" had been removed. (*Id.*, Ex. 24)

On March 3, 2023, Spearman-Scott emailed Simons a meeting request.  (*Id.*, Ex. 25.)

Shortly thereafter, Spearman-Scott emailed Simons another version of the unsigned Severance

Agreement, updating the amount of the separation payment (the "March 3 Severance

Agreement").[4]  (*See id.* Exs. 26–27; MOL ¶ 19 (noting that the March 3 Severance Agreement

"did not include any of the non-compete provisions in the original, and the amount of severance

pay had changed.").)

Following what appears to be Simons's lack of response, Crawford emailed Simons on

March 6, 2023 to check in on her prior email with the March 3 Severance Agreement and

requested that he "review these documents and let [her] know if [he had] any questions."  (*Id.*,

Ex. 28.)  The Debtor indicates that Crawford included another copy of the March 3 Severance

Agreement, which remained unsigned.  (MOL ¶ 19.)  Simons, unclear if this was the same as

what he previously received, inquired whether the attached included any further revisions from

what Spearman-Scott sent on March 3.  (MOL Bixler Declaration, Ex. 30.)  Crawford confirmed

that it was and no further changes had been made.  (*Id.*)

### 4.  Simons's Submission of the Severance Agreement

Ultimately, Simons continued to work until March 3, 2023 after which Simons's access

to his work email and the Debtor's systems was terminated.  (First Simons Response ¶ 7; Second

Simons Response ¶ 11.)

---

[4]      The Debtor represents that, instead of the $225,000 initially offered, the March 3, 2023 Severance
Agreement provided for a lump sum payment of $309,000, which was "approximately equal to the total of (i) a lump
sum payment of $84,000; and (ii) a payment of six (6) months of Employee's regular base salary as of the
Separation Date [(March 17)]."  (MOL ¶ 19 (quoting MOL Bixler Declaration, Ex. 27).)  Simons later confirmed in
a September 6, 2023 email to Gregory Winter, an individual with the FDIC, that this lump sum payment of $84,000
was to account for an allegedly "acknowledged and agreed" underpayment of Simons's 2022 bonus that could not
be added to the actual bonus payment because the bonus payments were already in process and scheduled to be paid
on March 10, 2023.  (First Simons Response at 85.)

Following the closure of SVB (and prior to March 17, 2023—the earliest date he was permitted to sign and submit the Severance Agreement), Simons signed the March 3 Severance Agreement on March 10, 2023 using an execution date of March 17, 2023 instead of his actual date of signature.  (MOL Bixler Declaration, Exs. 31–32; *see also* Second Simons Response ¶ 12 (conceding that Simons emailed his signed Severance Agreement "mere minutes after the time when . . . the [DFPI] announced it had taken possession of Silicon Valley Bank and appointed the FDIC as receiver").)  Rather than submitting his signed Severance Agreement via DocuSign as discussed, Simons emailed his signed copy to Spearman-Scott.  (*See* MOL Bixler Declaration, Ex. 31.)  He indicates that he emailed Spearman-Scott because he had not received a DocuSign link.  (Second Simons Response ¶ 12.)

5. <u>Subsequent Communications Concerning the Severance Agreement</u>

On March 11, 2023, Simons emailed Crawford and Spearman-Scott and inquired, among other things, (i) how he could receive relevant employee communications "given what's going on" as his email and "systems access [had] been terminated," and (ii) "where . . . to go to have [his Severance Agreement] countersigned or if [he] should still expect a docusign this week." (MOL Bixler Declaration, Ex. 33.)  In response, Spearman-Scott stated, on March 12, 2023, that she had "raised this as an issue and ***it is being discussed with the FDIC***.  At this point [they] have provided all agreements to [the] FDIC but [did] not have any information on how they will handle them."  (*Id.* (emphasis added).)

On March 15, 2023, Simons emailed Cushing, who the Debtor submits was now a Bridge Bank employee, and included a copy of his signed Severance Agreement.  (*Id.*, Ex. 34.)  He indicated that he was reaching out to her because she was the "signatory on the attached [Severance Agreement] [he] received on February 16th (and subsequently revised . . . per mutual agreement)."  (*Id.*)  Simons stated:

> I have signed and returned the agreement per your request, and I understand that it is valid and in effect this Friday based on the language of your letter, and expect it will be honored. I have been advised to ask that it be countersigned as, independent of the financial obligations contained therein, I also may need it as evidence of my final disposition from SVB with prospective employers. If a signed version is still scheduled for the 17th via docusign per Linda's original representation please let me know.

(*Id.*)

Subsequently, on March 22, 2023, Crawford emailed and notified Simons that Spearman-Scott passed along his signed Severance Agreement and requested that he resubmit the agreement with March 10 as the signature date instead of March 17. (*Id.*, Ex. 36.) Included with her email was another unsigned copy of the March 3 Severance Agreement. (*See id.*, Ex. 37.) The Debtor highlights that Crawford's email signature, at this point, noted that she was an employee of "Silicon Valley Bridge Bank, N.A., [a] full-service FDIC-operated 'bridge bank', formerly Silicon Valley Bank." (*Id.*, Ex. 36; MOL ¶ 24.)

In compliance with Crawford's request, Simons provided a new version of the signed Severance Agreement that was dated March 10 instead of March 17. (*See* MOL Bixler Declaration, Ex. 38.) In his email, he notified her that he had "put the 17th because [he] was instructed to do so in the original email" and "never received the docusign request as indicated" while asking if it would still be "most efficient . . . for [her] to just send that instead." (*Id.*) Once more, Simons requested that Crawford "either send [him] the originally promised docusign orsend [sic] me back a countersigned copy of attached." (*Id.*) This version of the Severance Agreement with a modified signature date, along with all prior iterations, reflects that the Severance Agreement is governed by Connecticut law. (*See* MOL ¶ 41.)

Finally, on March 27, 2023, Simons emailed Spearman-Scott, Crawford, and Cushing, as well as Tim Mayopolous, CEO of Bridge Bank, and other Bridge Bank employees. (MOL Bixler Declaration, Ex. 40.) The Debtor submits that this email appears to lay out a list of facts

detailing why the FDIC and/or Bridge Bank owed Simons severance payments.[5]  (MOL ¶ 26.)

He notes that, "[a]ccording to the March 14th [sic], 2023 Financial Institution Letter posted by

the FDIC, ***the receiver is 'obligated to and has the full ability to make timely payments' to***

***counterparties and otherwise perform its obligations***."  (MOL Bixler Declaration, Ex. 40

(emphasis added).)  Simons then demanded that the recipients of the email respond with the

"process and timeline for fulfilling the payment obligations" purportedly owed to him, including,

among other things, his separation benefits.  (*Id.*)

### 6.  <u>The Simons Claim and His Claim with the FDIC</u>

The Simons Claim, asserted in the total amount of $427,595.46 against the Debtor, is

predicated on amounts Simons believes he is due under the Severance Agreement, which is

comprised of "earned but unpaid wages, severance, [and] accrued compensation."  (Simons

Claim at 2.)  The amounts comprising the $427,595.46 amount are:

- $101,250, which represents prorated "earned but unpaid wages" from January 1 through March 3, 2023;

- $84,000 as a lump-sum adjustment for unpaid 2022 compensation;

- $225,000 severance pay in accordance with the Severance Agreement; and

- $17,345.46, which represents six months' worth of COBRA coverage at $2,890.91 per month.

(*Id.* at 5; *see also* First Simons Response ¶ 15 (arguing that the Severance Agreement required

the Debtor to make (i) a $309,000 separation payment, and (ii) payments of $101,250, a *pro rata*

amount of Simons's 2023 annual bonus, and $17,345.46, which represents six months of

COBRA payments).)  Simons submits that he has complied with the Severance Agreement but

has not received any of the payments due thereunder.  (*Id.* ¶ 16.)

---

[5]    A "substantially identical" email was sent to counsel for the Debtor on April 9, 2023.  (*See* MOL ¶ 27 (citing First Simons Response at 46–48).)

In addition to the Simons Claim filed in this chapter 11 case, Simons also filed a claim with the FDIC for the same amounts due to him under the Severance Agreement "[o]ut of an abundance of caution." (*Id.* ¶ 17; *see also id.* at 84–86.)  Ultimately, however, the FDIC disallowed his claim, concluing that it was "[n]ot proven to the satisfaction of the Receiver." (*Id.* ¶ 17; *see also id.* at 88–89.)

### C. The Third Omnibus Claims Objection

#### 1. The Objection

The Debtor objects to the Simons Claim on "no liability" grounds and seeks entry of an order disallowing and expunging the Simons Claim in its entirety.  Underlying the Debtor's objection to the Simons Claim is its contention that Simons's "severance agreement is nonexecuted," which the Debtor believes renders it "not liable for the Claimant's assertions." (Claims Objection, Ex. 1 at 10.)  The Debtor submits that the Simons Claim, along with other "no liability" claims, "unjustifiably encumbers the Debtor's asset pool and hinders the equitable treatment of legitimate creditors." (*Id.* ¶ 18.)  The Debtor points to section 502(b)(1) of the Bankruptcy Code, which provides that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor." 11 U.S.C. § 502(b)(1). (*Id.* ¶ 16.)

#### 2. The First Simons Response

Simons argues that the Debtor has failed to satisfy its burden in objecting to the Simons Claim, and therefore, the Claims Objection should be overruled and the Simons Claim allowed (First Simons Response ¶ 31.)  Relying on the three-factor test articulated in *Klein v. Chatfield*, 347 A.2d 58 (Conn. 1974), which evaluates whether parties intended to enter into a contract, Simons contends that the Severance Agreement is a binding agreement on the Debtor as he and the Debtor have mutually assented that under Connecticut law would render a contract binding irrespective of whether it is signed. (*Id.* ¶¶ 20–22.)  Specifically, the *Klein* test states that

14

parties' intent may be determined from "the (1) language used, (2) circumstances surrounding the transaction, including the motives of the parties, and (3) purposes which they sought to accomplish." *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 444 (2d Cir. 2005) (citing to *Klein*, 347 A.2d at 61).

Here, Simons submits that each of the *Klein* factors is satisfied, which supports a finding that the Debtor "indicated its assent to the Severance Agreement" and is thus, bound by it regardless of whether a countersigned version was delivered. (First Simons Response ¶ 29.) In support, Simons argues that (i) the express terms of the Severance Agreement demonstrated that only Simons needed to sign the document to be bound (*id.* ¶¶ 23–24); (ii) the parties understood that the Debtor's signature to the Severance Agreement was merely a "ministerial act" (*id.* ¶ 25 (quotation marks omitted)); and (iii) the parties' purposes for entering into the Severance Agreement are "plain"—the Debtor sought to terminate Simons's employment and obtain a release from possible litigation while Simons sought compensation (*id.* ¶ 28).

As an alternative and independent ground for relief, Simons also argues that the Debtor ratified the Severance Agreement when it accepted the benefits of Simons's performance of his obligations. (*Id.* ¶ 30.) At no point in time, Simons contends, did the Debtor suggest that it would not honor the Severance Agreement or otherwise repudiate its terms. (*Id.*) Indeed, the Debtor's post-Closure Date and post-Petition Date request that Simons change the signature date on his Severance Agreement, Simons argues, supports a finding that the Debtor intended to ratify the Severance Agreement despite not delivering a countersigned version. (*Id.*)

Lastly, as part of the First Simons Response, Simons requested that the Court treat the hearing on the Simons Claim as a "preliminary hearing" and to hold a separate "evidentiary hearing on the [Claims] Objection after the conclusion of the [Claims] Objection-related

discovery." (*Id.* ¶ 32.)  Simons indicates that he served "limited, targeted discovery on the

Debtor seeking documents relevant to the central issue whether the Severance Agreement is

enforceable." (*Id.* ¶ 33.)  The Debtor's responses to Simons's document requests were due on

May 2, 2024. (*Id.*)  Subsequently, the Debtor and Simons met and conferred regarding discovery

related to Simons's separation.  (MOL ¶ 32.)

### 3. Other Relevant Procedural History

On May 9, 2024, Debtor filed *Debtor's Ex Parte Motion for Entry of an Order Pursuant

to Bankruptcy Code Section 105 and Federal Rules of Bankruptcy Procedure Rule 2004

Authorizing Discovery* (the "First FCB Discovery Request," ECF Doc. # 1108) that sought

authorization to serve discovery requests on First Citizens Bank ("FCB").  (MOL ¶ 32.)  FCB

had acquired certain assets and liabilities of SVB relating to Simons's and the other severance

claimants' separation from SVB.  (*Id.*)  The Court granted the First FCB Discovery Request on

May 13, 2024. (*See* ECF Doc. # 1128.)

FCB ultimately provided the Debtor with documents and communications relating to the

Simons claim, which the Debtor, in turn, produced to Simons's counsel for review.  (MOL ¶ 33.)

Parties on both sides have now had an opportunity to assess the documentation.  (*Id.*)

### 4. The MOL

The Debtor argues that Simons's claim should be disallowed since (i) the parties did not

mutually assent to the terms of the Severance Agreement; (ii) Simons failed to satisfy an

expressly stated condition precedent to enforceability; and (iii) Simons did not timely

communicate his acceptance to the Debtor.  (MOL ¶ 48.)

In support of its first contention, the Debtor argues that the parties were "engaged in

ongoing negotiations regarding the essential terms of Simons's[s] [Severance Agreement], none

of which crystalized into binding obligations." (*Id.* ¶ 50.)  The context of Simons and the

Debtor's negotiations, the Debtor believes, supports this and reflects that it was "far from clear that, as of the Closure Date, the parties had cemented the essential terms of the agreement." (*Id.* ¶ 53.) The Debtor points to, in particular, "(i) the apparent insufficiency of Simons'[s] severance payment in comparison to the payments contemplated under the [Boston Private Executive Vice President] Severance Plan, (ii) the purported inadequacy of his 2022 bonus payment given his lack of performance review, and (iii) the consequences, if any, of the allegedly truncated notice period." (*Id.*) Whether further negotiations occurred as to the Severance Agreement's non-compete provisions, the Debtor states, is also unclear. (*Id.*)

Moreover, irrespective of whether Simons accepted the Severance Agreement, the Debtor contends that it never demonstrated its mutual assent to the agreement's terms, including signing it. (*Id.* ¶ 54.) Both the form and content of the Severance Agreement along with the parties' communications, the Debtor argues, show that neither Simons nor the Debtor intended to be bound until the Severance Agreement was fully executed. (*Id.* ¶ 55 (noting the two signature blocks for each party and the requirement that all modifications must be made in writing by both sides); *id.* ¶ 57 (highlighting Simons's repeated efforts to get a countersigned version).)

As for its second contention, the Debtor asserts that the condition precedent that Simons continue to remain employed with SVB until March 17, 2023 was not satisfied. (*Id.* ¶ 60; *see also id.* ¶ 61 (noting that Simons concedes that he is an SVB employee).) The Debtor maintains that Simons's employment with SVB ceased on March 10, 2023 when the Bank was placed under receivership, resulting in Simons becoming an employee of Bridge Bank instead. (*Id.* ¶ 61.) The requirement to remain employed through March 17, the Debtor argues, is the "actual condition" of the Severance Agreement as opposed to the requirement for him to "continu[e] to work" until March 3, 2023. (*Id.* ¶ 60.)

17

Finally, in support of its third and final contention, the Debtor maintains that, at the time Simons emailed his signed Severance Agreement to Spearman-Scott on the afternoon of March 10, the transmission of his acceptance was, in actuality, sent to the FDIC and not the Debtor. (*Id.* ¶ 66.) Consequently, the Debtor argues that a contract could not have been formed. (*Id.*) In other words, because Spearman-Scott was no longer an employee of SVB at the time, she was not acting on behalf of the Debtor. (*Id.* ¶ 65.) For similar reasons, the Debtor also contests Simons's assertion that Crawford's request for him to correct his signature date constituted the Debtor's ratification of the Severance Agreement as she was also no longer an SVB employee. (*Id.* ¶ 68.) Any offer that existed, the Debtor argues, had lapsed by its own terms at the close of the 45-day consideration period on April 2, 2023, one week before Simons emailed Debtor's counsel on April 9, 2023. (*Id.* ¶¶ 69–70.) Therefore, denial of Simons's claim is appropriate, the Debtor argues, because Simons's acceptance, if any, was "never communicated to Debtor and he failed to accept the Release in the manner prescribed by Debtor." (*Id.* ¶ 71.)

5.   The Second Simons Response

In response to the MOL, Simons filed the Second Simons Response, maintaining that the Severance Agreement is a "binding obligation of [the Debtor] and its arguments to the contrary all lack merit." (Second Simons Response ¶ 21.) At the outset, Simons argues that the Debtor has conceded that, under Connecticut law, execution of a contract is unnecessary where parties have mutually assented. (*Id.* ¶ 22.) He reiterates the arguments set forth in the First Simons Response, which he believes adequately establishes how each *Klein* factor demonstrates the Debtor's intent to be bound by the Severance Agreement notwithstanding the absence of its countersignature, and how the Debtor has otherwise ratified the contract. (*Id.* ¶¶ 23–24.)

Simons rejects the Debtor's contention that the Severance Agreement sent to Simons on March 3 was not an offer that Simons could accept. (*Id.* ¶ 26.) Rather, the "clear implication"

18

from the factual record, including the Debtor's "overt" acts, was that it was the Debtor's offer, which Simons accepted and performed under (*i.e.*, working through March 3 and not revoking his signature) and, in so doing, formed a binding contract. (*Id.* ¶¶ 28–31.) In other words, the "undisputed record" establishes that the parties mutually assented. (*Id.* ¶ 29.)

Moreover, Simons also rejects the Debtor's assertion that the parties did not intend to be bound until the Severance Agreement was fully executed since nothing in the Severance Agreement conditioned its effectiveness on the Debtor's signature. (*Id.* ¶ 32.) Additionally, contrary to the Debtor's statements, Simons's repeated inquires for a countersigned agreement was, as he communicated, for prospective employers and independent of the financial obligations contained therein. (*Id.* ¶ 33.) The Debtor's reliance, Simons argues, on the seven-day revocation period is also unavailing. (*Id.* ¶ 34.)

Nothing in the Severance Agreement, Simons maintains, conditions the agreement on Simons remaining employed through March 17, 2023 and imposing such a requirement on Simons would be "unjust" since he had no control over whether he could do so. (*Id.* ¶ 39.) Connecticut's prevention doctrine, Simons contends, also excuses him from demonstrating satisfaction of that condition even if there was one since Simons's ability to meet the March 17 requirement was entirely within the Debtor's control. (*Id.* ¶ 40.) Simons asserts that the Debtor is also estopped from arguing that Simons was not employed on March 17 since "Simons's COBRA continuation of coverage election form . . . reports March 17, 2023 as the date of his 'termination.'" (*Id.* ¶ 41.)

Finally, as for the Debtor's arguments regarding his acceptance, Simons makes several points in opposition. *First*, Simons argues that the Debtor did not communicate an intent to revoke its offer before Simons accepted such that the offer was never withdrawn since DFPI's

closure of Silicon Valley Bank could not constitute a manifestation of such intent. (*Id.* ¶ 43.)
*Second*, Simons's submission of the signed Severance Agreement via email as opposed to
DocuSign was a "reasonable" means of acceptance, Simons asserts, as he was never provided
with a DocuSign link. (*Id.* ¶ 44.) In any event, Simons believed at the time that Spearman-Scott,
Cushing, and Crawford all possessed apparent authority to receive Simons's acceptance of the
Severance Agreement on the Debtor's behalf. (*Id.* ¶¶ 45–47.) *Third* and relatedly, Simons
argues that there is "[n]othing about the interposition of the FDIC's receivership of [the Bank]
prevented Simons from forming a binding contract with [the Debtor]." (*Id.* ¶ 50.) Rather, the
only possible relevance of the FDIC receivership, Simons remarks, is the status of the employees
to whom Simons sent the signed Severance Agreement to on March 10, for which the Debtor
fails to offer support. (*Id.* ¶ 51.)

Notwithstanding the foregoing, Simons argues that, even if the Court were to conclude
that the Severance Agreement is not binding, the Claims Objection should still be overruled
because Simons established a claim for unjust enrichment. (*Id.* ¶¶ 21, 52–54.) He performed
under the Severance Agreement by working through March 3, 2023 and granting the Debtor a
release per the Severance Agreement; the Debtor did not pay him severance; and, as a result,
Simons has, therefore, been deprived of $427,595.46. (*Id.* ¶ 54.)

6.  The Debtor's MOL Reply

The MOL Reply reiterates that there was no mutual assent to the terms in the Severance
Agreement (i) as it was clear to all parties that the Debtor's countersignature was required, and
(ii) given the state of the parties' negotiations, there no evidence that the Severance Agreement
Simons signed was an offer he could accept. (MOL Reply ¶¶ 2, 4–7, 10.) The Debtor also
suggest that Simons misconstrues the seven-day revocation provision in the Severance

Agreement, which did not provide that the agreement would only be effective "merely upon Simons'[s] signing and not revoking his signature for 7 days." (*Id.* ¶ 13.)

The Debtor, instead, maintains that the operative condition and date to the effectiveness of the Severance Agreement was Simons's continued employment through March 17, 2023 as opposed to being merely contingent upon him continuing through March 3. (*Id.* ¶¶ 14–16.) Moreover, the prevention doctrine is inapplicable here, the Debtor argues, since it applies only after a contract has been formed and the risk of cooperation was assumed by another party. (*Id.* ¶¶ 17–18, 20.) In the Debtor's mind, no agreement existed between Simons and Debtor at the time of the alleged "hindering conduct," and Simons, as an at-will employee, had otherwise assumed the risk that his employment could have been terminated prior to March 17, 2023. (*Id.*) There is also no evidence that the Debtor engaged in bad faith conduct that prevented the occurrence of a condition precedent. (*Id.* ¶ 19.)

Consistent with the MOL, the Debtor continues to argue that Simons has not established that he communicated his acceptance to the Debtor before the expiration of the Severance Agreement. As an initial matter, Simons's acceptance fails to satisfy the requirements for an "operative acceptance" under Connecticut law since he "knew or should have known" that emailing his agreement was an "unauthorized method of acceptance." (*Id.* ¶ 23.) His apparent authority argument, the Debtor contends, is also unavailing since Connecticut law requires that an agent's principal to hold out the agent as possessing authority, which did not happen here. (*Id.* ¶¶ 25–26.) Thus, it was unreasonable for Simons to believe that Crawford, in particular, possessed apparent authority. (*Id.* ¶ 27.) Moreover, the Debtor disputes that it withdrew or revoked the Severance Agreement and believes the factual records reflects otherwise. (*Id.* ¶ 29.)

Finally, the Debtor argues that Simons's work through March 3 does not entitle him to a claim

for unjust enrichment since no agreement was ever formed between the Debtor and Simons.  (*Id.*

¶ 31.)  Therefore, there was no benefit to the Debtor and, consequently, unjust failure to pay

Simons.  (*Id.*)  The Debtor also notes that Simons has failed to allege that he was not

compensated for his work through that date.  (*Id.*)

## II.    <u>LEGAL STANDARD</u>

Section 502 of the Bankruptcy Code provides that "[a] claim or interest, proof of which is

filed under section 501 of [the Bankruptcy Code], is deemed allowed, unless a party in interest . .

. objects."  11 U.S.C. § 502.  Bankruptcy Rule 3007(c) and 3007(d) provide that, under certain

circumstances, or with Court approval, more than one claim may be joined in a single objection.

FED. R. BANKR. P. 3007(c)–(d).[6]

As set forth in Bankruptcy Rule 3001(f), a proof of claim executed and filed in

accordance with Bankruptcy Rule 3001 shall constitute *prima facie* evidence of the validity and

amount of claim.  *See In re Residential Cap.*, 501 B.R. 531, 538 (Bankr. S.D.N.Y. 2013).

"Failure to attach the documentation required by Rule 3001 will result in the loss of the *prima*

*facie* validity of the claim."  *In re Minbatiwalla*, 424 B.R. 104, 112 (Bankr. S.D.N.Y. 2010); *see*

*also In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 n.13, 553 (Bankr. S.D.N.Y. 2000) (citing

Bankruptcy Rule 3001(f) in analysis of debtors' objection to former tenant's proof of claim and

granting partial summary judgment with respect to the objection where there were no material

facts in dispute).

To receive the benefit of *prima facie* validity, however, "the proof of claim must set forth

the facts necessary to support the claim."  *In re Marino*, 90 B.R. 25, 28 (Bankr. D. Conn. 1988)

---

[6]    The order establishing the certain omnibus claims objections procedures (ECF Doc. # 713) provides a list
of certain grounds upon which the Debtor is authorized to join claims in a single omnibus objection.

(citations and internal quotation marks omitted) (holding that claimant's proof of claim was not entitled to the presumption of *prima facie* validity because it did not set forth the necessary facts); *see also* FED. R. BANKR. P. 3001(c)(1) (requiring claimant to provide documentation where claim is based on a writing).

On the whole, "[a]n objecting party 'bears the initial burden of production and must provide evidence showing the claim is legally insufficient' under 11 U.S.C. § 502." *In re Lehman Bros. Holdings, Inc.*, 519 B.R. 47, 53–54 (Bankr. S.D.N.Y. 2014) (quoting *In re Arcapita Bank B.S.C.(c)*, 508 B.R. 814, 817 (S.D.N.Y. 2014)). A party objecting to the proof of claim must only provide evidence sufficient to negate the *prima facie* validity of the claim by refuting one or more of the facts in the filed claim. *See In re Waterman S.S. Corp.*, 200 B.R. 770, 774–75, 777 (Bankr. S.D.N.Y. 1996) (reopening discovery into asbestos claims due to insufficient information upon which to determine validity of claims); *see also In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir. 1992); *In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 Civ. 2229 (DC), 2010 WL 234827, at *3 (S.D.N.Y. Jan. 22, 2010) (same); *In re Adelphia Commc'ns Corp.*, Case No. 02-41729 (REG), 2007 WL 601452, at *5 (Bankr. S.D.N.Y. Feb. 20, 2007); *Rockerfeller*, 272 B.R. at 539 (same).

Once this occurs, "the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." *In re WorldCom, Inc.*, No. 02-13533 (AJG), 2005 WL 3832065, at *4, *9 (Bankr. S.D.N.Y. 2005) (citing Bankruptcy Rule 3001(f) and holding that claimant did not meet its burden to prove validity of anticipatory breach and unjust enrichment claims, but that further evidence was needed to assess the merits of lack of good faith claim) (quoting *Allegheny Int'l*, 954 F.2d at 173–74); *see also In re St. Johnsbury Trucking Co.*, 206

B.R. 318, 323, 328 (Bankr. S.D.N.Y. 1997) (citing Bankruptcy Rule 3001(f) and allowing claim

where debtor failed to refute any of the material facts in proof of claim).

Generally, the claimant must prove the claim and not sit back while the objector attempts

to disprove it. *See In re Bennett,* 83 B.R. 248, 252 (Bankr. S.D.N.Y. 1988) (holding that debtor

presented sufficient evidence to rebut the *prima facie* validity of claimant's claim and that

claimant failed to prove claim by a preponderance of credible evidence). "Federal pleading

standards apply when assessing the validity of a proof of claim." *In re Residential Cap.*, No. 12-

12020, 2015 WL 4747860, *7 (Bankr. S.D.N.Y. 2015). Courts look to applicable nonbankruptcy

law to determine whether a claim is allowable by law. *Residential Cap.*, 2015 WL 4747860, at

*7.

### III.    DISCUSSION

#### A.  The Severance Agreement is Not a Binding Contract

##### 1.  Mutual Assent Did Not Exist Between the Debtor and Simons

Under Connecticut law, which governs the Severance Agreement, "[t]he rules governing

contract formation are well settled." *Geary v. Wentworth Lab'ys, Inc.*, 760 A.2d 969, 972 (Conn.

App. Ct. 2000). "To form a valid and binding contract, there must be a mutual understanding of

the terms that are definite and certain between the parties." *Id.* (quoting *L & R Realty v.

Connecticut Nat'l Bank*, 732 A.2d 181, 188, *cert. denied*, 734 A.2d 984 (Conn. App. Ct. 1999)).

Such "mutual understanding must manifest itself by a mutual assent between the parties."

*Dunne v. Doyle*, No. 3:13-CV-01075 (VLB), 2014 WL 3735619, at *18 (D. Conn. July 28,

2014).

"To constitute an offer and acceptance sufficient to create an enforceable contract, each

must be found to have been based on an identical understanding by the parties." *Geary*, 760

A.2d at 972 (quoting *L & R*, 732 A.2d at 188); *Chambers v. Manning*, 169 F.R.D. 5, 7 (D. Conn.

1996) ("The rule requires that an acceptance mirror the offer.").  Where there has been no meeting of the minds, "no enforceable contract exists." *Geary*, 760 A.2d at 972–73 (citations omitted); *see also Elec. Wholesalers, Inc. v. M.J.B. Corp.*, 912 A.2d 1117, 1123 (Conn. App. Ct. 2007) ("In order for an enforceable contract to exist, the court must find that the parties' minds had truly met." (quoting *Fortier v. Newington Grp., Inc.*, 620 A.2d 1321, 1323 (Conn. App. Ct. 1993))).  Therefore, "[i]f there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract which they themselves did not make." *Elec. Wholesalers*, 912 A.2d at 1123.  Additionally, any attempts by the offeree to "add to, or change, terms of the offer" will constitute "a rejection and counteroffer." *Chambers*, 169 F.R.D. at 7.  Acceptance of an offer must be "unequivocal . . . explicit, full and unconditional." *Bridgeport Pipe Eng'g Co. v. DeMatteo Const. Co.*, 268 A.2d 391, 393 (Conn. 1970) (citations omitted).

The party seeking to establish the existence of an enforceable contract "bears the burden of proving a meeting of the minds between the parties." *Downing v. Dragone*, 285 A.3d 59, 75 (Conn. App. Ct. 2022), *cert. denied*, 287 A.3d 601 (Conn. 2023) (citations omitted).  Courts will look to parties' intentions as "manifested by their acts and words . . . whether a contract was entered into and what its terms were," and mutual assent is to be "judged only by overt acts and words." *Id.* at 68 (citations omitted); *see also Klein*, 347 A.2d at 61 ("The intention is to be determined from the language used, the circumstances, the motives of the parties and the purposes which they sought to accomplish.").  Whether parties intend to be bound in the absence of a formal written contract is determined based on the "(1) language used, (2) circumstances surrounding the transaction, including the motives of the parties, and (3) purposes which they

25

sought to accomplish." *Burckhardt v. Olschafskie*, No. 3:19-CV-00619 (RNC), 2022 WL

993578, at *2 (D. Conn. Mar. 31, 2022) (quoting *Omega Eng'g*, 432 F.3d at 444).

 Here, the Debtor asserts that there was no mutual assent between the parties because (i)

there was no meeting of the minds regarding material terms of the Severance Agreement at the

time of Simons's "purported acceptance," and (ii) the parties understood that the Debtor's

countersignature was necessary.  (MOL ¶¶ 49, 54.)  Each argument is addressed in turn.

### a.  *Inconclusive Whether Offer Could Be Accepted*

 Correspondence between Simons and Spearman-Scott and Crawford from February 16,

2023 to March 9, 2023 reflects a substantial back-and-forth over the terms of the Severance

Agreement.  (*See* MOL ¶¶ 50–51.)  The factual record makes clear that Simons rejected the

Debtor's initial offer, alleging "deficiencies" in the February 16 version of the Severance

Agreement, and, as Simons himself concedes, the parties were engaged in negotiations.  (MOL

Bixler Declaration, Exs. 9–10, 18 (reflecting meetings scheduled between Simons and

Spearman-Scott to discuss the Severance Agreement terms); *id.*, Exs. 12–13 (examples of

documentation exchanged between the parties); *see also* Second Simons Response ¶ 27

(acknowledging that Simons "expressed dissatisfaction with the contract's terms").)  These

negotiations continued into March over the proposed severance and bonus payments Simons

would be entitled to under the Severance Agreement as well as the non-compete provisions

thereunder.  (*See* MOL Bixler Declaration, Exs. 21, 24.)  Indeed, by the close of March 3, three

iterations of the Severance Agreement had been circulated as parties worked to reach agreement

on its terms (*i.e.*, the February 16 Severance Agreement, the March 2 Severance Agreement, and

the March 3 Severance Agreement).  When those negotiations concluded, however, is in dispute.

 Simons argues that the March 3 Severance Agreement constituted the Debtor's final offer

that he accepted, resulting in a binding contract.  (*See* Second Simons Response ¶ 10.)  However,

as the Debtor recognizes, it is unclear from the evidence presented whether the parties had

cemented the essential terms of the agreement.  Spearman-Scott first emailed the March 3

Severance Agreement to Simons on March 3, stating only, "Paul we added the amount we

discussed to the separation payment.  Thank you."  (*See* MOL Bixler Declaration, Ex. 26.)

Simons did not respond.  Crawford followed up on March 6, 2023, reattaching the March 3

Severance Agreement and requested that Simons "review these documents and let [her] know if

[he had] any questions."  (*Id.*, Ex. 28.)  At this, Simons finally responded and asked if the version

he received was the same as the last one he received on March 3, which Crawford confirmed was

the case.  (*Id.*, Ex. 30.)  No further communications between the parties took place until March

10 when Simons emailed a signed copy to Spearman-Scott.

    While it is true that nothing in the March 3 Severance Agreement itself or in Spearman-

Scott's March 3 email suggests that the contract was "non-final" or a "draft subject to further

negotiations," there is also nothing in the record that makes clear that the parties were in

consensus on material terms.  (*See* Second Simons Response ¶ 10.)  Simons contends that the

Debtor could have made explicit that the March 3 Severance Agreement remained subject to

further negotiations or approval, including using a "DRAFT" watermark.  (*See id.* ¶ 30.)

However, that argument is unavailing as prior iterations of the Severance Agreement did not

include such language, and it is clear from the parties' correspondence that those iterations

remained subject to further discussion.

    While no one ultimately questioned Simons's signing of the Severance Agreement after

he emailed it on March 10, there is nonetheless lack of clarity over whether the March 3

Severance Agreement constituted an offer that Simons could have accepted.  Regardless, the

Court need not make a determination since, for the reasons discussed below, it was clear that the Debtor's countersignature was necessary.[7]

### b. Nonetheless, the Debtor's Countersignature Was Necessary

"Whether the parties intended to be bound without signing a formal written document is an inference of fact." *Comput. Reporting Serv., LLC* v. *Lovejoy & Assocs., LLC*, 145 A.3d 266, 274 (Conn. App. Ct. 2016) (citations omitted). In evaluating this intent, courts will look to "(1) language used, (2) circumstances surrounding the transaction, including the motives of the parties, and (3) purposes which they sought to accomplish." *Burckhardt*, 2022 WL 993578, at *2 (quoting *Omega Eng'g,*, 432 F.3d at 444).

While the Severance Agreement did not include explicit language that the Debtor's countersignature was necessary, several factors support a finding that there was a mutual understanding this was so.[8] Beginning one day after Simons emailed his signed Severance Agreement, Simons made repeated requests for a countersigned version over the course of 11 days. Simons, however, argues that his email to Cushing and Spearman-Scott on March 15 makes clear that he sought a countersigned version notwithstanding his argument that the Severance Agreement was "valid and in effect [on March 17]" since he was "advised" to do so "independent of the financial obligations contained therein . . . as evidence of [his] final disposition from SVB with prospective employers." (Second Simons Response ¶ 33; MOL Bixler Declaration, Ex. 34.) However, Simons fails to acknowledge that just a few days prior, on March 11 and one day after he emailed his signed Severance Agreement, he had already emailed

---

[7]    For similar reasons, the Court also need to reach whether the Debtor revoked its offer.

[8]    In the context of New York law rather than Connecticut law, this Court previously found in *In re Motors Liquidation Co.*, 580 B.R. 319 (Bankr. S.D.N.Y. 2018) that "[e]ven where there is no **explicit** reservation by the parties not to be bound until execution of a written agreement, the parties' language and conduct can nevertheless imply the existence, or absence, of such an intent." *Motors Liquidation*, 580 B.R. at 345 (emphasis in original) (citations omitted).

28

Crawford and Spearman-Scott to inquire, among other things, "where . . . to go to have [his Severance Agreement] countersigned or if [he] should still expect a docusign this week." (MOL Bixler Declaration, Ex. 33.) At that time, he made no indication that he otherwise thought his Severance Agreement was valid and binding.

Moreover, the form and substance of the signed Severance Agreement suggest that the signatures of both parties were contemplated. The signature pages to the Severance Agreement include the following language:

> IN WITNESS WHEREOF, Employee and [the Debtor], each acknowledging that he or it is acting of his or its own free will, that they have had a sufficient opportunity to read and review the terms of this Agreement, that they have each received the advice of their respective counsel with respect hereto, have ***voluntarily caused the execution of this Agreement as of the day and year written below***.

(*Id.*, Ex. 39 at 9 (emphasis added).) Immediately following this language were signature blocks for both Simons and the Debtor. (*Id.* at 9–10.) Additionally, section 15 of the signed Severance Agreement also provides that any modification or amendment must be made "in a writing signed by both Employee and a duly authorized officer of [the Debtor]." (*Id.* at 8.) The foregoing make clear that the Debtor's signature was more than a mere "ministerial" act.

Accordingly, there is sufficient support to find that the Debtor's countersignature was necessary, which Simons, through his repeated requests for a countersigned version, also understood to be so.

### 2. Conditions Precedent Not Satisfied

In general, a contract is not formed "so long as, in the contemplation of the parties, something remains to be done to establish the contractual relation." *Klein*, 347 A.2d at 61. "Where a contract contains a condition precedent, a party to the contract may refuse to perform

its obligations under the contract if the condition has not occurred." *W. All. Ins. Co.* v. *Wells Fargo Alarm Servs.*, 965 F. Supp. 271, 278 (D. Conn. 1997).

Here, as set forth in the Notification Letter, Simons's last projected day of work was March 3, and his eligibility for severance pay was "contingent upon both [his] continued employment until it is terminated in accordance with the [Notification Letter] ***and*** [his] signing of the [Severance Agreement]." (First Simons Response ¶ 6 (emphasis added) (quoting Notification Letter at 1)); *see also* Notification Letter at 1 ("We would like for you to remain employed during the transition preceding the last day of work [or March 3], during which time your employment would remain at-will. ***If you remain employed until your termination date***, you will be eligible for separation pay based on your [Severance Agreement]." (emphasis added)).) This is consistent with the terms of the Severance Agreement itself, which provided that Simons would be entitled to separation benefits "[i]n consideration for [him] signing and not revoking [his] signature" (MOL Bixler Declaration, Ex. 39 § 4), and separation pay "subject to [his] continued employment until the date determined for the separation" (*id.* at 11 (Exhibit A to Severance Agreement)).[9] That date, as noted, was March 17, 2023. Indeed, as discussed above, many of the benefits to be provided under the Severance Agreement were to be calculated based on the March 17 date.

As Simons was no longer employed by the Debtor on March 10, 2023 as a result of the Bank's entry into receivership, the condition that he remain employed through March 17 was not satisfied. Simons contends that he "indisputably performed the only conditions set forth in the

---

[9]      Simons argues that Exhibit A to the Severance Agreement, as merely a disclosure meant to provide information to employees about their separations, does not supersede the terms of the Severance Agreement. (Second Simons Response at 17 n.17.) However, this is unavailing as the Separation Agreement refers not to the March 3 date but the March 17 date as the basis from which benefits under the Separation Agreement will be determined.

Severance Agreement," which were to sign and not revoke his signature. (*See* Second Simons Response ¶ 36.) However, Simons fails to acknowledge other language that required him to remain employed through March 17 in order for him to receive his severance benefits. This is further evidenced by the fact that March 17 was the earliest date by which Simons could sign and return the Severance Agreement.

In an attempt to overcome this, Simons argues that he is nonetheless excused from satisfying this requirement pursuant to Connecticut's prevention doctrine. (*Id.* ¶ 40.) That doctrine provides that, "if a party to a contract 'prevents, hinders, or renders impossible the occurrence of a condition precedent to his or her promise to perform, or to the performance of a return promise, [that party] is not relieved of the obligation to perform, and may not legally terminate the contract for nonperformance.'" *Blumberg Assocs. Worldwide, Inc. v. Brown & Brown of Connecticut*, 84 A.3d 840, 876 (Conn. 2014) (alterations in original) (citations omitted). However, as the prevention doctrine's applicability is tied to the duty of good faith and fair dealing, such doctrine does not apply to conduct occurring before a contract is formed where no claim for breach of the duty of such duties can exist. *Id.* at 876–77 (indicating that the prevention doctrine does not apply where the "allegedly hindering conduct . . . occurred before the contract existed"); *id.* at 877 (stating that the doctrine applies solely to "conduct that was wrongful *because it violated a duty created by contract*, not to *all* wrongful conduct" (emphasis in original)). Therefore, as the issue here is whether a contract was formed at all between the Debtor and Simons, the prevention doctrine does not apply.

Moreover, in any event, there is also no evidence that the Debtor engaged in any wrongful conduct that prevented the occurrence of a condition precedent. In instances where the prevention doctrine does apply, conduct that amounts to "prevention of performance by the

adversary party, the conduct on the part of the party who is alleged to have prevented performance must be ***wrongful, and, accordingly, in excess of his legal rights***." *Country Holding Co., LLC v. Covanta Projects of Wallingford, LLC*, No. X08-FST-CV-216054488, 2024 WL 2826528, at *8 n.2 (Conn. Super. Ct. May 28, 2024) (emphasis added). Here, there is no evidence of any wrongful conduct by the Debtor in excess of its legal rights that prevented Simons from meeting this condition precedent.

Therefore, a condition precedent to the effectiveness of the Severance Agreement was not satisfied and also supports a finding that the agreement is not binding on the Debtor.

### 3. Simons's Communication of Acceptance Was Untimely

In general, "[a]cceptance is operative, ***if transmitted by means which the offeror has authorized***, as soon as its transmission begins and it is put out of the offeree's possession . . . irrespective of whether or when it is received by the offeror." *Lyon v. Adgraphics, Inc.*, 540 A.2d 398, 400 (Conn. App. Ct. 1988) (emphasis added) (citations omitted). "It is axiomatic that the offeror is the master of the bargain and, as such, the offeror may include any conditions on the bargain as it sees fit." *Brzezinek v. Covenant Ins. Co.*, 810 A.2d 306, 310 (Conn. App. Ct. 2002); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 58 (1981) ("An acceptance must comply with the requirements of the offer as to the promise to be made or the performance to be rendered.").

Here, Simons does not dispute that he was not to sign and return the agreement until March 17 through DocuSign. (*See* Second Simons Response ¶ 47 (acknowledging that he was instructed to wait until March 17 to return the signed contract); *id.* (alleging that the Debtor "disabled itself" from receiving Simons's acceptance because it did not send Simons a DocuSign link).) Instead, Simons emailed a signed Severance Agreement to Spearman-Scott on March 10 after the closure of the Bank as the Debtor did not provide him with a DocuSign link to do so.

(*See* Oct. 2, 2024 Hr'g Tr. at 51:7–14 (acknowledging that Simons first signed his Severance Agreement "[a]bout forty minutes" after the receivership began); *id.* at 61:15–20 (stating that Simons emailed a copy of the signed Severance Agreement to Spearman-Scott on March 10 "[a]pproximately forty-five minutes after the time that the debtor says the receivership went into place").)  Simons also does not dispute that the Debtor did not have employees of its own at the time he sought to accept the Severance Agreement.  (*See* Second Simons Response ¶ 44 ("[T]here was no one else [Simons] could have contacted because [the Debtor] cut off Simons's access to its systems and, as [the Debtor] admits, it 'did not have any employees of its own'.").)

"Unless circumstances known to the offeree indicate otherwise, a medium of acceptance is reasonable if it is the one used by the offeror or one customary in similar transactions at the time and place the offer is received."  Restatement (Second) of Contracts § 65 (1981).  In this instance, however, Simons was instructed on multiple occasions to submit his acceptance of the Severance Agreement via DocuSign on or after March 17, 2023.  Simons, in recognition of the possibility that his method of acceptance was not valid, made repeated requests after his March 10 submission for a DocuSign link.  (*See, e.g.*, MOL Bixler Declaration, Ex. 33 (asking where he should go to have his Severance Agreement countersigned or if he "should still expect a docusign this week"); *id.*, Ex. 34 (asking if a "signed version is still scheduled for the 17th via docusign per Linda's original representation" and asking for a countersigned version via "docusign so [he doesn't] have to chase around looking for the right people as things wind down"); *id.*, Ex. 38 (indicating that he "never received the docusign request as indicated, so most efficient would be . . . to just send that instead").)

In an effort to overcome this, Simons argues that Spearman-Scott, Cushing, and Crawford were all "imbued . . . with the apparent authority to receive his acceptance" after the

Closure Date, which the Debtor never revoked. (Second Simons Response ¶ 45.) Under

Connecticut law, "[a]pparent authority is that semblance of authority which a principal, through

his own acts or inadvertences, causes or allows third persons to believe his agent possesses . . . .

Consequently, apparent authority is to be determined, not by the agent's own acts, but by the acts

of the agent's principal." *LeBlanc v. New England Raceway, LLC*, 976 A.2d 750, 759 (Conn.

App. Ct. 2009) (citations omitted). In determining whether apparent authority exists, two

elements must be satisfied:

> First, it must appear from the principal's conduct that the principal held the
> agent out as possessing sufficient authority to embrace the act in question,
> or knowingly permitted [the agent] to act as having such authority . . . .
> Second, the party dealing with the agent must have, acting in good faith,
> reasonably believed, under all the circumstances, that the agent had the
> necessary authority to bind the principal to the agent's action.

*Id.* (alterations in original) (quoting *Machado v. Statewide Grievance Comm.*, 890 A.2d 622, 627

n.8 (Conn. App. Ct. 2006)). Neither is met here. As this Court previously recognized, all former

SVB employees fell under the control of the FDIC following the closure of SVB, at which point

none possessed authority to accept agreements on the Debtor's behalf. (*See Memorandum*

*Opinion and Order Sustaining Debtor's Third Omnibus Objections to the Heller, Xu and Norfleet*

*Claims and Overruling Without Prejudice the Sixth Omnibus Objection to the Zwolfer Claim*, ECF

Doc. # 1471 at 38, 43, 50.) Indeed, on March 12, 2023, in response to Simons's inquiry

regarding where he should go to get a countersigned Severance Agreement or if he should still

expect a DocuSign, Spearman-Scott stated that she "raised this as an issue and ***it is being***

***discussed with the FDIC***. At this point [they] have provided all agreements to [the] FDIC but

[did] not have any information on how they will handle them." (MOL Bixler Declaration, Ex. 33

(emphasis added).) Simons concedes this, stating that he sent his "signed copy to individuals

who had just become FDIC employees." (Second Simons Response ¶ 51.)

Moreover, Simons indicated that he only emailed his Severance Agreement to Cushing, Spearman-Scott, and Crawford because they were the "individuals who had conveyed [the Debtor's] offer of the Severance Agreement to him, and he did so on multiple occasions." (Second Simons Response ¶ 44.)  In other words, he emailed them solely because he believed "there was no one else he could have contacted because [the Debtor] cut off [his] access to its systems and, as [the Debtor] admits, it 'did not have any employees of its own.'"  (*Id.*)  It was for this reason, as opposed to a reasonable belief that they possessed the authority to receive his acceptance on the Debtor's behalf, that he emailed them.  Simons's later correspondence confirms this.  (*See, e.g.*, MOL Bixler Declaration, Ex. 33 (asking Crawford and Spearman-Scott on March 11 where he should go to get a countersigned version or if he should still expect a DocuSign).)  Notably, in his email on March 15 to Cushing and Spearman-Scott, Simons makes another request for a countersigned version, asking her to send it either through email or by DocuSign so he does not "have to chase around ***looking for the right people as things wind down***"  (*Id.*, Ex. 34 (emphasis added).)  Moreover, in an email on March 27 to Mayopoulos, the CEO of Bridge Bank, and Spearman-Scott, Crawford, Cushing, John Longley, and Chester Te, Simons sought information regarding the "process and timing" for payment of his severance benefits.  (*Id.*, Ex. 40.)  In his March 27 email, Simons attributes the party responsible for such payments to the FDIC, writing:

> According to the March 14th, 2023 Financial Institution Letter posted by the FDIC, ***the receiver is "obligated to and has the full ability to make timely payments" to counterparties*** and otherwise perform its obligations."

(*Id.* ¶ 8 (emphasis added).)

In fact, Simons did not communicate with Debtor's counsel concerning his Severance Agreement until April 9, 2023, after the 45-day window on his Severance Agreement had lapsed on April 2, 2023.  (*See* First Simons Response at 46–48; *see also* MOL Reply ¶ 24 (noting that

the Debtor's chapter 11 petition identified Debtor's counsel and the Debtor's Chief Restructuring

Officer as parties authorized to act on the Debtor's behalf).)  Accordingly, Simons did not timely

communicate his acceptance of the Severance Agreement to the Debtor as it was sent to

individuals who lacked even apparent authority to receive his acceptance on the Debtor's

behalf.[10]

### B.  Simons Cannot Assert a Claim for Unjust Enrichment

#### 1.  Simons's Unjust Enrichment Claim is Not a Permissible Post-Bar Date Amendment

Rule 3003(c)(3) of the Federal Rules of Bankruptcy Procedure directs bankruptcy courts

"to establish a bar date beyond which proofs of claim are disallowed in a chapter 11 case."  *In re*

*Enron Creditors Recovery Corp.*, 370 B.R. 90, 94 (Bankr. S.D.N.Y. 2007).  The bar date "is

critically important to the administration of a successful chapter 11 case for it is intended to be a

mechanism providing the debtor and its creditors with finality."  *Id.* (internal quotations omitted).

Where the bar date has passed and a creditor seeks to file an amended proof of claim, "[t]he

decision to allow the amendment of the claim is committed to the discretion of the bankruptcy

judge."  *In re Asia Glob. Crossing, Ltd.*, 324 B.R. 503, 507 (Bankr. S.D.N.Y. 2005) (citations

omitted).

In the Second Circuit, courts will "freely allow[]" amendments to claims "where the

purpose is to cure a defect in the claim as originally filed, to describe the claim with greater

particularity, or to plead a new theory of recovery on the facts set forth in the original claim."

*Integrated Res., Inc. v. Ameritrust Co., N.A. (In re Integrated Res., Inc.)*, 157 B.R. 66, 70

(S.D.N.Y. 1993) (citations omitted).  Notwithstanding, post-bar date amendments to claims must

---

[10]    In light of the Court's conclusions, the Court need not reach Simons's arguments that Debtor ratified the
Severance Agreement.

be subject to "careful scrutiny to assure that there [is] no attempt to file a new claim under the guise of amendment." *Id.* (citations omitted).

Generally, courts will apply a two-step inquiry when considering whether to allow post bar date amendments to proofs of claim. *See Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115, 133 (2d Cir. 2005); *In re Barquet Grp. Inc.*, 477 B.R. 454, 464 (Bankr. S.D.N.Y. 2012), *aff'd*, 486 B.R. 68 (S.D.N.Y. 2012). First, the court must determine "whether there was [a] timely assertion of a similar claim or demand evidencing an intention to hold the estate liable." *Enron*, 419 F.3d at 133 (alterations in original) (quotation marks omitted). A claim satisfies this first prong if it: "1) corrects a defect of form in the original claim; 2) describes the original claim with greater particularity; or 3) pleads a new theory of recovery on the facts set forth in the original claim." *Id.* (quoting *In re McLean Indus., Inc.*, 121 B.R. 704, 708 (Bankr. S.D.N.Y. 1990)). In other words, the amendment must relate back to the original proof of claim.

If this "relation back" inquiry is satisfied, courts will then examine whether it would be equitable to allow the amendment. *Id.*; *see also Integrated Res.*, 157 B.R. at 70. Courts consider the following five equitable factors in determining whether to allow an amendment:

> (1) undue prejudice to opposing party; (2) bad faith or dilatory behavior on the part of the claimant; (3) whether other creditors would receive a windfall were the amendment not allowed; (4) whether other claimants might be harmed or prejudiced; and (5) the justification for the inability to file the amended claim at the time the original claim was filed.

*Id.* (citation omitted); *see also Enron*, 419 F.3d at 133. "The critical consideration is whether the opposing party will be unduly prejudiced by the amendment." *Integrated Res.*, 157 B.R. at 70 (citation omitted).

Here, Simons's claim for unjust enrichment satisfies the "relation back" inquiry as it "pleads a new theory of recovery on the facts set forth in the original claim." As the Debtor has

also not raised the issue of whether it would be permissible to allow this as an amendment of Simons's claim, the question of whether it would be equitable need not be reached.

### 2.   Nonetheless, Unjust Enrichment Cannot Be Established

Under Connecticut law, "[u]njust enrichment applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract." *Meaney v. Connecticut Hosp. Ass'n, Inc.*, 735 A.2d 813, 820 (Conn. 1999); *see also MBMB, LLC v. First Niagara Bank, Nat'l Ass'n*, No. CV106011842, 2013 WL 1277279, at *5 (Conn. Super. Ct. Mar. 11, 2013) ("Unjust enrichment applies wherever justice requires compensation to be given for property or services rendered.  The lack of a remedy under a contract is a precondition to recovery based on unjust enrichment." (citations omitted)).  Recovery on a theory of unjust enrichment is proper "if the defendant was benefited, the defendant did not pay for the benefit and the failure of payment operated to the detriment of the plaintiff." *Russell v. Russell*, 882 A.2d 98, 111 (Conn. App. Ct. 2005) (citation omitted).

Simons argues that the "undisputed record" establishes that each of the foregoing elements has been satisfied.  (Second Simons Response ¶ 54.)  Namely, the Debtor "received the benefit of Simons's performance under the Severance Agreement (*i.e.*, his work through March 3, 2023 and his release); SVBFG failed to pay the severance it promised, contending that Simons did not communicate his acceptance to the Debtor when SVBFG never provided Simons the means it had promised him to do so; and Simons has been deprived of $427,595.46 as a result." (*Id.*)  However, as no binding agreement was formed between Simons and the Debtor, there was no benefit conferred on the Debtor that resulted in an "unjust failure" to pay Simons.  Moreover, the Severance Agreement makes clear that "[r]egardless of whether Employee signs this Agreement, Employee will receive . . . his regular salary, minus lawful deductions, through the

38

Separation Date [of March 17]." (MOL Bixler Declaration, Ex. 39 § 1(a).) Accordingly, there is

no basis for Simons's unjust enrichment claim.

### IV.    <u>CONCLUSION</u>

For the reasons discussed, the Third Claims Objection is **SUSTAINED** as to the Simons

Claim, which shall be expunged from the claims register.

**IT IS SO ORDERED.**

Dated: October 15, 2024
     New York, New York

                *Martin Glenn*
                MARTIN GLENN
        Chief United States Bankruptcy Judge