**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | **FOR PUBLICATION** |
| SVB FINANCIAL GROUP, | Chapter 11 |
| Reorganized Debtor. | Case No. 23-10367 (MG) |
| JOINT OFFICIAL LIQUIDATORS OF SILICON VALLEY BANK (IN OFFICIAL CAYMAN ISLANDS LIQUIDATION), | |
| Plaintiff, | |
| v. | Adv. Proc. No. 24-04014 (MG) |
| SVB FINANCIAL GROUP, | |
| Defendant. | |

**OPINION AND ORDER DENYING JOLS STANDING ON ALL CLAIMS**

*A P P E A R A N C E S:*

HOLLAND & KNIGHT LLP
*Counsel to the Joint Official Liquidators of Silicon Valley Bank (in Official Liquidation)*
31 W. 52nd Street
New York, NY 10019
By:   Warren E. Gluck, Esq.
       Marie E. Larsen, Esq.

150 N. Riverside Plaza Suite 2700
Chicago, Illinois 60606
By:   Richard A. Bixter, Jr., Esq. (*pro hac vice*)

SULLIVAN & CROMWELL LLP
*Counsel to SVB Financial Trust, as successor to the Debtor*
125 Broad Street
New York, NY 10004
By:    Robert A. Sacks, Esq.
         James L. Bromley, Esq.
         Adam S. Paris, Esq.
         Christian P. Jensen, Esq.
         Matthew T. Souza, Esq.
         James R. Bowen, Esq.

REED SMITH LLP
*Counsel to the Federal Deposit Insurance Corporation, as Receiver for Silicon Valley Bank*
599 Lexington Avenue
New York, NY 10022
By:    Kurt F. Gwynne, Esq.
         Casey D. Laffey, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

The present dispute concerns the standing of the Joint Official Liquidators ("JOLs") of

Silicon Valley Bank's Cayman Islands branch ("SVB Cayman") to pursue their proofs of claim

(Nos. 1247 ("Initial POC"), 1450 ("Amended POC"), 1489 ("Second Amended POC"), case no.

23-10367) and their complaints in this adversary proceeding (case no. 24-04014, ECF Doc. ## 1

("Initial Complaint"), 11 ("Amended Complaint")).[1]   The relevant briefing spans both the

chapter 11 and adversary proceeding dockets.

Silicon Valley Bank Financial Group ("SVBFG" or "Debtor") filed a standing objection

in the Chapter 11 Case to the JOLs' original proof of claim (claim no. 1247) (case no. 23-10367,

ECF Doc. # 1048), to which the JOLs responded (case no. 23-10367, ECF Doc. # 1218).   The

FDIC, as receiver for SVB, filed a reply to the JOLs' response (case no. 23-10367, ECF Doc. #

1277), as did SVBFG (case no. 23-10367, ECF Doc. # 1278).   The parties submitted further

---

[1]         Citations to the docket, unless otherwise noted, are to the adversary proceeding docket.

briefing concerning the JOLs' standing in the above-captioned adversary proceeding.  (*See* ECF Doc. ## 24 ("JOL Brief"), 25 (declaration and exhibits in support of JOL Brief), 26 ("SVBFG Brief"), 27 (declaration and exhibits in support of SVBFG Brief), 28 ("FDIC Brief").)

The Court held a two-day evidentiary hearing on standing issues on August 4 and 5, 2025.  (Transcripts are available at ECF Doc. ## 35 ("Day 1 Tr.") and 36 ("Day 2 Tr.").)  At the conclusion of the hearing, the Court ordered briefing on the timeliness of the JOLs' amended proofs of claim and amended complaint, which the parties submitted (*see* ECF Doc. ## 38 ("SVBFG Post-Hrg. Br."), 39 ("SVBFG Post-Hrg. Reply"); case no. 23-10367, ECF Doc. # 1823 ("JOL Post-Hrg. Br.").)

This opinion addresses *only* issues of standing and timeliness, not the merits of the JOLs' claims.  Because the briefing and evidence introduced concerned solely issues of standing, the Court assumes *arguendo* the veracity of certain factual claims made by the JOLs, for the purpose of discussing their standing.  This opinion contains the Court's findings of fact and conclusions of law following trial.  *See* Fed. R. Bankr. P. 7052.

As explained below, the Court finds that the Initial Complaint, the Amended Complaint, and the Second Amended POC are untimely, and that the JOLs abandoned the claim or set of claims asserted in their Initial POC.  Even assuming the Amended Complaint and Second Amended POC were timely, the Court finds that the JOLs lacked standing to sue on any of the claims asserted therein.

## I.   BACKGROUND

### A.  Case Background

Silicon Valley Bank (the "Bank"), a California-incorporated bank that was insured by the Federal Deposit Insurance Corporation ("FDIC"), failed, and the FDIC was appointed as its

receiver on March 10, 2023. The Bank's parent company, SVB Financial Group, filed a chapter

11 case on March 17, 2023; its chapter 11 plan was confirmed on August 2, 2024. (Case no. 23-

10367, ECF Doc. # 1379.) The SVB Financial Trust ("SVBFT") is the successor to the chapter

11 debtor (SVBFG) under the Plan. For ease of reference, the Court refers only to SVBFG here.

The JOLs allege that SVB and SVBFG shared personnel and management and, upon information

and belief, all material decisions concerning SVB's operations were made by SVBFG executives

at the direction of the shared board of directors. (Second Amended POC at 7.)

   The Bank had a branch in the Cayman Islands ("SVB Cayman") that was not a

separately-incorporated entity but was a branch of SVB licensed by the Cayman Islands

Monetary Authority ("CIMA") to operate in the Cayman Islands. *In re Silicon Valley Bank*

*(Cayman Islands Branch)*, 658 B.R. 75, 76 (Bankr. S.D.N.Y. 2024), *aff'd*, No. 24 CIV. 1871

(LGS), 2025 WL 448403 (S.D.N.Y. Feb. 10, 2025), *appeal withdrawn sub nom. In re Silicon*

*Valley Bank*, No. 25-536, 2025 WL 2542152 (2d Cir. Aug. 20, 2025) (hereinafter "Chapter 15

Opinion"). This Court previously determined that SVB Cayman is *not* a separate business entity

from SVB. *Id.* at 79–89 ("The SVB Cayman branch is not a separate business entity . . . . SVB

Cayman's existence was inseparable from that of Silicon Valley Bank and, by virtue of such, is a

bank."). SVB Cayman had a mail drop presence in the Cayman Islands, but no employees. *Id.*

at 76. SVB Cayman was at all times overseen and regulated by the Cayman Islands Monetary

Authority. *Id.* at 80.

   SVB Cayman offered its customers three types of Eurodollar deposit accounts (owners of

which are herein called "Cayman creditors"). When the Bank failed, customers of SVB Cayman

had deposited a total of $866 million in the three types of accounts—SVB Eurodollar Sweep

Accounts, SVB Eurodollar Money Market Accounts, and SVB Eurodollar Operating Accounts.

*Id.* at 76–77.  Owners of SVB Cayman Sweep Accounts (but not Deposit or Business Operating

Accounts) had corresponding deposit accounts automatically opened in the depositors' names in

the Bank's California office into which their Cayman deposits were swept.  *Id.* at 77.  The

deposit agreements[2] for all three types of Cayman accounts made clear that deposits in those

accounts were not insured by the FDIC.  (*Id.*)

      A standard agreement governing a Eurodollar Sweep Account contains the following

language:

> This Agreement will be governed by and construed in accordance with the laws of
> the State of California (without reference to its conflict of law provisions).  The
> California Commercial Code (including Section 9304(b)(2)) shall govern the
> attachment, perfection and priority of security interests and liens in the SVB
> Eurodollar Sweep Account.  Notwithstanding the foregoing, the SVB Eurodollar
> Sweep Account shall be and shall remain subject to the laws of the Cayman Islands
> and to the paragraph below.  You agree not to conduct any transaction that would
> violate any laws of any state or the United States (including the economic sanctions
> administered by the U.S. Treasury's Office of Foreign Assets Control), of the
> Cayman Islands or of any other government.
>
> SVB Eurodollar Sweep Account deposits are deposits of the Cayman Islands
> branch of Silicon Valley Bank ("Cayman Branch") and are subject to the laws of
> the Cayman Islands.  These deposits are NOT domestic deposits, are NOT insured
> by the FDIC and are NOT guaranteed in any way by the United States government
> or any government agency thereof.  The obligations related to the SVB Eurodollar
> Sweep Account will be payable and collectible only at and by the Cayman Branch,
> subject to the laws (including any governmental actions, orders, decrees and/or
> regulations) and under the exclusive jurisdiction of the courts of the Cayman
> Islands.

(ECF Doc. # 25 ("Ledwidge Decl.") at Ex. 5.)  The agreements governing Eurodollar Money

Market Accounts and Eurodollar Operating Accounts contain very similar language.  (*Id.* at Exs.

6, 7.)  Specifically, each account agreement states that the "deposits are NOT domestic deposits,

are NOT insured by the FDIC and are NOT guaranteed in any way by the United States

---

[2]     The FDIC challenges the status of the Cayman creditors as "depositors" because of their position on the
waterfall in the FDIC receivership of SVB.  The Court does not opine on the Cayman creditors' legal status in the
FDIC receivership, but to avoid confusion, calls the owners of Cayman deposit accounts "Cayman creditors."

government or any government agency thereof," and that the "obligations" related to each account "will be payable and collectible only at and by the Cayman Branch, subject to the laws . . . and under the exclusive jurisdiction of the courts of the Cayman Islands."

The JOLs claim that, prior to SVB's collapse, it was SVB Cayman's regular practice to deposit all of its cash with SVB in a deposit account located in the U.S.  (Second Amended POC ¶ 25.)  It was also SVB Cayman's practice to maintain a "domestic account in the United States at SVB's main headquarters with account number xxxx0000 and the notation 'non-interest bearing deposits' and 'foreign offices,' under circumstances where the sole beneficiary for this account was SVB Cayman (as there were no other foreign deposit taking branches), and the credits located in this domestic account were SVB Cayman's sole asset and located in the United States."  (*Id.* ¶ 26.)  The JOLs also allege that SVB's main (US) headquarters maintained "domestic, United States sitused accounts" for all SVB Cayman Eurodollar Accounts.  (*Id.* ¶ 27.)

The JOLs set out, in their Second Amended Proof of Claim and Amended Complaint, the alleged managerial failures which led to SVB's collapse, which this Court will not review in detail here.  In short, the JOLs pin the collapse to "the Board [of SVB] and SVBG's executives fail[ing] to update their risk management practices upon SVB's rapid growth and fail[ing] to sufficiently address the serious risks that were evident once interest rates began to increase." (Second Amended POC ¶ 79 (internal citation omitted); *see also* Amended Compl. at 20–21.) For example, the JOLs point to failed stress tests, insufficient risk management processes, interest rate and liquidity risks, and other bank-wide problems.  (*Id.*)

In the fourth quarter of 2022, "in the months prior to the SVB collapse," SVB distributed a $294 million dividend to SVBFG ("Upstream Distribution" or "Upstream Dividend"), at what

the JOLs describe as a "time when SVBFG's mismanagement of SVB would result in the certain insolvency and collapse of SVB." (Second Amended POC ¶¶ 104–07.)

On March 10, 2023, the California Department of Financial Protection and Innovation determined that SVB's liquidity position was inadequate, SVB was insolvent, and it was conducting its business in an unsafe manner. (*Id.* ¶ 59.) It therefore ordered that SVB's property and business be placed in receivership with the FDIC ("FDIC-R1"). (*Id.* ¶ 60.) The day SVB was closed (March 10, 2023), the FDIC in its corporate capacity ("FDIC-C") created the Deposit Insurance National Bank of Santa Clara ("DINB") and transferred all deposits of SVB to this bank. (*Id.* ¶ 61.) When attempts to find a purchaser for this bank were unsuccessful, the FDIC-C rescinded the agreement transferring all of SVB's deposits into the DINB and moved the deposits instead into the newly-created Silicon Valley Bridge Bank, operated by FDIC-R1 ("Bridge Bank"). (*Id.* ¶¶ 62–63.) These transferred deposits included SVB Cayman's deposits with SVB, *i.e.*, included assets deposited by SVB Cayman's creditors. (*Id.*) The JOLs claim that FDIC-R1 has no authority to deal with the SVB Cayman creditors' assets because the FDIC had not sought recognition of the SVB Receivership in the Cayman Islands. (*Id.* ¶ 63.)

Over the weekend of March 11, 2023, then-Treasury Secretary Janet Yellen invoked the systemic risk exception, which allows depositors at FDIC-insured depository institutions to recover the full value of their deposits, over and above the usual $250,000 cap on deposit insurance. (*Id.* ¶¶ 64–66; for the $250,000 deposit insurance cap, *see* 12 U.S.C. § 1821(a)(4).) For foreign bank branches, FDIC insurance only applies to depositors who are U.S. citizens and whose accounts are payable in the U.S. (*Id.*; *see also* 12 U.S.C. § 1813(m).) The FDIC's announcement concerning the systemic risk exception removed the $250,000 insurance cap and the requirement that the insured accountholder be a U.S. person within the meaning of the

Federal Deposit Insurance Act. (Second Amended POC ¶ 68.) However, the geographic credit situs limitation was left intact. (*Id.*)

On or around March 27, 2023, the FDIC entered into a Purchase and Assumption Agreement ("P&A Agreement") with First-Citizens Bank & Trust Company ("First-Citizens") to sell SVB's assets. (*Id.* ¶ 69.) This P&A Agreement allowed First-Citizens the option to purchase the Canadian, German, and Hong Kong branches of SVB but did not provide it with the option to purchase SVB Cayman, which was the only foreign branch of SVB which accepted deposits. (*Id.* ¶ 70.) Consequently, First-Citizens did not purchase SVB Cayman. (*Id.*) The JOLs call this the "orphaning" of SVB Cayman.[3] (*Id.*) In connection with the P&A Agreement, the Bridge Bank was placed into further receivership with the FDIC ("FDIC-R-2"). (*Id.*) The JOLs allege that, on or around March 31, 2023, without the consent of or notice to the holders of Eurodollar Money Market Accounts and Eurodollar Operating Accounts, "FDIC-R terminated access to all SVB Cayman accounts, with the credits having long been transferred (around March 11), and showing these accounts bearing a $0 balance." (Second Amended POC ¶ 72.) (Holders of Eurodollar Sweep Accounts did receive the full value of their deposits. Chapter 15 Opinion at 77.) Counsel for the JOLs stated during trial that the credits in the Cayman accounts were

---

[3]     At an earlier stage of the litigation, the JOLs tried to argue that SVB Cayman had become a separate legal entity when it was not transferred to First-Citizens, and that instead the Cayman court's winding-up order had turned SVB Cayman into an insolvency estate and trust under Cayman Islands law. The District Court for the Southern District of New York squarely rejected this argument, finding that "each step of [the argument's] foundation is faulty." *In re Silicon Valley Bank (Cayman Islands Branch),* No. 24 CIV. 1871 (LGS), 2025 WL 448403, at *4 (S.D.N.Y. Feb. 10, 2025). The court held, "It would run counter to this legislative purpose [of FDIC receiverships] to hold that the initiation of an FDIC receivership converts former branches into separate entities that may then independently pursue relief through the bankruptcy process, outside of the FDIC's control . . . . Here, SVB Cayman was not 'orphaned' because the FDIC asserted jurisdiction over the branch's assets and the claims of its depositors who would be treated as general unsecured creditors . . . . [T]he JOLs are, at most, stepping into the shoes of SVB Cayman, which remains a bank branch without a separate legal existence or rights from SVB. In contrast, the FDIC stepped into the shoes of SVB -- including SVB Cayman -- and assumed all of SVB's rights and liabilities as described above." *Id.* at *4–5. The Court need not opine on the merits of the claims related to SVB Cayman's alleged "orphaning." It merely notes that, despite this rebuke from the District Court, the JOLs persist in their "orphaning" allegations.

transferred "after the collapse of Silicon Valley Bank and before" the winding-up petition was entered in the Cayman Islands (discussed *infra*). (Day 1 Tr. at 17:2–6.)

These "transfers" were not without any explanation: also on March 31, 2023, SVB Cayman depositors with Eurodollar Operating Accounts and Eurodollar Money Market Accounts received a notice from the FDIC that their balances were not deposits and therefore their status was that of general unsecured creditors junior to both insured and uninsured depositors (and thus they were unlikely to receive any recovery from the SVB receivership). Chapter 15 Opinion at 82. In contrast, the holders of Eurodollar Sweep Accounts did not receive this notice, since their accounts were granted insured deposit status, despite the language in their account agreements stating that the accounts were not FDIC-insured (which language appeared in the account agreements for all three types of deposit accounts offered by SVB Cayman). *Id.* The FDIC's stated reason for treating the deposits in the Eurodollar Sweep Accounts as insured was that these accounts had parallel FDIC-insured U.S. accounts where the funds were "swept." *Id.* Many of the SVB Cayman account holders filed claims in the FDIC receivership—all but 11 of the 615. Chapter 15 Opinion at 84. The JOLs also filed claims in the FDIC receivership. *Id.* at 83– 84. The FDIC rejected the claims filed by the JOLs and by the holders of Eurodollar Operating Accounts and Eurodollar Money Market Accounts with a short statement, without any further explanation, that the claim "is not proved to the satisfaction of the receiver." *Id.* at 77.

Certain Cayman creditors filed a winding-up application in the Cayman Islands court. (Amended Compl. ¶ 89.) The Cayman court granted the application and appointed three joint official liquidators on June 29, 2023. (*Id.* ¶ 90.) The "Winding-Up Order (ECF Doc. # 25, Ex. 8)" dated June 30, 2023, states that "the Company"—defined as SVB, not SVB Cayman alone— was "wound up by the Court under the provisions of the Companies Act (2023 Revision)." (*Id.*

at 3.)  The Winding-Up Order provides that the JOLs' powers are "limited to acting in respect of the assets and affairs of the Cayman Islands branch of the Company and its creditors."  (*Id.*)  The Winding-Up Order was eventually accompanied by a written opinion, dated July 21, 2023 ("July 2023 Opinion," ECF Doc. # 25, Ex. 9).  The July 2023 Opinion states that the Cayman court had jurisdiction "to make a winding up order in respect of a foreign company"—SVB—"under section 91(d) of the Companies Act . . . which (i) has property located in the Islands; (ii) is carrying on business in the Islands; (iii) is the general partner of a limited partnership; (iv) is registered under Part IX" of the Companies Act.  (*Id.* at 15.)  The Cayman court made it especially clear that the winding-up order applied to SVB as a whole as a foreign company, writing: "a branch is not a separate legal entity.  The winding up order in this case would be in relation to the foreign company [SVB] which is the relevant legal entity."  (*Id.* at 16.)  The Cayman court explained why SVB met all the statutory requirements and could be the subject of a Cayman winding-up process.  (*Id.* at 15–17.)  The Cayman judge, Justice Doyle, also stated that he is "conscious of issues of comity between the courts of the Cayman Islands and the courts of the United States of America," and he "factor[s] all those matters into [his] mind when considering the exercise of [his] discretion in this case."  (*Id.* at 16.)  The JOLs emphasize that the Cayman court found that it could issue the winding-up order not solely because SVB was unable to pay its debts, but also "on a just and equitable basis," as "[t]here appear[ed] to be a battle looming in respect of the treatment of the American and Cayman depositors.  An investigation needs to take place in respect of the apparent removal of any monies and assets from the Branch out of this jurisdiction.  The position of the Cayman depositors needs to be investigated further and where appropriate safeguarded."  (*Id.* at 18.)  The Cayman court also noted that the FDIC declined to submit to its jurisdiction.  (*Id.* at 15.)

10

On September 20, 2023, the JOLs held the first meeting of creditors of SVB Cayman, where the SVB Cayman Liquidation Committee was elected.  (Second Amended POC ¶ 137.) The Cayman Liquidation Committee was formally constituted on October 31, 2023.  (*Id.*)  The JOLs claim that there was "substantial participation" at this October meeting, "with 159 creditors . . . participating in the meeting and tendering votes in connection with the composition of the Cayman Liquidation Committee.  The Cayman Liquidation Committee is currently comprised of five SVB Cayman creditors with an aggregate claim value of approximately $40 million."[4]  (*Id.*) The JOLs claim they have "regularly communicated with depositors and creditors" throughout the Cayman insolvency proceeding, and that they "discussed various strategies for maximizing recovery and protecting the interests of SVB Cayman depositors with the Cayman Liquidation Committee, and the Cayman Liquidation Committee has at all times been engaged and supportive of the JOLs' efforts on behalf of the SVB Cayman depositors."  (*Id.* ¶¶ 138, 140.) The JOLs claim that the "SVB Cayman depositors not only know that pursuant to the Winding Up Order, the JOLs became their exclusive agent, but supported this as the best possible avenue for" recovery.  (*Id.* ¶ 143.)  This claim is misleading, incorrect on the law, and not credible, for reasons discussed further below.

The Cayman law expert for the JOLs, Dr. Riz Mokal, provided undisputed testimony concerning the JOLs' powers.  Upon their appointment via the Winding-Up Order, the JOLs gained certain (albeit unspecified) powers necessary to "get in the property of the [wound-up] company" pursuant to the Cayman Companies Act (CCA); such powers can be considered the JOLs' statutory powers which they can exercise without further sanction by the Cayman court (Dr. Mokal calls them "proceedings without sanction power").  (JOL 22 ("RM3") ¶ 62.2.)  The

---

[4]     The Chapter 15 Opinion indicates that there were over 600 Cayman creditors with positive balances in their Cayman accounts.  Chapter 15 Opinion at 84.

JOLs may gain additional powers with the express sanction of the Cayman court—specifically, the power to bring legal proceedings in the wound-up company's name (what Dr. Mokal calls "proceedings with sanction power"). (*Id.* (citing CCA provision).) In other words, Cayman liquidators can bring claims *in their own names* merely upon appointment, pursuant to the CCA, but need to seek additional authorization from the Cayman court if they want to bring proceedings in their liquidating company's name. (*Id.* ¶ 62.4.) The Cayman law expert for the Debtor, Mr. Sebastian William St. John Said, provided similar testimony and fleshed out the specifics of the powers JOLs need court sanction to exercise, and the parameters which the Cayman court will consider in deciding whether to grant the JOLs' request for additional authority. (*See* SVBFT-1 ("Said Report") ¶¶ 65–66.) (Crucially, and as discussed further below, both experts agree that Cayman Islands liquidators do *not* become the agents of the creditors of their liquidating company either upon appointment via winding-up order or upon sanction by the Cayman court – in other words, neither the operation of the CCA nor an order of the Cayman court can create an agency relationship between the JOLs and the Cayman creditors.)

Three other orders from the Cayman court followed: a January 2024 sanction order ("January 2024 Sanction Order," ECF Doc. # 25, Ex. 10); an October 2024 sanction order ("October 2024 Sanction Order," ECF Doc. # 25, Ex. 11); and a November 2024 sanction order ("November 2024 Sanction Order," ECF Doc. # 25, Ex. 12). The January 2024 Sanction Order authorized the JOLs to file a chapter 15 petition for recognition of the Cayman liquidation proceeding in this Court. (Jan. 2024 Sanction Order at 2.) The October 2024 Sanction Order authorized the JOLs to file and pursue a complaint against the FDIC in the U.S. District Court for the District of Columbia, and retroactively authorized the July 2024 filing of the First Amended Proof of Claim and Adversary Complaint against SVBFG (*see infra*); and it authorized

the JOLs "to file and pursue claims against the executives and employees of SVB who had

responsibility for managing and operating the Cayman branch of SVB, and to take all steps in

those proceedings as the JOLs consider necessary and appropriate." (Oct. 2024 Sanction Order

at 3.) The November 2024 Sanction Order authorized the JOLs to file and pursue a complaint

against the FDIC in the U.S. District Court for the Northern District of California. (Nov. 2024

Sanction Order at 2.) The records before the Cayman court during the pendency of these

sanction proceedings are sealed and the Debtor never saw them; Dr. Mokal explained that this is

*de rigueur* with requests for sanction orders. (Day 1 Tr. at 151:6–152:7.) Dr. Mokal testified

that the Cayman court, in deciding whether to issue a sanction order, would have considered

"whether he was persuaded that there was a course of action" (when asked to sanction the filing

of complaints), "whether there was a reasonable prospect of success of that course of action, and

whether it was in the interests of the estate for the JOLs to be authorized to pursue that course of

action." (*Id.* at 154:2–13; *see also id.* at 174:18–175:12.) Later he explained that all that the

issuance of a sanction order means is that the Cayman judge thinks "there are causes of action,

and it's in the interests of the creditors for those actions to be brought"; the issuance of a sanction

order "absolutely doesn't guarantee that the action would win." (Day 2 Tr. 71:8–19.) Mr. Said

also opined on the test the Cayman court applies when deciding whether to grant a sanction order

and agreed with Dr. Mokal: "once the judge has the kind of legal opinion from a respectable law

firm that doesn't on its face look ridiculous in some way, it's almost a smell test type of

approach for a judge," and if the position articulated by the JOLs "looks broadly all right" and

the judge does not "see any problems with it," he or she would be "happy to rely on it," the JOLs

would "say we think it's in the best interest of the estate," and the Cayman court would defer to

the JOLs' determination of the best interests of the estate. (*Id.* 180:4–19.)

13

On or around October 1, 2024, the JOLs sent, via email, an opt-out notice to all creditors

of the SVB Cayman estate.  (ECF Doc. # 25, Ex. 17.)  The notice was titled, "Notice to

Depositors of Silicon Valley Bank (Cayman Islands) (In Official Liquidation) Regarding

Winding-Up Order and Ratification of Appointment of Joint Official Liquidators as Agents of

Cayman Islands Depositors."  (*Id.* at 2.)  The notice was in English and was sent via email to the

Cayman creditors, whom the JOLs have claimed are mostly Chinese.  *See* Chapter 15 Opinion at

83 (noting that the JOLs have claimed that over 90% of the Cayman creditors are "of Chinese

origin or China-investment connected"); ECF Doc. # 25, Exs. 17 (notice, in English), 18

(distribution list with email addresses of Cayman creditors to which the JOLs sent the notice).

That notice explains that a Winding-Up Order "in respect of SVB Cayman"[5] was issued, and the

JOLs were appointed and "are responsible for the management of SVB Cayman's assets and

affairs, as well as representing the interests of the depositors in the Cayman Islands . . . as agent

and for the purpose of investigating and addressing issues concerning the treatment of Cayman

Depositors by authorities in the United States of America."  (ECF Doc. # 25, Ex. 17 at 2.)  The

JOLs state in the notice that they "have challenged the treatment of Cayman Depositors as

'unsecured creditors' in the receivership of Silicon Valley Bank in the United States.  The JOLs

are the only party challenging that determination.  The deadline for individual depositors to

challenge that determination passed in July 2024.  Consequently, if Cayman Depositors are not

represented by the JOLs, then their ability to challenge their classification as 'unsecured

creditors' falls away."  (*Id.* at 2.)  The JOLs explained that they were issuing the notice "[f]or the

avoidance of doubt" and to "to confirm that the Cayman Depositors do not object to the JOLs

continued representation of them as agents," including to bring various lawsuits.  (*Id.*)  The

---

[5]      This is also misleading: as noted above, the language of the opinion accompanying the Winding-Up Order
makes clear that the wind-up is *of SVB as a whole*, not just of the Cayman branch.

notices established an opt-out system which purported to cement the JOLs as the Cayman creditors' agents unless the recipient creditor completed and returned the form provided to them and thereby "opted out" of the putative agency relationship with the JOLs; without such an opt-out, per the notice, "it will be taken that you acknowledge and confirm that the Order dated 30 June 2023 [the Winding-Up Order] appointed the JOLs as your agents for the purposes of recovering and distributing your deposits, asserting and conducting any relevant legal or insolvency claims concerning the same deposits, and representing your interests in all relevant matters related to the winding-up of SVB Cayman and Silicon Valley Bank.  If you agree and assent to the JOLs continued representation of you as fiduciaries and agents in matters connected with your deposits at SVB Cayman NO RESPONSE TO THIS COMMUNICATION IS REQUIRED." (*Id.* at 2 –3.)  Three Cayman creditors who received the notice opted out. (ECF Doc. # 25 ¶ 63.)  The legal effect of this notice and opt-out system – whether it created an agency relationship, and whether (as they claim in the notice) the JOLs were even the creditors' agents before they sent the notice – is discussed below.

The Cayman Branch previously filed under chapter 15 in this Court, but the Court dismissed its application, concluding that the Cayman Branch was not eligible to be a foreign debtor under Chapter 15 of the Bankruptcy Code, on the grounds that SVB Cayman and SVB are a single entity and banks are not eligible to be debtors under section 109 of the Code, which, in the Second Circuit, applies to chapter 15. *See* Chapter 15 Opinion.  That decision was affirmed on appeal. *In re Silicon Valley Bank (Cayman Islands Branch)*, No. 24 CIV. 1871 (LGS), 2025 WL 448403, at *1 (S.D.N.Y. Feb. 10, 2025).

On February 23, 2024, the JOLs filed a complaint against the FDIC in the District of Columbia. (SVBFG Brief at 7.)  The operative complaint pleads 11 claims under U.S. and

Cayman law. (*Id.*) The FDIC's motion to dismiss for lack of standing remains pending as of the time of the trial. (Day 1 Tr. at 23:10–14.)

SVBFG has also sued the FDIC seeking the return of its $1.98 billion deposit funds, which the FDIC has refused to make available to SVBFG because of alleged setoff claims. (SVBFG Brief at 8–9.) Litigation is pending in this Court, and also in the Northern District of California, where SVBFG brought claims against FDIC-R1, FDIC-R2, and FDIC-C in connection with the $1.98 billion in deposit funds. (*Id.* at 9.) FDIC-R asserted multiple "setoff" claims against SVBFG in that case; as relevant here, FDIC-R (1) argues that SVBFG is vicariously responsible for breaches of fiduciary duties through mismanagement of SVB, (2) argues that SVBFG was negligent in failing to "avoid causing SVB unnecessary risk of loss and to serve as a source of financial and managerial strength to SVB," and (3) seeks to avoid the $294 million bank-to-parent dividend (the Upstream Distribution) from 2022 as a fraudulent transfer. (*Id.* at 9.) FDIC-C also asserted affirmative defenses in the California litigation based on SVBFG's purported mismanagement of SVB and SVB's $294 million dividend to SVBFG. (*Id.*) These setoff claims and affirmative defenses remain pending in the California court. (*Id.*)

On November 22, 2024, the JOLs, too, commenced an action against the FDIC-C and its former chairman in the District Court for the Northern District of California. (*Id.* at 10.) SVBFG alleges that the claims raised by the JOLs in that action mirror those asserted by SVBFG against FDIC-C. (*Id.*) The FDIC moved to dismiss for the JOLs' lack of standing to pursue claims on behalf of SVB or SVB Cayman depositors. (*Id.*) As far as this Court is aware, that motion remains pending as of this writing.

**B. JOLs' Proofs of Claim, Complaints**

1. <u>First Proof of Claim (Claim No. 1247)</u>

The JOLs filed their Initial POC on the August 11, 2023 bar date.  The JOLs indicate on

the First POC that they (the JOLs) did not acquire the claim from anyone else (Initial POC at 1)

and that they are the creditors (*id.* at 3, 7) (not a creditor's "authorized agent") (*see also id.* at 5

(listing the "Joint Official Liquidators of SVB Cayman" as the "current creditor")).  In the

attachment to the First POC, the JOLs state that, by the time of filing, they had not yet had

enough time to "adequately review the books and records of SVB Cayman, or to review the

FDIC-R's transfer of the Cayman Deposits." (*Id.* at 8.)  Therefore, the JOLs were filing the First

POC merely "in response to the Debtor's establishment of the bar date of August 11, 2023," and

reserved the right to "amend or supplement this Claim as additional matters are discovered in the

course of their investigation." (*Id.*)  As their basis for the claim, they stated that they "file[d] this

Claim to assert any and all of their rights . . . against the Debtor, at law or in equity, arising out

of or related to the transfer of the Cayman Deposits." (*Id.* at 9.)  The JOLs stated that they were

filing the claim "as a protective measure" while they continued their investigation and "to assert

any and all of their rights to payment, reimbursement, indemnification, remedies and other

claims (including contingent or unliquidated claims) against the Debtor, at law or in equity,

arising out of or related to the transfer of the Cayman Deposits." (*Id.* at 9.)  If any of the claims

within this unspecified universe are "invalid," the JOLs assert that "such individual claim or

theory of damages alone shall be deemed invalid, and the remainder of this Claim (including

alternative claims, potential claims, and/or theories of damages) shall remain operative and in

full force and effect." (*Id.*)  They also attached and incorporated the claim they filed in the FDIC

receivership (*id.* Ex. B), which, by their own description, asserted rights "arising out of, *inter*

*alia*, the FDIC's . . . transfer of deposits . . . made at SVB Cayman to the Bridge Bank on or

around March 10, 2023" (*id.* at 8; *see also id.* Ex. B at 1–2). In the FDIC receivership claim, the

JOLs also asserted a variety of potential claims they might bring in the future against "the FDIC-

R, the Receivership, the Bank, the Bridge Bank, First-Citizens, the United States government

(including any division or agency thereof), the State of California (including any division,

agency, or municipality thereof), or any agent, affiliate, predecessor or successor of the

foregoing." (*Id.* Ex. B at 2–3.)

> 2. SVBFG objected to the Initial POC on April 18, 2024, on standing grounds.
>    (*See* ECF Doc. # 1048, case no. 23-10367.)

SVBFG argued that the JOLs lack standing to assert any claim against the Debtor

because SVB Cayman is not and was never a separate legal entity from the rest of the Bank, and

so all the JOLs' claims asserted in the First POC can only be asserted by the FDIC as receiver for

SVB. (*Id.* at 7.) The Debtor also objected to the Initial POC on the basis that the JOLs provided

no supporting documentation and, more simply, failed to articulate any actual claims or factual

basis to verify the unidentified potential claims (or even the amount claimed). (*Id.* at 8–9.) The

JOLs filed a response (ECF Doc. # 1218, case no. 23-10367), in which they argued that the

Cayman court orders gave them standing to pursue their claims (*id.* at 3–6)[6] and that the Chapter

15 Opinion had no impact on their standing or on comity to the Cayman court orders (*id.* at 6–

13). The FDIC's reply (ECF Doc. # 1277, case no. 23-10367) featured FIRREA-based

arguments discussed in further detail *infra*; SVBFG's reply (ECF Doc. # 1278, case no. 23-

10367) explains why the JOLs' "estate trust" theory of standing fails. As discussed below, the

---

[6]    Including by the creation of an "estate trust," an argument roundly rejected by the District Court of the
Southern District of New York in the chapter 15 dispute. *See supra.*

Court finds that the JOLs abandoned the claims asserted in the First POC, so does not address this briefing in detail.

### 3.  First Amended Proof of Claim (Claim No. 1450)

The JOLs filed an amended proof of claim on June 28, 2024, seeking $476,612,862.[7] Again, the JOLs indicated on Official Form 410 that they did not acquire the claim from anyone else (Amended POC at 1) and that the JOLs themselves are the creditors, not any other creditor's agent(s) (*id.* at 3, 8).  Later, however, in the addendum to the amended proof of claim, the JOLs claim that they are "acting on behalf of the SVB Cayman estate and as the exclusive agent of SVB Cayman's creditors-depositors" and as such, hold "various substantial claims against SVBFG" for a total amount of $476,612,862, "equal to the amount of SVB Cayman's deemed uninsured depositor-creditor base which will receive no distribution from the SVB Receivership."  (*Id.* ¶ 97.)  The JOLs claim that SVBFG "severely mismanaged SVB in the years leading up to" the bank's collapse and thereby breached "their fiduciary duties to SVB Cayman's creditors-depositors and aided and abetted the breach of fiduciary duties by SVB and its directors and officers" (many of whom were allegedly SVBFG's directors and officers); it is unclear whether this is a claim asserted under U.S. or Cayman law.  (*Id.* ¶ 98.)  They also claim that "SVBFG's consent to the practice of maintaining SVB Cayman's and SVB Cayman's depositor-customers' funds in United States-based accounts was directly in violation of the SVB Account Agreements and applicable Cayman Islands law and resulted in FDIC-R1 being able to drain these accounts upon the SVB Collapse."  (*Id.* ¶ 99.)  They allege a claim based on the "improper

---

[7]    This filing came on the heels of the JOLs' response to SVBFG's objection to the Initial POC on standing grounds; the JOLs filed the First Amended POC just four days after their response brief.  (*See* ECF Doc. # 1218, case no. 23-10367.)

Upstream Distribution" as well.  (*Id.* ¶ 100.)  They list some more claims they claim to have
under applicable Cayman Islands law, "including but not limited to":

> (1) a breach of fiduciary duty claim against SVBFG, as well as a claim for aiding and
> abetting "the breach of duties of SVB's and SVBFG's overlapping Board and
> management"); and
>
> (2) claims under (i) Section 145 of the Companies Act (voidable preference); (ii) Section
> 146 of the Companies Act (disposition of property made at an undervalue); (iii) Section
> 4(1) of the Cayman Islands Fraudulent Dispositions Law; (iv) Section 147 of the
> Companies Act (liability for carrying out business of SVB with intent to defraud the
> company's creditors); and (v) Section 34(2) of the Companies Act and Cayman common
> law (pertaining to unlawful distributions), all stemming from the Upstream Distribution.

(*Id.* ¶ 101.)

### 4.  Initial Complaint

On July 24, 2024, the JOLs filed an adversary complaint and commenced an adversary
proceeding against SVBFG.  The JOLs assert three causes of action: they seek (1) a declaratory
judgment that the Upstream Distribution was void under California law, (2) a declaratory
judgment that the Upstream Distribution was void under Cayman law, and (3) the imposition of a
constructive trust on the money in SVBFG's possession.  (*Id.* at 26–28.)

### 5.  Second Amended Proof of Claim (Claim No. 1489)

The JOLs filed their Second Amended POC on November 22, 2024, along with their First
Amended Complaint.  Here, for the first time, the JOLs indicate on the Official Form 410 that
they are "the creditor's attorney or authorized agent" (not the creditors themselves) (*id.* at 3); on
the second form, they indicate that they are the creditors themselves (*id.* at 7).  They increased

the claim amount to "not less than $944,000,000.00." (*Id.* at 6.)  The JOLs articulate four claims in their Second Amended Proof of Claim:

(1) Count I: Cayman law clawback claims, seeking to claw back the $294 million Upstream Dividend.  The JOLs claim that the Upstream Distribution "constitutes an avoidable transaction and tort liability under Cayman statutory law available to joint official liquidators, including: (i) Section 145 of the Companies Act (voidable preference); (ii) Section 146 of the Companies Act (disposition of property made at an undervalue); (iii) Section 4(1) of the Cayman Islands Fraudulent Dispositions Law ("FDL"); (iv) Section 147 of the Companies Act (liability for carrying out business of SVB with intent to defraud the company's creditors); and (v) Section 34(2) of the Companies Act and Cayman common law (pertaining to unlawful distributions)." (*Id.* ¶¶ 145–47.)

(2) Count II: Negligence claims based on SVBFG's alleged duty to oversee SVB and its Cayman operations and its alleged failure to ensure "the protection and proper management of the SVB Cayman Estate and Cayman Depositor funds subject to Cayman regulation and Cayman jurisdiction, leading to their unlawful dissipation." (*Id.* ¶ 148.) The JOLs claim that the Cayman creditors' funds "should have never been permitted by SVBFG to leave the jurisdictionally significant Cayman accounts because a condition of the application and granting of the Class "B" banking license to SVB and SVBFG required subjecting itself to the regulatory regime of the Cayman Islands, including its liquidation procedures under the supervision of the Cayman Court." (*Id.*)  The JOLs also claim that "SVBFG's consent to the practice of maintaining SVB Cayman's and Cayman Depositors' funds in United States-based accounts was directly in violation of the SVB Account Agreements and applicable Cayman Islands law, which resulted in the FDIC

Receivership additionally being able to drain these accounts upon the SVB Collapse."

(*Id.* ¶ 149.)  (The JOLs never identify the provisions of the account agreements which

were allegedly breached.)  They also claim that, during "the period leading to the FDIC-

First Citizens agreement, SVBFG's oversight failures also extended to the strategic

mismanagement of the Cayman branch's assets during the FDIC-First Citizens sale,

leading to the exclusion, orphaning and financial harm to the SVB Cayman Estate."  (*Id.*

¶ 140.)  The JOLs do not specify whether this negligence claim is under US or Cayman

law.

(3) Count III: A claim for "vicarious liability in respect of SVB management with Cayman

responsibility," based on the "decision-making process that allowed the withdrawal of

funds from the jurisdictionally significant Cayman account to the SVB Receivership and

the orphaning of SVB Cayman proximate to the FDIC-First Citizens Agreement," which

resulted in "a significant breach of the fiduciary duties owed to the Cayman branch and

its depositors."  (*Id.* ¶¶ 151–53.)

(4) Count IV: The JOLs bring this claim "[s]olely in the event that a Court decision which

cannot be appealed finds that foreign deposits are not 'Deposits' for purposes of the

FIRREA Receivership waterfall or if there is a finding that the FDIC is prohibited from

or may as a matter of discretion decline to insure foreign deposits notwithstanding

invocation of the systemic risk exception and receivership."  (*Id.* ¶ 154.)  Count IV is a

"conditional negligence claim against SVBFG" for "gross mismanagement practices"

which resulted in the collapse of SVB.  (*Id.* ¶ 154–55.)  The JOLs claim that the Cayman

creditors were "specifically and uniquely harmed" because they were "left without access

to their funds and with zero prospect of recovery in the SVB Receivership."  (*Id.* ¶ 155.)

6. <u>First Amended Complaint</u>

The JOLs filed their Amended Complaint on November 22, 2024 as well.  The factual

allegations in that complaint are nearly identical to those in the Second Amended POC.  The

JOLs assert a single count in their Amended Complaint, based on the Upstream Dividend: they

seek a declaratory judgment that the Upstream Distribution is void under various Cayman laws,

including but not limited to: "(i) Section 145 of the Companies Act (voidable preference); (ii)

Section 146 of the Companies Act (disposition of property made at an undervalue); (iii) Section

4(1) of the Cayman Islands Fraudulent Dispositions Law; (iv) Section 147 of the Companies Act

(liability for carrying out business of SVB with intent to defraud the company's creditors); and

(v) Section 34(2) of the Companies Act and Cayman common law (pertaining to unlawful

distributions)."  (Amended Compl. ¶ 168.)  They also seek the imposition of a constructive trust

over cash held by SVBFG equal in amount to the Upstream Distribution.  (*Id.* ¶ 169.)  The JOLs

assert that they have standing to bring this cause of action "directly in their role as joint official

liquidators and as exclusive agents of the depositors-creditors of SVB Cayman."  (*Id.* ¶ 162.)

**C.  Expert Reports**

The JOLs and the Debtor each hired experts on Cayman law to support them in their

standing dispute: the JOLs hired Dr. Mokal, and the Debtor hired Mr. Said.  Portions of each

expert report concern the merits of the JOLs' claims and are thus irrelevant to the standing

dispute; the Court only summarizes those sections relevant to the present dispute below.

1. <u>RM1</u>

Dr. Mokal's first report ("RM1," ECF Doc. # 21, Ex. A) was submitted in support of the

JOLs' motion for recognition under chapter 15 but also provides some relevant context for this

stage of the litigation as well.  He explains that legal system of the Cayman Islands is a common

law system, and the doctrine of judicial precedent applies; since Cayman common law is based

on the common law of England and Wales, Cayman Islands courts generally refer to and follow

the jurisprudence of the courts of England and Wales.  (RM1 ¶¶ 14–15.)  He also explains that

Cayman corporate insolvency law derives from the Cayman Companies Act ("Companies Act"

or "CCA").  (*Id.* ¶ 16.)  Both Dr. Mokal and Mr. Said rely on English law when they deem it

appropriate.

Dr. Mokal explains that the "core functions of an official liquidator" "[p]ursuant to the

Companies Act" are: (1) to investigate the business and affairs of the company, including the

causes (if any) of its failure; (2) to collect, realize, and distribute the assets of the company to its

creditors; and (3) to report to the company's creditors "and contributories" on the company's

affairs and winding-up.  (*Id.* ¶ 24.)  The exercise of such statutory powers is "subject to the

control of the [Cayman] court."  (*Id.* ¶ 25.)

### 2. RM2 (Mokal Opening Report on Standing)

Dr. Mokal submitted a second report ("RM2," ECF Doc. # 21, Ex. B) in support of the

JOLs' standing to bring their claims.  As relevant here, he discusses the kinds of claims JOLs can

bring, starting with "Officeholder Claims," which he defines as "claims brought by an

insolvency officeholder (relevantly, a liquidator, but also a trustee in bankruptcy and an

administrator, amongst others) pursuant to statutory powers which are never vested in the debtor

and which, in any given case, do not exist prior to the commencement of the relevant insolvency

proceeding."  (*Id.* ¶ 54.)  Officeholder Claims do not exist prior to the relevant insolvency

proceeding, and never belong to the debtor, only to the relevant officeholder (here, the JOLs).

(*Id.*)  Dr. Mokal then asserts that "a Cayman law-governed Officeholder Claims [sic] may be

pursued in a foreign court," pointing to a Cayman case in which the Cayman court authorized

liquidators to pursue a claim in relation to fraudulent trading in relevant U.S. courts, and to the

Sanction Orders in this case authorizing the JOLs to pursue certain Officeholder Claims. (*Id.* ¶

64.) Dr. Mokal identifies certain claims brought by the JOLs as Officeholder Claims,

specifically, claims arising under sections 145, 146, and 147 of the Companies Act (*id.* ¶ 65).

Dr. Mokal then examines "the principles by which the JOLs may come to act as agents to

Cayman Creditors in order to be able to press relevant Creditor Claims" – claims which belong

to the Cayman creditors. (*Id.* ¶ 89.) In general, a company's liquidator is an agent for the

*company* but not for its creditors. (*Id.* ¶ 90.) But an agency relationship can be created under

Cayman law between its creditors and the liquidator, either by *ex ante* express agreement, or by

*ex post* ratification by the creditors of conduct previously undertaken by the liquidator (which

ratification has retroactive effect). (*Id.* ¶¶ 89, 95.2.) When there is no express evidence of

consent, an agency relationship may be inferred from the conduct of the purported principal and

the purported agent "which is only consistent with the conferral of authority by the principal

upon the agent to do the relevant acts on the principal's behalf, and inconsistent with any other

intended relationship between the parties." (*Id.* ¶ 94.2.) Dr. Mokal argues that it is perfectly

permissible for a liquidator to act as an agent for his/her company's creditors if and only if "the

liquidator's role, powers, duties, and functions qua agent to the creditors were consistent with the

liquidator's other duties and functions." (*Id.* ¶ 93.) Dr. Mokal points to Cayman and English

law to support his claims about the methods of establishing an agency relationship, but he was

unable to identify any Cayman case in which a liquidator actually acted as an agent for his/her

company's creditors. He cites to a single Scottish case which suggests, but did not hold, that a

liquidator may "have the character of . . . an agent for the benefit of creditors." (*Id.* ¶ 93.1.) He

also identifies another case in which, for a company which was in "ancillary liquidation both in

England and separately in Scotland," the "English liquidators acted as agents to the Scottish

liquidators in adjudicating upon the claims of Scottish creditors and as agents to Scottish

creditors by filing their claims in the English winding-up"; he does not explain how any agency

relationship was created there. (*Id.* ¶ 93.2.) Dr. Mokal then applies his reasoning to the context

of this case, arguing that the JOLs have brought Creditor Claims in various U.S. proceedings

with the authorization of the Cayman Court and "with due notice to and discussion with Cayman

Creditors, in particular through the Cayman Liquidation Committee." (*Id.* ¶ 96.) Taken with the

notices the JOLs sent to the Cayman creditors in October of 2024 (see *supra*), Dr. Mokal states

that, in his opinion, "these facts show that Cayman Creditors have consented to the JOLs acting

as their agents in (relevantly) asserting the Creditor Claims, and that such consent persists

(except in relation to the three Creditors who have opted out)." (*Id.* ¶ 99.) He also states that

"the Cayman Court's Sanction Order expressly authorises the JOLs to press the claims stated in

the Amended Proofs and the Amended Complaint, that both these documents were placed before

Doyle J [the Cayman judge], and that they contain several Creditor Claims," thus demonstrating

that the Cayman judge "authorised the JOLs (insofar as relevant) to act as agents to the Cayman

Creditors in pressing Creditor Claims, and therefore, that he did not see any necessary conflict

between the JOLs acting in this capacity on the one hand and their duly discharging their other

duties and functions on the other." (*Id.* ¶ 100.)

    Dr. Mokal then identifies the Creditor Claims. First is a claim pursuant to the Fraudulent

Dispositions Law. (*Id.* ¶ 102.) Second, he claims that the Cayman creditors "may in principle

also have a Creditor Claim for breach of statutory duty," since certain statutes were (according to

Dr. Mokal) enacted in order to protect the Cayman creditors as a limited class of the public and

the statutes at issue were intended to confer a private right of action on these creditors. (*Id.* ¶

104.)  For the source of such duties, Dr. Mokal points to the Cayman Banks and Trust

Companies Act ("BTCA"), arguing that it gives rise to a private right of action.  (*Id.* ¶¶ 105–08.).

Third, Dr. Mokal theorizes that the Cayman creditors may have a claim against SVBFG for

procuring breaches by SVB of its obligations to the creditors pursuant to their account

agreements.  (*Id.* ¶ 109.)

Finally, Dr. Mokal discusses the FDIC's authority to act on behalf of the Bank.  He states

that he was "instructed to assume that, under applicable US law, the FDIC Receiver's authority

to act for the Bank was territorially limited to the US, and that the Receiver had no authority

under that law to act in relation to the asserts, liabilities, and affairs of the Bank in the Cayman

Islands unless and until it sought and received recognition from the Cayman Court."  (*Id.* ¶ 114.)

Because the FDIC decided not to submit to the jurisdiction of the Cayman Court and therefore

did not obtain recognition from that Court, Dr. Mokal claims that, "insofar as they related to the

territory of the Cayman Islands, the actions of the FDIC Receiver purportedly on behalf of the

Bank could not be attributed to the Bank . . . any purported . . . act done by the FDIC Receiver in

the Bank's name [within the Cayman Islands] was in principle of no legal effect" (and ditto for

the acts of any employee, agent, or manager of SVB who was "caused to comply with the FDIC

Receiver's instructions").  (*Id.* ¶¶ 115.2-115.3.)  Moreover, he argues that "any causes of action

originally vested in the Bank for any breach of contractual, statutory, and/or tortious duty that

arose in the Cayman Islands may not have become vested in the FDIC Receiver (though whether

and to what extent any such vesting occurred was a matter for applicable US law).  In principle,

such claim may be vested in the Bank's estate created upon the making of the Winding-Up

Order.  Such claims may be pressed by the JOLs acting on the Bank's behalf."  (*Id.* ¶ 115.4.)

3. <u>Said Opening Report</u>

Mr. Said's opening report ("Said Report," ECF Doc. # 22, Ex. A) focuses on the standing issue. He first notes that the winding-up of SVB is the first known instance of a Cayman winding-up of a foreign company. (*Id.* ¶¶ 61, 75.) He turns to English law to fill the gap concerning this ancillary liquidation. He maintains that the purpose of an ancillary liquidation is "gathering the assets and compiling creditor claims within the territorial jurisdiction of the place of appointment. (*Id.* ¶ 76.) He claims that English courts have long acknowledged "the limited territorial reach of an English liquidation of a foreign company" – given the "practical constraints" inherent in trying to collect local assets without interfering with the primary insolvency process. (*Id.* ¶¶ 79–80.) Mr. Said was not able to identify any case in English or Cayman law where an ancillary liquidator was permitted to assert avoidance claims within the jurisdiction of the foreign debtor's primary insolvency. (*Id.* ¶ 84.) (Dr. Mokal was likewise unable to find such a case.) Against this background, Mr. Said believes that the limitation the Cayman court imposed on the powers of the JOLs in the Winding-Up Order (to "acting in respect of the assets and affairs of the Cayman Islands branch of [SVB] and its creditors") "was the Judge's attempt at imposing a limitation on the scope of the Cayman Proceedings to reflect their ancillary nature." (*Id.* ¶ 85.)

Mr. Said then turns to the question of whether the JOLs have the power to pursue claims on behalf of the Cayman creditors. He agrees with Dr. Mokal that "liquidators generally act as agents of the company" in liquidation, but in his view, the JOLs do *not* have the power to act as the creditors' agents. (*Id.* ¶ 100.) He identifies three theories of agency which the JOLs rely on: (1) the "usual principles governing liquidations under Cayman law," (2) "pursuant to the specific terms of the Winding Up Order and the Winding Up Judgment," and (3) "pursuant to the Deposit

Agreements or some other express or implied appointment or ratification by the Cayman

Depositors."[8]  (*Id.* ¶ 102.)  Mr. Said argues that it is "very well-established that during the

liquidation, as a matter of Cayman law, the liquidators act as agents <u>of the company</u> over which

they were appointed," and he was not able to find authority for the proposition that liquidators

act as the agents of the creditors under Cayman insolvency law.  (*Id.* ¶¶ 103–11 (emphasis in

original).)  He was also unable to find a single Cayman case in which a liquidator acted as an

agent for his/her company's creditors.  (*Id.* ¶ 128.)  Mr. Said also maintains that the terms of the

Winding-Up Order do not support or create an agency relationship between the JOLs and the

Cayman creditors because, in his view, if the Cayman judge "had intended to confer on the JOLs

a power that appears, based on my survey of the authorities, to be entirely novel, I would have

expected the Judge to have been explicit in that grant of authority," and he thinks the wording of

the Winding-Up Order is more reasonably interpreted as limiting the JOLs' powers to affect only

the property and creditors of SVB that exist in the Cayman Islands.  (*Id.* ¶¶ 135–36.)  Finally,

Mr. Said argues that there exists no basis for finding an agency relationship.[9]  He points out that,

under Cayman and English caselaw, *ex post* ratification of an agency relationship requires "clear

adoptive acts" on the part of the principal and "unequivocal" conduct, and he sees no evidence of

such acts.  (*Id.* ¶¶ 147–48.)  And as for any argument that the Cayman court's sanction order

constitutes a ruling that the JOLs have the power to act on behalf of the Cayman depositors as

their agent, Mr. Said disagrees: a sanction order can sanction powers sought to be exercised

pursuant to the JOLs' appointment, functions, and duties under the statutory scheme, but *cannot*

---

[8]      The JOLs do not advance the third theory.

[9]      It is Mr. Said's view that, because of the total absence of authority to enable liquidators to act as creditors' agents, "the JOLs would not be entitled to undertake this extra-statutory function (at least in their official capacity as JOLs)." (*Id.* ¶ 138.)  This does not address Dr. Mokal's point that the liquidators could, in theory, enter into an agency relationship with the creditors and thus take on responsibilities over and above those which they have via the operation of Cayman insolvency statutes *without* operating as liquidators, so long as their responsibilities as agents and liquidators do not conflict.

expand those duties, which according agency authority to the JOLs would do.  (*Id.* ¶¶ 149–50.)

Moreover, the filings before the Cayman Court which that Court considered in relation to the

Sanction Order are sealed, so "it is not possible to accurately assess what the Court has

considered" —whether it considered the JOLs' assertion of an agency relationship between

themselves and the Cayman creditors.  (*Id.* ¶ 152.)

Mr. Said then turns to the claims that can and cannot be brought by the JOLs as part of a

Cayman liquidation.  He starts with setting out several key points: (1) the Winding-Up Order did

not create a separate legal entity, which means that claims that could have been brought by a

company prior to a winding-up order remain the company's after the order is issued; (2) what

property is subject to liquidation proceedings (i.e., falls within the estate) is determined by the

*lex situs* of the property, and this also applies to choses in action; (3) in terms of available

remedies, unless the recipient of property continues to hold that property or its traceable

proceeds, the relief available to a claimant as against that recipient is personal—*i.e.*, is an

ordinary unsecured claim.  (*Id.* ¶ 157.)  As relevant here, he argues that under Cayman law, "if

property is situated in another jurisdiction, and under the law of that jurisdiction that property is

validly transferred from the company to another person prior to the company being wound up,

that property will not be subject to the liquidation."  (*Id.* ¶ 174.)  Turning to the facts of this case,

Mr. Said argues that the "relevant property here is choses in action, i.e., alleged legal claims

against SVBFG," and "[c]hoses in action generally are situate [sic] in the country where they are

properly recoverable or can be enforced," which is generally where the defendant resides.  (*Id.* ¶

175-176.)  So if, "according to the state or federal laws applicable in the State of Delaware,

claims that SVB had against SVBFG were validly transferred to the FDIC prior to the

commencement of the Cayman Proceedings . . . that transfer would be recognized as a matter of

Cayman law" and such "claims would not be considered to come into the liquidation estate."

(*Id.* ¶ 178.)

Mr. Said divides up the JOLs' claims into the following buckets: (1) the unlawful

dividend claims (encompassing the arguments that the Upstream Dividend was prohibited by

section 34(2) of the Companies Act and/or Cayman common law, the claim that SVBFG is liable

for the distribution "as a constructive trustee" on the basis of knowingly receiving it and

knowing it was unlawful, and the claim for constructive trust); (2) breaches of fiduciary duties

(that SVBFG is liable for breaches of duties owed to SVB and its stakeholders)[10]; (3) negligence

claims (the claims that SVBFG was negligent in its alleged failure to properly oversee SVB and

is liable to SVB, and that SVBFG is vicariously liable to SVB for the alleged negligence of

SVB's management); (4) statutory avoidance claims (all of which relate to the Upstream

Distribution); (5) fraudulent disposition (that the Upstream Distribution constitutes a fraudulent

disposition under the Fraudulent Dispositions Act). (*Id.* ¶ 186.)

Said then assesses whether the JOLs had the power to bring each of the claims. He starts

by examining claims which could have been brought regardless of the company's liquidation.

Liquidators can, under Cayman law, bring claims to vindicate the preexisting rights *of the*

*company* in liquidation. (*Id.* ¶ 188.) He claims that, from a Cayman law perspective, the JOLs'

claims, other than the Statutory Avoidance Claims, have been improperly brought since SVB

was not named as a plaintiff. (*Id.* ¶ 190.) As for the unlawful dividend claims—which exist

regardless of the company's liquidation—he presents two reasons why the JOLs cannot bring

them: (1) "there is no Cayman law claim that is available to the JOLs" (for reasons the Court will

not get into here as they concern the merits) (*id.* ¶ 193), and (2) even if a claim existed under

---

[10]    Mr. Said notes that this claim seems to have been dropped, as it was in the First Amended POC but not the
Second Amended POC. (*Id.* ¶ 186.)

Cayman or California law, "if the effect of the FDIC process is that all property of SVB was transferred to the FDIC sometime prior to June 13, 2023" (the date of the Winding-Up Order), then the chose in action was transferred to the FDIC and such transfer would be recognized by Cayman law (*id.* ¶ 194).  He makes the same argument with respect to the negligence claims: they could have been brought before SVB's liquidation, so they are property of the company to be realized by the liquidators acting in the name of the company.  (*Id.* ¶ 196).  Because these claims were brought against SVBFG, "they would be considered to be situated in the State of Delaware," so belong to the FDIC instead (as they were transferred from SVB to the FDIC).  (*Id.* ¶ 197).  Said also argues that even if the Negligence Claims are pursued in relation to losses suffered by the Cayman depositors, because he does not think the JOLs can act on behalf of creditors, the Cayman depositors alone have the power to bring such claims.  (*Id.* ¶ 198.)

As for the Statutory Claims: these are vested in the liquidators personally, so 'did not transfer to the FDIC.  (*Id.* ¶ 201.)  He still does not think these claims should survive, for two reasons which pertain to standing: (1) in the case of an ancillary liquidation, there is a question of whether the Court ought to permit ancillary liquidators to exercise the powers to bring avoidance claims extraterritorially, because ancillary winding-up cases are territorially limited (*id.* ¶ 203); and (2) Said does not think Justice Doyle intended to permit the JOLs to bring such statutory avoidance claims overseas—since the extraterritorial application of these statutes is a novel issue, Said argues that Justice Doyle would have been much clearer about the intended scope of the JOLs' powers if he had wished them to apply the law in such a novel way (*id.* ¶¶ 209–212).

As for the FDA claim (which is a creditor claim), Said argues that this should be brought by the Cayman depositors directly, because the JOLs cannot act as the Cayman depositors' agents.  (*Id.* ¶¶ 213–16.)

Finally, Said addresses the legal effect of the FDIC process in the Cayman Islands.  He points out that the Cayman liquidation is ancillary, and the FDIC resolution is the primary insolvency process, and argues that the Cayman court wished to limit the effect of the Cayman winding-up proceeding in the shadow of the FDIC resolution.  (*Id.* ¶ 218.)  Before the Winding-Up Order was entered, as a matter of Cayman law, if the FDIC was entitled under California law to act in the name of SVB, under Cayman principles of private international law, Cayman law would defer to California law on the question of corporate capacity.  (*Id.* ¶ 219.)  There is also an "important unresolved issue" concerning the law governing the claims of the Cayman creditors who submitted claims in the FDIC receivership process in light of the rule in *Gibbs* and whether such creditors' claims are expunged; the Court does not discuss the arguments on *Gibbs* in detail as it is not necessary for its decision.

### 4.  Dr. Mokal's Rebuttal

First, Dr. Mokal argues that just because it is often pointless for liquidators appointed in an ancillary winding-up to try to operate outside their home jurisdiction, this does not mean they are not permitted to do so, and it is a mistake to confuse "inexpediency" with "impermissibility." (ECF Doc. # 21, Ex. C ("RM3") ¶ 5.)  He argues that, in fact, English law provides that ancillary liquidations have worldwide effect, not just local; any limitations on their powers arise from practical, not legal, constraints.  (*Id.* ¶¶ 15–16, 18–36.)  He claims that the Winding-Up Order does not limit the JOLs' powers to the territory of the Cayman Islands, but rather to the "assets and affairs" of SVB Cayman, which is not a territorial limitation; this is supported by the fact that the Cayman court sanctioned the JOLs' filing lawsuits in the U.S.  (*Id.* ¶¶ 38–40.)  It is Dr. Mokal's view that there will be "no improper or unnecessary conflict between the primary U.S.

proceeding and the ancillary Cayman one" because the U.S. courts will moderate potential inter-court disputes. (*Id.* ¶ 46.)

Dr. Mokal then moves on to the agency question. He admits that the JOLs do not, *qua* liquidators, have the power to act as the depositors' agents. (*Id.* ¶¶ 53, 60–61.) However, he maintains that there is no prohibition on the JOLs acting as the depositors' agents (according to general principles of agency law), and they can act as agents so long as their role *qua* agents does not conflict with their functions *qua* liquidators. (*Id.* ¶¶ 54–55.) He clarifies that his position is that the JOLs' status as agent does not arise from a sanction order (specifically the October 2024 Sanction Order) but instead by "general principles of agency law." (*Id.* ¶ 66.) The October 2024 Sanction Order, however, "expressly authorizes the JOLs to pursue (relevantly) certain Creditor Claims," showing that the Cayman Court sees no conflict between the JOLs' role as liquidators and their role as the Cayman Creditors' agents, and was therefore willing to authorize the JOLs to bring Creditor Claims. (*Id.* ¶ 67.)

Dr. Mokal seems to admit that Cayman law would recognize the transfer claims owned by SVB against SVBFG, if such claims were transferred to the FDIC pursuant to Delaware law. (*Id.* ¶¶ 91–93.) He only points out that such reasoning would not apply to Officeholder Claims or Creditor Claims (which Mr. Said does not argue). (*Id.*)

### 5. Mr. Said's Response Brief

Mr. Said addresses a number of the points Dr. Mokal made in RM2, but this Court only focuses on those concerning standing. While Dr. Mokal argues that there is no "jurisdictional bar" on JOLs bringing an officeholder claim in the Cayman winding-up of a company incorporated outside the Cayman, Mr. Said points out that this statement "does not grapple with the key issue which is whether there is authority for liquidators in an ancillary liquidation to

assert avoidance claims in the jurisdiction of the primary insolvency," and notes that neither he

nor Dr. Mokal has been able to find such authority in English or Cayman law. (ECF Doc. # 22,

Ex. B ("Said Rebuttal") ¶ 33.) In Mr. Said's view, the very purpose of Statutory Avoidance

Claims indicates that such powers should not be exercised extraterritorially—in a standard

situation, a payment would be avoided, repaid to liquidators, and then creditors would submit

claims in the liquidation to share ratably among other creditors; but here, if SVBFG was required

to repay the Upstream Distribution as part of the Cayman ancillary liquidation, many creditors

would not be able to share ratably in the proceeds of that claim as the terms of the Winding Up

Order limit the scope of the Cayman liquidation to SVB Cayman and its creditors. (*Id.* ¶ 36.)

Mr. Said maintains that the liquidators cannot act as the Cayman creditors' agents. He

points out that Dr. Mokal was unable to identify any Cayman or English law in support of his

stance (and the Scottish cases he cites are unpersuasive as they have not been cited by English or

Cayman courts for the propositions Dr. Mokal relies on them for, all language in them about

liquidators acting as creditors' agents is nonbinding dicta, and Cayman courts do not treat

Scottish caselaw as authoritative in the Cayman Islands due to the fact that Scotland is a mixed,

rather than common law, jurisdiction). (*Id.* ¶ 65.) As for the general agency law principles, Mr.

Said points out that these principles have not previously been applied in the liquidator/creditor

context, and even if such principles could be said to support the existence of an agency

relationship on the facts (which Said does not think they do), the JOLs still are not entitled to

exercise this extra-statutory function, "at least in their capacity as official liquidators." (*Id.* ¶ 67.)

Said thinks that the facts also do not support an agency relationship, since an agency relationship

cannot be created from *silence*, but the JOLs relied on the silence of creditors (via opt-outs). (*Id.*

¶ 68.) Moreover, Said thinks the opt-out notice provided to Cayman creditors "misrepresents the

legal position by stating that the" Winding Up order "appointed the JOLs as your [the creditors'] agents," which Said argues is an inaccurate characterization of the Winding-Up Order as the Winding-Up Order cannot itself create an agency relationship. (*Id.*)  And the opt-out notice was sent by email, which Said suggests is an improper form of service, and there was no evidence that the creditors read it; moreover, the notice was in English, despite the fact that the JOLs have stated elsewhere than more than 90% of the Cayman creditors "are of Chinese origin or China-investment connected," further undercutting any inference of assent to an agency relationship. (*Id.*)  In addition, Said points out that Dr. Mokal admits that the JOLs can act as agents only insofar as their duties as agents do not conflict with their duties as liquidators; Said argues that their duties do conflict, because, as fiduciaries and officers of the Court, the JOLs have a duty to be impartial as between individuals interested in the winding-up. (*Id.* ¶ 69.)  However, because three of the Cayman depositors have opted out of having the JOLs act on their behalf, their duties as agents to the rest of the depositors who did *not* opt out do not align with their duties as liquidators to *all* of the Cayman creditors: while all of the Cayman creditors have an interest in claims brought by the JOLs on behalf of SVB, most but *not* all creditors have an interest in the creditor claims. (*Id.*)  The JOLs therefore are not impartial, as they ought to be.  Said disagrees with Dr. Mokal's claim that the Sanction Order constitutes compelling evidence that Justice Doyle authorized the JOLs to act as agents.

As for claims based on alleged breaches of statutory duties, Said makes the same argument: these claims (if they exist) belong to the Cayman creditors and, in his view, cannot be brought by the JOLs. (*Id.* ¶ 77.)  He also does not think that there is a private cause of action in the BTC Act; the Court will also not address this argument in any detail as it is unnecessary to the Court's conclusion.

Finally, Said addresses the question of the FDIC's authority to act on behalf of SVB in the Caymans.  He argues that it is not always necessary for a foreign officeholder to obtain formal recognition in the Cayman Islands before taking steps within the jurisdiction—if a person can validly act in the name of the corporation, recognition is not necessary if steps can be taken in the name of the corporation.  (*Id.* ¶ 98.)  Said therefore disagrees with the instruction given to Dr. Mokal to assume that the FDIC had no authority to "act in relation to the assets, liabilities and affairs of the Bank in the Cayman Islands unless and until it sought and received recognition from the Cayman court."  (*Id.*)  He argues that, even assuming the FDIC did not have authority to cause SVB to take steps in the Cayman Islands, whether those "unauthorized acts may still bind SVB is likely a matter for California law, being the law that governs the constitution of SVB."  (*Id.*)  (He also notes that SVB had no staff in the Caymans and no more than a mail-drop presence, so it is difficult to identify what steps the JOLs say the FDIC improperly took within the Cayman Islands such that this analysis would matter at all. (*Id.*))

### D.  Standing Arguments

#### 1. SVBFG's Standing Objection

SVBFG divvies up the JOLs' claims in their Second Amended POC and Amended Complaint into three buckets, in accordance with how both sides' Cayman law experts approach them:

(1) Officeholder Claims: claims to avoid the $294 million dividend under sections 145, 146, and 147 of the Cayman Companies Act which are asserted in Counts I of the Second Amended POC and the Amended Complaint.  Both experts agree that these claims are vested in the JOLs as Cayman "officeholders" and do not constitute assets of SVB.

(2) Creditor Claims: these include (i) the negligence claims asserted in Counts II, III, and IV of the Second Amended POC (to the extent they allege harm specific to SVB's Cayman depositors); and (ii) claims under the Cayman Fraudulent Dispositions Act ("FDA") in connection with the $294 million dividend, which are asserted in Counts I of the Second Amended POC and Amended Complaint. Both experts agree that these claims are vested in SVB's creditors.

(3) Company Claims: these include (i) claims for unlawful dividend under section 34(2) of the Companies Act, which are asserted in Counts I of the Second Amended POC and Amended Complaint; and (ii) the negligence claims asserted in Counts II, III, and IV of the Second Amended POC to the extent they do not allege harm specific to Cayman depositors. The experts do not dispute that these claims are vested in SVB.

(SVBFG Brief at 1–2.)[11]  The Court agrees that these buckets reflect the experts' categorizations of the claims.

SVBFG argues that under either U.S. or Cayman law, the JOLs lack standing to pursue all three kinds of claims, on three primary grounds: (1) having lost their bid for chapter 15 recognition, the JOLs have "no capacity to sue and be sued in a court" in the U.S. pursuant to 11 U.S.C. § 1509(b); (2) 12 U.S.C. § 1821(d)(2)(A)(i) mandates that the FDIC succeed to the Company and Creditor Claims; and (3) Cayman law provides the same result.

---

[11]    The JOLs instead break up their claims into the following groups: (1) "Officeholder Claims" and "Tort Claims" "that the JOLs – qua JOLs – like JOLs in every Cayman Official Liquidation are authorized to bring, and which the currently known or knowable factual matrix support"; (2) "the proprietary remedy – constructive trust ('Constructive Trust'), that Cayman law affords to JOLs in connection with certain of the Officeholder and Tort Claims"; (3) "Depositor Claims" asserted "by the JOLs based upon their contractual designation by the Cayman depositors as their agent – pursuant to the ordinary tenets of agency law in the Cayman Islands, and as *envisioned* in the Winding Up Order." (JOL Brief at 5 (emphasis in original).) The Court finds that SVBFG's categorization is comprehensive and reflective of the experts' opinions, so uses SVBFG's approach.

*a. Standing to pursue claims under the Bankruptcy Code*

SVBFG argues that section 1509 of the Code bars the JOLs from seeking any relief in

U.S. courts.  It relies on section 1509(b), which reads as follows:

> If the court grants recognition under section 1517, and subject to any limitations
> that the court may impose consistent with the policy of this chapter—
> (1) the foreign representative has the capacity to sue and be sued in a court in the
> United States;
> (2) the foreign representative may apply directly to a court in the United States for
> appropriate relief in that court; and
> (3) a court in the United States shall grant comity or cooperation to the foreign
> representative.

11 U.S.C. § 1509(b).  SVBFG takes that language as requiring the foreign representative to first

obtain recognition of a foreign proceeding pursuant to section 1517 before it may "gain[] the

capacity to sue and be sued" in a U.S. court, "apply directly to a [U.S.] court . . . for appropriate

relief," or "request comity or cooperation" by a U.S. court.  (SVBFG Brief at 11.)  It points to

chapter 15's legislative history to argue that chapter 15 was meant to be the "exclusive door to

ancillary assistance to foreign proceedings," as well as to cases purportedly holding that foreign

representatives must first obtain chapter 15 recognition before appearing in U.S. courts.  (*Id.* at

12.)

SVBFG frames section 1509(f) as the "sole specified exception" to the recognition

requirement, and it is to be narrowly applied.  (SVBFG Brief at 13.)  Section 1509(f) reads:

"Notwithstanding any other provision of this section, the failure of a foreign representative to

commence a case or to obtain recognition under this chapter does not affect any right the foreign

representative may have to sue in a court in the United States to collect or recover a claim which

is the property of the debtor."  SVBFG argues that most of the JOLs' claims fall outside the

scope of subsection (f): both sides' Cayman law experts agree that the Officeholder Claims and

Creditor Claims are not property of the purported chapter 15 debtor (SVB Cayman).  (*Id.* at 14–

15.)  The language of chapter 15, therefore, deprives the JOLs of standing to bring the

Officeholder and Creditor Claims.

### b.  FIRREA

Next, SVBFG argues that the Financial Institutions Reform, Recovery, and Enforcement

Act ("FIRREA") bars the JOLs from asserting the Company and Creditor Claims by operation of

12 U.S.C. § 1821(d)(2)(A)(i) (the "Succession Clause"), and that the JOLs have no standing to

bring the Officeholder Claims by operation of 12 U.S.C. § 1821(j).

Section 1821(d) of FIRREA addresses the "powers and duties of" the FDIC "as

conservator or receiver."  Subsection 1821(d)(2) specifies its general powers as receiver.

Subsection 1821(d)(2)(A)(i) provides that the "Corporation [FDIC] shall, as conservator or

receiver, and by operation of law, succeed to – (i) all rights, titles, powers, and privileges of the

insured depository institution, and of any stockholder, member, accountholder, depositor, officer,

or director of such institution with respect to the institution and the assets of the institution."

This provision places the FDIC "in the shoes of the insolvent" depository institution "to work out

its claims under state law."  (SVBFG Brief at 16 (internal citation omitted).)  There are two

prevalent readings of section 1821(d)(2)(A)(i): that it strips a "stockholder," "accountholder," or

"depositor" of standing to assert derivative claims because it assigns the FDIC the exclusive right

to bring such actions; or that it strips such claimants of both *direct and derivative* actions by

assigning them to the FDIC, so long as such actions "relate to or concern the assets" of the bank.

(SVBFG Brief at 16–17.)  While SVBFG pushes for this Court to adopt the latter, broader read

of section 1821(d)(2)(A)(i) (*id.* at 18–20), it also argues that, as the Company and Creditor

Claims are derivative,[12] even the narrower interpretation of the statute deprives the JOLs of

standing (*id.* at 20–26).

For the Officeholder Claims, SVBFG turns to section 1821(j) of FIRREA, which

provides: "Except as provided in this section, no court may take any action, except at the request

of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or

functions of the Corporation as a conservator or a receiver." SVBFG argues that, since the FDIC

is seeking to avoid the $294 million dividend SVB paid to SVBFG in the California litigation

between the FDIC and SVBFG, the JOLs' clawback claim seeking to recover the same amount

would interfere with the FDIC's exercise of its regulatory powers, which is what section 1821(j)

is meant to prevent. (*Id.* at 26–27.)

SVBFG then addresses arguments the JOLs made previously concerning FIRREA. First,

the JOLs previously argued that FIRREA is expressly territorial and doesn't apply to causes of

action inuring to SVB Cayman. (*Id.* at 27.) SVBFG explains that this case does not involve the

extraterritorial application of FIRREA—the relevant conduct occurred in the U.S. (*Id.* at 27–28.)

Second, the JOLs also argued earlier that their claims are based on particularized harm unique to

the Cayman depositors. (*Id.* at 29.) This, per SVBFG, is simply inaccurate, as the JOLs' claims

seek to claw back the $294 million upstream dividend payment and assert that SVBFG breached

duties allegedly owed to SVB. This conclusion is supported by the amount the JOLs are seeking

in damages: "not less than 94,000,000.00." (*Id.* at 30.) This is "orders of magnitude" greater

than the total value of the claims held by all the Cayman depositors, so there is no way the JOLs

are merely seeking compensation for harm to the Cayman creditors *alone*. (*Id.*) The Company

and Creditor Claims are therefore derivative claims. Third, as for the JOLs' argument that their

---

[12]    SVBFG applies California law to determine whether the claims are direct or derivative. (SVBFG Brief at 21-22.)

claims will not "impinge on exclusive FDIC-R rights" to bring claims against SVBFG under

section 1821(d)(2)(A)(i), (*id.* at 31 (cleaned up)), SVBFG points to the language of the FDIC-R's

answer (quoted above) and argues that there is significant overlap between the FDIC-R's and

JOLs' allegations and theories of recovery, overlap which FIRREA is meant to eliminate. (*Id.* at

31.)

### c. Cayman Islands Common Law

Finally, SVBFG argues that Cayman law, "to the extent it applies," also does not give the

JOLs standing to pursue their claims. (*Id.* at 31.) The Company Claims, as they are property of

SVB and must be brought in the name of the company, can only be brought by the FDIC, per

SVBFG. (*Id.* at 31–32.) The Creditor Claims are, all parties agree, vested in the Cayman

depositors; the JOLs argue that they are the appropriate agents of the Cayman depositors and that

they therefore have standing to assert the Creditor Claims. (*Id.* at 32–33.) SVBFG contests the

application of both "general agency principles" to this scenario, and, even assuming they apply,

contests the existence of an agency relationship between the depositors and JOLs. (*Id.* at 33–34.)

Moreover, the JOLs are acting both as SVB Cayman's liquidators and, purportedly, as agents of

SVB Cayman's creditors; SVBFG argues that there is an irreconcilable conflict of interest

inherent in assuming both positions at once. (*Id.* at 34–35.) And even if the JOLs were agents of

the Cayman depositors under Cayman law, SVBFG argues that Article III standing requirements

mandate that the JOLs themselves have suffered injury to bring the Creditor Claims, and that

they cannot sue solely on behalf of the Cayman depositors as their agent absent an injury to

themselves. (*Id.* at 35.) As for the Officeholder Claims, while both sides agree that they are

vested in the JOLs, SVBFG maintains that they cannot be brought extraterritorially (i.e., outside

of the Cayman Islands). (*Id.* at 36–39.)

42

2. <u>FDIC's Objection</u>

The FDIC also relies on section 1821(d)(2)(A)(i) of FIRREA, arguing that this provision
exclusively gives the FDIC "all" the "rights" and "titles" of the "depository institution" in
receivership, including all of SVB's claims and causes of action. (FDIC Brief at 7.) Therefore,
all claims to recover the Upstream Distribution belong to the FDIC, because they are based on
harm to SVB, not particularized injury to the Cayman depositors or the JOLs (*i.e.*, the claims are
derivative). (*Id.* at 7–10.) The same goes for claims based on SVB's general mismanagement.
(*Id.* at 9.) The FDIC also argues that, even if the JOLs' claims are direct, FIRREA bars the JOLs
from bringing them, under the broad read of the Succession Clause. (*Id.* at 11–17.) The FDIC
also frames both of these categories of claims as "materially indistinguishable from the setoff
defenses" it has asserted in the litigation pending in the Northern District of California, described
above. (*Id.* at 9.)

The FDIC addresses the JOLs' argument that they have a claim under section
1821(d)(17) of FIRREA, which vests the FDIC with federal claims for intentionally fraudulent
transfers, and provides that such claims "shall be superior to any rights of a trustee or any other
party (other than any party which is a Federal agency) under title 11." (*Id.* at 17.) The FDIC
points out that (1) this section *only* gives the FDIC rights, and it does not create rights for any
other entity; and (2) the JOLs do not and cannot have claims under title 11, so this portion of the
statute is fundamentally inapplicable and certainly does not create rights for the JOLs. (*Id.* at
17–18.)

Finally, the FDIC also argues that the Cayman law which the JOLs assert claims under
should not apply extraterritorially, especially since so applying it would "permit Cayman law to
override multiple provisions of Title 12 applicable to a transfer and other conduct occurring *in*

43

*the United States*." (*Id.* at 22 (emphasis in original).)  The principles of comity do not compel

this Court to permit the JOLs to pursue their claims in this case, because so doing would result in

a "true conflict" with the laws and policies of the U.S.: applying Cayman law here would conflict

with the FIRREA provisions laid out above, and would permit the JOLs to "circumvent the

priority provisions that Congress expressly set forth in section 1821(d)(11)(A) of title 12." (*Id.*

at 23.)  That section provides for the payment of claims in the following order: (1) administrative

expenses of the receiver, (2) any deposit liability of the institution, and (3) any other general

liability of the institution.  (*Id.* at 24.)  Because the Cayman creditors are "accountholders" but

not "depositors," given the terms of the accounts they created (*id.* at 24 n.10), they are third in

the waterfall created by section 1821(d)(11)(A).  Allowing the JOLs to bring Cayman law-based

claims in the U.S. would allow the JOLs to leapfrog ahead of second-priority depositors, since

the JOLs would be using clawed-back money to pay off the third-priority account-holders in full

before the depositors are paid off.  (*Id.* at 24–25.)

The FDIC also makes the same argument about section 1821(j) that SVBFG sets out.  (*Id.*

at 25–26.)

### 3.  JOLs' Argument in Support of Standing

The JOLs divide up their claims into the following categories: "the officeholder claims

('Officeholder Claims') and tort claims ('Tort Claims') that the JOLs – qua JOLs – like JOLs in

every Cayman Official Liquidation are authorized to bring, and which the currently known or

knowable factual matrix support; . . . and . . . the claims of the Cayman Depositors ('Depositor

Claims'), which claims are asserted and will continue to be asserted by the JOLs based upon

their contractual designation by the Cayman depositors as their agent – pursuant to the ordinary

tenets of agency law in the Cayman Islands, and as envisioned in the Winding Up Order." (JOL

44

brief at 5.)  "At a high level," the JOLs explain, "the Officeholder Claims are effectively those that sound in clawback and insolvent or wrongful trading," the "Tort Claims arise from the fact that the bank credits in connection with the SVB Cayman operating account and the Cayman Depositors' accounts . . . were transferred and removed beyond Cayman judicial reach and SVBFG and SVB Cayman management either acquiesced to such instruction or did not stop the total capitalization strip when they had a duty to do so." (*Id.* at 10.)

The JOLs begin to address SVBFG's arguments concerning FIRREA.  They claim that FIRREA "clearly and explicitly declines to exclusively vest clawback claims in the FDIC Receiver," but instead "merely contemplates that (real, not hypothetical) clawback claims of the FDIC Receiver would be 'superior' as compared to the '[implicitly] inferior' clawback claims of others." (*Id.* at 11.)  Moreover, according to the JOLs, the FDIC has only "interposed arguments concerning clawback as a _setoff defense_ – not a claim." (*Id.* (emphasis in original).)  The JOLs call this defense "an impermissibly <u>hypothetical</u> *constructive fraudulent transfer* contention that comprises just one paragraph of their relevant answer and affirmative defenses." (*Id.* (emphasis in original).)  As for the "Depositor Claims and Tort Claims," the JOLs claim that they "arise almost solely as a result of the unprecedented orphaning of the Cayman operations and the removal of the Cayman credits form the jurisdictionally significant, Cayman-law governed Cayman Depositor and SVB Cayman operational accounts that are in turn subject to the exclusive jurisdiction of the Cayman Courts in relation to all disputes and controversies.  By definition they are claims unique to the particular Cayman Depositor accounts and SVB Cayman operational accounts, as well as the JOLs and the Cayman depositors." (*Id.*)  The JOLs also argue that the "FDIC-R's authority to act in respect of the bank, did not effectively reach the shores of Cayman . . . the analysis of a  corporation's personhood under Cayman law (including

45

the identity of those that may act on its behalf), is governed by Cayman common law in the first instance, which in turn points to the law of the company's place of incorporation . . . applicable California law does not *automatically* provide the right to act in connection with the property of a company in receivership extraterritorially." (*Id.* at 11–12.)

The JOLs then press this Court to grant comity to the Cayman proceeding, for which chapter 15 recognition is not necessary. (*Id.* at 2.) They argue that Cayman law governs the question of standing, as a matter of comity—since "the rights and powers granted to foreign liquidators – i.e., their standing to appear in United States Courts . . . rests upon the rights and powers afforded to them under applicable foreign law." (*Id.* at 13.) This applicable foreign law "is then *arguably* subject to modification pursuant to the dictates of the FIRREA federal bank receivership regime." (*Id.* (emphasis in original).) The JOLs claim that their expert's testimony supports a finding that Cayman law grants the JOLs standing to pursue "the Officeholder Claims, the Tort Claims, the Constructive Trust Remedy, and the Depositor claims as agents,' and that the Cayman court has explicitly authorized the JOLs to bring these claims. (*Id.* at 14.) Moreover, they argue that this Court should grant comity to the Cayman wind-up proceeding because the wind-up was commenced in an appropriate and legal manner in the Cayman Islands (*id.* at 14), and the Cayman court entered orders authorizing the JOLs "to assert claims against the FDIC, in both its corporate and receivership capacity, as well as the claims at issue here" (*id.* at 15). As for this Court's prior dismissal of the JOLs' chapter 15 petition, the JOLs frame it as a narrow ruling solely predicated on the finding under section 109(b) that SVB cannot be a "debtor" under the Code; this alone, they argue, is not enough to justify this Court's denial of comity to the Cayman proceeding. (*Id.* at 15–17.) And granting comity to the Cayman proceeding is not barred by the chapter 15 decision and would violate neither U.S. law nor public

46

policy, because, per the JOLs, "U.S. law recognizes the power of courts to exercise insolvency jurisdiction over foreign entities operating in the United States in their assets in the name of protecting creditors, <u>exactly</u> as the Grand Court did here with respect to Silicon Valley Bank's presence in the Cayman Islands," and the "actions taken here by the Grand Court to protect the Cayman creditor-depositors of Silicon Valley Bank are entirely consistent with the jurisdiction and authority exercised by the FDIC, in the case of the U.S. branches of foreign banks, and by U.S. bankruptcy courts with respect to entities that are eligible to be debtors under the Bankruptcy Code." (*Id.* at 19 (emphasis in original).)  The JOLs also point to the section of the chapter 15 opinion which indicates that the JOLs may have a remedy under section 1509(f) to bring suit in the U.S., regardless of the denial of their petition.  (*Id.* at 15–16.)

Next, the JOLs point to the Cayman Sanction Orders.  The JOLs maintain that these orders are valid, final, and non-appealable, and that any attempt by SVBFG to argue otherwise is an "impermissible collateral attack."  (*Id.* at 20–21.)

The JOLs respond to SVBFG's argument that the Cayman laws on which they sue do not apply extraterritorially.  According to the JOLs' Cayman law expert, the statutory insolvency scheme under English and Cayman law "has <u>worldwide</u>, and not merely territorial, effect in the first instance," and the JOLs did not need specific authorization from the Cayman court to sue internationally.  (*Id.* at 22 (emphasis in original).)  Just because there has never before been a "Cayman ancillary liquidation in which actions were taken outside the territory of the Cayman Islands" does not mean that that is impermissible.  (*Id.* at 22–23.)  In short, "it cannot be credibly argued that Cayman law prohibits the JOLs from seeking recovery of assets within the United States."  (*Id.* at 23.)

47

Next, the JOLs argue that FIRREA does not foreclose their claims.  First, the
Officeholder Claims are solely and exclusively vested in the JOLs pursuant to Cayman law, and
"arise and crystallize *solely* upon the issuance of a liquidation order by the Cayman court."  (*Id.*
at 25 (emphasis in original).)  The FDIC-R could not have "succeeded" to such claims, per the
JOLs, because the FDIC Receivership was created *before* the claims arose via order of the
Cayman court.  (*Id.*)  The JOLs also point to section 1821(d)(17)(A)-(D) to argue that as to their
clawback claims, "the FDIC-R rights are not predicated on a subsummation/succession
framework," but rather, the FDIC's rights are "merely 'superior' to those of others," meaning
that the JOLs still hold onto clawback claims—albeit inferior ones—despite the operation of
FIRREA.  (*Id.* at 25–26.)  However, since the FDIC-R failed to assert intentional or constructive
fraudulent transfer claims against SVBFG, the JOLs argue that the FDIC-R has abandoned those
claims.  (*Id.* at 26.)  The JOLs dismiss the FDIC-R's affirmative defense in the JOL-FDIC
litigation of constructive fraudulent transfer as a setoff to the SVBFG claims as merely a
hypothetical, and one which will "vaporize" if the FDIC-R wins on any of its other asserted
defenses.  (*Id.* at 26–27.)  In other words, the FDIC-R did not *really* bring a fraudulent transfer
claim, according to the JOLs, so nothing in FIRREA operates to render the Officeholder Claims
inferior to any claim brought by the FDIC-R pursuant to section 1821(d)(17)(A)–(D) of
FIRREA.

As for the Tort and Depositor Claims, the JOLs argue that they are particularized to the
Cayman depositors/creditors (*i.e.*, they are direct), and the FDIC-R does not succeed to direct
claims ("particularized and individual claims that are not common to either the bank, its
shareholders or the depositors as a whole") pursuant to the Succession Clause.  (*Id.* at 27.)  The
JOLs argue that these claims "all arise from the 'orphaning' of the Cayman operations and

Cayman depositors-*cum*-creditors" of SVB, because in "dissipat[ing] and usurp[ing] the Cayman

Account credits beyond the reach of the Cayman Court," SVB violated the Cayman laws which

governed the Cayman accounts and gave rise to capital and support requirements unique to the

Cayman Islands. (*Id.* at 30–31.) The JOLs break down their claims and their arguments for why

each is particularized in a chart which the Court will not reproduce here. (*Id.* at 31–32.)

Regardless of the direct/derivative distinction, the JOLs maintain that since the FDIC

receivership was never effectuated in the Cayman Islands, it is "doubtful" that "FDIC-R

effectively gained or succeeded to Cayman-law choses in action," because (among other reasons)

it does not appear that precedent for the extraterritorial application of section 1821(d)(2)(A) of

FIRREA exists. (*Id.* at 33-34.) The JOLs argue that the FDIC receivership is limited to the

territory of the U.S., because the FDIC receiver never registered the receivership order creating it

in the Cayman Court, which would have been necessary for the FDIC to succeed to Cayman law-

governed claims. (*Id.* at 34-36.) The method of "registration" the JOLs argue would be

applicable here is "a recognition application to the Cayman Court pursuant to the Cayman law

equivalents of Chapter 15 and the cross-border insolvency regimes." (*Id.* at 35.) The JOLs point

to the FDIC's refusal to submit to the jurisdiction of the Cayman court. (*Id.* at 36–37.) In sum,

the JOLs argue that "due to the territorial limits placed on FDIC-R and its failure to obtain

recognition in the Cayman Islands, there is no impingement due to the Cayman-governed claims

asserted by the JOLs in the Amended Complaint and Amended POC." (*Id.* at 37.)

The JOLs argue that under applicable Cayman law, the JOLs are authorized to bring

Clawback and Tort Claims on behalf of SVB Cayman's creditors because of their role as both

estate fiduciaries and based on the common law agency relationship which "arose under the

circumstances of [the JOLs'] appointment" and which they claim was ratified by the Cayman

49

creditors.  (*Id.* at 37–40.)  To the extent SVBFG challenges this, the JOLs argue that it is a

factual issue to be resolved at trial.  (*Id.* at 40.)

### E.  Briefing on Timeliness

At the end of the evidentiary hearing, the Court requested briefing on the timeliness of

the JOLs' proofs of claim.

SVBFG argues that the claims the JOLs asserted in both its Second Amended POC and

its Amended Complaint should be dismissed because they do not relate back to the first POC and

allowing the JOLs to assert them now would be inequitable.  (SVBFG Post-Hrg. Brief at 4.)  The

Creditor Claims were only introduced in the Second Amended POC; asserting new claims on

behalf of a new claimant is not a permissible amendment of a proof of claim.  (*Id.* at 5–6.)

SVBFG also argues that the Initial POC did not provide SVBFG or SVBFG with adequate notice

of the claims asserted on behalf of the Cayman creditors: not only did the First POC make no

reference to any Creditor Claims, but the Creditor Claims are based on entirely novel legal

theories under foreign law which SVBFG was under no obligation to guess at.  (*Id.* at 7.)  The

omission of claims belonging to the Cayman creditors was not a mistake, as the JOLs asserted

them in the FDIC receivership but not in SVBFG's bankruptcy.  (*Id.* at 7–8.)  SVBFG also

argues that the assertion of Creditor Claims is invalid as a matter of bankruptcy procedure, since

Rule 3001(b) of the Federal Rules of Bankruptcy Procedure provides that "[o]nly a creditor or

the creditor's agent may sign a proof of claim"; courts in this District interpret Rule 3001(b) to

require agents filing proofs of claim on behalf of a creditor to receive express authorization from

the creditors to do so.  (*Id.* at 8.)

As for the JOLs' claims based on the Upstream Dividend and SVBFG's risk

management, the Debtor argues that those also do not relate back.  The First POC states just that

50

the JOLs were investigating the transfer of the Cayman deposits and their rights to payment against the Debtor "arising out of or related to the transfer of the Cayman Deposits." (*Id.* at 9.) It said nothing about the Upstream Dividend or liquidity management. The claims about the transfer of the Cayman deposits are premised on entirely different allegations than the claims about the Upstream Dividend and risk management at SVB, so the commonality required to allow relation back of an amended claim is lacking. (*Id.* at 10.)

Even if their claims relate back, SVBFG argues it would be inequitable to let the JOLs proceed with their new theories because they have not established excusable neglect for their failure to assert their claims in the first instance: the Upstream Dividend was disclosed to the public nearly six months before the bar date, the Winding-Up Order which the JOLs claim "envisioned" the Creditor Claims was issued before the bar date, and there was a substantial delay in filing the claim with the new theory (15 months between the bar date and the filing of the Second Amended POC). (*Id.* at 12-14.) SVBFG also claims it would be prejudiced by the late claims and that the JOLs have not acted in good faith. (*Id.* at 14-15.)

The JOLs' excuse is that they "relied on the 'placeholder' and 'provisional' nature of the" Initial POC. (JOL Post-Hrg. Brief at 9.) They argue that while the claims based on the Upstream Dividend were "not expressly noted in the [initial] POC, the fact remains that the claim inherently arises out of the failure of SVB and such insolvency was the sine qua non for the Cayman Liquidation of SVB and the JOLs' appointment. It should hardly be surprising that the JOLs would assert claims sounding in 'clawback' under Cayman law—that is what Cayman officeholders appointed in a liquidation do." (*Id.* at 9.) Since the Cayman liquidation arises from the failure of SVB, "that failure was obviously the basis for the POC and therefore these claims are within the same and involve the same 'commonality of facts'—i.e. the assets of the

bank, their transfer, and the circumstances giving rise to the bank's insolvency." (*Id.* at 9–10.) And as for the Creditor Claims, they claim that "this is a classic example of new information that is being used to correct a defect in form of the original claim": since the JOLs "genuinely believed" that they "had been empowered protect [sic] the rights of the Cayman Depositors in the United States," "[i]t would have been natural to assume that the POC submitted in this matter on the basis of the Cayman Liquidation included such agency-based claims." (*Id.* at 11.)

The JOLs claim that there is no prejudice to SVBFG in allowing these claims to proceed now (*id.* at 12–13), and that they have acted in good faith (*id.* at 13). The JOLs also claim they established excusable neglect, because they were "wholly without documents and resources" to bring the full set of claims, and because the original POC was a "placeholder" claim. (*Id.* at 14.)

In its reply, SVBFG notes that the JOLs did not address the fact that they stated in their initial POC that they were asserting the POC "solely" in their capacity as liquidators. (SVBFG Post-Hrg. Reply at 2.) The Debtor argues that the JOLs do not demonstrate compliance with Rule 15(c) (which requires, among other things, that the defendant receive sufficient notice of the new claimant's claims and proof that the defendant knew or should have known that, but for a mistake, the action would have been brought on that claimant's behalf), which is mandatory if an amendment attempts to assert a claim on behalf of a new claimant, and the lack of notice is especially glaring given the "unprecedented nature of the Cayman Creditor claims." (*Id.* at 2–3.) The JOLs point to their own "subjective belief" about the existence of Creditor Claims at the time of the initial POC several times, which SVBFG argues is irrelevant (and also undermines the JOLs' position— if they knew of the claims, why did they not mention them in the initial POC?). (*Id.* at 3–4.) SVBFG also points to caselaw in this Circuit rejecting the argument that a reservation of rights (a "placeholder") in an initial proof of claim can support all future

amendments.  (*Id.* at 4–5.)  As for specific claims, SVBFG argues that the JOLs do not explain

how the Upstream Dividend claims inherently arise out of the failure of SVB or at all share a

common nexus with the claims that were hinted at in the first POC, which only had to do with

the transfer of Cayman deposit credits.  (*Id.* at 5–6.)  SVBFG also points out that the JOLs did

not provide any evidence to suggest that the Debtor was aware of the JOLs' intention to assert

the Cayman Creditor claims until (at the earliest) the Amended POC's filing almost ten months

after the bar date; SVBFG argues that the record clearly shows that the JOLs did not indicate any

intent to assert the Upstream Dividend and Cayman Creditor claims until almost a year after the

bar date.  (*Id.* at 10.)

### F.  Evidentiary Hearing

The Court does not summarize the entirety of the two-day trial below and provides only

the most relevant highlights.

At the trial, counsel for the JOLs focused only on Officeholder and Creditor Claims.

(Day 1 Tr. at 15:18–16:16 (noting that the Court faces "two sets of claims": "Cayman law claims

owned by the Cayman depositors in respect of their Cayman law governed account agreements

with Silicon Valley Bank and the torts that arise from the conduct assumed or agreed to be

assumed by Silicon Valley Bank Holding Company . . . [and] officeholder claims . . . [which] are

not property of Silicon Valley Bank").)  It is not clear whether the JOLs intended to drop the

Company Claims.

Counsel for the JOLs conceded that there is no written contract signed by both sides

which could form the basis of an agency relationship between the JOLs and the Cayman

creditors.  (Day 1 Tr. at 25:15–25.)  Counsel admitted that there is no order by the Cayman court

which authorized the JOLs "on an agency basis to pursue contract claims" "on behalf of

depositors." (*Id.* at 31:3–19, 33:9–15; *see also id.* at 38:17–39:9 (admitting that the Winding-Up Order also did not create an agency relationship).)  Counsel also admitted that the Cayman judge's sanctioning of the JOLs bringing a complaint in the U.S. which asserted Cayman creditors' claims was *not* "judicial imprimatur to every claim asserted in the complaint," and that the Cayman judge did not "expressly authorize" the JOLs to pursue Creditor Claims.  (*Id.* at 35:10–23.)  Counsel also conceded that neither expert has identified Cayman law which holds that an opt-out mechanism can constitute consent to an agency relationship.  (*Id.* at 62:11–13.)  The agency was narrowed down to two claims: first, that there was "ratification by silence" which applied retroactively and was evidenced through the opt-out mechanism, and that silence constituted acceptance of an agency relationship under Cayman law in the circumstances presented (despite the lack of Cayman law on point); and second, that the Cayman depositors did rely on the JOLs to challenge their classification as uninsured depositors in the FDIC resolution, and that reliance also created an agency relationship.  (*Id.* at 46:18–47:23.)

Counsel for SVBFG conceded that if there were a "clear adoptive act demonstrating consent" from the principal and which "qualified under Cayman law," and if there were also "no clear and obvious conflict" between responsibilities *qua* agent of creditors and responsibilities *qua* liquidator, then an agency relationship could be created between Cayman creditors and the JOLs.  (*Id.* at 73:15–22.)  Counsel also maintained that the notice with the opt-out was misleading on its face because it purported to reference an order by the Cayman court which either created or authorized an agency relationship between the JOLs and the Cayman creditors when, in truth, no such order existed or could exist under Cayman law; the creditors were mostly in China but there was no evidence that the notice was translated into Chinese or that the notices were received (or sent to the right email addresses in the first place) (*id.* at 109:7–110:11).

54

Dr. Mokal conceded that there is no case in the Cayman Islands "where in an ancillary liquidation of a foreign company . . . a Cayman court has authorized the appointment of liquidators to litigate an avoidance action in the primary insolvency process" (*id.* at 182:18–25), and that he has not come across a "Cayman case where the Cayman Court has authorized the appointed liquidators to bring claims owned by creditors" (*id.* at 183:8–11).  Dr. Mokal was also not able to point to specific language in any of the Sanction Orders which, by its terms, stated that the JOLs were authorized to bring agency claims, save for broad language about authorizing the JOLs to bring a complaint, despite the fact that he was not aware of any other Cayman court ever authorizing liquidators to assert claims as an agent of creditors.  (*Id.* at 185:3–188:3.)  Since the records before the Cayman court on the sanction orders were sealed, Dr. Mokal never read the documents underlying any of the sanction orders, and he admitted that without this basis, he could not "legally construe" the Sanction Orders.  (*Id.* at 188:9–17.)  Dr. Mokal admitted that the Cayman court "could not grant agency in relation to the creditors" to the JOLs.  (*Id.* at 193:13–17.)  He also admitted that the language in the notice distributed to SVB Cayman's creditors was incorrect: the notice stated that "[u]nder Cayman Islands law, the JOLs are responsible for . . . representing the interests of the depositors in the Cayman Islands . . . as agent"; Dr. Mokal conceded that this was an incorrect statement of Cayman law.  (*Id.* at 193:25–194:9; *see also id.* at 207:5–17 (explaining that the statement in the notice that Justice Doyle appointed the JOLs as the creditors' agent is incorrect as a matter of Cayman law).)  Dr. Mokal insisted that an agency relationship was created, both *ex ante* and *ex post*: *ex ante* via the interactions between the JOLs and the creditors' committee[13] in the Caymans (he points to the "documents that he JOLs have

---

[13]    Which he described as consisting of "creditors who are appointed to represent the general creditor body," "act[ing] in a fiduciary capacity," "provid[ing] information" to the broader swath of creditors and communicating with the JOLs.  (Day 2 Tr. 62:19-63:6.)

provided to the committee and to the creditors" as relevant evidence; later he cites to the creditors' "going to court to seek the making of the winding-up order and the appointment of JOLs," *id.* at 200:19-201:12, and to language in the Winding-Up Order, *id.*, despite the Cayman court's being unable to create an agency relationship, *id.* at 201:13–20), and *ex post* (ratification) via the opt-out (*id.* at 196:9–198:5.). Dr. Mokal insisted that "no affirmative action is required in relation to ratification"—i.e., silence sufficed to count as a principal's *ex post* consent to an agency relationship. (*Id.* at 199:20–200:2; *see also* Day 2 Tr. 52:5–54:4.) (By contrast, he believes that acceptance in an *ex ante* context cannot arise by silence. *Id.* at 209:20–210:24.) He also insisted that the JOLs' filing an appeal on behalf of the creditors to contest their status in the FDIC receivership as unsecured creditors was "solely consistent with the agency relationship by the creditors delegating the right to protect their position by filing a challenge to the classification of the creditors." (*Id.* at 203:16–205:14.) Dr. Mokal claimed for the first time on the second day of the hearing that the burden of proof rests on the third party which contests a purported agency relationship to show that an agency relationship does *not* exist; but he did not point to any Cayman or English law on the matter, but instead references a textbook he claims is authoritative. (Day 2 Tr. 46:12–47:13.) (Mr. Said agreed on cross-examination that, as a matter of Cayman law, this is correct. (*Id.* 165:2–166:4.)) He also attempted to explain away the failure of the JOLs to accurately represent the effect of the Winding-Up Order on the relationship between the Cayman creditors and the JOLs (the misrepresentation being that they claimed that the Winding-Up Order created such a relationship when it in fact did no such thing) by stating that "if the parties [the purported principal and agent] are mistaken about the basis of the agency, then that cannot be a bar to the existence of the agency." (*Id.* 56:5–23.)

On cross-examination, Mr. Said confirmed that, as far as he was aware, there was no

authority "on the role of a liquidation committee in a sanctioned liquidation proceeding in the

Cayman beyond the exercise of the role in liquidation itself." (*Id.* 170:14–18; *see also id.* 171:1–

3 ("I'm aware of no case law that refers to any role of the liquidation committee beyond and

outside the scope of the liquidation.").)  As for the issue of the JOLs' responsibilities *qua*

liquidators and those *qua* (purported) agents conflicting, Mr. Said explained that, if there is a

conflict, the principals affected by the conflict would be entitled to "a full material disclosure of

the potential conflicts" and would have to issue "a fully informed consent" for the JOLs to

overcome the problem.  (*Id.*189:22–190:24.)  The conflict here, per Mr. Said, is that some of the

claims the JOLs assert as liquidators (the officeholder claims) would (if successful) lead to

recoveries to the Cayman estate, while others they assert as agents (creditor claims) would lead

to recoveries directly for a subset of Cayman creditors.  (*Id.* 190:5–21.)

## II.    <u>LEGAL STANDARD</u>

### A.  Timeliness

The Federal Rules of Bankruptcy Procedure provide that

> when an act is required or allowed to be done at or within a specified period . . . by order of court, the court for cause shown may at any time in its discretion . . . on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.

FED. R. BANKR. P. 9006(b)(1).  Rule 9006 governs the admission of proofs of claim filed after a

court-ordered bar date.  *See Pioneer Investment Services Co. v. Brunswick Associates L.P.*, 507

U.S. 380, 382 (1993) (noting that Rule 9006(b)(1) "empowers a bankruptcy court to permit a late

filing if the movant's failure to comply with an earlier deadline 'was the result of excusable

neglect'").

Bankruptcy courts apply a two-part test to determine whether to accept a late-filed amendment to a timely proof of claim. *In re Enron Corp.*, 419 F.3d 115, 133 (2d Cir. 2005). First, courts examine whether the amendment relates back to a timely filed proof of claim. *Id.* Second, if an amendment does relate back to the timely filed claim, courts will then "examine each fact within the case and determine whether it would be equitable to allow the amendment." *Id.* (quoting *In re Integrated Res., Inc.*, 157 B.R. 66, 70 (S.D.N.Y.1993)).

For part one of the test, an amendment to a timely filed proof of claim will relate back if it:

1) corrects a defect of form in the original claim;
2) describes the original claim with greater particularity; or
3) pleads a new theory of recovery on the facts set forth in the original claim.

*Id.* (quoting *In re McLean Indus., Inc.*, 121 B.R. 704, 708 (Bankr. S.D.N.Y. 1990)).  To determine whether an amendment relates back to an earlier claim, the court must decide "whether there is a sufficient commonality of facts between the allegations relating to the two causes of action to preclude the claim of unfair surprise." *In re Residential Cap., LLC*, No. 12-12020 (MG), 2015 WL 6734478, at *6 (Bankr. S.D.N.Y. Nov. 3, 2015) (internal citation omitted).  The Court should consider: (a) whether the defendant had notice of the claim that the plaintiff is now asserting; (b) whether the plaintiff will rely on the same kind of evidence offered in support of the original claim to prove the new claim; and (c) whether unfair surprise to the defendant would result if the court allowed the amendment to relate back. 3 MOORE'S FEDERAL PRACTICE - CIVIL § 15.19 (2022); *see also In re Residential Cap., LLC*, 2015 WL 6734478, at *6.

For part two of the test, factors that courts consider when balancing the equities include:

> (1) undue prejudice to opposing party; (2) bad faith or dilatory behavior on part of the claimant; (3) whether other creditors would receive a windfall were the amendment not allowed; (4) whether other claimants might be harmed or prejudiced; and (5) the justification for the inability to file the amended claim at the time the original claim was filed.

*In re Integrated Res., Inc.*, 157 B.R. at 70 (quoting *In re McLean Indus., Inc.*, 121 B.R. at 708).

"The critical consideration is whether the opposing party will be unduly prejudiced by the amendment." *Id.* (internal quotations omitted).

With exceptions that are not applicable here, section 502(b)(9) empowers a court to disallow a claim that has been objected to if "proof of such claim is not timely filed." 11 U.S.C. § 502. Rule 9006(b)(1) provides, in relevant part, that a court may enlarge the time period for doing an act "on motion made after the expiration of the specified period . . . where the failure to act was the result of excusable neglect." FED. R. BANKR. P. 9006. The late claimant has the burden of proving excusable neglect. *In re Enron Corp.*, 419 F.3d at 121.

Whether neglect is "excusable" under Rule 9006(b)(1) is an equitable determination based on "all relevant circumstances surrounding the party's omission." *Pioneer*, 507 U.S. at 395. In *Pioneer*, the Supreme Court considered four factors in determining whether neglect may be considered "excusable": (1) the danger of prejudice to the debtor; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith. *Pioneer*, 507 U.S. at 395. The Second Circuit takes a "hard line" in applying the *Pioneer* test that focuses on and emphasizes the third factor: the reason for the delay, including whether it was within the reasonable control of the movant. *In re Enron Corp.*, 419 F.3d at 122 (citing *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 368 (2d Cir. 2003)). This is because, in the typical case, the three other *Pioneer* factors—danger of prejudice, length of the delay, and good

faith—usually weigh in favor of the party seeking the extension.  *Id.*  "[I]nadvertence, ignorance

of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect."

*Pioneer*, 507 U.S. at 392.

### B.  Determinations of Foreign Law

Federal Rule of Civil Procedure 44.1 provides that, in determining foreign law, "the court

may consider any relevant material or source, including testimony, whether or not submitted by a

party or admissible under the Federal Rules of Evidence"; *see also* FED. R. BANKR. P. 9017

(making Fed. R. Civ. P. 44.1 applicable to adversary proceedings).  Additionally, FRCP 44.1

permits "the court . . . to conduct '[its] own research and interpretation' into the content of

foreign law."  *In re Tyson*, 433 B.R. 68, 78 (S.D.N.Y.2010) (citations omitted).

### C.  Standing

"Standing is a jurisdictional requirement that must be met in order to have claims

litigated in federal court."  *Official Comm. of Unsecured Creditors of the Debtors v. Austin Fin.*

*Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 502–03 (Bankr.S.D.N.Y.1999) (internal

citation omitted).  Because standing is a jurisdictional matter, "it is the burden of the 'party who

seeks the exercise of jurisdiction in his favor,' . . . 'to [clearly] allege facts demonstrating that he

is a proper party to invoke judicial resolution of the dispute.'"  *Thompson v. Cnty. of Franklin*,

15 F.3d 245, 249 (2d Cir.1994).  The burden of proof in this Court is determined by *federal*, not

Cayman law.[14]  *See also In re Hellas Telecommunications (Luxembourg) II SCA*, 524 B.R. 488,

524 (Bankr. S.D.N.Y.), *adhered to*, 526 B.R. 499 (Bankr. S.D.N.Y. 2015) (applying the above

---

[14]       To the extent the JOLs tried to turn this federal standard on its head and argue that Cayman law puts the burden of showing *no* agency relationship on the third party challenging the assertion of a relationship, they did so only through their expert, which is an improper use of expert testimony.  *Choi v. Tower Rsch. Cap.* LLC, 2 F.4th 10, 20 (2d Cir. 2021) ("Expert testimony that usurps the role of the factfinder or that serves principally to advance legal arguments should be excluded.").

burden of proof to issue of foreign law concerning standing).  The court may base its finding

regarding a plaintiff's standing on the complaint, the complaint supplemented by undisputed

facts, or the complaint and any disputed factual issues resolved by the court.  *Thompson*, 15 F.3d

at 249.

Generally, to have standing in bankruptcy court, a party must possess: (i) prudential

standing; (ii) constitutional standing; and (iii) standing under section 1109 of the Bankruptcy

Code.  *In re Motors Liquidation Co.*, 580 B.R. 319, 340 (Bankr. S.D.N.Y. 2018).  "All three

standing requirements must be met to have standing."  *Id*.

First, a party seeking to appear in federal court must demonstrate prudential standing.

*See Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 843 F.2d 636, 644 (2d Cir.

1988) ("The prudential concerns limiting third-party standing are particularly relevant in the

bankruptcy context.  Bankruptcy proceedings regularly involve numerous parties, each of whom

might find it personally expedient to assert the rights of another party even though that other

party is present in the proceedings and is capable of representing himself.").  The doctrine, self-

imposed by federal courts, bars litigants "from asserting the constitutional and statutory rights of

others in an effort to obtain relief for injury to themselves."  *See id*. at 643.

Once a party has shown that it has prudential standing, it then must prove that it has

constitutional standing.  Specifically, under the "case or controversy" requirement of Article III

of the United States Constitution, a party "must have a 'personal stake in the outcome of the

controversy'" to have standing.  *Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 708

(S.D.N.Y. 2001) (citation omitted), *aff'd sub nom. Breeden v. Kirkpatrick & Lockhart LLP (In re*

*Bennett Funding Grp.)*, 336 F.3d 94 (2d Cir. 2003).  Similar to the prudential standing

requirements, "[a] party can only assert its own legal rights and cannot assert the rights of third

parties." *Id.* Furthermore, "[t]he Art[icle] III judicial power exists only to redress or otherwise

to protect against injury to the complaining party, even though the court's judgment may benefit

others collaterally." *Warth v. Seldin,* 422 U.S. 490, 499 (1975).

To prove constitutional standing, a party must establish "an invasion of a legally

protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural

or hypothetical." *See Spokeo, Inc. v. Robins,* 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defs. of*

*Wildlife*, 504 U.S. 555, 560–61 (1992)).

### III.    DISCUSSION

#### A. Timeliness

##### 1.    Complaints

SVBFG's argument that the Amended Complaint is untimely relies on comparing the

Amended Complaint to the Initial POC.  (*See, e.g.*, SVBFG Post-Hrg. Br. at 9–10.)  This is the

correct frame of reference—the relevant question is whether the complaint relates back to the

timely-filed proof of claim.  "The law is clear that a claimant cannot pursue a debtor for claims if

the claimant did not file a timely proof of claim . . . .  Courts regularly grant a debtor's motion to

dismiss under Fed. R. Bankr. P. 7012 when a creditor seeks to assert claims against the debtor

[through an adversary proceeding] after having failed to timely file a proof of claim . . . .

[C]learly, a creditor cannot circumvent the temporal proscription of a bar date by the facile

device of filing an adversary proceeding against a debtor after the bar date has run." *In re Major*

*Model Mgmt. Inc.*, No. 22-10169 (MG), 2023 WL 5338580, at *6 (Bankr. S.D.N.Y. Aug. 18,

2023), *aff'd sub nom. Agra v. Dolci*, No. 22-10169, 2024 WL 3442964 (S.D.N.Y. July 17, 2024),

*appeal dismissed* (Dec. 9, 2024) (cleaned up).  If a creditor raises an argument for the first time

after the claims bar date has passed, whether in an amended claim or in an adversary proceeding

complaint filed after the bar date, that claim is time-barred.  *See In re InterBank Funding Corp.*,

310 B.R. 238, 251 (Bankr. S.D.N.Y. 2004) (holding that creditor's new argument raised after the

bar date and not mentioned in the creditor's timely proofs of claim is time-barred); *Boyle v. PMA*

*Med. Specialists, LLC*, No. CV 16-2492, 2017 WL 3967638, at *2 (E.D. Pa. Sept. 7, 2017), *aff'd*,

754 F. App'x 93 (3d Cir. 2019) (granting motion to dismiss complaint on timeliness grounds

where creditor failed to timely file a proof of claim after having received notice of the bar date

but thereafter commenced an adversary proceeding against debtor  alleging claims which arose

before the bankruptcy filing).  It does not matter whether the creditor is trying to "circumvent the

bar date" by filing  an amended proof of claim or an adversary proceeding, *In re Drexel*

*Burnham Lambert Group Inc.*, 151 B.R. 684, 694 (Bankr.S.D.N.Y.1993)—regardless of the

mechanism, creditors are not permitted to "create an entirely new claim" after the bar date, *In re*

*Enron Corp.*, 328 B.R. 75, 86 (Bankr. S.D.N.Y. 2005).

     In *In re Asia Glob. Crossing, Ltd.*, 324 B.R. 503 (Bankr. S.D.N.Y. 2005), Judge

Bernstein dealt with a similar procedural posture: a creditor filed a timely proof of claim, then

wanted to add new claims based on facts not raised in the initial proof of claim.  *Id.* at 506.  The

creditor filed both an adversary complaint and an amended proof of claim featuring the new

claims.  *Id.* at 507.  Judge Bernstein rejected this effort, framing both the filing of the amended

proof of claim *and* the filing of the complaint as impermissible amendments to the original proof

of claim.  *Id.* at 509–10.  The Court finds Judge Bernstein's approach convincing and applies the

same legal framework to both the JOLs' untimely complaints and the Second Amended POC: the

legal standard is that applicable to late-filed amendments to timely proofs of claim.[15]

---

[15]     The First Amended POC is superseded by the Second Amended POC.  *See In re Dewey & Leboeuf LLP*,
No. 12-12321 (MG), 2014 WL 201586, at *2 (Bankr. S.D.N.Y. Jan. 16, 2014).

SVBFG's timeliness objection focuses on the Amended Complaint as well as the Second Amended POC. SVBFG requests in a footnote, however, that this Court expunge the claims in the initial Complaint for the reasons discussed in the rest of its brief (which pertain to the Second Amended POC and the Amended Complaint) and because the initial complaint was superseded by amendments. It is true that the Amended Complaint supersedes the Initial Complaint. *See In re Dewey & Leboeuf LLP*, 2014 WL 201486, at *2. But more importantly, the Initial Complaint is untimely (as is the Amended Complaint for the same reasons).

The Initial Complaint plainly does not relate back to the Initial POC, as it features claims based on facts which do not appear in the Initial POC. It does not "correct[] a defect of form in" the Initial POC, "describe[] the original claim [in the Initial POC] with greater particularity," or "plead[] a new theory of recovery *on the facts set forth*" in the Initial POC. The Initial POC only contained claims held by the JOLs (i.e., Officeholder Claims) which related to the alleged movement of Cayman deposit credits outside of the Cayman Islands. The Initial Complaint, by contrast, contains both Officeholder and Creditor Claims, all of which concern the Upstream Distribution and none of which touch on the movement of the Cayman account credits. The Amended Complaint does the same. The JOLs cannot assert claims on behalf of new claimants (the Cayman creditors) in post-bar-date filings and expect them to relate back to the Initial POC.[16] *See In re Barquet Group, Inc.*, 477 B.R. 454, 465 (Bankr. S.D.N.Y. 2012). Moreover, as they admitted at trial, the JOLs did not receive the requisite "express authorization" from the Cayman creditors to file claims on their behalf. *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 852

---

[16]    The JOLs' counterargument fails. They rely on their "genuine belie[f]" that they were operating as the Cayman creditors' agents in bringing the Creditor Claims, and state that "[i]t would have been natural to assume that the POC submitted in this matter on the basis of the Cayman Liquidation included such agency-based claims." (JOL Post-Hrg. Br. at 11.) This is not remotely credible: it is tantamount to requiring SVBFG to read the JOLs' minds at the time of their filing of the Initial POC *despite* the clear language of the Initial POC which clearly stated that the JOLs were *not* acting as any other party's agent in filing a claim.

(Bankr. S.D.N.Y. 1989) ("Only when an agent has express authorization may he file a claim on behalf of another.")  Moreover, the claims set out in both Complaints are completely different from those in the Initial POC; the Upstream Distribution has nothing to do with the FDIC's movement of credits out of Cayman deposit accounts.  Nothing in the Initial POC gave SVBFG any notice that the JOLs would bring claims which they themselves do not hold or claims unrelated to the movement of the Cayman account credits.[17]

The JOLs cannot just file a "placeholder" claim and then feel free to add any unrelated claim they like to an untimely amendment or complaint: not only does this fly in the face of existing precedent, *see Aristeia Cap., L.L.C. v. Calpine Corp. (In re Calpine Corp.)*, No. 07-cv-8493, 2007 WL 4326738, at *3, *5 (S.D.N.Y. Nov. 21, 2007) (rejecting an argument that the "catch-all language in the Original Claims and the attached Indentures put the Debtors on notice of the Conversion Right Claims" because "the Original Claims did not mention the Noteholders' conversion rights or any alleged breach of those rights"); *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2023 WL 3574203, at *10 (Bankr. S.D.N.Y. May 19, 2023) (rejecting a similar argument about the effect of "broad reservation of rights language" in original claims) but allowing the JOLs to rely on their "placeholder" would subvert all law on bar dates and timely amendments.

The JOLs have not demonstrated excusable neglect.  They do not provide an explanation for their delay in asserting Creditor Claims or claims based on the Upstream Dividend, saying

---

[17]    The JOLs' argument to the contrary—that SVBFG should not have been surprised by their assertion of claims stemming from the Upstream Distribution because claims concerning that dividend "inherently arise[]" out of SVB's failure which in turn gave rise to the Cayman liquidation and the JOLs' appointment (JOL Post-Hrg. Br. at 9) —is not convincing.  A myriad number of potential claims arise out of the collapse of a bank, not all of which share the same factual nexus; the JOLs' argument "ignores the Rule's requirement that the new claims must 'ar[ise] out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading.'"  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 594 B.R. 167, 210 (Bankr. S.D.N.Y. 2018) (citing Rule 15(c)(1)(B)).

only that they thought they had "a valid an [sic] on-file proof of debt" and SVBFG "lulled the

JOLs into a view that the placeholder and protective POC was sufficient for current purposes."

(JOL Post-Hrg. Br. at 14–15.)  As SVBFG points out in its Reply, the JOLs' belief about

whether their Initial POC was sufficient is irrelevant under the *Pioneer* test.  The JOLs do not

suggest that the reason for the delay was at all out of their control.  Therefore, the third and most

important *Pioneer* factor cuts against permitting amendments.  The length of the JOLs' delay,

and the subsequent costs imposed on SVBFG/SVBFT from defending against the JOLs' whack-

a-mole-inducing approach to asserting claims, also counsel against permitting the JOLs to amend

their Initial POC through the Complaints.  The Court need not opine on whether the JOLs acted

in bad faith, as the rest of the *Pioneer* factors cut against the JOLs.

    For these reasons, the Complaints are barred because they are untimely.

        2.  Second Amended POC

    The Second Amended POC is also barred because it is untimely, for the same reasons as

the Complaints are barred.  The Creditor Claims asserted in the Second Amended POC are

untimely, just like the ones in the Complaint and Amended Complaint.  The Company Claims

are untimely for the same reason as the Creditor Claims are—the JOLs did not purport to bring

*any* claims *not* on their own behalf in their Initial POC.  So are all their claims arising from the

Upstream Distribution.  *See supra*.  The same reasoning applies to the claims premised on

SVBFG's alleged mismanagement of SVB which caused it to fall afoul of Cayman law; such

claims have separate factual nuclei from the claims concerning the FDIC's transfer of the

Cayman account credits.  The only claims in the Second Amended POC that would conceivably

survive would be Officeholder Claims concerning the transfer of the Cayman account credits, but

both sides agree that the JOLs do not assert such claims, as the only Officeholder Claims in the

Second Amended POC concern the Upstream Distribution.  In other words, the only claims

conceivably related to the FDIC's transfer of the account credits are the negligence claims,

which are either Creditor Claims or Company Claims, but are not Officeholder Claims; since the

JOLs did not assert Creditor Claims or Company Claims in their Initial POC, these claims are

barred.  As for excusable neglect, the *Pioneer* factor analysis remains the same as above.

      The Second Amended POC, then, is barred because it is untimely.

      Does the Initial POC itself survive?  No.  In it, the JOLs asserted unspecified

Officeholder Claims against SVBFG which might arise from the transfer of the Cayman account

credits.  The JOLs did not, in the years following that filing, elaborate on such a theory of

liability in subsequent papers and indeed entirely drop this theory from every recent filing,

including all briefing on standing which took place in this adversary proceeding on all the claims

in the Second Amended POC and the Amended Complaint.  The JOLs had numerous

opportunities to assert this claim (or rather, to assert a more specific claim within the contours of

the vague theory of liability set out in the Initial POC) in multiple rounds of subsequent briefing,

amendments, and re-amendments, but chose not to.  They thereby abandoned the sole

identifiable claim or bucket of claims set out in the Initial POC—Officeholder Claims "arising

out of or related to the transfer of the Cayman Deposits."  *See Sjunde AP-Fonden v. Gen. Elec.

Co.*, 722 F. Supp. 3d 347, 351 n.1 (S.D.N.Y. 2024) (deeming argument abandoned where not

addressed in reply brief); *Doe v. Indyke*, 465 F. Supp. 3d 452, 467 (S.D.N.Y. 2020) ("Defendants

do not respond to this argument in reply, and the Court deems them to have abandoned the

argument."); *Zambito v. United States*, No. 18-CV-3612(SIL), 2025 WL 1652145, at *2

(E.D.N.Y. June 11, 2025) (similar); *Rice v. NBCUniversal Media, LLC*, No. 19-CV-447 (JMF),

2019 WL 3752491, at *1 (S.D.N.Y. Aug. 8, 2019) ("[A]fter seeking and being granted leave to file a reply . . . [movant] dropped the argument altogether – thereby abandoning it.").[18]

For the sake of completeness, the Court addresses the standing arguments concerning the Amended Complaint and Second Amended POC below.  Even if the Second Amended POC and the Amended Complaint were timely, the JOLs would lose on standing grounds.

### B.  Chapter 15 Does Not Apply; Section 1509 Does Not Bar JOLs' Claims

Before moving on to the Cayman law issues, the Court briefly addresses SVBFG's argument that section 1509 of the Code deprives the JOLs of standing of all but the Company Claims, since the JOLs are foreign representatives seeking judicial assistance and so needed to gain recognition of the Cayman liquidation in order to gain "the capacity to sue . . . in a court in the United States."  (SVBFG Br. at 12–13.)  This Court previously denied recognition to the Cayman liquidation because SVB Cayman is a branch of a U.S. bank and so does not qualify as a debtor according to section 109(b), and it therefore was excluded from eligibility under chapter

---

[18]    Even if the JOLs had not abandoned the claim in their Initial POC, the Court finds that the JOLs would not have standing to bring that claim (as best as it can be discerned from the broad language in the Initial POC).  To support their theory of standing, the JOLs claimed that the issuance of the Winding-Up Order in the Caymans "created a separate estate and trust on behalf of SVB Cayman and its creditors, and authorized the JOLs to pursue claims on their behalf."  (ECF Doc. # 1218, case no. 23-10367, at 2–3.)  As explained herein, the JOLs did not show that they have standing under Cayman law to bring claims on behalf of the Cayman creditors.  Moreover, the District Court for the Southern District of New York roundly rejected the JOLs' argument that the Winding-Up Order created a "separate estate and trust," calling the theory an "extraordinary proposition" unsupported by caselaw or expert testimony and "faulty."  *In re Silicon Valley Bank (Cayman Islands Branch)*, 2025 WL 448403, at *4; *see supra*.  And even assuming *arguendo* that the Winding-Up Order did create a "separate estate and trust on behalf of SVB Cayman," as the District Court explained, "the creation of an insolvency trust does not give that trust new or different property rights from those originally held by the branch [of the larger bank, SVB], nor does it change the nature of SVB Cayman as a branch of SVB.  Instead, the JOLs are, at most, stepping into the shoes of SVB Cayman, which remains a bank branch without a separate legal existence or rights from SVB."  *Id.* at *5.  In other words, rights belonging to such a "trust" would be properly characterized as Company Claims.  As discussed further *infra*, FIRREA bars the JOLs from asserting Company Claims as the Succession Clause placed those claims squarely within the FDIC's hands.  Additionally, and as also discussed further *infra*, FIRREA bars the JOLs from bringing Officeholder Claims which would "restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver."  The Officeholder Claim vaguely outlined in the Initial POC directly targets the actions the FDIC took as a receiver and thus would be barred by FIRREA.  The JOLs therefore have not shown that they would have standing under Cayman or U.S. law to bring an Officeholder Claim based on the FDIC's transfer of Cayman account credits.

15 as well, pursuant to section 1501(c).  *See In re Silicon Valley Bank (Cayman Islands Branch)*,

2025 WL 448403, at *4 (affirming this Court's decision to deny JOLs' chapter 15 petition

because SVB Cayman is the same legal entity as SVB, which is "a domestic bank insured by the

FDIC" and hence "excluded from eligibility to be a debtor under § 109(b) and therefore from

eligibility under Chapter 15" because section 109(b) applies to chapter 15).  SVBFG argues that

chapter 15 is "intended to be the exclusive door to ancillary assistance to foreign proceedings,"

and cites to several opinions in which U.S. courts declined to allow a foreign representative to

bring suit in the U.S. in the absence of recognition under chapter 15 of the relevant foreign

proceeding.  (SVBFG Br. at 12.)

      If chapter 15 is inapplicable because of the nature of the entity involved (a bank), section

1509 and its limitations should also be inapplicable.  *See In re Bozel S.A.*, 434 B.R. 86, 94–95

(Bankr. S.D.N.Y. 2010) (permitting liquidator of foreign company to sue in the U.S. despite

liquidator's failing to apply for chapter 15 recognition of foreign liquidation because chapter 15

did not apply under the circumstances; "Chapter 15 is not applicable because no foreign

proceeding involving the Debtor has been commenced, and no foreign representative of the

Debtor is seeking for ancillary relief before this Court . . . .  [T]he Court finds that Chapter 15 is

not applicable, and as the sole shareholder of the Debtor, the Liquidator has standing to pursue

the Adversary Proceeding."); *Bartlett v. Société Générale de Banque au Liban SAL*, No. 19-CV-

00007, 2021 WL 3706909, at *3–4 (E.D.N.Y. Aug. 6, 2021) (overruled on other grounds)

(concluding that Chapter 15 applied "only in limited circumstances" and therefore, the lack of a

Chapter 15 petition did not preclude a representative of a foreign bank from intervening in

pending litigation); *Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31 (2d Cir. 2017) (holding that

chapter 15 did not apply to proceeding when it did not fit within the categories enumerated in

section 1501(b) of the Code).

Sections 1501(b)–(c) of the Code read:

(b) This chapter applies where—
(1) assistance is sought in the United States by a foreign court or a foreign representative in connection with a foreign proceeding;
(2) assistance is sought in a foreign country in connection with a case under this title;
(3) a foreign proceeding and a case under this title with respect to the same debtor are pending concurrently; or
(4) creditors or other interested persons in a foreign country have an interest in requesting the commencement of, or participating in a case or proceeding under this title.
(c) This chapter does not apply to--
(1) a proceeding concerning an entity, other than a foreign insurance company, identified by exclusion in section 109(b);
(2) an individual, or to an individual and such individual's spouse, who have debts within the limits specified in section 109(e) and who are citizens of the United States or aliens lawfully admitted for permanent residence in the United States; or
(3) an entity subject to a proceeding under the Securities Investor Protection Act of 1970, a stockbroker subject to subchapter III of chapter 7 of this title, or a commodity broker subject to subchapter IV of chapter 7 of this title.

11 U.S.C. §§ 1501(b) – (c).

As this Court explained in the Chapter 15 Opinion, banks are excluded from the

definition of "debtor" in section 109(b).  The text of section 1501(c)(1) does not limit section

109(b)'s applicability *solely* to the question of *recognition* under chapter 15; rather, section

1501(c) concerns the applicability of the *entirety* of chapter 15 to various circumstances, and

states that *nothing* in chapter 15 of the Code applies to entities identified under section 109(b)

(save for foreign insurance companies).  While the Court has not been able to find precedent

applying section 1501(c) to a case similar to this one on the facts, the best read of the statute is

that chapter 15 does not apply when the insolvent entity is a bank.[19]

Section 1509 itself does not bar the JOLs from bringing all but the Company Claims.

However, the JOLs still lack standing to bring the rest of their claims.  The Court looks to

Cayman law and FIRREA to analyze the JOLs' standing.  *See In re Hellas Telecommunications*

---

[19]    This does *not* mean that comity should not be granted in non-chapter 15 cases dealing with foreign insolvency proceedings.  Chapter 15 creates a streamlined mechanism *in certain cases* for foreign representatives to gain standing in U.S. courts, for U.S. courts to grant comity, and generally "for dealing with cases of cross-border insolvency."  11 U.S.C. 1501(a).  Those cases are identified in section 1501(b).  However, the caselaw indicates that where the conditions of section 1501(b) are *not* met – i.e., *when chapter 15 does not apply* – courts *can* still grant comity.  For example, if the party seeking judicial assistance is *not* a foreign representative, the conditions of section 1501(b) are not met, and yet courts have granted comity in such cases.  *See Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 30-31 (2d Cir. 2017) (holding that "the requirements of Chapter 15 [did] not apply" because no party was "seeking the assistance of the district court in enforcing or administering a foreign liquidation proceeding"); *Bartlett v. Société Générale de Banque au Liban SAL*, No. 19-CV-00007 (CBA) (TAM), 2021 WL 3706909, at \*3–4 (E.D.N.Y. Aug. 4, 2021) (examining whether chapter 15, which "applies only in limited circumstances," applied by determining first whether the case fit under section 1501(b); "The strictures of Chapter 15 are inapplicable here because [movant's] motion cannot be fairly characterized as an attempt to enforce or administer a foreign liquidation proceeding."); *Tiber Creek Partners, LLC v. Ellume USA LLC*, No. 23-1882, 2025 WL 1950071, at \*5 (4th Cir. July 16, 2025) (Chapter 15 "does not apply here, where the defendants are not foreign representatives and do not seek relief available under Chapter 15 . . . . [Plaintiff] cites no authority that would require formal recognition of foreign proceedings before a court can consider them as a relevant factor in the *forum non conveniens* analysis."); *Moyal v. Munsterland Gruppe GmbH & Co. KG*, 539 F. Supp. 3d 305, 309 n.1 (S.D.N.Y. 2021) ("Plaintiff's suggestion that the insolvency trustee appointed under German law should have commenced a proceeding in U.S. bankruptcy court under Chapter 15 of the Bankruptcy Code to seek a stay of this action in the District Court is absurd and would fly in the face of comity principles."); 8 COLLIER ON BANKRUPTCY ¶ 1509.02 (16th ed. 2021) ("[C]ourts regularly rule that chapter 15 recognition is not a prerequisite to grant comity to foreign proceedings on the request of a party other than a foreign representative.")

By contrast, when the requirements of section 1501(b) *are* met, the strictures of chapter 15 do apply, and foreign representatives are first required to apply for recognition.  *See United States v. J.A. Jones Constr. Grp., LLC*, 333 B.R. 637, 638-39 (E.D.N.Y. 2005) (declining to grant an indefinite "stay of this action in accordance with Canadian bankruptcy law" where movant had not commenced a Chapter 15 proceeding); *Orchard Enter. NY, Inc. v. Megabop Records Ltd.*, No. 09-CIV-9607, 2011 WL 832881, at \*2-3 (S.D.N.Y. Mar. 4, 2011) (same, where movant sought stay pursuant to English law); *Rsrv. Int'l Liquidity Fund, Ltd. v. Caxton Int'l Ltd.*, No. 09 CIV. 9021 (PGG), 2010 WL 1779282, at \*5 (S.D.N.Y. Apr. 29, 2010) (where foreign representatives seek stay from U.S. court in connection with foreign liquidation, foreign representatives must first obtain recognition of foreign proceeding under chapter 15).  While the Court has not found precedent applying section 1501(c) to determine that chapter 15 as a whole, and its strictures and procedural requirements, does not apply, the plain text of the statute states that chapter 15 is entirely inapplicable in certain circumstances.

Simply put, section 1501 tells us when chapter 15 applies and when it does not; when it applies (section 1501(b)), its rigors must be strictly followed, but when it does not (section 1501(c)), that does *not* mean courts *cannot* grant comity.  *See also* 8 COLLIER ON BANKRUPTCY P 1501.04 (16th 2025) ("The mere fact that a case in a United States court is related to a foreign proceeding does not implicate a need for a chapter 15 case if none of the above four circumstances [in section 1501(b)] exist.").

*(Luxembourg) II SCA*, 535 B.R. 543, 582 (Bankr. S.D.N.Y. 2015) (assessing foreign liquidators'

standing to bring foreign law claim under that foreign law).

### C.  JOLs Lack Standing

The animating principle here is that this Court will *not* create foreign law or push it

beyond its extant boundaries.  This Court's precedent and *In re Nortel Networks, Inc.*, 469 B.R.

478 (Bankr. D. Del. 2012) both hold that "it is not the role of the [U.S.] Court to extend [foreign]

law where [foreign] statutes and case law have not done so."  *In re Lyondell Chem. Co.*, 567 B.R.

55, 126–27 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018).

Many of the JOLs' arguments fail simply because they were not able to point to specific

Cayman or English law for support, and they instead ask this Court to read the tea leaves of

Justice Doyle's orders and a smattering of secondary source material and nonbinding (Scottish)

caselaw.  The Court will not follow the JOLs down this rabbit hole in the absence of relevant

precedent or statutory law applicable in the Cayman Islands.

### 1.  Creditor Claims: JOLs Failed to Prove Standing under Cayman Law

The JOLs and Dr. Mokal advance a hodgepodge of different, and shifting, arguments in

support of their agency theory.  All fail.  The following analysis assumes *arguendo* that

liquidators and creditors can enter into agency relationships so long as the liquidators' duties *qua*

agents do not conflict with their duties *qua* liquidators, as the JOLs assert; even assuming

without deciding that this can work under Cayman law, the JOLs lose.

Their first argument is that the Cayman court in issuing Sanction Orders permitting the

JOLs to bring complaints in the U.S. which contained creditor claims recognized an agency

relationship between the JOLs and the Cayman Creditors.  This is too grand a claim, for several

reasons.  First, it is clear that both experts agree that an order of the Cayman court—any order—

*cannot* create an agency relationship between the JOLs and the Cayman creditors. As explained

by the experts in their reports and at trial, Sanction Orders can be used to give JOLs additional

statutorily-specified powers *as liquidators*, but they cannot expand their powers beyond those of

liquidators. The most the JOLs can say the Sanction Orders do, therefore, is indicate that

Cayman law permits JOLs to act as creditors' agents. This is still a stretch. Both experts agreed

that in considering a motion for a Sanction Order, Cayman judges would simply assess whether

the proposed claims had any leg to stand on and whether bringing such claims would benefit the

Cayman estate. At *most*, this means that the Cayman Court 1) recognized that the JOLs were

trying to bring Creditor Claims as the Cayman creditors' agents, and 2) found the assertion of an

agency relationship at least somewhat credible. But even this analysis reads too much into the

Sanction Orders. There is no indication in any of the Sanction Orders that Justice Doyle

separately assessed the viability of each claim in every filing he was asked to bless. Since, per

mutual expert testimony, the only power a Cayman court has in issuing a sanction order is

granting statutorily-specified powers to Cayman liquidators *qua* liquidators, and since there is

nothing in any of the Sanction Orders discussing the Creditor Claims or otherwise indicating that

Justice Doyle assessed the assertion of an agency relationship, another entirely valid read of the

Sanction Orders is merely that Justice Doyle granted the JOLs more statutory powers *as*

*liquidators* upon finding that claims the JOLs sought to assert *as liquidators* had a reasonable

likelihood of success and allowing them to pursue those claims pursuant to their statutory

authority with a sanction order. In other words, the Sanction Orders can be read to say *nothing*

*at all* about the Creditor Claims. The JOLs cannot rely on them as proof of either the existence

of an agency relationship or of the validity of a liquidator-creditor agency relationship under

Cayman law.

Next, there is no evidence that the JOLs established an agency relationship *ex ante* with the Cayman creditors by interacting with the Cayman liquidation committee or by filing papers in the FDIC proceeding.  Dr. Mokal established that silence cannot provide the basis for *ex ante* consent to an agency relationship under Cayman law, and the JOLs do not advance any evidence of express consent to an agency relationship, so the JOLs (per their own expert) had to show "conduct of both the purported principal (here, the relevant creditors) and the purported agent (here, the liquidator) which is only consistent with the conferral of authority by the principal upon the agent to do the relevant acts on the principal's behalf, and inconsistent with any other intended relationship between the parties."  (RM2 ¶ 94.2 (emphasis in original).)  "Put another way, it must be fatal to the implication of an agency relationship if the parties would have or might have acted as they did in the absence of such a relationship."  (*Id.* (emphasis added).)  The JOLs presented no such evidence.[20]

They point to the interactions they had with the creditors' committee in the Cayman liquidation proceeding as evidence of an *ex ante* agency relationship.  But, per Dr. Mokal's testimony at trial, it is the job of the JOLs *as liquidators* to interact with the committee and provide them with documents concerning the liquidation, so the mere existence of communications between them cannot support a finding of agency.[21]  There is simply no evidence in the record concerning the nature of the communications (*i.e.*, whether an agency relationship was discussed and approved by the committee), of affirmative conduct on the part of the committee or any of the creditors to create or approve an agency relationship, or even of

---

[20]    The same rationale applies to the creditors' committee going to the Cayman court seeking a winding-up order, a fact which Dr. Mokal seems to rely on for his assertion of *ex ante* creation of an agency relationship; the creditors' committee would have done this anyway, without there being an agency relationship between itself and the JOLs.

[21]    *See* Day 2 Tr. at 62:3–63:6 (testimony of Dr. Mokal on redirect).

whether the committee can, under Cayman law, create an agency relationship between each of the Cayman creditors and the JOLs, to support a finding of agency.  In other words, the creditors on the committee and the liquidators "would have or might have acted as they did in the absence" of an agency relationship, which is "fatal to the implication of an agency relationship."

They also point to their filing a claim in the FDIC receivership which challenged the Cayman creditors' status as accountholders and not depositors.  But the unilateral action of the JOLs cannot create an agency relationship under Cayman law, per Dr. Mokal's testimony—the JOLs must be able to point to "conduct of *both* the purported principal . . . *and* the purported agent."  And there is no evidence in the record that any creditor agreed *ex ante* to the JOLs' filing such a claim, or that any creditor even knew the JOLs took this action.

The JOLs' argument for the creation of an agency relationship *ex post* also fails.  The JOLs distributed notices to Cayman creditors which read: "In order to avoid any doubt as to the appointment of the JOLs as your agents in this regard and to have the same ratified, unless you complete and return the form below 'opting out', it will be taken that you acknowledge and confirm that the Order dated 30 June 2023 [the Winding-Up Order] appointed the JOLs as your agents for the purposes of recovering and distributing your deposits, asserting and conducting any relevant legal or insolvency claims concerning the same deposits, and representing your interests in all relevant matters related to the winding-up of SVB Cayman and Silicon Valley Bank."  (ECF Doc. # 25 Ex. 17 (emphasis added).)  The JOLs did not introduce any evidence to show that the Cayman creditors (apart from the three who opted out) who received this emailed notice actually read it, could understand it despite its being in English as the creditors were Chinese, and could reasonably be assumed to have relied on it.  (And as the purpose of this hearing was to establish standing, this trial was the appropriate time to introduce such evidence,

not later, as counsel for the JOLs suggested.)  But even if the JOLs could have been able to

provide such evidence, the notice is patently misleading; both experts testified that this is a

misstatement of Cayman law as the Winding-Up Order *could not* appoint the JOLs as the

creditors' agents, so the notice entirely misrepresented the basis on which there might have been

an agency relationship between the Cayman creditors and the JOLs.  Dr. Mokal suggests that

there still could have been an agency relationship even premised on a mutual misunderstanding

of the law or circumstances governing or creating the relationship.  Even assuming this is the

case, Mr. Said's unrebutted testimony established that a court must rely on clear adoptive acts on

the part of the principal and unequivocal conduct to find *ex post* ratification of an agency

relationship.  There is no such evidence, indeed no evidence whatsoever concerning the vast

majority of the creditors' knowledge or understanding of the notice or of any assertion by the

JOLs that they are the creditors' agents.  This Court will not go out on such a thin limb to find an

agency relationship, especially when no Cayman or English court has *ever* found a liquidator to

be acting as a creditor's agent, by the mutual admission of both experts.

Significant time was spent at trial on the question of whether the BTCA gives rise to a

private right of action.  If it does, it is a Creditor Claim and thus the JOLs have no standing to

bring it here.  The Court notes that no court or authority (in the Cayman Islands or elsewhere)

has previously found that the BTCA contains a private right of action, and it is not this Court's

role to go where no Cayman court has gone before; furthermore, it is clear that the text of the

BTCA itself does not give rise to such a right.

The Court finds that the JOLs did not bear their burden of proof in establishing that they

have standing under Cayman law to bring claims on behalf of the Cayman creditors.  But even if

they were the creditors' agents, FIRREA bars the Creditor Claims.  *See infra.*

2.   Creditor and Company Claims: Creditors Lack Standing Due To FIRREA

The JOLs spent no time discussing their standing to bring Company Claims at trial, but

this Court will not assume waiver in the interest of completeness.  The Company Claims are

barred by FIRREA, as are the Creditor Claims.

Both SVBFG and the FDIC[22] argue that FIRREA bars all of the JOLs' claims,

specifically 12 U.S.C. § 1821(d)(2)(A)(i) (the Succession Clause), which reads as follows: "The

Corporation [FDIC] shall, as conservator or receiver, and by operation of law, succeed to—(i) all

rights, titles, powers, and privileges of the insured depository institution, and of any stockholder,

member, accountholder, depositor, officer, or director of such institution with respect to the

institution and the assets of the institution."[23]  (Emphasis added.)  Section 1821(d)(2)(A)(i) gives

the FDIC the *exclusive* right to bring actions which fall into these categories, so if the JOLs'

claims fall into the categories outlined in section 1821(d)(2)(A), they do not have standing to

bring the claims as the FDIC has exclusive standing.  While courts broadly agree that the FDIC

succeeds to all claims held by "the insured depository institution" (here, SVB), there is a circuit

split over the interpretation of the second clause—*i.e.*, over whether FIRREA only transfers to

---

[22]      The FDIC suggests in its brief that the JOLs' standing in light of FIRREA is a question of Article III standing, and hence necessarily governed by federal law (so the JOLs cannot rely on foreign law to claim standing).  However, arguments concerning FIRREA's applicability have more to do with prudential standing, which doctrine bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves.  *See supra*; *see also Am. W. Bank Members v. Utah*, No. 2:16-CV-326, 2023 WL 4108352, at *4 n.3 (D. Utah June 21, 2023), *aff'd*, No. 23-4091, 2024 WL 3812451 (10th Cir. Aug. 14, 2024) (noting that an argument over FIRREA's Succession Clause "does not concern this court's Article III standing," but instead concerns prudential standing).  At least some courts in this Circuit, including the Second Circuit in a nonprecedential summary order, have held that prudential standing is jurisdictional and hence a threshold issue.  *See In re Sofer*, 613 F. App'x 92 (2d Cir. 2015) (summary order) ("Prudential standing remains a jurisdictional requirement in our Circuit."); *Phoenix Light SF Ltd. v. Bank of New York Mellon*, No. 14-CV-10104 (VEC), 2020 WL 2950799, at *1 n.3 (S.D.N.Y. June 3, 2020) ("In this Circuit, prudential standing remains a non-waivable, jurisdictional requirement."); *Sjunde AP-Fonden v. DePaolo*, 771 F. Supp. 3d 182, 186 (E.D.N.Y. 2025) (similar); *but see In re Magnesium Corp. of Am.*, 583 B.R. 637, 647 (Bankr. S.D.N.Y. 2018) ("The Supreme Court recently clarified that prudential standing (also known as statutory standing) is not really standing in a jurisdictional sense.")  Regardless, at least in bankruptcy court, movants must prove that they have prudential standing as a threshold matter.  *See supra*.  Therefore, if FIRREA bars the JOLs' claims (as it does), that is the end of the discussion – questions of comity become irrelevant because this Court simply would lack subject matter jurisdiction over the claims.

[23]      The FDIC considers the Cayman creditors to be "accountholders," not "depositors."  (FDIC Brief at 3 n.1.)

the FDIC *derivative* actions held by stockholders/accountholders/depositors/etc. which actually

belong to the bank, or whether the FDIC also has the exclusive right to bring *direct* actions held

by stockholders/members/accountholders/etc.  *See infra* for a discussion of the circuit split; *see*

*also In re SVB Fin. Grp*., 662 B.R. 53, 68 (Bankr. S.D.N.Y. 2024) ("By operation of 12 U.S.C. §

1821(d)(2)(A)(i), the FDIC-R1 has succeeded to 'all rights, titles, powers and privileges of

[SVB], and of any stockholder, member, accountholder, depositor, officer or director of [SVB]

with respect to the institution and the assets of the institution' . . . .  Accordingly, the FDIC-R1

stands in the shoes of SVB and has the authority to bring claims against the Debtor."); *Fed.*

*Deposit Ins. Corp. v. U.S. Titles, Inc*., 939 F. Supp. 2d 30, 33 (D.D.C. 2013) ("Upon

appointment, the FDIC succeeded to all claims held by" the bank put in receivership.); *Am. Nat.*

*Ins. Co. v. JPMorgan Chase & Co*., 893 F. Supp. 2d 218, 228 (D.D.C. 2012) ("[T]he FDIC–

Receiver controls all claims that a failed bank might have against others."); *Levin v. Miller*, No.

1:11-CV-1264-SEB-TAB, 2012 WL 1982287, at *3 (S.D. Ind. June 1, 2012) ("[I]f some or all of

Plaintiff's claims fall within the scope of FIRREA, Plaintiff lacks standing to bring those

claims.") (internal citation omitted).  However, all circuits are unanimous in holding that the

FDIC succeeds to all derivative claims.  *See infra*.

### d.  Applicability of FIRREA

Before addressing which claims the Succession Clause covers, it is necessary to address

the JOLs' objection to FIRREA's applicability.  To the extent the JOLs argue that FIRREA does

not apply extraterritorially (an argument which is not clearly in its papers but which the FDIC

addresses), the FDIC responds by arguing that there is no extraterritorial application of FIRREA

here, merely a domestic one, because the conduct relevant to FIRREA's focus occurred entirely

within the borders of the U.S.—specifically, the Upstream Distribution and all decisions

concerning the management of SVB, including SVBFG's allegedly faulty oversight of SVB

Cayman and "withdrawal of credits" from Cayman accounts.  (FDIC Brief at 19–22.)

The FDIC's analysis is correct.  The Supreme Court "has established a two-step

framework for deciding questions of extraterritoriality."  *WesternGeco LLC. v. ION Geophysical*

*Corp.*, 585 U.S. 407, 413 (2018). "The first step asks 'whether the presumption against

extraterritoriality has been rebutted.'"  *Id*. (internal citation omitted). "It can be rebutted only if

the text provides a 'clear indication of an extraterritorial application.'"  *Id*. (internal citation

omitted).  "If the presumption against extraterritoriality has not been rebutted, the second step . .

. asks 'whether the case involves a domestic application of the statute,'" an inquiry which

requires "looking to the statute's 'focus'" and determining "whether the conduct relevant to that

focus occurred in United States territory."  *Id.* (internal citations omitted).  If the case involves

*only* a domestic application of the statute, there is no need to run through this entire legal test.

*See id.* at 413 ("We resolve this case at step two.  While 'it will usually be preferable' to begin

with step one, courts have the discretion to begin at step two "in appropriate cases' . . . .  One

reason to exercise that discretion is if addressing step one would require resolving 'difficult

questions' that do not change 'the outcome of the case,' but could have far-reaching effects in

future cases.") (internal citations omitted).  The focus of a statute is "the objec[t] of [its]

solicitude," which can include the conduct it "seeks to 'regulate,'" as well as the parties and

interests it "seeks to 'protec[t]'" or vindicate.  *Id.* at 414 (internal citations omitted).  "If the

conduct relevant to the statute's focus occurred in the United States, then the case involves a

permissible domestic application" of the statute, "even if other conduct occurred abroad."  *Id.*

(internal citation omitted).

The FDIC provides a succinct, and correct, summary of FIRREA's focus in its brief: FIRREA's purposes include "strengthening the powers of the FDIC as receiver" and enabling the FDIC to "preserve and conserve the failed bank's assets and property, liquidate those assets where appropriate, and pay all valid obligations of the failed bank"—hence, the focus of FIRREA, including the Succession Clause which enables this outcome, is "the regulation of conduct relating to an insured bank and strengthening the powers of FDIC, as receiver, to preserve the deposit insurance fund and strengthen the country's financial system," including by pursuing the failed bank's claims as set out in the Succession Clause. (FDIC Br. at 20–21.) The activity underlying the claims at hand all occurred in the U.S.; as best as the Court can ascertain, SVB transferred the relevant $294 million from its California account to SVBFG's accounts, and SVBFG's alleged mismanagement of SVB occurred in New York and California. (FDIC Brief at 21–22.) SVB Cayman was nothing more than a mail-drop presence in the Caymans with no employees, and the JOLs do not allege otherwise. Because no extraterritorial activity occurred, there is no extraterritorial application of FIRREA here.

> e. *Succession Clause Applies to Both Direct and Derivative Claims, Bars Creditor and Company Claims*

The FDIC and SVBFG both argue that FIRREA, specifically the Succession Clause, bars the Company and Creditor Claims.[24] The plain text of the Succession Clause clearly covers Company Claims and bars the JOLs from bringing them. The Company Claims are clearly a "right . . . of the insured depository institution" and so the FDIC succeeds to them regardless of whether the Court applies the direct/derivative distinction. *See O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994) (finding that the Succession Clause places "the FDIC in the shoes of the

---

[24]    No party argues that the Succession Clause bars the Officeholder Claims. As discussed *infra*, SVBFG argues that section 1821(j) of FIRREA bars the Officeholder Claims.

insolvent [depository institution], to work out its claims under state law"); *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 52 (Bankr. S.D.N.Y. 2007) ("[Section] 1821(d)(2)(A)(i) simply gave the FDIC ownership of the claim [of the failed institution]."); *see also supra*.

The JOLs therefore do not have standing to bring the Company Claims.

Whether the Succession Clause bars the JOLs from bringing Creditor Claims depends on its scope: if it only covers *derivative* claims, it does *not* bar the Creditor Claims, but this read of the statute is contested—and, for reasons discussed below, incorrect.

The Court has not found, nor have the parties identified, any binding Second Circuit or SDNY precedent concerning the scope of the Succession Clause (the only on-point SDNY decision is unpublished).[25]  *See also Verdi v. Fed. Deposit Ins. Corp.*, No. 24 CIV. 791 (DEH) (RFT), 2024 WL 4252038, at *3 (S.D.N.Y. Sept. 20, 2024) ("The parties do not identify, and the Court has not found in its research, any binding authority in the Second Circuit on the scope of the Succession Clause as relevant here.").  There is a circuit split whether the Succession Clause deprives stockholders/accountholders/depositors of standing to assert only *derivative* claims on behalf of the bank in receivership; or whether the Succession Clause applies more broadly to deprive claimants of standing, irrespective of the direct/derivative distinction, if (1) the claimant asserts the rights of any "stockholder, member, accountholder, depositor, officer, or director" of the bank, and (2) the rights asserted "relate to or concern the assets of the bank."  "The majority

---

[25]       The one Second Circuit case the JOLs cite in their brief, *Adato v. Kagan*, 599 F.2d 1111 (2d Cir. 1979), is unhelpful.  First, this case dates to 1979, while FIRREA was only passed in 1989.  At least as of 1976, 12 U.S.C. § 1821(d) had significantly different text than it does today; in relevant part, it read: "Notwithstanding any other provision of law, it shall be the duty of the [FDIC] . . . to realize upon the assets of such closed bank . . . to wind up the affairs of such closed bank . . . .  With respect to any such closed bank, the Corporation as such receiver shall have all the rights, powers, and privileges now possessed by or hereafter granted by law to a receiver of a national bank or District bank . . . ."  *See* 12 U.S.C. §§ 1811–1832 (1976).  It said nothing about rights held by shareholders, accountholders, or depositors.  The key question in this case is whether the FDIC succeeds to certain rights of the shareholders/accountholders/depositors.  *Adato* says nothing to that effect—nor could it, as the statute at that point contained no relevant language.  *Adato* is discussed further *infra*.

of cases considering this question have held or assumed that the Succession Clause applies only

to derivative claims, but the most recent decisions have not.  Specifically, the Fourth, Seventh,

and Eleventh Circuits have held that the Succession Clause applies only to derivative claims, and

not to direct claims.  The Ninth and Tenth Circuits have similarly employed the direct-derivative

distinction to evaluate whether the FDIC has succeeded to certain claims; while these cases do

not expressly hold that the Succession Clause applies only to derivative claims, they can be fairly

read as assuming that the Succession Clause is limited in that manner." *Verdi*, 2024 WL

4252038, at *3.

　　　The cases holding that the Succession Clause only bars derivative claims rely on reading

the reference to claims of "any stockholder [or accountholder or depositor] . . . with respect to . .

. the assets of the institution" as a reference solely to derivative claims.  *See, e.g.*, *Levin v. Miller*,

763 F.3d 667, 672 (7th Cir. 2014) ("Section 1821(d)(2)(A)(i) transfers to the FDIC only

stockholders' claims 'with respect to . . . the assets of the institution'—in other words, those that

investors (but for § 1821(d)(2)(A)(i)) would pursue derivatively on behalf of the failed bank.

This is why we have read § 1821(d)(2)(A)(i) as allocating claims between the FDIC and the

failed bank's shareholders rather than transferring to the FDIC every investor's claims of every

description."); *see also Lubin v. Skow*, 382 F. App'x 866, 871 (11th Cir. 2010) ("Because the

FDIC succeeded to all of the Bank's legal rights under FIRREA, only the FDIC can sue Bank

officers for this alleged breach of fiduciary duty to the Bank.  The Trustee therefore lacks

standing to bring a derivative suit against the Bank's officers.  However, if the Trustee can

establish a direct harm to the Holding Company caused by the Bank officers, that harm would be

separate from the derivative harm.  If the Trustee were seeking to enforce such a claim, FIRREA

would not be a bar to standing."); *FDIC v. Jenkins*, 888 F.2d 1537, 1545 (11th Cir.1989)

(holding that FIRREA does not prohibit shareholders from "proceeding against solvent third-parties in non-derivative shareholder suits"); *Pareto v. FDIC*, 139 F.3d 696, 700 (9th Cir. 1998) ("Plainly, the section vests all rights and powers of a stockholder of the bank to bring a derivative action in the FDIC."); *Barnes v. Harris*, 783 F.3d 1185, 1193 (10th Cir. 2015) (holding that if a shareholder's claims are "based on harm derivative of injuries to the Bank," then they are covered by the Succession Clause).[26]  As the District Court for the Southern District of New York pointed out in *Verdi*, the only circuit court thus far to give a textual analysis in support of its holding that the Succession Clause only bars derivative claims is the Seventh Circuit in *Levin*.  *Verdi*, 2024 WL 4252038, at *4.  The entirety of *Levin*'s reasoning is quoted above; in short, the Seventh Circuit held that the language "with respect to . . . the assets of the institution" (in receivership) ties the language of those stockholders' claims which are transferred by the Succession Clause to "an injury to the failed bank," and hence concerns *derivative*, not direct, claims.  *Levin*, 763 F.3d at 672.  The other circuit court cases which agree with *Levin* in the holding do not assess the text of the Succession Clause.  *See supra*.

However, the First Circuit recently issued a decision holding that the direct/derivative distinction is inapplicable to the Succession Clause.  It noted that "direct-derivative distinction appears nowhere in the language of § 1821(d)(2)(A).  Courts must avoid reading into statutes concepts or exceptions absent from the text, so we cannot assume, without a textual basis, that Congress intended to place such a limitation on the FDIC's power."  *Zucker v. Rodriguez*, 919 F.3d 649, 657 (1st Cir. 2019).  It disagreed with the Seventh Circuit's holding in *Levin* that the phrase "rights . . . with respect to . . . the assets of the institution" referred only to derivative

---

[26]    As the EDNY recently pointed out, the "Ninth and Tenth Circuits have taken a softer stance in also holding that the Succession Clause applies to shareholders' derivative claims, without foreclosing its possible application to direct claims."  *Sjunde AP-Fonden v. DePaolo*, 771 F. Supp. 3d 182, 186–87 (E.D.N.Y. 2025) (citing *Pareto v. F.D.I.C.*, 139 F.3d 696, 700 (9th Cir. 1998); *Barnes v. Harris*, 783 F.3d 1185, 1193 (10th Cir. 2015)).

claims, writing that "those concepts are not self-evidently synonymous." *Id.* Instead, the First

Circuit established a two-step test for determining whether a claim is covered by the Succession

Clause: first, the court looked to whether the claim was brought by the plaintiff in its capacity as

a stockholder/accountholder/depositor/etc. *Id.* at 656. Next, the court determined whether the

stockholder-plaintiff's claim was "with respect to the institution and the assets of the

institution"—i.e., whether it "relate[d] to or concern[ed] the assets of the Bank." *Id.*; *see also*

*Verdi*, 2024 WL 4252038, at *4 (articulating the two-step test outlined in *Zucker*); *Am. W. Bank*

*Members v. Utah*, No. 2:16-CV-326, 2023 WL 4108352, at *5–6 (D. Utah June 21, 2023), *aff'd*,

No. 23-4091, 2024 WL 3812451 (10th Cir. Aug. 14, 2024) (same). The First Circuit therefore

held that a claim brought by a stockholder which was "based on the [relevant] Bank's failure"

was transferred to the FDIC per the Succession Clause. *Zucker*, 919 F.3d at 657–58. In

articulating this test, the First Circuit in *Zucker* looked more closely at the text of the Succession

Clause than did other circuit courts. It did still base its decision on the fact that the plaintiff's

suit "depend[ed] entirely on the [plaintiff's] position as a Bank stockholder," as the plaintiff

sought to recover for "lost interest in the Bank" and hence its claims required the plaintiff to

prove that, "but-for the malfeasance of the Holding Company Directors, the assets of the Bank

would have been much greater, and that increase in Bank assets would have inured to the benefit

of the holding Company as the Bank's parent stockholder." *Id.* at 656. That led one district

court to comment that, "[w]hile *Zucker* may not have expressly applied a direct and derivative

distinction, the function of the inquiry is the same: to determine whether the harm to the claimant

occurred indirectly through harm to the Bank or occurred directly through harm to the claimant."

*Aaron v. Illinois Nat'l Ins. Co.*, No. 19-10341, 2023 WL 7389034, at *4 (E.D. La. Nov. 8, 2023).

However, multiple other district court decisions have followed *Zucker* in ruling that there is no

direct/derivative distinction in the Succession Clause's applicability, including the District

Courts for the Southern and Eastern Districts of New York.  *See Verdi*, 2024 WL 4252038, at *6

("In sum, the Court holds that the text of the Succession Clause does not explicitly require

categorizing claims as derivative or direct, and at the very least, does not explicitly foreclose the

possibility that at least some direct claims are covered by the Clause.  Moreover, the structure

and purpose of FIRREA also counsel in favor of an expansive reading."); *Sjunde AP-Fonden*,

2025 WL 879800, at *3 ("The Succession Clause's applicability does not hinge on some

distinction between direct and derivative claims, but on the statutory text in § 1821(d)(2)(A).");

*Am. W. Bank Members v. Utah*, 2023 WL 4108352, at *6 ("The court finds the reasoning of the

First Circuit in Zucker with respect to the scope of FIRREA's succession clause persuasive.

There is nothing in the plain language of Section 1821(d)(2)(A) that limits the scope of the

statute's succession language to derivative claims exclusively.").

     The interpretation of the Succession Clause advanced in *Verdi* is particularly instructive.

In agreeing with *Zucker* and rejecting the direct/derivative distinction here, the SDNY noted that

"the ordinary meaning of the longer phrase, 'rights . . . with respect to . . . the institution and the

assets of the institution,' . . . simply means any rights 'regarding' an institution and its assets.

Such rights are not limited only to those that may be asserted derivatively on behalf of the

institution itself."  2024 WL 4252038, at *4.  The District Court for the Eastern District of New

York elaborated, explaining that the direct/derivative and "statutory test[s]" (the *Zucker* test) can

overlap, but are distinct in that the former makes determinative the question of where the harm

falls in the first instance (on the bank or the shareholder), and the latter does not make the harm

inquiry dispositive.  *Sjunde AP-Fonden*, 2025 WL 879800, at *4 ("The Succession Clause does

not necessarily cover direct claims under the former, but some direct claims might be "with

respect to the institution" and its assets under the latter . . . . [T]he statutory test applies

wherever the at-issue claims are 'with respect to the institution and' its assets . . . . Deeming this

harm inquiry dispositive would effectively reincarnate the direct-derivative interpretation of the

Succession Clause.").  The First Circuit and District Court for the Eastern District of New York

also found support for the *Zucker* textual test in the structure and purpose of FIRREA: "the

direct/derivative dichotomy could allow those who run the banks into the ground to take for

themselves some of the modest sums available to reimburse the FDIC for a portion of the

socialized losses they inflicted . . . .  This dichotomy could also circumvent FIRREA's priority

scheme for satisfying Signature's outstanding obligations . . . .  The priority scheme provides that

'amounts realized' from liquidating a failed bank 'shall be distributed' first to cover the FDIC's

administrative expenses, then to 'any deposit liability of the institution,' next to 'any other

general or senior liability,' then to subordinate obligations, and finally to shareholders or

members . . . .  Erroneously reading in a direct-derivative distinction would usurp claims that the

FDIC could recover from and then distribute proceeds pursuant to the priority scheme.  It would

thus enable direct claims to be paid from the very assets the FDIC has to satisfy the failed bank's

obligations."  *Id.* (citing *Zucker*, 919 F.3d at 658).

The textual test set out in in *Zucker*, *Verdi*, and *Sjunde* is convincing for an additional

reason.  Using the direct/derivative test renders the second sub-clause of the Succession Clause

duplicative of the first.  Derivative actions are the property of the corporation against whom (or

against whose officers and directors) the claim is being asserted—the named plaintiff is only a

nominal plaintiff.  *See Harrington v. Purdue Pharma*, 603 U.S. 204, 219 (2024) ("In a derivative

action, the named plaintiff is only a nominal plaintiff.  The substantive claim belongs to the

corporation.") (cleaned up).  The Succession Clause gives to the FDIC "all rights . . . [1] *of the*

*insured depository institution*, and [2] of any stockholder . . . with respect to the institution and

the assets of the institution." Derivative actions should fall under the first sub-clause, as they are

rights of the insured depository institution. Reading sub-clause [2] as referring to derivative

actions owned by a stockholder/accountholder/etc. not only ignores the nature of derivative

actions, but also renders subclause [2] duplicative of subclause [1], as derivative actions would

fall within the bucket of actions contemplated by [1] and would comprise the *entire* bucket of

actions contemplated by [2].

 This interpretation is supported by the history of the statute. The history of 12 U.S.C. §

1821(d) shows that Congress added subclause [2] only at the time of FIRREA's passage. As of

1976, 12 U.S.C. § 1821(d) read, in relevant part, as follows: "With respect to any such closed

bank, the Corporation as such receiver shall have all the rights, powers, and privileges now

possessed by or hereafter granted by law to a receiver of a national bank or District bank." 12

U.S.C. §§ 1811–1832 (1976). The statute said nothing about the FDIC succeeding to the rights

of shareholders—in substance, the 1976 version of the statute was limited to the content of

subclause [1] of the current version ("all rights . . . of the insured depository institution"). In

1979, the Second Circuit in *Adato v. Kagan* put the following gloss on that statutory text: "As a

general rule, wrongdoing by bank officers that adversely affects all depositors creates a liability

which is an asset of the bank, and only the bank or its receiver may sue for its recovery." 599

F.2d 1111, 1117 (2d Cir. 1979) (citing 12 U.S.C. § 1821(d) (1976)). *Adato* continued by noting

that "[i]ndividual depositors may sue in their own right . . . if they have suffered a wrong that is

distinctly theirs and not common to all." *Id.* In other words, *Adato* was drawing the

direct/derivative distinction and explaining that derivative claims belonged to the FDIC *based on*

*the text of the statute at the time*, which stated *solely* that the FDIC "shall have all the rights" *of*

*the closed bank* and did not mention *shareholders'* rights. The *Adato* court derived a direct/derivative test from what became, in essence, subclause [1] of the current statute. Congress subsequently (in 1989) *added* subclause [2] concerning shareholders', accountholders', etc. rights. Reading subclause [2] to refer only to derivative claims would render it duplicative of subclause [1], as evidenced not only by the nature of derivative claims but also by the Second Circuit's *Adato* decision.

The Court is therefore convinced by the approach taken in *Zucker*, *Verdi*, and *Sjunde* and finds that there is no direct/derivative distinction in the Succession Clause; it simply gives to the FDIC the exclusive right to bring actions belonging to "the insured depository institution" as well as those belonging to "any stockholder . . . accountholder, [and] depositor . . . with respect to the institution and the assets of the institution."

Under such a test, both the Company Claims and the Creditor Claims are barred by the Succession Clause. The Company Claims are discussed above. Each of the Creditor Claims plainly asserts the rights of the Cayman creditors *as* accountholders, as they would not have such claims absent their accountholder status. And each of the Creditor Claims plainly concerns the "institution" (SVB or SVB Cayman) "and the assets of the institution," either SVB's alleged mismanagement or the Upstream Dividend. Therefore, even if the JOLs had standing under Cayman law to bring the Creditor Claims (which they have failed to prove), the Succession Clause would bar them from asserting these claims.

### f. *JOLs' Counterarguments Fail*

The JOLs counter by arguing that FIRREA creates a regime of superior and inferior clawback claims (citing 12 U.S.C. § 1821(d)(17)), rather than a regime based on succession. Section 1821(d)(17) of FIRREA reads:

(A)In general. The Corporation, as conservator or receiver for any insured depository institution, and any conservator appointed by the Comptroller of the Currency may avoid a transfer of any interest of an institution-affiliated party, or any person who the Corporation or conservator determines is a debtor of the institution, in property, or any obligation incurred by such party or person, that was made within 5 years of the date on which the Corporation or conservator was appointed conservator or receiver if such party or person voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the insured depository institution, the Corporation or other conservator, or any other appropriate Federal banking agency.

(B)Right of recovery. To the extent a transfer is avoided under subparagraph (A), the Corporation or any conservator described in such subparagraph may recover, for the benefit of the insured depository institution, the property transferred, or, if a court so orders, the value of such property (at the time of such transfer) from—

>    (i)the initial transferee of such transfer or the institution-affiliated party or person for whose benefit such transfer was made; or

>    (ii)any immediate or mediate transferee of any such initial transferee.

(C)Rights of transferee or obligee. The Corporation or any conservator described in subparagraph (A) may not recover under subparagraph (B) from—

>    (i)any transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith; or

>    (ii)any immediate or mediate good faith transferee of such transferee.

(D)Rights under this paragraph. <u>The rights under this paragraph of the Corporation and any conservator described in subparagraph (A) shall be superior to any rights of a trustee or any other party (other than any party which is a Federal agency) under title 11.</u>

12 U.S.C. § 1821(d)(17)) (Emphasis added.)  The JOLs argue that the highlighted provision establishes, "in respect of clawback claims, [that] the FDIC Receiver merely has rights that are 'superior' to other parties." (JOL Brief at 25.)  The JOLs neglect to note that their claims are *not* claims of a trustee under title 11, which is the only type of right affected by the highlighted provision.  Moreover, the JOLs' reading would contradict the plain text of the Succession Clause and every court which has interpreted it, as a clawback claim could well be a claim held directly by the bank or derivatively by its shareholders.[27]   The JOLs' "superior/inferior" theory is unconvincing.

---

[27]    The sensible use case of the highlighted provision which would accord with the Succession Clause is as follows: the FDIC succeeds to clawback claims held by the bank itself (or "held" derivatively by its "stockholder, member, accountholder, depositor, officer, or director," *see* Succession Clause) and that claim would then be

The JOLs also argue that the FDIC has abandoned the claims the JOLs now bring and to which the FDIC purports to have the exclusive right to bring. (JOL Brief at 26.) This is despite the fact that the FDIC has brought a counterclaim asserting a fraudulent transfer in the SVBFG-FDIC litigation in California. However, nothing in the text of the Succession Clause suggests that the FDIC need *actually* bring the claims of the types listed in the Succession Clause in order to have the exclusive jurisdiction to bring them. The one case the JOLs cite in support of their abandonment argument, *Branch v. F.D.I.C.*, 825 F. Supp. 384, 402–05 (D. Mass. 1993), does not discuss abandonment.

### 3.   Officeholder Claims

The JOLs lack standing to bring the Officeholder Claims for two distinct reasons. First, FIRREA bars them. Second, the JOLs have not shown that Cayman law would permit them to bring the Cayman law-governed Officeholder Claims extraterritorially.

#### a.   *Section 1821(j) of FIRREA Bars Officeholder Claims*

SVBFG argues that section 1821(j) of FIRREA bars the Officeholder Claims. Section 1821(j) provides that "no court may take any action, except at the request of the [FDIC] Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver." SVBFG argues that allowing the JOLs to bring the Officeholder Claims in order to claw back the Upstream Dividend would restrain the FDIC from exercising its powers, since the FDIC has brought a claim against SVBFG (now SVBFT) for clawback of that same Upstream Dividend: since there is only one $294 million dividend to claw back, allowing the JOLs to proceed on the Officeholder Claims would interfere with the FDIC's ability to collect all obligations and money due to SVB, a core function of FDIC-R. (SVBFG

---

superior to a *separate* cause of action held by a "trustee" or some other party in chapter 11—note that the FDIC does *not* succeed to causes of action held by trustees, as trustees are not listed in subclause 2 of the Succession Clause.

Brief at 26-27.)  The FDIC seconds this argument.  (FDIC Br. at 25–26.)[28]  The JOLs do not

address this point.

The question posed by this argument is whether section 1821(j) of FIRREA prevents

entities (here, the JOLs) from taking actions which will "restrain or affect the exercise of powers

or functions of the [FDIC] as a conservator or a receiver" (i.e., bringing Company Claims) even

when those actions are not directed at the FDIC-R, but instead are directed at third parties (here,

SVBFG/SVBFT).

While this Court has not been able to find relevant precedent within this Circuit, courts in

other circuits have held that the FDIC can seek to enjoin claims against third parties under

section 1821(j) if it shows that (1) the challenged action is within the receiver's duties and

powers and (2) the third party will "affect" the exercise of the FDIC's powers.  *Dittmer Props.,*

*L.P. v. F.D.I.C.*, 708 F.3d 1011, 1017 (8th Cir. 2013) (setting up two-part test to determine if

section 1821(j) is implicated: "the court must first determine whether the challenged action is

within the receiver's power or function; if so, it then determines whether the action requested

would indeed 'restrain or affect' those powers"; holding that request for injunctive relief against

third party to which the FDIC sold a note would "affect[] the FDIC's ability to function as

receiver in the case," even though FDIC was no longer the holder of the note, because "an action

can 'affect' the exercise of powers by an agency without being aimed directly at the agency";

finding that the disposition of a failed bank's assets "is one of the quintessential statutory

powers" of the FDIC as receiver, so if a third party's claim would render that asset "subject to

---

[28]       The FDIC also argues more generally that *all* claims to avoid the Upstream Distribution belong to SVB,
and now FDIC-R, because those claims are based on general damage to SVB.  (FDIC Br. at 8.)  This seemingly
ignores the fact that the *Officeholder Claims* arose only upon the entry of the Winding-Up Order and the
appointment of the JOLs as liquidators, as explained by both experts, and so cannot belong to the FDIC since they
never belonged to SVB.

dilution in a later judicial proceeding, there would be a substantial chilling effect upon the

receiver's ability to perform its statutory functions") (cleaned up); *see also Hindes v. FDIC*, 137

F.3d 148, 161 (3d Cir. 1998) (finding that section 1821(j) precluded an APA claim against the

FDIC in its corporate capacity, which was a third party to the dispute: "[A]ppellants would have

us interpret section 1821(j) to preclude only those orders directly against the FDIC as receiver or

as conservator.  We find, however, that the plain language of the statute is not so limited.

Rather, the statute, by its terms, can preclude relief even against a third party, including the FDIC

in its corporate capacity, where the result is such that the relief 'restrain[s] or affect[s] the

exercise of powers or functions of the [FDIC] as a conservator or a receiver.' . . . .  After all, an

action can 'affect' the exercise of powers by an agency without being aimed directly at it."), *id.*

at 166 ("[S]ection 1821(j) precludes injunctive and declaratory relief which would restrain or

affect the powers of the FDIC as receiver, even where that relief is directed against a third

party."); *Radian Ins., Inc. v. Deutsche Bank Nat. Tr. Co*., No. CIV.A. 08-2993, 2009 WL

3163557, at *13–14 (E.D. Pa. Oct. 1, 2009) (finding that section 1821(j) barred a party from

seeking declaration of rights from a bank which went into FDIC receivership, because the

declaration was "likely to directly affect the FDIC in the execution of its responsibilities" by, for

example, "impact[ing] the FDIC's ability to assert certain claims" in the future and thereby

"potentially reducing the assets of the depository institutions, contrary to the express goals of

FIRREA"; noting that the "impact of the [requested] declaratory judgment on the FDIC is not

diminished merely because the FDIC has not yet indicated its intent to pursue any claims . . . .

The fact that the FDIC might exercise its powers to assert claims . . . in the future is sufficient to

invoke the § 1821(j) bar."); *Hoxeng v. Topeka Broadcomm, Inc*., 911 F. Supp. 1323, 1334–35

(D. Kan. 1996) (holding that the FDIC's agent could assert § 1821(j) to bar a claim for specific

performance even when the FDIC was not, and could not have been, a party to the case; rejecting a "narrow interpretation of § 1821(j)" and noting that the broad language of the provision evinces "an intent by Congress to prohibit any interference with the [FDIC as receiver—either directly or indirectly"); *Furgatch v. Resolution Trust Corp.*, No. 93–20304, 1993 WL 149084, at *2 (N.D. Cal. April 30, 1993) (unpublished) (holding that § 1821(j) barred a claim to enjoin a bank and its trustee from conducting a foreclosure sale because "enjoining these parties indirectly enjoins [the receiver], which a district court has no power to do").

This Court agrees with the reasoning set out in the above-cited cases, given the broad language of section 1821(j). The Officeholder Claims asserted by the JOLs are all targeted at clawing the Upstream Dividend back into the Cayman estate. The FDIC is charged with the disposition of SVB's assets, *see Dittmer Props., L.P.*, 708 F.3d at 1017, and has asserted a counterclaim against SVBFG seeking to claw back that same $294 million Upstream Dividend which the JOLs are pursuing via the Officeholder Claims. Clawing back the Upstream Dividend is squarely within the FDIC-R's duties and powers and allowing the JOLs to pursue the same money the FDIC is pursuing would affect and interfere with the FDIC's own efforts to exercise its statutory prerogative. The Court therefore finds that section 1821(j) bars the JOLs from bringing the Officeholder Claims.

But even if FIRREA did not bar the JOLs' Officeholder Claims, the Court finds that the JOLs failed to show that they have standing under Cayman law to bring the Officeholder Claims here.

### b. *JOLs Failed to Prove Standing to Bring Officeholder Claims Outside the Cayman Islands*

Even if FIRREA did not bar the Officeholder Claims, almost all of them fail for another independent reason: the JOLs did not show that Cayman law allows JOLs to bring Cayman

93

statutory claims in this proceeding.  They did cite one case which found that Cayman liquidators

can bring claims under sections 146 and 147 of the Companies Act outside of the Caymans (*see*

*infra*).  However, no Cayman court (at least, none identified by the experts) has thus far held that

Cayman liquidators *in an ancillary proceeding* can bring such claims *in the jurisdiction of the*

*foreign debtor's main insolvency proceeding*.  This Court will, again, not venture beyond where

Cayman courts have already gone.

The cases Dr. Mokal relies on are mostly inapposite.  First, he cites to *In re BCCI (No 10)*

[1997] Ch 213 (JOLs 122), an English High Court case, to argue that, in a Cayman winding-up

even of a foreign entity, the Cayman court "will apply Cayman insolvency laws to issues of both

substance and procedure." (RM2 ¶ 54.)  But *In re BCCI* is distinguishable.  *In re BCCI* does not

feature a Cayman liquidator seeking to assert a Cayman law claim outside the the of the Cayman

Islands.  Rather, it concerned an English winding-up of a branch of a Luxembourg bank which

was in liquidation in Luxembourg, and whether the English liquidators, in seeking to distribute

funds from the English branch to the Luxembourg liquidators for distribution to creditors

worldwide, should follow English or Luxembourg law in determining how much to send to the

Luxembourg liquidators; the Court instructed the English liquidators to follow English law.

(JOL 122 at 1–2.)  The High Court held that an English court overseeing an ancillary liquidation

will try to assist the foreign court in the conduct of its insolvency proceeding, but will do so

according to English law, and will not "disapply" English law *in a proceeding pending in the*

*English court* just because that law does not parallel the law governing the foreign main

insolvency proceeding.  (*Id.* at 5–6, 34.)  Dr. Mokal does not cite it for any broader statement.

(RM2 ¶ 62.)  *In re BCCI* is clearly inapplicable, as the question presented by the JOLs is *not*

whether the *Cayman court* should require the JOLs to follow U.S. or Cayman law in a

proceeding *in the Cayman court*, but whether *this* Court should allow the JOLs to bring Cayman

statutory claims in an American proceeding with no knowledge of whether a Cayman court

would allow the extraterritorial application of the relevant Cayman statutes.

Second, Dr. Mokal cites *Re Howard Holdings Inc* [1998] BCC 549 (Ch) (JOLs 64),

another English High Court opinion, which opined on whether an English court had the

jurisdiction "to make declarations against foreign directors of foreign companies . . . in an

appropriate case" pursuant to section 214 of the UK Insolvency Act 1986.  (RM2 ¶ 63.)  *Re*

*Howard Holdings* is irrelevant because (1) while it concerned a winding-up of a foreign

company in an English court, there is no indication in the opinion that this insolvency was

ancillary; and (2) it concerns the specific provisions of an English statute, not a Cayman one, and

does not feature any principles of English statutory interpretation which Cayman courts might

rely upon.  (Dr. Mokal supports his claim that "Cayman Courts have drawn from the English

case law on wrongful trading to inform their decisions concerning Cayman law-governed

Officeholder Claims" with a citation to portions of a separate opinion which are entirely

irrelevant.  (RM 2 ¶ 63.1 n.72 (citing *Re ICP Strategic Credit Income Fund Ltd* [2014] CIGC

J0404-1).))

Third, Dr. Mokal cites *In re ICP* 2014 (2) CILR 1 (JOL 61) for the proposition that

Cayman law-governed Officeholder Claims may be pursued in a foreign court.  (RM2 ¶ 64.)  The

Cayman Grand Court did find in this case that Cayman liquidators can bring claims under

sections 146 and 147 of the Companies Act outside of the Cayman Islands (JOL 61 at 1–4) and

sanctioned their bringing such claims in the U.S. when the Cayman court was reasonably certain

that the U.S. court would apply substantive Cayman law (*id.* at 5).  And the Cayman court in the

present case did sanction the JOLs' bringing claims under sections 146 and 147 of the

Companies Act in the U.S.  However, *ICP* involved an insolvency proceeding centered in the

Caymans, not an ancillary proceeding, and the liquidators there were not seeking to sue in the

jurisdiction of the main insolvency proceeding (here, the U.S.) as the main insolvency

proceeding in *ICP* was in the Caymans.  Mr. Said's contends that Cayman and English courts

overseeing ancillary liquidations tend to limit the effect of those ancillary liquidations to the

Caymans (or England) and fully supports his claim with citations to Cayman and English

precedents.  (Said Report ¶¶ 80–84, Said Reply ¶¶ 33–34.)

The JOLs bring other Officeholder Claims in addition to those under sections 146 and

147 of the Companies Act, and the JOLs do not introduce any Cayman caselaw concerning the

extraterritorial applicability of those others—sections 145 and 34(2) of the Companies Act, the

FDL, and claims under Cayman common law.  The Court is reluctant to permit the JOLs to bring

such claims extraterritorially without any Cayman law support for their extraterritorial use.  But

even assuming that there exists caselaw holding that such claims can be brought outside the

Caymans, that is not enough to set the Court's mind at ease that Cayman law would permit JOLs

to bring any of their asserted Officeholder Claims in the jurisdiction of the main insolvency

proceeding, especially when such claims throw a spanner in the works of the main insolvency

proceeding (as they clearly do, given the FDIC's vociferous opposition to the JOLs' mounting

Officeholder Claims here).

It is clear to the Court that Cayman and English courts express concern about the

extraterritorial effects of liquidation proceedings when such proceedings are ancillary and try to

limit such effects to avoid conflict between the ancillary and main liquidation proceedings.  (*See*

Said Report ¶¶ 79–83.)  And in this very case, the Cayman court evinced such a concern,

limiting the JOLs' powers to those "in respect of the assets and affairs of" SVB Cayman and its

96

creditors, and noting in the Winding-Up Judgment that it would consider issues of comity

between the Caymans and the U.S. going forward.  Justice Doyle did issue the October Sanction

Order sanctioning the JOLs' assertion of the Officeholder Claims in this Court through both the

First Amended POC and the initial Complaint.  (And unlike with the other Sanction Orders, in

which the record before Judge Doyle was sealed, the Court knows the contents of at least some

of the filings which Justice Doyle considered in issuing the October Sanction Order.)  However,

unlike the sanction order in *ICP*, the October Sanction Order is not accompanied by a fleshed-

out, reasoned opinion explaining the basis for its grant.  The Cayman court in *ICP* fully

explained why it was permitting the liquidators in that case to bring claims under sections 146

and 147 of the Companies Act extraterritorially, and why it thought the American court would

apply Cayman law (because, unlike in this case, the Cayman liquidation in *ICP* was the foreign

main insolvency proceeding and had already been recognized via chapter 15 in the U.S.

bankruptcy court).  All this Court can divine from the October Sanction Order, by contrast, is

that Justice Doyle thought there was *some likelihood* that the JOLs would succeed on their

claims here.  It is impossible to tell whether Justice Doyle determined that *all* of the Officeholder

Claims could be brought extraterritorially (or whether it was just *likely* that they could be),

whether he considered the JOLs' assertions of the Officeholder Claims to be "in respect of the

assets and affairs of" SVB Cayman and its creditors, whether he decided that allowing the JOLs

to bring such claims in this Court would not cause a conflict with the FDIC's receivership

process (or whether he just thought such a conflict, if one existed, was necessary (*see* RM3 ¶

20.5)), whether the novelty of this posture (a JOL in an ancillary liquidation suing in the

jurisdiction of the main liquidation and bringing a Cayman law claim which would interfere with

the main liquidation) was at all a relevant factor in the analysis, or whether or how he thought

about comity in light of the backdrop of caselaw on the largely territorial effects of ancillary liquidations in the Caymans.  In short, the October Sanction Order cannot be read to definitively hold that the JOLs have standing under Cayman law to pursue the Officeholder Claims in this case—at most, it can be read to mean that the JOLs have a *reasonable likelihood* of having standing.

The most that Dr. Mokal could say about the JOLs' ability to assert Cayman statutory claims in the U.S. in this case was that he could not identify a prohibiting principal under Cayman law—it may be "inexpedient," but inexpediency does not equal impermissibility.  But given the novelty of this case, the absence of any Sanction Order clearly establishing the JOLs' standing under Cayman law to bring the Officeholder Claims here (unlike in *ICP*), and the backdrop of English and Cayman courts' reluctance to have ancillary liquidations conflict with primary ones, that is not solid enough ground for this Court to rely upon to find standing under Cayman law.  If the Court were to permit the JOLs to go forward with the Officeholder Claims, that would have the effect of predetermining (or at least, determining without grounding in Cayman precedent) at least two sets of Cayman law issues: (1) the extraterritorial applicability of the Officeholder Claims apart from those based on sections 146 and 147 of the Companies Act; and (2) the appropriateness of allowing a Cayman JOL in an ancillary liquidation to bring a Cayman law-governed Officeholder Claim in the jurisdiction of the primary insolvency proceeding, especially when such a claim would conflict with the operation of the primary proceeding.  The Court will not tread a new path through the forest of Cayman law before the Cayman courts themselves do so and permit the JOLs to bring Officeholder Claims premised on Cayman law.  And any ruling by Justice Doyle on the Cayman law issues would not be the final

word within the Cayman courts, and the FDIC process cannot be held hostage while the Cayman

courts resolve these disputed issues.

At bottom, permitting the JOLs to pursue the Officeholder Claims in this Court would

create a clear conflict with the powers of the FDIC.  This Court concludes that such a result is

unsupportable under existing U.S. and Cayman precedents.

### IV.    <u>CONCLUSION</u>

For the foregoing reasons, the JOLs lack standing to bring any of the claims they assert

across their papers.

**IT IS SO ORDERED.**

Dated:      September 29, 2025
            New York, New York

_Martin Glenn_

MARTIN GLENN
Chief United States Bankruptcy Judge